Edward O. Sassower, P.C.
Joshua A. Sussberg, P.C. (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:        (212) 446-4800
Facsimile:        (212) 446-4900

-and-

Michael A. Condyles (VA 27807)
Peter J. Barrett (VA 46179)
Jeremy S. Williams (VA 77469)
**KUTAK ROCK LLP**
901 East Byrd Street, Suite 1000
Richmond, Virginia 23219-4071
Telephone:        (804) 644-1700
Facsimile:        (804) 783-6192

James H.M. Sprayregen, P.C.
Anup Sathy, P.C.
Chad J. Husnick, P.C. (*pro hac vice* admission pending)
Robert A. Britton (*pro hac vice* admission pending)
Emily E. Geier (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:        (312) 862-2000
Facsimile:        (312) 862-2200

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| TOYS "R" US, INC., *et al.*,[1] | ) | Case No. 17-34665 (KLP) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

## DEBTORS' MOTION FOR ENTRY OF
## INTERIM AND FINAL ORDERS (I) AUTHORIZING
## THE DEBTORS TO PAY CERTAIN PREPETITION CLAIMS OF
## CRITICAL VENDORS AND (II) GRANTING RELATED RELIEF

The above-captioned debtors and debtors in possession (collectively, the "Debtors")[2]

respectfully state as follows in support of this motion (this "Motion"):

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are set forth in the *Debtors' Motion for Entry of an Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief* filed contemporaneously herewith. The location of the Debtors' service address is One Geoffrey Way, Wayne, NJ 07470.

[2]    A detailed description of the Debtors and their business, and the facts and circumstances supporting the Debtors' chapter 11 cases, are set forth in greater detail in (i) the *Declaration of David A. Brandon, Chairman of the Board and Chief Executive Officer of Toys "R" Us, Inc., in Support of Chapter 11 Petitions and First Day Motions* (the "Brandon Declaration") and (ii) the *Declaration of Michael J. Short, Chief Financial Officer of Toys "R" Us, Inc., in Support of First Day Motions* (the "Short Declaration" and together with the Brandon Declaration,

## Relief Requested

1.      The Debtors seek entry of interim and final orders, substantially in the forms attached hereto as **Exhibit A** and **Exhibit B** (the "Interim Order" and the "Final Order," respectively), (a) authorizing, but not directing, the Debtors to pay, in the ordinary course of business, undisputed, liquidated, prepetition amounts owing on account of claims held by Critical Vendors (as defined herein) (the "Critical Vendor Claims") in an amount not to exceed $115 million on an interim basis, and a total of $325 million on a final basis, and (b) granting related relief.  In addition, the Debtors request that the Court schedule a final hearing within 21 days of the commencement of these chapter 11 cases to consider approval of this Motion on a final basis.[3]

## Jurisdiction and Venue

2.      The United States Bankruptcy Court for the Eastern District of Virginia (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Standing Order of Reference from the United States District Court for the Eastern District of Virginia*, dated July 10, 1984.  The Debtors confirm their consent, pursuant to rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

---

the "First Day Declarations"), filed contemporaneously with the Debtors' voluntary petitions for relief filed under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), on September 18, 2017 (the "Petition Date").  Capitalized terms used, but not otherwise defined in this Motion shall have the meanings ascribed to them in the First Day Declarations.

[3]      The relief requested herein does not apply to any claims against, or critical vendors of, Debtor Toys "R" Us (Canada) Ltd. ("Toys Canada"), which will be addressed in Toys Canada's Companies' Creditors Arrangement Act (Canada) proceedings ("CCAA").

3.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4.      The bases for the relief requested herein are sections 105(a), 363, 503, 1107(a), and 1108 of the Bankruptcy Code, Bankruptcy Rules 6003 and 6004, and rules 6004-2 and 9013-1 of the Local Rules of the United States Bankruptcy Court for the Eastern District of Virginia (the "Local Bankruptcy Rules").

## The Critical Vendors

5.      The Debtors are in the business of selling toys and baby products to millions of parents and children around the world.  Parents and other caregivers shop at Toys "R" Us because they know that if they want to buy the latest "hot" toy on the market, it will be available.  Likewise, new mothers come to Babies "R" Us to register for their needs because they know that Babies "R" Us provides a wide selection of the most in-demand baby products.  This is the core of the Debtors' business—engaging a limited number of critical product and service providers (collectively, the "Critical Vendors") that ensure that Toys "R" Us and Babies "R" Us are *the* destinations for toys, baby products, and related items.  The Debtors' business is dependent on fashionable and in-trend items, and without these vendors of specialized goods, the Debtors could not effectively compete in the marketplace.  If the Debtors fail to stock such products, the effects would extend far beyond simply not selling those particular products.  If consumers become aware that the Debtors do not stock a hot seasonal item, they will simply not come to the Debtors' stores or visit their website, where they may have purchased additional items beyond the one product that they initially came to purchase.  Furthermore, in the baby segment, many of the products most popular on registries are not substitutable, and not being able to provide such a product would have long-term negative impacts on consumer confidence.  In addition, many of the Debtors' items are already included in advertisements, and in some instances, the Debtors have taken pre-sales on

inventory they have not received. Without these core products, the Debtors' business would suffer greatly.

6.      The Debtors obtain these core products from a limited number of highly specialized vendors that are irreplaceable, due to, among other things, demand created by branding and marketing.  Moreover, the Debtors rely on timely and frequent delivery of these critical goods and services, and any interruption in this supply—however brief—would disrupt the Debtors' operations and could potentially cause irreparable harm to their business, goodwill, customer base, and market share.  The harm to the Debtors' estates of not having products or services provided by the Critical Vendors would far outweigh the cost of payment of the Critical Vendor Claims.

7.      As of the Petition Date, the Debtors also enjoy favorable trade terms with many of their Critical Vendors, including favorable trade payment terms, a high allocation of the most sought after products on the market, and exclusive deals with certain Critical Vendors.  The Debtors' business model is effectively built on these trade terms and, because the Debtors do not have contracts with most of the Critical Vendors, these trade terms are subject to contraction at the Critical Vendors' discretion.  The Debtors believe that many of their vendors may be relatively inexperienced with the chapter 11 process and unwilling to do business with the Debtors on customary trade terms absent the relief requested herein.  This unwillingness would effectively be a death-knell for the business relationship between the parties.

8.      The Debtors have extended trade terms with many of their vendors. This allows the Debtors to pay for goods, on average, 60 days after the goods are received.  In other words, if the Debtors receive a shipment of product on September 1, they do not pay for that product until, on average 60 days later.  Any modification to these terms may require the Debtors to pay for goods on materially shortened terms, including cash on delivery, or even *prepayment* for their products,

creating significant inefficiencies in their operations.  The less time the Debtors have to repay their vendors, the more they must rely on sources of funds other than sales to make such payments.  If the Debtors' trade terms contracted from 60 days to cash-on-delivery, the Debtors estimate that they would require over $1.0 billion in additional liquidity as of the Petition Date.  Absent that amount—which the Debtors do not have and could not procure—the Debtors would be unable to purchase inventory, sell product, build inventory for the critical holiday season, and continue as a going concern.  Accordingly, a contraction in trade terms could have a severe negative effect on the value of the Debtors' estates and the recoveries available to stakeholders.

9.      The impact of trade terms is especially acute now as the Debtors are in the process of building substantial inventory for the holiday shopping season, their busiest selling season of the year, where the Debtors' historically have earned approximately 40 percent of their annual net retail sales.  If the Debtors are unable to stock sufficient quantities of the most in-demand merchandise due to the liquidity impact of reduced trade terms, they will simply not have the product to sell and will not generate the foot-traffic to cross-sell other merchandise.  Given the need to build inventory now, the Debtors need the ability to pay the Critical Vendor Claims to ensure a successful holiday season.  If there is an interruption in the Debtors' supply chain, lead times for vendors to provide goods can be up to 60-90 days and it is difficult for the Debtors to re-start shipments or switch to new vendors.  In addition, many of the Debtors' Critical Vendors ship their goods from abroad, and with a Chinese holiday during the week beginning October 1, 2017, any delay in the supply chain now would cause an extended delay in shipments and risk delivery timing and amount for the holiday season.

10.      Moreover, the relief requested herein is necessary because the Critical Vendors have no obligation to continue providing goods, including under any master purchase agreements,

and, as a result, the Debtors would be unable to force those vendors to continue to perform under section 365 of the Bankruptcy Code.  Additionally, the Debtors do not seek authorization to honor prepetition obligations arising under contract.

11.     The Debtors submit that the requested relief will allow the Debtors to preserve stakeholder value by paying the prepetition claims of certain counterparties that are critical to the Debtors' business enterprise.  The Critical Vendors generally fall into the categories discussed below.

### A.     Merchandise Vendors.

12.     The bulk of the Debtors' Critical Vendors are suppliers of the inventory and merchandise that the Debtors sell in their stores (the "Merchandise Vendors").  As discussed in greater details herein, the Merchandise Vendors provide the Debtors with goods on trade terms that provide the Debtors' business with considerable liquidity.  A small portion of the Merchandise Vendors also have consignment relationships with the Debtors.  Indeed, the Merchandise Vendors represent approximately 97 percent of the Debtors' outstanding accounts payable balance.  Given the unique nature of the merchandise sold in the Debtors' stores, with certain toys having strong, entrenched brand identities that render them irreplaceable, the inventory and merchandise that the Debtors purchase from the Merchandise Vendors is not substitutable.  Furthermore, the Debtors' business is wholly reliant on the sale of such Merchandise, as a failure to stock the hottest, most in-demand products would render the Debtors' stores irrelevant to the vast majority of shoppers, resulting in significant lost revenue.  As discussed above, the trade terms on which the Merchandise Vendors supply goods are also critical to the Debtors' success and ability to build their holiday inventory. Without these Merchandise Vendors' products and agreement to continue an ordinary course relationship, the Debtors cannot operate a profitable, successful business.

### B.      Non-Merchandise Vendors.

13.      The Debtors do business with certain suppliers of goods and equipment that are vital to the Debtors day-to-day operations (the "Operating and Retail Vendors") as well as vendors that provide critical marketing support products and services for their business operations (the "Marketing Support Vendors" and together with the Operating and Retail Vendors, collectively, the "Non-Merchandise Vendors").  Essential goods provided by such vendors include online operations, website development and maintenance, and management, general supplies and packaging materials, employee onboarding and management programs, regulated direct mail and digital marketing campaigns, customer relationship management capabilities, brand creative services, and the Debtors' omnichannel initiatives, among others.  In many instances, the Non-Merchandise Vendors are the only vendors able to produce or deliver the volume or quality of certain materials or products sufficient to meet the Debtors' operational needs.

14.      The Debtors also rely on the Non-Merchandise Vendors to attract customers and drive sales.  The services provided by the Non-Merchandise Vendors allow customers to seamlessly transition their engagement with the Company's products between physical stores, online websites or mobile apps, catalogs, and through social media.  This infrastructure is essential to promoting upcoming events and programs, building customer loyalty, and ultimately driving revenue for the benefit of the Debtors' estates and all stakeholders.

15.      Without these Non-Merchandise Vendors, the Debtors cannot sustain the highest quality retail and website operations that they have worked for years to achieve, would be unable to continue serving their customers, and would likely lose significant revenue.  Given the proximity to the holiday season, if certain Non-Merchandise Vendors refuse to provide goods and services (including implementing the holiday seasonal marketing plans that certain

Non-Merchandise vendors have already developed) to the Debtors after the Petition Date on account of unpaid prepetition claims, the Debtors would be left scrambling to procure new vendors.  This process could take several months and would almost certainly not be completed in time for effective holiday marketing campaigns, resulting in a detrimental impact to the Company's customer interface and brand messaging efforts.

16.     The Non-Merchandise Vendors represent approximately three percent of the Debtors' outstanding accounts payable balance.  The vast majority of these Non-Merchandise Vendors are subject to contractual arrangements (and as a result would not receive relief as Critical Vendors).    The relief requested herein remains necessary, however, for certain of these Non-Merchandise Vendors that provide products and services to the Debtors on the basis of informal arrangements and are irreplaceable to the debtors for the reasons stated above.

### C.    Estimated Claim Amounts.

17.     The Debtors request authority to make payments on account of prepetition Critical Vendor Claims of up to $115 million on an interim basis and a total of $325 million on a final basis.[4]  The Debtors submit that the requested relief will allow the Debtors to preserve stakeholder value by paying the prepetition claims of certain counterparties that are critical to the Debtors' business enterprise.

### Customary Trade Terms

18.     In return for paying the Critical Vendor Claims, the Debtors will require the applicable Critical Vendor to provide favorable trade terms in line with historical practices,

---

[4]    For the avoidance of doubt, this number does not include approximately $145 million owed to Critical Vendors that the Debtors believe would qualify as 503(b)(9) Claims as set forth in the *Debtors Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Prepetition Claims of Lien Claimants, Import Claimants, and 503(b)(9) Claimants, (II) Confirming Administrative Expense Priority of Outstanding Orders, and (III) Granting Related Relief* (the "Lien Claimants Motion"), filed contemporaneously herewith.

including with respect to credit limits, pricing, cash discounts, timing of payments, allowances, (as may be incorporated or contemplated by any agreements between the Debtors and the Critical Vendors or based on historical practice, as applicable), product mix, availability, other terms covered by existing agreements including master purchase agreements, and other programs, for the postpetition delivery of goods and services and otherwise continue supplying the Debtors with essential goods and services for the duration of these chapter 11 cases. The Debtors therefore request authority to condition payment upon such Critical Vendor's written agreement to continue supplying goods or services to the Debtors for the duration of these chapter 11 cases in accordance with trade terms at least as favorable to the Debtors as those practices and programs in place 180 days prior to the Petition Date, as may be modified by any Trade Agreement (as defined herein) (collectively, the "Customary Trade Terms").

19. More specifically, the Debtors may condition the payment of Critical Vendor Claims upon such party's agreement to continue supplying goods or services on Customary Trade Terms for the duration of these chapter 11 cases by executing a trade agreement substantially in the form attached hereto as **Exhibit C** (each, a "Trade Agreement"). Such Trade Agreement, once agreed to and accepted by a Critical Vendor, shall be a legally binding contractual arrangement between the parties governing the commercial trade relationship as provided therein.

20. If any party accepts payment pursuant to the relief requested by this Motion and thereafter does not continue to provide goods or services on Customary Trade Terms, then, subject to such party's right to object as set forth in the proposed Final Order, and subject to any Trade Agreement that may be executed between the Debtors and such party: (a) such payment may be deemed to be an improper postpetition transfer on account of a prepetition claim, and

therefore, such payment will be immediately recoverable by the Debtors in cash upon written request; (b) upon recovery by the Debtors, any prepetition claim of such party shall be reinstated as if the payment had not been made; and (c) if there exists an outstanding postpetition balance due from the Debtors to such party, the Debtors may elect to recharacterize and apply any payment made pursuant to the relief requested by this Motion to such outstanding postpetition balance and such supplier or vendor will be required to repay to the Debtors such paid amounts that exceed the postpetition obligations then outstanding without the right of any setoffs, claims, provisions for payment of any claims, or otherwise.

## **The Critical Vendors Process**

21.     With the assistance of their advisors, the Debtors have spent considerable time reviewing and analyzing their books and records, consulting with management and the Debtors' personnel responsible for operations and purchasing, reviewing contracts and supply agreements, and analyzing applicable laws, regulations, and historical practice to identify certain critical business relationships and/or suppliers of goods and services—the loss of which would materially impair the going-concern viability of the Debtors' business.  In this process, the Debtors considered a variety of factors, including:

- whether a vendor is a sole- or limited-source or high-volume supplier for goods or services critical to the Debtors' business operations;

- whether alternative vendors are available that can provide requisite volumes of similar goods or services on equal (or better) terms and, if so, whether the Debtors would be able to continue operating while transitioning business thereto;

- the degree to which replacement costs (including pricing, transition expenses, professional fees, and lost sales or future revenue) exceed the amount of a vendor's prepetition claim;

- whether an agreement exists by which the Debtors could compel a vendor to continue performing on prepetition terms;

- whether certain specifications or contract requirements prevent, directly or indirectly, the Debtors from obtaining goods or services from alternative sources;

- whether failure to pay all or part of a particular vendor's claim could cause the vendor to refuse to ship inventory or to provide critical services on a postpetition basis;

- whether the Debtors' inability to pay all or part of the vendor's prepetition claim could trigger financial distress for the applicable vendor; and

- whether failure to pay a particular vendor could result in contraction of trade terms as a matter of applicable nonbankruptcy law or regulation.

**Basis for Relief**

22.     Courts across many jurisdictions have recognized that it is appropriate to authorize the payment of prepetition obligations where necessary to protect and preserve the estate, including an operating business' going-concern value.  *See, e.g.*, *In re NVR L.P.*, 147 B.R. 126, 127 (Bankr. E.D. Va. 1992); *see also In re Universal Fin., Inc.*, 493 B.R. 735, 739–40 (Bankr. M.D. N.C. 2013); *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002); *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) ("The ability of a Bankruptcy Court to authorize the payment of pre-petition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a novel concept."); *Armstrong World Indus., Inc. v. James A. Phillips, Inc.*, (*In re James A. Phillips, Inc.*), 29 B.R. 391, 398 (S.D.N.Y. 1983).  In doing so, these courts acknowledge that several legal theories rooted in sections 105(a) and 363(b) of the Bankruptcy Code support the payment of prepetition claims as provided herein.

23.     Section 105(a) of the Bankruptcy Code empowers the Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."  11 U.S.C. § 105(a).  "Under 11 U.S.C. § 105 the court can permit pre-plan payment of a prepetition obligation when essential to the continued operation of the debtor." *NVR L.P.*, 147 B.R. at 127 (citing *Ionosphere Clubs*, 98 B.R. at 177).

24.     Courts have consistently permitted postpetition payment of certain prepetition obligations where necessary to preserve or enhance the value of a debtor's estate for the benefit of all creditors.  *See, e.g., Miltenberger v. Logansport Ry.*, 106 U.S. 286, 312 (1882) (payment of pre-receivership claim prior to reorganization permitted to prevent "stoppage of . . . [crucial] business relations"); *In re Chateaugay Corp.*, 973 F.2d 141, 143 (2d Cir. 1992) (approving lower court order authorizing payment of prepetition wages, salaries, expenses and benefits).  Indeed, "a *per se* rule proscribing the payment of pre-petition indebtedness may well be too inflexible to permit the effectuation of the rehabilitative purposes of the Code."  *In re Structurlite Plastics Corp.*, 86 B.R. 922, 932 (Bankr. S.D. Ohio 1988).  This "doctrine of necessity" functions in a chapter 11 case as a mechanism by which the bankruptcy court can exercise its equitable power to allow payment of critical prepetition claims not explicitly authorized by the Bankruptcy Code and further supports the relief requested herein.  *See In re United Am., Inc.,* 327 B.R. 776, 781 (Bankr. E.D. Va. 2005) (acknowledging the doctrine of necessity "is a necessary deviation because otherwise there will be no reorganization and no creditor will have an opportunity to recoup any part of its pre-petition claim"); *In re NVR L.P.*, 147 B.R. 126, 127 (Bankr. E.D. Va. 1992) ("Under [section 105(a)] the court can permit pre-plan payment of a pre-petition obligation when essential to the continued operation of the debtor."); *see also In re Lehigh & New Eng. Ry.*, 657 F.2d 570, 581 (3d Cir. 1981) (holding that a court may authorize payment of prepetition claims if such payment is essential to debtor's continued operation); *In re Just for Feet, Inc.*, 242 B.R. 821, 824– 25 (D. Del. 1999) (holding that section 105(a) of the Bankruptcy Code "provides a statutory basis for payment of pre-petition claims" under the doctrine of necessity).

25.     Courts in the Fourth Circuit have applied the doctrine of necessity where payment of a prepetition claim (1) is "necessary for the successful reorganization of the debtor," (2) falls

within "the sound business judgment of the debtor" and (3) will not "prejudice other unsecured creditors." *United Am.*, 327 B.R. at 782; *see also In re Universal Fin., Inc.*, 493 B.R. 735, 739–40 (Bankr. M.D. N.C. 2013) (applying the *United Am.* three-part test). The doctrine is frequently invoked early in a chapter 11 case, particularly in connection with those chapter 11 sections that relate to payment of prepetition claims. Moreover, allowing the Debtors to pay the Critical Vendor Claims is especially appropriate where, as here, doing so is consistent with the "two recognized policies" of chapter 11 of the Bankruptcy Code—preserving going concern value for the Debtors' business and maximizing the value of property available to satisfy creditors. *See Bank of Am. Nat'l Trust & Savs. Ass'n v. 203 N. LaSalle St. P'Ship*, 526 U.S. 434, 453 (1999).

26.     Section 363(b) of the Bankruptcy Code permits a debtor, subject to court approval, to "use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Courts have allowed debtors to use assets outside of the ordinary course of business, such as pay prepetition obligations, where a sound business purpose exists for doing so. *See Ionosphere Clubs*, 98 B.R. at 175 (noting that section 363(b) provides "broad flexibility" to authorize a debtor to honor prepetition claims where supported by an appropriate business justification); *see also In re W.A. Mallory Co.*, 214 B.R. 834, 836 (Bankr. E.D. Va. 1997) ("This Court follows the 'sound business purpose' test when examining § 363(b) sales.").

27.     No provision of the Bankruptcy Code expressly prohibits the postpetition payment of prepetition critical vendor claims. Indeed, the above-referenced sections of the Bankruptcy Code authorize such payments when the payments are critical to preserving the going-concern value of the debtor's estate, as is the case here.

28.    As described above, the Debtors require a steady stream of goods and services from their Critical Vendors to maintain adequate inventory and operational stability as they transition into chapter 11.  Without the goods and services provided by the Critical Vendors, the Debtors would be forced to cease or substantially curtail operations as they would not have products to sell in their stores.  Not only would the Debtors be unable to stock their stores and distribution centers, they would also be unable to timely fulfill internet orders, placing holiday season revenue at significant risk.

29.    Importantly, any disruption to the Debtors' business operations could result in a significant loss of operational efficiency, decreasing the value of their business and impairing stakeholder value at this critical juncture in these chapter 11 cases.  Accordingly, the Debtors submit that it is appropriate for the Court to authorize the Debtors to satisfy the Critical Vendor Claims as set forth herein.

30.    If the Debtors do not pay the Critical Vendor Claims, the resulting harm to the Debtors' estates would far outweigh the cost associated with paying a portion of the Debtors' prepetition obligations to the Critical Vendors.  Thus, the Debtors' other creditors will be far better off on account of the Debtors ability to continue their operations if they successfully negotiate such Critical Vendor payments and achieve a smooth transition into bankruptcy with minimal disruption to their operations.  As such, the Debtors believe the relief sought in this Motion will not burden the Debtors, but will help maximize the value of their estates.

31.    Courts in this district and in other jurisdictions regularly authorize chapter 11 debtors to pay claims to critical vendors where it would be unduly time-consuming and expensive to seek to enforce an order of the bankruptcy court in the creditor's home country, and where the payments are essential to the debtor's continued operations.  Similar relief has been granted in

14

other chapter 11 cases in this district and other districts. *See, e.g.*, *In re Patriot Coal Corp.*, No. 15-32450 (KLP) (Bankr. E.D. Va. June 4, 2015) (requesting payments up to $22 million on a final basis for critical vendors); *In re James River Coal Co.*, No. 14-31838 (KRH) (Bankr. E.D. Va. Apr. 7, 2014) (requesting payments to fuel suppliers and material suppliers, up to $7.5 million); *In re Payless Holdings LLC*, No. 17-42267 (KAS) (Bankr. E.D. Mo. May 9, 2017) (authorizing payments up to $113 million); *In re Avaya, Inc.*, No. 17-10089 (SMB) (Bankr. S.D.N.Y. Feb. 10, 2017) (authorizing payments up to $39.5 million); *In re Quiksilver, Inc.*, No. 15-11880 (BLS) (Bankr. D. Del. Oct. 28, 2015) (authorizing payments up to $52 million).[5]

### Processing of Checks and Electronic Fund Transfers Should Be Authorized

32.     The Debtors have sufficient funds to pay any amounts described in this Motion in the ordinary course of business by virtue of expected cash flows from ongoing business operations and anticipated access to debtor-in-possession financing and cash collateral.  In addition, under the Debtors' existing cash management system, the Debtors can readily identify checks or wire transfer requests as relating to an authorized payment in respect of the Critical Vendor Claims. Accordingly, the Debtors believe there is minimal risk that checks or wire transfer requests that the Court has not authorized will be inadvertently made.   Therefore, the Debtors respectfully request that the Court authorize all applicable financial institutions, when requested by the Debtors, to receive, process, honor, and pay any and all checks or wire transfer requests in respect of the relief requested in this Motion.

---

[5]     Because of the voluminous nature of the orders cited herein, such orders have not been attached to this Motion. Copies of these orders are available upon request to the Debtors' proposed counsel.

## The Requirements of Bankruptcy Rule 6003 Are Satisfied

33.    Bankruptcy Rule 6003 empowers a court to grant relief within the first 21 days after the Petition Date "to the extent that relief is necessary to avoid immediate and irreparable harm." For the reasons discussed above, authorizing, but not directing, the Debtors to pay the Critical Vendor Claims in the ordinary course of business, as well as granting the other relief requested herein is integral to the Debtors' ability to transition their operations into these chapter 11 cases. Failure to receive such authorization and other relief during the first 21 days of these chapter 11 cases would severely disrupt the Debtors' operations at this critical juncture.  For the reasons discussed herein, the relief requested is necessary in order for the Debtors to operate their business in the ordinary course and preserve the ongoing value of the Debtors' operations and maximize the value of their estates for the benefit of all stakeholders.  Accordingly, the Debtors submit that they have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 to support granting the relief requested herein.

## Waiver of Bankruptcy Rule 6004(a) and 6004(h)

34.    To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

## Waiver of Memorandum of Points and Authorities

35.    The Debtors respectfully request that this Court treat this Motion as a written memorandum of points and authorities or waive any requirement that this Motion be accompanied by a written memorandum of points and authorities as described in Local Bankruptcy Rule 9013-1(G).

16

## Reservation of Rights

36.     Nothing contained herein is intended or shall be construed as:  (a) an admission as to the amount of, basis for, or validity of any claim against the Debtors under the Bankruptcy Code, or any foreign bankruptcy or insolvency law, including the Companies' Creditors Arrangement Act (Canada) (the "CCAA"), or other applicable nonbankruptcy law; (b) a waiver of the Debtors' or any other party in interest's right to dispute any claim; (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Motion; (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code or pursuant to the CCAA; (f) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; or (g) a waiver of any claims or causes of action which may exist against any entity under the Bankruptcy Code, the CCAA, or any other applicable law.  If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity of any particular claim or a waiver of the Debtors' rights to subsequently dispute such claim.

## Notice

37.     The Debtors will provide notice of this Motion via first class mail and email (where available) to: (a) the Office of the United States Trustee for the Eastern District of Virginia, Attn: Robert B. Van Arsdale and Lynn A. Kohen; (b) the holders of the 50 largest unsecured claims against the Debtors (on a consolidated basis); (c) DIP ABL Agent and the advisors and counsel thereto; (d) DIP Taj Term Loan Agent and the advisors and counsel thereto; (e) DIP Delaware Term Loan Agent and the advisors and counsel thereto; (f) the indenture trustee for the TRU Taj 12.00% Senior Notes and the advisors and counsel thereto; (g) the administrative agent for the prepetition Secured Revolving Credit Facility and the advisors and counsel thereto; (h) the

administrative agent for the prepetition Secured Term Loan B Facility and the advisors and counsel thereto; (i) the prepetition administrative agent for the Propco I Unsecured Term Loan Facility and the advisors and counsel thereto; (j) the agent for the Propco II Mortgage Loan and the advisors and counsel thereto; (k) the agent for the Giraffe Junior Mezzanine Loan and the advisors and counsel thereto; (l) the administrative agent for the prepetition European and Australian Asset-Based Revolving Credit Facility ("Euro ABL") and the advisors and counsel thereto; (m) the administrative agent for the Senior Unsecured Term Loan Facility and the advisors and counsel thereto; (n) the indenture trustee for the Debtors' 7.375% Senior Notes and the advisors and counsel thereto; (o) the indenture trustee for the Debtors' 8.75% Unsecured Notes and the advisors and counsel thereto; (p) counsel to the ad hoc group of the Term B-4 Holders; (q) counsel to the Ad Hoc Committee of Taj Noteholders; (r) the monitor in the CCAA proceeding and counsel thereto; (s) the Debtors' Canadian Counsel, (t) the Internal Revenue Service; (u) the office of the attorneys general for the states in which the Debtors operate; (v) the Securities and Exchange Commission; and (w) any party that has requested notice pursuant to Bankruptcy Rule 2002 (collectively, the "Notice Parties").  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

### No Prior Request

38.    No prior request for the relief sought in this Motion has been made to this or any other court.

*[Remainder of page intentionally left blank]*

WHEREFORE, the Debtors respectfully request that the Court enter the Interim Order and the Final Order granting the relief requested herein and such other relief as the Court deems appropriate under the circumstances.

Richmond, Virginia
Dated:  September 19, 2017

/s/ *Jeremy S. Williams*

**KUTAK ROCK LLP**
Michael A. Condyles (VA 27807)
Peter J. Barrett (VA 46179)
Jeremy S. Williams (VA 77469)
901 East Byrd Street, Suite 1000
Richmond, Virginia 23219-4071
Telephone:    (804) 644-1700
Facsimile:    (804) 783-6192
Email:        Michael.Condyles@KutakRock.com
              Peter.Barrett@KutakRock.com
              Jeremy.Williams@KutakRock.com

*Proposed Co-Counsel to the Debtors*
*and Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C.
Joshua A. Sussberg, P.C.
(*pro hac vice* admission pending)
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900
Email:        edward.sassower@kirkland.com
              joshua.sussberg@kirkland.com

-and-

James H.M. Sprayregen, P.C.
Anup Sathy, P.C.
Chad J. Husnick, P.C.
(*pro hac vice* admission pending)
Robert A. Britton (*pro hac vice* admission pending)
Emily E. Geier (*pro hac vice* admission pending)
300 North LaSalle
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200
Email:        james.sprayregen@kirkland.com
              anup.sathy@kirkland.com
              chad.husnick@kirkland.com
              robert.britton@kirkland.com
              emily.geier@kirkland.com

*Proposed Co-Counsel to the Debtors*
*and Debtors in Possession*

## Exhibit A

**Proposed Interim Order**

Edward O. Sassower, P.C.
Joshua A. Sussberg, P.C. (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:        (212) 446-4800
Facsimile:        (212) 446-4900

-and-

Michael A. Condyles (VA 27807)
Peter J. Barrett (VA 46179)
Jeremy S. Williams (VA 77469)
**KUTAK ROCK LLP**
901 East Byrd Street, Suite 1000
Richmond, Virginia 23219-4071
Telephone:        (804) 644-1700
Facsimile:        (804) 783-6192

James H.M. Sprayregen, P.C.
Anup Sathy, P.C.
Chad J. Husnick, P.C. (*pro hac vice* admission pending)
Robert A. Britton (*pro hac vice* admission pending)
Emily E. Geier (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:        (312) 862-2000
Facsimile:        (312) 862-2200

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| TOYS "R" US, INC., *et al.*,[1] | ) | Case No. 17-34665 (KLP) |
|  | ) |  |
| Debtors. | ) | (Joint Administration Requested) |
|  | ) |  |

## INTERIM ORDER (I) AUTHORIZING THE DEBTORS
## TO PAY CERTAIN PREPETITION CLAIMS OF CRITICAL
## VENDORS AND (II) GRANTING RELATED RELIEF

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession

(collectively, the "Debtors") for entry of an interim order (this "Interim Order"):  (a) authorizing,

but not directing, the Debtors to pay certain Critical Vendor Claims held by Critical Vendors, and

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are set forth in the *Debtors' Motion for Entry of an Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief* filed contemporaneously herewith.  The location of the Debtors' service address is One Geoffrey Way, Wayne, NJ 07470.

[2]    Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

(b) granting related relief, all as more fully set forth in the Motion; and upon the First Day

Declarations; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and

1334 and the *Standing Order of Reference from the United States District Court for the Eastern

District of Virginia*, dated July 10, 1984; and upon the First Day Declarations; and this Court

having found that it may enter a final order consistent with Article III of the United States

Constitution; and this Court having found that venue of this proceeding and the Motion in this

district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the

relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and

other parties in interest; and this Court having found that the Debtors' notice of the Motion and

opportunity for a hearing on the Motion were appropriate under the circumstances and that no

other notice need be provided; and this Court having reviewed the Motion and having heard the

statements in support of the relief requested therein at a hearing before this Court (the "Hearing");

and this Court having determined that the legal and factual bases set forth in the Motion and at the

Hearing establish just cause for the relief granted herein; and upon all of the proceedings had

before this Court; and after due deliberation and sufficient cause appearing therefor, it is HEREBY

ORDERED THAT:

1.      The Motion is granted on an interim basis as set forth herein.

2.      The final hearing (the "Final Hearing") on the Motion shall be held on _____,

2017, at__:__ _.m., prevailing Eastern Time.  Any objections or responses to entry of a final order

on the Motion shall be filed on or before 4:00 p.m., prevailing Eastern Time on _____, 2017,

and served on the Notice Parties. In the event no objections to entry of a final order on the Motion

are timely received, this Court may enter such final order without need for the Final Hearing.

3.      The Debtors are authorized but not directed, to honor, pay, or otherwise satisfy prepetition amounts on account of Critical Vendor Claims in an amount not to exceed $115 million; *provided* that only those Debtors that incurred the Critical Vendor Claims, or a Debtor that in the ordinary course of business pays the Critical Vendor Claims of other Debtor entities, shall be authorized to make payments under this Interim Order, *provided further* that the Debtors are authorized only to pay prepetition amounts due and owing to Critical Vendors and are not authorized to provide Critical Vendors with any prepayments on account of Critical Vendor Claims.

4.      Beginning September 29, 2017 and through the conclusion of these cases, the Debtors shall provide a weekly report of all payments made to Critical Vendors on account of Critical Vendor Claims to the U.S. Trustee and any official committee of unsecured creditors appointed in these chapter 11 cases.

5.      The form of Trade Agreement, substantially in the form attached to the Motion as **Exhibit C**, is approved in its entirety, and the Debtors are authorized, but not directed, to negotiate, modify, or amend the Trade Agreement in their reasonable business judgment.

6.      The Debtors are authorized, but not directed, to condition payment of Critical Vendor Claims upon the execution of a Trade Agreement, and the Debtors are authorized, but not directed, to enter into such Trade Agreements when and if the Debtors determine, in the exercise of their reasonable business judgment that it is appropriate to do so.

7.      If any party accepts payment hereunder and does not continue supplying goods or services to the Debtors in accordance with Customary Trade Terms, then: (a) any payment on account of a prepetition claim received by such party shall be deemed, in the Debtors' discretion, an improper postpetition transfer and, therefore, immediately recoverable by the Debtors in cash

3

upon written request by the Debtors; (b) upon recovery by the Debtors, any prepetition claim of such party shall be reinstated as if the payment had not been made; and (c) if there exists an outstanding postpetition balance due from the Debtors to such party, the Debtors may elect to recharacterize and apply any payment made pursuant to the relief requested by the Motion to such outstanding postpetition balance and such supplier or vendor will be required to repay to the Debtors such paid amounts that exceed the postpetition obligations then outstanding without the right of any setoffs, recoupments, provisions for payment of any claims, or otherwise.

8.    Any Critical Vendor that accepts payment from the Debtors on account of all or a portion of a Critical Vendor Claim pursuant to this Interim Order shall be deemed to (a) agree to the terms and provisions of this Interim Order and (b) have waived, to the extent so paid, any and all prepetition claims, of any type, kind, or priority (including any reclamation claim), against the Debtors, their assets, and properties.

9.    Nothing herein shall impair or prejudice the Debtors' ability to contest, in their sole discretion, the extent, perfection, priority, validity, or amounts of any claims held by any Critical Vendor.  The Debtors do not concede that any claims satisfied pursuant to this Interim Order are valid, and the Debtors expressly reserve all rights to contest the extent, validity, or perfection or seek the avoidance of all such liens or the priority of such claims.

10.    The banks and financial institutions on which checks were drawn or electronic payment requests made in payment of the prepetition obligations approved herein are authorized to receive, process, honor, and pay all such checks and electronic payment requests when presented for payment, and all such banks and financial institutions are authorized to rely on the Debtors' designation of any particular check or electronic payment request as approved by this Interim

Order without any duty of further inquiry and without liability for following the Debtors' instructions.

11.     Notwithstanding the relief granted in this Interim Order and any actions taken pursuant to such relief, nothing in this Interim Order shall be deemed: (a) an admission as to the amount of, basis for, or validity of any claim against the Debtors under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Debtors' or any other party in interest's right to dispute any claim; (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Motion; (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; or (g) a waiver of any claims or causes of action which may exist against any entity under the Bankruptcy Code or any other applicable law.  If the Court grants the relief sought herein, any payment made pursuant to the Court's Interim Order is not intended and should not be construed as an admission as to the validity of any particular claim or a waiver of the Debtors' rights to subsequently dispute such claim.

12.     The Debtors are authorized to issue postpetition checks, or to effect postpetition fund transfer requests, in replacement of any checks or fund transfer requests that are dishonored as a consequence of these chapter 11 cases with respect to prepetition amounts owed in connection with the relief granted herein.

13.     Notwithstanding the relief granted in this Interim Order, any payment made by the Debtors pursuant to the authority granted herein shall be subject to any order authorizing use of cash collateral

14.     Nothing in this Interim Order shall alter or limit any authorization or relief contained in, or prevent Debtor Toys "R" Us (Canada) Ltd. ("Toys Canada") from taking any action authorized pursuant to, the Initial Order in respect of Toys Canada issued by the Ontario Superior Court of Justice (Commercial List) (the "CCAA Court") in proceedings in respect of Toys Canada pursuant to the Companies' Creditors Arrangement Act (Canada), and to the extent of any inconsistency between this Interim Order and the terms of the Initial Order or any other Order of the CCAA Court, the Order of the CCAA Court shall govern.

15.     Notwithstanding anything to the contrary in this Interim Order, any payment made or action taken by any of the Debtors pursuant to the authority granted in this Interim Order must be in compliance with, and shall be subject to: (i) any orders approving the Debtors' use of cash collateral and/or any postpetition financing facilities (the "DIP Orders"), (ii) the documentation in respect of any such postpetition financing facilities and/or use of cash collateral, and (iii) the budgets governing any such postpetition financing and/or use of cash collateral.

16.     To the extent there is any inconsistency between the terms of any of the DIP Orders and this Interim Order, the terms of the DIP Order (or DIP Orders, as applicable) shall control.

17.     The contents of the Motion satisfy the requirements of Bankruptcy Rule 6003(b).

18.     The requirement under Local Bankruptcy Rule 9013-1(G) to file a memorandum of law in connection with the Motion is waived.

19.     Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion and the requirements of Bankruptcy Rule 6004(a) are satisfied by such notice.

20.     Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Interim Order are immediately effective and enforceable upon its entry.

21.     The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Interim Order.

22.     This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Interim Order.

Dated:  _____, 2017                   _____
Richmond, Virginia                                    United States Bankruptcy Judge

WE ASK FOR THIS:

/s/ *Jeremy S. Williams*

Michael A. Condyles (VA 27807)
Peter J. Barrett (VA 46179)
Jeremy S. Williams (VA 77469)
**KUTAK ROCK LLP**
901 East Byrd Street, Suite 1000
Richmond, Virginia 23219-4071
Telephone:        (804) 644-1700
Facsimile:        (804) 783-6192

- and -

Edward O. Sassower, P.C.
Joshua A. Sussberg, P.C. (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:        (212) 446-4800
Facsimile:        (212) 446-4900

- and -

James H.M. Sprayregen, P.C.
Anup Sathy, P.C.
Chad J. Husnick, P.C. (*pro hac vice* admission pending)
Robert A. Britton (*pro hac vice* admission pending)
Emily E. Geier (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:        (312) 862-2000
Facsimile:        (312) 862-2200

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

## CERTIFICATION OF ENDORSEMENT
## UNDER LOCAL BANKRUPTCY RULE 9022-1(C)

Pursuant to Local Bankruptcy Rule 9022-1(C), I hereby certify that the foregoing proposed order has been endorsed by or served upon all necessary parties.

/s/ *Jeremy S. Williams*

**<u>Exhibit B</u>**

**Proposed Final Order**

Edward O. Sassower, P.C.
Joshua A. Sussberg, P.C. (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:        (212) 446-4800
Facsimile:        (212) 446-4900

-and-

Michael A. Condyles (VA 27807)
Peter J. Barrett (VA 46179)
Jeremy S. Williams (VA 77469)
**KUTAK ROCK LLP**
901 East Byrd Street, Suite 1000
Richmond, Virginia 23219-4071
Telephone:        (804) 644-1700
Facsimile:        (804) 783-6192

James H.M. Sprayregen, P.C.
Anup Sathy, P.C.
Chad J. Husnick, P.C. (*pro hac vice* admission pending)
Robert A. Britton (*pro hac vice* admission pending)
Emily E. Geier (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:        (312) 862-2000
Facsimile:        (312) 862-2200

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| TOYS "R" US, INC., *et al.*,[1] | ) | Case No. 17-34665 (KLP) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## FINAL ORDER AUTHORIZING DEBTORS TO PAY CERTAIN PREPETITION CLAIMS OF CRITICAL VENDORS AND (II) GRANTING RELATED RELIEF

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession

(collectively, the "Debtors") for entry of a final order (this "Final Order"): (a) authorizing, but not

directing, the Debtors to pay certain Critical Vendor Claims held by Critical Vendors, and (b)

granting related relief, all as more fully set forth in the Motion; and upon the First Day

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are set forth in the *Debtors' Motion for Entry of an Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief* filed contemporaneously herewith.  The location of the Debtors' service address is One Geoffrey Way, Wayne, NJ 07470.

[2]    Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

Declarations; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and

1334 and the *Standing Order of Reference from the United States District Court for the Eastern*

*District of Virginia*, dated July 10, 1984; and upon the First Day Declarations; and this Court

having found that it may enter a final order consistent with Article III of the United States

Constitution; and this Court having found that venue of this proceeding and the Motion in this

district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the

relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and

other parties in interest; and this Court having found that the Debtors' notice of the Motion and

opportunity for a hearing on the Motion were appropriate under the circumstances and that no

other notice need be provided; and this Court having reviewed the Motion and having heard the

statements in support of the relief requested therein at a hearing before this Court (the "Hearing");

and this Court having determined that the legal and factual bases set forth in the Motion and at the

Hearing establish just cause for the relief granted herein; and upon all of the proceedings had

before this Court; and after due deliberation and sufficient cause appearing therefor, it is HEREBY

ORDERED THAT:

1.     The Motion is granted on a final basis as set forth in this Final Order.

2.     The Debtors are authorized but not directed, to honor, pay, or otherwise satisfy

prepetition amounts on account of Critical Vendor Claims in an amount not to exceed

$325 million; *provided* that only those Debtors that incurred the Critical Vendor Claims, or a

Debtor that in the ordinary course of business pays the Critical Vendor Claims of other Debtor

entities, shall be authorized to make payments under this Final Order, *provided further* that the

Debtors are authorized only to pay prepetition amounts due and owing to Critical Vendors and are

not authorized to provide Critical Vendors with any prepayments on account of Critical Vendor Claims.

3.     Beginning September 29, 2017 and through the conclusion of these cases, the Debtors shall provide a weekly report of all payments made to Critical Vendors on account of Critical Vendor Claims to the U.S. Trustee and any official committee of unsecured creditors appointed in these chapter 11 cases.

4.     The form of Trade Agreement, substantially in the form attached to the Motion as **Exhibit C**, is approved in its entirety, and the Debtors are authorized, but not directed, to negotiate, modify, or amend the Trade Agreement in their reasonable business judgment.

5.     The Debtors are authorized, but not directed, to condition payment of Critical Vendor Claims upon the execution of a Trade Agreement, and the Debtors are authorized, but not directed, to enter into such Trade Agreements when and if the Debtors determine, in the exercise of their reasonable business judgment that it is appropriate to do so.

6.     The Debtors are authorized, but not directed, to pay Critical Vendor Claims, in the event that no Trade Agreement has been executed if the Debtors determine, in their business judgment that a formal Trade Agreement is unnecessary to ensure a vendor's continued performance on Customary Trade Terms.

7.     If any party accepts payment hereunder and does not continue supplying goods or services to the Debtors in accordance with Customary Trade Terms, then: (a) any payment on account of a prepetition claim received by such party shall be deemed, in the Debtors' discretion, an improper postpetition transfer and, therefore, immediately recoverable by the Debtors in cash upon written request by the Debtors; (b) upon recovery by the Debtors, any prepetition claim of such party shall be reinstated as if the payment had not been made; and (c) if there exists an

outstanding postpetition balance due from the Debtors to such party, the Debtors may elect to recharacterize and apply any payment made pursuant to the relief requested by the Motion to such outstanding postpetition balance and such supplier or vendor will be required to repay to the Debtors such paid amounts that exceed the postpetition obligations then outstanding without the right of any setoffs, claims, provisions for payment of any claims, or otherwise.

8.      Any Critical Vendor that accepts payment from the Debtors on account of all or a portion of a Critical Vendor Claim pursuant to this Final Order shall be deemed to (a) agree to the terms and provisions of this Final Order and (b) have waived, to the extent so paid, any and all prepetition claims, of any type, kind, or priority (including any reclamation claim), against the Debtors, their assets, and properties.

9.      Nothing herein shall impair or prejudice the Debtors' ability to contest, in their discretion, the extent, perfection, priority, validity, or amounts of any claims held by any Critical Vendor.  The Debtors do not concede that any claims satisfied pursuant to this Final Order are valid, and the Debtors expressly reserve all rights to contest the extent, priority, validity, or perfection or seek the avoidance of all such liens or the priority of such claims.

10.     The banks and financial institutions on which checks were drawn or electronic payment requests made in payment of the prepetition obligations approved herein are authorized to receive, process, honor, and pay all such checks and electronic payment requests when presented for payment, and all such banks and financial institutions are authorized to rely on the Debtors' designation of any particular check or electronic payment request as approved by this Final Order without any duty of further inquiry and without liability for following the Debtors' instructions.

11.     Notwithstanding the relief granted in this Final Order and any actions taken pursuant to such relief, nothing in this Final Order shall be deemed:  (a) an admission as to the

amount of, basis for, or validity of any claim against the Debtors under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Debtors' or any other party in interest's right to dispute any claim, (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Motion; (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; or (g) a waiver of any claims or causes of action which may exist against any entity under the Bankruptcy Code or any other applicable law.  If the Court grants the relief sought herein, any payment made pursuant to the Court's Final Order is not intended and should not be construed as an admission as to the validity of any particular claim or a waiver of the Debtors' rights to subsequently dispute such claim.

12.    The Debtors are authorized to issue postpetition checks, or to effect postpetition fund transfer requests, in replacement of any checks or fund transfer requests that are dishonored as a consequence of these chapter 11 cases with respect to prepetition amounts owed in connection with the relief granted herein.

13.    Notwithstanding the relief granted in this Final Order, any payment made by the Debtors pursuant to the authority granted herein shall be subject to any order authorizing use of cash collateral

14.    Nothing in this Final Order shall alter or limit any authorization or relief contained in, or prevent Debtor Toys "R" Us (Canada) Ltd. ("Toys Canada") from taking any action authorized pursuant to, the Initial Order in respect of Toys Canada issued by the Ontario Superior Court of Justice (Commercial List) (the "CCAA Court") in proceedings in respect of Toys Canada

pursuant to the Companies' Creditors Arrangement Act (Canada), and to the extent of any inconsistency between this Final Order and the terms of the Initial Order or any other Order of the CCAA Court, the Order of the CCAA Court shall govern.

15.     Notwithstanding anything to the contrary in this Final Order, any payment made or action taken by any of the Debtors pursuant to the authority granted in this Interim Order must be in compliance with, and shall be subject to: (i) any orders approving the Debtors' use of cash collateral and/or any postpetition financing facilities (the "DIP Orders"), (ii) the documentation in respect of any such postpetition financing facilities and/or use of cash collateral, and (iii) the budgets governing any such postpetition financing and/or use of cash collateral.

16.     To the extent there is any inconsistency between the terms of any of the DIP Orders and this Final Order, the terms of the DIP Order (or DIP Orders, as applicable) shall control.

17.     The requirement under Local Bankruptcy Rule 9013-1(G) to file a memorandum of law in connection with the Motion is waived.

18.     Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion and the requirements of Bankruptcy Rule 6004(a) are satisfied by such notice.

19.     Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Final Order are immediately effective and enforceable upon its entry.

20.     The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Final Order.

21.     This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Final Order.

Dated: _____, 2017            _____
Richmond, Virginia                        United States Bankruptcy Judge

WE ASK FOR THIS:


/s/ Jeremy S. Williams

Michael A. Condyles (VA 27807)
Peter J. Barrett (VA 46179)
Jeremy S. Williams (VA 77469)
**KUTAK ROCK LLP**
901 East Byrd Street, Suite 1000
Richmond, Virginia 23219-4071
Telephone:        (804) 644-1700
Facsimile:        (804) 783-6192

- and -

Edward O. Sassower, P.C.
Joshua A. Sussberg, P.C. (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:        (212) 446-4800
Facsimile:        (212) 446-4900

- and -

James H.M. Sprayregen, P.C.
Anup Sathy, P.C.
Chad J. Husnick, P.C. (*pro hac vice* admission pending)
Robert A. Britton (*pro hac vice* admission pending)
Emily E. Geier (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:        (312) 862-2000
Facsimile:        (312) 862-2200

*Proposed Co-Counsel to the Debtors and Debtors in Possession*


## <u>CERTIFICATION OF ENDORSEMENT</u><br><u>UNDER LOCAL BANKRUPTCY RULE 9022-1(C)</u>

Pursuant to Local Bankruptcy Rule 9022-1(C), I hereby certify that the foregoing proposed order has been endorsed by or served upon all necessary parties.

/s/ Jeremy S. Williams

## **Exhibit C**

**Form of Trade Agreement**

**THIS TRADE AGREEMENT IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF A CHAPTER 11 PLAN. ACCEPTANCE OR REJECTION OF A CHAPTER 11 PLAN MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT FOR ANY SUCH CHAPTER 11 PLAN. THE INFORMATION IN THIS TRADE AGREEMENT STATEMENT IS SUBJECT TO CHANGE. THIS TRADE AGREEMENT STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.**

TRADE AGREEMENT

[●] (the "Company"), on the one hand, and the supplier identified in the signature block below ("Supplier"), on the other hand, hereby enter into the following trade agreement (this "Trade Agreement") dated as of the date in the Supplier's signature block below.

## Recitals

WHEREAS on September 18, 2017 (the "Petition Date"), Toys "R" Us, Inc. and its indirect and direct subsidiaries and related entities (collectively, the "Debtors") filed voluntary petitions for relief under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Eastern District of Virginia (the "Court").

WHEREAS on [**DATE**], the Court entered its *Interim Order Authorizing Debtors to Pay Certain Prepetition Claims of Critical Vendors* (the "Interim Critical Trade Order") [Docket No. [●]] authorizing the Debtors on an interim basis, under certain conditions, to pay the prepetition claims of certain suppliers, including Supplier, subject to the terms and conditions set forth therein.

WHEREAS on [**DATE**], the Court entered its *Final Order Authorizing Debtors to Pay Certain Prepetition Claims of Critical Vendors* (the "Final Critical Trade Order") [Docket No. [●]] authorizing the Debtors on a final basis, under certain conditions, to pay the prepetition claims of certain suppliers, including Supplier, subject to the terms and conditions set forth therein.[1]

WHEREAS prior to the Petition Date, Supplier delivered goods to the Company, and the Company paid Supplier for such goods, according to Customary Trade Terms (as defined herein).

WHEREAS the Company and Supplier (each a "Party," and collectively, the "Parties") agree to the following terms as a condition of payment on account of certain pre-petition claims Supplier may hold against the Company.

## Agreement

1.    Recitals. The foregoing recitals are incorporated herein by reference as if set forth at length herein.

2.    Supplier Payment. Supplier represents and agrees that, after due investigation, the sum of all amounts currently due and owing by the Company to Supplier is $[●]

---

[1]    Capitalized terms used but not defined herein shall have the meanings set forth in the Critical Trade Orders.

(the "Agreed Supplier Claim").  Following execution of this Trade Agreement, the Company shall, in full and final satisfaction of the Agreed Supplier Claim, pay Supplier $[●] on account of its prepetition claim (the "Supplier Payment") (without interest, penalties, or other charges), as such invoices become due and payable.

3.    Agreement to Supply.

a.    Supplier shall supply goods and/or perform services to the Company, and the Company shall accept and pay for goods and/or service from Supplier, for the duration of the Debtors' chapter 11 cases based on the following "Customary Trade Terms":  the trade terms at least as favorable to the Company as those practices and programs (including credit limits, pricing, cash discounts, timing of payments, allowances (as may be incorporated or contemplated by any agreements between the Parties or based on historic practice, as applicable), product mix, availability, and other programs) in place in the 180 days prior to the Petition Date except for any partial payments or other payments (or assurances) Company made with respect to any unfinished product.

b.    The Customary Trade Terms may not be modified, adjusted, or reduced in a manner adverse to the Company except as agreed-to in writing by the Parties.

c.    Supplier shall continue to honor any existing allowances, credits, contractual obligations, or balances that were accrued as of the Petition Date and shall apply all such allowances, credits, or balances towards future orders in the ordinary course of business.

4.    Other Matters.

a.    Supplier agrees that it shall not require a lump-sum payment upon the effective date of a plan in the Company's chapter 11 cases on account of any outstanding administrative claims Supplier may assert arising from the delivery of postpetition goods or services, to the extent that payment of such claims is not yet due.  Supplier agrees that such claims will be paid in the ordinary course of business after confirmation of a plan pursuant to the Customary Trade Terms then in effect.  The Supplier Payment will be made concurrently with payment of other outstanding administrative clams as provided in a confirmed plan.

b.    Supplier will not separately seek payment from the Company on account of any prepetition claim (including, without limitation, any reclamation claim or any claim pursuant to section 503(b)(9) of the Bankruptcy Code) outside the terms of this Trade Agreement or a plan confirmed in the Company's chapter 11 case.

c.    Supplier will not file or otherwise assert against the Company, its assets, or any other person or entity or any of their respective assets or property (real or personal) any lien, regardless of the statute or other legal authority upon which the lien is asserted, related in any way to any remaining prepetition amounts allegedly owed to Supplier by the Company arising from prepetition agreements or transactions.  Furthermore, if Supplier has taken steps to file or assert such a lien prior to entering into this Trade Agreement, Supplier will promptly take all necessary actions to remove such liens.

2

5.      <u>Supplier Breach</u>.

a.      In the event that the Company pays Supplier its Supplier Payment and Supplier is determined to have breached this Trade Agreement (a "<u>Supplier Breach</u>"), upon written notice to Supplier, Supplier shall promptly pay to the Company immediately available funds in an amount equal to, at the election of the Company, the Supplier Payment or any portion of the Supplier Payment which cannot be recovered by the Company from the postpetition receivables then owing to Supplier from the Company.

b.      In the event that the Company recovers the Supplier Payment pursuant to Section 5(a) hereof or otherwise, the full Agreed Supplier Claim shall be reinstated as if the Supplier Payment had not been made.

c.      Supplier agrees and acknowledges that irreparable damage would occur in the event of a Supplier Breach and remedies at law would not be adequate to compensate the Company.  Accordingly, Supplier agrees that the Company shall have the right, in addition to any other rights and remedies existing in its favor, to seek an injunction or injunctions to prevent breaches of the provisions of this Trade Agreement and to enforce its rights and obligations hereunder not only by an action or actions for damages but also by an action or actions for specific performance, injunctive relief and/or other equitable relief.  The right to equitable relief, including specific performance or injunctive relief, shall exist notwithstanding, and shall not be limited by, any other provision of this Trade Agreement.  Supplier hereby waives any defense that a remedy at law is adequate and any requirement to post bond or other security in connection with actions instituted for injunctive relief, specific performance, or other equitable remedies.

6.      <u>Notice</u>.

If to Supplier, then to the person and address identified in the signature block hereto.

If to Company:

Toys "R" Us, Inc.
[_____]
[_____]
Attn:  [_____]

and

Kirkland & Ellis LLP
300 North LaSalle, Chicago, Illinois 60654
Attn:  Chad J. Husnick and Emily Geier
E-mail:  chad.husnick@kirkland.com
        emily.geier@kirkland.com
Facsimile: (312) 862-2000

7.      <u>Representations and Acknowledgements</u>.    The Parties agree, acknowledge and represent that:

3

a.      the Parties have reviewed the terms and provisions of the Critical Trade Order and this Trade Agreement and consent to be bound by such terms and that this Trade Agreement is expressly subject to the procedures approved pursuant to the Critical Trade Order;

b.      any payments made on account of the Agreed Supplier Claim shall be subject to the terms and conditions of the Critical Trade Order;

c.      if Supplier refuses to supply goods or services to the Company as provided herein or otherwise fails to perform any of its obligations hereunder, the Company may exercise all rights and remedies available under the Critical Trade Order, the Bankruptcy Code, or applicable law; and

d.      in the event of disagreement between the Parties regarding whether a breach has occurred, either Party may apply to the Court for a determination of their relative rights, in which event, no action may be taken by either Party, including, but not limited to, the discontinuing of shipment of goods from Supplier to the Company, until a ruling of the Court is obtained.

8.      <u>Confidentiality</u>.  In addition to any other obligations of confidentiality between Supplier and Company, Supplier agrees to hold in confidence and not disclose to any party: (a) this Trade Agreement; (b) any and all payments made by the Company pursuant to this Trade Agreement; (c) the terms of payment set forth herein; and (d) the Customary Trade Terms (collectively, the "<u>Confidential Information</u>"); *provided* that if any party seeks to compel Supplier's disclosure of any or all of the Confidential Information, through judicial action or otherwise, or Supplier intends to disclose any or all of the Confidential Information, Supplier shall immediately provide the Company with prompt written notice so that the Company may seek an injunction, protective order or any other available remedy to prevent such disclosure; *provided, further, that*, if such remedy is not obtained, Supplier shall furnish only such information as Supplier is legally required to provide.

9.      <u>Miscellaneous</u>.

a.      The Parties hereby represent and warrant that:  (i) they have full authority to execute this Trade Agreement on behalf of the respective Parties; (ii) the respective Parties have full knowledge of, and have consented to, this Trade Agreement; and (iii) they are fully authorized to bind that Party to all of the terms and conditions of this Trade Agreement.

b.      This Trade Agreement sets forth the entire understanding of the Parties regarding the subject matter hereof and supersedes all prior oral or written agreements between them.  This Trade Agreement may not be changed, modified, amended or supplemented, except in a writing signed by both Parties.  Moreover, Supplier agrees to vote all claims now or hereafter beneficially owned by Supplier in favor of, and not take any direct or indirect action to oppose or impede confirmation of, any chapter 11 plan on a timely basis in accordance with the applicable procedures set forth in any related disclosure statement and accompanying solicitation materials, and timely return a duly-executed ballot to the Debtors in connection therewith, if such chapter 11 plan provides for a treatment of any Agreed Supplier Claim that is materially consistent with this Agreement.

4

c.      Signatures by facsimile or electronic signatures shall count as original signatures for all purposes.

d.      This Trade Agreement may be executed in counterparts, each of which shall be deemed to be an original, but all of which shall constitute one and the same agreement.

e.      The Parties hereby submit to the exclusive jurisdiction of the Court to resolve any dispute with respect to or arising from this Trade Agreement.

f.      This Trade Agreement shall be deemed to have been drafted jointly by the Parties, and any uncertainty or omission shall not be construed as an attribution of drafting by any Party.

[Signature Page Follows]

AGREED AND ACCEPTED AS OF THE DATE SET FORTH ABOVE:

**[COMPANY]**                                    **[SUPPLIER]**

_____          _____
By:                                             By:
Title:                                          Title:
                                                Address:

                                                Date: