Edward O. Sassower, P.C.
Joshua A. Sussberg, P.C. (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:        (212) 446-4800
Facsimile:        (212) 446-4900

-and-

Michael A. Condyles (VA 27807)
Peter J. Barrett (VA 46179)
Jeremy S. Williams (VA 77469)
**KUTAK ROCK LLP**
901 East Byrd Street, Suite 1000
Richmond, Virginia 23219-4071
Telephone:        (804) 644-1700
Facsimile:        (804) 783-6192

James H.M. Sprayregen, P.C.
Anup Sathy, P.C.
Chad J. Husnick, P.C. (*pro hac vice* admission pending)
Robert A. Britton (*pro hac vice* admission pending)
Emily E. Geier (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:        (312) 862-2000
Facsimile:        (312) 862-2200

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| TOYS "R" US, INC., *et al.*,[1] | ) | Case No. 17-34665 (KLP) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

## DECLARATION OF DAVID A. BRANDON, CHAIRMAN OF THE
## BOARD AND CHIEF EXECUTIVE OFFICER OF TOYS "R" US, INC.,
## IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

I, David A. Brandon, hereby declare under penalty of perjury:

1.        I am the Chairman of the Board and Chief Executive Officer of Toys "R" Us, Inc.[2]

and have served in that role since July 1, 2015.  I also currently serve on the boards of directors of

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are set forth in the *Debtors' Motion for Entry of an Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief* filed contemporaneously herewith.  The location of the Debtors' service address is One Geoffrey Way, Wayne, NJ 07470.

[2]     In this declaration "Toys" refers to Toys "R" Us, Inc., and "Debtors" refers to Toys together with its Debtor affiliates.  I will use "Company" to refer to Debtors and their non-Debtor affiliates, collectively.

Toys "R" Us – Delaware Inc., Toys "R" Us Children's Fund, Inc., Domino's Pizza Inc., DTE Energy Company, and Herman Miller, Inc.

2.    From 1999 to 2010, I was Chairman of the Board of Directors and Chief Executive Officer of Domino's Pizza Inc.  Before Domino's, I was the Chief Executive Officer of Valassis Communications, a provider of media and marketing services in North America and Europe.  I also served at Athletic Director at the University of Michigan from 2010 to 2014.

3.    I graduated from the University of Michigan in 1974 with a bachelor's degree in speech communications and have been awarded honorary doctoral degrees from Walsh College, Schoolcraft College, Lawrence Technological University, Cleary College, Central Michigan University, and Albion College.

4.    Each Debtor filed voluntary petitions for relief under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101–1532 (the "<u>Bankruptcy Code</u>"), in the United States Bankruptcy Court for the Eastern District of Virginia (the "<u>Court</u>") on September 18, 2017 the ("<u>Petition Date</u>").  To minimize the adverse effects on their business, the Debtors also filed motions and pleadings seeking various types of "first day" relief (the "<u>First Day Motions</u>").

5.    I am generally familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records.  I submit this declaration to explain to the Court and interested parties why the Debtors filed these cases, and in support of the First Day Motions.

6.    Unless I state otherwise, this declaration is based upon the following:

- personal knowledge;

- information provided to me by my management team and advisors, including investment banker Lazard Frères & Co. LLC ("<u>Lazard</u>"), restructuring advisor Alvarez & Marsal North America, LLC ("<u>A&M</u>"), and restructuring counsel Kirkland & Ellis LLP("<u>K&E</u>");

- my review of documents and information concerning the Debtors' operations, financial affairs, and restructuring initiatives; and

2

- my opinions based on my experience and knowledge.

7.    I am over the age of 18 and authorized to submit this declaration on behalf of the Debtors.  I would testify to the matters stated in this declaration.

### Preliminary Statement

♪♪♪        *"I don't want to grow up, I'm a Toys "R" Us Kid.*        ♪♪♪

*There's a million toys at Toys "R" Us that I can play with….*

*From bikes to trains to video games*

*It's the biggest toy store there is*

*I don't wanna grow up, cause if I did*

♪♪♪        *I couldn't be a Toys "R" Us kid."*        ♪♪♪

### — Toys "R" Us Theme Song

8.    Toys "R" Us delivers children their biggest smiles of the year.  Toys "R" Us gives parents, in turn, who used to be Toys "R" Us kids, an opportunity to fulfill their children's wildest dreams.  Close your eyes and see visions of the gleeful smiles, the bouncing feet, and even hear shrieks of a child frantically ripping off the wrapping paper to reveal the awaiting surprise.  A toy is so much more than "a small article of little value;" it is a "prized souvenir" or the most special gift that lasts a lifetime.[3]  This is why toys always will be the object of children's affection (and attention).  While the average price of each toy is not substantial, the global toy market exceeds $87 billion annually.  And it continues to grow.[4]  Yet just one toy "showroom" exists in the United States, Europe, Asia, Africa, and the Middle East, affording children and toy manufacturers across

---

[3]    Dictionary.com

[4]    http://www.toyassociation.org/PressRoom2/News/2016_News/Global_Toy_Market_to_Surpass_90_Billion_in_2016.aspx

the globe a chance to create life-long memories through gifts and souvenirs 365 days each year.

That one toy showroom—Toys "R" Us—is here to stay.

9.      Since Charles Lazarus opened a baby furniture store in 1948, Toys "R" Us has

grown into the leading retail brand dedicated exclusively to kids, toys, and games.  Toys "R" Us

offers one of the largest and most up-to-date selection of toys at nearly 1,600 toy stores in 49 states

and 38 countries.  Operating under the Toys "R" Us, Babies "R" Us, Toys "R" Us Outlet, and

Toys "R" Us Express brand names as well as at Toysrus.com, Babiesrus.com, and other websites

in international markets, Toys "R" US is the leading chain of toy stores in the world.  A global

reach, effective marketing, and broad product diversity—combined with the Company's loyalty

program, which includes 19 million domestic users and 12 million international users—increases

market exposure and builds customer loyalty.  Today, The Toys "R" Us brand is one of the most

recognizable brands in the world, overtaking the likes of Crayola®, LEGO®, and Apple® for

recognition among children.[5]

10.      Toys "R" Us, however, has been operating for more than a decade with significant

leverage, necessitating the use of substantial amounts of cash each year (approximately

$400 million) to service the more than $5.0 billion of funded indebtedness.  But these substantial

debt service obligations impair the Company's ability to invest in its business and future.  As a

result, the Company has fallen behind some of its primary competitors on various fronts, including

with regard to general upkeep and the condition of our stores, our inability to provide expedited

shipping options, and our lack of a subscription-based delivery service.  Further, the Company has

---

[5]      *See* "Kids Top 50 Brands" (2016 Smarty Pants Brand Love Study) (ranking Toys "R" Us the number #7 among kids' top 50 brands).

failed to capitalize on the iconic Toys "R" Us brand and its unique position as a one-stop shop for toys every day year round.  The time for change, and reinvestment in operations, has come.

11.     More recently, the Company's need for a comprehensive solution to its capital structure issues caused widespread "bankruptcy" speculation in the media, leading to a severe constriction in the Company's trade terms.  More specifically, in late July the Company hired Kirkland & Ellis LLP and Alvarez & Marsal North America, LLC, complementing its retention of Lazard, to consider restructuring and capital structure solutions.  Recognizing that short term "Band-Aids"—which the Company utilized historically to solve near-term maturities—no longer were appropriate amidst an ever shifting landscape in the retail world, Toys "R" Us appreciated and embraced the notion that a holistic reorganization was necessary to ensure viability and growth.  Beginning in late August, the Company engaged with a group of its B-4 Term Loan lenders to secure liquidity and afford breathing room through the holidays to consider (and in engage in discussions regarding) restructuring alternatives.  While those discussions ultimately morphed into negotiations regarding debtor-in-possession financing, a news story published on September 6, 2017, reporting that the Debtors were considering a chapter 11 filing, started a dangerous game of dominos: within a week of its publication, nearly 40 percent of the Company's domestic and international product vendors refused to ship product without cash on delivery, cash in advance, or, in some cases, payment of all outstanding obligations.  Further, many of the credit insurers and factoring parties that support critical Toys "R" Us vendors withdrew support.  Given the Company's historic average of 60-day trade terms, payment of cash on delivery would require the Debtors to immediately obtain a significant amount—over $1.0 billion—of new liquidity.

12.     The timing of all of this could not have been worse, as the Company is in the process of building holiday inventory.  While birthdays, new game releases, and other special events drive

year-round sales, the holiday season is the most important for annual results.  In the fourth quarter

(the weeks prior to Christmas), the Company generates approximately 40% of its annual revenue.



To prepare for the holiday season, Toys "R" Us significantly increases inventory in September to

fill store shelves with the selection and variety of products our customers expect.  Accordingly, I

believe it is critical that the Company reopen its supply chain immediately to ensure a successful

holiday season.

13.      The Company commenced these chapter 11 cases to address its near-term liquidity

issues, longer-term capital needs, and accomplish a comprehensive reorganization that will enable

Toys "R" Us to turnaround and simply make better its business for the millions of Toys "R" kids

around the globe. This turnaround begins today.  The proposed $3.1 billion of debtor-in-possession

financing, coupled with authority to pay certain vendors in the ordinary course, will stabilize

operations and reopen the supply channels before the holiday season.  In addition, and of critical

importance, the debtor-in-possession financing also provides the Company with hundreds of millions of dollars of new money that is available for *immediate and direct investment* in the Company's stores and operations.  I am advised that procuring liquidity for direct operational investment as part of a DIP financing is the exception not the rule.  But securing this much-needed capital infusion now presents Toys "R" Us with an opportunity to stabilize operations, reset its balance sheet, and begin building a better and brighter future for the benefit of all stakeholders. Chapter 11 was certainly not the Company's preferred outcome, but this is exactly what chapter 11 is intended to accomplish.   And that is exactly what Toys "R" Us intends to do.

14.    To familiarize the Court with the Debtors, their business, the circumstances leading to these chapter 11 cases, and the relief the Debtors are seeking in the First Day Motions, I have organized this declaration as follows:

- Part I describes the Debtors' corporate history;[6]

- Part II describes the Debtors' prepetition capital structure;

- Part III describes the Debtors' operations and current improvement initiatives;

- Part IV describes the circumstances leading to the filing of these chapter 11 cases; and

- Part V describes the proposed debtor-in-possession financing.

<u>Discussion</u>

**I.    Company History.**

15.    Charles Lazarus grew up in his father's bicycle shop where he dreamed of opening his own store.  Anticipating a growth in birth rates following his service in World War II, he opened Children's Bargain Town, a baby furniture store, in Washington D.C. in 1948.  Lazarus

---

[6]    Many of the financial figures presented in this declaration are unaudited and potentially subject to change, but reflect the Debtors' most recent review of their business.  The Debtors reserve all rights to revise and supplement the figures presented herein.

oversaw everything, from bookkeeping to merchandise deliveries.  After adding toys and baby products to Children's Bargain Town in response to strong customer demand, Lazarus opened the first Toys "R" Us store in 1957.  Since then, Toys "R" Us and the iconic backwards "Я" in its logo have come to symbolize fun and games to millions of children and adults.

16.    The playful "Я" is now emphasized by the Company's enduring and iconic "spokesanimal"; "Geoffrey" the Giraffe was born in 1965.  He quickly attained celebrity status, starring in television commercials and becoming a featured product line at Toys "R" Us stores. Geoffrey continues to be an integral part of the Toys "R" Us brand.



17.    Toys "R" Us completed an initial public offering in 1978.  After going public, the Company continued to focus on the everyday shopper—such as the parent searching for the perfect birthday gift, or child hoping to spend his or her weekly allowance.  Over time, the Company grew into a toy conglomerate with a broad, loyal customer base.  The Company expanded internationally in 1984 with its first wholly-owned store in Canada and a licensed operation in Singapore. Additionally, the Company launched Toysrus.com in 1998.  Today, Toysrus.com is one of the most visited sites in the specialty toy and baby products retail category.

18.    The Company launched its first Babies "R" Us location in 1996.  Babies "R" Us stores focus solely on baby products and furniture, aiming to provide shopping expertise and specialized products for new families.  Babiesrus.com also offers a wide selection of baby products

and supplies, as well as a convenient, premier baby registry.  The Company endeavors to guide its customers from Babies "R" Us shoppers to Toys "R" Us shoppers to maintain a long-term relationship.

19.     Toys was acquired and taken private in 2005.  Following a highly competitive process, an investment group led by entities advised by or affiliated with Bain Capital Private Equity, LP ("Bain"), Kohlberg Kravis Roberts & Co. L.P. ("KKR"), and Vornado Realty Trust ("Vornado," collectively with Bain and KKR, the "Sponsors") bought Toys "R" Us for approximately $6.6 billion, including $5.3 billion of debt secured in large part by Company assets.[7]

20.     After going private, Toys "R" Us expanded its international presence.  In 2011, it opened its first store in Beijing.  That same year, it introduced international shipping through Toysrus.com and Babiesrus.com.  The Company also strengthened its global e-commerce capabilities by launching Toysrus.com.cn, a dedicated webstore in China.  In addition, the Company formed a joint venture with Li & Fung Retailing, assuming ownership and oversight of 90 stores in Southeast Asia and Greater China.  This joint venture has since merged with the Company's Japanese operations.



---

[7]     Section III.B contains more detail about this transaction.

21. The timeline below shows milestones in the Debtors' history:



22. The Company has continued to grow, with approximately 1,697 stores and 257 licensed stores in 38 countries, plus additional e-commerce sites in various countries. Toys also runs seasonal "pop-up shops" and express stores during the holiday season. These global operations are supported by approximately 60,000 full-time and part-time employees worldwide, growing to more than 100,000 during peak holiday season. **Exhibit A** is a chart of the Company's current organizational and capital structure.

## II. The Debtors' Prepetition Capital Structure.

23. As of the Petition Date, the Debtors, collectively, have approximately $5,268 million of total funded debt obligations. At a high level, the funded debt falls into three categories: (i) financing for the Debtors' domestic operations (the Delaware Secured ABL Credit Facility and the three tranches of the Delaware Secured Term Loan), with sub-facilities for the Debtors' Canadian operations; (ii) financing for the Debtors' international operations (the Taj

Senior Notes, the Euro ABL Facility, with separate dedicated facilities for the United Kingdom, France, and Japan (the UK Real Estate Credit Facility, the French Real Estate Credit Facility, and the Toys-Japan Bank Loans); and (iii) financing for certain standalone domestic entities, including Toys "R" Us Delaware, Inc. and two of the Debtors' real estate holding companies (the Propco I Term Loan Facility, the Propco II Mortgage Loan, the Giraffe Junior Mezzanine Loan, the Delaware 7.375% Senior Notes, and the Toys Inc. 8.75% Unsecured Notes).  The obligors under each financing are depicted on the corporate organizational structure chart, attached hereto as **Exhibit A**, and the maturity dates and aggregate principal amount outstanding outstanding as of the Petition Date under each financing are as follows:

| Funded Debt | Maturity | Outstanding Principal Amount as of 9/17/17[8] |
|---|---|---|
| **North American Debt Facilities** | | |
| Delaware Secured ABL Credit Facility | March 21, 2019 | $1,025 million[9] |
| Tranche A-1 ("FILO") Loan Facility | October 24, 2019 | $280 million |
| Delaware Secured Term Loan - Incremental Facility ("B-2") | May 25, 2018 | $123 million |
| Delaware Secured Term Loan - Second Incremental Facility ("B-3") | May 25, 2018 | $61 million |
| Delaware Secured Term Loan - Incremental Facility ("B-4") | April 24, 2020 | $998 million |
| Delaware 8.75% Unsecured Notes | September 1, 2021 | $22 million |
| Toys, Inc. 7.375% Senior Notes | October 15, 2018 | $208 million |

---

[8] All balances as of September 17, 2017 other than certain de minimis Asian and Japanese balances.

[9] $1,850 million of total commitments

| Funded Debt | Maturity | Outstanding Principal Amount as of 9/17/17[8] |
|---|---|---|
| Propco I Unsecured Term Loan Facility | August 21, 2019 | $859 million |
| Propco II Mortgage Loan | November 9, 2019 | $507 million |
| Giraffe Junior Mezzanine Loan | November 9, 2019 | $70 million |
| **International Debt Facilities** | | |
| Euro ABL Facility | December 18, 2020 | $84 million[10] |
| Taj Senior Notes | August 15, 2021 | $583 million |
| UK Real Estate Credit Facility | July 7, 2020 | $355 million |
| French Real Estate Credit Facility | February 27, 2018 | $54 million |
| Toys-Japan Bank Loans | October 25, 2019; January 29, 2021; February 26, 2021 | $36 million |
| Total Funded Debt: | | $5,265 million |

A.      **North American Debt Facilities and Intercreditor Agreements**

1.  **Delaware Secured ABL Facility.**

24.      Toys "R" Us-Delaware, Inc. ("Toys-DE"), as lead borrower, Toys "R" Us (Canada) Ltd./Toys "R" Us (Canada) Ltee ("Toys Canada"), as Canadian borrower, certain direct and indirect wholly-owned subsidiaries of Toys-DE, as guarantors, Bank of America, N.A., as administrative agent, Bank of America, N.A. and Wells Fargo Bank, N.A., as co-collateral agents, and certain financial institutions, as lenders, are party to that certain Third Amended and Restated Credit Agreement, dated as of March 21, 2014 (as amended, novated, supplemented, extended or restated from time to time, including through the First Amendment dated as of October 24, 2014,

---

[10]    $186 million of total commitments (£138 million at .74 GBP/USD as of September 18, 2017).

the "Delaware ABL Credit Agreement"). The Delaware ABL Credit Agreement provides for a senior secured asset based revolving credit facility consisting of a revolving commitment of $1.85 billion, which matures on March 21, 2019 (the "ABL Facility"), and a senior secured tranche A-1 "first-in-last-out" term loan of $280 million that matures on October 24, 2019 (the "FILO Facility" and together with the ABL Facility, the "Delaware Secured ABL Facility").

25.    The obligations under the Delaware Secured ABL Facility are secured, subject to certain exceptions, by a first priority lien on certain of the assets of Toys-DE and the other domestic guarantors, including, without limitation, accounts receivable, inventory, certain deposit accounts and amounts deposited therein, and a third priority lien on the common equity shares of Toys Canada. The obligations of Toys Canada as the Canadian Borrower under the Delaware Secured ABL Facility are secured, subject to certain exceptions, by a security interest on certain of the assets of the Canadian Borrower including, without limitation, accounts receivable, inventory, certain deposit accounts and amounts deposited therein. Toys Canada has no liability under the Delaware ABL Credit Agreement for any obligation of Toys-DE or the other U.S. loan parties. As of the Petition Date, approximately $1,025 million in borrowings and approximately $91 million of letters of credit are outstanding under the ABL Facility.

**2.    Secured Term Loan B Facility.**

26.    Toys "R" Us-Delaware, Inc. ("Toys-DE"), as borrower, certain of the borrowers domestic subsidiaries, as guarantors, Bank of America, N.A., as administrative agent, and the lender parties thereto, are party to that certain Amended and Restated Credit Agreement, dated as of August 24, 2010 (as amended, novated, supplemented, extended or restated from time to time, the "Term Loan B Credit Agreement"). The Term Loan B Credit Agreement provides for several tranches of term loans, including:  (a) term loans maturing on May 25, 2018, in an initial aggregate principal amount of $400 million (the "Term B-2 Loans"); (b) term loans maturing on May 25,

2018, in an initial aggregate principal amount of $225 million (the "Term B-3 Loans"); and (c)

term loans maturing on April 24, 2020, in an initial aggregate principal amount of $1,025,726,000

(the "Term B-4 Loans" and together with the Term B-2 Loans and Term B-3 Loans, the "Secured

Term Loan B Facility").

27.     The obligations under the Secured Term Loan B Facility are guaranteed by certain

wholly-owned subsidiaries of Toys-DE.  Collateral securing the Secured Term Loan B Facility

consists, subject to certain restrictions and exceptions, of a first priority lien on the intellectual

property owned by Geoffrey, LLC,  and a second priority lien on the shared collateral pledged by

the subsidiaries of Toy-DE that are guarantors under both the Delaware Secured ABL Facility and

the Secured Term Loan B Facility to the secured parties under the Delaware Secured ABL Facility

and the secured parties under the Secured Term Loan B Facility.  The Term B-2 Loans and

Term B-3 Loans are secured by a second priority lien on the pledge of the common equity shares

of Toys Canada.

28.     Toys-DE created the Term B-4 Loans pursuant to Amendment No. 3 to the Term

Loan B Credit Agreement dated as of October 24, 2014.  Amendment No. 3 permitted the lenders

of the Term B-2 Loans and Term B-3 Loans to extend the maturity date of these loans by

exchanging them for Term B-4 Loans.  Wayne Real Estate Parent Company, LLC has provided an

unsecured guarantee of the Term B-4 Loans.   In addition to the security interests described in the

immediately preceding paragraph, the Term B-4 Loans are also secured by, subject to certain

restrictions, a first priority security interest in the Canadian Pledge and, after the Springing

Covenant is triggered (which shall occur on the earlier of the date on which the 7.375% Notes have

been redeemed, defeased or discharged or the removal from such 7.375% Notes of the negative

pledge covenant and any restrictions on liens related to certain specified real property), a first

priority security interest in all of the Specified Real Property, subject to Permitted Liens, Applicable Law and any restrictions or limitations under the applicable deeds, leases or real estate contracts.

29.    As of the Petition Date, approximately $123 million in aggregate principal amount of Term B-2 Loans remains outstanding, approximately $61 million in aggregate principal amount of Term B-3 Loans remains outstanding, and approximately $998 million in aggregate principal amount of Term B-4 Loans remains outstanding.

**3.  US ABL and Term Loan Intercreditor**

30.    On August 24, 2010, Bank of America, N.A., as Term Agent, and Bank of America, N.A., as ABL Agent, and the other parties thereto entered into that certain Amended and Restated Intercreditor Agreement, dated as of August 24, 2010 (as amended, amended and restated, supplemented or otherwise modified from time to time (including pursuant to that certain Amendment No. 1 to Amended and Restated Intercreditor Agreement, dated as of October 24, 2014, by and among the Term Agent and the ABL Agent) the, "ABL-Term Intercreditor Agreement"), which. among other things, governs the relative rights and priorities of the Term Agent and the ABL Agent with respect to the shared collateral.

**4.  8.75% Unsecured Notes.**

31.    On November 15, 2006, Toys "R" Us, Inc. ("Toys Inc.") and Toys-DE co-issued $200 million in original principal amount of 8.75% unsecured notes due September 1, 2021 (as amended, novated, supplemented, extended or restated from time to time, the "8.75% Notes"). The 8.75% Notes are governed by that certain Indenture, dated as of August 21, 1991, among Toys-DE, as issuer, and United Jersey Bank, as Indenture Trustee, as amended by and through that certain Second Supplemental Indenture, dated as of November 15, 2006, among Toys Inc. and Toys-DE, as co-issuers, and The Bank of New York, as successor trustee.  No other Debtor entity

15

guarantees or is otherwise obligated under the 8.75% Notes.  As of the Petition Date, approximately $22 million in aggregate principal amount of 8.75% Notes remains outstanding.

**5.  7.375% Senior Notes.**

32.    On May 28, 2002, Toys Inc. issued $400 million of 7.375% senior unsecured notes due October 15, 2018 (as amended, novated, supplemented, extended or restated from time to time, the "7.375% Notes").  The 7.375% Notes are governed by that certain Indenture, dated as of May 28, 2002, among Toys Inc., as issuer, and The Bank of New York, as Indenture Trustee, as amended by that certain First Supplemental Indenture, dated as of May 28, 2002, among Toys Inc., as Issuer, and The Bank of New York, as Indenture Trustee.  No other Debtor entity guarantees or is otherwise obligated under the 7.375% Notes.  As of the Petition Date, approximately $208 million in aggregate principal amount of 7.375% Notes remains outstanding.

**6.  Propco I Unsecured Term Loan Facility.**

33.    Toys "R" Us Property Company I, LLC ("Propco I") (a non-Debtor) is the borrower of approximately $985 million under that certain Term Loan Credit Agreement, dated as of August 21, 2013 (as amended, novated, supplemented, extended or restated from time to time, the "Propco I Credit Agreement"), among Propco I, the lenders party thereto from time to time, Goldman Sachs Lending Partners LLC, as Administrative Agent, and the other agents and arrangers named therein. The loan obligations under the Propco I Credit Agreement (the "Propco I Loans") mature on August 21, 2019.  The Propco I Credit Agreement is guaranteed by each subsidiary of Propco I. As of the Petition Date, approximately $859 million in aggregate principal amount of Propco I Loans remains outstanding.

**7.  Propco II Mortgage Loan.**

34.    On November 3, 2016, Toys "R" Us Property Company II, LLC ("Propco II"), an indirect wholly-owned subsidiary of Toys-DE, borrowed $512 million, due November 9, 2019,

pursuant to that certain Loan Agreement among Propco II, as Borrower, and Goldman Sachs Mortgage Company and Bank of America, N.A., as the lenders party thereto (as amended, novated, supplemented, extended or restated from time to time, the "Propco II Mortgage Loan").    The Propco II Mortgage Loan obligations are guaranteed by Toys Inc., and are secured by all assets owned from time to time by Propco II, including (i) all of Propco II's interest in certain real property, and (ii) certain accounts and other related collateral of Propco II.  As of the Petition Date, approximately $507 million in aggregate principal amount remains outstanding under the Propco II Mortgage Loan.

### 8.  Giraffe Junior Mezzanine Loan.

35.    On November 3, 2016, Giraffe Junior Holdings, LLC ("Giraffe Junior") borrowed $88 million, due November 19, 2019, pursuant to that certain 12.5% Mezzanine Loan Agreement among Giraffe Junior, as Borrower, and the lenders party thereto from time to time (as amended, novated, supplemented, extended or restated from time to time, the "Giraffe Junior Mezzanine Loan").  Giraffe Junior Mezzanine Loan obligations are guaranteed by Toys Inc., and are secured by assets owned by Giraffe Junior, including (i) 100% of the issued and outstanding limited liability company interests in Propco II, and (ii) certain accounts and other related collateral of Giraffe Junior.  As of the Petition Date, approximately $70 million in aggregate principal amount remained outstanding under the Giraffe Junior Mezzanine Loan.

### B.    International Debt Facilities and Intercreditor Agreements

### 1.  European and Australian ABL Revolving Credit Facility.

36.    TRU Europe Limited (the "European Parent"), TRU Iberia Holdings 1, S.L.U. (the "Spanish Parent"), TRU Australia Holdings, LLC (the "Australian Parent," and together with the European Parent and the Spanish Parent, the "Parent Guarantors"), Toys "R" Us (UK) Limited and Toys "R" Us Limited (the "UK Borrowers"), Toys "R" US (Australia) Pty Ltd (the "Australian

Borrower"), Toys "R" Us GmbH (the "German Borrower"), Toys "R" Us Iberia, S.A.U. (the "Spanish Borrower" and together with the UK Borrowers, the Australian Borrower, the German Borrower and the Spanish Borrower, collectively, the "European ABL Borrowers"), certain of the European ABL Borrowers' direct and indirect wholly-owned subsidiaries, as guarantors (the "European ABL Guarantors"), Deutsche Bank AG New York Branch, as Administrative Agent, Security Agent and Facility Agent, Deutsche Bank AG New York Branch and Bank of America, N.A., as Co-Collateral Agents, and the lenders party thereto from time to time, are parties to that certain Syndicated Facility Agreement dated as of October 15, 2009, (as amended, novated, supplemented, extended or restated from time to time, including through the Second Amended and Restated Syndicated Facility Agreement dated as of December 18, 2015, the "Europe Credit Agreement").

37.     The Europe Credit Agreement provides for a senior secured revolving credit facility with revolving commitments of £138 million, which matures on December 18, 2020 (the "Euro ABL Facility").  The obligations under the Euro ABL Facility are secured, subject to certain exceptions, by a first priority lien on substantially all of the assets of the Parent Guarantors, the European ABL Borrowers and the European ABL Guarantors, including, without limitation, accounts receivable, inventory, cash and cash equivalents, and a pledge of the common equity shares of certain direct and indirect wholly-owned subsidiaries of the Parent Guarantors.  As of the Petition Date, approximately $84 million in borrowings are outstanding under the Euro ABL Facility.  As of the Petition Date, the aggregate borrowing base (*i.e.*, the effective maximum availability) under the Euro ABL Facility was $84 million.

**2.  Taj Senior Notes.**

38.     On August 16, 2016, Tru Taj LLC ("Tru Taj") and Tru Taj Finance, Inc. ("Tru Taj Finance") issued $441.2 million of 12.00% senior secured notes due August 15, 2021 (as amended,

novated, supplemented, extended or restated from time to time, the "Taj Senior Notes"). The Taj Senior Notes are governed by that certain First Supplemental Indenture, dated as of August 26, 2016, among Tru Taj and Tru Taj Finance, as co-issuers, Toys Inc. and certain of its direct and indirect wholly-owned subsidiaries in the United States, Europe and Australia, as guarantors (the "Taj Guarantors"), and Wilmington Trust, N.A., as trustee and collateral trustee. The obligations under the Taj Senior Notes are secured, subject to certain exceptions, by a first priority lien on the common equity shares of certain of the Taj Guarantors and certain of their subsidiaries that were not pledged under the Euro ABL Facility, and a second priority lien on the common equity shares of certain of the Taj Guarantors and certain of their subsidiaries that were previously pledged under the Euro ABL Facility. As of the Petition Date, $583 million in aggregate principal amount of Taj Senior Notes remains outstanding.

### 3. US ABL and Term Loan Intercreditor

39.    On August 16, 2016, Deutsche Bank AG New York Branch, as First Lien Collateral Agent, Wilmington Trust, National Association, as Collateral Trustee, as Second Priority Representative for the Second Priority Debt Parties, and the certain of Toys Inc.'s direct and indirect subsidiaries party to the Europe Credit Agreement, as grantors, entered into that certain certain Intercreditor Agreement, dated as of August 16, 2014 (as amended, amended and restated, supplemented or otherwise modified from time to time the, "Taj-Euro ABL Intercreditor Agreement"), which, among other things, governs the relative rights and priorities of the secured parties under the Taj Senior Notes and the Europe Credit Agreement.

### 4. UK Real Estate Credit Facility.

40.    On March 25, 2013, Toys "R" Us Properties (UK) Limited ("UK Propco I") and TRU (UK) H5 Limited, as borrowers, Debussy DTC PLC as Original Lender, Elavon Financial Services Limited, UK Branch, as Facility Agent, and U.S. Bank TRU STEES Limited as Security

Agent entered into that certain Agreement Relating to the UK Propco Facility Agreement, (as amended, novated, supplemented, extended or restated from time to time, including that certain Amendment and Restatement Agreement Relating to the UK Propco Facility AG dated as of July 24, 2013, the "UK Facility Agreement").

41.     The UK Facility Agreement, which provides for a senior secured credit facility with a maximum total availability of £263,159,000, matures on July 7, 2020 (the "UK Facility").  The obligations under the UK Facility are secured, subject to certain exceptions, by a first ranking priority charge on certain of the issuer's assets and property, including, without limitation, certain deposit accounts.  As of the Petition Date, approximately $355 million in borrowings are outstanding under the UK Facility.

**5.   French Real Estate Credit Facility.**

42.     On February 27, 2013, Toys "R" Us France Real Estate S.A.S. ("Toys France Real Estate"), as borrower, entered into that certain €48 million facility agreement (as amended, novated, supplemented, extended or restated from time to time, the "Facility Agreement"), with Deutsche Bank AG, acting through its London Branch as Original Lender, Arranger and Security Agent, and Situs Asset Management Limited as Agent.

43.     The Facility Agreement provides for a senior secured credit facility with a maximum availability of €48 million, and matures on February 27, 2018 (the "French Facility"). The obligations under the French Facility are secured, subject to certain exceptions, by a first priority lien on substantially all of the assets of Toys France Real Estate, including, without limitation, mortgages on the properties to be refinanced, assignment by way of security of rental income generated on the properties, a pledge of any inter-company and shareholder loans, accounts receivable, inventory, cash and cash equivalents, and a pledge of the common equity shares of

Toys France Real Estate.  As of the Petition Date, approximately $54 million in borrowings are outstanding under the French Facility.

**6.  Toys-Japan Bank Loans.**

44.    Toys "R" Us-Japan, Ltd ("Toys Japan") has borrowed approximately $36 million under a syndicated bank loan (collectively the "Toys-Japan Bank Loan"), which consists of two unsecured lines of credit.  On October 31, 2014, Toys Japan borrowed ¥0.5 billion, due October 25, 2019, pursuant to the Toys-Japan Bank Loan agreement executed between Toys Japan, as borrower, and the lender parties thereto (as amended, novated, supplemented, extended or restated from time to time, the "2019 Toys-Japan Bank Loan").   On January 29, 2016, Toys Japan borrowed an additional ¥4.1 billion, due January 29, 2021.  On February 28, 2013, Toys Japan borrowed a further ¥2.0 billion, due February 26, 2012.  As of the Petition Date, approximately $40 million in aggregate principal amount remained outstanding under the Toys-Japan Bank Loans.

45.    Toys Japan also has an agreement with a syndicate of financial institutions, which includes an unsecured committed lines of credit ("Tranche 2") expiring on June 29, 2018.  Tranche 2 is available in amounts of up to ¥9.45 billion (approximately $86 million as of September 1, 2017).  As of the Petition Date, the Company had no outstanding borrowings under Tranche 2. As of the Petition Date, Toys-Japan had total liquidity of $335 million under committed facilities, which included cash and cash equivalents of $171 million.

46.    In addition, Toys-Japan has two uncommitted lines of credit with ¥1.0 billion and ¥0.5 billion of total availability, respectively.  As of the Petition Date, approximately $36 million in borrowings are outstanding under these uncommitted lines of credit.

### C.   Intercompany Indebtedness

47.     The Debtors and Non-Debtor Affiliates regularly engage in intercompany transactions in the ordinary course of business, resulting in various intercompany balances, claims, and obligations. A summary of some of the intercompany indebtedness includes:

### 1.   Toys Inc. and Toys-DE Intercompany Credit Agreement

48.     Toys Inc. is the borrower of $90 million under that certain Credit Agreement, dated as of July 25, 2012 (as amended, amended and restated, supplemented or otherwise modified from time to time, the "Intercompany Credit Agreement"), among Toys Inc., as borrower, and Toys-DE, as lender.  Pursuant to that certain Amendment No. 1 to Credit Agreement, dated as of March 30, 2017, by and between Toys Inc., as borrower, and Toys-DE, as lender, the intercompany loan under the Intercompany Credit Agreement matures on December 31, 2018.

### 2.   2006 Grid Promissory Note

49.     Toys Inc. and Toys-DE are parties to that certain Promissory Note, dated as of January 28, 2006 (as amended, amended and restated, extended, supplemented or otherwise modified from time to time, the "2006 Grid Promissory Note"), which evidences the intercompany loans made between the parties both as borrowers and lenders, and pursuant to which the parties thereto shall offset and net any amounts owed by one party to the other under the 2006 Grid Promissory Note.  The outstanding amount of the 2006 Grid Promissory Note as of July 29, 2017 was $383,992,731 owed by Toys Inc. to Toys-DE.  The 2006 Grid Promissory Note matures on November 30, 2020.

### 3.   2009 Intercompany Promissory Note (Toys Inc. Borrower)

50.     Pursuant to that certain Promissory Note, dated as of June 15, 2009 (as amended, amended and restated, extended, supplemented or otherwise modified from time to time, the "2009 Promissory Note"), between Toys Inc., as borrower, and Toys-DE, as lender, Toys Inc. borrowed

an initial principal amount of $150 million.  The outstanding amount of the 2009 Promissory Note
as of July 29, 2017 was $307,091,591. The 2009 Promissory Note matures on November 30, 2020.

### 4.  2009 Intercompany Promissory Note (Toys-DE Borrower)

51.    Pursuant to that certain Promissory Note, dated as of July 22, 2009 (as amended,
amended and restated, extended, supplemented or otherwise modified from time to time, the "July
2009 Promissory Note"), between Toys-DE, as borrower, and Toys Inc., as lender, Toys-DE
borrowed an initial principal amount of $286,400,000.  The outstanding amount of the July 2009
Promissory Note as of July 29, 2017 was $281,051,655. The July 2009 Promissory Note matures
on February 3, 2018.

### 5.  2012 Intercompany Promissory Note

52.    Pursuant to that certain Promissory Note, dated as of July 24, 2012 (as amended,
amended and restated, extended, supplemented or otherwise modified from time to time, the "2012
Promissory Note"), between Toys Inc., as borrower, and Toys-DE, as lender, Toys Inc. borrowed
an aggregate principal amount of $175 million. The outstanding amount of the 2012 Promissory
Note as of July 29, 2017 was $297,564,074.  The 2012 Promissory Note matures on August 1,
2018.

### III.    The Company Today and Current Improvement Initiatives

53.    Although the toy industry overall is healthy and growing, the Debtors' EBITDA
declined sharply in fiscal year 2013 after sales dropped by 7 percent year-over-year.  This drop
was primarily due to a series of organizational and operational changes, including senior leadership
turnover, undisciplined promotional activity resulting in selling product too cheap, poor inventory
management resulting in overstock, and a misaligned cost structure resulting in net losses.
Recovering from this substantial one-year downturn was compounded by the Debtors' substantial
annual debt service obligations, which direct liquidity towards interest payments that might

otherwise have been used to reinvest in the business.  While the Company could not easily modify its capital structure to reduce debt obligations, under new leadership, the Company implemented certain measures to turnaround its operations and made modifications to its inventory management processes, and cost controls.   These efforts ultimately saved the Company approximately $325 million.  The Debtors also hired new senior leaders in key business roles, and made selective limited investments in inventory, website, and store formats.

54.     Despite these improvements, expensive debt service and unrelenting competition from e-commerce and big-box retailers continue to drag on the Company's performance. Practically speaking, this competition manifests itself in price wars; during the 2016 holiday season, big box retailers slashed prices on toys and flooded marketing channels, knowing that if they can get consumers in the door to purchase attractively-priced toys, they can make up for decreased toy revenue with other in-store purchases.  Further, online retailers such as Amazon are not concerned with making a profit at this juncture, rendering their pricing model impossible to compete with for a company such as Toys "R" Us.  To compete, Toys "R" Us would have needed to slash prices on the same toys to keep traffic coming into its stores, decreasing its revenue and cash flows in an unrelenting race to the bottom. But Toys did not engage in this race to the bottom. The Company does not have supplemental departments and revenue streams from which to make up for the lost margin on selling, as do Walmart®, Target®, and Amazon®, among others.  Instead, the Company is reprioritizing the things it does best.   By making investments in marketing, technology, the in-store experience, and inventory flow, the Company believes it can offer consumers a far superior experience and effectively compete in this new retail environment.  These chapter 11 proceedings and the DIP Facilities are integral to brining this vision to fruition.

## A.    Business Operations.

55.    The Debtors' business is seasonal, primarily focused on the fourth quarter holiday season.  The importance of executing a successful holiday season cannot be overstated.  The Debtors' marketing campaigns are heavily focused on driving fourth quarter sales and approximately 40% of net retail sales occurred in the fourth quarters of 2014, 2015, and 2016.  The Company's overall annual financial performance is driven by sales during this period.  Accordingly, building and meeting holiday demand is an essential component of the Company's business, and the Debtors believe their superior ability to create and manage increased holiday demand sets them apart from competitors.

### 1.    The Big Box Model.

56.    The Debtors operate stores in 49 states, Canada, Puerto Rico, and Guam.  They also serve the market more broadly through e-commerce and temporary or pop-up stores.  For example, the Debtors recently returned to the Times Square area in New York City with a 2017 holiday pop-up shop.

57.    The Debtors and their non-Debtor affiliates also have franchise stores across several international markets, including the Middle East, Asia, Europe, Australia, and Africa.  As of July 2017, the Debtors operated approximately 1,600 stores and licensed approximately 250 stores worldwide.



58.    The Debtors lease a majority of their store properties in a variety of different locations such as regional malls, outlet centers, strip malls, and street level stores.  The Debtors have a significant number of their leased stores concentrated with Simon Property Group, Inc., DDR Corp. Kimco, and Brixmor. The Debtors' remaining leases are with a variety of other landlords.

59.    The Company's stores are organized by aisle for easy customer browsing.  The Company is currently developing and implementing initiatives to further improve the shopping experience at Toys "R" Us stores.  Once these initiatives are implemented, Toys "R" Us stores will be interactive spaces with rooms to use for parties, live product demonstrations put on by trained employees, and the freedom for employees to remove product from boxes to let kids play with the latest toys.  Additionally, the Company has engaged app developers to create augmented reality video games that can be played by customers on their mobile devices in the Company's stores.

## 2.    The Company's Brands and Product Offerings.



60.    There are approximately 568 domestic Toys "R" Us stores and 780 international Toys "R" Us stores.  Toys "R" Us stores sell a wide variety of products, including action figures, arts and crafts materials, active toys such as bikes and scooters, building toys such as LEGO®, playsets, dolls, electronics (including video games), board games, puzzles, kids clothing and accessories (including costumes), outdoor equipment, party supplies, and toy vehicles. Toys "R" Us stores generated approximately 76 percent of the Debtors' total gross revenue in 2016.  These stores compete primarily with other so-called "big-box" retailers such as Target® and WalMart®.  Online retailers such as Amazon® are also main competitors.



61.    Launched in 1996, Babies "R" Us caters to the needs of newborn children until they turn four years old.  These stores sell a wide variety of products, including baby gear, baby clothes, food and formula, diapers, cribs, bedding, and nursery décor.   There are approximately 223 domestic Babies "R" Us stores, and 12 international Babies "R" Us stores.   Babies "R" Us stores accounted for 11 percent of the Debtors' total gross revenue in 2016.  Like Toys "R" Us stores, Babies "R" Us stores compete with big-box retailers such as WalMart® and Target®, and online retailers such as Amazon.  Babies "R" Us' performance in particular has been affected by online "subscription" ordering models, where customers sign-up for regularly scheduled deliveries

of products like diapers and formula.  The Company's old technology infrastructure did not enable it to offer subscription services.  After significant developments, Babies "R" Us is now in the process of launching its own online subscription service to better compete in the marketplace. Additionally, while Toys "R" Us does not face large, toy-focused competitors, Babies "R" Us competes with other baby-specific retailers such as buybuy BABY®.

### 3.    The Company's Sourcing and Procurement Procedures.

62.    The Debtors and their non-Debtor affiliates purchase merchandise from a wide variety of international and domestic vendors.  These well-established relationships are one of the Company's core strengths.   In fiscal year 2016, the Debtors had over 3,600 active vendor relationships.  For many vendors, the Company's stores are the only year-round dedicated platform to showcase their brands and test new products.  As part of these long-term relationships, the Company receives a higher allocation of in-demand products than is provided to competitors, certain exclusive products, advertising support, and favorable trade terms.

63.    The Company utilizes the services of APL Logistics ("APLL")[11] to coordinate all steps of the inventory purchase process related to imports from Southern China, from which 90% of the Debtors' foreign imports are shipped.  When an order is ready for delivery, the vendor utilizes APLL's online platform to inform APLL that the product is ready for shipment.  APLL then analyzes relevant information to determine how the product needs to be distributed and provides the vendor instructions regarding how to get the product to the port, such as whether the product should be delivered directly to the port in a shipping container or trucked to a consolidator to build a container that is then delivered to the port.  Within (on average) 48 hours of a shipping

---

[11]    The Debtors use similar providers for deliveries from other ports and for deliveries to Europe, Australia, and other regions in which they operate.

container arriving at port, it is boarded on a ship for delivery to the United States or its other destination.

64.    The Company operates 18 distribution centers, including eight supporting domestic operations and ten supporting international operations.  Shipments that arrive at port are brought directly to these distribution centers.  These distribution centers are equipped with warehouse management systems to manage inventory levels and distribution costs.  In the U.S., the Debtors also have agreements with third-party logistics providers including, JB Hunt Transport, Inc., Performance Team Freight, Systems, Inc., and DHL Supply Chain to manage warehouse operations and deliveries to their stores. The Company maintains similar arrangements with different vendors internationally.  The Company utilizes this system to optimize flexibility and stock levels in their stores.  Nonetheless, the Company is continuously refining and improving its procurement and delivery process.

65.    The Debtors' stores also allow them to offer their online customers unique delivery and payment arrangements.  For example, customers can buy online and pick up their purchases in stores as little as one hour later if the item is in stock.   If an item is not in stock, a customer can pick the item up at the store later, free of shipping costs.

**B.    Prepetition Transactions.**

**1.    Take Private.**

66.    Negative trends and developments in the retail and toy industry in 2003 and 2004 damaged the Company's performance and prospects.  Discount and mass merchandisers with greater financial resources and lower operating expenses drove down prices and margins in the broader retail and toy industry.  This competition and price pressure changed consumer habits, ultimately decreasing the Debtors' toy sales.  Around this same time, the Debtors' Kids "R" Us apparel business was underperforming.  On November 17, 2003, the Debtors announced plans to

close all 146 of the free standing Kids "R" Us stores.  But not all news was bad news during this period:  the Debtors' international division, saw an increase in net sales of 7.2 percent and 10.9 percent.

67.     Facing difficult industry trends and weak performance of U.S. toy stores during the 2003 holiday season, the Company conducted a strategic evaluation of their worldwide assets. They retained Credit Suisse First Boston ("CSFB") to advise on strategic alternatives.  The Company and CSFB initially expected to separate the U.S. toy retailing business from the Babies "R" Us brand.  CFSB led a thorough sale process for the toy retailing business.  Eventually, participants in the auction determined that it would be too difficult to separate the toy and baby businesses and the Company determined to sell both businesses together.

68.     On March 17, 2005, the Company announced a definitive agreement to sell its worldwide operations to the Sponsors for $26.75 per share in a $6.6 billion transaction.

### C.     The Debtors' Investment in Growth Begins Today.

69.     The Company's overleveraged capital structure has constrained it from making necessary operational and capital expenditures, including investing in the revitalization of stores. The Debtors cannot wait until they emerge from these chapter 11 proceedings to make these crucial investments.   Accordingly, the DIP Financing discussed herein includes approximately $1.0 billion of new money commitments that will allow the Debtors to make significant operational investments and drive in-store sales.  This is not merely strategic speak from the company, the various proposals for DIP financing that the Debtors received over the last several weeks all indicate that the investment community is supportive of the Company and its future business plan.  Investors are providing money to support immediate investment in the business.

70.     The Company also anticipates that by reconnecting customers with the Toys "R" Us brand and enlivening their customers' shopping experience, they will slowly begin

to increase their market share and become the clear market leader.  To this end, the Company has developed a four-pillared business plan designed to improve the customer experience, operations and drive sales:

| | |
|---|---|
| **Serve Our Customers with What They Want – When and How They Want It** | **Provide a World-Class Digital Experience** |
| **Bring Our Toy Stores to Life** | **Transform the Babies"R"Us Brand** |

71.    To further develop their strategy and execute on all four of the strategic pillars, the Debtors have identified a comprehensive set of key initiatives, including store-level wage rate increases, U.S. store service improvements, U.S. supply chain efficiency enhancements, U.S. baby business transformations, technological investments, capital investments in U.S. real estate, re-prioritizing brand management, and international expansion.  Each of these initiatives is discussed in turn.

### 1.  U.S. Store Service Enhancement

72.    Happier customers spend more money.  To improve customers' in-store shopping experience, the Debtors plan to invest $64.8 million from 2018 through 2021.  This investment

will allow the Debtors to position more highly-skilled and trained employees in higher value areas in the store to conduct product demonstrations, host in-store events, and improve the in-store customer experience.

### 2. U.S. Real Estate Capital Investment

73.     The nicer the store, the more customers want to shop there.  To revitalize their portfolio of stores, the Debtors plan to invest $276.6 million from 2018 to 2021.  This investment will enable the Debtors to (i) convert existing stores into a "side-by-side" format to combine toy and baby offerings, (ii) relocate, remodel and/or close targeted stores, (iii) create event and activity spaces within existing stores to facilitate the enhancement discussed above, and (iv) develop plans for small format stores in urban areas.

### 3. Technology Investment

74.     Today's retail customer expects a seamless, easy-to-use, online shopping experience.  To enhance the Debtors' online presence and e-commerce capacity, they plan to invest $90.4 million from 2018 through 2021.  The Debtors will use this investment to continue developing their new, upgraded webstore, integrate digital customer loyalty programs that reward customers for repeat business, and further bring the stores to life with "gamification," including augmented reality tools and increased in-store digital content.

### 4. U.S. Supply Chain Efficiency Enhancement

75.     Customers want their purchases delivered as quickly as possible.  To increase delivery speed and streamline their packing-and-shipping operations, the Debtors plan to invest $117.8 million in capital expenditures, $37.6 million in SG&A, and $104.8 million in margin investment from 2018 through 2021.  This substantial investment will remodel the Debtors' supply chain infrastructure, increase the Debtors' ship-from-store capacity and decrease delivery time to customers.

### 5. Transform U.S. Baby Business

76.    Despite increasing competition, Babies "R" Us remains the industry leader in baby registry requests.  To enhance the Babies "R" Us brand, the Debtors plan to invest $54 million from 2018 through 2021 to upgrade in-store product offerings and employee service levels, launch a new Babies "R" Us registry app, remodel the brand's website, implement a customer loyalty program, and create a digital concierge service that helps new and expecting—and often overwhelmed—parents find the items they need.

### 6. Wage Rate Increase

Better employees make for happier customers.  To recruit and retain the highest quality workers, the Debtors plan to invest $72.4 million from 2018 to 2021 to (i) raise starting wages to market-competitive levels for store employees and (ii) ensure that employees who take on greater levels of responsibility will be compensated appropriately.

### 7. Re-Prioritizing Brand Management

77.    Customers are loyal to the brands that meaningfully engage them.  The Debtors plan to invest $175.2 million from 2018 to 2021 to reconnect customers with the Toys and Babies brands.  Specifically, the Debtors plan to launch a Babies "R" Us brand campaign to reposition Babies "R" us as a lifestyle brand and introduce the newly-created Toys "R" Us "PLAY" branding strategy, relaunch an updated loyalty program integrated with customer relationship management tools, and roll-out marketing and media plans that showcase the Debtors' unique, exclusive product offerings.

### 8. International Expansion

78.    The Debtors' brands are well positioned in their various international markets.  To further penetrate the Canadian, European, and Asian markets, where they already have a substantial foothold, the Debtors plan to invest $82 million from 2018 to 2021.  This investment

will allow the Debtors to remodel their international portfolio of physical stores, transition to a new internationally focused webstore, invest further in growing their Asian joint venture, and build out their number of stores in certain European markets.

79.    These initiatives are expected to streamline the Company's operations, revitalize the customer shopping experience, and improve financial performance.  The Company's ongoing liquidity constraints have made it difficult to implement these initiatives.  But the Company anticipates that a simplified capital structure and reduced debt load post-emergence, will provide ample liquidity to focus on these initiatives and use them to transform the Company's financial performance.

**D.    International Debtors and Non-Debtors.**

80.    The Debtors' operations span the globe, but their organizational structure and capital structure are effectively separated into two silos: (i) North America, including U.S. and Canadian entities and credit facilities and (ii) international, including all other foreign entities and various international and country specific credit facilities.  The main parent company Toys "R" Us, Inc. (DE) is the only entity that sits above both the North American and International operations and has liability on account of debt in both silos.  As discussed below, the North American entities are part of these chapter 11 cases, but the International entities are not.  The Debtors have obtained the appropriate forbearance agreements and waivers to keep these international entities out of both these chapter 11 cases and bankruptcy proceedings in their local jurisdictions.

**1.    Toys Canada and the CCAA Filing**

81.    Toys "R" Us (Canada) Ltd. ("Toys Canada") is the Company's Canadian subsidiary. While the Company has one Executive leadership team, Toys Canada, among other things, has its own management structure, conducts its own business operations, makes its own

purchasing decisions, manages its own supply chain, and procures its own vendors. Like the foreign non-Debtor affiliates discussed below, Toys Canada is party to an intercompany shared services agreement pursuant to which it makes regular payments to certain of the domestic Debtors. Toys Canada has also advanced intercompany loans to Toys Delaware and it is anticipated this practice may continue post-petition, subject to appropriate protections. Additionally, the Canadian revolving credit and "first-in last-out" (FILO) facility (which is secured by a first lien on substantially all the property of Toys Canada) is a sub-facility of the Delaware Secured ABL Facility; however, Toys Canada is only obligated under the Delaware Secured ABL Facility for its own borrowings and is not a guarantor of Toys Delaware's obligations thereunder. It is contemplated that Toys Canada will be a borrower under the Domestic DIP ABL Credit Facility based upon the same structure.

82.      Toys Canada filed for chapter 11 protection because of its status as a borrower under the Delaware Secured ABL Facility and a proposed borrower under the Domestic DIP ABL Credit Facility, and because of its desire to obtain the benefit of the automatic stay in the United States to prevent any potential creditor enforcement against it here. Given that Toys Canada is a Canadian company and conducts its business in Canada, it will also commence a plenary restructuring proceeding under Canada's Companies' Creditors Arrangement Act (the "CCAA Proceedings") before the Ontario Superior Court of Justice in Toronto, Ontario (the "Canadian Court") to obtain the benefit of a stay of proceedings and other relief in Canada similar to that sought on the First Day Motions, including approval of the Canadian portion of the Domestic DIP ABL Credit Facility.

83.      In light of the commencement of the CCAA Proceedings, the Debtors are also seeking approval of a customary cross-border insolvency protocol (the "Cross-Border Protocol")

with a view to ensuring effective and efficient coordination and administration of the chapter 11

proceedings and the CCAA Proceedings.  I am advised by K&E that approval of such a protocol

is customary in cross-border insolvency filings of this nature and that the form of Cross-Border

Protocol is consistent with protocols approved in other recent U.S. chapter 11 cases.

### 2. The Foreign Non-Debtor Affiliates

84.    The Debtors also have affiliates in 36 other countries around the globe that conduct

business under the Toys "R" Us or Babies "R" Us Brand names (collectively, the "Non-Debtor

Affiliates." Similar to Toys Canada, the Non-Debtor Affiliates have their own management

structures, conduct their own business operations, make their own purchasing decisions, manage

their own supply chains, and procure their own vendors.  The Non-Debtor Affiliates are also party

to various intercompany agreements, pursuant to which they make regular payments to certain of

the domestic Debtors.

85.    The international silo of the Debtors' capital structure includes the Euro ABL, the

Taj 12.00% Notes, and various country specific credit arrangements (each as discussed below).

While certain cross-default provisions in the Taj 12% Notes would generally result in a

cross-default on the such notes and the Euro ABL as a result of the chapter 11 filing, as part of the

DIP Financings, the requisite Taj noteholders agreed to wave and forebear from exercising any

rights and remedies on account of such default, thus guaranteeing that the Euro ABL will remain

in place on a postpetition basis to provide liquidity to the Non-Debtor Affiliates in the ordinary

course. Accordingly, the Debtors did not need to file the Non-Debtor Affiliates in these chapter 11

cases nor does the company believe that bankruptcy proceedings will be required by law in any

foreign jurisdictions.  The Company intends for operations of all Non-Debtor Affiliates, including

any intercompany transactions or services rendered in the ordinary course of business, to continue

uninterrupted during these chapter 11 cases.

IV.    **Circumstances Leading Up to the Petition Date.**

86.    A confluence of factors contributed to the Debtors' need to commence these chapter 11 cases, including market trends and a highly-leveraged capital structure.  As discussed in more detail below, in light of shifting consumer demand toward online marketplaces and competition from one-stop retailers such as Walmart® and Target®, the Company's revenue has trended downwards over the past five years, decreasing profits and increasing leverage.  Although the Company has managed its complex, highly-leveraged capital structure by refinancing its debt obligations before they come due, the Company's cash debt service burden of approximately $400 million per year is unsustainable in the current competitive environment.  As a result, the Company concluded that a comprehensive deleveraging would be required to allow the Company to right-size its balance sheet, make necessary investments, and maximize the long-term value of the business.

87.    The Company also faced certain liquidity challenges that reduced the Company's strategic flexibility in executing a deleveraging strategy.  For example, because the Company may not have been able to show its auditors that it would have sufficient liquidity on hand to pay the $186 million of B-2 and B-3 Term Loans at scheduled maturity in May 2018, the Company faced the possibility of having to make a disclosure under applicable accounting regulations that it had "substantial doubt" about the its ability to continue as a going concern.  The Debtors feared that such a disclosure would have caused substantial tightening of trade terms, exhausting the Company's liquidity.

88.    In the face of these liquidity concerns, the Company worked with Lazard and its other advisors to investigate the possibility of raising approximately $200 million of incremental liquidity.  The Company and its advisors engaged with potential lenders and their advisors regarding alternative structures to raise the necessary incremental funds, including considering a

sale-leaseback transaction with certain existing lenders.  Ultimately, no such liquidity-enhancing transaction proved to be viable.

89.     With the goal of implementing a comprehensive deleveraging, but without a solution to near-term liquidity pressures, the Company asked Lazard, K&E, and A&M to focus on contingency planning, including securing debtor-in-possession financing and preparing for an orderly chapter 11 filing.   When news broke on September 6, 2017 that Toys was considering restructuring options, including a chapter 11 filing, trade and credit insurers immediately began to pull terms and cease shipping product.  As a result, the Debtors accelerated their preparations for these chapter 11 cases, finalized negotiations, and documented their proposed DIP financing arrangements.  Below is a more detailed description of the events, transactions, and circumstances over the last several years, ultimately leading to this chapter 11 filing.

**A.     Refinancing Efforts.**

90.     The Company has a large and complex organizational and capital structure. Historically, when faced with pending debt maturities, Toys has sought and obtained refinancing of such pending debt, generally extending the maturities five to seven years to avoid making large cash payments.  Over time, this has created an ever-increasing debt-service burden, hampering the Debtors operational investment.  The current capital structure reflects these various financings and refinancings.  For example, since 2014, the Debtors have engaged in several successful refinancing transactions to extend maturities, including:

- On August 21, 2013, Toys "R" Us Property Company I, LLC and its subsidiaries ("TRU Propco I") entered into the Propco I Term Loan Facility, providing financing to effectively extend certain debt maturities from 2017 to 2019;

- On March 21, 2014, Toys and certain of its subsidiaries amended and restated, at the same time, its Delaware Secured ABL Credit Facility, extending its maturity from August 10, 2015 to March 21, 2019;

- On October 24, 2014, Toys amended the credit agreement for its secured term loan facilities to provide for, among other things, the refinancing of certain loans thereunder into the B-4 Term Loans.  At the same time, the Company amended the Delaware Secured ABL Credit Facility to provide the Tranche A-1 FILO Loan. The proceeds of these new facilities were used to, among other things, refinance debt maturing in 2016;

- On December 18, 2015, certain foreign Debtors amended and restated the Euro ABL Facility, extending the maturity date of the facility from March 8, 2016 to December 18, 2020; and

- On August 16, 2016, Tru Taj LLC successfully completed a private exchange transaction, issuing the Taj Senior Notes and eliminating maturities on certain 2017 notes and reducing the outstanding principal on certain 2018 notes.

- On November 3, 2016, the Debtors obtained the PropCo II Mortgage Loan and the Giraffe Junior Mezzanine Loan, the proceeds of which were used (along with a rent prepayment from Toys-Delaware to Toys "R" Us Property Company II, LLC) to effectively extend the maturity of debt at PropCo II from 2017 to 2019.

**B.**    **Operational and Market Considerations.**

91.    The Company is facing challenges to its liquidity resulting from operational struggles, outdated technology, a failure to adapt to market changes, and above-market leases.  As outlined below, management has taken steps to begin addressing these challenges; however, they continue to negatively impact the Company's financial performance.

**3.  Management Changes**

92.    Following the close of the 2013 fiscal year, the Company recognized the need to implement broad organizational changes to confront market headwinds and drive increased revenue.  Over the next several years, the Company's Board of Directors conducted executive searches and hired several new executives, including a chief financial officer in 2014 and myself, as chief executive officer in 2015. Following my arrival, we added a new chief talent officer, a communications and customer satisfaction officer, and a supply chain officer in 2015, a chief technology officer in 2016, and a general counsel and a chief marketing officer in 2017.

93.     Additionally, the Board of Directors and management began making short-term and long-term strategic changes to, among other things, the Company's inventory and supply chain process, website and IT platform, and store formats.  Additionally, the Company invested in and expanded to strategic geographic markets to stabilize and grow topline sales. Yet, despite the Company's best efforts, the overall revenue trend in the United States has been downward as the Company has struggled to maintain market share and compete in the changing retail environment.

### 4.  Challenging Operating Environment.

94.     The Company, like many other apparel and retail companies, is facing a challenging environment as a result of pressure from competitive big box retailers and the general market shift towards online shopping.  These factors have left the Company with a relatively high cost structure coupled with decreasing revenues, resulting in diminishing cash flow. Further, the Company's IT platform did not, until recently, allow them to provide consumers with certain advantageous purchase options, such as weekly subscription deliveries of disposable baby products, which features are a staple of their competitors' offerings.  The inability to provide this service allowed other retailers to take market share from the Company.  These trends, along with deep discounting to drive in-store sales, contributed to a 3.4 percent decrease in revenue during the 2016 holiday season as compared to the 2015 season, and negative or declining same-store sales trends.  This trend has continued into 2017. As of Q2 2017, the Debtors' same-store sales have declined 4.3%.

### 5.  Real Estate Expenses.

95.     The Debtors are burdened by above-market leases on massive retail stores.  These leases are a substantial burden on the Debtors' operations and profitability.  In recent years, the Debtors have capitalized on naturally-terminating leases to reduce their store count or square footage, in some cases combining Babies "R" Us and Toys "R" Us retail stores under one roof. As a result of rent savings to the Debtors and convenience to shoppers, these combined stores have

substantially outperformed preexisting separate store structures.  The Company intends to migrate additional stores to a shared-roof or smaller store footprint model.

96.     The Debtors are currently performing a detailed review of their real estate portfolio, identifying underperforming stores and above-market leases as part of an overall strategy to reduce and optimize their existing store footprint.  The Debtors believe that they can utilize these chapter 11 cases to close underperforming stores and renegotiate lease terms of other stores to reduce rent to current market terms.  Additionally, the Debtors intend to utilize this opportunity to create more combined stores and open some smaller-footprint stores, which the Debtors believe will outperform the existing store structure.  These efforts have, and will continue to, increase profit from operations.

### C.     Preparations for Chapter 11 Proceedings.

97.     In anticipation of a potential going-concern notation in their second quarter 2017 10-Q, the Debtors began to prepare for these chapter 11 cases and to negotiate debtor-in-possession financing to ensure that the Debtors would be able to obtain the liquidity necessary to build their seasonal inventory if trade vendors began to pull terms. K&E, A&M, and Lazard worked with the Debtors and various stakeholders to prepare for this scenario.

98.     As discussed above, on September 6, 2017, a news article stating that the Company was considering all strategic options, including a potential restructuring, was published.  This news story was picked up by media outlets around the world and appeared on national television shows within hours.  Within 72 hours, a significant percentage of the Debtors' vendors called the Company to inform the Debtors that they would not ship product without cash on delivery. In addition, as discussed above, the Company's international credit insurers withdrew their coverage. The impact on the Company's supply chain was fast and furious. Within a week, 40 percent of the Debtors' supply chain refused to ship product and 10 days later, practically all of the Debtors'

vendors had refused to ship without cash on delivery. The Company lost its access to product during the critical shipping period to build inventory for the holiday season.

99.     The Debtors and their advisors worked feverishly during this period to finalize the terms of a debtor-in-possession financing facility to ensure that the Debtors would have sufficient liquidity to reactivate their supply chain, build inventory, and fund these chapter 11 cases. In a relatively tight time-frame, the Debtors and their advisor conducted a robust marketing process, receiving 11 proposals from existing lenders and third-parties. Negotiations over the terms of these proposals provided the Debtors with clear insight into the available market terms and allowed the Debtors to procure the best available terms under these circumstances.  The Debtors believe that DIP Facilities (as defined below), will provide them with sufficient liquidity to stabilize operations, implement their holiday business plan, and negotiate a consensual plan of reorganization with their lenders.  Before the proverbial ink was dry on the DIP Documents, the Debtors initiated these chapter 11 proceedings, seeking to stabilize operations and approval of their first day relief. Failure to do get such relief now will jeopardize the entire holiday season.

**V.      The Proposed DIP Financing.**

100.    As described in detail in the Kurtz Declaration, to ensure adequate liquidity during, and fund the administration of, these chapter 11 cases, the Debtors engaged in an intense, well-organized, and extremely competitive marketing process have negotiated three debtor in possession financing facilities (collectively, the "<u>DIP Facilities</u>"):

A.  **<u>North American DIP ABL/FILO Facility</u>**.  J.P. Morgan Chase Bank, N.A ("<u>J.P.
Morgan</u>") acting as Administrative Agent and Collateral Agent, for itself and a
syndicate of financial institutions, has agreed, together with four arrangers led by
J.P. Morgan as lead arranger (together, the "<u>JPM Lead Arranger Group</u>"), to make
available a debtor-in-possession ABL facility to Toys-DE and Toys Canada in order
to fund the Debtors' North American operations. Specifically, the JPM Lead
Arranger Group will make available a $2.3 billion postpetition DIP ABL credit
facility consisting of a $1,850 million ABL ($1,300 million of which on an interim
basis) and a $450 million FILO senior secured term loan, which will be used to

refinance existing obligations under the Prepetition ABL Facility in full and for general corporate purposes (the "Domestic DIP ABL Credit Facility"). The Domestic DIP ABL Credit Facility contains a sub-facility which provides a $300 million tranche for Canadian operations, which is lent only against Canadian assets and inventory. Toys Canada has no liability under the Domestic DIP ABL Credit Facility for any obligation of Toys-DE or the other U.S. loan parties. The Domestic DIP ABL Credit Facility will be integrated into the Debtors' current cash management system,

B. **North American Term Loan DIP**. An ad hoc group of Prepetition Term Loan Lenders have agreed to provide a $450 million ($350 million new money term loan to Toys "R" Us, Inc. (the "Domestic DIP Term Loan" and, collectively with the Domestic DIP ABL Credit Facility, the "Domestic DIP Facilities"), which will provide an additional source of liquidity to be used for general corporate purposes, including the administration of these chapter 11 cases.

C. **International Term Loan and Default Forbearance**. An ad hoc group of Taj Noteholders have agreed to provide $375 million in incremental notes to support the Debtors' international operations. (the "International DIP Term Loan"). The group of Taj Noteholders also agreed to waive certain defaults under the Prepetition Taj Notes and to forbear from exercising rights and remedies pursuant to a default against the Debtors (the "Taj Waiver").

The Taj Waiver will allow the Debtors' prepetition Euro ABL Facility to remain in place and continue to be a source of liquidity to the Debtors in the ordinary course of business.

101. The DIP Facilities are critical to the Debtors' ability to operate postpetition and make necessary investments in their operations. These facilities will enhance the Debtors liquidity by almost $1 billion, ensuring that the Debtors will have sufficient liquidity to maintain the free flow of inventory to the Debtors' stores and customers, make operational and strategic improvements, and fund the administrative costs of these chapter 11 cases. Based on my personal knowledge and extensive discussions with the Debtors' management team and advisors, I believe that the DIP Facilities provide the Debtors sufficient liquidity to stabilize their operations and fund the administration of these chapter 11 cases as the Debtors seek to implement the going-concern restructuring of their business. Based on my conversations with Lazard, I also understand that the approximately $96.5 million in aggregate fees to procure the DIP Facilities (approximately

3 percent of the financing amount) is reasonable under the circumstances. Finally, based on extensive discussions with the Debtors' advisors and my own participation in the DIP financing process, I believe that the DIP Facilities are on the most favorable terms available in light of the circumstances of these chapter 11 cases, present the best reasonable path to the Debtors' going-concern reorganization, were negotiated in good faith and at arms' length, and will allow the Debtors to maximize the value of their estates for the benefit of all parties in interest.

102.    Importantly, the DIP Facilities include very few case controls. Specifically, the only terms that can be viewed as case controls are the conditions to the DIP Facilities that:

- not later than 5 days after the Petition Date, the interim order approving the DIP Facilities shall have been entered by this Court and the Canadian initial order shall have been entered by the Canadian Court;

- not later than 45 days after the Petition Date, the final order approving the DIP Facilities shall have been entered by this Court; and

- not later than 30 days after the Petition Date, the entry of the Canadian initial order, the Canadian comeback motion shall have been heard and resolved by the Canadian Court.

103.    With more than $3.1 billion in new financing commitments in hand, including significant capital to immediately invest in operations, the Company has an opportunity to stabilize operations and reset its balance sheet. This is exactly what chapter 11 is intended to accomplish and exactly what the Company intends to do. The DIP Facilities will provide the foundation for negotiations over a massive deleveraging and further investment in the businesses that will ensure the iconic Toys "R" Us brand stays viable for years to come, preserving the Debtors' estates for the benefit of all of their stakeholders and saving the jobs of the Debtors' over 100,000 regular and seasonal employees.

*[Remainder of Page Left Intentionally Blank]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: September 19, 2017

/s/ *David A. Brandon*
David A. Brandon
Chairman of the Board and Chief Executive
Officer of Toys "R" Us, Inc.

## Exhibit A

**Corporate Organizational and Capital Structure**