Edward O. Sassower, P.C.
Joshua A. Sussberg, P.C. (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

-and-

James H.M. Sprayregen, P.C.
Anup Sathy, P.C.
Chad J. Husnick, P.C. (*pro hac vice* admission pending)
Robert A. Britton (*pro hac vice* admission pending)
Emily E. Geier (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

Michael A. Condyles (VA 27807)
Peter J. Barrett (VA 46179)
Jeremy S. Williams (VA 77469)
**KUTAK ROCK LLP**
901 East Byrd Street, Suite 1000
Richmond, Virginia 23219-4071
Telephone: (804) 644-1700
Facsimile: (804) 783-6192

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**RICHMOND DIVISION**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | LP |
| TOYS "R" US, INC., *et al.*,[1] | ) | Case No. 17-34665 (KLP) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

# DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO (A) PAY PREPETITION WAGES, SALARIES, OTHER COMPENSATION, AND REIMBURSABLE EXPENSES AND (B) CONTINUE EMPLOYEE BENEFITS PROGRAMS, AND (II) GRANTING RELATED RELIEF

The above-captioned debtors and debtors in possession (collectively, the "Debtors")[2] respectfully state as follows in support of this motion (this "Motion"):

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are set forth in the *Debtors' Motion for Entry of an Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief* filed contemporaneously herewith. The location of the Debtors' service address is One Geoffrey Way, Wayne, NJ 07470.

[2] A detailed description of the Debtors and their business, and the facts and circumstances supporting the Debtors' chapter 11 cases, are set forth in greater detail in (i) the *Declaration of David A. Brandon, Chief Executive Officer of Toys "R" Us, Inc., in Support of Chapter 11 Petitions and First Day Motions* (the "Brandon Declaration") and (ii) the *Declaration of Michael J. Short, Chief Financial Officer of*

## Relief Requested

1. The Debtors seek entry of interim and final orders, substantially in the forms attached hereto as **Exhibit A** and **Exhibit B** (the "Interim Order" and the "Final Order," respectively), (a) authorizing the Debtors to (i) pay all prepetition wages, salaries, reimbursable expenses, and other obligations on account of the Employee Compensation and Benefits Programs (as defined below) in the ordinary course of business and (ii) continue to administer the Employee Compensation and Benefits Programs, including payment of prepetition obligations related thereto and (b) granting related relief. In addition, the Debtors request that the Court schedule a final hearing within 21 days of the commencement of these chapter 11 cases to consider approval of this Motion on a final basis.[3]

## Jurisdiction and Venue

2. The United States Bankruptcy Court for the Eastern District of Virginia (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Standing Order of Reference from the United States District Court for the Eastern District of Virginia*, dated July 10, 1984. The Debtors confirm their consent, pursuant to rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court,

*Toys "R" Us, Inc., in Support of First Day Motions* (the "Short Declaration" and together with the Brandon Declaration, the "First Day Declarations"), filed contemporaneously with the Debtors' voluntary petitions for relief filed under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), on September 18, 2017 (the "Petition Date"). Capitalized terms used, but not otherwise defined in this Motion shall have the meanings ascribed to them in the First Day Declarations.

[3] The relief requested herein does not apply to any claims against, or employees of, Debtor Toys "R" Us (Canada) Ltd. ("Toys Canada"), which will be addressed in Toys Canada's Companies' Creditors Arrangement Act (Canada) ("CCAA") proceedings. Notwithstanding the foregoing, the Debtors do not seek to make payments to employees of Toys Canada that exceed the statutory cap under section 507(a)(4) of the Bankruptcy Code.

absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

3. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4. The bases for the relief requested herein are sections 105(a), 362(d), 363(b), and 507(a) of the Bankruptcy Code, Bankruptcy Rules 6003 and 6004, and rule 9013-1 of the Local Rules of the United States Bankruptcy Court for the Eastern District of Virginia (the "Local Bankruptcy Rules").

**The Debtors' Workforce**

5. The Debtors employ over 11,150 individuals on a full-time basis and 21,300 individuals on a part-time basis (collectively, the "Employees") in the United States and U.S. Territories. Approximately 28,700 Employees are paid on an hourly basis, and approximately 3,750 Employees earn a salary. The Employees are not party to any collective bargaining agreements. In addition to the Employees, the Debtors also periodically retain specialized individuals as independent contractors, as well as temporary workers sourced from various staffing agencies (the "Staffing Agencies"), to complete discrete projects and fulfill certain duties on a short- and long-term basis when the Debtors are otherwise unable to fill required positions (such individuals collectively, the "Temporary Staff"). The Temporary Staff are an important supplement to the efforts of the Debtors' Employees. At this time, the Debtors retain approximately 1,010 Temporary Staff.

6. In addition, over the next four months, in preparation for and during the holiday season, the Debtors anticipate that the number of seasonal part-time Employees in their distribution centers and stores will grow by approximately 38,600, increasing the total number of hourly Employees to over 67,200. This growth is consistent with historic annual headcount during this peak selling period and the Debtors' financial projections. The Debtors endeavor to

hire all part-time Employees directly, but in the event that they are unable to fill all open positions in specific stores, the Debtors will utilize the Staffing Agencies to ensure they are able to maintain their operations. These seasonal Employees are all paid hourly, and are generally not entitled to the benefits addressed herein, with the exception of certain performance-based bonuses.

7. The Debtors' Employees and Temporary Staff perform a wide variety of functions critical to the Debtors' operations at the Debtors' home office, distribution centers, and regional stores. Certain of these individuals are highly trained and have an essential working knowledge of the Debtors' business that cannot be easily replaced. The remainder of these individuals provide services necessary to continue the Debtors' store-level operations. Without the continued, uninterrupted services of their Employees and Temporary Staff, the Debtors' reorganization efforts will be threatened.

**Employee Compensation and Benefits Programs**

8. The Debtors maintain the following compensation and benefits programs and pay various administrative fees and premiums in connection therewith (each as defined herein, and together, the "Employee Compensation and Benefits Programs"):

- Employee Compensation;
- Temporary Staff Compensation;
- Deductions and Payroll Taxes;
- Non-Insider Employee Incentive Programs;
- Health and Welfare Programs;
- Paid Leave and Unpaid Leave;
- Severance; and
- Non-Employee Director Compensation.

9. The vast majority of Employees rely exclusively on the Employee Compensation and Benefits Programs to pay their daily living expenses and support their families. Thus, Employees will face significant financial consequences if the Debtors are not permitted to continue the Employee Compensation and Benefits Programs in the ordinary course of business. The Debtors seek to minimize the personal hardship the Employees and Temporary Employees would suffer if employee obligations are not paid when due or as expected. Consequently, the relief requested is necessary and appropriate.

10. Subject to Court's approval, the Debtors intend to continue their Employee Compensation and Benefits in the ordinary course. The Debtors further request confirmation of their right to modify, change, and discontinue any of their Employee Compensation and Benefits and to implement new programs, policies, and benefits in the ordinary course of business during these chapter 11 cases in their discretion and without the need for further court approval, subject to other orders entered in these chapter 11 cases, any agreements executed in contemplation of these chapter 11 cases, and the requirements of the Bankruptcy Code.

11. Specifically, by this Motion, the Debtors seek authority to pay the following aggregate amounts on account of the prepetition Employee Compensation and Benefits:

| Employee-Related Obligations | Interim Amount | Final Amount |
|---|---|---|
| Employee Compensation | $7,330,000 | $7,330,000 |
| Temporary Staff Compensation | $2,820,000 | $6,080,000 |
| Payroll Processing Fees | $732,000 | $732,000 |
| Withholding Obligations | $18,220,000 | $24,600,000 |
| Reimbursable Expenses | $759,000 | $1,275,000 |
| Relocation Expenses | $150,000 | $300,000 |
| Non-Insider Incentive Plans | $ - | $145,000 |
| Health Insurance Programs | $4,333,000 | $8,665,000 |
| Life and AD&D Insurance, Disability Benefits | $221,000 | $239,000 |
| Workers' Compensation Programs | $3,610,000 | $27,380,000 |
| Employee Assistance Programs | $28,000 | $46,000 |

| Employee-Related Obligations | Interim Amount | Final Amount |
|---|---|---|
| Paid Time Off | $1,510,000 | $18,100,000 |
| Severance | $ - | $3,137,000 |
| **Total** | $39,713,000 | $98,029,000 |

12. The Debtors do not believe that amounts owed to any Employees on account of the Employee Compensation and Benefits Programs will exceed the statutory cap of $12,850 under sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code. For the avoidance of doubt, the Debtors do not seek authority to pay any amounts in excess of $12,850 per Employee pursuant to the Interim Order. The Debtors do, however, seek authority to pay amounts in excess of $12,850, solely pursuant to the Final Order, in the event that it is determined that payment of certain prepetition amounts owed on account of Employee Compensation and Benefits are in excess of $12,850. In addition, for the avoidance of doubt, the Debtors do not seek authority to pay any amounts on account of employee bonuses, severance, or director compensation on an interim basis. The Debtors do, however, seek to authority to pay amounts on account of the Non-Insider Employee Incentive Programs, the Non-Insider Severance Program, and Director Compensation (all as defined herein) pursuant to the Final Order.

## I. Compensation and Withholding Obligations.

### A. Unpaid Wages.

13. The Debtors pay Employees' wages, salaries, and other compensation (excluding reimbursable expenses and paid leave) on (a) a bi-weekly basis, for salaried Employees or (b) a weekly basis for hourly Employees (collectively, the "Employee Compensation"). Because hourly Employees are paid in arrears, certain Employees will be owed accrued but unpaid Employee Compensation as of the Petition Date. Employee Compensation may also be due and owing as of the Petition Date because of, among other things, potential

discrepancies between the amounts paid and the amounts that Employees believe they should have been paid, which, upon resolution, may reveal that additional amounts are owed to such Employees, or as a result of Employees holding uncashed paper paychecks as of the Petition Date. In the 12 months before the Petition Date, the Debtors spent an average of approximately $61.6 million per month on Employee Compensation.

14. As of the Petition Date, the Debtors estimate that the amount of accrued but unpaid obligations owed to Employees is approximately $7.3 million on account of Employee Compensation earned before the Petition Date, all of which will become due and owing within the first 21 days of these chapter 11 cases (the "Interim Period"). The Debtors do not believe that amounts owed to any Employees on account of Employee Compensation will exceed the statutory cap of $12,850 under sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code.

**B. Temporary Staff Compensation.**

15. The Debtors make payments to Temporary Staff, as well as Staffing Agencies on account of Temporary Staff (the "Temporary Staff Compensation") for the performance of certain services critical to the Debtors' operations, including, among other things, administrative functions, such as accounting support, information technology and maintenance services, and operational functions related to the Debtors' retail business and warehousing operations. The Debtors rely on Temporary Staff to complete discrete projects in furtherance of the Debtors' business and to fill short-term, sometimes seasonal, positions that are not economically feasible to employ on a full- or part-time basis. The Debtors believe the authority to continue paying Temporary Staff and the Staffing Agencies is critical to minimize disruption of the Debtors' continued business operations.

16. On an average annual basis, the Debtors spend approximately $48.7 million on Temporary Staff and the Staffing Agencies in the aggregate. As of the Petition Date, the Debtors

estimate that Temporary Staff and the Staffing Agencies are owed an aggregate of approximately $6.1 million on account of accrued services rendered prior to the Petition Date, approximately $2.8 million of which will come due and owing within the Interim Period. The Debtors do not believe they owe any Temporary Staff amounts in excess of $12,850.

**C. Payroll Processing.**

17. The Debtors utilize ADP, LLC ("ADP") and Workday, Inc. ("Workday") to administer payroll and several other employee related benefits programs. While ADP technically provides the payroll processing system, Workday feeds the Company's human resources information to ADP, providing the necessary information for ADP to, among other things, administer payroll processing, ensure proper tax withholding, and provide electronic timesheet management for hourly employees. On an average annual basis, the Debtors pay administration fees in the amount of approximately $2.6 million to ADP and in the amount of approximately $1.8 million to Workday.[4] As of the Petition Date, the Debtors estimate that the amount of accrued but unpaid obligations owed on account of administration fees is approximately $432,000 to ADP Processing and approximately $300,000 to Workday, all of which will come due and owing within the Interim Period.

**D. Withholding Obligations.**

18. During each applicable pay period, the Debtors routinely deduct certain amounts from Employees' paychecks, including, without limitation, garnishments, levies, child support and related fees, and pre-tax deductions payable pursuant to certain of the Health and Welfare Programs (as defined below) discussed herein, such as an Employee's share of healthcare benefits and insurance premiums, 401(k) contributions, legally ordered deductions, and

---

4 Payments to Workday are on account of all services provided by Workday related to the Debtors' overall human resources information system, not only payroll processing.

miscellaneous deductions, such as employee-elected charitable contributions, (collectively, the "Deductions"), and forward such amounts to various third-party recipients. In the 12 months before the Petition Date, average monthly Deductions were approximately $2.2 million. The Debtors estimate that as of the Petition Date, they hold approximately $3.3 million in such Deductions.

19. The Debtors also are required by law to withhold from the Employees' Compensation amounts related to, among other things, federal, state, and local income taxes, and Social Security and Medicare taxes (collectively, the "Employee Payroll Taxes") for remittance to the appropriate federal, state, and local taxing authorities. The Debtors must then match the Employee Payroll Taxes from their own funds and pay, based upon a percentage of gross payroll, additional amounts for state and federal unemployment insurance (the "Employer Payroll Taxes" and, together with the Employee Payroll Taxes, the "Payroll Taxes"). The majority of Payroll Taxes are generally processed and forwarded to the appropriate federal, state, or local taxing authority within a few days of when Employees' payroll checks are disbursed, or on a monthly or quarterly basis in accordance with applicable state and local taxing authority requirements. In the 12 months before the Petition Date, average monthly Payroll Taxes were approximately $20.0 million.

20. As of the Petition Date, the Debtors estimate that the aggregate amount of accrued but unpaid Deductions and Payroll Taxes (together, the "Withholding Obligations") is approximately $24.6 million, approximately $18.2 million of which will come due within the Interim Period. By this Motion, the Debtors seek authority, but not direction, to pay or deduct in a manner consistent with historical practice any unpaid Withholding Obligations and to continue

to honor the Withholding Obligations in the ordinary course of the Debtors' business on a postpetition basis.

**E. Reimbursable Expenses.**

21. The Debtors reimburse certain Employees and members of the board of directors for certain expenses incurred in the scope of their duties (the "Reimbursable Expenses"). Reimbursable Expenses are typically associated with travel, transportation, lodging, and meals incurred in connection with business travel, and certain other work-related expenses. As a result of shifting corporate policy, as of the Petition Date, the Debtors provide Employees with five different ways they may pay Reimbursable Expenses, three of which require reimbursement directly to Employees. By this Motion, the Debtors seek authority to continue and pay amounts relating to Reimbursable Expenses, including unpaid amounts owed to Employees and directors on account of Reimbursable Expenses incurred through their personal credit cards, administrative fees related to Reimbursable Expenses, the Corporate Credit Cards (as defined below), the Business Vehicle Reimbursement Plan (as defined below), and the Business Travel Account (as defined below).

**1. Personal Credit Cards.**

22. Employees and directors may elect to use their personal credit cards and seek reimbursement from the Debtors. Because these expenses are incurred through the use of personal funds, the Employee or director is personally liable for any unpaid obligations. The Debtors' inability to reimburse such expenses would impose hardship on such individuals where the obligations were incurred for the Debtors' benefit. In the 12 months before the Petition Date, the Debtors spent approximately $300,000 per month on account of Reimbursable Expenses incurred by Employees and directors through their personal credit cards. As of the Petition Date, the Debtors estimate that the aggregate amount of accrued but unpaid amounts

owed to Employees and directors on account of Reimbursable Expenses incurred through their personal credit cards is $532,000, approximately $271,000 of which will come due within the Interim Period.

23. In the ordinary course, Employees submit their Reimbursable Expenses on an online platform called Oracle, I-Expense, which is part of the Debtor's Oracle ERP system ("Oracle"). The Debtors then process reimbursement requests and pay the Employee for approved expenses. Oracle greatly reduces the administrative burden that would otherwise fall on the Debtors related to the prompt payment of Reimbursement Expenses.

**2. Corporate Credit Cards.**

24. The Debtors also provide certain Employees with corporate credit cards (the "Corporate Credit Cards"). Currently, approximately 230 Corporate Credit Cards are used by Employees. The Corporate Credit Cards are issued to Employees in each Employee's own name and monthly invoices are sent to the Employee's personal attention. Employees are personally liable on account of the Corporate Credit Card and must make payments in a timely manner.[5] The Employee can then submit the invoice through the Oracle system for reimbursement.

25. In the 12 months before the Petition Date, the average monthly amount paid on account of the Corporate Credit Cards was approximately $151,000. As of the Petition Date, the Debtors estimate that the aggregate amount of accrued but unpaid amounts owed on account of the Corporate Credit Cards is approximately $227,000, approximately $152,000 of which will come due within the Interim Period. Given the importance of Employees' ability to use the

[5] If certain Employees default on payment, the Company is responsible for the amount.

Corporate Credit Cards, the Debtors request authority to continue utilizing and making payments on account of the Corporate Credit Cards in the ordinary course of business.

**3. Business Vehicle Reimbursement Plan.**

26. The Debtors are piloting a business vehicle reimbursement plan administered by Runzheimer (the "Business Vehicle Reimbursement Plan"). As of the Petition Date, 17 Employees participate in the Business Vehicle Reimbursement Plan. An Employee is eligible for reimbursement under the Business Vehicle Reimbursement Plan if that Employee is required to provide a personal vehicle at work each day and if the Employee meets the minimum annual business mileage requirement. Under the Business Vehicle Reimbursement Plan, the Debtors reimburse eligible Employees for the business use of their personal vehicles through (i) a variable reimbursement based on a cents-per-mile rate multiplied by each business mile that the Employees drive and report and (ii) a fixed reimbursement to cover fixed costs such as insurance, license and registration fees, taxes, and other annual vehicle costs. The Debtors pay Runzheimer administrative fees in connection with the Business Vehicle Reimbursement Plan. The Debtors estimate that the average annual cost of the Business Vehicle Reimbursement Plan is approximately $133,000 in payments to Employees and approximately $8,000 in annual administrative fees. As of the Petition Date, the Debtors estimate that the aggregate amount of accrued but unpaid amounts owed on account of the Business Vehicle Reimbursement Plan is approximately $18,000, approximately $4,000 of which will come due within the Interim Period.

**4. Business Travel Account Billing.**

27. The Debtors also maintain a Business Travel Account and related central travel credit card (the "Business Travel Account"). Employees are able to utilize the Egencia website to book air, hotel, and rental cars that are part of the Egencia program. All expenses for travel booked through the Business Travel Account are billed to the central travel credit cards, which is

maintained in the Debtors' corporate offices, and is paid directly by the Debtors. No reimbursements are made to Employees on account of travel expenses billed through the Business Travel Account.

28. In the 12 months before the Petition Date, the average monthly amount paid on account of the Business Travel Account was approximately $285,000. As of the Petition Date, the Debtors estimate that the aggregate amount of accrued but unpaid amounts owed on account of the Business Travel Account is approximately $498,000, approximately $332,000 of which will come due within the Interim Period.

**F. Charitable Donation Programs**

29. In the ordinary course of business, the Debtors support and encourage their Employees to support their communities through various charitable donation programs (collectively, the "Charitable Donation Programs"). In particular, the Debtors allow Employees to elect to have certain charitable contributions withheld from their paychecks. The Debtors then remit such charitable withholdings to applicable third parties on behalf of Employees. Such amounts are included in the Debtors' Withholding Obligations described above. In addition, the Debtors maintain a program through which the Debtors match certain charitable contributions made by Employees (the "Matching Gifts Program"). On an average annual basis, the Debtors pay approximately $50,000 in matching contributions on account of the Matching Gifts Program. As of the Petition Date, the Debtors do not believe they owe any amounts on account of the Matching Gifts Program. By this Motion, the Debtors seek authority to continue the Charitable Donation Programs in the ordinary course of business.

**G. Relocation Expenses.**

30. In the ordinary course of business, the Debtors also pay certain expenses of Employees that are transferred in connection with their job (the "Relocation Expenses"). The

majority of Relocation Expenses are either reimbursed to the Employees or directly billed to the Debtors by the Debtors' relocation provider, Weichert Workforce Mobility ("Weichert"). The Relocation Expenses include, but are not limited to, costs associated with the transportation of household goods, lease cancellation expenses, eligible home sale and purchase closing cost expenses, temporary living accommodations, and other covered expenses.

31. On an average annual basis, the Debtors spend approximately $2.9 million on account of Relocation Expenses. As of the Petition Date, the Debtors estimate that the aggregate amount of accrued but unpaid Relocation Expenses is approximately $300,000, approximately $150,000 of which will come due within the Interim Period.

**II. Non-Insider Employee Incentive Programs.**

32. The Debtors maintain certain employee incentive programs to motivate, reward, and retain certain of their non-insider Employees (collectively, the "Non-Insider Employee Incentive Programs").[6] Certain non-Insider Employees are eligible to participate in various performance-based incentive programs, including the 2017 Team Achievement Dividend Plan (the "2017 TAD Plan"), the 2017 Team Achieved Gainsharing Plan (the "2017 TAG Plan"), and the 2017 Hybrid Incentive Plan (the "2017 Hybrid Plan") (collectively, the "Performance Incentive Programs"). Awards under the Performance Incentive Programs are distributed entirely at the discretion of the Company and are calculated and paid in cash, up to the maximum incentive payment for each Employee, based on the specific performance metrics and timeline as set forth in the applicable program, as further described below.

---

[6] The relief sought under this Motion with respect to the Non-Insider Employee Incentive Programs does not include the payment of any obligation to an "insider" (as that term is defined in section 101(31) of the Bankruptcy Code, the "Insiders"). The Debtors will seek separate authority with respect to such parties and reserve all rights with respect to the "insider" status of such parties.

33. The Debtors believe the Performance Incentive Programs are integral to the Debtors' business operations. In particular, the Performance Incentive Programs align Employees' interests with those of the Debtors generally by linking payments under the Performance Incentive Programs to performance and overall efficiency of the Debtors' operations. As of the Petition Date, the Debtors estimate that the aggregate amount of accrued but unpaid amounts owed on account of the Performance Incentive Plans is approximately $2.0 million.

34. By this Motion, the Debtors seek authority to pay the approximately $145,000 due but not yet paid on account of the Performance Incentive Programs (the "Performance Incentive Programs Obligations") pursuant to the Final Order and to continue, supplement, or modify the Programs Performance Incentive Programs in the ordinary course of business on a postpetition basis.

**A. 2017 TAD Plan.**

35. Certain of the Debtors' regular, non-insider[7] full-time and part-time Employees, including, but not limited to, Employees employed in the Debtors' stores and distribution centers around the globe are eligible to participate in the 2017 TAD Plan. Eligible Employees must be employed on the payout date to receive payment under the 2017 TAD Plan. Awards under the 2017 TAD Plan will be paid out in one lump sum cash payment to Employees in 2018 during the first quarter following the close of the Debtors' 2017 fiscal year.

36. Awards under the 2017 TAD Plan are based on achievement of applicable performance metrics, which vary based on an eligible Employee's business unit, and on a

[7] The 2017 TAD Plan includes certain members of the Leadership Team. To the extent any such individual is an "Insider," the Debtors do not seek authority to continue the 2017 TAD Plan as to such Employee by this Motion.

particular Employee's annual base salary if the Employee is salaried or total base wages over the annual period if the Employee is paid on an hourly basis (the "Incentive Earnings Base"). For example, for Employees in the Debtors' distribution centers in the U.S., awards under the 2017 TAD Plan will be paid if the Debtors achieve "total cost per carton" of over 96% and/or "regional EBITDA" of over $469.26 million in the U.S., with any awards under each applicable metric capped at a specified percentage of an Employee's Incentive Earnings Base (the "Percentage Payout Cap"). Individual awards will be paid out to Employees only if applicable performance metrics are achieved, with awards increasing based on performance above the achievement threshold for each applicable performance metric, subject to the Percentage Payout Cap for each applicable performance metric.

**B. 2017 TAG Plan.**

37. All full-time, part-time, and seasonal Employees that receive an hourly wage while working at one of the Debtors' distribution centers are eligible for the 2017 TAG Plan, which serves as a supplement to such Employee's monthly income based on contributions to the Debtors' desired performance goals. Awards under the 2017 TAG Plan are based on the metric "total cost per carton" and are added to eligible Employees' payroll checks on a monthly basis. As of the Petition Date, the Debtors estimate that the aggregate accrued but unpaid amounts owed on account of the 2017 TAG program is approximately $145,000. For the avoidance of doubt, the Debtors do not seek to pay these amounts on an interim basis.

**C. 2017 Hybrid Plan.**

38. All store managers and assistant store managers at 50 select store locations are eligible for the 2017 Hybrid Plan, which serves to incentivize store managers during the holiday season with a 2% incentive bonus based upon such Employee meeting specified plan criteria. The Debtors anticipate that any awards under the 2017 Hybrid Plan will be paid in early 2018.

As of the Petition Date, the Debtors do not have any amounts owing on account of the 2017 Hybrid Plan.

**III. Employee Benefit Programs.**

**A. Health and Welfare Programs.**

39. The Debtors offer several health and welfare benefits programs to eligible current and former Employees, including the Health Insurance Programs, the Life and AD&D Insurance, the Disability Benefits, the Workers' Compensation Program, the 401(k) Plan, and the Assistance Programs, and pay certain administrative fees to third-party providers associated with such programs (each as defined herein, and collectively, the "Health and Welfare Programs").

**1. Health Insurance Programs.**

40. Employees are offered the opportunity to participate in, or are otherwise provided, a number of health benefit plans, including the Medical Plans, the HSA, the FSA, the Vision Plans, the Dental Plans, the Supplemental Benefit Plans, and the Wellness Programs (each as defined herein, and collectively, the "Health Insurance Programs"). The Debtors also subsidize or continue to provide certain benefits to certain former Employees after their termination, retirement, or disability leave, including (without limitation) benefits provided under the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA").

41. The Debtors offer medical and prescription drug benefit programs (the "Medical Plans") to current and certain former Employees, which are administered to domestic Employees by Aetna, Kaiser Permanente, and Triple-S Salud (collectively, the "Medical Plan Administrators"). The coverage in the Medical Plans differs depending on the level of coverage Employees or former Employees elect to receive. Monthly health care premiums differ depending on the Medical Plan in which the Employee or former Employee is enrolled and whether the Employee or former Employee has dependents covered by the applicable plan. The

total cost of the Medical Plans is approximately $4.8 million per month, of which approximately $1.5 million is covered by premiums paid by Employees and approximately $3.3 million is paid by the Debtors. In addition, the Debtors pay administrative fees of approximately $230,000 per month to the Medical Plan Administrators.

42. The Debtors also spend approximately $3.8 million per month on average on medical claims asserted under the Medical Plans. The Medical Plan Administrators receive claims from Employees and make payments to health care providers on account of such claims. The Debtors make payments on account of medical claims asserted under the Medical Plans on either a daily or weekly basis depending on the particular program. On average, Employees submit claims approximately five weeks after incurring such expense, so the Debtors are unable to ascertain with certainty the prepetition amounts due and outstanding on account of the Medical Plan. Based on historical trends, the Debtors estimate that as of the Petition Date they owe approximately $7.6 million for unreimbursed prepetition medical claims, approximately $4.6 million of which will come due within the Interim Period, and approximately $1 million for premiums on account of the Medical Plan, approximately $600,000 of which will come due within the Interim Period. In addition, the Debtors estimate that as of the Petition Date they owe approximately $404,000 on account of administrative fees to the Medical Plan Administrators, approximately $230,000 of which will come due within the Interim Period.

43. Employees who participate in certain of the Medical Plans may contribute a portion of their compensation into a health savings account (the "<u>HSA</u>"), administered by PayFlex, which may be used for incidental medical expenses. Participating Employees can make before-tax contributions to the HSA through payroll deductions to cover reimbursements under the program up to the maximum amount permitted by the IRS. Additionally, the Debtors

provide a one-time contribution to each participating Employee's HSA in the amount of $100 or $600 per Employee for Employees enrolled in employee-only coverage based on the Employee's choice of medical plan or in the amount of $150 to $1,200 per Employee for Employees enrolled in employee-plus-one or family coverage based on the Employee's choice of medical plan. Additionally, Employees who participate in certain wellness programs, as discussed herein, are entitled to additional contribution to their HSA from the Debtors ranging from $50 to $100, up to a maximum additional contribution of $350 per Employee (or $700 with a spouse/partner) per year. Currently, approximately 2,800 Employees utilize the HSA. The Debtors pay a monthly administration fee of approximately $21,300 to PayFlex on account of the HSA. As of the Petition Date, the Debtors estimate that they owe approximately $120,300 in HSA administrative fees, approximately $70,000 of which will come due within the Interim Period. As of the Petition Date, the Debtors estimate that they are obligated to pay approximately $118,600 of Employee HSA withholdings and Debtor contributions, in the aggregate, to Employees on account of the HSA, approximately $10,000 of which will become due and owing in the Interim Period.

44. The Debtors also provide Employees who participate in certain of the Medical Plans with access to two limited purpose flexible spending accounts (the "FSA"), each administered by PayFlex. The Debtors offer an FSA which can be used to cover qualified dental and vision expenses and FSA that can be used to cover dependent child/elder care. Currently, approximately 230 Employees use the FSA for medical costs and 65 Employees use the FSA for dependent child/elder care. The Debtors do not make any contributions to any Employee's FSA. The Debtors pay a monthly administration fee of approximately $3,800 to PayFlex and on account of the FSAs. As of the Petition Date, the Debtors estimate that they owe approximately

$6,200 on account of administrative fees in connection with the FSA, all of which will come due within the Interim Period. As of the Petition Date, the Debtors estimate that they hold approximately $23,400 in accrued but unremitted Employee contributions on account of the FSA, all of which will become due and owing within the Interim Period.

45. The Debtors also offer their Employees the option of participating in vision insurance plans administered by Vision Service Plan (the "Vision Plans"). The total cost of the Vision Plans is approximately $61,500 per month, which is fully covered by premiums paid by Employees. As of the Petition Date, the Debtors estimate that they hold approximately $105,000 in accrued but unremitted Employee-contributed premiums on account of the Vision Plans, all of which will become due and owing within the Interim Period.

46. The Debtors also offer their Employees the option of participating in dental insurance plans administered by Aetna (the "Dental Plans"). The total cost of the Dental Plans is approximately $295,500 per month, of which approximately $144,600 is covered by premiums paid by Employees and approximately $150,900 is paid by the Debtors. The Debtors also spend approximately $259,000 per month on average on claims asserted under the Dental Plans. The Debtors pay a monthly administration fee of approximately $16,800 to Aetna on account of the Dental Plans. As of the Petition Date, the Debtors estimate that they owe Aetna approximately $27,200 on account of the administration fees in connection with the Dental Plans, approximately $20,000 of which will come due within the Interim Period. As the Petition Date, the Debtors estimate that they owe $40,000 on account of accrued by unpaid premiums in connection with the Dental Plans, approximately $24,000 of which will become due within the Interim Period. As of the Petition Date, the Debtors estimate that they have $517,700 of claims asserted under the Dental Plans.

47. The Debtors also offer their Employees three supplemental benefit programs administered by Aetna (collectively, the "Supplemental Benefit Plans"). Specifically, eligible Employees may enroll in an accident plan, a critical illness plan, and/or an in-patient hospital plan. Enrollment in a Medical Plan is not required for an otherwise eligible Employee to elect these Supplemental Benefit Plans. The Debtors are not obligated to make any payments with respect to the Supplemental Benefit Plans, as all costs are covered by premiums paid by Employees. As of the Petition Date, the Debtors estimate that they hold approximately $30,000 in accrued but unremitted Employee-contributed premiums on account of the Supplemental Benefit Plans, all of which will become due and owing within the Interim Period.

48. The Debtors also offer their eligible Employees the option to participate in various miscellaneous wellness programs (collectively, the "Wellness Programs"), administered through ComPsych Corporation ("ComPsych"). ComPsych administers an array of Wellness Programs, such as a tobacco cessation program, access to a mobile nutrition platform, and Weight Watchers at Work. The total cost of the Wellness Programs to the Debtors is approximately $1.0 million per year. As of the Petition Date, the Debtors estimate that they owe approximately $470,000 on account of the Wellness Programs, approximately $250,000 of which will come due within the Interim Period.

49. In sum, the Debtors spend approximately $5.8 million per month on average on the Health Insurance Programs. Of this amount, certain vendors under the Health Insurance Programs are paid in arrears, and certain are paid in advance on a daily, monthly, quarterly, or annual basis. As of the Petition Date, the Debtors estimate that the amount of accrued but unpaid obligations under the Health Insurance Programs and administration fees thereto is

approximately $8.7 million, approximately $4.3 million of which will come due within the Interim Period.

**2. Insurance, Disability, and Workers' Compensation Programs.**

**a. Life and AD&D Insurance Programs.**

50. The Debtors provide life and accidental death and dismemberment insurance coverage (the "Basic Life and AD&D Insurance") to current Employees through Aetna, which each provide maximum coverage of $1,000,000 in the event of an Employee's death or dismemberment. Current Employees may also purchase supplemental life insurance and accidental death and dismemberment insurance (the "Supplemental Life and AD&D Insurance" and, together with the Basic Life and AD&D Insurance, the "Life and AD&D Insurance") covering themselves and their spouses and children, through Aetna. The total cost of the Life and AD&D Insurance is approximately $121,400 each month, of which approximately $93,000 is paid by Employees and $28,400 is paid by the Debtors. As of the Petition Date, the Debtors estimate that the amount of accrued but unpaid obligations on account of the Life and AD&D Insurance is approximately $122,000, all of which will come due within the Interim Period.

51. In addition, the Debtors also provide business travel accident insurance (the "BTA Insurance") to certain of their Employees through Federal Insurance Company (Chubb). The total cost of the BTA Insurance to the Debtors is approximately $53,300 each month. As of the Petition Date, the Debtors estimate that they do not owe any amounts on account of the BTA Insurance.

**b. Disability Benefits.**

52. The Debtors provide Employees with short- and long-term disability benefits (the "Disability Benefits"). Employees are eligible for Disability Benefits upon completion of a benefit eligibility waiting period. Under the short-term disability benefits program, Employees

are entitled to, among other things, salary continuation of up to 60 percent of their base wages in the event of a short-term medical disability due to an illness, injury, or pregnancy related condition (the "Short-Term Disability Benefits"). Such payments are made out of the Debtors' ordinary payroll processing.

53. Under the long-term disability benefits program, Employees are entitled to, among other things, continuation of up to 60 percent of their wages, up to a maximum monthly benefit of $10,000 in the event of a long-term medical disability due to illness or injury (the "Long-Term Disability Benefits" and, together with the Short-Term Disability Benefits, the "Disability Benefits"). The maximum duration of such Long-Term Disability Benefits is determined based on the individual's age at the time such Long-Term Disability Benefits begins. The Debtors also offer certain eligible Employees the option to purchase supplemental long-term disability for an additional monthly cost, under which the continuation of 60 percent of their wages is subject to an increased aggregate maximum monthly limit of $20,000. The Long-Term Disability Benefits are administered by Aetna.

54. Currently, 290 Employees receive Short-Term Disability Benefits and 20 Employees receive Long-Term Disability Benefits. In the 12 months before the Petition Date, the Debtors paid an average of approximately $67,400 per month in administrative fees and premiums with respect to the Disability Benefits. As of the Petition Date, the Debtors estimate that the amount of accrued but unpaid obligations on account of the Disability Benefits is approximately $71,000, all of which will come due within the Interim Period. The Debtors seek authority to pay all prepetition amounts due under the Disability Benefits and to continue the Disability Benefits on a postpetition basis in the ordinary course of business.

**c. Workers' Compensation Program.**

55. The Debtors maintain workers' compensation insurance for their Employees (or are otherwise self-insured) at the statutorily required level for each state in which the Debtors have Employees (collectively, the "Workers' Compensation Program"). The Debtors maintain coverage for the Workers' Compensation Program through Zurich. The Debtors also continue to process claims under a legacy policy through Travelers. The Debtors pay approximately $2.2 million in premiums and fees annually to maintain the Workers' Compensation Program. By this Motion, the Debtors seek authority to pay accrued but unpaid prepetition amounts related to the Workers' Compensation Program, continue and maintain the Workers' Compensation Program in the ordinary course of business, and modify the automatic stay to allow Employees to assert claims under the Workers' Compensation Program to the extent applicable. As of the Petition Date, the Debtors estimate that the amount of accrued and unpaid premiums and fees on account of the Workers' Compensation Program is approximately $570,000, approximately $110,000 million of which will come due within the Interim Period.

56. In certain states, including North Dakota and Washington, and territories, including Puerto Rico (collectively, the "Governmental Jurisdictions"), the Debtors are required to make payments into workers' compensation replenishment funds (the "Workers' Compensation Funds") to pay workers' compensation claims as they are adjudicated. The Debtors have historically contributed to the Workers' Compensation Funds on a quarterly, bi-monthly, or annual basis depending on the Governmental Jurisdiction. The Debtors estimate that, as of the Petition Date, $320,000 in accrued but unpaid obligations are owed to the Governmental Jurisdictions on account of the Workers' Compensation Program, $110,000 of which will become due within the Interim Period.

57. The Debtors must continue the claim assessment, determination, adjudication, and payment process pursuant to the Workers' Compensation Program without regard to whether such liabilities are outstanding before the Petition Date to ensure that the Debtors comply with applicable workers' compensation laws and requirements.[8] There are currently 580 open claims under the Workers' Compensation Program. As of the Petition Date, the Debtors estimate that the amount of accrued and unpaid claims on account of the Workers' Compensation Program is approximately $26.8 million, approximately $3.5 million of which will come due within the Interim Period.

58. The Workers' Compensation Program is subject to regular audits (the "Workers' Compensation Audits"), which may result in an adjustment of the premiums owed on account thereof. Workers' Compensation Audits for prepetition premium payments will not conclude until after the Petition Date. As a result, the aggregate amount of the Debtors' obligations arising from the Workers' Compensation Audits is not known at this time. Accordingly, the Debtors seek authority to honor any amounts owed on account of any Workers' Compensation Audits in the ordinary course of business.

**3. Retirement Plans.**

59. The Debtors offer eligible Employees the opportunity to participate in a 401(k) plan (the "401(k) Plan"). The 401(k) Plan generally provides for pre-tax salary deductions of compensation up to limits set by the Internal Revenue Code. Each Employee's 401(k) contributions are deducted automatically from each paycheck. The Debtors match an Employee's 401(k) Plan contributions dollar-for-dollar up to an amount equal to an Employee's first four percent of eligible compensation (the "401(k) Contributions"). Generally, the

[8] The Debtors' Workers' Compensation Program may change postpetition in the ordinary course of business due to changes in applicable laws and regulations and the Debtors' ability to meet requirements thereunder.

401(k) Contributions are made by the Debtors on or just following each pay date. The Debtors do not believe that they owe any 401(k) Contributions as of the Petition Date but, out of an abundance of caution, seek authority to honor their commitment to 401(k) Contributions (whether due prepetition or arising postposition) in the ordinary course on a postpetition basis.

60. The 401(k) Plan is administered by Fidelity Investments and allows for automatic pre-tax wage deductions of eligible compensation up to the limits set forth by the Internal Revenue Code. The Debtors pay administrative fees of $44 per participant in the 401(k) Plan, per year. In the 12 months before the Petition Date, the Debtors' monthly payments and disbursements on account of 401(k) Contributions averaged approximately $900,000 and the Employee contributions averaged approximately $1.5 million. As of the Petition Date, the Debtors estimate that they do not owe any amounts on account of the 401(k) Plan.

**4. Assistance Programs.**

61. The Debtors provide the Employees with a confidential counseling and referral service (the "Employee Assistance Program"). The Employee Assistance Program pairs Employees with clinicians, financial professionals, and attorneys. The Employee Assistance Program is administered by ComPsych. On an average annual basis, the Debtors pay $340,000 on account of the Employee Assistance Program. As of the Petition Date, the Debtors estimate that they owe approximately $46,000 on account of the Employee Assistance Program, approximately $28,000 of which will come due within the Interim Period.

62. In the ordinary course of business, the Debtors also offer eligible Employees the opportunity to participate in a variety of miscellaneous assistance programs and partnerships (collectively, the "Additional Assistance Programs"), such as a travel emergency assistance program, a legal assistance program, emergency backup childcare and eldercare partnerships, and an adoption assistance program. In the 12 months before the Petition Date, the Debtors paid

on average, approximately $80,000 per month on account of the Additional Assistance Programs. As of the Petition Date, the Debtors estimate that they owe approximately $12,000 on account of the Additional Assistance Programs, approximately $6,000 of which will come due within the Interim Period.

**B. Paid and Unpaid Leave.**

63. The Debtors provide paid to Employees leave in the form of Paid Time Off (as defined below), and certain other paid leave (together, the "Paid Leave"); the Debtors also provide Unpaid Leave in certain situations (as defined below).

64. In the ordinary course of business, the Debtors provide paid time off and non-statutory sick pay ("Paid Time Off") to the Employees as a Paid Leave benefit that may be used for any reason. Paid Time Off generally accrues at specified rates up to a maximum amount based on the Employee's level, area of employment, and years of service. As of the Petition Date, the Debtors estimate that approximately $18.1 million in Paid Time Off has accrued but has not been used by Employees. This amount, however, is not a current cash payment obligation. By this Motion, the Debtors seek authority, but not direction, to pay any "cash out" amounts due with respect to earned but unused Paid Time Off and to continue the Paid Time Off policies in the ordinary course. For the avoidance of doubt, the Debtors seek to pay Paid Time Off to any Employee in excess of the $12,850 priority cap imposed by section 507(a)(4) of the Bankruptcy Code solely pursuant to the Final Order, and not pursuant to the Interim Order.

65. In addition, the Debtors provide certain other forms of Paid Leave and Unpaid Leave, including:

- paid holidays throughout the year for employees who work in the Global Resource Center (the "Holidays");

- leave under the Family and Medical Leave Act (the "FMLA") for: (a) birth, adoption, or foster care, (b) family care, (c) medical emergencies, (d) military exigencies, and (e) military caregiving needs;

- two weeks of paid parental leave for all Employees for the birth or adoption of each child; and

- other paid and unpaid leaves of absence for personal reasons, many of which are required by law, including statutory sick leave, workers' compensation leave, missed work time in the ordinary course of business for bereavement leave, jury or court attendance, or time spent voting (the "Other Paid Leave") and unpaid leaves of absence for family medical leaves, educational leaves, and military leaves (the "Unpaid Leave").

These other forms of Paid Leave and Unpaid Leave do not involve incremental cash outlays beyond standard payroll obligations.

66. The Debtors believe that the continuation of the Paid Leave and Unpaid Leave policies in accordance with prior practice is essential to maintaining Employee morale during these chapter 11 cases. Further, the policies are broad-based programs upon which all Employees have come to depend. The Debtors anticipate that their Employees will utilize any accrued Paid Leave in the ordinary course of business, which will not create any material cash flow requirements beyond the Debtors' regular payroll obligations.

**C. Severance.**

67. In the ordinary course of business, the Debtors maintain a severance program for the benefit of certain non-executive, non-Insider Employees (the "Non-Insider Severance Program"). Certain Employees are eligible, on a discretionary basis, for severance benefits if such non-executive, non-Insider Employees are terminated due to a work-force adjustment or any not-for-cause employer-initiated termination. Pursuant to the Non-Insider Severance Program, eligible Employees, upon termination and on a discretionary basis, are entitled to

receive payments at base compensation levels (based on their job position) in accordance with standard company guidelines (the "Non-Insider Severance Benefits"). These guidelines provide that non-insider Employees accrue Non-Insider Severance Benefits at various rates based on length of service and level of employment. Non-Insider Severance Benefits for eligible hourly Employees, including, but not limited to, Employees working at the Debtors' stores and distribution centers consist of two weeks of pay for any Employee who has four or fewer years of service, increasing by half a week of pay for each additional year of service up to 26 years.

68. The Debtors' ability to pay and provide discretionary severance amounts and other benefits has been critical to maintaining Employee morale and loyalty. Increased instability in the Debtors' workforce will only undermine the Debtors' ability to strengthen their financial and operational foundation, to generate growth, and to be positioned for long-term success. As a condition to receiving Non-Insider Severance Benefits as part of the Non-Insider Severance Program, the Debtors typically require that each Employee execute a release agreement, whereby the Employee releases any claims held against the Debtors. The Debtors believe that the Non-Insider Severance Program and the Non-Insider Severance Benefits reduce the time and expense that would be spent defending against the assertion of claims by any severed Employees.

69. In the last 12 months, the Debtors have paid approximately $8.1 million to former Employees on account of Non-Insider Severance Benefits. As of the Petition Date, the Debtors believe that 43 former Employees are entitled to Non-Insider Severance Benefits. The Debtors estimate that, as of the Petition Date, the aggregate amount of accrued but unpaid obligations under the Non-Insider Severance Program is approximately $3.1 million. By this Motion, the Debtors seek authority to continue the Non-Insider Severance Program and pay obligations

thereunder on a final basis. For the avoidance of doubt, the Debtors do not seek authority to pay obligations on account of the Non-Insider Severance Program on an interim basis.

**D. Postpetition Non-Employee Director Compensation.**

70. Certain of the Debtors maintain boards of directors (or boards of managers, as applicable) that include non-Employee directors (or managers, as applicable) (each, a "Director"). As of the Petition Date, the Debtors' boards of directors included 11 non-Employee Directors on an aggregate basis.[9] The non-Employee Directors currently receive a $200,000 annual retainer, which is paid in advance on a quarterly basis in cash (the "Annual Retainer"). The non-Employee Directors are also entitled to expense reimbursement for out-of-pocket expenses and "per diem" compensation at a rate of $5,000 in cash for each day on which a non-Employee Director devotes more than four hours of time (outside of Board meetings) for meetings or activities outside the scope of regular board duties (together with the Annual Retainer, the "Director Compensation"). As of the Petition Date, the Debtors do not believe they owe any amounts on account of Director Compensation and believe that they are authorized to pay any postpetition Director Compensation in the ordinary course. However, out of an abundance of caution, by this Motion, the Debtors seek authority to continue to pay the Director Compensation on a postpetition basis in the ordinary course of business and consistent with their prepetition practices on a final basis. For the avoidance of doubt, the Debtors do not seek authority to pay any amounts on account of Director Compensation on an interim basis.

[9] These non-Employee Directors sit on the boards of directors of the following Debtor entities: Giraffe Holdings, LLC; Toys "R" Us, Inc.; Toys "R" Us-Delaware, Inc.; TRU Taj LLC; TRU Taj Finance, Inc; and Wayne Real Estate Parent Company, LLC.

## Basis for Relief

### I. Sufficient Cause Exists to Authorize the Debtors to Honor the Employee Compensation and Benefits Programs.

#### A. Certain Employee Compensation and Benefits Programs Are Entitled to Priority Treatment.

71. Sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code entitle certain of the Employee Compensation and Benefits Programs owed to the Employees to priority treatment, to the extent such payments do not exceed $12,850 for each individual as provided for under sections 507(a)(4) and (5) of the Bankruptcy Code. As priority claims, the Debtors are required to pay these claims in full to confirm a chapter 11 plan. *See* 11 U.S.C. § 1129(a)(9)(B) (requiring payment in full of certain allowed unsecured claims for (a) wages, salaries, or commissions, including severance, and sick leave pay earned by an individual, and (b) contributions to an employee benefit plan). Thus, granting the relief requested herein should only affect the timing of certain payments to the Employees, and should not negatively affect recoveries for general unsecured creditors. Indeed, the Debtors submit that payment of the Employee Compensation and Benefits Programs at this time enhances value for the benefit of all interested parties.

#### B. Payment of Certain Employee Compensation and Benefits Programs Is Required by Law.

72. The Debtors seek authority to pay the Withholding Obligations to the appropriate third-party entities. These amounts principally represent Employee earnings that governments, Employees, and judicial authorities have designated for deduction from the Employees' paychecks. Indeed, certain Withholding Obligations are not property of the Debtors' estates because the Debtors have withheld such amounts from the Employees' paychecks on another party's behalf. *See* 11 U.S.C. §§ 541(b)(1), (d). Furthermore, federal and state laws require the

Debtors to withhold certain tax payments from the Employees' paychecks and to pay such amounts to the appropriate taxing authority. 26 U.S.C. §§ 6672, 7501(a); *see also City of Farrell v. Sharon Steel Corp.*, 41 F.3d 92, 95–97 (3d Cir. 1994) (finding that state law requiring a corporate debtor to withhold city income tax from its employees' wages created a trust relationship between debtor and the city for payment of withheld income taxes); *In re DuCharmes & Co.*, 852 F.2d 194, 196 (6th Cir. 1988) (noting that individual officers of a company may be held personally liable for failure to pay trust fund taxes). Because the Withholding Obligations may not be property of the Debtors' estates, the Debtors request that the Court authorize them to transmit the Withholding Obligations on account of the Employees to the proper parties in the ordinary course of business. *See In re Dameron*, 155 F.3d 718, 721 (4th Cir. 1998). The Debtors therefore request that the Court recognize that the Withholding Obligations are not property of the Debtors' estates and, regardless of whether the Debtors collected the amounts prior to the Petition Date, authorize the Debtors to transmit such monies to the proper parties in the ordinary course of business.

73. Similarly, state laws require the Debtors to maintain the Workers' Compensation Program. If the Debtors fail to maintain the Workers' Compensation Program, state laws may prohibit the Debtors from operating in those states. Payment of all Workers' Compensation Program amounts is therefore crucial to the Debtors' continued operations and the success of the Debtors' restructuring. The Debtors therefore request that the Court authorize the Debtors to maintain the Workers' Compensation Program.

## II. Payment of the Employee Compensation and Benefits Programs Is Proper Pursuant to Section 363(b) of the Bankruptcy Code and the Doctrine of Necessity.

74. Section 363 of the Bankruptcy Code provides, in relevant part, that "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of

business, property of the estate." 11 U.S.C. § 363(b)(1). Under section 363(b) of the Bankruptcy Code, courts require only that the debtor "show that a sound business purpose" justifies the proposed use of property. *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999); *see also Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070–71 (2d Cir. 1983) (requiring a "good business reason" to approve a sale pursuant to section 363(b)); *In re W.A. Mallory Co.*, 214 B.R. 834, 836 (Bankr. E.D. Va. 1997) ("This Court follows the 'sound business purpose' test when examining § 363(b) sales.") (citing *In re WBQ P'ship*, 189 B.R. 97, 102 (Bankr. E.D. Va. 1995)). Moreover, "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *In re Johns-Manville Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986); *see also In re Tower Air, Inc.*, 416 F.3d 229, 238 (3d Cir. 2005) ("Overcoming the presumptions of the business judgment rule on the merits is a near-Herculean task."). Thus, if a transaction satisfies the business judgment rule, it should be approved under section 363(b) of the Bankruptcy Code.

75. Furthermore, section 105(a) of the Bankruptcy Code further provides that a court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of" the Bankruptcy Code, pursuant to the "doctrine of necessity." 11 U.S.C. § 105(a). The "doctrine of necessity" functions in a chapter 11 case as a mechanism by which the bankruptcy court can exercise its equitable power to allow payment of critical prepetition claims not explicitly authorized by the Bankruptcy Code and further supports the relief requested herein. *See In re United Am., Inc.*, 327 B.R. 776, 781 (Bankr. E.D. Va. 2005) (acknowledging the doctrine of necessity "is a necessary deviation because otherwise there will be no reorganization and no creditor will have an opportunity to recoup any part of its pre-petition claim"); *In re NVR*

*L.P.*, 147 B.R. 126, 127 (Bankr. E.D. Va. 1992) ("Under [section 105(a)] the court can permit pre-plan payment of a pre-petition obligation when essential to the continued operation of the debtor."); *see also In re Lehigh & New Eng. Ry.*, 657 F.2d 570, 581 (3d Cir. 1981) (holding that a court may authorize payment of prepetition claims if such payment is essential to debtor's continued operation); *see also In re Just for Feet, Inc.*, 242 B.R. 821, 824–25 (D. Del. 1999) (holding that section 105(a) of the Bankruptcy Code "provides a statutory basis for payment of pre-petition claims" under the doctrine of necessity); *In re Columbia Gas Sys., Inc.*, 171 B.R. 189, 191–92 (Bankr. D. Del. 1994) (explaining that the doctrine of necessity is the standard in the Third Circuit for enabling a court to authorize the payment of prepetition claims prior to confirmation of a reorganization plan).

76. Moreover, the doctrine of necessity is designed to foster a debtor's rehabilitation, which courts have recognized is "the paramount policy and goal of Chapter 11." *Ionosphere Clubs*, 98 B.R. at 176; *see also In re Quality Interiors, Inc.*, 127 B.R. 391, 396 (Bankr. N.D. Ohio 1991) ("[P]ayment by a debtor-in-possession of pre-petition claims outside of a confirmed plan of reorganization is generally prohibited by the Bankruptcy Code," but "[a] general practice has developed . . . where bankruptcy courts permit the payment of certain pre-petition claims, pursuant to 11 U.S.C. § 105, where the debtor will be unable to reorganize without such payment."); *In re Eagle-Picher Indus., Inc.*, 124 B.R. 1021, 1023 (Bankr. S.D. Ohio 1991) (approving payment of prepetition unsecured claims of toolmakers as "necessary to avert a serious threat to the Chapter 11 process"); *Mich. Bureau of Workers' Disability Comp. v. Chateaugay Corp. (In re Chateaugay Corp.)*, 80 B.R. 279, 285–86 (S.D.N.Y. 1987) (approving lower court order authorizing payment of prepetition wages, salaries, expenses, and benefits).

77. Payment of the Employee Compensation and Benefits Programs is warranted under this authority and the facts of these chapter 11 cases. Employees will be exposed to significant financial difficulties if the Debtors are not permitted to honor obligations for unpaid Employee Compensation and Benefits Programs. Additionally, continuing ordinary course benefits will help maintain Employee morale and minimize the adverse effect of the commencement of these chapter 11 cases on the Debtors' ongoing business operations.

78. Moreover, Employees provide the Debtors with services necessary to conduct the Debtors' business, and the Debtors believe that absent the payment of the Employee Compensation and Benefits Programs owed to the Employees, the Debtors may experience Employee turnover and instability at this critical time in these chapter 11 cases. The Debtors believe that without these payments, the Employees may become demoralized and unproductive because of the potential significant financial strain and other hardships the Employees may face. Such Employees may then elect to seek alternative employment opportunities. Additionally, a significant portion of the value of the Debtors' business is tied to their workforce, which cannot be replaced without significant efforts—which efforts may not be successful given the overhang of these chapter 11 cases. Enterprise value may be materially impaired to the detriment of all stakeholders in such a scenario. The Debtors therefore believe that payment of the prepetition obligations with respect to the Employee Compensation and Benefits Programs is a necessary and critical element of the Debtors' efforts to preserve value and will give the Debtors the greatest likelihood of retention of their Employees as the Debtors seek to operate their business in these chapter 11 cases.

79. Courts in this and other districts have granted similar relief to that requested in this Motion in previous chapter 11 cases. *See, e.g.*, *In re Gymboree Corporation*, No. 17-32986

(KLP) (Bankr. E.D. Va. July 11, 2017); *In re Penn Virginia Corporation,* No. 16-32395 (KLP) (Bankr. E.D. Va. June 9, 2016); *In re Alpha Natural Res., Inc.*, No. 15-33896 (KRH) (Bankr. E.D. Va. Aug. 5, 2015); *In re Patriot Coal Corp.*, No. 15-32450 (KLP) (Bankr. E.D. Va. June 4, 2015); *In re James River Coal Co.*, No. 14-31848 (KRH) (Bankr. E.D. Va. May 8, 2014); *In re AMF Bowling Worldwide, Inc.*, No. 12-36495 (KRH) (Bankr. E.D. Va. Dec. 17, 2012); *In re Bear Island Paper Co., L.L.C.*, No. 10-31202 (DOT) (Bankr. E.D. Va. Mar. 25, 2010); *In re Movie Gallery, Inc.*, No. 10-30696 (DOT) (Bankr. E.D. Va. Feb. 3, 2010).[10] Accordingly, the Debtors respectfully request that the Court authorize the Debtors to pay and continue the Employee Compensation and Benefits Programs in the ordinary course of business and consistent with past practice.

## III. A Limited Waiver of the Automatic Stay for Workers' Compensation Claims Is Appropriate Here.

80. Section 362(a) of the Bankruptcy Code operates to stay "the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title . . . ." 11 U.S.C. § 362(a)(1).

81. Section 362 of the Bankruptcy Code, however, permits a debtor or other parties in interest to request a modification or termination of the automatic stay for "cause." *Id.* at § 362(d)(1). Cause exists here to modify the automatic stay to permit the Employees to proceed with workers' compensation claims in the appropriate judicial or administrative forum.

---

[10] Because of the voluminous nature of the orders cited herein, such orders have not been attached to this Motion. Copies of these orders are available upon request to the Debtors' proposed counsel.

Staying the workers' compensation claims could have a detrimental effect on the financial well-being and morale of the Employees.

**IV. Cause Exists to Authorize the Debtors' Financial Institutions to Honor Checks and Electronic Fund Transfers.**

82. The Debtors have sufficient funds to pay the amounts described in this Motion in the ordinary course of business by virtue of expected cash flows from ongoing business operations, anticipated debtor-in-possession financing, and access to cash collateral. In addition, under the Debtors' existing cash management system, the Debtors can readily identify checks or wire transfer requests as relating to an authorized payment in respect of the Employee Compensation and Benefits Programs, as applicable. Accordingly, the Debtors believe that checks or wire transfer requests, other than those relating to authorized payments, will not be honored inadvertently. Therefore, the Debtors respectfully request that the Court authorize all applicable financial institutions, when requested by the Debtors, to receive, process, honor, and pay any and all checks or wire transfer requests in respect of the relief requested in this Motion.

**<u>The Requirements of Bankruptcy Rule 6003 Are Satisfied</u>**

83. Bankruptcy Rule 6003 empowers a court to grant relief within the first 21 days after the Petition Date "to the extent that relief is necessary to avoid immediate and irreparable harm." For the reasons discussed above, authorizing the Debtors to (a) pay all prepetition and postpetition obligations on account of the Employee Compensation and Benefits Programs (as defined below) in the ordinary course of business, (b) continue to administer the Employee Compensation and Benefits Programs, including payment of prepetition obligations related thereto, as well as granting the other relief requested herein is integral to the Debtors' ability to transition their operations into these chapter 11 cases. Failure to receive such authorization and other relief during the first 21 days of these chapter 11 cases would severely disrupt the Debtors'

operations at this critical juncture. For the reasons discussed herein, the relief requested is necessary in order for the Debtors to operate their business in the ordinary course and preserve the ongoing value of the Debtors' operations and maximize the value of their estates for the benefit of all stakeholders. Accordingly, the Debtors submit that they have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 to support granting the relief requested herein.

**Waiver of Bankruptcy Rule 6004(a) and 6004(h)**

84. To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

**Waiver of Memorandum of Points and Authorities**

85. The Debtors respectfully request that this Court treat this Motion as a written memorandum of points and authorities or waive any requirement that this Motion be accompanied by a written memorandum of points and authorities as described in Local Bankruptcy Rule 9013-1(G).

**Reservation of Rights**

86. Nothing contained herein is intended or shall be construed as: (a) an admission as to the amount of, basis for, or validity of any claim against the Debtors under the Bankruptcy Code, any foreign bankruptcy or insolvency law, including the CCAA, or other applicable nonbankruptcy law; (b) a waiver of the Debtors' or any other party in interest's right to dispute any claim; (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined in this motion; (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code or pursuant to the CCAA; (f) an admission as to the validity,

priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; or (g) a waiver of any claims or causes of action which may exist against any entity under the Bankruptcy Code, the CCAA, or any other applicable law. If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity of any particular claim or a waiver of the Debtors' rights to subsequently dispute such claim.

**Notice**

87. The Debtors will provide notice of this Motion via first class mail and email (where available) to: (a) the Office of the United States Trustee for the Eastern District of Virginia, Attn: Robert B. Van Arsdale and Lynn A. Kohen; (b) the holders of the 50 largest unsecured claims against the Debtors (on a consolidated basis); (c) DIP ABL Agent and the advisors and counsel thereto; (d) DIP Taj Term Loan Agent and the advisors and counsel thereto; (e) DIP Delaware Term Loan Agent and the advisors and counsel thereto; (f) the indenture trustee for the TRU Taj 12.00% Senior Notes and the advisors and counsel thereto; (g) the administrative agent for the prepetition Secured Revolving Credit Facility and the advisors and counsel thereto; (h) the administrative agent for the prepetition Secured Term Loan B Facility and the advisors and counsel thereto; (i) the prepetition administrative agent for the Propco I Unsecured Term Loan Facility and the advisors and counsel thereto; (j) the agent for the Propco II Mortgage Loan and the advisors and counsel thereto; (k) the agent for the Giraffe Junior Mezzanine Loan and the advisors and counsel thereto; (l) the administrative agent for the prepetition European and Australian Asset-Based Revolving Credit Facility ("Euro ABL") and the advisors and counsel thereto; (m) the administrative agent for the Senior Unsecured Term Loan Facility and the advisors and counsel thereto; (n) the indenture trustee for the Debtors' 7.375% Senior Notes and the advisors and counsel thereto; (o) the indenture trustee for the

Debtors' 8.75% Unsecured Notes and the advisors and counsel thereto; (p) counsel to the ad hoc group of the Term B-4 Holders; (q) counsel to the Ad Hoc Committee of Taj Noteholders; (r) the monitor in the CCAA proceeding and counsel thereto; (s) the Debtors' Canadian Counsel, (t) the Internal Revenue Service; (u) the office of the attorneys general for the states in which the Debtors operate; (v) the Securities and Exchange Commission; and (w) any party that has requested notice pursuant to Bankruptcy Rule 2002 (collectively, the "Notice Parties"). The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

**No Prior Request**

88. No prior request for the relief sought in this Motion has been made to this or any other court.

[*Remainder of page intentionally left blank*]

WHEREFORE, the Debtors respectfully request that the Court enter the Interim Order and the Final Order granting the relief requested herein and such other relief as the Court deems appropriate under the circumstances.

Richmond, Virginia
Dated: September 19, 2017

/s/ *Michael A. Condyles*

**KUTAK ROCK LLP**
Michael A. Condyles (VA 27807)
Peter J. Barrett (VA 46179)
Jeremy S. Williams (VA 77469)
901 East Byrd Street, Suite 1000
Richmond, Virginia 23219-4071
Telephone: (804) 644-1700
Facsimile: (804) 783-6192
Email: Michael.Condyles@KutakRock.com
Peter.Barrett@KutakRock.com
Jeremy.Williams@KutakRock.com

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C.
Joshua A. Sussberg, P.C.
(*pro hac vice* admission pending)
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
Email: edward.sassower@kirkland.com
joshua.sussberg@kirkland.com

-and-

James H.M. Sprayregen, P.C.
Anup Sathy, P.C.
Chad J. Husnick, P.C.
(*pro hac vice* admission pending)
Robert A. Britton (*pro hac vice* admission pending)
Emily E. Geier (*pro hac vice* admission pending)
300 North LaSalle
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
Email: james.sprayregen@kirkland.com
anup.sathy@kirkland.com
chad.husnick@kirkland.com
robert.britton@kirkland.com
emily.geier@kirkland.com

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

# **Exhibit A**

**Proposed Interim Order**

Edward O. Sassower, P.C.
Joshua A. Sussberg, P.C. (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

-and-

James H.M. Sprayregen, P.C.
Anup Sathy, P.C.
Chad J. Husnick, P.C. (*pro hac vice* admission pending)
Robert A. Britton (*pro hac vice* admission pending)
Emily E. Geier (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

Michael A. Condyles (VA 27807)
Peter J. Barrett (VA 46179)
Jeremy S. Williams (VA 77469)
**KUTAK ROCK LLP**
901 East Byrd Street, Suite 1000
Richmond, Virginia 23219-4071
Telephone: (804) 644-1700
Facsimile: (804) 783-6192

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**RICHMOND DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| TOYS "R" US, INC., *et al.*,[1] | ) | Case No. 17-34665 (KLP) |
| Debtors. | ) | (Joint Administration Requested) |

**INTERIM ORDER (I) AUTHORIZING THE DEBTORS TO (A) PAY PREPETITION WAGES, SALARIES, OTHER COMPENSATION, AND REIMBURSABLE EXPENSES AND (B) CONTINUE EMPLOYEE BENEFITS PROGRAMS, AND (II) GRANTING RELATED RELIEF**

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for entry of an interim order (this "Interim Order"): (i) authorizing the Debtors to (a) pay all prepetition and postpetition obligations on account of

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are set forth in the *Debtors' Motion for Entry of an Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief* filed contemporaneously herewith. The location of the Debtors' service address is One Geoffrey Way, Wayne, NJ 07470.

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

the Employee Compensation and Benefits Programs in the ordinary course of business and (b) continue to administer the Employee Compensation and Benefits Programs, including payment of prepetition obligations related thereto, (ii) granting related relief, and (iii) scheduling a final hearing to consider approval of the Motion on a final basis, all as more fully set forth in the Motion; and upon the First Day Declarations; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Standing Order of Reference from the United States District Court for the Eastern District of Virginia*, dated July 10, 1984; and this Court having found that it may enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having found that the Debtors' notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and that no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before this Court (the "Hearing"); and this Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

1. The Motion is granted on an interim basis as set forth herein.

2. The final hearing (the "Final Hearing") on the Motion shall be held on _________, 2017, at__:__ _.m., prevailing Eastern Time. Any objections or responses to entry of a final order on the Motion shall be filed on or before 4:00 p.m., prevailing Eastern Time on

_________, 2017, and served on the Notice Parties. In the event no objections to entry of a final order on the Motion are timely received, this Court may enter such final order without need for the Final Hearing.

3. The Debtors are authorized to: (a) continue and discontinue the Employee Compensation and Benefits Programs in the ordinary course of business during these chapter 11 cases and without the need for further Court approval, subject to applicable law; and (b) pay and honor prepetition amounts outstanding under or related to the Employee Compensation and Benefits Programs in the ordinary course of business; *provided*, that pending entry of the Final Order, the Debtors are not authorized to honor obligations under the Non-Insider Employee Incentive Programs, pay any Non-Insider Severance Payments, or pay any Director Compensation; *provided, further*, that pending entry of the Final Order, the Debtors shall not honor any Employee Compensation and Benefits Programs obligations that exceed the priority amounts set forth in sections 507(a)(4) or 507(a)(5) of the Bankruptcy Code; *provided further* that only those Debtors that incurred the Employee Compensation and Benefits Programs obligations, or a Debtor that in the ordinary course of business pays amounts related to the Employee Compensation and Benefits Programs obligations of other Debtor entities, shall be authorized to make payments under this Interim Order.

4. Pursuant to section 362(d) of the Bankruptcy Code, Employees are authorized to proceed with their claims under the Workers' Compensation Program in the appropriate judicial or administrative forum and the Debtors are authorized to continue the Workers' Compensation Program and pay all prepetition amounts relating thereto in the ordinary course of business. This modification of the automatic stay pertains solely to claims under the Workers' Compensation Program.

5. Nothing contained herein is intended or should be construed to create an administrative priority claim on account of any obligations owed under any Employee Compensation and Benefits Program.

6. The banks and financial institutions on which checks were drawn or electronic payment requests made in payment of the prepetition obligations approved herein are authorized to receive, process, honor, and pay all such checks and electronic payment requests when presented for payment, and all such banks and financial institutions are authorized to rely on the Debtors' designation of any particular check or electronic payment request as approved by this Interim Order, without any duty of further inquiry and without liability for following the Debtors' instructions.

7. Notwithstanding the relief granted in this Interim Order and any actions taken pursuant to such relief, nothing in this Interim Order shall be deemed: (a) an admission as to the validity of any prepetition claim against a Debtor entity; (b) a waiver of the Debtors' or any other party in interest's right to dispute any prepetition claim on any grounds; (c) a promise or requirement to pay any prepetition claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Interim Order or the Motion; (e) a request or authorization to assume any prepetition agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; or (f) a waiver of the Debtors' or any other party in interest's rights under the Bankruptcy Code or any other applicable law.

8. The Debtors are authorized to issue postpetition checks, or to effect postpetition fund transfer requests, in replacement of any checks or fund transfer requests that are dishonored as a consequence of these chapter 11 cases with respect to prepetition amounts owed in connection with the relief granted herein.

9. Nothing in this Interim Order shall alter or limit any authorization or relief contained in, or prevent Debtor Toys "R" Us (Canada) Ltd. ("Toys Canada") from taking any action authorized pursuant to, the Initial Order in respect of Toys Canada (the "Initial Order") issued by the Ontario Superior Court of Justice (Commercial List) (the "CCAA Court") in proceedings in respect of Toys Canada pursuant to the Companies' Creditors Arrangement Act (Canada), and to the extent of any inconsistency between this Interim Order and the terms of the Initial Order or any other Order of the CCAA Court, the Order of the CCAA Court shall govern.

10. Notwithstanding anything to the contrary in this Interim Order, any payment made or action taken by any of the Debtors pursuant to the authority granted in this Interim Order must be in compliance with, and shall be subject to: (i) any orders approving the Debtors' use of cash collateral and/or any postpetition financing facilities (the "DIP Orders"), (ii) the documentation in respect of any such postpetition financing facilities and/or use of cash collateral, and (iii) the budgets governing any such postpetition financing and/or use of cash collateral.

11. To the extent there is any inconsistency between the terms of any of the DIP Orders and this Interim Order, the terms of the DIP Order (or DIP Orders, as applicable) shall control.

12. The contents of the Motion satisfy the requirements of Bankruptcy Rule 6003(b).

13. The requirement under Local Bankruptcy Rule 9013-1(G) to file a memorandum of law in connection with the Motion is waived.

14. Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion and the requirements of Bankruptcy Rule 6004(a) are satisfied by such notice.

15. Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Interim Order are immediately effective and enforceable upon its entry.

16. The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Interim Order.

17. This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Interim Order.

Dated: ___________, 2017
Richmond, Virginia

_______________________________________
United States Bankruptcy Judge

WE ASK FOR THIS:

/s/ *Michael A. Condyles*

Michael A. Condyles (VA 27807)
Peter J. Barrett (VA 46179)
Jeremy S. Williams (VA 77469)
**KUTAK ROCK LLP**
901 East Byrd Street, Suite 1000
Richmond, Virginia 23219-4071
Telephone: (804) 644-1700
Facsimile: (804) 783-6192

- and -

Edward O. Sassower, P.C.
Joshua A. Sussberg, P.C. (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

- and -

James H.M. Sprayregen, P.C.
Anup Sathy, P.C.
Chad J. Husnick, P.C. (*pro hac vice* admission pending)
Robert A. Britton (*pro hac vice* admission pending)
Emily E. Geier (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

## CERTIFICATION OF ENDORSEMENT UNDER LOCAL BANKRUPTCY RULE 9022-1(C)

Pursuant to Local Bankruptcy Rule 9022-1(C), I hereby certify that the foregoing proposed order has been endorsed by or served upon all necessary parties.

/s/ *Michael A. Condyles*

# <u>Exhibit B</u>

## Proposed Final Order

Edward O. Sassower, P.C.
Joshua A. Sussberg, P.C. (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

-and-

Michael A. Condyles (VA 27807)
Peter J. Barrett (VA 46179)
Jeremy S. Williams (VA 77469)
**KUTAK ROCK LLP**
901 East Byrd Street, Suite 1000
Richmond, Virginia 23219-4071
Telephone: (804) 644-1700
Facsimile: (804) 783-6192

James H.M. Sprayregen, P.C.
Anup Sathy, P.C.
Chad J. Husnick, P.C. (*pro hac vice* admission pending)
Robert A. Britton (*pro hac vice* admission pending)
Emily E. Geier (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**RICHMOND DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| TOYS “R” US, INC., *et al.*,[1] | ) | Case No. [______] (___) |
| Debtors. | ) | (Jointly Administered) |

**FINAL ORDER (I) AUTHORIZING THE DEBTORS TO (A) PAY PREPETITION WAGES, SALARIES, OTHER COMPENSATION, AND REIMBURSABLE EXPENSES AND (B) CONTINUE EMPLOYEE BENEFITS PROGRAMS, AND (II) GRANTING RELATED RELIEF**

Upon the motion (the “Motion”)[2] of the above-captioned debtors and debtors in possession (collectively, the “Debtors”) for entry of a final order (this “Final Order”): (i) authorizing the Debtors to (a) pay all prepetition and postpetition obligations on account of

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor’s federal tax identification number, are set forth in the *Debtors’ Motion for Entry of an Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief* filed contemporaneously herewith. The location of the Debtors’ service address is One Geoffrey Way, Wayne, NJ 07470.

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

the Employee Compensation and Benefits Programs in the ordinary course of business and (b) continue to administer the Employee Compensation and Benefits Programs, including payment of prepetition obligations related thereto and (ii) granting related relief, all as more fully set forth in the Motion; and upon the First Day Declarations; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Standing Order of Reference from the United States District Court for the Eastern District of Virginia*, dated July 10, 1984; and this Court having found that it may enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having found that the Debtors' notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and that no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before this Court (the "Hearing"); and this Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

1. The Motion is granted on a final basis as set forth herein.

2. The Debtors are authorized to: (a) continue and discontinue the Employee Compensation and Benefits Programs in the ordinary course of business during these chapter 11 cases and without the need for further Court approval, subject to applicable law; and (b) pay and honor prepetition amounts outstanding under or related to the Employee Compensation and

Benefits Programs in the ordinary course of business; *provided* that only those Debtors that incurred the Employee Compensation and Benefits Programs obligations, or a Debtor that in the ordinary course of business pays amounts related to the Employee Compensation and Benefits Programs obligations of other Debtor entities, shall be authorized to make payments under this Final Order.

3. Pursuant to section 362(d) of the Bankruptcy Code, Employees are authorized to proceed with their claims under the Workers' Compensation Program in the appropriate judicial or administrative forum and the Debtors are authorized to continue the Workers' Compensation Program and pay all prepetition amounts relating thereto in the ordinary course of business. This modification of the automatic stay pertains solely to claims under the Workers' Compensation Program.

4. Nothing herein shall be deemed to authorize the payment of any amounts which violates or implicates section 503(c) of the Bankruptcy Code; *provided*, that nothing herein shall prejudice the Debtors' ability to seek approval of relief pursuant to section 503(c) of the Bankruptcy Code at a later time.

5. Nothing contained herein is intended or should be construed to create an administrative priority claim on account of any obligations owed under any Employee Compensation and Benefits Program.

6. The banks and financial institutions on which checks were drawn or electronic payment requests made in payment of the prepetition obligations approved herein are authorized to receive, process, honor, and pay all such checks and electronic payment requests when presented for payment, and all such banks and financial institutions are authorized to rely on the Debtors' designation of any particular check or electronic payment request as approved by

this Final Order without any duty of further inquiry and without liability for following the Debtors' instructions.

7. Notwithstanding the relief granted in this Final Order and any actions taken pursuant to such relief, nothing in this Final Order shall be deemed: (a) an admission as to the validity of any prepetition claim against a Debtor entity; (b) a waiver of the Debtors' or any other party in interest's right to dispute any prepetition claim on any grounds; (c) a promise or requirement to pay any prepetition claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Final Order or the Motion; (e) a request or authorization to assume any prepetition agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; or (f) a waiver of the Debtors' or any other party in interest's rights under the Bankruptcy Code or any other applicable law.

8. The Debtors are authorized to issue postpetition checks, or to effect postpetition fund transfer requests, in replacement of any checks or fund transfer requests that are dishonored as a consequence of these chapter 11 cases with respect to prepetition amounts owed in connection with the relief granted herein.

9. Nothing in this Final Order shall alter or limit any authorization or relief contained in, or prevent Debtor Toys "R" Us (Canada) Ltd. ("Toys Canada") from taking any action authorized pursuant to, the Initial Order in respect of Toys Canada (the "Initial Order") issued by the Ontario Superior Court of Justice (Commercial List) (the "CCAA Court") in proceedings in respect of Toys Canada pursuant to the Companies' Creditors Arrangement Act (Canada), nor shall anything in this Final Order and to the extent of any inconsistency between this Final Order and the terms of the Initial Order or any other Order of the CCAA Court, the Order of the CCAA Court shall govern.

10. Notwithstanding anything to the contrary in this Final Order, any payment made or action taken by any of the Debtors pursuant to the authority granted in this Final Order must be in compliance with, and shall be subject to: (i) any orders approving the Debtors' use of cash collateral and/or any postpetition financing facilities (the "DIP Orders"), (ii) the documentation in respect of any such postpetition financing facilities and/or use of cash collateral, and (iii) the budgets governing any such postpetition financing and/or use of cash collateral.

11. To the extent there is any inconsistency between the terms of any of the DIP Orders and this Final Order, the terms of the DIP Order (or DIP Orders, as applicable) shall control.

12. The requirement under Local Bankruptcy Rule 9013-1(G) to file a memorandum of law in connection with the Motion is waived.

13. Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion and the requirements of Bankruptcy Rule 6004(a) are satisfied by such notice.

14. Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Final Order are immediately effective and enforceable upon its entry.

15. The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Final Order.

16. This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Final Order

Dated: __________, 2017
Richmond, Virginia

______________________________________
United States Bankruptcy Judge

WE ASK FOR THIS:

/s/ *Michael A. Condyles*

Michael A. Condyles (VA 27807)
Peter J. Barrett (VA 46179)
Jeremy S. Williams (VA 77469)
**KUTAK ROCK LLP**
901 East Byrd Street, Suite 1000
Richmond, Virginia 23219-4071
Telephone: (804) 644-1700
Facsimile: (804) 783-6192

- and -

Edward O. Sassower, P.C.
Joshua A. Sussberg, P.C. (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

- and -

James H.M. Sprayregen, P.C.
Anup Sathy, P.C.
Chad J. Husnick, P.C. (*pro hac vice* admission pending)
Robert A. Britton (*pro hac vice* admission pending)
Emily E. Geier (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

**CERTIFICATION OF ENDORSEMENT**
**UNDER LOCAL BANKRUPTCY RULE 9022-1(C)**

Pursuant to Local Bankruptcy Rule 9022-1(C), I hereby certify that the foregoing proposed order has been endorsed by or served upon all necessary parties.

/s/ *Michael A. Condyles*