Edward O. Sassower, P.C.
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:        (212) 446-4800
Facsimile:        (212) 446-4900

-and-

Michael A. Condyles (VA 27807)
Peter J. Barrett (VA 46179)
Jeremy S. Williams (VA 77469)
**KUTAK ROCK LLP**
901 East Byrd Street, Suite 1000
Richmond, Virginia 23219-4071
Telephone:        (804) 644-1700
Facsimile:        (804) 783-6192

James H.M. Sprayregen, P.C.
Anup Sathy, P.C.
Chad J. Husnick, P.C. (admitted *pro hac vice*)
Emily E. Geier (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:        (312) 862-2000
Facsimile:        (312) 862-2200

*Co-Counsel to the Debtors and Debtors in Possession*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| TOYS "R" US, INC., *et al.*,[1] | ) | Case No. 17-34665 (KLP) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**DEBTORS' MOTION
FOR ENTRY OF AN ORDER (I) ESTABLISHING
BIDDING PROCEDURES FOR THE REMAINING TOYS
DELAWARE REAL ESTATE ASSETS, (II) APPROVING THE SALE
OF CERTAIN REAL ESTATE ASSETS, AND (III) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>")[2]

respectfully state as follows in support of this motion (this "<u>Motion</u>"):

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are set forth in the *Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief* [Docket No. 78].  The location of the Debtors' service address is One Geoffrey Way, Wayne, New Jersey 07470.

[2]    A detailed description of the Debtors and their business, and the facts and circumstances supporting the Debtors' chapter 11 cases, are set forth in greater detail in (i) the *Declaration of David A. Brandon, Chief Executive Officer of Toys "R" Us, Inc., in Support of Chapter 11 Petitions and First Day Motions* (the "<u>Brandon Declaration</u>") and (ii) the *Declaration of Michael J. Short, Chief Financial Officer of Toys "R" Us, Inc., in Support of First Day Motions* (the "<u>Short Declaration</u>" and together with the Brandon Declaration, the "<u>First Day Declarations</u>"), filed

## Relief Requested

1.     By this Motion, the Debtors respectfully seek:  (I) entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Bidding Procedures Order");  (a) establishing bidding procedures, attached to the Bidding Procedures Order as **Exhibit 1** (the "Bidding Procedures"), by which the Debtors will solicit and select the highest or otherwise best offer(s) for the sale, or sales (the "Sales"), of any remaining owned real property and commercial leases of Toys "R" Us-Delaware, Inc. ("Toys Delaware," and such assets, the "Remaining Real Estate Assets") at all future auctions of Remaining Real Estate Assets (each, an "Auction"); (b) approving the form and manner of notice for any Auction and subsequent sale hearing (each, a "Sale Hearing") attached to the Bidding Procedures Order as **Exhibit 2** (the "Auction and Hearing Notice"); (c) approving the noticing and procedures for the assumption and assignment of executory contracts and unexpired leases for any Auction, including the notice of proposed cure amounts, attached to the Bidding Procedures as **Exhibit 3** (the "Assignment Notice"); (d) approving the form agreements attached to the Bidding Procedures as **Exhibit A**; (e) scheduling an initial Auction and hearing to approve the Sales (the "Sale Hearing"); fe) approving procedures for selling certain Remaining Real Estate Assets not sold at the Auctions; and (g) granting related relief; (II) following each Sale Hearing, entry of orders (a) authorizing the Sales and (b) authorizing the assumption and assignment of certain executory contracts and unexpired leases; and (III) related relief.

---

contemporaneously with the Debtors' voluntary petitions for relief filed under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), on September 18, 2017 (the "Petition Date").  Capitalized terms used, but not otherwise defined in this Motion shall have the meanings ascribed to them in the First Day Declarations.

## Jurisdiction and Venue

2.      The United States Bankruptcy Court for the Eastern District of Virginia (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Standing Order of Reference from the United States District Court for the Eastern District of Virginia*, dated July 10, 1984.  The Debtors confirm their consent, pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

3.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4.      The bases for the relief requested herein are sections 105, 363, 503, and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006, and rule 9013-1 of the Local Rules of the United States Bankruptcy Court for the Eastern District of Virginia (the "Local Bankruptcy Rules").

## Background

### I.    General Background.

5.      As part of the U.S. Wind-Down approved by this Court, the Debtors are in the process of selling their real estate assets.  This Court already approved procedures and a timeline for the sale of certain real property and unexpired leases [Docket No. 2351] (the "Initial Bidding Procedures Order").[3]  Now as the Debtors are finalizing store closings, they seek approval of procedures for the sale of the Remaining Real Estate Assets of Toys Delaware.

---

[3]    Capitalized terms used but not otherwise defined herein have the meaning ascribe to them in the Initial Bidding Procedures Order.

6.      Accordingly, by this Motion, the Debtors seek approval of Bidding Procedures for the Remaining Real Estate Assets of Toys Delaware (but not, for the avoidance of doubt, either of Toys "R" Us Property Company I, LLC or Toys "R" Us Property Company II, LLC).  As described more fully in the Debtors' initial motion seeking Bidding Procedures to approve the sale of certain real estate assets [Docket No. 1880] (the "Initial Bidding Procedures Motion"), the Debtors and their advisors have conducted Appraisals (as defined in the Initial Bid Procedures Motion) and other analyses of the value of their properties.  Further, the Debtors will complete the store closings at all of these properties on or around June 30, 2018.  Accordingly, by this Motion, the Debtors, in consultation with their advisors and other parties in interest in these chapter 11 cases, propose the following Bidding Procedures and notice procedures that will apply to the Sales of all Remaining Real Estate Assets of Toys Delaware.

7.      The Debtors believe that the proposed Bidding Procedures and various notice procedures will help the Debtors capture substantial value for their stakeholders by capitalizing on the value of their owned property and/or long-term leases at below-market rates.  Selling the Remaining Real Estate Assets is a sound exercise of the Debtors' business judgment. Significantly, because the Debtors intend to close all stores on or around June 30, 2018, the Debtors must assume or reject such unexpired leases by that time to avoid any additional expenses that may be associated with staying in the properties beyond that date and to ensure that the extensions of the 365(d)(4) deadline provided by the applicable landlords do not inadvertently expire.  The Debtors intend to transfer the Real Estate Assets directly from the liquidators conducting the Store Closings to the Successful Bidder (as defined herein) to save time and avoid leaving the property vacant.

8.      The proposed Bidding Procedures are part-and-parcel of a robust marketing process that the Debtors are pursuing to maximize the value of those Remaining Real Estate Assets being

sold.  The Debtors, utilizing the services and expertise of A&G and their other advisors, including additional advisors that may be retained as the Debtors deem necessary and advisable to maximize value of the real estate sale process, initiated and will continue to implement and foster a competitive marketing process.  Specifically, on January 31, 2018, A&G sent a marketing flyer, attached to the Initial Bidding Procedures Motion as Exhibit B, via e-mail to approximately 260,000 parties that are known by A&G to be institutional investors, owners of or investors in property or leases similar to those being sold, or interested in the particular properties based on direct inquiries over the last several months.  This marketing flyer served as a "teaser," highlighting the Real Estate Assets (as defined in the Initial Bidding Procedures Motion) that the Debtors intended to sell at the initial auction and informing interested parties that a bid deadline and auction would be set shortly.  Subsequently, the Debtors, A&G, and the Debtors' other advisors have continued to receive inquiries regarding the Remaining Real Estate Assets.  A&G has sent e-mail blasts, posted on online message boards, and placed advertisements in newspapers and newsletters, and will continue these efforts, in order to ensure that as many potential purchasers are informed of all Auctions for the Remaining Real Estate Assets as possible.  Given the nature of the market and A&G's experience conducting auctions similar to the Auction contemplated herein, A&G is confident that its communications and marketing efforts will reach, a substantial portion of likely interested bidders and generate a competitive bidding process.  Further, given the nature of the assets being sold, the nature of general communications between potential bidders, and general public awareness and media coverage of these chapter 11 cases and the store closings, the Debtors believe that the marketing process will result in a competitive, value-maximizing Auction that will inure to the benefit of all stakeholders and maximize the value of the Debtors' estates.  The Debtors will provide notice of this Motion to all affected landlords and believe such notice is good and sufficient notice of the date of the Auction.

9.      The Debtors believe that based on the size, scale, and geographic distribution of the Remaining Real Estate Assets for sale, information learned from potential interested buyers, and the advice of the Debtors' advisors, the Debtors may not be able to sell certain of the Remaining Real Estate Assets or may determine, before or after an Auction, that the highest or otherwise best bid received for certain Remaining Real Estate Assets would be achieved outside the context of an Auction.  The Debtors may learn that a particular asset in one area would be substantially more valuable to potential buyers if sold as part of a package with other Remaining Real Estate Assets in that geographic areas or may determine that the final bid on any particular Remaining Real Estate Asset is substantially lower than such asset's appraised value.  Accordingly, the Debtors reserve the right to not accept the highest or otherwise best bid at the Auction and to propose a process at another date in the future to maximize the value of such property, or to sell any Remaining Real Estate Asset or group of Remaining Real Estate Assets with an aggregate purchase price less than $5,000,000 without holding an Auction.

## II.      Summary of the Bidding Procedures and the Bidding Procedures Order.

### A.      <u>Key Provisions of the Bidding Procedures.</u>

10.      To efficiently solicit, receive, and evaluate bids in a fair and accessible manner, the Debtors have developed and proposed the Bidding Procedures to govern all future Sales and Auctions of the Remaining Real Estate Assets.  The Bidding Procedures are designed to encourage all entities to put their best bids forward and to maximize the value of the Debtors' estates.  The key provisions of the Bidding Procedures are summarized below:[4]

(a)      **Qualified Bidders**: Only a Qualified Bidder may participate in and make subsequent Bids at the Auction.  The Debtors shall have the sole right to determine, in the exercise of their reasonable business judgment, in consultation with the

---

[4]    This summary is qualified in its entirety by the Bidding Procedures attached as **Exhibit 1** to the Bidding Procedures Order.  All capitalized terms used in this Motion but not otherwise defined herein shall have the meanings ascribed to such terms in the Bidding Procedures.  To the extent there are any conflicts between this summary and the Bidding Procedures, the terms of the Bidding Procedures shall govern.

Consultation Parties, whether a bidder is a Qualified Bidder. A Qualified Bidder must (among other requirements set forth in the Bidding Procedures) (i) deliver to the Debtors by the Bid Deadline an irrevocable, good faith, and bona fide offer (a "<u>Bid</u>") to purchase all or a portion of the Assets that is a Qualified Bid pursuant to the Bidding Procedures; (ii) demonstrate the financial wherewithal to enter into the proposed transaction to the satisfaction of the Debtors; and (iii) provide, at the Debtors request, adequate assurance of future performance, (which the Qualified Bidder agrees may be disseminated to affected landlords if such Qualified Bidders' Bid is determined to be a Qualified Bid), which may include, without limitation, information regarding the Qualified Bidders' financial condition such as tax returns, current financial statements, or bank accounts. Bidding Procedures ¶ C(i).

(b)     **Qualified Bids**: No bid will be a Qualified Bid unless it is made by a Qualified Bidder. Bidding Procedures ¶ C.

(c)     **Bids for Individual Assets or Combinations of Assets**: A Qualified Bid must detail which of the Remaining Real Estate Assets up for sale the Qualified Bidder proposes to purchase. The Bidding Procedures contemplate that a single bidder or group of bidders may purchase all or a portion of the Remaining Real Estate Assets. If a bidder or group of bidders submits an offer for a combination of assets, such bidder or group of bidders must indicate (i) if it would be willing to purchase any of such assets if not sold as a group and, if so, (ii) a schedule indicating the Bid as to any individual or sub-group of assets that such bidder would purchase. The Debtors, in consultation with the Consultation Parties (to the extent reasonably practicable), reserve the right to determine whether to auction any assets as part of a group or individually up through and including at the Auction or to conduct an Auction of any Remaining Real Estate Asset both individually and as part of a group in order to determine which option maximizes value of the assets. Bidding Procedures ¶ C(i)(c).

(d)     **Committed Financin**g: A Qualified Bid must contain documentation acceptable to the Debtors (in the Debtors' reasonable business judgment) evidencing that the Qualified Bidder has financial resources or committed financing sufficient to close the transaction within twenty-one (21) days after the Auction. Bidding Procedures ¶ C(i)(f).

(e)     **Deposit**: Contemporaneous with the submission of a Qualified Bid, a Qualified Bidder shall tender an earnest money deposit of ten percent (10.0%) of the proposed purchase price. Bidding Procedures ¶ C(ii).

(f)     **Markup of Applicable Agreement**: A Qualified Bid must include an executed form of the purchase, assignment, or termination agreement, as applicable, that may not deviate substantially from the terms of the applicable form purchase agreement attached as **<u>Exhibit A</u>** to the Bidding Procedures as well as a "redline" to the form purchase agreement. Bidding Procedures ¶ C(i)(a)–(b).

(g)     **Due Diligence**: Any Qualified Bidder may request diligence from the Debtors, and the Debtors may grant or deny any such request that they deem to be unreasonable.

The Debtors may require such Qualified Bidder to execute a non-disclosure agreement prior to providing diligence to such Qualified Bidder. Bidding Procedures ¶ F.

(h)     **No Contingencies**: A Qualified Bid must contain no contingencies to the validity, effectiveness, and/or binding nature of the bid, including without limitation, contingencies for due diligence and inspection or financing of any kind. Bidding Procedures ¶ C(i)(e).

(i)     **Irrevocability**: A Qualified Bid, if determined to be the Successful Bid or Backup Bid, will be irrevocable for a period of thirty (30) days after the conclusion of the Auction. Bidding Procedures ¶ C(i)(h).

(j)     **As-Is, Where-Is**: All bidders must acknowledge and agree that upon closing the Debtors shall sell and transfer the assets to the Successful Bidder and the Successful Bidder shall accept the assets "AS IS, WHERE IS, WITH ALL FAULTS." Bidding Procedures ¶ O.

(k)     **Initial Overbid**: Any Qualified Bidder may submit successive bids in minimum increments, which will be determined by the Debtors, in consultation with the Consultation Parties (to the extent reasonably practicable), at each Auction depending on the total dollar value of the Remaining Real Estate Assets being sold at the Auction. The minimum increments may be different with respect to each asset or group of assets being auctioned. Bidding Procedures ¶ H(iii)(c).

(l)     **Closing**: The closing of the sale of the Remaining Real Estate Assets will occur no later than the Sale Closing Deadline listed in the Auction and Hearing Notice. Bidding Procedures ¶ J.

11.     Most importantly, the Bidding Procedures recognize the Debtors' fiduciary obligations to maximize value for the benefit of their estates, and, as such, do not impair the Debtors' ability to consider all potential bids, and preserve the Debtors' right to modify the Bidding Procedures, in consultation with the Consultation Parties, as necessary or appropriate to maximize value for the Debtors' estates.

**B.     Bid Protections.**

12.     The Bidding Procedures contemplate that the Debtors, in consultation with the Consultation Parties, would be authorized, but not obligated, in an exercise of their business judgment, to agree to reimburse the reasonable and documented out-of-pocket fees and expenses of one or more Qualified Bidder (each, an "Expense Reimbursement"), and/or agree to pay one or

more Qualified Bidders a "work fee" or other similar cash fee (each, a "Work Fee") if the Debtors

reasonably determine in their business judgment that any such Expense Reimbursement or Work

Fee will encourage one or more parties to submit a Qualified Bid or result in a competitive bidding

and Auction process.  The aggregate amount of all Expense Reimbursements and Work Fees may

not exceed $50,000.00 per Qualified Bidder or $1,000,000.00 in the aggregate, and the Debtors

shall consult with the Consultation Parties prior to agreeing to any specific Expense

Reimbursement or Work Fee.

13.    The Bidding Procedures also contemplate that the Debtors, in consultation with the

Consultation Parties, will be authorized, but not obligated, to, in their business judgment, (a) select

no more than one Qualified Bidder to act as a stalking horse bidder (a "Stalking Horse Bidder") in

connection with the Auction of any Remaining Real Estate Asset or group thereof and (b) in

connection with any staking horse agreement with a Stalking Horse Bidder, provide a breakup fee

(the "Breakup Fee" and, collectively with the Expense Reimbursement and the Work Fee, the "Bid

Protections") in an amount not to exceed three percent (3%) of the proposed purchase price.  The

amount of any Expense Reimbursement or Work Fee paid to any Stalking Horse Bidder pursuant

to these Bidding Procedures shall be deducted from the Breakup Fee, if payable.  The Debtors

shall consult with the Consultation Parties prior to agreeing to any specific Bid Protections,

including the Breakup Fee.  For the avoidance of doubt, the Consultation Parties will retain the

right to object to the payment of any Bid Protections.  The Debtors may choose a Stalking Horse

Bidder after May 25, 2018 until two days prior to the Auction, and will inform the court if a

Stalking Horse Bidder has been selected and any terms thereto at the hearing to approve the

Bidding Procedures.  The Debtors submit that the opportunity to enter into a Stalking Horse

Agreement that provides these bid protections will encourage bidders to submit bids and

participate at the Auction, thereby maximizing value for the Debtors estates.  The Debtors intend

to only enter into a Stalking Horse Agreement with bid protections after consultation with the Debtors' various advisors and the Consultation Parties.

14.     Upon entry of a Stalking Horse Agreement, the Debtors will file and serve notice of the proposed Stalking Horse Agreement on the master service list maintained in these cases no later than two business days after execution of the Stalking Horse Agreement.  The notice will include the type and amount of bid protections, if any, any modifications or amendments to the Bidding Procedures, a summary of the Stalking Horse Agreement, a copy of the Stalking Horse Agreement, and a copy of the relevant Sale Order.  The Stalking Horse Bidder will be deemed to be a Qualified Bidder and the Stalking Horse Bidder's bid will be deemed a Qualified Bid.

**III.    Summary of the Auction and Hearing Notice Procedures.**

15.     The Debtors may from time to time determine to auction additional properties that are not contemplated by this Motion (as may be amended or supplemented).  The Debtors believe that the Bidding Procedures proposed herein are appropriate for the sale of any of their Real Estate Assets and propose to use such Bidding Procedures for future Auctions.

**A.     <u>Notice of Sale, Auction, and Sale Hearing.</u>**

16.     The Debtors propose to utilize these Bidding Procedures for future Auctions by filing an Auction and Hearing Notice that contains: (a) all relevant dates for the Auction, including the Bid Deadline, Notice of Qualified Bids, Auction, Notice of Successful and Backup Bidders, Sale Objection Deadline, Hearing date, and Sale Closing Deadline; (b) a list of properties to be sold at the Auction; and (c) a copy of the Bidding Procedures approved herein.  The Debtors reserve the right to amend the list of properties to be sold at the Auction at any time.

17.     Parties will have the right to object to the proposed Auction (or related dates) by filing an objection (an "<u>Auction Objection</u>") with the Court by 5:00 p.m. (prevailing Eastern Time) fourteen (14) days after the Debtors file the Auction and Hearing Notice and serving it on the

Objection Notice Parties (as defined herein).  If no Auction Objections are filed and served as set forth herein, the Auction (and related dates) will be deemed authorized and approved without any further order of the Court and the Debtors are authorized to proceed with the Auction and all applicable related dates.  If the Debtors receive any Auction Objections that the parties cannot consensually resolve, the Debtors will set a hearing with the Court to approve the Auction.

18.     Within three (3) days after the Auction is authorized, or as soon as reasonably practicable thereafter, following a hearing or deemed authorized by the expiration of the Auction Objection period, the Debtors will file and serve on the Notice Parties (as defined herein) an Auction and Hearing Notice.  The Auction and Hearing Notice will indicate that copies of this Motion and any future sale documents, if applicable, can be obtained on the website of the Debtors' claims and noticing agent, Prime Clerk, http://www.cases.primeclerk.com/toysrus (the "Case Website").

19.     Within three (3) days after the Auction is authorized following a hearing or deemed authorized by the expiration of the Auction Objection period, or as soon as reasonably practicable thereafter, the Debtors will place a publication version of the Auction and Hearing Notice for one day in *The USA Today (National Edition)* and the *Richmond Times Dispatch*, and post it onto the Case Website.

20.     The Debtors will be permitted to choose a Stalking Horse Bidder through and including two days prior to the Auction.

21.     Pursuant to Bankruptcy Rule 2002(a), the Debtors are required to provide their creditors with 21 days' notice of the Sale Hearing.  Pursuant to Bankruptcy Rule 2002(c), such notice must include the date, time, and place of the Auction and the Sale Hearing, and the deadline for filing any objections to the relief requested.  The Debtors will file any Auction and Hearing Notice at least 21 days prior to the proposed Sale Hearing.

22.    The Debtors submit that the methods of notice described herein comply fully with Bankruptcy Rule 2002 and constitute good and adequate notice of the proposed sale of the Remaining Real Estate Assets.  The Debtors request that such notice be deemed sufficient and proper notice of the Sales with respect to known interested parties.

**B.**    **Sale Objections.**

23.    Parties objecting to approval of the proposed Sales must file a written objection (each, a "Sale Objection") so that such Sale Objection is filed with the Court by the date listed in the Auction and Hearing Notice, and serve such Sale Objection on the following parties (the "Objection Notice Parties"):  (a) Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, Attn: Joshua A. Sussberg, P.C., and Kirkland & Ellis LLP, 300 North LaSalle Street, Chicago, Illinois 60654, Attn:  Chad Husnick, P.C. and Emily Geier, and Kutak Rock LLP, 901 East Byrd Street, Suite 1000, Richmond, Virginia 23218, Attn:  Michael A. Condyles, Peter J. Barrett, and Jeremy S. Williams, co-counsel to the Debtors; (b) the Office of the United States Trustee for the Eastern District of Virginia, Attn:  Robert B. Van Arsdale and Lynn A. Kohen; (c) Kramer Levin Naftalis & Frankel LLP, 1177 Avenue of the Americas, New York, New York 10036, Attn:  Adam C. Rogoff, Esq. and Rachael Ringer, Esq., counsel to the Official Committee of Unsecured Creditors; (d) Davis, Polk & Wardwell LLP, 450 Lexington Avenue, New York, New York 11017, Attn:  Marshall Huebner and Kenneth Steinberg, counsel to the DIP ABL Agent; and (e) Wachtell, Lipton, Rosen, and Katz, 51 West 52nd Street, New York, New York 10019, Attn:  Joshua A. Feltman, counsel to the DIP Delaware Term Loan Agent.

C.    **Dates and Deadlines of Initial Auction of Remaining Real Estate Assets**.

24.    The Debtors propose to set the following dates and deadlines for the initial Auction

of Remaining Real Estate Assets included on **Exhibit 5** hereto,[5] which the Debtors may adjourn

from time to time[6] in order to facilitate a smooth and efficient sale process:

(a)    **Stalking Horse Date**: **May 25, 2018, at 5:00 p.m., prevailing Eastern Time**, until two days prior to the Auction, as the period during which the Debtors may choose a Stalking Horse Bidder, if any.

(b)    **Bid Deadline**: **May 29, 2018, at 5:00 p.m., prevailing Eastern Time**, as the deadline by which all bids must be actually received pursuant to the Bidding Procedures.

(c)    **Notice of Qualified Bids: June 5, 2018, at 5:00 p.m., prevailing Eastern Time**, as the date and time by which the Debtors shall file with the Court a notice of Qualified Bids.

(d)    **Auction**: **June 11, 2018, at 10:00 a.m., prevailing Eastern Time**, as the date and time by which the Auction, if needed, would be held at the offices of Kirkland & Ellis LLP, located at:  601 Lexington Avenue, New York, NY 10022.

(e)    **Notice of Successful and Backup Bidders**:  if applicable, **June 13, 2018,** as the date by which the Debtors must file with the Court a notice of Successful and Backup Bidders (as defined herein).

(f)    **Sale Objection Deadline**:  if applicable, **June 17, 2018, at 5:00 p.m.**, prevailing Eastern Time, as the deadline to object to the Sale, proposed assumption and assignment, and/or to the Successful Bidder's proposed form of adequate assurance of future performance.

(g)    **Hearing to Designate Successful Bidder(s)**: **June 25, 2018,** (or such other date as determined by the Court's availability) is the date set for a hearing at which the Debtors shall seek approval from the Court to designate the Successful Bidders in connection with the Sales.  The Sale Hearing shall be an evidentiary hearing on matters relating to the Sales and there will be no further bidding at the Sale Hearing.  In the event that the Successful Bidder cannot or refuses to consummate the Sales, the Debtors may, in accordance with the Bidding Procedures, and after consultation with the Consultation Parties,

---

[5]    The Debtors reserve their right to amend the list of properties to be sold at any Auction at any time and for any reason in their business judgment, in consultation with the Consultation Parties.

[6]    For the avoidance of doubt, the Debtors may, upon notice to the Consultation Parties and after consultation with their advisors, extend any of the proposed dates as to any of the Remaining Real Estate Assets in order to facilitate an efficient and value-maximizing process for the portfolio of Remaining Real Estate Assets as a whole.

designate the Backup Bid to be the new Successful Bid and the Backup Bidder to be the new Successful Bidder, and the Debtors shall be authorized, but not required, to consummate the transaction with the Backup Bidder without further order of the Court.

### D.    Notice of Successful Bidder.

25.    As soon as reasonably practicable after the conclusion of the Auction, the Debtors will file on the docket, but not serve, a notice identifying the Successful Bidder(s) (the "Notice of Successful and Backup Bidders"), Remaining Real Estate Asset(s), key terms of the agreement, and identifying the Backup Bidder(s), substantially in the form attached to the Bidding Procedures Order as **Exhibit 4**.

## IV.    Summary of the Assumption Procedures.

26.    The Debtors propose the procedures set forth below for notifying counterparties (the "Lease Counterparties") to unexpired leases (the "Leases") of proposed cure amounts in the event the Debtors determine to assume and assign such contracts or leases in connection with a sale, liquidation, or other disposition.

### A.    Assumption and Assignment Procedures.

27.    On a date no later than ten days prior to the Sale Hearing, the Debtors shall file with the Court a notice in the form attached to the Bidding Procedures Order as **Exhibit 3** (the "Assumption and Assignment Notice") to assume one or more Leases pursuant to section 365 of the Bankruptcy Code, which shall set forth, among other things: (i) the Lease or Leases to be assumed; (ii) the names and addresses of the counterparties to such Leases; (iii) the identity of the proposed assignee of such Leases (the "Assignee"), if applicable; (iv) the effective date of the assumption for each such Lease (the "Assignment Date"); (v) the proposed cure amount (the "Cure Costs"), if any for each such Lease; and (vi) the deadlines and procedures for filing objections to the Assumption and Assignment Notice (as set forth below).

14

28.     The Debtors will cause the Assumption and Assignment Notice to be served (i) by overnight delivery service upon the Lease Counterparties affected by the Assumption and Assignment Notice at the address set forth in the notice provision of the applicable Lease (and their counsel, if known) and (ii) by first class mail, email, or fax upon the Notice Parties.

29.     To the extent the Debtors seek to assume and assign a lease of non-residential real property, the Debtors will provide by overnight delivery to the applicable Lease Counterparty (and their counsel, if known), within 24 hours of the Qualified Bid Deadline upon request by a Lease Counterparty that has submitted a valid ROFR Notice (as defined in the Bidding Procedures) and within 24 hours upon request by any other Lease Counterparty following the filing of the Notice of Successful and Backup Bidders, evidence that the proposed assignee of the lease has the ability to comply with the requirements of adequate assurance of future performance required under sections 365(b)(1) or 365(b)(3), as applicable, including the Adequate Assurance Package (as defined in the Bidding Procedures) on a confidential basis.

30.     Parties objecting to a proposed assumption and assignment and/or to a Successful Bidder's proposed form of adequate assurance of future performance must file a written objection with the Court by the Sale Objection Deadline (each, an "Assignment Objection") and serve such Assignment Objection on the Objection Notice Parties.

31.     If no objection to the assumption of any Lease is timely filed, each Lease shall be assumed as of the Assignment Date set forth in the applicable Assignment Notice or such other date as the Debtors and the Lease Counterparties agree and the proposed cure amount shall be binding on all Lease Counterparties and no amount in excess thereof shall be paid for cure purposes; *provided*, *however* that the Assignment Date for a lease of nonresidential real property shall not occur earlier than the date the Debtors filed and served the applicable Assumption and Assignment Notice.

32.    If the Lease Counterparty does not file and serve an Assignment Objection in a manner that is consistent with the requirements set forth herein, and absent a subsequent order of the Court in connection with such objection establishing an alternative Cure Cost or an agreement between the Debtors and the Lease Counterparty resolving such objection, (a) the Cure Costs, if any, set forth in the Notice of Assumption and Assignment shall be controlling, notwithstanding anything to the contrary in any Assigned Lease or any other document, and (b) the Lease Counterparty will be deemed to have consented to the assumption and assignment of the Assigned Lease and the Cure Costs, if any, and will be forever barred from asserting any other claims related to such Assigned Lease against the Debtors or the Successful Bidder, or the property of any of them.

33.    The inclusion of an Assigned Lease on the Notice of Assumption and Assignment will not:  (a) obligate the Debtors to assume any Assigned Lease listed thereon or the Successful Bidder to take assignment of such Assumed Lease; or (b) constitute any admission or agreement of the Debtors that such Assigned Leases an executory contract.  Only those Assumed Leases that are included on a schedule of assumed and acquired contracts attached to a final asset purchase agreement with a Successful Bidder (including amendments or modifications to such schedules in accordance with such asset purchase agreement) will be assumed and assigned to the applicable Successful Bidder.  No Assigned Lease shall be assumed absent closing on the assignment thereof to the applicable Successful Bidder.

34.    With regard to Leases to be assigned, pursuant to section 363(f) of the Bankruptcy Code, the assignment of any Lease shall:  (a) be free and clear of (i) all liens (and any liens shall attach to the proceeds in the same order and priority, subject to all existing defenses, claims, setoffs, and rights) and (ii) any and all claims (as that term is defined in section 101(5) of the Bankruptcy Code), obligations, demands, guarantees of or by the Debtors, debts, rights,

16

contractual commitments, restrictions, interests, and matters of any kind and nature, whether arising prior to or subsequent to the commencement of these chapter 11 cases, and whether imposed by agreement, understanding, law, equity, or otherwise (including, without limitation, claims and encumbrances that purport to give to any party a right or option to effect any forfeiture, modification, or termination of the interest of any Debtor or Assignee, as the case may be, in the Lease(s) (but only in connection with the assignment by the Debtor to the Assignee)), provided that any payment on account of such liens, claims, interests, and encumbrances are subject to further order of the Court, and (b) constitutes a legal, valid, and effective transfer of such Lease(s) and vests the applicable Assignee with all rights, titles, and interests to the applicable Lease(s). For the avoidance of doubt, all provisions of the applicable assigned Lease, including any provision limiting future assignment, shall be binding on the applicable Assignee after consummation of the assignment of such Lease by the Debtors to the Assignee.

## V.    Procedures for Unsold Property.

35.    If the Debtors determine that holding an Auction with respect to a particular Remaining Real Estate Asset would not result in the highest or otherwise best offer for such asset, or if the Debtors receive no bids on certain properties prior to the close of the Auction, or if the Debtors determine (in consultation with the Consultation Parties) that the highest or otherwise best bid at the Auction will not, in the Debtors' business judgment (in consultation with the Consultation Parties) maximize the value of the Remaining Real Estate Asset(s) being sold, the Debtors shall follow the following procedures (the "Non-Auction Sale Procedures") to sell such Remaining Real Estate Assets (the "Non-Auction Real Estate Assets"):

    a.    With regard to sales or transfers of Non-Auction Real Estate Assets in any individual transaction or series of related transactions to a single buyer or

group of related buyers with a sale price[7] less than or equal to $5,000,000.00:

i.      subject to the procedures set forth herein, the Debtors (in consultation with the Consultation Parties) are authorized to consummate such transaction(s) without further order of the Court if the Debtors determine in the reasonable exercise of their business judgment that such sales or transfers are in the best interests of their estates and the sale price is higher or otherwise better than any bid received at the Auction, if applicable;

ii.     subject to the Sale Order and any conditions therein, any such transactions shall be deemed final and fully authorized by the Court and free and clear of liens, with such liens attaching only to the sale proceeds with the same validity, extent, and priority as immediately prior to the sale or transfer;

iii.    the Debtors shall cause, at least fourteen (14) days prior to the proposed closing date of such sale or effectuating such transfer, a notice of such sale (a "Non-Auction Sale Notice") to be filed with the Court and served on:  (a) the Office of the United States Trustee for the Eastern District of Virginia, Attn:  Robert B. Van Arsdale and Lynn A. Kohen; (b) Kramer Levin Naftalis & Frankel LLP, 1177 Avenue of the Americas, New York, New York 10036, Attn: Adam C. Rogoff, Esq. and Rachael Ringer, Esq., counsel to the Official Committee of Unsecured Creditors; (c) the DIP ABL Agent and the advisors and counsel thereto; (d) the DIP Delaware Term Loan Agent and the advisors and counsel thereto;  (e) counsel to the administrative agent for the prepetition Secured Term Loan B Facility; (f) the United States Attorney's Office for the Eastern District of Virginia; (g) the office of the attorneys general for the states in which the Debtors operate; (h) the Internal Revenue Service; (i) the United States Securities and Exchange Commission; (j) any party that has requested notice pursuant to Bankruptcy Rule 2002, (k) any Qualified Bidder who placed a bid on such property at the Auction, (l) any counterparty or counterparties to any Lease(s) proposed to be sold or transferred,  (collectively, the "Non-Auction Sale Notice Parties");

iv.     the content of the Non-Auction Sale Notice shall consist of:  (A) an identification of the Non-Auction Real Estate Assets being sold or transferred; (B) an identification of the purchaser of the assets; (C) the purchase price to be paid for the Non-Auction Real Estate Assets; (D) the marketing or sales process, including any

---

[7]    For purposes of these Non-Auction Sale Procedures, "sale price" shall refer to the bidder's proposed purchase price as agreed to by the Debtors (in consultation with the Consultation Parties).

commissions to be paid to third parties, used to sell the assets; and (E) the significant terms of the sale or transfer agreement;[8]

v.      if, within fourteen (14) days after receipt of such Non-Auction Sale Notice by any of the Non-Auction Sale Notice Parties (or such additional time period as my be agreed to by the Debtors), (A) no written objections are filed with the Court, and (B) the Debtors do not receive any competing bids for any of the Non-Auction Real Estate Assets being sold (a "Competing Bid"), the Debtors are authorized to immediately consummate such sale or transfer;

vi.     if any Non-Auction Sale Notice Party files a written objection to any such sale or transfer with the Court within fourteen (14) days (or such additional time period as my be agreed to by the Debtors) after receipt of such Non-Auction Sale Notice, the applicable Non-Auction Real Estate Asset shall only be sold or transferred upon either (A) the consensual resolution of the objection by the parties or (B) further order of the Court after notice and a hearing; and

vii.    if the Debtors receive a Competing Bid, the Debtors will evaluate such Competing Bid, in consultation with the Consultation Parties, and hold an Auction between the initial purchaser and the competing bidder to determine the higher or otherwise better bid. The Debtors shall be authorized to enter into a sale agreement with the successful bidder at the Auction without further order of this Court.

b.    To the extent the Debtors seek to assume and assign a lease of non-residential real property, the Debtors will, at the request of the applicable lease counterparty, provide evidence to such applicable lease counterparty (and their counsel, if known) within seven (7) days of the Non-Auction Sale Notice demonstrating that the assignee of the lease has the ability to comply with the requirements of adequate assurance of future performance to the extent required under sections 365(b)(1) or 365(b)(3), as applicable.

c.    These Non-Auction Sale Procedures shall not apply to any sale or transfer to an insider, Committee member, or lender of the Debtors.

---

[8]    A copy of the definitive agreement for the applicable Non-Auction Real Estate Assets shall be provided promptly to any Non-Auction Sale Notice Parties upon request.

### Basis for Relief

**I.    The Bidding Procedures are Fair, Designed to Maximize the Value Received for the Assets, and an Exercise of the Debtors' Reasonable Business Judgment.**

36.    Courts have made clear that a debtor's business judgment is entitled to substantial deference with respect to the procedures to be used in disposing of an estate's assets. *See, e.g.*, *In re Trilogy Dev. Co., LLC*, 2010 Bankr. LEXIS 5636, at *3–4 (Bankr. W.D. Mo. 2010) (holding that section 363 of the Bankruptcy Code permits the debtor to sell their assets if a sound business purpose exists); *In re Channel One Commc'ns, Inc.*, 117 BR 493 (Bankr. E.D. Mo. 1990) (same); *In re Schipper*, 933 F.2d 513, 515 (7th Cir. 1991) ("Under Section 363, the debtor in possession can sell property of the estate . . . if he has an 'articulated business justification.'") (citations omitted); *see also In re Farmland Indus., Inc.*, 294 B.R 855, 881 (Bankr. W.D. Mo. 2003) (holding that courts in this district are reluctant to interfere with corporate decisions unless "it is made clear that those decisions are, inter alia, clearly erroneous, made arbitrarily, are in breach of the officers' and directors' fiduciary duty to the corporation, are made on the basis of inadequate information or study, are made in bad faith, or are in violation of the Bankruptcy Code"); *In re Integrated Res., Inc.*, 147 B.R. 650, 656–57 (S.D.N.Y. 1992) (noting that bidding procedures that have been negotiated by a trustee are to be reviewed according to the deferential "business judgment" standard, under which such procedures and arrangements are "presumptively valid").

37.    The paramount goal in any proposed disposition of property of the estate is to maximize the proceeds received by the estate. *See In re Edwards*, 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998) ("The purpose of procedural bidding orders is to facilitate an open and fair public sale designed to maximize value for the estate."); *In re Food Barn Stores, Inc.*, 107 F.3d 558, 564–65 (8th Cir. 1997) (in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand"); *In re Integrated Res., Inc.*, 147 B.R. at 659 ("[I]t is a well-established principle of bankruptcy law that the objective of the bankruptcy rules and the trustee's duty with respect to

20

such sales is to obtain the highest price or greatest overall benefit possible for the estate.")
(citations omitted).

38.    To that end, courts uniformly recognize that procedures intended to enhance
competitive bidding are consistent with the goal of maximizing the value received by the estate
and therefore are appropriate in the context of bankruptcy transactions. *See, e.g.*, *In re Integrated
Res., Inc.*, 147 B.R. at 659 (bidding procedures "are important tools to encourage bidding and to
maximize the value of the debtor's assets"); *In re Fin. News Network, Inc.*, 126 B.R. 152, 156
(Bankr. S.D.N.Y. 1991) ("court-imposed rules for the disposition of assets . . . [should] provide an
adequate basis for comparison of offers, and [should] provide for a fair and efficient resolution of
bankrupt estates").

39.    The Debtors believe that the Bidding Procedures will promote active bidding from
seriously interested parties and will elicit the highest or otherwise best offer available for the
Remaining Real Estate Assets offered for sale.  The Bidding Procedures will allow the Debtors to
conduct the Sales in a controlled, fair, and open fashion that will encourage participation by
financially capable bidders who will offer the best package for the Remaining Real Estate Assets
and who can demonstrate the ability to close the transaction.  In particular, the Bidding Procedures
contemplate an open auction process with minimum barriers to entry and provide potential bidding
parties with sufficient time to perform due diligence and acquire the information necessary to
submit a timely and well-informed bid.

40.    At the same time, the Bidding Procedures provide the Debtors with a robust, final
opportunity to consider competing bids and select the highest or otherwise best offer related to the
Sales, while preserving the Debtors' right to not sell any particular Remaining Real Estate Asset
if the Debtors do not believe that such a sale on the terms received at Auction would maximize the

value of the asset.  As such, creditors of the Debtors' estates can be assured that the consideration

obtained will be fair and reasonable in light of the circumstances and at or above market-value.

41.    The Debtors submit that the Bidding Procedures will encourage competitive

bidding, are appropriate under the relevant standards governing auction proceedings and bidding

incentives in bankruptcy proceedings, and are consistent with other procedures previously

approved by this Court.  Moreover, similar procedures in complex chapter 11 cases have been

previously approved by the Court.  *See, e.g.*, *In re Toys "R" Us, Inc.*, No. 17-34665 (KLP) (Bankr.

E.D. Va. Mar. 23, 2018); *In re RoomStore, Inc.*, No. 11–37790 (DOT) (Bankr. E.D. Va. Jan. 3,

2012); *In re Movie Gallery, Inc.*, No. 10–30696 (DOT) (Bankr. E.D. Va. Oct. 27, 2010); *In re

LandAmerica Fin. Grp., Inc.*, No. 08–35994 (KRH) (Bankr. E.D. Va. April 16, 2009); *In re Circuit

City Stores, Inc.*, No. 08–35653 (KRH) (Bankr. E.D. Va. Mar. 3, 2009); *In re S & K Famous

Brands, Inc.*, No. 09–30805 (KRH) (Bankr. E.D. Va. Feb. 9, 2009); *In re Chesapeake Corp.*, No.

08–36642 (DOT) (Bankr. E.D. Va. Jan. 20, 2009).

42.    Accordingly, for all of the foregoing reasons, the Debtors believe that the Bidding

Procedures:  (a) will encourage robust bidding for the Remaining Real Estate Assets; (b) are

consistent with other procedures previously approved by courts in this and other districts; and

(c) are appropriate under the relevant standards governing auction proceedings and bidding

incentives in bankruptcy proceedings and should be approved.

**II.    The Bid Protections Have a Sound Business Purpose and Should be Approved.**

43.    The Debtors are also seeking authority, but not direction, to offer customary bid

protections.  The use of a stalking horse in a public auction process for dispositions pursuant to

section 363 of the Bankruptcy Code is a customary practice in chapter 11 cases, as the use of a

stalking horse bid is, in many circumstances, the best way to maximize value in an auction process

by "establish[ing] a framework for competitive bidding and facilitat[ing] a realization of that

value." *Official Comm. of Unsecured Creditors v. Interforum Holding LLC*, 2011 WL 2671254,

*1 (E.D. Wis. July 7, 2011); *see also AgriProcessors, Inc. v. Fokkena (In re Tama Beef Packing,*

*Inc.)*, 321 B.R. 496, 497–98 (B.A.P. 8th Cir. 2005). As a result, stalking horse bidders often require

break-up fees and, in many cases, other forms of bid protections as an inducement for "setting the

floor at auction, exposing its bid to competing bidders, and providing other bidders with access to

the due diligence necessary to enter into an asset purchase agreement." *Interforum Holding*, 2011

WL 2671254, at *1 (citations omitted). Thus, the use of bid protections has become an established

practice in chapter 11 cases.

44.     Indeed, break-up fees and other forms of bid protections are a normal and, in many

cases, necessary, component of significant dispositions conducted under section 363 of the

Bankruptcy Code. "Break-up fees are important tools to encourage bidding and to maximize the

value of the debtor's assets . . . In fact, because the . . . corporation has a duty to encourage bidding,

break-up fees can be necessary to discharge [such] duties to maximize value." *In re Integrated*

*Res., Inc.*, 147 B.R. 650, 659–60 (S.D.N.Y. 1992) (emphasis added). Specifically, bid protections

may be necessary to convince a white knight bidder to enter the bidding by providing some form

of compensation for the risks that it is undertaking. *Id.* at 660–61 (bid protections can prompt

bidders to commence negotiations and "ensure that a bidder does not retract its bid"); *In re Hupp*

*Int'l Indus., Inc.*, 140 B.R. 191, 194 (Bankr. N.D. Ohio 1992) ("[W]ithout such fees, bidders would

be reluctant to make an initial bid for fear that their first bid will be shopped around for a higher

bid from another bidder who would capitalize on the initial bidder's . . . due diligence.").

45.     As a result, courts routinely approve bid protections in connection with proposed

bankruptcy sales where a proposed fee or reimbursement provides a benefit to the estate. *See In*

*re Wintz Cos.*, 230 B.R. 840, 847 (B.A.P. 8th Cir. 1999) (holding that bid protections "benefitted

the estate rather than chilled bidding); *In re O'Brien Envtl. Energy, Inc.*, 181 F.3d 527 (3d Cir.

1999).  The Debtors believe that the ability to offer bid protections should they deem it necessary and appropriate is in the best interests of the Debtors' estates and their creditors, as the Stalking Horse Bidder will establish a floor for further bidding that may increase the consideration for the Sales.

46.    If the bid protections are paid, it likely will be because the Debtors received higher or otherwise superior Qualified Bids for a Remaining Real Estate Asset or group thereof.  In short, the proposed bid protections are fair and reasonable under the circumstances because they constitute a "fair and reasonable percentage of the proposed purchase price" and are "reasonably related to the risk, effort, and expenses of the prospective purchaser."  *In re Integrated Res., Inc.*, 147 B.R. at 662 (approving a breakup fee of 1.6 percent of the proposed purchase price); *see also Tama Beef*, 321 B.R. at 498 (noting that breakup fees are "usually limited to one to four percent of the purchase price").  Similar breakup fees have been approved by this Court in other complex chapter 11 cases.  *See, e.g.*, *In re Patriot Coal Corp.*, No. 15-32450 (KLP) (Bankr. E.D. Va. June 25, 2015) (approving breakup fee of up to 3.0% of the purchase price); *In re James River Coal Co.*, No. 14-31848 (KRH) (Bankr. E.D. Va. May 9, 2014) (approving breakup fee of up to 3.0% of the purchase price); *In re Movie Gallery, Inc.*, No. 10-30696 (DOT) (Bankr. E.D. Va. Oct. 27, 2010) (approving breakup fee of approximately 2.8% of the purchase price); *In re S & K Famous Brands, Inc.*, No. 09-30805 (KRH) (Bankr. E.D. Va. Feb. 9, 2009) (approving breakup fee of approximately 3.1% of the purchase price); *In re Chesapeake Corp.*, No. 08-36642 (KLP) (Bankr. E.D. Va. Jan. 20, 2009) (approving breakup fee of approximately 3.3% of the purchase price).  Accordingly, the Debtors should be granted the authority, but not direction, to enter into bid protections.

### III.    The Sales Should Be Approved as an Exercise of Sound Business Judgment.

47.    Section 363(b)(1) of the Bankruptcy Code authorizes a bankruptcy court, after notice and a hearing, to authorize a debtor to "use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  To approve a use, sale or lease of property other than in the ordinary course of business, the court must find "some sound business purpose" that satisfies the business judgment test.  *See In re W.A. Mallory Co.*, 214 B.R. 834, 836 (Bankr. E.D. Va. 1997); *see also In re Glover*, No. 09-74787 at *4 (SCS) (Bankr. E.D. Va. Mar. 31, 2010) ("The standard in this Circuit is whether the debtor in possession has exercised sound business judgment") (citing *Lubrizol Enterprises, Inc. v. Richmond Metal Finishers, Inc.*, 756 F.2d 1043, 1046 (4th Cir. 1985)).  Courts generally show great deference to a debtor's decisions when applying the business judgment standard.  *See In re Alpha Nat. Res., Inc.*, 546 B.R. 348, 356 (Bankr. E.D. Va. 2016) ("Courts apply the deferential business judgment test when analyzing transactions under § 363(b)(1)").  Deference to a debtor's business judgment is inappropriate only if such business judgment is "so manifestly unreasonable that it could not be based on sound business judgment, but only on bad faith, or whim or caprice." *Lubrizol Enters., Inc. v. Richmond Metal Finishers, Inc.*, 756 F.2d 1043, 1047 (4th Cir. 1985).

48.    Once the Debtors articulate a valid business justification, "[t]he business judgment rule is a presumption that in making the business decision the directors of a corporation acted on an informed basis, in good faith, and in the honest belief that the action was in the best interests of the company." *In re S.N.A. Nut Co.*, 186 B.R. 98, 102 (Bankr. N.D. Ill 1995) (citations omitted); *In re Filene's Basement, LLC*, 11-13511 (KJC), 2014 WL 1713416, at *12 (Bankr. D. Del. Apr. 29, 2014) ("If a valid business justification exists, then a strong presumption follows that the agreement at issue was negotiated in good faith and is in the best interests of the estate") (citations omitted); *Integrated Resources*, 147 B.R. at 656; *In re Johns-Manville Corp.*, 60 B.R. 612, 615–

16 (Bankr. S.D.N.Y. 1986) ("a presumption of reasonableness attaches to a Debtor's management decisions.").

### A.    A Sound Business Purpose Exists for the Sales.

49.    As set forth above, the Debtors have a sound business justification for the Sales. First, the Debtors believe the Sales will maximize the Remaining Real Estate Assets' value through a competitive marketing and auction process.   The Sales will be subject to competing bids, enhancing the Debtors' ability to receive the highest or otherwise best value for the Assets. Consequently, the ultimately successful bid or bids, after being subject to a further "market check" in the form of the Auction, will constitute, in the Debtors' reasonable business judgment, the highest or otherwise best offer for the Remaining Real Estate Assets and will provide a greater recovery for their estates than any known or practically available alternative. *See, e.g., In re Trans World Airlines, Inc.*, No. 01-00056, 2001 WL 1820326, at *4 (Bankr. D. Del. 2001) (while a "section 363(b) sale transaction does not require an auction procedure . . . the auction procedure has developed over the years as an effective means for producing an arm's length fair value transaction."); *see also In re Wintz Cos.*, 219 F.3d 807, 813 (8th Cir. 2000) (holding that an auction procedure for the disposition of the debtor's property can be structured to "maximize the value of estate property").   Further, the Debtors are reserving their rights to not enter into a Sale if the Debtors believe in their reasonable business judgment that entry into any such Sale will not maximize the value of the Remaining Real Estate Asset(s) being considered.

50.    Thus, the Debtors submit that any Successful Bidder's bid, which may include a Stalking Horse Agreement, will constitute the highest or otherwise best offer for the Remaining Real Estate Assets and will provide a greater recovery for the Debtors' estates than would be provided by any other available alternative.   As such, the Debtors' determination to sell the Remaining Real Estate Assets through an Auction process and to enter into the Stalking Horse

Agreement will be a valid and sound exercise of the Debtors' business judgment.  The Debtors

will submit evidence at the Sale Hearing to support these conclusions.  Therefore, the Debtors

request that the Court make a finding that the proposed Sale(s) are a proper exercise of the Debtors'

business judgment and are rightly authorized.

### B.      The Debtors Will Provide Adequate and Reasonable Notice of the Sales.

51.      As described above, the Auction and Hearing Notice: (a) will be served in a manner

that provides adequate notice of the date, time, and location of the Sale Hearing; (b) informs parties

in interest of the deadlines for objecting to the Sales or the assumption and assignment of the

Assumed Leases; and (c) otherwise includes all information relevant to parties interested in or

affected by the Sale(s).  Significantly, the form and manner of the Auction and Hearing Notice

will have been approved by the Court pursuant to the Bidding Procedures Order after notice and a

hearing before it is served on parties in interest.

### C.      The Sales and Purchase Prices Will Reflect a Fair Market Value Sale.

52.      It is well settled that, where there is a court-approved auction process, a full and

fair price is presumed to have been obtained for the assets sold, as the best way to determine value

is exposure to the market.  *See Bank of Am. Nat'l Trust & Sav. Ass'n. v. 203 N. LaSalle St. P'ship*,

526 U.S. 434, 457 (1999) (explaining that the "best way to determine value is exposure to a

market"); *see also In re Wintz Cos.*, 219 F.3d 807, 813 (8th Cir. 2000) (holding that an auction

procedure for the disposition of the debtor's property can be structured to "maximize the value of

estate property").  The process proposed here will allow the market to set a value for any Sale(s).

### D.      The Sales Are Proposed in Good Faith and Without Collusion, and Any Successful Bidder Will Be a Good-Faith Purchaser.

53.      The Debtors request that the Court find that the Successful Bidder will be entitled

to the benefits and protections provided by section 363(m) of the Bankruptcy Code in connection

with the Sale(s).

27

54.     Section 363(m) of the Bankruptcy Code provides in pertinent part:

> [t]he reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease or property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).

55.     Section 363(m) of the Bankruptcy Code thus protects the purchaser of assets sold pursuant to section 363 of the Bankruptcy Code from the risk that it will lose its interest in the purchased assets if the order allowing the sale is reversed on appeal, as long as such purchaser leased or purchased the assets in "good faith."  While the Bankruptcy Code does not define "good faith," courts have held that a purchaser shows its good faith through the integrity of its conduct during the course of the sale proceedings, finding that where there is a lack of such integrity, a good-faith finding may not be made.  *See, e.g., In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 147 (3d Cir. 1986) ("Typically, the misconduct that would destroy a [buyer's] good faith status at a judicial sale involves fraud, collusion between the [proposed buyer] and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders."); *In re Paulson*, 276 F.3d 389, 392 (8th Cir. 2002); *In re Trism, Inc.*, 328 F.3d 1003, 1006 (8th Cir. 2003); *In re Sasson Jeans, Inc.*, 90 B.R. 608, 610 (S.D.N.Y. 1988) (same).  The Debtors submit that the Successful Bidder will be deemed a "good faith purchaser" within the meaning of section 363(m) of the Bankruptcy Code, and any Stalking Horse Agreement, or any marked versions thereof, is a good-faith agreement on arm's-length terms entitled to the protections of section 363(m) of the Bankruptcy Code.[9]

---

[9]     The Debtors believe that a finding of good faith within the meaning of section 363(m) of the Bankruptcy Code is appropriate for the Successful Bidder.  Pursuant to the Bidding Procedures, the Successful Bidder will have had to present a proposal in accordance with the Bidding Procedures.  In addition, the Debtors will not choose as the Successful Bidder or Backup Bidder (as defined in the Bidding Procedures) any entity whose good faith under

56.     First, as set forth in more detail above, the consideration to be received by the Debtors pursuant to the Sales will be substantial, fair, and reasonable.  Second, any sale agreement with the Successful Bidder will be the culmination of a competitive Auction in which the parties will presumably be represented by counsel and all negotiations will be conducted on an arm's-length, good-faith basis.  Third, there will be no indication of any "fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders" or similar conduct that would cause or permit the Sales to be avoided under section 363(n) of the Bankruptcy Code.  *In re Abbotts Dairies of Pa., Inc., supra.*  And, with respect to potential bidders, the Bidding Procedures are designed to ensure that no party is able to exert undue influence over the process.  Fourth, any Successful Bidder's offer will have been evaluated and approved by the Debtors in consultation with their advisors.  Accordingly, the Debtors believe that the Successful Bidder and Stalking Horse Agreement (or marked version thereof) will be should to the full protections of section 363(m) of the Bankruptcy Code.

**E.      The Sales Should be Approved "Free and Clear" Under Section 363(f).**

57.     Section 363(f) of the Bankruptcy Code permits a debtor to sell property free and clear of another party's interest in the property if:  (a) applicable nonbankruptcy law permits such a free and clear sale; (b) the holder of the interest consents; (c) the interest is a lien and the sale price of the property exceeds the value of all liens on the property; (d) the interest is the subject of a bona fide dispute; or (e) the holder of the interest could be compelled in a legal or equitable proceeding to accept a monetary satisfaction of its interest.  *See* 11 U.S.C. § 363(f).

---

section 363(m) of the Bankruptcy Code can reasonably be doubted, and will be prepared to present the Court with sufficient evidence to allow the Court to find that the "good faith" standard of section 363(m) of the Bankruptcy Code has been satisfied.

58.     Section 363(f) is drafted in the disjunctive.   Thus, satisfaction of any of the requirements enumerated therein will suffice to warrant the sale of the Debtors' Assets free and clear of all liens, claims, rights, interests, charges, or encumbrances ("Interests"), except with respect to any Interests that may be assumed liabilities under a Successful Bidder's purchase agreement.  *See In re Kellstrom Indus., Inc.*, 282 B.R. 787, 793 (Bankr. D. Del. 2002) ("[I]f any of the five conditions are met, the debtor has the authority to conduct the sale free and clear of all liens.").

59.     The Debtors submit that any interest that will not be an assumed liability satisfies or will satisfy at least one of the five conditions of section 363(f) of the Bankruptcy Code, and that any such Interest will be adequately protected by either being paid in full at the time of closing, or by having it attach to the net proceeds of the Sales, subject to any claims and defenses the Debtors may possess with respect thereto.   The Debtors accordingly request authority to convey the Remaining Real Estate Assets free and clear of all Interests, with any such interests to attach to the proceeds of the Sales, provided that any payment on account of such liens, claims, interests, and encumbrances are subject to further order of the Court,.[10]

## IV.     The Form and Manner of the Auction and Hearing Notice Should Be Approved.

60.     Pursuant to Bankruptcy Rule 2002(a), the Debtors are required to provide creditors with 21 days' notice of the Sale Hearing.  Pursuant to Bankruptcy Rule 2002(c), such notice must include the time and place of the Auction and the Sale Hearing and the deadline for filing any objections to the relief requested herein.

61.     As noted above, within three days of entry of authorization of the Auction and Hearing Notice, or as soon as reasonably practicable thereafter, the Debtors will serve the Auction

---

[10]   The Debtors do not seek authority to sell any non-Debtor property free and clear pursuant to section 363(f) of the Bankruptcy Code, but rather will assign such interests consistent with their underlying property documents.

and Hearing Notice upon the Notice Parties, and also publish an abbreviated version of the Auction and Hearing Notice in *The Wall Street Journal (National Edition)* and the *Richmond Times-Dispatch*, and the Case Website.

62.     The Debtors submit that notice of this motion and the related hearing to consider entry of the Bidding Procedures Order, coupled with service of the Auction and Hearing Notice, and the Assumption and Assignment Procedures as provided for herein, constitutes good and adequate notice of the Sales and the proceedings with respect thereto in compliance with, and satisfaction of, the applicable requirements of Bankruptcy Rule 2002.  Accordingly, the Debtors request that the Court approve the form and manner of the Auction and Hearing Notice.

**V.     The Assumption Procedures Are Appropriate and Should Be Approved.**

63.     As set forth above, the Sales contemplate the assumption and assignment of the Assumed Leases to the Successful Bidder.  In connection with this process, the Debtors believe it is necessary to establish a process by which:  (a) the Debtors and Assigned Lease Counterparties can reconcile cure obligations, if any, in accordance with section 365 of the Bankruptcy Code; and (b) such counterparties can object to the assumption and assignment of the Assumed Leases and/or related cure amounts.

64.     As set forth in the Bidding Procedures Order, the Debtors also request that any party that fails to object to the proposed assumption and assignment of any Assigned Lease be deemed to consent to the assumption and assignment of the applicable Assigned Lease pursuant to section 365 of the Bankruptcy Code on the terms set forth in the Sales Order, along with the cure amounts identified in the Notice of Assumption and Assignment.  *See, e.g., In re Tabone, Inc.*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (by not objecting to sale motion, creditor deemed to consent); *Pelican Homestead v. Wooten (In re Gabel)*, 61 B.R. 661, 667 (Bankr. W.D. La. 1985) (same).

65.     The Debtors believe that the Assumption and Assignment Procedures are fair and reasonable, provide sufficient notice to the Assigned Lease Counterparties, and provide certainty to all parties in interest regarding their obligations and rights in respect thereof.  Accordingly, the Debtors request the Court approve the Assumption and Assignment Procedures set forth in the Bidding Procedures Order.

## VI.    The Assumption and Assignment of the Leases Should Be Approved.

### A.    The Assumption and Assignment of the Leases Reflects the Debtors' Reasonable Business Judgment.

66.     To facilitate and effectuate the Sales, the Debtors are seeking authority to assign or transfer the Assumed Leases to the Successful Bidder to the extent required by the Successful Bidder.

67.     Section 365 of the Bankruptcy Code authorizes a debtor to assume and/or assign its executory contracts and unexpired leases, subject to the approval of the court, provided that the defaults under such contracts and leases are cured and adequate assurance of future performance is provided.  The Debtors' decision to assume or reject an executory contract or unexpired lease must only satisfy the "business judgment rule" and will not be subject to review unless such decision is clearly an unreasonable exercise of such judgment.  *See, e.g., Grp. of Institutional Investors v. Chicago, Milwaukee, St. Paul & Pac. Ry. Co.*, 318 U.S. 523 (1943) (applying Bankruptcy Act section 77(b), predecessor to Bankruptcy Code section 365, and rejecting test of whether executory contract was burdensome in favor of whether rejection is within debtor's business judgment); *Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 40 (3d Cir. 1989) (describing deference to a debtor's business judgment as "breathing space afforded [to] the debtor to consider whether to reject or assume executory contracts under the Code."); *In re Spirit Holding Co., Inc.*, 166 B.R. 371, 378 (Bankr. E.D. Mo. 1994) (providing that the standard for

approving the assumption of an executory contract is to determine if the debtor "exercise[d] wise business judgment").

68.    Here, the Court should approve the decision to assume and assign the Assumed Leases in connection with the Sales as a sound exercise of the Debtors' business judgment.  First, the Assumed Leases are essential to inducing the best offer for some or all of the Remaining Real Estate Assets.  Second, the Assumed Leases will be assumed and assigned through the process approved by the Court pursuant to the Bidding Procedures Order and, thus, will be reviewed by key constituents in these chapter 11 cases.

69.    Accordingly, the Debtors submit that the assumption and assignment of the Assumed Leases by way of the Assumption and Assignment Procedures should be approved as an exercise of their business judgment.

**B.    Assumption and Assignment of the Unexpired Leases Satisfies the Requirements of the Bankruptcy Code.**

70.    Upon finding that a debtor has exercised its business judgment in determining that assuming an executory contract is in the best interest of its estate, courts must then evaluate whether the assumption meets the requirements of section 365(b) of the Bankruptcy Code, specifically that a debtor (a) cure, or provide adequate assurance of promptly curing, prepetition defaults in the executory contract, (b) compensate parties for pecuniary losses arising therefrom, and (c) provide adequate assurance of future performance thereunder.  This section "attempts to strike a balance between two sometimes competing interests, the right of the contracting non-debtor to get the performance it bargained for and the right of the debtor's creditors to get the benefit of the debtor's bargain."  *In re Luce Indus., Inc.*, 8 B.R. 100, 107 (Bankr. S.D.N.Y. 1980).

C. **Defaults Under the Assumed Leases Will Be Cured in Connection with the Sales.**

71.     The Debtors submit that the statutory requirements of section 365(b)(1)(A) of the Bankruptcy Code will be promptly satisfied because the Stalking Horse Agreement requires the cure of all defaults associated with, or that are required to properly assume, the Assumed Leases. Because the Assumption and Assignment Procedures provide a clear process by which to resolve disputes over cure amounts or other defaults, the Debtors are confident that if defaults exist that must be cured, such cure will be achieved fairly, efficiently, and properly, consistent with the Bankruptcy Code and with due respect to the rights of non-Debtor parties.

D. **Non-Debtor Parties Will Be Adequately Assured of Future Performance.**

72.     Similarly, the Debtors submit that the third requirement of section 365(b) of the Bankruptcy Code—adequate assurance of future performance—is also satisfied given the facts and circumstances present here.  "The phrase 'adequate assurance of future performance' adopted from section 2-609(1) of the Uniform Commercial Code, is to be given a practical, pragmatic construction based upon the facts and circumstances of each case."  *In re U.L. Radio Corp.*, 19 B.R. 537, 542 (Bankr. S.D.N.Y. 1982); *see In re Alipat, Inc.*, 36 B.R. 274, 277 (Bankr. E.D. Mo. 1984).  Although no single solution will satisfy every case, "the required assurance will fall considerably short of an absolute guarantee of performance."  *In re Prime Motor Inns, Inc.*, 166 B.R. 993, 997 (Bankr. S.D. Fla. 1994).  Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned.  *See In re Bygaph, Inc.*, 56 B.R. 596, 605–06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance present where a prospective assignee has financial resources and has expressed a willingness to devote sufficient funding to a business to give it a strong likelihood of succeeding).

73.     The Debtors submit that the information required for any bidder to become a Qualified Bidder satisfies any adequate assurance inquiry.   Further, the Bidding Procedures provide that the Debtors may disseminate certain information of a Qualified Bidder to affected landlords to satisfy the requirement of providing adequate assurance of future performance.

**VII.    Relief Under Bankruptcy Rules 6004(h) and 6006(d) Is Appropriate.**

74.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of fourteen days after the entry of the order, unless the court orders otherwise."  Fed. R. Bankr. P. 6004(h).   Additionally, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease . . . is stayed until the expiration of fourteen days after the entry of the order, unless the court orders otherwise."  Fed. R. Bankr. P. 6006(d).   The Debtors request that the Sales Order be effective immediately upon its entry by providing that the fourteen-day stays under Bankruptcy Rules 6004(h) and 6006(d) are waived.

75.     The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to appeal before an order can be implemented.  See Advisory Committee Notes to Fed. R. Bankr. P. 6004(h) and 6006(d).  Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the fourteen-day stay period, the leading treatise on bankruptcy suggests that the fourteen-day stay should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to procedure."  10 Collier on Bankr. ¶ 6004.10 (15th rev. ed. 2006).  Furthermore, if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal.  *Id.*

76.    To maximize the value received for the Assets, the Debtors seek to close the Sales as soon as possible after the Sale Hearing.  Accordingly, the Debtors hereby request that the Court waive the 14-day stay period under Bankruptcy Rules 6004(h) and 6006(d).

### Waiver of Memorandum of Law

77.    The Debtors respectfully request that this Court treat this Motion as a written memorandum of law or waive any requirement that this Motion be accompanied by a written memorandum of law as described in Local Bankruptcy Rule 9013-1(b).

### Reservation of Rights

78.    Nothing contained herein is intended or shall be construed as: (a) an admission as to the amount of, basis for, or validity of any claim against the Debtors under the Bankruptcy Code, any foreign bankruptcy or insolvency law, including the CCAA, or other applicable nonbankruptcy law; (b) a waiver of the Debtors' or any other party in interest's right to dispute any claim, (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined in this motion; (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code or pursuant to the CCAA; (f) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; or (g) a waiver of any claims or causes of action which may exist against any entity under the Bankruptcy Code, the CCAA, or any other applicable law.

### Notice

79.    The Debtors will provide notice of this Motion via first class mail and email (where available) to: (a) the Office of the United States Trustee for the Eastern District of Virginia, Attn: Robert B. Van Arsdale and Lynn A. Kohen; (b) counsel to the committee of unsecured creditors; (c) DIP ABL Agent and the advisors and counsel thereto; (d) DIP Taj Term Loan Agent and the

advisors and counsel thereto; (e) DIP Delaware Term Loan Agent and the advisors and counsel thereto; (f) the indenture trustee for the TRU Taj 12.00% Senior Notes and the advisors and counsel thereto; (g) the administrative agent for the prepetition Secured Revolving Credit Facility and the advisors and counsel thereto; (h) the administrative agent for the prepetition Secured Term Loan B Facility and the advisors and counsel thereto; (i) the prepetition administrative agent for the Propco I Unsecured Term Loan Facility and the advisors and counsel thereto; (j) the agent for the Propco II Mortgage Loan and the advisors and counsel thereto; (k) the agent for the Giraffe Junior Mezzanine Loan and the advisors and counsel thereto; (l) the administrative agent for the prepetition European and Australian Asset-Based Revolving Credit Facility and the advisors and counsel thereto; (m) the administrative agent for the Senior Unsecured Term Loan Facility and the advisors and counsel thereto; (n) the indenture trustee for the Debtors' 7.375% Senior Notes and the advisors and counsel thereto; (o) the indenture trustee for the Debtors' 8.75% Unsecured Notes and the advisors and counsel thereto; (p) counsel to the ad hoc group of the Term B-4 Holders; (q) counsel to the Ad Hoc Committee of Taj Noteholders; (r) the monitor in the CCAA proceeding and counsel thereto; (s) the Debtors' Canadian Counsel; (t) the Internal Revenue Service; (u) the office of the attorneys general for the states in which the Debtors operate; (v) the Securities and Exchange Commission; and (w) any party that has requested notice pursuant to Bankruptcy Rule 2002 (collectively, the "Notice Parties").  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## No Prior Request

80.    No prior motion for the relief requested herein has been made to this or any other court.

*[Remainder of page intentionally left blank]*

Richmond, Virginia
Dated:   April 19, 2018

/s/ *Jeremy S. Williams*

**KUTAK ROCK LLP**
Michael A. Condyles (VA 27807)
Peter J. Barrett (VA 46179)
Jeremy S. Williams (VA 77469)
901 East Byrd Street, Suite 1000
Richmond, Virginia 23219-4071
Telephone:   (804) 644-1700
Facsimile:   (804) 783-6192
Email:        Michael.Condyles@KutakRock.com
              Peter.Barrett@KutakRock.com
              Jeremy.Williams@KutakRock.com

*Co-Counsel to the Debtors*
*and Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C.
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:   (212) 446-4800
Facsimile:   (212) 446-4900
Email:        edward.sassower@kirkland.com
              joshua.sussberg@kirkland.com

-and-

James H.M. Sprayregen, P.C.
Anup Sathy, P.C.
Chad J. Husnick, P.C. (admitted *pro hac vice*)
Emily E. Geier (admitted *pro hac vice*)
300 North LaSalle
Chicago, Illinois 60654
Telephone:   (312) 862-2000
Facsimile:   (312) 862-2200
Email:        james.sprayregen@kirkland.com
              anup.sathy@kirkland.com
              chad.husnick@kirkland.com
              emily.geier@kirkland.com

*Co-Counsel to the Debtors*
*and Debtors in Possession*

**<u>Exhibit A</u>**

**Proposed Order**

Edward O. Sassower, P.C.
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:        (212) 446-4800
Facsimile:        (212) 446-4900

-and-

Michael A. Condyles (VA 27807)
Peter J. Barrett (VA 46179)
Jeremy S. Williams (VA 77469)
**KUTAK ROCK LLP**
901 East Byrd Street, Suite 1000
Richmond, Virginia 23219-4071
Telephone:        (804) 644-1700
Facsimile:        (804) 783-6192

James H.M. Sprayregen, P.C.
Anup Sathy, P.C.
Chad J. Husnick, P.C. (admitted *pro hac vice*)
Emily E. Geier (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:        (312) 862-2000
Facsimile:        (312) 862-2200

*Co-Counsel to the Debtors and Debtors in Possession*

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### RICHMOND DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| TOYS "R" US, INC., *et al.*,[1] | ) | Case No. 17-34665 (KLP) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## ORDER (I) ESTABLISHING
## BIDDING PROCEDURES FOR THE
## REMAINING REAL ESTATE ASSETS OF TOYS
## DELAWARE AND (II) GRANTING RELATED RELIEF

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession

(collectively, the "Debtors") for entry of an order (this "Order") (a) establishing bidding

procedures, attached hereto as **Exhibit 1** (the "Bidding Procedures"), by which the Debtors will

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are set forth in the *Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief* [Docket No. 78].  The location of the Debtors' service address is One Geoffrey Way, Wayne, New Jersey 07470.

[2]    Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

solicit and select the highest or otherwise best offer(s) for the sale, or sales (the "Sales"), of any remaining owned real property and commercial leases of Toys "R" Us-Delaware, Inc. ("Toys Delaware," and such assets, the "Remaining Real Estate Assets") at all future auctions of the Remaining Real Estate Assets (each, an "Auction"); (b) approving the form and manner of notice for any Auction and subsequent sale hearing (each, a "Sale Hearing") attached hereto as **Exhibit 2** (the "Auction and Hearing Notice"); (c) approving the noticing and procedures for the assumption and assignment of executory contracts and unexpired leases sold at an Auction, including the notice of proposed cure amounts, attached hereto as **Exhibit 3** (the "Assignment Notice"); (d) approving the form agreements attached to the Bidding Procedures as **Exhibit A**; (e) scheduling an initial Auction and hearing to approve the Sales (the "Sale Hearing"); (f) approving procedures for selling certain Remaining Real Estate Assets not sold at the Auctions; and (g) granting related relief, it is **HEREBY ORDERED THAT**:

1.    The Motion is granted as provided herein.

2.    All objections to the relief requested in the Motion that have not been withdrawn, waived, or settled as announced to this Court at the hearing on the Motion or by stipulation filed with this Court, are overruled.

**I.    Auction and Bidding Procedures.**

3.    The Bidding Procedures, attached as **Exhibit 1** hereto, are incorporated herein and are hereby approved in their entirety, and the Bidding Procedures shall govern the submission, receipt, and analysis of all bids related to any Sales of the Remaining Real Estate Assets and any Auction.  Any party desiring to submit a bid shall comply with the Bidding Procedures and this

Order.  The Debtors are authorized to take any and all actions necessary to implement the Bidding Procedures.

4.      If the Debtors do not receive a Qualified Bid as to a particular Remaining Real Estate Asset by the Bid Deadline (or such later date as may be determined by the Debtors in consultation with the Consultation Parties), the Auction shall be cancelled or adjourned (as may be determined by the Debtors in consultation with the Consultation Parties) as to such asset.  If the Debtors receive one or more Qualified Bids, the Debtors will conduct the Auction in accordance with the Bidding Procedures.

5.      At the Auction, each Qualified Bidder will be entitled, but will not be obligated, to submit overbids and will be entitled in any such overbids to credit bid all or a portion of the value of the secured portion of its claims, if any, within the meaning of section 363(k) of the Bankruptcy Code.  Each counterparty to a Lease proposed to be sold or transferred at the Auction (each a "Lease Counterparty") may credit bid all or a portion of the applicable Cure Cost (as defined below) proposed by such Lease Counterparty.  If such Lease Counterparty is the Successful Bidder on the applicable Lease, and it is later determined by this Court or agreement by and among the Debtors and Lease Counterparty that the actual Cure Cost is a lesser amount, then the Lease Counterparty shall pay the difference in cash prior to the Sale Closing Deadline.  For the avoidance of doubt, any Lease Counterparty shall be deemed a Qualified Bidder.

6.      At or following the Auction, the Debtor who is a party to the lease, as applicable, may:  (a) select, in its business judgment, pursuant to the Bidding Procedures, (i) the highest or otherwise best bid as the Successful Bidder and (ii) the second highest or otherwise second-best bid as the Backup Bidder; and (b) reject any bid (regardless of whether such bid is a Qualified Bid) that, in such Debtor's business judgment, is (i) inadequate, insufficient, or not the highest or best

3

bid, (ii) not in conformity with the requirements of the Bankruptcy Code, the Bankruptcy Rules, or the Bidding Procedures, or (iii) contrary to, or otherwise not in the best interests of the Debtors' estates, affected stakeholders, or other parties in interest, in each case subject to and in accordance with the Bidding Procedures.  For the avoidance of doubt, no Debtor is required to name a Successful Bidder for any given Remaining Real Estate Asset or group thereof and may elect to not sell such asset to the highest or otherwise best bidder.

7.      In the event the Successful Bidder does not close for any given Remaining Real Estate Asset, the Debtors shall promptly file a supplemental notice on or before the Sale Closing Deadline, seeking to approve the sale to the Backup Bidder, if applicable, on expedited notice and a hearing.  The Backup Bidder (as identified by the Notice of Successful and Backup Bidders) shall not be approved at the Sale Hearing.  If the Debtors submit a supplemental notice of a Backup Bidder, the deadline to assume or reject the applicable Lease shall be tolled until the applicable hearing.  If any sale to a Backup Bidder is not approved by this Court, any applicable Leases shall be deemed rejected on the Sale Closing Deadline, unless otherwise ordered by the Court.

8.      Notwithstanding anything to the contrary in this Order, Debtors Toys "R" Us Europe, LLC, TRU Taj Holdings 1, LLC, TRU Taj Holdings 2, Limited, TRU Taj Holdings 3, LLC, TRU Taj LLC, TRU Taj (Europe) Holdings, LLC, TRU Taj Asia, LLC, and Tru Taj Finance, Inc. shall not be authorized to make any payments under this Order, including any payments in respect of the Bid Protections.

## II.    Notice of Sale, Auction, and Sale Hearing.

9.      The Debtors may utilize these Bidding Procedures for future Auctions by filing an Auction and Hearing Notice that contains: (a) all relevant dates for the Auction, including the Bid Deadline, Notice of Qualified Bids, Auction, Notice of Successful and Backup Bidders, Sale

4

Objection Deadline, Hearing date, and Sale Closing Deadline; (b) a list of properties to be sold at the Auction; and (c) a copy of the Bidding Procedures approved herein.

10.     Parties will have the right to object to the proposed Auction (or related dates) by filing an objection (an "Auction Objection") with the Court by 5:00 p.m. (prevailing Eastern Time) fourteen (14) days after the Debtors file the Auction and Hearing Notice and serving it on the Objection Notice Parties (as defined herein).  If no Auction Objections are filed and served as set forth herein, the Auction (and related dates) will be deemed authorized and approved without any further order of the Court and the Debtors are authorized to proceed with the Auction and all applicable related dates.  If the Debtors receive any Auction Objections that the parties cannot consensually resolve, the Debtors will set a hearing with the Court to approve the Auction.

11.     Within three (3) days after the Auction is authorized, or as soon as reasonably practicable thereafter, following a hearing or deemed authorized by the expiration of the Auction Objection period, the Debtors will file and serve on the Notice Parties (as defined herein) an Auction and Hearing Notice.  The Auction and Hearing Notice will indicate that copies of this Order and any future sale documents, if applicable, can be obtained on the website of the Debtors' claims and noticing agent, Prime Clerk, http://www.cases.primeclerk.com/toysrus (the "Case Website").

12.     Within three (3) days after the Auction is authorized following a hearing or deemed authorized by the expiration of the Auction Objection period, or as soon as reasonably practicable thereafter, the Debtors will place a publication version of the Auction and Hearing Notice for one day in *The USA Today (National Edition)* and the *Richmond Times Dispatch*, and post it onto the Case Website.

5

13.     The Debtors shall be permitted to choose a Stalking Horse Bidder through and including two days prior to the Auction.

14.     The Debtors shall file any Auction and Hearing Notice at least 21 days prior to the proposed Sale Hearing.  Such notice is deemed sufficient and proper notice of the Sales with respect to known interested parties.

15.     After the conclusion of the Auction, the Debtors will file on the docket, but not serve on any party other than the Objection Notice Parties (as defined herein), a notice identifying the Successful Bidder(s) and Backup Bidder(s) (the "Notice of Successful and Backup Bidders"), identifying the applicable Successful Bidder(s), Remaining Real Estate Asset(s), the key terms of the agreement, and any Expense Reimbursement and/or Breakup Fee proposed to be paid, substantially in the form attached to this Order as **Exhibit 4**.

16.     The Debtors shall seek approval of any Bid Protections at the Sale Hearing, *provided*, that, for the avoidance of doubt, the amount of the Breakup Fee shall not exceed three percent (3%) of any proposed Stalking Horse Bidder Purchase Price; *provided further,* that the Debtors will only select one Stalking Horse Bidder per Remaining Real Estate Asset, regardless of whether such Remaining Real Estate Asset is part of a single or group bid; *provided further,* that the Debtors will provide Expense Reimbursements only to the Stalking Horse Bidder and such expenses must be reasonable, documented, and subject to review by the Debtors and the Objection Notice Parties (as defined herein), who shall have the right to review upon 14 days' notice and shall have the right to raise objections during that time to be heard at the Sale Hearing.  For the avoidance of doubt, the Consultation Parties will retain the right to object to the payment of any Bid Protections.

6

17.    Parties objecting to approval of the proposed Sales must file a written objection (each, a "Sale Objection") so that such Sale Objection is filed with the Court by the date listed in the Auction and Hearing Notice, and serve such Sale Objection on the following parties (the "Objection Notice Parties"):  (a) Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, Attn: Joshua A. Sussberg, P.C., and Kirkland & Ellis LLP, 300 North LaSalle Street, Chicago, Illinois 60654, Attn:  Chad Husnick, P.C. and Emily Geier, and Kutak Rock LLP, 901 East Byrd Street, Suite 1000, Richmond, Virginia 23218, Attn:  Michael A. Condyles, Peter J. Barrett, and Jeremy S. Williams, co-counsel to the Debtors; (b) the Office of the United States Trustee for the Eastern District of Virginia, Attn:  Robert B. Van Arsdale and Lynn A. Kohen; (c) Kramer Levin Naftalis & Frankel LLP, 1177 Avenue of the Americas, New York, New York 10036, Attn:  Adam C. Rogoff, Esq. and Rachael Ringer, Esq., counsel to the Official Committee of Unsecured Creditors; (d) Davis, Polk & Wardwell LLP, 450 Lexington Avenue, New York, New York 11017, Attn:  Marshall Huebner and Kenneth Steinberg, counsel to the DIP ABL Agent; and (e) Wachtell, Lipton, Rosen, and Katz, 51 West 52nd Street, New York, New York 10019, Attn:  Joshua A. Feltman, counsel to the DIP Delaware Term Loan Agent.

A.    **Dates and Deadlines of Initial Auction of Remaining Real Estate Assets.**

18.    The following dates and deadlines are hereby approved for the initial Auction of Remaining Real Estate Assets included on **Exhibit 5** hereto,[3] which the Debtors may adjourn from time to time[4] in order to facilitate a smooth and efficient sale process:

(a)    **Stalking Horse Date**:  **May 25, 2018, at 5:00 p.m., prevailing Eastern Time**, until two days prior to the Auction, as the period during which the Debtors

---

[3]    The Debtors reserve the right to amend the list of properties to be sold at any Auction at any time and for any reason in their business judgment, in consultation with the Consultation Parties.

[4]    For the avoidance of doubt, the Debtors may, upon notice to the Consultation Parties and after consultation with their advisors, extend any of the proposed dates as to any of the Remaining Real Estate Assets in order to facilitate an efficient and value-maximizing process for the portfolio of Remaining Real Estate Assets as a whole.

may choose a Stalking Horse Bidder, if any.

(b) **Bid Deadline**: **May 29, 2018, at 5:00 p.m., prevailing Eastern Time**, as the deadline by which all bids must be actually received pursuant to the Bidding Procedures.

(c) **Notice of Qualified Bid**s:  **June 5, 2018, at 5:00 p.m., prevailing Eastern Time**, as the date and time by which the Debtors shall file with the Court a notice of Qualified Bids.

(d) **Auction**: **June 11, 2018, at 10:00 a.m., prevailing Eastern Time**, as the date and time by which the Auction, if needed, would be held at the offices of Kirkland & Ellis LLP, located at:  601 Lexington Avenue, New York, NY 10022.

(e) **Notice of Successful and Backup Bidders**:  if applicable, **June 13, 2018,** as the date by which the Debtors must file with the Court a notice of Successful and Backup Bidders (as defined herein).

(f) **Sale Objection Deadline**:  if applicable, **June 17, 2018, at 5:00 p.m.**, prevailing Eastern Time, as the deadline to object to the Sale, proposed assumption and assignment, and/or to the Successful Bidder's proposed form of adequate assurance of future performance.

(g) **Hearing to Designate Successful Bidder(s)**:  **June 25, 2018,** (or such other date as determined by the Court's availability) is the date set for a hearing at which the Debtors shall seek approval from the Court to designate the Successful Bidders in connection with the Sales.  The Sale Hearing shall be an evidentiary hearing on matters relating to the Sales and there will be no further bidding at the Sale Hearing.  In the event that the Successful Bidder cannot or refuses to consummate the Sales, the Debtors may, in accordance with the Bidding Procedures, and after consultation with the Consultation Parties, designate the Backup Bid to be the new Successful Bid and the Backup Bidder to be the new Successful Bidder, and the Debtors shall be authorized, but not required, to consummate the transaction with the Backup Bidder without further order of the Court.

**B.**     **Notice of Successful Bidder.**

19.    As soon as reasonably practicable after the conclusion of the Auction, the Debtors shall file on the docket, but not serve, a notice identifying the Successful Bidder(s) (the "Notice of Successful and Backup Bidders"), Remaining Real Estate Asset(s), key terms of the agreement, and identifying the Backup Bidder(s), substantially in the form attached hereto as **Exhibit 4**.

### III.    Summary of the Assumption Procedures.

20.    The Assumption and Assignment Procedures below are hereby approved and shall be the procedures by which the Debtors will notify counterparties (the "Lease Counterparties") to unexpired leases (the "Leases") of proposed cure amounts in the event the Debtors determine to assume and assign such contracts or leases in connection with a sale, liquidation, or other disposition.

21.    On a date no later than ten days prior to the Sale Hearing, the Debtors shall file with the Court a notice in the form attached hereto as **Exhibit 3** (the "Assumption and Assignment Notice") to assume one or more Leases pursuant to section 365 of the Bankruptcy Code, which shall set forth, among other things: (i) the Lease or Leases to be assumed; (ii) the names and addresses of the counterparties to such Leases; (iii) the identity of the proposed assignee of such Leases (the "Assignee"), if applicable; (iv) the effective date of the assumption for each such Lease (the "Assignment Date"); (v) the proposed cure amount (the "Cure Costs"), if any for each such Lease; (vi) a description of any material amendments to the Lease made outside of the ordinary course of business; and (vii) the deadlines and procedures for filing objections to the Assumption and Assignment Notice (as set forth below).

22.    The Debtors will cause the Assumption and Assignment Notice to be served (i) by overnight delivery service upon the Lease Counterparties affected by the Assumption and Assignment Notice at the address set forth in the notice provision of the applicable Lease (and their counsel, if known) and (ii) by first class mail, email, or fax upon the Notice Parties.

23.    To the extent the Debtors seek to assume and assign a lease of non-residential real property, the Debtors will provide by overnight delivery to the applicable Lease Counterparty (and their counsel, if known), within 24 hours of the Qualified Bid Deadline upon request by a Lease

Counterparty that has submitted a valid ROFR Notice (as defined in the Bidding Procedures) and within 24 hours upon request by any other Lease Counterparty following the filing of the Notice of Successful and Backup Bidders, evidence that the proposed assignee of the lease has the ability to comply with the requirements of adequate assurance of future performance required under sections 365(b)(1) or 365(b)(3), as applicable, including the Adequate Assurance Package (as defined in the Bidding Procedures) on a confidential basis.

24.    Parties objecting to a proposed assumption and assignment and/or to a Successful Bidder's proposed form of adequate assurance of future performance must file a written objection with the Court by the Sale Objection Deadline (each, an "Assignment Objection") and serve such Assignment Objection on the Objection Notice Parties.

25.    If no objection to the assumption of any Lease is timely filed, each Lease shall be assumed as of the Assignment Date set forth in the applicable Assignment Notice or such other date as the Debtors and the Lease Counterparties agree and the proposed cure amount shall be binding on all Lease Counterparties and no amount in excess thereof shall be paid for cure purposes; *provided*, *however* that the Assignment Date for a lease of nonresidential real property shall not occur earlier than the date the Debtors filed and served the applicable Assumption and Assignment Notice.

26.    If the Lease Counterparty does not file and serve an Assignment Objection in a manner that is consistent with the requirements set forth herein, and absent a subsequent order of the Court in connection with such objection establishing an alternative Cure Cost or an agreement between the Debtors and the Lease Counterparty resolving such objection, (a) the Cure Costs, if any, set forth in the Notice of Assumption and Assignment shall be controlling, notwithstanding anything to the contrary in any Assigned Lease or any other document, and (b) the Lease

Counterparty will be deemed to have consented to the assumption and assignment of the Assigned

Lease and the Cure Costs, if any, and will be forever barred from asserting any other claims related

to such Assigned Lease against the Debtors or the Successful Bidder, or the property of any of

them.

27.    The inclusion of an Assigned Lease on the Notice of Assumption and Assignment

will not:  (a) obligate the Debtors to assume any Assigned Lease listed thereon or the Successful

Bidder to take assignment of such Assumed Lease; or (b) constitute any admission or agreement

of the Debtors that such Assigned Leases an executory contract.  Only those Assumed Leases that

are included on a schedule of assumed and acquired contracts attached to a final asset purchase

agreement with a Successful Bidder (including amendments or modifications to such schedules in

accordance with such asset purchase agreement) will be assumed and assigned to the applicable

Successful Bidder.  No Assigned Lease shall be assumed absent closing on the assignment thereof

to the applicable Successful Bidder.

**IV.    Procedures for Unsold Property.**

28.    If the Debtors determine that holding an Auction with respect to a particular

Remaining Real Estate Asset would not result in the highest or otherwise best offer for such asset,

or if the Debtors receive no bids on certain properties prior to the close of the Auction, or if the

Debtors determine (in consultation with the Consultation Parties) that the highest or otherwise best

bid at the Auction will not, in the Debtors' business judgment (in consultation with the

Consultation Parties) maximize the value of the Remaining Real Estate Asset(s) being sold, the

Debtors shall follow the following procedures (the "Non-Auction Sale Procedures") to sell such

Remaining Real Estate Assets (the "Non-Auction Real Estate Assets"):

      a.    With regard to sales or transfers of Non-Auction Real Estate Assets in any
individual transaction or series of related transactions to a single buyer or

group of related buyers with a sale price[5] less than or equal to $5,000,000.00:

i.    subject to the procedures set forth herein, the Debtors (in consultation with the Consultation Parties) are authorized to consummate such transaction(s) without further order of the Court if the Debtors determine in the reasonable exercise of their business judgment that such sales or transfers are in the best interests of their estates and the sale price is higher or otherwise better than any bid received at the Auction, if applicable;

ii.    subject to the Sale Order and any conditions therein, any such transactions shall be deemed final and fully authorized by the Court and free and clear of liens, with such liens attaching only to the sale proceeds with the same validity, extent, and priority as immediately prior to the sale or transfer;

iii.    the Debtors shall cause, at least fourteen (14) days prior to the proposed closing date of such sale or effectuating such transfer, a notice of such sale (a "Non-Auction Sale Notice") to be filed with the Court and served on:  (a) the Office of the United States Trustee for the Eastern District of Virginia, Attn:  Robert B. Van Arsdale and Lynn A. Kohen; (b) Kramer Levin Naftalis & Frankel LLP, 1177 Avenue of the Americas, New York, New York 10036, Attn: Adam C. Rogoff, Esq. and Rachael Ringer, Esq., counsel to the Official Committee of Unsecured Creditors; (c) the DIP ABL Agent and the advisors and counsel thereto; (d) the DIP Delaware Term Loan Agent and the advisors and counsel thereto;  (e) counsel to the administrative agent for the prepetition Secured Term Loan B Facility; (f) the United States Attorney's Office for the Eastern District of Virginia; (g) the office of the attorneys general for the states in which the Debtors operate; (h) the Internal Revenue Service; (i) the United States Securities and Exchange Commission; (j) any party that has requested notice pursuant to Bankruptcy Rule 2002, (k) any Qualified Bidder who placed a bid on such property at the Auction, (l) any counterparty or counterparties to any Lease(s) proposed to be sold or transferred,  (collectively, the "Non-Auction Sale Notice Parties");

iv.    the content of the Non-Auction Sale Notice shall consist of:  (A) an identification of the Non-Auction Real Estate Assets being sold or transferred; (B) an identification of the purchaser of the assets; (C) the purchase price to be paid for the Non-Auction Real Estate

---

[5]    For purposes of these Non-Auction Sale Procedures, "sale price" shall refer to the bidder's proposed purchase price as agreed to by the Debtors (in consultation with the Consultation Parties).

Assets; (D) the marketing or sales process, including any commissions to be paid to third parties, used to sell the assets; and (E) the significant terms of the sale or transfer agreement;[6]

v.   if, within fourteen (14) days after receipt of such Non-Auction Sale Notice by any of the Non-Auction Sale Notice Parties (or such additional time period as my be agreed to by the Debtors), (A) no written objections are filed with the Court, and (B) the Debtors do not receive any competing bids for any of the Non-Auction Real Estate Assets being sold (a "Competing Bid"), the Debtors are authorized to immediately consummate such sale or transfer;

vi.   if any Non-Auction Sale Notice Party files a written objection to any such sale or transfer with the Court within fourteen (14) days (or such additional time period as my be agreed to by the Debtors) after receipt of such Non-Auction Sale Notice, the applicable Non-Auction Real Estate Asset shall only be sold or transferred upon either (A) the consensual resolution of the objection by the parties or (B) further order of the Court after notice and a hearing; and

vii.   if the Debtors receive a Competing Bid, the Debtors will evaluate such Competing Bid, in consultation with the Consultation Parties, and hold an Auction between only the initial purchaser and the competing bidder to determine the higher or otherwise better bid. The Debtors shall be authorized to enter into a sale agreement with the successful bidder at the Auction without further order of this Court.

b.   To the extent the Debtors seek to assume and assign a lease of non-residential real property, the Debtors will, at the request of the applicable lease counterparty, provide evidence to such applicable lease counterparty (and their counsel, if known) within seven (7) days of the Non-Auction Sale Notice demonstrating that the assignee of the lease has the ability to comply with the requirements of adequate assurance of future performance to the extent required under sections 365(b)(1) or 365(b)(3), as applicable.

c.   These Non-Auction Sale Procedures shall not apply to any sale or transfer to an insider, Committee member, or lender of the Debtors.

---

[6]   A copy of the definitive agreement for the applicable Non-Auction Real Estate Assets shall be provided promptly to any Non-Auction Sale Notice Parties upon request.

13

V.    **Miscellaneous.**

29.    All Bids shall be irrevocable.  If any Successful Bidder or Backup Bidder seeks to revoke its Bid for any reason, then the Debtors shall be entitled to retain such bidder's deposit and pursue all contractual remedies against such bidder under law and equity.

30.    Unless otherwise agreed in the applicable Assumption and Assignment Agreement, the Assignee shall assume and cure all outstanding liabilities with respect to the Assigned Asset(s), including, but not limited to, accrued but unbilled adjustments for CAM, real estate taxes and insurance.

31.    For the avoidance of doubt, the relief granted herein shall apply only to the Remaining Real Estate Assets of Toys Delaware.  The Debtors shall not seek to extend any of the relief granted herein to any real property owned or commercial lease subleased by Toys "R" Us Property Company I, LLC ("Propco I") or any subsidiary of Propco I without the prior written consent of Propco I and upon separate motion and further order of this Court.

32.    The Debtors reserve the right to seek authority to sell any of the Remaining Real Estate Assets pursuant to a separate process pursuant to a separate order of this Court.

33.    To the extent this Court authorizes the sale of any Remaining Real Estate Asset pursuant to the Bidding Procedures free and clear of any interest (including, but not limited to, any liens, security interests, or encumbrances) in such Remaining Real Estate Asset pursuant to section 363(f) of the Bankruptcy Code, such interest shall attach to the proceeds of the sale of such Remaining Real Estate Asset, with any payment on account of such liens, claims, interests, and encumbrances subject to further order of this Court.

34.     Except as otherwise set forth in the Bidding Procedures, any right of first refusal over the sale of any Remaining Real Estate Asset shall be unenforceable pursuant to section 365(f) of the Bankruptcy Code.

35.     The failure to include or reference a particular provision of the Bidding Procedures in this Order shall not diminish or impair the effectiveness or enforceability of such a provision in the Bidding Procedures.

36.     The Debtors shall properly file reports of sale for all Sales, including Sales pursuant to the Bidding Procedures.

37.     Notwithstanding anything to the contrary in this Order or the Bidding Procedures, (i) the Debtors shall not, and shall not permit their agents or advisors to, take any action that is not in compliance with, or would result in a default or breach under that certain Second Amended and Restated Master Lease Agreement, by and among Toys "R" Us-Delaware, Inc. as Tenant, and Propco II, as Landlord, dated as of November 3, 2016, and as may be amended, supplemented, or modified from time to time (the "Propco II Master Lease") without either (a) an amendment to or waiver under the Propco II Master Lease in accordance with its terms and all consents required (if any) under the Propco II Master Lease, that certain Loan Agreement, dated as of November 3, 2016, among Propco II as Borrower, Goldman Sachs Mortgage Company and Bank of America N.A. as Lender (the "Propco II Loan Agreement") and each of the other Loan Documents (as defined in the Propco II Loan Agreement), and all consents required (if any) under the Mezzanine Loan Agreement and each of the other Loan Documents (as defined in the Mezzanine Loan Agreement), or (b) the entry of a further order of this Court, in either case, permitting such action, and all parties reserve all rights, remedies, and positions with respect to any proceedings regarding a request for such further Court order; (ii) nothing in this Order or the Bidding Procedures shall

15

affect the relief granted or any of the Debtors' obligations under the *Agreed Order to Provide Adequate Protection to the TRU Trust 2016-Toys, Commercial Mortgage Pass-Through Certificates, Series 2016-Toys Pursuant to 11 U.S.C. §§ 361, 362, 363, 503, and 507* [Docket No. 1003] (the "Propco II Adequate Protection Order"); and (iii) nothing herein shall be construed as a waiver of any rights, claims, or defenses of the Debtors' estates, the Trust, the Special Servicer, or the Lender (as defined in the Mezzanine Loan Agreement) under, as applicable, the Loan Documents (as defined in the Propco II Loan Agreement), the Propco II Master Lease, or the Propco II Adequate Protection Order, all of which rights, claims, and defenses are expressly reserved.  For the avoidance of doubt, Debtor Propco II is entitled to all of the relief provided by this Order in its capacity as tenant under its third-party leases and related property documents.

38.    The Debtors are authorized to establish an escrow account to accept deposits from Qualified Bidders and may pay any reasonable fees related to such account.  Any deposits made by Qualified Bidders into the Escrow Account shall not be property of the Debtors.

39.    In the event of any inconsistencies between this Order and the Motion, this Order shall govern.  In the event of any inconsistencies between this Order and the Bidding Procedures, the Bidding Procedures shall govern, except with respect to paragraph 43 of this Order, which shall govern notwithstanding any inconsistencies in the Bidding Procedures.

40.    Nothing in this Order or in the Bidding Procedures shall apply to the Debtor Toys "R" Us (Canada) Ltd. Toys "R" Us (Canada) Ltee ("Toys Canada"), which shall be permitted to take such actions with respect to the subject matter of this Order as may be authorized pursuant to the Companies' Creditors Arrangement Act (Canada) (the "CCAA"), the Initial Order or any other Order of the Ontario Superior Court of Justice (Commercial List) in the CCAA proceedings in respect of Toys Canada.

16

41.    The requirement under Local Bankruptcy Rule 9013-1(b) to file a memorandum of law in connection with the Motion is waived.

42.    The requirement under Local Bankruptcy Rule 6004-2(B) to submit objections at least seven (7) days prior to a proposed sale of assets outside the ordinary course of business is waived.

43.    Notice of the Motion as provided therein shall be deemed good and sufficient notice as to such Motion and the requirements of the Bankruptcy Rules and the Local Bankruptcy Rules for the Eastern District of Virginia are satisfied by such notice.

44.    Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

45.    The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Order in accordance with the Motion.

46.    This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation of this Order.


Dated: _____
Richmond, Virginia

_____
THE HONORABLE KEITH L. PHILLIPS
UNITED STATES BANKRUPTCY JUDGE

WE ASK FOR THIS:


/s/ Jeremy S. Williams

Michael A. Condyles (VA 27807)
Peter J. Barrett (VA 46179)
Jeremy S. Williams (VA 77469)
**KUTAK ROCK LLP**
901 East Byrd Street, Suite 1000
Richmond, Virginia 23219-4071
Telephone:          (804) 644-1700
Facsimile:          (804) 783-6192

- and -

Edward O. Sassower, P.C.
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:          (212) 446-4800
Facsimile:          (212) 446-4900

- and -

James H.M. Sprayregen, P.C.
Anup Sathy, P.C.
Chad J. Husnick, P.C. (admitted *pro hac vice*)
Emily E. Geier  (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:          (312) 862-2000
Facsimile:          (312) 862-2200

*Co-Counsel to the Debtors and Debtors in Possession*


## CERTIFICATION OF ENDORSEMENT
## UNDER LOCAL BANKRUPTCY RULE 9022-1(C)

Pursuant to Local Bankruptcy Rule 9022-1(C), I hereby certify that the foregoing proposed order has been endorsed by or served upon all necessary parties.

/s/ Jeremy S. Williams

18

## Exhibit 1

**Bidding Procedures**

Edward O. Sassower, P.C.
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

-and-

Michael A. Condyles (VA 27807)
Peter J. Barrett (VA 46179)
Jeremy S. Williams (VA 77469)
**KUTAK ROCK LLP**
901 East Byrd Street, Suite 1000
Richmond, Virginia 23219-4071
Telephone:    (804) 644-1700
Facsimile:    (804) 783-6192

James H.M. Sprayregen, P.C.
Anup Sathy, P.C.
Chad J. Husnick, P.C. (admitted *pro hac vice*)
Emily E. Geier (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

*Co-Counsel to the Debtors and Debtors in Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| TOYS "R" US, INC., *et al.*,[1] | ) | Case No. 17-34665 (KLP) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## BIDDING PROCEDURES
## FOR THE DISPOSITION OF THE
## REMAINING REAL ESTATE ASSETS OF TOYS DELAWARE

On [•], 2018 the United States Bankruptcy Court for the Eastern District of Virginia (the "Court") entered the *Order (I) Establishing Bidding Procedures for the Remaining Real Estate Assets of Toys Delaware and (II) Granting Related Relief* (the "Bidding Procedures Order"),[2] by which the Court approved the following procedures. These Bidding Procedures set forth the process by which the Debtors are authorized to conduct an auction (the "Auction") for the sale of

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are set forth in the *Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief* [Docket No. 78]. The location of the Debtors' service address is One Geoffrey Way, Wayne, New Jersey 07470.

[2]    All capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Bidding Procedures Order or the *Debtors' Motion for Entry of an Order (I) Establishing Bidding Procedures for the Remaining Real Estate Assets of Toys Delaware and (II) Granting Related Relief* [Docket No. [•]] (the "Motion").

the remaining real property and commercial leases of Toys "R" Us-Delaware, Inc. ("Toys Delaware," and such assets, the "Remaining Real Estate Assets").

## A.     Solicitation Process; Distribution of Bidding Procedures.

For any sale of the Remaining Real Estate Assets in these chapter 11 cases (the "Bankruptcy Case"), Toys "R" Us, Inc. and affiliated Debtors (the "Debtors"), A&G Realty Partners, LLC ("A&G"), and/or any such other agent of the Debtors shall, at the Debtors' direction, distribute these Bidding Procedures to any potential interested bidders.  The Debtors, in the exercise of their reasonable business judgment may elect to exclude any Remaining Real Estate Assets from these Bidding Procedures and sell such Remaining Real Estate Assets at either a private or public sale, subject to Bankruptcy Court approval of any alternative sale method. Furthermore, the Debtors may determine in their discretion whether to proceed with a sale of any Remaining Real Estate Asset pursuant to these Bidding Procedures.

## B.     Eligibility of Bidders to Participate in Auction.

(i)      In order to be eligible to bid for the sale of any real estate in this Bankruptcy Case subject to bidding process or otherwise participate in the Auction (as defined below), each bidder must be determined, in the sole discretion of the Debtors, to be a Qualified Bidder (as defined below).  The Debtors shall have the sole right to determine whether a bidder is a Qualified Bidder.

(ii)     Any counterparty to a Lease proposed to be sold or transferred at the Auction ("Lease Counterparty") shall be deemed a Qualified Bidder.  The Trust shall be deemed a Qualified Bidder with respect to any Remaining Real Estate Assets owned by Toys "R" Us Property Company II, LLC ("Propco II," and such assets, the "Propco II Real Estate Assets").  The Special Servicer of the Trust's mortgage loan to Propco II may submit, on behalf of the Trust, bids (including credit bids) on any Propco II Remaining Real Estate Assets that the Debtors seek to sell at the Auction.

## C.     Qualification of Bidders.

Except as otherwise set forth herein, in order to be considered for status as a Qualified Bidder and to have a Qualified Bid, a bidder must:

(i)      Deliver to A&G Realty Partners, LLC, c/o Emilio Amendola, 445 Broadhollow Road, Suite 410, Melville, NY 11747; email: emilio@agrealtypartners.com; Tel: (631) 465-9507; Fax: (631) 420-4499; with copy to the Debtors' counsel, Kirkland & Ellis LLP, c/o Emily E. Geier, Joshua M. Altman, and Kevin S. McClelland, 300 N. LaSalle Drive, Chicago, IL 60654; email: emily.geier@kirkland.com, josh.altman@kirkland.com,      kevin.mcclelland@kirkland.com;      Tel: (312) 862-2200; Fax: (312) 862-2200; and with copy to the Official Committee of Unsecured Creditors, Kramer Levin Naftalis & Frankel LLP, c/o Adam C. Rogoff,

Rachael Ringer, and Nathaniel Allard, 1177 Avenue of the Americas, New York, New York 10036, email: arogoff@kramerlevin.com, rringer@kramerlevin.com, nallard@kramerlevin.com; tel: 212-715-9100; fax: 212-715-8265, so as to be received before 5:00 p.m. (prevailing Eastern time) on the Bid Deadline, a written offer to purchase the Remaining Real Estate Assets at issue (a "Qualified Bid") that:

(a)    Consists of an executed form of the applicable agreement for sale that may not deviate substantially from the terms of the applicable form purchase agreement attached hereto as **Exhibit A** (such bidder's executed agreement, the "Bidder PA"). If the Bid is to purchase a parcel of owned property, the Bid must include an executed form of the Purchase and Sale Agreement attached hereto as **Exhibit A-1**. If the Bid is purchase a lease to which the Bidder is not currently a party, the Bid must include an executed form of the Assumption and Assignment Agreement attached hereto as **Exhibit A-2**. If the Bid is to purchase a lease to which the Bidder is currently a party, the Bid must include an executed form of the Lease Termination Agreement attached hereto as **Exhibit A-3**.

(b)    A Qualified Bid must also include (i) a Microsoft Word copy of the applicable form agreement and (ii) a PDF "redline" showing any proposed revisions to the form agreement. Any bidder may propose to purchase more than one Remaining Real Estate Asset. The purchase agreement shall be marked to reflect differences as to the Remaining Real Estate Assets proposed to be purchased.

(c)    A Qualified Bid must be accompanied by a completed bidder registration form, substantially in the form attached hereto as **Exhibit B** (the "Bidder Registration Form"), which must detail which of the Remaining Real Estate Assets up for sale the Qualified Bidder proposes to purchase and list an allocation of a portion of the aggregate proposed purchase price to each Remaining Real Estate Asset included in its total Bid. A single bidder or group of bidders may purchase all or a portion of the Remaining Real Estate Assets. If a bidder or group of bidders submits an offer for a combination of Remaining Real Estate Assets, such bidder or group of bidders must (i) indicate if it would be willing to purchase any of such assets if not sold as a group and, if so, (ii) include a schedule indicating the Bid as to any individual or sub-group of assets that such bidder would purchase and the allocation of a portion of the aggregate purchase price for any subgroup to each Remaining

3

Real Estate Asset in such subgroup.  The Debtors reserve the right to determine whether to auction any assets as part of a group or individually up through and including at the Auction or to conduct an Auction of any Remaining Real Estate Asset both individually and as part of a group in order to determine which option maximizes value of the assets.

(d)     The Debtors reserve the right to set a minimum bid for each of the Remaining Real Estate Assets (which minimum bid may vary by asset).

(e)     Contains no contingencies to the validity, effectiveness, and/or binding nature of the bid, including without limitation, contingencies for due diligence and inspection or financing of any kind.

(f)     Contains documentation acceptable to the Debtors evidencing that the bidder has financial resources sufficient to close the transaction within twenty-one (21) days after the Auction which evidence may include, without limitation, evidence of cash on hand, a binding financing commitment from an established and financially sound financial institution or investment fund and the identity of contact persons at the entity issuing such commitment letter.

(g)     Demonstrates, to the Debtors' satisfaction, that the bidder has the legal capacity to consummate the transaction it is proposing.

(h)     Includes a statement from the bidder that:  (i) it is prepared to enter into and consummate the transactions contemplated in the Bidder PA immediately upon entry by the Bankruptcy Court of an order approving the sale of the real estate to such bidder; and (ii) the Qualified Bid, if determined to be a Successful Bid (defined below) or Backup Bid (defined below), will then be irrevocable for a period of thirty (30) days after the conclusion of the Auction.

(i)     Includes audited and unaudited financial statements, tax returns, bank account statements, and a description of the proposed business to be conducted at the premises and/or any other documentation that the Debtors further request (the "Adequate Assurance Package").  The Adequate Assurance Package should be submitted in its own compiled PDF document.

4

(j)        Subparagraphs C(i)(c), C(i)(f), and C(i)(i) shall not apply to Lease Counterparties bidding on Contracts to which they are party.

(ii)       **ALL QUALIFIED BIDS SHALL BE DEEMED IRREVOCABLE, NOTWITHSTANDING ANY CONDITIONS LISTED IN THE APPLICABLE AGREEMENT. IN THE EVENT THAT A BIDDER SEEKS TO REVOKE SUCH BID, THE DEBTORS SHALL BE ENTITLED TO KEEP SUCH BIDDER'S DEPOSIT AND PURSUE ALL OTHER CONTRACTUAL REMEDIES UNDER LAW OR EQUITY.**

(iii)      Contemporaneous with the submission of a Bid, tender an earnest money deposit of ten percent (10.0%) of the proposed purchase price for the sale of the real estate (the "Qualified Bidder Deposit") by cashier's or certified check or wire transfer of immediately available funds, which deposit shall be held in an escrow account in accordance with the terms of the Bidder PA.[3] The wire transfer or check memo line must include (a) the company name listed on the Bidder Registration Form and (b) the store name, store address, and store number of the store(s) that correspond to the bid.

(iv)      A Qualified Bidder Deposit will be refunded only if (a) the bid corresponding to the Qualified Bidder Deposit is rejected; or (b) the bid corresponding with the Qualified Bidder Deposit is not approved by the Bankruptcy Court. The Debtors reserve the right to hold each Qualified Bidder Deposit until five (5) days after the closing of the sale of the Remaining Real Estate Assets, but the Debtors may refund the full Qualified Bidder Deposit any time after the Sale Hearing. The provisions of this subparagraph (iv) shall apply to Qualified Bidders and control notwithstanding any conflicting provisions in the Bidder PA. Notwithstanding the foregoing, any Lease Counterparty Bidder may submit a Bid to acquire any Lease without submitting a Qualified Bidder Deposit.

(v)      The Qualified Bidder agrees the Adequate Assurance Package may be disseminated to the affected Lease Counterparty if such Qualified Bidders' Bid is determined to be a Qualified Bid. Prior to receiving any Adequate Assurance Package, the Lease Counterparty must agree to keep all the information contained therein confidential. If the requesting Lease Counterparty has submitted a ROFR Notice (as defined below) prior to the Bid Deadline, and the Debtors have confirmed such right of first refusal is valid under nonbankruptcy law, the Debtors shall provide the applicable Adequate Assurance Package and purchase price to such Lease Counterparty as

---

[3]    For the avoidance of doubt, these funds are not property of the Debtors.

soon as reasonably practicable after the determining the applicable bidder is a Qualified Bidder, but in all cases one day prior to the Auction.

**D.**    **Rejection of "Qualified Bid" Status for Non-Conforming Bids.**

The Debtors shall provide a copy of each bid received by the Debtors on or prior to the Bid Deadline to the Consultation Parties as soon as reasonably practicable after the Debtors receive such bid. The Debtors shall determine in their discretion which bids qualify as Qualified Bids and which bids shall be rejected as non-confirming bids. The Debtors shall have the right to reject bids as non-conforming bids; *provided*, *however*, the Debtors shall have the right to negotiate with any bidder with respect to clarification of any bid.

**E.**    **Expense Reimbursement, Work Fee, and Breakup Fee.**

Subject to entry of the Sale Order, the Debtors shall be further authorized, but not obligated, in an exercise of their business judgment, to (a) select no more than one Qualified Bidder, to act as a stalking horse bidder (a "Stalking Horse Bidder") in connection with the Auction and (b) in connection with any staking horse agreement with a Stalking Horse Bidder, provide for a breakup fee (the "Breakup Fee"), in an amount not to exceed three percent (3%) of the proposed purchase price (inclusive of any Expense Reimbursement or Work Fee, each as defined below); *provided*, *however*, any Breakup Fee will not be binding on the Debtors until entry of the Sale Order; *provided further, however*, that no Breakup Fee shall be paid to a credit bidder, insider, or member of the Committee. The Breakup Fee shall be allocated among the Remaining Real Estate Assets included in the Stalking Horse Bidder's bid in the same proportion as the allocation of its aggregate purchase price among Remaining Real Estate Assets listed on the Stalking Horse Bidder's Bidder Registration Form. The amount of any Expense Reimbursement or Work Fee paid to any Stalking Horse Bidder pursuant to these Bidding Procedures shall be deducted from the Breakup Fee, if payable. Any Breakup Fee, Expense Reimbursement, or Work Fee shall be payable solely from the proceeds of the sale of Remaining Real Estate Assets to a Successful Bidder or Successful Bidders.

Subject to entry of the Sale Order, the Debtors shall be authorized, but not obligated, in an exercise of their business judgment, to close an agreement, if any, to reimburse the reasonable and documented out-of-pocket fees and expenses of one or more Stalking Horse Bidders (each, an "Expense Reimbursement"), and/or agree to pay one or more Stalking Horse Bidders a "work fee" or other similar cash fee (each, a "Work Fee") if the Debtors reasonably determine in their business judgment that any such Expense Reimbursement or Work Fee will encourage one or more parties to submit a Qualified Bid or result in a competitive bidding and Auction process. For the avoidance of doubt, the Debtors will provide Expense Reimbursements and/or Work Fees only to the Stalking Horse Bidder and such expenses must be reasonable, documented, and subject to review by the Debtors. Subject to entry of the Sale Order, the Debtors shall be authorized to indefeasibly pay any such amounts to such Stalking Horse Bidders pursuant to section 363(b)(1) of the Bankruptcy

Code and any such amounts paid by the Debtors to such Stalking Horse Bidders will not be subject to disgorgement irrespective of whether the Stalking Horse Bidders receiving such reimbursements or payments are ultimately the Successful Bidder as long as such Stalking Horse Bidder acted in good faith.

**F.      Due Diligence**.

Any Qualified Bidder may request diligence from the Debtors, and the Debtors may grant or deny the request.  The Debtors may require such Qualified Bidder to execute a non-disclosure agreement prior to providing diligence to such Qualified Bidder.

**G.      Bid Deadline.**

All Qualified Bids must be submitted to A&G, with a copy to the Debtors' counsel and counsel to the Official Committee of Unsecured Creditors in accordance with paragraph C (above), so as to be received not later than the Bid Deadline.

**H.      Terms of Auction.**

In the event that one or more Qualified Bids are submitted in accordance with these Bidding Procedures, the Debtors will conduct an auction sale of the Remaining Real Estate Assets (the "Auction") on the following terms:

(i)      **Time, Date and Location of Auction; Adjournment of Auction; Appearance of Qualified Bidders at Auction.**  The Auction will take place at the offices of Kirkland & Ellis LLP, 601 Lexington Avenue, New York, NY 10022.  The Auction will be conducted on the date and time listed in the Auction and Hearing Notice. The Debtors will send written notice of the date, time, and place of the Auction to the Qualified Bidders no later than two business days before such Auction, and file a notice of the date, time, and place of the Auction with the Court no later than two business days before such Auction and post such notice on the Debtors' Case Website:  http://www.cases.primeclerk.com/toysrus.  The Debtors may modify the date, time, and place of the Auction by providing written notice to Qualified Bidders and filing a notice with the Court so long as such notice is no later than two days before the Auction.

(ii)      **Permitted Attendees at Auction.**  Unless otherwise ordered or directed by the Bankruptcy Court, only representatives of the Debtors, any other parties invited specifically by the Debtors, the Consultation Parties, Lease Counterparties, the Special Servicer, and any Qualified Bidders (and the professionals for each of the foregoing) shall be entitled to attend the Auction; *provided that*, only (i) Special Servicer, (ii) Lease Counterparties that have either submitted a Qualified Bid or

affirmatively provided evidence of a right of first refusal in writing (the "ROFR Notice") by the Bid Deadline, and (iii) other Qualified Bidders that have submitted Qualified Bids by the Bid Deadline shall be entitled to bid at the Auction. The Special Servicer shall not be required to submit a Qualified Bid prior to the Auction to bid on Propco II Real Estate Assets at the Auction. Any permitted attendee may attend the Auction telephonically; *provided* that such permitted attendee must provide actual notice to A&G that it will make such an appearance at least one day prior to the Auction.

(iii)    **Auction Bid Submission Procedures.**  Auction bidding shall be subject to the following procedures:

    (a)    For a Qualified Bid to be considered and in order for a Qualified Bidder to further bid at the Auction, Qualified Bidders must appear in person at the Auction, or through a duly authorized representative, unless alternative arrangements are agreed upon in advance by the Debtors.

    (b)    Only Qualified Bidders shall be entitled to make any subsequent bids at the Auction.

    (c)    Bidding will commence with the announcement of the highest and best Qualified Bid with respect to each Remaining Real Estate Asset or group thereof, which shall be determined solely by the Debtors in their business judgment.  Any Qualified Bidder may then submit successive bids in minimum increments, which will be determined by the Debtors at each Auction depending on the total dollar value of the Remaining Real Estate Assets being sold (the "Minimum Overbid Amount").  The Minimum Overbid Amount may be different with respect to each asset or group of assets being auctioned.  Any Lease Counterparty that submits a ROFR Notice by the Bid Deadline may submit successive bids on the applicable Remaining Real Estate Asset(s) without offering any additional consideration, *provided* that the Debtors have determined such Lease Counterparty's right of first refusal would be enforceable under nonbankruptcy law.

    (d)    If one or more Qualified Bids are received by the Debtors, each such Qualified Bidder shall have the right to improve its respective bid at the Auction.

(e)     Each successive bid submitted by any bidder at the Auction must contain an actual cash purchase price that exceeds the then existing highest bid by at least the Minimum Overbid Amount.

(f)     At commencement of the Auction, the Debtors may announce procedural and related rules governing the Auction, including time periods available to all Qualified Bidders to submit successive bid(s) in an amount equivalent to at least the Minimum Overbid Amount.

(iv)    **No Collusion.**  Each Qualified Bidder participating at the Auction will be required to confirm on the record at the Auction that (i) it has not engaged in any collusion with respect to the bidding, and (ii) its Qualified Bid is a good-faith *bona fide* offer and it intends to consummate the proposed transaction if selected as the Successful Bidder.

(v)     **Selection of Successful Bid.**  The Auction shall continue until there is only one bid remaining to purchase a certain portion or all of the Remaining Real Estate Assets that the Debtors determine in their sole discretion, and in consultation with the Consultation Parties, subject to Bankruptcy Court approval, is the highest and/or best Qualified Bid (such bid, the "Successful Bid" and such bidder, the "Successful Bidder").  For the avoidance of doubt, if there are any Qualified Bids for different portions of the Remaining Real Estate Assets, there may be multiple Successful Bidders.  In making this decision, each Debtor shall consider the amount of the purchase price, the form of consideration being offered, the contents of the Bidder PA, the likelihood of such Qualified Bidder's ability to close the transaction, the timing thereof, and the net benefit to the estates.  Each Debtor reserves the right to select the Successful Bid, even if it is not the highest bid; *provided* that in the event a Stalking Horse Bidder is selected by the Debtors and is not the Successful Bidder, the aggregate amount of the Successful Bid or Successful Bids (other than credit bids) must exceed the amount of the Stalking Horse Bid plus the Breakup Fee payable to the Stalking Horse Bidder plus the aggregate amount of Expense Reimbursement or Work Fees paid or payable to the Stalking Horse Bidder.  The Debtors reserve the right to not select any Successful Bid or Successful Bidder with respect to any Remaining Real Estate Asset or group thereof.  The Successful Bidder shall have such rights and responsibilities of the purchaser, as set forth in the Bidder PA.  Prior to the Sale Hearing, the Successful Bidder shall complete and execute a final and revised Bidder PA, as necessary to conform to the terms of the Auction, and all other agreements, contracts, instruments, and other documents evidencing and containing the terms and conditions upon which the Successful Bid was made (such documents collectively, the "Successful Bidder Sale Documents").

The Successful Bid shall be irrevocable for a period of thirty (30) days after the conclusion of the Auction.

(vi)  **Selection of Backup Bidder.**  The bidder of the second highest and best bid for a portion or all of the Remaining Real Estate Assets, as determined by the Debtors in their discretion, may be deemed a backup bidder (such bidder the "Backup Bidder" and such bid the "Backup Bid").  Notwithstanding the foregoing, the Trust shall not be required to serve as the Backup Bidder.  For the avoidance of doubt, if there are Qualifying Bids for different portions of the Remaining Real Estate Assets, there may be multiple Backup Bidders.  If the Debtors so designate a bidder as a Backup Bidder, such Backup Bidder shall be required to complete and execute a purchase agreement in form and substance reasonably acceptable to the Debtors memorializing, among other things, the amount of the Backup Bid (the "Backup Bidder PA").  Upon the failure of the Successful Bidder to timely consummate its purchase of the Remaining Real Estate Assets, pursuant to the terms of the Successful Bidder Sale Documents, the Debtors shall promptly file a supplemental notice seeking to approve the sale to the Backup Bidder, if applicable, on expedited notice and a hearing.  The Backup Bidder PA shall be irrevocable for a period of thirty (30) days after the conclusion of the Auction.

(vii)  **Irrevocability of Bids; Rejection of Bids.**  A Qualified Bid must be irrevocable unless and until the Debtors accept a higher Bid and such Qualified Bidder is not selected as the Backup Bidder.  Unless determined by the Debtors to be the Successful Bid or Backup Bid, all other Qualified Bids and all other successive bids at the Auction shall be deemed rejected at the conclusion of the Auction.  Notwithstanding the foregoing, all bids shall be deemed rejected on the Sale Closing Deadline; *provided*, *however*, in the event the Successful Bidder does not close for any given Remaining Real Estate Asset, and the Debtors promptly file a supplemental notice on or before the Sale Closing Deadline, seeking to approve the sale to the Backup Bidder, if applicable, on expedited notice and a hearing, such bids shall remain irrevocable until the transaction is approved and closed, or rejected by the Court.

## I.  Sale Hearing.

The Bankruptcy Court shall hold a Sale Hearing on the date listed in the Auction and Hearing Notice to approve the Sale of the Remaining Real Estate Assets, if any.  The Sale Hearing will be held at the United States Bankruptcy Court for the Eastern District of Virginia.  At the Sale Hearing, the Debtors will seek entry of an order approving and authorizing the proposed sale to the Successful Bidder(s), if any.  The Debtors shall also notify the Bankruptcy Court of the Backup Bidder, if any.  The Debtors shall ascertain whether the Successful Bidder and the Backup Bidder are insiders of one or more of the Debtors, whether the sale represents an arm's-length transaction

between the parties, made without fraud or collusion, and whether there has been any attempt by either party to take any unfair advantage of the other such that the Successful Bidder or Backup Bidder may be deemed to be purchasing the Remaining Real Estate Assets in good faith pursuant to 11 U.S.C. § 363(m). At the Sale Hearing, the Debtors shall make a record of these findings with respect to the Successful Bidder and any order approving the Sales shall include such findings in order to approve the sale to the Successful Bidder(s), pursuant to 11 U.S.C. § 363(m). The Sale Hearing may be adjourned or rescheduled without notice other than by announcement of the adjourned date at the Sale Hearing or the Debtors' filing notice of a rescheduled Sale Hearing with the Court.

In the event the Successful Bidder does not close for any given Remaining Real Estate Asset, the Debtors will promptly file a supplemental notice on or before the Sale Closing Deadline, seeking to approve the sale to the Backup Bidder. The Backup Bidder (as identified by the Notice of Successful and Backup Bidders) shall not be approved at the Sale Hearing.

**J.**     **Closing.**

The closing of the sale of the Remaining Real Estate Assets will occur no later than the Sale Closing Deadline, in accordance with the terms of the Successful Bidder Sale Documents or the purchase agreement of the entity otherwise authorized by the Bankruptcy Court to purchase the Remaining Real Estate Assets, as applicable.

**K.**     **Failure of Successful Bidder to Consummate Purchase.**

If the Successful Bidder fails to consummate the purchase of the Remaining Real Estate Assets pursuant to the terms of the Successful Bidder Sale Documents, and such failure is the result of the Successful Bidder's breach of, or default or failure to perform under any Successful Bidder Sale Documents or the terms of these Bidding Procedures (the "Defaulting Bidder"), such Defaulting Bidder's Qualified Bidder Deposit shall be forfeited to the Debtors as liquidated damages, and the Debtors shall have all rights and remedies available under applicable law.

**L.**     **Disclosures.**

Qualified Bidders shall disclose to the Debtors all communications with other Qualified Bidders following the submission of a Qualified Bid until the sale of the Remaining Real Estate Assets is consummated.

**M.**     **Commissions.**

Subject to section E hereof, the Debtors shall be under no obligation to pay commission to any agent or broker, with the exception of any agent or broker retained by the Debtors. All commissions, fees, or expenses for agents, other than as retained by the Debtors, may be paid by bidders at such bidder's discretion. In no case shall any commissions, fees, or expenses be deducted from the proceeds of the sale of the Remaining Real Estate Assets or the agreed Successful Bid, subject to section E hereof.

11

**N.**  **Consultation Parties.**

The term "Consultation Parties" as used in these Bidding Procedures shall mean:  (i) the official committee of unsecured creditors (the "Committee"); (ii) counsel and financial advisor to the group of term B-4 lenders (the "B-4 Lenders"); and counsel and financial advisor to the DIP ABL Agent.  In the event that any Consultation Party, any member of the Committee, or any affiliate of any of the foregoing submits a bid for any Remaining Real Estate Asset at the Auction under these Bidding Procedures, any obligation of the Debtors to consult with such bidding party pursuant to these Bidding Procedures, solely with respect to any Remaining Real Estate Asset on which such party placed a bid, will be suspended without further action until such party advises the Debtors and the other Consultation Parties that it has irrevocably withdrawn its bid for such Remaining Real Estate Assets, at which time such party's consultation privileges will be reinstated. If a member of the Committee submits a Qualifying Bid, counsel and financial advisors to the Committee will continue to have consultation rights as set forth in these Bidding Procedures; *provided* that the such advisors shall exclude such member from any discussions of deliberations regarding the sale of the Remaining Real Estate Assets in question and shall not provide any information regarding the sale of the Remaining Real Estate Assets to such member.

Prior to the Bid Deadline, the Debtors' counsel shall provide all diligence that the Debtors and/or their advisors receive to the Consultation Parties, and respond to any inquiries from the Consultation Parties regarding the sales as soon as reasonably practicable.  As soon as reasonably practical following the Bid Deadline, the Debtors shall provide access to the data room to the Consultation Parties.  Following the Bid Deadline, the Debtors shall consult with the Consultation Parties prior to making all material decisions prior to the Auction (including for the avoidance of doubt, selection of a Stalking Horse Bidder), and shall consult with the Consultation Parties present at the Auction prior to making all material decisions at the Auction (including, for the avoidance of doubt, minimum bids and bidding increments and the selection of Successful Bidders and Backup Bidders).  The failure to specifically identify consultation rights in any section of these Bidding Procedures and/or the Bidding Procedures Order shall not limit or otherwise impair the rights of the Consultation Parties to consult with the Debtors.

**O.**  **No Representation; Qualified Bidder's Duty to Review.**

The Debtors are not making and have not at any time made any warranties or representations of any kind or character, express or implied, with respect to the Remaining Real Estate Assets, including, but not limited to, any warranties or representations as to habitability, merchantability, fitness for a particular purpose, title, zoning, tax consequences, latent or patent physical or environmental condition, utilities, operating history or projections, valuation, governmental approvals, the compliance of the Remaining Real Estate Assets with governmental laws (including, without limitation, accessibility for handicapped persons), the truth, accuracy, or completeness of any documents related to the Remaining Real Estate Assets, or any other information provided by or on behalf of the Debtors to a bidder, or any other matter or thing

regarding the Remaining Real Estate Assets.  All bidders must acknowledge and agree that upon closing the Debtors shall sell and transfer to the Successful Bidder and the Successful Bidder shall accept the Remaining Real Estate Assets "AS-IS, WHERE IS, WITH ALL FAULTS," except to the extent expressly provided otherwise in the Bankruptcy Court's order approving the sale.  All bidders must agree that they have not relied on and will not rely on, and the Debtors are not liable for or bound by, any express or implied warranties, guaranties, statements, representations, or information pertaining to the Remaining Real Estate Assets or relating thereto (including specifically, without limitation, information regarding the Remaining Real Estate Assets distributed with respect to such real estate) made or furnished by the Debtors or any real estate broker or agent representing or purporting to represent the Debtors, to whomever made or given, directly or indirectly, orally or in writing, unless specifically set forth in the Bankruptcy Court's order approving the sale.

## P.    <u>Reservation of Rights.</u>

The Debtors reserve their rights to modify these Bidding Procedures, other than paragraphs B(ii), C(i)(c), H (ii), H(iii)(c), H(iv), N, and R, in their business judgment, with the consent of the Committee for all material modifications (which consent shall not be unreasonably withheld), in any manner that will best promote the goals of these Bidding Procedures, or impose, at or prior to the Auction, additional customary terms and conditions on Sales, including, without limitation:  (a) extending the deadlines set forth in these Bidding Procedures; (b) adjourning the Auction at the Sale Hearing; (c) adding procedural rules that are reasonably necessary or advisable under the circumstances for conducting the Auction; (d) canceling the Auction; and (e) rejecting any or all Bids or Qualified Bids.  Nothing in these Bidding Procedures shall abrogate the fiduciary duties of the Debtors.

## Q.    <u>Consent to Jurisdiction.</u>

All Qualified Bidders at the Auction shall be deemed (i) to have consented to the jurisdiction of the Court and (ii) to have waived any right to a jury trial in connection with any disputes relating to the Auction, the construction, and enforcement of these Bidding Procedures.

## R.    <u>Return of Qualified Bidder Deposit.</u>

The Qualified Bidder Deposit of the Successful Bidder shall be applied to the purchase price of any transaction that closes with respect to that Qualified Bidder.  The Qualified Bidder Deposits for each Qualified Bidder shall be held in one or more escrow accounts on terms acceptable to the Debtors and shall be returned (other than with respect to the Successful Bidder and the Backup Bidder) on the date that is five business days after the close of the Sales, or as soon as is reasonably practicable thereafter.

If a Successful Bidder (or Backup Bidder, as applicable) fails to consummate a proposed transaction because of a breach by such Successful Bidder (or Backup Bidder, as applicable), the Qualified Bidder Deposit shall be released to the Debtors and the Debtors shall not have any obligation to return the Qualified Bidder Deposit deposited by such Successful Bidder (or Backup Bidder, as applicable).  Such Qualified Bidder Deposit released to the Debtors may be retained by

the Debtors as liquidated damages, in addition to any and all rights, remedies, or causes of action that may be available to the Debtors and their estates.

**S.**    **Fiduciary Out.**

Nothing in these Bidding Procedures shall require each Debtor's management or board of directors to take any action, or to refrain from taking any action, with respect to these Bidding Procedures, to the extent each Debtor's management or board of directors determines, or based on the advice of counsel, that taking such action, or refraining from taking such action, as applicable, is required to comply with applicable law or its fiduciary obligations under applicable law.

## **Exhibit A-1**

**Form Purchase and Sale Agreement**

# PURCHASE AND SALE AGREEMENT

This Purchase and Sale Agreement Subject to Bidding Process (this "<u>Agreement</u>") is executed as of the _____ day of _____, 2018 (the "<u>Effective Date</u>"), by and between _____ ("<u>Seller</u>") and _____ ("<u>Purchaser</u>").

## RECITALS

WHEREAS, on September 18, 2017 (the "<u>Petition Date</u>"), Toys "R" Us, Inc. and its indirect and related subsidiaries and related entities (collectively, the "<u>Debtors</u>") filed voluntary petitions for relief under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101-1532 (the "<u>Bankruptcy Code</u>"), in the United States Bankruptcy Court for the Eastern District of Virginia (the "<u>Court</u>").

WHEREAS, the Debtors seek to sell real property described in **Exhibit A** hereof (the "<u>Property</u>") pursuant to the terms and conditions of the *Bidding Procedures for the Disposition of the Remaining Real Estate Assets of Toys Delaware* (the "<u>Bidding Procedures</u>") subject to approval by the the United States Bankruptcy Court for the Eastern District of Virginia in the chapter 11 cases of *In re Toys "R" Us, Inc.*, Case No. 17-34665 (KLP) (Bankr. E.D. Va. 2018) (the "<u>Bankruptcy Cases</u>").

WHEREAS, Seller believes that the Property should be sold through an orderly sale and/or auction process as part of the Bankruptcy Cases.

WHEREAS, Seller is willing to sell the Assets to Purchaser, and Purchaser is willing to purchase the Property from Seller.

NOW, THEREFORE, in consideration of the mutual covenants, agreements, and conditions stated herein, the sufficiency of which is hereby acknowledged by the parties hereto, Seller and Purchaser hereby agree as follows:

## AGREEMENT

1.    <u>Sale of Property</u>.  On the terms and conditions set forth in this Agreement, Seller agrees to sell, assign, convey, and transfer to the Purchaser, and the Purchaser agrees to purchase from the Debtors, all rights, title, and interests held by the Debtors in the Property.

2.    <u>Purchase Price</u>.

A.    Seller is to sell and Purchaser is to purchase the Property for a total of _____ Dollars ($_____) (the "<u>Purchase Price</u>").

B.    The Purchase Price for the Assets (exclusive of closing adjustments and costs provided for herein) shall be paid in the following manner:

(i)    An initial deposit in the amount of $_____ (the "<u>Initial Deposit</u>") is due when Purchaser signs and submits this Agreement and is payable in

immediately available funds and shall be delivered to the Seller who shall hold such Initial Deposit in a segregated, non-interest bearing account (the "<u>Account</u>").

(ii)    The balance of the Purchase Price, exclusive of closing adjustments and costs (the "<u>Balance</u>"), is due at the closing of the transaction contemplated hereunder (the "<u>Closing</u>") and is payable in immediately available funds and shall be delivered to the Seller, who shall hold the Balance in the Account.

C.    The acceptance by Purchaser of the delivery of the Bankruptcy Trustee's Deed at Closing shall be deemed to be full performance and discharge of every agreement and obligation (either express or implied) on the part of the Seller to be performed pursuant to this Agreement and no representation, warranty or agreement, express or implied, of Seller shall survive the Closing except those which are herein specifically stated to survive the Closing.

5.    <u>Access and Cooperation</u>.  Purchaser, its agents, employees, contractors and designees, at any time after the Effective Date, upon 24 hours prior written notice, and continuing through the Contingency Waiver Date, shall have the right to enter upon the Property during the Seller's business hours for the purpose of conducting any and all Inspections, studies and investigations of the Property which may be desired by Purchaser.  Purchaser shall not perform any invasive testing on the property without obtaining Seller's prior written consent.  Purchaser shall indemnify and hold Seller harmless from and against any and all cost, expense, liability or damage arising out of: (i) any injury to any person or the Property attributable to Purchaser's exercise of any of its rights hereunder (including, but not limited to, the entry upon the Property by Purchaser or any of its agents or contractors); and (ii) any mechanics liens filed against the Property or claims or demands made against Seller for work performed by or on the behalf of Purchaser.

6.    <u>Bankruptcy Court Approval and Sale Order</u>.  The parties' obligations set forth in this Agreement are expressly subject to approval by the Bankruptcy Court ("<u>Bankruptcy Court Approval</u>") pursuant to an Order (the "<u>Sale Order</u>") approving the sale to the Purchaser. The Sale Order shall include factual findings and ordering provisions that provide (i) title to the Property shall be transferred to the Purchaser free and clear of all liens, claims, encumbrances and interests pursuant to Section 363(f) of the Bankruptcy Code, with all such liens, claims, encumbrances and interests to attach to the proceeds of the sale in the same order, priority and validity that presently exists; provided however, the Property shall be transferred subject to all easements, right of ways, leases (recorded or unrecorded), covenants, restrictions and all other exceptions of record; (ii) the Purchaser is purchasing the Property in "good faith" within the meaning of Section 363(m) of the Bankruptcy Code and, as such, is entitled to the protections offered thereby; (iii) the Agreement was negotiated, proposed, and entered into by the parties without collusion, in good faith and arms' length bargaining position; and (iv) that stay provided under the Rule 6004(g) of the Federal Rules of Bankruptcy Procedure shall be waived to the extent necessary to permit a Closing to occur as soon as possible after entry of the Sale Order.

7.    <u>Bidding Procedures Order</u>.  The Purchaser's right to purchase the Property is subject to entry of, and governed exclusively by an order entered by the Bankruptcy Court (the "<u>Bidding Procedures Order</u>"), a copy of which is attached hereto as **Exhibit C**, the terms and provisions of

which are incorporated herein by reference.  Where the terms of this Agreement and the Bidding Procedures Order conflict, the terms of the Bidding Procedures Order will prevail.

8.    <u>Representations of Purchaser.</u>  Purchaser covenants, represents, and warrants to Seller that, both now and as of the Closing Date:

A.    The proposed sale represents an arms-length transaction between the parties, made without fraud or collusion with any other person (including any other prospective bidder for the Property); and

B.    There has been no attempt to take any unfair advantage of Seller.

9.    <u>Closing Deliveries</u>.

A.    At Closing, Seller shall deliver to Purchaser each of the following, executed and acknowledged, as appropriate: (a) the Sale Order in recordable form, (b) a Bankruptcy Trustee's Deed (in proper statutory form for recording) so as to transfer all of its right, title and interest in and to the Property, (c) a settlement sheet, and (d) such other documents required to effect a transfer of the Property under applicable state law.  Notwithstanding anything to the contrary contained herein, Seller shall not be required to execute or deliver any Vendor's Affidavit or Owner's Title Affidavit.

B.    At Closing, Purchaser shall deliver to Seller each of the following, executed and acknowledged, as appropriate: (a) a settlement sheet, and (b) such other documents reasonably requested by the title company handling the Closing ("Title Company") and which are consistent with this Agreement to effectuate the conveyance of real property.  Purchaser shall also deliver the Balance of the Purchase Price in accordance with Section 2 hereof.

10.    <u>Closing Date and Office</u>.  The Closing shall take place not later than the Sale Closing Deadline, at the offices of the Seller's attorney, or at such other location as may be mutually agreed by the parties, at a time mutually convenient for all parties; provided however, Seller has obtained a Sale Order by the Closing Date.  Buyer to execute all closing documents offsite, and transmit to Title Company accordingly.  In the event the Bankruptcy Court has not entered the Sale Order by the Closing Date, the parties may agree, in writing, to extend the Closing Date or terminate this Agreement, with no consequences to the Seller and/or the Bankruptcy Estate.  In the event of such termination, the Seller shall immediately refund the Deposit to the Purchaser and neither party shall have any further obligation hereunder.  In the event the Bankruptcy Court rejects Purchaser's offer as set forth herein, the rights and remedies of the parties shall be as set forth in the Bidding Procedures Order.  Time is of the essence with respect to Closing.

11.    <u>Subject to Provisions</u>.  At Closing, Seller shall convey title to the Property, subject to all easements, covenants, restrictions, declarations or agreements of record set forth on **Exhibit B** attached hereto and made a part hereof plus those matters that would be disclosed upon a visual inspection of the Property, but expressly excluding any mortgages, deeds of trust, tax liens, judgments, mechanics' liens or other monetary encumbrances against the Property ("<u>Permitted</u>

Exceptions," and the condition of the title subject only to the Permitted Exceptions is referred to herein as "Acceptable Title").

12.    Title Company Approval.  Purchaser shall accept title subject to the Permitted Exceptions. If Purchaser desires to purchase title insurance from the Title Company (or any other title company), Purchaser may do so, at Purchaser's discretion and at its sole cost and expense.  Seller shall not be obligated to cause the Title Company to omit any Permitted Exception, including, but not limited to, the satisfaction of any exception to title relating to the filing of Seller's federal or state tax return.  Purchaser shall not have the right to terminate this Agreement if Seller is able to provide Acceptable Title.

13.    Survey.  Purchaser may order a survey of the Property, at its sole cost and expense.

14.    Flood Area/Other.  If the Property is located in a flood plain, the Purchaser may be required to carry insurance at the Purchaser's expense.  Revised flood maps and changes to Federal law may substantially increase future flood insurance premiums or require insurance for formerly exempt properties.  The Purchaser should consult with one or more flood insurance agents regarding the need for flood insurance and possible premium increases.  In the event the Property requires flood insurance, the Purchaser may not terminate this Agreement.  The Purchaser may not terminate this Agreement if the Property is subject to building or use limitations by reason of the location which materially interfere with the Purchaser's intended use of the Property.

15.    Insurance and Risk of Loss.  The Seller shall cause the insurance on the Property to be canceled as of the Closing Date.  In the event that, prior to the Closing, all or any portions of the Property, any interests therein, or any rights appurtenant thereto are taken or appropriated (either permanently or for temporary periods) under the power of eminent domain or condemnation by any authority having such power, or by virtue of any actions or proceedings in lieu thereof, or if any notice or threat of such taking or appropriation has been given or is pending at the Closing Date, then the Purchaser, at his or her option, may either (a) terminate this Agreement by written notice to the Seller, and upon receipt of such written notice, the Seller shall immediately refund the Deposit to the Purchaser and neither party shall have any further obligation hereunder, or (b) elect to proceed with Closing, in which event the Purchase Price shall be reduced by an amount equal to any sums actually received by the Seller from the condemning authority by reason of such taking, appropriation or action or proceeding in lieu thereof.  In the event the Property is damaged prior to closing, and there is no insurance to cover the loss, either the Purchaser or the Seller can terminate this Agreement, by written notice to the other party.  In such an event, the Seller shall immediately refund the Deposit to the Purchaser and neither party shall have any further obligation hereunder.  In the event the Property is damaged prior to Closing, and there is insurance to cover the loss, then Purchaser shall proceed with Closing in which event the Purchase Price shall be reduced by all insurance proceeds payable in respect of such damage collected by Seller before the Closing Date and Seller shall assign to Purchaser all of Seller's rights, title and interest in and to all such insurance proceeds not collected by Seller before Closing Date.

16.    Acceptance of State and Municipal Department Violations and Orders.  Purchaser accepts the Property subject to all notes or notices of violations, known or unknown, of law or municipal ordinances, orders or requirements noted in or issued by any governmental department having

authority as to lands, housing, buildings, fire and health and labor conditions affecting the Property.  This provision shall survive Closing.

17.    Closing Adjustments and Costs.

A.    Purchaser shall pay the cost of all (i) documentary stamps, recordation taxes, transfer taxes and any other similar tax related to the conveyance of title to Property and (ii) title searches, title commitments, title policies, survey(s), investigations, tests and closing costs of the Title Company.

B.    If at the time of Closing the Property is affected by an assessment which is or may become payable in annual installments, and the first installment is then a lien, or has been paid, then for the purposes of this Agreement all the unpaid installments shall be payable by Purchaser when each installment as to such assessment is due and payable after the Closing.

C.    Each of the following items are to be apportioned as of midnight the day before Closing: (a) real estate taxes on the basis of the fiscal period for which assessed; (b) special assessment liens in accordance with the preceding paragraph; (c) utilities; (d) water and sewer charges; and (e) any other charges customarily prorated in similar transactions.  If Closing shall occur before a new tax rate is fixed, the apportionment of taxes shall be upon the basis of the old tax rate for the preceding period applied to the latest assessed valuation.

18.    Use of Purchase Price to Pay Encumbrances.  If there is any monetary encumbrance which is capable of being reduced to a sum certain affecting the sale which Seller is obligated to pay and discharge at Closing pursuant to this Agreement, Seller may, to the extent permitted by the Sale Order, use any portion of the balance of the Purchase Price to discharge it.  As an alternative, Seller may, to the extent permitted by the Sale Order, deposit money with the Title Company in such amount as reasonably required by the Title Company to assure its discharge.  Upon request made within a reasonable time before Closing, Purchaser agrees to provide separate certified checks to assist in clearing up these matters.

19.    Personal Property.  Purchaser accepts such personal property, identified in the third paragraph of the recitals herein, in its "as-is" condition, without representation as to quantity, quality, or any other matter.

20.    Events of Default.

A.    Purchaser shall be in default under this Agreement if Purchaser (1) fails to pay the balance of the Purchase Price on or before the Closing Date, (2) fails to pay, perform or observe any of Purchaser's obligations hereunder, or (3) assigns this Agreement, or records any written instrument regarding this Agreement, without the consents set forth in Section 36 of this Agreement.

B.    If any payment or any other material covenant of this Agreement hereof is not made, tendered or performed by either Seller or Purchaser, as herein provided, then this Agreement, at the option of the party who is not in default, may be terminated by such party.

(i)      In the event of such default by Seller, if Purchaser elects to treat this Agreement as terminated, then, as Purchaser's sole remedy, the Deposit shall be returned to Purchaser and Seller shall be released from any and all liability hereunder. Purchaser expressly waives its right to seek damages in the event of Seller's default hereunder.

(ii)      In the event of such default by Purchaser, if Seller elects to treat this Agreement as terminated, then all payments made hereunder shall be forfeited to and retained by Seller and Seller shall be entitled to the retention of the Deposit as liquidated damages and not a penalty, and Seller shall retain all rights to bring such other causes of action against Seller as are allowed by law as a result of the Purchaser's default.

C.      Notwithstanding the occurrence of an event of default hereunder by Purchaser, the Seller, may, in its sole discretion, keep this Agreement in effect and proceed to Closing.

D.      If Purchaser breaches this Agreement and Seller institutes a judicial action to enforce its rights or obtain remedies hereunder, the Purchaser shall pay to the Seller the reasonable attorneys' fees, court costs and expenses incurred by the Seller.

21.      <u>No Representation; Purchaser's Duty to Review</u>.

IT IS UNDERSTOOD AND AGREED THAT SELLER IS NOT MAKING AND HAS NOT AT ANY TIME MADE ANY WARRANTIES OR REPRESENTATIONS OF ANY KIND OR CHARACTER, EXPRESS OR IMPLIED, WITH RESPECT TO THE PROPERTY INCLUDING, BUT NOT LIMITED TO, ANY WARRANTIES OR REPRESENTATIONS AS TO HABITABILITY, MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, TITLE, ZONING, TAX CONSEQUENCES, LATENT OR PATENT PHYSICAL OR ENVIRONMENTAL CONDITION, UTILITIES, OPERATING HISTORY OR PROJECTIONS, VALUATION, GOVERNMENTAL APPROVALS, THE COMPLIANCE OF THE PROPERTY WITH GOVERNMENTAL LAWS (INCLUDING, WITHOUT LIMITATION, ACCESSIBILITY FOR HANDICAPPED PERSONS), THE TRUTH, ACCURACY OR COMPLETENESS OF ANY PROPERTY DOCUMENTS OR ANY OTHER INFORMATION PROVIDED BY OR ON BEHALF OF SELLER TO PURCHASER, OR ANY OTHER MATTER OR THING REGARDING THE PROPERTY.   PURCHASER ACKNOWLEDGES AND AGREES THAT UPON CLOSING SELLER SHALL SELL AND TRANSFER TO PURCHASER AND PURCHASER SHALL ACCEPT THE PROPERTY "AS IS, WHERE IS, WITH ALL FAULTS", EXCEPT TO THE EXTENT EXPRESSLY PROVIDED OTHERWISE IN THIS AGREEMENT. PURCHASER HAS NOT RELIED AND WILL NOT RELY ON, AND SELLER IS NOT LIABLE FOR OR BOUND BY, ANY EXPRESS OR IMPLIED WARRANTIES, GUARANTIES, STATEMENTS, REPRESENTATIONS OR INFORMATION PERTAINING TO THE PROPERTY OR RELATING THERETO (INCLUDING SPECIFICALLY, WITHOUT LIMITATION, PROPERTY INFORMATION PACKAGES DISTRIBUTED WITH RESPECT TO THE PROPERTY) MADE OR FURNISHED BY THE SELLER OR ANY REAL ESTATE BROKER OR AGENT REPRESENTING OR PURPORTING TO REPRESENT SELLER, TO WHOMEVER MADE OR GIVEN, DIRECTLY OR INDIRECTLY, ORALLY OR IN WRITING, UNLESS SPECIFICALLY SET FORTH IN

THIS AGREEMENT. PURCHASER REPRESENTS TO SELLER THAT PURCHASER HAS CONDUCTED, OR WILL CONDUCT PRIOR TO CLOSING, SUCH INVESTIGATIONS OF THE PROPERTY, INCLUDING, BUT NOT LIMITED TO, THE PHYSICAL AND ENVIRONMENTAL CONDITIONS THEREOF, AS PURCHASER DEEMS NECESSARY TO SATISFY ITSELF AS TO THE CONDITION OF THE PROPERTY AND THE EXISTENCE OR NONEXISTENCE OR CURATIVE ACTION TO BE TAKEN WITH RESPECT TO ANY HAZARDOUS OR TOXIC SUBSTANCES ON OR DISCHARGED FROM THE PROPERTY, AND WILL RELY SOLELY UPON SAME AND NOT UPON ANY INFORMATION PROVIDED BY OR ON BEHALF OF SELLER OR ITS AGENTS OR EMPLOYEES WITH RESPECT THERETO, OTHER THAN SUCH REPRESENTATIONS, WARRANTIES AND COVENANTS OF SELLER AS ARE EXPRESSLY SET FORTH IN THIS AGREEMENT. THE PROVISIONS OF THIS PARAGRAPH SHALL SURVIVE THE CLOSING.

22.    Broker's Commission. Any commission or fee of any type due and payable to a broker on behalf of Purchaser as a result of this Agreement or related to the sale of the Property shall be paid solely by Purchaser. Seller shall have no obligation to fund or cause the funding of any commission or fee due to any broker acting on behalf of Purchaser. Purchaser indemnifies Seller in this regard including, without limitation, for any such fee and for all expenses incurred in respect of any litigation or claims brought seeking the payment of such fee. This paragraph shall survive Closing.

23.    Notices. Any notice pursuant to this Agreement shall be given in writing by (a) personal delivery, or (b) reputable overnight delivery service with proof of delivery, or (c) United States Mail, postage prepaid, registered or certified mail, return receipt requested, or (d) legible facsimile transmission sent to the intended addressee at the address set forth below, or to such other address or to the attention of such other person as the addressee shall have designated by written notice sent in accordance herewith, and shall be deemed to have been given either at the time of personal delivery, or, in the case of expedited delivery service or mail, as of the date of first attempted delivery at the address and in the manner provided herein, or, in the case of facsimile transmission, as of the date of the facsimile transmission provided that an original of such facsimile is also sent to the intended addressee by means described in clauses (a), (b) or (c) above. Unless changed in accordance with the preceding sentence, the addressees for notices given pursuant to this Agreement shall be as follows:

    If to Seller:        _____
                        Attn: _____
                        _____
                        _____
                        Phone: _____
                        Email: _____

If to Purchaser:     _____

Attn: _____
_____
_____
Phone: _____
Email:  _____

24.    <u>Additional Provisions</u>.

A.    This Agreement shall be governed and construed in accordance with the laws of the State of New York without regard to conflicts of laws principles.

B.    The parties agree that neither this contract nor any memorandum thereof shall be recorded or filed in any government office charged with the obligation to accept documents for recording or filing, and such office is instructed to refuse to accept same for recordation or filing.

25.    <u>Strict Compliance</u>.  Any failure by either party to insist upon strict performance by the other party of any of the provisions of this Agreement shall not be deemed a waiver of any of the provisions hereof, irrespective of the number of violations or breaches that may occur, and each party, notwithstanding any such failure, shall have the right thereafter to insist upon strict performance by the other of any and all of the provisions of this Agreement.

26.    <u>Waiver of Jury Trial</u>.  EXCEPT AS PROHIBITED BY LAW, THE PARTIES SHALL, AND THEY HEREBY DO, EXPRESSLY WAIVE TRIAL BY JURY IN ANY LITIGATION ARISING OUT OF, CONNECTED WITH, OR RELATING TO THIS AGREEMENT, OR THE RELATIONSHIP CREATED HEREBY.  With respect to any matter for which a jury trial cannot be waived, the parties agree not to assert any such claim as a counterclaim in, nor move to consolidate such claim with, any action or proceeding in which a jury trial is waived.  The parties submit to the exclusive jurisdiction and venue of the Bankruptcy Court with respect to any dispute, claim or issue arising out of this Agreement.

27.    <u>Entire Agreement</u>.  All prior understandings and agreements between Seller and Purchaser are merged in this Agreement.  It completely expresses their full agreement; neither party is relying upon any statements made by anyone else that are not set forth in this Agreement.

28.    <u>Singular Also Means Plural</u>.  Any singular word or term herein shall also be read as in the plural whenever the sense of this Agreement may require it.

29.    <u>Gender</u>.  A reference in this Agreement to any one gender, masculine, feminine or neuter, includes the other two, and the singular includes the plural, and vice versa, unless the context requires otherwise.

30.    <u>Certain References</u>.  The term "herein," "hereof" or "hereunder" or similar terms used in this Agreement shall refer to this entire Agreement and not to the particular provision in which the

term is used.  Unless otherwise stated, all references herein to paragraphs, subparagraphs or other provisions are references to paragraph, subparagraphs, or other provisions of this Agreement.

31.      No Oral Changes.  This Agreement cannot be changed or any provision waived orally. ANY CHANGES OR ADDITIONAL PROVISIONS OR WAIVERS MUST BE SET FORTH IN A RIDER ATTACHED HERETO OR IN A SEPARATE WRITTEN AGREEMENT SIGNED BY THE PARTIES.

32.      Date of Performance.  If any date for performance hereunder falls on a Saturday, Sunday or other day which is a federal holiday or holiday under the laws of the state where the Property is located, the date for such performance shall be the next succeeding business day.

33.      Severability.  Except as set forth herein, if any clause or provision of this Agreement is held to be invalid or unenforceable by any court of competent jurisdiction as against any person or under any circumstances, the remainder of this Agreement and the applicability of any such clause or provision to other persons or circumstances shall not be affected thereby; provided, however, the parties agree that the conditions for Bankruptcy Court approval and issuance of a Sale Order is a non-negotiable condition precedent to the validity and enforcement of this Agreement against the Trustee.   Any other clauses or provisions of this Agreement, not found invalid and unenforceable, shall be and remain valid and enforceable.

34.      Counterparts.  This Agreement may be executed in multiple counterparts all of which when taken together shall constitute an Agreement for the sale of real estate under the laws of the State of Indiana.  It is binding upon and inures to the benefit of the parties hereto and their respective heirs, devisees, executors, administrators, successors and assigns, and may be canceled, modified or amended only by a written instrument executed by both the Seller and the Purchaser.

35.      Facsimile Execution.  For the purposes of executing this Agreement, a document signed and transmitted by facsimile machine or electronic (PDF) mail shall be treated as an original document.  The signature of any party thereon shall be considered as an original signature, and the document transmitted shall be considered to have the same binding legal effect as an original signature on an original document.  At the request of either party, any facsimile or electronic (PDF) mail document shall be re-executed by both parties in original form.  No party hereto may raise the use of a facsimile machine or electronic (PDF) mail or the fact that any signature was transmitted through the use of a facsimile machine or electronic (PDF) mail as a defense to the enforcement of this Agreement or any amendment executed in compliance with this paragraph. This paragraph does not supersede the requirements of Section 23 hereof.

36.      Assignment.  Purchaser shall not assign this Agreement without the prior written consent of the Seller, such consent to be given in Seller's sole discretion.  Any purported assignment by Purchaser in violation of this Agreement shall be voidable at the option of the Seller.  The refusal of any such person to consent to an assignment shall not entitle Purchaser to cancel this Agreement nor give rise to any claim for damages against the Seller.  Any assignment by Purchaser, even if consented to by Seller, shall not act to limit, reduce or impact in any way any of Purchaser's obligations to perform all of its obligations under this Agreement including, without limitation, its obligation to pay the Purchase Price.

37.    <u>Construction of Agreement</u>.  This Agreement has been drafted through a cooperative effort of both Parties, and neither Party shall be considered the drafter of this Agreement so as to give rise to any presumption of convention regarding construction of this document.  All terms of this Agreement were negotiated in good faith and at arm's-length, and this Agreement was prepared and executed without fraud, duress, undue influence, or coercion of any kind exerted by any of the Parties upon the other.  The execution and delivery of this Agreement is the free and voluntary act of the Parties.

*[Signatures appear on following page]*

IN WITNESS HEREOF, Purchaser and Seller agree that the date of this Agreement shall be the date Seller executes this Agreement.

**PURCHASER:**

_____

By:_____

Printed:_____

Title:_____

**SELLER:**

_____

**[COMPANY]**

<u>Exhibit A</u>

Legal Description of Property

<u>Exhibit B</u>

Permitted Exceptions

<u>Exhibit C</u>

Bidding Procedures Order

**<u>Exhibit A-2</u>**

**Form Assumption and Assignment Agreement**

## ASSUMPTION AND ASSIGNMENT AGREEMENT

This ASSIGNMENT AND ASSUMPTION AGREEMENT (the "Agreement"), dated as of _____, 2018, is by and between _____ ("Assignor") and ___._____ ("Assignee").

## RECITALS

WHEREAS, Assignor, along with its affiliated debtors and debtors in possession, has filed a voluntary petition for relief pursuant to chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (as amended, the "Bankruptcy Code"), in the United States Bankruptcy Court for the Eastern District of Virginia (the "Bankruptcy Court"), Case No. 17-34665; and

WHEREAS, Assignor has agreed to assign and Assignee has agreed to assume the real property lease(s) listed on the attached Schedule A (referred to as either the "Assigned Asset(s)" or the "Lease(s)") with respect to the premises set forth on Schedule A (the "Premises") pursuant to the terms and conditions of the *Bidding Procedures for the Disposition of the Remaining Real Estate Assets of Toys Delaware* subject to approval by the United States Bankruptcy Court for the Eastern District of Virginia in the chapter 11 cases of *In re Toys "R" Us, Inc.*, Case No. 17-34665 (KLP) (Bankr. E.D. Va. 2018).

NOW, THEREFORE, in consideration of the premises and the mutual agreements herein contained, the parties hereto agree as follows:

## AGREEMENT

1.  <u>Assignment and Assumption</u>.

    (a)    Assignor hereby sells, transfers, conveys, assigns and sets over to Assignee, its successors and assigns, all of Assignor's right, title, and interest in and to the Assigned Asset(s).

    (b)    Assignee hereby assumes and undertakes to pay, perform and discharge all of Assignor's obligations and duties with respect to the Assigned Asset(s).

2.  <u>Payment of Purchase Price</u>. Assignee shall, on the date hereof, deliver the purchase price for the Assigned Asset(s) in the amount of _____ (the "Purchase Price") in immediately available funds wired to the account specified by Assignor. If the assumption and assignment of the Assigned Asset(s) do(es) not occur by _____, 2018, Assignee will additionally reimburse Assignor for all amounts that came due, were required to be paid, and were in fact paid in connection with the Assigned Asset(s) on and after _____, 2018.

3.  <u>Assumption of Liabilities</u>. In addition to assuming all remaining obligations that exist with respect to the Assigned Asset(s), including, but not limited to, accrued but unbilled adjustments for CAM, real estate taxes and insurance, Assignee shall assume and cure all outstanding liabilities with respect to the Assigned Asset(s).

4.  <u>No Further Liability of Assignor</u>. From and after the date hereof, Assignor shall have no further obligations and duties with respect to the Assigned Asset(s).

5.    <u>Further Assurances</u>.  At any time and from time to time after the date hereof, at the request of Assignee, and without further consideration, Assignor shall execute and deliver such other instruments of sale, transfer, conveyance, assignment, and confirmation or consents and take such other action as Assignee may reasonably request as necessary or desirable in order to more effectively transfer, convey, and assign to Assignee Assignor's rights to the Assigned Asset(s).

6.    <u>"As Is Where Is" Transaction</u>.  Assignee hereby acknowledges and agrees that Assignor makes no representations or warranties whatsoever, express or implied, with respect to any matter relating to the Assigned Asset(s).  Without limiting the foregoing, Assignor hereby disclaims any warranty (express or implied) of merchantability or fitness for any particular purpose as to any portion of the Assigned Asset(s).  Assignee further acknowledges that the Assignee has conducted an independent inspection and investigation of the physical condition of the Assigned Asset(s) and all such other matters relating to or affecting the Assigned Asset(s) as Assignee deemed necessary or appropriate and that in proceeding with its acquisition of the Assigned Asset(s), Assignee is doing so based upon such independent inspections and investigations. Accordingly, Assignee will accept the Assigned Asset(s) "AS IS" and "WHERE IS."

7.    <u>Compliance With Law</u>.  Assignee hereby agrees to comply with all applicable laws. Assignee agrees to indemnify and hold Assignor harmless for any violation or alleged violation of this section.

8.    <u>Governing Law</u>.  This Agreement shall be governed by and construed in accordance with the laws of the State of New York without regard to principles of conflicts of law.

9.    <u>Jurisdiction.</u>  The Parties consent to the exclusive jurisdiction of the United States Bankruptcy Court for the Eastern District of Virginia with respect to all matters arising under or relating to this Agreement.  The Parties hereby irrevocably waive any objection on the grounds of venue, forum non conveniens, or any similar grounds and irrevocably consent to service of process by mail or in any other manner permitted by applicable law.  The Parties further hereby waive any right to a trial by jury with respect to any lawsuit or judicial proceeding arising or relating to this Agreement.

10.    <u>No Reliance</u>.  Each Party represents and warrants that in entering into this Agreement it is relying on its own judgment, belief and knowledge and, as applicable, on that of any attorney it has retained to represent it in this matter.  In entering into this Agreement, no Party is relying on any representation or statement made by any other Party or any person representing such other Party.

11.    <u>Construction</u>.  This Agreement has been drafted through a cooperative effort of both Parties, and neither Party shall be considered the drafter of this Agreement so as to give rise to any presumption of convention regarding construction of this document.  All terms of this Agreement were negotiated in good faith and at arm's-length, and this Agreement was prepared and executed without fraud, duress, undue influence, or coercion of any kind exerted by any of the Parties upon the other.  The execution and delivery of this Agreement is the free and voluntary act of the Parties.

12.    <u>Execution in Counterparts</u>.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  All signatures of the Parties to this Agreement may be transmitted by facsimile or by electronic mail, and such transmission will, for all purposes, be deemed to be the original signature of such Party whose signature it reproduces, and will be binding upon such Party.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

*[Signatures appear on following page]*

**ASSIGNOR:**
**[COMPANY]**

By_____
Name_____
Its_____

**ASSIGNEE:**
**[ASSIGNEE]**

By_____
Name_____
Its_____

<u>Schedule A</u>

Description of Asset(s)

**<u>Exhibit A-3</u>**

**Form Lease Termination Agreement**

# LEASE TERMINATION AGREEMENT

This Lease Termination Agreement (the "Agreement") is made as of this ___ day of _____, 2018 by and between _____ ("Landlord") and _____ ("Tenant" or "Debtor").

## RECITALS

WHEREAS, Landlord and Tenant entered into a certain lease dated _____ (the "Lease"), covering certain premises located at _____ (the "Premises"), on the terms and conditions set forth therein;

WHEREAS, Tenant, along with its affiliated debtors and debtors in possession, has filed a voluntary petition for relief pursuant to chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (as amended, the "Bankruptcy Code"), in the United States Bankruptcy Court for the Eastern District of Virginia (the "Bankruptcy Court");

WHEREAS, Landlord has prepetition and postpetition sums due and owing from Tenant. The Parties desire to enter into this Agreement, for among things, Landlord to be restored to possession of the Premises as of the Termination Date, the parties release the other Landlord is able to dispose of any remaining equipment at the Premises in its sole and absolute discretion;

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained herein, the receipt and sufficiency of which are hereby acknowledged, Landlord and Tenant hereby covenant and agree as follows subject only to an order of the Bankruptcy Court approving this Agreement:

## AGREEMENT

1.    Recitals.  The Recitals are incorporated herein as if set forth at length.

2.    Lease Termination.    The Lease is terminated effective _____ (the "Termination Date").  Tenant shall file a notice in the Bankruptcy Court rejecting the Lease effective upon the Termination Date.

3.    Consideration.  Landlord shall pay to Tenant $_____.

4.    Landlord Release of Tenant.  For valuable consideration, and the mutual covenants and agreements contained herein, Landlord does hereby fully, forever and irrevocably release, discharge and acquit Tenant, and its respective past and present affiliates, and the respective past and present officers, directors, shareholders, agents, and employees of each and all of the foregoing entities, and its and their respective successors, heirs, and assigns, and any other person or entity now, previously, or hereafter affiliated with any or all of the foregoing entities, of and from any and all rights, claims, demands, obligations liabilities, indebtedness, breaches of contract, breaches of duty or any relationship, acts, omissions, misfeasance, malfeasance, cause or causes of action, debts, sums of money, accounts, compensations, contracts, controversies, promises, damages, costs, losses and expenses of every type, kind, nature, description or character, and irrespective of how, why, or by reason of what facts, whether heretofore or now existing, or that could, might, or

may be claimed to exist, of whatever kind or name, whether known or unknown, suspected or unsuspected, liquidated or unliquidated, claimed or unclaimed, whether based on contract, tort, breach of any duty, or other legal or equitable theory of recovery, each as though fully set forth herein at length, including, without limitation, any and all claims evidenced by the Lease.

5.    Tenant Release of Landlord.  For valuable consideration, and the mutual covenants and agreements contained herein, Tenant does hereby fully, forever and irrevocably release, discharge and acquit Landlord, and its respective past and present affiliates, and the respective past and present officers, directors, shareholders, agents, property managers, and employees of each and all of the foregoing entities, and its and their respective successors, heirs, and assigns, and any other person or entity now, previously, or hereafter affiliated with any or all of the foregoing entities, of and from any and all rights, claims, demands, obligations liabilities, indebtedness, breaches of contract, breaches of duty or any relationship, acts, omissions, misfeasance, malfeasance, cause or causes of action, debts, sums of money, accounts, compensations, contracts, controversies, promises, damages, costs, losses and expenses of every type, kind, nature, description or character, and irrespective of how, why, or by reason of what facts, whether heretofore or now existing, or that could, might, or may be claimed to exist, of whatever kind or name, whether known or unknown, suspected or unsuspected, liquidated or unliquidated, claimed or unclaimed, whether based on contract, tort, breach of any duty, or other legal or equitable theory of recovery, each as though fully set forth herein at length, including, without limitation, any and all claims evidenced by the Lease.

6.    As further consideration for this Release, the parties hereto, for themselves and their successors and assigns, hereby agree, represent and warrant that the matters released herein are not limited to matters that are known or disclosed, and the parties hereby waive any and all rights and benefits that they now have, or in the future may have, conferred upon it by virtue of the provisions of Section 1542 of the Civil Code of the State of California (or any other statute or common law principles of similar effect), which Section provides as follows:

A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.

7.    In this connection, the parties hereby agree, represent and warrant that they realize and acknowledge that factual matters now unknown to them may have given or may hereafter give rise to causes of action, claims, demands, debts, controversies, damages, costs, losses, and expenses that are presently unknown, unanticipated, and unsuspected, and the parties further agree, represent and warrant that this Release has been negotiated and agreed upon in light of that realization and that, except as expressly limited above, it nevertheless hereby intends to release, discharge, and acquit the Released Parties from any such unknown causes of action, claims, demands, debts, controversies, damages, costs, losses, and expenses.

8.    Conditions Precedent.  As a condition precedent to the effectiveness of this Agreement, each and all of the following shall have occurred no later than the Termination Date:
47.    (a)    Tenant has delivered possession of the Premises to Landlord;

(b)      Tenant has delivered to Landlord the keys and access codes to the Premises;

(c)      An order has been entered approving the entirety of this Agreement.

9.      <u>Furniture, Fixtures and Equipment (FF&E)</u>.  Any FF&E remaining at the Premises after the Termination Date is deemed abandoned and the Landlord and their managing agents are free to dispose of the FF&E in their sole and absolute discretion without liability to the Debtor or any entity.

10.      <u>Authority to Settle</u>.  Each of the parties to this Agreement respectively represents and warrants that each such party has the absolute and unfettered power, right and authority to enter into this Agreement and settle, compromise and release fully and completely all matters and claims contemplated to be resolved hereby.  Each of the parties to this Agreement respectively represents and warrants that each such party owns and controls each of the claims, causes of action, or other matters that are the subject matter of this Agreement and that it has not assigned or transferred to any other person any of such claims, causes of action, or other matters.

11.      <u>Entire Agreement</u>.  This Agreement, the exhibits hereto and the other items to be delivered as a condition precedent to the effectiveness of this Agreement, contains the entire agreement and understanding concerning the subject matter of the Agreement supersedes and replaces all prior negotiations and proposed settlement agreements, written or oral.  Each of the parties to this Agreement respectively represents and warrants that no other party to this Agreement, nor any agent or attorney of any such party, has made any promise, representation or warranty, express or implied, not contained in this Agreement or the exhibits hereto to induce any party to execute this Agreement.  Each of the parties to this Agreement further acknowledges that such party is not executing this Agreement in reliance on any promise, representation or warranty not contained in this Agreement or the exhibits hereto.

12.      <u>Advice of Counsel</u>.  Each of the parties to this Agreement respectively represents and warrants that each such party has (a) been adequately represented, or has had the opportunity to be represented, by independent legal counsel of its own choice, throughout all of the negotiations that preceded the execution of this Agreement, (b) executed this Agreement with the consent and upon the competent advice of such counsel, or that it has had the opportunity to seek such consent and advice, (c) read this Agreement, and understands and assents to all the terms and conditions contained in this Agreement without any reservations; and (d) had, or has had the opportunity to have had, the same explained to it by its own counsel. In entering into this Agreement, no Party is relying on any representation or statement made by any other Party or any person representing such other Party.

13.      <u>Attorneys' Fees</u>.  Each party to this Agreement agrees that in the event a dispute arises as to the validity, scope, applicability, or enforceability of this Agreement, the prevailing party shall be entitled to recover its costs and attorneys' fees.

14.      <u>Counterparts</u>.  This Agreement may be executed in one or more counterparts, each of which shall be an original, and all of which shall constitute one and the same document.  Further, each of the parties to this Agreement agrees that scanned signatures of each party hereto shall be deemed original signatures and shall be binding on each such party whose signature is by scan to the same extent as if it were its original signature.

15.    <u>Governing Law.</u>  This Agreement shall be governed by and construed under the laws of the State of New York, without regard to conflicts of laws principles that would require the application of the law of another jurisdiction.

16.    <u>Jurisdiction</u>.  The Parties consent to the exclusive jurisdiction of the United States Bankruptcy Court for the Eastern District of Virginia with respect to all matters arising under or relating to this Agreement.  The Parties hereby irrevocably waive any objection on the grounds of venue, forum non conveniens, or any similar grounds and irrevocably consent to service of process by mail or in any other manner permitted by applicable law.  The Parties further hereby waive any right to a trial by jury with respect to any lawsuit or judicial proceeding arising or relating to this Agreement.

17.    <u>Miscellaneous</u>.

(a)    The headings of the sections of this Agreement are for convenience of reference only and shall not affect the meaning or interpretation of this Agreement.  This Agreement and its terms, provisions, covenants and conditions may not be amended, changed, altered, modified or waived except by an express instrument in writing signed by each and all of the parties hereto.

(b)    This Agreement and each of its provisions are binding upon and shall inure to the benefit of the Tenant's successors and assigns, including, without limitation, a trustee, if any, subsequently appointed under Chapter 7 or 11 of the Bankruptcy Code.

(c)    Each of the parties to this Agreement shall take all necessary steps, cooperate, and use reasonable best efforts to obtain and achieve the objectives and fulfill the obligations of this Agreement.  Each of the parties hereto shall cooperate with each other and shall execute and deliver any and all additional notices, papers, documents, and other assurances, and shall do any and all acts and things reasonably necessary in connection with the performance of their obligations hereunder and to carry out the intent of this Agreement.

(d)    Each of the parties to this Agreement shall pay all of its own legal fees, costs, and any other expenses incurred or to be incurred in connection with the consummation of this Agreement.

(e)    The determination of the terms of, and the drafting of, this Agreement has been by mutual agreement after negotiation, with consideration by and participation of all parties hereto and their counsel.  Because this Agreement was drafted with the participation of all parties hereto and their counsel, the presumption that ambiguities shall be construed against the drafter does not apply.  Each of the parties to this Agreement respectively represents and warrants that each such party was represented by competent and effective counsel throughout the course of settlement negotiations and in the drafting and execution of this Agreement, and there was no disparity in bargaining power among the parties to this Agreement.

*[Signatures appear on following page]*

4

IN WITNESS HEREOF, the parties have duly executed this Agreement as of the date and year first written above.

**[LANDLORD]**

By:_____

Print Name:_____

Its:_____

**[TENANT]**

By:_____

Print Name:_____

Its:_____

**<u>Exhibit B</u>**

**Bidder Registration Form**

## OFFER AND BIDDER REGISTRATION FORM

Bidder, _____, hereby:

- Offers to purchase the following Real Estate, Real Estate & Leasehold Interest, and/or Lease for the bid set forth below, pursuant to this Offer & Qualified Bidder Form and the terms and conditions of the accompanying purchase agreement (the "Bidder PA"), and

- Seeks to become a Qualified Bidder pursuant to the terms and conditions of the *Bidding Procedures for the Disposition of the Remaining Real Estate Assets of Toys Delaware* subject to approval by the United States Bankruptcy Court for the Eastern District of Virginia in the chapter 11 cases of *In re Toys "R" Us, Inc.*, Case No. 17-34665 (KLP) (Bankr. E.D. Va. 2018) (the "Bidding Procedures").

Bidder's offer is for the following Properties at the following bids:

| REAL ESTATE, REAL ESTATE & LEASEHOLD INTEREST &/OR LEASE | BID/PURCHASE PRICE |
|---|---|
| 1. | |
| 2. | |
| 3. | |
| 4. | |
| 5. | |
| 6. | |
| 7. | |
| 8. | |
| **Aggregate Purchase Price:** | |

**Bidder hereby warrants and represents as follows**:

(a)   Bidder has received, reviewed, understands and agrees to abide by the terms and conditions of the Bidding Procedures, the terms and conditions of which are incorporated herein by reference.

(b)   Bidder has received, reviewed and understands the terms and conditions of the Bidder PA the terms and conditions of which are incorporated herein by reference.

(c)   To the extent that the words and phrases which are capitalized in this Offer & Qualified Bidder Form have been defined in the Bidding Procedures or in the Bidder PA, those definitions are incorporated herein by reference.

(d)   Each Bid made at the Auction shall constitute a binding, irrevocable "Bid" pursuant to the Bidding Procedures.

(e)   Each Bid is and shall be a good faith, bona fide, irrevocable offer to purchase the Real Estate, the Real Estate & Leasehold Interests, and/or the Leases on an as-is, where-is basis, with no contingencies.

(f)   Bidder (a) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the Real Estate, the Real Estate & Leasehold Interests, and/or the Leases in making its offer; (b) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express or implied (by operation of law or otherwise), regarding the Real Estate, the Real Estate & Leasehold Interests, and/or the Leases or the completeness of any information provided in connection therewith or the Auction other than as provided in the Bidder PA; and (c) is not entitled to any break-up fee, termination fee, expense reimbursement, or similar type of payment, (d) and by submitting a Bidder PA, waives, and shall be deemed to waive, the right to pursue a substantial contribution claim under § 503 of title 11 of the United States Code (the "Bankruptcy Code") related in any way to the submission of its bid, the Bidding Procedures, or any earnest money Deposit.

(g)   Bidder is either not represented by a broker seeking a commission, or if Bidder is represented by a broker, Bidder exclusively authorizes broker to submit such offer on behalf of Bidder and that any commission or fee of any type due and payable to such broker as a result of a Sale shall be paid solely by Bidder and Bidder shall indemnify the Debtors and their agents in this regard, and (ii) Bidder acknowledges that it will comply with the Bidding Procedures.

(h)   Bidder acknowledges that, pursuant to, *inter alia*, 18 U.S.C. § 371, it is a federal crime to engage in collusive bidding or to chill the bidding.

(i)   Bidder confirms that it has not engaged, and will not engage, in any collusion with respect to the bidding or the Sale.

(j)   Identification of how the Bidder will pay the purchase price at Closing.

*[Signatures appear on following page]*

8

AGREED & ACCEPTED this _____ day of _____, 2018


Company: _____

By:_____
Name:
Title:


*BIDDER I.D.*

Bidder's Company: _____

Bidder's Address:_____

Bidder's Contact:_____

Bidder's Phone & Facsimile Numbers:_____

Bidder's Email Address: _____

Bidder's Tax ID Number:_____


*ATTORNEY OR AUTHORIZED AGENT I.D.*

Attorney or Agent Name:_____

Law Firm or Company: _____

Address:_____

Phone & Facsimile Numbers:_____

Email Address: _____


*BIDDER WIRING INFORMATION FOR DEPOSIT RETURN*

Bidder's Bank Name:_____

Account Name:_____

Account Number:_____

ABA Number:_____

Bidder's Address:_____


9

## Exhibit 2

**Auction and Hearing Notice**

Edward O. Sassower, P.C.
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:       (212) 446-4800
Facsimile:       (212) 446-4900

-and-

Michael A. Condyles (VA 27807)
Peter J. Barrett (VA 46179)
Jeremy S. Williams (VA 77469)
**KUTAK ROCK LLP**
901 East Byrd Street, Suite 1000
Richmond, Virginia 23219-4071
Telephone:       (804) 644-1700
Facsimile:       (804) 783-6192

*Co-Counsel to the Debtors and Debtors in Possession*

James H.M. Sprayregen, P.C.
Anup Sathy, P.C.
Chad J. Husnick, P.C. (admitted *pro hac vice*)
Emily E. Geier (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:       (312) 862-2000
Facsimile:       (312) 862-2200

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| TOYS "R" US, INC., *et al.*,[1] | ) | Case No. 17-34665 (KLP) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

### NOTICE OF BID DEADLINE AND POTENTIAL SALE HEARING

On [•], 2018 the United States Bankruptcy Court for the Eastern District of Virginia (the "Court") entered the *Order (I) Establishing Bidding Procedures for the Remaining Real Estate Assets of Toys Delaware and (II) Granting Related Relief* (the "Bidding Procedures Order"),[2] by which the Court approved procedures setting forth the process by which the Debtors are authorized

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are set forth in the *Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief* [Docket No. 78]. The location of the Debtors' service address is One Geoffrey Way, Wayne, New Jersey 07470.

[2]   All capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Bidding Procedures Order or the *Debtors' Motion for Entry of an Order (I) Establishing Bidding Procedures for the Remaining Real Estate Assets of Toys Delaware and (II) Granting Related Relief* [Docket No. [•]].

to conduct an auction (the "<u>Auction</u>") for the sale of certain real property and commercial leases (collectively, the "<u>Remaining Real Estate Assets</u>").

**PLEASE TAKE NOTICE** that the Debtors are soliciting offers for the sale, liquidation, or other disposition of certain of the Debtors' Remaining Real Estate Assets consistent with the Bidding Procedures approved by the Court by entry of an order on [•], 2018 [Docket No.[ •]] (the "<u>Bidding Procedures Order</u>").  **<u>All interested bidders should carefully read the Bidding Procedures and Bidding Procedures Order.</u>**  To the extent that there are any inconsistencies between this notice and the Bidding Procedures or Bidding Procedures Order, the Bidding Procedures or Bidding Procedures Order, as applicable, shall govern in all respects.

**PLEASE TAKE FURTHER NOTICE** that, if the Debtors receive qualified competing bids within the requirements and time frame specified by the Bidding Procedures, the Debtors will conduct an Auction of certain of the Debtors' Remaining Real Estate Assets **on or about [•]** at the offices of Kirkland & Ellis LLP, 601 Lexington Avenue, New York, NY 10022 (or at any other location as the Debtors may hereafter designate on proper notice).

**PLEASE TAKE FURTHER NOTICE** that the Debtors will seek approval of the Sale(s) at the Sale Hearing scheduled to commence on or before **[•], 2018** (the "<u>Sale Hearing</u>") before the Honorable Judge Keith L. Phillips, at the Court, 701 East Broad Street, 5th Floor, Courtroom No. 5100, Richmond, Virginia 23219.

**PLEASE TAKE FURTHER NOTICE** that objections to approval of the proposed Sale, the proposed assumption and assignment, and/or to the Successful Bidder's proposed form of adequate assurance of future performance must file a written objection (each, a "<u>Sale Objection</u>") so that such objection is filed with the Court so as to be **actually received** by [•] and serve such Objection on:  (a) Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, Attn: Joshua A. Sussberg, P.C. Kirkland & Ellis LLP, 300 North LaSalle Street, Chicago, Illinois 60654, Attn:  Chad Husnick, and Emily Geier, and Kutak Rock LLP, 901 East Byrd Street, Suite 1000, Richmond, Virginia 23218, Attn:  Michael A. Condyles, Peter J. Barrett, and Jeremy S. Williams, co-counsel to the Debtors; (b) the Office of the United States Trustee for the Eastern District of Virginia, Attn:  Robert B. Van Arsdale and Lynn A. Kohen; (c) Kramer Levin Naftalis & Frankel LLP, 1177 Avenue of the Americas, New York, New York 10036, Attn:  Adam C. Rogoff, Esq. and Rachael Ringer, Esq., counsel to the Official Committee of Unsecured Creditors; (d) Davis, Polk & Wardwell LLP, 450 Lexington Avenue, New York, New York 11017, Attn: Marshall Huebner and Kenneth Steinberg, counsel to the DIP ABL Agent; (e) if the applicable Debtor Lease counterparty is an obligor on the Taj Notes, then to (1) counsel to the Taj DIP Notes Trustee; (2) counsel to the Taj Notes Trustee; and (3) Paul, Weiss, Rifkind, Wharton & Garrison, LLP, 1285 Avenue of the Americas, New York, New York 10019-6064, Attn:  Brian S. Hermann, Samuel E. Lovett, and Kellie A. Cairns, counsel to the Ad Hoc Group of Taj Noteholders; and (f) Wachtell, Lipton, Rosen, and Katz, 51 West 52nd Street, New York, New York 10019, Attn: Joshua A. Feltman, counsel to the DIP Delaware Term Loan Agent.

2

## CONSEQUENCES OF FAILING TO TIMELY MAKE AN OBJECTION

**ANY PARTY OR ENTITY WHO FAILS TO TIMELY MAKE AN OBJECTION TO THE SALE ON OR BEFORE THE TRANSACTION OBJECTION DEADLINE IN ACCORDANCE WITH THE BIDDING PROCEDURES ORDER SHALL BE FOREVER BARRED FROM ASSERTING ANY OBJECTION TO THE SALE, INCLUDING WITH RESPECT TO THE DISPOSITION OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS, EXCEPT AS SET FORTH IN SUCH OTHER AGREEMENT WITH THE SUCCESSFUL BIDDER.**

**PLEASE TAKE FURTHER NOTICE** that copies of the Sale Procedures Motion, Bidding Procedures, and the Bidding Procedures Order, as well as all related exhibits, including the form purchase agreement, are available:  (a) upon request to Prime Clerk LLC (the notice and claims agent retained in these chapter 11 cases) by calling (844) 794-3476 (toll free) or, for international callers, (917) 962-8499; (b) by visiting the website maintained in these chapter 11 cases at **http://www.cases.primeclerk.com/toysrus**; or (c) for a fee via PACER by visiting http://www.vaeb.uscourts.gov.

Richmond, Virginia
Dated:

/s/ *Jeremy S. Williams*

**KUTAK ROCK LLP**
Michael A. Condyles (VA 27807)
Peter J. Barrett (VA 46179)
Jeremy S. Williams (VA 77469)
901 East Byrd Street, Suite 1000
Richmond, Virginia 23219-4071
Telephone:   (804) 644-1700
Facsimile:   (804) 783-6192
Email:        Michael.Condyles@KutakRock.com
              Peter.Barrett@KutakRock.com
              Jeremy.Williams@KutakRock.com

*Co-Counsel to the Debtors*
*and Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C.
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:   (212) 446-4800
Facsimile:   (212) 446-4900
Email:        edward.sassower@kirkland.com
              joshua.sussberg@kirkland.com

-and-

James H.M. Sprayregen, P.C.
Anup Sathy, P.C.
Chad J. Husnick, P.C. (admitted *pro hac vice*)
Emily E. Geier (admitted *pro hac vice*)
300 North LaSalle
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200
Email:        james.sprayregen@kirkland.com
              anup.sathy@kirkland.com
              chad.husnick@kirkland.com
              emily.geier@kirkland.com

*Co-Counsel to the Debtors*
*and Debtors in Possession*

## Exhibit 3

**Assumption and Assignment Notice**

Edward O. Sassower, P.C.
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900

-and-

Michael A. Condyles (VA 27807)
Peter J. Barrett (VA 46179)
Jeremy S. Williams (VA 77469)
**KUTAK ROCK LLP**
901 East Byrd Street, Suite 1000
Richmond, Virginia 23219-4071
Telephone:      (804) 644-1700
Facsimile:      (804) 783-6192

James H.M. Sprayregen, P.C.
Anup Sathy, P.C.
Chad J. Husnick, P.C. (admitted *pro hac vice*)
Emily E. Geier (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200

*Co-Counsel to the Debtors and Debtors in Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| TOYS "R" US, INC., *et al.*,[1] | ) | Case No. 17-34665 (KLP) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## NOTICE OF ASSUMPTION OF CERTAIN UNEXPIRED LEASES

**PLEASE TAKE NOTICE** that on [•], 2018 the United States Bankruptcy Court for the District of Virginia (the "Court") entered the *Order (I) Establishing Bidding Procedures for the Remaining Real Estate Assets of Toys Delaware and (II) Granting Related Relief* (the "Bidding Procedures Order"),[2] by which the Court approved expedited procedures for the assumption and

---

[1]   The in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are set forth in the *Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief* [Docket 78].  The location of the Debtors' service address is One Geoffrey Way, Wayne, New Jersey 07470.

[2]   All capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Bidding Procedures Order or the *Debtors' Motion for Entry of an Order (I) Establishing Bidding Procedures for the Remaining Real Estate Assets of Toys Delaware and (II) Granting Related Relief.*

assignment of unexpired leases and granting related relief, which order is attached hereto as **Exhibit A**.

PLEASE TAKE FURTHER NOTICE that, pursuant to the Bidding Procedures Order and by this written notice (this "Assumption and Assignment Notice"), the Debtors hereby notify you that they have determined, in the exercise of their business judgment, that each unexpired lease set forth on **Exhibit B** attached hereto is hereby assumed and assigned effective as of the date (the "Assumption Date") set forth in **Exhibit B** or such other date as the Debtors and the counterparties to such unexpired leases agree.

PLEASE TAKE FURTHER NOTICE that the Debtors believe that the party to which each applicable unexpired lease will be assigned has the financial wherewithal to meet all future obligations under such unexpired lease and the Debtors will, at the request of the applicable lease counterparty, use commercially reasonable efforts to provide evidence thereof to such applicable lease counterparty (and their counsel, if known) thereby demonstrating that the assignee of the lease has the ability to comply with the requirements of adequate assurance of future performance.

PLEASE TAKE FURTHER NOTICE that parties objecting to the proposed assumption and assignment and/or to the Successful Bidder's proposed form of adequate assurance of future performance must file a written objection (each, an "Assumption Objection") so that such objection is filed with the Court so as to be **actually received by [•]** and serve such Assumption Objection on:  (a) Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, Attn: Joshua A. Sussberg, P.C., and Kirkland & Ellis LLP, 300 North LaSalle Street, Chicago, Illinois 60654, Attn:  Chad Husnick, P.C. and Emily Geier, and Kutak Rock LLP, 901 East Byrd Street, Suite 1000, Richmond, Virginia 23218, Attn:  Michael A. Condyles, Peter J. Barrett, and Jeremy S. Williams, co-counsel to the Debtors; (b) the Office of the United States Trustee for the Eastern District of Virginia, Attn:  Robert B. Van Arsdale and Lynn A. Kohen; (c) Kramer Levin Naftalis & Frankel LLP, 1177 Avenue of the Americas, New York, New York 10036, Attn: Adam C. Rogoff, Esq. and Rachael Ringer, Esq., counsel to the Official Committee of Unsecured Creditors; (d) Davis, Polk & Wardwell LLP, 450 Lexington Avenue, New York, New York 11017, Attn:  Marshall Huebner and Kenneth Steinberg, counsel to the DIP ABL Agent; (e) if the applicable Debtor Contract counterparty is an obligor on the Taj Notes, then to (1) counsel to the Taj DIP Notes Trustee; (2) counsel to the Taj Notes Trustee; and (3) Paul, Weiss, Rifkind, Wharton & Garrison, LLP, 1285 Avenue of the Americas, New York, New York 10019-6064, Attn:  Brian S. Hermann, Samuel E. Lovett, and Kellie A. Cairns, counsel to the Ad Hoc Group of Taj Noteholders; and (f) Wachtell, Lipton, Rosen, and Katz, 51 West 52nd Street, New York, New York 10019, Attn:  Joshua A. Feltman, counsel to the DIP Delaware Term Loan Agent.

PLEASE TAKE FURTHER NOTICE that, absent an Assumption Objection being timely filed, the assumption of each unexpired lease shall become effective on the Assumption Date set forth in **Exhibit B**, or such other date as the Debtors and the counterparty or counterparties to such unexpired lease agree.[3]

---

[3]    An objection to the assumption of any particular unexpired lease listed in this Assumption and Assignment Notice shall not constitute an objection to the assumption of any other contract listed in this Assumption and Assignment Notice.  Any objection to the assumption of any particular unexpired lease listed in this Assumption and

**PLEASE TAKE FURTHER NOTICE** that, if a Sale Objection is timely filed and not withdrawn or resolved, such objection will be heard at the Sale Hearing or such other date and time as agreed to by the Debtors and the objecting party or ordered by the Court.  If such Sale Objection is overruled or withdrawn, such unexpired lease shall be assumed as of the Assumption Date set forth in **<u>Exhibit B</u>** or such other date as the Debtors and the counterparty or counterparties to such unexpired lease agree.

[*Remainder of page intentionally left blank*]

---

Assignment Notice must state with specificity the unexpired lease(s) to which it is directed.  For each particular unexpired lease whose assumption is not timely or properly objected to, such assumption will be effective in accordance with this Assumption and Assignment Notice and the Bidding Procedures Order.

Richmond, Virginia
Dated:

/s/ *Jeremy S. Williams*
_____

**KUTAK ROCK LLP**
Michael A. Condyles (VA 27807)
Peter J. Barrett (VA 46179)
Jeremy S. Williams (VA 77469)
901 East Byrd Street, Suite 1000
Richmond, Virginia 23219-4071
Telephone:   (804) 644-1700
Facsimile:   (804) 783-6192
Email:       Michael.Condyles@KutakRock.com
             Peter.Barrett@KutakRock.com
             Jeremy.Williams@KutakRock.com

*Co-Counsel to the Debtors*
*and Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C.
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:   (212) 446-4800
Facsimile:   (212) 446-4900
Email:       edward.sassower@kirkland.com
             joshua.sussberg@kirkland.com

-and-

James H.M. Sprayregen, P.C.
Anup Sathy, P.C.
Chad J. Husnick, P.C. (admitted *pro hac vice*)
Emily E. Geier (admitted *pro hac vice*)
300 North LaSalle
Chicago, Illinois 60654
Telephone:   (312) 862-2000
Facsimile:   (312) 862-2200
Email:       james.sprayregen@kirkland.com
             anup.sathy@kirkland.com
             chad.husnick@kirkland.com
             emily.geier@kirkland.com

*Co-Counsel to the Debtors*
*and Debtors in Possession*

**<u>Exhibit A</u>**

Bidding Procedures Order

## Exhibit B

Assumed Unexpired Leases

| Unexpired Lease[1] | Lease Counterparty | Assignee | Cure Amount | Assumption Date |
|---|---|---|---|---|
|  |  |  |  |  |

---

[1] The inclusion of an unexpired lease on this list does not constitute an admission as to the existence or validity of any claims held by the counterparty or counterparties to such unexpired lease.

## Exhibit 4

**Notice of Successful and Backup Bidders**

Edward O. Sassower, P.C.
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900


-and-

Michael A. Condyles (VA 27807)
Peter J. Barrett (VA 46179)
Jeremy S. Williams (VA 77469)
**KUTAK ROCK LLP**
901 East Byrd Street, Suite 1000
Richmond, Virginia 23219-4071
Telephone:      (804) 644-1700
Facsimile:      (804) 783-6192

*Co-Counsel to the Debtors and Debtors in Possession*

James H.M. Sprayregen, P.C.
Anup Sathy, P.C.
Chad J. Husnick, P.C. (admitted *pro hac vice*)
Emily E. Geier (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| TOYS "R" US, INC., *et al.*,[1] | ) | Case No. 17-34665 (KLP) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

## NOTICE OF SUCCESSFUL AND BACKUP BIDDER WITH RESPECT TO
## THE AUCTION OF CERTAIN OF THE DEBTORS' REAL ESTATE ASSETS

On [•], 2018 the United States Bankruptcy Court for the Eastern District of Virginia (the "Court") entered the *Order (I) Establishing Bidding Procedures for the Remaining Real Estate Assets of Toys Delaware and (II) Granting Related Relief* (the "Bidding Procedures Order"),[2] attached hereto as **Exhibit A**, by which the Court approved procedures setting forth the process by

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are set forth in the *Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief* [Docket No. 78].  The location of the Debtors' service address is One Geoffrey Way, Wayne, New Jersey 07470.


[2]   All capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Bidding Procedures Order or the *Debtors' Motion for Entry of an Order (I) Establishing Bidding Procedures for the Remaining Real Estate Assets of Toys Delaware and (II) Granting Related Relief* [Docket No. [•]].

which the Debtors are authorized to conduct an auction (the "Auction") for the sale of certain real property and commercial leases (collectively, the "Real Estate Assets").

**PLEASE TAKE FURTHER NOTICE** that, on [•], pursuant to the Bidding Procedures Order, the Debtors conducted the Auction with respect to certain of the Real Estate Assets at the offices of Kirkland & Ellis, LLP, located at 601 Lexington Avenue, New York, New York, 10022.

**PLEASE TAKE FURTHER NOTICE** that, at the conclusion of the Auction, the Debtors, in consultation with their professionals, selected the following Successful Bidder and Backup Bidder with respect to each of the Remaining Real Estate Assets listed on **Exhibit B** attached hereto:

| Real Estate Asset(s) | Successful Bidder | Backup Bidder | Proposed Expense Reimbursement and/or Breakup Fee | Key Terms of Proposed Sale |
|---|---|---|---|---|
|  |  |  |  |  |

**PLEASE TAKE FURTHER NOTICE** that the Sale Hearing to consider approval of the sale, liquidation, or other disposition of the Remaining Real Estate Assets to the Successful Bidders at the Auction, free and clear of all liens, claims, interests, and encumbrances in accordance with Bankruptcy Code section 363(f), will be held before the Honorable Judge Keith L. Phillips, at the Court, 701 East Broad Street, 5th Floor, Courtroom No. 5100, Richmond, Virginia 23219, **on [•], 2018**.

**PLEASE TAKE FURTHER NOTICE**, that at the Sale Hearing, the Debtors will seek the Court's approval of the Successful Bid. Unless the Court orders otherwise or as agreed to by the applicable parties, the Sale Hearing shall be an evidentiary hearing on matters relating to the Sale and there will be no further bidding at the Sale Hearing. In the event that the Successful Bidder cannot or refuses to consummate the Sale following entry of a Sale Order because of the breach or failure on the part of the Successful Bidder, the Debtors shall promptly file a supplemental notice on or before the Sale Closing Deadline, seeking to approve the sale to the Backup Bidder, if applicable, on expedited notice and a hearing.

**PLEASE TAKE FURTHER NOTICE** that this Notice of Successful Bidder and Backup Bidder is subject to the terms and conditions of the Sale Procedures Motion and the Bidding Procedures Order, with such Bidding Procedures Order controlling in the event of any conflict, and the Debtors encourage parties in interest to review such documents in their entirety. Parties interested in receiving more information regarding the sale or other disposition of the Remaining Real Estate Assets may make a written request to: Prime Clerk LLC (the notice and claims agent retained in these chapter 11 cases) by calling (844) 794-3476 (toll free) or, for international callers, (917) 962-8499.

**PLEASE TAKE FURTHER NOTICE** that copies of the Sale Procedures Motion, the Bidding Procedures Order, this Notice, and any other related documents are available:  (a) upon request to Prime Clerk LLC by calling (844) 794-3476 (toll free) or, for international callers, (917) 962-8499;  (b) by visiting the website maintained in these chapter 11 cases at **http://www.cases.primeclerk.com/toysrus**;  or (c) for a fee via PACER by visiting http://www.vaeb.uscourts.gov.

Richmond, Virginia
Dated:

/s/ *Jeremy S. Williams*

**KUTAK ROCK LLP**
Michael A. Condyles (VA 27807)
Peter J. Barrett (VA 46179)
Jeremy S. Williams (VA 77469)
901 East Byrd Street, Suite 1000
Richmond, Virginia 23219-4071
Telephone:   (804) 644-1700
Facsimile:   (804) 783-6192
Email:       Michael.Condyles@KutakRock.com
             Peter.Barrett@KutakRock.com
             Jeremy.Williams@KutakRock.com

*Co-Counsel to the Debtors*
*and Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C.
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:   (212) 446-4800
Facsimile:   (212) 446-4900
Email:       edward.sassower@kirkland.com
             joshua.sussberg@kirkland.com

-and-

James H.M. Sprayregen, P.C.
Anup Sathy, P.C.
Chad J. Husnick, P.C. (admitted *pro hac vice*)
Emily E. Geier (admitted *pro hac vice*)
300 North LaSalle
Chicago, Illinois 60654
Telephone:   (312) 862-2000
Facsimile:   (312) 862-2200
Email:       james.sprayregen@kirkland.com
             anup.sathy@kirkland.com
             chad.husnick@kirkland.com
             emily.geier@kirkland.com

*Co-Counsel to the Debtors*
*and Debtors in Possession*

## **Exhibit A**

Bidding Procedures Order

## **Exhibit B**

Remaining Real Estate Asset(s) to be Sold

| Real Estate Assets(s) to be Sold | Name and Address of Purchaser | Proposed Purchase Price | Location of Assets to be Sold | Location of Sale (if different than location of Assets) | Description of Marketing or Sale Process | Significant Terms of Sale or Transfer Agreement |
|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |

**Exhibit 5**

**Remaining Real Estate Assets Included in Initial Auction[1]**

| No. | Store # | Store Name | Chain | State | Entity | Type |
|-----|---------|------------|-------|-------|--------|------|
| 1 | 5669 | Tustin | BRU | CA | Delaware | Lease |
| 2 | 5670 | Tempe | BRU | AZ | Delaware | Lease |
| 3 | 5673 | Henderson | BRU | NV | Delaware | Lease |
| 4 | 5693 | Ontario | BRU | CA | Delaware | GL |
| 5 | 5858 | Salinas | BRU | CA | Delaware | GL |
| 6 | 6370 | Deptford | BRU | NJ | Delaware | Lease |
| 7 | 6371 | Bensalem | BRU | PA | Map 2005 | Lease |
| 8 | 6372 | Fairless Hills | BRU | PA | Map 2005 | Lease |
| 9 | 6373 | Mays Landing | BRU | NJ | Delaware | Lease |
| 10 | 6376 | Christiana | BRU | DE | Delaware | Lease |
| 11 | 6384 | Peabody | BRU | MA | Map 2005 | Lease |
| 12 | 6385 | Warwick | BRU | RI | Delaware | Lease |
| 13 | 6410 | Nanuet | BRU | NY | Delaware | Lease |
| 14 | 6425 | Harrisburg | BRU | PA | Map 2005 | GL |
| 15 | 6426 | Winston Salem | BRU | NC | Delaware | GL |
| 16 | 6429 | Manchester | BRU | CT | Delaware | GL |
| 17 | 6440 | Taylor | BRU | MI | Delaware | Lease |
| 18 | 6444 | Staten Island | BRU | NY | Delaware | Lease |
| 19 | 6456 | Clearwater | BRU | FL | Delaware | Lease |
| 20 | 6481 | Manalapan | BRU | NJ | Delaware | Lease |
| 21 | 6478 | Cranberry | BRU | PA | Map 2005 | Lease |
| 22 | 6477 | Waldorf | BRU | MD | Delaware | Lease |
| 23 | 6491 | Waterford | BRU | CT | Delaware | Lease |
| 24 | 6508 | Toms River | BRU | NJ | Delaware | Lease |
| 25 | 6504 | Lancaster | BRU | PA | Map 2005 | Lease |
| 26 | 6502 | Springfield | BRU | IL | Delaware | GL |
| 27 | 6518 | Danbury | BRU | CT | Delaware | GL |
| 28 | 6539 | Totowa | BRU | NJ | Delaware | Lease |
| 29 | 6534 | Chula Vista | BRU | CA | Delaware | GL |
| 30 | 6563 | Nashville | BRU | TN | Delaware | Lease |
| 31 | 6570 | S. Richmond | BRU | VA | Delaware | GL |

---

[1]   The Debtors reserve the right to amend this list of properties to be sold at any Auction at any time and for any
reason in their business judgment, in consultation with the Consultation Parties.

| 32 | 6536 | Ft. Myers | BRU | FL | Delaware | GL |
| 33 | 6576 | Shorewood | BRU | IL | Delaware | Lease |
| 34 | 6642 | Pearl City | BRU | HI | Delaware | Lease |
| 35 | 7705 | South Austin | BRU | TX | Delaware | Lease |
| 36 | 7703 | Metairie | BRU | LA | Delaware | Lease |
| 37 | 7713 | McAllen | BRU | TX | Delaware | Lease |
| 38 | 7711 | San Antonio | BRU | TX | Delaware | Lease |
| 39 | 8826 | Coral Way | BRU | FL | Delaware | Lease |
| 40 | 6605 | Kissimmee | BRU | FL | Delaware | Lease |
| 41 | 8857 | Kendall | BRU | FL | Delaware | Lease |
| 42 | 8854 | Kennesaw | BRU | GA | Delaware | Lease |
| 43 | 8828 | Mobile | BRU | AL | Delaware | Lease |
| 44 | 8855 | Evans | BRU | GA | Delaware | GL |
| 45 | 8861 | Pembroke Pines | BRU | FL | Delaware | Lease |
| 46 | 8880 | Chattanooga | BRU | TN | Delaware | Lease |
| 47 | 8865 | Lauderhill | BRU | FL | Delaware | Lease |
| 48 | 8881 | Concord | BRU | NC | Delaware | GL |
| 49 | 8884 | Chantilly | BRU | VA | Delaware | Lease |
| 50 | 8863 | Knoxville | BRU | TN | Delaware | Lease |
| 51 | 8878 | Pineville | BRU | NC | Delaware | Lease |
| 52 | 8882 | Chesapeake | BRU | VA | Delaware | Lease |
| 53 | 8894 | Greensboro | BRU | NC | Delaware | Lease |
| 54 | 9247 | Sterling Heights | BRU | MI | Delaware | Lease |
| 55 | 9246 | Burbank | BRU | IL | Delaware | Lease |
| 56 | 9244 | Forest Park | BRU | OH | Map 2005 | Lease |
| 57 | 9541 | St. Louis | BRU | MO | Delaware | Lease |
| 58 | 9548 | Tulsa | BRU | OK | Delaware | Lease |
| 59 | 9547 | Cypress | BRU | TX | Delaware | Lease |
| 60 | 9572 | Lynnwood | BRU | WA | Delaware | Lease |
| 61 | 9553 | Westminster | BRU | CO | Delaware | Lease |
| 62 | 9552 | Arlington | BRU | TX | Delaware | Lease |
| 63 | 9562 | Mesquite | BRU | TX | Delaware | Lease |
| 64 | 9577 | Oklahoma City | BRU | OK | Delaware | GL |
| 65 | 9583 | Kansas City | BRU | MO | Delaware | GL |
| 66 | 5602 | Van Nuys | TRU | CA | Delaware | Lease |
| 67 | 5626 | La Mesa | TRU | CA | Delaware | Lease |
| 68 | 5634 | Huntington Beach | TRU | CA | Delaware | Lease |
| 69 | 5639 | Hawaii | TRU | HI | Delaware | GL |
| 70 | 5683 | Ontario Mills | TRU | CA | Delaware | GL |
| 71 | 5685 | Murray | TRU | UT | Delaware | Lease |
| 72 | 5807 | Arden Way | TRU | CA | Delaware | Lease |

| 73 | 5808 | Sunrise | TRU | CA | Delaware | Lease |
| 74 | 5810 | Stockton | TRU | CA | Delaware | GL |
| 75 | 5811 | Dublin | TRU | CA | Delaware | Lease |
| 76 | 6003 | Springfield | TRU | IL | Delaware | GL |
| 77 | 6005 | Melrose | TRU | IL | Delaware | Owned |
| 78 | 6012 | Woodridge | TRU | IL | Delaware | Owned |
| 79 | 6033 | Madison | TRU | WI | Delaware | GL |
| 80 | 6077 | Jackson | TRU | MI | Delaware | Lease |
| 81 | 6304 | Totowa | TRU | NJ | Delaware | GL |
| 82 | 6308 | Flatbush | TRU | NY | Delaware | Owned |
| 83 | 6309 | Massapequa | TRU | NY | Delaware | Lease |
| 84 | 6312 | Staten Island | TRU | NY | Delaware | Lease |
| 85 | 6313 | Eatontown | TRU | NJ | Delaware | Lease |
| 86 | 6332 | Danbury | TRU | CT | Delaware | GL |
| 87 | 7022 | Monroe | TRU | LA | Delaware | Lease |
| 88 | 7028 | West El Paso | TRU | TX | Delaware | Lease |
| 89 | 7040 | Hattiesburg | TRU | MS | Delaware | Lease |
| 90 | 7043 | Lake Charles | TRU | LA | Delaware | Owned |
| 91 | 7046 | Sugarland | TRU | TX | Delaware | GL |
| 92 | 7080 | Citrus Park | TRU | FL | Delaware | Lease |
| 93 | 7081 | Santa Ana | TRU | CA | Delaware | Lease |
| 94 | 7502 | Warwick | TRU | RI | Delaware | Lease |
| 95 | 7503 | Peabody | TRU | MA | Map 2005 | GL |
| 96 | 7517 | Clay | TRU | NY | Delaware | Lease |
| 97 | 7532 | Buckland Hills | TRU | CT | Delaware | GL |
| 98 | 7802 | Fort Worth | TRU | TX | Delaware | Lease |
| 99 | 7805 | Mesquite | TRU | TX | Delaware | Lease |
| 100 | 8302 | Montgomeryville | TRU | PA | Map 2005 | Lease |
| 101 | 8308 | Cottman | TRU | PA | Map 2005 | Lease |
| 102 | 8314 | Christiana | TRU | DE | Delaware | Owned |
| 103 | 8319 | Gaithersburg | TRU | MD | Delaware | Lease |
| 104 | 8331 | Colonial Heights | TRU | VA | Delaware | GL |
| 105 | 8350 | Glen Burnie | TRU | MD | Delaware | Lease |
| 106 | 8373 | Greensboro South | TRU | NC | Delaware | GL |
| 107 | 8376 | Winston-Salem | TRU | NC | Delaware | Owned |
| 108 | 8705 | Hialeah | TRU | FL | Delaware | Lease |
| 109 | 8706 | Plantation | TRU | FL | Delaware | Owned |
| 110 | 8710 | Fort Myers | TRU | FL | Delaware | GL |
| 111 | 8719 | Mayaguez | TRU | PR | Delaware | GL |
| 112 | 8732 | Orange Park | TRU | FL | Delaware | GL |
| 113 | 8733 | Gainesville | TRU | FL | Delaware | Lease |

| 114 | 8810 | Knoxville | TRU | TN | Delaware | Lease |
| 115 | 8811 | Gwinnett | TRU | GA | Delaware | Lease |
| 116 | 8825 | Concord | TRU | NC | Delaware | GL |
| 117 | 8827 | Mobile | TRU | AL | Delaware | Owned |
| 118 | 8909 | Greenwood | TRU | IN | Delaware | Lease |
| 119 | 8918 | Evansville | TRU | IN | Delaware | GL |
| 120 | 8920 | Fort Wayne | TRU | IN | Delaware | Lease |
| 121 | 9206 | Niles | TRU | OH | Map 2005 | Lease |
| 122 | 9227 | Henrietta | TRU | NY | Delaware | GL |
| 123 | 9229 | Greensburg | TRU | PA | Map 2005 | GL |
| 124 | 9502 | Independence | TRU | MO | Delaware | Lease |
| 125 | 9520 | Metro North | TRU | MO | Delaware | GL |
| 126 | 9525 | Tulsa | TRU | OK | Delaware | Lease |
| 127 | 7543 | Kissimmee | TRU | FL | Delaware | Lease |
| 128 | 6322 | Douglaston | TRU | NY | Delaware | Lease |
| 129 | 5573 | Garland, TX | SBS | TX | Delaware | Lease |
| 130 | 5579 | Upland, CA | SBS | CA | Delaware | Lease |
| 131 | 5641 | Goodyear | SBS | AZ | Delaware | Lease |
| 132 | 5644 | North Phoenix | SBS | AZ | Delaware | Lease |
| 133 | 5646 | E. Tucson | SBS | AZ | Delaware | GL |
| 134 | 5657 | Chino Hills | SBS | CA | Delaware | Lease |
| 135 | 5803 | Pleasant Hill (Concord) | SBS | CA | Delaware | Lease |
| 136 | 5806 | Elk Grove | SBS | CA | Delaware | GL |
| 137 | 5822 | Fremont | SBS | CA | Delaware | Lease |
| 138 | 6019 | Riverview | SBS | IL | Delaware | GL |
| 139 | 6022 | Algonquin | SBS | IL | Delaware | Lease |
| 140 | 6034 | Rockford | SBS | IL | Delaware | Lease |
| 141 | 6063 | South Elgin | SBS | IL | Delaware | Lease |
| 142 | 6305 | E. Brunswick | SBS | NJ | Delaware | Lease |
| 143 | 6307 | Watchung | SBS | NJ | Delaware | Lease |
| 144 | 6310 | Valley Stream | SBS | NY | Delaware | Owned |
| 145 | 6315 | Jersey City | SBS | NJ | Delaware | Lease |
| 146 | 6317 | Lake Grove | SBS | NY | Delaware | Lease |
| 147 | 6318 | Woodbridge | SBS | NJ | Delaware | Lease |
| 148 | 6324 | Bayshore | SBS | NY | Delaware | Lease |
| 149 | 6329 | Union | SBS | NJ | Delaware | Lease |
| 150 | 6334 | Raritan | SBS | NJ | Delaware | Lease |
| 151 | 6335 | Rockaway | SBS | NJ | Delaware | GL |
| 152 | 6336 | Bronx | SBS | NY | Delaware | Lease |
| 153 | 6347 | White Plains | SBS | NY | Delaware | Lease |
| 154 | 6623 | Secaucus | SBS | NJ | Delaware | Lease |

| 155 | 6624 | NW Las Vegas | SBS | NV | Delaware | Lease |
| 156 | 6629 | Bronx Terminal | SBS | NY | Delaware | Lease |
| 157 | 6753 | Rego Park | SBS | NY | Delaware | Lease |
| 158 | 6755 | Coral Springs | SBS | FL | Delaware | Lease |
| 159 | 6756 | Memphis | SBS | TN | Delaware | Lease |
| 160 | 7004 | Katy | SBS | TX | Delaware | Lease |
| 161 | 7009 | Willowbrook | SBS | TX | Delaware | Lease |
| 162 | 7017 | Baton Rouge | SBS | LA | Delaware | Lease |
| 163 | 7032 | North San Antonio | SBS | TX | Delaware | Lease |
| 164 | 7506 | Woburn | SBS | MA | Map 2005 | Lease |
| 165 | 7507 | Dedham | SBS | MA | Delaware | Lease |
| 166 | 7518 | Utica | SBS | NY | Delaware | GL |
| 167 | 7527 | Leominster | SBS | MA | Map 2005 | Lease |
| 168 | 7530 | Hyannis | SBS | MA | Map 2005 | Lease |
| 169 | 7808 | Cedar Hill Plaza | SBS | TX | Delaware | Lease |
| 170 | 7820 | Dallas_North Park | SBS | TX | Delaware | Lease |
| 171 | 8002 | Tukwila | SBS | WA | Delaware | Lease |
| 172 | 8004 | Jantzen Beach | SBS | OR | Delaware | Lease |
| 173 | 8011 | Bellevue | SBS | WA | Delaware | Lease |
| 174 | 8014 | Meridian | SBS | ID | Delaware | Lease |
| 175 | 8245 | Thornton | SBS | CO | Delaware | Lease |
| 176 | 8315 | West Harrisburg | SBS | PA | Delaware | Lease |
| 177 | 8322 | Horsham | SBS | PA | Delaware | Lease |
| 178 | 8330 | Vineland | SBS | NJ | Delaware | GL |
| 179 | 8345 | Hagerstown | SBS | MD | Delaware | Lease |
| 180 | 8348 | Bel Air | SBS | MD | Delaware | GL |
| 181 | 8353 | Richmond | SBS | VA | Delaware | Lease |
| 182 | 8357 | Virginia Beach | SBS | VA | Delaware | GL |
| 183 | 8358 | Roanoke | SBS | VA | Delaware | GL |
| 184 | 8363 | Columbia | SBS | MD | Delaware | Lease |
| 185 | 8367 | Parkersburg | SBS | WV | Delaware | Lease |
| 186 | 8374 | Fayetteville | SBS | NC | Delaware | Lease |
| 187 | 8722 | Plaza Las Americas | SBS | PR | Delaware | GL |
| 188 | 8725 | Waterford Lakes | SBS | FL | Delaware | Lease |
| 189 | 8727 | Wesley Chapel | SBS | FL | Delaware | Lease |
| 190 | 8729 | Jacksonville | SBS | FL | Delaware | Lease |
| 191 | 8751 | Milennia | SBS | FL | Delaware | Lease |
| 192 | 8803 | McDonough | SBS | GA | Delaware | Lease |
| 193 | 8805 | Smyrna | SBS | GA | Delaware | Lease |
| 194 | 8809 | Huntsville | SBS | AL | Delaware | Lease |
| 195 | 8818 | Columbus | SBS | GA | Delaware | GL |

5

| 196 | 8819 | Pensacola | SBS | FL | Delaware | Lease |
| 197 | 8822 | Greenville | SBS | SC | Delaware | Lease |
| 198 | 8823 | Spartanburg | SBS | SC | Delaware | Lease |
| 199 | 8834 | Gastonia | SBS | NC | Delaware | Lease |
| 200 | 8870 | Mall of Georgia | SBS | GA | Delaware | Lease |
| 201 | 8889 | North Raleigh | SBS | NC | Delaware | Lease |
| 202 | 8911 | Polaris | SBS | OH | Delaware | Lease |
| 203 | 8928 | Paducah | SBS | KY | Delaware | Lease |
| 204 | 8931 | Beavercreek | SBS | OH | Delaware | Lease |
| 205 | 9007 | Southlake | SBS | TX | Delaware | Lease |
| 206 | 9009 | Birmingham | SBS | AL | Delaware | Lease |
| 207 | 9062 | Rossmoor, CA | SBS | CA | Delaware | GL |
| 208 | 9063 | Vallejo, CA | SBS | CA | Delaware | Lease |
| 209 | 9204 | Mayfield | SBS | OH | Map 2005 | GL |
| 210 | 9205 | Parma | SBS | OH | Map 2005 | Lease |
| 211 | 9223 | Amherst | SBS | NY | Delaware | GL |
| 212 | 9504 | Topeka | SBS | KS | Delaware | GL |
| 213 | 9512 | Springfield | SBS | MO | Delaware | GL |
| 214 | 9528 | Aurora | SBS | CO | Delaware | GL |
| 215 | 9533 | Fort Collins | SBS | CO | Delaware | Lease |
| 216 | 9537 | Sioux Falls | SBS | SD | Delaware | GL |
| 217 | 9549 | Ingram | SBS | TX | Delaware | Lease |
| 218 | 7047 | Austin, TX | SBS | TX | Delaware | Lease |
| 219 | 9545 | LITTLETON | SBS | CO | Delaware | Lease |
| 220 | 5654 | Montebello | SBS | CA | Delaware | GL |
| 221 | 6338 | Long Island City | SBS | NY | Delaware | GL |
| 222 | 6350 | Holbrook | SBS | NY | Delaware | Lease |
| 223 | 7504 | Auburn | SBS | MA | Map 2005 | Lease |
| 224 | 7058 | Sevierville | Outlet | TN | Delaware | Lease |
| 225 | 7059 | National Harbor | Outlet | MD | Delaware | Lease |
| 226 | 7060 | Los Angeles | Outlet | CA | Delaware | Lease |
| 227 | 7061 | Tempe | Outlet | AZ | Delaware | Lease |
| 228 | 7063 | St. Augustine | Outlet | FL | Delaware | Lease |
| 229 | 7064 | Glendale | Outlet | NY | Delaware | Lease |
| 230 | 7065 | Tannersville | Outlet | PA | Delaware | Lease |
| 231 | 7066 | Orlando | Outlet | FL | Delaware | Lease |
| 232 | 7067 | Tinton Falls | Outlet | NJ | Delaware | Lease |
| 233 | 7071 | Tulalip | Outlet | WA | Delaware | Lease |
| 234 | 7082 | Livermore | Outlet | CA | Delaware | Lease |
| 235 | 7085 | Las Vegas | Outlet | NV | Delaware | Lease |
| 236 | 7068 | Wrentham | Outlet | MA | Delaware | Lease |

| 237 | 7077 | Woodbridge | Outlet | VA | Delaware | Lease |
|---|---|---|---|---|---|---|
| 238 | 7088 | San Marcos | Outlet | TX | Delaware | Lease |
| 239 | 7089 | Grapevine | Outlet | TX | Delaware | Lease |
| 240 | 7093 | Southaven | Outlet | MS | Delaware | Lease |
| 241 | 7094 | Branson | Outlet | MO | Delaware | Lease |
| 242 | 7544 | Miami | Outlet | FL | Delaware | Lease |
| 243 | 7546 | Gilroy | Outlet | CA | Delaware | Lease |
| 244 | 7547 | Birch Run | Outlet | MI | Delaware | Lease |
| 245 | 7548 | Smithfield | Outlet | NC | Delaware | Lease |
| 246 | 7549 | Ontario | Outlet | CA | Delaware | Lease |
| 247 | 5749 | Camarillo | Outlet | CA | Delaware | Lease |
| 248 | 5750 | Dawsonville | Outlet | GA | Delaware | Lease |
| 249 | 5751 | Barceloneta | Outlet | PR | Delaware | Lease |
| 250 | 5752 | Round Rock | Outlet | TX | Delaware | Lease |
| 251 | 5753 | West Palm Beach | Outlet | FL | Delaware | Lease |
| 252 | 5754 | San Diego | Outlet | CA | Delaware | Lease |
| 253 | 5755 | Nashville | Outlet | TN | Delaware | Lease |
| 254 | 5756 | Woodstock | Outlet | GA | Delaware | Lease |
| 255 | 5757 | Chesterfield | Outlet | MO | Delaware | Lease |
| 256 | 6164 | El Paso | Outlet | TX | Delaware | Lease |
| 257 | 6630 | Oceanside | Outlet | NY | Delaware | Lease |
| 258 | 6978 | Limerick | Outlet | PA | Delaware | Lease |
| 259 | 7103 | Orlando | Outlet | FL | Delaware | Lease |
| 260 | 7158 | Woodbury | Outlet | NY | Delaware | Lease |
| 261 | 7159 | Elizabeth | Outlet | NJ | Delaware | Lease |
| 262 | 8018 | Milpitas | Outlet | CA | Delaware | Lease |
| 263 | 8285 | Atlantic City | Outlet | NJ | Delaware | Lease |
| 264 | 8286 | Las Vegas | Outlet | NV | Delaware | Lease |
| 265 | 8288 | Sunrise | Outlet | FL | Delaware | Lease |
| 266 | 8289 | Shirley | Outlet | NY | Delaware | Lease |
| 267 | 9057 | Foley | Outlet | AL | Delaware | Lease |
| 268 | 9058 | Kaneohe | Outlet | HI | Delaware | Lease |
| 269 | 5601 | Rialto Warehouse | DC | CA | Delaware | Owned |
| 270 | 6001 | Joliet Warehouse | DC | IL | Delaware | Lease |
| 271 | 6301 | Mount Olive Warehouse | DC | NJ | Delaware | Owned |
| 272 | 7701 | Midlothian Warehouse | DC | TX | Delaware | Owned |
| 273 | 9501 | Lee Summit Warehouse | DC | MO | Delaware | Owned |