Edward O. Sassower, P.C.
Joshua A. Sussberg, P.C.  (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900

-and-

Michael A. Condyles (VA 27807)
Peter J. Barrett (VA 46179)
Jeremy S. Williams (VA 77469)
**KUTAK ROCK LLP**
901 East Byrd Street, Suite 1000
Richmond, Virginia 23219-4071
Telephone:      (804) 644-1700
Facsimile:      (804) 783-6192

James H.M. Sprayregen, P.C.
Anup Sathy, P.C.
Chad J. Husnick, P.C. (admitted *pro hac vice*)
Emily E. Geier (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200

*Co-Counsel to the Debtors and Debtors in Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| TOYS "R" US, INC., *et al.*,[1] | ) | Case No. 17-34665 (KLP) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | Re: Docket No. 711 |

## FINAL ORDER (A) AUTHORIZING THE NORTH AMERICAN DEBTORS' ENTRY INTO WAIVERS WITH RESPECT TO ABL/FILO DIP DOCUMENTS AND THE TERM DIP DOCUMENTS AND (B) AMENDING FINAL ORDER (I) AUTHORIZING THE NORTH AMERICAN DEBTORS TO OBTAIN POSTPETITION FINANCING, (II) AUTHORIZING THE NORTH AMERICAN DEBTORS TO USE CASH COLLATERAL, (III) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (IV) GRANTING ADEQUATE PROTECTION TO THE PREPETITION LENDERS, (V) MODIFYING THE AUTOMATIC STAY AND (VI) GRANTING RELATED RELIEF

---

[1]    The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are set forth in the *Debtors' Motion for Entry of an Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief* filed contemporaneously herewith.  The location of the Debtors' service address is One Geoffrey Way, Wayne, NJ 07470

#90771003v21
W/3119214v5
#90820486v2
KL2 3065692.13

Upon the Motion (the "Motion") of the Debtors seeking an order (this "Order") (A) authorizing the North American Debtors to enter into that certain Waiver substantially in the form attached hereto as **Exhibit 1** (the "ABL/FILO Waiver") and that certain Waiver substantially in the form attached hereto as **Exhibit 2** (the "Term DIP Waiver" and together with the ABL/FILO Waiver, the "Waivers") and (B) amending the *Final Order (I) Authorizing The North American Debtors To Obtain Postpetition Financing, (II) Authorizing The North American Debtors To Use Cash Collateral, (III) Granting Liens And Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection To The Prepetition Lenders, (V) Modifying The Automatic Stay And (VI) Granting Related Relief* [Docket No. 711] (the "Final DIP Order" and the amendments thereto, the "DIP Order Amendments")[2]; and the Motion, and opportunity for a hearing, being consistent with paragraph 6 of the Final DIP Order and the *Order (I) Establishing Certain Notice, Case Management, And Administrative Procedures And (II) Granting Related Relief* [Docket No. 129], and appropriate under the circumstances; and a hearing to consider approval of the Motion having been held by this Court on March 20, 2018 (the "Interim Hearing"); and the Court having entered an order approving the relief requested in the Motion on an interim basis on March 21, 2018 [Docket No. 2318] (the "March 21 Order"), as amended by the orders entered by the Court on March 27, 2018 [Docket No. 2427] (the "March 27 Order"), April 13, 2018 [Docket No. 2713] (the "April 13 Order") and April 20, 2018 [Docket No. 2796] (the "April 20 Order" and, together with the March 21 Order, the March 27 Order and the April 13 Order, the "Interim Orders"); and a hearing to consider approval of the Motion on a final basis having been held on April 24, 2018 (the "Final Hearing"), and the Court having determined that the legal and factual bases set forth in the

---

[2]    All capitalized terms used but not otherwise defined herein have the meaning ascribed to them in the Final DIP Order and the Motion, as applicable.

W/3119214v5
#90820486v2
KL2 3065692.13

Motion and at the Interim Hearing and the Final Hearing establish just cause for the relief granted herein; and upon the record made in the Motion and at the Interim Hearing and Final Hearing, and after due deliberation and good and sufficient cause having been shown;

IT IS FOUND, DETERMINED, ORDERED AND ADJUDGED THAT:

1. *Disposition.* The relief requested in the Motion is GRANTED ON A FINAL BASIS in accordance with the terms of this Order. Any objections to the Motion that have not been withdrawn, waived or settled, and all reservations of rights included therein, are hereby DENIED and OVERRULED on the merits.

2. *Jurisdiction, Venue*. This Court has core jurisdiction over the Chapter 11 Cases, the Motion, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334 and the *Standing Order of Reference from the United States District Court for the Eastern District of Virginia*, dated August 15, 1984. Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409. This Court may enter this final Order consistent with Article III of the United States Constitution.

*3.* *Notice.* The notice given by the Debtors of the Motion, the relief requested therein and the Interim Hearing and Final Hearing thereon constitutes proper, timely, adequate and sufficient notice thereof and complies with the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules and any other applicable law, and no other or further notice thereof is required.

4. *Continued Application of Final DIP Order*. The Final DIP Order shall remain unchanged and in full force and effect, including with respect to the Waivers, except to the extent expressly modified by this Order and by the terms of the ABL/FILO Waiver or the Term DIP Waiver, and the budgets attached thereto and hereto as **Exhibit 3** (the "Wind-Down Budget").

- 3 -

For the avoidance of doubt, nothing herein or in the Waivers shall modify or amend the provisions in the Final DIP Order regarding 506(c), 552(b) or marshalling or any terms of the Final DIP Order governing the permitted use of DIP Loans, Cash Collateral, DIP Collateral or Prepetition Collateral, and all such provisions shall remain fully applicable with all parties' rights reserved. All factual and other findings and conclusions of law contained in the Final DIP Order shall remain fully applicable, including with respect to the ABL/FILO Waiver or the Term DIP Waiver, except to the extent specifically modified herein, subject to the Creditors' Committee's challenge rights as preserved in the *Stipulation and Agreed Order Extending the Challenge Period Through March 30, 2018* [Docket No. 1772], and the *Second Stipulation and Agreed Order Extending the Challenge Period Through April 30, 2018* [Docket No. 2465], or as further agreed by the parties or ordered by the Court.

5.     *Authority to Enter into the Waivers*.  The Borrowers are authorized to enter into the ABL/FILO Waiver and the Term DIP Waiver, to make, execute, and deliver all instruments and documents, and to perform all acts in connection therewith that may be reasonably required for the Borrowers' performance of their obligations under the ABL/FILO Waiver and the Term DIP Waiver.

6.     *Waivers Valid and Binding*.  The terms of both the ABL/FILO Waiver and the Term DIP Waiver are hereby approved.  Upon execution and delivery of the ABL/FILO Waiver, and upon the satisfaction (or waiver) of the conditions to effectiveness set forth in the ABL/FILO Waiver, the ABL/FILO Waiver shall constitute (a) one of the ABL/FILO DIP Documents and (b) a valid and binding obligation of each of the parties thereto, enforceable against each party thereto in accordance with the terms thereof.  Upon execution and delivery of the Term DIP Waiver, and upon the satisfaction of the conditions to effectiveness set forth in the Term DIP

- 4 -

Waiver, the Term DIP Waiver shall constitute (a) one of the Term DIP Documents and (b) a valid and binding obligation of each of the parties thereto, enforceable against each party thereto in accordance with the terms thereof.  Except as otherwise provided in this Order, the Interim Orders, the Final DIP Order, the ABL/FILO DIP Documents or the Term DIP Documents, no obligation or payment under the ABL/FILO Waiver, the Term DIP Waiver, the Interim Orders,  or this Order shall be stayed, restrained, voidable, avoidable, or recoverable under the Bankruptcy Code or under any applicable law, or subject to any defense, reduction, setoff, recoupment, or counterclaim.

7.    *Wind-Down Budget*.  The Wind-Down Budget (including its constituent Domestic Wind-Down Budget and Canadian Going Concern Budget (each as defined in the Waivers)) is hereby approved.

8.    *Good Cause*.  Good cause has been shown for the entry of this Order.  The relief requested in the Motion is in the best interests of the Debtors, their creditors and their estates and all other parties-in-interest in these Chapter 11 Cases, and is necessary, essential, and appropriate for the management and preservation of the Debtors' estates.  The terms of each of the ABL/FILO Waiver and the Term DIP Waiver are fair and reasonable, reflect the Debtors' exercise of prudent business judgment, and are supported by reasonably equivalent value and fair consideration.

9.    *Amendment of Final DIP Order*.  The Final DIP Order is hereby amended as follows:

    a.    Paragraph 9(a)(iii) of the Final DIP Order is replaced with:

    "to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses (the "**Allowed Professional Fees**") incurred by persons or firms retained by the Debtors pursuant to section 327, 328 or 363 of the

W/3119214v5
#90820486v2
KL2 3065692.13

Bankruptcy Code (the "**Debtor Professionals**") and the creditors' committee (the "**Creditors' Committee**") pursuant to section 328 or 1103 of the Bankruptcy Code (the "**Committee Professionals**" and, together with the Debtor Professionals, the "**Professional Persons**"), allocable to the Borrowers and, with respect to each Professional Person, (i) accrued on or prior to March 15, 2018, plus (ii) not in excess of the aggregate amounts provided for such Professional Person pursuant to the Domestic Wind-Down Budget (as defined in the amendments to the ABL/FILO DIP Credit Agreement and the Term DIP Credit Agreement dated March 20, 2018)[3] for the period from March 15, 2018 (prorated for the month of March 2018) through the date to which such allowed amounts accrued (in each case other than any restructuring, sale or other success fee of any investment bankers or financial advisors of the Debtors or any committee, and other than fees and expenses of third party professionals employed by Creditors' Committee members) at any time before or on the first business day following delivery by a DIP Agent of a Carve-Out Trigger Notice (as defined below), whether allowed by this Court prior to or after delivery of a Carve-Out Trigger Notice; and"

b.       Paragraph 9(a)(iv) of the Final DIP Order is replaced with:

"Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed: $2,500,000 incurred after the first business day following delivery by a DIP Agent of the Carve-Out Trigger Notice to the extent allowed at any time, whether by interim order, procedural order or otherwise, and allocable to the Borrowers pursuant to the DIP Budget (the amounts set forth in this clause (iv) being the "**Post-Carve-Out Trigger Notice Cap**")."

c.       Paragraph 9 of the Final DIP Order is supplemented by adding the following at the end thereof:

"Notwithstanding anything to the contrary in this Order or in any of the DIP Documents, all rights of the ABL/FILO DIP Secured Parties and the Term DIP Secured Parties with respect to the allocation of the Carve-Out as between the ABL Collateral (as defined in the DIP ICA) and the Term Collateral (as defined in the DIP ICA) are fully reserved."

---

[3]       To the extent that the amounts accrued in a particular month for any Professional Person is less than the amount budgeted for such Professional Person under the Domestic Wind-Down Budget (any such amount, a "Budget Surplus"), the amount budgeted under the Domestic Wind-Down Budget for such Professional Person in subsequent months shall increase by any aggregate Budget Surplus.

W/3119214v5
#90820486v2
KL2 3065692.13

d.    Paragraph 18(c) of the Final DIP Order is amended by replacing clause (ii) thereof with the following:

"(ii) the Ad Hoc Group of B-2 Term Lenders and B-3 Term Lenders, limited to an aggregate of $50,000 per month of (A) the reasonable and documented hourly fees and expenses of Arnold & Porter Kaye Scholer LLP as counsel to the Ad Hoc Group of B-2 Term Lenders and B-3 Term Lenders, and (B) the reasonable and documented hourly fees and expenses of Huron Consulting Group Inc. as financial advisor to the Ad Hoc Group of B-2 Term Lenders and B-3 Term Lenders; which payments shall, in the case of both (i) and (ii) above, be made in the manner provided for in paragraph 19 below; *provided* that the members of such Ad Hoc Group of B-2/B-3 Lenders shall also have access to the work product of, and be entitled to consult with, Houlihan Lokey Capital Inc. with respect to matters not involving a conflict between the interests of Term B-2/B-3 Lenders, on the one hand, and Term B-4 Lenders, on the other hand; and *provided further* that the Ad Hoc Group of B-4 Term Lenders will be limited to an aggregate of $50,000 per month in professional fee and expense reimbursements under this Paragraph with respect to matters involving a conflict between the interests of Term B-2/B-3 Lenders, on the one hand, and Term B-4 Lenders, on the other hand.  Notwithstanding anything to the contrary in the Final DIP Order, the Debtors shall no longer be authorized or permitted to make any Adequate Protection Payments (as defined in the Final DIP Order), except to the extent expressly made in accordance with the Wind-Down Budget."

e.    Paragraph 37 of the Final DIP Order is supplemented[4] by adding the following at the end thereof:[5]

"To the extent that any of the obligations of the Canadian ABL/FILO Borrower under the ABL/FILO DIP Documents are satisfied, as to any ABL/FILO DIP Secured Party, by or with funds of the US Borrower or any other North American Debtor, such obligations shall not be discharged (unless and until ultimately paid or reimbursed by the Canadian ABL/FILO Borrower), but rather the US Borrower or such North American Debtor, as the case may be (in such capacity, the "Subrogated Borrower"), shall (in addition to any other rights granted to sureties under applicable law) be subrogated to the rights of the applicable ABL/FILO DIP

---

[4]    Except as expressly set forth this paragraph 9(e) of this Order, nothing in this Order shall amend, modify or limit in any way paragraph 37 of the Final DIP Order.

[5]    To clarify that the Collateral is released and the obligations terminated if the amount of the subrogated claim is subsequently reimbursed by the Canadian ABL/FILO Borrower.

W/3119214v5
#90820486v2
KL2 3065692.13

Lenders, shall stand in the position of the applicable ABL/FILO DIP Lenders, and shall be entitled to all the equities of the applicable ABL/FILO DIP Lenders, in each case with respect to such obligations of the Canadian ABL/FILO Borrower, and such rights of the applicable ABL/FILO DIP Lenders to which the Subrogated Borrower has been subrogated and such obligations of the Canadian ABL/FILO Borrower to the Subrogated Borrower shall constitute Collateral subject to all of the Liens securing the DIP Obligations and all of the Adequate Protection Liens including the Canadian DIP Charge granted by the Canadian Court, in each case without set off, counterclaim, or recoupment of any kind, until ultimately paid or reimbursed by the Canadian ABL/FILO Borrower.  For the avoidance of doubt, any such subrogation rights shall be subject to Section 10.07 of the ABL/FILO DIP Credit Agreement, and any liens granted in such subrogation rights and any exercise thereof shall be subject to the DIP ICA.  The US Borrower is hereby authorized and directed to use proceeds of Prime Rate Loans issued (as defined in the ABL/FILO DIP Credit Agreement) on the effective date of the Waivers, in an amount equal to the U.S. dollar equivalent of CAD $5,112,945.28, to cash collateralize the Canadian Letter of Credit Outstandings (as defined in the ABL/FILO DIP Credit Agreement) in accordance with the ABL/FILO Waiver; provided that the US Borrower's claims in respect thereof shall be subrogated to the claims of the ABL/FILO DIP Lenders in accordance with the terms of this Order."

10.    *Lazard Fees.* Notwithstanding anything to the contrary in this Order, the Interim Orders, the Final DIP Order, the Interim DIP Order, the DIP Documents, or the *Order (I) Authorizing the Employment and Retention of Lazard* Frères *& Co. LLC as Investment Banker to the Debtors and Debtors in Possession, Effective* Nunc Pro Tunc *to the Petition Date, (II) Modifying Certain Time Keeping Requirements, and (III) Granting Related Relief* [Docket No. 732] (the "Lazard Retention Order"), any sale or transaction fees payable to Lazard Frères & Co ("Lazard") pursuant to the Lazard Retention Order in connection with any asset sales of Collateral shall be added to the Carve-Out (payable subject to further order of the Court), and shall have priority over and be paid before any amounts included in the ABL Wind-Down Carve Out, or the Term Loan Wind-Down Carve Out, or any DIP Obligations, in each case from the

- 8 -

proceeds of such asset sales at the closing of such asset sales, but subject to clawback for the account of a particular Debtor and/or adjustment or allocation across Debtors to the extent aggregate fees earned by Lazard exceed the cap set forth in paragraph 16 of the Lazard Retention Order.

11.    *Wind-Down Order.* Notwithstanding anything to the contrary in this Order, the Interim Orders, the Final DIP Order, the Interim DIP Order, or the DIP Documents, any and all fees, costs and/or expenses payable to the Consultants (as defined in the *Order (I) Authorizing the Debtors to Wind-Down U.S. Operations, (II) Authorizing the Debtors to Conduct U.S. Store Closings, (III) Enforcing and Administrative Stay, and (IV) Granting Related Relief* (the "Wind-Down Order")), pursuant to the Wind-Down Order or the *Order (I) Authorizing the Debtors to Enter into the Consulting Agreements, (II) Authorizing and Approving the Conduct of Store Closing Sales, With Such Sales to Be Free and Clear of All Liens, Claims and Encumbrances, (III) Authorizing Customary Bonuses to Employees of Closing Stores, and (IV) Granting Related Relief* (the "Initial Store Closing Order") shall be added to the Carve-Out, and have priority over and be paid before any amounts included in the ABL Wind-Down Carve Out, or the Term Loan Wind-Down Carve Out, or any DIP Obligations, *provided* that the Consultants shall not share in the Post-Carve-Out Trigger Notice Cap.

12.    *Wind-Down Priorities.* The DIP Order is amended to reflect that amounts (i) payable to employees of the DIP Loan Parties (other than the Canadian ABL/FILO Borrower), (ii) payable to taxing authorities on account of trust fund taxes incurred by the DIP Loan Parties (other than the Canadian ABL/FILO Borrower), including payroll taxes and sales and use taxes, or (iii) payable to third party vendors, in each case, on account of goods (other than, except as and to the extent provided in 12(b) and 12(c) below, merchandise inventory) or

- 9 -

services (including, without limitation, third-party landlords and other third party service providers) in the case of each of (i)-(iii) on account of goods or services actually provided to or trust fund taxes incurred by the DIP Loan Parties (other than the Canadian ABL/FILO Borrower), in each case incurred by the Debtors on or after the dates specified below (collectively, the "Employee and New Value Expenses"), shall have superpriority status under section 364 of the Bankruptcy Code solely to the extent set forth below:

      a.   subject only to the Carve Out, allowed and unpaid Employee and New Value Expenses not to exceed the amount therefor set forth in the "Domestic Wind-Down Budget" attached to the ABL/FILO Waiver as Exhibit A thereto (provided that Employee and New Value Expenses of the type described in clause (iii) of the definition thereof, shall not be subject to limitation by such budget) incurred by the DIP Loan Parties (other than the Canadian ABL/FILO Borrower) on or after March 15, 2018 and before the earlier to occur of (x) the repayment in full in cash of all ABL/FILO DIP Obligations and (y) the date that is five (5) Business Days following written notice by the ABL/FILO DIP Lenders to (i) the Debtors, (ii) the Creditors' Committee, (iii) the Term DIP Agent and (iv) the US Trustee, of any Event of Default under the ABL/FILO DIP Facility (the "ABL/FILO EOD Notice") shall be senior to all liens and claims securing the ABL/FILO DIP Facility and the Term DIP Facility, the Canadian Intercompany DIP Facility, the Wayne DIP Facility, Adequate Protection Liens, and the 507(b) Claims, and any and all other forms of adequate protection, liens, or claims securing the DIP Obligations, or the obligations secured pursuant to any prepetition secured

- 10 -

facilities (including the Prepetition Term Loan Credit Facility and the Prepetition

ABL/FILO Credit Facility) (the "ABL Wind-Down Carve Out"); and

b.  (i) allowed and unpaid Employee and New Value Expenses not to exceed the

amount therefor set forth in the "Domestic Wind-Down Budget" attached to the

Term DIP Waiver as Exhibit A thereto (provided that Employee and New Value

Expenses of the type described in clause (iii) of the definition thereof (but

excluding merchandise inventory), shall not be subject to limitation by such

budget) incurred by the DIP Loan Parties (other than the Canadian ABL/FILO

Borrower) on or after March 5, 2018 through the earlier to occur of (x) the

repayment in full in cash of all Term DIP Obligations and the obligations under

Prepetition Term Loan and (y) the date that is five (5) Business Days following

written notice by the Term DIP Lenders to (1) the Debtors, (2) the Creditors'

Committee, (3) the ABL/FILO DIP Agent and (4) the US Trustee, of any Event of

Default under the Term DIP Facility (the "Term Loan EOD Notice"), (ii) the

obligation to fund the Merchandise Reserve as set forth below shall be (x) senior

to all liens and claims securing the Term DIP Facility, the Canadian Intercompany

DIP Facility, the Wayne DIP Facility, Prepetition Term Loan Adequate Protection

Liens, and the 507(b) Claims, and any and all other forms of adequate protection,

liens, or claims securing the Term DIP Obligations, or the obligations secured

pursuant to the Prepetition Term Loan Credit Facility, and (y) junior only to the

Carve Out, the ABL Wind-Down Carve Out, and, with respect to the Prepetition

ABL/FILO Priority Collateral, the ABL/FILO DIP Liens, the Prepetition

ABL/FILO Adequate Protection Liens, and the Contingent ABL/FILO Liens (the

- 11 -

"Term Loan Wind-Down Carve Out") and (iii) the funds in the Merchandise

Reserve shall be (x) free and clear of all liens and claims securing the Term DIP

Facility, the Canadian Intercompany DIP Facility, the Wayne DIP Facility,

Prepetition Term Loan Adequate Protection Liens, and the 507(b) Claims, and

any and all other forms of adequate protection, liens, or claims securing the Term

DIP Obligations, or the obligations secured pursuant to the Prepetition Term Loan

Credit Facility and (y) subject only to the Carve Out, the ABL Wind-Down Carve

Out, the ABL/FILO DIP Liens, and, with respect to the Prepetition ABL/FILO

Priority Collateral, the Prepetition ABL/FILO Adequate Protection Liens, and the

Contingent ABL/FILO Liens.

c.   The US Borrower shall establish a reserve in a segregated account (the

"Merchandise Reserve"), which Merchandise Reserve shall be in an amount equal

to the cost of all merchandise received by the DIP Loan Parties[6] (other than the

Canadian ABL/FILO Borrower) for the period on and after March 5, 2018 and

that has not been paid for, which amounts shall be subject to a reconciliation to be

determined by the Debtors, subject to consultation, review, and objection by the

---

[6]     As used herein, the clause "cost of all merchandise received by the DIP Loan Parties" refers to the contracted price of such merchandise between the selling vendor or its agent and the applicable DIP Loan Party, giving effect to any allowances, rebates or reductions under applicable agreements solely if and to the extent such allowance, rebates, or reductions are applicable to the invoices at issue.  In addition, for purposes of determining when merchandise is "received" as used herein, received shall be determined by when: (i) such merchandise is received by the DIP Loan Parties at their distribution centers, or (ii) to the extent any merchandise is not transported to any of the Loan Parties' distribution centers, such merchandise is received at domestic docks for pickup by the Loan Parties or their agents, or (iii) in the case of any merchandise that is fulfilled through online ordering, such merchandise is received by the Loan Parties' customers in fulfillment of such online orders placed through the Loan Parties' websites.  For the avoidance of doubt, any merchandise for which a DIP Loan Party already paid, or any merchandise initially accepted by a DIP Loan Party but subsequently returned to the selling vendor or its agent, shall not be counted as inventory that was received by the DIP Loan Party for purposes of calculating the "cost of merchandise received by the DIP Loan Parties" hereunder.  In addition, nothing herein shall impair or affect the right of any DIP Loan Party to contest any invoice to the extent it is inconsistent with any applicable agreement with a selling vendor, subject to any party's claims, rights or defenses thereto.

Claims Oversight Representative (as defined below), the Creditors' Committee and the DIP Secured Parties, and shall be without prejudice to the rights of any other party-in-interest to object to the reconciled amount of the Merchandise Reserve.  Within three (3) Business Days' after the completion of such reconciliation of size of the Merchandise Reserve, the Debtors shall file a statement on the public Court docket in these cases disclosing the reconciled amount of the Merchandise Reserve.  The Merchandise Reserve shall be funded only after the later of (x) the payment in cash in full of all Obligations (as defined in the ABL/FILO DIP Credit Agreement)[7] and (y) on the schedule set forth in the Wind Down Budget for payment of claims for merchandise received on or after March 5, 2018.[8]  All parties' rights and claims regarding an allocation of the Merchandise Reserve, including the right to assert that (i) all or a portion of the Merchandise Reserve should be allocated to payment of goods received from and after March 5, 2018, and (ii) all or a portion of the Merchandise Reserve should be allocated ratably among all holders of unpaid chapter 11 administrative

---

[7] For the avoidance of doubt, indemnity rights of the ABL/FILO DIP Secured Parties shall survive the payment in full of the ABL/FILO DIP Obligations, with the lien and claim priority granted under the Final DIP Order and recourse to all property of the DIP Loan Parties' estates including the Merchandise Reserve. In the event that the ABL/FILO Secured Parties obtain payment from the Merchandise Reserve, the obligation of the US Borrower to maintain the Merchandise Reserve in the agreed amount shall continue and the Merchandise Reserve shall be replenished, including from the Collateral securing the Term DIP Obligations and/or the Prepetition Term Loan Credit Facility, consistent with this Order.

[8] For the avoidance of doubt, the timing of funding the Merchandise Reserve shall not impact the obligation to fund the Merchandise Reserve nor shall it impact the inclusion of the Merchandise Reserve in the Term Loan Wind-Down Carve Out. Nor shall the obligation to fund the Merchandise Reserve in accordance with this Order be affected by a subsequent Event of Default or other limitations imposed by the Wind Down Budget.

- 13 -

W/3119214v5
#90820486v2
KL2 3065692.13

expense claims or otherwise, shall be expressly reserved and any distributions from the Merchandise Reserve are subject to further order of the Court.[9]

d.   The Merchandise Reserve shall be funded only from the Collateral securing the Term DIP Obligations and/or the Prepetition Term Loan Credit Facility.  Upon entry of this Order, and in accordance with Paragraph 21 hereof, the ABL Wind-Down Carve Out and the Term Loan Wind-Down Carve Out, including the Debtors' obligation to fund the Merchandise Reserve (and the DIP Lenders' and Prepetition Secured Parties' consent to such funding), solely pursuant to clauses (a)-(c) above shall remain binding regardless of any subsequent events, including the appointment of a trustee, the conversion of these cases to cases under Chapter 7 of the Bankruptcy Code, or dismissal of these cases. Additionally, notwithstanding any conversion of these cases to cases under Chapter 7 of the Bankruptcy Code or any dismissal of these cases, any funds held in the Merchandise Reserve shall be preserved and, subject to footnote 7 of this Order and any amounts payable to a liquidating trustee or its professionals on account of the disbursement or administration of the Merchandise Reserve, shall be used exclusively for the purpose of making distributions to the holders of unpaid chapter 11 administrative expense claims in accordance with the order of the Court governing such distributions.

---

[9]    In connection with any claims or causes of action, all rights are reserved with respect to whether any legal or factual significance should be attached to the use of the March 5, 2018 date in this Order in connection with the funding of the Merchandise Reserve.  Without limiting the foregoing, all rights are reserved to argue that the use of the March 5, 2018 date should not give rise to any inference that there may not be claims or causes of action arising out of acts or omissions that occurred prior to March 5, 2018 or as to the absence of damages relating to the period prior to March 5, 2018.

W/3119214v5
#90820486v2
KL2 3065692.13

e.  Promptly upon receipt of the ABL/FILO EOD Notice and/or the Term Loan EOD Notice, the Borrowers shall provide notice of such default to all known providers of goods and services, including, without limitation, to the creditors who have been approved to provide such goods and services by Authorized Approvers. Upon the occurrence of an Event of Default under either the ABL/FILO DIP Facility or the Term DIP Facility, the ABL/FILO DIP Lenders or the Term DIP Lenders, as applicable, shall promptly file a copy of the ABL/FILO EOD Notice and/or the Term Loan EOD Notice, as applicable, on the Court's docket and serve a copy of such notice upon: (i) counsel to the Debtors, (ii) counsel to the Creditors' Committee, (iii) the U.S. Trustee, and (iv) all parties who have requested notice in the Chapter 11 Cases pursuant to Bankruptcy Rule 2002.

f.  Upon the delivery of an ABL/FILO EOD Notice and/or a Term Loan EOD Notice, during the five business day period after delivery thereof (the "<u>ENVE Cap Notice Period</u>") the DIP Secured Parties shall negotiate in good faith with the Debtors and the Creditors' Committee regarding the manner in which they intend to exercise their rights and remedies under the DIP Documents and the Final DIP Order, including with respect to the funding of ongoing Employee and New Value Expenses; provided that nothing herein shall obligate any party to fund, whether from the proceeds of its collateral or otherwise, or subordinate its liens or claims to, Employee and New Value Expenses incurred on or after the expiration of the ENVE Cap Notice Period.

- 15 -

g.  To the extent there is any dispute regarding the occurrence of an Event of Default or the notice of such Event of Default, the Bankruptcy Court shall hear such dispute on an expedited basis.

h.  For the avoidance of doubt, administrative expense claims that are not Employee and New Value Expenses expressly described in the foregoing clauses (a) and (b), including any administrative expenses incurred outside of the applicable date ranges in the foregoing clauses (a) and (b), are not affected by this section and are not granted superpriority status hereunder.

13.    *Reservation of Rights.*  Nothing in this Order shall prohibit any party-in-interest (including the Creditors' Committee) from (i) continuing any investigation into or the pursuit of claims against any party-in-interest, including without limitation any claims identified in the Creditors' Committee's motion seeking discovery pursuant to Bankruptcy Rule 2004 [Docket No. 1162] or (ii) seeking information from the Debtors, the ABL/FILO DIP Lenders or the Term DIP Lenders – through formal or informal discovery, including pursuant to Bankruptcy Rule 2004 – relating to the Wind-Down Motion, the Motion and the Waivers and the decision to pursue the Wind-Down Motion, the Motion and the Waivers, and/or pursuing any claims related thereto.  Nothing in this Order shall impair, prohibit, waive, release or restrain any claim, cause of action, objection, defense, right or remedy available to any party-in-interest (including the Creditors' Committee), including to assert that amounts incurred by the DIP Loan Parties prior to March 5, 2018 should be subject to payment pursuant to section 506(c) and/or 552 of the Bankruptcy Code as and to the extent provided in the Final DIP Order, or other applicable remedy at law, including, without limitation, allegations of claims for unjust enrichment, constructive trust, or other legal or equitable remedies or claims against the North American DIP

W/3119214v5
#90820486v2
KL2 3065692.13

Lenders or the DIP Secured Parties.  Nothing in this Order shall impair, affect or limit any defenses, objections or positions of the DIP Secured Parties or other parties in interest relating to such matters including, without limitation, their rights under the DIP Documents and the Final DIP Order.  The DIP Loan Parties acknowledge that the ABL/FILO DIP Secured Parties have asserted their rights to indemnification under Section 9.03(b) of the ABL/FILO DIP Credit Agreement relating to any such actual or prospective claims, litigations, investigations or proceedings and the DIP Loan Parties and the Term DIP Secured Parties acknowledge and agree that the Discharge of ABL Secured Obligations (as defined in the DIP ICA) shall not occur until any such indemnification obligations have been paid in full in cash.  The ABL/DIP FILO Secured Parties hereby expressly reserve all of their rights under the ABL/FILO DIP Documents, including without limitation indemnity rights and the right to seek the funding of a reserve for indemnification in connection with any actual or prospective claims, litigation, investigation or proceeding by any party against any ABL/FILO DIP Secured Parties, and the fact that such litigation reserve is not included in the Wind-Down Budget at this time should not be construed as a waiver of any such rights.  For the avoidance of doubt, nothing in the Interim Orders or this Order will impair the rights or ability of any party-in-interest to pursue any claims or causes of action otherwise available to such party.  The reservation of rights provided for herein shall expressly survive termination (including as a result of repayment of all obligations) of the ABL/FILO DIP Facility and/or the Term DIP Facility.

14.      *Application of Proceeds of Collateral*.  The proceeds from the sale or liquidation of DIP Collateral will be used to repay the outstanding amount of the North American DIP Facilities, *provided*, *however*, that, for the avoidance of doubt:  (i) section 13(d) of the Final DIP Order will continue in full force and effect, and further to the foregoing, with respect to the

- 17 -

repayment of Term DIP Obligations (x) in the first instance, the proceeds from the sale of Collateral securing the ABL/FILO DIP Obligations on a senior basis to the Term DIP Obligations ("ABL/FILO DIP Priority Collateral") will be used (subject to satisfaction of the ABL/FILO DIP Obligations as required by the ABL/FILO DIP Documents and this Order) to repay the Term DIP Obligations and fund all wind-down costs associated with the liquidation of DIP Collateral, and (y) proceeds from the sale of assets unencumbered as of the Petition Date that do not constitute ABL/FILO DIP Priority Collateral shall be segregated pending application thereof and only be used to repay the Term DIP Obligations (and, for the avoidance of doubt, subject to the DIP Documents, the ABL/FILO DIP Obligations to the extent not satisfied from ABL/FILO DIP Priority Collateral) (1) to the extent the proceeds from the sale of the ABL/FILO DIP Priority Collateral (after application thereof to the ABL/FILO DIP Obligations and to wind-down costs) are insufficient to repay such Term DIP Obligations (or ABL/FILO DIP Obligations, as applicable), *or* (2) with the consent of the Creditors' Committee or by further order of the Court; (ii) entry of this Order and approval of the Wind-Down Budget shall not prejudice or impair the rights of any party-in-interest to bring claims or seek remedies against the North American DIP Lenders; and (iii) following the repayment-in-full of the North American DIP Facilities, the proceeds of the sale or liquidation of any assets of the Debtors shall not be used to repay any Prepetition Secured Obligations absent further order of the Court.

15.    *Claims Administration*.    As soon as practicable after entry of this Order, an individual from FTI Consulting, Inc., financial advisor to the Committee, shall be identified and appointed as claims oversight representative (the "Claims Oversight Representative") to assist the Debtors in overseeing the reconciliation of unpaid administrative expense claims and interfacing with creditors and vendors on the status of such reconciliation.

W/3119214v5
#90820486v2
KL2 3065692.13

16.     *Liquidation Expense Budget Reforecast*: On or before May 4, 2018, the Debtors, in good faith, and with the consent of Creditors' Committee (not to be unreasonably withheld) and the North American DIP Lenders (not to be unreasonably withheld), and in consultation with the Consultants, will reforecast the costs of the GOB Sales, and such agreed cost reductions shall be incorporated into the Wind Down Budget and become binding on the Debtors; provided that any modifications to the costs components of the Wind-Down Budget related to the Consultants' fees and expense reimbursement entitlements may only be made with the consent of the Consultants.

17.     *Interim Compensation and Appointment of Fee Examiner*.   Notwithstanding anything to the contrary in the Wind-Down Order, upon entry of this Order the Debtors shall be authorized to make payments to professionals, subject to the Final DIP Order (as amended herein), in accordance with the *Order (I) Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Retained Professionals and (II) Granting Related Relief* [Dkt. No. 746].   As soon as reasonably practicable after the entry of this Order, the U.S. Trustee shall seek the appointment of a fee examiner to review the fees and expenses requested by certain professionals retained by the estates, on terms reasonably acceptable to the Debtors and the Committee.

18.     *Canadian ABL/FILO Borrower*.   The Debtors are hereby authorized to seek relief in the Canadian Court, to the extent required, to enter into the ABL/FILO Waiver, to make, execute, and deliver all instruments and documents, and to perform all acts in connection therewith that may be reasonably required for performance of their obligations under the ABL/FILO Waiver.

19.     *Information Rights*. The Debtors shall provide the Creditors' Committee with the same access and all information supplied to the DIP Agents, the DIP Lenders, and the Prepetition Secured Parties whether under this Order, the Final DIP Order, the DIP Documents (including

- 19 -

the ABL/FILO Waiver and the Term DIP Waiver), the Prepetition Secured Debt Documents, or

otherwise. At the reasonable request of the Creditors' Committee, the Debtors shall provide the

Committee (and simultaneously the DIP Secured Parties) with information, and make a

representative with appropriate subject matter knowledge available, on the following topics: (i)

the Wind-Down Budget, including weekly budget to actual results and variance explanations,

explanations regarding subsequent amended budgets and a detail buildup of receipts (including

liquidation receipts, sales of assets, fixtures, and equipment) and escrowed amounts, (ii) on a

weekly basis, a summary of actual expenses by category with a comparison to the Wind-Down

Budget; (iii) data sufficient for the Creditors' Committee professionals to assess unpaid

administrative claims (including, without limitation, merchandise receipts from prior to March 5,

2018 and any other unpaid administrative expenses claims for goods or services provided prior to

March 5, 2018); (iv) summaries of the information set forth the foregoing clause (iii) that can be

provided to members of the Creditors' Committee; (v) ongoing reporting of administrative claim

balances and payments, (vi) weekly reporting regarding the reconciliation of amounts owed to

merchandise vendors for goods delivered on or after March 5, 2018; (vii) information with

respect to the methodology to be implemented by the Debtors to ensure all receipts of inventory

are reasonably accounted for; (viii) weekly reporting and calls with the Creditors' Committee

professionals regarding the status of the sales process for any assets of the DIP Loan Parties,

including updates regarding interested parties, indications of interest, and the status of due

diligence; and (ix) any other information reasonably requested by the Creditors' Committee or its

professionals. The Debtors shall consult with the Creditors' Committee and its professionals to

share certain of the reporting set forth in this paragraph 19 with the Debtors' creditors on a

W/3119214v5
#90820486v2
KL2 3065692.13

public basis, as reasonably requested by the Debtors' creditors or the Creditors' Committee and its professionals.

20.    *Effect on Cash Management Order.*  For the avoidance of doubt, neither this Order, nor the Wind-Down Budget and the wind-down of the Debtors' domestic business shall impair or affect the rights and obligations of any party pursuant to the Final Order (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms, and (D) Perform Intercompany Transactions, and (II) Granting Related Relief [Docket No. 704]  (the "Cash Management Order").  Without limiting the foregoing, the Debtors (subject, in the case of the Canadian ABL/FILO Borrower, to the consent of the CCAA Monitor or order of the Canadian Court) are authorized and directed to settle any and all intercompany accounts (including without limitation with respect to services, royalties and expense allocations on or after the Petition Date) as among the Debtors and as among the Debtors and their non-Debtor affiliates in accordance with the terms of the Cash Management System as defined and described in the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate their Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms, and (D) Perform Intercompany Transactions, and (II) Granting Related Relief* [Docket No. 22] and as provided for in the Cash Management Order and subject to the terms of section 25 thereof.

21.    *Binding Effect; Successors and Assigns.* The ABL/FILO Waiver, the Term DIP Waiver and the provisions of this Order, including all findings herein, shall be binding upon all parties in interest in these Chapter 11 Cases, including, without limitation, the DIP Agents, the DIP Lenders, the Creditors' Committee, any non-statutory committees appointed or formed in

- 21 -

these Chapter 11 Cases, the Debtors and their respective successors and assigns (including any

chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of any of the

Debtors, an examiner appointed pursuant to section 1104 of the Bankruptcy Code, or any other

fiduciary appointed as a legal representative of any of the Debtors or with respect to the property

of the estate of any of the Debtors) and shall inure to the benefit of the DIP Agents, the DIP

Lenders, and the Debtors and their respective successors and assigns; *provided that* the DIP

Agents and the DIP Lenders shall have no obligation to extend any financing to any chapter 7

trustee, chapter 11 trustee or similar responsible person appointed for the estates of the Debtors.

22.    *Effectiveness*.  This Order shall constitute findings of fact and conclusions of law

and shall take effect and be fully enforceable nunc pro tunc to the Petition Date immediately

upon entry hereof.  Notwithstanding Bankruptcy Rules 4001 (a)(3), 6004(h), 6006(d), 7062, or

9014, or any Local Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this

Order shall be immediately effective and enforceable upon its entry and there shall be no stay of

execution or effectiveness of this Order.

23.    *Headings*.  Section headings used herein are for convenience only and are not to

affect the construction of or to be taken into consideration in interpreting this Order.

24.    *Interim Orders*. Except as specifically amended, supplemented or otherwise

modified hereby, all of the provisions of the Interim Orders shall remain in effect and are hereby

ratified by this Order.

25.    *Final Order Governs*. In the event of any inconsistency between the provisions of

this Order and the Interim Orders, the provisions of this Order shall govern.

26.    *Retention of Jurisdiction.*  The Court shall retain jurisdiction to implement,

interpret and enforce the provisions of this Order, and this retention of jurisdiction shall survive

W/3119214v5
#90820486v2
KL2 3065692.13

the confirmation and consummation of any chapter 11 plan for any one or more of the Debtors

notwithstanding the terms or provisions of any such chapter 11 plan or any order confirming any

such chapter 11 plan.

Apr 25 2018

Dated: _____, 2018.
      Richmond, Virginia

/s/ Keith L. Phillips
_____
THE HONORABLE JUDGE KEITH L. PHILLIPS
UNITED STATES BANKRUPTCY JUDGE

Entered on Docket: Apr 25 2018

- 23 -

WE ASK FOR THIS:

/s/ Jeremy S. Williams

Michael A. Condyles (VA 27807)
Peter J. Barrett (VA 46179)
Jeremy S. Williams (VA 77469)
**KUTAK ROCK LLP**
901 East Byrd Street, Suite 1000
Richmond, Virginia 23219-4071
Telephone:      (804) 644-1700
Facsimile:      (804) 783-6192

- and -

Edward O. Sassower, P.C.
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900

- and -

James H.M. Sprayregen, P.C.
Anup Sathy, P.C.
Chad J. Husnick, P.C. (admitted *pro hac vice*)
Robert A. Britton  (admitted *pro hac vice*)
Emily E. Geier  (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200

*Co-Counsel to the Debtors and Debtors in Possession*

## CERTIFICATION OF ENDORSEMENT
## UNDER LOCAL BANKRUPTCY RULE 9022-1(C)

Pursuant to Local Bankruptcy Rule 9022-1(C), I hereby certify that the foregoing proposed order has been endorsed by or served upon all necessary parties.

/s/ Jeremy S. Williams

## **Exhibit 1**

**ABL/FILO Waiver**

#90820486v2
KL2 3065692.13

## SECOND AMENDED AND RESTATED WAIVER, CONSENT AND AMENDMENT AGREEMENT

THIS SECOND AMENDED AND RESTATED WAIVER, CONSENT AND AMENDMENT AGREEMENT, dated as of April [•], 2018 (this "**Agreement**") is entered into by and among Toys "R" Us-Delaware, Inc., as a debtor and debtor-in-possession under chapter 11 of the Bankruptcy Code (the "**Lead Borrower**"), Toys "R" Us (Canada) Ltd. Toys "R" Us (Canada) Ltee, as a debtor and debtor-in-possession under chapter 11 of the Bankruptcy Code and applicant under the CCAA (the "**Canadian Borrower**"), the Facility Guarantors under the DIP ABL/FILO Credit Agreement (as defined below), JPMorgan Chase Bank, N.A. as administrative agent (the "**Administrative Agent**"), JPMorgan Chase Bank, N.A., Toronto Branch, as Canadian administrative agent (the "**Canadian Agent**"), JPMorgan Chase Bank, N.A. and Wells Fargo Bank, National Association as co-collateral agents (the "**Co-Collateral Agents**") and the lenders under the DIP ABL/FILO Credit Agreement party hereto, which lenders constitute the "Required Lenders" as defined in the DIP ABL/FILO Credit Agreement (such Lenders, the "**Consenting Lenders**").

## RECITALS:

**WHEREAS**, reference is made to that certain Superpriority Secured Debtor-in-Possession Credit Agreement dated as of September 22, 2017, by and among the Lead Borrower, the other Domestic Borrowers from time to time party thereto, the Canadian Borrower, the Facility Guarantors from time to time party thereto, the Administrative Agent, the Canadian Agent, the Co-Collateral Agents and the lenders from time to time party thereto (as amended by Amendment No. 1 thereto dated as of October 12, 2017 and as otherwise supplemented, restated or otherwise modified from time to time prior to the date hereof, the "**DIP ABL/FILO Credit Agreement**"; capitalized terms used and not otherwise defined herein have the meanings assigned to them in the DIP ABL/FILO Credit Agreement);

**WHEREAS**, the Domestic Loan Parties (i) have obtained from the Bankruptcy Court authority to close additional Stores and conduct bulk sales of inventory in connection therewith, pursuant to the order entered March 22, 2018 [Docket No. 2344] granting the Store Liquidation Motion (as defined in that certain Limited and Temporary Forbearance, dated as of March 14, 2018 (the "**Forbearance**"), among the Loan Parties and the lenders party thereto, which would have given rise to an Event of Default pursuant to Section 7.01(bb) of the DIP ABL/FILO Credit Agreement, (ii) have determined to suspend the operation of the Domestic Loan Parties' business in the ordinary course, liquidate all or substantially all of the Loan Parties' assets and Store locations, and employ an agent or other third party to conduct store closing, store liquidation and "Going-Out-Of-Business" sales for substantially all of the Domestic Loan Parties' Stores, which would give rise to an Event of Default pursuant to Section 7.01(j) of the DIP ABL/FILO Credit Agreement and (iii) have informed the Administrative Agent of the Domestic Loan Parties' commencement of bulk sales in connection with the closing of substantially all Stores of the Domestic Loan Parties, which sales would give rise to an Event of Default pursuant to Section 7.01(d) of the DIP ABL/FILO Credit Agreement resulting from the failure to observe the covenant set forth in Section 6.05 of the DIP ABL/FILO Credit Agreement (the Events of Default and potential Events of Defaults described in the foregoing clauses and any potential

Default or Event of Default arising out of the inaccuracy of any representation that may have resulted therefrom, the "**Specified Events of Default**");

WHEREAS, the Domestic Loan Parties have the intention to wind-down their operations in the United States and to liquidate substantially all of their inventory in the United States (the "**Domestic Wind-Down**"), consistent with the weekly budget delivered to the Administrative Agent and attached hereto as Exhibit A (the "**Domestic Wind-Down Budget**"; provided, the Domestic Wind-Down Budget or (if applicable) the Canadian Wind-Down Budget shall be reduced by the Loan Parties as provided in Section 3(k) below (but not increased) to the extent the Loan Parties amend, modify or terminate contractual arrangements, including lease obligations, to provide for disbursements that are less than those contemplated by the existing Domestic Wind-Down Budget, the Canadian Going Concern Budget or (if applicable) the Canadian Wind-Down Budget) and pursuant to liquidation agreements attached hereto as Exhibit B;

WHEREAS, the Loan Parties have informed the Administrative Agent that they intend to sell or otherwise dispose of all of the Capital Stock of the Canadian Borrower  or all or substantially all of the assets of the Canadian Borrower on a going concern basis (the "**TRU Canada Sale**"), which sale or other disposition would give rise to an Event of Default pursuant to Section 7.01(d) of the DIP ABL/FILO Credit Agreement resulting from the failure to observe the covenant set forth in Section 6.05 of the DIP ABL/FILO Credit Agreement;

WHEREAS, the Canadian Borrower intends to continue going concern business operations at all of the Stores of the Canadian Borrower consistent with the terms of the budget attached hereto as Exhibit C (the "**Canadian Going Concern Budget**") while it pursues the TRU Canada Sale;

WHEREAS, the Loan Parties acknowledge and agree that upon the occurrence and during the continuance of an Event of Default, the Administrative Agent, the Canadian Agent and the Co-Collateral Agents are authorized to and shall at the direction of the Required Lenders proceed to protect and enforce certain rights and remedies under the DIP ABL/FILO Credit Agreement and the other Loan Documents, subject in all respects to (i) the Remedies Notice Period (as defined in the Final Order) and (ii) solely to the extent required in the Canadian Case, leave of the Canadian Court;

WHEREAS, the Loan Parties have requested that the Lenders waive the Specified Events of Default, amend certain provisions of the DIP ABL/FILO Credit Agreement and provide certain consents in connection with the TRU Canada Sale and (if applicable) the Canadian Wind-Down;

WHEREAS, the Loan Parties, the Administrative Agent, the Canadian Agent, the Co-Collateral Agents and certain Lenders constituting the Required Lenders have previously entered into (i) that certain Waiver, Consent and Amendment Agreement, dated as of March 20, 2018 (the "**Original Waiver, Consent and Amendment**") and (ii) that certain Amended and Restated Waiver, Consent and Amendment Agreement which amended and restated the Original Waiver,

Consent and Amendment, dated as of March 28, 2018 (the "**Existing Waiver, Consent and Amendment**"), in each case to accommodate such requests of the Loan Parties on the terms and subject to the conditions set forth therein and herein; and

**WHEREAS**, the Loan Parties, the Administrative Agent, the Canadian Agent, the Co-Collateral Agents and the Consenting Lenders parties hereto have agreed to amend and restate the Existing Waiver, Consent and Amendment as set forth herein;

**NOW, THEREFORE**, in consideration of the foregoing, the covenants and conditions contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree to amend and restate the Existing Waiver, Consent and Amendment in its entirety as follows:

1.      Incorporation of Recitals.

Each of the Loan Parties acknowledges that the recitals set forth above are true and correct in all respects.

2.      Limited Waiver; Consent.

(a)      In reliance upon the representations, warranties and covenants of the Loan Parties contained in this Agreement, and upon the terms and subject to the conditions of this Agreement, the Consenting Lenders hereby, effective as of the Waiver Effective Date, waive each of the Specified Events of Default (the "**Waiver**").  Except as expressly set forth in this Agreement, no terms, covenants or other provisions of the DIP ABL/FILO Credit Agreement or any other Loan Document are intended pursuant to any provision of this Agreement to (or shall) be affected by any provision of this Agreement, all of which remain in full force and effect unaffected by any provision of this Agreement.

(b)      The Waiver is limited to the extent specifically set forth herein and nothing contained herein is intended, or shall be deemed or construed, (i) to constitute a waiver of any Defaults or Events of Default or compliance with any term or provision of the Loan Documents (as amended hereby), in each case other than the Specified Events of Default, (ii) to constitute a waiver of any Defaults or Events of Default that may exist under the Original Waiver, Consent and Amendment or the Existing Waiver, Consent and Amendment, or (iii) to establish a custom or course of dealing between the Loan Parties, on the one hand, and the Administrative Agent, the Canadian Agent, the Co-Collateral Agents and/or any Lender, on the other hand.

(c)      The Consenting Lenders hereby, effective as of the Waiver Effective Date, consent (i) to the TRU Canada Sale and (ii) to the entry of (and to the filing of any motion by the Loan Parties seeking) any order of the Bankruptcy Court or the Canadian Court permitting the TRU Canada Sale, and agree that no Default of Event of Default shall result from the foregoing (including pursuant to Section 7.01(w), (x), (bb) and (cc) of the DIP ABL/FILO Credit Agreement), so long as, in each case, the TRU Canada Sale is a Qualifying TRU Canada Sale.  A "**Qualifying TRU Canada Sale**" shall mean a TRU Canada Sale that is made pursuant to an

3

Approved TRU Canada Purchase Agreement (as defined below) (including the performance of any transition services by the Domestic Loan Parties as contemplated thereby) and notwithstanding any other provision of this Agreement (including, for greater certainty, any provision of the Domestic Wind-Down Budget) prior to or upon consummation thereof (and as a condition to the consummation thereof) (i) the Canadian Commitments shall have been terminated, all Canadian Liabilities and Other Liabilities of the Canadian Borrower shall have been indefeasibly and irrevocably paid and satisfied in full in cash (other than contingent indemnity obligations with respect to then unasserted claims), all Canadian Letters of Credit shall have expired or terminated (or been collateralized in a manner satisfactory to the Issuing Banks), all Canadian Letter of Credit Outstandings have been reduced to zero (or been collateralized in a manner satisfactory to the Issuing Banks) (and the Consenting Lenders hereby consent to the making of the foregoing payments and terminations) and the Canadian Borrower shall have indefeasibly and irrevocably paid in full in cash to the Domestic Borrower all amounts owed under subrogation claims in respect of the cash collateralization by the Domestic Borrower of Canadian Letter of Credit Outstandings and (ii) a final order of the Bankruptcy Court and/or the Canadian Court, as applicable, satisfactory to the Administrative Agent and the Canadian Agent shall have been entered that ratifies such termination, payment and satisfaction or the Required Lenders shall otherwise be satisfied that such indefeasible and irrevocable termination, payment and satisfaction has occurred.  The date on which the conditions set forth in clauses (i) and (ii) of the immediately preceding sentence are satisfied or waived is referred to as the "**Canadian Facility Termination Date**".

(d)      The Administrative Agent, the Canadian Agent and the Co-Collateral Agent are hereby authorized, (i) upon the consummation of the Qualifying TRU Canada Sale and the occurrence of the Canadian Facility Termination Date and consistent and pursuant to the provisions set forth in Section 8.18 of the DIP ABL/FILO Credit Agreement, to release the Canadian Borrower from all of its obligations and liabilities under the Loan Documents (other than such obligations and liabilities which by their terms expressly survive the termination of the Loan Documents) and release all Liens granted by the Canadian Borrower and (if such Qualifying TRU Canada Sale is in the form of a disposition of the Capital Stock of the Canadian Borrower) the Capital Stock of the Canadian Borrower as security therefor and (ii) upon the Canadian Facility Termination Date, (x) to deliver evidence of the release of such Liens granted by the Canadian Borrower and (if a Qualifying TRU Canada Sale is in the form of a disposition of the Capital Stock of the Canadian Borrower has been consummated) Liens on the Capital Stock of the Canadian Borrower and (y) consent to the granting of Liens to any third party lender (including on a "priming" basis) over the assets and property of the Canadian Loan Parties and (if a Qualifying TRU Canada Sale in the form of a disposition of the Capital Stock of the Canadian Borrower has been consummated) the Capital Stock of the Canadian Borrower to the extent requested.

3.      <u>Additional Covenants</u>.  From and after the Waiver Effective Date (as defined below), the Loan Parties shall comply with the following covenants:

(a)      The Domestic Loan Parties shall (i) on Thursday of each week (beginning with the week starting on April 1, 2018) provide to the Administrative Agent a weekly report for the previous week in a form acceptable to the Administrative Agent summarizing the status of

the Domestic Wind-Down, which report shall include (x) an inventory balance of the Domestic Loan Parties, (y) a variance comparison of actual results, disbursements and proceeds to the results, disbursements and proceeds set forth in the Domestic Wind-Down Budget on a line item basis, and the timing of the delivery of the Domestic Loan Parties' portion of proceeds and a reconciliation with the liquidators' portion of such proceeds and (z) an explanation for any variance between the Domestic Wind-Down Budget and actual results that is not immaterial and a summary status report of the implementation of the Domestic Wind-Down Budget, (ii) on Thursday of each second week (beginning with the week starting on April 1, 2018),  provide to the Administrative Agent a bi-weekly report, with allocations on an estate-by-estate and loan-by-loan basis, of all paid and estimated accrued professional fees and expenses, (iii) on Thursday of each week (beginning with the week starting on April 1, 2018) provide to the Administrative Agent an updated schedule of store and distribution center closings during the previous week, (iv) provide access to the Administrative Agent, the Canadian Agent, the Co-Collateral Agents and their respective advisors and representatives to financial records and properties of the Loan Parties relating to the Domestic Wind-Down and provide all information as may be requested by the Administrative Agent, the Canadian Agent, the Co-Collateral Agents and their respective advisors and representatives in connection with the status of the Domestic Wind-Down (other than such information that is subject to attorney-client privilege or could result in a breach of a confidentiality obligation or applicable law or otherwise constitutes attorney work product) promptly after request therefor, (v) on Thursday of each week (beginning with the week starting on April 1, 2018), provide to the Administrative Agent with an updated inventory report for the last day of the previous week in such form as has been agreed prior to the Waiver Effective Date or otherwise satisfactory to the Administrative Agent and (vi) prepay the Loans and collateralize the Letters of Credit in accordance with the Domestic Wind-Down Budget (subject in all respects to the Wind-Down Orders (as defined below)).

(b)     Prior to the delivery of the Canadian Wind-Down Notice (as defined below), the Canadian Borrower shall (i) on Thursday of each week (beginning with the week starting on April 1, 2018) provide to the Administrative Agent and the Canadian Agent a weekly report for the previous week  in a form acceptable to the Administrative Agent and the Canadian Agent summarizing the status of the Sale Process (as defined below), which report shall include (x) a comparison of actual results, disbursements and proceeds to the results, disbursements and proceeds set forth in the Canadian Going Concern Budget on a line item basis and (y) an explanation for any variance between the Canadian Going Concern Budget and actual results that is not immaterial and (ii) provide access to the Administrative Agent, the Canadian Agent, the Co-Collateral Agents and their respective advisors and representatives to financial records relating to the Sale Process and properties of the Canadian Borrower and provide all information as may be requested by the Administrative Agent, the Canadian Agent, the Co-Collateral Agents and their respective advisors and representatives in connection with the Sale Process promptly after request therefor, including for greater certainty copies of teaser letters, letters of intent, written expressions of interest, bid letters and draft purchase agreements promptly after request therefor (other than such information that is subject to attorney-client privilege or could result in a breach of a confidentiality obligation or applicable law or otherwise constitutes attorney work product).

(c)      Following the delivery of the Canadian Wind-Down Notice, the Canadian Borrower shall (i) on Thursday of each week (beginning with the week starting after the Canadian Wind-Down Notice has been delivered) provide to the Administrative Agent and the Canadian Agent a weekly report for the previous week in a form acceptable to the Administrative Agent and the Canadian Agent summarizing the status of the Canadian Wind-Down, which report shall contain (w) an inventory balance of the Canadian Borrower, (x) a comparison of actual results, disbursements and proceeds to the results, disbursements and proceeds set forth in the Canadian Wind-Down Budget on a line item basis, and the timing of the delivery of the Canadian Loan Parties' portion of proceeds and a reconciliation with the liquidators' portion of such proceeds and (y) an explanation for any variance between the Canadian Wind-Down Budget and actual results that is not immaterial, (ii) on Thursday of each week (beginning with the week starting after the Canadian Wind-Down Notice has been delivered) provide to the Administrative Agent and the Canadian Agent an updated schedule of store and distribution center closings during the previous week, (iii) provide access to the Administrative Agent, the Canadian Agent, the Co-Collateral Agents and their respective advisors and representatives to financial records relating to the Canadian Wind-Down and properties of the Canadian Borrower and provide all information as may be requested by the Administrative Agent, the Canadian Agent, the Co-Collateral Agents and their respective advisors and representatives in connection with the status of the Canadian Wind-Down promptly after request therefor (other than such information that is subject to attorney-client privilege or could result in a breach of a confidentiality obligation or applicable law or otherwise constitutes attorney work product), (iv) prepay the Canadian Loans and cash collateralize the Canadian Letters of Credit in accordance with the Canadian Wind-Down Budget (subject in all respects to the Wind-Down Orders) and (v) on Thursday of each week (beginning with the week starting after the Canadian Wind-Down Notice has been delivered), provide to the Administrative Agent with an updated inventory report for the last day of the previous week in such form as has been agreed prior to the Waiver Effective Date or otherwise satisfactory to the Administrative Agent.

(d)      The Loan Parties shall not use proceeds of the ABL Collateral, directly or indirectly, to pay any interest, principal, fees, expenses, or other obligations owed with respect to the DIP Term Loan Facility or any Existing Debt until the Commitments have expired or been terminated, the principal of, and interest on, each Loan and all fees and other Obligations (other than contingent indemnity obligations with respect to then unasserted claims) shall have been indefeasibly and irrevocably paid and satisfied in full in cash, all Letters of Credit shall have expired or terminated (or been Cash Collateralized in a manner satisfactory to the Issuing Bank and all Letter of Credit Outstandings have been reduced to zero (or Cash Collateralized in a manner satisfactory to the Issuing Bank). The Loan Parties shall cause all proceeds of Term Collateral (as defined in the Intercreditor Agreement) to be held in a separate account pending application thereof consistent with the Intercreditor Agreement and the other Loan Documents.

(e)      No Domestic Loan Party shall make any Investment in any Canadian Loan Party (or any Subsidiary of a Canadian Loan Party) and no Canadian Loan Party shall make any Investment in any Domestic Loan Party, in each case, except Investments to cash collateralize the Canadian Letter of Credit Outstandings as contemplated in Section 6(c) of this Agreement and Investments in the form of services provided in the ordinary course of business consistent

with past practice (and reimbursed in the ordinary course of business consistent with past practice) to the extent consistent with the Domestic Wind-Down Budget.

(f)    The Canadian Borrower and/or the Lead Borrower, as applicable, shall achieve the following milestones in connection with the TRU Canada Sale by the prescribed dates (the "**Sale Milestones**") (in each case unless the Canadian Facility Termination Date shall have occurred):

(i)    Not later than April 30, 2018, the Bankruptcy Court and, if required in the Canadian Case, the Canadian Court shall have entered an order, in form and substance satisfactory to the Administrative Agent and the Canadian Agent approving a sale process with respect to the TRU Canada Sale and/or ratifying and affirming a sale process with respect to the TRU Canada Sale (the "**Sale Process**");

(ii)    Not later than April 30, 2018, the Canadian Borrower shall have entered into an asset purchase agreement or the Lead Borrower shall have entered into a stock purchase agreement with respect to the Capital Stock of the Canadian Borrower, as applicable, in form and substance satisfactory to the Required Lenders, the Administrative Agent and the Canadian Agent, for the TRU Canada Sale, which agreement provides for a closing no later than May 31, 2018 and provides for indefeasible and irrevocable payment and satisfaction in full in cash at closing of all Canadian Liabilities and Other Liabilities of the Canadian Borrower outstanding at the time of such closing (other than contingent indemnity obligations with respect to then unasserted claims), the indefeasible and irrevocable payment in full in cash to the Domestic Borrower of all amounts owed under subrogation claims in respect of the cash collateralization of Canadian Letter of Credit Outstandings by the Domestic Borrower and the collateralization of any obligations in respect of Letters of Credit in a manner satisfactory to the Issuing Bank (any such agreement an "**Approved TRU Canada Purchase Agreement**"); provided, that neither the Administrative Agent, the Canadian Agent nor any Lender shall be deemed to waive any objection to the TRU Canada Sale on any terms;

(iii)    Not later than May 15, 2018, the Bankruptcy Court and the Canadian Court shall have issued and entered an order approving the Approved TRU Canada Purchase Agreement or otherwise facilitating or permitting the TRU Canada Sale (each a "**Sale Approval Order**") in form and substance satisfactory to the Administrative Agent and the Canadian Agent; the Sale Approval Order entered by the Canadian Court (and the US Court, if applicable) shall also authorize and direct the Canadian Borrower, or the Monitor on its behalf, to pay to the Administrative Agent or the Canadian Agent, as applicable, an amount sufficient to satisfy the then outstanding Canadian Liabilities and Other Liabilities of the Canadian Borrower (other than contingent indemnity obligations with respect to then unasserted claims) on the closing of the TRU Canada Sale; and

7

(iv)    Not later than May 31, 2018 (the "**Anticipated Sale Closing Date**"), the Qualifying TRU Canada Sale shall have closed and the Canadian Facility Termination Date shall have occurred; <u>provided</u> that the Debtors may extend the Anticipated Sale Closing Date to July 15, 2018 so long as, as of May 31, 2018, (w) all Revolving Credit Loans shall have been indefeasibly and irrevocably paid and satisfied in full in cash, all Letters of Credit have been collateralized in a manner that is satisfactory to the Issuing Bank and all Commitments shall have been terminated, (x) the aggregate outstanding principal amount of Term Loans shall not exceed $100,000,000, (y) the cash balance of the Loan Parties shall be at least $36,200,000 and (z) the Loan Parties shall have paid to the Administrative Agent, for the ratable benefit of the Term Lenders, a fee in the amount of $5,000,000 (which such extension payment shall be due and payable in dollars on May 31, 2018 and once paid, shall not be refundable or revocable);

<u>provided</u> that if the Lead Borrower or Canadian Borrower fails to meet any of the Sale Milestones, such failure shall not constitute a breach of this Section 3(f) if either (A)(x) the Canadian Borrower, within 5 Business Days of the failure to meet the applicable Sale Milestone, delivers a written notice to the Administrative Agent and the Canadian Agent of its intent to commence a liquidation of its inventory (the "**Canadian Wind-Down Notice**"), (y) within 5 Business Days after the delivery of the Canadian Wind-Down Notice, delivers to the Canadian Agent and the Administrative Agent, in each case in form and substance satisfactory to the Canadian Agent and the Administrative Agent (I) a budget setting forth, in reasonable detail, a plan to liquidate substantially all of the Canadian Borrower's inventory (the "**Canadian Wind-Down Budget**") (which Canadian Wind-Down Budget shall also be in form and substance satisfactory to the Required Lenders) and (II) liquidation agreements reasonably satisfactory to the Canadian Agent pursuant to which such liquidation will occur, and (z) within 5 Business Days after the delivery of a Canadian Wind-Down Notice, seeks an order from the Canadian Court and the Bankruptcy Court (if required) (the "**Canadian Wind-Down Orders**") in form and substance satisfactory to the Canadian Agent and the Administrative Agent authorizing and directing it to conduct the liquidation of its inventory in accordance with the foregoing clause (the actions described in clauses (x), (y) and (z) and such liquidation, collectively, the "**Canadian Wind-Down**") or (B) the Required Lenders (in their sole discretion) instruct the Canadian Borrower not to commence a liquidation (which instruction may be revoked at any time thereafter, in which case the preceding clause (A) shall apply).

(g)    At all times following the delivery of the Canadian Wind-Down Notice, the Canadian Borrower shall (i) pursue the liquidation of the Canadian Borrower's inventory in a manner that is consistent with the Canadian Wind-Down Budget and the Canadian Wind-Down Orders in all material respects and (ii) comply with the additional reporting requirements described in Section 3(c) of this Agreement.

(h)    The Loan Parties shall, promptly following the delivery of any written notice, reports or other written information to the administrative agent or the lenders under the DIP Term Loan Facility or the receipt of any written notice from the administrative agent or the lenders under the DIP Term Loan Facility, deliver a copy of such notice, report or other written information to the Administrative Agent.

(i)    The Domestic Loan Parties shall (i) commence liquidation sales at all remaining Stores in the United States by no later than March 27, 2018, (ii) complete liquidation sales at all remaining Stores in the United States by no later than June 30, 2018 (provided, that liquidation sales may continue at a reasonable number of Stores so long as such sales are completed no later than July 15, 2018), and (iii) reject all third-party leases and all leases with Propco I and Propco II by no later than June 30, 2018; *provided* that, prior to the Domestic Facility Termination Date (as defined below), any such leases that the Domestic Borrowers determines in good faith, after consultation with the lenders under the DIP ABL/FILO Credit Agreement, the lenders under the DIP Term Loan Credit Agreement and the Unsecured Creditors Committee, are capable of assignment for value may be assumed and assigned; *provided*, *further*, that no collateral of the Secured Parties shall be used to pay rent on or otherwise maintain any property following completion of a going-out-of-business sale at such property.

(j)    The Loan Parties shall give the Canadian Agent and the Administrative Agent prior notice of and a reasonable opportunity to review any motions to be filed with, and orders to be sought from, the Bankruptcy Court or the Canadian Court, as applicable, with respect to the Domestic Wind-Down, the Sale Process or, if applicable, the Canadian Wind-Down and all such motions and orders shall be in form and substance reasonably satisfactory to the Required Lenders (except in exigent circumstances in which case reasonably practicable notice (as early as possible under the circumstances) to the Administrative Agent will be given).

(k)    The Loan Parties shall not amend, modify, revise, update or change in any respect any of the Domestic Wind Down Budget, the Canadian Going Concern Budget or the Canadian Wind Down Budget, unless (i) any such amendment, modification, revision, update or change shall have been provided to the Administrative Agent, the Canadian Agent, their respective advisors and representatives and the Specified Legal Advisor with a reasonable opportunity to review and (ii) the Required Lenders (acting in their sole discretion) shall have consented to any such amendment, modification, revision, update or change. The applicable portions of the Domestic Wind-Down Budget or (if applicable) the Canadian Wind-Down Budget shall be automatically reduced (but not increased) to the extent the Loan Parties amend, modify or terminate any Master Lease or any Material Contract to provide for disbursements that are less than those contemplated by the existing Domestic Wind-Down Budget.   "Material Contract" shall mean any contract providing for annual disbursements by the Loan Parties of greater than $2,500,000.

All reports, access rights, notices and information required to be delivered or provided to the Administrative Agent, the Canadian Agent and/or their respective advisors and representatives pursuant to this Section 3 shall also be delivered or provided by the Loan Parties to the Specified Legal Advisor (as defined below) promptly following delivery or provision to the Administrative Agent, the Canadian Agent and/or their respective advisors and representatives.

4.    <u>Additional Events of Default</u>.  From and after the Waiver Effective Date (and without in any way limiting the provision of Article VII of the DIP ABL/FILO Credit Agreement), it shall constitute an immediate Event of Default under the DIP ABL/FILO Credit

Agreement if any of the following shall occur (as though the following had been fully set forth in the DIP ABL/FILO Credit Agreement):

(a)     the Loan Parties shall fail to comply (x) in any material respect with any of the undertakings (other than with respect to Sections 3(f) and 3(i)) set forth in this Agreement or (y) in any respect with any of the undertakings set forth in Sections 3(f) and 3(i) and, in the case of the undertakings set forth in Sections 3(a)(iv), 3(b)(ii), 3(c)(iii), and 3(h), such failure shall continue for a period of 2 days after (i) in the case of any failure to comply with any undertaking set forth in Sections 3(a)(iv), 3(b)(ii) or 3(c)(iii), receipt of written notice from the Administrative Agent and (ii) in the case of the undertaking set forth in section 3(h), knowledge of the applicable Loan Party of such failure;

(b)     the Loan Parties shall (x) in the case of the Domestic Loan Parties, cease to proceed with the Domestic Wind-Down, in the manner set forth in and consistent in all material respects with the Domestic Wind-Down Budget, (y) make any payment (other than any payment (which in the case of the Domestic Loan Parties and, after the delivery of the Canadian Wind-Down Notice, the Canadian Borrower, shall only be to facilitate an orderly wind-down) that is, considered alone or together with all other payments not consistent with the Domestic Wind-Down Budget, the Canadian Going Concern Budget or, if applicable, the Canadian Wind-Down Budget, immaterial) that is not consistent with the Domestic Wind-Down Budget, the Canadian Going Concern Budget or, if applicable, the Canadian Wind-Down Budget or (z) make any payments to any individual legal or financial advisor of the Debtors (including advisors to their various independent directors) or the Unsecured Creditors Committee that, as of any date of determination, exceed on a cumulative basis from March 1, 2018 the amounts provided therefor in the Domestic Wind-Down Budget, the Canadian Going Concern Budget or, if applicable, the Canadian Wind-Down Budget;

(c)     with respect to any fiscal month (commencing with March 2018), the aggregate principal amount of Domestic Revolving Credit Loans, Domestic Term Loans and Canadian Term Loans prepaid and Letters of Credit cash collateralized during such fiscal month (including, for the avoidance of doubt, for any part of any such month prior to the Waiver Effective Date) shall be less than the prepayment/cash collateralization amount set forth for such fiscal month on <u>Schedule I</u> hereto (the "<u>Prepayment Requirement</u>") (it being understood that, for the avoidance of doubt, (i) the Domestic Borrower shall repay Domestic Revolving Credit Loans and cash collateralize any Letter of Credit Outstandings that have not been cash collateralized in an amount equal to 103% of such Letter of Credit Outstandings prior to making any prepayments or repayments of Term Loans (which in the case of the cash collateralization with respect to Canadian Letter of Credit Outstandings shall result in a subrogated claim pursuant to Section 10.07 of the DIP ABL/FILO Credit Agreement), it being understood that the cash collateralization of any Letter of Credit Outstandings from the proceeds of Revolving Credit Loans made pursuant to Section 6(c) below shall not reduce the prepayment/cash collateralization amounts set forth on <u>Schedule I</u>, and (ii) if the aggregate principal amount of Domestic Revolving Credit Loans, Domestic Letter of Credit Outstandings, Domestic Term Loans or Canadian Term Loans, as applicable, prepaid or cash collateralized during such fiscal month is greater than the prepayment/cash collateralization amount set forth for such fiscal month on <u>Schedule I</u> hereto, then such additional amounts shall be applied to the succeeding

10

months as determined by the Lead Borrower); <u>provided</u> that, solely with respect to the Term Loans, the Prepayment Requirement shall be deemed to be satisfied for (i) any prepayments required to be made during the fiscal month of April 2018 if such payment is made no later than 14 days after the last day of the fiscal month of April 2018 and (ii) any prepayments required to be made during the fiscal month of May 2018 if such payment is made no later than 7 days after the last day of the fiscal month of May 2018;

(d)    (i) at any time, the net cash flow before debt of the Domestic Loan Parties for any Test Period shall be less than as set forth on Schedule II for such Test Period, (ii) on the last day of any week, the cash balance of the Canadian Borrower shall be less than projected by the Canadian Going Concern Budget or, beginning with the first full week starting on the Sunday after the delivery of the Canadian Wind-Down Budget, the Canadian Wind-Down Budget, by more than $7,000,000, (iii) at any time, the cash balance of the Canadian Borrower shall be lower than $5,000,000 or (iv) the Loan Parties shall disburse any amounts to legal or financial advisors of the Debtors (including advisors to their various independent directors) or the Unsecured Creditors Committee in violation of Section 24 of the Final Order. For purposes of this Section 4(d), "**Test Period**" shall mean, as of any date, (i) beginning with the last day of the week ending on March 31, 2018, the two-week period ending on March 31, 2018, (ii) beginning with the last day of the week ending on April 7, 2018, the three-week period ending on April 7, 2018, and (iii) on and after the last day of any week thereafter, the period beginning on March 18, 2018 and ending on the last day of the week ended most recently on or prior to such date;

(e)    the Loan Parties shall (x) unless a Canadian Wind-Down Notice has been delivered, cease to pursue the Qualifying TRU Canada Sale, in a manner consistent in all material respects with the Sale Milestones and otherwise in compliance in all material respects with the Canadian Going Concern Budget, (y) following delivery of a Canadian Wind-Down Notice, cease to proceed with the Canadian Wind-Down, in the manner set forth in and consistent in all material respects with the Canadian Wind-Down Budget or (z) make any payment (other than any payment (which, after the delivery of the Canadian Wind-Down Notice, shall only be to facilitate an orderly wind-down) that is, considered alone or together with all other payments not consistent with the Canadian Going Concern Budget (or if applicable the Canadian Wind-Down Budget), immaterial) that is not consistent with the Canadian Going Concern Budget or (if applicable) the Canadian Wind-Down Budget;

(f)    any Loan Party shall make any adequate protection payments in respect of interest on any Existing Debt;

(g)    the Domestic Facility Termination Date shall not have occurred on or prior to June 9, 2018;

(h)    the Canadian Facility Termination Date shall not have occurred on or prior to June 30, 2018 (or, if the Canadian Wind-Down Notice has been delivered, July 31, 2018);

(i)    on or prior to April 25, 2018, the Bankruptcy Court shall not have entered a final order, in form and substance consistent with the Interim Domestic Waiver Approval Order, the Extended Interim Domestic Waiver Approval Order, the Second Extended Interim

11

Domestic Waiver Approval Order and the Third Extended Interim Domestic Waiver Approval Order (each as defined below), with modifications thereto to reflect the final nature thereof, and any other modifications thereto satisfactory to the Administrative Agent and the Required Lenders, authorizing the Loan Parties to enter into this Agreement and to perform the obligations hereunder, which final order shall not have been vacated or reversed, shall not be subject to any stay, and shall not have been modified or amended in any manner without the consent of the Administrative Agent and the Required Lenders (the "**Final Domestic Waiver Approval Order**") and the date of the satisfaction of the condition in this paragraph (i), (the "**Final Domestic Waiver Approval Order Date**");

(j)      on or prior to April 30, 2018, the Canadian Court shall not have entered an order, in form and substance satisfactory to the Canadian Agent and the Administrative Agent, authorizing the Canadian Borrower to enter into this Agreement and to perform the obligations hereunder, which order shall not have been vacated or reversed, shall not be subject to any stay, and shall not have been modified or amended in any manner without the consent of the Canadian Agent (the "**Canadian Waiver Approval Order**", and, together with the Final Domestic Waiver Approval Order, the Interim Domestic Waiver Approval Order, the Extended Interim Domestic Waiver Approval Order, the Second Extended Interim Domestic Waiver Approval Order and the Third Extended Interim Domestic Waiver Approval Order, the "**Waiver Approval Orders**" and collectively with the Sale Approval Order, the Orders attached to the Store Liquidation Motion and the Canadian Wind-Down Orders, the "**Wind-Down Orders**");

(k)      any of the Waiver Approval Orders shall have been stayed, reversed, vacated, rescinded or modified in any material respect without the prior written consent of the Required Lenders;

(l)      on or prior to April 16, 2018, the Loan Parties shall not have obtained consent to extend the deadline to assume or reject (x) the master lease with Propco II, and (y) those third-party leases which are necessary to the liquidation process, in each case, through and including a date no earlier than June 30, 2018;

(m)      (i) on or prior to April 16, 2018, the Loan Parties shall not have obtained consent to extend the deadline to assume or reject the master lease with Propco I through and including a date no earlier than April 30, 2018 (the "**Initial PropCo I Extension Date**"), and (ii) on or prior to the Initial PropCo I Extension Date, the Loan Parties shall not have obtained further consent to extend the deadline to assume or reject the master lease with Propco I through and including a date no earlier than June 30, 2018;

The "**Domestic Facility Termination Date**" means the date on which the Domestic Commitments have been irrevocably terminated, the Domestic Borrowers shall have indefeasibly and irrevocably paid and satisfied in full in cash all Obligations (other than Canadian Liabilities and contingent indemnity obligations with respect to then unasserted claims), the Domestic Borrowers shall have indefeasibly and irrevocably paid and satisfied in full in cash the Other Liabilities then due and payable (other than Canadian Liabilities), all Domestic Letters of Credit shall have expired or terminated (or been collateralized in a manner satisfactory to the Issuing

Banks) and all Domestic Letter of Credit Outstandings have been reduced to zero (or been collateralized in a manner satisfactory to the Issuing Banks).

5.    <u>Termination of Swingline Facility</u>.  Effective as of the Waiver Effective Date, the parties hereto agree that (i) the Domestic Swingline Loan Ceiling shall be equal to $0 and (ii) the Canadian Swingline Loan Ceiling shall be equal to $0.

6.    <u>Treatment of Loans, Commitments and Letters of Credit</u>.

(a)    With effect as of the Waiver Effective Date, and notwithstanding the waivers and consents in this Agreement, (i) all Revolving Credit Loans shall be automatically converted into Prime Rate Loans bearing interest, effective from March 15, 2018, at the Prime Rate plus 3.50% and all Revolving Credit Loans shall continue as Prime Rate Loans bearing interest at the Prime Rate plus 3.50% at all times thereafter, (ii) all Term Loans shall be automatically converted into Prime Rate Loans bearing interest, effective from March 15, 2018, at the Prime Rate plus 7.75% and all Term Loans shall continue as Prime Rate Loans bearing interest at the Prime Rate plus 7.75% at all times thereafter, and (iii) all Letter of Credit Fees shall be increased by an amount equal to 2% per annum.  The Lead Borrower shall reimburse each Domestic Lender and the Canadian Borrower shall reimburse each Canadian Lender for any Breakage Costs resulting from such conversion calculated consistent with Section 2.16(b) of the DIP ABL/FILO Credit Agreement.

(b)    Notwithstanding anything to the contrary in Sections 2.08 and 2.19 of the DIP ABL/FILO Credit Agreement, interest on Loans, Unused Canadian Fees and Letter of Credit Fees shall be payable on the last Business Day of each calendar month.

(c)    Notwithstanding anything to the contrary in Section 2.04 of the DIP ABL/FILO Credit Agreement, effective as of the Final Domestic Waiver Approval Order Date, (i) the Lead Borrower shall submit a notice of Borrowing for Prime Rate Loans in an amount equal to 103% of the amount of all Domestic Letter of Credit Outstandings as of such date that have not been cash collateralized, the proceeds of which shall be used to cash collateralize the Domestic Letter of Credit Outstandings as of such date and (ii) the Lead Borrower shall submit a notice of Borrowing for Prime Rate Loans in an amount equal to the U.S. Dollar equivalent of 103% of the amount of the Canadian Letter of Credit Outstandings as of such date that have not been cash collateralized, the proceeds of which shall be converted immediately into Canadian Dollars and shall be used to cash collateralize the Canadian Letter of Credit Outstandings as of such date (which cash collateralization shall result in a subrogated claim pursuant to Section 10.07 of the DIP ABL/FILO Credit Agreement). The Consenting Lenders hereby waive the conditions set forth in Section 4.02 of the DIP ABL/FILO Credit Agreement with respect to such Borrowings, and the applicable Lenders with Commitments shall fund such Borrowing in accordance with the terms of the DIP ABL/FILO Credit Agreement; <u>provided</u> that the proceeds of such Revolving Credit Loans shall be applied to cash collateralize the Domestic Letter of Credit Outstandings and Canadian Letter of Credit Outstandings, as applicable.  If prior to the Domestic Facility Termination Date or the Canadian Facility Termination Date, as applicable, any Letter of Credit expires undrawn or the principal amount of any Letter of Credit is reduced, any cash collateral held in respect of the expired or reduced amount shall be applied by the

13

Administrative Agent or the Canadian Agent, as applicable, promptly following the date of such expiration or reduction, as applicable, to the payment of principal and accrued interest outstanding under the Domestic Revolving Credit Loans (which, in the event cash collateral held in respect of the Canadian Letter of Credit Outstandings is used for such payment, shall reduce the amount of the subrogation claims provided in Section 6(c)), and, thereafter, to the payment of principal and accrued interest outstanding under the Domestic Term Loans, and thereafter, to the payment of principal and accrued interest outstanding under the Canadian Revolving Credit Loans, and, thereafter, to the payment of principal and accrued interest outstanding under the Canadian Term Loans, and thereafter to the repayment of all other Obligations that are then due and payable.

(d)    Immediately following the funding of the Revolving Credit Loans described in the preceding clause (c), the Domestic Commitments shall be permanently reduced to an amount equal to (x) the Total Domestic Revolver Outstandings as of such date (after giving effect to Borrowing of Revolving Credit Loans made pursuant to Sections 6(c)(i) and 6(c)(ii) to cash collateralize the Domestic Letter of Credit Outstandings and the Canadian Letter of Credit Outstandings) plus (y) $40,623,829.60, which reduction shall be applied ratably to the Domestic Commitment of each Lender and from and after the Final Domestic Waiver Approval Order Date, no Lender shall have any commitment to make any Credit Extension to the Lead Borrower. In addition, the Domestic Commitments shall automatically and without the requirement of any notice be permanently reduced by the amount of (i) any principal repayment of Domestic Revolving Credit Loans made on or after the Final Domestic Waiver Approval Order Date, (ii) any reduction in the Domestic Letter of Credit Outstandings or the Canadian Letter of Credit Outstandings upon a drawing or payment under a Letter of Credit or the expiration or termination thereof, in each case made on or after the Final Domestic Waiver Approval Order Date, (iii) any reduction of the Canadian Letter of Credit Outstandings during the period from the Amendment and Restatement Date to the Waiver Effective Date and (iv) any reduction of the amount of the Canadian Commitments made on or after the Waiver Effective Date.

(e)    With effect as of the Waiver Effective Date, the Canadian Commitments shall hereby be permanently reduced to an amount equal to (x) $40,623,829.60, less (y) the amount of any reduction of the Canadian Letter of Credit Outstandings during the period from the Amendment and Restatement Date (as defined below) to the Waiver Effective Date, which reduction shall be applied ratably to the Canadian Commitment of each Lender.

7.    Amendments to DIP ABL/FILO Credit Agreement. With effect as of the Waiver Effective Date, the DIP ABL/FILO Credit Agreement is amended as follows:

(a) The definition of "Permitted Encumbrances" shall be amended by deleting the "and" at the end of paragraph (gg) thereof, replacing the "." at the end of paragraph (hh) thereof with "; and" and by adding the following new paragraph (ii):

"(ii) following (or substantially contemporaneously with) the Canadian Facility Termination Date (as defined in the Second Amended and Restated Waiver, Consent and Amendment Agreement hereto, dated as of April [ ], 2018), any Liens on

property of any Canadian Loan Party to secure any Post-Termination Canadian Indebtedness."

(b) The definition of "Permitted Indebtedness" shall be amended by deleting the "and" at the end of paragraph (aa) thereof, replacing the "." at the end of paragraph (bb) thereof with "; and" and by adding the following new paragraph (cc):

"(cc) following  (or substantially contemporaneously with) the Canadian Facility Termination Date, any additional Indebtedness of the Canadian Borrower; provided, that such Indebtedness shall not be guaranteed by any Domestic Loan Party or secured by any property of any Domestic Loan Party (the "**Post-Termination Canadian Indebtedness**")."

(c) The definition of "Specified Indebtedness" shall be amended by deleting clause (ii) therein in its entirety.

(d) The definition of "Substantial Liquidation" shall be amended by adding "(other than, following the Canadian Facility Termination Date the Collateral of the Canadian Borrower or the Capital Stock of the Canadian Borrower)" immediately after "by the Loan Parties".

(e) Section 4.02 of the DIP ABL/FILO Credit Agreement shall be amended by adding the following paragraph (l) after the existing paragraph (k) thereof:

"(l) The Required Lenders, acting in their sole discretion, shall have consented to the making of such Revolving Credit Loan or issuance or extension of Letter of Credit, as applicable (provided that the Required Lenders have consented to the making of the Revolving Credit Loans to be made pursuant to Section 6 of the Second Amended and Restated Waiver, Consent and Amendment Agreement hereto, dated as of April [ ], 2018, to be used to cash collateralize the Domestic Letter of Credit Outstandings and the Canadian Letter of Credit Outstandings)."

(f) Section 4.02 of the DIP ABL/FILO Credit Agreement shall be amended by deleting the last two sentences of the last paragraph thereof.

(g) Section 5.01(a) of the DIP ABL/FILO Credit Agreement shall be replaced in its entirety with the following:

"(a) [reserved],".

(h) Section 5.01(b) of the DIP ABL/FILO Credit Agreement shall be replaced in its entirety with the following:

"(b) [reserved],".

(i) Section 5.01(c) of the DIP ABL/FILO Credit Agreement shall be replaced in its entirety with the following:

"(c) [reserved],".

(j) Section 5.01(d) of the DIP ABL/FILO Credit Agreement shall be replaced in its entirety with the following:

"(d) [reserved],".

(k) Section 5.01(f) of the DIP ABL/FILO Credit Agreement shall be replaced in its entirety with the following:

"(f) [reserved],".

(l) Section 5.01(i) of the DIP ABL/FILO Credit Agreement shall be replaced in its entirety with the following:

"(i) [reserved],".

(m) Section 5.01(k) of the DIP ABL/FILO Credit Agreement shall be replaced in its entirety with the following:

"(k) [reserved],"

(n) Section 5.01(l) of the DIP ABL/FILO Credit Agreement shall be replaced in its entirety with the following:

"(l) [reserved],".

(o) Section 5.01(m) of the DIP ABL/FILO Credit Agreement shall be replaced in its entirety with the following:

"(m) [reserved],".

(p) Section 5.02(d) of the DIP ABL/FILO Credit Agreement shall be replaced in its entirety with the following:

"(d) [reserved],".

(q) Section 5.16 of the DIP ABL/FILO Credit Agreement shall be replaced in its entirety with the following:

16

"Section 5.16    [Reserved],".

(r) Section 5.19(b) and (c) of the DIP ABL/FILO Credit Agreement shall be replaced in their entirety with the following:

"a weekly call (at a time to be mutually agreed) with the Administrative Agent and its advisors and the law firm acting as counsel to the holders of a majority of the Term Loans that has been previously identified to the Lead Borrower and the Administrative Agent (the "**Specified Legal Advisor**") to discuss the status of the implementation of the Domestic Wind-Down Budget (as defined in the Second Amended and Restated Waiver, Consent and Amendment Agreement hereto, dated as of April [ ], 2018) and related going out of business sales, which will include a discussion of the maximization of value of inventory and any other assets with respect to any going out of business sales and the efforts to effectuate the TRU Canada Sale (as defined in the Second Amended and Restated Waiver, Consent and Amendment Agreement hereto, dated as of April [ ], 2018) or the status of the implementation of the Canadian Wind-Down Budget (as defined in the Second Amended and Restated Waiver, Consent and Amendment Agreement hereto, dated as of April [ ], 2018), as applicable".

(s) Section 6.09(x) of the DIP ABL/FILO Credit Agreement shall be amended by replacing the words "to have an adverse effect" with the words "to have a material adverse effect (other than any such amendments made to effect the terms of the Second Amended and Restated Waiver, Consent and Amendment Agreement hereto, dated as of April [ ], 2018)".

(t) Section 6.09(y) of the DIP ABL/FILO Credit Agreement shall be amended by adding "(in each case, other than any such amendments to the DIP Term Loan Facility made on or prior to March 20, 2018)" immediately prior to "." at the end of such section.

(u) Section 6.10 of the DIP ABL/FILO Credit Agreement shall be replaced in its entirety with the following:

"SECTION 6.10 [Reserved]".

(v) Section 6.15 of the DIP ABL/FILO Credit Agreement shall be replaced in its entirety with the following:

"SECTION 6.15 [Reserved]".

(w) Sections 7.01(x) of the DIP ABL/FILO Credit Agreement shall be amended by adding "(in each case, other than any Liens or claims on the assets or properties of the Canadian Borrower or (if a Qualifying TRU Canada Sale in the form of a disposition of the Capital Stock of the Canadian Borrower has been consummated) the Stock of the Canadian Borrower after the Canadian Facility Termination Date (as defined in the

Second Amended and Restated Waiver, Consent and Amendment Agreement hereto, dated as of April [ ], 2018)" immediately prior to ";" at the end of each such clause.

(x) Section 7.01(r)(vii), Section 7.01(u), Section 7.01(w), Section 7.01(x) and Section 7.01(bb) of the DIP ABL/FILO Credit Agreement shall each be amended by adding, immediately prior to ";" at the end of each such clause, "; provided, however, that after the Canadian Facility Termination Date (as defined in the Second Amended and Restated Waiver, Consent and Amendment Agreement hereto, dated as of April [ ], 2018) no Event of Default under this clause shall occur solely with respect to the Canadian Borrower".

(y) Article VI shall be amended by replacing "(provided that the Canadian Borrower covenants only for itself and its Subsidiaries)" with the following:

"(provided that the Canadian Borrower covenants only for itself and its Subsidiaries and, after the Canadian Facility Termination Date (as defined in the Second Amended and Restated Waiver, Consent and Amendment Agreement hereto, dated as of April [ ], 2018), such covenants shall not be deemed to apply to the Canadian Borrower and its Subsidiaries)"

(z) Section 9.18 shall be amended by adding "and, after the Canadian Facility Termination Date (as defined in the Second Amended and Restated Waiver, Consent and Amendment Agreement hereto, dated as of April [ ], 2018), (w) the Canadian Borrower shall have no liability whatsoever under the Loan Documents (including, pursuant to Section 2.26), (x) no representations and warranties under Article III hereof or under any other Loan Documents shall apply to the Canadian Borrower, (y)  no covenants under Article V or Article VI hereof or under any other Loan Documents shall apply to the Canadian Borrower and (z) the Canadian Borrower shall be excluded from any determination as to whether a Default or Event of Default has occurred" immediately prior to "." at the end of such section.

8.     Representations and Warranties.  Each Loan Party party hereto represents and warrants to the Agents and the Lenders, on and as of the Waiver Effective Date, that:

(a)     Each Loan Party has all requisite organizational power and authority to perform all its obligations under the DIP ABL/FILO Credit Agreement and to execute and deliver and perform all its obligations under this Agreement.

(b)     The transactions contemplated by this Agreement and by the DIP ABL/FILO Credit Agreement are within such Loan Party's corporate powers and have been duly authorized by all necessary corporate, membership, partnership or other necessary action. Subject to the entry of the Waiver Approval Orders and the terms thereof, this Agreement has been duly executed and delivered by each Loan Party that is a party hereto or thereto and constitutes, and when executed and delivered by such Loan Party, this Agreement and the DIP ABL/FILO Credit Agreement will constitute, a legal,

valid and binding obligation of such Loan Party, enforceable in accordance with its terms subject to the terms of the Orders and the Waiver Approval Orders.

(c)     The transactions to be entered into and contemplated by this Agreement and the DIP ABL/FILO Credit Agreement will not violate the Charter Documents of any Loan Party.

(d)     On and as of the Waiver Effective Date, no Default or Event of Default (other than the Specified Events of Default) has occurred and is continuing or will result from the entry by the Loan Parties into this Agreement.

9.     <u>Conditions to Effectiveness</u>.

(a) Subject to paragraphs (b), (c) and (d) below, this Agreement shall become effective (the date of such effectiveness being referred to herein as the "**Waiver Effective Date**") upon satisfaction or waiver of each of the following conditions:

(i)     execution and delivery of this Agreement by the Administrative Agent, the Canadian Agent, the Co-Collateral Agents, Lenders constituting the Required Lenders under the DIP ABL/FILO Credit Agreement and the Loan Parties and, in each case, delivered to the Administrative Agent; and

(ii)     (w) the Canadian Waiver Approval Order shall have been entered by the Canadian Court, (x) the Final Domestic Waiver Approval Order shall have been entered by the Bankruptcy Court, (y) the interim order entered by the Bankruptcy Court on March 21, 2018 in connection with the Original Waiver, Consent and Amendment [Docket No. 2318] (the "**Interim Domestic Waiver Approval Order**"), as amended by the amended interim order entered by the Bankruptcy Court on March 27, 2018 [Docket No. 2427] (the "**Extended Interim Domestic Waiver Approval Order**") and as further amended by the second amended interim order entered by the Bankruptcy Court on April 13, 2018 [Docket No. 2713] (the "**Second Extended Interim Domestic Waiver Approval Order**") and by the third amended interim order entered by the Bankruptcy Court on April 20, 2018 [Docket No. 2796] (the "**Third Extended Interim Domestic Waiver Order**"), shall not have been vacated or reversed, shall not be subject to any stay, and shall not have been modified or amended in any manner without the consent of the Administrative Agent and the Required Lenders, and (z) the DIP Term Waiver (as defined in the Debtors' motion seeking the Domestic Waiver Approval Order) shall have become effective substantially in the form provided to the Lenders in connection with the execution of this Agreement; and

(iii) the Loan Parties shall have indefeasibly and irrevocably paid and satisfied in full in cash all previously invoiced Credit Party Expenses payable pursuant to this Agreement or Section 9.03 of the DIP ABL/FILO Credit Agreement.

19

(b) Immediately upon the satisfaction or waiver of the conditions set forth in the foregoing clauses (a)(i) and (a)(iii) (the date of the satisfaction of such conditions, the "**Amendment and Restatement Date**"), (x) the date set forth in clause 2(b) of the Forbearance shall be automatically extended to April 30, 2018 at 11:59 pm New York time and (y) the Forbearance and its terms shall extend to all Specified Events of Default and each reference to the "Designated Defaults" in the Forbearance shall be deemed to be replaced with a reference to the Specified Events of Defaults (as defined in this Agreement); provided that the Forbearance shall terminate if a fact or circumstance occurs that would constitute an Event of Default under this Agreement, had the Waiver Effective Date occurred.

(c) Section 6(c) and Section 6(d) of this Agreement shall become effective upon the Final Domestic Waiver Approval Order Date if the Amendment and Restatement Date has occurred prior to such date.

(d) For the avoidance of doubt, upon the Amendment and Restatement Date, the Existing Waiver, Consent and Amendment shall be amended and restated and superseded in its entirety by this Agreement; provided that notwithstanding the foregoing, this Agreement shall not act as a waiver of any default or event of default, or cure any breach of the terms of, the Original Waiver, Consent and Amendment or the Existing Waiver, Consent and Amendment that may have occurred prior to the Amendment and Restatement Date.

10.   Miscellaneous.

(a)   This Agreement and the Waiver shall be limited precisely as written and, except as expressly provided herein, shall not be deemed (a) to be a consent granted pursuant to, or a waiver or modification of, any term or condition of the DIP ABL/FILO Credit Agreement, any other Loan Documents or any of the instruments or agreements referred to therein or (b) other than as expressly stated herein, to prejudice any right or rights which the Agents or the other Secured Parties may now have or have in the future under or in connection with the DIP ABL/FILO Credit Agreement, the other Loan Documents or any of the instruments or agreements referred to therein including any rights from the existence or continuation of a Cash Dominion Event. The Loan Parties agree that their obligations set forth in Section 9.03 of the DIP ABL/FILO Credit Agreement shall extend to the preparation, execution and delivery of this Agreement and that the Credit Party Expenses payable pursuant to Section 9.03 of the DIP ABL/FILO Credit Agreement shall include the reasonable fees, charges and disbursements of the Specified Legal Advisor incurred (whether before or after the Waiver Effective Date) in connection with this Agreement, the DIP ABL/FILO Credit Agreement and the other Loan Documents.  This Agreement is hereby deemed to be a Loan Document for purposes of each Loan Document.  All terms and provisions of the Loan Documents remain in full force and effect, except to the extent expressly modified by this Agreement (it being understood and agreed that nothing contained in the Domestic Wind-Down Budget, the Canadian Going Concern Budget or the Canadian Wind-Down Budget, as the case may be, shall modify the obligations of the Loan Parties under the Loan Documents).  Each of the Loan Parties acknowledges that the Administrative Agent, the Canadian Agent, the Co-Collateral Agents and the Consenting

20

Lenders have made no representations as to what actions, if any, they will take after the Waiver Effective Date, and the Administrative Agent and each Consenting Lender hereby specifically reserves any and all rights, remedies, and claims it has (after giving effect hereto) with respect to any Events of Default and other Defaults that may occur (other than the Specified Events of Default). The Loan Parties hereby acknowledge and agree that account number 528277937 in the name of the Lead Borrower and account numbers 4000013288 and 4000013289 in the name of the Canadian Borrower are under the sole and exclusive dominion and control of the Administrative Agent and the Canadian Agent (subject in all respects to the Wind-Down Orders).

(b)    For the avoidance of doubt, all payments on account of Loans and Letters of Credit made by the Loan Parties shall be applied in accordance with the payment waterfall provisions set forth in Section 7.03(a) and (b) of the DIP ABL/FILO Credit Agreement (subject in all respects to the Wind-Down Orders).

(c)    Unless specifically stated otherwise herein, for purposes of this Agreement, a "week" shall begin on a Sunday and end on a Saturday.

(d)    Each of the parties hereto agrees that upon the Waiver Effective Date, the "Forbearance Period" as defined in the Forbearance shall immediately terminate.

11.    Remedies upon Events of Default. Upon the Administrative Agent's delivery of written notice of the occurrence of an Event of Default (which written notice may be provided via email) to the Loan Parties, counsel to the Loan Parties, counsel to the Unsecured Creditors Committee and, to the extent affecting the Canadian Borrower, the Monitor, during the 5 Business Day period after delivery thereof, the Credit Parties shall negotiate in good faith with the Loan Parties, the Unsecured Creditors Committee and, to the extent affecting the Canadian Borrower, the Monitor, the manner in which the Credit Parties intend to exercise their rights and remedies under the Loan Documents; provided, that this section 11 shall not be deemed a waiver of any rights or remedies of the Credit Parties under the Loan Documents upon an Event of Default, and the Credit Parties can proceed in their sole discretion following such 5 Business Day period if no agreement is reached with the Loan Parties, the Unsecured Creditors Committee and/or the Monitor.

12.    Counterparts. This Agreement may be executed in any number of counterparts and by the different parties hereto in separate counterparts, each of which shall be an original and all of which, when taken together, shall constitute but one and the same instrument. A facsimile or pdf copy of a counterpart signature page shall serve as the functional equivalent of a manually executed copy for all purposes.

13.    Governing Law. THIS AGREEMENT AND ALL ACTIONS ARISING UNDER THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK AND (TO THE EXTENT APPLICABLE) THE BANKRUPTCY CODE AND THE CCAA.

[SIGNATURE PAGES FOLLOW]

<u>Schedule I</u>

Required Repayment Amounts

| *Fiscal Month* | *Domestic Revolving Credit Loans and Cash Collateralization of Letters of Credit* | *Domestic Term Loans* | *Canadian Term Loans* |
|---|---|---|---|
| March 2018 | $100.0 million | $0 | $0 |
| April 2018 | In full | $125.0 million | $0 |
| May 2018 | - | $125.0 million (in full) | $50.0 million |
| June 2018 | - | - | $150.0 million (in full) |

Schedule II

| | Week ending | Cumultative Net Cash Flow Compliance Threshold | |
|---|---|---|---|
| 2 weeks ending | 3/31/18 | $ | 14.9 |
| 3 weeks ending | 4/7/18 | $ | 81.2 |
| 4 weeks ending | 4/14/18 | $ | 122.8 |
| 5 weeks ending | 4/21/18 | $ | 171.6 |
| 6 weeks ending | 4/28/18 | $ | 232.5 |
| 7 weeks ending | 5/5/18 | $ | 273.3 |
| 8 weeks ending | 5/12/18 | $ | 328.9 |
| 9 weeks ending | 5/19/18 | $ | 398.7 |
| 10 weeks ending | 5/26/18 | $ | 417.0 |
| 11 weeks ending | 6/2/18 | $ | 444.6 |
| 12 weeks ending | 6/9/18 | $ | 498.6 |
| 13 weeks ending | 6/16/18 | $ | 559.2 |
| 14 weeks ending | 6/23/18 | $ | 565.4 |
| 15 weeks ending | 6/30/18 | $ | 628.2 |

**Exhibit 2**

**Term DIP Waiver**

### SECOND AMENDED AND RESTATED WAIVER, CONSENT AND AMENDMENT AGREEMENT

THIS SECOND AMENDED AND RESTATED WAIVER, CONSENT AND AMENDMENT AGREEMENT, dated as of April [●], 2018 (this "**Agreement**") is entered into by and among Toys "R" Us-Delaware, Inc. a Delaware corporation, as debtor and debtor-in-possession under chapter 11 of the Bankruptcy Code (the "**Borrower**"), the Guarantors party to the DIP Term Loan Credit Agreement (as defined below) and NexBank SSB, as administrative agent (together with its permitted successors and assigns in such capacity, the "**Administrative Agent**"), and NexBank SSB, as collateral agent (together with its permitted successors and assigns in such capacity, the "**Collateral Agent**") and the lenders under the DIP Term Loan Credit Agreement party hereto, which lenders constitute the "Required Lenders" as defined in the DIP Term Loan Credit Agreement (such Lenders, the "**Consenting Lenders**").

**RECITALS:**

**WHEREAS**, reference is made to that certain Debtor-in-Possession Credit Agreement dated as of September 22, 2017, by and among the Borrower, the Guarantors from time to time party thereto, the Administrative Agent, the Collateral Agent and the lenders from time to time party thereto (as amended, restated, amended and restated, supplemented otherwise modified from time to time prior to the date hereof, the "**DIP Term Loan Credit Agreement**"; capitalized terms used and not otherwise defined herein have the meanings assigned to them in the DIP Term Loan Credit Agreement);

**WHEREAS**, the Loan Parties (i) have defaulted in their obligations pursuant to Section 6.16 of the DIP Term Loan Credit Agreement as in effect prior to giving effect to this Agreement, (ii) have determined to suspend the operation of the Loan Parties' business in the ordinary course, liquidate all or substantially all of the Loan Parties' assets and Store locations, and employ an agent or other third party to conduct store closing, store liquidation and "Going-Out-Of-Business" sales for substantially all of the Loan Parties' Stores, which would give rise to an Event of Default pursuant to Section 8.01(v) of the DIP Term Loan Credit Agreement and (iii) have informed the Administrative Agent of the Loan Parties' commencement of bulk sales in connection with the closing of substantially all Stores of the Domestic Loan Parties, which sales would give rise to an Event of Default pursuant to Section 8.01(b) of the DIP Term Loan Credit Agreement resulting from the failure to observe the covenant set forth in Section 7.05 of the DIP Term Loan Credit Agreement (the Events of Default and potential Events of Defaults described in the foregoing clauses and any potential Default or Event of Default arising out of the inaccuracy of any representation that may have result therefrom, the "**Specified Events of Default**");

**WHEREAS**, the Loan Parties have the intention to wind-down their operations in the United States and to liquidate substantially all of their inventory in the United States (the "**Domestic Wind-Down**"), consistent with the weekly budget delivered to the Administrative Agent and attached hereto as <u>Exhibit A</u> (together with the corresponding detailed monthly budget delivered to Consenting Lenders in connection herewith, the "**Domestic Wind-Down Budget**"; <u>provided</u>, the Domestic Wind-Down Budget or (if applicable) the Canadian Wind-

Down Budget shall be reduced by the Loan Parties as provided in Section 3(k) below (but not increased) to the extent the Loan Parties amend, modify or terminate contractual arrangements, including lease obligations, to provide for disbursements that are less than those contemplated by the existing Domestic Wind-Down Budget, the Canadian Going Concern Budget or (if applicable) the Canadian Wind-Down Budget) and pursuant to liquidation agreements attached hereto as Exhibit B;

**WHEREAS**, the Loan Parties have informed the Administrative Agent that they intend to sell or otherwise dispose of all of the Capital Stock of Toys "R" Us (Canada) Ltd. / Toys "R" Us (Canada) Ltee. ("**TRU Canada**") or all or substantially all of the assets of TRU Canada on a going concern basis (the "**TRU Canada Sale**"), which sale or other disposition would give rise to an Event of Default pursuant to Section 8.01(b) of the DIP Term Loan Credit Agreement resulting from the failure to observe the covenant set forth in Section 7.05 of the DIP Term Loan Credit Agreement;

**WHEREAS**, TRU Canada intends to continue going concern business operations at all of the Stores of TRU Canada consistent with the terms of the budget attached hereto as Exhibit C (the "**Canadian Going Concern Budget**") while it pursues the TRU Canada Sale;

**WHEREAS**, the Loan Parties acknowledge and agree that upon the occurrence and during the continuance of an Event of Default, the Administrative Agent and the Collateral Agent are authorized to and shall at the direction of the Required Lenders proceed to protect and enforce certain rights and remedies under the DIP Term Loan Credit Agreement and the other Loan Documents, subject in all respects to the Remedies Notice Period (as defined in the U.S. Order);

**WHEREAS**, the Loan Parties, the Administrative Agent the Collateral Agent and certain Lenders constituting the Required Lenders have previously entered into that certain Waiver, Consent and Amendment Agreement, dated as of March 20, 2018 (the "**Original Waiver, Consent and Amendment**") and (ii) that certain Amended and Restated Waiver, Consent and Amendment Agreement which amended and restated the Original Waiver, Consent and Amendment, dated as of March 28, 2018 (the "**Existing Waiver, Consent and Amendment**"), in each case to accommodate such requests of the Loan Parties on the terms and subject to the conditions set forth therein and herein; and

**WHEREAS**, the Loan Parties, the Administrative Agent, the Collateral Agent and the Consenting Lenders parties hereto have agreed to amend and restate the Existing Waiver, Consent and Amendment as set forth herein;

**NOW, THEREFORE**, in consideration of the foregoing, the covenants and conditions contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree to amend and restate the Existing Waiver, Consent and Amendment in its entirety as follows:

1.      Incorporation of Recitals.

2

Each of the Loan Parties acknowledges that the recitals set forth above are true and correct in all respects.

2.    <u>Limited Waiver; Consent.</u>

(a)    In reliance upon the representations, warranties and covenants of the Loan Parties contained in this Agreement, and upon the terms and subject to the conditions of this Agreement, the Consenting Lenders hereby, effective as of the Waiver Effective Date, waive each of the Specified Events of Default (the "**Waiver**").  Except as expressly set forth in this Agreement, no terms, covenants or other provisions of the DIP Term Loan Credit Agreement or any other Loan Document are intended pursuant to any provision of this Agreement to (or shall) be affected by any provision of this Agreement, all of which remain in full force and effect unaffected by any provision of this Agreement.

(b)    The Waiver is limited to the extent specifically set forth herein and nothing contained herein is intended, or shall be deemed or construed, (i) to constitute a waiver of any Defaults or Events of Default or compliance with any term or provision of the Loan Documents (as amended hereby), in each case other than the Specified Events of Default, (ii) to constitute a waiver of any Defaults or Events of Default that may exist under the Original Waiver, Consent and Amendment or the Existing Waiver, Consent and Amendment or (iii) to establish a custom or course of dealing between the Loan Parties, on the one hand, and the Administrative Agent, the Collateral Agent and/or any Lender, on the other hand.

(c)    The Consenting Lenders hereby, effective as of the Waiver Effective Date, consent (i) to the TRU Canada Sale and (ii) to the entry of (and to the filing of any motion by the Loan Parties seeking) any order of the Bankruptcy Court or the Ontario Superior Court of Justice (Commercial List (the "**Canadian Court**") permitting the TRU Canada Sale, and agree that no Default or Event of Default shall result from the foregoing (including pursuant to Section 8.01(b), (m) and (q) of the DIP Term Loan Credit Agreement), so long as, in each case, the TRU Canada Sale is a Qualifying TRU Canada Sale.  A "**Qualifying TRU Canada Sale**" shall mean a TRU Canada Sale that is made pursuant to an Approved TRU Canada Purchase Agreement (as defined below) (including the performance of any transition services by the Loan Parties as contemplated thereby) and notwithstanding any other provision of this Agreement (including, for greater certainty, any provision of the Domestic Wind-Down Budget) prior to or upon consummation thereof (and as a condition to the consummation thereof) (i) the Canadian Commitments (as defined in the ABL Credit Agreement) shall have been terminated, all Canadian Liabilities (as defined in the ABL Credit Agreement) and Other Liabilities (as defined in the ABL Credit Agreement) of TRU Canada shall have been indefeasibly and irrevocably paid and satisfied in full in cash (other than contingent indemnity obligations with respect to then unasserted claims), all Canadian Letters of Credit (as defined in the ABL Credit Agreement) shall have expired or terminated (or been collateralized in a manner reasonably satisfactory to the Issuing Banks (as defined in the ABL Credit Agreement)), all Letter of Credit Outstandings (as defined in the ABL Credit Agreement) have been reduced to zero (or been collateralized in a manner satisfactory to the Issuing Banks (as defined in the ABL Credit Agreement)) (and the Consenting Lenders hereby consent to the making of the foregoing payments and terminations) and TRU Canada shall have indefeasibly and irrevocably paid in full in cash to the Borrower all

3

amounts owed under subrogation claims in respect of the cash collateralization by the Borrower of the Canadian Letter of Credit Outstandings and (ii) a final order of the Bankruptcy Court and/or the Canadian Court, as applicable, satisfactory to the Administrative Agent (as defined in the ABL Credit Agreement) and the Canadian Agent (as defined in the ABL Credit Agreement) shall have been entered that ratifies such termination, payment and satisfaction or the Required Lenders (as defined in the ABL Credit Agreement) shall otherwise be satisfied that such indefeasible and irrevocable termination, payment and satisfaction has occurred.  The date on which the conditions set forth in clauses (i) and (ii) of the immediately preceding sentence are satisfied or waived is referred to as the "**Canadian Facility Termination Date**".

3.    Additional Covenants.  From and after the Waiver Effective Date (as defined below), the Loan Parties shall comply with the following covenants:

(a)    The Loan Parties shall (i) on Thursday of each week (beginning with the week starting on April 1, 2018) provide to the Administrative Agent a weekly report for the previous week in a form acceptable to the Administrative Agent summarizing the status of the Domestic Wind-Down, which report shall include (x) an inventory balance of the Loan Parties, (y) a variance comparison of actual results, disbursements and proceeds to the results, disbursements and proceeds set forth in the Domestic Wind-Down Budget on a line item basis, and the timing of the delivery of the Loan Parties' portion of proceeds and a reconciliation with the liquidators' portion of such proceeds and (z) an explanation for any variance between the Domestic Wind-Down Budget and actual results that is not immaterial and a summary status report of the implementation of the Domestic Wind-Down Budget, (ii) on Thursday of each second week (beginning with the week starting on April 1, 2018), provide to the Administrative Agent a bi-weekly report, with allocations on an estate-by-estate and loan-by-loan basis, of all paid and estimated accrued professional fees and expenses, (iii) on Thursday of each week (beginning with the week starting on April 1, 2018) provide to the Administrative Agent an updated schedule of store and distribution center closings during the previous week, (iv) provide access to the Administrative Agent, the Collateral Agent and their respective advisors and representatives to financial records and properties of the Loan Parties relating to the Domestic Wind-Down and provide all information as may be requested by the Administrative Agent, the Collateral Agent and their respective advisors and representatives in connection with the status of the Domestic Wind-Down (other than such information that is subject to attorney-client privilege or could result in a breach of a confidentiality obligation or applicable law or otherwise constitutes attorney work product) promptly after request therefor and (v) on Thursday of each week (beginning with the week starting on April 1, 2018), provide to the Administrative Agent with an updated inventory report for the last day of the previous week in such form as has been agreed prior to the Waiver Effective Date or otherwise satisfactory to the Administrative Agent.

(b)    Prior to the delivery of the Canadian Wind-Down Notice (as defined below), TRU Canada shall (i) on Thursday of each week (beginning with the week starting on April 1, 2018) provide to the Administrative Agent a weekly report for the previous week in a form acceptable to the Administrative Agent summarizing the status of the Sale Process (as defined below), which report shall include (x) a comparison of actual results, disbursements and proceeds to the results, disbursements and proceeds set forth in the Canadian Going Concern Budget on a line item basis and (y) an explanation for any variance between the Canadian Going Concern Budget and actual results that is not immaterial and (ii) provide access to the

4

Administrative Agent the Collateral Agent and their respective advisors and representatives to financial records relating to the Sale Process and properties of TRU Canada and provide all information as may be requested by the Administrative Agent, the Collateral Agent and their respective advisors and representatives in connection with the Sale Process promptly after request therefor, including for greater certainty copies of teaser letters, letters of intent, written expressions of interest, bid letters and draft purchase agreements promptly after request therefor (other than such information that is subject to attorney-client privilege or could result in a breach of a confidentiality obligation or applicable law or otherwise constitutes attorney work product).

(c)    Following the delivery of the Canadian Wind-Down Notice, TRU Canada shall (i) on Thursday of each week (beginning with the week starting after the Canadian Wind-Down Notice has been delivered) provide to the Administrative Agent a weekly report for the previous week in a form acceptable to the Administrative Agent summarizing the status of the Canadian Wind-Down, which report shall contain (w) an inventory balance of TRU Canada, (x) a comparison of actual results, disbursements and proceeds to the results, disbursements and proceeds set forth in the Canadian Wind-Down Budget on a line item basis, and the timing of the delivery of the Canadian Loan Parties' (as defined in the ABL Credit Agreement) portion of proceeds and a reconciliation with the liquidators' portion of such proceeds and (y) an explanation for any variance between the Canadian Wind-Down Budget and actual results that is not immaterial, (ii) on Thursday of each week (beginning with the week starting after the Canadian Wind-Down Notice has been delivered) provide to the Administrative Agent an updated schedule of store and distribution center closings during the previous week, (iii) provide access to the Administrative Agent, the Collateral Agent and their respective advisors and representatives to financial records relating to the Canadian Wind-Down and properties of TRU Canada and provide all information as may be requested by the Administrative Agent, the Collateral Agent and their respective advisors and representatives in connection with the status of the Canadian Wind-Down promptly after request therefor (other than such information that is subject to attorney-client privilege or could result in a breach of a confidentiality obligation or applicable law or otherwise constitutes attorney work product), (iv) prepay the Canadian Loans (as defined in the ABL Credit Agreement) and cash collateralize the Canadian Letters of Credit (as defined in the ABL Credit Agreement) in accordance with the Canadian Wind-Down Budget (subject in all respects to the Wind-Down Orders) and (v) on Thursday of each week (beginning with the week starting after the Canadian Wind-Down Notice has been delivered), provide to the Administrative Agent with an updated inventory report for the last day of the previous week in such form as has been agreed prior to the Waiver Effective Date or otherwise satisfactory to the Administrative Agent.

(d)    The Loan Parties shall not use proceeds of the Term Collateral (as defined in the Intercreditor Agreement), directly or indirectly, to pay any interest, principal, fees, expenses, or other obligations owed with respect to the ABL Credit Agreement.

(e)    No Loan Party (other than TRU Canada or any of its Subsidiaries) shall make any Investment in TRU Canada or any of its Subsidiaries, except (i) to the extent required to enable TRU Canada or any of its Subsidiaries to repay or cash collateralize obligations under the ABL Credit Agreement as required by that certain Waiver, Consent and Amendment Agreement, dated as of March 20, 2018, by and among the Borrower, TRU Canada, the guarantors under the ABL Credit Agreement party thereto, JPMorgan Chase Bank, N.A., as

5

administrative agent, JPMorgan Chase Bank, N.A., Toronto Branch, as Canadian administrative agent, JPMorgan Chase Bank, N.A. and Wells Fargo Bank, National Association as co-collateral agents, and the lenders under the ABL Credit Agreement party thereto (and actually used for such purpose) and (b) the Loan Party making such Investment is fully subrogated to all rights, remedies, claims, priorities, Liens and other benefits available to the lenders and other secured parties under the ABL Credit Agreement to the extent of such Investment and (ii) Investments in the form of services provided in the ordinary course of business consistent with past practice (and reimbursed in the ordinary course of business consistent with past practice) to the extent consistent with the Domestic Wind-Down Budget.

(f)    TRU Canada and/or the Borrower, as applicable, shall achieve the following milestones in connection with the TRU Canada Sale by the prescribed dates (the "**Sale Milestones**"):

(i)    Not later than April 30, 2018, the Bankruptcy Court and, if required in the Canadian Case, the Canadian Court shall have entered an order, in form and substance satisfactory to the Administrative Agent approving a sale process with respect to the TRU Canada Sale and/or ratifying and affirming a sale process with respect to the TRU Canada Sale (the "**Sale Process**");

(ii)    Not later than April 30, 2018, TRU Canada shall have entered into an asset purchase agreement or the Borrower shall have entered into a stock purchase agreement with respect to the Capital Stock of TRU Canada, as applicable, in form and substance satisfactory to the Required Lenders and the Administrative Agent, for the TRU Canada Sale, which agreement provides for a closing no later than May 31, 2018 and provides for (i) indefeasible and irrevocable payment and satisfaction in full in cash at closing of all Canadian Liabilities (as defined in the ABL Credit Agreement) and Other Liabilities (as defined in the ABL Credit Agreement) of TRU Canada outstanding at the time of such closing (other than contingent indemnity obligations with respect to then unasserted claims), the indefeasible and irrevocable payment in full in cash to the Domestic Borrower of all amounts owed under subrogation claims in respect of the cash collateralization of Canadian Letter of Credit Outstandings by the Domestic Borrower and the collateralization of any obligations in respect of Letters of Credit (as defined in the ABL Credit Agreement) in a manner satisfactory to the Issuing Bank (as defined in the ABL Credit Agreement) and (ii) a gross purchase price of not less than the Canadian Liabilities and Other Liabilities of TRU Canada outstanding at the time of closing (any such agreement an "**Approved TRU Canada Purchase Agreement**"); provided, that neither the Administrative Agent nor any Lender shall be deemed to waive any objection to the sale of TRU Canada on any terms;

(iii)    Not later than May 15, 2018, the Bankruptcy Court and the Canadian Court shall have issued and entered an order approving the Approved TRU Canada Purchase Agreement or otherwise facilitating or permitting the TRU Canada Sale (each a "**Sale Approval Order**") in form and substance satisfactory to the Administrative Agent; the Sale Approval Order entered by the Canadian

Court (and the US Court, if applicable) shall also authorize and direct TRU Canada, or the Monitor on its behalf, to pay to the Administrative Agent (as defined in the ABL Credit Agreement) or the Canadian Agent (as defined in the ABL Credit Agreement), as applicable, an amount sufficient to satisfy the then outstanding Canadian Liabilities (as defined in the ABL Credit Agreement) and Other Liabilities (as defined in the ABL Credit Agreement) of TRU Canada (other than contingent indemnity obligations with respect to then unasserted claims) on the closing of the TRU Canada Sale; and

(iv)    Not later than May 31, 2018 (the "**Anticipated Sale Closing Date**"), the Qualifying TRU Canada Sale shall have closed and the Canadian Facility Termination Date shall have occurred; provided that the Debtors may extend the Anticipated Sale Closing Date to July 15, 2018 so long as, as of May 31, 2018, (w) all Revolving Credit Loans (as defined in the ABL Credit Agreement) shall have been indefeasibly and irrevocably paid and satisfied in full, all Letters of Credit (as defined in the ABL Credit Agreement) have been collateralized in a manner that is satisfactory to the Issuing Bank (as defined in the ABL Credit Agreement) and all Commitments (as defined in the ABL Credit Agreement) shall have been terminated, (x) the aggregate outstanding principal amount of Term Loans (as defined in the ABL Credit Agreement) shall not exceed $100,000,000, (y) the cash balance of the Loan Parties (as defined in the ABL Credit Agreement) shall be at least $36,200,000 and (z) the Loan Parties shall have paid to the Administrative Agent (as defined in the ABL Credit Agreement), for the ratable benefit of the Term Lenders (as defined in the ABL Credit Agreement), a fee in the amount of $5,000,000 (which such extension payment shall be due and payable in dollars on May 31, 2018 and once paid, shall not be refundable or revocable);

provided that if TRU Canada fails to meet any of the Sale Milestones, such failure shall not constitute a breach of this Section 3(f) if either (A)(x) the Borrower, within 5 Business Days of the failure to meet the applicable Sale Milestone, delivers a written notice to the Administrative Agent of its intent to commence a liquidation of its inventory (the "**Canadian Wind-Down Notice**"), (y) within 5 Business Days after the delivery of the Canadian Wind-Down Notice, delivers to the Administrative Agent, in each case in form and substance satisfactory to the Administrative Agent (I) a budget setting forth, in reasonable detail, a plan to liquidate substantially all of TRU Canada's inventory (the "**Canadian Wind-Down Budget**") (which Canadian Wind-Down Budget shall also be in form and substance satisfactory to the Required Lenders) and (II) liquidation agreements pursuant to which such liquidation will occur, and (z) within 5 Business Days after the delivery of a Canadian Wind-Down Notice, seeks an order from the Canadian Court and the Bankruptcy Court (if required) (the "**Canadian Wind-Down Orders**") authorizing and directing it to conduct the liquidation of its inventory in accordance with the foregoing clause (the actions described in clauses (x), (y) and (z) and such liquidation, collectively, the "**Canadian Wind-Down**") or (B) the Required Lenders (as defined in the ABL Credit Agreement) instruct TRU Canada not to commence a liquidation (which instruction may be revoked at any time thereafter, in which case the preceding clause (A) shall apply).

7

(g)      At all times following the delivery of the Canadian Wind-Down Notice, the Canadian Borrower shall (i) pursue the liquidation of the Canadian Borrower's inventory in a manner that is consistent with the Canadian Wind-Down Budget and the Canadian Wind-Down Orders in all material respects and (ii) comply with the additional reporting requirements described in Section 3(c) of this Agreement.

(h)      The Loan Parties shall, promptly following the delivery of any written notice, reports or other written information to the administrative agent or the lenders under the ABL Credit Agreement, or the receipt of any written notice from the administrative agent or the lenders under the ABL Credit Agreement, deliver a a copy of such notice, report or other written information to the Administrative Agent.

(i)      The Loan Parties shall, except with the consent of Required Lenders in their sole discretion, (i) commence liquidation sales at all remaining Stores in the United States by no later than March 27, 2018, (ii) complete liquidation sales at all remaining Stores in the United States by no later than June 30, 2018 (provided, that liquidation sales may continue at a reasonable number of Stores so long as such sales are completed no later than July 15, 2018) and (iii) reject all third-party leases and all leases with Propco I and Propco II not theretofore assumed and assigned by no later than June 30, 2018, *provided however*, that the Loan Parties shall not be obligated to, and shall not, reject any third-party leases or leases with Propco I and Propco II that they determine, after consultation with (and subject to the consent, not to be unreasonably withheld of) the Required Lenders and the Unsecured Creditors Committee, are capable of assignment for value in excess of the incremental cost of maintaining such leases.

(j)      The Loan Parties shall give the Administrative Agent prior notice of and a reasonable opportunity to review any motions to be filed with, and orders to be sought from, the Bankruptcy Court or the Canadian Court, as applicable, with respect to the Domestic Wind-Down, the Sale Process or, if applicable, the Canadian Wind-Down and all such motions and orders (other than the Canadian Wind-Down) shall be in form and substance reasonably satisfactory to the Required Lenders (except in exigent circumstances in which case reasonably practicable notice (as early as possible under the circumstances) to the Administrative Agent will be given).

(k)      The Loan Parties shall not amend, modify, revise, update or change in any respect any of the Domestic Wind Down Budget, the Canadian Going Concern Budget or the Canadian Wind Down Budget, unless (i) any such amendment, modification, revision, update or change shall have been provided to the Administrative Agent and the B-4 Advisors with a reasonable opportunity to review and (ii) the Required Lenders (acting in their sole discretion) shall have consented to any such amendment, modification, revision, update or change.  With respect to periods after June 23, 2018, the Loan Parties shall provide an update to the Domestic Wind Down Budget, which (i) shall be provided to the Administrative Agent and the B-4 Advisors with a reasonable opportunity to review and (ii) shall be subject to the approval of the Required Lenders (acting in their sole discretion) (and shall thereafter constitute the "Domestic Win-Down Budget" for all purposes hereunder).  The applicable portions of the Domestic Wind-Down Budget or (if applicable) the Canadian Wind-Down Budget shall be automatically reduced (but not increased) to the extent the Loan Parties amend, modify or terminate any Master Lease or any Material Contract to provide for disbursements that are less than those contemplated by

8

the existing Domestic Wind-Down Budget.  "Material Contract" shall mean any contract providing for annual disbursements by the Loan Parties of greater than $2,500,000.

(l)     Subject to the Final Waiver Approval Order, the Loan Parties shall cause the Domestic Wind-Down Budget to be funded with cash proceeds of sales of real property, equity interests and other non-working capital assets, in addition to sales of inventory, except to the extent used to prepay the obligations under the DIP Term Loan Credit Agreement.

(m)    The Loan Parties shall consult and cooperate in good faith with the Lenders respect to a plan of reorganization or other exit from the Bankruptcy Cases for Geoffrey, LLC, Geoffrey International, LLC and Geoffrey Holdings, LLC.

All reports, access rights, notices and information required to be delivered or provided to the Administrative Agent pursuant to this Section 3 shall also be delivered or provided by the Loan Parties to the professional advisors of the Ad Hoc Group of B-4 Term Lenders (as defined in the Bankruptcy Court Order) (the "**B-4 Advisors**") promptly following delivery or provision to the Administrative Agent and/or their respective advisors and representatives.

4.     Additional Events of Default.  From and after the Waiver Effective Date (and without in any way limiting the provision of Article VIII of the DIP Term Loan Credit Agreement), it shall constitute an immediate Event of Default under the DIP Term Loan Credit Agreement if any of the following shall occur (as though the following had been fully set forth in the DIP Term Loan Credit Agreement):

(a)     the Loan Parties shall fail to comply (x) in any material respect with any of the undertakings (other than with respect to Sections 3(f) and 3(i)) set forth in this Agreement or (y) in any respect with any of the undertakings set forth in Sections 3(f) and 3(i) and, in the case of the undertakings set forth in Sections 3(a)(iv), 3(b)(ii), 3(c)(iii), and 3(h), such failure shall continue for a period of 2 days after (i) in the case of any failure to comply with any undertaking set forth in Sections 3(a)(iv), 3(b)(ii) or 3(c)(iii), the earlier of receipt of written notice from the Administrative Agent and (ii) in the case of the undertaking set forth in section 3(h) knowledge of the applicable Loan Party of such failure;

(b)     the Loan Parties shall (x) cease to proceed with the Domestic Wind-Down, in the manner set forth in and consistent in all material respects with the Domestic Wind-Down Budget, (y) make any payment (other than any payment to facilitate an orderly wind-down that is, considered alone or together with all other payments not consistent with the Domestic Wind-Down Budget, immaterial) that is not consistent with the Domestic Wind-Down Budget, or (z) make any payments to any individual legal or financial advisor of the Debtors (including advisors to their various independent directors) or the Unsecured Creditors Committee that, as of any date of determination and solely to the extent accrued after March 15, 2018, exceed on a cumulative basis the amounts provided therefor in the Domestic Wind-Down Budget, the Canadian Going Concern Budget or, if applicable, the Canadian Wind-Down Budget;

(c)     (i) at any time, the net cash flow before debt of the Loan Parties for any Test Period shall be less than as set forth on Schedule I for such Test Period, (ii) on the last day

of any week, the cash balance of the TRU Canada shall be less than projected by the Canadian Going Concern Budget or, beginning with the first full week starting on the Sunday after the delivery of the Canadian Wind-Down Budget, the Canadian Wind-Down Budget, by more than $7,000,000 (iii) at any time, the cash balance of TRU Canada shall be lower than $5,000,000 or (iv) the Loan Parties shall disburse any amounts to legal or financial advisors of the Debtors (including advisors to their various independent directors) or the Unsecured Creditors Committee in violation of Section 24 of the Bankruptcy Court Order. For purposes of this Section 4(d), "Test Period" shall mean, as of any date, (i) beginning with the last day of the week ending on March 31, 2018, the two-week period ending on March 31, 2018, (ii) beginning with the last day of the week ending on April 7, 2018, the three-week period ending on April 7, 2018, and (iii) on and after the last day of any week thereafter, the period beginning on March 18, 2018 and ending on the last day of the week ended most recently on or prior to such date;

(d)     at any time, actual total corporate and winddown expenses (excluding professional fees) exceed the greater of (i) 115% of the amounts projected in the Domestic Wind Down Budget dated March 20, 2018 or (b) $2 million above the amount set forth in the Domestic Wind Down Budget, tested monthly on a cumulative basis, starting July 1, 2018 tested at the end of each fiscal month thereafter;

(e)     the Loan Parties shall (x) unless a Canadian Wind-Down Notice has been delivered, cease to pursue the Qualifying TRU Canada Sale, in a manner consistent in all material respects with the Sale Milestones and otherwise in compliance in all material respects with the Canadian Going Concern Budget, (y) following delivery of a Canadian Wind-Down Notice, cease to proceed with the Canadian Wind-Down, in the manner set forth in and consistent in all material respects with the Canadian Wind-Down Budget or (z) make any payment from Collateral or the proceeds of Collateral (other than any payment (which, after the delivery of the Canadian Wind-Down Notice, shall only be to facilitate an orderly wind-down) that is, considered alone or together with all other payments not consistent with the Canadian Going Concern Budget (or if applicable the Canadian Wind-Down Budget), immaterial) that is materially in excess of the amount provided in the Canadian Going Concern Budget or (if applicable) the Canadian Wind-Down Budget (solely to the extent such payment is subject to the Canadian Going Concern Budget or (if applicable) the Canadian Wind-Down Budget);

(f)     the ABL Domestic Facility Termination Date (as defined below) shall not have occurred on or prior to June 9, 2018;

(g)     the Canadian Facility Termination Date shall not have occurred on or prior to June 30, 2018 (or, if the Canadian Wind-Down Notice has been delivered, July 31, 2018);

(h)     on or prior to April 25, 2018, the Bankruptcy Court shall not have entered a final order, in form and substance consistent with the Interim Domestic Waiver Approval Order, the Extended Interim Domestic Waiver Approval Order, the Second Extended Interim Domestic Waiver Approval Order and the Third Extended Interim Domestic Waiver Approval order (each as defined below), with modifications thereto to reflect the final nature thereof, and any other modifications thereto satisfactory to the Administrative Agent and the Required Lenders, authorizing the Loan Parties to enter into this Agreement and to perform the obligations hereunder, which final order shall not have been vacated or reversed, shall not be subject to any

10

stay, and shall not have been modified or amended in any manner without the consent of the Administrative Agent and the Required Lenders (the "**Final Waiver Approval Order**" and the date of the satisfaction of the condition in this paragraph (i), the "**Final Waiver Approval Order Date**");

(i)    the Waiver Approval Order shall have been stayed, reversed, vacated, rescinded or modified in any material respect without the prior written consent of the Required Lenders; or

(j)    on or prior to April 16, 2018, the Loan Parties shall not have obtained consent to extend the deadline to assume or reject (x) the master lease with Propco II, and (y) those third-party leases which are necessary to the liquidation process, in each case, through and including a date no earlier than June 30, 2018; or

(k)    (i) on or prior to April 16, 2018, the Loan Parties shall not have obtained consent to extend the deadline to assume or reject the master lease with Propco I through and including a date no earlier than April 30, 2018 (the "**Initial PropCo I Extension Date**"), and (ii) on or prior to the Initial PropCo I Extension Date, the Loan Parties shall not have obtained further consent to extend the deadline to assume or reject the master lease with Propco I through and including a date no earlier than June 30, 2018.

The "**ABL Domestic Facility Termination Date**" means the date on which the Domestic Commitments (as defined in the ABL Credit Agreement) have been irrevocably terminated, the Domestic Borrowers (as defined in the ABL Credit Agreement) shall have indefeasibly and irrevocably paid and satisfied in full in cash all Obligations (as defined in the ABL Credit Agreement) (other than Canadian Liabilities (as defined in the ABL Credit Agreement) and contingent indemnity obligations with respect to the then unasserted claims), the Domestic Borrowers shall have indefeasibly and irrevocably paid and satisfied in full in cash the Other Liabilities (as defined in the ABL Credit Agreement) then due and payable (other than Canadian Liabilities), all Domestic Letters of Credit (as defined in the ABL Credit Agreement) shall have expired or terminated (or been collateralized in a manner satisfactory to the Issuing Banks) and all Domestic Letter of Credit Outstandings have been reduced to zero (or been collateralized in a manner satisfactory to the Issuing Banks (as defined in the ABL Credit Agreement)).

6.    <u>Treatment of Loans and Commitments</u>.

(a)    With effect as of the Waiver Effective Date, and notwithstanding the waivers and consents in this Agreement, all Loans shall be automatically converted into Base Rate Loans bearing interest, effective from March 15, 2018, at the Default Rate and all Loans shall continue as Base Rate Loans bearing interest at the Default Rate at all times thereafter. The Borrower shall reimburse each Lender for any breakage costs resulting from such conversion calculated consistent with Section 3.05 of the DIP Term Loan Credit Agreement.

(b)    Notwithstanding anything to the contrary in Sections 2.02 and 2.06 of the DIP Term Loan Credit Agreement, interest on Loans shall be payable on the last Business Day of each calendar month.

7.    <u>Amendments to DIP Term Loan Credit Agreement</u>. With effect as of the Waiver Effective Date, the DIP Term Loan Credit Agreement is amended as follows:

(a) The definition of "Asset Sale" shall be amended by replacing clause (v) thereof with the following:

"solely for purposes of <u>Section 2.03(b)</u> hereof, any transaction permitted by <u>Section 7.05</u> (other than transactions permitted by <u>Sections 7.05(h)</u>, <u>(i)</u>, <u>(j)</u>, <u>(l)</u> (other than with respect to sales of inventory to the extent the proceeds are reasonably necessary to fund the Domestic Wind-Down Budget), <u>(n)</u>, <u>(o)</u>, <u>(p)</u> and <u>(q)</u>, and, to the extent relating to a lease that is required to be capitalized on the lessor's financial statements prepared in accordance with GAAP, <u>Section 7.05(g))</u>;"

(b) The definition of "Specified Indebtedness" shall be amended by deleting clauses (ii) and (iii) therein in their entirety.

(c) The first paragraph of Section 2.03(b) of the DIP Term Loan Credit Agreement is hereby deleted and replaced in its entirety with the following:

"Following the receipt of any Net Cash Proceeds of any Asset Sale after the Closing Date and solely to the extent that the aggregate Net Cash Proceeds for all such Asset Sales since the Closing Date or the most recent prepayment made pursuant to this Section 2.03(b), as applicable, is greater than or equal to $5,000,000 after giving effect to the most recent Asset Sale, such Net Cash Proceeds (other than, prior to the Discharge of the ABL Obligations (as defined in the Intercreditor Agreement), the Net Cash Proceeds of ABL Priority Collateral) shall be applied to the prepayment of the Loans on a ratable basis within five (5) Business Days. For the avoidance of doubt, the Net Cash Proceeds of the TRU Canada Sale shall constitute Net Cash Proceeds for purposes of this provision regardless whether TRU Canada constitutes an Applicable Subsidiary.

(d) Section 6.01(a) of the DIP Term Loan Credit Agreement shall be replaced in its entirety with the following:

"(a) [reserved],".

(e) Section 6.01(b) of the DIP Term Loan Credit Agreement shall be replaced in its entirety with the following:

"(b) [reserved],".

(f) Section 6.01(d) of the DIP Term Loan Credit Agreement shall be replaced in its entirety with the following:

"(d) [reserved],".

(g) Section 6.01(g) of the DIP Term Loan Credit Agreement shall be replaced in its entirety with the following:

"(g) [reserved],".

(h) Section 6.01(h) of the DIP Term Loan Credit Agreement shall be replaced in its entirety with the following:

"(h) [reserved],".

(i) Section 6.01(i) of the DIP Term Loan Credit Agreement shall be replaced in its entirety with the following:

"(i) [reserved],".

(j) Section 6.01(k) of the DIP Term Loan Credit Agreement shall be replaced in its entirety with the following:

"(k) [reserved],".

(k) Section 6.02(d) of the DIP Term Loan Credit Agreement shall be replaced in its entirety with the following:

"(d) [reserved],".

(l) Sections 6.13(a), (b) and (c) of the DIP Term Loan Credit Agreement shall be replaced in their entirety with the following:

"a weekly call (at a time to be mutually agreed) with the Administrative Agent and its advisors and the B-4 Advisors to discuss (i) the status of the implementation of the Domestic Wind-Down Budget (as defined in the Second Amended and Restated Waiver, Consent and Amendment Agreement hereto, dated as of April [], 2018) and related going out of business sales, which will include a discussion of the maximization of value of inventory and any other assets with respect to any going out of business sales, (ii) the efforts to effectuate the TRU Canada Sale (as defined in the Second Amended and Restated Waiver, Consent and Amendment Agreement hereto, dated as of April [ ], 2018) or the status of the implementation of the Canadian Wind-Down Budget (as defined in the Second Amended and Restated Waiver, Consent and Amendment Agreement hereto, dated as of April [  ], 2018), as applicable, and (iii) such other matters as the B-4 Advisors shall reasonably request prior to such call, including, if applicable, matters related to the Geoffrey Collateral, TRU Taj LLC and/or Holdings".

(m) Section 6.15 of the DIP Term Loan Credit Agreement shall be replaced in its entirety with the following:

13

"6.15  [Reserved]".

(n) Section 6.16 of the Credit Agreement is hereby deleted and replaced in its entirety with the following:

"[Reserved]."

(o) Section 7.01 shall be amended by replacing the ";" at the end of paragraph (hh) thereof with "; and" and by adding the following new paragraph (ii):

"(ii) following (or substantially contemporaneously with) the Canadian Facility Termination Date (as defined in the Second Amended and Restated Waiver, Consent and Amendment Agreement hereto, dated as of April [ ], 2018), any Liens on property of any Canadian Loan Party or on the Capital Stock of such Canadian Loan Party (as defined in the ABL Credit Agreement) to secure any Post-Termination Canadian Indebtedness."

(p) Section 7.03 shall be amended by deleting the "and" at the end of paragraph (w) thereof, replacing the "." at the end of paragraph (x) thereof with "; and" and by adding the following new paragraph (y):

"(y) following (or substantially contemporaneously with) the Canadian Facility Termination Date, Indebtedness of the Canadian Borrower (as defined in the ABL Credit Agreement) incurred to refinance or replace the ABL Credit Agreement Obligations of the Canadian Borrower; provided, that such Indebtedness shall not be guaranteed by any Loan Party or secured by any property of any Loan Party (the "**Post-Termination Canadian Indebtedness**")."

(q) Section 7.02(b)(iii) of the DIP Term Loan Credit Agreement shall be replaced in its entirety with the following:

"(iii) [Reserved],"

(r) Section 7.02(q)(ii) of the DIP Term Loan Credit Agreement shall be replaced in its entirety with the following:

"(q)    [Reserved]; and"

(s) Section 7.02(r) of the DIP Term Loan Credit Agreement shall be replaced in its entirety with the following:

"(r)    Investments in the form of loans or advances by any Loan Party that is a Debtor in the Cases to Holdings in an amount necessary for Holdings to pay Permitted Holdings Expenses consistent with the Domestic Wind-Down Budget (as defined in the Second Amended and Restated Waiver, Consent and Amendment Agreement hereto, dated as of April [  ], 2018); provided that the claims in respect of such loans constitute allowed superpriority administrative expense claims against Holdings pursuant to Bankruptcy Code Sections 364(c)(1),

14

503 and 507 and are secured by Liens that are junior only to any third-party debtor-in-possession financing of Holdings."

(t)   Section 7.05(l) of the DIP Term Loan Credit Agreement is hereby deleted and replaced in its entirety with the following:

"the sales of Real Property, inventory, fixtures and related assets by the Borrower after the Petition Date; provided that (i) all such sales (A) of inventory are made in accordance with customary liquidation agreements with professional liquidators, and (B) of other assets, are made on arm's-length terms pursuant to bid procedures determined in consultation with the B-4 Advisors (as defined in the Second Amended and Restated Waiver, Consent and Amendment Agreement hereto, dated as of April [  ], 2018) and reasonably acceptable to the Required Lenders (whose consent shall be assumed barring objection by or at the instruction of the Required Lenders), and (ii) the Net Cash Proceeds thereof are applied in accordance with Section 2.03(b)."

(u)   Section 7.05(n), (o) and (p) of the DIP Term Loan Credit Agreement are hereby replaced with the following:

"(n)   [reserved];

(o)   [reserved];

(p)   [reserved]; and

(q)   the sale or Disposition of all or substantially all of the assets of, and/or all of the Equity Interest in, Toys "R" Us (Canada) Ltd. / Toys "R" Us (Canada) Ltee."

(v)   Sections 7.06(c), (d), (e) and (f)  of the DIP Term Loan Credit Agreement shall be replaced in their entirety with the following:

"(c)   to the extent actually used by Holdings to pay such expenses, the Loan Parties and their Subsidiaries may make Restricted Payments to or on behalf of Holdings in an amount necessary to pay Permitted Holdings Expenses that are allocable and chargeable to the Loan Parties in accordance with Holdings' ordinary course practice and contemplated in the Domestic Wind-Down Budget (as defined in the Second Amended and Restated Waiver, Consent and Amendment Agreement hereto, dated as of April [  ], 2018);

(d)   Permitted Tax Distributions to Holdings to the extent set forth in the Domestic Wind-Down Budget (as defined in the Second Amended and Restated Waiver, Consent and Amendment Agreement hereto, dated as of April [ ], 2018), so long as Holdings uses such distributions to pay its taxes;

(e)   [Reserved];

(f)   [Reserved]; and"

15

(w) Section 7.07(j) of the DIP Term Loan Credit Agreement shall be replaced in its entirety with the following:

(j)    transactions set forth on <u>Schedule 7.07</u> hereto and, with the consent of the Required Lenders, any amendments and replacements thereto;

(x) Section 7.07(l) of the DIP Term Loan Credit Agreement shall be replaced in its entirety with the following:

(l)    payment and performance under the Specified Intercompany Agreements, in each case, as in effect on the Petition Date or as may be amended, supplemented, modified or waived with the consent of the Required Lenders in their sole discretion (whose consent shall be assumed barring objection by or at the instruction of the Required Lenders after not fewer than 5 business days' advance notice);

(y) Section 7.07 of the Credit Agreement is hereby amended by (i) deleting "." at the end of clause (m) thereof and replacing it with "; and" and (ii) adding the following:

"(n)    the provision to Subsidiaries of Holdings of services with respect to the Loan Parties' private brands, including design, development, product sourcing and related services, provided such services shall, from and after April 30, 2018 (or such later date as agreed by the Required Lenders in their sole discretion), be paid for on arm's-length-terms."

(z) Section 7.11(b) and (c) of the DIP Term Loan Credit Agreement shall be replaced in their entirety with the following:

"(b) amend, supplement, waive any provision of or otherwise modify the terms of any Specified Intercompany Agreement in any manner that would have an adverse effect (other than rejection of the agreements set forth in items 5, 6 and 7 in Part II of Schedule 7.07 with effect from and after closing of the applicable Stores), except with the Required Lenders' consent;

(c) fail to enforce any of the rights of the Loan Parties under the Specified Intercompany Agreements upon breach thereof by any other party thereto, other than with respect to (i) non-monetary defaults that are not material to the interests of the Lenders or (ii) monetary defaults if the defaulting party is a Debtor and the liability for any overdue amount constitutes a secured, super-priority administrative claim against such Debtor, subject only to any third-party debtor-in-possession financing and any Lien or claim to which such third-party financing is subject;"

(aa)    Section 7.17 of the DIP Term Loan Credit Agreement shall be replaced in its entirety with the following:

16

"7.17 [Reserved]".

(bb)        Section 7.18 of the DIP Term Loan Credit Agreement shall be replaced in its entirety with the following:

"7.18 [Reserved]".

(cc)        Section 8.01(m) of the DIP Term Loan Credit Agreement is hereby deleted and replaced in its entirety with the following:

"(m)        Alternate Financing.  Except in respect of the ABL Credit Agreement or any Indebtedness incurred by the Canadian Borrower (as defined in the ABL Credit Agreement) pursuant to Section 7.03(y), any Loan Party shall file a motion in the Chapter 11 Cases without the express written consent of Required Lenders, to obtain additional financing from a party other than Lenders under Section 364(d) of the Bankruptcy Code."

(dd)        Section 8.01(q) of the DIP Term Loan Credit Agreement is hereby deleted and replaced in its entirety with the following:

"(q)        Order With Respect to Chapter 11 Cases.  Except for the Waiver Approval Order (as defined in the Second Amended and Restated Waiver, Consent and Amendment Agreement hereto, dated as of April [  ], 2018), an order with respect to any of the Chapter 11 Cases shall be entered by the Bankruptcy Court without the express prior written consent of the Required Lenders (and with respect to any provisions that affect the rights or duties of the Administrative Agent, the Administrative Agent), (i) to revoke, reverse, stay, modify, supplement or amend any of the Bankruptcy Court Orders or the Adequate Protection Order in a manner adverse to the Lenders or (ii) to permit any administrative expense or any claim (now existing or hereafter arising, of any kind or nature whatsoever) to have administrative priority equal or superior to the priority of the Obligations (other than the Carve Out, the Wayne Loans, the TRU Canada Loans or the ABL Obligations); or"

(ee)        Section 8.01(v) of the Credit Agreement is hereby deleted and replaced in its entirety with the following:

"[Reserved]."

8.        Representations and Warranties.  Each Loan Party party hereto represents and warrants to the Agents and the Lenders, on and as of the Waiver Effective Date, that:

(a)        Each Loan Party has all requisite organizational power and authority to perform all its obligations under the DIP Term Loan Credit Agreement and to execute and deliver and perform all its obligations under this Agreement.

17

(b)    The transactions contemplated by this Agreement and by the DIP Term Loan Credit Agreement are within such Loan Party's corporate powers and have been duly authorized by all necessary corporate, membership, partnership or other necessary action. Subject to the entry of the Waiver Approval Order and the terms thereof, this Agreement has been duly executed and delivered by each Loan Party that is a party hereto or thereto and constitutes, and when executed and delivered by such Loan Party, this Agreement and the DIP Term Loan Credit Agreement will constitute, a legal, valid and binding obligation of such Loan Party, enforceable in accordance with its terms subject to the terms of the Orders and the Waiver Approval Order.

(c)    The transactions to be entered into and contemplated by this Agreement and the DIP Term Loan Credit Agreement will not violate the Charter Documents of any Loan Party.

(d)    On and as of the Waiver Effective Date, no Default or Event of Default (other than the Specified Events of Default) has occurred and is continuing or will result from the entry by the Loan Parties into this Agreement.

9.    <u>Conditions to Effectiveness</u>.

(a) Subject to paragraphs (b) and (c) below, this Agreement shall become effective (the date of such effectiveness being referred to herein as the "**Waiver Effective Date**") upon satisfaction or waiver of each of the following conditions:

(i)    execution and delivery of this Agreement by Lenders constituting the Required Lenders under the DIP Term Loan Credit Agreement and the Loan Parties and, in each case, delivered to the Administrative Agent;

(ii)    (x) the Final Domestic Waiver Approval Order shall have been entered by the Bankruptcy Court, (y) the interim order entered by the Bankruptcy Court on March 21, 2018 in connection with the Original Waiver, Consent and Amendment [Docket No. 2318] (the "**Interim Domestic Waiver Approval Order**"), as amended by the amended interim order entered by the Bankruptcy Court on March 27, 2019 [Docket No. 2427] (the "**Extended Interim Domestic Waiver Approval Order**") and as further amended by the second amended interim order entered by the Bankruptcy Court on April 13, 2018 [Docket No. 2713] (the "**Second Extended Interim Domestic Waiver Approval Order**") and by the third amended interim order entered by the Bankruptcy Court on April [ ], 2018 [Docket No. [ ]] (the "**Third Extended Interim Domestic Waiver Order**") shall not have been vacated or reversed, shall not be subject to any stay, and shall not have been modified or amended in any manner without the consent of the Administrative Agent and the Required Lenders, and (z) the ABL/FILO Waiver (as defined in the Debtors' motion seeking the Waiver Approval Order) shall have become effective substantially in the form provided to the Lenders in connection with execution hereof; and

18

(iii)    the Loan Parties shall have paid all previously invoiced expenses payable pursuant to this Agreement or Section 10.04 of the DIP Term Loan Credit Agreement.

(b) Immediately upon the satisfaction or waiver of the conditions set forth in the foregoing clauses (a)(i) and (a)(iii) (the date of the satisfaction of such conditions, the "**Amendment and Restatement Date**"), the date set forth in Section 1 of the Extension to Waiver Agreement, dated as of March 14, 2018 (the "**Extension**"), relating to the DIP Term Loan Credit Agreement shall be automatically extended to April 30, 2018 at 11:59 pm New York time; provided that the Extension shall terminate if a fact or circumstance occurs that would constitute an Event of Default under this Agreement, had the Waiver Effective Date occurred.

(c) For the avoidance of doubt, upon the Amendment and Restatement Date, the Existing Waiver, Consent and Amendment shall be amended and restated and superseded in its entirety by this Agreement; provided that notwithstanding the foregoing, this Agreement shall not act as a waiver of any default or event of default, or cure any breach of the terms of the Original Waiver, Consent and Amendment or the Existing Waiver, Consent and Amendment that may have occurred prior to the Amendment and Restatement Date.

10.    Miscellaneous.  This Agreement and the Waiver shall be limited precisely as written and, except as expressly provided herein, shall not be deemed (a) to be a consent granted pursuant to, or a waiver or modification of, any term or condition of the DIP Term Loan Credit Agreement, any other Loan Documents or any of the instruments or agreements referred to therein or (b) other than as expressly stated herein, to prejudice any right or rights which the Agents or the other Secured Parties may now have or have in the future under or in connection with the DIP Term Loan Credit Agreement, the other Loan Documents or any of the instruments or agreements referred to therein including any rights from the existence or continuation of a Cash Dominion Event. The Loan Parties agree that their obligations set forth in Section 10.04 of the DIP Term Loan Credit Agreement shall extend to the preparation, execution and delivery of this Agreement and that the amounts payable pursuant to Section 10.04 of the DIP Term Loan Credit Agreement shall include the reasonable fees, charges and disbursements of the B-4 Advisors incurred (whether before or after the Waiver Effective Date) in connection with this Agreement, the DIP Term Loan Credit Agreement and the other Loan Documents.  This Agreement is hereby deemed to be a Loan Document for purposes of each Loan Document.  All terms and provisions of the Loan Documents remain in full force and effect, except to the extent expressly modified by this Agreement (it being understood and agreed that nothing contained in the Domestic Wind-Down Budget, the Canadian Going Concern Budget or the Canadian Wind-Down Budget, as the case may be, shall modify the obligations of the Loan Parties under the Loan Documents).  Each of the Loan Parties acknowledges that the Administrative Agent, the Collateral Agent and the Consenting Lenders have made no representations as to what actions, if any, they will take after the Waiver Effective Date, and the Administrative Agent and each Consenting Lender hereby specifically reserves any and all rights, remedies, and claims it has (after giving effect hereto) with respect to any Events of Default and other Defaults that may occur (other than the Specified Events of Default).

19

11.    <u>Remedies upon Events of Default</u>.  Upon the Administrative Agent's delivery of written notice of the occurrence of an Event of Default (which written notice may be provided via email) to the Loan Parties, counsel to the Loan Parties and counsel to the Unsecured Creditors Committee, during the 5 Business Day period after delivery thereof, the Lenders shall negotiate in good faith with the Loan Parties and the Unsecured Creditors Committee the manner in which the Lenders intend to exercise their rights and remedies under the Loan Documents; provided, that this section 11 shall not be deemed a waiver of any rights or remedies of the Lenders under the Loan Documents upon an Event of Default, and the Lenders can ultimately proceed in their sole discretion if no agreement is reached with the Loan Parties and/or the Unsecured Creditors Committee.

12.    <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts and by the different parties hereto in separate counterparts, each of which shall be an original and all of which, when taken together, shall constitute but one and the same instrument.  A facsimile or pdf copy of a counterpart signature page shall serve as the functional equivalent of a manually executed copy for all purposes.

13.    <u>Governing Law</u>.  THIS AGREEMENT AND ALL ACTIONS ARISING UNDER THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK AND (TO THE EXTENT APPLICABLE) THE BANKRUPTCY CODE.

[SIGNATURE PAGES FOLLOW]

Schedule I

| | Week ending | Cumultative Net Cash Flow Compliance Threshold | |
|---|---|---|---|
| 2 weeks ending | 3/31/18 | $ | 14.9 |
| 3 weeks ending | 4/7/18 | $ | 81.2 |
| 4 weeks ending | 4/14/18 | $ | 122.8 |
| 5 weeks ending | 4/21/18 | $ | 171.6 |
| 6 weeks ending | 4/28/18 | $ | 232.5 |
| 7 weeks ending | 5/5/18 | $ | 273.3 |
| 8 weeks ending | 5/12/18 | $ | 328.9 |
| 9 weeks ending | 5/19/18 | $ | 398.7 |
| 10 weeks ending | 5/26/18 | $ | 417.0 |
| 11 weeks ending | 6/2/18 | $ | 444.6 |
| 12 weeks ending | 6/9/18 | $ | 498.6 |
| 13 weeks ending | 6/16/18 | $ | 559.2 |
| 14 weeks ending | 6/23/18 | $ | 565.4 |
| 15 weeks ending | 6/30/18 | $ | 628.2 |

## <u>Exhibit 3</u>

**Wind-Down Budget**

W/3119214v5

#90820486v2
KL2 3065692.13

**Project Sunrise**
Weekly Wind Down Budget
($ in MMs)

**Weekly Budget**

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Mar Wk 3 | Mar Wk 4 | Apr Wk 1 | Apr Wk 2 | Apr Wk 3 | Apr Wk 4 | Apr Wk 5 | May Wk 1 | May Wk 2 | May Wk 3 | May Wk 4 | Jun Wk 1 | Jun Wk 2 | Jun Wk 3 | Total |
| | 3/24/18 | 3/31/18 | 4/7/18 | 4/14/18 | 4/21/18 | 4/28/18 | 5/5/18 | 5/12/18 | 5/19/18 | 5/26/18 | 6/2/18 | 6/9/18 | 6/16/18 | 6/23/18 | |
| Receipts | 97.8 | 95.9 | 94.5 | 94.7 | 106.8 | 109.6 | 104.8 | 95.3 | 93.3 | 90.9 | 89.3 | 85.6 | 80.0 | 58.2 | 1,296.7 |
| **Disbursements** | | | | | | | | | | | | | | | |
| Payroll & Benefits | (4.6) | (25.6) | (4.7) | (26.1) | (5.6) | (24.8) | (3.4) | (19.3) | (2.7) | (17.7) | (3.2) | (14.7) | (2.6) | (15.0) | (170.0) |
| Taxes | (0.9) | (2.0) | (1.0) | (6.4) | (34.8) | (6.5) | (1.0) | (1.8) | (0.6) | (41.3) | (0.7) | (1.4) | (0.5) | (28.5) | (127.2) |
| Rent | (14.5) | (43.8) | (0.1) | (0.8) | (0.1) | (0.1) | (41.3) | (0.1) | (0.8) | (0.1) | (41.2) | (0.1) | (0.8) | (0.1) | (143.6) |
| Advertising / Supervision (GOB) | (0.5) | (3.4) | (3.6) | (3.7) | (3.6) | (3.2) | (2.9) | (2.7) | (2.7) | (2.6) | (2.5) | (2.5) | (2.3) | (1.7) | (37.9) |
| Liquidator Fees | (0.8) | (1.8) | (2.0) | (2.1) | (2.0) | (1.8) | (1.8) | (1.7) | (1.6) | (1.6) | (1.5) | (1.5) | (1.4) | (1.4) | (23.0) |
| Post-Petition Merchandise | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Professional Fees | (1.3) | (5.9) | (2.6) | (3.4) | (2.6) | (2.6) | (2.6) | (4.3) | (4.3) | (4.3) | (4.3) | (2.0) | (2.0) | (2.0) | (44.4) |
| Financing Activity | (0.2) | (2.4) | (0.1) | (0.1) | - | - | - | - | - | - | - | - | - | - | (5.0) |
| Other Operating Disbursements | (37.6) | (23.4) | (14.3) | (7.0) | (4.0) | (3.0) | (4.2) | (3.6) | (3.0) | (2.9) | (5.2) | (3.4) | (3.0) | (2.7) | (117.4) |
| Total Store / DC Disbursements | (60.3) | (108.4) | (28.3) | (49.4) | (52.6) | (41.9) | (59.5) | (33.5) | (15.7) | (70.6) | (58.7) | (25.6) | (12.6) | (51.3) | (668.4) |
| **Net Cash Flow before Debt** | 37.4 | (12.5) | 66.2 | 45.3 | 54.2 | 67.6 | 45.3 | 61.8 | 77.6 | 20.4 | 30.6 | 60.0 | 67.4 | 6.9 | 628.2 |
| **Cash Schedule** | | | | | | | | | | | | | | | |
| Beginning Cash Balance | 105.4 | 47.0 | 30.3 | 30.6 | 30.0 | 32.9 | 100.5 | 20.9 | 57.7 | 110.3 | 55.6 | 38.2 | 71.2 | 113.6 | 105.4 |
| Net Cash Flow Before Debt | 37.4 | (12.5) | 66.2 | 45.3 | 54.2 | 67.6 | 45.3 | 61.8 | 77.6 | 20.4 | 30.6 | 60.0 | 67.4 | 6.9 | 628.2 |
| ABL Paydown | (95.8) | (4.2) | (66.0) | (45.8) | (51.3) | - | (125.0) | (25.0) | (25.0) | (75.0) | (50.0) | (25.0) | (25.0) | (100.0) | (263.2) |
| FILO Paydown | - | - | - | - | - | - | (125.0) | (25.0) | (25.0) | (75.0) | (50.0) | (25.0) | (25.0) | (100.0) | (450.0) |
| **Ending Cash Balance** | 47.0 | 30.3 | 30.6 | 30.0 | 32.9 | 100.5 | 20.9 | 57.7 | 110.3 | 55.6 | 38.2 | 71.2 | 113.6 | 20.5 | 20.5 |
| **ABL Schedule** | | | | | | | | | | | | | | | |
| Beginning Balance | 165.0 | 167.4 | 163.2 | 97.2 | 51.3 | - | - | - | - | - | - | - | - | - | 165.0 |
| LC Collateralization | 98.2 | - | - | - | - | - | - | - | - | - | - | - | - | - | 98.2 |
| Paydown | (95.8) | (4.2) | (66.0) | (45.8) | (51.3) | - | - | - | - | - | - | - | - | - | (263.2) |
| Ending Balance | 167.4 | 163.2 | 97.2 | 51.3 | - | - | - | - | - | - | - | - | - | - | - |
| **FILO Roll-Forward** | | | | | | | | | | | | | | | |
| Beginning Balance | 450.0 | 450.0 | 450.0 | 450.0 | 450.0 | 450.0 | 450.0 | 325.0 | 300.0 | 275.0 | 200.0 | 150.0 | 125.0 | 100.0 | 450.0 |
| Paydown | - | - | - | - | - | - | (125.0) | (25.0) | (25.0) | (75.0) | (50.0) | (25.0) | (25.0) | (100.0) | (450.0) |
| Ending Balance | 450.0 | 450.0 | 450.0 | 450.0 | 450.0 | 450.0 | 325.0 | 300.0 | 275.0 | 200.0 | 150.0 | 125.0 | 100.0 | - | - |

**Toys "R" Us (Canada) Ltd.**
Cash Flow Forecast
For the thirteen-week period ending June 9, 2018
(Unaudited, in $'000s CAD)

| | Week 26 17-Mar-18 | Week 27 24-Mar-18 | Week 28 31-Mar-18 | Week 29 7-Apr-18 | Week 30 14-Apr-18 | Week 31 21-Apr-18 | Week 32 28-Apr-18 | Week 33 5-May-18 | Week 34 12-May-18 | Week 35 19-May-18 | Week 36 26-May-18 | Week 37 2-Jun-18 | Week 38 9-Jun-18 | 13 - Week Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Receipts** | 15,129 | 15,070 | 17,106 | 17,278 | 14,461 | 15,286 | 15,472 | 15,338 | 15,527 | 15,544 | 15,372 | 15,663 | 15,451 | 202,698 |
| **Disbursements** | | | | | | | | | | | | | | |
| Merchandise vendors | 11,600 | 14,471 | 17,706 | 14,723 | 10,104 | 12,488 | 8,820 | 7,543 | 8,369 | 7,357 | 7,251 | 7,210 | 7,044 | 134,687 |
| Non-merchandise vendors | 4,533 | 4,283 | 3,533 | 3,948 | 3,398 | 6,032 | 3,048 | 3,093 | 2,962 | 3,111 | 3,361 | 3,361 | 3,995 | 48,659 |
| Rent | - | - | 5,305 | - | - | - | - | 5,305 | - | - | - | 5,301 | - | 15,912 |
| Payroll | 2,844 | 1,204 | 3,086 | 1,167 | 2,862 | 1,282 | 2,934 | 1,185 | 2,816 | 1,190 | 2,833 | 1,210 | 2,918 | 27,530 |
| Capital expenditures | 308 | 308 | 308 | 308 | 308 | 308 | 308 | 231 | 231 | 231 | 231 | 231 | 231 | 3,538 |
| Tax | - | 25 | 973 | - | - | - | (176) | (831) | - | - | (40) | 1,386 | - | 1,337 |
| **Total Disbursements** | 19,285 | 20,290 | 30,912 | 20,146 | 16,672 | 20,110 | 14,934 | 16,526 | 14,378 | 11,889 | 13,636 | 18,699 | 14,188 | 231,664 |
| **Operating Net Cash Flow** | (4,155) | (5,220) | (13,805) | (2,868) | (2,211) | (4,823) | 537 | (1,188) | 1,150 | 3,655 | 1,736 | (3,036) | 1,263 | (28,966) |
| Restructuring professional fees | 606 | 520 | 325 | 350 | 300 | 300 | 325 | 350 | 300 | 225 | 225 | 275 | 225 | 4,326 |
| DIP fees, interest & payments | - | - | 2,652 | - | - | - | - | 2,652 | - | - | - | 2,741 | - | 8,046 |
| **Net Cash Flow** | (4,762) | (5,740) | (16,783) | (3,218) | (2,511) | (5,123) | 212 | (4,191) | 850 | 3,430 | 1,511 | (6,052) | 1,038 | (41,338) |
| **Beginning Cash** | 54,273 | 49,512 | 43,772 | 26,989 | 23,771 | 21,260 | 16,137 | 16,349 | 12,159 | 13,008 | 16,438 | 17,950 | 11,897 | 54,273 |
| Net Cash Flow | (4,762) | (5,740) | (16,783) | (3,218) | (2,511) | (5,123) | 212 | (4,191) | 850 | 3,430 | 1,511 | (6,052) | 1,038 | (41,338) |
| **Ending Cash** | 49,512 | 43,772 | 26,989 | 23,771 | 21,260 | 16,137 | 16,349 | 12,159 | 13,008 | 16,438 | 17,950 | 11,897 | 12,936 | 12,936 |