Edward O. Sassower, P.C.
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:        (212) 446-4800
Facsimile:        (212) 446-4900

-and-

Michael A. Condyles (VA 27807)
Peter J. Barrett (VA 46179)
Jeremy S. Williams (VA 77469)
**KUTAK ROCK LLP**
901 East Byrd Street, Suite 1000
Richmond, Virginia 23219-4071
Telephone:        (804) 644-1700
Facsimile:        (804) 783-6192

James H.M. Sprayregen, P.C.
Anup Sathy, P.C.
Chad J. Husnick, P.C. (admitted *pro hac vice*)
Emily E. Geier (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:        (312) 862-2000
Facsimile:        (312) 862-2200

*Co-Counsel to the Debtors and Debtors in Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| TOYS "R" US, INC., *et al.*,[1] | ) | Case No. 17-34665 (KLP) |
| | ) | |
| Debtors. | ) | |
| | ) | (Jointly Administered) |

## DEBTORS' MOTION FOR ENTRY OF AN
## ORDER (I) AUTHORIZING THE DEBTORS TO PROVIDE
## TRANSITION SERVICES, (II) AUTHORIZING THE DEBTORS TO
## TAKE ANY CORPORATE ACTION NECESSARY TO CONSUMMATE THE
## CENTRAL EUROPEAN SALE, (III) AUTHORIZING CERTAIN DEBTORS TO
## ENTER INTO RELATED AGREEMENTS, AND (IV) GRANTING RELATED RELIEF

The above-captioned debtors and debtors in possession (collectively, the "Debtors")[2]

respectfully state as follows in support of this motion (this "Motion"):

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are set forth in the *Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief* [Docket No. 78]. The location of the Debtors' service address is One Geoffrey Way, Wayne, New Jersey 07470.

[2]     A detailed description of the Debtors and their business, and the facts and circumstances supporting the Debtors' chapter 11 cases, are set forth in greater detail in (i) the *Declaration of David A. Brandon, Chief Executive Officer of Toys "R" Us, Inc., in Support of Chapter 11 Petitions and First Day Motions* (the "Brandon Declaration") and (ii) the *Declaration of Michael J. Short, Chief Financial Officer of Toys "R" Us, Inc., in Support of First Day*

## Relief Requested

1.      By this Motion, the Debtors seek entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Order"):  (a) authorizing the Debtors to take any corporate action necessary to consummate the sale (the "Central European Sale") of non-Debtor TRU (UK) H8 Limited's (the "Seller") equity interest in Toys "R" US-Handelsgesellschaft ("Toys Austria"), Toys "R" Us GmbH ("Toys Germany"), and Toys "R" Us AG ("Toys Switzerland," and together with Toys Austria and Toys Germany, the "Central European Business") to Smyths Toys EU HQ Limited (the "Purchaser") contemplated by that certain Sale and Purchase Agreement entered into by and between the Seller and Purchaser on April 21, 2018 (the "Sale and Purchase Agreement"),[3] including:  (i)  authorizing the applicable Debtors, as necessary, including Toys Inc. and the Tru Taj Debtors to provide any instructions and consents necessary to effectuate and implement the Sale and Purchase Agreement;[4] (ii) authorizing Toys "R" Us—Delaware, Inc. ("Toys Delaware") to enter into a transition services agreement in connection with the Sale and Purchase Agreement (the "Transition Services Agreement") and an accompanying support agreement (the "Transition Services Support Agreement");[5] (iii) confirming the Release Deeds substantially in the form

---

*Motions* (the "Short Declaration" and together with the Brandon Declaration, the "First Day Declarations"), filed contemporaneously with the Debtors' voluntary petitions for relief filed under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), on September 18, 2017 (the "Petition Date").  Capitalized terms used but not defined herein shall have the meaning set forth in the Sale and Purchase Agreement, the First Day Declarations, or the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the TRU TAJ Debtors to Obtain Postpetition Financing, (II) Authorizing the TRU TAJ Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection to the Prepetition Lenders, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* [Docket No. 32], as applicable.

[3]    A copy of the Sale and Purchase Agreement is attached to the Order as **Exhibit 1.**

[4]    The forms of each agreement contemplated by this Motion as attached to the Sale and Purchase Agreement were negotiated between Seller and Purchaser, and remain subject to negotiation between the Debtors and interested parties.  All parties intend to file final forms of agreements prior to the final hearing on the Motion.

[5]    The Debtors filed a motion contemporaneously herewith seeking authority for Toys Delaware to provide the transition services under the Transition Services Agreement contemplated by this Motion (the "Transition Services Motion").

attached to the Sale and Purchase Agreement as Annex 2.8.2; and (iv)  authorizing Toys "R" Us, Inc. ("Toys Inc.") and Toys "R" Us Europe, LLC ("Toys Europe") to enter into the Waiver and Release of Contingent Interests, the current form of which is attached to the Sale and Purchase Agreement as Annex 2.4.3 (the "Waiver and Release Agreement"); and (b) granting related relief. In support of this Motion, the Debtors submit the *Declaration of Christian Tempke in Support of the Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to Provide Transition Services, (II) Authoring the Debtors to Take Any Corporate Action Necessary to Consummate the Central European Sale, (III) Authorizing Certain Debtors to Enter Into Related Agreements, and (IV) Granting Related Relief* attached hereto as **Exhibit B** (the "Tempke Declaration").

### Jurisdiction and Venue

2.      The United States Bankruptcy Court for the Eastern District of Virginia (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Standing Order of Reference from the United States District Court for the Eastern District of Virginia*, dated July 10, 1984.  The Debtors confirm their consent, pursuant to rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

3.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4.      The bases for the relief requested herein are sections 105 and 363(b) of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006, and rule 9013-1 of the Local Rules of the United States Bankruptcy Court for the Eastern District of Virginia (the "Local Bankruptcy Rules").

**Background**

I.                    **The Central European Sale.**

5.        In connection with the wind-down of the Debtors' U.S. operations (the "U.S. Wind-Down"), the Debtors initiated efforts to monetize their viable operations throughout Canada, Europe, and Asia.  Over the course of the last several months, the Debtors have undertaken substantial efforts to realize value-maximizing sales of these businesses.  On April 25, 2018, the Court approved a sale of the Debtors' Canadian operations for a base purchase price of CAD $300 million [Docket No. 2852].  And as publicly reported, the Debtors continue to explore a sale of their Asian-Pacific operations with multiple potential purchasers continuing to conduct diligence.

6.        The Debtors seek through this Motion approval of certain actions and agreements relating to the sale of their Central European Business.  More specifically, the Seller seeks to sell its operations in Germany, Austria, and Switzerland to the Purchaser, an affiliate of Smyths Toys Superstores ("Smyths Toys"), which currently operates 110 toy stores and online shops in Ireland and Great Britain.  If consummated, the Central European Sale will provide for a baseline purchase price of EUR 64.4 million (approximately $79.3 million) and could yield up to approximately EUR 79 million (approximately $97.7 million), subject to certain adjustments and escrows and meeting certain conditions.[6]  The sale of the Central European Business is the product of extensive marketing efforts, as well as extensive, arm's-length negotiations (described in detail in Section III below).

7.        Importantly, the Central European Business is being sold on a going-concern basis.  Thus, employees, customers, and vendors will all benefit from the proposed transaction.

---

[6]    The USD figures are calculated using the forex rate as of the Sale and Purchase Agreement signing date, April 20, 2018.

Additionally, as the sale is structured as a "stock deal," the Purchaser is assuming all liabilities, including pension liabilities (other than those liabilities expressly waived as described herein and set forth in the Sale and Purchase Agreement).

8.    Moreover, intercompany claims of any Debtors or non-Debtor affiliate, if any, that exist against Toys Germany, Toys Austria, and/or Toys Switzerland will be waived as to the Purchaser, and such claims will be subject to an express reservation of rights for the Debtor and non-Debtor affiliates to prosecute such claims against the proceeds of the Central European Sale in the same priority as such claims would have been afforded if allowed on the date of the sale.  While the proceeds of the sale will be used in the first instance to pay down the higher interest rate obligations under the Taj DIP notes pursuant to the terms of the Taj DIP indentures and the TAJ DIP orders (subject to obtaining applicable waivers), any reservations of rights on account of the reserved intercompany claims will be trued up in subsequent distributions from the Taj Debtors' estates whether under a chapter 11 plan or otherwise (but in all cases subject to a further order of the Court or consent of the applicable parties).[7]

## II.    Effect of Central European Sale on Intellectual Property.

9.    Under the terms of existing license agreements between Debtor Geoffrey LLC ("Geoffrey") and Toys Germany, Toys Austria, and Toys Switzerland, respectively (the "IP License Agreements"), the Central European Business currently uses various trademarks, service marks, trade names, and other intellectual property owned by Geoffrey.  This arrangement differs materially from the Toys Canada business, which owns its own regional intellectual property.  Pursuant to the IP License Agreements, in the event there is a change of control in

---

[7]    Pursuant to Section 2.5 and 2.6 of the Sale and Purchase Agreement, the Central European Businesses shall pay the outstanding payables that they have vis-à-vis the Seller and its Affiliates (as defined in the Sale and Purchase Agreement).  However, the Debtors and their non-debtor affiliates make the foregoing reservation of rights out of an abundance of caution (i) in case such amounts are not made as contemplated and (ii) to preserve any other intercompany claims such parties may have against Toys Germany, Toys Austria, and/or Toys Switzerland.

ownership, Geoffrey and the Central European Business have an obligation to engage in arm's-length negotiations to enter into a potential amendment to the IP License Agreements. During the course of those negotiations, the IP License Agreements will remain in full force and effect. Absent an agreement, Geoffrey maintains the ability to terminate the IP License Agreements.

10.    Geoffrey, the Seller, and the Purchaser were engaged in conversations regarding the IP License Agreement in early April before focusing on finalizing the Sale and Purchase Agreement, and have reengaged in these conversations in recent days. On April 30, 2018, Geoffrey sent a letter to the Central European Business seeking to resume these negotiations, and intends to continue seeking a commercially reasonable agreement prior to the closing date of the Sale and Purchase Agreement. To the extent necessary, Geoffrey will seek authority to enter any new or modified license agreements pursuant to separate motion. If the parties are unable to reach an agreement on an amendment or new license, the IP License Agreements may be terminated by Geoffrey. If they are terminated, the Central European Business under the Purchaser will transition to an alternative brand name and sell or otherwise dispose of private label inventory.

## III.        The Marketing Process.

11.    The Debtors, with the assistance of their investment banker Lazard Frères & Co. LLC ("Lazard"), ran a fair and robust marketing process for their Central European Business. In late January 2018,[8] Lazard began reaching out to potential investors to explore a sale of all or part of the Debtors' European businesses. Over the course of the months that followed, Lazard contacted over 90 potential investors and executed non-disclosure agreements ("NDAs") with approximately 25 parties. Lazard provided additional details to these parties, including a

---

[8]    The Debtors initiated the sale processes in response to the performance of European operations and in order to understand the market value of their assets in preparation for a plan of reorganization in these chapter 11 cases.

confidential management presentation and access to other confidential diligence materials.  In February, the Debtors received letters of intent ("LOIs") from five different parties for all or parts of the European businesses, of which two LOIs were specifically for the Central European Business.

12.    After evaluating the non-binding LOIs, the Debtors pursued a second-round process for certain of their European businesses.  The Debtors arranged meetings between local management and potential investors and their advisors, and had numerous follow-up discussions and diligence sessions over the following weeks.  The Debtors requested binding second-round bids by early April and received one binding offer for the Central European Business from the Purchaser.  Over the course of the following two weeks, the Debtors and certain of their non-debtor affiliates (as defined herein), and their respective advisors, engaged with the Purchaser in extensive, arm's-length negotiations to finalize the Purchaser's offer.  The Debtors and the Non-Debtor Affiliates have determined that the Central European Sale to the Purchaser is the best or otherwise highest proposal under the circumstances.

## IV.    Approval of Related Transactions.

13.    Neither the Seller, Toys Germany, Toys Austria, nor Toys Switzerland (such parties, collectively, the "Non-Debtor Affiliates") are Debtors.  However, (a) they are all wholly-owned indirect subsidiaries of the Debtors and (b) the Seller and Toys Germany are guarantors on the Prepetition Taj Senior Notes and International DIP Facility (together with the Europe Credit Agreement, the "Secured Taj Obligations," and the lenders thereunder, the "Taj Secured Lenders").  Subject to reaching a mutually agreeable Waiver and Release Agreement, the Ad Hoc Group of Taj Noteholders[9] support the Central European Sale and have

---

[9]    The "Ad Hoc Group of Taj Noteholders" refers to certain beneficial holders of Notes represented by Paul, Weiss Rifkind, Wharton & Garrison LLP, as described in the Third Amended Verified Statement of the Ad Hoc Group of Taj Noteholders Pursuant to Bankruptcy Rule 2019, [Docket No. 2056], as may be updated from time to time.

agreed to release their liens and claims on the Central European Business (the "<u>Release Deeds</u>").

Additionally, certain Debtors are party to one or more of the agreements attached to the Sale and

Purchase Agreement, and the consent or direction of certain Debtors and non-Debtor affiliates is

required to effectuate the Sale and Purchase Agreement and related agreements.

14.      Below is a summary of the various agreements contemplated by the Sale and

Purchase Agreement:[10]

- **<u>Transition Services Agreement and Transition Services Support Agreement</u>**.  The Transition Services Agreement, a current non-binding draft of which is attached to the Order as **<u>Exhibit 2</u>**, provides for certain information technology services to be provided by Toys Delaware through April 30, 2019.   The Transition Services Support Agreement, a draft of which will be attached to the Order as **<u>Exhibit 3</u>**, provides for additional funding to Toys Delaware in the event that the costs to provide the Transition Services exceed the fees provided for in the Transition Services Agreement, thus preventing additional costs to Toys Delaware.  Because the Purchaser operates toy stores, it may have different needs than the purchaser of Toys Canada or the Toys Asian-Pacific businesses, but the Debtors believe that the Transition Services Agreement for the Central European Business will be materially consistent with the services the Debtors will provide to the purchasers of their other international operations. Further, approval of the Transition Services Motion and Toys Delaware's entry into the Transition Services Agreement is a necessary component of the overall transaction with Purchaser, and entry into the Transition Services Support Agreement is a condition of Toys Delaware agreeing to provide such services. Accordingly, by this Motion, the Debtors seek approval of entry into the Transition Services Agreement and the Transition Services Support Agreement as relating to the Central European Business, subject to Toys Delaware obtaining authorization to provide such services by the Transition Services Motion.

- **<u>Release Deeds</u>**.  The Release Deeds, substantially in the form attached to the Sale and Purchase Agreement as Annex 2.8.2, confirm the release by each of Wilmington Savings Fund Society, FSB as First-Priority trustee and First-Priority Collateral Trustee and Wilmington Trust N.A. as Second-Priority Trustee and Second-Priority Collateral Trustee of: (i) certain Share Pledges, pursuant to which the shares of the Central European Business were pledged as collateral to secure the Secured Taj Obligations and (ii) all security interests relating to the Taj Indenture and Taj DIP Indenture. The Taj Secured Lenders support the Release Deeds and believe the consideration for, and immediate use of proceeds from, the Central European Business to repay the obligations under the DIP Orders justifies such releases.

---

[10]  The forms of each agreement contemplated by this Motion as attached to the Sale and Purchase Agreement were negotiated between Seller and Purchaser, and remain subject to negotiation between the Debtors and interested parties.  All parties intend to file final forms of agreements prior to the final hearing on the Motion.

- **Waiver and Release Agreement**.  The Waiver and Release Agreement, substantially in the form attached to the Order as **Exhibit 4**, provides the Purchaser a waiver of certain contingent claims.  Specifically, Toys Europe and Toys Inc. (together, the "Debtor Parties") are both lenders under certain loan agreements with Toys Germany (the "Shareholder Loans") and party to a waiver of the Shareholder Loans, which waiver requires repayment under the Shareholder Loans in certain circumstances (all such obligations, the "Contingent Interests" defined in the Sale and Purchase Agreement).  The validity, status, and value of the Contingent Interests are all in dispute.  To facilitate the Central European Sale, by the Waiver and Release Agreement, the Debtor Parties will agree to waive the right to payment of the Contingent Interests from the Purchaser and certain related parties but retain all rights and claims by and between the Debtor Parties, as set forth in the Waiver and Release Agreement.

- **Intercompany Claims**.  As discussed above, the Sale and Purchase Agreement provides a release for the Purchaser related to claims held by certain Debtor and non-Debtor affiliates. Intercompany claims of any Debtors or non-Debtor affiliate, if any, that exist against Toys Germany, Toys Austria, and/or Toys Switzerland will be waived as to the Purchaser, and such claims will be subject to an express reservation of rights for the Debtor and non-Debtor affiliates to prosecute such claims against the proceeds of the Central European Sale in the same priority as such claims would have been afforded if allowed on the date of the sale.  While the proceeds of the sale will be used in the first instance to pay down the higher interest rate obligations under the Taj DIP notes pursuant to the terms of the Taj DIP indentures and the TAJ DIP orders (subject to obtaining applicable waivers), any reservations of rights on account of the reserved intercompany claims will be trued up in subsequent distributions from the Taj Debtors' estates whether under a chapter 11 plan or otherwise  (but in all cases subject to a further order of the Court or consent of the applicable parties).

15.    Additionally, out of an abundance of caution, the Debtors seek authorization from the Court to take any corporate action, including but not limited to granting consents or giving directions to affiliates, necessary to implement the Central European Sale.  As entry of the proposed Order is a condition to the Central European Sale, failure to obtain the relief requested herein may jeopardize the Central European Sale.

16.    Accordingly, the Debtors request that the Court enter the Order and approve the relief requested by this Motion.

## V.         Material Terms of the Central European Sale.

17.    The following chart summarizes the key terms and conditions of the Central

European Sale.

| Provision | Summary Description |
|---|---|
| **Seller** | TRU (UK) H8 Limited |
| **Purchaser** | Smyths Toys EU HQ Limited.  The purchaser is not an affiliate or insider of the Debtors. |
| **Assets** | Seller's equity interest in Toys Germany, Toys Austria, and Toys Switzerland. |
| **Purchase Price** | EUR 64.4 million baseline purchase price less potential lockbox leakage adjustments and escrows and up to an estimated EUR 79.0 million subject to certain positive adjustments and meeting certain conditions. |
| **Austrian Merger Clearance** | The sale of Toys Austria is subject to Austrian merger review regulations, and as such, may not close until a later time.  Nonetheless, the Debtors believe it is appropriate to seek and obtain all relief by this Motion.  However, if the Debtors do not obtain approval to authorize the sale of Toys Austria at this time, the sale of the other Central European Business should not be impacted. |
| **Release of Certain Intercompany Claims** | As discussed herein, sections 2.5 and 2.6 of the Sale and Purchase Agreement release certain intercompany transactions between the Seller, and its Affiliates (as defined in the Sale and Purchase Agreement), and the Central European Business.

The Order Provides: "Notwithstanding anything in the Sale and Purchase Agreement to the contrary, the Debtors agree that any intercompany claims that any Debtor or non-Debtor affiliate held against Toys Germany, Toys Austria, and/or Toys Switzerland as of the date of closing the Sale and Purchase Agreement will be released as to the Purchaser only, and each Debtor or non-Debtor affiliate with valid intercompany claims against the entities sold to the Purchaser as of such date shall be allowed to assert such intercompany claims against the proceeds of the Central European Sale in the same priority as such intercompany claims had against the applicable entities sold to the Purchaser; *provided* that the proceeds of the Central European Sale may be used to repurchase the Taj DIP Notes (subject to obtaining applicable waivers) and any such intercompany claims shall be trued up from distributions from the Taj  Debtors estates, whether under a chapter 11 plan or otherwise  (but in all cases subject to a further order of the Court or consent of the applicable parties).  All parties reserve all rights and |

| | |
|---|---|
| | defenses related to any such intercompany claims, other than that such claims have been released pursuant to this Order." |
| **Key Conditions** | The Central European Sale is conditioned on the execution of the Waiver and Release Agreement, the Release Deeds, and the Transition Services Agreement. |
| **Court Approvals** | The Central European Sale is also conditioned upon entry of orders approving the Waiver and Release Agreement, Release Deeds, approving the Transition Services Agreement, and authorizing the Debtors to take any corporate action necessary to consummate the Central European Sale.<br><br>Given that the Seller and the Central European Business are all non-Debtors, the Debtors submit that Court approval of the Central European Sale itself is not required.  If the Court does require the Debtors to subject the Central European Sale to an additional, Court-monitored marketing process, the Debtors would be required to seek approval of bidding protections acceptable to the Purchaser. |

### Basis for Relief

I.    **Entry into the Transition Services Agreement, Transition Services Support Agreement, Release Deeds, and Waiver and Release Agreement and Take Any Other Corporate Action Necessary to Consummate the Central European Sale Is a Reasonable Exercise of the Debtors' Business Judgment.**

18.    Section 363(b)(1) of the Bankruptcy Code authorizes a bankruptcy court, after notice and a hearing, to authorize a debtor to "use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  To approve a use, sale or lease of property other than in the ordinary course of business, the court must find "some sound business purpose" that satisfies the business judgment test.  *See In re W.A. Mallory Co.*, 214 B.R. 834, 836 (Bankr. E.D. Va. 1997); *see also In re Glover*, No. 09-74787 at *4 (SCS) (Bankr. E.D. Va. Mar. 31, 2010) ("The standard in this Circuit is whether the debtor in possession has exercised sound business judgment.") (citing *Lubrizol Enters., Inc. v. Richmond Metal Finishers, Inc.*, 756 F.2d 1043, 1046 (4th Cir. 1985)).  Courts generally show great deference to a debtor's decisions when applying the business judgment standard.  *See In re Alpha Nat. Res., Inc.*, 546 B.R. 348, 356

(Bankr. E.D. Va. 2016) ("Courts apply the deferential business judgment test when analyzing transactions under § 363(b)(1)."). Deference to a debtor's business judgment is inappropriate only if such business judgment is "so manifestly unreasonable that it could not be based on sound business judgment, but only on bad faith, or whim or caprice." *Lubrizol* at 1047.

19.    Once the Debtors articulate a valid business justification, "[t]he business judgment rule is a presumption that in making the business decision the directors of a corporation acted on an informed basis, in good faith, and in the honest belief that the action was in the best interests of the company." *In re S.N.A. Nut Co.*, 186 B.R. 98, 102 (Bankr. N.D. Ill. 1995) (citations omitted); *In re Filene's Basement, LLC*, 11-13511 (KJC), 2014 WL 1713416, at *12 (Bankr. D. Del. Apr. 29, 2014) ("If a valid business justification exists, then a strong presumption follows that the agreement at issue was negotiated in good faith and is in the best interests of the estate") (citations omitted); *Integrated Res.* 147 B.R. at 656; *In re Johns-Manville Corp.*, 60 B.R. 612, 615–16 (Bankr. S.D.N.Y. 1986) ("a presumption of reasonableness attaches to a Debtor's management decisions.").

20.    The Debtors have determined in their business judgment that entry into the Sale and Purchase Agreements is in the best interest of their estates. Significantly, the Ad Hoc Group of Taj Noteholders have agreed to release, pursuant of the terms of the Release Deeds, the Central European Business from their collateral to effectuate the transaction. The Debtors, together with the Ad Hoc Group of Taj Noteholders, explored the possibility of operating Central Europe as a standalone. The parties all believe, however, that the Purchase and Sale Agreement represents the highest and best recovery for stakeholders under the circumstances. Accordingly, the Debtors believe that entry into the Transition Services Agreement, Transition Services Support Agreement, Release Deeds, Waiver and Release Agreement, and subject to the reservation of rights contained in the proposed Order, the release of certain intercompany claims to effectuate the Sale and Purchase Agreement should be approved.

21.     The Debtors submit that Court approval is not required for any non-debtor subsidiary to sell its interest in other non-debtor subsidiaries because such assets do not constitute property of a debtor's estate within the meaning of section 541(a) of the Bankruptcy Code. Nonetheless, out of an abundance of caution, the Debtors request that this Court also authorize the Debtors to take any other corporate action necessary to consummate the Central European Sale.   In doing so, the Debtors submit that the Court may grant such relief pursuant to section 105(a) using the same standards under section 363(b) of the Bankruptcy Code set forth above.

22.     Here, the Debtors amply satisfy the applicable standards.  Entry into the Transition Services Agreement, Transition Services Support Agreement, Release Deeds, Waiver and Release Agreement, and subject to the reservation of rights contained in the proposed Order, the release of certain intercompany claims and taking any other corporate actions to approve and facilitate the Central European Sale, is a sound exercise of the Debtors' business judgment, as such actions are part and parcel of an overall transaction that will bring significant value to the Debtors' estates.

23.     As described above, the Central European Sale is the result of a robust and fair marketing process, and extensive, arm's-length negotiations.  By vetting the Central European Sale through the market, the Debtors have obtained the highest or otherwise best offer for the Central European Business under the circumstances.  *See In re Wintz Cos.*, 219 F.3d 807, 813 (8th Cir. 2000) (holding that an auction procedure for the disposition of the debtor's property can be structured to "maximize the value of estate property").  Moreover, given the U.S. Wind-Down, any delay in monetizing the Central European Business may hamper any efforts to do so in the future. Thus, for all the reasons stated herein, the Debtors request that the Court grant the Motion as a proper exercise of the Debtors' business judgment.

24.     Courts have authorized substantially similar relief.  *See, e.g.*, *In re Abeinsa Holding Inc.*, No. 16-10790 (KJC), (Bankr. D. Del. May 3, 2016) [Docket No. 162] (authorizing debtor to sell substantially all assets of non-debtor subsidiaries); *In re Haggen Holdings, LLC*, No. 15-11874

(KG) (Bankr. D. Del. Apr. 26, 2016) [Docket No. 1832] (authorizing debtor to monetize assets of non-debtor affiliates); *In re Variant Holding Company, LLC*, No. 14-12021 (BLS) (Bankr. D. Del. June 5, 2015) [Docket No. 381] (authorizing debtor to sell assets of non-debtor subsidiaries pursuant to purchase agreement); *In re Arcapita Bank B.S.C.(c)*, No. 12-11076 (SHL) (Bankr. S.D.N.Y. Dec. 18, 2012) [Docket No. 726] (authorizing debtor to grant consents and approvals in connection with sale by non-debtor subsidiary pursuant to purchase agreement).

## II.    Relief Under Bankruptcy Rules 6004(h) and 6006(d) Is Appropriate.

25.    Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of fourteen days after the entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h).  Additionally, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease . . . is stayed until the expiration of fourteen days after the entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6006(d).  Although the Central European Business is not property of the Debtors' estates, to the extent Bankruptcy Rules 6004(h) and 6006(d) apply, the Debtors request that the fourteen-day stays under Bankruptcy Rules 6004(h) and 6006(d) are waived and the Order be effective immediately upon its entry.

26.    The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to appeal before an order can be implemented.  *See* Advisory Committee Notes to Fed. R. Bankr. P. 6004(h) and 6006(d).  Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the fourteen-day stay period, the leading treatise on bankruptcy suggests that the fourteen-day stay should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to procedure." 10 Collier on Bankr. ¶ 6004.10 (15th rev. ed. 2006).  Furthermore, if an objection is filed and overruled, and the objecting party informs the

court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal. *Id.*

27.    To maximize the value received for the Central European Business, the Debtors seek to close the Central European Sales as soon as possible. Accordingly, the Debtors hereby request that the Court waive the 14-day stay period under Bankruptcy Rules 6004(h) and 6006(d).

## Waiver of Memorandum of Law

28.    The Debtors respectfully request that this Court treat this Motion as a written memorandum of law or waive any requirement that this Motion be accompanied by a written memorandum of law as described in Local Bankruptcy Rule 9013-1(b).

## Reservation of Rights

29.    Nothing contained herein is intended or shall be construed as: (a) an admission as to the amount of, basis for, or validity of any claim against the Debtors under the Bankruptcy Code, any foreign bankruptcy or insolvency law, including the CCAA, or other applicable non-bankruptcy law; (b) a waiver of the Debtors' or any other party in interest's right to dispute any claim, (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Motion; (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code or pursuant to the CCAA; (f) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; or (g) a waiver of any claims or causes of action which may exist against any entity under the Bankruptcy Code, the CCAA, or any other applicable law.

## Notice

30.    The Debtors will provide notice of this Motion via first class mail and email (where available) to: (a) the Office of the United States Trustee for the Eastern District of Virginia, Attn: Robert B. Van Arsdale and Lynn A. Kohen; (b) counsel to the committee of unsecured creditors;

(c) DIP ABL Agent and the advisors and counsel thereto; (d) DIP Taj Term Loan Agent and the advisors and counsel thereto; (e) DIP Delaware Term Loan Agent and the advisors and counsel thereto; (f) the indenture trustee for the TRU Taj 12.00% Senior Notes and the advisors and counsel thereto; (g) the administrative agent for the prepetition Secured Revolving Credit Facility and the advisors and counsel thereto; (h) the administrative agent for the prepetition Secured Term Loan B Facility and the advisors and counsel thereto; (i) the prepetition administrative agent for the Propco I Unsecured Term Loan Facility and the advisors and counsel thereto; (j) the agent for the Propco II Mortgage Loan and the advisors and counsel thereto; (k) the agent for the Giraffe Junior Mezzanine Loan and the advisors and counsel thereto; (l) the administrative agent for the prepetition European and Australian Asset-Based Revolving Credit Facility and the advisors and counsel thereto; (m) the administrative agent for the Senior Unsecured Term Loan Facility and the advisors and counsel thereto; (n) the indenture trustee for the Debtors' 7.375% Senior Notes and the advisors and counsel thereto; (o) the indenture trustee for the Debtors' 8.75% Unsecured Notes and the advisors and counsel thereto; (p) counsel to the ad hoc group of the Term B-4 Holders; (q) counsel to the Ad Hoc Group of Taj Noteholders; (r) the monitor in the CCAA proceeding and counsel thereto; (s) the Debtors' Canadian Counsel; (t) the Internal Revenue Service; (u) the office of the attorneys general for the states in which the Debtors operate; (v) the Securities and Exchange Commission; (w) counsel to the Purchaser, via email only at AKWalker@mintz.com and (x) any party that has requested notice pursuant to Bankruptcy Rule 2002.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

### No Prior Request

31.     No prior motion for the relief requested herein has been made to this or any other court.

Richmond, Virginia
Dated:   May 2, 2018

/s/ *Jeremy S. Williams*
_____

**KUTAK ROCK LLP**
Michael A. Condyles (VA 27807)
Peter J. Barrett (VA 46179)
Jeremy S. Williams (VA 77469)
901 East Byrd Street, Suite 1000
Richmond, Virginia 23219-4071
Telephone:   (804) 644-1700
Facsimile:   (804) 783-6192
Email:        Michael.Condyles@KutakRock.com
              Peter.Barrett@KutakRock.com
              Jeremy.Williams@KutakRock.com

*Co-Counsel to the Debtors*
*and Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C.
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:   (212) 446-4800
Facsimile:   (212) 446-4900
Email:        edward.sassower@kirkland.com
              joshua.sussberg@kirkland.com

-and-

James H.M. Sprayregen, P.C.
Anup Sathy, P.C.
Chad J. Husnick, P.C. (admitted *pro hac vice*)
Emily E. Geier (admitted *pro hac vice*)
300 North LaSalle
Chicago, Illinois 60654
Telephone:   (312) 862-2000
Facsimile:   (312) 862-2200
Email:        james.sprayregen@kirkland.com
              anup.sathy@kirkland.com
              chad.husnick@kirkland.com
              emily.geier@kirkland.com

*Co-Counsel to the Debtors*
*and Debtors in Possession*

## Exhibit A

**Proposed Order**

Edward O. Sassower, P.C.
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:        (212) 446-4800
Facsimile:        (212) 446-4900

-and-

Michael A. Condyles (VA 27807)
Peter J. Barrett (VA 46179)
Jeremy S. Williams (VA 77469)
**KUTAK ROCK LLP**
901 East Byrd Street, Suite 1000
Richmond, Virginia 23219-4071
Telephone:        (804) 644-1700
Facsimile:        (804) 783-6192

James H.M. Sprayregen, P.C.
Anup Sathy, P.C.
Chad J. Husnick, P.C. (admitted *pro hac vice*)
Emily E. Geier (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:        (312) 862-2000
Facsimile:        (312) 862-2200

*Co-Counsel to the Debtors and Debtors in Possession*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| TOYS "R" US, INC., *et al.*,[1] | ) | Case No. 17-34665 (KLP) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

**ORDER (I) AUTHORIZING THE DEBTORS TO PROVIDE
TRANSITION SERVICES, (II) AUTHORIZING THE DEBTORS TO
TAKE ANY CORPORATE ACTION NECESSARY TO CONSUMMATE THE
CENTRAL EUROPEAN SALE, (III) AUTHORIZING CERTAIN DEBTORS TO
ENTER INTO RELATED AGREEMENTS, AND (IV) GRANTING RELATED RELIEF**

Upon consideration of the motion (the "Motion")[2] of the above captioned debtors and

debtors in possession (the "Debtors") for the entry of an order (this "Order"):  (a) authorizing the

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification
number, are set forth in the *Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting
Related Relief* [Docket 78].  The location of the Debtors' service address is One Geoffrey Way, Wayne,
New Jersey 07470.

[2]     Capitalized terms used herein and not otherwise defined shall have the meaning ascribed to them in the Motion,
the Sale and Purchase Agreement, the First Day Declarations, or the *Debtors' Motion for Entry of Interim and
Final Orders (I) Authorizing the TRU TAJ Debtors to Obtain Postpetition Financing, (II) Authorizing the TRU*

Debtors to take any corporate action necessary to consummate the sale (the "Central European

Sale") of non-Debtor TRU (UK) H8 Limited's (the "Seller") equity interest in Toys "R" US-

Handelsgesellschaft ("Toys Austria"), Toys "R" Us GmbH ("Toys Germany"), and Toys "R" Us

AG ("Toys Switzerland," and together with Toys Austria and Toys Germany, the "Central

European Business") to Smyths Toys EU HQ Limited (the "Purchaser") contemplated by that

certain Sale and Purchase Agreement[3] entered into by and among the Seller and Purchaser on

April 21, 2018 (the "Sale and Purchase Agreement"), including:  (i)  to the extent necessary,

authorizing the applicable Debtors, including Toys Inc. and the Tru Taj Debtors to provide any

instructions and consents necessary to effectuate and implement the Sale and Purchase Agreement,

(ii) authorizing Toys "R" Us—Delaware, Inc. ("Toys Delaware") to enter into Transition Services

Agreement and Transition Services Support Agreement in connection with the Sale and Purchase

Agreement, (iii) confirming the Release Deeds substantially in the form attached to the Sale and

Purchase Agreement as Annex 2.8.2, and (iv)  authorizing Toys "R" Us, Inc. ("Toys Inc.") and

Toys "R" Us Europe, LLC ("Toys Europe") to enter into the Waiver and Release of Contingent

Interests, current form of which is attached to the Sale and Purchase Agreement as Annex 2.4.3

(the "Waiver and Release Agreement"); and (b) granting related relief, including the release of

certain intercompany claims subject to the reservation of rights contained herein, all as more fully

set forth in the Motion; and the Court having considered the Tempke Declaration; and the upon

having found that it has jurisdiction to consider this Motion and the relief requested therein in

accordance with 28 U.S.C. §§ 157 and 1334; and the Court having found that consideration of the

---

*TAJ Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection to the Prepetition Lenders, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* [Docket No. 32], as applicable.

[3]    A copy of the Sale and Purchase Agreement is attached hereto as **Exhibit 1.**

Motion and the relief requested therein is a core proceeding pursuant to 28 U.S.C. § 157(b)(2) and

that it may enter a final order consistent with Article III of the United States Constitution; and the

Court having found that venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409;

and the Court having found that the Debtors provided due and proper notice of the Motion that is

adequate and appropriate under the particular circumstances; and  the Court having held a hearing

to consider the relief requested in the Motion (the "Hearing"); and upon consideration of the record

of the Hearing, and all proceedings had before the Court; and the Court having found and

determined that the relief sought in the Motion is in the best interests of the Debtors' estates, their

creditors, and other parties in interest, and that the legal and factual bases set forth in the Motion

and the Tempke Declaration and at the Hearing establish just cause for the relief granted herein;

and upon all of the proceedings had before the Court; and any objections to the relief requested

herein having been withdrawn or overruled on the merits; and after due deliberation and sufficient

cause appearing therefor, it is **HEREBY ORDERED THAT**:

      1.     The Motion is granted as set forth herein.

      2.     Each applicable Debtors is authorized and directed to enter into the

Transition Services Agreement, Transition Services Support Agreement, Release Deeds, and

Waiver and Release Agreement, and perform thereunder.  Specifically, (a) the Toys Inc. directors

(or any agent, representative, or manager acting on their behalf) are authorized and directed to

execute the Waiver and Release Agreement, (b) the Taj Holders (or any agent or representative

acting on their behalf) are authorized and directed to execute the Release Deeds, and (c) Toys

Delaware is authorized to enter into the Transition Services Agreement and Transition Services

Support Agreement.

3.      Except as set forth in the Waiver and Release Agreement, all parties reserve all rights with respect to the Contingent Interests.

4.      Notwithstanding anything in the Sale and Purchase Agreement to the contrary, the Debtors agree that any intercompany claims that any Debtor or non-debtor affiliate held against Toys Germany, Toys Austria, and/or Toys Switzerland as of the date of closing the Sale and Purchase Agreement will be released as to the Purchaser only, and each Debtor or non-debtor affiliate with valid intercompany claims against the entities sold to the Purchaser as of such date shall be allowed to assert such intercompany claims against the proceeds of the Central European Sale in the same priority as such intercompany claims had against the applicable entities sold to the Purchaser; *provided* that the proceeds of the Central European Sale may be used to repurchase or redeem the Taj DIP Notes (subject to obtaining applicable waivers) and any such intercompany claims shall be trued up from distributions from the Taj Debtors estates, whether under a chapter 11 plan or otherwise (but in all cases subject to a further order of the Court or consent of the applicable parties).  All parties reserve all rights and defenses related to any such intercompany claims, other than that such claims have been released pursuant to this Order.

5.      To the extent required, the Debtors are authorized, but not directed, to take all such corporate actions as are desirable or necessary to implement the Central European Sale and this Order, including approving, effectuating, and consummating the Central European Sale, using the proceeds of the Central European Sale to repurchase or redeem the Taj DIP Notes after making payments to the escrow accounts contemplated by, or in connection with the transactions contemplated by, the Sale and Purchase Agreements, and entering into any agreements related thereto. For the avoidance of doubt, the Debtors are authorized, but not directed, to consent to any

4

agreements consistent with this Order or direct the Non-Debtor Affiliates to effectuate any agreement or task consistent with this Order.

6.    This Order shall constitute the findings of fact and conclusions of law and shall take immediate effect upon execution hereof.

7.    To the extent the automatic stay provisions of section 362 of the Bankruptcy Code would otherwise apply, such provisions are vacated and modified to effectuate all terms and provisions of this Order, including, without limitation, to permit any notices contemplated by and in accordance with the Waiver and Release Agreement without further order of the Court.

8.    Notwithstanding anything to the contrary in the *Order (I) Authorizing the Employment and Retention of Lazard Frères & Co. LLC as Investment Banker to the Debtors and Debtors in Possession, Effective* Nunc Pro Tunc *to the Petition Date, (II) Modifying Certain Time Keeping Requirements, and (III) Granting Related Relief* [Docket No. 732] (the "Lazard Retention Order") or the *Order (I) Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Retained Professionals and (II) Granting Related Relief* [Docket No. 746], the Partial Company Sale Transaction Fee (as defined in the engagement letter attached as Exhibit 1 to the Lazard Retention Order) payable by the Debtors to Lazard Frères & Co. LLC ("Lazard") on account of the Central European Sale pursuant to the Lazard Retention Order is hereby approved and allowed on a final basis as an administrative expense pursuant to sections 330 and 503(b) of the Bankruptcy Code and shall be remitted directly to Lazard from the proceeds of the Central European Sale, subject to paragraph 16 of the Lazard Retention Order.

9.    To the extent any of the deadlines set forth in this Order do not comply with the Local Rules, such Local Rules are waived and the terms of this Order shall govern.

10.     Notwithstanding the possible applicability of Bankruptcy Rules 4001, 6004(h), 6006(d), 7062, 9014, or otherwise, this Court, for good cause shown, orders that the terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

11.     This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation, interpretation, or enforcement of this Order.

Dated: _____, 2018
Richmond, Virginia

_____
THE HONORABLE KEITH L. PHILLIPS
UNITED STATES BANKRUPTCY JUDGE

WE ASK FOR THIS:


*/s/ Jeremy S. Williams*

Michael A. Condyles (VA 27807)
Peter J. Barrett (VA 46179)
Jeremy S. Williams (VA 77469)
**KUTAK ROCK LLP**
901 East Byrd Street, Suite 1000
Richmond, Virginia 23219-4071
Telephone:        (804) 644-1700
Facsimile:        (804) 783-6192

- and -

Edward O. Sassower, P.C.
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:        (212) 446-4800
Facsimile:        (212) 446-4900

- and -

James H.M. Sprayregen, P.C.
Anup Sathy, P.C.
Chad J. Husnick, P.C. (admitted *pro hac vice*)
Emily E. Geier  (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:        (312) 862-2000
Facsimile:        (312) 862-2200

*Co-Counsel to the Debtors and Debtors in Possession*


## <u>CERTIFICATION OF ENDORSEMENT</u>
## <u>UNDER LOCAL BANKRUPTCY RULE 9022-1(C)</u>

Pursuant to Local Bankruptcy Rule 9022-1(C), I hereby certify that the foregoing proposed order has been endorsed by or served upon all necessary parties.

*/s/ Jeremy S. Williams*

## <u>Exhibit 1</u>

**Sale and Purchase Agreement**

Number    119    of the Roll of Deeds for 2018



Done

in Frankfurt am Main                                                on 20/21 April 2018

Before me, the undersigned notary public

**Dr. Finn Lubberich**

with offices in Frankfurt am Main

MesseTurm, Friedrich-Ebert-Anlage 49, 60308 Frankfurt am Main

appeared today:

1.    Mr. **Samuel Valentin Frommelt**, born on 6 September 1989, business address: Maximilianstraße 11, 80539 Munich, Germany,

acting not in his own name but under exclusion of personal liability based on power of attorney dated **16 April 2018**, which was presented in copy today, promising to hand in the original as soon as possible upon notarization, and of which a certified copy shall be attached to this deed as

**Exhibit VM.1**

released from the restrictions pursuant to Section 181 Civil Code (*BGB*) for and on behalf of

**TRU (UK) H8 Limited**

a private company limited by shares under the laws of England and Wales, registered office ad-
dress: Cannon Place, 78 Cannon Street, London, United Kingdom, EC4N 6AF, registered with
the Companies House under company number 09873452

("**Seller**");

2.    Ms **Helen Carroll**, born on 6 October 1978, business address: Lyrr 1, Mervue Business Park,
Galway, Ireland,

acting not in her own name, but under exclusion of personal liability

a)    based on power of attorney dated **16 April 2018**, which was presented in original form today
and of which a copy is attached to this deed as

**Exhibit VM.2**

- the officiating notary hereby certifies the respective copy to be identical with the corre-
sponding original - as attorney-in-fact released from the restrictions pursuant to Section 181
Civil Code (*BGB*) for and on behalf of

**Smyths Toys EU HQ Limited**

a private company limited by shares under the laws of Ireland registered with the CRO under
company registration number 615469 with its registered office at Lyrr 1, Mervue Business
Park, Galway, Ireland

( "**Purchaser**"),

and

b)    based on power of attorney dated **19 April 2018**, presented in copy today, promising to hand
in the original as soon as possible upon notarization, and of which a certified copy shall be at-
tached to this deed as

**Exhibit VM.3**

as attorney-in-fact released from the restrictions pursuant to Section 181 Civil Code (*BGB*)
for and on behalf of

**Smyths Toys HQ IOM Unlimited**, a company incorporated on the Isle of Man registered in the Companies Registry under No. 007179V with registered address in PO Box 145, Level 6, 10A Prospect Hill, Douglas, IM99 1FY, Isle of Man.

The deponents identified themselves by submitting their valid passport/identity card, a copy of each was taken by the notary to his files with the consent of the deponents. The notary advised according to § 18 Hessian Information Protection Law, that name, address and personal information of the parties are stored. The underlying statute is §§ 7 and 11 HDSG.

Being informed about their obligations under the German Money Laundering Act (*Geldwäschegesetz, GwG*), the deponents declared that they/respectively the parties represented by them are acting exclusively on their own account.

On being asked whether there had been any prior involvement (*Vorbefassung*) by the notary within the meaning of Sec. 3 para 1 sentence 1 no. 7 of the German Notarization Act (*Beurkundungsgesetz*), the provisions of which had been explained by the notary, the deponents confirmed that there had been no such prior involvement.

The deponents requested that this deed be recorded in the English language. As the notary and the deponents have sufficient command of the English language, this recording is done in English. After having been instructed by the notary, the deponents waived the right to obtain the assistance of a sworn interpreter and to obtain a certified translation of this deed.

**Reference Deed**

A reference deed (*Bezugsurkunde*) was drawn up as part of the preparation of this deed on 20/21 April 2018, with which agreements and documents relating to this contract are enclosed (the preceding deed no. of the acting notary, prior to this deed) ("**Reference Deed**"). The "**Annexes**" mentioned in this deed are the Annexes to the Reference Deed, the original of which was present during notarization. Reference is hereby made to this Reference Deed pursuant to Sec. 13a German Notarization Act (*BeurkG*), and its content shall become the subject of the agreements in this record. The deponents are fully aware of the content of the Reference Deed; the content of the Reference Deed is herewith, after comprehensive review, fully ratified and confirmed by the deponents on behalf of the parties. After instruction by the notary with regard to the legal relevance of such reference, the deponents waived the right to have such Reference Deed read out again and attached to this record.

Thereupon, the deponents, acting as indicated, requested that the following **SALE AND PURCHASE AGREEMENT (Part I of this deed)** and **EQUITY COMMITMENT LETTER (Part II of this deed)** be notarized:

<u>Part I</u>

**SALE AND PURCHASE AGREEMENT**

**relating to**

**Project Elf**

1

## Sale and Purchase Agreement

by and among

(1)     **TRU (UK) H8 Limited**, a private company limited by shares under the laws of England and Wales registered with the Companies House under company number 09873452 with its registered office at Cannon Place, 78 Cannon Street, London, United Kingdom EC4N 6AF

- "**Seller**" -

(2)     **Smyths Toys EU HQ Limited**, a private company limited by shares under the laws of Ireland registered with the Companies Registration Office under company registration number 615469 with its registered office at Lyrr 1, Mervue Business Park, Galway, Ireland

- "**Purchaser**" -

- Seller and Purchaser each referred to
as a "**Party**" and collectively as the "**Parties**" -

## TABLE OF CONTENTS

1    Certain Definitions ............................................................................. 7

2    Corporate Status ............................................................................... 8

3    Sale and Purchase of the Sold Shares, Transition Services ................... 12

4    Purchase Price ................................................................................. 13

5    Rules for Payment ............................................................................ 21

6    Locked Box ..................................................................................... 22

7    Closing Conditions; Merger Clearance; US Bankruptcy Court Matters ............. 25

8    Closing ........................................................................................... 29

9    Termination; Withdrawal Rights ........................................................ 31

10    Seller's Warranties ......................................................................... 32

11    Seller's Covenants .......................................................................... 36

12    Purchaser's Remedies ..................................................................... 38

13    Purchaser's Guarantees ................................................................... 45

14    Purchaser's Covenants; Indemnities .................................................. 46

15    Equity Commitment Letter ............................................................... 47

16    Seller's Remedies ........................................................................... 48

17    Confidentiality; Announcements ....................................................... 48

18    Miscellaneous ................................................................................. 49

## TABLE OF ANNEXES

| Annex (A) | Group Companies |
| Annex 2.4.2 | Copy of Waiver Agreement |
| Annex 2.4.3 | Contingent Interests Waiver Agreement |
| Annex 2.5.1 | Intra-Group Loan Agreements |
| Annex 2.5.3 | Swiss Receivables |
| Annex 2.8.2 | Form of Release Deeds |
| Annex 3.1.1 | Form of German Transfer Agreement |
| Annex 3.1.2 | Form of Austrian Transfer Agreement |
| Annex 4.5 | Allocation of Estimated Purchase Price |
| Annex 4.8.1 | Terms of Specified Contract |
| Annex 6.1 | Financial Statements |
| Annex 6.2.2(a) | Permitted Leakage |
| Annex 7.1.5 | Form of Transition Services Agreement |
| Annex 8.2.3 | Form of Closing Confirmation |
| Annex 10.4 | Participations of Group Companies |
| Annex 10.7 | Conduct of Business |
| Annex 10.9 | IP License Agreement |
| Annex 10.10 | Land Register Excerpts |
| Annex 11.3 | Seller Activities |
| Annex 12.2.3 | Representatives of Purchaser |

## LIST OF DEFINITIONS

### A

Accounting Firm ............................ Section 4.7.3(a)
Acquired Assets.....................................Section 4.1
Affiliate ..................................................Section 1
Agreement ........................................... Preamble (B)
Austrian Share ....................................Section 2.2.2
Austrian Target....................................Section 2.2.1
Austrian Transfer Agreement ............. Section 3.1.2

### B

Beneficiary ..........................................Section 14.2.2
BGB....................................................Section 1
Breach .................................................Section 12.1.1
Breach Notice ....................................Section 12.3.1
Business................................................Preamble (A)
Business Day .......................................Section 1

### C

Closing ...................Section 8.1, Section 1
Closing Actions ...................................Section 8.2.1
Closing Conditions ................................Section 7.1
Closing Confirmation ...........................Section 8.2.3
Closing Date .........................................Section 1
Closing Statement...............................Section 4.7.1
Collateral Trustees..............................Section 2.8.1
Commitments ................................ Section 7.5.4(a)
Confidential Information.....................Section 17.1
Contingent Interests...........................Section 2.4.1
Contingent Interests Waiver Agreement
..............................................................Section 2.4.3
Covered Amount ..................................Section 4.8.3

### D

Data Room...........................................Section 12.2.3
De Minimis Amount...........................Section 12.5.3
Deductible...........................................Section 12.5.3
Designation Right..............................Section 18.5.2
Designee ................................................Section 1
DIP Collateral Trustee ........................Section 2.8.1
DIP Indenture .......................................Section 2.8.1
DIP Notes ............................................Section 2.8.1
Due Diligence Review.........................Section 10.1.2

### E

Equity Commitment Letter.....................Section 15
Escrow Account I ................................Section 4.4.1
Escrow Account II................................Section 4.4.5
Escrow Agent .............Section 4.4.1, Section 4.3.1
Escrow Agreement ..............................Section 4.4.1

Escrow Amount I.................................. Section 4.4.1
Escrow Amount II................................. Section 4.4.2
Escrow Amount III ............................... Section 4.4.3
Escrow Amount IV ............................... Section 4.4.4
Escrow Amount V ................................ Section 4.4.5
Estimated Leakage................................. Section 4.2
Estimated Permitted Leakage ................ Section 4.2
Estimated Purchase Price..................... Section 4.2
Exempted Claims.............................. Section 12.5.2

### F

Fairly Disclosed .................................. Section 12.2
Final Purchase Price ............................. Section 4.1
Financial Statements .............................. Section 6.1

### G

German Shares..................................... Section 2.1.2
German Target..................................... Section 2.1.1
German Transfer Agreement .............. Section 3.1.1
Global Deed of Release ....................... Section 2.8.2
Group Companies ..............................Preamble (A)

### I

Indentures ........................................... Section 2.8.1
Interim Period .................................... Section 11.2.1
Intra-Group Loan Agreements............ Section 2.5.1
Intra-Group Loan Settlement Confirmation
..................................................... Section 2.5.2

### L

Leakage................................................. Section 6.2.1
Locked Box Date .................................. Section 3.2
Longstop Date.................................Section 9.1.1(b)
Losses .................................................. Section 12.1.2

### M

Merger Clearance................................. Section 7.1.1
Merger Control Filings ....................... Section 7.5.1

### N

Notary ..................................................... Section 1
Notes.................................................... Section 2.8.1
Notice of Disagreement ..................... Section 4.7.2

### O

Other Party.......................................... Section 9.1.2

5

## P

Parties .................................................. Parties Section
Party .................................................... Parties Section
Permitted Encumbrances ..................... Section 10.6
Permitted Leakage ................................ Section 6.2.2
Policies ................................................ Section 10.5
Purchase Price ..................................... Section 4.1.1
Purchaser ............................................. Parties Section
Purchaser Claim .................................. Section 12.1.1
Purchaser's Account ............................. Section 5.3
Purchaser's Group ................................ Section 1
Purchaser's Warranties .......................... Section 13

## R

Release Deeds ...................................... Section 2.8.2
Relevant Claim ..................................... Section 4.3.3

## S

Sale Approval Motion ......................... Section 7.6.1
Scheduled Closing Date ....................... Section 1
Seller .................................................. Parties Section
Seller Person ........................................ Section 1
Seller's Account .................................... Section 5.3
Seller's Anti-Leakage Warranty .......... Section 6.3.1
Seller's Covenants ............................... Section 11.2.1
Seller's Group ...................................... Section 1
Seller's Knowledge ............................... Section 1
Seller's Representatives ...................... Section 10.1.2
Seller's Warranties ............................... Section 10.1.1
Shareholder Loans ............................... Section 2.4.1
Shares Pledges ..................................... Section 2.8.1

Signing .................................................. Section 1
Signing Date .......................................... Section 1
Sold Shares ........................................... Section 2.3.2
Spanish Deed of Release .................... Section 2.8.2
Specified Contract ............................... Section 4.8.1
Swiss Distribution ................................ Section 2.5.3
Swiss Escrow Account ....................... Section 4.3.1
Swiss Escrow Amount I ...................... Section 4.3.1
Swiss Escrow Amount II ................... Section 4.3.2
Swiss Receivables ............................... Section 2.5.3
Swiss Shares ........................................ Section 2.3.2
Swiss Target ........................................ Section 2.3.1

## T

TAJ Collateral Trustee ........................ Section 2.8.1
TAJ Indenture ...................................... Section 2.8.1
TAJ Note .............................................. Section 2.8.1
Tax Certificate ..................................... Section 4.4.3
Terminating Party ............................... Section 9.1.2
Third Party Claim .............................. Section 12.3.3
Toys R Us, Inc. .................................... Section 2.4.1
Transition Services Agreement ........... Section 7.1.5
TRU Europe .......................................... Section 2.4.1
TRU France .......................................... Section 4.3.3
TRU Iberia ........................................... Section 4.3.3
TSA Fee ................................................ Section 3.3

## U

U.S. Bankruptcy Court ........................ Section 1
U.S. Debtors .......................................... Section 1
Upstream Securities and Guarantees .. Section 2.8.1

KE 53231411.2

**Preamble**

(A)     Seller is the direct owner of the companies set out in the group chart attached as **Annex (A)** ("**Group Companies**"). The Group Companies are engaged in the specialty retail business for toys and baby products in Germany, Austria and Switzerland ("**Business**").

(B)     Seller intends to sell the Group Companies to Purchaser, and Purchaser intends to acquire the Group Companies from Seller, in accordance with and subject to the terms of this sale and purchase agreement (the "**Agreement**").

Now, therefore, the Parties agree as follows:

**1      Certain Definitions**

In addition to the other definitions set forth in this Agreement, the following terms shall have the following meanings:

"**Affiliate**" shall mean any affiliate within the meaning of section 15 of the German Stock Corporation Act, provided that (i) neither the Group Companies nor, for the avoidance of doubt, NTG Network (as defined in **Annex 10.4**) shall be deemed to be Affiliates of any Party and (ii) Geoffrey, LLC, a Delaware limited liability company, having offices located at c/o Toys "R" Us, Inc., One Geoffrey Way, Wayne New Jersey 07470, USA, shall be deemed an Affiliate of Seller.

"**BGB**" shall mean the German Civil Code (*Bürgerliches Gesetzbuch*).

"**Business Day**" shall mean a day (other than a Saturday or Sunday) on which the banks are open for general business in Frankfurt am Main, Germany, and in Galway, Ireland.

"**Closing**" shall be the time when all Closing Actions have been taken or duly waived in accordance with this Agreement.

"**Closing Date**" shall be the day on which Closing occurs.

"**Designee**" means: (i) until such time as all amounts due and payable under the DIP Notes are fully and finally discharged, Wilmington Savings Fund Society, FSB , as trustee and collateral agent in respect of the DIP Notes, provided that if the DIP Notes are refinanced, then the trustee and collateral agent under such refinanced DIP Notes, (ii) thereafter, until such time as all amounts due and payable under the TAJ Notes are fully and finally discharged, Wilmington Trust, National Association as trustee and collateral agent in respect of the TAJ Notes; provided that if the Taj Notes are refinanced, then the trustee and collateral agent under such refinanced Taj Notes and (iii) thereafter, the Seller (or any nominee appointed by Wilmington Savings Fund Society, FSB, Wilmington Trust, National Association or the Seller, as applicable).

7

**"Notary"** shall mean the acting notary and his official deputy (*amtlich bestellter Vertreter*) or successor in office (*Nachfolger im Amt*).

**"Purchaser's Group"** shall mean Purchaser and its Affiliates.

**"Scheduled Closing Date"** shall be (i) the fifth Business Day after the date on which all Closing Conditions have been fulfilled (and the Closing Conditions in Sections 7.1.2 and 7.1.7 remain fulfilled) or (ii) any other date as agreed in writing between the Parties after the Signing.

**"Seller Person"** shall mean (i) Seller, (ii) any Affiliate of Seller and (iii) any general partner, investment manager or Affiliate of any of them.

**"Seller's Group"** shall mean Seller and its Affiliates.

**"Seller's Knowledge"** shall mean exclusively the actual knowledge (*positive Kenntnis*) of (i) Mr. Detlef Mutterer (Managing Director - Central Europe & Poland) or (ii) Mr. Markus Modla (Finance & Administration Central Europe) as of the Signing.

**"Signing"** means the due execution of this Agreement by the Parties.

**"Signing Date"** shall be the day on which the Signing occurs.

**"U.S. Bankruptcy Court"** shall mean the United States Bankruptcy Court for the Eastern District of Virginia.

**"U.S. Debtors"** shall mean each of the respective estates, individually and collectively, of Toys "R" Us, Inc., Geoffrey Holdings, LLC, Geoffrey International, LLC, Geoffrey, LLC, Giraffe Holdings, LLC, Giraffe Junior Holdings, LLC, MAP 2005 Real Estate, LLC, Toys "R" Us - Value, Inc., Toys "R" Us (Canada) Ltd., Toys "R" Us - Delaware Inc., Toys "R" Us Europe, LLC, Toys "R" Us Property Company II, LLC, Toys Acquisition, LLC, TRU Asia, LLC, TRU Guam, LLC, TRU Mobility, LLC, TRU of Puerto Rico, Inc., TRU Taj (Europe) Holdings, LLC, TRU Taj Finance, Inc., TRU Taj Holdings 1, LLC, TRU Taj Holdings 2 Limited, TRU Taj Holdings 3, LLC, TRU Taj LLC, TRU-SVC, Inc., and Wayne Real Estate Parent Company, LLC.

## 2    Corporate Status

### 2.1    German Target; German Shares

2.1.1    Seller is the sole shareholder of Toys "R" Us GmbH, a limited liability company under the laws of Germany, registered with the commercial register at the local court of Cologne, Germany, under registration number HRB 16651 (**"German Target"**).

8

2.1.2    The registered share capital of German Target amounts to DEM 30,000,000.00 and is divided into four shares in the nominal amounts of DEM 50,000.00, DEM 1,250,000.00, DEM 3,700,000.00 and DEM 25,000,000.00 (**"German Shares"**). Seller holds all German Shares.

2.1.3    German Target in turn holds one share in the nominal amount of EUR 5,000.00, representing approx. 16.67% of the total share capital in the aggregate nominal amount of EUR 30,000.00 in NTG Network Toys Germany GmbH, a limited liability company under the laws of Germany, registered with the commercial register at the local court of Cologne, Germany, under registration number HRB 78259. The other five shares in NTG Network are held by five different third party shareholders.

2.2    Austrian Target; Austrian Shares

2.2.1    Seller is the sole shareholder of Toys "R" Us Handelsgesellschaft mbH, a limited liability company under the laws of Austria, registered with the companies book at the regional court of Linz, under registration number FN 91792 p (**"Austrian Target"**).

2.2.2    The registered share capital of Austrian Target amounts to EUR 36,336.42 and is represented by one share quota representing the entire share capital (**"Austrian Share"**). Seller holds the Austrian Share.

2.3    Swiss Target; Swiss Shares

2.3.1    Seller is the sole shareholder of Toys R Us AG, a stock corporation under the laws of Switzerland, registered with the commercial register of canton Zurich, under identification number CHE-106.090.137 (**"Swiss Target"**).

2.3.2    The registered share capital of Swiss Target amounts to CHF 100,000.00 and is divided into 100 shares in the nominal amount of CHF 1,000.00 (**"Swiss Shares"**, and together with the German Shares and the Austrian Share the **"Sold Shares"**). Seller holds all Swiss Shares.

2.4    Contingent Interests

2.4.1    Toys "R" Us Europe LLC (formerly TRU, Inc.), a limited liability company organized under the laws of Delaware, USA, with registered office at 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808, USA, and registered with the Delaware Secretary of State under number 2026162 (**"TRU Europe"**), and Toys "R" Us Inc., a stock corporation organized under the laws of Delaware, USA, with registered office at 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808, USA and registered with the Delaware

Secretary of State under number 2356739 (**"Toys "R" Us, Inc."**), as lenders and the German Target as borrower were parties to certain loan agreements (**"Shareholder Loans"**), respectively (all rights of the lenders under or in connection with the Shareholder Loans, including without limitation all receivables under the Shareholder Loans for repayment of the principal amounts plus any accrued, unpaid and future interest and any unilateral rights (*Gestaltungsrechte*) under the Shareholder Loans (e.g. termination rights (*Kündigungsrechte*)) collectively, the **"Contingent Interests"**).

2.4.2    In 2000, TRU Europe, Toys R Us, Inc. and the German Target entered into a waiver agreement in respect of the Contingent Interests, a copy of which is attached, for documentation purposes only, as **Annex 2.4.2**, pursuant to which TRU Europe and Toys R Us, Inc. waived the Contingent Interests under the condition subsequent (*auflösende Bedingung*) that full or partial repayments of the Contingent Interests have to be made by German Target under certain circumstances.

2.4.3    Seller shall use commercially reasonable efforts that the Contingent Interests shall, upon the terms and conditions of this Agreement, be waived by TRU Europe and Toys "R" Us, Inc., on or before the Scheduled Closing Date with effect prior to the Closing and without any costs to the Group Companies under a separate waiver agreement substantially in the form as attached as **Annex 2.4.3** (**"Contingent Interests Waiver Agreement"**).

2.5    <u>Intra-Group Loan Payables and Receivables</u>

2.5.1    The Group Companies are further parties to certain intra-group loan agreements with companies of Seller's Group as of the Signing as listed in **Annex 2.5.1** (**"Intra-Group Loan Agreements"**). As of April 18, 2018, the Group Companies had receivables under the Intra-Group Loan Agreements as shown in **Annex 2.5.1**, but no payables under the Intra-Group Loan Agreements.

2.5.2    Subject to Section 2.5.3, all payables and receivables of the Group Companies under the Intra-Group Loan Agreements shall be distributed to Seller (with the proviso that certain receivables may have to be transferred between the Austrian Target and the German Target before such distribution), assumed by Seller, waived or settled by the parties to the Intra-Group Loan Agreements (in case of payables of the Group Companies with full release of the Group Companies) no later than as of the day immediately prior to the Closing Date, and the parties to the Intra-Group Loan Agreements shall, in case of payables of the Group companies, confirm such distribution, assumption, waiver or

10

settlement and such release in writing ("**Intra-Group Loan Settlement Confirmation**").

2.5.3   In respect of the loan receivables of the Swiss Target listed in **Annex 2.5.3** ("**Swiss Receivables**"), prior to Closing, Seller shall procure that Swiss Target shall take a resolution to distribute such receivables in an amount of up to CHF 39,000,000 to Seller and shall pay such distribution to Seller prior to Closing (the "**Swiss Distribution**").

2.6   Other Intra-Group Arrangements

Except as explicitly set forth in this Agreement (including, under Section 6.2.2(a)) or in the agreements entered into pursuant to this Agreement, with effect from the Closing Date, all long-term agreements and other arrangements between Seller or any of its Affiliates on the one hand and the Group Companies, or any of them, on the other hand shall be terminated with full release of the Group Companies and Seller and its Affiliates from all claims, liabilities and other obligations; this includes any balances owing to companies in the Seller's Group not already dealt with under the provisions of Sections 2.4 and 2.5. If after the Closing Date any such claim, liability or other obligation still exists, (i) Seller shall waive, and shall procure that its Affiliates waive, on demand by Purchaser all rights against the relevant Group Company, its directors, officers and employees in respect of such claim, liability or other obligation, and (ii) Purchaser shall procure that the Group Companies will waive on demand by Seller all rights against Seller and its Affiliates, directors, officers and employees in respect of such claim, liability or other obligation.

2.7   Seller's Obligations

Seller shall indemnify and hold harmless Purchaser and the Group Companies from and against any and all Losses, costs and liabilities (whether present or future, actual or contingent) (including any taxes, e.g. any withholding tax or stamp duties) resulting from the measures set out in Sections 2.5 and 2.6 other than the obligation to consummate the transaction as such. Seller shall promptly furnish to Purchaser all information and permit Purchaser to review in advance any proposed documents in connection with any measures set out in Sections 2.5 and 2.6, including, but not limited to, the mechanics and supporting documents relating to any German withholding tax.

2.8   Existing Security Interests

2.8.1   Seller and German Target and Swiss Target are guarantors under an indenture ("**TAJ Indenture**") dated August 16, 2016 by and among TRU Taj LLC and TRU Taj Finance, Inc. as issuers, the guarantors parties thereto and

11

Wilmington Trust, NA (**"TAJ Collateral Trustee"**) as trustee and collateral trustee relating to those certain 12% senior secured notes (collectively, **"TAJ Note"**), and Seller and the Group Companies are guarantors under an indenture (**"DIP Indenture"**, and collectively with the TAJ Indenture, the **"Indentures"**) dated September 22, 2017 by and among TRU Taj LLC and TRU Taj Finance Inc. as issuers, the guarantors parties thereto and Wilmington Savings Fund Society, FSB (**"DIP Collateral Trustee"**, and together with the TAJ Collateral Trustee, the **"Collateral Trustees"**) as trustee and collateral trustee relating to those certain 11% senior secured ABL DIP notes (**"DIP Notes"** and, collectively, the **"Notes"**). The Group Companies are neither debtors nor issuers under these Indentures, but have granted certain guarantees and security interests to the holders of the Notes under the Indentures (collectively, **"Upstream Securities and Guarantees"**). Furthermore, Seller has pledged the German Shares, the Austrian Share and the Swiss Shares to the holders of the Notes (**"Shares Pledges"**).

2.8.2   The Upstream Securities and Guarantees and the Shares Pledges shall be released on the Closing Date, as set forth in Section 8.2.1(j), under a Deed of Release to be entered into, *inter alios*, the Group Companies, and the Collateral Trustees (**"Global Deed of Release"**) and a Public Deed of Release of Pledges under Spanish law between the German Target and the Collateral Trustees (the **"Spanish Deed of Release"**), each substantially in the form attached hereto as **Annex 2.8.2** but with such amendments as the parties thereto shall reasonably require and agree between themselves (the **"Release Deeds"**) and Seller shall deliver to Purchaser at Closing a copy of a written statement from each Collateral Trustee confirming the release, the re-assignment or re-transfer of all Upstream Securities and Shares Pledges upon payment of the Estimated Purchase Price each in substantially the form attached as drafts to the Release Deeds but with such amendments as the parties thereto shall reasonably require and agree between themselves.

# 3   Sale and Purchase of the Sold Shares, Transition Services

## 3.1   Sale and Purchase of the Sold Shares

3.1.1   Seller, upon the terms and conditions of this Agreement, hereby sells and undertakes to assign (*abtreten*) on the Scheduled Closing Date with *in rem* effect (*mit dinglicher Wirkung*) as of the Closing Date to Purchaser the German Shares in accordance with a separate transfer agreement substantially in the form as attached as **Annex 3.1.1** (**"German Transfer Agreement"**). Purchaser hereby purchases the German Shares from Seller and undertakes to accept the assignment thereof as provided for under the German Transfer Agreement.

12

3.1.2    Seller, upon the terms and conditions of this Agreement, hereby sells and undertakes to assign (*abtreten*) on the Scheduled Closing Date with *in rem* effect (*mit dinglicher Wirkung*) as of the Closing Date to Purchaser the Austrian Share in accordance with a separate transfer agreement substantially in the form as attached as **Annex 3.1.2** (**"Austrian Transfer Agreement"**). Purchaser hereby purchases the Austrian Share from Seller and undertakes to accept the assignment thereof as provided for under the Austrian Transfer Agreement.

3.1.3    Seller, upon the terms and conditions of this Agreement, hereby sells and, undertakes to assign (*abtreten*) on the Scheduled Closing Date with *in rem* effect (*mit dinglicher Wirk*ung) as of the Closing Date to Purchaser the Swiss Shares. Purchaser hereby purchases the Swiss Shares from Seller and undertakes to accept the assignment thereof on the Scheduled Closing Date.

3.2    Economic Effect

The Sold Shares are sold with economic effect as of February 3, 2018, 24:00 hours (**"Locked Box Date"**), with all rights and obligations pertaining thereto, including the right to receive all profits for the current fiscal year as well as all profits for the previous fiscal years not yet distributed prior to or on the Closing Date or to be distributed by Swiss Target to Seller in accordance with Section 2.5.3.

3.3    Transition Services

The Parties agree that certain companies of Seller's Group shall provide certain transition services to the Group Companies for a certain period of time after Closing based on the Transition Services Agreement (the total of the fees payable by the Group Companies for a 12 months' period pursuant to the terms of the Transition Services Agreement on the Scheduled Closing Date in an amount of USD 5,404,000, the **"TSA Fee"**). The Transition Services Agreement and the TSA Fee shall include migration services in accordance with the Transition Services Agreement. On the Scheduled Closing Date, Purchaser shall pay an amount equal to the TSA Fee into the Escrow Account II as set forth in Section 8.2.1(i).

**4    Purchase Price**

4.1    Purchase Price for the Sold Shares

The total consideration payable by Purchaser to Seller for the Sold Shares (collectively, **"Acquired Assets"**) shall be the aggregate of

4.1.1    a fixed amount of EUR 64,400,000.00 (in words: Euro sixty-four million four hundred thousand) (**"Purchase Price"**),

4.1.2 minus an amount equal to all Leakage other than Permitted Leakage (each as defined in Section 6 below), if any, existing on the Closing Date,

4.1.3 plus an amount equal to the Covered Amount, if the requirements in Section 4.8 are satisfied,

(the Purchase Price as adjusted as set forth in this Section 4.1, **"Final Purchase Price"**).

Final Purchase Price items pursuant to this Section 4.1 which are not expressed in Euro shall be converted for the mere purpose of calculating the Final Purchase Price into Euro using the exchange rate of the relevant currency, officially determined by the European Central Bank in Frankfurt am Main as the relevant exchange rate of the Closing Date and as published on the website www.ebc.int.

4.2    Estimated Purchase Price

No later than five (5) Business Days prior to the Scheduled Closing Date, Seller shall deliver to Purchaser a statement which sets out Seller's good faith estimate of the Final Purchase Price (**"Estimated Purchase Price"**), including a separate breakdown of the estimated amount of all Leakage (**"Estimated Leakage"**), and the estimated amount of all Permitted Leakage (**"Estimated Permitted Leakage"**), each from the Locked Box Date until the Scheduled Closing Date. For the purposes for determining the Estimated Purchase Price Seller shall reflect the Covered Amount at EUR 5,600,000.00.

4.3    ███████████████

4.3.1 ████████████████████████████████████████

4.3.2 ████████████████████████████████████████

4.3.3 ████████████████████████████████████████

14



15



4.3.4

4.3.5

4.3.6

4.3.7

4.4 Escrow Amounts

On the Scheduled Closing Date, subject to the fulfilment of all Closing Conditions, Purchaser shall make, or cause to be made, the following payments:

4.4.1 A partial amount of EUR 2,500,000.00 (**"Escrow Amount I"**) out of the Estimated Purchase Price shall be paid by Purchaser into an escrow account (**"Escrow Account I"**) operated by the Notary (**"Escrow Agent"**). The Escrow Amount I (including accrued interest) shall serve as collateral only for any claims of Purchaser pursuant to Section 6.3 (*Seller's Guarantees and Undertaking to Prevent Leakage*) of this Agreement as set forth in the escrow agreement which the Parties undertake to enter into on or before the Scheduled

16

Closing Date with the Notary in the form acceptable to each of the Parties, Wilmington Savings Fund Society, FSB (as trustee and collateral agent under the DIP Notes) and Wilmington Trust, National Association (as trustee and collateral agent under the TAJ Notes) (**"Escrow Agreement"**). Any Escrow Amount I remaining in the Escrow Account on the 4-months anniversary of the Closing Date (including accrued interest) shall be paid to Seller or Purchaser in accordance with the Escrow Agreement.

4.4.2   A partial amount of EUR 6,440,000.00 (**"Escrow Amount II"**) out of the Estimated Purchase Price shall be paid by Purchaser into the Escrow Account I. The Escrow Amount II (including accrued interest) shall serve as collateral for (i) any claims of Purchaser against Seller under this Agreement and (ii) any claims of any Group Company under the Transition Services Agreement as set forth in the Escrow Agreement.

In accordance with the Escrow Agreement, the Escrow Amount II shall be released in an amount of EUR 357,777.77 per month for 12 consecutive months unless Purchaser has asserted relevant claims exceeding the remaining Escrow Amount II, provided that the release to Seller shall not result in any reduction of the Escrow Amount II below EUR 2,000,000.00 prior to the 12-months anniversary of the Closing Date. Any Escrow Amount II remaining in the Escrow Account I on the 18-month anniversary of the Closing Date (including accrued interest) shall be paid to Seller as set forth in the Escrow Agreement and to the extent not required to cover any claims notified by Purchaser on or before such date.

4.4.3   If no unqualified binding tax certificate by the competent Swiss tax authorities stating that Seller (and not Purchaser) is beneficially entitled to the Swiss Distribution and that a 0% or 5% rate of withholding tax may be applied at source (a **"Tax Certificate"**) is received prior to the Swiss Distribution, a partial amount of EUR 11,300,000.00 (**"Escrow Amount III"**) out of the Estimated Purchase Price shall be paid by Purchaser into Escrow Account I in accordance with the Escrow Agreement. The Escrow Amount III (including accrued interest) shall serve as collateral only for any amount due from the Swiss Target to the competent Swiss tax authorities in respect of withholding tax due in connection with the Swiss Distribution. In accordance with the Escrow Agreement, Escrow Amount III (including accrued interest) shall be paid to Seller or to the competent Swiss tax authorities as set forth in the Escrow Agreement.

The Purchaser shall use all reasonable endeavors to obtain, or to procure that the Swiss Target obtains, a Tax Certificate in relation to the Swiss Distribution as soon as reasonably practicable.

17

4.4.4    A partial amount of EUR 5,600,000.00 out of the Estimated Purchase Price shall be paid by Purchaser either (i) if the Specified Contract is in full force and effect as of the Closing Date, into the Seller's Account as part of the Estimated Purchase Price, or (ii) in all other cases into the Escrow Account I in accordance with the Escrow Agreement (in this case: **"Escrow Amount IV"**). The Escrow Amount IV (including accrued interest) shall be released to Purchaser or Seller as set forth in the Escrow Agreement.

4.4.5    An amount equal to the TSA Fee (**"Escrow Amount V"**) shall be paid by Purchaser into a further escrow account (the **"Escrow Account II"**) in accordance with the Escrow Agreement. The Escrow Amount V (including accrued interest) shall be released to Purchaser or Toys "R" Us Delaware, Inc., as set forth in the Escrow Agreement.

4.4.6    Purchaser shall pay an amount equal to the Estimated Purchase Price less the sum of the Escrow Amount I, Escrow Amount II, Escrow Amount III (if applicable) and Escrow Amount IV (if applicable) to Seller to Seller's Account.

4.5    Purchase Price Allocation

The Estimated Purchase Price shall be allocated to the Sold Shares as set forth in **Annex 4.5**. Any payment made by either Party to or for the benefit of the other Party in connection with this Agreement after Closing shall be treated as adjustment of the Final Purchase Price paid by Purchaser under this Section 4 and allocated *pro rata* to the Sold Shares, unless any adjustment of the Final Purchase Price pertains directly to the Sold Shares.

4.6    No Withholding Tax; VAT

Any amounts payable by Purchaser under or in connection with this Agreement are to be made free and clear of withholding taxes. If and to the extent payments by Purchaser are subject to withholding or value added taxes (*Umsatzsteuer*), the respective amounts shall be grossed up for such withholding or value added taxes. Seller shall not opt to treat the sale and transfer of the Sold Shares as transaction subject to value added tax.

4.7    Review of Estimated Leakage

4.7.1    As promptly as practical after the Closing Date, but not later than sixty (60) calendar days after the Closing Date, Purchaser shall prepare, or cause to be prepared, and deliver to Seller an update, as of the Closing Date, of the Estimated Leakage and the Estimated Permitted Leakage together with the underlying documentation on calculations of such numbers (**"Closing**

18

**Statement**"). Seller will co-operate and assist Purchaser and its representatives in the preparation of the Closing Statement.

4.7.2   If Seller believes that the Closing Statement has not been prepared in accordance with the principles as set forth in Section 6.2, Seller may, within thirty (30) Business Days after delivery of the Closing Statement, deliver a notice to Purchaser objecting the Closing Statement, which has to specify, in reasonable detail those items and amounts as to which Seller disagrees, the scope of disagreement in the form of an alternative calculation setting out all items and amounts, and the reasons for each deviation from Purchaser's calculation together with the underlying evidence and documentation to the extent available to Seller ("**Notice of Disagreement**"), and Seller shall be deemed to have agreed to all other items and amounts contained in the Closing Statement delivered by Purchaser pursuant to Section 4.7.1.

4.7.3   Dispute Resolution

(a)     If Seller has delivered a Notice of Disagreement in accordance with Section 4.7.2, Seller and Purchaser shall, during the 30-calendar day period following such delivery (or any other period of time mutually agreed in writing upon between Seller and Purchaser), use all reasonable efforts to reach an agreement on the disputed items or amounts. If and to the extent that Seller and Purchaser are unable to reach such agreement during such period, on request of either of Seller or Purchaser (to be notified to the other Party within ten (10) Business Days from the expiry of the period under sentence 1) the remaining differences shall be resolved by Baker Tilly Roelfs ("**Accounting Firm**") acting as an expert (*Schiedsgutachter*) (and not as an arbitrator) and being jointly appointed by the Parties. If the aforesaid firm is not available and Seller and Purchaser cannot mutually agree upon the Accounting Firm within two weeks after Seller or Purchaser has requested its appointment, an internationally-renowned accountancy firm shall be appointed, upon request of either Seller or Purchaser, by the "*Institut der Wirtschaftsprüfer in Deutschland e. V.*", Düsseldorf, and shall be the Accounting Firm.

(b)     The Accounting Firm shall, based on the principles set forth in Section 6.2, decide whether and to what extent the Closing Statement requires adjustment to comply with the provisions of this Agreement. The Accounting Firm, in making its determination, shall only take into account any remaining differences submitted to it and shall limit its determination to the scope of the dispute between the Parties, taking into account any compensating effects.

19

    (c)    The Parties shall co-operate with and assist and shall cause their respective accountants and the Group Companies to co-operate with and assist the Accounting Firm in the conduct of its review. Such co-operation and assistance shall include, without limitation, the making available to the Accounting Firm of all relevant books and records of the Group Companies and any other information relating to the Business.

    (d)    The Parties shall instruct the Accounting Firm to deliver its written opinion (including reasons for the Accounting Firm's decision to each disputed item) to them no later than two months (or within any other period of time mutually agreed) after the remaining differences have been referred to it. To the maximum extent legally possible, the decision of the Accounting Firm shall be conclusive and binding on the Parties and shall not be subject to any appeal, especially not to appeal under Section 319 BGB. The fees and disbursements of the Accounting Firm shall be allocated by the Accounting Firm between Seller and Purchaser in proportion to the respective success and defeat.

4.7.4    Seller or Purchaser, as the case may be, shall effect payment of the difference between (i) the Estimated Leakage less the Estimated Permitted Leakage and the (ii) Leakage less the Permitted Leakage as determined in accordance with Section 4.7 plus interest on such difference at a rate of 1% starting from (but excluding) the Closing Date until (and including) the day of payment, within ten (10) Business Days after the Closing Statement has become final and binding upon the Parties. To the extent that the Escrow Amount I is still available for release in accordance with the Escrow Agreement, any payment to Purchaser shall be made from the Escrow Account I and reduce the Escrow Amount I.

4.8    <u>Special Matters</u>

4.8.1    The Parties agree that Seller may arrange for entry into the contract described in **<u>Annex 4.8.1</u>** ("**Specified Contract**"), provided that the Specified Contract must be in full force and effect within three (3) months after the Closing Date.

4.8.2    If Seller within three (3) months after the Closing Date enters into the Specified Contract,

    (a)    the Seller may at its cost cause the Group Companies to take all steps and make all declarations required or useful to enter into and to implement the Specified Contract, and

(b)      as set forth in Section 4.1.3, the Purchase Price shall be increased by an amount equal to the Covered Amount, if and when the Specified Contract is in full force and effect.

4.8.3    The "**Covered Amount**" shall be as set forth in <u>Annex 4.8.1</u>.

4.8.4    Seller shall indemnify and hold harmless Purchaser and the Group Companies from and against any and all Losses, costs and liabilities (whether present or future, actual or contingent) (including any taxes) resulting from the Specified Contract, and the transactions contemplated thereby or steps and declarations taken or made in connection therewith.

## 5    Rules for Payment

### 5.1    <u>Due Date</u>

The Estimated Purchase Price and any portion of the TSA Fee amount payable on the Scheduled Closing Date under the TSA shall be due on the Scheduled Closing Date and be paid by Purchaser (in case of the TSA Fee on behalf of the Group Companies) in accordance with the provisions of this Section 5 and Section 8.2.1. The additional amounts payable under Section 4.3 shall be due and payable in accordance with Section 4.3.

### 5.2    <u>Modes of Payment</u>

Except as expressly provided otherwise herein, any payments under or in connection with this Agreement shall be made in Euros by irrevocable wire transfer of immediately available funds, free of bank and other charges. Any such payment shall be deemed made only upon the irrevocable and unconditional crediting of the amount payable (without deduction of any costs or charges) to the relevant bank account.

### 5.3    <u>Accounts</u>

Except for payments which shall be paid into the Escrow Accounts pursuant to Section 4.4, all payments owed by Purchaser to Seller under or in connection with this Agreement shall be paid to one or more bank accounts notified by Seller to Purchaser in writing no later than five Business Days prior to the Scheduled Closing Date or such other account(s) as notified at least five Business Days prior to the due date of such payment ("**Seller's Account**"). Seller hereby agrees that payment into the Seller's Account shall constitute full satisfaction by Purchaser of the relevant payment obligations. All payments owed by Seller to Purchaser under or in connection with this Agreement shall be paid to the bank account notified by Purchaser in writing at least five Business Days prior to the due date of such payment ("**Purchaser's Account**").

21

5.4     No Set-Off; No Right of Retention

No Party shall be entitled (i) to set off any rights or claims it may have against any rights or claims any other Party may have under or in connection with this Agreement, or (ii) to refuse to perform any obligation it may have under or in connection with this Agreement on the grounds that it has a right of retention, unless the rights or claims to be set-off or the right of retention have been acknowledged in writing by the relevant other Party or have been confirmed by final decision of a competent court (*Gericht*) or arbitration court (*Schiedsgericht*).

5.5     Default Interest

Except as provided otherwise herein, each of the Parties shall pay interest on any amount becoming due to another Party under this Agreement as from (and including) the respective due date until (but excluding) the day of actual payment at the rate of eight percent (8%) per annum.

5.6     Calculation of Interest

Interest for any amounts due under or in connection with this Agreement shall be calculated on the basis of actual days elapsed and a 365-day year.

**6       Locked Box**

6.1     Financial Statements

Purchaser has been provided with an excerpt from the aggregated reporting pack for the period starting January 29, 2017 until February 3, 2018, which are attached hereto as **Annex 6.1** (collectively "**Financial Statements**").

6.2     Leakage, Permitted Leakage

6.2.1   "**Leakage**" shall mean

(a)     any dividend or distribution declared, paid or made (whether actual or deemed) by any Group Company to any Seller Person;

(b)     any payments made (or future benefits granted) to (or assets transferred or surrendered to, or liabilities assumed, indemnified, or incurred for the benefit of) any of the Seller Person or for the direct or indirect benefit of any of them by any Group Company (including, for the avoidance of doubt, any professional advisers' costs relating to this Agreement or the transactions reflected in this Agreement and any costs and fees payable to finance parties in connection with the Release

22

Deeds, in each case if made or agreed to be made by any Group Company);

(c) any payments made or agreed to be made by any Group Company to any Seller Person in respect of any share capital, reserves (*Rücklagen*), loan capital or other securities of any Group Company being issued, redeemed, purchased or repaid, or any other return of capital;

(d) the waiver by any Group Company of any amount owed to that Group Company by any Seller Person;

(e) economic benefits of any kind (including, without limitation, the discharge or waiver of any liability) conferred on any Seller Person by any Group Company;

(f) the agreement or understanding by any Group Company to do any of the matters set out in (a) to (e) above; and

(g) any tax becoming payable by any Group Company as a consequence of any of the matters referred to in (a) to (f) above net of any tax benefits resulting from the same circumstances giving rise to the Leakage.

6.2.2 **"Permitted Leakage"** shall mean the following:

(a) all payments or other consideration by any Group Company to any Seller Person made or to be made from (but excluding) the Locked Box Date until (and including) the Closing Date to the extent set forth in **Annex 6.2.2(a)**;

(b) any transaction carried out pursuant to and in accordance with this Agreement or agreements to be entered into as set forth in this Agreement (including the transactions in Sections 4.3.1 and 4.3.2 but excluding any transactions pursuant to Section 2.5 and Section 2.6 to the extent they result in cash-outs of the Group Companies and are not explicitly set forth in Annex 6.2.2(a)); and

(c) for the avoidance of doubt, any payment deferral by any Group Company of any maturity with respect to any amount owed by a Seller Person to such Group Company under any Intra-Group Loan Agreement.

6.3 Seller's Guarantees and Undertaking to Prevent Leakage

6.3.1 Seller hereby guarantees by way of an independent guarantee (*selbständiges Garantieversprechen*) pursuant to Section 311 BGB regardless of any

23

knowledge of Seller that as from the Locked Box Date until the Signing Date no Leakage other than Permitted Leakage has occurred ("**Seller's Anti-Leakage Warranty**"), provided, that notwithstanding anything in this Agreement to the contrary, Seller shall be entitled to take such actions as are necessary to  fill in, execute and file IRS form 8832 with respect to the Austrian Target, which form shall provide that Austrian Target shall be classified as a disregarded entity for U.S. federal income tax purposes, provided, further, that in the event such action to cause the Austrian Target to become a disregarded entity causes any incremental tax liability for the Austrian Target that is not satisfied prior to Closing, Seller shall indemnify Purchaser for such tax liability.

6.3.2    Seller shall procure (*einstehen*) that, between the Signing Date and Closing, unless otherwise provided in this Agreement or the agreements to be entered into as set forth in this Agreement, no Leakage other than Permitted Leakage will occur without Purchaser's prior written consent (which may be withheld in Purchaser's reasonable discretion). Such consent shall not relieve Seller of its indemnification or compensation obligations under this Agreement.

6.4    <u>Legal Consequences in case of Breach of the Undertakings</u>

6.4.1    If Seller acknowledges in writing or, absent such written acknowledgment, if the Accounting Firm determines in line with Section 4.7.3 that the Seller's Anti-Leakage Warranty in Section 6.3.1 is incorrect or Seller has breached any of the undertakings pursuant to Section 6.3.2, Seller shall promptly, but in any event prior to Closing, remedy the relevant breach, i.e. put the relevant Group Company in the position, which it would be in, had the Leakage not occurred. If and to the extent that factual remediation of the Breach is not achieved prior to Closing or impossible or finally refused (*ernsthaft und endgültig verweigert*) by Seller, Seller shall fully compensate (*Schadensersatz*) Purchaser or, at Purchaser's request, the respective Group Company, on a EUR for EUR basis in respect of the relevant breach.

6.4.2    Claims arising from an incorrectness of the Seller's Anti-Leakage Guarantee and/or a breach of any of the undertakings pursuant to Section 6.3 shall become time-barred twelve (12) months after the Closing Date.

6.4.3    To the extent that the Purchase Price was reduced for any Leakage as set forth in Section 4.1.2 or Leakage has been remedied before Closing, Seller shall not be required to compensate Purchaser and any Group Company for such Leakage (no double dip).

24

## 7    Closing Conditions; Merger Clearance; US Bankruptcy Court Matters

7.1    <u>Closing Conditions</u>

The obligations of the Parties to take the Closing Actions set forth in Section 8.2.1 shall be subject to the following conditions precedent (*aufschiebende Bedingungen*) (the "**Closing Conditions**") having been satisfied or duly waived:

7.1.1    The merger control clearance in Austria for the acquisition of the Sold Shares ("**Merger Clearance**") has been obtained or is deemed to be obtained (*e.g.*, due to lapse of applicable waiting periods or due to jurisdiction having been declined by any relevant governmental authority).

7.1.2    No enforceable judgment, injunction, order or decree by any court or government authority in Germany or any other competent jurisdiction prohibits the consummation of the Closing.

7.1.3    TRU Europe, Toys "R" Us Inc. and the German Target have duly entered into the Contingent Interests Waiver Agreement with effect no later than as of the Closing Date.

7.1.4    The Release Deeds have been duly executed by the respective parties thereto in accordance with Annex 2.8.2.

7.1.5    A transition services agreement to be mutually agreed has been duly executed by the respective parties thereto, which provides for a term of not less than 18 months and a total fee of not more than EUR 10,404,000.00 (the "**Transition Services Agreement**"); a current non-binding draft of the Transition Services Agreement is attached as **<u>Annex 7.1.5</u>**.

7.1.6    The U.S. Bankruptcy Court has entered an order in form and substance reasonably acceptable to Seller and Purchaser, which order has become final and non-appealable in accordance with US law, approving (a) the entry into and performance under the Transition Services Agreement by the relevant U.S. Debtors, (b) the Release Deeds, confirming the release by Wilmington Trust N.A. as trustee and collateral trustee of the Upstream Securities and Guarantees and the Shares Pledges, and (c) the issuance by the relevant U.S. Debtors of consents and instructions, if any, to its subsidiaries that are not U.S. Debtors to the extent such consents and instructions are necessary for such non-debtor parties to enter into and perform their obligations under the Transition Services Agreement.

7.1.7    None of the Group Companies has filed for the institution of insolvency proceedings under its applicable local laws prior to or until the Closing nor has

25

an application (other than a frivolous or vexatious application) been made for any such proceedings against one or more Group Companies pursuant to the applicable local laws prior to or until the Closing.

## 7.2     Waiver

7.2.1   Purchaser may waive any of the Closing Conditions under Sections 7.1.3, 7.1.4, and 7.1.7 in its sole discretion. To the extent legally permissible, all other Closing Conditions may be waived, in full or in part, at any time by mutual written agreement of Seller and Purchaser.

7.2.2   The effect of each of such waiver shall be limited to eliminating the need that the respective (entire or part of the) Closing Condition is satisfied prior to the Closing and shall not limit or prejudice any claims that a Party may have with respect to any circumstances relating to such (entire or part of the) Closing Condition not being satisfied pursuant to this Agreement.

## 7.3     Reasonable Efforts

Each Party shall use reasonable efforts to ensure that the Closing Conditions will be fulfilled as soon as possible.

## 7.4     Notification

The Parties shall keep each other informed of the status of satisfaction of the Closing Conditions and shall notify each other without undue delay in writing as soon as a Closing Condition has been satisfied or has become legally impossible to be satisfied.

## 7.5     Merger Filings and Clearance

7.5.1   Filing Obligation

Without undue delay after the Signing and in any event no later than within five (5) Business Days after the Signing Date, Purchaser, on behalf of Seller and Purchaser, shall make, at its own cost and expenses (including all applicable fees), all filings necessary for the Merger Clearance ("**Merger Control Filings**"). Seller undertakes to cooperate with Purchaser with respect to any Merger Control Filings and any other antitrust filings in connection with the transaction contemplated under this Agreement in providing all reasonably required information concerning the Business and to assist in such filings.

7.5.2   Cooperation

(a)     With regard to any such Merger Control Filings, the Parties shall:

26

(i) reasonably cooperate in all respects with each other in the preparation of any filing and in connection with any submission, investigation or inquiry;

(ii) supply to any competent governmental authority as promptly as practicable any additional information requested pursuant to any applicable law and shall undertake (or cause to be undertaken) all commercially reasonable other procedural actions required in order to obtain the Merger Clearance or to cause any applicable waiting period to commence and expire;

(iii) provide each other without undue delay with copies (or, in the case of oral communications, advise the other of the contents) of any material communication or information in connection with any proceeding and permit the other to review and discuss in advance (and to consider in good faith any comments made by the other in relation to) any proposed material communication to a competent governmental authority (on an outside counsel only basis to the extent such written materials contain competitively sensitive information);

(iv) contact any competent governmental authority only after consultation with the other Party; and

(v) promptly inform each other in advance of the time and place of any developments, discussions, meetings and conferences with the competent governmental authority.

(b) Neither Party shall participate or agree to participate in any substantive meeting, telephone call or discussion with any competent governmental authority in respect of any filings, investigation, litigation or other inquiry relating to such matters unless it consults with the other Party in advance and, to the extent permitted by the competent governmental authority, gives the other Party the opportunity to attend and participate in such meeting, telephone call or discussion. Whenever any event occurs that is required to be set forth in an amendment or supplement to any Merger Control Filing, Purchaser shall promptly inform Seller of such occurrence and shall undertake (or cause to be undertaken) all commercially reasonable steps to cooperate in filing with the competent governmental authority such amendment or supplement.

7.5.3   Legal Proceeding

Purchaser shall give Seller prompt notice of the commencement or known threat of commencement of any legal proceeding by or before any competent governmental antitrust authority with respect to the transaction contemplated by this Agreement, keep Seller informed as to the status of any such legal proceeding or threat, and in connection with any such legal proceeding, Purchaser shall permit authorized representatives of Seller to be present at each meeting or conference relating to any such legal proceeding, to the extent permitted by the competent governmental authority, and to have access to and be consulted in connection with any material document, opinion or proposal made or submitted to any competent governmental authority in connection with any such proceeding.

7.5.4   Commitments

(a)   If the Merger Clearance or any other governmental approvals are granted only subject to obligations or conditions, commitments or other agreements required by any competent governmental authority ("**Commitments**"), Purchaser shall undertake and shall cause Purchaser's direct and indirect subsidiaries to undertake and (after the Closing) the Group Companies to undertake any and all commercially reasonable steps necessary for the fulfillment of such Commitments.

(b)   In the event that any action is threatened or instituted challenging the transactions contemplated by this Agreement, Purchaser shall undertake and shall cause Purchaser's direct and indirect subsidiaries to undertake any commercially reasonable steps to contest (including by way of litigation) any decision, order, decree, complaint, injunction or other impediment or restriction which impedes or threatens to impede the Closing or the transactions contemplated hereunder; provided, however, that such litigation in no way limits the right and obligation of Purchaser to take any and all commercially reasonable steps necessary, to eliminate each and every impediment under any antitrust, competition or trade regulation law by way of Commitments, to close the transaction contemplated hereunder prior to the Longstop Date.

7.5.5   No Conflicting Transaction

Purchaser shall not, and shall procure that none of its Affiliates shall, enter into any transaction or any agreement that might reasonably be expected to make it more difficult or to materially increase the time required to obtain the Merger Clearances except to the extent this would be inacceptable according to the principles of good faith (*nach Treu und Glauben unzumutbar*) to Purchaser.

28

7.6    US Bankruptcy Court Matters

    7.6.1    Within two (2) Business Days following the execution of this Agreement, Seller shall cause to be filed with the US Bankruptcy Court motions seeking entry of an order approving (a) the entry into and performance under the Transition Services Agreement by the relevant U.S. Debtors, (b) the Release Deeds, confirming the release by Wilmington Trust N.A. as trustee and collateral trustee of the Upstream Securities and Guarantees and the Shares Pledges, and (c) the issuance by the relevant U.S. Debtors of consents and instructions, if any, to its subsidiaries that are not U.S. Debtors to the extent such consents and instructions are necessary for such non-debtor parties to enter into and perform their obligations under the Transition Services Agreement (collectively **"Sale Approval Motion"**). Seller shall provide Purchaser with advance drafts of the Sale Approval Motion, pleadings or US Bankruptcy Court filings relating to the Transition Services Agreement, release and any other ancillary matters as soon as reasonably practicable but in any event no later than two (2) Business Days prior to the date Seller intends to file such motion with the US Bankruptcy Court. Purchaser may file or join in any motion with the US Bankruptcy Court relating to the matters hereunder. In the event the entry of the orders referenced in this section is appealed, Seller shall use (or cause its Affiliates to use) its commercially reasonable efforts to defend such appeal.

    7.6.2    If the U.S. Bankruptcy Court requires a competitive sale process for the Acquired Assets, the U.S. Debtors and Seller shall designate Purchaser as the stalking horse buyer for the Acquired Assets and shall seek bidding protections and entry of a sale order for the Acquired Assets in form and substance reasonably acceptable to Purchaser. Any such process shall be expedited before the U.S. Bankruptcy Court such that a sale order is entered prior to the Longstop Date.

**8    Closing**

8.1    Place and Time

The consummation of the transactions contemplated hereunder (**"Closing"**) shall occur on the Scheduled Closing Date at the offices of PricewaterhouseCoopers Legal AG in Frankfurt am Main, or at any other place as Seller and Purchaser may mutually agree in writing after the Signing. If the distribution of the Swiss Receivables pursuant to Section 2.5.3 has not been completed until the fourth Business Day before the Scheduled Closing Date, Seller shall be entitled to request by written notice to Purchaser to adjourn the Scheduled Closing Date to a Business Day on or before the Longstop Date to enable Seller to complete the distribution of the Swiss Receivables.

8.2    Closing

8.2.1    Closing Actions

On the Scheduled Closing Date, Seller and Purchaser shall, in prompt succession (*Zug-um-Zug*), take the following actions ("**Closing Actions**") in the sequence as set out below, provided that the Party being obliged to carry out a Closing Action may elect to perform such Closing Action prior to the Scheduled Closing Date (which election shall not affect the maturity of any other Closing Action):

(a)    delivery by Seller of a copy of duly executed resolutions of the board of directors of Seller authorizing the transfer of the Sold Shares;

(b)    execution, if not occurred before, of the Escrow Agreement;

(c)    execution of a notarial agreement by Seller and Purchaser regarding the transfer of the German Shares from Seller to Purchaser in due form and materially as attached as draft as **Annex 3.1.1**;

(d)    execution of an agreement by Seller and Purchaser regarding the transfer of the Austrian Share from Seller to Purchaser in the form of an Austrian notarial deed and materially as attached as draft as **Annex 3.1.2**;

(e)    delivery by Seller to Purchaser of a copy of the duly executed Contingent Interests Waiver Agreement as attached as draft as **Annex 2.4.3**;

(f)    if required pursuant to Section 2.5.2, delivery by Seller to Purchaser of a copy of the duly executed Intra-Group Loan Settlement Confirmation;

(g)    delivery by Seller to Purchaser of a copy of the duly executed Transition Services Agreement;

(h)    payment by Purchaser of the following amounts: (i) an amount equal to the sum of (A) the Escrow Amount I, (B) the Escrow Amount II, (C) the Escrow Amount III, and, if applicable, (D) the Escrow Amount IV into the Escrow Account I; and (ii) an amount equal to the Estimated Purchase Price less the sum of the Escrow Amount I through Escrow Amount III and, if applicable, Escrow Amount IV into the Seller's Account in accordance with Section 5;

KE 53231411.2

(i)     payment by Purchaser of an amount of USD 5,404,000 or the equivalent Euro amount relating to the TSA Fee into the Escrow Account II;

(j)     delivery by Seller to Purchaser of a copy of the duly executed confirmations of the Collateral Trustees under the Release Deeds; and

(k)     delivery by Seller to Purchaser of the original stock certificate representing the Swiss Shares, duly endorsed (*indossiert*) to Purchaser.

### 8.2.2    Waiver

All Closing Actions may be waived, in full or in part, at any time by mutual written agreement of Seller and Purchaser. The effect of each of such waiver shall be limited to eliminating the need that the respective Closing Action is taken on the Closing Date and shall not limit or prejudice any claims that a waiving Party may have with respect to any circumstances relating to such Closing Action not being taken pursuant to this Agreement.

### 8.2.3    Closing Confirmation

On the Closing Date, after all Closing Actions have been taken or occurred or have been duly waived, Seller and Purchaser shall confirm in a written document, to be jointly executed substantially in the form attached as **Annex 8.2.3** ("**Closing Confirmation**"), (i) that all Closing Conditions have been duly satisfied or waived and (ii) that all Closing Actions have been duly taken or waived. The legal effect of the Closing Confirmation shall be to serve as evidence that all Closing Conditions and all Closing Actions have been satisfied or waived and that Closing has occurred. However, the execution of the Closing Confirmation shall not limit or prejudice any rights of the Parties arising under or in connection with this Agreement or under applicable law.

## 9    Termination; Withdrawal Rights

### 9.1    Termination Rights

9.1.1    This Agreement may be terminated with immediate effect for all Parties at any time prior to Closing:

(a)     by mutual written consent of Purchaser and Seller; or

(b)     by Seller or Purchaser by way of written notice to the other Party if the Closing has not occurred by May 31, 2018 ("**Longstop Date**").

31

A Party may not terminate the Agreement pursuant to Section 9.1.1, if the Closing has not occurred by the Longstop Date for reasons for which the Party is predominantly responsible or its actions or inactions.

9.1.2    Furthermore, this Agreement may be terminated with immediate effect for all Parties by a Party (**"Terminating Party"**) if all or some of the Closing Actions to be taken by the other Party (**"Other Party"**) have not been taken by the Other Party in accordance with Section 8.2.1 within five Business Days after the Scheduled Closing Date, provided that the Terminating Party is at the same time not in breach of its obligations under this Agreement with regard to the performance of a Closing Action.

9.2    Consequences

In the event of a termination of this Agreement in accordance with Section 9.1, the Parties shall have no claims and incur no liability against each other except that (a) damage claims for a breach of the terms and conditions of this Agreement which occurred prior to the termination shall remain unaffected and (b) Sections 17 and 18 of this Agreement shall survive and remain in full force and effect also after such termination.

**10    Seller's Warranties**

10.1    General

10.1.1    Form and Date

Subject to the limitations, qualifications and disclosures set forth in this Agreement, Seller hereby represents to Purchaser by way of an independent promise of guarantee (*selbstständiges Garantieversprechen*) pursuant to Section 311 para. 1 BGB that the statements made in Sections 10.2 through Section 10.12 (collectively with Seller's Anti-Leakage Warranty, **"Seller's Warranties"**) are true and correct as of the Signing Date and the Closing Date unless it is specifically provided that a Seller's Warranty is made as of a different or additional date or dates, in which case such Seller's Warranty shall be true and correct as of such different or additional date or dates.

10.1.2    No other Representation

Seller does not make any representations or warranties regarding the Sold Shares, the Group Companies and their business other than the Seller's Warranties. Purchaser hereby expressly confirms and agrees to acquire the Sold Shares, the Group Companies and their business in the state they are in on the Closing based on Purchaser's own limited inspection, examination and

determination with respect thereto, including the due diligence investigation, which it has conducted with respect to the Sold Shares, Group Companies and their business prior to the Signing (the "**Due Diligence Review**"), without relying on any express or implied representations, guarantees, warranties, undertakings or disclosure or similar obligations of any nature made, given or undertaken by Seller, Seller's Affiliates or any of their respective directors, officers, employees, representatives, advisors and counsels ("**Seller's Representatives**") under or in connection with this Agreement and the transactions contemplated hereby, except for the Seller's Warranties expressly provided for in Sections 10.2 through 10.12. Seller and Purchaser agree and explicitly confirm that none of the Seller's Warranties shall be construed as a guarantee within the meaning of Sections 443 and 444 BGB (*Garantie für die Beschaffenheit der Sache*).

### 10.1.3 No Reliance

Purchaser further confirms and agrees that Seller does not make any representations or warranties, and that Purchaser has not relied on nor will it make any claim against Seller or any of Seller's Representatives, in respect of:

(a)     any budget, forecast, estimate or other projection of any nature (including projections of future revenues, future results of operations, future cash flows, future financial condition or future business operations (or any underlying components thereof)); or

(b)     any other information or documents with respect to the Sold Shares, the Group Companies and their Business.

### 10.2    Status of Seller

As of the Signing and as of the Closing, Seller is duly incorporated and validly existing under the laws of England and Wales. Seller has the requisite authority pursuant to mandatory law and its constitutional documents and has obtained all necessary consents, except for the Merger Clearance and the approvals in Section 7.1.6, to enter into and perform the obligations expressed to be assumed by it pursuant to this Agreement. Subject to the terms and conditions of the Release Deeds, Seller may freely dispose of the Sold Shares.

### 10.3    Sold Shares

### 10.3.1  Title to Sold Shares

As of the Signing and as of the Closing, the statements under Preamble (A) and Sections 2.1, 2.2 and 2.3 are each true and correct. Seller has full legal and

33

beneficial title to the Sold Shares. The shares in each Group Company are (i) validly authorized and issued, (ii) fully paid, not repaid and non-assessable, (iii) except for the Share Pledges, free and clear of any security interests, liens, pledges, or other encumbrances or third-party rights and (iv) not subject to any transfer restrictions or pre-emption or similar acquisition rights, except as provided in the relevant Group Company's articles of association or the Release Deeds.

### 10.3.2 No Outstanding Subscriptions

As of the Signing and as of the Closing, there are no outstanding subscriptions, options, warrants or rights to acquire any shares or interests of any Group Company or any agreements to which any Group Company is a party by which it is bound to issue any new shares or interests and there are no securities or other instruments convertible into shares or equity interests in any Group Company.

## 10.4    Group Companies

As of the Signing and as of the Closing, each Group Company is duly incorporated and validly existing under the laws of its jurisdiction and has the requisite power and authority to own its property and to carry its business conducted at present in each jurisdiction in which it conducts its business. Except as disclosed in **Annex 10.4**, no Group Company owns any shares or any form of equity, options, warrants, subscription rights, or other securities of any kind in any other company, partnership, joint venture or other enterprise. Seller confirms that the information set forth in Sections 2.4 and 2.5 regarding the intra-group arrangements is complete and accurate as of the date hereof. Except as disclosed in Sections 2.4 and 2.5, no Group Company has entered into any financing agreement with Seller and/or its Affiliates.

## 10.5    Financial Statements

To Seller's Knowledge, the Financial Statements have been prepared in accordance with the Toys "R" Us accounting policies (the **"Policies"**) provided in the Data Room for the time period covered by such Financial Statements in a manner customary for management accounts, except for the fact that full provision may not have been made for inter-company receivables from other Affiliate companies which may not be ultimately collectible.

## 10.6    Inventories

As of Closing all inventory of the Group Companies is free of any third party encumbrances except for Permitted Encumbrances. **"Permitted Encumbrances"** are retention of title (it being understood that any encumbrances for Seller Persons are

34

limited to simple retention of title outside the Business) and encumbrances arising by operation of law, in either case in the ordinary course of business consistent with past practice.

### 10.7    Conduct of Business

Except as set forth in **Annex 10.7** (i) from January 1, 2018 until (and including) the Signing, the Group Companies have continued to operate in the ordinary course of business and substantially consistent with past practice and so as to maintain the Business as a going concern with a view to maintaining in all material respects the business organization intact and preserving in all material respects the relationships with employees and business partners, and (ii) the Group Companies have refrained from any of the actions listed in Section 11.3.

### 10.8    No Insolvency

As of the Signing Date only, none of the Group Companies is subject to a voluntary or involuntary liquidation, administration order, suspension of payments, attachment of any of its assets or any other insolvency proceeding in any jurisdiction and, to Seller's Knowledge, no facts or circumstances exist which would require or entitle any person to begin any of those proceedings in any jurisdiction against a Group Company.

### 10.9    IP License Agreement

**Annex 10.9** contains a true and complete copy of the IP License Agreement which is in full force and effect and is enforceable against Geoffrey, LLC, in accordance with its terms. The Group Companies are free to sell or otherwise dispose of their stock and such sale and disposition does not violate any legal obligations of the Group Companies.

### 10.10   German Real Estate

The land register excerpts attached as **Annex 10.10** are correct and up to date.

### 10.11   Repayment of Intra-Group Loans by TRU France and TRU Iberia

The intra-group loans set out in Section 4.3.3 have been repaid on February 4, 2018. The facts stated in Section 4.3.3 are correct.

10.12    Information

The persons relevant for Seller's Knowledge have confirmed to the Seller that to their knowledge  no written statement made by them to Purchaser contains an untrue statement of a material fact or omits to state a material fact, which could from their view reasonably be expected to have a material adverse effect on the transactions under this Agreement or the Business, unless such information has been Fairly Disclosed to Purchaser.

**11**    **Seller's Covenants**

11.1    Access to Information, Disclosure, Transition Preparation

To the extent permitted by applicable law, from the date hereof until the Closing Date:

(a)    Seller shall keep Purchaser informed regarding the operation of the Business, and Seller shall afford to Purchaser (or any person designated by Purchaser) upon reasonable advance notice during normal business hours access to (i) the books and records of the Group Companies to the extent they relate to the Business, with the right to take copies, (ii) the premises of the Group Companies, and (iii) directors, employees (including any officers) and auditors of the Group Companies; the Parties will implement practical ways for each of (i) to (iii) above; and

(b)    Seller shall promptly disclose to Purchaser all relevant information which comes to its attention in relation to any fact or matter which may constitute a breach of any of the representations and warranties of Seller at any time before the Closing if the representations and warranties in this Agreement were to be repeated at such time by reference to the facts and circumstances then existing.

11.2    Conduct of Business prior to Closing

11.2.1    General

From the Signing until (and including) the Closing (the **"Interim Period"**), Seller shall, if and to the extent permitted by mandatory law, ensure (*stehen dafür ein*) that the Group Companies continue to operate in the ordinary course of business and substantially consistent with past practice and so as to maintain the Business as a going concern with a view to maintaining in all material respects the business organization intact and preserving in all material respects the relationships with employees and business partners (together with Seller's obligations under Section 11.2.2, **"Seller's Covenants"**).

36

11.2.2 Restricted Actions

During the Interim Period, Seller shall, if and to the extent permitted by mandatory law, ensure (*stehen dafür ein*) that the Group Companies shall not, except with the prior consent of Purchaser (which consent shall not be unreasonably conditioned, withheld or delayed):

(a)     materially amend the articles of association of any Group Company;

(b)     enter into any merger, split-off or other company reorganization within the meaning of and pursuant to the German Reorganization Act (*Umwandlungsgesetz*) or equivalent foreign statutes involving any Group Company;

(c)     conduct any dissolution or liquidation of any Group Company;

(d)     repurchase or redeem (*einziehen*) the shares in any of the Group Companies or parts thereof;

(e)     incur any material liabilities of any kind, other than trade accounts payables in the ordinary course of Business;

(f)     delay or accelerate any payments to its suppliers for goods or services;

(g)     offer sales at reduced prices, or carry out significant or unusual sales promotions to offer product for sale at significantly reduced prices other than in line with past practice and as would be conducted by a reasonable seller of toys without regard to the specific situation of the Group; and

(h)     enter into any materially disadvantageous contracts with suppliers, service providers or other parties.

11.3   <u>Purchaser's Consent</u>

With respect to Section 11.2, Purchaser hereby consents to (i) any actions, measures and transactions required to be taken or performed pursuant to the provisions of this Agreement (including in preparation of the satisfaction of the Closing Conditions and the Closing Actions), (ii) any actions required under the Indentures and/or the Notes in order to comply with their terms, (iii) any actions required to be taken to get approval by the U.S. Bankruptcy Court and/or any other court competent for the transactions contemplated in this Agreement, (iv) any actions required to comply with applicable laws and orders of a competent governmental authority and (v) any actions set out in **Annex 11.3** and in each case under (i) through (v) any actions, measures and transactions required or expedient in connection therewith.

## 12    Purchaser's Remedies

### 12.1    Breach; Losses; Advantages

#### 12.1.1    Consequences of Breach

Subject to the provisions of this Section 12, in the event of any breach or non-fulfillment by Seller of any of the Seller's Warranties or of any of the Seller's Covenants or any other covenant, obligation, agreement or undertaking contained in this Agreement, as the case may be (a **"Breach"**), Seller shall put Purchaser or the relevant Group Company, into the position that it would have been in if the Breach had not occurred (*Naturalrestitution*), provided that if and to the extent such remediation in kind (*Naturalrestitution*) (a) has not been effected by Seller within a period of one (1) month after the receipt of a Breach Notice, (b) is impossible, or (c) is refused in writing by Seller, Purchaser shall be entitled to request from Seller exclusively compensation in cash for any Losses incurred by Purchaser (a **"Purchaser Claim"**).

#### 12.1.2    Definition of Losses

For the purposes of this Agreement, **"Losses"** shall be determined using the legal principles of calculation of damages, mitigation of damages and off-setting of losses by any corresponding net financial advantages directly resulting from the relevant matter (*Schadensberechnung, Schadensminderung, Vorteilsausgleich*) pursuant to Sections 249 et seq. BGB but shall only mean any actual damages incurred and shall exclude (a) any potential or actual reduction in value (*Minderung*) of any Group Company beyond the actual damage incurred, (b) any consequential damages (*Folgeschäden*) or any lost profits, (c) any frustrated expenses within the meaning of Section 284 BGB, and (d) any internal administration and overhead costs. The limitations under this Section 12.1.2 regarding the determination of the liability of Seller shall not apply in case of a willful (*vorsätzlich*) breach by Seller of Seller's obligations under this Agreement.

#### 12.1.3    Multiples; Valuation Method

Purchaser shall not be entitled to any compensation for damages to the extent such damages are only based on the application, or alleged application, of any multiple underlying the purchase price determination or any valuation method, or based on any argument or reasoning to the effect that the Final Purchase Price (or any component thereof) or any underlying value or financial figure was incorrect or has been determined based on an incorrect assumption or would otherwise have been different.

38

12.1.4  Advantages

Any corresponding net financial advantages of Purchaser and/or of a Group Company directly resulting from the relevant damaging event shall be set off against any Purchaser Claim against Seller under this Agreement, without prejudice (*unbeschadet*) to the other provisions of this Section 12.

12.2   Exclusion of Liability

Seller shall not be liable for, and Purchaser shall not be entitled to bring, any Purchaser Claim or any other claim under or in connection with this Agreement if and to the extent that:

12.2.1  Purchaser or any of the Group Companies, or any successor to all or parts of their business has recovered from any third party (other than any of the Group Companies) damages or any other compensation, including under any insurance policy in force on the Closing;

12.2.2  either Purchaser or (following the Closing) the Group Companies have caused or participated in causing or have aggravated such Breach or any Losses directly resulting therefrom or failed to mitigate Losses directly resulting therefrom pursuant to Section 254 BGB;

12.2.3  all relevant underlying facts and circumstances forming the basis (*anspruchsbegründende Tatsachen*) of a claim of Purchaser for breach of a Seller's Warranty were positively known by any of the representatives of Purchaser listed in **Annex 12.2.3** as of the Signing, in particular as a result of reviewing documents contained in the virtual data room operated by Merrill for Project Sunrise from January 27, 2018 until April 18, 2018 ("**Data Room**"), a complete set of which has been set aside in electronic form on a DVD and handed over by the Parties to the acting notary who shall keep the DVD for Seller and Purchaser for a period of three years after the Closing Date (provided the information therein was Fairly Disclosed). Purchaser shall in any event be deemed to have knowledge of all matters which were Fairly Disclosed in:

(a)     this Agreement, including its Annexes; or

(b)     all information in the Data Room and all answers given by Seller or its representatives to Purchaser, any other member of Purchaser's Group and/or to any Purchaser's representatives until the Signing Date in writing or text form and kept on the DVD in connection with the question & answer process in the course of the Due Diligence Review; or

39

12.2.4 the Purchaser Claim results from or is increased by the passing of, or any change in, after the Signing, any law, statute, ordinance, rule, regulation, common law rule or administrative practice of any government, governmental department, agency or regulatory body after the Closing.

**"Fairly Disclosed"** means that the disclosure was in a manner and with sufficient detail to enable the Purchaser to reasonably appreciate the significance of the matter disclosed by applying the standard care of a reasonable business man.

12.3    Claim Procedures

12.3.1  Breach Notice

If Purchaser or, after the Closing, any of the Group Companies becomes aware of any facts or circumstances which constitute, or are reasonably likely to constitute, a Breach, Purchaser shall give Seller written notice thereof without undue delay but in any case no later than six weeks after any of the Group Companies or Purchaser has discovered all relevant facts and circumstances underlying such Breach (**"Breach Notice"**). The Breach Notice shall state in reasonable detail the nature of the alleged Breach and the amount involved, to the extent that such nature and amount have been determined at the time when such notice is given.

12.3.2  Access to Information

Without prejudice to the validity of the alleged Purchaser Claim in question, Purchaser shall allow, and shall cause the Group Companies to allow, Seller and Seller's Representatives to investigate the matter or circumstance alleged to give rise to such Purchaser Claim, and whether and to what extent any amount is payable in respect of such Purchaser Claim. For such purpose, Purchaser shall give, and shall cause the Group Companies to give such reasonable information and assistance, including access to Purchaser's and the Group Companies' books, records, assets, premises and any of the Group Companies' representatives and including the right to examine and copy any documents or other materials during normal business hours, as Seller or Seller's Representatives may reasonably request for the purpose of such investigation subject to Purchaser being reimbursed for all reasonable out-of-pocket costs and expenses. To the extent any remedial action requires the cooperation of Purchaser, Purchaser shall take all reasonably practical steps which Seller may reasonably request from Purchaser for the purpose of such remedial action.

12.3.3  Third Party Claims

40

After receiving written notice of any claim or demand asserted by a third party (including any governmental authority) that may trigger a claim by Purchaser against Seller for a Breach in particular to the effect that (i) such third party may have a claim against any Group Company or (ii) an audit or examination is being or will be conducted by any court or other governmental authority (**"Third Party Claim"**), the following shall apply, if Purchaser intends to raise a claim against Seller because of the Third Party,

(a)     Purchaser shall, without prejudice to its obligations under Section 12.3.1, procure that Seller shall be provided with all reasonably necessary materials, information and assistance reasonably necessary for Seller to investigate the Third Party Claim and shall to the extent reasonably practicable be given opportunity to comment or discuss with Purchaser any measures which Seller proposes to take or to omit in connection with a Third Party Claim subject to Purchaser being paid all reasonable out-of-pocket costs and expenses. In particular, Seller shall be given an opportunity to comment on, participate in, and review any reports related to any audits, investigations or other governmental measures and shall receive copies of all relevant orders of any authority without undue delay, but in any event at least 15 Business Days prior to the expiry of any relevant objection period (*Einspruchs- oder Widerspruchsfrist*), provided that Purchaser or the relevant Group Company received such order prior to such 15 Business Day period.

(b)     If Purchaser controls the conduct and settlement of such Third Party Claim, Purchaser shall use commercially reasonable efforts to permit Seller to participate in such conduct or settlement through counsel chosen by Seller, provided that all fees and expenses of such counsel are borne by Seller. No admission of liability shall be made by or on behalf of Purchaser or the Group Companies and the Third Party Claim shall not be compromised, disposed of or settled without the prior written consent of Seller (not to be unreasonably withheld or delayed).

(c)     If Seller unconditionally acknowledges (*anerkennen*) in writing to Purchaser that the facts and circumstances underlying the Third-Party Claim constitute a Breach and that Seller will be liable towards Purchaser for such Breach under this Agreement, Purchaser shall give Seller the opportunity to defend the claim addressee against the Third Party Claim at Seller's cost and risk and Seller shall have the right to conduct and control, through counsel of its choice, the defense of any such Third Party Claim, thereby reasonably considering the best interest of Purchaser and the Group Companies. Seller may

41

compromise or settle any Third Party Claim only to the extent (i) Seller gives Purchaser advance notice of any proposed compromise or settlement, and (ii) Purchaser gives its prior written consent which shall not be unreasonably withheld or delayed. Seller shall permit Purchaser to participate in the defense of any such Third Party Claim through counsel chosen by Purchaser.

(d)   All costs and expenses incurred by Seller in connection with the defense shall be borne by Seller. All other costs and expenses, in particular of the Group Companies or Purchaser, in relation to the defense and the Third Party Claim shall be borne by Purchaser unless such costs qualify as Losses to be indemnified against by Seller under this Agreement.

### 12.3.4  Consequences of Non-Compliance

In case of any non-fulfillment by Purchaser of any of the obligations set forth in this Section 12.3, Section 254 BGB shall apply.

## 12.4  Claims against Escrow Amount II as Sole Remedy for Certain Purchaser's Claims

12.4.1  In case of claims under Section 6.3, the Parties agree that as long as and to the extent there are any funds available in the Escrow Amount I, Purchaser may only claim release of funds from time to time from the Escrow Amount I and shall not have, and undertakes not to try to enforce, any such Purchaser's Claim against Seller. If and when no further funds are within Escrow Amount I, Purchaser shall be free to assert and enforce claims under Section 6.3 against Seller and take recourse to Escrow Amounts II and the assets of Seller.

12.4.2  In case of any Purchaser's Claim other than claims under Section 6.3 and Exempted Claims, Purchaser's sole remedy shall be claiming release of the Escrow Amounts II funds in Escrow Account I as reduced from time to time as set forth in the Escrow Agreement and Purchaser shall not have, and undertakes not to try to enforce, any such Purchaser's Claim against Seller.

12.4.3  The limitations set out in Section 12.4.1 and 12.4.2 shall not apply to any claim against Seller for specific performance.

## 12.5  Limitations of Seller's Liability

### 12.5.1  Limitation Periods

Any claims of Purchaser under or in connection with this Agreement, including for Breaches of the Seller's Warranties or any other indemnities,

42

covenants, agreements or undertakings set forth in this Agreement shall become time-barred eighteen months after the Closing Date, except for

(a)     claims for Breaches of Seller's Warranties in Sections 10.2 through 10.4, which shall become time-barred upon the expiration on the fifth anniversary of the Closing Date;

(b)     claims for Breaches of Seller's Covenants, which shall become time-barred upon the expiration of six months following the Closing Date;

(c)     claims arising as a result of willful breaches of this Agreement or fraud which shall become time-barred upon expiration of the statutory limitation period; and

(d)     claims under Section 6.3 which shall become time-barred in accordance with Section 6.4.2.

Section 203 BGB shall not apply unless the Parties agree in writing that the expiry period shall be tolled on the basis of pending settlement negotiations.

## 12.5.2  Exempted Claims

Any Claims referred to under Section 12.5.1(a) are herein collectively referred to as **"Exempted Claims"**.

## 12.5.3  De Minimis; Deductible

Seller shall only be liable for Losses resulting from any individual Breach of Seller's Warranties if and to the extent that such Losses exceed an amount of EUR 50,000.00 (**"De Minimis Amount"**) and if the aggregate amount of all Losses resulting from individual Breaches (excluding Exempted Claims) exceeding the De Minimis Amount exceeds an amount of EUR 500,000.00 (**"Deductible"**), in which case only the amount of such Losses exceeding the Deductible shall be recoverable. The limitations of this Section 12.5.3 shall not apply to Exempted Claims or claims under Section 6.3.

## 12.5.4  General Liability Caps

(a)     Subject to Section 12.4, Seller's aggregate liability for all claims of Purchaser under or in connection with this Agreement other than Exempted Claims and claims under Section 6.3 shall be limited to the Escrow Amount II funds remaining in Escrow Account I as reduced from time to time.

43

(b)     Subject to Section 12.4, Seller's overall aggregate liability under or in connection with this Agreement, including for Breaches resulting in Exempted Claims – but excluding any claims under Section 6.3 (which shall be not limited in amount) –, shall in no event exceed the Final Purchase Price actually received by Seller.

12.6    No Additional Rights or Remedies

12.6.1  Exclusive Remedies

The remedies which Purchaser may have against Seller under or in connection with this Agreement, including for Breaches of any of the Seller's Warranties, the Seller's Covenants, or any other covenants, agreements or undertakings set forth in this Agreement shall be the exclusive remedies available to Purchaser in respect to Seller. If and to the extent permitted by law, any claims and remedies other than those explicitly provided for in this Agreement, regardless of their nature, amount or legal basis, are hereby expressly excluded and waived by Purchaser, such waiver hereby being accepted by Seller.

12.6.2  No Other Remedies

Without limiting the generality of Section 12.6.1, in particular, any right of Purchaser to lower the Final Purchase Price or any portion thereof (*Minderung*), to withdraw from this Agreement (with Section 9.1 remaining unaffected) or to require the winding up of the transactions contemplated hereunder on any other legal basis (e.g., by way of so-called *großer Schadenersatz*) shall be excluded and waived by Purchaser. Further, (i) any claim for breach of pre-contractual obligations (*culpa in contrahendo*), including claims arising under Sections 241 para. 2, 311 para. 2 and 3 BGB or ancillary obligations (*Nebenpflichten*), including claims arising under Sections 241 para. 2, 280 BGB, (ii) any claims based on frustration of contract (*Störung der Geschäftsgrundlage*) pursuant to Section 313 BGB, (iii) all remedies of Purchaser for defect of the purchased object including claims arising under Sections 437 through 441 BGB and (iv) the right to rescind this Agreement are hereby also expressly excluded and waived by Purchaser. If and to the extent the exclusion of claims based on frustration of contract (*Störung der Geschäftsgrundlage*) is, despite the risk allocation agreed upon between the Parties in this Agreement, held invalid, such exclusion shall be construed, to the extent legally permissible, to set the thresholds for such principles to apply particularly high and to limit respective remedies to adjustment of this Agreement under exclusion of the right to withdraw.

12.6.3  Willful Deceit; Willful Misconduct

44

This Section 12.6.3 as well as any other limitations and exclusions of liability pursuant to this Agreement shall not apply to any rights and remedies for willful deceit (*arglistige Täuschung*) by Seller or Seller's own willful misconduct (*Vorsatz*), in which case statutory law shall apply. Seller's liability for willful deceit (*arglistige Täuschung*) and willful misconduct (*Vorsatz*) of any person assisting Seller in the performance of its obligations in the meaning of Section 278 BGB (*Erfüllungsgehilfe*) is under and in connection with this Agreement comprehensively and for all purposes excluded to the largest extent legally permissible. Purchaser's right to withdraw or to rescind this Agreement based on the willful deceit by persons other than Seller shall remain excluded in any event.

## 13 Purchaser's Guarantees

Subject to the limitations, qualifications and disclosures set forth in this Agreement, Purchaser hereby represents to Seller in the form of an independent promise of guarantee (*selbständiges Garantieversprechen*) within the meaning of Section 311 BGB that the statements in Sections 13.1 through 13.3 (**"Purchaser's Warranties"**) are true and correct as of the Signing and the Closing, unless it is specifically provided that a Purchaser's Warranty is made as of a different or additional date or dates, in which case such Purchaser's Warranty shall be true and correct as of such different or additional date or dates.

### 13.1 Status of Purchaser

#### 13.1.1 Corporate Status

Purchaser is a private company limited by shares duly incorporated and validly existing under the laws of Ireland.

#### 13.1.2 Due Authorization

Purchaser has obtained all required approvals for the execution of this Agreement and the consummation of the transactions contemplated hereunder and such execution and consummation does not violate any provisions of the articles of association of Purchaser.

#### 13.1.3 No Insolvency

Purchaser is not insolvent and no insolvency, bankruptcy or similar proceedings have been opened or initiated by or notified to Purchaser.

KE 53231411.2

### 13.1.4 Financial Capability

As of the Scheduled Closing Date, Purchaser will have sufficient immediately available funds in order to pay the Estimated Purchase Price at the Scheduled Closing Date.

## 13.2 No Knowledge of Breach

As of the Signing Date, neither Purchaser nor, to Purchaser's knowledge, any of Purchaser's representatives has actual knowledge of a Purchaser Claim for any breach of the Seller's Warranties.

## 13.3 Acquisition for Purchaser's Own Account

Purchaser is purchasing the Sold Shares on its own account.

## 14 Purchaser's Covenants; Indemnities

## 14.1 Access to Information

From the Closing, Purchaser will afford to Seller and its Representatives access, upon reasonable advance notice, to books and records, as well as to other information of the Group Companies and their representatives as long as and to the extent reasonably necessary to Seller in connection with any audit, investigation, dispute, or litigation (including under or in connection with this Agreement). If and to the extent Seller reasonably requires original documents, Purchaser shall forward such books and records, or cause that such books and records be forwarded, at Seller's expense, to Seller, and Seller shall return such books and records after the respective requirement to be in possession of original documents no longer applies. Purchaser shall inform Seller without undue delay of any tax or other governmental audit in respect of the Group Companies which pertains to time periods before the Closing Date.

## 14.2 Further Obligations

### 14.2.1 No Group Companies' Claims

Purchaser shall cause that after the Closing none of the Group Companies brings any claims against any Seller or any of Seller's Affiliates or any Seller's Representatives regardless of the legal basis of such claims.

### 14.2.2 Indemnification of Beneficiaries

If, after the Closing, any of Seller, Affiliates or assignees of any Seller, the advisors of any of the aforementioned, or any Seller's Representatives (each a **"Beneficiary"**) is held liable for

46

(a) any existing or future liability or obligation (on whatever legal grounds, and whether known or unknown, actual or contingent, accrued or not accrued) of any of the Group Companies arising out of, or in connection with, any Seller's shareholding or holding of securities or interest in, or any action taken as shareholders or member of any corporate body of any of the Group Companies, or the conduct of the business of any of the Group Companies and/or

(b) any claims arising out of, or in connection with, the Intra-Group Loan Agreements,

Purchaser shall indemnify and hold harmless each Beneficiary from and against any and all liability, loss, damage or injury, together with all reasonable out-of-pocket costs and expenses relating thereto, including reasonable legal fees, expenses and disbursements, arising out of, in connection with, or resulting from any such related third party claim.

14.2.3 Waiver of Claims against Beneficiaries

Purchaser hereby waives, and shall ensure that the Group Companies waive to the extent legally permitted, with effect as of the Closing, any claim they may have against any Beneficiary if and to the extent such claim is subject of the foregoing indemnification.

14.2.4 Agreement for the Benefit of Third Parties.

The obligations of Purchaser pursuant to Sections 14.2.2 and 14.2.3 are a true agreement for the benefit of third parties (*echter Vertrag zugunsten Dritter*) within the meaning of Section 328 para. 1 BGB for the benefit of each Beneficiary.

14.2.5 No Liability

This Section 14.2 shall not apply if and to the extent Seller is liable vis-à-vis Purchaser based on a claim expressly provided for in this Agreement.

**15    Equity Commitment Letter**

As Part 2 of this deed, Purchaser provides Seller with an equity commitment letter (**"Equity Commitment Letter"**) issued by Smyths Toys HQ IOM Unlimited. Purchaser undertakes not to agree to any amendment or termination of the Equity Commitment Letter or to the waiver of any rights thereunder, or to the use of the funds which are committed under the Equity Commitment Letter which could affect the consummation of this Agreement for any purpose other than to comply with its

47

obligations under this Agreement, and shall enforce all its rights under the Equity Commitment Letter to comply with its obligations under this Agreement.

**16   Seller's Remedies**

If and to the extent any of Purchaser's Warranties or Purchaser's covenants or indemnities, in particular those under Section 14, is breached or Purchaser is in breach of any of its other obligations or otherwise liable to Seller, as the case may be, under or in connection with this Agreement, Section 12 shall apply *mutatis mutandis*.

**17   Confidentiality; Announcements**

17.1   Confidentiality

For a period of three years after the Signing Date, the Parties shall treat all Confidential Information as strictly confidential and shall refrain from disclosing it to any third parties, unless:

17.1.1   such Confidential Information has been legally obtained from a third party who is not restricted from disclosing such Confidential Information by law or regulation or, to the relevant Party's best knowledge, by contractual obligations;

17.1.2   such Confidential Information has been independently developed by the relevant Party without use or benefit of any of the Confidential Information of the other Parties;

17.1.3   such Confidential Information is within the public domain or later becomes part of the public domain without a breach by a Party of its obligations under this Section 17;

17.1.4   agreed in writing between the Parties (for the avoidance of doubt, the Parties hereby agree that Confidential Information which is required for the Merger Control Filings and for obtaining the other governmental approvals as well as for registration of Purchaser as new shareholder of the Group Companies with the competent registers may be disclosed to the relevant governmental authorities); or

17.1.5   the disclosure is required by law or stock exchange regulations provided that, to the extent legally possible and practically feasible, any such disclosure shall only be made after providing the other Party with notice thereof in order to permit the other Party to seek an appropriate protective order or exemption.

**"Confidential Information"** shall mean the content of this Agreement.

48

17.2   Disclosure

    17.2.1   Subject to Section 17.2.2, either Party may disclose Confidential Information to its Affiliates and its or its Affiliates' officers and employees, brokers, lenders, insurers or professional advisors, financial sponsors in connection with fund raisings activities who have specifically agreed in writing to be bound by the receiving Party's confidentiality obligations hereunder, unless they are subject to confidentiality obligations with respect to such Confidential Information which are equivalent in scope and nature to the confidentiality obligations of the receiving Party hereunder on the basis of their employment or service agreements, enforceable rules of conduct or individual confidentiality undertakings.

    17.2.2   Neither Party shall disclose the terms of Section 4.3.3 (*Swiss Target Escrows*) to TRU France or TRU Iberia.

17.3   Public Announcements

Without the prior written approval of the other Parties which shall not be unreasonably withheld, no Party shall make any public announcement regarding this Agreement, unless required by law or stock exchange regulations or in connection with Seller seeking to get approval by the U.S. Bankruptcy Court. Notwithstanding the foregoing, Purchaser may indicate the direct and indirect purchase of the Group Companies in advertising materials.

**18**   **Miscellaneous**

18.1   Notices

All notices, requests and other communications under or in connection with this Agreement shall be made in writing in the English language and delivered by hand, courier or mail (incl. e-mail) to the person at the addresses set forth below, or such other person or address as may be designated by the respective Party in writing from time to time, provided that (a) receipt of a copy of a notice, request or other communication by a Party's advisors shall not constitute or substitute receipt thereof by the respective Party itself and (b) any notice, request or other communication shall be deemed received by a Party regardless of whether a copy thereof was sent to or received by an advisor of such Party, regardless of whether the delivery of such copy was mandated by this Agreement:

18.1.1   To Seller:

    TRU (UK) H8 Ltd.
    Attn.: Robert Zarra or Charles David Knight

Cannon Place, 78 Cannon Street, London, United Kingdom EC4N 6AF
Email: bob.zarra@toysrus.com; chuck.knight@toysrus.com

With a copy to:

Dr. Volkmar Bruckner, Kirkland & Ellis International LLP, Maximilianstr. 11,
80539 Munich, Germany, volkmar.bruckner@kirkland.com

18.1.2 To Purchaser:

Smyths Toys HQ EU Ltd.
Attn.: Ms Helen Carroll
Lyrr Building 1, Mervue Business Park, Galway, Ireland
Email: hcarroll@smythstoys.com

With a copy to:

Denis Bacina, PricewaterhouseCoopers Legal AG, Friedrich-Ebert-Anlage 37,
60327 Frankfurt am Main, Germany, denis.bacina@pwc.com

## 18.2    Costs, Taxes and Expenses

18.2.1 Taxes; Fees; Other Charges

Subject to Sections 2.7, 6.3 and 18.2.2, Purchaser shall bear all transfer taxes
(including any real estate transfer taxes), stamp duties, fees (including the fees
for notarization of this Agreement), registration duties and other charges in
connection with any regulatory requirements (including merger control
proceedings) and other charges and costs payable in connection with the
execution of this Agreement and the consummation of the transactions
contemplated hereby.

18.2.2 Own Expenses

Each Party shall bear its own expenses, including the fees of its advisors and
counsel.

## 18.3    Entire Agreement

This Agreement (together with all Annexes) contains the entire agreement between
the Parties concerning its subject matter and supersedes all prior agreements, oral and
written declarations of intent and other legal arrangements (whether binding or non-
binding) made by the Parties in respect to all or any part of the subject matter of this
Agreement.

50

18.4    Amendments, Supplements

Any amendments to this Agreement (including amendments to this Section) or a waiver of terms and conditions shall be valid and binding upon the Parties only if approved in writing by an authorized representative of each Party, unless applicable mandatory law requires otherwise.

18.5    Assignments

18.5.1   Subject to Section 18.5.2, no Party may assign, delegate or otherwise transfer any right or claim it may have under or in connection with this Agreement without the written consent of the other Party. However, Purchaser may assign or pledge for security purposes rights and claims under this Agreement to the banks and financing institutions financing the transaction contemplated by this Agreement (including the refinancing of existing indebtedness of the Group Companies).

18.5.2   Purchaser may between Signing and the Closing transfer and assign all rights and obligations (in whole or in part) under this Agreement to any Affiliate of Purchaser ("**Designation Right**") without any approval of Seller being required, provided that Purchaser shall always remain jointly and severally liable (*Gesamthaft*) to Seller after the exercise of such Designation Right.

18.6    No Rights of Third Parties

Subject to Section 14.2, this Agreement shall not grant any rights to, and is not intended to operate for, the benefit of any third parties, including any Group Company (*kein echter Vertrag zugunsten Dritter*).

18.7    Interpretation

18.7.1   Annexes and Schedules

All Annexes to this Agreement constitute an integral part of this Agreement.

18.7.2   Headings

The headings and sub-headings in this Agreement are inserted for convenience only and shall not affect the interpretation or construction of this Agreement.

18.7.3   Language

This Agreement is written in the English language (except that Annexes may be in the German language). Terms to which a German translation has been added in parentheses and italics shall be interpreted in accordance with such

51

German translation alone disregarding the English term to which such German translation relates.

### 18.7.4 Legal Terms

Any German legal term for any action, remedy, method of judicial proceeding, legal document, legal status, court, official or any legal concept shall, in respect of any jurisdiction other than Germany, be deemed to include what most nearly approximates in that jurisdiction to the German legal term and any reference to any German statute shall be construed so as to include equivalent or analogous laws of any other jurisdiction.

### 18.7.5 Specific Expressions

Whenever the words "include", "includes" or "including" or "in particular" or similar expressions are used in this Agreement, they shall be deemed to be followed by the words "without limitation". Whenever the words "hereof", "herein", "hereunder", "hereto" or similar expressions are used in this Agreement, they refer to this Agreement as a whole and not to a specific Section of this Agreement.

### 18.7.6 Disclosure

The disclosure of any matter in this Agreement (including its Annexes) shall be deemed to be a disclosure for all purposes of this Agreement. The fact that a matter has been disclosed in this Agreement (including Annex) shall not be used to construe the extent to which disclosure is required pursuant to the provisions of this Agreement.

## 18.8    Governing Law; Jurisdiction

### 18.8.1 Governing Law

This Agreement and any non-contractual rights and obligations arising out of or in connection with it shall be governed by, and construed in accordance with, the substantive laws of Germany, excluding the United Nations Convention on Contracts for the International Sale of Goods (CISG).

### 18.8.2 Arbitration

(a)    Any dispute arising out of, relating to, or having any connection with, this Agreement, including any question regarding its existence, validity, interpretation, performance, breach or termination, and any tort or other extra-contractual or statutory claims arising out of or relating to its negotiation, execution or performance, shall be

52

exclusively and finally settled by arbitration in accordance with the Rules of the ICC International Court of Arbitration. The Tribunal shall consist of three Arbitrators. The seat of the arbitration shall be Frankfurt, Germany. The language of the arbitration shall be English.

(b)     The Parties agree that any arbitral award rendered in connection with the parties' arbitration agreement shall be final and binding. The Parties undertake to carry out any award of the tribunal without delay, and waive their right to refer any question of law and any right of appeal on the law and/or merits to a court of law or other judicial authority, insofar as such waiver may be validly made. Awards shall be final and binding on the parties as from the date they are made.

## 18.9    Severability

If any court of competent jurisdiction holds any provision of this Agreement invalid or unenforceable, the other provisions of this Agreement shall remain in full force and effect. The invalid or unenforceable provision shall be deemed to have been replaced by a valid, enforceable and fair provision which comes as close as possible to the intentions of the Parties hereto at the time of the conclusion of this Agreement. It is the express intent of the Parties that the validity and enforceability of all other provisions of this Agreement shall be maintained and that this Section 18.9 shall not result in a reversal of the burden of proof but that Section 139 BGB is hereby excluded in its entirety.

* * * * *

KE 53231411.2

**Part II**

## EQUITY COMMITMENT LETTER

From:

**Smyths Toys HQ IOM Unlimited**, a company incorporated on the Isle of Man registered in the Companies Registry under No. 007179V with registered address in PO Box 145, Level 6, 10A Prospect Hill, Douglas, IM99 1FY, Isle of Man (**"Smyths"**)


To:

**Smyths Toys EU HQ Limited**, a private company limited by shares under the laws of Ireland registered under company registration number 615469 with its registered office at Lyrr 1, Mervue Business Park, Galway, Ireland (**"Purchaser"**);

and

**TRU (UK) H8 Limited**, a private company limited by shares under the laws of England and Wales, registered with the Companies House under company number 09873452 (**"Seller"**);

(Seller together with Smyths and Purchaser collectively **"Parties"** and each individually a **"Party"**)


Dear Sir or Madam:

We refer to the sale and purchase agreement regarding the sale and purchase of Toys "R" Us GmbH ("**German Target**"), Toys "R" Us Handelsgesellschaft m.b.H. ("**Austrian Target**") and Toys R Us AG ("**Swiss Target**") to be entered into by Purchaser and Seller on or about the date hereof (such sale and purchase agreement, as amended from time to time, **"SPA"**). Capitalized terms used but not defined in this letter agreement (**"Equity Commitment Letter"**) have the meaning ascribed to them in the SPA.

1.   **Closing Equity Commitment**

1.1   Smyths hereby irrevocably commits to provide to Purchaser, by way of direct or indirect contributions (which contributions may take the form of ordinary equity, preferred equity, shareholder loans or other equity or debt instruments), an amount of not less than **EUR 74,400,000.00** in immediately available EURO-denominated cash funds (**"Closing Equity Commitment"**) prior to or on the Scheduled Closing Date.

1.2   Smyths hereby irrevocably commits and undertakes to Sellers:

   (i)   that the Closing Equity Commitment will be provided to Purchaser in accordance with Clause 1.1 no later than on the Scheduled Closing Date;

   (ii)   to procure (*dafür einstehen*) that no funds provided under the Closing Equity Commitment will directly be extracted or withdrawn from or redeemed or

repaid by Purchaser prior to utilization by Purchaser of the funds provided under the Closing Equity Commitment in fulfilling its obligations to Sellers in respect to payment of the Preliminary Purchase Price and the Estimated TSA Fee Amount and any other amounts payable by Purchaser to Sellers on the Scheduled Closing Date (herein **"Closing Payment Obligations"**); and

(iii)  to procure (*dafür einstehen*) that no security, charge, mortgage, lien or other encumbrance or restriction on Purchaser's ability to pay out the funds provided under the Closing Equity Commitment will be created over, or affect, the provided funds prior to fulfillment of the Closing Payment Obligations.

1.3  Smyths' commitments under Sections 1.1 and 1.2 are subject to the satisfaction or waiver by Smyths of the following conditions:

(i)  The Purchaser has entered into the SPA and related documents with the Seller; and

(ii)  all of the conditions to the Purchaser's obligation contained in Section 7.1 of the SPA shall have been satisfied or to the extent applicable waived by the Purchaser in its sole discretion.

2.  **Beneficiaries**

This Equity Commitment Letter is addressed to Purchaser and Seller, and Smyths shall have no duty to any person or entity other than Purchaser and Seller. The fulfilment of the obligations of Smyths to provide funding to Purchaser in accordance with this Equity Commitment Letter may be claimed by Seller directly against Smyths on behalf of Purchaser in writing towards Smyths, in each case, if and to the extent the funds to be provided under the Closing Equity Commitment have not been provided to Purchaser in accordance with the terms of this Equity Commitment Letter by the Scheduled Closing Date at the latest.

3.  **Representations and Warranties**

3.1  Smyths hereby guarantees to Purchaser and Sellers by way of an independent guarantee pursuant to Section 311 (1) German Civil Code (*BGB*) that the statements set forth in Sections 3.1 (i) through 3.1 (v) are true and correct on the Signing Date and each Commitment Date:

(i)  Smyths is an unlimited company duly organized and validly existing under the laws of the Isle of Man and registered with the Companies Registry under company number 007179V.

(ii)  This Equity Commitment Letter constitutes the legal, valid and binding obligation of Smyths, enforceable against Smyths in accordance with its terms.

(iii)  Smyths has the absolute and unrestricted right, power, authority and capacity to execute this Equity Commitment Letter and to perform its obligations under this Equity Commitment Letter, which actions have been duly authorized and

approved by all necessary corporate actions of Smyths. Smyths is not required to give any notice to any person or obtain any consent or governmental authorisation or approval in connection with the execution and performance of this Equity Commitment Letter.

(iv)   Neither the execution nor the performance of this Equity Commitment Letter by Smyths do directly or indirectly (i) violate the certificate of incorporation, articles of association or by-laws of Smyths or (ii) violate any applicable law or court or governmental order to which Smyths is, or any of its assets are, subject, in each case except for such violations which would not adversely affect Smyths' ability to perform its obligations under this Equity Commitment Letter.

(v)   On the Scheduled Closing Date, Smyths will have the funds necessary to provide the cash amounts to be provided under this Equity Commitment Letter in accordance with its terms.

3.2   In the event of any breach or non-fulfilment by Smyths of any of the guarantees under Section 3.1 above, Smyths shall be liable for putting Sellers into the same position that they would have been in if the respective guarantee had been correct (*Naturalrestitution*) or, at the election of Sellers, for paying damages for non-performance (*kleiner Schadenersatz*) to Sellers. The liability of Smyths under this Section 3 shall be limited to EUR 7,440,000.

4.   **Agent for Service**

Smyths hereby irrevocably appoints and authorizes each of Denis Bacina and Dirk Stiller, each with business address c/o PricewaterhouseCoopers Legal AG Rechtsanwaltsgesellschaft, Friedrich-Ebert-Anlage 35-37, 60327 Frankfurt (Main), Germany, as agent for service of process (*Zustellungsbevollmächtigte*) for all legal proceedings involving Smyths arising out of or in connection with this Equity Commitment Letter. Such service shall be deemed completed on delivery to such agent (whether or not it is forwarded to and received by Smyths).

5.   **No Set-off and Subordination**

Smyths waives any right of set-off (*Aufrechnung*) or counterclaim, deduction or retention (*Zurückbehaltungsrecht*) which it might otherwise have in respect of any obligations under this Equity Commitment Letter.

6.   **Governing Law and Dispute Resolution**

6.1   This Equity Commitment Letter shall be governed by, and construed in accordance with, the substantive laws of Germany, excluding the United Nations Convention on Contracts for the International Sale of Goods (CISG).

6.2   Any dispute arising out of, relating to, or having any connection with, this Equity Commitment Letter, including any question regarding its existence, validity,

interpretation, performance, breach or termination, and any tort or other extra-contractual or statutory claims arising out of or relating to its negotiation, execution or performance, shall be exclusively and finally settled by arbitration in accordance with the Rules of the ICC International Court of Arbitration. The Tribunal shall consist of three Arbitrators. The seat of the arbitration shall be Frankfurt, Germany. The language of the arbitration shall be English. The Parties agree that any arbitral award rendered in connection with the parties' arbitration agreement shall be final and binding. The Parties undertake to carry out any award of the tribunal without delay, and waive their right to refer any question of law and any right of appeal on the law and/or merits to a court of law or other judicial authority, insofar as such waiver may be validly made. Awards shall be final and binding on the parties as from the date they are made.

7.     **Confidentiality**

The Parties shall keep confidential the contents of this Equity Commitment Letter unless a legal disclosure obligation exists or the respective other Party has consented to the disclosure or such disclosure is reasonably required to pursue any rights and claims under this Equity Commitment Letter.

8.     **Miscellaneous**

8.1    Unless otherwise explicitly provided for in this Equity Commitment Letter, no Party may assign, delegate or otherwise transfer any right or claim it may have under or in connection with this Equity Commitment Letter without the written consent of the other Parties.

8.2    The notarial fees incurred in connection with the notarization of this Equity Commitment Letter shall be borne by Smyths.

8.3    This Equity Commitment Letter will expire on the earliest to occur (i) the Closing or (ii) the termination of the SPA pursuant to its terms.

8.4    This Equity Commitment Letter constitutes the entire agreement between the Parties hereto with respect to the subject matter hereof, and supersedes all prior agreements, written or oral, between them in respect thereof. Any changes or amendments to this Equity Commitment Letter, including to this Section 8.4, shall only be valid if made in writing and shall require the prior written consent of the Sellers.

9.     **Severability**

If any court of competent jurisdiction holds any provision of this Equity Commitment Letter invalid or unenforceable, the other provisions of this Equity Commitment Letter shall remain in full force and effect. The invalid or unenforceable provision shall be deemed to have been replaced by a valid, enforceable and fair provision which comes as close as possible to the intentions of the Parties hereto at the time of the conclusion of this Equity Commitment Letter. It is the express intent of the Parties that the validity and enforceability of all other provisions of this Equity Commitment Letter

shall be maintained and that this Section 9 shall not result in a reversal of the burden of proof but that Section 139 BGB is hereby excluded in its entirety.

The Notary advised the deponents in particular as follows:

- When a German notary records a transfer of shares in a limited liability company incorporated under German law he is required, inter alia, to submit without undue delay a list of shareholders as soon as the transfer has become effective. This list of shareholders must show the shares held by the Parties to the deed as well as the nominal values of these shares.

- For legal purposes, in particular in relation to the company, anyone who is entered into the list of shareholders is deemed as the owner of a share. A legal transaction undertaken by the Purchaser in respect of the shareholding will only be deemed as valid ab initio, if a (new) list is entered into the commercial register following that legal transaction, failing which the transaction takes no effect.

- If a transfer of shares is made under one or more conditions the notary must not file an amended list of shareholders with the commercial register until the parties have notified him of the condition or conditions being met.

- The acquirer is liable together with the seller for any contributions to the share capital which is outstanding at the time of registration of the list of shareholders in the commercial register. The seller will be liable if any contributions towards a share that have not yet been made cannot be collected from the Purchaser at the time of such contribution becoming due and payable.

- The notary has not advised the parties on aspects of foreign law, and has not reviewed the validity of transfers of shares in companies not incorporated in Germany.

- The notary is unaware of the tax situations of the Parties. He did not review any tax effects that this agreement might have and was not requested to do so.

- The notary is required under sec. 54 of the Income Tax Implementation Ordinance / German Real Estate Transfer Tax Act to furnish the tax office with a copy/certified copy of this deed.

- The Parties are jointly and severally liable for the costs incurred by this deed. Any agreements deviating therefrom in this deed only have effect in the internal relationship of the Parties.

The notary is instructed to issue certified copies of this deed to the respective statutory recipients (fiscal authority) and one to each party.

\*\*\*

Thereafter, the above protocol was read to the deponents, approved by them and was signed by the deponents and the notary personally as follows:



Number    118      of the Roll of Deeds for 2018



Done

in Frankfurt am Main                                                          on 20/21 April 2018

Before me, the undersigned notary public

**Dr. Finn Lubberich**

with offices in Frankfurt am Main
MesseTurm, Friedrich-Ebert-Anlage 49, 60308 Frankfurt am Main

appeared today:

Ms. **Patricia Barros**, born on 10 February 1987, business address: Friedrich-Ebert-Anlage 49, 60308 Frankfurt am Main, acting not in her own name, but as attorney-in-fact by virtue of an oral power of attorney for and on behalf of:

1.      **TRU (UK) H8 Limited**, a private company limited by shares under the laws of England and Wales, registered office address: Cannon Place, 78 Cannon Street, London, United Kingdom, EC4N 6AF, registered with the Companies House under company number 09873452

2.      **Smyths Toys EU HQ Limited**, a private company limited by shares under the laws of Ireland registered with the CRO under company registration number 615469 with its registered office at Lyrr 1, Mervue Business Park, Galway, Ireland

3.     **Smyths Toys HQ IOM Unlimited**, a company incorporated on the Isle of Man registered in the Companies Registry under No. 007179V with registered address in PO Box 145, Level 6, 10A Prospect Hill, Douglas, IM99 1FY, Isle of Man

The deponent is personally known to the notary.

The notary advised according to § 18 Hessian Information Protection Law, that name, address and personal information of the parties are stored. The underlying statute is §§ 7 and 11 HDSG.

On being asked whether there had been any prior involvement (*Vorbefassung*) by the notary within the meaning of Sec. 3 para 1 sentence 1 no. 7 of the German Notarization Act (*Beurkundungsgesetz*), the provisions of which had been explained by the notary, the deponent confirmed that there had been no such prior involvement.

The deponent requested that this deed be recorded in the English language and partly in German language. As the notary and the deponent have sufficient command of the English (and German) language, this recording is done both in English and German (as the case may be). After having been instructed by the notary, the deponent waived the right to obtain the assistance of a sworn interpreter and to obtain a certified translation of this deed.

The Parties represented by the deponent intend to conclude a **SALE AND PURCHASE AGREEMENT** regarding shares in, *inter alia*, **Toys "R" Us GmbH** (the "SPA").

The Exhibits attached to this deed shall be incorporated by reference in the SPA pursuant to Section 13a German Notarisation Act (*BeurkG*).

Thereupon, the deponent, acting as indicated, requested that the following **Annexes** be notarized which shall become part of the agreement of the contracting parties and reference to which is made hereby:

| | |
|---|---|
| Annex (A) | Group Companies |
| Annex 2.4.2 | Copy of Waiver Agreement |
| Annex 2.4.3 | Contingent Interests Waiver Agreement |
| Annex 2.5.1 | List of Intra-Group Loan Agreements |
| Annex 2.5.3 | Swiss Receivables |
| Annex 2.8.2 | Form of Release Deeds |
| Annex 3.1.1 | Form of German Transfer Agreement |
| Annex 3.1.2 | Form of Austrian Transfer Agreement |
| Annex 4.5 | Allocation of Estimated Purchase Price |
| Annex 4.8.1 | Terms of Specified Contract |
| Annex 6.1 | Financial Statements |

Annex 6.2.2(a)   Permitted Leakage
Annex 7.1.5      Form of Transition Service Agreement
Annex 8.2.3      Form of Closing Confirmation
Annex 10.4       Participations of Group Companies
Annex 10.7       Conduct of Business
Annex 10.9       IP License Agreement
Annex 10.10      Land Register Excerpts
Annex 11.3       Seller Activities
Annex 12.2.3     Representatives of Purchaser

The Annexes (A), 2.5.1, 2.5.3, 2.8.2 (parts), 4.5, 6.1, 6.2.2 (a) (parts), 7.1.5 (parts), 10.9 (parts) and 10.10 are inventories and lists in accordance with Section 14 German Notarisation Act *(BeurkG)*. These Exhibits have been submitted for review and signed on each page by the deponent. Their reading was waived.

The costs of this deed shall be borne in accordance with the respective applicable provisions of the SPA as agreed by the Parties to it.

* * * *

This deed was read aloud to the deponent along with those parts of the Annexes which can be read out, all plans and parts of the Annexes which cannot be read out were presented to the deponent for review, all of the above was authorized by the deponent and signed by her and the notary with their own hands as follows:



*K&E Draft*
*April 15, 2018*

# ANNEX (A)

# GROUP COMPANIES



2

**ANNEX 2.4.2
COPY OF WAIVER AGREEMENT**

The undersigned TRU, Inc. (TRU") is the only shareholder of Toys 'R' US GmbH in Cologne (hereinafter „ GmbH"). The GmbH is in a state of over-indebtedness under German law and shows significant loss carry forwards on the face of its financial statements at year end January 31, 2000. The parties wish to recapitalise the GmbH to eliminate the state of over-indebtedness on the one hand and to provide the GmbH with sufficient equity going forward on the other hand.

To achieve this, a waiver of intercompany receivables will be expressed as detailed below. The waiver will, however, be subject to the condition of reinstatement of the waived receivables if and when the conditions of reinstatement will be met.

The condition of reinstatement under which principal and interest will become payable will be the full extinction of the company's cumulative corporate tax loss carry forwards as reported in its annual formal corporation tax returns. The date of full reinstatement of the waived debt will be the first day of the business year following the financial year in which the cumulative corporate tax loss carry forwards were extinct.

As from this date the reinstated receivables will bear interest at Euro interbank market rates for money market transactions. No interest shall be calculated on any waived amounts during the period until the reinstatement condition will be met.

Repayment of the reinstated loans can be effected by GmbH in full during the year after reinstatement or with the consent of the creditors in ten equal yearly instalments. Therefore, the undersigned affiliated group companies of TRU Group state the following:

1.   As of January 31, 2000 the GmbH owes to the undersigned group companies of TRU the following principal amount as loans

|  |  |
|---|---|
| TRU, Inc. | DM 40,000.000,- |
| Toys 'R' US | DM 190,000.000,- |

2.  The undersigned companies, being the affiliated creditors of the GmbH, hereby waive all
    their above-mentioned claims, including interest accrued until January 31, 2000, but
    under the condition subsequent that full or partial repayments have to be made by GmbH
    if and when and to the extent the above mentioned reinstatement condition is met.

Date:

TRU, Inc.                                          Toys R US, Inc.

                                                   Toys 'R' US GmbH

# ANNEX 2.4.3
# CONTINGENT INTERESTS WAIVER
# AGREEMENT

## WAIVER AND RELEASE OF CONTINGENT INTERESTS

This **WAIVER AND RELEASE OF CONTINGENT INTERESTS** ("Waiver and Release") is made as of [●] between **TOYS "R" US EUROPE LLC** (formerly TRU, Inc.), a limited liability company organized under the laws of Delaware, USA, with registered office at 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808, USA, and registered with the Delaware Secretary of State under number 2026162 ("TRU Europe") and **TOYS "R" US INC.**, a stock corporation organized under the laws of Delaware, USA, with registered office at 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808, USA and registered with the Delaware Secretary of State under number [●] ("Toys R Us, Inc." and collectively with TRU Europe, the "TRU Parties") and **TOYS "R" US GMBH**, a limited liability company under the laws of Germany, registered with the commercial register at the local court of Cologne, Germany, under registration number HRB 16651 ("German Target");

**WHEREAS**, up through and including the date hereof, German Target is and has been a wholly-owned subsidiary of TRU (UK) H8 Limited, a private company limited by shares under the laws of England and Wales registered with the Companies House under company number 09873452 with its registered office at Cannon Place, 78 Cannon Street, London, United Kingdom EC4N 6AF ("TRU H8 Ltd.") which, in turn, is a wholly-owned indirect subsidiary of each of the TRU Parties;

**WHEREAS**, the TRU Parties, as lenders, and German Target, as borrower, were parties to certain loan agreements ("Shareholder Loans"), respectively (all rights of the TRU Parties under or in connection with the Shareholder Loans, including without limitation all receivables under the Shareholder Loans for repayment of the principal amounts plus any accrued, unpaid and future interest and any unilateral rights under the Shareholder Loans (*e.g.*, termination rights) collectively, the "Contingent Interests");

**WHEREAS**, in 2000, the TRU Parties and the German Target entered into a waiver agreement in respect of the Contingent Interests pursuant to which TRU Europe and Toys R Us, Inc. waived the Contingent Interests under the condition subsequent that full or partial repayments of the Contingent Interests have to be made by German Target under certain circumstances. The value of such Contingent Interests is currently unknown and may be subject to dispute;

**WHEREAS**, TRU H8 Ltd. and Smyths Toys EU HQ Limited, a private company limited by shares under the laws of Ireland registered under company registration number 615469 with its registered office at Lyrr 1, Mervue Business Park, Galway, Ireland ("Smyths") entered into a share purchase agreement dated as of [●] (the "Share Purchase Agreement"), pursuant to which TRU H8 Ltd. has agreed to, *inter alia*, sell all of the outstanding share capital of German Target and Toys "R" Us Handelsgesellschaft mbH, a limited liability company under the laws of Austria, registered with the companies book at the regional court of Linz, under registration number FN 91792 p ("Austrian Target"), as well as Toys R Us AG, a stock corporation under the laws of Switzerland, registered with the commercial register of canton Zurich, under identification number CHE-106.090.137 ("Swiss Target"), to Smyths on the terms and conditions

set forth in the Share Purchase Agreement, including that the closing must occur on or before [May 31, 2018]; and

**WHEREAS,** the Share Purchase Agreement provides for the execution and delivery of this Waiver and Release as a closing action;

**NOW, THEREFORE**, in consideration for the above described transactions and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and in consideration of the premises and the mutual agreements herein contained:

1.      This Waiver and Release shall be effective as of [the end of the day immediately prior to the date of the consummation of the Share Purchase Agreement].

2.      The TRU Parties hereby waive the Contingent Interests *vis-à-vis* German Target and release German Target from any and all Contingent Interests whatsoever, in law, admiralty or equity, that the TRU Parties can, shall or may, have or had at any time *vis-à-vis* German Target.  For the avoidance of doubt, the TRU Parties represent that (i) the Contingent Interests do not comprise any rights of the TRU Parties *vis-à-vis* Swiss Target, Austrian Target or Smyths and (ii) the TRU Parties do not have any other rights arising from the Shareholder Loans *vis-à-vis* Swiss Target, Austrian Target or Smyths.

3.      The TRU Parties hereby acknowledges that to the extent any such parties have any claim(s) arising from the Contingent Interests, whether known or unknown, their sole recourse to pursue such claim(s) shall be against the proceeds of the Share Purchase Agreement.

4.      The undersigned have received full and adequate consideration for the execution and delivery of this Waiver and Release, and this Waiver and Release constitutes each of the undersigned's legal and valid obligation and is binding upon each of them in accordance with its terms.

5.      This Waiver and Release will be governed by and construed under the laws of the State of New York without regard to conflicts of laws principles that would require the application of any other law.  Each party to this Waiver and Release, including their successors and assigns, consents to the exclusive jurisdiction of the courts of the State of New York and of the federal courts sitting in the State of New York.

6.      This Waiver and Release may not be changed orally but only by a written instrument executed by the TRU Parties and German Target.  This Waiver and Release may be executed in one or more counterparts, each of which shall be deemed an original but all of which together will constitute one and the same instrument.

**[SIGNATURE PAGE FOLLOWS]**

KE 53189565

**IN WITNESS WHEREOF**, the Parties have executed this Waiver and Release as of the date first above written.

**TOYS "R" US EUROPE LLC**

By: _____

Name: _____

Title: _____

**TOYS "R" US INC.**

By: _____

Name: _____

Title: _____

**TOYS "R" US GMBH**

By: _____

Name:

Title:

Acknowledged:

**SMYTHS TOYS EU HQ LIMITED**

By: _____

Name:

Title:

*K&E Draft*
*April 19, 2018*

## ANNEX 2.5.1
## INTRA-GROUP LOAN AGREEMENTS

| # | Lender | Borrower | Currency | Outstanding Amount as of April 17, 2018* |
|---|--------|----------|----------|------------------------------------------|
| 1 | German Target | Toys "R" Us (Australia) Pty. Ltd. (Australia) | EUR | 45,312,165 |
| 2 | German Target | Toys "R" Us S.A.R.L. (France) | EUR | 15,100,000 |
| 3 | German Target | Toys "R" Us Iberia, S.A. (Spain) | EUR | 4,500,000 |
| 4 | German Target | Toys "R" Us Limited (United Kingdom) | EUR | 11,586.715 |
| 5 | Austrian Target | Toys "R" Us Iberia, S.A. (Spain) | EUR | 2,800,000 |
| 6 | Austrian Target | Toys "R" Us Limited (United Kingdom) | EUR | 11.740.211 |
| 7 | Austrian Target | TRU Netherlands Holdings B.V. (Netherlands) | EUR | 19,464,089[1] |
| 8 | Austrian Target | Toys "R" Us Poland sp. z o. o. (Poland) | EUR | 17,255,291 |
| 9 | Swiss Target | Toys "R" Us S.A.R.L. (France) | CHF | 16,948,370 |
| 10 | Swiss Target | Toys "R" Us Iberia, S.A. (Spain) | CHF | 21,695,727 |

* Face value

---

[1]    As of March 31 2018.

2

KE 53152133.2



3

KE 53152133.2

*K&E Draft
April 19, 2018*

**ANNEX 2.5.3
SWISS RECEIVABLES**

KE 53170694.2

| # | Lender | Borrower | Currency | Outstanding Amount as of April 17, 2018* |
|---|--------|----------|----------|------------------------------------------|
| 1 | Swiss Target | Toys "R" Us S.A.R.L. (France) | CHF | 16,948,370 |
| 2 | Swiss Target | Toys "R" Us Iberia, S.A. (Spain) | CHF | 21,695,727 |

* Face value

2

KE 53170694.2



**ANNEX 2.8.2**
**FORM OF RELEASE DEEDS**

# Linklaters

DEED OF RELEASE

dated [_____] 2018

between

**WILMINGTON SAVINGS FUND SOCIETY, FSB**
as First-Priority Collateral Trustee

**WILMINGTON TRUST, NATIONAL ASSOCIATION**
as Second-Priority Collateral Trustee

[*Insert name of Initial Proceeds Escrow Agent*]

as Initial Proceeds Escrow Agent

TRU TAJ LLC and

TRU TAJ FINANCE, INC.

as the Issuers

TRU (UK) H8 LIMITED as Seller

and

*THE ENTITIES LISTED IN SCHEDULE 1*

# Linklaters

Linklaters LLP
Ref: L-265363

# CONTENTS

**CLAUSE**                                                                    **PAGE**

1.    Interpretation ........................................................................................ 1
2.    Release ................................................................................................... 4
3.    Release conditions ................................................................................ 8
4.    Notifications ........................................................................................... 8
5.    Consideration ........................................................................................ 9
6.    Indemnity ............................................................................................... 9
7.    Preservation of rights ........................................................................... 9
8.    Collateral Trustees' rights .................................................................... 9
9.    Costs and expenses ............................................................................ 10
10.   Further assurance ............................................................................... 10
11.   Amendments and waivers ................................................................... 10
12.   Partial invalidity ................................................................................... 10
13.   Counterparts ........................................................................................ 11
14.   Governing law ...................................................................................... 11
15.   Enforcement ......................................................................................... 11

# THE SCHEDULES

**SCHEDULE**                                                                  **PAGE**

SCHEDULE 1 The Grantors ........................................................................ 12
SCHEDULE 2 Security Agreements ........................................................... 13
SCHEDULE 3 Release formalities .............................................................. 17
SCHEDULE 4 Form of Initial Proceeds Confirmation ............................... 20
SCHEDULE 5 Form of Release Effective Date Notices ............................. 21
SCHEDULE 6 Form of Seller Effective Date Notice .................................. 23
SCHEDULE 7 German Form of Notice to Account Bank ........................... 24
SCHEDULE 8 [German Form of Notice to Third Party Debtors ................. 26
SCHEDULE 9 Austrian Form of Termination and Release Notices ........... 28
SCHEDULE 10 Swiss Form of Release Notices ........................................ 35

**THIS DEED** is dated [_____] 2018 and made between:

(1)   **WILMINGTON SAVINGS FUND SOCIETY, FSB** as First-Priority Trustee and First-Priority Collateral Trustee for the First-Priority Secured Parties (the "**First-Priority Collateral Trustee**");

(2)   **WILMINGTON TRUST, NATIONAL ASSOCIATION** as Second-Priority Trustee and Second-Priority Collateral Trustee for the Second-Priority Secured Parties (the "**Second-Priority Collateral Trustee**");

(3)   [*Insert name of Initial Proceeds Escrow Agent*], as escrow agent under [●] (the "**Initial Proceeds Escrow Agent**");

(4)   **TRU TAJ LLC**, a Delaware limited liability company (the "**Company**"), and **TRU TAJ FINANCE INC.**, a Delaware corporation (together with the Company, the "**Issuers**");

(5)   **TRU (UK) H8 LIMITED**, as seller under the Sale and Purchase Agreement (the "**Seller**"); and

(6)   **THE ENTITIES LISTED IN SCHEDULE 1** (together, with the Seller, the "**Grantors**").

**BACKGROUND**

(A)   Each Grantor has granted certain covenants for payment, guarantees and indemnities under the First-Priority Documents and the Second-Priority Documents.

(B)   Each Grantor has entered into the Security Agreements to which it is a party in order to secure the claims of the First-Priority Secured Parties and the Second-Priority Secured Parties under the First-Priority Documents and the Second-Priority Documents.

(C)   The First-Priority Documents, the Second-Priority Documents and the Security Agreements are subject to the terms of the Intercreditor Agreement.

(D)   The Grantors request that the Collateral Trustees grant the releases pursuant to the terms of any Release Agreement.

(E)   Each Party intends this document to take effect as a deed (even though a Party may execute it under hand).

IT IS AGREED as follows:

1.    **INTERPRETATION**

1.1   **Definitions**

In this Deed:

"**Asset Sale Offer**" has the meaning given to that term in the First-Priority Indenture.

"**Austrian Security Agreements**" means the security agreements governed by Austrian law entered into in connection with the First-Priority Obligations and the Second-Priority Obligations, each of which is listed in Part I of Schedule 2 (*Security Agreements*) and any other document governed by Austrian law evidencing security created by Toys "R" Us Handelsgesellschaft m.b.H. pursuant to or in connection with the First-Priority Obligations and the Second-Priority Obligations (including, in each case, any amendments, restatements, confirmations and prolongation relating thereto).

"**Austrian Share Pledge Agreements**" means the Austrian Security Agreements listed as items 3 to 6 in Part I of Schedule 2 (*Security Agreements*).

"**Closing Date**" has the meaning given to that term in the Sale and Purchase Agreement.

**"Collateral Trustees"** means the First-Priority Collateral Trustee and the Second-Priority Collateral Trustee.

**"Effective Date"** means the date on which each of the conditions set out in Clause 3 *(Release conditions)* have been satisfied. For the avoidance of doubt, if the conditions are satisfied on separate dates, the Effective Date shall be the latter date.

**"Escrow Accounts"** has the meaning given to that term in the Escrow Agreement.

**"Escrow Agreement"** means the escrow agreement by and between the Seller, the Purchaser and the SPA Escrow Agent dated [*date*] 2018.

**"Escrow Amount"** means the total aggregate amount of the Escrow Amount I, the Escrow Amount II, the Escrow Amount III and, if applicable, the Escrow Amount IV (each as defined in Clause 4.4 (*Escrow Amounts*) of the Sale and Purchase Agreement.

**"Estimated Purchase Price"** has the meaning given to that term in the Sale and Purchase Agreement.

**"Excess Proceeds"** has the meaning given to that term in the First-Priority Indenture.

**"Finance Documents"** means the First-Priority Documents and the Second-Priority Documents.

**"German Account Pledge Agreements"** has the meaning given to such term in Part II of Schedule 2 (*Security Agreements*).

**"German Assignment Agreement"** has the meaning given to such term in Part II of Schedule 2 (*Security Agreements*).

**"German Pledge Agreements"** means the German Share Pledge Agreements and the German Account Pledge Agreements.

**"German Security Agreements"** means the security agreements governed by German law entered into in connection with the First-Priority Obligations and the Second-Priority Obligations, each of which is listed in Part II of Schedule 2 *(Security Agreements)* and any other document governed by German law evidencing security created by Toys "R" Us GmbH pursuant to or in connection with the First-Priority Obligations and the Second-Priority Obligations (including, in each case, any amendments, restatements, confirmations and prolongation relating thereto).

**"German Share Pledge Agreements"** has the meaning given to such term in Part II of Schedule 2 (*Security Agreements*).

**"Holders"** has the meaning given to that term in the First-Priority Indenture.

**"Initial Proceeds Confirmation"** means a confirmation from the Initial Proceeds Escrow Agent to the First-Priority Collateral Trustee and the Second-Priority Collateral Trustee in the form attached in Schedule 4 (*Form of Initial Proceeds Confirmation*).

**"Initial Proceeds Discharge Account"** means the account specified in paragraph (a) of Clause 3.1 *(Initial Proceeds Discharge Amount)*.

**"Initial Proceeds Discharge Amount"** means an amount equal to the Estimated Purchase Price less the sum of Escrow Amount I, Escrow Amount II, Escrow Amount III (if applicable) and

Escrow Amount IV (if applicable) (each as defined in Clause 4.4 *(Escrow Amounts)* of the Sale and Purchase Agreement.

"**Intercreditor Agreement**" means the first lien / second lien intercreditor agreement dated 17 November 2017 between, among others, the Issuers, the First-Priority Collateral Trustee and the Second-Priority Collateral Trustee, as amended and/or restated from time to time.

"**Notes**" has the meaning given to that term in the First-Priority Indenture.

"**Party**" means a party to this Deed.

"**Purchaser**" means Smyths Toys EU HQ Limited.

"**Release Agreements**" means this Deed and the Spanish Deed of Release of Pledges.

"**Released Security Assets**" means all of the assets subject to the Security Interests granted in favour of any Collateral Trustee, any First-Priority Secured Party or any Second-Priority Secured Party pursuant to the Security Agreements and released pursuant to any Release Agreement.

"**Sale and Purchase Agreement**" means the sale and purchase agreement dated [21] April 2018 between the Seller and the Purchaser.

"**Security Agreements**" means the Austrian Security Agreements, the German Security Agreements, the Swiss Security Agreements and the Spanish Security Agreements.

"**Security Interests**" means all or any of the Liens created or expressed to be created in favour of any Collateral Trustee, any First-Priority Secured Party or any Second-Priority Secured Party by or pursuant to the Security Agreements.

"**SPA Escrow Agent**" means notary public [Dr. Finn Lubberich].

"**SPA Escrow Agent Confirmation**" means a confirmation by the SPA Escrow Agent to the First-Priority Collateral Trustee and the Second-Priority Collateral Trustee in the form attached [as Annex 3.1] of the Escrow Agreement confirming receipt of the Escrow Amount into the Escrow Accounts.

"**Spanish Deed of Release of Pledges**" has the meaning given to that term in Clause 2.4 *(Release of Spanish Security Agreements)*.

"**Spanish Security Agreements**" means the security agreements governed by Spanish law entered into in connection with the First-Priority Obligations and the Second-Priority Obligations, each of which is listed in Part IV of Schedule 2 (*Security Agreements*).

"**Spanish Security Interests**" means all or any of the Liens created or expressed to be created in favour of any Collateral Trustee, any First-Priority Secured Party or any Second-Priority Secured Party by or pursuant to the Spanish Security Agreements.

"**Swiss Escrow Account**" has the meaning given to that term in the Sale and Purchase Agreement.

"**Swiss Escrow Amounts**" means the Swiss Escrow Amount I and the Swiss Escrow Amount II (each as defined in the Sale and Purchase Agreement).

"**Swiss Security Agreements**" means the security agreements governed by Swiss law entered into in connection with the First-Priority Obligations and the Second-Priority Obligations, each of which is listed in Part III of Schedule 2 (*Security Agreements*) and any other document governed by Swiss law evidencing security created by Toys "R" Us AG pursuant to or in connection with the First-Priority Obligations and the Second-Priority Obligations (including, in each case, any amendments, restatements, confirmations and prolongation relating thereto) .

## 1.2   Incorporation of defined terms

Unless a contrary indication appears, terms defined in the Intercreditor Agreement have the same meaning in this Deed.

## 1.3   Construction

(a)   Any reference in this Deed to a "**Finance Document**" or any other agreement or instrument is a reference to that Finance Document or other agreement or instrument as amended, novated, supplemented, extended, restated (however fundamentally and whether or not more onerously) and/or replaced and includes any change in the purpose of, any extension of or any increase in any facility or the addition of any new facility under that Finance Document or other agreement or instrument.

(b)   The provisions in Section 1.2 (*Terms generally*) of the Intercreditor Agreement apply to this Deed, except that references to "this Agreement" shall be construed as references to this Deed.

## 1.4   Third party rights

(a)   Unless expressly provided to the contrary in a Finance Document, a person who is not a Party has no right under the Contracts (Rights of Third Parties) Act 1999 (the "**Third Parties Act**") to enforce or enjoy the benefit of any term of this Deed.

(b)   Notwithstanding any term of any Finance Document, the consent of any person who is not a Party is not required to rescind or vary this Deed at any time.

## 2.   RELEASE

## 2.1   General release of Security Interests

The releases and other provisions of this Clause 2.1 (*General release of Security Interests*) are subject to Clause 3 (*Release conditions*) and Clause 5 (*Consideration*).

(a)   On the Effective Date each Collateral Trustee, acting, in respect of the First-Priority Collateral Trustee, in the name and on the behalf of the First-Priority Secured Parties and, in respect of the Second-Priority Collateral Trustee, in the name and on the behalf of the Second-Priority Secured Parties:

(i)   unconditionally and irrevocably releases and discharges each Grantor's property, assets and undertaking from the Security Interests constituted, created, evidenced or conferred by or pursuant to the Security Agreements;

(ii)   unconditionally and irrevocably releases, discharges, waives, terminates, reassigns and retransfers to each Grantor all its rights, title, and interest in that Grantor's property, assets and undertaking, present or future, that were assigned, charged or otherwise provided as Security Interests to each Collateral Trustee and/or the Secured Parties by or pursuant to the Security Agreements; and

4

    (iii)    consents to each Grantor or the Seller on behalf of a Grantor (at the cost and expense of the relevant Grantor) giving notice of the releases, discharges, waivers, terminations, reassignments and retransfers under this Deed and any other Release Agreement to any person to whom notice of any Security Interest created by or pursuant to any Security Agreements was given.

(b)    Upon the occurrence of the Effective Date, the Released Security Assets shall be held free and discharged from the Security Interests created by or pursuant to, and all claims arising under, the Security Agreements.

(c)    Each relevant Collateral Trustee confirms that it will promptly after the Effective Date, deliver all documents and notices described in Schedule 3 *(Release formalities)* (including all certificates and other documents of title or evidence of ownership in respect of the Released Security Assets) to legal counsel to the respective Grantors or as a Grantor may reasonably request.

**2.2**    **Release of Security Interests governed by Austrian law**

The releases and other provisions of this Clause 2.2 (*Release of Security Interests governed by Austrian law*) are subject to Clause 3 (*Release conditions*) and Clause 5 (*Consideration*).

(a)    Each Collateral Trustee herewith releases and discharges all Security Interests created under the Austrian Security Agreements and agrees to the termination of each Austrian Security Agreement with effect as of the occurrence of the Effective Date.

(b)    Each Collateral Trustee herewith notifies the Seller and Toys "R" Us Handelsgesellschaft m.b.H. of the release of the pledges created under the Austrian Share Pledge Agreements subject to and with effect as of the occurrence of the Effective Date.

(c)    Upon the occurrence of the Effective Date, Toys "R" Us Handelsgesellschaft m.b.H. is authorised to remove the respective entry in its books (*Buchvermerke*) (including, for the avoidance of doubt, any annotations made to accounting records kept in electronic form) made in accordance with the Austrian Security Agreements, to which it is a party, from their accounting books and records.

(d)    With effect as of the occurrence of the Effective Date,

    (i)    all powers of attorney and proxies granted to a Collateral Trustee under or in connection with the Austrian Share Pledge Agreements shall be revoked (*widerrufen*);

    (ii)    each Collateral Trustee confirms not to make use of any of the powers of attorney or proxies granted to it under or in connection with the Austrian Share Pledge Agreements; and

    (iii)    each of the Collateral Trustees undertakes to return each original of the special power of attorney and voting proxy granted to it under or in connection with the Austrian Share Pledge Agreements to the Seller promptly after the occurrence of the Effective Date.

(e)    Promptly (*unverzüglich*) after the occurrence of the Effective Date, the First-Priority Collateral Trustee shall deliver to the legal counsel to Toys "R" Us Handelsgesellschaft m.b.H. the signed termination and release notices substantially in the form attached hereto in Schedule 9 (*Austrian Form of Termination and Release Notices*).

It being understood that Toys "R" Us Handelsgesellschaft m.b.H. in its capacity as pledgor under the relevant Austrian Security Agreements shall provide the First-Priority Collateral Trustee with finalised drafts of such termination and release notices prior to the Effective Date.

2.3    **Release of Security Interests governed by German law**

The releases and other provisions of this Clause 2.3 (*Release of Security Interests governed by German law*) are subject to Clause 3 (*Release conditions*) and Clause 5 (*Consideration*).

(a)    Release of Security Interests under the German Pledge Agreements

(i)    On the Effective Date each Collateral Trustee hereby releases (*gibt frei*) all pledges created under the German Pledge Agreements, each in accordance with section 1255 para. 1 in connection with section 1273 para. 2 of the German Civil Code (*Bürgerliches Gesetzbuch*) and agrees with the relevant Grantors that the pledges created pursuant to the German Pledge Agreements shall cease to exist.

(ii)    For the avoidance of doubt, the parties to this Deed are aware that, due to their accessory nature (*Akzessorietät*), the pledges created pursuant to the German Pledge Agreements will cease to exist by operation of German mandatory law upon full and complete satisfaction of the obligations secured thereunder.

(iii)    Promptly (*unverzüglich*) after the occurrence of the Effective Date, each Collateral Trustee shall notify the relevant Account Banks (as defined in each German Account Pledge Agreement) of this Agreement and the release of the pledges created under the German Account Pledge Agreements by a notification letter substantially in the form attached hereto in Schedule 7 (*German Form of Notice to Account Bank*).

It being understood that Toys "R" Us GmbH in its capacity as pledgor under the German Account Pledge Agreements shall provide each Collateral Trustee with finalised drafts of such notification letters prior to the Effective Date.

(b)    Reassignment of rights and claims under the German Assignment Agreement

(i)    On the Effective Date, (i) the First-Priority Collateral Trustee hereby reassigns to Toys "R" Us GmbH all present or future receivables, rights and claims that have been assigned to it for security purposes under the German Assignment Agreement and (ii) Toys "R" Us GmbH accepts the reassignment of such receivables, rights and claims.

(ii)    Promptly after the occurrence of the Effective Date, the First-Priority Collateral Trustee shall notify each Third Party Debtor (as defined in the German Assignment Agreement) of this Agreement and the termination of the German Assignment Agreement by a notification letter substantially in the form attached hereto in Schedule 8 (*[German Form of Notice to Third Party Debtors]*).

It being understood that Toys "R" Us GmbH in its capacity as assignor under the German Assignment Agreement shall provide the First-Priority Collateral Trustee with finalised drafts of such notification letters prior to the Effective Date.

(c)    Other Releases

Further to the releases, reassignments and retransfers set out in paragraphs (a) – (b) above, and with effect from the Effective Date, each Collateral Trustee hereby releases, reassigns and retransfers to the respective Grantors all ancillary security rights and all other claims or assets that the respective Grantors have transferred for security purposes under the German Security Agreements and/or otherwise under or in connection with the First-Priority Obligations and the Second-Priority Obligations and which have not been otherwise re-assigned, re-transferred or otherwise released under this Deed. The Grantors hereby accept such releases, reassignments and retransfers.

(d)   Revocation of Authorization

With effect from the Effective Date, the respective Grantor, individually, revokes any authorizations and/or powers of attorney given to each Collateral Trustee under any of the German Security Agreements and each Collateral Trustee hereby confirms that it will not make further use of any of these authorizations and/or powers of attorney.

(e)   Rights and obligations under the German Security Documents

Each Collateral Trustee and the respective Grantors agree that, with effect from the Effective Date, the German Security Agreements shall be terminated and that no further rights and obligations exist under the German Security Agreements.

2.4   **Release of Spanish Security Agreements**

The First-Priority Collateral Trustee (acting in the name and on behalf of the First-Priority Secured Parties), the Second-Priority Collateral Trustee (acting in the name and on behalf of the Second-Priority Secured Parties) and Toys "R" Us GmbH shall enter into the Spanish Deed of Release before a Spanish notary public in order to expressly formalise the release and discharge of the Spanish Security Interests and the release of any irrevocable powers of attorney granted in connection to the Spanish Security Agreements (subject to the occurrence of the Effective Date) (the "**Spanish Deed of Release of Pledges**"). The releases and other provisions of the Spanish Deed of Release of Pledges are subject to Clause 3 (*Release conditions*) and Clause 5 (*Consideration*) of this Deed.

2.5   **Release of Swiss Security Agreements**

The releases and other provisions of this Clause 2.5 (*Release of Swiss Security Agreements*) are subject to Clause 3 (*Release conditions*) and Clause 5 (*Consideration*) of this Deed.

(a)   Each Collateral Trustee herewith notifies the Seller and Toys R Us AG of the release of the pledges created under the Swiss Security Agreements subject to and with effect as of the occurrence of the Effective Date.

(b)   Immediately following the occurrence of the Effective Date, the First-Priority Collateral Trustee shall deliver the original share certificate representing all shares in Toys R Us AG to the Seller. For the avoidance of doubt, the First-Priority Collateral Trustee shall ensure that and arrange for a representative of the First-Priority Collateral Trustee to participate at the Closing (as defined in the Sale and Purchase Agreement) and ensure that the original share certificate representing all shares in Toys R Us AG can be handed over to the Seller immediately upon occurrence of the Effective Date as part of the Closing (as defined in the Sale and Purchase Agreement).

(c)    Promptly (*unverzüglich*) after the occurrence of the Effective Date, the First-Priority Collateral Trustee shall deliver to the legal counsel of Toys R Us AG the signed release notices regarding all account banks, insurer and intercompany debtors, substantially in the form attached hereto in Schedule 10 (*Swiss Form of Release Notices*), it being understood that Toys R Us AG in its capacity as pledgor under the relevant Swiss Security Agreements shall provide the First-Priority Collateral Trustee with finalised drafts of such release notices prior to the Effective Date.

## 3.    RELEASE CONDITIONS

### 3.1    Initial Discharge Proceeds Amount

On the Closing Date, the Initial Proceeds Escrow Agent has received cleared funds for value of the Initial Proceeds Discharge Amount as follows:

| | |
|---|---|
| Currency and Amount: | EUR [●] |
| Bank: | [●] |
| IBAN: | [●] |
| SWIFT: | [●] |
| Sort-Code: | [●] |
| Account Number: | [●] |
| Account Name: | [●] |

### 3.2    Escrow Agreement and Escrow Amount

(a)    The Escrow Agreement irrevocably provides that all payments from an Escrow Account released for the benefit of the Seller shall be paid to the Initial Proceeds Discharge Account.

(b)    On the Closing Date, the SPA Escrow Agent has received cleared funds for value of the Swiss Escrow Amounts into the Swiss Escrow Account.

(c)    On the Closing Date, the SPA Escrow Agent has received cleared funds for value of the Escrow Amount into the Escrow Accounts.

## 4.    NOTIFICATIONS

(a)    The Initial Proceeds Escrow Agent shall issue the Initial Proceeds Confirmation to the First-Priority Collateral Trustee and the Second-Priority Collateral Trustee immediately upon receipt of the Initial Proceeds Discharge Amount.

(b)    The First-Priority Collateral Trustee shall notify the Seller, the Company, the Second-Priority Collateral Trustee and each other Grantor in the form set out in Part I of Schedule 5 (the "**First-Priority Release Effective Date Notice**") promptly upon satisfaction of each of the conditions in Clause 3 (*Release conditions*) and receipt of the Initial Proceeds Confirmation, the SPA Escrow Agent Confirmation and the Seller Effective Date Notice.

(c)    The Second-Priority Collateral Trustee shall notify the Seller, the Company, the First-Priority Collateral Trustee and each other Grantor in the form set out in Part II of Schedule 5 (the "**Second-Priority Release Effective Date Notice**") promptly upon satisfaction of each of the

conditions in Clause 3 (*Release conditions*) and receipt of the Initial Proceeds Confirmation, the SPA Escrow Agent Confirmation and the Seller Effective Date Notice.

(d)    The Seller shall promptly notify each Collateral Trustee, the Company and each other Grantor in the form set out in Schedule 6 (the "**Seller Effective Date Notice**") that each of the "**Closing Actions**" (as defined in the Sale and Purchase Agreement but excluding, for these purposes, Closing Action (j) relating to delivery by the Seller to the Purchaser of the duly executed First-Priority Effective Date Release Notice and Second-Priority Effective Date Release Notice) has been (or will on the Effective Date be) satisfied or waived in accordance with the terms of the Sale and Purchase Agreement.

## 5.    CONSIDERATION

(a)    As instructed, each Collateral Trustee grants the releases, discharges and other benefits conferred to the Grantors under this Deed in consideration of: (i) receipt by the Initial Proceeds Escrow Agent on the Closing Date of the Initial Proceeds Discharge Amount to the Initial Proceeds Discharge Account; and (ii) receipt by the SPA Escrow Agent on the Closing Date of the Escrow Amount to the Escrow Accounts.

(b)    The Seller acknowledges that the consummation of the Sale and Purchase Agreement constitutes an "Issuer Asset Sale" under the terms of the First-Priority Indenture. The Seller further acknowledges that pursuant to clause 4.11(c) of the First-Priority Indenture, the Issuers shall make an Asset Sale Offer to all Holders to purchase the maximum aggregate principal amount of Notes that may be purchased out of the Excess Proceeds. Accordingly, the Seller agrees to take any step necessary, including but not limited to the transfer of the Excess Proceeds to the Issuers, to enable the Issuers to commence the Asset Sale Offer in accordance with the procedures set forth in the Indenture.

## 6.    INDEMNITY

Each Grantor shall within five Business Days of demand, indemnify each Collateral Trustee against any documented cost, loss, liability or expense incurred by it as a result of the exercise or purported exercise of any of the rights, powers, discretions, authorities and remedies conferred on it or them by any Release Agreement or otherwise relating to the Released Security Assets.

## 7.    PRESERVATION OF RIGHTS

Except as expressly stated in Clause 2 (*Release*) in respect of each Grantor and the Security Agreements, nothing in any Release Agreement shall in any way affect or prejudice the provisions of the First-Priority Documents or the Second-Priority Documents (including any guarantees or the obligations of any Grantor thereunder) and the provisions of the First-Priority Documents and the Second-Priority Documents shall continue in full force and effect.

## 8.    COLLATERAL TRUSTEES' RIGHTS

Notwithstanding the releases referred to in Clause 2 *(Release)*, the provisions of the First-Priority Documents and the Second-Priority Documents which provide for rights, powers, discretions, exclusions or limitations of liability, indemnities or other protections, in favour of the

Collateral Trustees shall continue to apply in relation to the actions of the Collateral Trustees taken (or omitted to be taken) and the performance by the Collateral Trustees of their respective roles in each case on or before the Effective Date and in relation to the matters contemplated by any Release Agreement and the distribution of funds received thereto.

9. **COSTS AND EXPENSES**

The Company shall (or shall procure that each Grantor will) within five Business Days of demand, pay to each Collateral Trustee the amount of all costs, losses, liabilities and expenses (including legal fees) incurred by each Collateral Trustee or any other Secured Party in connection with:

(i) the negotiation, preparation, printing, execution and perfection of the Release Agreements and any other document referred to in a Release Agreement; and

(ii) any other action any Collateral Trustee takes in connection with a Release Agreement.

10. **FURTHER ASSURANCE**

(a) Insofar as additional declarations or actions are reasonably necessary in connection with the release, re-transfer and re-assignment of the Security Interests or the Additional Security Interests (as defined below), the respective Collateral Trustee undertakes, following the occurrence of the Effective Date, to each of the Grantors to make, upon reasonable request, such declarations and to undertake such actions at the respective Grantor's expense.

(b) In the event that any of Toys "R" Us Handelsgesellschaft m.b.H., Toys "R" Us GmbH, Toys R Us AG or any of their subsidiaries has granted a security interest in favour of the Secured Parties in connection with the First-Priority Obligations and the Second-Priority Obligations pursuant to or arising under a security document which is not referred to in this Agreement (the "**Additional Security Interests**"), the respective Collateral Trustee agrees that it will, without undue delay execute and deliver upon reasonable request of the respective Grantor all such agreements, documents and/or declarations as will be legally required to give effect to the releases, re-transfers and reassignments of such Additional Security Interest.

(c) Each Collateral Trustee shall as soon as reasonably practicable provide the respective Grantor with such notices and/or confirmations as may be reasonably requested from time to time by one or more Grantors.

11. **AMENDMENTS AND WAIVERS**

Any term of any Release Agreement may be amended or waived only with the consent of each Collateral Trustee and the Company.

12. **PARTIAL INVALIDITY**

If, at any time, any provision of this Deed is or becomes illegal, invalid or unenforceable in any respect under any law of any jurisdiction, neither the legality, validity or enforceability of the remaining provisions nor the legality, validity or enforceability of such provision under the law of any other jurisdiction will in any way be affected or impaired.

13. **COUNTERPARTS**

This Deed may be executed in any number of counterparts, and this has the same effect as if the signatures on the counterparts were on a single copy of this Deed.

14. **GOVERNING LAW**

(a) Subject to paragraph (b) to (d) below, this Deed and any non-contractual obligations arising out of or in connection with it are governed by English law.

(b) The release of the Austrian Security Agreements in accordance with Clause 2.2. *(Release of Security Interests governed by Austrian law)* is governed by Austrian law.

(c) The release of the German Security Agreements in accordance with Clause 2.3 *(Release of Security Interests governed by German law)* is governed by German law.

(d) The release of the Spanish Security Agreements in accordance with Clause 2.4 *(Release of Spanish Security Agreements)* is governed by Spanish law.

(e) The release of the Swiss Security Agreements in accordance with Clause 2.1 *(General release of Security Agreements)* in accordance Clause 2.5 (*Release of Swiss Security Agreements*) is governed by Swiss law.

15. **ENFORCEMENT**

(a) The courts of England have exclusive jurisdiction to settle any dispute arising out of or in connection with this Deed (including a dispute relating to the existence, validity or termination of this Deed or any non-contractual obligation arising out of or in connection with this Deed) (a **"Dispute"**).

(b) The Parties agree that the courts of England are the most appropriate and convenient courts to settle Disputes and accordingly no Party will argue to the contrary.

(c) This Clause 15 is for the benefit of the Collateral Trustees only. As a result, each Collateral Trustee shall not be prevented from taking proceedings relating to a Dispute in any other courts with jurisdiction. To the extent allowed by law, each Collateral Trustee may take concurrent proceedings in any number of jurisdictions.

**This Deed has been delivered on the date stated at the beginning of this Deed.**

## SCHEDULE 1

### THE GRANTORS

| Name of Grantor | Registration number (or equivalent, if any) | Jurisdiction of incorporation |
|---|---|---|
| Toys "R" Us Handelsgesellschaft m.b.H. | FN 91792 p | Austria |
| Toys "R" Us GmbH | HRB 16651 | Germany |
| Toys R Us AG | CHE-106.090.137 | Switzerland |



# SCHEDULE 2

## SECURITY AGREEMENTS

## PART I

### AUSTRIAN SECURITY AGREEMENTS

| No: | Security Agreement |
|-----|--------------------|
| 1. | Account Pledge Agreement between Toys "R" Us Handelsgesellschaft m.b.H. as pledgor and First-Priority Collateral Trustee as pledgee dated 17 November 2017[, as confirmed by a Confirmation Agreement between TRU (UK) H8 Limited and Toys "R" Us Handelsgesellschaft m.b.H. as pledgors and First-Priority Collateral Trustee as pledgee dated [___] 2018]. |
| 2. | Receivables Pledge Agreement between Toys "R" Us Handelsgesellschaft m.b.H. as pledgor and First-Priority Collateral Trustee as pledgee dated 17 November 2017[, as confirmed by a Confirmation Agreement between TRU (UK) H8 Limited and Toys "R" Us Handelsgesellschaft m.b.H. as pledgors and First-Priority Collateral Trustee as pledgee dated [___] 2018]. |
| 3. | Share Pledge Agreement between TRU (UK) H8 Limited as pledgor and First-Priority Collateral Trustee as pledgee dated 17 November 2017 relating to the shares held in Toys "R" Us Handelsgesellschaft m.b.H.[, as confirmed by a Confirmation Agreement between TRU (UK) H8 Limited and Toys "R" Us Handelsgesellschaft m.b.H. as pledgors and First-Priority Collateral Trustee as pledgee dated [___] 2018]. |
| 4. | Share Pledge Agreement between TRU (UK) H8 Limited as pledgor and First-Priority Collateral Trustee as pledgee dated 5 December 2017 relating to the shares held in Toys "R" Us Handelsgesellschaft m.b.H.[, as confirmed by a Confirmation Agreement between TRU (UK) H8 Limited and Toys "R" Us Handelsgesellschaft m.b.H. as pledgors and First-Priority Collateral Trustee as pledgee dated [___] 2018]. |
| 5. | Share Pledge Agreement between TRU (UK) H8 Limited as pledgor and Second-Priority Collateral Trustee as pledgee dated 17 November 2017 relating to the shares held in Toys "R" Us Handelsgesellschaft m.b.H.. |
| 6. | Share Pledge Agreement between TRU (UK) H8 Limited as pledgor and Second-Priority Collateral Trustee as pledgee dated 5 December 2017 relating to the shares held in Toys "R" Us Handelsgesellschaft m.b.H.. |



## PART II

### GERMAN SECURITY AGREEMENTS

| No: | Security Agreement |
|---|---|
| 1. | Share pledge agreement dated 16 August 2016 (no. 516/2016-H of the roll of deeds of the notary Dr. Alexander Haines in Frankfurt a.M., Germany) relating to the shares in Toys "R" Us GmbH between TRU (UK) H8 Limited as pledgor, the Second-Priority Collateral Trustee as pledgee Toys "R" Us GmbH as pledges company. |
| 2. | Share pledge agreement dated 17 November 2017 (no. 112/2017-H of the roll of deeds of the notary Dr. Rafael von Heppe in Frankfurt a.M., Germany) relating to the shares in Toys "R" Us GmbH between TRU (UK) H8 Limited as pledgor, the First-Priority Collateral Trustee as pledgee Toys "R" Us GmbH as pledges company. |
| 3. | [Confirmation and subsequent-ranking share pledge agreement dated [_____] 2018 (no. [_____] of the roll of deeds of the notary [_____], Germany) relating to the shares in Toys "R" Us GmbH between TRU (UK) H8 Limited as pledgor, the First-Priority Collateral Trustee as pledgee Toys "R" Us GmbH as pledges company.] |
| | (The German Security Agreements listed in nos. 1 to 3 are collectively referred to as the **"German Share Pledge Agreements"**) |
| 4. | Account pledge agreement dated 17 November 2017 between Toys "R" Us GmbH as pledgor and the Second-Priority Collateral Trustee as pledgee. |
| 5. | Account pledge agreement dated 17 November 2017 between Toys "R" Us GmbH as pledgor and the First-Priority Collateral Trustee as pledgee. |
| 6. | [Confirmation and subsequent-ranking account pledge agreement dated [_____] 2018 between Toys "R" Us GmbH as pledgor and the First-Priority Collateral Trustee as pledgee.] |
| | (The German Security Agreements listed in nos. 4 to 6 are collectively referred to as the **"German Account Pledge Agreements"**) |
| 7. | [Global assignment agreement dated [_____] 2018 between Toys "R" Us GmbH as assignor and the First-Priority Collateral Trustee as assignee (the **"German Assignment Agreement"**).] |



## PART III

### Swiss Security Agreements

| No: | Security Agreement |
|---|---|
| 1. | Share pledge agreement dated 17 November 2017 entered into between TRU (UK) H8 Limited as pledgor and the First-Priority Collateral Trustee concerning a first ranking pledge of all shares in Toys R Us AG ([as amended pursuant to an amendment and confirmation agreement dated [●] 2018, ] [1] the "**Share Pledge Agreement 1**") |
| 2. | Claims and rights pledge agreement dated 17 November 2017 entered into between Toys R Us AG as pledgor and the First-Priority Collateral Trustee concerning a first ranking pledge of claims and rights in respect of bank accounts and IP rights ([as amended pursuant to an amendment and confirmation agreement dated [●] 2018,][2] the "**Claims Pledge Agreement 1**") |
| 3. | Share pledge agreement dated 17 November 2017 entered into between TRU (UK) H8 Limited as pledgor and the Second-Priority Collateral Trustee concerning a second ranking pledge of all shares in Toys R Us AG (the "**Share Pledge Agreement 2**") |
| 4. | Claims and rights pledge agreement dated 17 November 2017 entered into between Toys R Us AG as pledgor and the Second-Priority Collateral Trustee concerning a second ranking pledge of claims and rights in respect of bank accounts and IP rights (the "**Claims Pledge Agreement 2**") |
| 5. | [Claims and rights pledge agreement dated [●] 2018 entered into between Toys R Us AG as pledgor and the First-Priority Collateral Trustee concerning a first ranking pledge of claims and rights in respect of intra-group receivables, trade receivables and insurance policies (the "**Claims Pledge Agreement 3**")[3]] |
| 6. | [Claims and rights pledge agreement dated [●] 2018 entered into between Toys R Us AG as pledgor and the Second-Priority Collateral Trustee concerning a second ranking pledge of claims and rights in respect of intra-group receivables, trade receivables and insurance policies (the "**Claims Pledge Agreement 4**")[4]] |

---

[1] *Agreements to be included in this Schedule if executed by the date of signature of this Deed.*

[2] *Ibid*

[3] *Ibid.*

[4] *Ibid.*



**PART IV**

**SPANISH SECURITY AGREEMENTS**

| No: | Security Agreement |
|---|---|
| 1. | Spanish deed of pledge over credit rights arising from bank accounts dated 20 November 2017 entered into between Toys "R" Us GmbH as pledgor and the First-Priority Collateral Trustee (the "**Spanish Pledge over Bank Accounts 1**"). |
| 2. | Spanish deed of pledge over credit rights arising from bank accounts dated 20 November 2017 entered into between Toys "R" Us GmbH as pledgor and the Second-Priority Collateral Trustee (the " **Spanish Pledge over Bank Accounts 2**"). |



**SCHEDULE 3**

RELEASE FORMALITIES

| Security Agreement | Governing law | Form of release | Ancillary documentation/corporate authority | Documents to be returned by the First-Priority Collateral Trustee | Documents to be returned by the Second-Priority Collateral Trustee | Local Filings |
|---|---|---|---|---|---|---|
| **Austrian law** | | | | | | |
| AUSTRIAN SHARE PLEDGE AGREEMENTS | Austrian | Deed of Release | NONE | SPECIAL POWER OF ATTORNEY AND VOTING PROXY | SPECIAL POWER OF ATTORNEY AND VOTING PROXY | NONE |
| AUSTRIAN RECEIVABLES PLEDGE AGREEMENT | Austrian | Deed of Release | NOTIFICATION OF EACH DEBTOR OF THE INTRACOMPANY LOAN RECEIVABLES AND INSURERS | NONE | NONE | NONE |
| AUSTRIAN ACCOUNT PLEDGE AGREEMENT | Austrian | Deed of Release | NOTIFICATION OF EACH ACCOUNT BANK | NONE | NONE | NONE |
| **German law** | | | | | | |
| GERMAN ACCOUNT PLEDGE AGREEMENTS | German | Deed of Release | NOTIFICATION TO ACCOUNT BANKS | N/A | N/A | N/A |
| GERMAN | German | Deed of | NOTIFICATION TO THIRD | N/A | N/A | N/A |

17

A36352487



| Security Agreement | Governing law | Form of release | Ancillary documentation/corporate authority | Documents to be returned by the First-Priority Collateral Trustee | Documents to be returned by the Second-Priority Collateral Trustee | Local Filings |
|---|---|---|---|---|---|---|
| ASSIGNMENT AGREEMENT | | Release | PARTY DEBTORS | | | |
| GERMAN SHARE PLEDGE AGREEMENTS | German | Deed of Release | N/A | N/A | N/A | N/A |
| **Spanish Law** | | | | | | |
| Spanish Pledge over Bank Accounts 1 | Spanish | Spanish Deed of Release | NOTIFICATION TO THE RELEVANT ACCOUNT BANK (according to the form of notice attached to the Spanish deed of release) | N/A | N/A | N/A |
| Spanish Pledge over Bank Accounts 2 | Spanish | Spanish Deed of Release | NOTIFICATION TO THE RELEVANT ACCOUNT BANK (according to the form of notice attached to the Spanish deed of release) | N/A | N/A | N/A |
| **Swiss law** | | | | | | |
| Share Pledge Agreement 1 | Swiss | Deed of Release | N/A | Original share certificate no. 1 representing all shares in Toys R Us AG, duly | N/A | N/A |

18



| Security Agreement | Governing law | Form of release | Ancillary documentation/corporate authority | Documents to be returned by the First-Priority Collateral Trustee | Documents to be returned by the Second-Priority Collateral Trustee | Local Filings |
|---|---|---|---|---|---|---|
| Claims Pledge Agreement 1 | Swiss | Deed of Release | NOTIFICATION OF EACH ACCOUNT BANK | endorsed in blank / N/A | N/A | N/A |
| Share Pledge Agreement 2 | Swiss | Deed of Release | N/A | N/A | N/A | N/A |
| Claims Pledge Agreement 2 | Swiss | Deed of Release | N/A | N/A | N/A | N/A |
| [Claims Pledge Agreement 3][5] | Swiss | Deed of Release | NOTIFICATION OF EACH DEBTOR OF INTRA-GROUP RECEIVABLES AND INSURER | [Original Promissory Notes regarding the intercompany loans] | N/A | N/A |
| [Claims Pledge Agreement 4][6] | Swiss | Deed of Release | N/A | N/A | N/A | N/A |

5  Note: Agreement to be included if executed by the date of signature of this Deed.

6  Note: Agreement to be included if executed by the date of signature of this Deed.

## SCHEDULE 4

### FORM OF INITIAL PROCEEDS CONFIRMATION

From:   [●], as Initial Proceeds Escrow Agent

To:     **Wilmington Savings Fund Society, FSB**, as First-Priority Collateral Trustee

        **Wilmington Trust, National Association**, as Second-Priority Collateral Trustee

Date:   [_____] 2018

1.  We refer to the deed of release, a copy of which is attached (the **"Deed of Release"**). This is the Initial Proceeds Confirmation. Terms defined in the Deed of Release have the same meaning in this Initial Proceeds Confirmation unless given a different meaning in this Initial Proceeds Confirmation.

2.  Pursuant to Clause 4 (*Notifications*) of the Deed of Release, we confirm receipt of the Initial Proceeds Discharge Amount.

3.  This Initial Proceeds Confirmation and any non-contractual obligations arising out of or in connection with it are governed by English law.

Yours faithfully,

………………………………

**[●], as Initial Proceeds Escrow Agent**

A36352487

20

## SCHEDULE 5

### FORM OF RELEASE EFFECTIVE DATE NOTICES

### PART I

### FORM OF FIRST-PRIORITY RELEASE EFFECTIVE DATE NOTICE

From:   **Wilmington Savings Fund Society, FSB**, as First-Priority Collateral Trustee

To:     **TRU TAJ LLC**, as Company

       **TRU (UK) H8 LIMITED**, as Seller

       **Wilmington Trust, National Association**, as Second-Priority Collateral Trustee

Cc:     **Toys "R" Us GmbH**, as Grantor

       **Toys "R" Us Handelsgesellschaft m.b.H.**, as Grantor

       **Toys R Us AG**, as Grantor

Date:   [_____] 2018


1.   We refer to the deed of release, a copy of which is attached (the **"Deed of Release"**). This is the First-Priority Release Effective Date Notice. Terms defined in the Deed of Release have the same meaning in this First-Priority Release Effective Date Notice unless given a different meaning in this First-Priority Release Effective Date Notice.

2.   Pursuant to Clause 4 (*Notifications*) of the Deed of Release, we confirm receipt by the Initial Proceeds Escrow Agent of the Initial Proceeds Discharge Amount and receipt by the SPA Escrow Agent of the Escrow Amount.

3.   We hereby confirm that:

    (a)   the conditions in Clause 3 (*Release conditions*) of the Deed of Release relating to the First-Priority Documents have been satisfied; and

    (b)   we have received the Seller Effective Date Notice.

4.   This First-Priority Release Effective Date Notice and any non-contractual obligations arising out of or in connection with it are governed by English law.


Yours faithfully,


…………………………………

**Wilmington Savings Fund Society, FSB**

solely in its capacity as First-Priority Collateral Trustee

## PART II

### FORM OF SECOND-PRIORITY RELEASE EFFECTIVE DATE NOTICE

From:  **Wilmington Trust, National Association**, as Second-Priority Collateral Trustee

To:    **TRU TAJ LLC**, as Company

**TRU (UK) H8 LIMITED**, as Seller

**Wilmington Savings Fund Society, FSB**, as First-Priority Collateral Trustee

Cc:    **Toys "R" Us GmbH**, as Grantor

**Toys "R" Us Handelsgesellschaft m.b.H.**, as Grantor

**Toys R Us AG**, as Grantor

Date:  [_____] 2018

1.    We refer to the deed of release, a copy of which is attached (the **"Deed of Release"**). This is the Second-Priority Release Effective Date Notice. Terms defined in the Deed of Release have the same meaning in this Second-Priority Release Effective Date Notice unless given a different meaning in this Second-Priority Release Effective Date Notice.

2.    Pursuant to Clause 4 (*Notifications*) of the Deed of Release, we confirm receipt by the Initial Proceeds Escrow Agent of the Initial Proceeds Discharge Amount and receipt by the SPA Escrow Agent of the Escrow Amount.

3.    We hereby confirm that:

(a)    the conditions in Clause 3 (*Release conditions*) of the Deed of Release relating to the Second-Priority Documents have been satisfied; and

(b)    we have received the Seller Effective Date Notice.

4.    This Second-Priority Release Effective Date Notice and any non-contractual obligations arising out of or in connection with it are governed by English law.

Yours faithfully,

………………………………

**Wilmington Trust, National Association**
solely in its capacity as Second-Priority Collateral Trustee

A36352487

## SCHEDULE 6

### FORM OF SELLER EFFECTIVE DATE NOTICE

From:   **TRU (UK) H8 LIMITED**, as Seller

To:   **Wilmington Savings Fund Society, FSB**, as First-Priority Collateral Trustee

   **Wilmington Trust, National Association**, as Second-Priority Collateral Trustee

Cc:   **TRU TAJ LLLC,** as Company

   **Toys "R" Us GmbH**, as Grantor

   **Toys "R" Us Handelsgesellschaft m.b.H.**, as Grantor

   **Toys R Us AG**, as Grantor

Date:   [_____] 2018

1.   We refer to the deed of release, a copy of which is attached (the **"Deed of Release"**). This is the Seller Effective Date Notice. Terms defined in the Deed of Release have the same meaning in this Seller Effective Date Notice unless given a different meaning in this Seller Effective Date Notice.

2.   We hereby confirm that each of the "Closing Actions" (as defined in the Sale and Purchase Agreements but excluding, for these purposes, Closing Action (j) relating to delivery by the Seller to the Purchaser of the duly executed First-Priority Effective Date Release Notice and Second-Priority Effective Date Release Notice) has been (or will on the Effective Date be) satisfied or waived in accordance with the terms of the Sale and Purchase Agreement.

3.   This Seller Effective Date Notice and any non-contractual obligations arising out of or in connection with it are governed by English law.

Yours faithfully,

………………………………

**TRU (UK) H8 LIMITED**

**as**                                                                                                          Seller

23

## SCHEDULE 7

### GERMAN FORM OF NOTICE TO ACCOUNT BANK

[*Please print on letterhead of respective Collateral Trusttee / Bitte auf Briefkopf des jeweiligen Sicherheitentreuhänders ausdrucken.*]

To: [*Account Bank*]

Date: [*Please insert date of this notice / Bitte Datum dieser Freigabeanzeige einfügen.*]

| | |
|---|---|
| **Notification of release of pledge of accounts and cash investments** | **Freigabeanzeige betreffend die Verpfändung von Konten, Anlagen und Einlagen** |
| Dear Sirs, | Sehr geehrte Damen und Herren, |
| We hereby notify you that by a release agreement dated [*Please insert date of Release Agreement*] between, inter alios, [_____] (the **"Security Grantor"**) and us as Security Agent (the **"Release Agreement"**) all pledges created under the Account Pledge Agreement entered into by us and Security Grantor dated [_____] in connection with in particular (but not limited to) the following cash account(s): | hiermit zeigen wir Ihnen an, dass gemäß einer Freigabevereinbarung vom [*Bitte Datum der Freigabevereinbarung einfügen.*] zwischen, unter anderem, [_____] als Sicherungsgeber (der **"Sicherungsgeber"**) und uns als Sicherheitentreuhänder (die **"Freigabevereinbarung"**) alle aus dem Kontenverpfändungsvertrag zwischen, unter anderem, uns und dem Sicherungsgeber vom [_____] insbesondere betreffend die folgenden Konten: |
| [*Insert account details*] | [*Kontodaten einfügen*] |
| which has been notified to you by notification letter dated Insert date of notification letter] have been released by us in accordance with section 1255 para. 1 in connection with section 1273 para. 2 of the German Civil Code (*Bürgerliches Gesetzbuch*). | entstandenen Pfandrechte, welche Ihnen mit Schreiben vom [Datum der Verpfändungsanzeige einfügen] angezeigt wurden, gemäß § 1255 Abs. 1 i. V. m. § 1273 Abs. 2 Bürgerliches Gesetzbuch, von uns freigegeben wurden. |
| We hereby kindly ask you to confirm receipt of this notification by countersigning it and returning it to | Wir bitten Sie, uns die Kenntnisnahme dieser Freigabeanzeige dadurch zu bestätigen, dass Sie diesen Brief |

24

|  | gegenzeichnen und an |
| --- | --- |
| [_____] | [_____] |
| [Address details to be inserted by purchaser] | [Adressdetails vom Käufer eizufügen] im Original |
| with a copy to us. | und uns in Kopie übersenden. |
| Yours sincerely, | Mit freundlichen Grüßen |

_____

[Collateral Trustee]

| We hereby confirm that we have received the above notification of release. | Wir bestätigen hiermit, dass wir den Inhalt obiger Freigabeanzeige zur Kenntnis genommen haben. |
| --- | --- |

_____

Place, Date/Ort, Datum

_____

[Account Bank]

25

## SCHEDULE 8

### [GERMAN FORM OF NOTICE TO THIRD PARTY DEBTORS

*[Please print on letterhead of First-Priority Collateral Trustee / Bitte auf Briefkopf des Sicherheitentreuhänders ausdrucken.]*

To: [Third Party Debtor]

Date: *[Please insert date of this notice / Bitte Datum dieser Freigabeanzeige einfügen.]*

| | |
|---|---|
| **Notification of release of assignment of [_____]** | **Freigabeanzeige betreffend die Abtretung von [_____]** |
| Dear Sirs, | Sehr geehrte Damen und Herren, |
| We hereby notify you that by a release agreement dated *[Please insert date of release agreement.]* between, *inter alios*, Toys "R" Us GmbH as Security Grantor and us as First-Priority Collateral Trustee (the **"Release Agreement"**) all present or future receivables, rights and claims that have been assigned to us for security purposes under the global assignment agreement dated [_____] 2018 and entered into by us and Toys "R" Us GmbH which has been notified to you by notification letter dated *[Please insert date of notification letter]* have been reassigned by us to Toys "R" Us GmbH. | hiermit zeigen wir Ihnen an, dass gemäß einer Freigabevereinbarung vom *[Bitte Datum der Freigabevereinbarung einfügen.]* zwischen, unter anderem, Toys "R" Us GmbH als Sicherungsgeber und uns als Sicherheitentreuhänder (die **"Freigabevereinbarung"**) alle gegenwärtigen oder zukünftigen Forderungen, Ansprüche und Rechte, die an uns zu Sicherungszwecken unter der Abtretung vom *[Datum des Global Assignment Agreements einfügen]* zwischen uns und Toys "R" Us GmbH abgetreten wurden, wie Ihnen am *[Datum der Abtretungsanzeige einfügen]* angezeigt wurde, von uns an Toys "R" Us GmbH zurückabgetreten wurden. |
| We hereby kindly ask you to confirm receipt of this notification by countersigning it and returning it to Toys "R" Us GmbH with a copy to us. | Wir bitten Sie, uns die Kenntnisnahme dieser Freigabeanzeige dadurch zu bestätigen, dass Sie diesen Brief gegenzeichnen und an Toys "R" Us GmbH im Original und uns in Kopie übersenden. |
| Yours sincerely, | Mit freundlichen Grüßen |

_____

[First-Priority Collateral Trustee

| | |
|---|---|
| We hereby confirm that we have received the above notification of release. | Wir bestätigen hiermit, dass wir den Inhalt obiger Freigabeanzeige zur Kenntnis genommen haben. |

_____

Place, Date/Ort, Datum

_____

[Third Party Debtor]]

## SCHEDULE 9

### AUSTRIAN FORM OF TERMINATION AND RELEASE NOTICES

### PART I

### FORM OF TERMINATION AND RELEASE NOTICE TO TRU NETHERLANDS HOLDINGS B.V.


### TERMINATION AND RELEASE NOTICE


| | |
|---|---|
| From: | **Wilmington Savings Fund Society, FSB** |
| To: | **TRU Netherlands Holdings B.V.** |
| | 327, 3013 AL Rotterdam |
| | The Netherlands |
| Copy to: | **Toys "R" Us Handelsgesellschaft m.b.H.** |
| | Ikea-Platz 4 4053 Haid |


Date:    [_____] 2018


**Termination of the Receivables Pledge**

Dear Sir or Madam,

We hereby refer to a notification dated 17 November 2017 whereby Toys "R" Us Handelsgesellschaft m.b.H. notified you that they have pledged to WILMINGTON SAVINGS FUND SOCIETY, FSB all present and future intercompany loan receivables against yourselves as security for certain claims of WILMINGTON SAVINGS FUND SOCIETY, FSB.

We hereby inform you that we have unconditionally and irrevocably released all such aforementioned security interest and that all agreements underlying such security interest have been terminated.

Yours sincerely


**WILMINGTON SAVINGS FUND SOCIETY, FSB**
solely in its capacity as First-Priority Collateral Trustee


By: _____

Name:

Title:

28

**PART II**

**FORM OF TERMINATION AND RELEASE NOTICE TO TOYS "R" US IBERIA S.A.U.**

**TERMINATION AND RELEASE NOTICE**

From:        **Wilmington Savings Fund Society, FSB**

To:          **Toys R Us Iberia, S.A.U.**

             N-11 Salida 23 Centra

             M-300, Km 29,800

             28802 Alcalá de Henares (Madrid)

Copy to:     **Toys "R" Us Handelsgesellschaft m.b.H.**

             Ikea-Platz 4

             4053 Haid

Date:   [_____] 2018

**Termination of the Receivables Pledge**

Dear Sir or Madam,

We hereby refer to a notification dated 17 November 2017 whereby Toys "R" Us Handelsgesellschaft m.b.H. notified you that they have pledged to WILMINGTON SAVINGS FUND SOCIETY, FSB all present and future intercompany loan receivables against yourselves as security for certain claims of WILMINGTON SAVINGS FUND SOCIETY, FSB.

We hereby inform you that we have unconditionally and irrevocably released all such aforementioned security interest and that all agreements underlying such security interest have been terminated.

Yours sincerely

**WILMINGTON SAVINGS FUND SOCIETY, FSB**

solely in its capacity as First-Priority Collateral Trustee

By: _____

Name:

Title:

## PART III

### FORM OF TERMINATION AND RELEASE NOTICE TO TOYS "R" US LIMITED

### TERMINATION AND RELEASE NOTICE

| | |
|---|---|
| From: | **Wilmington Savings Fund Society, FSB** |
| To: | **Toys "R" Us Limited** |
| | Cannon Place, 78 Cannon Street |
| | EC4N 6AF London |
| Copy to: | **Toys "R" Us Handelsgesellschaft m.b.H.** |
| | Ikea-Platz |
| | 4053 Haid |

Date:    [_____] 2018

**Termination of the Receivables Pledge**

Dear Sir or Madam,

We hereby refer to a notification dated 17 November 2017 whereby Toys "R" Us Handelsgesellschaft m.b.H. notified you that they have pledged to WILMINGTON SAVINGS FUND SOCIETY, FSB all present and future intercompany loan receivables against yourselves as security for certain claims of WILMINGTON SAVINGS FUND SOCIETY, FSB.

We hereby inform you that we have unconditionally and irrevocably released all such aforementioned security interest and that all agreements underlying such security interest have been terminated.

Yours sincerely

**WILMINGTON SAVINGS FUND SOCIETY, FSB**
solely in its capacity as First-Priority Collateral Trustee

By: _____

Name:

Title:

## PART IV

### FORM OF TERMINATION AND RELEASE NOTICE TO TOYS "R" US POLAND SP.ZO.O

## TERMINATION AND RELEASE NOTICE

From:      **Wilmington Savings Fund Society, FSB**

To:        **Toys "R" Us Poland sp.zo.o**
           Ul Marynarska 19A
           02-674 Warszawa

Copy to:   **Toys "R" Us Handelsgesellschaft m.b.H.**
           Ikea-Platz 4
           4053 Haid

Date:   [_____] 2018

**Termination of the Receivables Pledge**

Dear Sir or Madam,

We hereby refer to a notification dated 17 November 2017 whereby Toys "R" Us Handelsgesellschaft m.b.H. notified you that they have pledged to WILMINGTON SAVINGS FUND SOCIETY, FSB all present and future intercompany loan receivables against yourselves as security for certain claims of WILMINGTON SAVINGS FUND SOCIETY, FSB.

We hereby inform you that we have unconditionally and irrevocably released all such aforementioned security interest and that all agreements underlying such security interest have been terminated.

Yours sincerely

**WILMINGTON SAVINGS FUND SOCIETY, FSB**
solely in its capacity as First-Priority Collateral Trustee

By: _____

Name:

Title:

## PART V

### FORM OF TERMINATION AND RELEASE NOTICE TO UNICREDIT BANK AUSTRIA AG

## TERMINATION AND RELEASE NOTICE

From:        **Wilmington Savings Fund Society, FSB**

To:          **Unicredit Bank Austria AG**

Copy to:     **Toys "R" Us Handelsgesellschaft m.b.H.**
             Ikea-Platz 4
             4053 Haid

Date:   [_____] 2018

**Termination of the Account Pledge**

Dear Sir or Madam,

We hereby refer to a notification dated 7 March 2018 whereby Toys "R" Us Handelsgesellschaft m.b.H. notified you that they have pledged to WILMINGTON SAVINGS FUND SOCIETY, FSB all rights, title and interest in Toys "R" Us Handelsgesellschaft m.b.H.'s accounts: IBAN AT801100007933101300 and AT531100007933101301 against yourselves as security for certain claims of WILMINGTON SAVINGS FUND SOCIETY, FSB.

We hereby inform you that we have unconditionally and irrevocably released all such aforementioned security interest and that all agreements underlying such security interest have been terminated.

Yours sincerely

**WILMINGTON SAVINGS FUND SOCIETY, FSB**
solely in its capacity as First-Priority Collateral Trustee

By: _____

Name:

Title:

## PART VI

### FORM OF TERMINATION AND RELEASE NOTICE TO OBERBANK AG

## TERMINATION AND RELEASE NOTICE

From:        **Wilmington Savings Fund Society, FSB**

To:            **Oberbank AG**

Copy to:    **Toys "R" Us Handelsgesellschaft m.b.H.**
              Ikea-Platz 4
              4053 Haid

Date:    [_____] 2018

**Termination of the Account Pledge**

Dear Sir or Madam,

We hereby refer to a notification dated 7 March 2018 whereby Toys "R" Us Handelsgesellschaft m.b.H. notified you that they have pledged to WILMINGTON SAVINGS FUND SOCIETY, FSB all rights, title and interest in Toys "R" Us Handelsgesellschaft m.b.H.'s accounts: IBAN AT421500300591003462 and IBAN AT831500300591003694 with you against yourselves as security for certain claims of WILMINGTON SAVINGS FUND SOCIETY, FSB.

We hereby inform you that we have unconditionally and irrevocably released all such aforementioned security interest and that all agreements underlying such security interest have been terminated.

Yours sincerely

**WILMINGTON SAVINGS FUND SOCIETY, FSB**
solely in its capacity as First-Priority Collateral Trustee

By: _____

Name:

Title:

33

## PART VII

**FORM OF TERMINATION AND RELEASE NOTICE TO ZÜRICH VERSICHERUNGS-AKTIENGESELLSCHAFT**

### TERMINATION AND RELEASE NOTICE

From:       **Wilmington Savings Fund Society, FSB**

To:         **Zürich Versicherungs-Aktiengesellschaft**
            Schwarzenbergplatz 15
            1010 Vienna

Copy to:    **Toys "R" Us Handelsgesellschaft m.b.H.**
            Ikea-Platz 4
            4053 Haid

Date:   [_____] 2018

**Termination of the Account Pledge**

Dear Sir or Madam,

We hereby refer to a notification dated 7 March 2018 whereby Toys "R" Us Handelsgesellschaft m.b.H. notified you that they have pledged to WILMINGTON SAVINGS FUND SOCIETY, FSB all of their future rights, claims and interests in connection with the insurance policy No 251955530 with you against yourselves as security for certain claims of WILMINGTON SAVINGS FUND SOCIETY, FSB.

We hereby inform you that we have unconditionally and irrevocably released all such aforementioned security interest and that all agreements underlying such security interest have been terminated.

Yours sincerely

**WILMINGTON SAVINGS FUND SOCIETY, FSB**
solely in its capacity as First-Priority Collateral Trustee

By: _____

Name:

Title:

34

## SCHEDULE 10

### SWISS FORM OF RELEASE NOTICES

### PART I

### FORM OF RELEASE NOTICE TO ACCOUNT BANKS

From:          **Wilmington Savings Fund Society, FSB**

To:            **[Account Bank]**

Copy to:       **Toys R Us AG**
               Industriestrasse 29
               8305 Dietlikon

Date:          [_____] 2018

**Notification of Release of Account Pledge**

Dear Sir or Madam,

We hereby refer to a notification dated [●] whereby Toys R Us AG notified you that they have pledged to WILMINGTON SAVINGS FUND SOCIETY, FSB all of the present or future rights, claims, benefits and interests in and to the following account (the "**Bank Account**"):

[account no.].

We hereby inform you that we have unconditionally and irrevocably released all such aforementioned security interest and that all agreements underlying such security interest have been terminated.

As a consequence of the foregoing, Toys R Us AG may again freely dispose of the Bank Account without any restrictions whatsoever and all of the rights of WILMINGTON SAVINGS FUND SOCIETY, FSB with respect to the Bank Account have ceased to exist.

Yours sincerely

**WILMINGTON SAVINGS FUND SOCIETY, FSB**
solely in its capacity as First-Priority Collateral Trustee

By: _____

Name:

Title:

35

## PART II

### FORM OF RELEASE NOTICE TO INSURER

From:          **Wilmington Savings Fund Society, FSB**

To:            **[Insurer]**

Copy to:       **Toys R Us AG**
               Industriestrasse 29
               8305 Dietlikon

Date:   [_____] 2018

**Notification of Release of Insurance Claim**

Dear Sir or Madam,

We hereby refer to a notification dated [•] whereby Toys R Us AG notified you that they have pledged to WILMINGTON SAVINGS FUND SOCIETY, FSB all of the present or future actual and contingent claims arising under or in connection with the following insurance policy, including any and all (by statutory law) assignable rights and benefits relation thereto, including privileges an ancillary rights in respect thereof and any interest accruing thereon as well as any right to receive the proceeds of any security, indemnity, warranty or guarantee relating thereto (the "**Insurance Claims**"):

**Name of Insurer:**     [•]

**Policy No.:**          [•]

We hereby inform you that we have unconditionally and irrevocably released all such aforementioned security interest and that all agreements underlying such security interest have been terminated.

As a consequence of the foregoing, Toys R Us AG may again freely dispose of the Insurance Claims without any restrictions whatsoever and all of the rights of WILMINGTON SAVINGS FUND SOCIETY, FSB with respect to the Insurance Claims have ceased to exist.

Yours sincerely

**WILMINGTON SAVINGS FUND SOCIETY, FSB**
solely in its capacity as First-Priority Collateral Trustee

By: _____

Name:

Title:

36

**PART III**

**FORM OF RELEASE NOTICE TO INTRA-GROUP DEBTORS**

From:         **Wilmington Savings Fund Society, FSB**

To:           **[Intra-Group Debtor]**


Copy to:      **Toys R Us AG**
              Industriestrasse 29
              8305 Dietlikon


Date:    [_____] 2018


**Notification of Release of the Pledge on Intra-Group Debtors**

Dear Sir or Madam,

We hereby refer to a notification dated [•] whereby Toys R Us AG notified you that they have pledged to WILMINGTON SAVINGS FUND SOCIETY, FSB the following receivables (the " **Receivables**"):

[•]

We hereby inform you that we have unconditionally and irrevocably released all such aforementioned security interest and that all agreements underlying such security interest have been terminated.

As a consequence of the foregoing, Toys R Us AG may again freely dispose of the Receivables without any restrictions whatsoever and all of the rights of WILMINGTON SAVINGS FUND SOCIETY, FSB with respect to the Receivables have ceased to exist.


Yours sincerely


**WILMINGTON SAVINGS FUND SOCIETY, FSB**
solely in its capacity as First-Priority Collateral Trustee


By: _____

Name:

Title:

**SIGNATURES**

**The Collateral Trustees**

**SIGNED** as a **DEED** by

for and on behalf of **WILMINGTON SAVINGS**                    Authorised Signatory

**FUND SOCIETY, FSB**, solely in its capacity as

First-Priority Collateral Trustee, in the presence of

[name of witness]

..................................…………………..

Signature of witness

..................................…………………..

Name:

Address:

Occupation:

Address:

Fax No:

Attention:

SIGNATURE PAGE TO DEED OF RELEASE

**SIGNED** as a **DEED** by                        Authorised Signatory
for and on behalf of **WILMINGTON TRUST,**
**NATIONAL ASSOCIATION**, solely in its capacity as
Second-Priority Collateral Trustee, in the presence     ...............................…………………
of [name of witness]

Signature of witness

...............................………….….
Name:
Address:


Occupation:



Address:

Fax No:

Attention:

**SIGNED** as a **DEED** by                                    Authorised Signatory

for and on behalf of **[INITIAL PROCEEDS**

**ESCROW AGENT]** in the presence of [name of              ...........................………………..

witness]

Signature of witness

...........................………………..

Name:

Address:

Occupation:

Address:

Fax No:

Attention:

SIGNATURE PAGES TO THE DEED OF RELEASE

**SIGNED** as a **DEED** by **TRU TAJ LLC**
acting by [name of director] a Director and
[name of Director or Secretary] [a Director]
[the Secretary]]

[Signature of Director]

..................................

[Signature of Director or Secretary]

..................................

**SIGNED** as a **DEED** by **TRU TAJ FINANCE, INC.** acting by [name of Director] a Director in the presence of [name of witness]

[Signature of Director]

........................………………..

[Signature of witness]

........................………….….

Name:

Address:


Occupation:]



Address:

Fax No:

Attention:

SIGNATURE PAGES TO THE DEED OF RELEASE

**The Seller and the Grantors**

**SIGNED** as a **DEED** by **TRU (UK) H8 LIMITED** acting by [name of director] a Director and [name of Director or Secretary] [a Director] [the Secretary]]

[Signature of Director]

...................................

[Signature of Director or Secretary]

...................................

SIGNATURE PAGES TO THE DEED OF RELEASE

**TOYS "R" US HANDELSGESELLSCHAFT M.B.H.**

By    _____

Name:

Title:

SIGNATURE PAGES TO THE DEED OF RELEASE

**TOYS "R" US GMBH**

By  _____

Name:

Title:

SIGNATURE PAGES TO THE DEED OF RELEASE

**SIGNED** as a **DEED** by **TOYS R US AG** acting by [name of director] a Director and [name of Director or Secretary] [a Director] [the Secretary]]

[Signature of Director]

...................................

[Signature of Director or Secretary]

...................................

SIGNATURE PAGES TO THE DEED OF RELEASE