Edward O. Sassower, P.C.
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Emily E. Geier (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:        (212) 446-4800
Facsimile:        (212) 446-4900

-and-

Michael A. Condyles (VA 27807)
Peter J. Barrett (VA 46179)
Jeremy S. Williams (VA 77469)
**KUTAK ROCK LLP**
901 East Byrd Street, Suite 1000
Richmond, Virginia 23219-4071
Telephone:        (804) 644-1700
Facsimile:        (804) 783-6192

*Co-Counsel to the Debtors and Debtors in Possession*

James H.M. Sprayregen, P.C.
Anup Sathy, P.C.
Chad J. Husnick, P.C. (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:        (312) 862-2000
Facsimile:        (312) 862-2200

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| TOYS "R" US, INC., *et al.*,[1] | ) | Case No. 17-34665 (KLP) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## DEBTORS' MOTION FOR ENTRY OF AN ORDER
## (I) APPROVING THE SETTLEMENT AGREEMENT BETWEEN
## THE DEBTORS, THE AD HOC GROUP OF TAJ NOTEHOLDERS,
## THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS, AND
## THE AD HOC GROUP OF B-4 LENDERS AND (II) GRANTING RELATED RELIEF

The above-captioned debtors and debtors in possession (collectively, the "Debtors")[2]

respectfully state as follows in support of this motion (this "Motion"):

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are set forth in the *Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief* [Docket No. 78]. The location of the Debtors' service address is One Geoffrey Way, Wayne, New Jersey 07470.

[2]    A detailed description of the Debtors and their business, and the facts and circumstances supporting the Debtors' chapter 11 cases, are set forth in greater detail in:  (i) the *Declaration of David A. Brandon, Chief Executive*

**Relief Requested**

1.      By this Motion, the Debtors respectfully seek entry of an order, substantially in the form attached as **Exhibit A** hereto (the "Order"):  (a) approving the settlement agreement attached to the Order as **Exhibit 1** (the "Intercompany Settlement Agreement"); and (b) granting related relief.

**Jurisdiction and Venue**

2.      The United States Bankruptcy Court for the Eastern District of Virginia (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Standing Order of Reference from the United States District Court for the Eastern District of Virginia*, dated July 10, 1984.  The Debtors confirm their consent, pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

3.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4.      The bases for the relief requested herein are sections 105(a) and 363(b) of the Bankruptcy Code, Bankruptcy Rule 9019, and rule 9019-1 of the Local Rules of the United States Bankruptcy Court for the Eastern District of Virginia (the "Local Bankruptcy Rules").

---

*Officer of Toys "R" Us, Inc., in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 20] (the "Brandon Declaration"); and (ii) the *Declaration of Michael J. Short, Chief Financial Officer of Toys "R" Us, Inc., in Support of First Day Motions* [Docket No. 30] (the "Short Declaration" and together with the Brandon Declaration, the "First Day Declarations"), filed contemporaneously with the Debtors' voluntary petitions for relief filed under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), on September 18, 2017 (the "Petition Date").

## **Background**

5.      After more than a year of inter-silo disputes related to a multitude of issues, the Debtors, their key stakeholders, and the Official Committee of Unsecured Creditors (the "Creditors' Committee") have reached a comprehensive agreement reflecting a balanced resolution of all issues, thereby paving the way for the conclusion of these cases.  Among other things, the intercompany settlement agreement resolves all matters concerning licensing agreements between Toys (Labuan) Holding Limited (the "Asia JV"), its subsidiaries, and Geoffrey, LLC ("Geoffrey"), source-code-ownership, private-label goods and trademarks, and all other intercompany issues (including professional-fee allocation).

6.      The Debtors engaged in extensive negotiations with their stakeholders over the year in hopes of reaching a consensual resolution of these issues and avoiding protracted litigation. And after these extensive discussions, various Debtors, the Taj Holders Steering Group,[3] the Asia, JV, the Creditors' Committee, TRU GSO (HK) Limited and certain other non-Debtor subsidiaries, and the Ad Hoc Group of B-4 Lenders (together, the "Settlement Parties"), have agreed on the terms of the Intercompany Settlement Agreement.  Approval of the Intercompany Settlement Agreement goes hand in hand with the TRU Inc. Debtors[4] and Taj Debtors'[5] plan.

7.      If approved, the Intercompany Settlement Agreement will provide, among other things, the following:

- Geoffrey will enter into new license agreements with the Asia JV and certain of its

---

[3]   Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Intercompany Settlement Agreement.

[4]   The "TRU Inc. Debtors" include TRU Inc., MAP 2005 Real Estate, LLC, Toys "R" Us - Value, Inc., and TRU Mobility, LLC.

[5]   The "Taj Debtors" are TRU Europe, Tru Taj LLC, Tru Taj Finance, Inc., TRU Taj Holdings 1, LLC, TRU Taj Holdings 2, Ltd., TRU Taj Holdings 3, LLC, TRU Asia, LLC, and TRU Taj (Europe) Holdings, LLC.

subsidiaries, as well as the French business;

- the new license agreements will have a fixed 15-year term, subject to extension by the Asia JV after the 15-year term, and will have other amended terms as set forth in the Settlement Agreement;

- the Asia JV and/or its subsidiaries will pay Geoffrey a 2% net royalty rate under the new licensing agreements;

- the Asia JV will relinquish its rights to $26,279,192 it claims it is owed by Geoffrey under the Subsidy Agreement;

- the Asia JV or its subsidiaries will pay $3,720,808 to Geoffrey on the effective date of the Plan;

- the Asia JV and/or its subsidiaries will pay $6,000,000 to Toys "R" Us - Delaware, Inc. ("Toys Delaware") on April 30, 2019 (subject to Toys Delaware's compliance with certain transition services obligations referenced below);

- the Taj Debtors will pay Toys Delaware $3 million in settlement of certain professional fee allocation disputes;

- Toys Delaware will deliver the Source Code and Oracle Data to the Asia JV or its subsidiaries, which, following receipt of the Source Code and Oracle Data, will pay Toys Delaware $5 million, plus unpaid invoiced amounts under the ITASSA (which total approximately $7.6 million);

- Toys Delaware will enter into a transition services agreement to provide existing IT services to the Asia JV or its subsidiaries, as well as transition and migration services set forth in the Settlement Agreement or appended Statement of Work, and the Asia JV or its subsidiaries will pay Toys Delaware a $1.5 million monthly fee payable as of December 1, 2018;

- Geoffrey and the Asia JV will work in good faith to document their future private-label relationship, including the Asia JV's ability to source private-label goods and use trademarks, based on certain agreed-upon principles set forth in the Settlement Agreement;

- funds of MAP 2005 Real Estate, LLC ("MAP 2005") will be used to resolve certain intercompany fee allocation disputes, including through payment to Toys Delaware of $1.25 million, as well as payment to the Taj Debtors of $1.25 million (which shall be contributed to TRU Inc. as set forth below);

- the Taj Debtors and Taj Noteholders will provide a $1.25 million payment to be contributed to TRU, Inc. as a fund for creditors of TRU Inc. (to be distributed in accordance with the Intercompany Settlement Agreement and Plan) (the "Taj Settlement Consideration");

- the Ad Hoc Group of B-4 Lenders and the Creditors' Committee will withdraw their objections to the Plan;

- each Debtor will mutually release each other Debtor of all intercompany claims and causes of action (except those explicitly reserved); and

- the Taj Debtors and the Asia JV and its direct and indirect subsidiaries will exchange mutual releases with the TRU Inc. Debtors, Toys Delaware Debtors, and Geoffrey Debtors, as set forth more fully in the Settlement Agreement.[6]

8.      The Intercompany Settlement Agreement was negotiated in good faith and at arm's length, and is well within the range of reasonableness.  Moreover, the Taj Debtors and TRU Inc. Debtors have modified the Plan to incorporate the Intercompany Settlement Agreement.  The Settlement Parties respectfully request that the Court enter an order approving the Intercompany Settlement Agreement and granting the other relief requested in this Motion.

## The Intercompany Settlement Agreement

9.      The material terms of the Intercompany Settlement Agreement are summarized below:[7]

| Provision | Summary Description |
|---|---|
| **Intercompany-Claims Settlement, Settlement Party Stipulations**<br><br>**¶ 3.1(a)–(h)** | In exchange for the consideration provided in the Intercompany Settlement Agreement, the Debtors will mutually release all claims (except those explicitly preserved).  Furthermore, the Asia JV and the Debtors will mutually release all claims against each other (except as set forth in the Intercompany Settlement Agreement).<br><br>The Intercompany Settlement Agreement resolves all outstanding disputes between the Debtors regarding allocation of professional fees and expenses, and no Settlement Party will challenge the professional-fee allocation existing at the date of signing. |
| **Taj Senior Notes Claims** | Holders of Taj senior notes claims waive all recovery rights related to specific claims against TRU Inc. |

---

[6]     The Plan has been amended to remove the release carve-outs relating to the Toys Delaware Debtors and Geoffrey Debtors, and both the order confirming the Plan and the order approving the Intercompany Settlement Agreement are binding on each of the Debtors and on all parties in interest in their respective cases.

[7]     This summary is being provided for convenience only.  In the event of any conflict between anything contained in the Motion—including this summary—and the Intercompany Settlement Agreement, the Intercompany Settlement Agreement shall control.  Additional terms are also set forth in the Intercompany Settlement Agreement.

| Provision | Summary Description |
|---|---|
| ¶ 3.1(c) | |
| **Treatment of Certain Administrative Claims**<br><br>¶ 3.1(e) | TRU Inc. will pay a specified portion of Administrative Claims for state or federal taxes, if any, for which TRU Inc. and any other Debtor or Debtors are liable.<br><br>Administrative claims timely asserted by LEGO and Mattel against TRU Inc. will be allowed as general unsecured claims against TRU Inc. in an amount to be agreed by separate stipulation by the Debtors, LEGO, and Mattel. |
| **Cash Consideration to Geoffrey**<br><br>¶ 3.2(a) | The Asia JV or its subsidiaries shall pay:  (1) $3,720,808 to Geoffrey, LLC (or its designated successor) on the effective date of the Plan, and (2) $6,000,000 to Geoffrey, LLC (or its designated successor) no later than, as applicable (i) April 30, 2019, so long as Toys Delaware or its applicable successor has completed performance with respect to the SOW and is then in compliance with the Transition Services Agreement in all material respects or (ii) if not paid in accordance with clause (i), promptly following the completion of performance with respect to the SOW and/or the cure or remedy of any applicable material breach of the Transition Services Agreement. |
| **Relinquishment of Asia JV Rights to Geoffrey-JV Accrued Amount**<br>¶ 3.2(b) | Geoffrey, LLC or its successor shall retain and take title to, and the Asia JV shall waive and relinquish all rights to, the entirety of the Geoffrey-JV Accrued Amount of $26,279,192 which is all amounts owing under the Subsidy Agreement through November 30, 2018. |
| **Allocation-related Payment to Toys Delaware**<br><br>¶ 3.2(c) | On the Plan Effective Date, the Taj Debtors shall pay to Toys Delaware, in settlement of certain fee allocation issues and disputes among the Debtors, $3 million in respect of the fees and expenses charged, or to be charged, by Prime Clerk LLC in the Chapter 11 Cases. |
| **License Agreement**<br><br>¶ 3.3(a) | Geoffrey will enter into an amended Master License Agreement with the Asia JV and/or its subsidiaries in on the terms set forth in the Intercompany Settlement Agreement. |
| **Transition Services Agreement**<br><br>¶ 3.3(b) | Toys Delaware and the Asia JV and its subsidiaries will enter into a transition services agreement on the terms set forth in the Settlement Agreement. |
| **Private Label**<br><br>¶ 3.3(c) | The Asia JV and Geoffrey will work cooperatively to document and clarify their future relationship with respect to private-label goods, in accordance with specific principles detailed in the Intercompany Settlement Agreement. |
| **Information Rights**<br><br>¶ 3.3(d) | The Asia JV will provide certain financial information to Geoffrey as set forth in the Intercompany Settlement Agreement. |
| **France Issues**<br><br>¶ 3.3(f) | Geoffrey shall enter into a license agreement with Jellej Jouets based on the terms attached to the Intercompany Settlement Agreement as Exhibit 3, with such terms becoming applicable as of January 15, 2019. Prior to January 15, 2019, the License Agreement dated February 1, 2009, as amended December 21, 2010, shall remain in effect in France. |
| **Allocation of Cash at MAP 2005**<br><br>¶ 3.4(a) | The cash at MAP 2005 will be allocated to resolve certain disputes relating to the allocation of professional fees across the Debtors.  The remaining balance of MAP 2005's cash will be distributed in accordance with the Priority Waterfall in the Plan, subject to the modifications provided in the Intercompany Settlement Agreement. |
| **Proceeds from TRU (Vermont), Inc. Wind-** | Any proceeds from TRU (Vermont), Inc. will be distributed to TRU Inc., following the wind-down of TRU (Vermont), and then distributed in accordance with the |

| Provision | Summary Description |
|---|---|
| **Down**<br><br>¶ 3.4(b) | Priority Waterfall in the plan, subject to the modifications provided in the Intercompany Settlement Agreement. |
| **Plan Conformity with Settlement Agreement**<br><br>¶ 3.6(a)(2) | The TRU Inc. Plan will conform to the Intercompany Settlement Agreement. |
| **U.K. Issues**<br><br>¶ 3.6(a)(3) | The Debtors will work in good faith with the Taj Noteholders to resolve U.K. issues and matters. |
| **Extension of Challenge Period**<br><br>¶ 3.6(c) | The challenge period will be extended as provided in the Intercompany Settlement Agreement. |
| **Governing Law**<br><br>¶ 4.8 | New York law. |

10.     The Settlement Parties believe, in their business judgment and after substantial analysis, that entering into the Intercompany Settlement Agreement is reasonable under these circumstances and respectfully request that the Court approve the Intercompany Settlement Agreement and all other relief requested in this Motion.  The Intercompany Settlement Agreement will allow all interested parties to avoid the uncertainty and costs of prolonged litigation among the various Debtors and their stakeholders, thus ultimately providing the stability integral to any successful restructuring.  By drastically mitigating the threat of adverse intercompany litigation that could jeopardize the Plan, the Intercompany Settlement Agreement inures to the benefit of all stakeholders in these chapter 11 cases.

11.     Accordingly, the Debtors believe that entry into the Intercompany Settlement Agreement is in the best interests of the Debtors' estates, their creditors, and other parties in interest.

## Basis for Relief

**I.     Entry into the Intercompany Settlement Agreement Is in the Best Interests of the Debtors' Estates.**

12.     Bankruptcy Rule 9019 provides, in relevant part:

> On motion by the [debtor in possession] and after notice and a hearing, the court may approve a compromise or Settlement Agreement.  Notice shall be given to creditors, the United States trustee, . . . and indenture trustee as provided in Rule 2002 and to any other entity as the court may direct.

Fed. R. Bankr. P. 9019(a).

13.     Compromises are tools for expediting the administration of the case and reducing administrative costs, and are favored in bankruptcy.  *See In re Bond*, 16 F.3d 408, 1994 WL 20107, at *3 (4th Cir. 1994) (unpublished table decision) ("To minimize litigation and expedite the administration of a bankruptcy estate, compromises are favored in bankruptcy." (internal quotation marks omitted)); *see also In re Frye*, 216 B.R. 166, 172 (Bankr. E.D. Va. 1997) (citing *Richardson v. Richardson*, 10 Va. App. 391, 399 (1990)).   The Debtors believe that the Intercompany Settlement Agreement represents a fair and reasonable compromise of the Parties' competing interests.

14.     In order to approve the Intercompany Settlement Agreement under Bankruptcy Rule 9019, a court must determine that the Intercompany Settlement Agreement is in the "best interest of the estate" and is "fair and equitable."  *In re Frye*, 216 B.R. at 174.  Among the relevant factors considered by bankruptcy courts in the Eastern District of Virginia are "the interests of creditors with proper deference to their reasonable views" and "the complexity, time and expense of the litigation."  *In re Three Rivers Woods, Inc.*, No. 98-38685 (DOT), 2001 WL 720620, at *6 (Bankr. E.D. Va. 2001) (quoting *In re Austin*, 186 B.R. 397, 400 (Bankr. E.D. Va. 1995)).   In determining whether to approve a proposed settlement, however, the bankruptcy court should not substitute its judgment for that of the debtor.  *See In re Carla Leather, Inc.*, 44 B.R. 457, 465 (Bankr. S.D.N.Y. 1984).  Instead, rather than conduct "a mini-trial" of the lawsuit at issue, "[t]he Court's fundamental determination is . . . whether the settlement falls 'below the lowest point in

the range of reasonableness.'" *In re Three Rivers Woods*, 2001 WL 720620, at *6 (quoting *In re Austin*, 186 B.R. at 400).

15.    Additionally, section 363(b)(1) of the Bankruptcy Code authorizes a bankruptcy court, after notice and a hearing, to authorize a debtor to "use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). To approve a use, sale or lease of property other than in the ordinary course of business, the court must find "some sound business purpose" that satisfies the business judgment test. *See In re W.A. Mallory Co.*, 214 B.R. 834, 836 (Bankr. E.D. Va. 1997); *see also In re Glover*, No. 09-74787, 2010 WL 5239918, at *4 (Bankr. E.D. Va. 2010) ("The standard in this Circuit is whether the debtor in possession has exercised sound business judgment." (citing *Lubrizol Enters., Inc. v. Richmond Metal Finishers, Inc.*, 756 F.2d 1043, 1046 (4th Cir. 1985))). Courts generally show great deference to a debtor's decisions when applying the business judgment standard. *See In re Alpha Nat. Res., Inc.*, 546 B.R. 348, 356 (Bankr. E.D. Va. 2016) ("Courts apply the deferential business judgment test when analyzing transactions under § 363(b)(1).").  Deference to a debtor's business judgment is inappropriate only if such business judgment is "so manifestly unreasonable that it could not be based on sound business judgment, but only on bad faith, or whim or caprice." *Lubrizol Enters.*, 756 F.2d at 1047.

16.    The Debtors believe that the Intercompany Settlement Agreement is fair, equitable, in the best interests of the Debtors' estates, and easily falls within the range of reasonable outcomes. As set forth above, the Intercompany Settlement Agreement is the culmination of more than a year of hard-fought, good-faith negotiation among the Settlement Parties, embodying a resolution that is highly preferable to complex and unpredictable litigation that could have a value-destructive effect on the Debtors' remaining businesses. The settlement resolves a variety of

disputes relating to, among other things, licensing arrangements, certain releases in the Plan, the substantial contribution payment to Cyrus Capital L.P., and the allocation of certain professional fees to date. The Intercompany Settlement Agreement also establishes the framework of the various Debtors' go-forward business relationship—and resolves significant ongoing disputes regarding that relationship—as it addresses the provision of transition services to the Asia JV or its subsidiaries; the new licensing agreement between Geoffrey and the Asia JV and/or its subsidiaries; the private-label arrangements; and the ownership of the Source Code. The Intercompany Settlement Agreement resolves *all* of these complex, multi-party disputes and, thus, is exactly the sort of settlement that a bankruptcy court should approve. *Accord In re Three Rivers Woods, Inc.*, 2001 WL 720620, at \*6 (when evaluating the merits of a proposed settlement, bankruptcy courts in the Eastern District of Virginia look to "the interests of creditors with proper deference to their reasonable views" and "the complexity, time and expense of the litigation" (quoting *In re Austin*, 186 B.R. at 400)).

17.     Once this Court approves the Intercompany Settlement Agreement, the Debtors and the rest of the Settlement Parties will be able to allocate their resources toward resolving any remaining issues and expeditiously confirming and consummating the chapter 11 plans. All use of the Debtors' property contemplated by the Intercompany Settlement Agreement and any stipulations contemplated thereby is, in the Debtors' business judgment, appropriate given the circumstances.

18.     For the foregoing reasons, the Debtors respectfully submit that the Intercompany Settlement Agreement satisfies the standards for approval under applicable law and that the Court should therefore approve the Intercompany Settlement Agreement pursuant to sections 105 and 363 of the Bankruptcy Code and Bankruptcy Rule 9019.

## **Notice**

19.    The Debtors will provide notice of this Motion via first class mail and email (where available) to:  (a) the Office of the United States Trustee for the Eastern District of Virginia, Attn: Robert B. Van Arsdale and Lynn A. Kohen; (b) counsel to the Creditors' Committee; (d) DIP Taj Term Loan Agent and the advisors and counsel thereto; (f) the indenture trustee for the TRU Taj 12.00% Senior Notes and the advisors and counsel thereto; (g) the administrative agent for the prepetition Secured Revolving Credit Facility and the advisors and counsel thereto; (h) the administrative agent for the prepetition Secured Term Loan B Facility and the advisors and counsel thereto; (l) the administrative agent for the prepetition European and Australian Asset-Based Revolving Credit Facility and the advisors and counsel thereto; (m) the administrative agent for the Senior Unsecured Term Loan Facility and the advisors and counsel thereto; (n) the indenture trustee for the Debtors' 7.375% Senior Notes and the advisors and counsel thereto; (o) the indenture trustee for the Debtors' 8.75% Unsecured Notes and the advisors and counsel thereto; (p) counsel to the Ad Hoc Group of the Term B-4 Holders; (q) counsel to the Taj Holders Steering Committee; (r)  the Internal Revenue Service; (s) the office of the attorneys general for the states in which the Debtors operate; (t) the Securities and Exchange Commission; (u)  counsel to the Ad Hoc Group of B-4 Lenders; and (v) counsel to the Asia JV, Toys "R" Us (Asia) Limited, and Toys "R" Us Japan, Limited, and (w) any party that has requested notice pursuant to Bankruptcy Rule 2002.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

*[Remainder of page intentionally left blank.]*

WHEREFORE, the Debtors respectfully request that the Court enter the Orders granting the relief requested herein and such other relief as the Court deems appropriate under the circumstances.

Richmond, Virginia
Dated:   December 11, 2018

/s/ *Jeremy S. Williams*

**KUTAK ROCK LLP**
Michael A. Condyles (VA 27807)
Peter J. Barrett (VA 46179)
Jeremy S. Williams (VA 77469)
901 East Byrd Street, Suite 1000
Richmond, Virginia 23219-4071
Telephone:     (804) 644-1700
Facsimile:    (804) 783-6192
Email:      Michael.Condyles@KutakRock.com
                 Peter.Barrett@KutakRock.com
                 Jeremy.Williams@KutakRock.com

*Co-Counsel to the Debtors
and Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C.
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Emily E. Geier (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900
Email:      edward.sassower@kirkland.com
                 joshua.sussberg@kirkland.com
                 emily.geier@kirkland.com

-and-

James H.M. Sprayregen, P.C.
Anup Sathy, P.C.
Chad J. Husnick, P.C. (admitted *pro hac vice*)
300 North LaSalle
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200
Email:      james.sprayregen@kirkland.com
                 anup.sathy@kirkland.com
                 chad.husnick@kirkland.com

*Co-Counsel to the Debtors and Debtors in Possession*

## Exhibit A

**Proposed Order**

Edward O. Sassower, P.C.
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Emily E. Geier (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:        (212) 446-4800
Facsimile:        (212) 446-4900

-and-

Michael A. Condyles (VA 27807)
Peter J. Barrett (VA 46179)
Jeremy S. Williams (VA 77469)
**KUTAK ROCK LLP**
901 East Byrd Street, Suite 1000
Richmond, Virginia 23219-4071
Telephone:        (804) 644-1700
Facsimile:        (804) 783-6192

James H.M. Sprayregen, P.C.
Anup Sathy, P.C.
Chad J. Husnick, P.C. (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:        (312) 862-2000
Facsimile:        (312) 862-2200

*Co-Counsel to the Debtors and Debtors in Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| TOYS "R" US, INC., *et al.*,[1] | ) | Case No. 17-34665 (KLP) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

## ORDER (I) APPROVING
## THE SETTLEMENT AGREEMENT BETWEEN THE
## DEBTORS, THE AD HOC GROUP OF TAJ NOTEHOLDERS,
## THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS, AND
## THE AD HOC GROUP OF B-4 LENDERS AND (II) GRANTING RELATED RELIEF

Upon the motion (the "<u>Motion</u>")[2] of the above-captioned debtors and debtors in possession

(collectively, the "<u>Debtors</u>") for entry of an order (this "<u>Order</u>"):  (a) approving the Intercompany

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are set forth in the *Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief* [Docket 78].  The location of the Debtors' service address is One Geoffrey Way, Wayne, New Jersey 07470.

[2]    Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion or the

Settlement Agreement and authorizing the Debtors to perform thereunder; and (b) granting related

relief, all as more fully set forth in the Motion; and this Court having jurisdiction over this matter

pursuant to 28 U.S.C. §§ 157 and 1334 and the *Standing Order of Reference from the United States*

*District Court for the Eastern District of Virginia*, dated July 10, 1984; and this Court having found

that it may enter a final order consistent with Article III of the United States Constitution; and this

Court having found that venue of this proceeding and the Motion in this district is proper pursuant

to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion

is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this

Court having found that the Debtors' notice of the Motion and opportunity for a hearing on the

Motion were appropriate under the circumstances and that no other notice need be provided; and

this Court having reviewed the Motion and having heard the statements in support of the relief

requested therein at a hearing before this Court (the "Hearing"); and this Court having determined

that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for

the relief granted herein; and upon all of the proceedings had before this Court; and after due

deliberation and sufficient cause appearing therefor, the Court hereby makes and issues the

following findings of fact, conclusions of law, and orders:

## I.       FINDINGS OF FACT AND CONCLUSIONS OF LAW

**NOW, THEREFORE, THIS COURT HEREBY FINDS AND CONCLUDES THAT:[3]**

A.      The legal and factual bases set forth in the Motion establish just and sufficient cause

to grant the relief requested therein.

---

Intercompany Settlement Agreement, as applicable.

[3]     Findings of fact shall be construed as conclusions of law, and conclusions of law shall be construed as findings
of fact, as appropriate, pursuant to Bankruptcy Rule 7052.

B.      Notice of the Motion is sufficient notice of the Intercompany Settlement Agreement and no other notice is required.

C.      Parties-in-interest were afforded a full opportunity to participate in the Hearing on the Motion.

D.      The Intercompany Settlement Agreement was negotiated in good faith and at arm's length.

E.      Based on the range of possible outcomes and the cost, delay, and uncertainty associated with further litigation, the Intercompany Settlement Agreement is fair, well within the range of reasonableness, and cost-effective, and approval of the Intercompany Settlement Agreement is warranted.

F.      Other good and sufficient cause exists for granting the relief requested in the Motion.

## II.      <u>ORDER</u>

**BASED ON THE FOREGOING FINDINGS OF FACT, IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED THAT:**

1.      The Motion is granted as set forth herein.

2.      The Intercompany Settlement Agreement attached hereto as **<u>Exhibit 1</u>** is approved pursuant to sections 363 and 105(a) of the Bankruptcy Code and in accordance with Bankruptcy Rule 9019.

3.      The Settlement Parties are authorized to enter into the Transition Services Agreement on the terms described in the Intercompany Settlement Agreement.

4.      The Settlement Parties are authorized to enter into the amended License Agreement on the terms described in the Intercompany Settlement Agreement.

3

5.      The Settlement Parties are hereby authorized and directed to enter into, perform under, execute, and deliver the Intercompany Settlement Agreement.

6.      The Settlement Parties are authorized and directed to take any and all actions as may be necessary to effectuate and implement the Intercompany Settlement Agreement and the relief grant in this Order.

7.      The releases set forth in the Plan and the Intercompany Settlement Agreement are binding on each of the Debtors and all parties in interest in their respective chapter 11 cases.

8.      The Bankruptcy Court shall have and shall retain exclusive jurisdiction over the Intercompany Settlement Agreement and this Order.

9.      Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion and of the Intercompany Settlement Agreement, and the requirements of the Local Rules Bankruptcy Rule 6004(a) are satisfied by such notice.

10.      Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Order are immediately effective and enforceable upon its entry.

11.      This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

Dated:  _____

Richmond, Virginia

_____

UNITED STATES BANKRUPTCY JUDGE

WE ASK FOR THIS:

/s/ Jeremy S. Williams

Michael A. Condyles (VA 27807)
Peter J. Barrett (VA 46179)
Jeremy S. Williams (VA 77469)
**KUTAK ROCK LLP**
901 East Byrd Street, Suite 1000
Richmond, Virginia 23219-4071
Telephone:      (804) 644-1700
Facsimile:      (804) 783-6192

- and -

Edward O. Sassower, P.C.
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Emily E. Geier  (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900

- and -

James H.M. Sprayregen, P.C.
Anup Sathy, P.C.
Chad J. Husnick, P.C. (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200

*Co-Counsel to the Debtors and Debtors in Possession*

## <u>CERTIFICATION OF ENDORSEMENT</u>
## <u>UNDER LOCAL BANKRUPTCY RULE 9022-1(C)</u>

Pursuant to Local Bankruptcy Rule 9022-1(C), I hereby certify that the foregoing proposed order has been endorsed by or served upon all necessary parties.

/s/ Jeremy S. Williams

## Exhibit 1

**Intercompany Settlement Agreement**

## SETTLEMENT AGREEMENT

## PREAMBLE

This settlement agreement (this "<u>Settlement Agreement</u>"), is made and entered into as of December 11, 2018, by and among the following parties:

(a)         (i) Toys "R" Us, Inc. ("<u>TRU Inc.</u>"), (ii) MAP 2005 Real Estate, LLC ("<u>MAP 2005</u>"), (iii) Toys "R" US - Value, Inc., (iv) TRU Mobility, LLC (those entities identified in subclauses (i)-(iv), the "<u>TRU Inc. Debtors</u>"), (v) Geoffrey Holdings, LLC, (vi) Geoffrey, LLC; and (vii) Geoffrey International, LLC (those entities identified in subclauses (v)-(vii), the "<u>Geoffrey Debtors</u>"); (viii) Toys "R" Us - Delaware Inc. ("<u>Toys Delaware</u>"), (ix) Giraffe Holdings, LLC, (x) Toys Acquisition, LLC, (xi) TRU - SVC, Inc., (xii) TRU Guam, LLC, (xiii) TRU of Puerto Rico, Inc. (those entities identified in subclasses (viii-xiii), the "<u>Toys Delaware Debtors</u>"), (xiv) Wayne Real Estate Parent Company, LLC, (xv) Toys "R" Us Europe, LLC, (xvi) Tru Taj LLC, (xvii) Tru Taj Finance, Inc., (xviii) Tru Taj Holdings 1, LLC, (xix) TRU Taj Holdings 2, Ltd., (xx) TRU Taj Holdings 3, LLC, (xxi) TRU Asia, LLC, (xxii) TRU Taj (Europe) Holdings, LLC (those entities identified in subclauses (xv) through (xxii), the "<u>Taj Debtors</u>", and each of the foregoing entities identified in subclauses (i) through (xxii) individually, a "<u>Debtor</u>" and, collectively, the "<u>Debtors</u>");

(b)         Toys (Labuan) Holding Limited (the "<u>Asia JV</u>");

(c)         TRU GSO (HK) Limited ("<u>GSO</u>"), TRU GSO, LLC, TRU Global Sourcing Limited, TRU China Holdings, LLC, Toys "R" Us (China) Limited ("<u>TRU China</u>"), TRU Global Tooling, LLC and TRU Vermont, Inc. ("<u>TRU Non-Debtor Subsidiaries</u>");

(d)         the undersigned members of an ad hoc group of B-4 Lenders (the "<u>Ad Hoc Group of B-4 Lenders</u>"), comprised of funds and accounts (or holding companies thereof) managed or advised by Angelo, Gordon & Co., L.P.; Franklin Mutual Advisors, LLC; Highland Capital Management, LLC; Oaktree Capital Management, L.P.; and Solus Alternative Asset Management LP, holding positions set forth in the *Third amended Statement of Ad Hoc Group of B-4 Lenders Pursuant to Bankruptcy Rule 2019* filed on June 29, 2018 [Docket No. 3637];

(e)         Empyrean Capital Partners, LP and the undersigned members of an ad hoc group of Taj Senior Notes (the "<u>Taj Holders Steering Group</u>"), comprised of funds and accounts (or holding companies thereof) managed or advised by Barclays Bank PLC; Cerberus Capital Management LP; Cyrus Capital Partners, LP; Grantham, Mayo, Van Otterloo & Co. LLC; Rimrock Capital Management, LLC; TPG Sixth Street Partners, LLC; York Capital Management Global Advisors, LLC; holding positions set forth in the *Sixth Amended Verified*

*Statement of the Ad Hoc Group of Taj Noteholders Pursuant to Bankruptcy Rule 2019* filed on November 28, 2018 [Docket No. 5808];

(f)        the official committee of unsecured creditors appointed in the Chapter 11 Cases (defined below) pursuant to the *Appointment of Unsecured Creditors' Committee* [Docket No. 206] (the "Creditors' Committee"); and

(g)        any other parties whose signature pages are affixed hereto.

Each of the foregoing are referred to herein as a "Party" and are collectively referred to herein as the "Parties."

## RECITALS

**WHEREAS**, on September 18, 2017 (the "Petition Date"), the Debtors and certain of their direct and indirect subsidiaries filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Chapter 11 Cases") in the United States Bankruptcy Court for the Eastern District of Virginia (the "Bankruptcy Court"), which Chapter 11 Cases are being jointly administered and are captioned In re Toys "R" Us, Inc., et al., Case No. 17-34665 (KLP);

**WHEREAS**, on October 25, 2017, the Bankruptcy Court entered the Final DIP Financing Order (as defined below), pursuant to which (i) the Debtors stipulated to, among other things, the amount, validity, perfection, enforceability, and priority of the claims and liens of the Prepetition Secured Parties (as defined in the Final DIP Financing Order), and waived and released the Prepetition Secured Parties and their representatives from any claims or causes of action arising prior to the Petition Date, and (ii) all stipulations and releases by the Debtors were binding on all other parties in interest and the Creditors' Committee, subject to the Creditors' Committee's investigation of such claims and liens of the Prepetition Secured Noteholders and ability to commence an adversary proceeding or contested matter challenging such claims and liens (the "Challenge Period");

**WHEREAS**, with respect to the Taj Debtors, the Creditors' Committee's Challenge Period as it relates to the Prepetition Secured Noteholders under the Final DIP Financing Order was extended by stipulations through and including December 13, 2018;

**WHEREAS**, pursuant to its investigation subject to the Challenge Period under the Final DIP Financing Order, the Creditors' Committee identified various alleged claims and causes of action against, among others, the Prepetition Secured Noteholders, which claims are contested by such holders;

**WHEREAS**, on September 6, 2018, the Debtors filed the *Second Amended Joint Chapter 11 Plan of the Taj Debtors and the TRU Inc. Debtors* [Docket No. 4547] (as may be amended, modified, and supplemented from time to time, including to incorporate the terms of the Settlement Agreement, the "Plan"),[1] and the Bankruptcy Court entered the *Order (I) Approving*

---

[1]    Capitalized terms used herein but not otherwise define have the meaning set forth in the Plan.

*the Adequacy of the Disclosure Statement for the Joint Chapter 11 Plan of the Taj Debtors and the TRU Inc. Debtors, (II) Approving the Solicitation and Notice Procedures with Respect to Confirmation of the Taj Debtors and the TRU Inc. Debtors' Proposed Joint Chapter 11 Plan, (III) Approving the Forms of Ballots and Notices in Connection Therewith, (IV) Approving the Rights Offering Procedures, (V) Scheduling Certain Dates with Respect Thereto, (VI) Shortening the Objection Periods and Notice Requirements Related Thereto, (VII) Authorizing the Backstop Commitment Agreement and the Payment of the Commitment Premium as Administrative Claims, and (VIII) Granting Related Relief* [Docket No. 4572], approving the Disclosure Statement (as defined below), solicitation procedures, and related notices, forms, and ballots;

**WHEREAS**, on March 24, 2017, the Asia JV, among other entities, entered into a master license agreement with Geoffrey (the "Master License Agreement") which provides *inter alia* the exclusive right to use certain intellectual property in the licensed territories on the terms set forth in the Master License Agreement;

**WHEREAS**, on March 24, 2017, Geoffrey entered into an agreement (the "Subsidy Agreement") obligating Geoffrey to make payments to the Asia JV each fiscal year based upon the sales revenues of the subsidiaries of the Asia JV for such fiscal year (the "Geoffrey-JV Payment");

**WHEREAS**, on January 25, 2018, the Court entered the *Order (I) Authorizing Geoffrey LLC To Assume The Intercompany IP License Agreements, And (II) Granting Related Relief* [Docket No. 1610];

**WHEREAS**, on January 25, 2018, the Court entered the *Order (I) Authorizing Geoffrey, LLC to Assume the Subsidy Agreement and (II) Granting Related Relief* [Docket No. 1609] (the "Subsidy Order");

**WHEREAS**, the Subsidy Order preserves for Geoffrey, "without limitation," "any cause of action to avoid any obligation or transfer under" the Subsidy Agreement and "any other cause of action alleging that entry into or payments under . . . the Subsidy Agreement caused harm to Geoffrey," in addition to "all claims, defenses, and arguments relating to" the Subsidy Agreement;

**WHEREAS**, Geoffrey has not made any Geoffrey-JV Payments before or during these cases and owes the Asia JV an accrued amount of $26,279,192 under the Subsidy Agreement through November 30, 2018 (the "Geoffrey-JV Accrued Amount");

**WHEREAS**, absent consensual resolution of disputes relating to the Subsidy Agreement and related matters, Geoffrey intends to commence a lawsuit seeking to avoid obligations under the Subsidy Agreement and to disallow claims filed by the Asia JV for the Geoffrey-JV Accrued Amount, and the Asia JV disputes all of Geoffrey's claims and causes of action and believes it is entitled to payment in full of the Geoffrey-JV Accrued Amount;

**WHEREAS**, Geoffrey and the Asia JV have other disputes or disagreements relating to provisions of the Master License Agreement that they wish to resolve;

3

**WHEREAS**, the ownership interest in, and entitlement to a copy of the Source Code (as defined below) is the subject of ongoing litigation between Toys Delaware and the Asia JV, Toys "R" Us (Asia) Limited, and Toys "R" Us Japan, Ltd.;

**WHEREAS**, Toys Delaware and the Asia JV have been unable to reach agreement regarding the terms of a transition services agreement;

**WHEREAS**, the Asia JV, Toys "R" Us (Asia) Limited, and Toys "R" Us Japan, Ltd. intend to assert damages claims against Toys Delaware arising out of its rejection of the ITASSA;

**WHEREAS**, various of the Debtors, including the Taj Debtors and the Toys Delaware Debtors, have disputes or disagreements regarding the appropriate allocation of professional fees incurred by the Debtors' professionals and advisors, and both the Taj Debtors and the Toys Delaware Debtors contend that they have been allocated material fees and expenses that should be allocated to the other Debtors, including TRU Inc.;

**WHEREAS**, both the Toys Delaware Debtors and the Taj Debtors contend that they have other administrative expense claims against TRU Inc., including claims on account of post-petition advances and/or adequate protection claims, and both the Toys Delaware Debtors and the Taj Debtors have significant pre-petition claims against TRU Inc. on account of intercompany loans and/or guarantee claims;

**WHEREAS**, both the Creditors' Committee and the Ad Hoc Group of B-4 Lenders have objected to the Plan [Docket Nos. 5445, 5740];

**WHEREAS**, the Parties recognize that the outcome of litigation in connection with the Plan and the matters referenced above, including the Subsidy Agreement, license-related issues, source code litigation, ITASSA rejection issues, transition service agreement disputes, and fee allocation issues, is uncertain and may cause the Parties to incur significant costs and suffer delay in resolving their disputes, and the Parties seek to avoid the uncertainty, cost, and delay of litigating such disputes and have been, therefore, engaged in good-faith, arm's-length negotiations with each other regarding settlement of such disputes;

**WHEREAS**, the TRU Inc. Debtors and Toys Delaware Debtors are parties to the Vendor Settlement Agreement (as defined below), which, among other things, contemplates the establishment of the Non-Released Claims Trust to pursue certain claims and causes of action held by TRU Inc. and the Toys Delaware Debtors and their respective estates and creditors;

**WHEREAS**, Kramer Levin Naftalis & Frankel LLP, counsel to the Creditors' Committee, has authority to execute this Settlement Agreement and any other definitive documentation negotiated between the Parties on behalf of the Creditors' Committee; and

**WHEREAS**, the Parties intend to memorialize their settlements and resolutions of outstanding disputes by entering into this Settlement Agreement and, in the case of the applicable Parties described below, an amendment to the Master License Agreement (and the Subsidy Agreement and other related agreements) and a transition services agreement.

## AGREEMENT

**NOW, THEREFORE**, in consideration of the above recitals and the promises and mutual covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

**Section 2.    Definitions and Interpretation.**

2.1        Definitions.  The following terms shall have the following definitions:

"Ad Hoc Group of B-4 Lenders" has the meaning ascribed to it in the Recitals.

"Ad Hoc Vendor Group" means the ad hoc group of merchandise vendors represented by Foley & Lardner LLP, Fox Rothschild LLP; Schiff Hardin LLP; Saul Ewing Arnstein & Lehr LLP; Morris, Nichols, Arsht & Tunnell; and Wasserman, Jurista & Stolz, P.C.

"Administrative Claims" means a Claim for costs and expenses of administration of the Debtors' estates pursuant to sections 503(b) or 507(a)(2) of the Bankruptcy Code.

"Allowed" has the meaning ascribed to it in the Plan.

"B-4 Lenders" means the lenders holding the Term B-4 Loans.

"Bankruptcy Code" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532.

"Bankruptcy Court" has the meaning ascribed to it in the Recitals.

"Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure promulgated under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court.

"Causes of Action" means any claims, interests, damages, remedies, causes of action, demands, rights, actions, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, liens, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable, directly or derivatively, matured or unmatured, suspected or unsuspected, in contract, tort, law, equity, or otherwise. For the avoidance of doubt, "Causes of Action" includes: (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by law; (b) the right to object to or otherwise contest Claims or Interests; (c) claims pursuant to sections 362, 510, 542, 543, 544 through 550, or 553 of the Bankruptcy Code; (d) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; (e) any state or foreign law fraudulent transfer or similar claim; (f) any claims for which the Creditors' Committee or any other party may seek derivative standing to pursue; and (g) any other avoidance actions.

"Chapter 11 Cases" has the meaning ascribed to it in the Recitals.

"Claim" means any "claim" (as defined in section 101(5) of the Bankruptcy Code) against any of the Debtors.

"Creditors' Committee" has the meaning ascribed to it in the Preamble.

"D&O Claims" has the meaning ascribed to it in the Vendor Settlement Agreement.

"D&O Party" has the meaning ascribed to it in the Vendor Settlement Agreement.

"Debtor" has the meaning ascribed to it in the Preamble.

"Disclosure Statement" means the *Amended Disclosure Statement for the Second Amended Joint Chapter 11 Plan of the Taj Debtors and the TRU Inc. Debtors* [Docket No. 4552].

"Final DIP Financing Order" means the *Final Order (I) Authorizing the TRU Taj Debtors to Obtain Postpetition Financing, (II) Authorizing the TRU Taj Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection to the Prepetition Lenders, (V) Modifying the Automatic Stay, and (V) Granting Related Relief* [Docket No. 745].

"General Unsecured Claim" has the meaning ascribed to it in the Plan.

"Geoffrey Debtors" has the meaning ascribed to it in the Preamble and in the *Fourth Amended Chapter 11 Plans of Toys Delaware Debtors and Geoffrey Debtors* [Docket No. 5602].

"Geoffrey-JV Accrued Amount" has the meaning ascribed to it in the recitals.

"GSO" has the meaning ascribed to it in the Preamble.

"Interest" means the common stock or shares, limited liability company interests, limited partnership units, preferred interests, and any other equity, ownership or profits interests of any Debtor or non-Debtor subsidiary of a Debtor and options, warrants, rights or other securities or agreements to acquire the common stock or shares, limited liability company interests, or other equity, ownership or profits interests of any Debtor or non-Debtor subsidiary of a Debtor (whether or not arising under or in connection with any employment agreement).

"Interim Compensation Order" means the *Order (I) Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Retained Professionals and (II) Granting Related Relief*, entered October 25, 2017 [Docket No. 746].

"Invoiced Amounts" has the meaning ascribed to it in the Disclosure Statement.

"ITASSA" has the meaning ascribed to it in the Disclosure Statement.

"MAP 2005" has the meaning ascribed to it in the Recitals.

"Master License Agreement" has the meaning ascribed to it in the recitals.

"New Master License Agreement" has the meaning ascribed to it in Section 3.3(a)(1).

"New Subsidiary License Agreements" has the meaning ascribed to it in Section 3.3(a)(1).

"Non-Released Claims" has the meaning ascribed to it in the Vendor Settlement Agreement.

"Non-Released Claims Trust" has the meaning ascribed to it in the Vendor Settlement Agreement.

"Oracle Data" means the current and historical raw financial data generated by the Asia JV and its subsidiaries, including Toys "R" Us (Asia) Limited and Toys "R" Us Japan, Ltd., and stored in an Oracle database by Toys Delaware in New Jersey.

"Party" or "Parties" have the meanings ascribed to them in the Preamble.

"Petition Date" has the meaning ascribed to it in the Recitals.

"Plan" has the meaning ascribed to it in the Recitals.

"Plan Effective Date" means the effective date of the Plan.

"Prepetition Secured Notes Indenture" means that certain Indenture, dated as of August 26, 2016, (as amended, novated, supplemented, extended, or restated from time to time) by and among Tru Taj LLC and Tru Taj Finance, Inc. as co-issuers, TRU Inc. and certain of its direct and indirect wholly-owned subsidiaries in the United States, Europe and Australia, as guarantors, and the Prepetition Secured Notes Indenture Trustee.

"Prepetition Secured Noteholders" means all current, former, and future holders of Prepetition Secured Notes.

"Prepetition Secured Notes" means the 12.00% senior secured notes due August 16, 2021 issued under the Prepetition Secured Notes Indenture.

"Prepetition Secured Notes Indenture Trustee" means Wilmington Trust, N.A. as indenture trustee under the Prepetition Secured Notes Indenture.

"Released Taj Claims" shall mean all claims and Causes of Action, including Avoidance Actions, against any or all of the Taj Debtors, the Taj D&O Parties, the members of the Taj Holders Steering Group, the Holders of the Taj Senior Notes, the Taj DIP Lenders, the Taj DIP Notes Indenture Trustee, the Taj Senior Notes Indenture Trustee, the Asia JV and its subsidiaries, Fung Retailing Limited, and each of the foregoing parties' respective officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, investment bankers, consultants, representatives, and other professionals, in each case solely in their role or capacity for the foregoing parties.

"Secured Term Loan B Credit Agreement" means the Amended and Restated Credit Agreement, dated as of August 24, 2010 (as amended, novated, supplemented, extended, or restated from time to time) by and among the Bank of America, N.A., as administrative agent, Toys Delaware, as borrower, certain of the borrowers' domestic subsidiaries, as guarantors, and the lender parties thereto.

"Settlement Agreement" has the meaning ascribed to it in the Preamble.

"Settlement Approval Motion" has the meaning ascribed to it in Section 3.6(a)1.

"Settlement Effective Date" has the meaning ascribed to it in Section 4.1.

"Settlement Order" means an order of the Bankruptcy Court approving this Settlement Agreement and the compromise and settlement memorialized herein among the Parties pursuant to Rule 9019(a) of the Bankruptcy Rules, which Settlement Order shall be consistent with this Settlement Agreement in all respects and otherwise in form and substance reasonably acceptable to the Asia JV, the Creditors' Committee and its members, the members of the Ad Hoc Group of B-4 Lenders, and the members of the Taj Holders Steering Group, and will be binding on the Parties.

"Settlement Order Effective Date" means the date on which the Settlement Order becomes final and non-appealable.

"Sponsors" means, collectively, (a) Bain Capital Private Equity, LP, (b) Kohlberg Kravis Roberts & Co. L.P., (c) Vornado Realty Trust, and (d) funds and entities advised by each such entity, and each such entity's current and former affiliates, who own or owned any equity in the Debtors.

"Source Code" means: in a format and medium reasonably acceptable to the Asia JV and Toys Delaware, (a) code for application customization of the Asia Business Enterprise Resource Planning systems; (b) code for the Asia business data warehouse systems; (c) point of sale application code for the Asia business; and (d) the source code relating to the applications listed on Exhibit 1 hereto;

"Subsidiary License Agreements" has the meaning ascribed to it in Section 3.3(a)(1).

"Subsidy Agreement" has the meaning ascribed to it in the recitals.

"Taj Debtors" has the meaning ascribed to it in the Preamble.

"Taj Holders Steering Group" has the meaning ascribed to it in the Preamble.

"Taj Senior Notes Guaranty" has the meaning ascribed to it in the Plan.

"Taj Senior Notes Guaranty Claims" has the meaning ascribed to it in the Plan.

"Taj Settlement Consideration" means the $1.25 million payment contemplated herein to the holders of Taj Senior Notes to be contributed to TRU, Inc. in settlement of, among other

things, the Creditors' Committee's objection to the Plan and any professional fee claims Moelis & Company could assert against the Taj Debtors or their estates.

"Term B Lenders" means the lenders holding the Term B-2 Loans, Term B-3 Loans, and/or Term B-4 Loans.

"Term B-2 Loans" means the B-2 term loans maturing on May 25, 2018 provided for by the Secured Term Loan B Credit Agreement.

"Term B-3 Loans" means the B-3 term loans maturing on May 25, 2018 provided for by the Secured Term Loan B Credit Agreement.

"Term B-4 Loans" means B-4 term loans maturing on April 24, 2020 provided for by the Secured Term Loan B Credit Agreement.

"Toys Delaware" has the meaning ascribed to it in the Preamble.

"Toys Delaware Confirmation Order" means the *Order Confirming the Fourth Amended Chapter 11 Plans of Toys Delaware Debtors and Geoffrey Debtors* [Docket No. 5746].

"Toys Delaware Debtors" has the meaning ascribed to it in the Preamble and in the *Fourth Amended Chapter 11 Plans of Toys Delaware Debtors and Geoffrey Debtors* [Docket No. 5602].

"TRU Inc." has the meaning ascribed to it in the Preamble.

"TRU Inc. Debtors" has the meaning ascribed to it in the Preamble.

"TRU Inc. Unsecured Notes Trustees" means the 7.375% Senior Notes Indenture Trustee and the 8.75% Unsecured Notes Indenture Trustee, collectively (each as defined in the Plan).

"TRU Inc. Unsecured Notes Trustee Fees" means the compensation, fees, expenses, disbursements, and indemnification claims of each of the TRU Inc. Unsecured Notes Trustees incurred after the Petition Date, including, without limitation, any fees, expenses, and disbursements of attorneys, advisors, or agents retained or utilized by any of the TRU Inc. Unsecured Notes Trustees.

"TRU China" has the meaning ascribed to it in the Preamble.

"TRU Non-Debtor Subsidiaries" has the meaning ascribed to it in the Preamble.

"TRU Vermont" has the meaning ascribed to it in the Preamble.

"TSAs" refers to any existing transition services agreements to which Toys Delaware  or its successor is a party.

"Vendor Settlement Agreement" means that certain settlement agreement by and among the Toys Delaware Debtors and the Geoffrey Debtors and certain holders of Claims and

Interests, including the Creditors' Committee and certain of its members, the Ad Hoc Vendor Group and its members, the Sponsors, and the Ad Hoc Group of Term B-4 Lenders and its members, dated as of July 17, 2018.

"Vendors" refers to Tata Consultancy Services and/or HCL Technologies.

2.2 Interpretation. For the purposes of this Settlement Agreement:

(a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender;

(b) capitalized terms defined only in the plural or singular form shall nonetheless have their defined meanings when used in the opposite form;

(c) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions;

(d) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit shall mean such document, schedule, or exhibit, as it may have been or may be amended, restated, supplemented, or otherwise modified from time to time; provided that any capitalized terms herein which are defined with reference to another agreement, are defined with reference to such other agreement as of the date of this Settlement Agreement, without giving effect to any termination of such other agreement or amendments to such capitalized terms in any such other agreement following the date hereof;

(e) unless otherwise specified, all references herein to "Sections" are references to Sections of this Settlement Agreement;

(f) the words "herein," "hereof," and "hereto" refer to this Settlement Agreement in its entirety rather than to any particular portion of this Settlement Agreement;

(g) captions and headings to Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation or construction of this Settlement Agreement;

(h) references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable laws and in proper context; and

(i) the use of "include" or "including" is without limitation, whether stated or not.

**Section 3.**    **Settlement Terms**

3.1    <u>Treatment of Certain Claims</u>

    (a)    *Intercompany Releases.*  Except as specifically set forth herein and other than the obligations set forth herein and the agreements entered into in accordance herewith, for good and valuable consideration, on and after the Settlement Order Effective Date, each Debtor and its estate and the TRU Non-Debtor Subsidiaries hereby releases all Claims and Causes of Action, if any, whether known or unknown, whether direct or derivative, against each of the other Debtors and their estates, including, but not limited to, with respect to intellectual property claims of GSO or TRU China as against Toys Delaware, the Source Code and the related litigation, and the asserted intercompany receivable owed by Toys "R" Us GmbH; *provided*, *however*, that to the extent distributions are made to unsecured creditors of TRU Inc. under the Plan (other than on account of the Non-Released Claims Trust, which is addressed in Section 3.1(f) below), 25 percent of the first $6 million of such distributions shall be paid to Toys Delaware.

    (b)    *Additional Releases.*  Except as specifically set forth herein and other than the obligations set forth herein and the agreements entered into in accordance herewith, for good and valuable consideration, on and after the Settlement Order Effective Date:  (i) each of the Taj Debtors and the Asia JV (on behalf of itself and each of the Asia JV's subsidiaries) hereby releases all Claims and Causes of Action, if any, whether known or unknown, against each of the Geoffrey Debtors, the Toys Delaware Debtors, and the TRU Inc. Debtors., and each of the foregoing parties' respective officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, investment bankers, consultants, representatives and other professionals solely in their role or capacity for the foregoing parties; and (ii) each of the Geoffrey Debtors, the Toys Delaware Debtors, the TRU Inc. Debtors and their respective estates, hereby releases all claims and Causes of Action, if any, whether known or unknown, whether direct or derivative, against the Taj Debtors, Asia JV (and its direct shareholders), its direct and indirect subsidiaries, and each of the foregoing parties' respective officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, investment bankers, consultants, representatives and other professionals solely in their role or capacity for the foregoing parties. The Plan shall be amended to remove the release carve-outs relating to the Toys Delaware Debtors and Geoffrey Debtors, and both the order confirming the Plan and the order approving the Settlement Agreement shall provide that the releases in the Plan and in this Settlement Agreement shall be binding on each of the debtors and on all parties in interest in their respective cases.

    (c)    *Taj Senior Note Guaranty Claim Waiver.*  Holders of Taj Senior Notes shall waive all rights to receive any recovery from the TRU Inc. Debtors on account of any Taj Senior Notes Guaranty Claims and the Plan shall be amended to so reflect.

(d)         *GSO/TRU China Resolution*.  Each of the Debtors, the Asia JV (on behalf of itself and its subsidiaries) and the TRU Non-Debtor Subsidiaries hereby releases any and all claims, debts or causes of action against GSO or TRU China, including as to ownership of intellectual property.  All equity interests in GSO and TRU China (and thereby the beneficial interest in all assets of GSO or TRU China, including any intellectual property rights), will be transferred to Toys Delaware or Geoffrey, LLC (or their designated successors), as determined by the Ad Hoc Group of B-4 Lenders, free and clear of any such intercompany claims, debts or causes of action, and Toys Delaware or Geoffrey LLC (or their successors) shall assume ownership of GSO and TRU China subject only to their liabilities and contracts with respect to their employees.

(e)         *Treatment of Certain Administrative Claims*.  The Administrative Claims timely asserted by LEGO Systems, Inc. ("LEGO") and Mattel, Inc. ("Mattel") against TRU Inc. will be recharacterized as General Unsecured Claims against TRU Inc. and Allowed pursuant to separate stipulation to be agreed by the Debtors, LEGO, and Mattel.

(f)         *Non-Released Claims Allocable to TRU Inc*. In accordance with Section 3.2(k) of the Vendor Settlement Agreement, any proceeds of any Non-Released Claims and/or D&O Claims held by or allocable to TRU Inc. shall be allocated between creditors of TRU Inc. (other than Toys Delaware) and the beneficiaries of the Non-Released Claims Trust (which are creditors of Toys Delaware).  Such allocation shall be determined by further agreement to be approved by the Court or by further order of the Court.   For the avoidance of doubt, the Plan does not determine the allocation of any such proceeds on account on Non-Released Claims and/or D&O Claims held by or allocable to TRU Inc.  For the further avoidance of doubt, the claims of Toys Delaware against TRU Inc. for any proceeds of Non-Released Claims are not released hereunder or under the Plan and are instead preserved for the benefit of and transferred to the Non-Released Claims Trust and its beneficiaries pending resolution of any Non-Released Claims and/or D&O Claims held by or allocable to TRU Inc.  For the avoidance of doubt, (i) the Released Taj Claims shall not constitute Non-Released Claims or D&O Claims being transferred to the Non-Released Claims Trust, and (ii) all other Claims and Causes of Action held by the TRU Inc. Debtors and the Toys Delaware Debtors against any D&O Party and all other Avoidance Actions held by the TRU Inc. Debtors and the Toys Delaware Debtors, including those previously preserved in the Vendor Settlement Agreement shall remain preserved, and shall be transferred to the Non-Released Claims Trust under the Plan.

(g)         *Avoidance Actions*.  The Plan shall be modified so that any Avoidance Actions belonging to TRU Inc. or its estates or creditors that are not expressly released by the Vendor Settlement Agreement or herein shall be preserved and transferred to the Non-Released Claims Trust and not released under the Plan. For the avoidance of doubt and notwithstanding anything herein to the contrary, the only Avoidance Actions held by TRU, Inc. and its estates being released under this Agreement are Avoidance Actions held by TRU, Inc. against the Taj Debtors,

the Taj Debtors' D&O Parties, and Taj Noteholders or any other Released Taj Claims in exchange for the Taj Settlement Consideration.

(h)        *Geoffrey Claims.*  In consideration for the compromises and resolutions set forth herein, the Geoffrey Debtors agree not to pursue their Claims and Causes of Action against the D&O Parties preserved in the Vendor Settlement Agreement. For the avoidance of doubt and notwithstanding anything herein to the contrary, no claims against any D&O Party held by TRU Inc. or the Toys Delaware Debtors are being released under this Agreement or under the Plan, and all such claims shall be preserved and transferred to the Non-Released Claims Trust pursuant to the Plan and Vendor Settlement Agreement.

3.2        <u>Other Settlement Terms</u>

(a)        *Cash Consideration to Geoffrey*. In consideration of the compromises and resolutions set forth herein, including the release of Claims and Causes of Action of the Geoffrey Debtors against the Asia JV, the Asia JV (or its subsidiaries) shall pay:  (1) $3,720,808 to Geoffrey, LLC (or its designated successor) on the Plan Effective Date, and (2) $6,000,000 to Geoffrey, LLC (or its designated successor) no later than, as applicable (i) April 30, 2019, so long as Toys Delaware or its applicable successor has completed performance with respect to the SOW and is then in compliance with the Transition Services Agreement in all material respects or (ii) if not paid in accordance with clause (i), promptly following the completion of performance with respect to the SOW and/or the cure or remedy of any applicable material breach of the Transition Services Agreement.

(b)        *Relinquishment of Asia JV Rights to Geoffrey-JV Accrued Amount*. On the Settlement Order Effective Date, Geoffrey, LLC or its successor shall retain and take title to, and the Asia JV shall waive and relinquish all rights to, the entirety of the Geoffrey-JV Accrued Amount of $26,279,192 which is all amounts owing under the Subsidy Agreement through November 30, 2018.

(c)        *Allocation-related Payment to Toys Delaware*.  On the Plan Effective Date, the Taj Debtors shall pay to Toys Delaware, in settlement of certain fee allocation issues and disputes among the Debtors, $3 million in respect of the fees and expenses charged, or to be charged, by Prime Clerk LLC in the Chapter 11 Cases.

(d)        *Oracle Data; Source Code*.  Toys Delaware shall make good faith efforts to start delivering to the Asia JV or its subsidiaries the Oracle Data and Source Code immediately after the Settlement Order Effective Date and in any case as promptly as commercially practicable if not delivered by the fifteenth (15th) day following the Settlement Order Effective Date.  Within five (5) days of the Asia JV's receipt of both the Source Code and Oracle Data, the Asia JV (or its subsidiaries) shall pay to Toys Delaware (a) $5 million, plus (b) all unpaid Invoiced Amounts under the ITASSA, which total $7,592,556.  In addition to the initial delivery of Source Code and the Oracle Data (i) Toys Delaware shall make

13

incremental deliveries of the Oracle Data as reasonably requested by the Asia JV from time to time and (ii) any changes to the Source Code in Toys Delaware's possession made by vendors between the initial delivery date and April 30, 2019 shall also be delivered to the Asia JV. In addition, Toys Delaware shall also provide to the Asia JV, upon request of the Asia JV from time to time, any system appreciation documents, run-books, scripts or other documents and information associated with the Source Code that are reasonably accessible to Toys Delaware. For the avoidance of doubt, the Asia JV shall have a perpetual, royalty free right and license to use and run the Source Code.

3.3    <u>Other Agreements</u>

(a)    *License Agreement*.

1.    On or before March 1, 2019, Geoffrey, LLC (or its successor) and the Asia JV, as well as subsidiaries of the Asia JV that are party to the Master License Agreement and/or the subsidiary license agreements entered into pursuant thereto (the "<u>Subsidiary License Agreements</u>"), shall enter into an amended and restated master license agreement (the "<u>New Master License Agreement</u>") and amended and restated subsidiary license agreements  (the "<u>New Subsidiary License Agreements</u>"), which shall include the following material terms:

A.    the term of the New Master License Agreement shall be fifteen (15) years from March 1, 2019 and thus shall end on March 1, 2034.  The Asia JV shall have the option, in its sole discretion, to extend the term of the New Master License Agreement in an unlimited number of 5-year increments past such 2034 termination date;

B.    the net royalty rate paid to Geoffrey, LLC (or its successor) under the New Master License Agreement (together with any related agreements, including the Subsidy Agreement) shall be 2%; further, pending any different arrangement mutually agreed by the parties under the New Master License Agreement, effective with respect to the period commencing December 1, 2018, the Asia JV shall pay to Geoffrey, LLC a flat 2.0% royalty and no amounts shall accrue or otherwise be payable under the Subsidy Agreement;

C.    Geoffrey, LLC (or its successor) shall receive a minimum of $17.5 million net annually under the New Master License Agreement (subject to equitable downward adjustment in the event that the Asia JV sells all or substantially all of its business in a given country and assigns the applicable New Subsidiary License Agreement in accordance with Section 3.3(a)(1)(E) below to a buyer that agrees to pay minimum royalties sufficient to preserve

an overall guaranteed minimum for Geoffrey, LLC or its successor of $17.5 million);

D.          the non-compete provision of the Master License Agreement shall be amended such that it shall not apply following expiration of the New Master License Agreement pursuant to its terms in 2034 or the date of expiration of any further extension thereof (as applicable);

E.          each New Subsidiary License Agreement shall be assignable upon a sale of any business or subsidiary of the Asia JV, or the sale of the Asia JV as a whole, and any sale of the equity of any subsidiary subject to a New Subsidiary License Agreement, or of all or substantially all assets of such subsidiary or of the Asia JV as a whole, shall be subject to the condition that the purchaser of such equity or assets assumes the rights and obligations under the applicable New Subsidiary License Agreement and/or New Master License Agreement;

F.          subject to Section 3.3(d), below, and such other provisions as the parties may mutually agree in good faith to amend, the remaining terms of the New Master License Agreement and the New Subsidiary License Agreements shall be materially consistent with the terms of the existing Master License Agreement and the Subsidiary License Agreements (as applicable).

The New Master License Agreement and New Subsidiary License Agreements shall be effective as of December 1, 2018. The extension of the term of the Master License Agreement and each of the Subsidiary License Agreements subject to a net 2.0% royalty rate until March 1, 2034 (as provided in clause A and B above) is immediately effective upon the effectiveness of this Agreement as against the Geoffrey Debtors and the Asia JV and its subsidiaries.  The provisions of clauses (B) through (E) above shall take effect automatically on March 1, 2019 if the parties have not then entered into the New Master License Agreement and New Subsidiary License Agreements.  Except as modified by Section 3.3(a)(1)(B) above, the terms and conditions of the Master License Agreement and each of the Subsidiary License Agreements shall otherwise remain in effect pending execution of the New Master License Agreement and New Subsidiary License Agreements.

Geoffrey, LLC hereby agrees not to assert that the transactions contemplated by the Plan and otherwise disclosed in connection therewith relating to direct or indirect ownership changes in the Asia JV (including among creditors of the Taj Debtors and Fung Retailing Limited) constitute a change of control or otherwise give rise to a termination right under the Master License Agreement or any Subsidiary License Agreement.

(b)         *Transition Services Agreement.*  Notwithstanding anything to the contrary in the Toys Delaware Confirmation Order, on or prior to the Plan Effective Date, Toys Delaware and the Asia JV shall enter into a transition services agreement (the "Transition Services Agreement") containing the following material terms:

1.         Toys Delaware (or its successor) shall continue to provide all information technology services that it provides to the Asia JV (or its subsidiaries) as of the date hereof, and will retain such staffing as is necessary in order to do so, provided Toys Delaware (and its successor) shall not be accountable for the actions/failures of third party vendors.

2.         Toys Delaware (or its successor) will covenant to use reasonable best efforts to use existing resources and make them available as and when needed to complete the Statement of Work (under the column heading "SSC Services Required") attached hereto as Exhibit 2 (the "SOW") and assist the Asia JV and its subsidiaries in migrating off Toys Delaware services prior to April 30, 2019.  The costs with respect to the SOW will be borne by Toys Delaware (or its successor).  In the event of future material work requests by the Asia JV not covered by the SOW, the parties will negotiate in good faith with respect to scope, timing, cost, and allocation of responsibility and the Asia JV will be responsible for paying/reimbursing all incremental costs (including of third party vendors and/or incremental Toys Delaware staffing) associated therewith.

3.         Toys Delaware shall appoint a project manager from existing staff to oversee the transition and work relating to the SOW and coordinate with a project manager appointed by the Asia JV.

4.         Toys Delaware (or its successor) will covenant that its existing resources shall, to the extent necessary to meet the obligations to and requests of the Asia JV under the Transition Services Agreement, spend an amount of time providing services to the Asia JV (including with respect to the SOW and related tasks) generally commensurate with the Asia JV's payments under the Transition Services Agreement as compared to the payments under the other transition services agreements to which Toys Delaware (or its successor) is party.

5.         Toys Delaware (or its successor) will give the Asia JV and any contractors it may hire reasonable access to its shared service center and its employees.

6.         The Asia JV (or its subsidiaries) shall pay a $1.5 million monthly fee under the Transition Services Agreement beginning as of December 1, 2018.

7.         The Transition Services Agreement shall terminate on April 30, 2019 absent mutual agreement on an extension.  For the avoidance of

16

doubt, Toys Delaware (and its successor) has no obligation to ensure that the transition or migration of the Asia JV or its subsidiaries from Toys Delaware's (or its succesor's) systems or services be completed by any specific date, or at all.

(c)      *Private Label*.  The Asia JV and Geoffrey, LLC (or its successor) shall work cooperatively and in good faith to document and clarify their future relationship with respect to private label goods, based on the following principles, which shall be operative provisions of this Settlement Agreement, pending execution of the subsequent documentation just referenced: (i) the Asia JV may source private label goods and continue to use Authorized Marks independent of Geoffrey, LLC, subject to existing brand standards, style guides, compliance audits and related provisions in the existing Master License Agreement and international product safety standards; (ii) Geoffrey, LLC, in consultation with the Asia JV, shall implement a streamlined and standardized process to approve existing and new SKUs; the Asia JV will not be required to remove products from shelves (other than to the extent such products violate applicable law) or to cease sourcing existing SKUs pending implementation of the streamlined and standardized approval process; and Geoffrey will not unreasonably withhold or delay approval of any SKUs; (iii) the Asia JV has no rights to use existing or future product molds or product designs owned by Geoffrey, LLC (and without limitation or waiver of the foregoing, Geoffrey, LLC shall use commercially reasonable efforts to compile a comprehensive schedule of such existing molds and designs to be agreed upon by the Asia JV); and (iv) the Asia JV and Geoffrey each has the right, but not the obligation, to buy private label goods sourced by the other at mutually agreeable pricing.

(d)      *Information Rights*.

1.      Upon entry of the Settlement Order Effective Date, on a one time basis, to the extent already existing or created in the ordinary course of business, and subject to a reasonable confidentiality agreement pursuant to which Licensor will be liable for any breach thereof by its financing sources and/or representatives, the Asia JV shall provide the following financial information to Geoffrey, LLC (or its successor TRU Kids, Inc.): (a) the Asia JV's most recent 5-year financial plan, including store-count number, projections by country and the principal assumptions underlying such plan; (b) three years of historical financial statements, including current cash positions and debt levels; and (c) an organizational chart showing the new ownership structure for the Asia businesses and holding companies.

2.      The New Master License Agreement referenced in Section 3.3(a)(2) above shall require, to the extent permitted by law, the Asia JV to provide Geoffrey, LLC or its applicable successor ("Licensor") with the following, subject to a reasonable confidentiality agreement pursuant to which Licensor will be liable for any breach thereof by its financing

17

sources and/or representatives:  (a) three-year (or any longer period that the Asia JV prepares in its discretion) rolling financial projections and store-count number projections on an annual basis in form and substance consistent with the Asia JV's internal use; (b) unaudited quarterly and audited annual financial statement reporting in form and substance consistent with that contemplated by the form of Second Amended and Restated Shareholders Agreement of the Asia JV filed in connection with the Plan; (c) monthly revenues by territory; (d) such other readily available financial information regarding the business of the Asia JV as Licensor may reasonably request in connection with its financing activities, provided such requests shall not interfere with the ordinary course conduct of the business of the Asia JV; and (e) semi-annual calls with the chief financial officer and/or chief executive officer of the Asia JV to discuss the business of the Asia JV.  For the avoidance of doubt, (x) the information rights in subparagraphs (a)-(e) shall fall away if the New Master License Agreement is assigned by Licensor to, or Licensor's equity is acquired directly or indirectly by, a retailer (whether brick-and-mortar and/or e-commerce/online) that operates in any of the territories in which the Asia JV or any of its subsidiaries then operate or may operate under the New Master License Agreement and that competes with the Asia JV or any of its subsidiaries in the sale of toys or baby products (a "Competitor") and (y) under no circumstance shall Licensor provide any information received pursuant to subparagraphs (a)-(e) of this paragraph to (i) any Competitor or (ii) any entity that is not a Competitor unless that entity (A) executes a confidentiality agreement reasonably acceptable to the Asia JV and (B) reasonably needs such information in connection with the financing activities of Licensor and/or in connection with an investment in or acquisition of Licensor.  For the further avoidance of doubt, product brand licensing companies that do not own multiple brands that sell substantial lines of toys and baby products in any of the territories (e.g., Iconix Brand Group, Sequential Brand, Global Brand Groups, Authentic Brands) will be deemed not to be Competitors.

(e)    *Asia JV Subsidiaries*.  To the extent any direct or indirect subsidiary of the Asia JV is expressly required hereunder to be a party to any of the agreements or undertakings contemplated hereunder (including by executing a New Subsidiary License Agreement pursuant to Section 3.3(a)(1)), the Asia JV shall use best efforts to cause such subsidiary to execute such agreement on the terms set forth herein.

(f)    *France.*  Geoffrey, LLC shall enter into a license agreement with Jellej Jouets based on the terms attached hereto as Exhibit 3, with such terms becoming applicable as of January 15, 2019.  Prior to January 15, 2019, the License Agreement dated February 1, 2009, as amended December 21, 2010, shall remain in effect in France.

3.4    Allocation of Funds.

(a)         *Allocation of Cash held at MAP 2005.*   The TRU Inc. Debtors shall
allocate the cash held at MAP 2005 as follows:  (a) $1.25 million to the Taj
Debtors in settlement of certain intercompany fee allocation disputes; *provided*,
*however*, that such amounts shall be contributed to a fund for creditors of TRU
Inc. (to be distributed in accordance with the Plan and this Agreement) as the Taj
Settlement Consideration; (b) $1.25 million to Toys Delaware (for the benefit of
the Term B Lenders) in settlement of certain intercompany fee allocation
disputes; (c) Munger, Tolles & Olson LLP's documented fees and expenses in an
amount that shall not exceed $750,000; (d) Ronald Page, PLC's documented fees
and expenses in an amount that shall not exceed $100,000; (e) Ducera
Partners LLC's documented fees and expenses in an amount that shall not exceed
$1.833 million; (f) except as previously approved in the Toys Delaware
Confirmation Order, or as otherwise agreed to by Moelis and the Term B Lenders,
$1.75 million to Moelis & Company, which shall fully and finally resolve any and
all claims of Moelis & Company against any and all of the Debtors; (g) the
Creditors' Committee professionals' (other than Moelis & Company) documented
fees and expenses allocated to TRU Inc. in an amount that shall not exceed $1.6
million; and (h) the TRU Inc. Unsecured Notes Trustee Fees in an amount that
shall not exceed $950,000.   For the avoidance of doubt, the Plan and
Confirmation Order shall provide that any payments made pursuant to this
Section 3.4(a) shall not be subject to any contest, attack, rejection, recovery, claw-
back, recoupment, reduction, defense, counterclaim, offset, subordination,
recharacterization, avoidance or other claim, cause of action or other challenge of
any nature under the Bankruptcy Code or applicable non-bankruptcy law.  The
remaining balance of MAP 2005's cash shall be distributed in accordance with the
Priority Waterfall in the Plan and, if cash is available for unsecured creditors, the
allocation agreement reflected in Section 3.1(a) hereof. Following the distribution
of the specific amounts set forth above, TRU Inc. shall reserve all remaining
funds pending resolution of any Administrative Claims, including any accrued or
projected tax Administrative Claims, and shall not make any further distributions
pending resolution or satisfaction of such claims.

(b)         *Allocation of TRU Vermont Wind-Down*.  TRU Inc. shall use reasonable
best efforts to promptly effectuate the wind-down of  TRU (Vermont), Inc.
Following the wind-down of TRU (Vermont), Inc., any cash or other proceeds of
TRU (Vermont)  Inc. shall be distributed to TRU Inc. and shall be distributed by
TRU Inc. in accordance with the Priority Waterfall in the Plan and, if cash is
available for unsecured creditors, the allocation agreement reflected in Section
3.1(a) hereof.  Such cash or other proceeds of TRU (Vermont), Inc. shall be
included in the above-referenced reserve for Administrative Claims and shall not
be distributed pending resolution or satisfaction of such claims.

(c)         *Allocation of Certain Administrative Claims*.   TRU Inc. shall be
responsible for paying no less than two-thirds of Administrative Claims for state
or federal taxes, if any, for which TRU Inc. and any other Debtor or Debtors are
jointly and severally liable.  If any other Debtor makes a payment on account of
any tax Administrative Claim for which TRU Inc. is jointly and severally liable

19

without TRU Inc. paying two-thirds of the amount thereof, such Debtor shall have an Allowed tax Administrative Claim against TRU Inc. for an amount equal to the difference between the portion paid by TRU Inc. and two-thirds of such claim. The foregoing is without prejudice to the claims of any taxing authority (or the joint and several nature thereof) and the rights of the Parties with respect to the liability for, amount or priority of any such claims.

(d)     *Allocation of Remaining TRU Inc. Assets*.  Any other assets, including cash at any of TRU Inc., of the TRU Inc. Debtors (other than any recoveries by the Non-Released Claims Trust) shall be distributed in accordance with the Priority Waterfall in the Plan, subject to the terms hereof, including the establishment of a reserve for administrative claims.

3.5     <u>Professional Fees</u>.

(a)     In consideration of the compromises and resolutions set forth herein, including the payments made hereunder, no Party hereto shall challenge or object to the allocation of Professional fees between or among the Debtors' estates as determined by the Debtors and/or the applicable Professionals as of the date hereof as set forth in Exhibit 4; *provided*, for the avoidance of doubt, that Toys Delaware shall not object to any reallocations made, or agreed to, by Kirkland & Ellis LLP and Kramer Levin Naftalis & Frankel LLP prior to the date hereof and shall permit any setoffs between the Taj Debtors and Toys Delaware if necessary to effectuate such reallocation. The Debtors' and Creditors' Committee's Professionals shall, as required by the Interim Compensation Order, continue to allocate their fees and expenses to the applicable Debtors going forward, including to TRU Inc., and all Parties' rights to object to the allowance or allocation of any and all such fees and expenses are reserved. This Settlement Agreement resolves all outstanding disputes between or among any of the Debtors regarding allocation of professional fees and expenses.

3.6     <u>Commitments Regarding Implementation of the Settlement Agreement</u>.

(a)     The Debtors shall use good faith efforts to implement this Settlement Agreement and the disposition of the Debtors' chapter 11 cases on the agreed terms set forth herein, including:

1.     filing a motion consistent with this Settlement Agreement and otherwise in a form reasonably acceptable to the Parties (the "<u>Settlement Approval Motion</u>") with the Bankruptcy Court seeking (i) approval of this Settlement Agreement pursuant to Rule 9019(a) of the Bankruptcy Rules and (ii) waiver of any stay of the Settlement Order pursuant to Rule 6004(h) of the Bankruptcy Rules;

2.     amending the Plan, as applicable, to incorporate the terms of this Settlement Agreement;

20

3.　　　　cooperating with the Taj Holders Steering Group to resolve outstanding issues relating to the liquidation of the Debtors' U.K. business and issues relating to liquidating TRU (UK) Noteholder Limited; and

4.　　　　not taking any action inconsistent with this Settlement Agreement, including entry into any agreement to pursue any auction, sale process, or restructuring transaction for the Debtors inconsistent with this Settlement Agreement.

(b)　　　　Provided that the Debtors are not in breach of this Settlement Agreement, the non-Debtor Parties shall (severally and not jointly):

1.　　　　use good faith efforts to implement this Settlement Agreement and the transactions and other actions contemplated hereby;

2.　　　　withdraw any objection to the Plan;

3.　　　　not (i) further object to, delay, interfere, impede, or take any other action to delay, interfere, or impede, directly or indirectly, with the confirmation of the Plan or (ii) propose, file, support, or vote for, directly or indirectly, any restructuring, workout, plan of arrangement, alternative transaction, including a sale pursuant to section 363 of the Bankruptcy Code, or chapter 11 plan for the Debtors other than the Plan;

4.　　　　not, nor encourage any other person or entity to, take any action, including (i) initiating or joining in any legal proceeding that is inconsistent with this Settlement Agreement and the allocation and distribution of assets and value set forth in this Settlement Agreement or (ii) delaying, impeding, appealing, or taking any other action, directly or indirectly, that could reasonably be expected to interfere with the approval, acceptance, confirmation, consummation, or implementation of the Plan or the Settlement Agreement, as applicable; and

(c)　　　　The Debtors and the Taj Holders Steering Group agree that the Creditors' Committee's Challenge Period under the Final DIP Financing Order shall be extended through the earlier of (i) 30 days after the termination of this Settlement Agreement, or (ii) the Plan Effective Date; *provided, that*, following entry of the Settlement Order the Creditors' Committee agrees not to file a motion seeking standing to pursue a Challenge, unless the Taj Holders Steering Group is in breach of the Settlement Order; *provided further, that*, if prior to the termination of the Challenge Period the Taj Holders Steering Group breaches the Settlement Order and the Creditors' Committee files a motion seeking standing to pursue a Challenge, then the Challenge Period for the Creditors' Committee shall be extended until the date that is two (2) business days after the Bankruptcy Court rules on such request.

(d)　　　　The Parties shall cooperate with each other in good faith and shall coordinate their activities (to the extent possible and subject to the terms of this

Settlement Agreement) in respect of (a) the implementation of the terms set forth in this Settlement Agreement, and (b) the consummation of the transactions contemplated by this Settlement Agreement and the allocation and distribution of assets and value contemplated by this Settlement Agreement.

(e)         In no event shall any Party file, permit an affiliate or any other related third party to file, or encourage any affiliate or any third party to file, an opposition to the Plan, the Settlement Approval Motion or the Settlement Agreement.

## Section 4.    Miscellaneous Provisions

4.1         <u>Settlement Agreement Effective Date.</u>

This Settlement Agreement shall become effective and binding on the Parties at 12:01 a.m., prevailing Eastern Time, on the date (the "<u>Settlement Effective Date</u>") on which all of the Parties have executed and delivered to the other Parties pursuant to Section 4.11 hereof counterpart signature pages of this Settlement Agreement; *provided*, *however*, that no provisions of this Settlement Agreement shall be effective as to the Debtors or the Creditors' Committee until the Settlement Order Effective Date.

4.2         <u>Non-Debtor Parties Representations and Warranties.</u>

To induce each other Party to enter into and perform its obligations under this Settlement Agreement, each non-Debtor Party, severally but not jointly, represents, warrants and acknowledges, as of the Settlement Effective Date, as follows:

(a)         *Authority*.  (A) It is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization and has all the requisite corporate, partnership, limited liability company, or other power and authority to execute and deliver this Settlement Agreement and the other documents and instruments contemplated hereby to which it is contemplated to be a party and perform its obligations under this Settlement Agreement and the other documents and instruments contemplated hereby to which it is contemplated to be a party, and to consummate the transactions contemplated herein and therein, and (B) the execution, delivery and performance by it under this Settlement Agreement and the other documents and instruments contemplated hereby to which it is contemplated to be a party and the consummation of the transactions contemplated herein and therein, have been duly authorized by all necessary action on its part, and no other actions or proceedings on its part are necessary to authorize and approve this Settlement Agreement or the other documents or instruments contemplated hereby to which it is contemplated to be a party or any of the transactions contemplated herein or therein.

(b)         *Ownership*.  Other than with respect to the Creditors' Committee, it is the legal owner, beneficial owner, and/or the investment advisor or manager for such legal or beneficial owner or discretionary account of such legal or beneficial owner of a Claim against and/or Equity Interest in the Debtors, as applicable.

(c)        *Validity*.    This Settlement Agreement has been duly executed and delivered by it and constitutes its legal, valid, and binding agreement, enforceable against it in accordance with its terms.

(d)        *No Conflict*.    Its execution, delivery, and performance (when such performance is due) of this Settlement Agreement does not and shall not (A) subject to the actions, consents, and filings referred to in Section 4.2(e) below, violate any provision of law, rule, or regulation applicable to it or any of its subsidiaries or its or their subsidiaries' certificates of incorporation or bylaws or other organizational documents, or (B) conflict with, result in a breach of, or constitute a default under any material contractual obligations to which it or any of its subsidiaries is a party.

(e)        *Authorization of Governmental Authorities*.    No action by (including any authorization, consent, or approval), in respect of, or filing with, any governmental authority or regulatory body, except such filing as may be necessary and/or required for disclosure by the Securities and Exchange Commission or pursuant to state securities or "blue sky" laws, is required for, or in connection with, the valid and lawful authorization, execution, delivery, and performance by it of this Settlement Agreement.

(f)        *No Reliance*.    It (A) is a sophisticated party with respect to the matters that are the subject of this Settlement Agreement, (B) has had the opportunity to be represented and advised by legal counsel in connection with this Settlement Agreement, (C) has adequate information concerning the matters that are the subject of this Settlement Agreement, and (D) has independently and without reliance upon any other Party hereto, or any of their affiliates, or any officer, employee, agent, or representative thereof, and based on such information as it has deemed appropriate, made its own analysis and decision to enter into this Settlement Agreement, except that it has relied upon each other Party's express representations, warranties, and covenants in this Settlement Agreement, which it enters, or as to which it acknowledges and agrees, voluntarily and of its own choice and not under coercion or duress.

4.3        Debtor Representations and Warranties.

To induce each other Party to enter into and perform its obligations under this Settlement Agreement, each Debtor hereby represents, warrants, and acknowledges, as of the Settlement Effective Date, as follows:

(a)        *Authority*.    Except as expressly provided in this Settlement Agreement and subject to the Bankruptcy Code, Bankruptcy Court approval, and/or regulatory approvals associated with the Settlement Agreement, Plan, or a structured dismissal, as applicable, (A) each of the Debtors is duly organized, validly existing, and in good standing under the laws of the jurisdiction of its organization and has all the requisite corporate, partnership, limited liability company, or other power and authority to execute and deliver this Settlement Agreement and the

other documents and instruments contemplated hereby to which the Debtors are contemplated to be parties and perform their obligations under this Settlement Agreement and the other documents and instruments contemplated hereby to which they are contemplated to be parties, and to consummate the transactions contemplated herein and therein, and to consummate the transactions contemplated herein and therein, and (B) the execution, delivery, and performance by such Debtors under this Settlement Agreement and the other documents and instruments contemplated hereby to which each such Debtor is contemplated to be a party and the consummation of the transactions contemplated herein and therein, have been duly authorized by all necessary action on the part of such Debtor, and no other actions or proceedings on the part of such Debtor are necessary to authorize and approve this Settlement Agreement or the other documents or instruments contemplated hereby to which such Debtor is contemplated to be a party or any of the transactions contemplated herein or therein.

(b)        *Validity*.  Except as expressly provided in this Settlement Agreement and subject to the Bankruptcy Code, Bankruptcy Court approval, and/or regulatory approvals associated with the Plan or a structured dismissal, as applicable, this Settlement Agreement has been duly executed and delivered by the Debtors and constitutes the legal, valid, and binding agreement of the Debtors, enforceable against the Debtors in accordance with its terms.

(c)        *No Conflict*.  Subject to the Bankruptcy Code, Bankruptcy Court approval and/or regulatory approvals associated with this Settlement Agreement, the Plan, the execution, delivery, and performance by the Debtors (when such performance is due) of this Settlement Agreement does not and shall not (A) subject to the actions, consents, and filings referred to in Section 4.3(d) below, violate any provision of law, rule, or regulation applicable to the Debtors or any of their subsidiaries or the Debtors' or their subsidiaries' certificates of incorporation or bylaws or other organizational documents, or (B) conflict with, result in a breach of, or constitute (with due notice or lapse of time or both) a default under any material contractual obligations to which it or any of its subsidiaries is a party.

(d)        *Authorization of Governmental Authorities*.  No action by (including any authorization, consent, or approval), in respect of, or filing with, any governmental authority or regulatory body, except such filing as may be necessary and/or required for disclosure by the Securities and Exchange Commission or pursuant to state securities or "blue sky" laws, and the approval of the Bankruptcy Court of the Debtors' authority to enter into and implement this Settlement Agreement, is required for, or in connection with, the valid and lawful authorization, execution, delivery and performance by the Debtors of this Settlement Agreement.

(e)        *No Reliance*.  Each of the Debtors (A) is a sophisticated party with respect to the matters that are the subject of this Settlement Agreement, (B) has had the opportunity to be represented and advised by legal counsel in connection with this

Settlement Agreement (including its disinterested directors' counsel, as applicable), (C) has adequate information concerning the matters that are the subject of this Settlement Agreement, and (D) has independently and without reliance upon any other Party hereto, or any of their affiliates, or any officer, employee, agent or representative thereof, and based on such information as such Debtor has deemed appropriate, made its own analysis and decision to enter into this Settlement Agreement, except that the Debtors have relied upon each other Party's express representations, warranties, and covenants in this Settlement Agreement, which each of the Debtors enters, or as to which each Debtor acknowledges and agrees, voluntarily and of its own choice and not under coercion or duress.

4.4      Termination.

This Settlement Agreement and the obligations of the Parties may be terminated by mutual written agreement of all the Parties, if the Bankruptcy Court (or any court of competent jurisdiction) does not approve this Settlement Agreement, or if the Settlement Order is reversed or materially modified on appeal.

4.5      Effect of Termination.

Upon termination of this Settlement Agreement in accordance with Section 4.4 hereof, all obligations of the Parties under this Settlement Agreement shall terminate and shall be of no further force and effect; *provided*, that any claim for prior breach of this Settlement Agreement shall survive termination and all rights and remedies with respect to such claim shall be neither waived nor prejudiced in any way by termination of this Settlement Agreement.

4.6      Acknowledgments.

**Notwithstanding any other provision herein, this Settlement Agreement is not and shall not be deemed to be an offer with respect to any securities or solicitation of votes for the acceptance of a plan for purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise.  Any such offer or solicitation will be made only in compliance with all applicable securities laws and provisions of the Bankruptcy Code.  The relevant Parties will not solicit acceptances of the Plan from the relevant Parties in any manner inconsistent with the Bankruptcy Code or applicable non-bankruptcy law.**

4.7      Cooperation and Support.

The Parties shall cooperate with each other in good faith and shall coordinate their activities (to the extent possible and subject to the terms of this Settlement Agreement) in respect of (a) the filing of the Settlement Approval Motion with the Bankruptcy Court, obtaining Bankruptcy Court approval of this Settlement Agreement, the entry of the Settlement Order, and the implementation of the terms set forth in this Settlement Agreement, and (b) the consummation of the transactions contemplated by this Settlement Agreement.

4.8      Governing Law; Jurisdiction.

(a)      This Settlement Agreement shall be construed and enforced in accordance with, and the rights of the Parties shall be governed by, the laws of the State of New York, without giving effect to the conflict of laws principles thereof. Each Party hereto agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Settlement Agreement in the Bankruptcy Court, and solely in connection with claims arising under this Settlement Agreement: (i) irrevocably submits to the exclusive jurisdiction and the constitutional authority of the Bankruptcy Court; (ii) waives any objection to laying venue in any such action or proceeding in the Bankruptcy Court; and (iii) waives any objection that the Bankruptcy Court is an inconvenient forum, does not have jurisdiction over any Party hereto, or lacks the constitutional authority to enter final orders in connection with such action or proceeding; *provided*, *however*, that this Settlement Agreement and the releases set forth herein may be submitted in any court, arbitration, and/or other legal proceeding to enforce the terms of such releases.

(b)      Each Party hereby waives, to the fullest extent permitted by applicable law, any right it may have to a trial by jury in any legal proceeding arising out of, or relating to, this Settlement Agreement or the transactions contemplated hereby (whether based on contract, tort, or any other theory). Each Party (i) certifies that no representative, agent, or attorney of any other Party has represented, expressly or otherwise, that such other Party would not, in the event of litigation, seek to enforce the foregoing waiver and (ii) acknowledges that it and the other Parties have been induced to enter into this Settlement Agreement by, among other things, the mutual waivers and certifications in this Section 4.8.

4.9      No Admission of Liability.

Each Party enters into this Settlement Agreement without admitting any liability or conceding any allegations not already expressly admitted. This Settlement Agreement and its provisions shall not be offered or received in evidence in any action or proceeding as an admission or concession of liability or wrongdoing of any nature on the part of any Party except that it may be offered and received in evidence solely to enforce this Settlement Agreement.

4.10      Third-Party Beneficiaries.

Except as otherwise explicitly set forth herein, nothing in this Settlement Agreement is intended to benefit or create any right or cause of action in or on behalf of any person other than the Parties hereto (and their affiliated persons and entities who are intended to be beneficiaries of the releases and settlements to the extent set forth herein); *provided, however*, that Fung Retailing Limited is a third-party beneficiary of this Settlement Agreement and is entitled to the rights and benefits provided for it hereunder and may enforce the provisions herein as if it were a party hereto.

4.11      Notices.

All notices hereunder shall be deemed given if in writing and delivered, if sent by electronic mail, courier, or registered or certified mail (return receipt requested) to the following addresses (or at such other addresses as shall be specified by like notice):

(a)        if to the Debtors, to:

Toys "R" Us, Inc.
One Geoffrey Way
Wayne, New Jersey  07470
Attention:  James Young, General Counsel
E-mail address:  James.Young@toysrus.com

with copies (which shall not constitute notice) to:

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York  10022
Attention:  Joshua Sussberg, P.C., Emily E. Geier
E-mail address:  jsussberg@kirkland.com, Emily.geier@kirkland.com

and

Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, IL  60654
Attention:  Chad J. Husnick, P.C.
E-mail address:  chusnick@kirkland.com

(b)        if to the Creditors' Committee, to:

Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, New York  10036
Attention:        Kenneth H. Eckstein, Rachael L. Ringer
E-mail address:  keckstein@kramerlevin.com; rringer@kramerlevin.com

(c)        if to the Ad Hoc Group of B-4 Lenders, to:

Wachtell, Lipton Rosen and Katz
51 West 52nd Street
New York, New York  10019
Attention:        Joshua A. Feltman
                Emil A. Kleinhaus
E-mail address:  jafeltman@wlrk.com; eakleinhaus@wlrk.com

    (d)            if to the Taj Holders Steering Group, to:

> Paul, Weiss, Rifkind, Wharton & Garrison LLP
> 1285 Avenue of the Americas
> New York, New York 10019
> Attention:  Brian S. Hermann, Samuel E. Lovett
> Email addresses: bhermann@paulweiss.com; slovett@paulweiss.com

    (e)            if to the Asia JV, to:

> Quinn Emanuel Urquhart & Sullivan
> 51 Madison Avenue, 22nd Floor
> New York, New York 10010
> Attention: James C. Tecce, Daniel Holzman
> E-mail address: jamestecce@quinnemanuel.com;
> danielholzman@quinnemanuel.com

or such other address as may have been furnished by a Party to each of the other Parties by notice given in accordance with the requirements set forth above.  Any notice given by delivery, mail, or courier shall be effective when received.

4.12        <u>Entire Agreement.</u>

This Settlement Agreement, including any exhibits, annexes, and/or schedules hereto and the exhibits, annexes, and/or schedules thereto, constitutes the entire agreement between the Parties concerning the subject matter of this Settlement Agreement and supersedes all prior negotiations, agreements, and understandings, whether written or oral, between and among the Parties concerning the subject matter of this Settlement Agreement.  Each of the Parties hereto acknowledges that it is executing this Settlement Agreement without reliance on any representations, warranties, or commitments other than those representations, warranties, and commitments expressly set forth in this Settlement Agreement.

4.13        <u>Modification or Amendment.</u>

This Settlement Agreement may be modified or amended only by written agreement executed by: (i) the Debtors, (ii) the undersigned members of the Ad Hoc Group of B-4 Lenders, (iii) the undersigned members of the Taj Holders Steering Group, (iv) the Creditors' Committee, and (vi) the Asia JV.

The Parties may extend or modify any dates in this Settlement Agreement via e-confirmation.

4.14        <u>Further Assurances.</u>

From and after the Settlement Effective Date, each of the Parties agrees to use their respective reasonable best efforts to execute or cause to be executed and deliver or cause to be delivered all such agreements, instruments and documents and take or cause to be taken all such

further actions as may reasonably be necessary from time to time to carry out the intent and purpose of this Settlement Agreement, and to consummate the transactions contemplated hereby and thereby.

4.15        Successors and Assigns.

Except as otherwise provided in this Settlement Agreement, this Settlement Agreement is intended to bind and inure to the benefit of each of the Parties and each of their respective successors, assigns, heirs, executors, administrators, and representatives.

4.16        Interpretation.

This Settlement Agreement is the product of negotiations among the Parties, and the enforcement or interpretation of this Settlement Agreement is to be interpreted in a neutral manner and in accordance with section 102 of the Bankruptcy Code; and any presumption with regard to interpretation for or against any Party by reason of that Party (or its counsel) having drafted or caused to be drafted this Settlement Agreement or any portion of this Settlement Agreement, shall not be effective in regard to the interpretation of this Settlement Agreement.

4.17        Settlement Discussions.

This Settlement Agreement and the transactions contemplated herein are part of a settlement among the Parties.  Nothing herein shall be deemed an admission of any kind.  To the extent provided by Federal Rule of Evidence 408, any applicable mediation privileges, and any applicable state rules of evidence, this Settlement Agreement and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce the terms of this Settlement Agreement.

4.18        Specific Performance.

It is understood and agreed by the Parties that money damages would be an insufficient remedy for any breach of this Settlement Agreement by any Party, that such breach would represent irreparable harm, and that each non-breaching Party shall be entitled to specific performance and injunctive relief (without the posting of any bond and without proof of actual damages) as a non-exclusive remedy for any such breach, including an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder; *provided*, that each Party agrees to waive any requirement for the securing or posting of a bond in connection with such remedy.

4.19        Execution of Agreement.

This Settlement Agreement may be executed in counterparts, and by the different Parties hereto on separate counterparts, each of which when executed and delivered shall constitute an original.  Delivery of an executed counterpart by facsimile or electronic mail shall be equally as effective as delivery of an original executed counterpart.

4.20         <u>Non-Severability of Agreement.</u>

This Settlement Agreement is to be construed as a whole, and all provisions of it are to be read and construed together.  Notwithstanding anything in this Settlement Agreement or the Settlement Order to the contrary, and in light of the integrated nature of the settlements and compromises embodied in this Settlement Agreement and the Settlement Order, in the event that (a) a court of competent jurisdiction enters a final order ruling that any of the provisions of this Settlement Agreement or the Settlement Order are void, invalid, illegal, or unenforceable in any material respect, or (b) any of the provisions of this Settlement Agreement or the Settlement Order are reversed, vacated, overturned, voided, or unwound in any material respect, then in each case, the entirety of this Settlement Agreement (other than this Section 4.20) shall be void ab initio and of no force and effect and, during any subsequent proceeding, the Parties shall not assert claim preclusion, issue preclusion, estoppel or any similar defense in respect of rights and claims of the Parties that were the subject of this Settlement Agreement prior to this Settlement Agreement being of no force or effect.

[Signature pages follow]