Edward O. Sassower, P.C.
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Emily E. Geier (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900

-and-

Michael A. Condyles (VA 27807)
Peter J. Barrett (VA 46179)
Jeremy S. Williams (VA 77469)
**KUTAK ROCK LLP**
901 East Byrd Street, Suite 1000
Richmond, Virginia 23219-4071
Telephone:      (804) 644-1700
Facsimile:      (804) 783-6192

James H.M. Sprayregen, P.C.
Anup Sathy, P.C.
Chad J. Husnick, P.C. (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200

*Co-Counsel to the Debtors and Debtors in Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

| | |
|---|---|
| In re: | ) )  Chapter 11 |
| TOYS "R" US, INC., *et al.*,[1] | )  Case No. 17-34665 (KLP) |
| Debtors. | )  (Jointly Administered) |

## ORDER (I) CONFIRMING THE THIRD AMENDED
## JOINT CHAPTER 11 PLAN OF THE TAJ DEBTORS AND THE
## TRU INC. DEBTORS AND (II) APPROVING THE CREDIT BID TRANSACTION

The Taj Debtors and TRU Inc. Debtors (collectively, the "Debtors"), having, as applicable:

a.      commenced, on September 18, 2017 (the "Petition Date"), these chapter 11 cases
(the "Chapter 11 Cases") by filing voluntary petitions in the United States
Bankruptcy Court for the Eastern District of Virginia (the "Bankruptcy Court") for

---

[1]      The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification
number, are set forth in the *Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting
Related Relief* [Docket No. 78].  The location of the Debtors' service address is One Geoffrey Way, Wayne,
New Jersey 07470.

relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code");[2]

b.      continued to operate their businesses and manage their properties as debtors in possession in accordance with sections 1107(a) and 1108 of the Bankruptcy Code;

c.      filed, on July 17, 2018, the *Debtors' Motion for Entry of an Order (I) Approving (A) the Settlement Agreement, (B) Opt-Out Procedures Applicable to the Settlement Agreement, and (C) a Substantial Contribution Claim Under Section 503(B)(3)(D) of the Bankruptcy Code and (II) Granting Related Relief* (the "July 2018 Settlement Motion") [Docket No. 3814];

d.      filed, on August 4 and August 5, 2018, the *Joint Chapter 11 Plan of the Taj Debtors and the TRU Inc. Debtors* [Docket No. 4015], the *Disclosure Statement for the Joint Chapter 11 Plan of the Taj Debtors and the TRU Inc. Debtors* [Docket No. 4018], and the *Debtors' Motion for Entry of an Order (I) Approving the Adequacy of the Disclosure Statement for the Joint Chapter 11 Plan of the Taj Debtors and the TRU Inc. Debtors, (II) Approving the Solicitation and Notice Procedures with Respect to Confirmation of the Taj Debtors and the TRU Inc. Debtors' Proposed Joint Chapter 11 Plan, (III) Approving the Forms of Ballots and Notices in Connection Therewith, (IV) Approving the Rights Offering Procedures, (V) Scheduling Certain Dates with Respect Thereto, (VI) Shortening the Objection Periods and Notice Requirements Related Thereto, (VII) Authorizing the Backstop Commitment Agreement and the Payment of the Commitment Premium as Administrative Claims, and (VIII) Granting Related Relief* [Docket No. 4019];

e.      obtained, on August 8, 2018, entry of the *Order (I) Approving (A) the Settlement Agreement, (B) Opt-Out Procedures Applicable to the Settlement Agreement, (C) a Substantial Contribution Claim Under Section 503(B)(3)(D) of the Bankruptcy Code, and (II) Granting Related Relief* [Docket No. 4083] (the "July 2018 Settlement Order") approving, among other things, the terms of the settlement agreement dated July 17, 2018, (the "July 2018 Settlement Agreement") among the Toys Delaware Debtors, Geoffrey Debtors, TRU Inc., the Ad Hoc Group of B-4 Lenders, the Creditors' Committee and certain members of the Creditors' Committee in their capacity as Holders of Administrative Claims, the Ad Hoc Group of Postpetition Vendor Administrative Claimants (the "Ad Hoc Vendor Group"), NexBank SSB (the "Term DIP Facility Agent"), Bank of America, N.A. (the "Prepetition Term Loan Agent"), and each of Bain Capital Private Equity, LP, Kohlberg Kravis Roberts & Co. L.P., and Vornado Realty Trust in their capacity as equity owners of Toys "R" Us, Inc. (together, the "Sponsors") (collectively, the "July 2018 Settlement Parties"), the procedures to opt out of the July 2018

---

[2]      Capitalized terms used but not otherwise defined in these findings of fact, conclusions of law, and order (collectively, the "Confirmation Order") have the meanings ascribed to them in the *Third Amended Joint Chapter 11 Plan of the Taj Debtors and TRU Inc. Debtors*, attached hereto as **Exhibit A** (as may be amended, supplemented, or otherwise modified from time to time, and including all exhibits and supplements thereto, the "Plan"). The rules of interpretation set forth in Article 1.B. of the Plan apply to this Confirmation Order.

Settlement Agreement (the "Opt Out Procedures"), and distributions in accordance with the July 2018 Settlement Agreement;

f.      caused, on August 10, 2018, the *Administrative Claim Holder Opt-Out Form for Opting Out of the Settlement Agreement* (the "Opt-Out Form") to be mailed to administrative claimants that filed notice of appearances and/or are on the Core/2002 List, as evidenced by, among other things, the *Affidavit of Service* for the Opt-Out Form [Docket No. 4435] (the "Opt-Out Affidavit");

g.      filed, on August 28, 2018, the *Settlement Effectiveness Notice* [Docket No. 4385], providing that holders of less than 7.5% in aggregate value of Administrative Claims opted-out of the July 2018 Settlement Agreement on or before August 24, 2018, i.e. the opt-out deadline, and, accordingly, the July 2018 Settlement Agreement became effective as of such date;

h.      filed, on August 31, 2018, the *First Amended Joint Chapter 11 Plan of the Taj Debtors and the TRU Inc. Debtors* [Docket No. 4492], and the *Disclosure Statement for the First Amended Joint Chapter 11 Plan of the Taj Debtors and the TRU Inc. Debtors* [Docket No. 4493];

i.      filed, on September 6, 2018, the *Second Amended Joint Chapter 11 Plan of the Taj Debtors and the TRU Inc. Debtors* [Docket No. 4547], the *Disclosure Statement for the Second Amended Joint Chapter 11 Plan of the Taj Debtors and the TRU Inc. Debtors* [Docket No. 4550], the *Amended Disclosure Statement for the Second Amended Joint Chapter 11 Plan of the Taj Debtors and the TRU Inc. Debtors* [Docket No. 4552], and the *Notice of Filing of Revised Order (I) Approving the Adequacy of the Disclosure Statement for the Joint Chapter 11 Plan of the Taj Debtors and the TRU Inc. Debtors, (II) Approving the Solicitation and Notice Procedures with Respect to Confirmation of the Taj Debtors and the TRU Inc. Debtors' Proposed Joint Chapter 11 Plan, (III) Approving the Forms of Ballots and Notices in Connection Therewith, (IV) Approving the Rights Offering Procedures, (V) Scheduling Certain Dates with Respect Thereto, (VI) Shortening the Objection Periods and Notice Requirements Related Thereto, (VII) Authorizing the Backstop Commitment Agreement and the Payment of the Commitment Premium as Administrative Claims, and (VIII) Granting Related Relief* [Docket No. 4548];

j.      obtained, on September 6, 2018, entry of the *Order (I) Approving the Adequacy of the Disclosure Statement for the Joint Chapter 11 Plan of the Taj Debtors and the TRU Inc. Debtors, (II) Approving the Solicitation and Notice Procedures with Respect to Confirmation of the Taj Debtors and the TRU Inc. Debtors' Proposed Joint Chapter 11 Plan, (III) Approving the Forms of Ballots and Notices in Connection Therewith, (IV) Approving the Rights Offering Procedures, (V) Scheduling Certain Dates with Respect Thereto, (VI) Shortening the Objection Periods and Notice Requirements Related Thereto, (VII) Authorizing the Backstop Commitment Agreement and the Payment of the Commitment Premium as Administrative Claims, and (VIII) Granting Related Relief* [Docket No. 4572]

(the "<u>Disclosure Statement Order</u>"), approving of the Disclosure Statement, solicitation procedures (the "<u>Solicitation Procedures</u>"), and related notices, forms, and ballots (collectively, the "<u>Solicitation Packages</u>");

k.      caused the Solicitation Packages and notice of the Confirmation Hearing (the "<u>Confirmation Hearing Notice</u>") and the deadline for objecting to confirmation of the Plan to be distributed on or about September 7, 2018 (the "<u>Solicitation Date</u>"), in accordance with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), the Disclosure Statement Order, and the Solicitation Procedures, as evidenced by, among other things, the Affidavit of Service of Solicitation Materials [Docket No. 4683] (the "<u>Solicitation Affidavit</u>");

l.      caused the Confirmation Hearing Notice to be published on September 11, 2018, in the national edition of *USA Today*, as evidenced by the Affidavit of Publication [Docket No. 4667] (the "<u>Publication Affidavit</u>");

m.      obtained on September 14, 2018, entry of the *Order (I) Establishing Bidding Procedures for the Sale of Certain Assets, (II) Scheduling an Auction and Hearing to Consider the Sale, (III) Approving the Form and Manner of Notice; and (IV) Granting Related Relief* [Docket No. 4671] (the "<u>Bidding Procedures Order</u>");

n.      filed, on September 21, 2018, the *Notice of Filing of Plan Supplement for the TRU Inc. and Taj Debtors' Plan* [Docket No. 4851] (the "<u>First Plan Supplement</u>");

o.      obtained, on September 27, 2018, the *Order Extending the Automatic Stay and Granting Preliminary Injunctive Relief Halting the Prosecution of the Fung Retailing Limited Arbitration Against the Non-Debtor Respondents* [Adv. Pro. No. 18-03090 (KLP) Docket No. 25] (the "<u>Order Extending the Automatic Stay</u>");

p.      filed, on September 28, 2018, the *Notice of Revised Dates and Deadlines in Connection with the Asia JV Sale* [Docket No. 5047] (the "<u>Revised Sale Deadlines</u>") revising the deadline to bid on the Asia JV (the "<u>Bid Deadline</u>") to October 1, 2018 at 5:00 p.m. (prevailing Eastern Time). The Revised Sale Deadlines also revised the date for the Auction for the Asia JV to October 29, 2018 at 10:00 a.m. (prevailing Eastern Time), and the deadline for objecting to the sale of the Asia JV (the "<u>Sale Objection Deadline</u>") to October 30, 2018, at 5:00 p.m. (prevailing Eastern Time);

q.      filed, on October 1, 2018, the *Notice of Adjournment of the Taj Confirmation Hearing* [Docket No. 5060] (the "<u>Adjournment Notice</u>"). The Adjournment Notice continued the deadline for objecting to the Plan (the "<u>Plan Objection Deadline</u>") and the deadline for voting to accept or reject the Plan (the "<u>Voting Deadline</u>") to October 30, 2018, at 5:00 p.m. (prevailing Eastern Time);

r.      filed, on November 2, 2018, the second *Notice of Adjournment of the Taj Confirmation Hearing* [Docket No. 5486] (the "<u>Second Adjournment Notice</u>");

s.        filed, on November 2, 2018, the *Agenda for Hearing on Motions Scheduled for November 5, 2018, at 1:00 p.m.* [Docket 5501] (the "Agenda for the November Hearing");

t.        filed, on November 9, 2018, the third *Notice of Adjournment of the Taj Confirmation Hearing* [Docket No. 5585] (the "Third Adjournment Notice") continuing the deadline for filing the voting report (the "Voting Declaration Deadline") to November 26, 2018, at 5:00 p.m. (prevailing Eastern Time);

u.        filed, on November 15, 2018, 2018, the *Debtors' Motion for Entry of an Order (I) Approving the Fung Settlement Agreement, and (II) Granting Related Relief* [Docket No. 5689] (the "Fung Settlement Motion");

v.        filed, on November 26, 2018, 2018, the *Declaration of James Daloia of Prime Clerk LLC Regarding Solicitation of Votes and Tabulation of Ballots Cast on the Second Amended Joint Chapter 11 Plan of the Taj Debtors and the TRU Inc. Debtors* [Docket No. 5776] (the "Voting Declaration");

w.        filed, on November 27, 2018, the fourth *Notice of Adjournment of the Taj Confirmation Hearing* [Docket No. 5793] (the "Fourth Adjournment Notice") continuing the deadline for parties in interest to file briefs in support of Confirmation of the Plan and replies to objections filed in opposition to the Plan (the "Confirmation Brief Deadline") to December 4, 2018, at 5:00 p.m. (prevailing Eastern Time).  The Fourth Adjournment Notice also continued the Confirmation Hearing to December 6, 2018 at 10:00 a.m. (prevailing Eastern Time);

x.        filed, on November 29, 2018, the *Notice of Adjournment of Asia JV Sale Hearing.* [Docket 5831] (the "Sale Hearing Adjournment Notice") adjourning the Sale Hearing to December 6, 2018 at 10:00 a.m. (prevailing Eastern Time);

y.        obtained, on November 30, 2018, 2018, the *Order (I) Approving the Settlement Agreement, and (II) Granting Related Relief* [Docket No. 5833] (the "Fung Settlement Order") approving the settlement agreement dated November 15, 2018, (the "Fung Settlement Agreement") among the Taj Debtors, the TRU Inc. Debtors, TRU (UK) Asia Limited, and Fung Retailing Limited ("Fung") (collectively, the "Fung Settlement Parties");

z.        filed, on December 4, 2018, the fifth *Notice of Adjournment of the Taj Confirmation Hearing* [Docket No. 5851] (the "Fifth Adjournment Notice") continuing the Confirmation Brief Deadline to December 11, 2018, at 5:00 p.m. (prevailing Eastern Time).  The Fifth Adjournment Notice also continued the Confirmation Hearing to December 13, 2018 at 11:00 a.m. (prevailing Eastern Time);

aa.        filed, on December 4, 2018, the *Agenda for Hearing on Motions Scheduled for December 6, 2018* [Docket 5852] (the "Second Sale Hearing Adjournment Notice") adjourning the Sale Hearing to December 13, 2018 at 11:00 a.m. (prevailing Eastern Time);

bb.     filed, on December 11, 2018, the *Debtors' Motion for Entry of an Order (I) Approving the Settlement Agreement Between the Debtors, the Ad Hoc Group of Taj Noteholders, the Official Committee of Unsecured Creditors, and the Ad Hoc Group of B-4 Lenders and (II) Granting Related Relief* [Docket No. 5922] (the "Global Settlement Motion");

cc.     filed, on December 12, 2018, the *Third Amended Joint Chapter 11 Plan of the Taj Debtors and the TRU Inc. Debtors* [Docket No. 5940];

dd.     filed, on December 11, 2018, the *Debtors' Memorandum of Law in Support of Confirmation of the Third Amended Joint Chapter 11 Plan of the Taj Debtors and TRU Inc. Debtors* [Docket No. 5926] (the "Confirmation Brief");

ee.     filed, on December 11, 2018, the *Declaration of Cari Turner in Support of Confirmation of the Third Amended Joint Chapter 11 Plan of the Taj Debtors and TRU Inc. Debtors* [Docket No. 5927] (the "Turner Declaration");

ff.     filed, on December 11, 2018, the *Declaration of Christian Tempke in Support of Confirmation of the Third Amended Joint Chapter 11 Plan of the Taj Debtors and TRU Inc. Debtors* [Docket No. 5929] (the "Tempke Declaration");

gg.     filed, on December 11, 2018, the *Declaration of Jeffrey S. Stein, Independent Director of TRU Taj LLC and TRU Taj Finance LLC, in Support of Confirmation of the Third Amended Joint Chapter 11 Plan of the Taj Debtors and TRU Inc. Debtors* [Docket No. 5928] (the "Stein  Declaration");

hh.     filed, on December 11, 2018, the *Declaration of Mohsin Y. Meghji, Disinterested Director of TRU Inc., in Support of Confirmation of the Third Amended Joint Chapter 11 Plan of the Taj Debtors and TRU Inc. Debtors* [Docket No. 5930] (the "Meghji Declaration"); and

ii.     filed, on December 11, 2018, the *Order (I) Approving the Settlement Agreement Between the Debtors, the Ad Hoc Group of Taj Noteholders, the Official Committee of Unsecured Creditors, and the Ad Hoc Group of B-4 Lenders and (II) Granting Related Relief* [Docket No. 5922] (as may be subsequently, amended, and modified, the "Global  Settlement  Order") approving the settlement agreement dated as of December 11, 2018, (the "Global Settlement Agreement") among the TRU Inc. Debtors, the Geoffrey Debtors, the Toys Delaware Debtors, the Taj Debtors, the Asia JV, the TRU Non-Debtor Subsidiaries (as defined in the Global Settlement Agreement), the Ad Hoc Group of B-4 Lenders, the Taj Holders Steering Group, the Creditors' Committee, and the other parties thereto, (collectively, the "Global Settlement Parties").

This Court having:

jj.     entered the Disclosure Statement Order on September 6, 2018 [Docket No. 4572];

kk.     entered the Bidding Procedures Order on September 14, 2018 [Docket No. 4671];

ll.      entered the Fung Settlement Order on November 30, 2018 [Docket No. 5833];

mm.      set October 26, 2018, at 5:00 p.m. (prevailing Eastern Time) as the date and time for the Bid Deadline pursuant to the Notice of Revised Sale Deadlines;

nn.      set October 29, 2018, at 10:00 a.m. (prevailing Eastern Time) as the date and time for the Auction, if necessary, pursuant to the Notice of Revised Sale Deadlines;

oo.      set October 30, 2018, at 5:00 p.m. (prevailing Eastern Time) as the date and time for the Sale Objection Deadline pursuant to the Notice of Revised Sale Deadlines;

pp.      set October 30, 2018, at 5:00 p.m. (prevailing Eastern Time) as the deadline for filing objections in opposition to the Plan pursuant to the Adjournment Notice;

qq.      set October 30, 2018, at 5:00 p.m. (prevailing Eastern Time) as the deadline for voting on the Plan pursuant to the Adjournment Notice;

rr.      set November 26, 2018, at 5:00 p.m. (prevailing Eastern Time) as the deadline for the Voting Declaration pursuant to the Third Adjournment Notice;

ss.      set December 11, 2018, at 5:00 p.m. (prevailing Eastern Time) as the date and time for the Confirmation Brief Deadline pursuant to the Fifth Adjournment Notice;

tt.      set December 13, 2018, at 11:00 a.m. (prevailing Eastern Time) as the date and time for the commencement of the Confirmation Hearing pursuant to the Fifth Adjournment Notice;

uu.      set December 13, 2018, at 10:00 a.m. (prevailing Eastern Time) as the date and time for the Sale Hearing pursuant to the Second Sale Hearing Adjournment Notice;

vv.      reviewed the Plan, the Disclosure Statement, the Confirmation Brief, the Voting Declaration, and all pleadings, exhibits, statements, responses, and comments regarding Confirmation, including all objections, statements, and reservations of rights filed by parties in interest on the docket of the Chapter 11 Cases;

ww.      held the Confirmation Hearing;

xx.      heard the statements and arguments made by counsel with respect to Confirmation;

yy.      considered all oral representations, live testimony, written direct testimony, designated deposition testimony, exhibits, documents, filings, and other evidence presented at the Confirmation Hearing;

zz.      entered rulings on the record at the Confirmation Hearing held on December 13, 2018 (the "Confirmation Ruling");

aaa.      entered the Global Settlement Order;

bbb.    overruled any and all objections to the Plan and to Confirmation, except as otherwise stated or indicated on the record, and all statements and reservations of rights not consensually resolved, agreed to, or withdrawn, unless otherwise indicated; and

ccc.    taken judicial notice of all papers and pleadings filed in the Chapter 11 Cases.

NOW, THEREFORE, after due deliberation thereon and good cause appearing therefor, the Bankruptcy Court hereby makes and issues the following findings of fact, conclusions of law, and order:[3]

## I.    FINDINGS OF FACT AND CONCLUSIONS OF LAW

IT IS HEREBY FOUND AND DETERMINED THAT:

### A. Jurisdiction and Venue.

1.    The Bankruptcy Court has subject matter jurisdiction over this matter under 28 U.S.C. §§ 157 and 1334 and the *Standing Order of Reference from the United States District Court for the Eastern District of Virginia*, dated July 10, 1984.  The Bankruptcy Court has exclusive jurisdiction to determine whether the Plan complies with the applicable provisions of the Bankruptcy Code and should be confirmed.  The Debtors confirm their consent, pursuant to Bankruptcy Rule 7008, to entry of a final order by the Bankruptcy Court in connection with Confirmation to the extent that it is later determined that the Bankruptcy Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.  Venue in this Court was proper as of the Petition Date and

---

[3]    In accordance with Bankruptcy Rules 2002 and 3020(c), no later than the first Business Day that is seven (7) days after the Effective Date, the Debtors must cause notice of Confirmation and occurrence of the Effective Date (the "Notice of Confirmation"), the form of which is attached hereto **Exhibit B**, to be served by United States mail, first class postage prepaid, by hand, or by overnight courier service to all parties served with the Confirmation Hearing Notice.  To supplement the notice procedures described in the preceding sentence, the Debtors shall cause the Notice of Confirmation, modified for publication, to be published on one occasion in *USA Today* (national edition).

continues to be proper under 28 U.S.C. §§ 1408 and 1409. Confirmation of the Plan is a core

proceeding within the meaning of 28 U.S.C. § 157(b)(2).

**B.  Eligibility for Relief.**

2.        The Debtors were and continue to be entities eligible for relief under section 109 of

the Bankruptcy Code.

**C.  Commencement and Joint Administration of the Chapter 11 Cases.**

3.        On the Petition Date, the Debtors commenced the Chapter 11 Cases by filing

voluntary petitions for relief under chapter 11 of the Bankruptcy Code. On September 19, 2017,

the Bankruptcy Court entered an order [Docket No. 78] authorizing the joint administration of the

Chapter 11 Cases in accordance with Bankruptcy Rule 1015(b). The Debtors have operated their

businesses and managed their properties as debtors in possession pursuant to sections 1107(a) and

1108 of the Bankruptcy Code.

**D.  Appointment of the Creditors' Committee.**

4.        On September 26, 2017, the U.S. Trustee appointed the Official Committee of

Unsecured Creditors (the "Creditors' Committee") [Docket No. 206] to represent the interests of

the unsecured creditors of the various debtors in the Chapter 11 Cases.

**E.  Plan Supplement.**

5.        On September 21, 2018, the Debtors filed the initial Plan Supplement with the

Bankruptcy Court, which the Debtors may subsequently supplement or amend, and which may be

further amended or supplemented, including with respect to the Transaction Steps Memorandum.

The Plan Supplement complies with the terms of the Plan, and the Debtors provided good and

proper notice of the filing in accordance with the Bankruptcy Code, the Bankruptcy Rules, the

Disclosure Statement Order, and the facts and circumstances of the Chapter 11 Cases. No other

or further notice is or will be required with respect to the Plan Supplement unless otherwise

provided for in this Confirmation Order or the Plan.  All documents included in the Plan

Supplement are integral to, part of, and incorporated by reference into the Plan.  The terms of all

such documents remain subject to compliance with the conditions set forth in Article IX.A of the

Plan.  In the event that any term in any such Plan Supplement document conflicts with or is

inconsistent in any respect with the terms of the Plan, the terms of the Plan shall control.  Subject

to the terms of the Plan, the Debtors reserve the right to alter, amend, update, supplement, or

modify the Plan Supplement before the Effective Date subject to compliance with the Bankruptcy

Code and the Bankruptcy Rules, provided that no such alteration, amendment, update, supplement,

or modification shall be inconsistent with the terms of this Confirmation Order or the terms of the

Plan.

      **F.  Modifications to the Plan.**

      6.      On December 12, 2018, the Debtors made certain modifications to the Plan.

Pursuant to section 1127 of the Bankruptcy Code, these modifications to the Plan described or set

forth in this Confirmation Order and the Plan filed on December 12, 2018 constitute technical

changes, changes with respect to particular Claims by agreement with Holders of such Claims,

including as contemplated in the Global Settlement Agreement, or modifications that do not

otherwise materially and adversely affect or change the treatment of any other Claim or Interest.

These modifications are consistent with the disclosures previously made pursuant to the Disclosure

Statement and solicitation materials served pursuant to the Disclosure Statement Order, and notice

of these modifications was adequate and appropriate under the facts and circumstances of the

Chapter 11 Cases.

      7.      In accordance with Bankruptcy Rule 3019, these modifications do not require

additional disclosure under section 1125 of the Bankruptcy Code or the resolicitation of votes

under section 1126 of the Bankruptcy Code, and they do not require that Holders of Claims and

Interests be afforded an opportunity to change previously cast acceptances or rejections of the Plan.

Accordingly, the Plan, as modified, is properly before this Court and all votes cast with respect to

the Plan prior to such modification shall be binding and shall apply with respect to the Plan.

**G. Objections Overruled.**

8.        Any resolution or disposition of objections to Confirmation explained or otherwise

ruled upon by the Bankruptcy Court on the record at the Confirmation Hearing is hereby

incorporated by reference.  All unresolved objections, statements, and reservations of rights are

hereby overruled on the merits.

**H. Disclosure Statement Order, and Bidding Procedures Order.**

9.        On September 6, 2018, the Bankruptcy Court entered the Disclosure Statement

Order [Docket No. 4572], which, among other things, approved (a) the Disclosure Statement as

containing adequate information within the meaning of section 1125 of the Bankruptcy Code and

Bankruptcy Rule 3017; (b) the Solicitation and Notice Procedures; (c) the Solicitation Packages;

(d) the Rights Offering Procedures; and (e) the Backstop Commitment Agreement and the

Commitment Premium provided for therein.

10.      The Bankruptcy Court, on September 14, 2018, entered the Bidding Procedures

Order, which, among other things: (a) approved the Bidding Procedures; (b) approved the selection

of the Stalking Horse Bidder (as defined in the Bidding Procedures Order); (c) approved the form

of the Stalking Horse Purchase Agreement; and (d) established the Sale Timeline (as defined in

the Bidding Procedures Order).

11.      On September 28, 2018, the Court entered the Notice of Revised Sale Deadlines,

which, among other things: (a) revised the Bid Deadline to October 26, 2018, at 5:00 p.m.

(prevailing Eastern Time); (b) revised the auction, if necessary, to October 29, 2018, at 10:00 a.m.

(prevailing Eastern Time); and (c) revised the Sale Objection Deadline to October 30, 2018, at

5:00 p.m. (prevailing Eastern Time).

12.     On October 1, 2018, the Debtors continued the Plan Objection Deadline to October

30, 2018 at 5:00 p.m. (prevailing Eastern Time) and continued the Voting Deadline to October 30,

2018 at 5:00 p.m. (prevailing Eastern Time) pursuant to the Adjournment Notice.

13.     On November 9, 2018, the Debtors continued the Voting Declaration Deadline to

November 26, 2018 at 5:00 p.m. (prevailing Eastern Time).   On December 4, 2018, the Debtors

continued the deadline to file the Confirmation Brief to December 11, 2018, at 5:00 p.m.

(prevailing Eastern Time) pursuant to the Fifth Adjournment Notice.   The Debtors also continued

the Confirmation Hearing to December 13, 2018 at 11:00 a.m. (prevailing Eastern Time).   The

Debtors continued the Sale Hearing to December 13, 2018 at 11:00 a.m. (prevailing Eastern Time)

pursuant to the Second Sale Hearing Adjournment Notice on December 4, 2018.

**I.     Transmittal and Mailing of Materials; Notice.**

14.     As evidenced by the Solicitation Affidavit, the Publication Affidavit, and the

Voting Declaration, the Debtors provided due, adequate, and sufficient notice of the Plan, the

Disclosure Statement, the Disclosure Statement Order, the Solicitation Packages, the Confirmation

Hearing Notice, the Plan Supplement, and all the other materials distributed by the Debtors in

connection with the Confirmation of the Plan in compliance with the Bankruptcy Rules, including

Bankruptcy Rules 2002(b), 3017, 3019, and 3020(b), the Bankruptcy Local Rules of the United

States Bankruptcy Court for the Eastern District of Virginia (the "<u>Bankruptcy Local Rules</u>"), and

the procedures set forth in the Disclosure Statement Order.   The Debtors provided due, adequate,

and sufficient notice of the Voting and Plan Objection Deadline, the Confirmation Hearing (as

may be continued from time to time), and any applicable bar dates and hearings described in the

Disclosure Statement Order in compliance with the Bankruptcy Code, the Bankruptcy Rules, the

Bankruptcy Local Rules, and the Disclosure Statement Order. No other or further notice is or shall be required.

**J. Solicitation.**

15. The Debtors solicited votes for acceptance and rejection of the Plan in good faith, and such solicitation complied with sections 1125 and 1126, and all other applicable sections, of the Bankruptcy Code, Bankruptcy Rules 3017, 3018, and 3019, the Disclosure Statement Order, the Bankruptcy Local Rules, and all other applicable rules, laws, and regulations. The Solicitation Packages provided the opportunity for voting creditors to opt out of the releases.

**K. Voting Declaration.**

16. On November 26, 2018, 2018, the Debtors filed the Voting Declaration. The Voting Declaration was admitted into evidence during the Confirmation Hearing. The procedures used to tabulate ballots were fair and conducted in accordance with the Disclosure Statement Order, the Bankruptcy Code, the Bankruptcy Rules, the Bankruptcy Local Rules, and all other applicable rules, laws, and regulations.

17. As set forth in the Plan, Holders of Claims in Classes A3, A4, A5, A6, A7, A8, B3, B4, and B7 (collectively, the "Voting Classes") were eligible to vote on the Plan in accordance with the Solicitation Procedures. Holders of Claims and Interests in Classes A1, B1, and B2 (collectively, the "Deemed Accepting Classes") are Unimpaired and conclusively presumed to accept the Plan and, therefore, did not vote to accept or reject the Plan. Holders of Claims in Classes A9, A10, B5, and B6 either are Unimpaired and conclusively presumed to have accepted the Plan (to the extent reinstated) or Impaired and conclusively deemed to reject the Plan, and, therefore, are not entitled to vote to accept or reject the Plan. Holders of Interests in Classes A2, and A11 (the "Deemed Rejecting Classes") are Impaired under the Plan, are entitled to no recovery under the Plan, and are therefore deemed to have rejected the Plan.

18.     As evidenced by the Voting Declaration, Classes A3, A4, A5, A6, A8, B3, and B4 voted in favor of the Plan.  Class B7 abstained from voting on the Plan.  Class A7 rejected the Plan.

**L.  Bankruptcy Rule 3016.**

19.     The Plan and all modifications thereto are dated and identify the Entities submitting them, thereby satisfying Bankruptcy Rule 3016(a).  The Debtors appropriately filed the Disclosure Statement and the Plan with the Bankruptcy Court, thereby satisfying Bankruptcy Rule 3016(b). The injunction, release, and exculpation provisions in the Disclosure Statement and the Plan describe, in bold font and with specific and conspicuous language, all acts to be enjoined and identify the entities that will be subject to the injunction, thereby satisfying Bankruptcy Rule 3016(c).

**M. Burden of Proof.**

20.     The Debtors, as proponents of the Plan, have met their burden of proving the elements of sections 1129(a) and 1129(b) of the Bankruptcy Code by a preponderance of the evidence, the applicable evidentiary standard for Confirmation.  Further, the Debtors have proven the elements of sections 1129(a) and 1129(b) by clear and convincing evidence.  Each witness who testified on behalf of the Debtors in connection with Confirmation was credible, reliable, and qualified to testify as to the topics addressed in his or her testimony.

**N.  Compliance with the Requirements of Section 1129 of the Bankruptcy Code.**

21.     The Plan complies with all applicable provisions of section 1129 of the Bankruptcy Code as follows:

**a. Section 1129(a)(1)—Compliance of the Plan with Applicable Provisions of the Bankruptcy Code.**

22.    The Plan complies with all applicable provisions of the Bankruptcy Code, including

sections 1122 and 1123, as required by section 1129(a)(1) of the Bankruptcy Code.

**i.    Sections 1122 and 1123(a)(1)—Proper Classification.**

23.    The classification of Claims and Interests under the Plan is proper under the

Bankruptcy Code.  In accordance with sections 1122(a) and 1123(a)(1) of the Bankruptcy Code,

Article III of the Plan provides for the separate classification of Claims and Interests into

eleven (11) different Classes for the TRU Inc. Debtors, and seven (7) different Classes for the Taj

Debtors, based on differences in the legal nature or priority of such Claims and Interests (other

than Administrative Claims, DIP Claims, Accrued Professional Compensation Claims, and

Priority Tax Claims, which are addressed in Article II of the Plan and are not required to be

designated as separate Classes by section 1123(a)(1) of the Bankruptcy Code).  Valid business,

factual, and legal reasons exist for the separate classification of such Claims and Interests, such

classifications were not implemented for any improper purpose, and the creation of such Classes

does not unfairly discriminate between, or among, holders of Claims and Interests.

24.    In accordance with section 1122(a) of the Bankruptcy Code, each Class of Claims

or Interests contains only Claims or Interests that are substantially similar to the other Claims or

Interests within that Class.    Accordingly, the Plan satisfies the requirements of

sections 1122(a), 1122(b), and 1123(a)(1) of the Bankruptcy Code.

**ii.    Section 1123(a)(2)—Specification of Unimpaired Classes.**

25.    Article III of the Plan specifies that Claims and Interests in Classes A1, B1, and B2

are Unimpaired under the Plan and Claims in Classes A9, A10, B5, and B6 are either Impaired or

Unimpaired under the Plan. Accordingly, the Plan satisfies the requirements of section 1123(a)(2) of the Bankruptcy Code.

### iii. Section 1123(a)(3)—Specification of Treatment of Impaired Classes.

26.　　Article III of the Plan specifies the treatment of each Impaired Class under the Plan. Accordingly, the Plan satisfies the requirements of section 1123(a)(3) of the Bankruptcy Code.

### iv. Section 1123(a)(4)—No Discrimination.

27.　　Article III of the Plan provides that each holder of an Allowed Claim and Interest will receive the same treatment as all other holders of Allowed Claims and Interests within the same class, except to the extent any holders of Allowed Claims and Interests have agreed to different treatment. Accordingly, the Plan satisfies the requirements of section 1123(a)(4) of the Bankruptcy Code.

### *v.* Section 1123(a)(5)—Adequate Means for Plan Implementation.

28.　　Article IV and various other provisions of the Plan provide adequate means for the Plan's implementation. Among other things, the Plan provides for:

- the sources of consideration for Plan distributions, including the Sale Proceeds, Liquidation Proceeds, Cash on hand, and Cash raised or held by the Debtors, including, as applicable, Cash raised from the Rights Offering;

- the authorization for the Debtors or the Reorganized Debtors, as applicable, to take corporate actions necessary to effectuate the Plan, including filing any New Organizational Documents of the Reorganized Debtors;

- the authorization for the Debtors or the Reorganized Debtors, as applicable, to undertake certain Restructuring Transactions, including the Rights Offering and the Credit Bid Transaction;

- the formation of the Wind Down Entities to implement the Wind Down;

- the designation of the Administrator pursuant to the terms of the Administrator Agreement for the purposes of conducting the Wind Down and dissolving the Debtors;

16

- the cancellation of notes, instruments, certificates, and other existing securities; and

- except as otherwise provided in the July 2018 Settlement Agreement, the Fung Settlement Agreement, and the Global Settlement Agreement, the preservation of certain Causes of Action and the waiver of all rights to commence or pursue Avoidance Actions.

29. Accordingly, the Plan satisfies the requirements of section 1123(a)(5) of the Bankruptcy Code.

### vi.  Section 1123(a)(6)—Non-Voting Equity Securities.

30. The Plan establishes the Wind Down Entities to implement the Wind Down with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Wind Down Entities, and therefore, it is unlikely any of the Debtors will be issuing any stock or drafting new corporate charters. However, to the extent any of the Debtors emerge as a reorganized entity, Article IV.G of the Plan provides that the New Organizational Documents for such Reorganized Debtors will prohibit the issuance of non-voting stock and will provide related protections for holders of preferred shares.  Accordingly, the Plan satisfies the requirements of section 1123(a)(6) of the Bankruptcy Code.

31. For the avoidance of doubt, the equity securities issued in connection with the Credit Bid Transaction do not constitute equity securities of any of the Reorganized Debtors and, therefore, section 1123(a)(6) of the Bankruptcy Code is not implicated.

### vii. Section 1123(a)(7)—Directors, Officers, and Trustees.

32. The Plan establishes the Wind Down Entities to implement the Wind Down with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Wind Down Entities. Therefore, it is unlikely any of the Reorganized Debtors will appoint any directors or officers and

section 1123(a)(7) will be inapplicable to these cases.  However, to the extent any of the Debtors

emerge as a reorganized entity, the new board of directors for such entity will be selected consistent

with the interests of the Debtors' stakeholders in accordance with section 1123(a)(7) of the

Bankruptcy Code.  Accordingly, the Plan satisfies the requirements of section 1123(a)(7) of the

Bankruptcy Code.

### b. Section 1123(b)—Discretionary Contents of the Plan.

33.     The Plan's discretionary provisions comply with section 1123(b) of the Bankruptcy

Code and are not inconsistent with the applicable provisions of the Bankruptcy Code.  Thus, the

Plan satisfies section 1123(b).

### i. Impairment/Unimpairment of Any Class of Claims or Interests.

34.     Article III of the Plan impairs or leaves unimpaired, as the case may be, each Class

of Claims and Interests, as contemplated by section 1123(b)(1) of the Bankruptcy Code.

### ii. Assumption and Rejection of Executory Contracts and Unexpired Leases.

35.     Article V of the Plan provides for the rejection of the Debtors' Executory Contracts

and Unexpired Leases in existence as of the Confirmation Date, effective as of the Effective Date

(except as otherwise provided in the Plan), unless such Executory Contract or Unexpired Lease:

(a) was previously assumed or rejected by the Debtors; (b) is identified on the Assumed Executory

Contract and Unexpired Lease List; (c) is the subject of a motion to assume Executory Contracts

or Unexpired Leases that is pending on the Confirmation Date; (d) is part of transition services;

(e) is a D&O Liability Insurance Policy, a Chubb Insurance Contract or a Zurich Insurance

Contract; or (f) the counterparty to the Executory Contract or Unexpired Lease has consented to

extend the deadline for the Debtors to assume or reject such Executory Contract or Unexpired

Lease after the Effective Date, *provided that* Article V.E. is subject to the *Order (A) Authorizing*

*Entry Into the Zurich Buyout Agreement, (B) Establishing Expedited Procedures to Engage in*

*Further LPT Transactions, and (C) Granting Related Relief.* For the avoidance of doubt, the Debtors believe the Chubb Insurance Contracts and the Zurich Insurance Contracts are prefunded and will not require any additional premiums on or after the Effective Date. To the extent the Chubb Insurance Contracts or Zurich Insurance Contracts are not prefunded, the Taj Debtors shall only be required to pay that portion of any post-Effective Date amounts that relate to and are for the benefit of the Taj Debtors.

36.    The Plan further provides that the Debtors, with the consent of the Taj Holders Steering Group or the Asia JV, as applicable, may alter, amend, modify, or supplement the schedules of Executory Contracts and Unexpired Leases identified in Article V of the Plan, and in the Plan Supplement at any time through and including 90 days after the Effective Date (or such later date as provided in the event of any objection by a counterparty to an Executory Contract or Unexpired Lease to the amount of any Cure Obligation or other matter relating to the proposed assumption and assignment).    Unless otherwise agreed, the Cure or Assumption Objection Deadline with respect to any Executory Contract or Unexpired Lease is hereby approved. Therefore, the Plan satisfies section 1123(b)(2) of the Bankruptcy Code.

### iii. Compromise and Settlement.

37.    In accordance with section 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the distributions and other benefits provided under the Plan, the July 2018 Settlement Agreement, the Fung Settlement Agreement, and the Global Settlement Agreement, the provisions of the Plan and this Confirmation Order constitute a good faith compromise of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that all Holders of Claims or Interests may have with respect to any Allowed Claim or Interest or any distribution to be made on account of such Allowed Claim or Interest. The entry of this Confirmation Order constitutes the Bankruptcy Court's approval of all

compromises and settlements of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromises and/or settlements are in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and are fair, equitable, and reasonable.

### iv. Debtor Release.

38.    In accordance with section 1123(b)(3)(A) of the Bankruptcy Code, the releases of claims and Causes of Action by the Debtors described in Article VIII.C of the Plan (the "Debtor Release") represent a valid exercise of the Debtors' business judgment under Bankruptcy Rule 9019.  The Debtors' or the Reorganized Debtors' pursuit of any such claims against the Released Parties is not in the best interests of the estates' various constituencies because the costs involved would likely outweigh any potential benefit from pursuing such claims.  The Debtor Release is fair and equitable and complies with the absolute priority rule.

39.    Nearly all Voting Classes have voted in favor of the Plan, including the Debtor Release.  The Plan, including the Debtor Release, was negotiated by sophisticated parties represented by able counsel and financial advisors.  The Debtor Release is therefore the result of an arm's-length negotiation process.

40.    The Debtor Release appropriately offers protection to parties that participated in and contributed to the Debtors' restructuring process.  Specifically, the Released Parties under the Plan—including the (a) the Creditors' Committee and its members; (b) Holders of 8.75% Unsecured Notes Claims; (c) the 8.75% Unsecured Notes Trustee; (d) Holders of 7.375% Senior Notes Claims; (e) the 7.375% Senior Notes Trustee; (f) Holders of Giraffe Junior Mezzanine Loan Guaranty Claims; (g) Holders of Propco II Mortgage Loan Guaranty Claims; (h) the Propco II Special Servicer; (i) Holders of Taj Senior Notes Claims; (j) the Taj Senior Notes Indenture Trustee; (k) the Taj Holders Steering Group and its members; (l) the Taj DIP Lenders; (m) the Sponsors (other than Sponsor-affiliated directors, officers, and managers, in their capacity as

such); and (n) Fung—made significant concessions and contributions to the Debtors' Chapter 11

Cases, including, as applicable, entering into the Restructuring Support Agreement, the Fung

Settlement Agreement, the Global Settlement Agreement, and related agreements, actively

supporting the Plan and the Chapter 11 Cases, participating in the extensive sale process for the

TRU Asia Equity Interests held directly or indirectly by the Debtors, and settling and

compromising substantial rights and claims against the Debtors and their direct and indirect

subsidiaries under the Plan.  The Debtor Release for the Debtors' directors, officers and managers

is appropriate because the Debtors' directors, officers and managers share an identity of interest

with the Debtors, supported the Plan and the Chapter 11 Cases, and actively participated in

meetings, negotiations, and implementation of the restructuring during the Chapter 11 Cases, and

have provided other valuable consideration to the Debtors to facilitate the Debtors' reorganization,

*provided*, for the avoidance of doubt, that (1) none of the D&O Parties are being released by the

TRU Inc. Debtors or the Toys Delaware Debtors under the Plan, the July 2018 Settlement

Agreement, or the Global Settlement Agreement, and all claims and Causes of Action against such

parties are preserved, and (2) all Released Taj Claims are being released pursuant to the Plan, this

Confirmation Order, and/or the Global Settlement Agreement.

41.     The scope of the Debtor Release is appropriately tailored under the facts and

circumstances of the Chapter 11 Cases.  In light of, among other things, the value provided by the

Released Parties to the Debtors' estates and the critical nature of the Debtor Release to the Plan,

the Debtor Release is approved.

### v.   Release by Holders of Claims and Interests.

42.     The release by the Releasing Parties (the "Third Party Release"), set forth in Article

VIII.D of the Plan, is an essential provision of the Plan.  The Third Party Release is:  (a) consensual;

(b) in exchange for the good and valuable consideration provided by the Released Parties; (c) a

good-faith settlement and compromise of the claims and Causes of Action released by the Third

Party Release; (d) materially beneficial to, and in the best interests of, the Debtors, their estates,

and their stakeholders, and is important to the overall objectives of the Plan to finally resolve

certain Claims among or against certain parties in interest in the Chapter 11 Cases; (e) fair,

equitable, and reasonable; (f) given and made after due notice and opportunity for hearing; (g) a

bar to any of the Releasing Parties asserting any claim or Cause of Action released by the Third

Party Release against any of the Released Parties; and (h) consistent with sections 105, 524, 1123,

1129, and 1141 and other applicable provisions of the Bankruptcy Code.

43.     The Third Party Release is an integral part of the Plan that is overwhelmingly

supported by the Debtors' creditors and provides a meaningful recovery to all of the Debtors'

Creditors.  Like the Debtor Release, the Third Party Release facilitated participation of the

Released Parties in both the Plan and the chapter 11 processes generally.  The Third Party Release

is instrumental to the Plan and was critical in incentivizing the Released Parties to support the Plan

and preventing potentially significant and time-consuming litigation regarding the parties'

respective rights and interests.  The Third Party Release was a core negotiation point in connection

with the July 2018 Settlement Agreement, the Restructuring Support Agreement, the Fung

Settlement Agreement, and the Global Settlement Agreement, and instrumental in developing a

Plan that maximized value for all of the Debtors' stakeholders and preserved the Debtors' business

as a going concern.  The Third Party Release is necessary to the restructuring.

44.     The Released Parties have made a substantial contribution to the Debtors'

reorganization.  Furthermore, the Third Party Release is consensual as the Releasing Parties were

provided adequate notice of the chapter 11 proceedings, the Plan, and the deadline to object to

confirmation of the Plan, and voting creditors and interest holders were given the opportunity to

opt out of the Third Party Release, and the release provisions of the Plan were conspicuous, emphasized with boldface type in the Plan, the Disclosure Statement, and the ballots.

45.    There is an identity of interests between the Debtors and the entities that will benefit from the Third Party Release.    Each of the Released Parties, as stakeholders and critical participants in the Debtors' reorganization process, share a common goal with the Debtors in seeing the Plan succeed.    Further, the Debtors and the Reorganized Debtors are required to indemnify certain of the Released Parties under, among other agreements, their pre- and postpetition credit facilities.    Any Cause of Action against one of the Debtors' indemnitees would create an obligation on behalf of the Debtors and would effectively amount to litigation against the Debtors, depleting assets of the estates.

46.    The scope of the Third Party Release is appropriately tailored to the facts and circumstances of the Chapter 11 Cases, and parties received due and adequate notice of the Third Party Release.    Among other things, the Plan provides appropriate and specific disclosure with respect to the claims and Causes of Action that are subject to the Third Party Release, and no other disclosure is necessary.    The Debtors, as evidenced by the Solicitation Affidavit, provided sufficient notice of the Third Party Release, and no further or other notice is necessary.    The Third Party Release is specific in language, integral to the Plan, a condition of the settlements under the Fung Settlement Agreement and the Global Settlement Agreement, and given for substantial consideration.

47.    In light of the foregoing, the Third Party Release is approved and the Third Party Release and the releases provided in the Global Settlement Agreement are binding on all Releasing Parties, including, without limitation, the Debtors, the Geoffrey Debtors, and the Toys Delaware Debtors, and all parties in interest in the above-captioned chapter 11 cases.

### vi. Exculpation.

48.    The exculpation provisions set forth in Article VIII.E of the Plan are essential to the Plan.  The record in the Chapter 11 Cases fully supports the exculpation and the exculpation provisions set forth in Article VIII.E of the Plan, which are appropriately tailored to protect the Exculpated Parties from unnecessary litigation.

### vii. Injunction.

49.    The injunction provisions set forth in Article VIII.F of the Plan are essential to the Plan and are necessary to implement the Plan and to preserve and enforce the discharge, the Debtor Release, the Third Party Release, and the exculpation provisions in Article VIII of the Plan.  Such injunction provisions are appropriately tailored to achieve those purposes.

### viii.    Reservation of Claims and Causes of Action and Assignment to the Credit Bid Purchasers.

50.    Article IV.J of the Plan appropriately provides that, unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan, a Bankruptcy Court order, or the Global Settlement Agreement, the Taj Debtors reserve, and assign to the Credit Bid Purchasers pursuant to the Interest Transfer Agreement or other definitive documents (collectively, the "Credit Bid Transaction Documents"), any and all Causes of Action, including any actions specifically enumerated in and in accordance with the terms of the Plan Supplement, whether arising before or after the Petition Date, and preserve and assign to the Credit Bid Purchasers or the Asia JV pursuant to the Credit Bid Transaction Documents, the right to commence, prosecute, or settle such Causes of Action, notwithstanding the occurrence of the Effective Date; *provided, however*, notwithstanding the foregoing, the Non-Released Claims shall include all claims or Causes of Action, if any, held by TRU Inc. and the Toys Delaware Debtors and each of their respective estates or creditors against

any D&O Party (the "D&O Claims"), excluding any Released Taj Claims, and shall be transferred

and/or assigned to the Non-Released Claims Trust (as defined in the Toys Delaware Plan), which

shall be the successor-in-interest to the TRU Inc. Debtors and the TRU Inc. Debtors' rights, title

and interest in any Non-Released Claims of the TRU Inc. Debtors, the Non-Released Claims Trust

shall have standing to pursue the Non-Released Claims, and the Non-Released Claims Trust

Manager (as defined in the Toys Delaware Plan) shall have the right to commence, prosecute, or

settle such Non-Released Claims in its discretion, in consultation with the Non-Released Claims

Trust Oversight Committee (as defined in the Toys Delaware Plan); *provided further that* the July

2018 Settlement Agreement and/or the Global Settlement Agreement (as applicable) shall control

over this provision in all respects.  In pursuing any claim, right, or Cause of Action, the Non-

Released Claims Trust shall be entitled to the tolling provisions provided under section 108 of the

Bankruptcy Code, and shall succeed to the TRU Inc. Debtors' rights with respect to the time

periods in which a Cause of Action may be brought under section 546 of the Bankruptcy Code.

The Credit Bid Purchasers or the Asia JV, as applicable, may pursue such Causes of Action in

their sole discretion.  No Entity may rely on the absence of a specific reference in the Plan, the

Plan Supplement, or the Disclosure Statement to any Cause of Action against them as any

indication that either the Taj Debtors or Reorganized Taj Debtors, the Non-Released Claims Trust,

the Wind Down Entities, the Credit Bid Purchasers, or the Asia JV, as applicable, will not pursue

any and all available Causes of Action against them.  No preclusion doctrine, including the

doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial,

equitable or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a

consequence of the Confirmation or Consummation.

51.    The Plan is specific with respect to the Causes of Action to be retained by the Debtors or transferred to the Asia JV, and the Plan and Plan Supplement provide meaningful disclosure with respect to the potential Causes of Action that the Debtors may retain or transfer to the Asia JV, and all parties in interest received adequate notice with respect to such Causes of Action.  The provisions regarding Causes of Action in the Plan are appropriate and in the best interests of the Debtors, their respective estates, and Holders of Claims and Interests.  For the avoidance of any doubt, Causes of Action released or exculpated under the Plan will not be retained by the Reorganized Debtors or transferred to the Credit Bid Purchasers, the Non-Released Claims Trust (as defined in the Toys Delaware Plan), and the Non-Released Claims Trust Manager (as defined in the Toys Delaware Plan).

### ix. Lien Releases.

52.    Except as otherwise specifically provided in the Plan, in any contract, instrument, release, or other agreement or document created pursuant to the Plan, or executed in connection therewith, to implement the Plan, it is necessary that all mortgages, deeds of trust, Liens, pledges, encumbrances, or other security interests against any property of the Debtors' estates shall be fully released, settled, and compromised and all rights, titles, and interests of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Debtors' Estates shall revert to the Debtors or the Wind Down Entities or assigned to the Credit Bid Purchasers or the Asia JV pursuant to the Interest Transfer Agreement or other relevant documentation, as applicable (the "Lien Releases").  The provisions of the Lien Releases are appropriate, fair, equitable and reasonable and in the best interests of the Debtors, their estates, and Holders of Claims and Interests.

### x. Reimbursement of Partial Professional Fees for Substantial Contribution.

53.    Article IV.B of the Plan appropriately provides for the reimbursement, on the Effective Date, of Cyrus Capital Partners, L.P. ("Cyrus") for fees and expenses incurred by it in connection with the Chapter 11 Cases in an amount not to exceed $950,000 (the "Substantial Contribution Payment"), so long as it participates, *pro rata*, in the Rights Offering and Credit Bid Transaction on account of its Taj Senior Notes and Taj DIP Notes.  Cyrus has made a substantial contribution to these Chapter 11 Cases, and has participated, *pro rata*, in the Rights Offering and Credit Bid Transaction on account of its Taj Senior Nots and Taj DIP Notes.  The substantial contribution payment provided to Cyrus is a material part of the Plan and meets the standard for substantial contribution set forth in section 503(b) of the Bankruptcy Code.

### xi. Transition Services Officer Escrow

54.    Article IV.N of the Plan appropriately provides that on the Confirmation Date, the Transition Services Escrow Agent shall release the Transition Services Escrow Amount due to the Transition Services Officer pursuant to the terms of the Transition Services Offer Letter and the Transition Services Escrow Agreement.  For the avoidance doubt, any of the Transition Services Escrow Amount distributed and released pursuant to Article IV.N of the Plan shall only include amounts already escrowed for the benefit of the Transition Services Officer pursuant to the terms of the Transition Services Offer Letter and the Transition Services Escrow Agreement.

### xii. Additional Plan Provisions.

55.    The other discretionary provisions of the Plan, including the Plan Supplement, are appropriate and consistent with applicable provisions of the Bankruptcy Code, including, without limitation, provisions for the allowance of certain Claims and Interests, treatment of indemnification obligations, and the retention of court jurisdiction.

### c.  Section 1123(d)—Cure of Defaults.

56.    Article V.B of the Plan provides for the satisfaction of Cure Obligations associated

with each Executory Contract and Unexpired Lease to be assumed in accordance with

section 365(b)(1) of the Bankruptcy Code.  Any monetary defaults under each Assumed Executory

Contract or Unexpired Lease shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy

Code, by payment of the cure amount in Cash, subject to the limitations described in Article V.B

of the Plan, or on such other terms as the parties to such Executory Contracts or Unexpired Leases

may otherwise agree.  Any disputed cure amounts will be determined in accordance with the

procedures set forth in Article V.B of the Plan, and applicable bankruptcy and nonbankruptcy law.

As such, the Plan provides that the Debtors will cure, or provide adequate assurance that the

Debtors will promptly cure, defaults with respect to assumed Executory Contracts and Unexpired

Leases in accordance with section 365(b)(1) of the Bankruptcy Code.  Thus, the Plan complies

with section 1123(d) of the Bankruptcy Code.

### d.  Section 1129(a)(2)—Compliance of the Debtors and Others with the Applicable Provisions of the Bankruptcy Code.

57.    The Debtors, as proponents of the Plan, have complied with all applicable

provisions of the Bankruptcy Code as required by section 1129(a)(2) of the Bankruptcy Code,

including sections 1122, 1123, 1124, 1125, 1126, 1128, and 1129, and with Bankruptcy Rules

2002, 3017, 3018, and 3019.

58.    The Debtors and their agents solicited votes to accept or reject the Plan after the

Bankruptcy Court approved the adequacy of the Disclosure Statement, pursuant to section 1125(a)

of the Bankruptcy Code and the Disclosure Statement Order.

59.    The Debtors and their agents have solicited and tabulated votes on the Plan and

have participated in the activities described in section 1125 of the Bankruptcy Code fairly, in good

faith within the meaning of section 1125(e), and in a manner consistent with the applicable

provisions of the Disclosure Statement Order, the Disclosure Statement, the Bankruptcy Code, the

Bankruptcy Rules, and all other applicable rules, laws, and regulations and are entitled to the

protections afforded by section 1125(e) of the Bankruptcy Code and the exculpation provisions set

forth in Article VIII.E of the Plan.

60.     The Debtors and their agents have participated in good faith and in compliance with

the applicable provisions of the Bankruptcy Code with regard to the offering, issuance, and

distribution of recoveries under the Plan and therefore are not, and on account of such distributions

will not be, liable at any time for the violation of any applicable law, rule, or regulation governing

the solicitation of acceptances or rejections of the Plan or distributions made pursuant to the Plan,

so long as such distributions are made consistent with and pursuant to the Plan.

### e.  Section 1129(a)(3)—Proposal of Plan in Good Faith.

61.     The Debtors have proposed the Plan in good faith and not by any means forbidden

by law.  In determining that the Plan has been proposed in good faith, the Bankruptcy Court has

examined the totality of the circumstances surrounding the filing of the Chapter 11 Cases, the Plan

itself, and the process leading to its formulation.  The Debtors' good faith is evident from the facts

and the record of the Chapter 11 Cases, the Disclosure Statement, the hearing on the Disclosure

Statement, and the record of the Confirmation Hearing and other proceedings held in the Chapter

11 Cases.

62.     The Plan is the product of good faith, arm's-length negotiations by and among

the Debtors, the Debtors' directors, officers and managers, Fung, and the other constituencies

involved in the Chapter 11 Cases, and incorporates a very public marketing process.  The Plan

itself and the process leading to its formulation provide independent evidence of the Debtors' and

such other parties' good faith, serve the public interest, and assure fair treatment of holders of

Claims and Interests.  Consistent with the overriding purpose of chapter 11, the Debtors filed the Chapter 11 Cases with the belief that the Debtors were in need of restructuring and the Plan was negotiated and proposed with the intention of maximizing stakeholder value and for no ulterior purpose.  Accordingly, the requirements of section 1129(a)(3) of the Bankruptcy Code are satisfied.

**f.  Section 1129(a)(4)—Court Approval of Certain Payments as Reasonable.**

63.     Any payment made or to be made by the Debtors, or by a person issuing securities or acquiring property under the Plan or pursuant to the Rights Offering Procedures and Backstop Commitment Agreement, for services or costs and expenses in connection with the Chapter 11 Cases, or in connection with the Plan, the Fung Settlement Agreement, the Global Settlement, or incident to the Chapter 11 Cases, has been approved by, or is subject to the approval of, the Bankruptcy Court as reasonable.  Accordingly, the Plan satisfies the requirements of section 1129(a)(4).

**g.  Section 1129(a)(5)—Disclosure of Directors, Officers and Managers and Consistency with the Interests of Creditors and Public Policy.**

64.     The Plan establishes the Wind Down Entities to implement the Wind Down with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Wind Down Entities. As such, the Reorganized Debtors will not appoint any directors or officers and section 1129(a)(5) is inapplicable to these cases.

**h.  Section 1129(a)(6)—Rate Changes.**

65.     The Plan does not contain any rate changes subject to the jurisdiction of any governmental regulatory commission and therefore will not require governmental regulatory approval.  Therefore, section 1129(a)(6) of the Bankruptcy Code does not apply to the Plan.

### i. Section 1129(a)(7)—Best Interests of Holders of Claims and Interests.

66.    The evidence in support of the Plan that was proffered or adduced at the Confirmation Hearing, and the facts and circumstances of the Chapter 11 Cases, establishes that each holder of Allowed Claims or Interests in each Class will recover as much or more value under the Plan on account of such Claim or Interest, as of the Effective Date, than the amount such holder would receive if the Debtors were liquidated on the Effective Date under chapter 7 of the Bankruptcy Code.  As a result, the Debtors have demonstrated that the Plan is in the best interests of their creditors and equity holders and the requirements of section 1129(a)(7) of the Bankruptcy Code are satisfied.

### j. Section 1129(a)(8)—Conclusive Presumption of Acceptance by Unimpaired Classes; Acceptance of the Plan by Certain Impaired Classes; Fairness of Plan with Respect to Deemed Rejecting Classes.

67.    The Deemed Accepting Classes are Unimpaired under the Plan and are deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Nevertheless, because the Plan has not been accepted by the Deemed Rejecting Classes and Class A7, the Debtors seek Confirmation under section 1129(b), solely with respect to the Deemed Rejecting Classes and Class A7, rather than section 1129(a)(8), of the Bankruptcy Code.  Although section 1129(a)(8) has not been satisfied with respect to the Deemed Rejecting Classes and Class A7, the Plan is confirmable because the Plan does not discriminate unfairly and is fair and equitable with respect to the Deemed Rejecting Classes and Class A7 and thus satisfies section 1129(b) of the Bankruptcy Code with respect to such Classes as described further below.  As a result, the requirements of section 1129(b) of the Bankruptcy Code are satisfied.

**k. Section 1129(a)(9)—Treatment of Claims Entitled to Priority Pursuant to Section 507(a) of the Bankruptcy Code.**

68.      The treatment of Administrative Claims, Accrued Professional Compensation Claims, DIP Claims, and Priority Tax Claims under Article II of the Plan satisfies the requirements of, and complies in all respects with, section 1129(a)(9) of the Bankruptcy Code.

69.      On the Effective Date, except to the extent that a Holder of an Allowed Administrative Claim or Priority Tax Claim and the TRU Inc. Debtor against which such Allowed Administrative Claim is asserted agree to less favorable treatment for such Holder, each Holder of an Allowed Administrative Claim or Priority Tax Claim, shall receive, in full and final satisfaction, compromise, settlement, and release of and in exchange for its Claim, its pro rata share of the TRU Inc. Silo Recovery, if any, after paying in full all Senior Claims.   The failure to object to Confirmation by a Holder of an Allowed Administrative Claim or Priority Tax Claim shall be deemed to be such Holder's consent to receive treatment for such Claim that is different from that set forth in section 1129(a)(9) of the Bankruptcy Code; *provided*, *however*, that the Holders of such Claims shall be deemed to consent to the treatment on account of such Claims as provided herein.   Notwithstanding any other provision of the Plan, as set forth in the Global Settlement Agreement, TRU Inc. shall be responsible for paying no less than two-thirds of Administrative Claims for state or federal taxes, if any, for which TRU Inc. and any other Debtor or Debtors are jointly and severally liable.   If any other Debtor makes a payment on account of any tax Administrative Claim for which TRU Inc. is jointly and severally liable without TRU Inc. paying two-thirds of the amount thereof, such Debtor shall have an Allowed tax Administrative Claim against TRU Inc. for an amount equal to the difference between the portion paid by TRU Inc. and two-thirds of such claim.

**l.    Section 1129(a)(10)—Acceptance by at Least One Impaired Class.**

70.    As set forth in the Voting Declaration, a majority of the Impaired Classes that were entitled to vote on the Plan have voted to accept the Plan.  Specifically, Holders of Claims in Class A3, Class A5, Class A6, Class A8, Class B3, and Class B4, which are impaired Classes of Claims under the Plan, voted to accept the Plan independent of any insiders' votes.  As such, with respect to each Debtor's Plan there is either at least one class of Claims that is Impaired under the Plan and has accepted the Plan, determined without including any acceptance of the Plan by any insider (as defined by the Bankruptcy Code).  Accordingly, the requirements of section 1129(a)(10) of the Bankruptcy Code are satisfied.

**m.  Section 1129(a)(11)—Feasibility of the Plan.**

71.    The Plan satisfies the feasibility requirements of section 1129(a)(11) of the Bankruptcy Code.  The Plan provides for the consummation of the Credit Bid Transaction and the liquidation of (i) the TRU Inc. Debtors' assets and (ii) the Taj Debtors' assets not transferred or acquired pursuant to the Credit Bid Transaction.  The cash proceeds of the Rights Offering, along with the other liquidated assets of the Debtors' estates, including the TRU Inc. Silo Recovery, will fund distributions to Holders of Claims and Interests pursuant to the Plan.  The Debtors will also establish and fund the Professional Fee Escrow Account to pay Allowed Accrued Professional Compensation Claims in accordance with the Professional Fee Allocation Mechanism.  The Plan also compensates the Administrator for reasonable costs and expenses, subject to the Wind Down Budget (as defined herein) and the terms and conditions of the Administrator Agreement. Accordingly, the Plan satisfies the requirements of section 1129(a)(11) of the Bankruptcy Code.

72.    In addition, the Plan provides for the settlement of all Causes of Actions and disposition of all assets of the Debtors' estates and brings a conclusion to these chapter 11 proceedings.  Rather than unnecessarily elongate these cases, the Plan provides closure and

assurance that the assets of the Debtors' estates are being distributed in an efficient and value maximizing manner pursuant to the Debtors' obligations under the Plan, without the need for any further financial restructuring.  Accordingly, the Plan satisfies the requirements of section 1129(a)(11) of the Bankruptcy Code.

**n.  Section 1129(a)(12)—Payment of Statutory Fees.**

73.    Article XII.C of the Plan provides that all fees payable pursuant to section 1930(a) of the Judicial Code, as determined by the Bankruptcy Court at the Confirmation Hearing in accordance with section 1128 of the Bankruptcy Code, will be paid by the applicable Debtor (on the Effective Date) or each of the applicable Reorganized Debtors for each quarter (including any fraction of a quarter) until the Chapter 11 Cases are converted, dismissed, or closed, whichever occurs first.  Accordingly, the Plan satisfies the requirements of section 1129(a)(12) of the Bankruptcy Code.

**o.  Section 1129(a)(13), (14), (15), and (16)—Retiree Benefits, Domestic Support Obligations, Individuals, and Nonprofit Corporations.**

74.    The Debtors do not owe any retiree benefits, domestic support obligations, are not individuals, and are not nonprofit corporations.  Therefore, sections 1129(a)(13), 1129(a)(14), 1129(a)(15), and 1129(a)(16) of the Bankruptcy Code do not apply to these Chapter 11 Cases.

**p.  Section 1129(b)—Confirmation of Plan Over Nonacceptance of Impaired Classes.**

75.    Notwithstanding the fact that the Deemed Rejecting Classes and Class A7 have not accepted the Plan, the Plan may be confirmed pursuant to section 1129(b)(1) of the Bankruptcy Code because:  (a) all applicable requirements of section 1129(a) of the Bankruptcy Code other than paragraph (8) thereof are met; and (b) the Plan does not discriminate unfairly and is fair and equitable with respect to the Interests in the Deemed Rejecting Classes and Class A7.  As a result, the Plan satisfies the requirements of section 1129(b) of the Bankruptcy Code.  Thus, the Plan may

be confirmed even though section 1129(a)(8) of the Bankruptcy Code is not satisfied.  After entry

of this Confirmation Order and upon the occurrence of the Effective Date, the Plan shall be binding

upon the members of the Deemed Rejecting Classes and of Class A7.

76.     Article III.B of the Plan provides alternative treatment to priority claims on the

Effective Date.  To the extent that the Holder of a priority claim did not object to the Plan, it is

deemed to consent and agree to the Plan and accordingly is not within the purview of section

1129(b).  If such a holder objected, that objection must be addressed by the Debtors.  Therefore,

to the extent that the Plan "impairs" priority claims, it does so on the basis of statutory impairment,

not as a result of "plan impairment."

### q.  Section 1129(c)—Only One Plan.

77.     Other than the Plan (including previous versions thereof), no other plan has been

filed in the Chapter 11 Cases of the Debtors.  Accordingly, the requirements of section 1129(c) of

the Bankruptcy Code are satisfied.

### r.  Section 1129(d)—Principal Purpose of the Plan Is Not Avoidance of Taxes or Section 5 of the Securities Act.

78.     No governmental unit or any other party has requested that the Bankruptcy Court

refuse to confirm the Plan on the grounds that the principal purpose of the Plan is the avoidance

of taxes or the avoidance of the application of section 5 of the Securities Act.  As evidenced by its

terms, the principal purpose of the Plan is not such avoidance.  Accordingly, the requirements of

section 1129(d) of the Bankruptcy Code have been satisfied.

### s.  Section 1129(e)—Not Small Business Cases.

79.     The Chapter 11 Cases are not small business cases, and accordingly,

section 1129(e) of the Bankruptcy Code does not apply to the Chapter 11 Cases.

**O.  Satisfaction of Confirmation Requirements.**

80.     Based upon the foregoing and all other pleadings and evidence proffered or adduced at or prior to the Confirmation Hearing, the Plan and the Debtors, as applicable, satisfy all the requirements for plan confirmation set forth in section 1129 of the Bankruptcy Code.

**P.  Good Faith.**

81.     The Debtors have proposed the Plan in good faith, with the legitimate and honest purpose of maximizing the value of the Debtors' estates for the benefit of their stakeholders.  The Plan is the product of extensive collaboration among the Debtors, Fung, and key stakeholders and accomplishes this goal.  Accordingly, the Debtors or the Reorganized Debtors, as appropriate, have been, are, and will continue acting in good faith if they proceed to:  (a) consummate the Plan, the Credit Bid Transaction, the Restructuring Transactions, the Rights Offering, and the agreements, settlements, transactions, and transfers contemplated thereby; and (b) take the actions authorized and directed or contemplated by this Confirmation Order.  Therefore, the Plan has been proposed in good faith to achieve a result consistent with the objectives and purposes of the Bankruptcy Code.

**Q.  Disclosure: Agreements and Other Documents.**

82.     The Debtors have disclosed all material facts, to the extent applicable, regarding: (a) the adoption of the New Organizational Documents or similar constituent documents; (b)  the method and manner of distributions under the Plan; (c) the issuance of the Initial Shares; (d) the adoption and execution of the Shareholders' Agreement; (e)  the adoption, execution, and implementation of the other matters provided for under the Plan, including those involving corporate action to be taken by or required of the Debtors or Reorganized Debtors, as applicable;  (f) the July 2018 Settlement Agreement; (g) the Fung Settlement Agreement; (h) the Global Settlement Agreement; (i) the retained Causes of Action; (j) the Rights Offering and

Backstop Commitment Agreement; (k) securities registration exemptions; (l) the exemption under

section 1146(a) of the Bankruptcy Code; (m) the appointment of the Administrator; (n) the Credit

Bid Transaction and the Credit Bid Transaction Documents; and (o) the adoption, execution, and

delivery of all contracts, leases, instruments, securities, releases, indentures, and other agreements

related to any of the foregoing.

### R. The Credit Bid Transaction.

83.    On September 14, 2018, the Bankruptcy Court entered the Bidding Procedures

Order, which established October 1, 2018 as the Bid Deadline (as defined therein) and scheduled

the Auction for October 5, 2018.  The Bankruptcy Court, on September 28, 2018, entered the

Notice of Revised Sale Deadlines, which revised the Bid Deadline to October 26, 2018 and

rescheduled the Auction to October 29, 2018.

84.    Following the Bid Deadline, the Debtors did not receive any other bids other than

the Credit Bid.  In an effort to maximize value for their stakeholders, the Debtors still held the

Auction on October 29, 2018.  No other party submitted a bid at the Auction.  Accordingly, the

Debtors determined that the Credit Bid Purchasers was the Successful Bidder (as defined in the

Bidding Procedures Order).  The bidding process afforded a full, fair, and reasonable opportunity

for any Person or Entity to make a higher or otherwise better offer to purchase the assets.  The

bidding and auction were duly noticed, and conducted in a non-collusive, fair, and good faith

manner.

85.    On the Effective Date, and as further described in the Transaction Steps

Memorandum, the Debtors shall consummate the Credit Bid Transaction, and, among other things,

the TRU Asia Equity Interests held directly or indirectly by the Debtors shall be transferred to and

vest in the Credit Bid Purchasers free and clear of (other than the Shareholders' Agreement) all

Liens, Claims, charges, or other encumbrances.   Upon consummation of the Credit Bid

Transaction, all outstanding TRU Asia Equity Interests will be held by the Credit Bid Purchasers and Fung.  On the Effective Date, all Holders of Taj Senior Notes Claims either (i) are deemed to have executed and become bound by the Shareholders' Agreement in connection with the receipt of their TRU Asia Equity Interests or, alternatively, (ii) are required to execute and become bound by the Shareholders' Agreement in order to receive their TRU Asia Equity Interests, in each case including the Amended Shareholders' Agreement upon Fung's execution of the Amended Shareholders' Agreement.  On and after the Effective Date, except as otherwise provided in the Plan, the Asia JV may operate its businesses and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules. Neither Fung, the Credit Bid Purchasers, the Asia JV, nor any of their respective Affiliates shall be deemed to be a successor of the Debtors.

### t.  Business Judgment; Highest or Best Offers.

86.    The Debtors have demonstrated good, sufficient, and sound business purposes and justifications for, and compelling circumstances to promptly consummate, each of the transactions constituting the Credit Bid Transaction, and such action is an appropriate exercise of the Debtors' business judgment and in the best interests of the Debtors and the Estates.  Such business reasons include, but are not limited to, the facts that:  (i) the value of the Debtors' assets may materially deteriorate if the Credit Bid Transaction is not consummated in a timely fashion; (ii) the transactions contemplated by the Interest Transfer Agreement constitute the highest or otherwise best offer for the assets subject to each such agreement; and (iii) unless the transaction contemplated by the Interest Transfer Agreement is concluded expeditiously as provided for in this Confirmation Order and pursuant to the Interest Transfer Agreement, potential creditor recoveries may be substantially diminished.

87.    The Interest Transfer Agreement constitutes the highest or best offer for the TRU Asia Equity Interests held directly or indirectly by the Debtors and will provide a greater recovery for the Estates than would be provided by any other available and viable alternatives.  The Debtors' determination that the Interest Transfer Agreement constitutes the highest or best offers for the Debtors' assets constitutes a valid and sound exercise of the Debtors' business judgment.  The Interest Transfer Agreement represents a fair and reasonable offer to purchase the relevant assets of the Debtors under the circumstances of the Chapter 11 Cases.  Approval of the Credit Bid Transaction Documents, and the prompt consummation of the Credit Bid Transaction contemplated thereby, is in the best interests of the Debtors and the Estates.

**S.  Good Faith of Credit Bid Purchasers; No Collusion.**

88.    The Credit Bid Purchasers are not insiders (as that term is defined in section 101(31) of the Bankruptcy Code) of any of the Debtors.

89.    The Credit Bid Purchasers are acquiring the applicable assets in good faith, and are good faith purchasers, within the meaning of section 363(m) of the Bankruptcy Code, and are therefore entitled to, and granted pursuant to paragraph 145 below, the full rights, benefits, privileges, and protections of that provision, and have otherwise proceeded in good faith in all respects in connection with the Credit Bid Transaction in that, *inter alia*:  (i) the Credit Bid Purchasers recognized that the Debtors were free to deal with any other party interested in acquiring the TRU Asia Equity Interests held directly or indirectly by the Debtors; (ii) the Credit Bid Purchasers complied with the provisions in the Bidding Procedures Order; (iii) the Credit Bid Purchasers agreed to subject their bid to the competitive bidding procedures set forth in the Bidding Procedures Order; (iv) the Credit Bid Purchasers have not violated section 363(n) of the Bankruptcy Code by any action or inaction; (v) no common identity of directors or controlling stockholders exists between the Credit Bid Purchasers, on the one hand, and any of the Debtors,

on the other hand; and (vi) the negotiation and execution of the Credit Bid Transaction Documents and the entirety of the Credit Bid Transaction Documents were at arms' length and in good faith.

90.     None of the Debtors, the Credit Bid Purchasers, or any of their respective Affiliates, partners, members, subsidiaries, officers, directors, principals, employees, agents, advisors, attorneys, accountants, investment bankers, consultants, representatives, and other Professionals, and their respective successors and assigns, each in their capacity as such, has engaged in any conduct that would cause or permit the Credit Bid Transaction Documents or the consummation of the Credit Bid Transaction, to be avoidable or avoided, or for costs or damages to be imposed, under section 363(n) of the Bankruptcy Code, or has acted in bad faith or in any improper or collusive manner with any Person in connection therewith.

**T.  No Fraudulent Transfer; Credit Bid Purchasers Not Successors.**

91.     The Interest Transfer Agreement, and the Transaction Documents collectively, were not entered into, and the Credit Bid Transaction is not being consummated, for the purpose of hindering, delaying or defrauding creditors of the Debtors under applicable law, and none of the parties to the Credit Bid Transaction Documents is consummating the Credit Bid Transaction with any fraudulent or otherwise improper purpose.  The consideration for the assets provided for in the Interest Transfer Agreement constitutes (i) reasonably equivalent value under the Bankruptcy Code and the Uniform Fraudulent Transfer Act, (ii) fair consideration under the Uniform Fraudulent Conveyance Act, and (iii) reasonably equivalent value, fair consideration, and fair value under any other applicable laws of the United States, any state, territory or possession or the District of Columbia.

92.     The transaction contemplated by the Interest Transfer Agreement does not cause there to be, and there is not, (i) a consolidation, merger, or *de facto* merger of the Credit Bid Purchasers, on the one hand, with or into the any Debtor or Estate, on the other hand, or vice versa,

(ii) a substantial continuity between the Credit Bid Purchasers, on the one hand, and any Debtor

or Estate, on the other hand, (iii) a common identity between the Credit Bid Purchasers, on the one

hand, and any Debtor or Estate, on the other hand, or (iv) a mere continuation of any Debtor or

any Estate, on the one hand, by the Credit Bid Purchasers, on the other hand.  No Credit Bid

Purchaser is or shall be deemed, as a result of any action taken in connection with the Credit Bid

Transaction, to:  (1) be a successor (or other such similarly situated party) to any of the Debtors

except as and to the extent set forth in the Credit Bid Transaction Documents (including with

respect to any assumed liabilities and permitted encumbrances under any Credit Bid Transaction

Document); or (2) have, *de facto* or otherwise, merged or consolidated with or into any of the

Debtors.

### U.  Conditions to Effective Date.

93.    The Plan shall not become effective unless and until the conditions set forth in

Article IX.B of the Plan have been satisfied or waived pursuant to Article IX.C of the Plan.

### V.  Implementation.

94.    All documents and agreements necessary to implement the transactions

contemplated by the Plan, including those contained or summarized in the Plan Supplement, and

all other relevant and necessary documents (including the New Organizational Documents of the

Reorganized Debtors and the Credit Bid Transaction Documents) have been negotiated in good

faith and at arm's-length, are in the best interests of the Debtors, and shall, upon completion of

documentation and execution, be valid, binding, and enforceable documents and agreements not

in conflict with any federal, state, or local law.  The documents and agreements are essential

elements of the Plan and entry into and consummation of the transactions contemplated by each

such document or agreement is in the best interests of the Debtors, the estates, and the holders of

Claims and Interests.  The Debtors have exercised reasonable business judgment in determining

which documents and agreements to enter into and have provided sufficient and adequate notice

of such documents and agreements.  The Debtors are authorized to take any action reasonably

necessary or appropriate to consummate such agreements and the transactions contemplated

thereby.

**W. Vesting of Assets.**

95.    Except as otherwise provided in the Plan, the Interest Transfer Agreement, the July

2018 Settlement Agreement, the Global Settlement Agreement, or in any agreement, instrument,

or other document incorporated in the Plan, and subject to the terms and the consummation of the

Credit Bid Transaction on the Effective Date, all property in each Estate, all Causes of Action, and

any property acquired by any of the Debtors pursuant to the Plan shall vest in each respective

Reorganized Debtor, the Asia JV, the Wind Down Entities, the Credit Bid Purchasers, or the Non-

Released Claims Trust, as applicable, free and clear of all liens, Claims, charges, or other

encumbrances.  On and after the Effective Date, except as otherwise provided in the Plan, each

Reorganized Debtor (or the applicable Wind Down Entity), the Asia JV, and the Non-Released

Claims Trust may operate its business and may use, acquire, or dispose of property and

compromise or settle any Claims, Interests, or Causes of Action without supervision or approval

by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

**X. Treatment of Executory Contracts and Unexpired Leases.**

96.    Pursuant to sections 365 and 1123(b)(2) of the Bankruptcy Code, upon the

occurrence of the Confirmation Date, the Plan provides for the rejection of certain Executory

Contracts and Unexpired Leases, effective as of the Effective Date.  The Debtors' determinations

regarding the rejection of Executory Contracts and Unexpired Leases are based on and within the

sound business judgment of the Debtors, are necessary to the implementation of the Plan and are

in the best interests of the Debtors, their estates, holders of Claims and Interests and other parties

in interest in the Chapter 11 Cases.

97.    The TRU Inc. Debtors and Winston-Salem Retail Associates, L.P. ("Winston")

have resolved the objection filed at Docket No. 4592.  Prior to the bankruptcy filing, Winston and

Toys Delaware's predecessor in interest Toys "R" Us, Inc.[4] were each 50% partners in ZT-

Winston-Salem Associates, a North Carolina general partnership (the "Winston-Salem

Partnership") pursuant to that certain ZT-Winston-Salem Joint Venture Agreement dated April 25,

1988 (as amended, the "JV Agreement").    Therefore, Toys Delaware has the interest in the

Winston-Salem Partnership, and TRU Inc. does not have an interest in the Winston-Salem

Partnership.

98.    Toys Delaware and Winston's rights are expressly reserved pursuant to paragraph

120 of the *Order Confirming the Fourth Amended Chapter 11 Plans of the Toys Delaware Debtors*

*and Geoffrey Debtors* (the "Delaware Confirmation Order").

**Y.  The Settlement Agreements.**

99.    The July 2018 Settlement Agreement is an essential element of the Plan as to the

TRU Inc. Debtors, and is necessary for confirmation and consummation of the Plan as to the TRU

Inc. Debtors.  The TRU Inc. Debtors' entry into the July 2018 Settlement Agreement is in the best

interests of the TRU Inc. Debtors, their Estates, and all Holders of Claims or Interests in respect

of the TRU Inc. Debtors.

100.    The Fung Settlement Agreement is a vital component of the Plan, and is necessary

for confirmation and consummation of the Plan.  Entry into the Fung Settlement Agreement was

---

[4]    For avoidance of doubt, this is referring to the Toys "R" Us, Inc. that formally changed its name to Toys Delaware
in December 1995.

in the best interest of the Debtors, their Estates, and all Holders of Claims or Interests.  The findings

of fact, conclusions of law, and decretal paragraphs contained in the Fung Settlement Order are

incorporated herein by reference, are an integral part this Confirmation Order, and are hereby

ratified in their entirety.

101.    The Global Settlement Agreement (and together with the July 2018 Settlement

Agreement and the Fung Settlement Agreement, the "Settlement Agreements") is an essential

component of the Plan, and is necessary for confirmation and consummation of the Plan.  Entry

into the Global Settlement Agreement was in the best interest of the Debtors, their Estates, and all

Holders of Claims or Interests.  The findings of fact, conclusions of law, and decretal paragraphs

contained in the Global Settlement Order are incorporated herein by reference, are an integral part

this Confirmation Order, and are hereby ratified in their entirety.

**Z.  Objections.**

102.    All parties have had a full and fair opportunity to litigate all issues raised in the

objections to Confirmation of the Plan, or which might have been raised, and the objections have

been fully and fairly litigated  or resolved, including by agreed-upon reservations of rights as set

forth in this Confirmation Order.

## II.  <u>ORDER</u>

**BASED ON THE FOREGOING FINDINGS OF FACT AND CONCLUSIONS OF
LAW, IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED THAT:**

103.    This Confirmation Order confirms the Plan in its entirety as modified herein.

104.    This Confirmation Order approves the Restructuring Documents (which include,

for the avoidance of doubt, the Credit Bid Transaction Documents) and the Plan Supplement,

including the documents contained therein, as they may be amended through and including the

Effective Date in accordance with and as permitted by the Plan.  The terms of the Plan, the Plan

Supplement, and the exhibits thereto are incorporated herein by reference and are an integral part

of this Confirmation Order; *provided* that if there is any direct conflict between the terms of the

Plan and the terms of this Confirmation Order, the terms of this Confirmation Order shall control

solely to the extent of such conflict.

105.    All holders of Claims that voted to accept the Plan are conclusively presumed to

have accepted the Plan as modified.  All Holders of Administrative Claims that did not opt-out of

the July 2018 Settlement Agreement are presumed to have accepted their treatment under the Plan.

106.    The terms of the Plan, the Plan Supplement, all exhibits thereto, this Confirmation

Order, and any related document or exhibit shall be effective and binding as of the Effective Date

on all parties in interest, including, but not limited to:   (a) the Debtors; (b) the Creditors'

Committee; (c) the Taj Holders Steering Group, and (d) all holders of Claims and Interests.

107.    The failure to include or refer to any particular article, section, or provision of the

Plan, the Plan Supplement, or any related document, agreement, or exhibit does not impair the

effectiveness of that article, section, or provision; it being the intent of the Bankruptcy Court that

the Plan, the Plan Supplement, and any related document, agreement, or exhibit are approved in

their entirety.

## A.    Objections.

108.    To the extent that any objections (including any reservations of rights contained

therein) to Confirmation have not been withdrawn, waived, or settled before entry of this

Confirmation Order, are not cured by the relief granted in this Confirmation Order, or have not

been otherwise resolved as stated on the record of the Confirmation Hearing, all such objections

(including any reservation of rights contained therein) are hereby overruled in their entirety and

on their merits.

**B.      Findings of Fact and Conclusions of Law.**

109.    The findings of fact and the conclusions of law set forth in this Confirmation Order

constitute findings of fact and conclusions of law in accordance with Bankruptcy Rule 7052, made

applicable to this proceeding by Bankruptcy Rule 9014.  All findings of fact and conclusions of

law announced by the Bankruptcy Court at the Confirmation Hearing in relation to Confirmation,

including the Confirmation Ruling, are hereby incorporated into this Confirmation Order.  To the

extent that any of the following constitutes findings of fact or conclusions of law, they are adopted

as such.  To the extent any finding of fact or conclusion of law set forth in this Confirmation Order

(including any findings of fact or conclusions of law announced by the Bankruptcy Court at the

Confirmation Hearing and incorporated herein) constitutes an order of this Court, it is adopted as

such.

**C.      Post-Confirmation Modification of the Plan.**

110.    Subject to the limitations and terms contained in Article X.A and B of the Plan, the

Debtors are hereby authorized to amend or modify the Plan at any time prior to the substantial

consummation of the Plan, but only in accordance with section 1127 of the Bankruptcy Code and

Bankruptcy Rule 3019, without further order of this Court.

**D.      Plan Classification Controlling.**

111.    The terms of the Plan shall solely govern the classification of Claims and Interests

for purposes of the distributions to be made thereunder and the classifications set forth on the

ballots tendered to or returned by the holders of Claims or Interests in connection with voting on

the Plan:  (a) were set forth thereon solely for purposes of voting to accept or reject the Plan; (b) do

not necessarily represent, and in no event shall be deemed to modify or otherwise affect, the actual

classification of Claims and Interests under the Plan for distribution purposes; (c) may not be relied

upon by any holder of a Claim or Interest as representing the actual classification of such Claim

or Interest under the Plan for distribution purposes; and (d) shall not be binding on the Debtors except for voting purposes.

**E.      General Settlement of Claims and Interests.**

112.    Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies resolved pursuant to the Plan.  Pursuant to the Fung Settlement Agreement, on the Closing Date, the Debtors shall pay Fung $8.25 million in cash in complete settlement, compromise, and release, effective as of the Effective Date, of all Claims and Causes of Action of any nature whatsoever, including appeals, that Fung has initiated or commenced, or could initiate or commence, as of the Closing Date, against the Debtors or any of their Affiliates.

113.    The entry of the Fung Settlement Order constituted (a) the Court's approval of the Taj Debtors' payment of $8.25 million in cash to Fung in exchange for (i) complete settlement, compromise, and releases of that certain litigation and arbitration in Hong Kong (A) related to the Shareholders' Agreement and (B) in response to certain relief requested from the Bankruptcy Court (collectively, the "Fung Litigation"), and (ii) the withdrawal and/or dismissal of the Fung Litigation in its entirety promptly after the Closing Date, (b) a finding by the Court that (i) such compromise or settlement (A) was negotiated in good faith and arm's-length, (B) is in the best interest of the Debtors, their Estates, the Reorganized Debtors, creditors, and all other parties in interests and (C) is fair, equitable, and reasonable and (ii) Fung participated in good faith in the sale process for the TRU Asia Equity Interests held directly or indirectly by the Debtors.  All distributions made to holders of Allowed Claims and Interests in any Class are intended to be and shall be final.

114.    Pursuant to the Global Settlement Agreement, on the Effective Date, the Taj Debtors shall pay to Toys Delaware, in settlement of certain fee allocation issues and disputes among the Debtors, $3 million in respect of the fees and expenses charged, or to be charged, by Prime Clerk LLC in the Chapter 11 Cases.

115.    The entry of the Global Settlement Order constituted: (a) the Court's (i) approval of the Taj Debtors' payment of $3 million in cash to Toys Delaware in settlement of certain fee allocation issues and other disputes; (ii) approval of the intercompany releases and allocations set forth in the Global Settlement Agreement; (iii) authorization for the relevant parties to enter into Transition Services Agreements on the terms described in the Global Settlement Agreement; (iv) authorization of the relevant parties to enter into an amended License Agreement on the terms described in the Global Settlement Agreement; (v) authorization and direction of the Global Settlement Parties to enter into, perform under, execute, and deliver the Global Settlement Agreement, and take any and all actions as may be necessary or desirable to effectuate and implement the Global Settlement Agreement and relief granted pursuant to the Global Settlement Order, (b) a finding by the Court that (i) such compromise or settlement (A) was negotiated in good faith and arm's-length, (B) is in the best interest of the Debtors, the Toys Delaware Debtors, the Geoffrey Debtors, their respective Estates and creditors, the Reorganized Debtors, the reorganized Toys Delaware Debtors and Geoffrey Debtors, and all other parties in interests in the above-captioned chapter 11 cases, and (C) is fair, equitable, and reasonable.  All distributions made to holders of Allowed Claims and Interests in any Class are intended to be and shall be final.

**F.    Restructuring Transactions.**

116.    The Debtors shall take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan.  The actions necessary to implement the Restructuring Transactions and the Credit Bid Transaction may

include, without limitation:  (a) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, arrangement, continuance, dissolution, sale, purchase, or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable Entities may agree; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and the Transaction Steps Memorandum and having other terms for which the applicable parties agree; (c) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable state or provincial law; (d) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law in connection with the Plan; (e) pursuant to the Rights Offering Procedures and the Backstop Commitment Agreement, the implementation of the Rights Offering, the distribution of the Subscription Rights to the Rights Offering Participants, and the issuance of the Initial Shares in connection therewith; and (f) all other actions that are provided for in the Restructuring Transactions Description and/or the Transaction Steps Memorandum, or that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law.

117.    With respect to the Plan, all amounts of Cash necessary for the Debtors or the Disbursing Agent to make payments or distributions pursuant hereto shall be obtained from the Sale Proceeds, Liquidation Proceeds, Cash on hand, and Cash raised or held by the Debtors, including, as applicable, Cash raised from the Rights Offering.

118.    The Reorganized Debtors shall use Cash on hand to fund distributions to certain

Holders of Allowed Claims in accordance with Article III of the Plan.  The allocation and

distribution of the Cash on hand at the TRU Inc. Debtors shall be subject to and distributed in

accordance with the Global Settlement Agreement.

119.    On the Effective Date, one or more Wind Down Entities will be formed to

implement the Wind Down.  The Wind Down Entities will be established for the primary purpose

of liquidating the Wind Down Entities' assets and Winding Down the Debtors' Estates, with no

objective to continue or engage in the conduct of a trade or business, except to the extent

reasonably necessary to, and consistent with, the liquidating purpose of the Wind Down Entities.

The Wind Down shall be subject to a budget acceptable to the Debtors and the Taj Holders Steering

Group (the "Wind Down Budget").  Upon the transfer of the Debtors' assets and equity as more

fully set forth in the Administrator Agreement, the Debtors will have no reversionary or further

interest in or with respect to the assets of the Wind Down Entities.

120.    Before or on the Effective Date, the Administrator may be designated by the

Debtors and the Taj Holders Steering Group pursuant to the terms of the Administrator Agreement

for the purposes of conducting the Wind Down and shall succeed to such powers as would have

been applicable to the Debtors' officers, directors, and shareholders, and the Debtors shall be

authorized to be (and, upon the conclusion of the Wind Down, shall be) dissolved by the

Administrator.  All property of the Estates not distributed to the Holders of Claims or Interests on

the Effective Date, or transferred to the Asia JV or the Credit Bid Purchasers pursuant to the

Interest Transfer Agreement, as applicable, shall be transferred to the Administrator and managed

and distributed by the Administrator pursuant to the terms of the Administrator Agreement and

shall be held in the name of the Debtors free and clear of all Claims and Interests except for rights

to such distributions provided to Holders of Allowed Claims and Allowed Interests as provided in the Plan. Any and all reasonable and documented costs and expenses incurred by the Administrator in connection with the Wind Down shall be paid from the funds of the Wind Down Entities, subject to the Wind Down Budget and the terms and conditions of the Administrator Agreement. The Administrator shall only file tax returns for Debtors in jurisdictions where such Debtor previously filed tax returns, unless the Administrator determines that a tax return is required to be filed due to a change in law, fact, or circumstance on or after the Effective Date. Following the Effective Date and in the event of the resignation or removal, liquidation, dissolution, death, or incapacity of the Administrator, the Credit Bid Purchasers shall designate another Entity to become Administrator and such Entity will become the successor Administrator and, without any further act, shall become fully vested with all of the rights, powers, duties, and obligations of the predecessor Administrator.

121.     Following the Wind down of TRU (Vermont), Inc., any Cash or other proceeds of TRU (Vermont) Inc. shall be distributed to TRU Inc. and shall be distributed by TRU Inc. in accordance with the Priority Waterfall. Such cash or other proceeds of TRU (Vermont), Inc. shall be reserved pursuant to section 3.4(a) of the Global Settlement Agreement pending resolution of any Administrative Claims, including any accrued or projected tax Administrative Claims, and TRU Inc. shall not make any further distributions pending resolution or satisfaction of such Claims.

122.     On or as soon as reasonably practicable after the Effective Date, the remaining Cash or other proceeds of MAP 2005 Real Estate, LLC and Cash held at TRU Inc. shall be distributed in accordance with and as set forth in the Global Settlement Agreement. Any payments made pursuant to section 3.4(a) of the Global Settlement Agreement shall not be subject to any contest,

attack, rejection, recovery, claw-back, recoupment, reduction, defense, counterclaim, offset, subordination, recharacterization, avoidance or other claim, cause of action or other challenge of any nature under the Bankruptcy Code or applicable nonbankruptcy law.

**G.    Corporate Action.**

123.    On the Effective Date or the Closing Date (as applicable), or as soon thereafter as is reasonably practicable, all actions contemplated by the Plan shall be deemed authorized and approved by the Bankruptcy Court in all respects, including, as applicable:  (a) the implementation of the Restructuring Transactions and Credit Bid Transaction, including generally allowing for all corporate action necessary to effectuate the Restructuring Transactions and Credit Bid Transaction; (b) the effectuation of the respective Settlement Agreements; (c) the cancellation of certain agreements, obligations, instruments, and certain Interests; (d) authorization and approval of all corporate actions contemplated under the Plan; (e) the execution, delivery, filing, or recording of all contracts, instruments, releases, and other agreements or documents in furtherance of the Plan; and (f) all other actions contemplated by the Plan (whether to occur before, on, or after the Effective Date).  Upon the Effective Date, all matters provided for in the Plan involving the corporate structure of the Reorganized Debtors, and any corporate action required by the Debtors, or the other Reorganized Debtors in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders, directors, or officers of the Debtors, or the Reorganized Debtors.

124.    On or (as applicable) before the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors shall be authorized and (as applicable) directed to issue, execute and deliver the agreements, documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name of and on behalf of the Reorganized Debtors, including any and all other agreements, documents,

securities, and instruments relating to the foregoing. The authorizations and approvals contemplated by Article IV.B of the Plan shall be effective notwithstanding any requirements under non-bankruptcy law.

**H.      Plan Implementation Authorization.**

125.    The Debtors or the Reorganized Debtors, as the case may be, and their respective directors, officers, members, agents, and attorneys, financial advisors, and investment bankers are authorized and empowered from and after the date hereof to negotiate, execute, issue, deliver, implement, file, or record any contract, instrument, release, or other agreement or document related to the Plan, as the same may be modified, amended and supplemented, and to take any action necessary or appropriate to implement, effectuate, consummate, or further evidence the Plan in accordance with its terms and the terms hereof, or take any or all corporate actions authorized to be taken pursuant to the Plan, this Confirmation Order, the July 2018 Settlement Order, the Fung Settlement Order, or the Global Settlement Order, whether or not specifically referred to in the Plan or any exhibit thereto, without further order of the Bankruptcy Court.  To the extent applicable, any or all such documents shall be accepted upon presentment by each of the respective state filing or recording offices and filed or recorded in accordance with applicable state law and shall become effective in accordance with their terms and the provisions of state law.

126.    Pursuant to section 303 of the General Corporation Law of the State of Delaware and any comparable provision of the business corporation laws of any other state, as applicable, no action of the Debtors' boards of directors or the Reorganized Debtors' boards of directors will be required to authorize the Debtors or Reorganized Debtors, as applicable, to enter into, execute and deliver, adopt or amend, as the case may be, any such contract, instrument, release, or other agreement or document related to the Plan, and following the Effective Date, each of the Plan documents will be a legal, valid, and binding obligation of the Debtors or Reorganized Debtors,

as applicable, enforceable against the Debtors and the Reorganized Debtors in accordance with the

respective terms thereof.  The Reorganized Debtors may also, consistent with the Plan, take any

additional steps on and after the Effective Date to consolidate and streamline their organization,

including, among other things, the merger, liquidation, dissolution, or consolidation of one or more

of the Debtors or Reorganized Debtors.

127.    On the Effective Date, all Holders of Taj Senior Notes Claims either (i) are deemed

to have executed and become bound by the Shareholders' Agreement in connection with the receipt

of their TRU Asia Equity Interests or, alternatively, (ii) are required to execute and become bound

by the Shareholders' Agreement in order to receive their TRU Asia Equity Interests, in each case

including the Amended Shareholders' Agreement upon Fung's execution of the Amended

Shareholders' Agreement.

**I.      The Settlement Agreements.**

128.    The July 2018 Settlement Agreement shall remain in full force and effect.  The

terms of the July 2018 Settlement Agreement and the July 2018 Settlement Order are incorporated

by reference herein, are an integral part of this Confirmation Order as to the TRU Inc. Debtors,

and are hereby ratified in their entirety, and the TRU Inc. Debtors shall continue to fulfill their

obligations thereunder.

129.    The Fung Settlement Agreement shall remain in full force and effect.  The terms of

the Fung Settlement Agreement and the Fung Settlement Order are incorporated by reference

herein, are an integral part of this Confirmation Order, are hereby ratified in their entirety, and the

Debtors shall continue to fulfill their obligations thereunder.

130.    The Global Settlement Agreement shall remain in full force and effect.  The terms

of the Global Settlement Agreement and the Global Settlement Order are incorporated by reference

herein, are an integral part of this Confirmation Order, are hereby ratified in their entirety, and the Debtors shall continue to fulfill their obligations thereunder.

**J.    Rights Offering.**

131.    The Rights Offering is in the best interests of the Debtors, their estates, and their stakeholders, and is necessary and appropriate for the consummation of the Plan and operations of the Reorganized Debtors.  The Debtors have provided sufficient and adequate notice of the Rights Offering to all parties in interest in the Chapter 11 Cases.  The terms and conditions of the Rights Offering Shares, as set forth in the Rights Offering Procedures, is fair and reasonable, reflects the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and is approved.

132.    For the avoidance of all doubt, neither the Rights Offering nor the Backstop Commitment Agreement, including the Rights Offering Shares and the Backstop Commitment Premium Shares, shall in any way dilute the TRU Asia Equity Interests owned by Fung (except, if applicable, for any Initial Shares that Fung may receive in its capacity as a Holder of the Taj Senior Notes Claim(s)).  Further, in the event that any term of either the Backstop Commitment Agreement or Rights Offering conflicts with or is inconsistent in any respect with the terms of the Plan, the terms of the Plan shall control.

133.    Notwithstanding anything in the Plan to the contrary, the "Maximum Rights Offering Amount" shall mean $365,000,000.

**K.    Credit Bid Transaction**

134.    The Credit Bid Transaction is hereby approved, according to the terms of the Restructuring Documents, including the Credit Bid Transaction Documents, and the Plan.

135.    The notices described herein were good, sufficient, and appropriate under the circumstances, and no other or further notice of the Restructuring Documents (including, without

limitation, the Plan, the Credit Bid Transaction Documents, and the Plan Supplement) or the

Confirmation Hearing, nor the consent of any counterparties to Executory Contracts or Unexpired

Leases Contracts is or shall be required.

136.    A reasonable opportunity to object or be heard with respect to the Plan, the Credit

Bid Transaction Documents, the Plan Supplement, and the Confirmation Hearing has been

afforded to all interested Persons and Entities.

137.    The Debtors are the lawful direct or indirect owners of the assets to be transferred

pursuant to the Credit Bid Transaction Documents and:  (a) have full power and authority to

execute the Credit Bid Transaction Documents, which have been duly and validly authorized, and

all other documents contemplated thereby; (b) have all of the power and authority necessary to

execute the Restructuring Documents and consummate the Credit Bid Transaction and

Restructuring Transactions; and (c) upon entry of this Confirmation Order need no consent or

approval from any other Person or Entity to transfer applicable assets, assign the Executory

Contracts and Unexpired Leases, or to otherwise consummate the Credit Bid Transaction in

accordance with the Credit Bid Transaction Documents.

138.    Pursuant to sections 363(f) and 1141(c) of the Bankruptcy Code the Debtors'

transfer of assets to the Credit Bid Purchasers will be, as of the Effective Date, a legal, valid, and

effective transfer, which transfer vests or will vest the Credit Bid Purchasers with all right, title,

and interest of the Debtors to the applicable assets free and clear of (other than the Shareholders'

Agreement) all Liens, Claims, Interests, and encumbrances (including any Liens and Claims:  (a)

that purport to give to any party a right of setoff or recoupment against, or a right or option to

effect any forfeiture, modification, profit sharing interest, right of first refusal, purchase or

repurchase right or option, or termination of, any of the Debtors' or the Credit Bid Purchasers', as

applicable, interest in the applicable assets, or any similar rights; or (b) in respect of taxes, restrictions, rights of first refusal, consent rights or requirements, charges of interests of any kind or nature, if any, including any restriction of use, voting, transfer, receipt of income or other exercise of any attributes of ownership).

139.    On the Effective Date, and as further described in the Transaction Steps Memorandum, the Debtors shall consummate the Credit Bid Transaction, and, among other things, the TRU Asia Equity Interests held directly or indirectly by the Debtors shall be transferred to and vest in the Credit Bid Purchasers free and clear of (other than the Shareholders' Agreement) all Liens, Claims, charges, or other encumbrances.   Upon consummation of the Credit Bid Transaction, all outstanding TRU Asia Equity Interests will be held by the Credit Bid Purchasers and Fung.  On the Effective Date, all Holders of Taj Senior Notes Claims either (a) are deemed to have executed and become bound by the Shareholders' Agreement in connection with the receipt of their TRU Asia Equity Interests or, alternatively, (b) are required to execute and become bound by the Shareholders' Agreement in order to receive their TRU Asia Equity Interests, in each case including the Amended Shareholders' Agreement upon Fung's execution of the Amended Shareholders' Agreement.  On and after the Effective Date, except as otherwise provided in the Plan, the Asia JV may operate its businesses and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules. Neither Fung nor the Credit Bid Purchasers nor any of their respective Affiliates shall be deemed to be a successor of the Debtors.

140.    Pursuant to sections 105, 363, and 365 of the Bankruptcy Code, the Debtors, the Asia JV, and the Credit Bid Purchasers, as applicable, are authorized, without further order of the

Court, to:  (a) take all actions as may be deemed necessary or appropriate to consummate any Credit Bid Transaction pursuant to the terms of the Plan, the Restructuring Documents, the Transaction Steps Memorandum, and this Confirmation Order; and (b) execute and deliver, perform under, consummate, and implement the Credit Bid Transaction Documents.  Entry of this Confirmation Order shall constitute approval of the Credit Bid Transaction and the Credit Bid Transaction Documents.

141.    All Persons currently in possession of any or all of the assets subject to transfer pursuant to the Credit Bid Transaction Documents are hereby directed to surrender possession of such assets to the Credit Bid Purchasers on the Closing Date.  All Persons or Entities are prohibited from taking any action to adversely affect or interfere with the ability of the Debtors to transfer such assets to the Credit Bid Purchasers, in accordance with the Credit Bid Transaction Documents or this Confirmation Order.

142.    Subject only to the reservations set forth in each and every federal, state, local, or foreign government or governmental or regulatory authority, agency, board, bureau, commission, court, department, or other governmental entity is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Credit Bid Transaction Documents.

143.    To the extent provided by section 525(a) of the Bankruptcy Code, no governmental unit may deny, revoke, suspend, condition, or refuse to renew a license, permit, charter, franchise, or other similar grant on account of the filing or pendency of the Chapter 11 Cases or the consummation of the Credit Bid Transaction.

144.    On the closing date of the Credit Bid Transaction, this Confirmation Order shall be considered and constitute, for any and all purposes, a full and general assignment, conveyance,

and transfer of the TRU Asia Equity Interests held directly or indirectly by the Debtors free and clear of (other than the Shareholders' Agreement) all Liens, Claims, charges, or other encumbrances. Notwithstanding anything to the contrary herein or in the Plan, all of the provisions of this Confirmation Order, the Plan, the Plan Supplement, the Restructuring Documents, and any other applicable documents relating to the Credit Bid Transaction shall be and remain effective notwithstanding the failure of the Effective Date to occur.

**L.  Good Faith of Credit Bid Purchasers; No Collusion.**

145.  The transactions contemplated by the Credit Bid Transaction Documents are undertaken by the Debtors and the Credit Bid Purchasers without collusion, as that term is defined in section 363(n) of the Bankruptcy Code, and in good faith, as that term is defined in section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided therein to consummate the transactions contemplated by the Interest Transfer Agreement and the Plan shall not affect the validity of such transactions (including the assumption, assignment and/or transfer of any Executory Contract or Unexpired Lease), unless such authorization and consummation of such transactions are duly stayed pending such appeal. The Credit Bid Purchasers are good faith purchasers within the meaning of section 363(m) of the Bankruptcy Code and, as such, are entitled to and hereby granted the full protections of section 363(m) of the Bankruptcy Code.

**M.  Credit Bid Transaction Fee**

146.  Pursuant to sections 327(a), 328(a), 330 and 331 of the Bankruptcy Code, and subject to paragraph 16 of the *Order (I) Authorizing the Employment and Retention of Lazard Frères & Co. LLC as Investment Banker to the Debtors and Debtors in Possession, Effective Nunc Pro Tunc to the Petition Date, (II) Modifying Certain Time Keeping Requirements, and (III) Granting Related Relief* [Docket No. 732] (the "Lazard Retention Order"), the consummation of

the Credit Bid Transaction shall be deemed to be a Partial Company Sale Transaction (as defined in the Lazard Retention Order) and, upon entry of this Confirmation Order, Lazard Frères & Co. LLC ("Lazard") shall earn a Partial Company Sale Transaction Fee (as defined in the Lazard Retention Order) on account thereof equal to $6,400,000 (the "JV Sale Fee"), which shall be paid by the Debtors (and not the Reorganized Debtors) to Lazard in cash in two installments, in each case as soon as reasonably practicable: (1) upon entry of this Confirmation Order, in an amount equal to $3,000,000, less the amounts previously paid on account of the DIP Financing Fee included in Lazard's third interim fee application [Docket No. 4968], and (2) upon the earliest of the following: (i) the occurrence of the Effective Date, (ii) any refinancing of the Taj DIP, or (iii) January 18, 2019, in an amount equal to the remaining unpaid portion of the JV Sale Fee; *provided that*, consistent with the Lazard Retention Order, (i) Lazard shall include such fee in its final fee application, (ii) the U.S. Trustee shall have the right to object to such fee based on the reasonableness standard provided in section 330 of the Bankruptcy Code and (iii) the rights of all parties other than the Taj Holders Steering Group to object to such fee under section 328 of the Bankruptcy Code are reserved.  Notwithstanding anything to the contrary in the Lazard Retention Order,  Lazard shall not be entitled to any further and incremental fees payable by the Debtors, including a restructuring fee, with respect to the Plan and the transactions contemplated thereby, including the Credit Bid Transaction, other than (i) the JV Sale Fee, (ii) the Debtors' allocable share of any unpaid monthly fees accruing through the Effective Date, and (iii) any other Partial Company Sale Transaction Fee to which Lazard is entitled in accordance with the Lazard Retention Order with respect to any other sale of the Debtors' assets (excluding the TRU Asia Equity Interests held directly or indirectly by the Debtors) occurring on or after the date hereof to a third-party purchaser.  Except for any actions reasonably necessary or appropriate to seek or obtain

approval of any fees earned and expenses incurred in the course of its retention, Lazard's retention

shall otherwise terminate upon entry of this Confirmation Order.

**N.      Transition Services Officer Escrow**

147.    On the Confirmation Date, the Transition Services Escrow Agent shall release the

Transition Services Escrow Amount due to the Transition Services Officer pursuant to the terms

of the Transition Services Offer Letter and the Transition Services Escrow Agreement.  For the

avoidance doubt, any of the Transition Services Escrow Amount distributed and released pursuant

to Article IV.N of the Plan shall only include amounts already escrowed for the benefit of the

Transition Services Officer pursuant to the terms of the Transition Services Offer Letter and the

Transition Services Escrow Agreement.

**O.  No Successor Liability for Credit Bid Purchasers.**

148.    Based on the record before this Court, except as otherwise expressly provided in

the Plan, this Confirmation Order, or the Credit Bid Transaction Documents, the Credit Bid

Purchasers:  (i) do not, pursuant to the Plan or otherwise, assume, agree to perform, pay, or

otherwise have any responsibilities for any liabilities or obligations of the Debtors or any other

Person relating to or arising out of the operations of or assets of the Debtors on or prior to the

Effective Date; (ii) are not, and shall not be, successors to the Debtors by reason of any theory of

law or equity; and (iii) shall not have any successor or transferee liability of any kind or character;

provided that the Credit Bid Purchasers shall promptly perform and discharge the obligations

specified in the Plan and the Interest Transfer Agreement.

149.    None of the Asia JV, the Credit Bid Purchasers, nor any of their Affiliates, shall be

deemed, as a result of any action taken in connection with the Credit Bid Transaction Documents,

the consummation of the transactions contemplated by the Credit Bid Transaction Documents, or

the transfer or operation of the relevant purchased assets (a) to be legal successors, or otherwise

be deemed successors to the Debtors; (b) to have, de facto or otherwise, merged with or into the

Debtors; (c) to be alter egos or continuations of the Debtors; or (d) to have any responsibility for

any obligations based on any theory of successor or similar theories of liability.

150.   Without limiting the generality of the foregoing, except as otherwise expressly

provided in the Credit Bid Transaction Documents or this Confirmation Order, none of the Asia

JV, the Credit Bid Purchasers, nor any of their Affiliates, shall be liable for any claims against or

in respect of the assets purchased under the Credit Bid Transaction Documents or against the

Debtors or any of their predecessors or Affiliates, and the Asia JV, the Credit Bid Purchasers, and

their Affiliates shall have no successor, transferee, derivative, or vicarious liabilities of any kind

or character, whether known or unknown as of the closing of the Credit Bid Transaction, then

existing or hereafter arising, whether fixed or contingent, asserted or unasserted, liquidated or

unliquidated, with respect to the Debtors or their Affiliates or any obligations of the Debtors or

their Affiliates arising prior to the closing of the Credit Bid Transaction, including, but not limited

to:  (a) any foreign, federal, state, or local revenue, pension, ERISA (as defined below), tax

(including, without limitation, taxes arising, accruing or payable under, out of, in connection with,

or in any way relating to the operation of the purchased assets prior to the closing of the Credit Bid

Transaction), labor, employment, antitrust, environmental, or other law, rule, or regulation

(including without limitation filing requirements under any such laws, rules or regulations); (b)

any products liability law, rule, regulation, or doctrine with respect to any Debtor's liability under

such law, rule, regulation, or doctrine, or under any product warranty liability law or doctrine; (c)

any employment or labor agreements, consulting agreements, severance arrangements, change-in-

control agreements, or other similar agreement to which any Debtor is a party; (d) any pension,

welfare, compensation, or other benefit plans, agreements, practices, and programs, including,

without limitation, any pension plan of any Debtor; (e) the cessation of any Debtor's operations, dismissal of employees, or termination of employment or labor agreements or pension, welfare, compensation, or other employee benefit plans, agreements, practices and programs, obligations that might otherwise arise from or pursuant to (i) the Employee Retirement Income Security Act of 1974 ("ERISA"), (ii) the Fair Labor Standards Act, (iii) Title VII of the Civil Rights Act of 1964, (iv) the Federal Rehabilitation Act of 1973, (v) the National Labor Relations Act, (vi) the Age Discrimination and Employment Act of 1967, (vii) the Americans with Disabilities Act of 1990, or (viii) Section 4980B of the Internal Revenue Code and Part 6 of Title I of ERISA; (f) environmental liabilities, debts, claims, or obligations arising from conditions first existing on or prior to the closing of the Credit Bid Transaction (including, without limitation, the presence of hazardous, toxic, polluting, or contamination substances or wastes), which may be asserted on any basis, including, without limitation, under the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601 et seq.; (g) any liabilities, debts, or obligations of or required to be paid by any Debtor for any taxes of any kind for any period; (h) any liabilities, debts, commitments, or obligations for any taxes relating to the operation of the applicable assets purchased under the Credit Bid Transaction Documents prior to the closing of the Credit Bid Transaction; (i) any bulk sale law; and (j) any litigation.

**P.  Cancellation of Notes, Instruments, Certificates, and Other Documents.**

151.    On the Effective Date, except to the extent otherwise provided in the Plan (including in Article IV.C.1. of the Plan), all notes, instruments, Certificates, and other documents evidencing, or in any way related to, Claims or Interests shall be canceled and the obligations of the Debtors thereunder or in any way related thereto shall be released, settled, and compromised; *provided*, *however*, that notwithstanding Confirmation, the occurrence of the Effective Date, or the releases contained in Article VIII of the Plan, any credit document, instrument, or agreement

that governs the rights of the holder of a Claim or Interest shall continue in effect solely for purposes of (a) allowing holders of Allowed Claims to receive distributions under the Plan, including the Liquidation Proceeds from the Wind Down Entities; (b) allowing each of the TRU Inc. Unsecured Notes Trustees and the Taj Senior Notes Indenture Trustee to make distributions to holders of the respective TRU Inc. Unsecured Notes Claims and Taj Senior Notes Claims, respectively, pursuant to the respective indenture or bond agreement under which such TRU Inc. Unsecured Notes Trustee and Taj Senior Notes Indenture Trustee serves; (c) preserving each of the TRU Inc. Unsecured Notes Trustees' and Taj Senior Notes Indenture Trustee's rights to compensation and indemnification under each of the applicable indentures or bond agreements as against any money or property distributable or allocable to holders of TRU Inc. Unsecured Notes Claims and Taj Senior Notes Claims, including, without limitation, the TRU Inc. Unsecured Notes Trustees' and the Taj Senior Notes Indenture Trustee's rights to maintain, enforce, and exercise their respective charging liens against such money or property; (d) permitting each of the TRU Inc. Unsecured Notes Trustees and Taj Senior Notes Indenture Trustee to enforce any right or obligation owed to them under the Plan, including in connection with the liquidation of the remaining assets of the Taj Debtors and their non-Debtor subsidiaries and the distribution of any proceeds in connection therewith; and (e) permitting each of the TRU Inc. Unsecured Notes Trustees and the Taj Senior Notes Indenture Trustee to appear in the Chapter 11 Cases or in any proceeding in the Bankruptcy Court or any other court; *provided*, that the reasonable and documented unpaid fees and expenses incurred by the Taj Senior Notes Indenture Trustee on or before the Effective Date shall be paid in full, pursuant to the notice and objection procedure set forth in the Final Taj DIP Order.  Each of the TRU Inc. Unsecured Notes Trustees and the Taj Senior Notes Indenture Trustee shall have no further obligation or liability except as expressly

provided in the Plan or Confirmation Order; *provided further that,* notwithstanding anything to the

contrary herein, as set forth in the Transaction Steps Memorandum, (a) the Holders of the Taj DIP

Claims, upon receipt of an amount equal to the Allowed Taj DIP Claims, shall assign or transfer

the Taj DIP Notes to the Wind Down Entities or one or more subsidiaries of the Wind Down

Entities, which Taj DIP Notes shall remain outstanding and shall retain the same security interests,

liens, pledges, guarantees, and encumbrances (in any jurisdiction) that currently secure the Taj DIP

Claims (or otherwise benefit the Holders from time to time of such Taj DIP Claims), other than as

against the Debtors and (b) the Taj Debtors or Wind Down Entities, in consultation with the Taj

Holders Steering Group, may cause the Taj Senior Notes to be transferred or assigned to the Wind

Down Entities or one or more subsidiaries of the Wind Down Entities, which Taj Senior Notes

shall remain outstanding for purposes of liquidating the remaining assets of the Taj Debtors and

shall retain the same security interests, liens, pledges, guarantees, and encumbrances (in any

jurisdiction) that currently secure the Taj Senior Notes Claims (or otherwise benefit the Holders

from time to time of such Taj Senior Notes Claims), other than as against the Debtors.  If at any

time the Wind Down Entities no longer retain any assets or interests, then the Taj Senior Notes

shall automatically be cancelled.  Notwithstanding anything to the contrary herein, as set forth in

the Transaction Steps Memorandum, the primary obligation(s) (including Secured Obligations, as

defined in the Taj Senior Notes Indenture and the Taj DIP Notes Indenture) in respect of the Taj

Senior Notes and Taj DIP Notes shall remain outstanding for purposes of, among other things,

liquidating the assets of the Taj Debtors and their non-Debtor subsidiaries after the Effective Date.

If at any time the Wind Down Entities no longer retain any assets or interests, then the Taj Senior

Notes and Taj DIP Notes shall automatically be cancelled.

**Q.    Wind Down and Dissolution**

152.    On and after the Effective Date, the Administrator will implement any other provision of the Plan and any applicable orders of the Bankruptcy Court, and the Administrator shall have the power and authority to take any action necessary to wind down and dissolve the Debtors.  After the Effective Date, the Debtors shall remain in existence for the sole purpose of dissolving.  As soon as practicable after the Effective Date, the Administrator shall:  (a) cause the Debtors to comply with, and abide by, the terms of the Interest Transfer Agreement, the Plan, the Settlement Agreements, and the Non-Released Claims Trust Agreement, as applicable; (b) at the appropriate time, file for each of the Debtors, a certificate of dissolution, together with all other necessary corporate and company documents, to effect the dissolution of the Debtors under the applicable laws of their state of incorporation or formation (as applicable); (c) complete and file all final or otherwise required federal, state, and local tax returns for each of the Debtors, and if the Administrator so elects, pursuant to section 505(b) of the Bankruptcy Code, request an expedited determination of any unpaid tax liability of such Debtor or its Estate for any tax incurred during the administration of such Debtor's Chapter 11 Case, as determined under applicable tax laws; and (d) take such other actions as the Administrator may determine to be necessary or desirable to carry out the purposes of the Plan and the other Restructuring Documents.

153.    The filing by the Administrator of any Debtor's certificate of dissolution shall be authorized and approved in all respects without further action under applicable law, regulation, order, or rule, including any action by the stockholders, members, board of directors, or board of managers of each such Debtor.  Solely to the extent and subject to the limitations provided in the Interest Transfer Agreement, the Administrator Agreement, the Wind Down Budget, the Plan, and the Confirmation Order, the Credit Bid Purchasers shall fund the Wind Down Entities with funds to pay costs, expenses, or claims arising from or related to any Wind Down of the Taj Debtors,

including the costs and expenses associated with any Claims resolution or similar process following the Effective Date. Notwithstanding anything in the Plan to the contrary, the Administrator or the Disbursing Agent will make, or cause to be made, all distributions under the Plan other than those distributions made by the Debtors on the Effective Date.

**R.      Approval of Consents and Authorization to Take Acts Necessary to Implement Plan.**

154.    This Confirmation Order shall constitute all authority, approvals, and consents required, if any, by the laws, rules, and regulations of all states and any other governmental authority with respect to the implementation or consummation of the Plan and any documents, instruments, or agreements, and any amendments or modifications thereto, and any other acts and transactions referred to in or contemplated by the Plan, the Plan Supplement, any other Restructuring Documents, and any documents, instruments, securities, or agreements, and any amendments or modifications thereto.

**S.      The Releases, Injunction, Exculpation, and Related Provisions Under the Plan.**

155.    The definition of "Released Parties" set forth in Section I.A.141 of the Plan is replaced with the following:

> "Released Party" means, collectively, and in each case in its capacity as such: (a) the Debtors; (b) Toys Delaware Debtors; (c) Geoffrey Debtors; (d) Reorganized Debtors; (e) the Creditors' Committee and its members; (f) Holders of 8.75% Unsecured Notes Claims; (g) the 8.75% Unsecured Notes Trustee; (h) Holders of 7.375% Senior Notes Claims; (i) the 7.375% Senior Notes Trustee; (j) Holders of Giraffe Junior Mezzanine Loan Guaranty Claims; (k) Holders of Propco II Mortgage Loan Guaranty Claims; (l) the Propco II Special Servicer; (m) Holders of Taj Senior Notes Claims; (n) the Taj Senior Notes Indenture Trustee; (o) the Taj Holders Steering Group and its members; (p) the Taj DIP Lenders; (q) the Sponsors (but not the Sponsor-affiliated directors, officers, and managers); (r) the Asia JV; (s) TRU (Japan) Holdings Parent Ltd.; (t) TRU (BVI) Asia 1 Ltd; (u) TRU (BVI) Asia 2 Ltd; (v) TRU (UK) Asia Limited; (w) Toys (Labuan) Holding Limited; (x) TRU Thailand, LLC; (y) TRU Retailing (Thailand) Limited; (z) TRU Thailand Limited; (aa) TRU GSO (HK) Limited; (bb) TRU GSO,

LLC; (cc) and TRU Vermont, Inc.; and (dd) with respect to each of the foregoing entities in clauses (d) through (cc) and the Taj Debtors, such entity's current and former affiliates (that are not the Propco II Plan Entities, Propco I Debtors, or Wayne), and its and their respective current and former equity holders (regardless of whether such interests are held directly or indirectly), subsidiaries, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals; and (ee) with respect to each of the foregoing entities in clauses (b), (c) and the TRU Inc. Debtors, such entity's affiliates (that are not the Propco II Plan Entities, Propco I Debtors, or Wayne), and its and their respective directors, officers, agents, advisors, and professionals; *provided* that TRU Inc. shall not release any director or officer of the TRU Inc. Debtors or of Toys Delaware in their capacities as such; and (ff) Fung and its current and former affiliates, equity holders (regardless of whether such interests are held directly or indirectly), subsidiaries, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals; *provided that*, notwithstanding any other provision herein, "Released Parties" shall not include, and in each case regardless of whether such party or entity would otherwise meet the definition of Released Party, (i) the Propco II Plan Entities, Propco I Debtors, or Wayne, (ii) any party entitled to vote on the Plan that votes against the Plan, or (iii) any party subject to a Non-Released Claim (including any D&O Party) but only to the extent, and in the capacity, that such party is subject to such Non-Released Claim, provided, for the avoidance of doubt, the TRU Inc. Debtors and the Toys Delaware Debtors and their respective estates and creditors are not releasing any Claims or Causes of Action against any D&O Party, except that the Released Taj Claims are being released hereunder and/or pursuant to the Global Settlement Agreement.

156.    The definition of "Exculpated Parties" set forth in Section I.A.76 of the Plan is

replaced with the following:

"Exculpated Parties" means, collectively, and in each case in its capacity as such: (a) the Debtors; (b) Toys Delaware Debtors; (c) Geoffrey Debtors; (d) the Reorganized Debtors; (e) the members of the Taj Holders Steering Group; (f) Fung; (g) the Creditors' Committee and its members; (h) the Sponsors (solely to the extent acting as a fiduciary of the Debtors, and not the Sponsor-affiliated directors, officers, and managers); (i) the Taj DIP Lenders; (j) the Prepetition Secured Parties (as defined in the Final Taj DIP Order);

(k) the Taj Senior Notes Indenture Trustee; (l) Taj DIP Notes Indenture Trustee; (m) the Asia JV and its direct and indirect subsidiaries; and (n) with respect to each of the foregoing entities in clauses (a) through (m), such entity's affiliates (that are not the Propco II Plan Entities, Propco I Debtors, or Wayne), and its and their respective directors, officers, agents, advisors, and professionals; *provided* that, notwithstanding the foregoing or any other provision herein, the term "Exculpated Parties" does not include the Propco II Plan Entities, Propco I Debtors, Wayne, or any party subject to a Non-Released Claim (including any D&O Party) but only to the extent, and in the capacity, that such party is subject to such Non-Released Claim, *provided*, for the avoidance of doubt, the TRU Inc. Debtors and the Toys Delaware Debtors and their respective estates and creditors are not releasing any Claims or Causes of Action against any D&O Party, in each case regardless of whether such party or entity would otherwise meet the definition of Exculpated Parties, except that the Released Taj Claims are being released hereunder and/or pursuant to the Global Settlement Agreement.

157.    The following releases, injunctions, exculpations, and related provisions set forth in Article VIII of the Plan are incorporated herein in their entirety, are hereby approved and authorized in all respects, are so ordered, and shall be immediately effective on the Effective Date without further order or action on the part of this Court or any other party:

    *a.    Debtor Release.*

158.    **Pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, on and after the Effective Date, except as otherwise expressly set forth herein, each Released Party shall be deemed released and discharged by the Debtors and the Reorganized Debtors, and their Estates from any and all claims and Causes of Action, including any derivative claims asserted or assertable on behalf of the Debtors, that the Debtors or the Reorganized Debtors, or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest, or that any Holder of any Claim or Interest could have asserted on**

behalf of the Debtors, based on or relating to, or in any manner arising from, in whole or in part, among other things:

(a) the Debtors or the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the formulation, preparation, dissemination, negotiation, or filing of any documents related to the Restructuring;

(b) any contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring, the Disclosure Statement, or the Plan;

(c) the Chapter 11 Cases, the Disclosure Statement, the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement;

(d) the negotiation, implementation, terms, or amendments to the DIP Facility or DIP Orders prior to or during the Chapter 11 Cases;

(e) (i) the transactions undertaken by the Sponsors in relation to the acquisition of the interests in TRU Inc., or (ii) any and all refinancing transactions or sale transactions related to the equity or assets of the Debtors undertaken, approved, planned, or implemented by the Sponsors and/or the Debtor's managers, officers, directors, and employees, as applicable;

(f) **the Asia JV, the marketing or sale process for the TRU Asia Equity Interests held**

**directly or indirectly by the Debtors, the Bidding Procedures, the Bidding Procedures**

**Order, the Auction, the Credit Bid, or the Credit Bid Transaction; or**

(g) **any other act or omission, transaction, agreement, event, or other occurrence taking**

**place on or before the effective date relating to any of the foregoing.**

**Notwithstanding the foregoing, nothing herein or in Article VIII of the Plan or the**

**Plan shall release any Non-Released Claims, any D&O Claims, or any claims of TRU**

**Inc. or the Toys Delaware Debtors against the D&O Parties, in respect of which the**

**July 2018 Settlement Agreement and/or the Global Settlement Agreement (as**

**applicable) shall control over this provision in all respects. Notwithstanding anything**

**to the contrary in the foregoing, the releases set forth above do not release (i) any**

**post-Effective Date obligations of any party or entity under the Plan or any document,**

**instrument, or agreement (including those set forth in the plan supplement) executed**

**to implement the Plan, the Credit Bid Transaction, and the Restructuring**

**Transactions, or (ii) any claims or causes of action relating to or arising out of the**

**chapter 11 cases of the Propco I Debtors, Wayne, or Propco II Plan Entities.**

*b. Release by Holders of Claims or Interests.*

159.    **Pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable**

**consideration, on and after the Effective Date, except as otherwise expressly set forth herein,**

**each Releasing Party is deemed to have released and discharged each Debtor, Reorganized**

**Debtor, and other Released Party from any and all claims and Causes of Action, including**

**any derivative claims asserted or assertable on behalf of the Debtors that such entity would**

have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, among other things:

(a) the Debtors or the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the formulation, preparation, dissemination, negotiation, or filing of any documents related to the Restructuring;

(b) any contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring, the Disclosure Statement, or the Plan;

(c) the Chapter 11 Cases, the Disclosure Statement, the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement;

(d) the negotiation, implementation, terms, or amendments to the DIP Facility or DIP Orders prior to or during the Chapter 11 Cases;

(e) (i) the transactions undertaken by the Sponsors in relation to the acquisition of the interests in TRU Inc., or (ii) any and all refinancing transactions or sale transactions related to the equity or assets of the Debtors undertaken, approved, planned, or implemented by the Sponsors and/or the Debtor's managers, officers, directors, and employees, as applicable;

(f) **the Asia JV, the marketing or sale process for the TRU Asia Equity Interests held directly or indirectly by the Debtors, the Bidding Procedures, the Bidding Procedures Order, the Auction, the Credit Bid, or the Credit Bid Transaction; or**

(g) **any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the effective date relating to any of the foregoing.**

**Notwithstanding the foregoing, nothing in Article VIII of the Plan or the Plan shall release any Non-Released Claims, any D&O Claims, or any claims of TRU Inc. against the D&O Parties, in respect of which the July 2018 Settlement Agreement and/or the Global Settlement Agreement (as applicable) shall control over this provision in all respects. Notwithstanding the foregoing, nothing in Article VIII of the Plan or the Plan shall release any claims that are specifically preserved or created by the Global Settlement Agreement, including claims to enforce the terms of the Global Settlement Agreement or the further agreements (including license and transition services arrangements) contemplated by the Global Settlement Agreement. Neither the Plan nor the Confirmation Order shall operate to provide broader releases to the Toys Delaware Debtors and the Geoffrey Debtors by the Releasing Parties (as defined in the Toys Delaware Plan) than those provided in the Toys Delaware Plan, and the Plan shall not operate to release any Avoidance Actions held by Toys Delaware other than the Released Taj Claims. Notwithstanding the foregoing, the releases set forth above do not release (i) any post-Effective Date obligations of any party or entity under the Global Settlement Agreement, the Plan, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, the Credit Bid Transaction, and the**

Restructuring Transactions, or (ii) any claims or causes of action relating to or arising out of the chapter 11 cases of the Propco I Debtors, Wayne or Propco II Plan Entities. For the avoidance of doubt, pursuant to Section 3.1(b) of the Global Settlement Agreement, each of the Geoffrey Debtors, the Toys Delaware Debtors, the TRU Inc. Debtors, and each of the foregoing debtor entities' respective estates, hereby releases all claims and Causes of Action, if any, whether known or unknown, whether direct or derivative, against (x) the Taj Debtors, (y) the Asia JV (and its direct shareholders) and its direct and indirect subsidiaries, and (z) with respect to each of the foregoing entities in clauses (x) and (y), such entity's respective officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, investment bankers, consultants, representatives and other professionals solely in their role or capacity for the foregoing parties.  For the avoidance of doubt, no claims against Wayne held by any creditor, including guarantee claims of the B-4 lenders against Wayne, are in any way affected, impaired or released by the Plan.

c. *Exculpation.*

160.    **Except as otherwise specifically provided in the Plan or any other Restructuring Documents, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from any cause of action for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, filing, or termination of any documents related to the Restructuring and related prepetition transactions, the Disclosure Statement, the Plan, or any Restructuring transaction, contract, instrument, release or other**

agreement or document (including providing any legal opinion requested by any entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Disclosure Statement, the Plan, the DIP Facility, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of securities pursuant to the Plan, or the distribution of property under the Plan, or any other related agreement, except for claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.  The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of, and distribution of, consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan. Notwithstanding anything to the contrary, other than any Released Taj Claims, the Plan shall not exculpate or otherwise release any Non-Released Claims, D&O Claims, and Claims against the D&O Parties by TRU Inc. or the Toys Delaware Debtors, in respect of which the July 2018 Settlement Agreement and/or the Global Settlement Agreement (as applicable) shall control over this provision in all respects.

### d. *Injunction*.

161.    Except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities that have held, hold, or may hold Claims or Interests that have been compromised, settled, or released, or are subject to exculpation pursuant to the Plan, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Credit Bid Purchasers, the Asia JV, the Non-Released Claims Trust, Non-Released Claims Trust Manager, Non-Released Claims Trust Oversight Committee, or any of the other Released Parties:  (i) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests; (ii) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such entities on account of or in connection with or with respect to any such claims or interests; (iii) creating, perfecting, or enforcing any lien or encumbrance of any kind against such entities or the property or the estates of such entities on account of or in connection with or with respect to any such claims or interests; (iv) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such entities or against the property of such entities on account of or in connection with or with respect to any such claims or interests unless such entity has timely asserted such setoff right in a document filed with the Bankruptcy Court explicitly preserving such setoff, and notwithstanding an indication of a claim or interest or otherwise that such entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (v) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests released or settled pursuant to the Plan.

**T.      Assumption and Rejection of Executory Contracts and Unexpired Leases.**

162.    The provisions governing the treatment of Executory Contracts and Unexpired Leases set forth in Article V of the Plan (including the procedures regarding the resolution of any and all disputes concerning the assumption or rejection, as applicable, of such Executory Contracts and Unexpired Leases) shall be, and hereby are, approved in their entirety.

163.    For the avoidance of doubt, on the Effective Date, except as otherwise provided herein, all Executory Contracts or Unexpired Leases will be deemed rejected in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, other than: (a) those that previously were assumed or rejected by the Debtors; (b) those that are identified on the Assumed Executory Contract and Unexpired Lease List; (c) those that are the subject of a motion to assume Executory Contracts or Unexpired Leases that is pending on the Confirmation Date; (d) those that are part of transition services; or (e) those that are a D&O Liability Insurance Policy, a Chubb Insurance Contract or a Zurich Insurance Contract. Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such assumptions, assignments, and rejections, including the assumptions of the Executory Contracts or Unexpired Leases listed on the Assumed Executory Contract and Unexpired Lease List and the rejection of the Executory Contracts or Unexpired Leases listed on the Rejected Executory Contract and Unexpired Lease List pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Any motions to assume or reject Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by the Bankruptcy Court on or after the Effective Date by a Final Order. Each Executory Contract and Unexpired Lease assumed pursuant to Article V.A of the Plan or by any order of the Bankruptcy Court, which has not been assigned to a third party before or on the Confirmation Date, shall revest in and be fully enforceable by the Debtors in accordance with its terms, except as such terms are modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing and

providing for its assumption under applicable federal law. Notwithstanding anything to the contrary in the Plan, the Debtors, with the consent of the Taj Holders Steering Group, may alter, amend, modify, or supplement the schedules of Executory Contracts and Unexpired Leases identified in Article V of the Plan, and in the Plan Supplement at any time through and including 90 days after the Effective Date (or such later date as provided in the event of any objection by a counterparty to an Executory Contract or Unexpired Lease to the amount of any Cure Obligation or other matter relating to the proposed assumption and assignment).

164.    Oracle America, Inc., successor to Art Technology Group, Inc., Endeca Technologies, Inc., Taleo Corporation, Retek, Inc., and Maxymiser, Inc. and/or its affiliate Oracle Credit Corporation (collectively, "Oracle") has filed an outstanding reservation of rights [Docket No. 5432] (the "Oracle Reservation of Rights"), by which Oracle objects to the Credit Bid Transaction to the extent it operates to (i) authorize the Debtors to assume, assume and assign, transfer, or share use of any agreement between the Debtors, on the one hand, and Oracle on the other hand (each an "Oracle Agreement"); or (ii) authorize the use of any Oracle Agreement that is inconsistent with the relevant license grant.  The Debtors do not believe that the Credit Bid Transaction conveys or transfers any Oracle Agreement and, therefore, believe the Oracle Reservation of Rights with respect to the Credit Bid Transaction is moot.  However, for the avoidance of doubt, nothing in this Confirmation Order shall authorize the Debtors to assume, assume and assign, transfer, or share use of any Oracle Agreement unless the Debtors (a) describe adequately each such Oracle Agreement, (b) obtain Oracle's prior written consent, (c) cure any default under the Oracle Agreement, and (d) keep payment on the Oracle Agreement current. Nothing in this Confirmation Order shall authorize the use of any Oracle Agreement that is

inconsistent with the relevant license grant, including but not limited to exceeding the number of authorized users, shared use, or license splitting, absent Oracle's express prior written consent.

**U.     Reimbursement of Partial Professional Fees for Substantial Contribution.**

165.     On the Effective Date, or as soon thereafter as is reasonably practicable, the Administrator shall release and pay Cyrus the Substantial Contribution Payment in cash in full and complete satisfaction of its substantial contribution to these Chapter 11 Cases pursuant to section 503(b)(3)(D) of the Bankruptcy Code.  Such payment shall be made in accordance with the written instructions of counsel for Cyrus.

**V.     Cure of Defaults for Assumed and Assigned Executory Contracts and Unexpired Leases.**

166.     Any Cure Obligations under each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the Cure Obligation in Cash on or after the Effective Date, subject to the limitation described below, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree.  In the event of a dispute regarding (a) the amount of the Cure Obligation, (b) the ability of the Debtors, the Asia JV, or any other assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (c) any other matter pertaining to assumption, the Cure Obligations required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order or orders resolving the dispute and approving the assumption.  The Debtors provided notices of proposed assumption and proposed Cure Obligations to be sent to applicable third parties and for procedures for objecting thereto and resolution of disputes by the Bankruptcy Court.  Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption or Cure Obligation must be filed, served,

and actually received by the Debtors at least three days before the Confirmation Hearing.  Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or cure amount will be deemed to have assented to such assumption or Cure Obligation.

167.    Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan, or otherwise, shall result in the full release and satisfaction of any Claims or defaults, subject to satisfaction of the Cure Obligations, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the effective date of assumption or assignment.  Anything in the Schedules and any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed and assigned shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

168.    Unless otherwise provided in the Plan, contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed by such Debtor or assumed and assigned to the Asia JV under the Interest Transfer Agreement, or any other document, as applicable, will be performed by the Reorganized Debtors or the Asia JV, as applicable, in the ordinary course of their business after the Effective Date.  Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) will survive entry of the Confirmation Order.

**W.    Provisions Governing Distributions.**

169.    The distribution provisions of Article VI of the Plan shall be, and hereby are, approved in their entirety.  Except as otherwise set forth in the Plan or this Confirmation Order, the Disbursing Agent shall make all distributions required under the Plan.  The timing of

distributions required under the Plan or this Confirmation Order shall be made in accordance with and as set forth in the Plan or this Confirmation Order, as applicable.

170.    For the avoidance of doubt, the distributions provided for under the Plan are without prejudice to any party's rights under any intercreditor or subordination agreement, including the rights of the Giraffe Junior Mezzanine Loan Lenders and the Holders of Propco II Mortgage Loan Guaranty Claims under that certain Intercreditor Agreement (the "Propco II/Giraffe Junior Intercreditor"), dated as of November 3, 2016, by and among Goldman Sachs Mortgage Company and Bank of America N.A., collectively as lender under the Propco II Mortgage Loan Agreement, and the Giraffe Junior Mezzanine Loan Lenders.  The rights of the Giraffe Junior Mezzanine Loan Lenders and the Holders of Propco II Mortgage Loan Guaranty Claims under the Propco II/Giraffe Junior Intercreditor are expressly reserved and any distributions under the Plan, and the Court's order approving such distributions, shall not otherwise affect the rights of the Giraffe Junior Mezzanine Loan Lenders and the Holders of Propco II Mortgage Loan Guaranty Claims to seek to enforce provisions of the Propco II/Giraffe Junior Intercreditor against other parties to the Propco II/Giraffe Junior Intercreditor.

171.    Notwithstanding anything in the Plan to the contrary, Holders of Claims in Class A8 shall receive the following treatment:  except to the extent a Holder has agreed to different treatment on account of an Allowed General Unsecured Claim, on the Effective Date, in full and final satisfaction, compromise, settlement, and release of and in exchange for each Allowed General Unsecured Claim against the TRU Inc. Debtors, each Holder thereof shall receive its pro rata share of the TRU Inc. Silo Recovery, if any, after paying in Cash all Senior Claims and on a pari passu basis with other Allowed Class A3 - A8 Claims to the extent set forth in the Priority Waterfall; provided however that, for the avoidance of doubt, the treatment of the Toys Delaware

Intercompany Claim against TRU Inc. shall be as set forth in the Global Settlement Agreement,
and the allocation of any proceeds of Non-Released Claims and/or D&O Claims held by or
allocable to TRU Inc. shall be as set forth in the Global Settlement Agreement and Section 3.2(k)
of the Vendor Settlement Agreement.

**X.      Release of Liens.**

172.    Except as otherwise provided herein or in any contract, instrument, release, or other
agreement or document created pursuant to the Plan, on the Effective Date and concurrently with
the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim,
satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all
mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the
Estates shall be fully released, settled, and compromised and all rights, titles, and interests of any
Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests against any
property of the Debtors' Estates shall revert to the Debtors or the Wind Down Entities or assigned
to the Credit Bid Purchasers or the Asia JV pursuant to the Interest Transfer Agreement or other
relevant documentation, as applicable; *provided, however,* that, notwithstanding anything to the
contrary herein, as set forth in the Transaction Steps Memorandum, (a) the Holders of the Taj DIP
Claims, upon receipt of an amount equal to the Allowed Taj DIP Claims, shall assign or transfer
the Taj DIP Notes to the Wind Down Entities (or one or more subsidiaries of the Wind Down
Entities), which Taj DIP Notes shall remain outstanding and shall retain the same security interests,
liens, pledges, guarantees, and encumbrances (in any jurisdiction) that currently secure the Taj DIP
Claims (or otherwise benefit the Holders from time to time of such Taj DIP Claims), other than as
against the Debtors, and (b) the Taj Debtors or Wind Down Entities, in consultation with the Taj
Holders Steering Group, may cause the Taj Senior Notes to be transferred or assigned to the Wind
Down Entities or one or more subsidiaries of the Wind Down Entities, which Taj Senior Notes

shall remain outstanding for purposes of liquidating the remaining assets of the Taj Debtors and shall retain the same security interests, liens, pledges, guarantees, and encumbrances (in any jurisdiction) that currently secure the Taj Senior Notes Claims (or otherwise benefit the Holders from time to time of such Taj Senior Notes Claims), other than as against the Debtors.

## Y.    Post-Confirmation Notices.

173.    In accordance with Bankruptcy Rules 2002 and 3020(c), no later than seven Business Days after the Effective Date, the Reorganized Debtors must cause notice of Confirmation and occurrence of the Effective Date (the "Notice of Confirmation") to be served by United States mail, first-class postage prepaid, by hand, by overnight courier service, or by electronic service to all parties served with the Confirmation Hearing Notice; *provided*, that no notice or service of any kind shall be required to be mailed or made upon any Entity to whom the Debtors mailed a Confirmation Hearing Notice but received such notice returned marked "undeliverable as addressed," "moved, left no forwarding address," "forwarding order expired," or similar reason, unless the Debtors have been informed in writing by such Entity, or are otherwise aware, of that Entity's new address.  For those parties receiving electronic service, filing on the docket is deemed sufficient to satisfy such service and notice requirements.

174.    To supplement the notice procedures described in the preceding sentence, no later than 10 Business Days after the Effective Date, the Reorganized Debtors must cause the Notice of Confirmation, modified for publication, to be published on one occasion in *USA Today* (national edition).  Mailing and publication of the Notice of Confirmation in the time and manner set forth in this paragraph will be good, adequate, and sufficient notice under the particular circumstances and in accordance with the requirements of Bankruptcy Rules 2002 and 3020(c).  No further notice is necessary.

175.    The Notice of Confirmation will have the effect of an order of the Bankruptcy Court, will constitute sufficient notice of the entry of this Confirmation Order to filing and recording officers, and will be a recordable instrument notwithstanding any contrary provision of applicable non-bankruptcy law.

**Z.    Professional Compensation and Reimbursement Claims and Professional Fee Escrow Account.**

176.    All final requests for payment of Claims of a Professional shall be Filed no later than 45 days after the Effective Date or such earlier date following the Effective Date as may be ordered by the Bankruptcy Court.  After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior Bankruptcy Court orders, the Allowed amounts of such Accrued Professional Compensation Claims shall be determined by the Bankruptcy Court. Subject to the Professional Fee Allocation Mechanism and the Global Settlement Agreement (including any setoff rights thereunder, including the setoff rights in Section 3.5 thereof), the amount of Allowed Accrued Professional Compensation Claims owing to the Professionals shall be paid in Cash to such Professionals from funds held in the Professional Fee Escrow Account. After all such Allowed Accrued Professional Compensation Claims have been paid in full, the escrow agent shall promptly return any excess amounts to the Wind Down Entities. Notwithstanding anything to the contrary herein, the Fee Examiner Order shall remain in effect pursuant to its own terms.

177.    To receive payment for unbilled fees and expenses incurred through the Confirmation Date, the Professionals of the Taj Debtors or the TRU Inc. Debtors shall estimate their Accrued Professional Compensation Claims before and as of the Confirmation Date and shall deliver such estimate to the Debtors no later than ten business days after the Confirmation Date; *provided*, *however*, that such estimate shall not be considered an admission with respect to the fees

and expenses of such Professional and such Professionals are not bound to any extent by the estimates.  If a Professional of the Debtors does not provide an estimate, the Debtors may estimate the unbilled fees and expenses of such Professional; *provided*, *however*, that such estimate shall not be binding or considered an admission with respect to the fees and expenses of such Professional.  The total amount so estimated shall comprise the Professional Fee Escrow Amount.

178.    In accordance with the Professional Fee Allocation Mechanism and the Global Settlement Agreement, as soon as reasonably practicable after the Confirmation Date and no later than the Effective Date of the Plan, the Debtors shall establish the Professional Fee Escrow Account and hold the same in trust for the benefit of Professionals, with a requisite form of escrow agreement, if any, to be negotiated in good faith between the Debtors and the applicable Professionals.  Except as otherwise provided for in the Global Settlement Agreement, the Debtors shall fund the Professional Fee Escrow Account with Cash in the amount of the aggregate Professional Fee Escrow Amount.  The Professional Fee Escrow Account shall be funded on the Effective Date.   The Debtors, the Reorganized Debtors, and/or the Wind Down Entities (as applicable) shall supplement the Professional Fee Escrow Account with additional funds (including Cash that would otherwise be distributable to holders of Claims against the TRU Inc. Debtors and/or Taj Debtors pursuant to the Plan) in an amount sufficient to ensure that Allowed Accrued Professional Compensation Claims are paid in full and in Cash from the Professional Fee Escrow Account, including after any reallocation has occurred in accordance with the Global Settlement Agreement and the Professional Fee Allocation Mechanism, and shall be available for the satisfaction of Allowed Accrued Professional Compensation Claims.

179.    Notwithstanding anything to the contrary in the Plan, the Debtors shall continue to allocate Accrued Professional Compensation Claims among each of the Debtors pursuant to the

Professional Fee Allocation Mechanism, to the extent any professional involved in the Debtors'

cases continues to work post-Confirmation.  The Debtors are authorized to publicize professional

fees and expenses incurred post-Confirmation, subject to the rights of parties-in-interest to object

in accordance with the Global Settlement Agreement and/or the Interim Compensation Order to

the post-Confirmation allocation of any professional fees or expenses to or among each or any of

the Debtors or any of their respective subsidiaries or affiliates.

180.    Except as otherwise provided in the Plan, from and after the Confirmation Date,

each Debtor shall, in the ordinary course of business and without any further notice to or action,

order, or approval of the Bankruptcy Court, pay in Cash the reasonable legal, professional, or other

fees and expenses related to implementation and Consummation of the Plan incurred by each

Debtor.  Except as otherwise provided in the Global Settlement Agreement, upon the Confirmation

Date, any requirement that Professionals and Ordinary Course Professionals comply with sections

327 through 331 and  1103 of the Bankruptcy Code or the Ordinary Course Professionals Order,

in seeking retention or compensation for services rendered after such date shall terminate, and the

Debtors may employ and pay any Professional or Ordinary Course Professional in the ordinary

course of business without any further notice to or action, order, or approval of the Bankruptcy

Court.

181.    Pursuant to sections 327(a), 328(a), 330, and 331 of the Bankruptcy Code, the

*Order Granting Application of the Official Committee of Unsecured Creditors for Entry of Order*

*(A) Authorizing Employment and Retention of Moelis & Company LLC as its Investment Banker,*

*Nunc Pro Tunc to October 2, 2017; (B) Waiving Certain Time-Keeping Requirements; and*

*(C) Granting Related Relief* [Docket No. 1054] (the "Moelis Retention Order") that certain

engagement letter, dated as of November 2, 2017, (the "Engagement Letter") authorized

thereunder, and the Global Settlement Agreement, Moelis & Company LLC ("Moelis"), except as previously approved in the Delaware Confirmation Order, or as otherwise agreed by Moelis and the Ad Hoc Group of B-4 Lenders, shall receive $1.75 million, which shall fully and finally resolve any and all claims of Moelis against any and all of the Debtors; *provided* that, consistent with the Moelis Retention Order, (a) Moelis shall include such fee and expenses in its final fee application, (b) the U.S. Trustee shall have the right to object to such fee and expenses based on the reasonableness standard provided in section 330 of the Bankruptcy Code, and (c) the rights of all parties other than the parties to the Global Settlement Agreement to object to such fee and expenses under section 328 of the Bankruptcy Code are reserved.

182.    For the avoidance of doubt, to the extent of any conflict or inconsistency between this Section Z and the Global Settlement Agreement, the terms of the Global Settlement Agreement shall govern.

**AA.    Notice of Subsequent Pleadings.**

183.    Except as otherwise provided in the Plan or in this Confirmation Order, notice of all subsequent pleadings in the Chapter 11 Cases after the Effective Date will be limited to the following parties:  (a) the Reorganized Debtors and their counsel; (b) the U.S. Trustee; (c) the Taj Holders Steering Group, (d)  any party known to be directly affected by the relief sought by such pleadings; and (e) any party that specifically requests additional notice in writing to the Debtors or Reorganized Debtors, as applicable, or files a request for notice under Bankruptcy Rule 2002 after the Effective Date.  The Notice and Claims Agent shall not be required to file updated service lists.

**BB.    Securities Law Exemptions.**

184.    Notwithstanding anything to the contrary in this Confirmation Order or the Plan, to the maximum extent provided by section 1145 of the Bankruptcy Code, applicable provisions of

the Securities Act and other applicable non-bankruptcy law, the offering, issuance, and distribution

of the Initial Shares, Subscription Rights, interests in any Wind Down Entities (as further described

in the Transaction Steps Memorandum) (the "Wind Down Interests") and, to the extent they

constitute "securities" (as defined in section 2(a)(1) of the Securities Act, section 101 of the

Bankruptcy Code, and applicable state securities laws), the Rights Offering Shares (collectively,

the "Eligible Securities") to the Holders of Taj Senior Notes Claims (Class B3) issued under the

Plan are exempt from, among other things, the registration and prospectus delivery requirements

of Section 5 of the Securities Act and any other applicable state or federal law requiring registration

and/or prospectus delivery or qualification prior to the offering, issuance, distribution, or sale of

Securities.  The offer and issuance of the Initial Shares by the Asia JV and Wind Down Interests

by any of the Wind Down Entities pursuant to the Plan qualify for section 1145(a)(1) of the

Bankruptcy Code treatment because the Asia JV and each Wind Down Entity is or, at the time of

emergence will be, (i) an "affiliate" of the Taj Debtors as defined in section 101(2) of the

Bankruptcy Code and (ii) participating in the Plan with the Taj Debtors.

185.    In connection with the Rights Offering, the Asia JV agrees to offer and sell the

Rights Offering Shares pursuant to the terms of the Rights Offering Procedures and the terms

hereof and fulfill its obligations under the Rights Offering Procedures and the terms hereof as the

issuer of the Rights Offering Shares, and, solely in respect thereof, submits to the jurisdiction of

this Court.  The Asia JV is "participating" (within the meaning of section 1145(a)(1)) in the Plan

and information with respect to the Rights Offering Shares and the Asia JV have been included in

the Disclosure Statement.  The offer and sale of the Rights Offering Shares to be offered and sold

by the Asia JV under the Plan qualify for section 1145(a)(1) of the Bankruptcy Code treatment

because the Asia JV (i) is a subsidiary of the Taj Debtors and an "affiliate" of the Taj Debtors as

defined in section 101(2) of the Bankruptcy Code and (ii) is participating in the Plan with the Taj Debtors.

186.    To the extent that Holders of Taj Senior Notes Claims (Class B3) who receive the Initial Shares, Subscription Rights or Rights Offering Shares are deemed to be "underwriters," such Holders' resale would not be exempted from registration under the Securities Act or other applicable law in accordance with section 1145 of the Bankruptcy Code.  Those Holders would be permitted to sell the Initial Shares, Subscription Rights or Rights Offering Shares without registration if they are able to comply with the provisions under Rule 144 or 144A of the Securities Act.

187.    The Rights Offering Shares that are securities and are issued to the Commitment Parties pursuant to the Backstop Commitment Agreement will be issued without registration under the Securities Act or any similar federal, state, or local law in reliance on the exemption set forth in section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder.

188.    In addition, under section 1145 of the Bankruptcy Code, to the extent applicable, such Eligible Securities will be freely tradable in the U.S. by the recipients thereof, subject to the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act and otherwise to the extent permitted under section 1145 of the Bankruptcy Code, and compliance with applicable securities laws and any rules and regulations of the U.S. Securities and Exchange Commission (the "SEC"), if any, applicable at the time of any future transfer of such Securities or instruments and subject to any restrictions in the Reorganized Debtors' New Organizational Documents.

**CC.    Section 1146 Exemption.**

189.    Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant hereto shall not be subject to any document recording tax, stamp tax, conveyance fee,

intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, sale or use tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, or other similar tax or governmental assessment, to the fullest extent contemplated by section 1146(a) of the Bankruptcy Code, and upon entry of this Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents pursuant to such transfers of property without the payment of any such tax, recordation fee, or governmental assessment.

**DD.    Preservation of Causes of Action.**

190.    Except as otherwise provided in the Plan (including the Debtor Release and the Third-Party Release) or in any contract, instrument, release or other agreement entered into or delivered in connection with the Plan, in accordance with section 1123(b)(3) of the Bankruptcy Code, Article IV.J of the Plan appropriately provides that, unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan, the Global Settlement Agreement or a Bankruptcy Court order, the Taj Debtors reserve, and assign to the Credit Bid Purchasers or the Asia JV, as applicable, pursuant to the Interest Transfer Agreement or other definitive documents, any and all Causes of Action, including any actions specifically enumerated in and in accordance with the terms of the Plan Supplement, whether arising before or after the Petition Date, and preserve and assign to the Credit Bid Purchasers or the Asia JV, as applicable, pursuant to the Interest Transfer Agreement or other definitive documents, the right to commence, prosecute, or settle such Causes of Action, notwithstanding the occurrence of the Effective Date; *provided, however*, notwithstanding the foregoing, the Non-Released Claims shall include all D&O Claims, excluding any Released Taj Claims, and such D&O Claims shall be transferred and/or assigned to the Non-Released Claims Trust (as defined in

the Toys Delaware Plan) and, with respect to Non-Released Claims and D&O Claims of the TRU

Inc. Debtors, the Non-Released Claims Trust shall be the successor-in-interest to the TRU Inc.

Debtors for such purposes and the TRU Inc. Debtors' rights, title and interest in any Non-Released

Claims, the Non-Released Claims Trust shall have standing to pursue the Non-Released Claims,

and the Non-Released Claims Trust Manager (as defined in the Toys Delaware Plan) shall have

the right to commence, prosecute, or settle such Non-Released Claims in its discretion, in

consultation with the Non-Released Claims Trust Oversight Committee (as defined in the Toys

Delaware Plan); *provided further that* the July 2018 Settlement Agreement and/or the Global

Settlement Agreement (as applicable) shall control over this proviso in all respects.  In pursuing

any claim, right, or Cause of Action, the Non-Released Claims Trust shall be entitled to the tolling

provisions provided under section 108 of the Bankruptcy Code, and shall succeed to the TRU Inc.

Debtors' rights with respect to the time periods in which a Cause of Action may be brought under

section 546 of the Bankruptcy Code.  The Credit Bid Purchasers or the Asia JV, as applicable, may

pursue such Causes of Action in their sole discretion.  No Entity may rely on the absence of a

specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of

Action against them as any indication that either the Taj Debtors or Reorganized Taj Debtors, the

Wind Down Entities, Credit Bid Purchasers, or the Asia JV, as applicable, will not pursue any and

all available Causes of Action against them.  No preclusion doctrine, including the doctrines of *res

judicata*, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or

otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the

Confirmation or Consummation.

      191.    The Plan is specific with respect to the Causes of Action to be retained by the

Debtors, or transferred to the Credit Bid Purchasers or the Asia JV, and the Plan and Plan

Supplement provide meaningful disclosure with respect to the potential Causes of Action that the

Debtors may so retain or transfer, and all parties in interest received adequate notice with respect

to such Causes of Action.  The provisions regarding Causes of Action in the Plan are appropriate

and in the best interests of the Debtors, their respective estates, and Holders of Claims and

Interests.  For the avoidance of any doubt, (i) Causes of Action released or exculpated under the

Plan will not be retained by the Reorganized Debtors or transferred to the Credit Bid Purchasers,

the Asia JV, the Non-Released Claims Trust (as defined in the Toys Delaware Plan), and the Non-

Released Claims Trust Manager (as defined in the Toys Delaware Plan), (ii) the claims preserved

under the Plan and assigned to the Non-Released Claims Trust include, without limitation, all Non-

Released Claims including D&O Claims, and the Non-Released Claims Trust shall have the right

to prosecute, defend, compromise, adjust, arbitrate, abandon, estimate, or otherwise deal with and

settle such Non-Released Claims without the consent of any third party or further notice to or

action, order, or approval of the Bankruptcy Court, and (iii) notwithstanding anything herein or in

the Plan, July 2018 Settlement Agreement or Global Settlement Agreement to the contrary, all

D&O Claims and Non-Released Claims are expressly preserved and not released.  For the

avoidance of doubt, the Non-Released Claims Trust shall retain all rights of the applicable Debtors

to assert claims against the D&O Liability Insurance Policies or to recover the proceeds thereof,

without prejudice to the rights of insured parties under the D&O Liability Insurance Policies to

assert claims against the D&O Liability Insurance Policies or to recover the proceeds thereof as

insured parties, subject to and in accordance with the July 2018 Settlement Agreement.

**EE.    Avoidance Actions.**

192.    The Debtors waive all rights to commence or otherwise pursue any and all

Avoidance Actions, including, without limitation, to assert or use any such Avoidance Actions for

defensive purposes, and such Avoidance Actions shall be released on the Effective Date; *provided*

that, notwithstanding the foregoing, any Avoidance Actions belonging to the TRU Inc. Debtors or their estates or creditors that are not expressly released by the July 2018 Settlement Agreement, the Global Settlement Agreement, or the Plan shall be preserved and transferred to the Non-Released Claims Trust and not released.  For the avoidance of doubt, the only Avoidance Actions held by the TRU Inc. Debtors and their estates released under the Global Settlement Agreement are Avoidance Actions held by TRU Inc. against the Taj Debtors, the Taj Debtors' current and former directors, officers, or managers, and Holders of Taj Senior Notes Claims or any other Released Taj Claims in exchange for the Taj Settlement Consideration (as defined in the Global Settlement Agreement).

**FF.    Reports.**

193.    The Debtors will continue to include information regarding their deposits, expenditures, and other relevant financial information in monthly operating reports (prior to the Effective Date) and quarterly post-confirmation reports (after the Effective Date) Filed with the Court until the applicable Chapter 11 cases are converted, dismissed, or closed, whichever occurs first.

**GG.    General Authorization.**

194.    Except as set forth in the Plan, Confirmation of the Plan shall be deemed to constitute approval of the transactions contemplated thereby and all actions to be taken, undertakings to be made, and obligations to be incurred by the Debtors, Reorganized Debtors, the Asia JV, the Credit Bid Purchasers, and their respective affiliates or subsidiaries in connection therewith, including the payment of all fees, indemnities, and expenses provided for therein) and, subject to the occurrence of the Effective Date or Closing Date (as applicable), authorization for the Reorganized Debtors, the Asia JV, the Credit Bid Purchasers, and their respective affiliates or

subsidiaries to enter into and perform their obligations under such other documents as may be reasonably required or appropriate.

**HH.    Binding Effect.**

195.    Subject to Article IX of the Plan and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding upon the Debtors and any and all Holders of Claims or Interests (irrespective of whether the Holders of such Claims or Interests accepted or rejected the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, and injunction described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.

**II.    Post-Confirmation Fees and Expenses.**

196.    Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, each Debtor shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable legal, professional, or other fees and expenses related to implementation and Consummation of the Plan incurred by each Debtor.  Upon the Confirmation Date, any requirement that Professionals and Ordinary Course Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code, the Interim Compensation Order, or the Ordinary Course Professionals Order, in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors may employ and pay any Professional or Ordinary Course Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

**JJ.    Nonseverability of Plan Provisions Upon Confirmation.**

197.    Notwithstanding the possible applicability of Bankruptcy Rules 6004(g), 7062, 9014, or otherwise, the terms and conditions of this Confirmation Order will be effective and enforceable immediately upon its entry.  Each term and provision of the Plan, and the transactions related thereto as it heretofore may have been altered or interpreted by the Bankruptcy Court is: (a) valid and enforceable pursuant to its terms; (b) integral to the Plan and may not be deleted or modified without the consent of the Debtors, the Taj Holders Steering Group, or Fung, as applicable; and (c) nonseverable and mutually dependent.

**KK.    Waiver or Estoppel.**

198.    Except as otherwise set forth in the Plan or this Confirmation Order, each Holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, Secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers Filed with the Bankruptcy Court before the Confirmation Date.

**LL.    Authorization to Consummate.**

199.    The Debtors are authorized to consummate the Plan, including the Credit Bid Transaction and the Restructuring Transactions contemplated thereby, at any time after the entry of this Confirmation Order subject to satisfaction or waiver (by the required parties) of the conditions precedent to Consummation set forth in Article IX of the Plan.  The substantial consummation of the Plan, within the meaning of sections 1101(2) and 1127 of the Bankruptcy Code, is deemed to occur on the first date, on or after the Effective Date, on which distributions are made in accordance with the terms of the Plan to holders of any Allowed Claims or Interests (as applicable).

**MM.    Injunctions and Automatic Stay.**

200.    Unless otherwise provided in the Plan or this Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or this Confirmation Order) shall remain in full force and effect until the Effective Date.    All injunctions or stays contained in the Plan or this Confirmation Order shall remain in full force and effect in accordance with their terms.

**NN.        Dissolution of the Creditors' Committee.**

201.    Except to the extent provided in the Plan, on the Effective Date, any statutory committee appointed in the Chapter 11 Cases of the Taj Debtors and the TRU Inc. Debtors shall dissolve solely with respect to the Taj Debtors and TRU Inc. Debtors, and members thereof shall be released and discharged from all rights and duties from or related to the Chapter 11 Cases of the Taj Debtors and the TRU Inc. Debtors.    The Taj Debtors and TRU Inc. Debtors shall no longer be responsible for paying any fees or expenses incurred by the members of or advisors to the Creditors' Committee after the Effective Date.    Upon the dissolution of the Creditors' Committee, the current and former members of the Creditors' Committee, and their officers, employees, counsel, advisors, and agents, shall be released and discharged of and from all further authority, duties, responsibilities, and obligations related to and arising from and in connection with the chapter 11 cases of the Taj Debtors and the TRU Inc. Debtors, and the retention or employment of the Creditors' Committee's respective attorneys, accountants, and other agents shall terminate, except that the Creditors' Committee and its professionals shall have the right to pursue, review, and object to any applications for compensation and reimbursement of expenses filed in accordance with Article II.B of the Plan; *provided*, *however*, each Professional shall be entitled to prosecute its respective Accrued Professional Compensation Claims and represent its respective

constituents with respect to applications for payment of such Accrued Professional Compensation Claims, and the Disbursing Agent shall have the authority to continue consulting on the reconciliation of Claims as set forth herein.  The Debtors and the Credit Bid Purchasers shall no longer be responsible for paying any fees or expenses incurred by the members of or advisors to any statutory committees with respect to the Debtors in the Plan after the Effective Date.

**OO.    Effect of Non-Occurrence of Conditions to the Effective Date.**

202.    Notwithstanding the entry of this Confirmation Order, in the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code, unless such deadline(s) have expired.

**PP.    Effect of Conflict Between Plan, the Disclosure Statement, the Plan Supplement, the Settlement Agreements, and Confirmation Order.**

203.    Except as set forth in the Plan, to the extent that any provision of the Disclosure Statement, the Plan Supplement, or any other order referenced in the Plan (or any exhibits, schedules, appendices, supplements, or amendments to any of the foregoing), conflict with or are in any way inconsistent with any provision of the Plan, the Plan shall govern and control; *provided*, *however*, with respect to any conflict or inconsistency between the Plan and the Confirmation Order, the Confirmation Order shall govern; *provided, however,* to the extent the Plan or Confirmation Order is inconsistent with the July 2018 Settlement Agreement, Global Settlement Agreement, Fung Settlement Agreement, July 2018 Settlement Order, Fung Settlement Order, or the Global Settlement Order with respect to provisions of the Plan that explicitly refer to or incorporate the July 2018 Settlement Agreement, Global Settlement Agreement, Fung Settlement Agreement, July 2018 Settlement Order, Fung Settlement Order, or the Global Settlement Order, the July 2018 Settlement Agreement, Global Settlement Agreement, Fung Settlement Agreement,

July 2018 Settlement Order, Fung Settlement Order, or the Global Settlement Order, as applicable, shall govern solely with respect to such provisions of the Plan (but solely as to the parties to the Global Settlement Agreement, Fung Settlement Agreement, or July 2018 Settlement Agreement, as applicable).

**QQ.    Retention of Jurisdiction.**

204.    This Court retains jurisdiction over the Chapter 11 Cases, all matters arising out of or related to the Chapter 11 Cases and the Plan, the matters set forth in Article XI, and other applicable provisions of the Plan.

**RR.    Waiver of 14-Day Stay.**

205.    Notwithstanding Bankruptcy Rule 3020(e), and to the extent applicable, Bankruptcy Rules 6004(h), 7062, and 9014, this Confirmation Order is effective immediately and not subject to any stay.

**SS.    Final Order.**

206.    This Confirmation Order is a Final Order and the period in which an appeal must be filed will commence upon entry of this Confirmation Order.

207.    This Confirmation Order is effective as of the date of entry of this order.

Dec 17 2018

Dated: _____, 2018          /s/ Keith L. Phillips
Richmond, Virginia               _____
                                 THE HONORABLE KEITH L. PHILLIPS
                                 UNITED STATES BANKRUPTCY JUDGE

                                 Entered on Docket: Dec 17 2018

WE ASK FOR THIS:

/s/ Jeremy S. Williams

Michael A. Condyles (VA 27807)
Peter J. Barrett (VA 46179)
Jeremy S. Williams (VA 77469)
**KUTAK ROCK LLP**
901 East Byrd Street, Suite 1000
Richmond, Virginia 23219-4071
Telephone:          (804) 644-1700
Facsimile:           (804) 783-6192

- and -

Edward O. Sassower, P.C.
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Emily E. Geier (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:          (212) 446-4800
Facsimile:           (212) 446-4900

- and -

James H.M. Sprayregen, P.C.
Anup Sathy, P.C.
Chad J. Husnick, P.C. (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:          (312) 862-2000
Facsimile:           (312) 862-2200

*Co-Counsel to the Debtors and Debtors in Possession*

## CERTIFICATION OF ENDORSEMENT
## UNDER LOCAL BANKRUPTCY RULE 9022-1(C)

Pursuant to Local Bankruptcy Rule 9022-1(C), I hereby certify that the foregoing proposed order has been endorsed by or served upon all necessary parties.

/s/ Jeremy S. Williams

## Exhibit A

**Plan**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**RICHMOND DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| TOYS "R" US, INC., *et al.*,[1] | ) | Case No. 17-34665 (KLP) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**THIRD AMENDED JOINT CHAPTER 11 PLAN OF**
**THE TAJ DEBTORS AND THE TRU INC. DEBTORS**

NOTHING CONTAINED HEREIN SHALL CONSTITUTE AN OFFER, ACCEPTANCE,
COMMITMENT, OR LEGALLY BINDING OBLIGATION OF THE DEBTORS
OR ANY OTHER PARTY IN INTEREST.

YOU SHOULD NOT RELY ON THE INFORMATION CONTAINED IN, OR THE TERMS OF, THIS PLAN
FOR ANY PURPOSE PRIOR TO THE CONFIRMATION OF THIS PLAN BY THE BANKRUPTCY COURT.

THIS PLAN IS SUBJECT TO APPROVAL BY THE BANKRUPTCY COURT AND OTHER
CUSTOMARY CONDITIONS.  THIS PLAN IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES.

Edward O. Sassower, P.C.
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Emily E. Geier (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900

-and-

Michael A. Condyles (VA 27807)
Peter J. Barrett (VA 46179)
Jeremy S. Williams (VA 77469)
**KUTAK ROCK LLP**
901 East Byrd Street, Suite 1000
Richmond, Virginia 23219-4071
Telephone:      (804) 644-1700
Facsimile:      (804) 783-6192

James H.M. Sprayregen, P.C.
Anup Sathy, P.C.
Chad J. Husnick, P.C. (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200

*Co-Counsel to the Debtors and Debtors in Possession*

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are set forth in the *Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief* [Docket No. 78].  The location of the Debtors' service address is One Geoffrey Way, Wayne, New Jersey 07470.

Mark K. Thomas (admitted *pro hac vice*)
Christopher M. Hayes (admitted *pro hac vice*)
**PROSKAUER ROSE LLP**
70 West Madison, Suite 3800
Chicago, Illinois 60602-4342
Telephone:      (312) 962-3550
Facsimile:      (312) 962-3551

Vincent Indelicato (admitted *pro hac vice*)
Stephen H. Holinstat (admitted *pro hac vice*)
**PROSKAUER ROSE LLP**
Eleven Times Square
New York, NY 10036-8299
Telephone:      (212) 969-3000
Facsimile:      (212) 969-2900

Peter J. Young (admitted *pro hac vice*)
**PROSKAUER ROSE LLP**
2049 Century Park East, Suite 3200
Los Angeles, California 90067-3206
Telephone:      (310) 557-2900
Facsimile:      (310) 557-2193

-and-

H. Slayton Dabney, Jr. (VA 14145)
**DABNEY, PLLC**
303 Grande Court
Richmond, Virginia 23229
Telephone:      (646) 549-1181

*Co-Counsel to Debtors and Debtors in Possession Tru Taj LLC
and Tru Taj Finance, Inc.*

Thomas B. Walper (admitted *pro hac vice*)
Seth Goldman (admitted *pro hac vice*)
Kevin Allfred (admitted *pro hac vice*)
**MUNGER, TOLLES & OLSON LLP**
350 South Grand Avenue, 50th Floor
Los Angeles, California 90071
Telephone:      (213) 683-9100
Facsimile:      (213) 687-3702

Ronald A. Page, Jr. (VA 71343)
**RONALD PAGE, PLC**
P.O. Box 73524
Richmond, Virginia 23235
Telephone:      (804) 562-8704
Facsimile:      (804) 482-2427

*Co-Counsel to Debtor and Debtor in Possession Toys "R" Us, Inc.*

Dated: December 12, 2018

2

## TABLE OF CONTENTS

**Page**

**ARTICLE I DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME,
AND GOVERNING LAW** ................................................................................................................1
    A.    Defined Terms. .......................................................................................................1
    B.    Rules of Interpretation. ........................................................................................17
    C.    Computation of Time. ..........................................................................................17
    D.    Governing Law. ...................................................................................................17
    E.    Reference to Monetary Figures. ..........................................................................18
    F.    Controlling Document. ........................................................................................18
    G.    Application of the Plan. ........................................................................................18

**ARTICLE II ADMINISTRATIVE CLAIMS, DIP FACILITY CLAIMS, AND PRIORITY TAX
CLAIMS** ............................................................................................................................................18
    A.    Administrative Claims and Priority Tax Claims. .................................................18
    B.    Accrued Professional Compensation Claims. .....................................................19
    C.    Taj DIP Claims. ...................................................................................................20

**ARTICLE III CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS** ..................20
    A.    Summary of Classification. ..................................................................................20
    B.    Treatment of Claims and Interests against the TRU Inc. Debtors. ......................22
    C.    Treatment of Claims and Interests. ......................................................................25
    D.    Special Provision Governing Unimpaired Claims. ..............................................27
    E.    Elimination of Vacant Classes. ...........................................................................27
    F.    Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code. ..................28
    G.    Subordinated Claims. ...........................................................................................28

**ARTICLE IV MEANS FOR IMPLEMENTATION OF THE PLAN** .............................................................28
    A.    Substantive Consolidation. ..................................................................................28
    B.    Restructuring Transactions and Sources of Consideration for Plan Distributions. ..........28
    C.    Credit Bid Transaction. ........................................................................................29
    D.    General Settlement of Claims. .............................................................................33
    E.    Cancellation of Securities and Agreements. ........................................................33
    F.    Corporate Action. ................................................................................................34
    G.    New Organizational Documents ..........................................................................34
    H.    Effectuating Documents; Further Transactions. ..................................................34
    I.    Exemption from Certain Taxes and Fees. ............................................................34
    J.    Preservation of Causes of Action. .......................................................................35
    K.    Vesting of Assets in the Reorganized Debtors ....................................................35
    L.    Avoidance Actions. .............................................................................................36
    M.    Compensation and Benefits Programs .................................................................36
    N.    Transition Services Officer Escrow .....................................................................36

**ARTICLE V TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES** .......................36
    A.    Assumption and Rejection of Executory Contracts and Unexpired Leases. .....................36
    B.    Cure of Defaults for Assumed and Assigned Executory Contracts and Unexpired
Leases. .................................................................................................................37
    C.    D&O Liability Insurance Policies. .......................................................................37
    D.    Chubb Companies' Insurance Contracts. .............................................................38
    E.    Zurich Insurance Policies. ....................................................................................38
    F.    Claims Based on Rejection of Executory Contracts and Unexpired Leases. .....................38
    G.    Preexisting Obligations to the Debtors Under Executory Contracts and
Unexpired Leases. ...............................................................................................39
    H.    Modifications, Amendments, Supplements, Restatements, or Other Agreements. ..........39

I.       Reservation of Rights...........................................................................................39
J.       Nonoccurrence of Effective Date.......................................................................39
K.      Contracts and Leases Entered Into After the Petition Date. ...........................40

**ARTICLE VI PROVISIONS GOVERNING DISTRIBUTIONS** ...........................................**40**
A.      Timing and Calculation of Amounts to Be Distributed. ...................................40
B.      Disbursing Agent. ...............................................................................................40
C.      Rights and Powers of Disbursing Agent. ...........................................................40
D.      Delivery of Distributions and Undeliverable or Unclaimed Distributions. ......41
E.      Bankruptcy Code and Securities Act Exemptions .............................................41
F.       Compliance with Tax Requirements/Allocations. .............................................43
G.      Claims Paid or Payable by Third Parties. ..........................................................43
H.      Indefeasible Distributions. ..................................................................................44

**ARTICLE VII PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND
DISPUTED CLAIMS** ...............................................................................................................**44**
A.      Allowance of Claims............................................................................................44
B.      Claims Administration Responsibilities. ............................................................44
C.      Estimation of Claims and Interests. ....................................................................44
D.      Adjustment to Claims or Interests without Objection.........................................45
E.      Time to File Objections to Claims. .....................................................................45
F.       Disallowance of Claims.......................................................................................45
G.      Amendments to Claims........................................................................................45
H.      No Distributions Pending Allowance. ................................................................45
I.        Distributions After Allowance. ...........................................................................45

**ARTICLE VIII SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS** ......................**46**
A.      Settlement, Compromise, and Release of Claims and Interests..........................46
B.      **Release of Liens.** ................................................................................................46
C.      **Releases by the Debtors.** ...................................................................................47
D.      **Releases by Holders of Claims and Interests.**..................................................47
E.      **Exculpation.** ......................................................................................................48
F.       **Injunction.** ........................................................................................................49
G.      Certain Claims of Governmental Units...............................................................49
H.      Setoffs. ................................................................................................................50
I.        Recoupment. ........................................................................................................50
J.       Subordination Rights. ..........................................................................................50
K.      Document Retention. ...........................................................................................50
L.       Reimbursement or Contribution. ........................................................................50

**ARTICLE IX CONDITIONS PRECEDENT TO CONFIRMATION AND THE EFFECTIVE DATE** ...........**50**
A.      Conditions Precedent to Confirmation................................................................50
B.      Conditions Precedent to the Effective Date. ......................................................51
C.      Waiver of Conditions. .........................................................................................52

**ARTICLE X MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN** ...............................**52**
A.      Modification and Amendments............................................................................52
B.      Effect of Confirmation on Modifications. ..........................................................52
C.      Revocation or Withdrawal of the Plan................................................................52

**ARTICLE XI RETENTION OF JURISDICTION** ................................................................................**53**

**ARTICLE XII MISCELLANEOUS PROVISIONS** ..............................................................................**55**
A.      Immediate Binding Effect....................................................................................55
B.      Additional Documents. ........................................................................................55
C.      Payment of Statutory Fees. .................................................................................55

D.        Dissolution of Committees. .................................................................................55
E.        Monthly Operating Reports and Post-Effective Date Reports...........................56
F.        Reservation of Rights...........................................................................................56
G.        Successors and Assigns........................................................................................56
H.        Service of Documents. .........................................................................................56
I.         Term of Injunctions or Stays................................................................................57
J.        Entire Agreement...................................................................................................58
K.        Exhibits..................................................................................................................58
L.        Nonseverability of Plan Provisions......................................................................58
M.       Waiver or Estoppel. ..............................................................................................58

**INTRODUCTION**

The Debtors propose the following joint plan of the Taj Debtors and the TRU Inc. Debtors pursuant to chapter 11 of the Bankruptcy Code (the "Plan"). Capitalized terms used in the Plan and not otherwise defined have the meanings ascribed to such terms in Article I.A.

The Chapter 11 Cases have been consolidated for procedural purposes only and are being jointly administered pursuant to an order of the Bankruptcy Court. Reference is made to the Disclosure Statement for a discussion of the Debtors' history, businesses, results of operations, historical financial information, projections and future operations, as well as a summary and analysis of the Plan and certain related matters, including distributions to be made under the Plan. Each of the Debtors is a proponent of the Plan contained herein within the meaning of section 1129 of the Bankruptcy Code.

**ARTICLE I**
**DEFINED TERMS, RULES OF INTERPRETATION,**
**COMPUTATION OF TIME, AND GOVERNING LAW**

A.      *Defined Terms.*

As used in this Plan, capitalized terms have the meanings and effect as set forth below.

1.      "*7.375% Senior Notes*" means the 7.375% senior unsecured notes due October 15, 2018 in the currently outstanding principal amount of $208,340,000, which are governed by the 7.375% Senior Notes Indenture.

2.      "*7.375% Senior Notes Claim*" means any Claim derived from or based upon the 7.375% Senior Notes.

3.      "*7.375% Senior Notes Indenture*" means that certain Indenture, dated as of May 28, 2002 (as amended, novated, supplemented, extended, or restated from time to time), among TRU Inc., as issuer, and the 7.375% Senior Notes Indenture Trustee.

4.      "*7.375% Senior Notes Indenture Trustee*" means the Bank of New York as indenture trustee under the 7.375% Senior Notes.

5.      "*8.75% Unsecured Notes*" means the 8.75% unsecured notes due September 1, 2021 in the currently outstanding principal amount of $21,673,000, which are governed by the 8.75% Unsecured Notes Indenture.

6.      "*8.75% Unsecured Notes Claim*" means any Claim derived from or based upon the 8.75% Unsecured Notes.

7.      "*8.75% Unsecured Notes Indenture*" means that certain Indenture, dated as of August 21, 1991 (as amended, novated, supplemented, extended, or restated from time to time), by and among TRU Inc. and Toys Delaware, as co-issuers, and the 8.75% Unsecured Notes Indenture Trustee.

8.      "*8.75% Unsecured Notes Indenture Trustee*" means and The Bank of New York, as successor trustee under the 8.75% Unsecured Notes Indenture.

9.      "*Accrued Professional Compensation Claims*" means, at any given moment, all Claims for accrued fees and expenses (including success fees) for services rendered by a Professional through and including the Effective Date, to the extent such fees and expenses have not been paid pursuant to the Interim Compensation Order or any other order of the Bankruptcy Court and regardless of whether a fee application has been Filed for such fees and expenses. To the extent the Bankruptcy Court denies or reduces by a Final Order any amount of a Professional's fees or expenses, then the amount by which such fees or expenses are reduced or denied shall reduce the applicable Accrued Professional Compensation Claim.

10.    "*Ad Hoc Group of Term B-4 Lenders*" means the ad hoc group of certain unaffiliated holders of Secured Term Loan B Credit Facility Claims (as defined in the Toys Delaware Plan) consisting of funds and accounts managed or advised by Angelo, Gordon & Co., L.P.; Franklin Mutual Advisors, LLC; Highland Capital Management, LP; Oaktree Capital Management, L.P.; and Solus Alternative Asset Management LP.

11.    "*Ad Hoc Vendor Group*" means the ad hoc group of merchandise vendors represented by Foley & Lardner LLP, Fox Rothschild LLP; Schiff Hardin LLP; Saul Ewing Arnstein & Lehr LLP; Morris, Nichols, Arsht & Tunnell; and Wasserman, Jurista & Stolz, P.C.

12.    "*Adjusted Rights Offering Amount*" means the final amount of new money to be raised (rounded to the nearest half million) pursuant to the Rights Offering, not to exceed the Maximum Rights Offering Amount, which amount shall be acceptable to the Taj Holders Steering Group.

13.    "*Administrative Claim*" means a Claim for costs and expenses of administration of the Debtors' estates pursuant to sections 503(b) or 507(a)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses of preserving the Estates and operating the business of the Debtors incurred after the Petition Date and through the Effective Date; (b) Claims of Professionals in the Chapter 11 Cases; and (c) amounts owing pursuant to the DIP Orders.

14.    "*Administrative Claims Bar Date*" means, except for Administrative Claims of Professionals, the first Business Day that is 30 days following the Effective Date, except as specifically set forth in the Plan or the Administrative Claims Bar Date Order.

15.    "*Administrative Claims Bar Date Order*" means the *Amended Order (I) Setting a Bar Date for Filing Proofs of Administrative Claims Against Certain Debtors, (II) Establishing Administrative Claims Procedures, (III) Approving the Form and Manner of Filing Proofs of Administrative Claims, (IV) Approving Notice of the Administrative Claim Bar Date, and (V) Granting Related Relief* [Docket No. 3260] entered by the Bankruptcy Court.

16.    "*Administrator*" means such Entity as may be designated by the Debtors as liquidator pursuant to the Administrator Agreement to effectuate the Wind Down.

17.    "*Administrator Agreement*" means the agreement governing, among other things, the retention and duties of the Administrator, which shall be agreed to between the Administrator and the Debtors and included in the Plan Supplement.

18.    "*Affiliate*" has the meaning set forth in section 101(2) of the Bankruptcy Code.

19.    "*Allowed*" means with reference to any Claim or Interest, as may be applicable, (a) any Claim, proof of which is timely filed by the applicable Claims Bar Date or which, pursuant to the Bankruptcy Code or a Final Order is not required to be filed; (b) any Claim that is listed in the Schedules as of the Effective Date as neither contingent, unliquidated, nor disputed, and for which no Proof of Claim has been timely filed; or (c) any Claim Allowed pursuant to the Plan; *provided*, *however*, that with respect to any Claim described in clause (a) above, such Claim shall be considered Allowed only if and to the extent that with respect to any Claim no objection to the allowance thereof has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court or such an objection is so interposed and the Claim shall have been Allowed for distribution purposes only by a Final Order.  Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated, or disputed, and for which no Proof of Claim has been timely filed, is not considered Allowed and shall be expunged without further action by the Debtors or the Reorganized Debtors and without any further notice to or action, order or approval of the Bankruptcy Court.

20.    "*Amended Shareholders' Agreement*" means that certain amended shareholders' agreement by and between the Asia JV, Fung and the other parties thereto in substantially the form attached to the Fung Settlement Agreement as Exhibit A or otherwise in form and substance satisfactory to Fung and the Taj Holders Steering Group, which agreement shall become effective upon the Closing Date.

21.     "*Asia JV*" means either (a) the BVI Company or (b) the UK Company, at the election of the Taj Holder Steering Group, or, alternatively (c) an entity that holds, directly or indirectly, all of the equity interests in the BVI Company, as determined by the Taj Holders Steering Group and Fung, in any case prior to the Effective Date; *provided* that in any case the Credit Bid Purchasers and Fung shall hold their equity interests directly in the BVI Company, UK Company, or an entity that holds, directly or indirectly, all of the equity interests in the BVI Company, as applicable, as set forth in the Transaction Steps Memorandum; *provided further* that, in the case of the UK Company or an entity that holds, directly or indirectly, all of the equity interests in the BVI Company, all agreements and arrangements shall have been entered into in form and substance reasonably satisfactory to Fung and the Taj Holders Steering Group as are necessary such that Fung's existing ownership interests in the BVI Company shall be exchanged into a corresponding percentage ownership interest on a fully-diluted basis in the share capital of the UK Company or an entity that holds, directly or indirectly, all of the equity interests in the BVI Company, as applicable, effective as of the Effective Date.

22.     "*Assumed Executory Contract and Unexpired Lease List*" means the list (as may be amended), as determined by the Debtors and the Taj Holders Steering Group of Executory Contracts and Unexpired Leases that will be assumed by the Debtors and will be included in the Plan Supplement.

23.     "*Auction*" means the auction for some or all of the equity or assets of the Taj Debtors or their subsidiaries, conducted in accordance with the Bidding Procedures.

24.     "*Avoidance Actions*" means any and all avoidance, recovery, subordination, or other claims, actions, or remedies that may be brought by or on behalf of the Debtors or their Estates or other authorized parties in interest under the Bankruptcy Code or applicable non-bankruptcy law, including actions or remedies under sections 502, 510, 542, 544, 545, 547 through 553, and 724(a) of the Bankruptcy Code or under similar or related state or federal statutes and common law, including fraudulent transfer laws.

25.     "*Backstop Approval Order*" means an order of the Bankruptcy Court approving the Backstop Commitment Agreement.

26.     "*Backstop Commitment Agreement*" means that certain Backstop Commitment Agreement, in substantially the form attached to the Disclosure Statement Order, as may be amended or modified from time to time in accordance with the terms thereof and the Backstop Approval Order, pursuant to which the Commitment Parties have agreed to backstop the Rights Offering.

27.     "*Backstop Commitment Premium Shares*" means the TRU Asia Equity Interests to be issued as payment of the Commitment Premium in accordance with the Backstop Commitment Agreement.

28.     "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532.

29.     "*Bankruptcy Court*" means the United States Bankruptcy Court for the Eastern District of Virginia having jurisdiction over the Chapter 11 Cases and, to the extent of the withdrawal of any reference under 28 U.S.C. § 157 or the General Order of the District Court pursuant to section 151 of the Judicial Code, the United States District Court for the Eastern District of Virginia.

30.     "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure promulgated under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court.

31.     "*Bidding Procedures*" means the procedures governing the Auction and sale of any or all of the equity or assets of the Taj Debtors or their subsidiaries, as approved by the Bankruptcy Court and as may be amended from time to time in accordance with its terms.

32.     "*Bidding Procedures Order*" means the *Order (I) Establishing Bidding Procedures for the Sale of Certain Assets, (II) Scheduling an Auction and Hearing to Consider the Sale, (III) Approving the Form and Manner of Notice, and (IV) Granting Related Relief* [Docket No. 4671] entered on September 14, 2018.

3

33.    "*Business Day*" means any day, other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

34.    "*BVI Company*" means Toys (Labuan) Holding Limited.

35.    "*Cash*" means the legal tender of the United States or the equivalent thereof.

36.    "*Causes of Action*" means any claims, interests, damages, remedies, causes of action, demands, rights, actions, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, liens, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable, directly or derivatively, matured or unmatured, suspected or unsuspected, in contract, tort, law, equity, or otherwise. For the avoidance of doubt, "Causes of Action" includes: (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by law; (b) the right to object to or otherwise contest Claims or Interests; (c) claims pursuant to sections 362, 510, 542, 543, 544 through 550, or 553 of the Bankruptcy Code; (d) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any state or foreign law fraudulent transfer or similar claim.

37.    "*Certificate*" means any instrument evidencing a Claim or Interest.

38.    "*Chapter 11 Cases*" means the jointly-administered chapter 11 cases of the Debtors pending before the Bankruptcy Court under the lead case of *In re Toys "R" Us, Inc.*, Case No. 17-34665 (KLP) (Bankr. E.D. Va.).

39.    "*Claim*" means any "claim" (as defined in section 101(5) of the Bankruptcy Code) against any of the Debtors.

40.    "*Claims Bar Date*" means, either, the General Claims Bar Date or the Governmental Claims Bar Date, as applicable.

41.    "*Claims Objection Bar Date*" means the deadline for objecting to a Claim asserted against a Debtor, which shall be on the date that is the later of (a) with respect to (i) Administrative Claims, 150 days after the Administrative Claims Bar Date, or (ii) all other Claims, 365 days after the Effective Date and (b) such other period of limitation as may be specifically fixed by the Debtors or the Reorganized Debtors, as applicable, or by an order of the Bankruptcy Court for objecting to such Claims.

42.    "*Claims Register*" means the official register of Claims maintained by the Notice and Claims Agent.

43.    "*Class*" means a category of Holders of Claims or Interests as set forth in Article III in accordance with section 1122(a) of the Bankruptcy Code.

44.    "*Closing Date*" has the meaning assigned to such term in the Fung Settlement Agreement.

45.    "*Commitment Parties*" means, at any time or from time to time, the holders of Taj Senior Notes that have committed to backstop the Rights Offering and to execute the Backstop Commitment Agreement, solely in their capacities as such, including their respective permitted transferees, successors and assigns, all in accordance with the Backstop Commitment Agreement.

46.    "*Commitment Premium*" has the meaning assigned to such term in the Backstop Commitment Agreement.

47.    "*Confirmation*" means the entry on the docket of the Chapter 11 Cases of a Confirmation Order.

4

48.      "*Confirmation Date*" means the date upon which the Bankruptcy Court enters the Confirmation Order.

49.      "*Confirmation Hearing*" means the hearing held by the Bankruptcy Court to consider Confirmation pursuant to section 1129 of the Bankruptcy Code.

50.      "*Confirmation Order*" means an order of the Bankruptcy Court confirming the Plan pursuant to section 1128(a) of the Bankruptcy Code.

51.      "*Consummation*" means the occurrence of the Effective Date for the Plan.

52.      "*Credit Bid*" means the bid submitted by the Credit Bid Purchasers.

53.      "*Credit Bid Purchasers*" means the Holders of Taj Senior Notes Claims that are or are deemed to be party to the Shareholders' Agreement immediately upon the occurrence of the Effective Date.

54.      "*Credit Bid Transaction*" means the transaction in which the Holders of Taj Senior Notes Claims acquire on account thereof, through a credit bid or otherwise, all or a portion of the TRU Asia Equity Interests held directly or indirectly by the Debtors and as further described in the Transaction Steps Memorandum.

55.      "*Creditors' Committee*" means the official committee of unsecured creditors appointed in the Chapter 11 Cases.

56.      "*Cure Obligations*" means all (a) amounts (or such lesser amount as may be agreed upon by the parties under an Executory Contract or Unexpired Lease) required to cure any monetary defaults and (b) other obligations required to cure any non-monetary defaults (the performance required to cure such non-monetary defaults and the timing of such performance will be described in reasonable detail in a notice of proposed assumption and assignment) under any Executory Contract or Unexpired Lease that is to be assumed by the Debtors pursuant to sections 365 or 1123 of the Bankruptcy Code.

57.      "*D&O Liability Insurance Policies*" means all insurance policies for directors, members, trustees, officers, and managers' liability issued at any time prior to the Effective Date to any of the Debtors (or any of their predecessors).

58.      "*D&O Party*" means all current and former directors, officers, or managers (including Sponsor-affiliated directors, officers, and managers) of the Toys Delaware Debtors, the Geoffrey Debtors, TRU Inc. and the other debtors party to the Settlement Agreement, in their capacities as such, including, for the avoidance of doubt, the Disinterested Directors, in their respective capacities as such.

59.      "*Debtors*" means, collectively, the TRU Inc. Debtors and the Taj Debtors.

60.      "*DIP Facility*" means the Taj DIP.

61.      "*DIP Facility Claims*" means any and all Claims arising under or related to the DIP Facility.

62.      "*DIP Lender*" means the DIP Taj Trustee, and the banks, financial institutions, and other lenders party to the DIP Facility from time to time, and each arranger, bookrunner, syndication agent, manager, and documentation agent under the DIP Facility.

63.      "*DIP Orders*" means the Final North American DIP Order and the Final Taj DIP Order.

64.      "*Disallowed*" means any Claim that is not Allowed.

65.      "*Disbursing Agent*" means the Entity or Entities selected by the Debtors and the Taj Holders Steering Group to make or facilitate distributions that are to be made on and after the Effective Date.

66.    "*Disclosure Statement*" means the *Second Amended Disclosure Statement for the Joint Chapter 11 Plan of the Taj Debtors and the TRU Inc. Debtors*, including all exhibits and schedules thereto, as approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code [Docket No. 4552].

67.    "*Disclosure Statement Order*" means the *Order (I) Approving the Adequacy of the Disclosure Statement for the Joint Chapter 11 Plan of the Taj Debtors and the TRU Inc. Debtors, (II) Approving the Solicitation and Notice Procedures with Respect to Confirmation of the Taj Debtors and the TRU Inc. Debtors' Proposed Joint Chapter 11 Plan, (III) Approving the Forms of Ballots and Notices in Connection Therewith, (IV) Approving the Rights Offering Procedures, (V) Scheduling Certain Dates with Respect Thereto, (VI) Shortening the Objection Periods and Notice Requirements Related Thereto, (VII) Authorizing the Backstop Commitment Agreement and the Payment of the Commitment Premium as Administrative Claims, and (VIII) Granting Related Relief*, ordered by the Bankruptcy Court on September 6, 2018 [Docket No. 4572], approving the Disclosure Statement and certain procedures for solicitation of votes on the Plan and granting related relief.

68.    "*Disinterested Directors*" means Alan Miller and Mohsin Meghji in their capacity as the disinterested directors for TRU Inc. and Jeffrey Stein and David Weinstein in their capacity as the disinterested directors for Tru Taj LLC and Tru Taj Finance, Inc., as applicable.

69.    "*Disputed*" means, with respect to any Claim or Interest, any Claim or Interest that is not yet Allowed.

70.    "*Distribution Record Date*" means the Confirmation Date.

71.    "*DTC*" means the Depository Trust Company.

72.    "*Effective Date*" means, with respect to the Plan, the date that is a Business Day selected by the Debtors after the Confirmation Date on which:  (a) no stay of the Confirmation Order is in effect; (b) all conditions precedent specified in Article IX.A have been satisfied or waived (in accordance with Article IX.C); and (c) the Plan is declared effective.  Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable after the Effective Date.

73.    "*Eligible Holder*" means each holder of an Allowed Taj Senior Notes Claim that is eligible to receive the Rights Offering Shares in the Rights Offering in accordance with the Rights Offering Procedures.

74.    "*Entity*" shall have the meaning set forth in section 101(15) of the Bankruptcy Code.

75.    "*Estate*" means, as to each Debtor, the estate created for each Debtor on the Petition Date pursuant to sections 301 and 541 of the Bankruptcy Code.

76.    "*Exculpated Parties*" means, collectively, and in each case in its capacity as such: (a) the Debtors; (b) Toys Delaware Debtors; (c) Geoffrey Debtors; (d) the Reorganized Debtors; (e) the members of the Taj Holders Steering Group; (f) Fung; (g) the Creditors' Committee and its members; (h) the Sponsors (solely to the extent acting as a fiduciary of the Debtors); (i) the Taj DIP Lenders; (j) the Prepetition Secured Parties (as defined in the Final Taj DIP Order); (k) the Taj Senior Notes Indenture Trustee; (l) Taj DIP Notes Indenture Trustee; (m) the Asia JV and its direct and indirect subsidiaries; and (n) with respect to each of the foregoing entities in clauses (a) through (m), such entity's affiliates (that are not the Propco II Plan Entities, Propco I Debtors, or Wayne), and its and their respective directors, officers, agents, advisors, and professionals; *provided* that, notwithstanding the foregoing or any other provision herein, the term "*Exculpated Parties*" does not include the Propco II Plan Entities, Propco I Debtors, Wayne, or any party subject to a Non-Released Claim (including any D&O Party) but only to the extent, and in the capacity, that such party is subject to such Non-Released Claim, provided, for the avoidance of doubt, the TRU Inc. Debtors are not releasing any Claims or Causes of Action against any D&O Party, in each case regardless of whether such party or entity would otherwise meet the definition of Exculpated Parties.

77.    "*Executory Contract*" means a contract to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

78.    "*Federal Judgment Rate*" means the federal judgment rate in effect as of the Effective Date.

79.    "*Fee Examiner Order*" means the *Stipulation and Order for Appointment of a Fee Examiner* [Docket No. 3463].

80.    "*File*," "*Filed*," or "*Filing*" means file, filed, or filing in the Chapter 11 Cases with the Bankruptcy Court or, with respect to the filing of a Proof of Claim or Proof of Interest, the Notice and Claims Agent.

81.    "*Final North American DIP Order*" means the *Final Order (I) Authorizing the North American Debtors to Obtain Postpetition Financing, (II) Authorizing the North American Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection to the Prepetition Lenders, (V) Modifying the Automatic Stay, and (VI) Granting Related Relief* [Docket No. 711] entered by the Bankruptcy Court on October 24, 2017, as subsequently amended by the *Final Order (A) Authorizing the North American Debtors' Entry into Waivers with Respect to ABL/FILO DIP Documents and the Term DIP Documents and (B) Amending Final Order (I) Authorizing the North American Debtors to Obtain Postpetition Financing, (II) Authorizing the North American Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection to the Prepetition Lenders, (V) Modifying the Automatic Stay, and (VI) Granting Related Relief* [Docket No. 2853] entered by the Bankruptcy Court on April 25, 2018.

82.    "*Final Order*" means an order or judgment of the Bankruptcy Court (or any other court of competent jurisdiction) entered by the clerk of the Bankruptcy Court (or such other court) on the docket in the chapter 11 cases (or the docket of such other court), which has not been modified, amended, reversed, vacated or stayed and as to which (x) the time to appeal, petition for certiorari, or move for a new trial, stay, reargument or rehearing has expired and as to which no appeal, petition for certiorari or motion for new trial, stay, reargument or rehearing shall then be pending or (y) if an appeal, writ of certiorari, new trial, stay, reargument or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court (or other court of competent jurisdiction) shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, stay, reargument or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari or move for a new trial, stay, reargument or rehearing shall have expired, as a result of which such order shall have become final in accordance with Rule 8002 of the Federal Rules of Bankruptcy Procedure; *provided* that no order shall fail to be a Final Order solely due to the possibility that a motion pursuant to section 502(j) of the Bankruptcy Code, Rules 59 or 60 of the Federal Rules of Civil Procedure, or Rule 9024 of the Bankruptcy Rules may be filed with respect to such order.

83.    "*Final Taj DIP Order*" means the *Final Order (I) Authorizing the Tru Taj Debtors to Obtain Postpetition Financing, (II) Authorizing the Tru Taj Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection to the Prepetition Lenders, (V) Modifying the Automatic Stay, and (VI) Granting Related Relief* [Docket No. 745] entered by the Bankruptcy Court on October 25, 2017, as subsequently amended by the *Final Order (I) Authorizing the Tru Taj Debtors to (A) Amend the DIP Facility to Obtain Additional Financing and Waive Certain Defaults and (B) Enter into the Supplemental DIP Documents and the FGA/Prepetition Notes Waivers, and (II) Granting Related Relief* [Docket No. 2851] entered by the Bankruptcy Court on April 25, 2018.

84.    "*Fung*" means Fung Retailing Limited.

85.    "*Fung Settlement Agreement*" means that certain settlement agreement, by and between certain of the Debtors parties thereto, TRU (UK) Asia Limited, and Fung, which settles, compromises, and releases certain claims and causes of action between the parties related to, among other things, (a) the BVI Company, (b) that certain Amended and Restated Shareholders' Agreement, dated March 24, 2017, by and between TRU Inc., the UK Company, the BVI Company, and Fung, and (c) the Credit Bid Transaction, which is incorporated in this Plan as set forth herein.

86.    "*Fung Settlement Order*" means the *Order (I) Approving the Settlement Agreement and (II) Granting Related Relief* [Docket No. 5833].

87.      "*General Claims Bar Date*" means April 6, 2018, or such other date established by the Bankruptcy Court by which Proofs of Claim must have been Filed by Entities except for governmental units, as ordered by the Bankruptcy Court in the *Amended Order  (I) Setting Bar Dates for Filing Proofs of Claim, Including Requests for Payment Under Section 503(B)(9), (II) Establishing Amended Schedules Bar Date and Rejection Damages Bar Date, (III) Approving the Form of and Manner for  Filing Proofs of Claim, Including Section 503(B)(9) Requests, (IV) Approving Notice of Bar Dates, and (V) Granting Related Relief*, entered by the Bankruptcy Court [Docket No. 1332].

88.      "*General Unsecured Claim*" means any unsecured Claims against any Debtor that are not otherwise paid in full during the Chapter 11 Cases pursuant to an order of the Bankruptcy Court (including Intercompany Claims against the Taj Debtors and TRU Inc. Debtors, other than as explicitly set forth in this definition) and are not:  (a) an Administrative Claim; (b) a Taj DIP Guaranty Claim; (c) a Taj DIP Claim; (d) a Priority Tax Claim; (e) an Other Secured Claim; (f) an Other Priority Claim; (g) a Taj Senior Notes Guaranty Claim; (h) a Taj Senior Notes Claim; (i) a Propco II Mortgage Loan Guaranty Claim; (j) a Giraffe Junior Mezzanine Loan Guaranty Claim; (k) a Taj Debtor Intercompany Claim against a Taj Debtor; or (l) a TRU Inc. Debtor Intercompany Claim against a TRU Inc. Debtor.

89.      "*Geoffrey Debtors*" means, collectively, Geoffrey Holdings, LLC, Geoffrey, LLC and Geoffrey International, LLC.

90.      "*Giraffe Junior Mezzanine Loan*" means the $88 million 12.5% loan due November 19, 2019, which is governed by the Giraffe Junior Mezzanine Loan Agreement.

91.      "*Giraffe Junior Mezzanine Loan Agreement*" means that certain 12.5% Mezzanine Loan Agreement, dated November 3, 2016 (as amended, novated, supplemented, extended or restated from time to time), among Giraffe Junior Holdings, LLC, as Borrower, TRU Inc., as guarantor, and the Giraffe Junior Mezzanine Loan Lenders.

92.      "*Giraffe Junior Mezzanine Loan Claim*" means any Claim derived from or based upon the Giraffe Junior Mezzanine Loan.

93.      "*Giraffe Junior Mezzanine Loan Guaranty*" means the guaranty of TRU Inc. of the Giraffe Junior Mezzanine Loan Claim.

94.      *Giraffe Junior Mezzanine Loan Guaranty Claim*" means any Claim derived from or based upon the Giraffe Junior Mezzanine Loan Guaranty.

95.      "*Giraffe Junior Mezzanine Loan Lenders*" means the lenders under the Giraffe Junior Mezzanine Loan Agreement.

96.      "*Global Settlement Agreement*" means that certain settlement agreement, dated as of December 11, 2018 and filed with the Bankruptcy Court at [Docket No. 5922], Exhibit 1, by and among the parties thereto.

97.      "*Governmental Claims Bar Date*" means June 18, 2018 or such other date established by the Bankruptcy Court by which Proofs of Claim must have been Filed by a Governmental Unit, as ordered by the Bankruptcy Court in the *Amended Order  (I) Setting Bar Dates for Filing Proofs of Claim, Including Requests for Payment Under Section 503(B)(9), (II) Establishing Amended Schedules Bar Date and Rejection Damages Bar Date, (III) Approving the Form of and Manner for  Filing Proofs of Claim, Including Section 503(B)(9) Requests, (IV) Approving Notice of Bar Dates, and (V) Granting Related Relief*, entered by the Bankruptcy Court [Docket No. 1332].

98.      "*Governmental Unit*" shall have the meaning set forth in section 101(27) of the Bankruptcy Code.

99.      "*Holder*" means any Entity holding a Claim or an Interest.

100.    "*Impaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is not Unimpaired.

101.    "*Initial Shares*" means the TRU Asia Equity Interests to be issued to the Holders of the Taj Senior Notes Claims in connection with the Credit Bid Transaction and in accordance with the Transaction Steps Memorandum prior to dilution by the Backstop Commitment or the Rights Offering.

102.    "*Intercompany Claim*" means any claim or Claim held by TRU Inc. or any of its direct or indirect subsidiaries against TRU Inc. or any of its direct or indirect subsidiaries.

103.    "*Interest*" means the common stock or shares, limited liability company interests, limited partnership units, preferred interests, and any other equity, ownership or profits interests of any Debtor or non-Debtor subsidiary of a Debtor and options, warrants, rights or other securities or agreements to acquire the common stock or shares, limited liability company interests, or other equity, ownership or profits interests of any Debtor or non-Debtor subsidiary of a Debtor (whether or not arising under or in connection with any employment agreement).

104.    "*Interest Transfer Agreement*" means the agreement pursuant to which the Initial Shares will be transferred to Holders of Taj Senior Notes Claims in connection with the Credit Bid Transaction and as further described in the Transaction Steps Memorandum.

105.    "*Interim Compensation Order*" means the *Order (I) Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Retained Professionals and (II) Granting Related Relief*, entered October 25, 2017 [Docket No. 746].

106.    "*Judicial Code*" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001.

107.    "*LBO*" means the 2005 transaction in which the Sponsors became the direct and indirect equity holders of the Debtors.

108.    "*Lien*" shall have the meaning set forth in section 101(37) of the Bankruptcy Code.

109.    "*Liquidation Proceeds*" means the proceeds from the sales of equity and/or assets of the Taj Debtors or the Reorganized Taj Debtors, as applicable, and their direct and indirect subsidiaries, other than proceeds of the sale of the TRU Asia Equity Interests.

110.    "*License Agreement*" means the agreement governing the license of certain intellectual property assets for the benefit of the Asia JV and included in the Restructuring Documents, as may or may not be amended and restated with the consent of the parties thereto and acceptable to the Taj Holders Steering Group and Fung.

111.    "*Maximum Rights Offering Amount*" means $350,000,000.

112.    "*Non-Released Claims*" means any Causes of Action held by the Toys Delaware Debtors, TRU Inc., or their respective estates or creditors against any D&O Party, and any Avoidance Actions held by, as applicable, the Toys Delaware Debtors or TRU Inc. or their respective estates that are not released pursuant to the Settlement Agreement or Global Settlement Agreement, including any Avoidance Actions against non-insiders not otherwise released herein or therein; *provided that*, for the avoidance of doubt, in no event shall any Released Taj Claims constitute Non-Released Claims.

113.    "*Notice and Claims Agent*" means Prime Clerk LLC.

114.    "*Ordinary Course Professional*" means professionals retained and compensated by the Debtors in accordance with the Ordinary Course Professionals Order.

115.    "*Ordinary Course Professionals Order*" means the *Order Authorizing the Debtors to Retain and Compensate Professionals Utilized in the Ordinary Course of Business* [Docket No. 736].

116.    "*Other Priority Claim*" means any Claim accorded priority in right of payment under section 507(a) of the Bankruptcy Code, other than a Priority Tax Claim or Claims entitled to administrative expense priority pursuant to section 503(b)(9) of the Bankruptcy Code.

117.    "*Other Secured Claim*" means any secured Claim against the Debtors not specifically described in the Plan.

118.    "*Petition Date*" means September 18, 2017.

119.    "*Plan*" means this Joint Plan of the Taj Debtors and the TRU Inc. Debtors, Pursuant to Chapter 11 of the Bankruptcy Code, including the Plan Supplement which is incorporated herein by reference and made part of this Plan as if set forth herein.

120.    "*Plan Supplement*" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan to be Filed on or before 10 business days prior to the deadline to vote on or object to the Plan (subject to further supplementation, amendment, and modification, as necessary), each of which shall be acceptable to the Taj Holders Steering Group, including:   (a) the Interest Transfer Agreement; (b) the Administrator Agreement; (c) the Assumed Executory Contract and Unexpired Lease List; (d) the Rejected Executory Contract and Unexpired Lease List; (e) the Restructuring Transactions Description; (f) the Transaction Steps Memorandum, which shall be in form and substance satisfactory to Fung and, for the avoidance of doubt, the Taj Holders Steering Group; (g) the Priority Waterfall; and (h) the Transition Services Agreement.   For the avoidance of doubt, in the event that any term of any Plan Supplement conflicts with or is inconsistent in any respect with the terms of the Plan, the terms of the Plan shall control.

121.    "*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

122.    "*Priority Waterfall*" means a schedule setting forth the priorities with respect to Senior Claims under Article III hereof, subject to the Global Settlement Agreement, that will be included in the Plan Supplement.

123.    "*Professional*" means an Entity: (a) retained in the Chapter 11 Cases pursuant to a Final Order in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered before or on the Confirmation Date, pursuant to sections 327, 328, 329, 330, 363, and 331 of the Bankruptcy Code; or (b) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code; excluding those Entities entitled to retention and payment pursuant to the Ordinary Course Professionals Order.

124.    "*Professional Fee Allocation Mechanism*" means the methodology for allocating Accrued Professional Compensation Claims among the Taj Debtors, the TRU Inc. Debtors, the Toys Delaware Debtors, Geoffrey Debtors, and Propco I Debtors, as set forth in the Global Settlement Agreement.

125.    "*Professional Fee Escrow Account*" means an interest-bearing escrow account to hold and maintain an amount of Cash equal to the Professional Fee Escrow Amount funded by the Debtors as soon as reasonably practicable after the Confirmation Date and no later than the Effective Date solely for the purpose of paying all Allowed and unpaid Accrued Professional Compensation Claims.   Such Cash shall remain subject to the jurisdiction of the Bankruptcy Court.

126.    "*Professional Fee Escrow Amount*" means the aggregate Accrued Professional Compensation Claims through the Confirmation Date as estimated in accordance with Article II.B.

127.    "*Proof of Claim*" means a proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

128.      "*Proof of Interest*" means a proof of Interest Filed against any of the Debtors in the Chapter 11 Cases.

129.      "*Propco I*" means Toys "R" Us Property Company I, LLC.

130.      "*Propco I Debtors*" means together, collectively, Propco I, Wayne Real Estate Holding Company, LLC, MAP Real Estate, LLC, TRU 2005 RE I, LLC, TRU 2005 RE II Trust, and Wayne Real Estate Company, LLC.

131.      "*Propco II Mortgage Loan Agreement*" means that certain loan agreement, dated as of November 3, 2016, by and among Goldman Sachs Mortgage Company and Bank of America, N.A., collectively, as a lender, and Toys "R" Us Property Company II, LLC.

132.      "*Propco II Mortgage Loan Claims*" means any Claims arising under the Propco II Mortgage Loan Documents, including Claims for principal, interest, fees, costs, expenses, and Propco II Special Servicer Fees.

133.      "*Propco II Mortgage Loan Documents*" means the Propco II Mortgage Loan Agreement, the Propco II Servicing Agreement, and any related documents.

134.      "*Propco II Mortgage Loan Guaranty*" means any guaranty of TRU Inc. of the Propco II Mortgage Loan Claims.

135.      "*Propco II Mortgage Loan Guaranty Claims*" means any Claim derived from or based upon the Propco II Mortgage Loan Guaranty.

136.      "*Propco II Plan Entities*" means together, Toys "R" Us Property Company II, LLC and Giraffe Junior Holdings, LLC.

137.      "*Propco II Servicing Agreement*" means that certain Trust and Servicing Agreement, dated as of November 3, 2016, by and among TRU 2016-1 Depositor, LLC, as depositor and Wells Fargo Bank, National Association, in its capacity as servicer, special servicer, and certificate administrator.

138.      "*Propco II Special Servicer*" means Wells Fargo Bank, National Association, in its capacity as special servicer under the Propco II Servicing Agreement.

139.      "*Propco II Special Servicer Fees*" means the reasonable and documented (a) out of pocket fees and expenses of the Propco II Special Servicer, (b) fees and expenses of counsel and financial advisor to the Propco II Special Servicer incurred on or prior to the Effective Date, and (c) any and all fees payable to the Propco II Special Servicer under the Propco II Mortgage Loan Documents.

140.      "*Rejected Executory Contract and Unexpired Lease List*" means the list, as determined by the Debtors and the Taj Holders Steering Group, of Executory Contracts and Unexpired Leases that will be rejected by the Debtors pursuant to the provisions of Article V and will be included in the Plan Supplement.

141.      "*Released Party*" means, collectively, and in each case in its capacity as such: (a) the Debtors; (b) Toys Delaware Debtors; (c) Geoffrey Debtors; (d) Reorganized Debtors; (e) the Creditors' Committee and its members; (f) Holders of 8.75% Unsecured Notes Claims; (g) the 8.75% Unsecured Notes Trustee; (h) Holders of 7.375% Senior Notes Claims; (i) the 7.375% Senior Notes Trustee; (j) Holders of Giraffe Junior Mezzanine Loan Guaranty Claims; (k) Holders of Propco II Mortgage Loan Guaranty Claims; (l) the Propco II Special Servicer; (m) Holders of Taj Senior Notes Claims; (n) the Taj Senior Notes Indenture Trustee; (o) the Taj Holders Steering Group and its members; (p) the Taj DIP Lenders; (q) the Sponsors; (r) the Asia JV; (s) TRU (Japan) Holdings Parent Ltd.; (t) TRU (BVI) Asia 1 Ltd; (u) TRU (BVI) Asia 2 Ltd; (v) TRU (UK) Asia Limited; (w) Toys (Labuan) Holding Limited; (x) TRU Thailand, LLC; (y) TRU Retailing (Thailand) Limited; (z) TRU Thailand Limited; (aa) TRU GSO (HK) Limited; (bb) TRU GSO, LLC; (cc) and TRU Vermont, Inc.; and (dd) with respect to each of the foregoing entities in clauses (a) through (cc), such entity's current and former affiliates (that are not the Propco II Plan Entities,

11

Propco I Debtors, or Wayne), and its and their respective current and former equity holders (regardless of whether such interests are held directly or indirectly), subsidiaries, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, provided that TRU Inc. shall not release any director or officer of the TRU Inc. Debtors or of  Toys Delaware; and (ee) Fung and its current and former affiliates, equity holders (regardless of whether such interests are held directly or indirectly), subsidiaries, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals; *provided that*, notwithstanding any other provision herein, "Released Parties" shall not include, and in each case regardless of whether such party or entity would otherwise meet the definition of Released Party, (i) the Propco II Plan Entities, Propco I Debtors, or Wayne, (ii) any party entitled to vote on the Plan that votes against the Plan, or (iii) any party subject to a Non-Released Claim (including any D&O Party) but only to the extent, and in the capacity, that such party is subject to such Non-Released Claim, provided, for the avoidance of doubt, the TRU Inc. Debtors are not releasing any Claims or Causes of Action against any D&O Party.

142.  "*Released Taj Claims*" shall have the meaning ascribed to such term in the Global Settlement Agreement.

143.  "*Releasing Parties*" means, collectively, and in each case in its capacity as such: (a) the Debtors; (b) Toys Delaware Debtors; (c) Geoffrey Debtors; (d) Reorganized Debtors; (e) the Creditors' Committee and its members; (f) Holders of 8.75% Unsecured Notes Claims; (g) the 8.75% Unsecured Notes Trustee; (h) Holders of 7.375% Senior Notes Claims; (i) the 7.375% Senior Notes Trustee; (j) Holders of Giraffe Junior Mezzanine Loan Guaranty Claims; (k) Holders of Propco II Mortgage Loan Guaranty Claims; (l) the Propco II Special Servicer; (m) Holders of Taj Senior Notes Claims; (n) the Taj Senior Notes Indenture Trustee; (o) the Taj Holders Steering Group and its members; (p) the Taj DIP Lenders; (q) the Sponsors; (r) the Asia JV; (s) TRU (Japan) Holdings Parent Ltd.; (t) TRU (BVI) Asia 1 Ltd; (u) TRU (BVI) Asia 2 Ltd; (v) TRU (UK) Asia Limited; (w) Toys (Labuan) Holding Limited; (x) TRU Thailand, LLC; (y) TRU Retailing (Thailand) Limited; (z) TRU Thailand Limited; (aa) TRU GSO (HK) Limited; (bb) Fung; and (cc) with respect to each of the foregoing entities in clauses (a) through (bb), such entity's current and former affiliates (that are not the Propco II Plan Entities, Propco I Debtors, or Wayne) and its and their respective current and former equity holders (regardless of whether such interests are held directly or indirectly), subsidiaries, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals; (dd) all holders of Claims and Interests that are deemed to accept the Plan and who do not opt out of the releases provided by the Plan; (ee) all holders of Claims and Interests who vote to accept the Plan; and (ff) all holders in voting classes who abstain from voting on the Plan and who do not opt-out of the releases provided by the Plan; *provided*, *that*, Holders of Claims deemed to reject the Plan are not Releasing Parties, in such capacity, *provided, further*, that Holders of Claims that vote to reject the Plan and opt-out of the releases, regardless of whether such party or entity would otherwise meet the definition of Releasing Party, are not Releasing Parties in such capacity; *provided, further,* that "Releasing Parties" shall not include the Propco II Plan Entities, the Propco I Debtors, or Wayne.

144.  "*Reorganized Debtors*" means the Debtors, in each case, or any successor thereto, by merger, consolidation or otherwise, on or after the Effective Date.

145.  "*Restructuring Documents*" means the Plan, the Disclosure Statement, the Plan Supplement, the Administrator Agreement, the License Agreement and the various other agreements and documentation formalizing the Plan, the Restructuring Transactions, and the Credit Bid Transaction.

146.  "*Reorganized Taj Debtors*" means the Taj Debtors, in each case, or any successor thereto, by merger, consolidation or otherwise, on or after the Effective Date.

147.  "*Restructuring Support Agreement*" means that certain restructuring support agreement, dated as of August 3, 2018, and among the Debtors and the members of the Taj Holders Steering Group, as may be amended, amended and restated, supplemented or modified from time to time in accordance with the terms thereof.

148. "*Restructuring Transactions*" means those mergers, amalgamations, consolidations, arrangements, continuances, restructurings, transfers, conversions, dispositions, liquidations, dissolutions, or other corporate transactions that the Debtors and/or the Taj Holders Steering Group, as applicable, determine to be necessary or desirable to implement the Plan, the Plan Supplement, and the Confirmation Order.

149. "*Restructuring Transactions Description*" means a memorandum or other presentation setting forth some or all of the Restructuring Transactions.

150. "*Rights Offering*" means the rights offering for Rights Offering Shares contemplated by the Backstop Commitment Agreement, the Restructuring Support Agreement, and the Rights Offering Procedures.

151. "*Rights Offering Amount*" means the lower of the Maximum Rights Offering Amount and the Adjusted Rights Offering Amount.

152. "*Rights Offering Participants*" means those Eligible Holders who duly subscribe for Rights Offering Shares in accordance with the Rights Offering Procedures.

153. "*Rights Offering Procedures*" means the procedures set forth in Schedule 12 to the Disclosure Statement Order, as they may be amended or modified from time to time in a manner that is reasonably acceptable to the Debtors and the Commitment Parties.

154. "*Rights Offering Shares*" means the TRU Asia Equity Interests to be purchased by the Rights Offering Participants pursuant to the Rights Offering. For the avoidance of doubt, (a) the term "Rights Offering Shares" does not include the TRU Asia Equity Interests issued on account of the Commitment Premium and (b) the Rights Offering Shares shall not dilute the TRU Asia Equity Interests owned by Fung (except, if applicable, for any Initial Shares that Fung may receive in its capacity as a Holder of Taj Senior Notes Claim(s)).

155. "*Sale Proceeds*" means all proceeds of the Credit Bid Transaction; *provided* that Sale Proceeds, other than in respect of Classes A3 and B3 Claims, shall not include any Initial Shares.

156. "*Schedules*" means, collectively, the schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases, and statements of financial affairs Filed by the Debtors pursuant to section 521 of the Bankruptcy Code and in substantial accordance with the official bankruptcy forms.

157. "*Secured*" means when referring to a Claim secured by a Lien on property in which the applicable Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order or the Plan, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in such Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code.

158. "*Securities Act*" means the Securities Act of 1933, 15 U.S.C. §§ 77a–77aa.

159. "*Securities Exchange Act*" means the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a–78nn.

160. "*Security*" shall have the meaning set forth in section 101(49) of the Bankruptcy Code.

161. "*Senior Claim*" means a Claim that is senior to a subject Claim in accordance with the priorities set forth in the Priority Waterfall.

162. "*Settlement Agreement*" means that certain settlement agreement by and among the Toys Delaware Debtors and the Geoffrey Debtors and certain Holders of Claims and Interests, including the Creditors' Committee and certain of its members, the Ad Hoc Vendor Group and its members, the Sponsors, and the Ad Hoc Group of Term B-4 Lenders and its members, dated as of July 17, 2018, attached hereto as Exhibit A.

163.    "*Settlement Order*" means the Final Order(s) of the Bankruptcy Court approving the Settlement Agreement.

164.    "*Shareholders' Agreement*" means (i) prior to the Closing Date, that certain Amended and Restated Shareholders' Agreement, dated March 24, 2017, by and between TRU Inc., TRU (UK) Asia Limited, Toys (Labuan) Holding Limited, and Fung, and (ii) on and after the Closing Date, the Amended Shareholders' Agreement.

165.    "*Sponsors*" means, collectively, (a) Bain Capital Private Equity, LP, (b) Kohlberg Kravis Roberts & Co. L.P., (c) Vornado Realty Trust, and (d) funds and entities advised by each such Entity, and each such Entity's current and former Affiliates, who own or owned any equity in the Debtors.

166.    "*Subscription Rights*" means the rights to purchase Rights Offering Shares on the terms set forth in the Rights Offering Procedures.

167.    "*Taj Debtors*" means TRU Europe, Tru Taj LLC, Tru Taj Finance, Inc., TRU Taj Holdings 1, LLC, TRU Taj Holdings 2, Ltd., TRU Taj Holdings 3, LLC, TRU Asia, LLC, and TRU Taj (Europe) Holdings, LLC.

168.    "*Taj Debtor Intercompany Claim*" means an Intercompany Claim held by a Taj Debtor.

169.    "*Taj DIP*" means the debtor-in-possession facility evidenced by the Taj DIP Notes Indenture.

170.    "*Taj DIP Claim*" means any and all claims derived from or based upon the Taj DIP.

171.    "*Taj DIP Guaranty*" means the guaranty of TRU Inc. of the Taj DIP.

172.    "*Taj DIP Guaranty Claim*" means any and all claims derived from or based upon the Taj DIP Guaranty.

173.    "*Taj DIP Lenders*" means the Taj DIP Notes Indenture Trustee, and the noteholders party to the Taj DIP.

174.    "*Taj DIP Notes*" means those certain 11% senior secured notes due sixteen months from the date of issuance, in the currently issued and outstanding principal amount of $455 million provided for under the Taj DIP.

175.    "*Taj DIP Notes Indenture*" means that certain Indenture, dated as of September 22, 2017, (as amended, novated, supplemented, extended, or restated from time to time) by and among Tru Taj LLC and Tru Taj Finance, Inc. as co-issuers, TRU Inc. and certain of its direct and indirect wholly-owned subsidiaries in the United States, Europe and Australia, as guarantors, and the Taj DIP Notes Indenture Trustee.

176.    "*Taj DIP Notes Indenture Trustee*" means Wilmington Savings Fund Society, FSB, as trustee and collateral trustee under the Taj DIP Notes Indenture.

177.    "*Taj Holders Steering Group*" means, collectively, certain beneficial holders of, or the investment advisor or investment manager to certain beneficial holders of, Taj Senior Notes and Taj DIP Notes represented by Paul, Weiss, Rifkind, Wharton & Garrison LLP and representing at least two-thirds of the aggregate amount of all outstanding Taj Senior Notes claims, each of whom executed the Restructuring Support Agreement.

178.    "*Taj Intercompany Interests*" means direct and indirect interests of Taj Debtors in other Taj Debtors and certain of their direct and indirect subsidiaries and affiliates, other than the equity interests in TRU Europe.

179.     "*Taj Senior Notes*" means the 12.00% senior secured notes due August 16, 2021, which are governed by the Taj Senior Notes Indenture and in the currently issued and outstanding principal amount of $582.7 million.

180.     "*Taj Senior Notes Adequate Protection Claim*" means the Adequate Protection Claims (as defined in the Final Taj DIP Order) with regards to the Taj Senior Notes as set forth in the Final Taj DIP Order.

181.     "*Taj Senior Notes Claim*" means any and all claims derived from or based upon the Taj Senior Notes, including the Taj Senior Notes Adequate Protection Claim.

182.     "*Taj Senior Notes Guaranty*" means the guaranty of TRU Inc. and certain of its direct and indirect wholly-owned subsidiaries in the United States, Europe and Australia of the Taj Senior Notes.

183.     "*Taj Senior Notes Guaranty Claim*" means any and all claims derived from or based upon the Taj Senior Notes Guaranty.

184.     "*Taj Senior Notes Indenture*" means that certain Indenture, dated as of August 26, 2016, (as amended, novated, supplemented, extended, or restated from time to time) by and among Tru Taj LLC and Tru Taj Finance, Inc. as co-issuers, TRU Inc. and certain of its direct and indirect wholly-owned subsidiaries in the United States, Europe and Australia, as guarantors, and the Taj Senior Notes Indenture Trustee.

185.     "*Taj Senior Notes Indenture Trustee*" means Wilmington Trust, N.A. as indenture trustee under the Taj Senior Notes Indenture.

186.     "*Tax Code*" means the United States Internal Revenue Code of 1986, as amended.

187.     "*Toys Delaware*" means Toys "R" Us Delaware, Inc.

188.     "*Toys Delaware Debtors*" means Toys Delaware, TRU Guam, LLC, Toys Acquisition, LLC, Giraffe Holdings, LLC, TRU of Puerto Rico, Inc., and TRU-SVC, Inc.

189.     "*Toys Delaware Debtors Effective Date*" means the effective date of any plan of the Toys Delaware Debtors.

190.     "*Toys Delaware Debtor Intercompany Claims*" means an Intercompany Claim held by Toys Delaware Debtor.

191.     "*Toys Delaware Plan*" means the chapter 11 plan of the Toys Delaware Debtors.

192.     "*Transaction Steps Memorandum*" means a memorandum to be included in the Plan Supplement, prior to the Effective Date, that, among other things, sets forth the steps necessary to effectuate the transfer of the Initial Shares to Holders of Taj Senior Notes Claims in connection with the Credit Bid Transaction, the Rights Offering, if applicable, the conversion of Fung's existing ownership interests in the BVI Company into a corresponding percentage ownership interest on a fully-diluted basis in the share capital of the Asia JV, and the transfer of the Taj DIP Notes to the Wind Down Entities as contemplated under Article IV.C.

193.     "*Transition Services Agreement*" means any transition services agreement agreed to between the Debtors and certain Debtor affiliates, on the one hand, and the Asia JV, on the other.

194.     "*Transition Services Escrow Agreement*" means that certain escrow agreement dated September 18, 2017 by and among Toys Delaware, the Transition Services Officer, and Wilmington Trust, N.A.

195.     "*Transition Services Escrow Amount*" means any amounts deposited with the escrow agent under the Transition Services Escrow Agreement.

196.    "*Transition Services Officer*" means Chetan Bhandari in his capacity as Finance Director of Toys Delaware pursuant to the Transition Services Offer Letter.

197.    "*Transition Services Offer Letter*" means that certain offer letter, dated as of September 8, 2017, by and between the Transition Services Officer and Toys Delaware.

198.    "*Treasury Regulations*" means the Treasury regulations promulgated under the Code.

199.    "*TRU Asia Equity Interests*" means the Interests in the Asia JV.

200.    "*TRU Europe*" means Toys "R" Us Europe, LLC.

201.    "*TRU Inc.*" means Toys "R" Us, Inc.

202.    "*TRU Inc. Debtors*" means, TRU Inc., MAP 2005 Real Estate, LLC, Toys "R" Us - Value, Inc., and TRU Mobility, LLC.

203.    "*TRU Inc. Debtor Intercompany Claims*" means an Intercompany Claim held by TRU Inc. Debtor.

204.    "*TRU Inc. Intercompany Interests*" means the direct and indirect interests of TRU Inc. Debtors in other TRU Inc. Debtors and certain of their direct and indirect subsidiaries and affiliates, other than the equity interests in TRU Inc.

205.    "*TRU Inc. Silo Recovery*" means (1) the balance of any (x) Sale Proceeds after repayment in full of all Allowed Claims against the Taj Debtors and (y) Liquidation Proceeds after repayment in full of all Senior Claims, in accordance with the Priority Waterfall; (2) the value, if any, distributed to the TRU Inc. Debtors on account of any claims or Causes of Action it may have against any other Entity; (3) Cash on hand or received by the TRU Inc. Debtors, including the proceeds of any dispositions of TRU Inc. Debtor assets and any distributions from non-Debtor subsidiaries to the TRU Inc. Debtors; and (4) any recoveries from the Non-Released Claims Trust allocated to creditors of TRU Inc. as contemplated by Section 3.2(k) of the Settlement Agreement, as determined by further agreement to be approved by the Court, or by further order of the Court, which such recoveries shall be distributed to holders of Claims and Interests in the TRU Inc. Debtors according to their relative priority and subject to Article III.B.8 of this Plan.  For the avoidance of doubt, the Plan does not determine the allocation of any such proceeds on account of Non-Released Claims and/or D&O Claims held by or allocable to TRU Inc. For the further avoidance of doubt, the claims of Toys Delaware against TRU Inc. for any proceeds of Non-Released Claims are not released under the Plan and are instead preserved for the benefit of the Non-Released Claims Trust and its beneficiaries pending resolution of any Non-Released Claims and/or D&O Claims held by or allocable to TRU Inc.

206.    "*TRU Inc. Unsecured Notes Trustees*" means the 7.375% Senior Notes Indenture Trustee and the 8.75% Unsecured Notes Indenture Trustee, collectively.

207.    "*TRU Inc. Unsecured Notes Claims*" means the 7.375% Senior Notes Claims and the 8.75% Unsecured Notes Claims, collectively.

208.    "*U.S. Trustee*" means the Office of the United States Trustee for the Eastern District of Virginia.

209.    "*UK Company*" means TRU (UK) Asia Limited, a UK limited company.

210.    "*Unexpired Lease*" means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

211.    "*Unimpaired*" means, with respect to a Class of Claims or Interests, a Claim or an Interest that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

212.    "*United States*" means the United States of America, its agencies, departments, or agents.

16

213.    "*Wayne*" means Wayne Real Estate Parent Company, LLC.

214.    "*Wind Down*" means the wind down, dissolution, and liquidation of the Debtors' Estates after the Effective Date.

215.    "*Wind Down Budget*" shall have the meaning ascribed to it in Article IV.C.2.

216.    "*Wind Down Entities*" means those certain entities contemplated to be created on the Effective Date as described in Article IV.C.2.

B.    *Rules of Interpretation.*

For purposes of the Plan:  (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (3) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit, whether or not Filed, having been Filed or to be Filed shall mean that document, schedule, or exhibit, as it may thereafter be amended, modified, or supplemented; (4) any reference to an Entity as a Holder of a Claim or Interest includes that Entity's successors and assigns; (5) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (6) unless otherwise specified, all references herein to exhibits are references to exhibits in the Plan Supplement; (7) unless otherwise specified, the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (8) subject to the provisions of any contract, certificate of incorporation, by-law, instrument, release, or other agreement or document entered into in connection with the Plan, the rights and obligations arising pursuant to the Plan shall be governed by, and construed and enforced in accordance with the applicable federal law, including the Bankruptcy Code and Bankruptcy Rules; (9) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (10) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply to the Plan; (11) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; (12) all references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (13) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, and as applicable to the Chapter 11 Cases, unless otherwise stated; (14) references to "Proofs of Claim," "holders of Claims," "Disputed Claims," and the like shall include "Proofs of Interest," "holders of Interests," "Disputed Interests," and the like, as applicable; and (15) any immaterial effectuating provisions may be interpreted in such a manner that is consistent with the overall purpose and intent of the Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.  References in the Plan to the Debtors shall mean the Debtors or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date, as applicable.

C.    *Computation of Time.*

The provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed in the Plan or Confirmation Order.  If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.

D.    *Governing Law.*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of Delaware, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as

otherwise set forth in those agreements, in which case the governing law of such agreement shall control); *provided*, *however*, that corporate or limited liability company governance matters relating to the Debtors shall be governed by the laws of the state of incorporation or formation (as applicable) of the applicable Debtor.

E.      *Reference to Monetary Figures.*

All references in the Plan to monetary figures shall refer to the legal tender of the United States, unless otherwise expressly provided.

F.      *Controlling Document.*

Except as set forth in the Plan, to the extent that any provision of the Disclosure Statement, the Plan Supplement, or any other order referenced in the Plan (or any exhibits, schedules, appendices, supplements, or amendments to any of the foregoing), conflict with or are in any way inconsistent with any provision of the Plan, the Plan shall govern and control; provided, however, with respect to any conflict or inconsistency between the Plan and the Confirmation Order, the Confirmation Order shall govern; *provided, however,* to the extent the Plan or Confirmation Order is inconsistent with the Global Settlement Agreement, Fung Settlement Agreement, Fung Settlement Order, Settlement Agreement, or the Settlement Order with respect to provisions of the Plan that explicitly refer to or incorporate the Global Settlement Agreement, Fung Settlement Agreement, Fung Settlement Order, Settlement Agreement, or the Settlement Order, the Global Settlement Agreement, Fung Settlement Agreement, Fung Settlement Order, Settlement Agreement, or the Settlement Order, as applicable, shall govern solely with respect to such provisions of the Plan (but solely as to the parties to the Global Settlement Agreement, Fung Settlement Agreement or Settlement Agreement, as applicable).

G.      *Application of the Plan.*

This Plan shall constitute a separate Plan for each Debtor.  Any one Debtor's inability to meet the requirements necessary for confirmation of the Plan as to such Debtor, whether determined at or prior to the Confirmation Hearing, in consultation with the Taj Holders Steering Group, shall not in any way prevent the Confirmation with respect to any other Debtor.

## ARTICLE II
## ADMINISTRATIVE CLAIMS, DIP FACILITY CLAIMS, AND PRIORITY TAX CLAIMS

A.      *Administrative Claims and Priority Tax Claims.*

Except for Claims of Professionals, unless previously Filed, requests for payment of Administrative Claims must be Filed and served on the Debtors and counsel to the Taj Holders Steering Group no later than the Administrative Claims Bar Date applicable to the Debtor against whom the Administrative Claim is asserted pursuant to the procedures specified in the Confirmation Order and the notice of the Effective Date.  Holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims by the Administrative Bar Date that do not File and serve such a request by the Administrative Claims Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors, the Asia JV, or their respective property and such Administrative Claims shall be deemed compromised, settled, and released as of the Effective Date.

1.      Administrative Claims and Priority Tax Claims against the TRU Inc. Debtors.

On the Effective Date, except to the extent that a Holder of an Allowed Administrative Claim or Priority Tax Claim and the TRU Inc. Debtor against which such Allowed Administrative Claim is asserted agree to less favorable treatment for such Holder, each Holder of an Allowed Administrative Claim or Priority Tax Claim, shall receive, in full and final satisfaction, compromise, settlement, and release of and in exchange for such Claim, its pro rata share of the TRU Inc. Silo Recovery, if any, after paying in full all Senior Claims.  The failure to object to Confirmation by a Holder of an Allowed Administrative Claim or Priority Tax Claim shall be deemed to be such Holder's consent to receive treatment for such Claim that is different from that set forth in section 1129(a)(9) of the

Bankruptcy Code; provided, however, that the Holders of such Claims shall be deemed to consent to the treatment on account of such Claims as provided herein. Notwithstanding any other provision of this Plan, as set forth in the Global Settlement Agreement, TRU Inc. shall be responsible for paying no less than two-thirds of Administrative Claims for state or federal taxes, if any, for which TRU Inc. and any other Debtor or Debtors are jointly and severally liable. If any other Debtor makes a payment on account of any tax Administrative Claim for which TRU Inc. is jointly and severally liable without TRU Inc. paying two-thirds of the amount thereof, such Debtor shall have an Allowed tax Administrative Claim against TRU Inc. for an amount equal to the difference between the portion paid by TRU Inc. and two-thirds of such claim.

2.    Administrative Claims and Priority Tax Claims against the Taj Debtors.

On the Effective Date, except to the extent that a Holder of an Allowed Administrative Claim or Priority Tax Claim and the Taj Debtor against which such Allowed Administrative Claim is asserted agree to less favorable treatment for such Holder, each Holder of an Allowed Administrative Claim or Priority Tax Claim shall receive, in full and final satisfaction, compromise, settlement, and release of and in exchange for its Claim, its pro rata share of: (i) the Liquidation Proceeds, if any, after paying in full all Senior Claims; and (ii) the Sale Proceeds, if any, after paying in full all Senior Claims. The failure to object to Confirmation by a Holder of an Allowed Administrative Claim or Priority Tax Claim shall be deemed to be such Holder's consent to receive treatment for such Claim that is different from that set forth in section 1129(a)(9) of the Bankruptcy Code.

B.    *Accrued Professional Compensation Claims.*

1.    Professional Fee Escrow Account.

In accordance with this Article II.B and the Professional Fee Allocation Mechanism, as soon as reasonably practicable after the Confirmation Date and no later than the Effective Date, the Debtors shall establish the Professional Fee Escrow Account. Subject to the Global Settlement Agreement and the Professional Fee Allocation Mechanism, the Debtors shall fund the Professional Fee Escrow Account in the amount of the aggregate Professional Fee Escrow Amount for all Professionals of the Debtors. The Professional Fee Escrow Account shall be maintained in trust for the Professionals. Such funds shall not be considered property of the Debtors' Estates, except as otherwise provided in Article II.B.2.

2.    Final Fee Applications and Payment of Accrued Professional Compensation Claims.

All final requests for payment of Claims of a Professional shall be Filed no later than 45 days after the effective date of all chapter 11 plans filed in the chapter 11 cases of the Debtors that are being jointly administered in these Chapter 11 Cases or such earlier date following the Effective Date as may be ordered by the Bankruptcy Court. After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior Bankruptcy Court orders, the Allowed amounts of such Accrued Professional Compensation Claims shall be determined by the Bankruptcy Court. The amount of Allowed Accrued Professional Compensation Claims owing to the Professionals shall be paid in Cash to such Professionals from funds held in the Professional Fee Escrow Account, subject to the Professional Fee Allocation Mechanism and the Global Settlement Agreement (including any setoff rights thereunder). After all such Allowed Accrued Professional Compensation Claims have been paid in full, the escrow agent shall promptly return any excess amounts to the Wind Down Entities. Notwithstanding anything to the contrary herein, the Fee Examiner Order shall remain in effect pursuant to its own terms.

3.    Professional Fee Escrow Amount.

To receive payment for unbilled fees and expenses incurred through the Confirmation Date, the Professionals of the Taj Debtors or the TRU Inc. Debtors shall estimate their Accrued Professional Compensation Claims before and as of the Confirmation Date and shall deliver such estimate to the Debtors no later than ten days after the Confirmation Date; *provided, however*, that such estimate shall not be considered an admission with respect to the fees and expenses of such Professional and such Professionals are not bound to any extent by the estimates. If a Professional of the Debtors does not provide an estimate, the Debtors may estimate the unbilled fees and expenses of such Professional; *provided, however*, that such estimate shall not be binding or considered an admission with

respect to the fees and expenses of such Professional.  The total amount so estimated shall comprise the Professional Fee Escrow Amount.

4.       Post-Confirmation Fees and Expenses.

Except as otherwise provided in the Plan, from and after the Confirmation Date, each Debtor shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable legal, professional, or other fees and expenses related to implementation and Consummation of the Plan incurred by each Debtor.  Upon the Confirmation Date, any requirement that Professionals and Ordinary Course Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code, the Interim Compensation Order, or the Ordinary Course Professionals Order, in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors may employ and pay any Professional or Ordinary Course Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

C.       *Taj DIP Claims.*

1.       Taj DIP Guaranty Claims against the TRU Inc. Debtors.

The Taj DIP Guaranty Claims shall be Allowed Claims in the full amount outstanding under the Taj DIP Notes Indenture, including principal, interest, fees, expenses, and all other obligations thereunder.  The Holder of each Allowed Taj DIP Guaranty Claim against the TRU Inc. Debtors shall receive on the Effective Date either: (a) payment in full in Cash; or (b) such other less favorable treatment for such Holder as may be agreed to by such Holder and the TRU Inc. Debtors.

2.       Taj DIP Claims against the Taj Debtors.

The Taj DIP Claims shall be Allowed Claims in the full amount outstanding under the Taj DIP Notes Indenture, including principal, interest, fees, expenses, and all other obligations thereunder.  The Holder of each Allowed Taj DIP Claim against the Taj Debtors shall receive on the Effective Date either: (a) payment in full in Cash; or (b) such other less favorable treatment for such Holder as may be agreed to by such Holder and the Taj Debtors.  In accordance with the Transaction Steps Memorandum, the Holders of Taj DIP Claims, upon receipt of an amount equal to the Allowed Taj DIP Claims, shall assign or transfer the Taj DIP Notes to the Wind Down Entities or one or more subsidiaries of the Wind Down Entities, which Taj DIP Notes shall remain outstanding and shall retain the same security interests, liens, pledges, guarantees, and encumbrances (in any jurisdiction) that currently secure the Taj DIP Claims (or otherwise benefit the Holders from time to time of such Taj DIP Claims), other than as against the Debtors.  Notwithstanding anything to the contrary herein, as set forth in the Transaction Steps Memorandum, the primary obligation(s) (including Secured Obligations, as defined in the Taj DIP Notes Indenture) in respect of the Taj DIP Notes shall remain outstanding for the purpose of, among other things, liquidating the assets of the Taj Debtors and their non-Debtor subsidiaries after the Effective Date.  If at any time the Wind Down Entities no longer retain any assets or interests, then the Taj DIP Notes shall be automatically cancelled.

**ARTICLE III**
**CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS**

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, DIP Facility Claims, and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in this Article III.

A.       *Summary of Classification.*

A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes.  A Claim or Interest is also classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is

20

an Allowed Claim or Allowed Interest in that Class and has not been paid, released, or otherwise satisfied before the Effective Date.

| Class | Claims and Interests | Status | Voting Rights |
|---|---|---|---|
| **Classified Claims and Interests against the TRU Inc. Debtors** | | | |
| Class A1 | Other Secured Claims against the TRU Inc. Debtors | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class A2 | Other Priority Claims against the TRU Inc. Debtors | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class A3 | Taj Senior Notes Guaranty Claims against the TRU Inc. Debtors | Impaired | Entitled to Vote |
| Class A4 | Propco II Mortgage Loan Guaranty Claims against the TRU Inc. Debtors | Impaired | Entitled to Vote |
| Class A5 | Giraffe Junior Mezzanine Loan Guaranty Claims against the TRU Inc. Debtors | Impaired | Entitled to Vote |
| Class A6 | 7.375% Senior Notes Claims against the TRU Inc. Debtors | Impaired | Entitled to Vote |
| Class A7 | 8.75% Unsecured Notes Claim against the TRU Inc. Debtors | Impaired | Entitled to Vote |
| Class A8 | General Unsecured Claims Against the TRU Inc. Debtors | Impaired | Entitled to Vote |
| Class A9 | TRU Inc. Debtor Intercompany Claims against other TRU Inc. Debtors | Unimpaired or Impaired | Not Entitled to Vote (Deemed to Accept or Deemed to Reject) |
| Class A10 | TRU Inc. Intercompany Interests | Unimpaired or Impaired | Not Entitled to Vote (Deemed to Accept or Deemed to Reject) |
| Class A11 | TRU Inc. Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| **Classified Claims and Interests against the Taj Debtors** | | | |
| Class B1 | Other Secured Claims against the Taj Debtors | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class B2 | Other Priority Claims against the Taj Debtors | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class B3 | Taj Senior Notes Claims against the Taj Debtors | Impaired | Entitled to Vote |
| Class B4 | General Unsecured Claims against the Taj Debtors | Impaired | Entitled to Vote |
| Class B5 | Taj Debtor Intercompany Claims against other Taj Debtors | Unimpaired or Impaired | Not Entitled to Vote (Deemed to Accept or Deemed to Reject) |
| Class B6 | Taj Debtor Intercompany Interests against the Taj Debtors | Unimpaired or Impaired | Not Entitled to Vote (Deemed to Accept or Deemed to Reject) |
| Class B7 | Interests in TRU Europe | Impaired | Entitled to Vote |

B.      *Treatment of Claims and Interests against the TRU Inc. Debtors.*

The treatment provided to each Class relating to each of the TRU Inc. Debtors for distribution purposes and voting rights are specified below:

1.      Class A1 - Other Secured Claims against the TRU Inc. Debtors.

   (a)      *Classification*:   Class A1 consists of all Other Secured Claims against the TRU Inc. Debtors.

   (b)      *Treatment*:  On the Effective Date, in full and final satisfaction, compromise, settlement, and release of and in exchange for each Allowed Other Secured Claim against the TRU Inc. Debtors, each Holder thereof shall receive, at the option of the applicable TRU Inc. Debtor:  (a) payment in full in Cash; (b) delivery of the collateral securing any such Claim and payment of any interest required under section 506(b) of the Bankruptcy Code; (c) reinstatement of such Other Secured Claim; or (d) such other treatment as shall render such Claim Unimpaired.

   (c)      *Voting*:  Class A1 is Unimpaired under the Plan.  Holders of Claims in Class A1 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

2.      Class A2 - Other Priority Claims against the TRU Inc. Debtors.

   (a)      *Classification*:   Class A2 consists of all Other Priority Claims against the TRU Inc. Debtors.

   (b)      *Treatment*:  On the Effective Date, in full and final satisfaction, compromise, settlement, and release of and in exchange for each Allowed Other Priority Claim against the TRU Inc. Debtors, each Holder thereof shall receive its pro rata share of the TRU Inc. Silo Recovery, if any, after paying in full in Cash all Senior Claims.  The failure to object to Confirmation by a Holder of an Allowed Other Priority Claim shall be deemed to be such Holder's consent to receive treatment for such Claim that is different from that set forth in section 1129(a)(9) of the Bankruptcy Code.

   (c)      *Voting*: Class A2 is Impaired under the Plan.  Holders of Claims in Class A2 are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

3.      Class A3 - Taj Senior Notes Guaranty Claims against the TRU Inc. Debtors.

   (a)      *Classification*:  Class A3 consists of all Taj Senior Notes Guaranty Claims against the TRU Inc. Debtors.

   (b)      *Allowance*: On the Effective Date, the Taj Senior Notes Guaranty Claims shall be Allowed in the aggregate principal amount of $582,749,000, plus Allowed interest, fees and other amounts payable under the Taj Senior Notes Guaranty.

   (c)      *Treatment*:  Pursuant to the Global Settlement Agreement, on the Effective Date, in full and final satisfaction, compromise, settlement, and release of and in exchange for each Allowed Taj Senior Notes Guaranty Claim, each Holder thereof shall be deemed to waive such Holder's right to receive any recovery from the TRU Inc. Debtors on account of such Claim.

(d)     *Voting*: Class A3 is Impaired under the Plan.  Holders of Allowed Claims in Class A3 are entitled to vote to accept or reject the Plan.

4.     <u>Class A4 – Propco II Mortgage Loan Guaranty Claims against the TRU Inc. Debtors.</u>

(a)     *Classification*:  Class A4 consists of all Propco II Mortgage Loan Guaranty Claims against the TRU Inc. Debtors.

(b)     *Allowance*: On the Effective Date, the Propco II Mortgage Loan Guaranty Claims shall be Allowed in the aggregate principal amount of $31,035,540.89.

(c)     *Treatment*:  On the Effective Date, in full and final satisfaction, compromise, settlement, and release of and in exchange for each Allowed Propco II Mortgage Loan Guaranty Claim, each Holder thereof shall receive its pro rata share of the TRU Inc. Silo Recovery, if any, after paying in full all Senior Claims and on a pari passu basis with other Allowed Class A3 - A8 Claims to the extent set forth in the Priority Waterfall.

(d)     *Voting*: Class A4 is Impaired under the Plan.  Holders of Allowed Claims in Class A4 are entitled to vote to accept or reject the Plan.

5.     <u>Class A5 - Giraffe Junior Mezzanine Loan Guaranty Claims against the TRU Inc. Debtors.</u>

(a)     *Classification*:  Class A5 consists of all Giraffe Junior Mezzanine Loan Guaranty Claims against the TRU Inc. Debtors.

(b)     *Allowance*: On the Effective Date, the Giraffe Junior Mezzanine Loan Guaranty Claims shall be Allowed in the aggregate principal amount of $70,295,816.47 plus Allowed interest, fees and other amounts payable under the Giraffe Junior Mezzanine Loan Agreement.

(c)     *Treatment*:  On the Effective Date, in full and final satisfaction, compromise, settlement, and release of and in exchange for each Allowed Giraffe Junior Mezzanine Loan Guaranty Claim, each Holder thereof shall receive its pro rata share of the TRU Inc. Silo Recovery, if any, after paying in full in Cash all Senior Claims and on a pari passu basis with other Allowed Class A3 - A8 Claims to the extent set forth in the Priority Waterfall.

(d)     *Voting*: Class A5 is Impaired under the Plan.  Holders of Allowed Claims in Class A5 are entitled to vote to accept or reject the Plan.

6.     <u>Class A6 - 7.375% Senior Notes Claims against the TRU Inc. Debtors.</u>

(a)     *Classification*:  Class A6 consists of all 7.375% Senior Notes Claims against the TRU Inc. Debtors.

(b)     *Allowance*: On the Effective Date, the 7.375% Senior Notes Claims shall be Allowed in the aggregate principal amount of $208,340,000, plus Allowed interest, fees and other amounts payable under the 7.375% Senior Notes.

(c)     *Treatment*:  On the Effective Date, in full and final satisfaction, compromise, settlement, and release of and in exchange for each Allowed 7.375% Senior Notes Claim, each Holder thereof shall receive its pro rata share of the TRU Inc. Silo Recovery, if any, after paying in full all Senior Claims and on a pari passu basis with other Allowed Class A3 - A8 Claims to the extent set forth in the Priority Waterfall.

(d)      *Voting*:  Class A6 is Impaired under the Plan.  Holders of Allowed Claims in Class A6 are entitled to vote to accept or reject the Plan.

7.      <u>Class A7 - 8.75% Unsecured Notes Claim against the TRU Inc. Debtors.</u>

(a)      *Classification*:  Class A7 consists of all 8.75% Unsecured Notes Claim against the TRU Inc. Debtors.

(b)      *Allowance*: On the Effective Date, the 8.75% Unsecured Notes Claims shall be Allowed in the aggregate principal amount of $21,673,000, plus Allowed interest, fees and other amounts payable under the 8.75% Unsecured Notes.

(c)      *Treatment*:  On the Effective Date, in full and final satisfaction, compromise, settlement, and release of and in exchange for each Allowed 8.75% Unsecured Notes Claim against the TRU Inc. Debtors, each Holder thereof shall receive its pro rata share of the TRU Inc. Silo Recovery, if any, after paying in full all Senior Claims and on a pari passu basis with other Allowed Class A3 - A8 Claims to the extent set forth in the Priority Waterfall.

(d)      *Voting*:  Class A7 is Impaired under the Plan.  Holders of Allowed Claims in Class A7 are entitled to vote to accept or reject the Plan.

8.      <u>Class A8 - General Unsecured Claims against the TRU Inc. Debtors.</u>

(a)      *Classification*:  Class A8 consists of all General Unsecured Claims against the TRU Inc. Debtors.

(b)      *Treatment*:  Except to the extent a Holder has agreed to different treatment on account of an Allowed General Unsecured Claim, on the Effective Date, in full and final satisfaction, compromise, settlement, and release of and in exchange for each Allowed General Unsecured Claim against the TRU Inc. Debtors, each Holder thereof shall receive its pro rata share of the TRU Inc. Silo Recovery, if any, after paying in Cash all Senior Claims and on a pari passu basis with other Allowed Class A3 - A8 Claims to the extent set forth in the Priority Waterfall; *provided* however that, for the avoidance of doubt, pursuant to section 3.2(k) of the Settlement Agreement, any Allowed Claims (including Intercompany Claims) held by Toys Delaware shall not participate in or receive any distributions from the Non-Released Claims Trust allocated to creditors of TRU Inc. as set forth therein, provided, further, however, that the treatment of Toys Delaware's Intercompany Claim against TRU Inc. shall be as set forth in the Global Settlement Agreement.

(c)      *Voting*:  Class A8 is Impaired under the Plan.  Holders of Allowed Claims in Class A8 are entitled to vote to accept or reject the Plan.

9.      <u>Class A9 - TRU Inc. Debtor Intercompany Claims against other TRU Inc. Debtors.</u>

(a)      *Classification*:  Class A9 consists of all TRU Inc. Debtor Intercompany Claims against other TRU Inc. Debtors.

(b)      *Treatment*:  On the Effective Date, in full and final satisfaction, compromise, settlement, and release of and in exchange for TRU Inc. Debtor Intercompany Claims against other TRU Inc. Debtors, each TRU Inc. Debtor Intercompany Claim against another TRU Inc. Debtor shall be reinstated or canceled and released, subject to the Global Settlement Agreement.

(c) *Voting*: Holders of Claims in Class A9 are conclusively deemed to have accepted or rejected the Plan pursuant to section 1126(f) or section 1126(g) of the Bankruptcy Code, respectively.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

10. <u>Class A10 - TRU Inc. Intercompany Interests.</u>

(a) *Classification:*  Class A10 consists of all TRU Inc. Intercompany Interests.

(b) *Treatment*:  On the Effective Date, interests in the TRU Inc. Debtors other than TRU Inc. shall be reinstated or canceled and released.

(c) *Voting*: Holders of Interests in Class A10 are conclusively deemed to have accepted or rejected the Plan pursuant to section 1126(f) or section 1126(g) of the Bankruptcy Code, respectively.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

11. <u>Class A11 - TRU Inc. Interests.</u>

(a) *Classification:*  Class A11 consists of all TRU Inc. Interests.

(b) *Treatment*:  On the Effective Date, each interest in TRU Inc. shall be canceled and released; *provided, however,* that for the avoidance of doubt, new TRU Inc. Interests may be issued pursuant to the Toys Delaware Plan, subject to the consent of the Taj Holders Steering Group.

(c) *Voting*: Class A11 is Impaired under the Plan.  Holders of Interests in Class A11 are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

*C.*      *Treatment of Claims and Interests.*

The treatment provided to each Class relating to each of the Taj Debtors for distribution purposes and voting rights are specified below:

1. <u>Class B1 - Other Secured Claims against the Taj Debtors.</u>

(a) *Classification*:  Class B1 consists of all Other Secured Claims against the Taj Debtors.

(b) *Treatment*:  On the Effective Date, in full and final satisfaction, compromise, settlement, and release of and in exchange for each Allowed Other Secured Claim against the Taj Debtors, each Holder thereof shall receive, at the option of the applicable Taj Debtor:  (a) payment in full in Cash; (b) delivery of the collateral securing any such Claim and payment of any interest required under section 506(b) of the Bankruptcy Code; (c) reinstatement of such Other Secured Claim; or (d) such other treatment as shall render such Claim Unimpaired.

(c) *Voting*:  Class B1 is Unimpaired under the Plan.  Holders of Claims in Class B1 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

2. <u>Class B2 - Other Priority Claims against the Taj Debtors.</u>

(a) *Classification*:  Class B2 consists of all Other Priority Claims against the Taj Debtors.

(b) *Treatment*: On the Effective Date, in full and final satisfaction, compromise, settlement, and release of and in exchange for each Allowed Other Priority Claim against the Taj Debtors, each Holder thereof shall receive payment in full in Cash or such other treatment as shall render such Claim Unimpaired.

(c) *Voting*: Class B2 is Unimpaired under the Plan. Holders of Claims in Class B2 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

3.    Class B3 - Taj Senior Notes Claims against the Taj Debtors.

(a) *Classification*: Class B3 consists of all Taj Senior Notes Claims against the Taj Debtors.

(b) *Allowance*: On the Effective Date, the Taj Senior Notes Claims shall be Allowed in the aggregate principal amount of $582,749,000, plus Allowed interest, fees and other amounts payable under the Taj Senior Notes Indenture.

(c) *Treatment*: On the Effective Date, and in accordance with the Transaction Steps Memorandum, each Holder of an Allowed Taj Senior Notes Claim shall receive its pro rata share of:

   (i)    the Liquidation Proceeds, if any, after paying in full all Senior Claims;

   (ii)    the Sale Proceeds, if any, after paying in full all Senior Claims; and

   (iii)    the Initial Shares and Subscription Rights.

(d) *Adequate Protection Distribution*: On or as soon as reasonably practicable after the Effective Date, the Taj Senior Notes Indenture Trustee shall, subject to its rights under the Taj Senior Notes Indenture (including without limitation its charging lien and indemnification rights), pay to the Holders of Taj Senior Notes Claims as of Distribution Record Date, any and all previously undistributed adequate protection payments in respect of interest received pursuant to the Final Taj DIP Order and held by the Taj Senior Notes Indenture Trustee as of the Effective Date.

(e) *Voting*: Class B3 is Impaired under the Plan. Holders of Allowed Claims in Class B3 are entitled to vote to accept or reject the Plan.

4.    Class B4 – General Unsecured Claims against Taj Debtors.

(a) *Classification*: Class B4 consists of all General Unsecured Claims against Taj Debtors.

(b) *Treatment*: On the Effective Date, in full and final satisfaction of each Allowed General Unsecured Claim, each Holder of an Allowed General Unsecured Claim shall receive its pro rata share of:

   (i)    the Liquidation Proceeds, if any, after paying in full all Senior Claims; and

   (ii)    the Sale Proceeds, if any, after paying in full all Senior Claims.

(c) *Voting*: Class B4 is Impaired under the Plan. Holders of Allowed Claims in Class B4 are entitled to vote to accept or reject the Plan.

5.  Class B5 - Taj Debtor Intercompany Claims against other Taj Debtors.

    (a)  *Classification*:  Class B5 consists of all Taj Debtor Intercompany Claims against other Taj Debtors.

    (b)  *Treatment*:  On the Effective Date, each Taj Debtor Intercompany Claim against another Taj Debtor shall be Reinstated, canceled, or compromised as determined between the Taj Debtors and the Taj Holders Steering Group.

    (c)  *Voting*:  Holders of Claims in Class B5 are conclusively deemed to have accepted or rejected the Plan pursuant to section 1126(f) or section 1126(g) of the Bankruptcy Code, respectively.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

6.  Class B6 - Taj Debtor Intercompany Interests against the Taj Debtors.

    (a)  *Classification*:  Class B6 consists of all Taj Debtor Intercompany Interests against the Taj Debtors.

    (b)  *Treatment*:  On the Effective Date, each Taj Debtor Intercompany Interest shall be Reinstated, canceled, or compromised as determined between the Taj Debtors and the Taj Holders Steering Group.

    (c)  *Voting*:  Holders of Interests in Class B6 are conclusively deemed to have accepted or rejected the Plan pursuant to section 1126(f) or section 1126(g) of the Bankruptcy Code, respectively.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

7.  Class B7 - Interests in TRU Europe.

    (a)  *Classification*:  Class B7 consists of all Interests in TRU Europe.

    (b)  *Treatment*:  On the Effective Date, in full and final satisfaction, compromise, settlement, and release of and in exchange for each interest in TRU Europe, each Holder of an Interest in TRU Europe shall receive its pro rata share of:

        (i)  the Liquidation Proceeds, if any, after paying in full all Senior Claims; and

        (ii)  the Sale Proceeds, if any, after paying in full all Senior Claims.

    (c)  *Voting*:  Class B7 is Impaired under the Plan.  Holders of Allowed Interests in Class B7 are entitled to vote to accept or reject the Plan.

D.  *Special Provision Governing Unimpaired Claims.*

Except as otherwise provided in the Plan, nothing under the Plan shall affect the rights of the Debtors in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claims.

E.  *Elimination of Vacant Classes.*

Any Class of Claims or Interests that, as of the commencement of the Confirmation Hearing, does not have at least one Holder of a Claim or Interest that is Allowed in an amount greater than zero for voting purposes pursuant to the Disclosure Statement Order shall be considered vacant, deemed eliminated from the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to that Class.

F.      *Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code.*

The Debtors shall seek Confirmation for the applicable Debtors pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.  The Debtors reserve the right to modify the Plan in accordance with Article X to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification.

G.      *Subordinated Claims.*

The allowance, classification, and treatment of all Allowed Claims and Allowed Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, all parties reserve their right to re-classify any Allowed Claim or Allowed Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

## ARTICLE IV
## MEANS FOR IMPLEMENTATION OF THE PLAN

A.      *Substantive Consolidation.*

The Debtors shall not be substantively consolidated.

B.      *Restructuring Transactions and Sources of Consideration for Plan Distributions.*

The Confirmation Order shall be deemed to authorize the Debtors to take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan. The actions to implement the Restructuring Transactions and the Credit Bid Transaction may include:  (a) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, arrangement, continuance, dissolution, sale, purchase, or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable Entities may agree; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable parties agree; (c) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable state or provincial law; (d) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law in connection with the Plan; (e) pursuant to the Rights Offering Procedures and the Backstop Commitment Agreement, the implementation of the Rights Offering, the distribution of the Subscription Rights to the Rights Offering Participants, and the issuance of the Initial Shares in connection therewith; and (f) all other actions that are provided for in the Restructuring Transactions Description or that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law.

With respect to the Plan, all amounts of Cash necessary for the Debtors or the Disbursing Agent to make payments or distributions pursuant hereto shall be obtained from the Sale Proceeds, Liquidation Proceeds, Cash on hand, and Cash raised or held by the Debtors, including, as applicable, Cash raised from the Rights Offering.

1.      <u>Cash on Hand</u>

The Reorganized Debtors shall use Cash on hand to fund distributions to certain Holders of Allowed Claims in accordance with Article III of the Plan and the Global Settlement Agreement.

2.      General Authorization

Confirmation of the Plan shall be deemed to constitute approval of the transactions contemplated thereby and all actions to be taken, undertakings to be made, and obligations to be incurred by the Debtors, Reorganized Debtors, the Asia JV, the Credit Bid Purchasers, and their respective affiliates or subsidiaries in connection therewith, including the payment of all fees, indemnities, and expenses provided therein) and, subject to the occurrence of the Effective Date, authorization for the Reorganized Debtors, the Asia JV, the Credit Bid Purchasers, and their respective affiliates or subsidiaries to enter into and perform their obligations under such other documents as may be reasonably required or appropriate.

3.      Rights Offering

In connection with a Credit Bid Transaction, on account of the Taj Senior Notes, the Debtors shall distribute the Subscription Rights to the Rights Offering Participants as set forth in the Plan, the Backstop Commitment Agreement and the Rights Offering Procedures.  Pursuant to the Backstop Commitment Agreement and the Rights Offering Procedures, the Rights Offering shall be open to all Rights Offering Participants, and all Commitment Parties shall be required to exercise the Subscription Rights allocated to them.  Rights Offering Participants shall be entitled to participate in the Rights Offering up to a maximum amount of each Holder's Pro Rata share of the Adjusted Rights Offering Amount.  Rights Offering Participants shall have the right to purchase their allocated Rights Offering Shares at the per unit purchase price set forth in the Rights Offering Procedures.

Upon exercise of the Subscription Rights by the Rights Offering Participants pursuant to the terms of the Backstop Commitment Agreement and the Rights Offering Procedures, the Asia JV shall be authorized to issue the Rights Offering Shares in accordance with the Plan, the Backstop Commitment Agreement, and the Rights Offering Procedures.  Proceeds of any Rights Offering shall be used to fund, among other things, distributions to Holders of Allowed Taj DIP Claims as provided herein and in accordance with the Transaction Steps Memorandum.

Pursuant to the Backstop Commitment Agreement, the Commitment Parties shall purchase any Rights Offering Shares not subscribed to for purchase by Rights Offering Participants who are not parties to the Backstop Commitment Agreement at the per share purchase price set forth in the Backstop Commitment Agreement.  On the Effective Date, the rights and obligations of the Debtors under the Backstop Commitment Agreement shall vest in the Reorganized Debtors, the Asia JV, or such other entity as provided by the Backstop Commitment Agreement or the Restructuring Transactions Description, as applicable.

In addition, on the Effective Date (or earlier in the case of termination of the Backstop Commitment Agreement), the Backstop Commitment Premium Shares (which shall be an administrative expense) shall be distributed or paid, as applicable, to the Commitment Parties under and as set forth in the Backstop Commitment Agreement and the Backstop Approval Order.

Further, upon the Effective Date, Cyrus Capital Partners, L.P. shall be reimbursed for fees and expenses incurred by it in connection with the Chapter 11 Cases in an amount not to exceed $950,000, so long as it participates pro rata in the Rights Offering and Credit Bid Transaction on account of its Taj Senior Notes and Taj DIP Notes.

For the avoidance of all doubt, neither the Rights Offering nor the Backstop Commitment Agreement, including the Rights Offering Shares and the Backstop Commitment Premium Shares, shall in any way dilute the TRU Asia Equity Interests owned by Fung (except, if applicable, for any Initial Shares that Fung may receive in its capacity as a Holder of Taj Senior Notes Claim(s)).  Further, in the event that any term of either the Backstop Commitment Agreement or Rights Offering conflicts with or is inconsistent in any respect with the terms of the Plan, the terms of the Plan shall control.

*C.*      *Credit Bid Transaction.*

On the Effective Date, and as further described in the Transaction Steps Memorandum, the Debtors shall consummate the Credit Bid Transaction, and, among other things, the TRU Asia Equity Interests held directly or

indirectly by the Debtors shall be transferred to and vest in the Credit Bid Purchasers, pursuant to the terms of the Interest Transfer Agreement and the Confirmation Order, free and clear of (other than the Shareholders' Agreement) all Liens, Claims, charges, or other encumbrances. Upon consummation of the Credit Bid Transaction, all outstanding TRU Asia Equity Interests will be held by the Credit Bid Purchasers and Fung. On the Effective Date, all Holders of Taj Senior Notes Claims either (i) are deemed to have executed and become bound by the Shareholders' Agreement in connection with the receipt of their TRU Asia Equity Interests or, alternatively, (ii) are required to execute and become bound by the Shareholders' Agreement in order to receive their TRU Asia Equity Interests, in each case including the Amended Shareholders' Agreement upon Fung's execution of the Amended Shareholders' Agreement. On and after the Effective Date, except as otherwise provided in the Plan, the Asia JV may operate its businesses and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules. Neither Fung, the Credit Bid Purchasers, the Asia JV, nor any of their respective Affiliates shall be deemed to be a successor of the Debtors.

1.    Consummation of Credit Bid Transaction.

No later than the Effective Date, the Credit Bid Purchasers shall consummate the Credit Bid Transaction, as and to the extent provided for in the Confirmation Order, the Interest Transfer Agreement or other definitive documents. In connection with a Credit Bid Transaction, each holder of a Taj Senior Notes Claim shall receive its pro rata share of the Initial Shares on account thereof, subject to dilution by the Backstop Commitment Premium Shares and the Rights Offering Shares. Also in connection with a Credit Bid Transaction and subject to the Transaction Steps Memorandum, the Holders of Taj DIP Claims upon receipt of an the amount equal to the Allowed Taj DIP Claims shall assign or transfer the Taj DIP Notes to the Wind Down Entities or one or more subsidiaries of the Wind Down Entities, which Taj DIP Notes shall remain outstanding and shall retain the same security interests, liens, pledges, guarantees, and encumbrances (in any jurisdiction) that currently secure the Taj DIP Claims (or otherwise benefit the Holders from time to time of such Taj DIP Claims), other than as against the Debtors. Furthermore, notwithstanding the treatment afforded to Holders of Taj Senior Notes Claims set forth in Article III hereof, as set forth in the Transaction Steps Memorandum, the Taj Debtors or Wind Down Entities, in consultation with the Taj Holders Steering Group, may cause the Taj Senior Notes to be transferred or assigned to the Wind Down Entities or one or more subsidiaries of the Wind Down Entities, which Taj Senior Notes shall remain outstanding for purposes of liquidating the remaining assets of the Taj Debtors and shall retain the same security interests, liens, pledges, guarantees, and encumbrances (in any jurisdiction) that currently secure the Taj Senior Notes Claims (or otherwise benefit the Holders from time to time of such Taj Senior Notes Claims), other than as against the Debtors. Notwithstanding anything to the contrary herein, as set forth in the Transaction Steps Memorandum, the primary obligation(s) (including Secured Obligations, as defined in the Taj Senior Notes Indenture and the Taj DIP Notes Indenture) in respect of the Taj Senior Notes and Taj DIP Notes shall remain outstanding for purposes of, among other things, liquidating the assets of the Taj Debtors and their non-Debtor subsidiaries after the Effective Date. If at any time the Wind Down Entities no longer retain any assets or interests, then the Taj Senior Notes and Taj DIP Notes shall automatically be cancelled.

2.    Wind Down Entities.

As specified in the Restructuring Transactions Description and/or the Transaction Steps Memorandum, on or about the Effective Date, one or more Wind Down Entities may be formed to implement the Wind Down. The Wind Down Entities will be established for the primary purpose of liquidating the Wind Down Entities' assets and to Wind Down the Debtors' Estates, with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Wind Down Entities. The Wind Down shall be subject to a budget acceptable to the Debtors and the Taj Holders Steering Group (the "Wind Down Budget"). Upon the transfer of the Debtors' assets and equity as more fully set forth in the Administrator Agreement, the Debtors will have no reversionary or further interest in or with respect to the assets of the Wind Down Entities.

The Restructuring Transactions Description and/or the Transaction Steps Memorandum may provide that the Wind Down Entities will be classified as "liquidating trusts," "disputed ownership funds" (each as described below) or other type of entity. The U.S. tax treatment of liquidating trusts and disputed ownership funds are described below.

(a)      Liquidating Trust Treatment

A Wind Down Entity may be classified as a "liquidating trust" under section 301.7701-4(d) of the Treasury Regulations and qualify as a "grantor trust" under section 671 of the Tax Code. In such case, any beneficiaries of such Wind Down Entities would be treated as grantors and deemed owners thereof and, for all United States federal income tax purposes, any beneficiaries would be treated as if they had received a distribution of an undivided interest in the assets of the Wind Down Entities and then contributed such undivided interest to the vehicle. If this treatment applies, the person or persons responsible for administering the Wind Down Entities shall, in an expeditious but orderly manner, make timely distributions to beneficiaries of the Wind Down Entities pursuant to the Plan and not unduly prolong its duration. The Wind Down Entities would not be deemed a successor in interest of the Debtors for any purpose other than as specifically set forth herein or in the governing documents of the Wind Down Entities.

No entity-level tax should be imposed on the Wind Down Entities with respect to earnings generated by the assets held by the Wind Down Entities. Each beneficiary must report on its federal income tax return its allocable share of income, gain, loss, deduction and credit, if any, recognized or incurred by the Wind Down Entities, even if no distributions are made. Allocations of taxable income with respect to the Wind Down Entities shall be determined by reference to the manner in which an amount of cash equal to such taxable income would be distributed (without regard to any restriction on distributions described herein) if, immediately before such deemed distribution, the Wind Down Entities had distributed all of their other assets (valued for this purpose at their tax book value) to the beneficiaries, taking into account all prior and concurrent distributions from the Wind Down Entities. Similarly, taxable losses of the Wind Down Entities will be allocated by reference to the manner in which an economic loss would be borne immediately after a liquidating distribution of the remaining assets. The tax book value of the assets for this purpose shall equal their respective fair market values on the Effective Date or, if later, the date such assets were acquired, adjusted in either case in accordance with the tax accounting principles prescribed by the applicable provisions of the Tax Code, Treasury Regulations and other applicable administrative and judicial authorities and pronouncements.

The character of items of income, gain, loss, deduction and credit to any Holder of a beneficial interest in the Wind Down Entities, and the ability of such Holder to benefit from any deductions or losses, may depend on the particular circumstances or status of the Holder. Taxable income or loss allocated to a beneficiary should be treated as income or loss with respect to the interest of such beneficiary in the Wind Down Entities and not as income or loss with respect to such beneficiary's applicable Claim or Interest. In the event any tax is imposed on the Wind Down Entities, the person or persons responsible for administering the Wind Down Entities shall be responsible for payment, solely out of the assets of the Wind Down Entities of any taxes imposed on the Wind Down Entities.

The person or persons responsible for administering the Wind Down Entities shall be liable to prepare and provide to, or file with, the appropriate taxing authorities and other required parties such notices, tax returns and other filings, including all federal, state and local tax returns as may be required under the Bankruptcy Code, the Plan or by other applicable law, including, if required under applicable law, notices required to report interest or dividend income. The person or persons responsible for administering the Wind Down Entities will file tax returns pursuant to section 1.671-4(a) of the Treasury Regulations on the basis that the Wind Down Entities are a "liquidating trust" within the meaning of section 301.7701-4(d) of the Treasury Regulations and related Treasury Regulations. As soon as reasonably practicable after the close of each calendar year, the person or persons responsible for administering the Wind Down Entities will send each affected beneficiary a statement setting forth such beneficiary's respective share of income, gain, deduction, loss and credit for the year, and will instruct the Holder to report all such items on its tax return for such year and to pay any tax due with respect thereto.

(b)      Disputed Ownership Fund Treatment

With respect to any of the assets of the Wind Down Entities that are subject to potential disputed claims of ownership or uncertain distributions, the Debtors may provide that such assets will be subject to disputed ownership fund treatment under Section 1.468B-9 of the Treasury Regulations, that any appropriate elections with respect thereto shall be made, and that such treatment will also be applied to the extent possible for state and local tax purposes. Under such treatment, a separate federal income tax return shall be filed with the IRS for any such account. Any taxes (including with respect to interest, if any, earned in the account) imposed on such account shall

be paid out of the assets of the respective account (and reductions shall be made to amounts disbursed from the account to account for the need to pay such taxes). To the extent property is not distributed to U.S. Holders of applicable Claims or Interests on the Effective Date but, instead, is transferred to any such account, although not free from doubt, U.S. Holders should not recognize any gain or loss on the date that the property is so transferred. Instead, gain or loss should be recognized when and to the extent property is actually distributed to such U.S. Holders.

3.    <u>Administrator.</u>

Before or on the Effective Date, the Administrator may be designated by the Debtors and the Taj Holders Steering Group pursuant to the terms of the Administrator Agreement for the purposes of conducting the Wind Down and shall succeed to such powers as would have been applicable to the Debtors' officers, directors, and shareholders, and the Debtors shall be authorized to be (and, upon the conclusion of the Wind Down, shall be) dissolved by the Administrator.  All property of the Estates not distributed to the Holders of Claims or Interests on the Effective Date, or transferred to the Asia JV or the Credit Bid Purchasers pursuant to the Interest Transfer Agreement, as applicable, shall be placed under the control of the Administrator (or the Wind Down Entities) and managed and distributed by the Administrator pursuant to the terms of the Administrator Agreement and shall be held in the name of the Debtors free and clear of all Claims and Interests except for rights to such distributions provided to Holders of Allowed Claims and Allowed Interests as provided in the Plan.  Any and all reasonable and documented costs and expenses incurred by the Administrator in connection with the Wind Down shall be paid from the funds of the Wind Down Entities, subject to the Wind Down Budget and the terms and conditions of the Administrator Agreement. The Administrator shall only file tax returns for Debtors in jurisdictions where such Debtor previously filed tax returns, unless the Administrator determines that a tax return is required to be filed due to a change in law, fact, or circumstance on or after the Effective Date.  Following the Effective Date and in the event of the resignation or removal, liquidation, dissolution, death, or incapacity of the Administrator, the Credit Bid Purchasers shall designate another Entity to become Administrator and such Entity will become the successor Administrator and, without any further act, shall become fully vested with all of the rights, powers, duties, and obligations of the predecessor Administrator.

The Entity chosen to be the successor Administrator shall have such qualifications and experience to enable the Administrator to perform its obligations under the Plan and under the Administrator Agreement.  The Administrator shall be compensated and reimbursed for reasonable costs and expenses as set forth in, and in accordance with, the Administrator Agreement.

4.    <u>Wind Down and Dissolution of the Debtors.</u>

On and after the Effective Date, the Administrator will implement any other provision of the Plan and any applicable orders of the Bankruptcy Court, and the Administrator shall have the power and authority to take any action necessary to wind down and dissolve the Debtors.  After the Effective Date, the Debtors shall remain in existence for the sole purpose of dissolving.  As soon as practicable after the Effective Date, the Administrator shall: (1) cause the Debtors to comply with, and abide by, the terms of the Interest Transfer Agreement and the Plan; (2) file for each of the Debtors, a certificate of dissolution, together with all other necessary corporate and company documents, to effect the dissolution of the Debtors under the applicable laws of their state of incorporation or formation (as applicable); (3) complete and file all final or otherwise required federal, state, and local tax returns for each of the Debtors, and if the Administrator so elects, pursuant to section 505(b) of the Bankruptcy Code, request an expedited determination of any unpaid tax liability of such Debtor or its Estate for any tax incurred during the administration of such Debtor's Chapter 11 Case, as determined under applicable tax laws; and (4) take such other actions as the Administrator may determine to be necessary or desirable to carry out the purposes of the Plan and the other Restructuring Documents.  The filing by the Administrator of any Debtor's certificate of dissolution shall be authorized and approved in all respects without further action under applicable law, regulation, order, or rule, including any action by the stockholders, members, board of directors, or board of managers of each such Debtor. Solely to the extent and subject to the limitations provided in the Interest Transfer Agreement, the Administrator Agreement, the Wind Down Budget, the Plan, and the Confirmation Order, the Credit Bid Purchasers shall fund the Wind Down Entities with funds to pay costs, expenses, or claims arising from or related to any Wind Down of the Taj Debtors, including the costs and reasonable expenses associated with any Claims resolution or similar process following the Effective Date.  Notwithstanding anything in the Plan to the contrary, the Administrator or the

Disbursing Agent will make, or cause to be made, all distributions under the Plan other than those distributions made by the Debtors on the Effective Date.

Following the wind down of TRU (Vermont), Inc., any Cash or other proceeds of TRU (Vermont) Inc. shall be distributed to TRU Inc. as set forth in the Global Settlement Agreement and shall be distributed by TRU Inc. in accordance with the Priority Waterfall and otherwise as set forth in the Global Settlement Agreement. Such cash or other proceeds of TRU (Vermont), Inc. shall be reserved pursuant to the Global Settlement Agreement. The remaining Cash or other proceeds of MAP 2005 Real Estate, LLC shall likewise be distributed in accordance with and as set forth in the Global Settlement Agreement.

On or as soon as reasonably practicable after the Effective Date, the remaining Cash or other proceeds of MAP 2005 Real Estate, LLC and Cash held at TRU Inc. shall be distributed in accordance with and as set forth in the Global Settlement Agreement. Any payments made pursuant to section 3.4(a) of the Global Settlement Agreement shall not be subject to any contest, attack, rejection, recovery, claw-back, recoupment, reduction, defense, counterclaim, offset, subordination, recharacterization, avoidance or other claim, cause of action or other challenge of any nature under the Bankruptcy Code or applicable nonbankruptcy law.

D.      General Settlement of Claims.

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, and controversies resolved pursuant to the Plan.

E.      Cancellation of Securities and Agreements.

On the Effective Date, except to the extent otherwise provided in the Plan (including in Article IV.C.1), all notes, instruments, Certificates, and other documents evidencing, or in any way related to, Claims or Interests shall be canceled and the obligations of the Debtors thereunder or in any way related thereto shall be released, settled, and compromised; *provided*, *however*, that notwithstanding Confirmation, the occurrence of the Effective Date, or the releases contained in Article VIII of this Plan, any credit document, instrument, or agreement that governs the rights of the holder of a Claim or Interest shall continue in effect solely for purposes of (a) allowing holders of Allowed Claims to receive distributions under the Plan, including the Liquidation Proceeds from the Wind Down Entities; (b) allowing each of the TRU Inc. Unsecured Notes Trustees and the Taj Senior Notes Indenture Trustee to make distributions to holders of the respective TRU Inc. Unsecured Notes Claims and Taj Senior Notes Claims, respectively, pursuant to the respective indenture or bond agreement under which such TRU Inc. Unsecured Notes Trustee and Taj Senior Notes Indenture Trustee serves; (c) preserving each of the TRU Inc. Unsecured Notes Trustees' and Taj Senior Notes Indenture Trustee's rights to compensation and indemnification under each of the applicable indentures or bond agreements as against any money or property distributable or allocable to holders of TRU Inc. Unsecured Notes Claims and Taj Senior Notes Claims, including, without limitation, the TRU Inc. Unsecured Notes Trustees' and the Taj Senior Notes Indenture Trustee's rights to maintain, enforce, and exercise their respective charging liens against such money or property; (d) permitting each of the TRU Inc. Unsecured Notes Trustees and Taj Senior Notes Indenture Trustee to enforce any right or obligation owed to them under the Plan, including in connection with the liquidation of the remaining assets of the Taj Debtors and their non-Debtor subsidiaries and the distribution of any proceeds in connection therewith; and (e) permitting each of the TRU Inc. Unsecured Notes Trustees and the Taj Senior Notes Indenture Trustee to appear in the Chapter 11 Cases or in any proceeding in the Bankruptcy Court or any other court; *provided*, that the reasonable and documented unpaid fees and expenses incurred by the Taj Senior Notes Indenture Trustee on or before the Effective Date shall be paid in full, pursuant to the notice and objection procedure set forth in the Final Taj DIP Order. Each of the TRU Inc. Unsecured Notes Trustees and the Taj Senior Notes Indenture Trustee shall have no further obligation or liability except as expressly provided in the Plan or Confirmation Order; *provided further that,* notwithstanding the Credit Bid Transaction or the treatment afforded to Holders of Taj Senior Notes Claims set forth in Article III hereof, as set forth in the Transaction Steps Memorandum, the Taj Debtors or Wind Down Entities, in consultation with the Taj Holders Steering Group, may cause the Taj Senior Notes to be transferred or assigned to the Wind Down Entities or one or more subsidiaries of the Wind Down Entities, which Taj Senior Notes shall remain outstanding for purposes of liquidating the remaining assets of the Taj Debtors and shall retain the same security interests, liens, pledges,

guarantees, and encumbrances (in any jurisdiction) that currently secure the Taj Senior Notes Claims (or otherwise benefit the Holders from time to time of such Taj Senior Notes Claims), other than as against the Debtors. If at any time the Wind Down Entities no longer retain any assets or interests, then the Taj Senior Notes shall automatically be cancelled. Notwithstanding anything to the contrary herein, as set forth in the Transaction Steps Memorandum, the primary obligation(s) in respect of the Taj Senior Notes shall remain outstanding for purposes of, among other things, liquidating the assets of the Taj Debtors and their non-Debtor subsidiaries after the Effective Date.

F.      *Corporate Action.*

Subject to the Credit Bid Transaction permitted under Article IV.C and the Plan, each Debtor shall continue to exist after the Effective Date as a separate corporation, limited liability company, partnership, or other form of entity, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form of entity, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other similar formation and governance documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation or bylaws (or other similar formation and governance documents) are amended by or in connection with the Plan or otherwise, and, to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law).

G.      *New Organizational Documents*

To the extent necessary, on or immediately prior to the Effective Date, the organizational documents of each of the Debtors shall be amended and restated, as may be necessary to effectuate the transactions contemplated by the Plan, in a manner consistent with section 1123(a)(6) of the Bankruptcy Code and shall otherwise be satisfactory to Taj Holders Steering Group. Each of the Reorganized Debtors will file its New Organizational Documents with the applicable Secretaries of State and/or other applicable authorities in its respective state, province, or country of incorporation in accordance with the corporate laws of the respective state, province, or country of incorporation. The New Organizational Documents will prohibit the issuance of non-voting equity securities to the extent required under section 1123(a)(6) of the Bankruptcy Code.

H.      *Effectuating Documents; Further Transactions.*

On and after the Effective Date, the Debtors and their directors, members, trustees, officers, and managers are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, the Credit Bid Transaction, and the other Restructuring Documents and the Securities issued pursuant to the Plan in the name of and on behalf of the Debtors, without the need for any approvals, authorizations, or consents, except for those expressly required pursuant to the Plan, or any further notice to or action, order, or approval of the Bankruptcy Court.

I.      *Exemption from Certain Taxes and Fees.*

Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property or any Interests pursuant to the Plan, including the recording of any amendments to such transfers, or any new mortgages or liens placed on the property in connection with such transfers, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment.

J.      *Preservation of Causes of Action.*

Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan, the Global Settlement Agreement or a Bankruptcy Court order, the Taj Debtors reserve, and assign to the Credit Bid Purchasers or the Asia JV, as applicable, pursuant to the Interest Transfer Agreement or other definitive documents, any and all Causes of Action, including any actions specifically enumerated in and in accordance with the terms of the Plan Supplement, whether arising before or after the Petition Date, and preserve and assign to the Credit Bid Purchasers or the Asia JV, as applicable, pursuant to the Interest Transfer Agreement or other definitive documents, the right to commence, prosecute, or settle such Causes of Action, notwithstanding the occurrence of the Effective Date; *provided, however,* notwithstanding the foregoing, the Non-Released Claims shall include all claims or Causes of Action, if any, held by TRU Inc. and its estate or creditors against any D&O Party (the "D&O Claims") and shall be transferred and/or assigned to the Non-Released Claims Trust (as defined in the Toys Delaware Plan) the Non-Released Claims Trust shall be the successor-in-interest to the TRU Inc. Debtors and the TRU Inc. Debtors' rights, title and interest in any Non-Released Claims, the Non-Released Claims Trust shall have standing to pursue the Non-Released Claims, and the Non-Released Claims Trust Manager (as defined in the Toys Delaware Plan) shall have the right to commence, prosecute, or settle such Non-Released Claims in its discretion, in consultation with the Non-Released Claims Trust Oversight Committee (as defined in the Toys Delaware Plan); *provided further that* the Settlement Agreement and/or the Global Settlement Agreement (as applicable) shall control over this provision in all respects (but solely with respect to the parties thereto). In pursuing any claim, right, or Cause of Action, the Non-Released Claims Trust shall be entitled to the tolling provisions provided under section 108 of the Bankruptcy Code, and shall succeed to the TRU Inc. Debtors' rights with respect to the time periods in which a Cause of Action may be brought under section 546 of the Bankruptcy Code. The Credit Bid Purchasers or the Asia JV, as applicable, may pursue such Causes of Action in their sole discretion. No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against them as any indication that either the Taj Debtors or Reorganized Taj Debtors, the Wind Down Entities Credit Bid Purchasers, or the Asia JV, as applicable, will not pursue any and all available Causes of Action against them. No preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Taj Debtors reserve and assign to the Credit Bid Purchasers or the Asia JV, as applicable, pursuant to the Interest Transfer Agreement or other definitive documents, the Causes of Action notwithstanding the rejection of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Taj Debtor may hold against any Entity shall vest in the Taj Debtors and be assigned to the Credit Bid Purchasers or the Asia JV, as applicable, pursuant to the Interest Transfer Agreement or other definitive documents. The Credit Bid Purchasers or the Asia JV, as applicable, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action and shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court; *provided, however*, notwithstanding the foregoing, the Non-Released Claims shall include the D&O Claims and shall be transferred and/or assigned to the Non-Released Claims Trust (as defined in the Toys Delaware Plan), the Non-Released Claims Trust shall be the successor-in-interest to the TRU Inc. Debtors and the TRU Inc. Debtors' rights, title and interest in any Non-Released Claims, the Non-Released Claims Trust shall have standing to pursue the Non-Released Claims, and the Non-Released Claims Trust Manager (as defined in the Toys Delaware Plan) shall have the right to commence, prosecute, or settle such Non-Released Claims in its discretion, in consultation with the Non-Released Claims Trust Oversight Committee (as defined in the Toys Delaware Plan); *provided further that* the Settlement Agreement and/or the Global Settlement Agreement (as applicable) shall control over this provision in all respects (but solely with respect to the parties thereto).

K.      *Vesting of Assets in the Reorganized Debtors*

Except as otherwise provided in the Plan, the Interest Transfer Agreement, the Settlement Agreement, the Global Settlement Agreement, or in any agreement, instrument, or other document incorporated in the Plan, and subject to the terms and the consummation of the Credit Bid Transaction on the Effective Date, all property in each

Estate, all Causes of Action, and any property acquired by any of the Debtors pursuant to the Plan shall vest in each respective Reorganized Debtor, the Asia JV, the Wind Down Entities, the Credit Bid Purchasers, or the Non-Released Claims Trust, as applicable, free and clear of all liens, Claims, charges, or other encumbrances.  On and after the Effective Date, except as otherwise provided in the Plan, each Reorganized Debtor (or the applicable Wind Down Entity), the Asia JV, and the Non-Released Claims Trust may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

L.        *Avoidance Actions*

The Debtors waive all rights to commence or otherwise pursue any and all Avoidance Actions, including, without limitation, to assert or use any such Avoidance Actions for defensive purposes, and such Avoidance Actions shall be released on the Effective Date; *provided* that, notwithstanding the foregoing, any Avoidance Actions belonging to the TRU Inc. Debtors or their estates or creditors that are not expressly released by the Settlement Agreement or the Global Settlement Agreement shall be preserved and transferred to the Non-Released Claims Trust and not released.  For the avoidance of doubt, the only Avoidance Actions held by the TRU Inc. Debtors and their estates released under the Global Settlement Agreement are Avoidance Actions held by TRU Inc. against the Taj Debtors, the Taj Debtors' current and former directors, officers, or managers, and Holders of Taj Senior Notes Claims or any other Released Taj Claims in exchange for the Taj Settlement Consideration (as defined in the Global Settlement Agreement).

M.        *Compensation and Benefits Programs*

Unless otherwise provided herein or in the Plan Supplement, the Confirmation Order, or any applicable agreements binding on the Debtors, all employee wages, compensation, and benefit programs in place as of the Effective Date with the Debtors shall be rejected by the Reorganized Debtors.  Notwithstanding the foregoing, pursuant to section 1129(a)(13) of the Bankruptcy Code, from and after the Effective Date, unless rejected in accordance herewith, all retiree benefits (as such term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law.

N.        *Transition Services Officer Escrow*

On the Confirmation Date, the Transition Services Escrow Agent shall release the Transition Services Escrow Amount due to the Transition Services Officer pursuant to the terms of the Transition Services Offer Letter and the Transition Services Escrow Agreement.  For the avoidance doubt, any of the Transition Services Escrow Amount distributed and released pursuant to this Article IV.N shall only include amounts already escrowed for the benefit of the Transition Services Officer pursuant to the terms of the Transition Services Offer Letter and the Transition Services Escrow Agreement.

**ARTICLE V**
**TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

A.        *Assumption and Rejection of Executory Contracts and Unexpired Leases.*

On the Effective Date, except as otherwise provided herein, all Executory Contracts or Unexpired Leases in existence as of the Confirmation Date will be deemed rejected in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, other than: (1) those that previously were assumed or rejected by the Debtors; (2) those that are identified on the Assumed Executory Contract and Unexpired Lease List; (3) those that are the subject of a motion to assume Executory Contracts or Unexpired Leases that is pending on the Confirmation Date; (4) those that are part of transition services; or (5) those that are a D&O Liability Insurance Policy, a Chubb Insurance Contract or a Zurich Insurance Contract. Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such assumptions, assignments, and rejections, including the assumptions of the Executory Contracts or Unexpired Leases listed on the Assumed Executory Contract and Unexpired Lease List and the rejection of the Executory Contracts or Unexpired Leases listed on the Rejected Executory Contract and Unexpired Lease List pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Any

motions to assume or reject Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by the Bankruptcy Court on or after the Effective Date by a Final Order. Each Executory Contract and Unexpired Lease assumed pursuant to this Article V.A or by any order of the Bankruptcy Court, which has not been assigned to a third party before or on the Confirmation Date, shall revest in and be fully enforceable by the Debtors in accordance with its terms, except as such terms are modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing and providing for its assumption under applicable federal law. Notwithstanding anything to the contrary in the Plan, the Debtors, with the consent of the Taj Holders Steering Group, may alter, amend, modify, or supplement the schedules of Executory Contracts and Unexpired Leases identified in Article V, and in the Plan Supplement at any time through and including 90 days after the Effective Date (or such later date as provided in the event of any objection by a counterparty to an Executory Contract or Unexpired Lease to the amount of any Cure Obligation or other matter relating to the proposed assumption and assignment).

B.       *Cure of Defaults for Assumed and Assigned Executory Contracts and Unexpired Leases.*

Any Cure Obligations under each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the Cure Obligation in Cash on or after the Effective Date, subject to the limitation described below, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree.  In the event of a dispute regarding (1) the amount of the Cure Obligation, (2) the ability of the Debtors, the Asia JV, or any other assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (3) any other matter pertaining to assumption, the Cure Obligations required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order or orders resolving the dispute and approving the assumption.  At least ten days before the Confirmation Hearing, the Debtors shall provide for notices of proposed assumption and proposed Cure Obligations to be sent to applicable third parties and for procedures for objecting thereto and resolution of disputes by the Bankruptcy Court. Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption or Cure Obligation must be filed, served, and actually received by the Debtors at least three days before the Confirmation Hearing.  Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or cure amount will be deemed to have assented to such assumption or Cure Obligation.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan, or otherwise, shall result in the full release and satisfaction of any Claims or defaults, subject to satisfaction of the Cure Obligations, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the effective date of assumption or assignment.  **Anything in the Schedules and any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed and assigned shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.**

C.       *D&O Liability Insurance Policies.*

The Debtors shall be deemed to have assumed all of the Debtors' D&O Liability Insurance Policies pursuant to sections 105 and 365(a) of the Bankruptcy Code, and coverage for defense and indemnity under any of the D&O Liability Insurance Policies shall remain available to all individuals within the definition of "Insured" in any of the D&O Liability Insurance Policies subject to the terms and conditions of the D&O Liability Insurance Policies. Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Debtors' foregoing assumption of each of the D&O Liability Insurance Policies. Notwithstanding anything to the contrary contained in the Plan, and except as otherwise may be provided in an Order from the Bankruptcy Court, Confirmation of the Plan shall not discharge, impair, or otherwise modify any obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such obligation will be deemed and treated as an Executory Contract that has been assumed by the Debtors under the Plan as to which no Proof of Claim need be filed. Provided, however, that the holder(s) of a Claim for an indemnity obligation will look only to the D&O Liability Insurance Policies for recovery and not the Estates.  For the avoidance of doubt, the D&O Liability Insurance Policies are prefunded and will not require any additional premiums on or after the Effective Date.

D.    *Chubb Companies' Insurance Contracts.*

Notwithstanding anything to the contrary in the Disclosure Statement, the Plan, the Plan Supplement, the Confirmation Order, any bar date notice or claim objection, any other document related to any of the foregoing or any other order of the Bankruptcy Court (including, without limitation, any other provision that purports to be preemptory or supervening, grants an injunction or release, or requires a party to opt out of any releases): (a) all insurance policies that have been issued (or provide coverage) at any time by ACE American Insurance Company, Federal Insurance Company, and/or each of their affiliates and successors (together, the "Chubb Companies") to any of the Debtors (or any of their predecessors), and any agreements, documents, or instruments relating thereto (collectively, including any that are D&O Liability Insurance Policies the "Chubb Insurance Contracts") shall be assumed in their entirety pursuant to sections 105 and 365 of the Bankruptcy Code; (b) nothing shall alter, modify, amend, affect, impair or prejudice the legal, equitable or contractual rights, obligations, and defenses of the Chubb Companies, the Debtors (or, after the Effective Date, the Reorganized Debtors), or any other individual or entity, as applicable, under any Chubb Insurance Contracts and any such rights and obligations shall be determined under the Insurance Contracts and applicable non-bankruptcy law; and (c) the claims of the Chubb Companies arising (whether before or after the Effective Date) under the Chubb Insurance Contracts (i) are actual and necessary expenses of the Debtors' estates (or the Reorganized Debtors, as applicable) and (ii) shall be paid in full in the ordinary course of businesses, whether as an Allowed Administrative Claim under section 503(b)(1)(A) of the Bankruptcy Code or otherwise, regardless of when such amounts are or shall become liquidated, due or paid.

E.    *Zurich Insurance Policies.*

Notwithstanding anything to the contrary in the Disclosure Statement, the Plan, the Plan Supplement, the Confirmation Order, any bar date notice or claim objection, any other document related to any of the foregoing or any other order of the Bankruptcy Court (including, without limitation, any other provision that purports to be preemptory or supervening, grants an injunction or release, or requires a party to opt out of any releases): (a) all insurance policies that have been  issued (or provide coverage) to any of the Debtors (or their predecessors), or any claims administration services agreements that have been entered into or provide services to any of the Debtors, by Zurich American Insurance Company, American Zurich Insurance Company, Steadfast Zurich Insurance Company, Zurich Services Corporation or any of their affiliates (collectively, together with theirs successors "Zurich") at any time, and any agreements, documents, or instruments relating thereto (collectively, the "Zurich Insurance Contracts") shall be assumed in their entirety pursuant to sections 105 and 365 of the Bankruptcy Code; (b) nothing shall alter, modify, amend, affect, impair or prejudice the legal, equitable or contractual rights, obligations, and defenses of Zurich, the Debtors (or, after the Effective Date, the Reorganized Debtors), or any other individual or entity, as applicable, under any Zurich Insurance Contracts and any such rights and obligations shall be determined under the Zurich Insurance Contracts and applicable non-bankruptcy law; (c) the claims of Zurich arising (whether before or after the Effective Date) under the Zurich Insurance Contracts (i) are actual and necessary expenses of the Debtors' estates (or the Reorganized Debtors, as applicable) and (ii) shall be paid in full in the ordinary course of businesses, whether as an Allowed Administrative Claim under section 503(b)(1)(A) of the Bankruptcy Code or otherwise, regardless of when such amounts are or shall become liquidated, due or paid; *provided* that any and all rights of the Debtors to dispute such payments or reimbursements are expressly reserved, including the right of the Debtors to dispute that such payments are owed because such claims have been paid as a result of Zurich's draws on letters of credit issued on behalf of Zurich at the request of the Debtors or any of its affiliates (the "Zurich Letters of Credit"), or that some or all of the obligations owed by the Debtors to Zurich have been assumed by a non-Debtor entity pursuant to order of the Bankruptcy Court with Zurich's rights to contest such assumption being expressly reserved; and (d) nothing therein alters or modifies Zurich's rights to draw on the Zurich Letters of Credit.

F.    *Claims Based on Rejection of Executory Contracts and Unexpired Leases.*

Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be filed with the Bankruptcy Court within 30 days after the later of (1) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection, (2) the effective date of such rejection, or (3) the Effective Date.

**Any Holders of Claims arising from the rejection of an Executory Contract or Unexpired Lease for which Proofs of Claims were not timely Filed as set forth in the above paragraph shall not (a) be treated as a creditor with respect to such Claim, (b) be permitted to vote to accept or reject the Plan, or (c) participate in any distribution in the Chapter 11 Cases on account of such Claim, and any Claims arising from the rejection of an Executory Contract or Unexpired Lease not filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors, the Estates, and if Credit Bid Transaction is consummated, the Asia JV, or their property without the need for any objection by the Debtors or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied and released, notwithstanding anything in the Schedules or a Proof of Claim to the contrary.** All Allowed Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims against the appropriate Debtor, except as otherwise provided by order of the Bankruptcy Court.

G.      *Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases.*

Rejection or repudiation of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors under such contracts or leases. In particular, notwithstanding any nonbankruptcy law to the contrary, the Debtors or the Wind Down Entities or the Asia JV, as applicable, expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations on goods previously purchased, or services previously received, by the contracting Debtors or the Asia JV, as applicable, from counterparties to rejected or repudiated Executory Contracts or Unexpired Leases.

H.      *Modifications, Amendments, Supplements, Restatements, or Other Agreements.*

Unless otherwise provided in the Plan, each assumed and assigned Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and all Executory Contracts and Unexpired Leases related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements have been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith, unless such Executory Contract or Unexpired Lease was assumed by the Debtors and approved by the Bankruptcy Court.

I.      *Reservation of Rights.*

Neither the exclusion nor inclusion of any contract or lease in the Plan Supplement, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that the Debtors, or if Credit Bid Transaction is consummated, the Wind Down Entities or the Asia JV, as applicable, have any liability thereunder. In the event of a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption and assignment or rejection, the Debtors or the Asia JV, as applicable, shall have 90 days following entry of a Final Order resolving such dispute to alter the treatment of such contract or lease as otherwise provided in the Plan.

J.      *Nonoccurrence of Effective Date.*

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code, unless such deadline(s) have expired.

K.      *Contracts and Leases Entered Into After the Petition Date.*

Unless otherwise provided in the Plan, contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed by such Debtor or assumed and assigned to the Asia JV under the Interest Transfer Agreement, as applicable, will be performed by the Reorganized Debtors or the Asia JV, as applicable, in the ordinary course of their business after the Effective Date.  Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) will survive entry of the Confirmation Order.

# ARTICLE VI
## PROVISIONS GOVERNING DISTRIBUTIONS

A.      *Timing and Calculation of Amounts to Be Distributed.*

Except as otherwise provided in the Plan, on the Effective Date (or if a Claim or Interest is not an Allowed Claim or Allowed Interest on the Effective Date, on the date that such a Claim or Interest becomes an Allowed Claim or Allowed Interest, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim or Allowed Interest against the Debtors shall receive the full amount of the distributions that the Plan provides for Allowed Claims or Allowed Interests in the applicable Class from the Disbursing Agent, as applicable.  In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.  If and to the extent that there are Disputed Claims or Disputed Interests, distributions on account of any such Disputed Claims or Disputed Interests shall be made pursuant to the provisions set forth in Article VII.  Except as otherwise provided in the Plan, Holders of Claims or Interests shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.  Notwithstanding anything to the contrary herein, no Holder of an Allowed Claim or Allowed Interest shall, on account of such Allowed Claim or Allowed Interest, receive a distribution in excess of the Allowed amount of such Claim or Interest plus any postpetition interest on such Claim or Interest payable in accordance with the Plan.

B.      *Disbursing Agent.*

All distributions under the Plan shall be made by the Disbursing Agent.  The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.  Additionally, in the event that the Disbursing Agent is so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Debtors.

C.      *Rights and Powers of Disbursing Agent.*

1.      <u>Powers of the Disbursing Agent.</u>

The Disbursing Agent shall be empowered to, as applicable:  (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated under the Plan; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

2.      <u>Expenses Incurred On or After the Effective Date.</u>

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Disbursing Agent after the Effective Date (including taxes) and any reasonable compensation and expense reimbursement Claims (including reasonable attorney fees and expenses) made by the Disbursing Agent shall be paid in Cash as provided herein without any further notice to or action, order, or approval of the Bankruptcy Court.

D.    *Delivery of Distributions and Undeliverable or Unclaimed Distributions.*

1.    Record Date for Distribution.

On the Distribution Record Date, the Claims Register shall be closed and any party responsible for making distributions shall instead be authorized and entitled to recognize only those record Holders listed on the Claims Register as of the close of business on the Distribution Record Date.

2.    Delivery of Distributions in General.

Except as otherwise provided herein, the Disbursing Agent shall make distributions to Holders of Allowed Claims and Allowed Interests as of the Distribution Record Date at the address for each such Holder as indicated on the Debtors' records as of the date of any such distribution; *provided*, *however*, that the manner of such distributions shall be determined at the discretion of the Disbursing Agent; *provided further*, *however*, that the address for each Holder of an Allowed Claim shall be deemed to be the address set forth in any Proof of Claim Filed by that Holder. If a Holder holds more than one Claim in any one Class, all Claims of the Holder will be aggregated into one Claim and one distribution will be made with respect to the aggregated Claim.

The Debtors, the Reorganized Debtors, or the Disbursing Agent, as applicable, shall seek the cooperation of DTC so as to ensure that any distribution on account of an Allowed Taj Senior Notes Claim that is held in the name of, or by a nominee of, DTC, shall be made through the facilities of DTC on the Effective Date or as soon as practicable thereafter.

3.    Minimum; De Minimis Distributions.

No Cash payment of less than $50.00, in the reasonable discretion of the Disbursing Agent, as applicable, shall be made to a Holder of an Allowed Claim or Allowed Interest on account of such Allowed Claim or Allowed Interest.

4.    Undeliverable Distributions and Unclaimed Property.

In the event that any distribution to any Holder is returned as undeliverable, no distribution to such Holder shall be made unless and until the Disbursing Agent has determined the then current address of such Holder, at which time such distribution shall be made to such Holder without interest; *provided*, *however*, such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of six months from the date the distribution is made.  After such date, all unclaimed property or interests in property shall revert (notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary) to the applicable Debtor automatically and without need for a further order by the Bankruptcy Court, as applicable, and the Claim of any Holder to such property or interest in property shall be released, settled, compromised, and forever barred. Upon the termination of the Wind Down Entities, any remaining funds, including such distributions, shall be returned to the Credit Bid Purchasers.

5.    Manner of Payment Pursuant to the Plan.

Any payment in Cash to be made pursuant to the Plan shall be made at the election of the Disbursing Agent by check or by wire transfer.

E.    *Bankruptcy Code and Securities Act Exemptions*

The Reorganized Debtors and the Asia JV will rely on section 1145 of the Bankruptcy Code to exempt from the registration requirements under the Securities Act the offer, issuance, and distribution of the Initial Shares, Subscription Rights, and, to the extent they constitute "securities" (as defined in section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code, and applicable state securities laws), the Rights Offering Shares to the Holders of Taj Senior Notes Claims (Class B3).  Section 1145(a)(1) of the Bankruptcy Code exempts the offer or sale of securities of a debtor, of an affiliate of the debtor participating in a joint plan with the debtor, or of a

successor to the debtor under the plan (except by an underwriter, as defined in section 1145(b) of the Bankruptcy Code) from registration under section 5 of the Securities Act and state laws when such securities are offered or sold under a plan and are to be exchanged for claims or interests or principally in exchange for claims or interests and partly for cash.

In connection with the Rights Offering, the Asia JV agrees to offer and sell the Rights Offering Shares pursuant to the terms of the Rights Offering Procedures and the terms hereof and fulfill its obligations under the Rights Offering Procedures and the terms hereof as the issuer of the Rights Offering Shares, and, solely in respect thereof, submits to the jurisdiction of the Bankruptcy Court. The Asia JV acknowledges that it is "participating" (within meaning of section 1145(a)(1)) in this Plan and information with respect to the Rights Offering Shares and the Asia JV have been included in the Disclosure Statement. The offer and sale of the Rights Offering Shares to be offered and sold by the Asia JV under this Plan qualify for section 1145(a)(1) of the Bankruptcy Code treatment because the Asia JV (i) is a subsidiary of the Taj Debtors and an "affiliate" of the Taj Debtors as defined in section 101(2) of the Bankruptcy Code and (ii) is participating in this Plan with the Taj Debtors.

To the extent that Holders of Taj Senior Notes Claims (Class B3) who receive the Initial Shares, Subscription Rights or Rights Offering Shares are deemed to be "underwriters," such Holders' resale would not be exempted from registration under the Securities Act or other applicable law in accordance with section 1145 of the Bankruptcy Code. However, those Holders would be permitted to sell the Initial Shares, Subscription Rights or Rights Offering Shares without registration if they are able to comply with the provisions under Rule 144 or 144A of the Securities Act, as described further below.

The Rights Offering Shares that are securities and are issued to the Commitment Parties pursuant to the Backstop Commitment Agreement will be issued without registration under the Securities Act or any similar federal, state, or local law in reliance on the exemption set forth in section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder.

Section 4(a)(2) of the Securities Act provides that the issuance of securities by an issuer in transactions not involving any public offering are exempt from registration under the Securities Act. Regulation D is a non-exclusive safe harbor promulgated by the United States Securities and Exchange Commission under the Securities Act related to, among others, section 4(a)(2) of the Securities Act.

The term "issuer," as used in section 4(a)(2) of the Securities Act, means, among other things, a person who issues or proposes to issue any security.

Securities issued pursuant to the exemption provided by section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder are considered "restricted securities." As a result, resales of such securities may not be exempt from the registration requirements of the Securities Act or other applicable law. Holders of such restricted securities may, however, be able, at a future time and under certain conditions described below, to sell securities without registration pursuant to the resale provisions of Rule 144 and Rule 144A under the Securities Act.

Under certain circumstances, holders of securities who are affiliates of the issuer may be entitled to resell their securities pursuant to the limited safe harbor resale provisions of Rule 144. Generally, Rule 144 provides that if certain conditions are met (e.g., that the availability of current public information with respect to the issuer, volume limitations, and notice and manner of sale requirements), specified persons who resell restricted securities or who resell securities which are not restricted but who are "affiliates" of the issuer of the securities sought to be resold, will not be deemed to be "underwriters" as defined in section 2(11) of the Securities Act. Rule 144 provides that: (i) a non-affiliate who has not been an affiliate during the preceding three months may resell restricted securities after a six-month holding period if at the time of the sale there is current public information regarding the issuer and after a one year holding period if there is not current public information regarding the issuer at the time of the sale; (ii) an affiliate may sell restricted securities after a six month holding period if at the time of the sale there is current public information regarding the issuer and after a one-year holding period if there is not current public information regarding the issuer at the time of the sale, provided that in each case the affiliate otherwise complies with the volume, manner of sale and notice requirements of Rule 144; and (iii) an affiliate may sell securities other than restricted securities if at the time of the sale there is current public information regarding the issuer, provided

that in each case the affiliate otherwise complies with the volume, manner of sale, and notice requirements of Rule 144.

Rule 144A provides a non-exclusive safe harbor exemption from the registration requirements of the Securities Act for resales to certain "qualified institutional buyers" of securities that are "restricted securities" within the meaning of the Securities Act, irrespective of whether the seller of such securities purchased its securities with a view towards reselling such securities, if certain other conditions are met (*e.g.*, the availability of information required by paragraph 4(d) of Rule 144A and certain notice provisions).  Under Rule 144A, a "qualified institutional buyer" is defined to include, among other persons, certain "dealers" registered as such pursuant to section 15 of the Exchange Act, and entities that purchase securities for their own account or for the account of another qualified institutional buyer and that, in the aggregate, own and invest on a discretionary basis at least $100 million in the securities of unaffiliated issuers.  Subject to certain qualifications, Rule 144A does not exempt the offer or sale of securities that, at the time of their issuance, were securities of the same class of securities then listed on a national securities exchange (registered as such pursuant to section 6 of the Exchange Act) or quoted in a United States automated inter-dealer quotation system).

The Credit Bid Purchasers will not be required to file periodic reports under the Securities Exchange Act or seek to list the Initial Shares for trading on a national securities exchange.  Consequently, there will not be "current public information" (as such term is defined in Rule 144) regarding the Credit Bid Purchasers.

*F.*      *Compliance with Tax Requirements/Allocations.*

In connection with the Plan, to the extent applicable, the Disbursing Agent shall comply with all tax withholding and reporting requirements imposed on it by any Governmental Unit, and all distributions pursuant hereto shall be subject to such withholding and reporting requirements.  Notwithstanding any provision in the Plan to the contrary, the Disbursing Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms it believes is reasonable and appropriate.  The Debtors, in consultation with the Taj Holders Steering Group, reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances.

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest.

Following the distribution of the specific amounts set forth in section 3.4(a) of the Global Settlement Agreement, TRU Inc. shall reserve all remaining funds as and to the extent set forth in the Global Settlement Agreement.

*G.*      *Claims Paid or Payable by Third Parties.*

1.      Claims Paid by Third Parties.

The Debtors shall reduce in full a Claim, and such Claim shall be disallowed without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor.  Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor on account of such Claim, such Holder shall, within 14 days of receipt thereof, repay or return the distribution to the applicable Debtor to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.  The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the applicable Debtor annualized interest at the

Federal Judgment Rate on such amount owed for each Business Day after the 14-day grace period specified above until the amount is repaid.

       2.        <u>Claims Payable by Insurers.</u>

No distributions under the Plan shall be made on account of a Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Claim has exhausted all remedies with respect to such insurance policy. To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction, an arbitration panel, or is otherwise settled), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

       3.        <u>Applicability of Insurance Policies.</u>

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy.  Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

*H.*       *Indefeasible Distributions.*

Any and all distributions made under the Plan shall be indefeasible and not subject to clawback.

## ARTICLE VII
## PROCEDURES FOR RESOLVING CONTINGENT,
## UNLIQUIDATED, AND DISPUTED CLAIMS

*A.*       *Allowance of Claims.*

After the Effective Date, each of the Debtors shall have and retain any and all rights and defenses such Debtor had with respect to any Claim or Interest immediately before the Effective Date.  Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases before the Effective Date (including the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code or the Bankruptcy Court has entered a Final Order, including the Confirmation Order (when it becomes a Final Order), in the Chapter 11 Cases allowing such Claim.

*B.*       *Claims Administration Responsibilities.*

Except as otherwise specifically provided in the Plan, a Final Order by the Bankruptcy Court, or the Interest Transfer Agreement, as applicable, after the Effective Date, the Debtors, with the consent of Taj Holders Steering Group, or by order of the Bankruptcy Court, shall have the sole authority, subject to a party in interest's right to object to a Claim or Interest under section 502(a) of the Bankruptcy Code:  (1) to File, withdraw, or litigate to judgment objections to Claims or Interests; (2) to settle or compromise any Disputed Claim or Disputed Interest without any further notice to or action, order, or approval by the Bankruptcy Court; and (3) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.

*C.*       *Estimation of Claims and Interests.*

Before or after the Effective Date, the Debtors may (but are not required to), by order of the Bankruptcy Court, at any time request that the Bankruptcy Court estimate any Disputed Claim or Disputed Interest that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or Interest or whether the Bankruptcy Court has ruled on any such

objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim or Interest, including during the litigation of any objection to any Claim or Interest or during the appeal relating to such objection. Notwithstanding any provision otherwise in the Plan, a Claim or Interest that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court.  In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim or Interest, that estimated amount shall constitute a maximum limitation on such Claim or Interest for all purposes under the Plan (including for purposes of distributions), and the relevant Debtor may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim or Interest.

D.      *Adjustment to Claims or Interests without Objection.*

Any Claim or Interest that has been paid or satisfied, or any Claim or Interest that has been amended or superseded, may be adjusted or expunged on the Claims Register by the Debtors without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

E.      *Time to File Objections to Claims.*

Any objections to Claims shall be Filed on or before the Claims Objection Bar Date.

F.      *Disallowance of Claims.*

Except as otherwise expressly provided herein or in a Final Order by the Bankruptcy Court, any Claims or Interests held by Entities from which property is recoverable under section 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims or Interests may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the applicable Debtor or the Credit Bid Purchasers, as applicable.

**Except as provided herein or otherwise agreed, any and all Proofs of Claim filed after the Claims Bar Date shall be deemed disallowed and expunged as of the Effective Date without any further notice to or action, order, or approval of the Bankruptcy Court, and Holders of such Claims may not receive any distributions on account of such Claims, unless on or before the Confirmation Hearing such late Claim has been deemed timely filed by a Final Order.**

G.      *Amendments to Claims.*

On or after the Effective Date, except as provided in the Plan or the Confirmation Order, a Claim or Interest may not be Filed or amended without the prior authorization of the Bankruptcy Court and the Debtors, and any such new or amended Claim or Interest Filed shall be deemed disallowed in full and expunged without any further action.

H.      *No Distributions Pending Allowance.*

If an objection to a Claim or Interest or portion thereof is Filed as set forth in Article VII, no payment or distribution provided under the Plan shall be made on account of such Claim or Interest or portion thereof unless and until such Disputed Claim or Interest becomes an Allowed Claim or Interest.

I.      *Distributions After Allowance.*

To the extent that a Disputed Claim or Disputed Interest ultimately becomes an Allowed Claim or Allowed Interest, distributions (if any) shall be made to the Holder of such Allowed Claim or Allowed Interest in accordance with the provisions of the Plan.  As soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim or Disputed Interest becomes a Final Order, the Disbursing Agent shall provide

to the Holder of such Claim or Interest the distribution (if any) to which such Holder is entitled under the Plan as of the Effective Date, less any previous distribution (if any) that was made on account of the undisputed portion of such Claim or Interest, without any interest, dividends, or accruals to be paid on account of such Claim or Interest unless required under applicable bankruptcy law or as otherwise provided in Article III.B.

## ARTICLE VIII
## SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

A.      *Settlement, Compromise, and Release of Claims and Interests.*

Pursuant to Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, and except as otherwise specifically provided in the Plan or in any contract, instrument, or other agreement or document created pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete settlement, compromise, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Debtors), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors before the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not:  (1) a Proof of Claim or Proof of Interest based upon such debt, right, or Interest is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has accepted the Plan.  Any default by the Debtors or their Affiliates with respect to any Claim or Interest that existed immediately before or on account of the filing of the Chapter 11 Cases shall be deemed cured on the Effective Date.  The Confirmation Order shall be a judicial determination of the settlement, compromise, and release of all Claims and Interests subject to the Effective Date occurring.

Pursuant to the Fung Settlement Agreement, on the Closing Date, the Debtors shall pay Fung $8.25 million in cash in complete settlement, compromise, and release, effective as of the Closing Date, of all Claims and Causes of Action of any nature whatsoever, including appeals, that Fung has initiated or commenced, or could initiate or commence, as of the Effective Date, against the Debtors or any of their Affiliates.

Pursuant to the Global Settlement Agreement, on the Effective Date, the Taj Debtors shall pay to Toys Delaware, in settlement of certain fee allocation issues and disputes, $3 million in respect of the fees and expenses charged, or to be charged, by Prime Clerk LLC in the Chapter 11 Cases.

B.      **Release of Liens.**

**Except as otherwise provided herein or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, settled, and compromised and all rights, titles, and interests of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Debtors' Estates shall revert to the Debtors or the Wind Down Entities, or assigned to the Credit Bid Purchasers or the Asia JV pursuant to the Interest Transfer Agreement or other relevant documentation, as applicable.**

C.      *Releases by the Debtors.*

Pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, on and after the Effective Date, except as otherwise expressly set forth herein, each Released Party shall be deemed released and discharged by the Debtors and the Reorganized Debtors, and their Estates from any and all claims and Causes of Action, including any derivative claims asserted on behalf of the Debtors, that the Debtors or the Reorganized Debtors, or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest, or that any Holder of any Claim or Interest could have asserted on behalf of the Debtors, based on or relating to, or in any manner arising from, in whole or in part, among other things:

1.  the Debtors or the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the formulation, preparation, dissemination, negotiation, or filing of any documents related to the Restructuring;

2.  any contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring, the Disclosure Statement, or the Plan;

3.  the Chapter 11 Cases, the Disclosure Statement, the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement;

4.  the negotiation, implementation, terms, or amendments to the DIP Facility or DIP Orders prior to or during the Chapter 11 Cases;

5.  (a) the transactions undertaken by the Sponsors in relation to the acquisition of the interests in TRU Inc., or (b) any and all refinancing transactions or sale transactions related to the equity or assets of the Debtors undertaken, approved, planned, or implemented by the Sponsors and/or the Debtor's managers, officers, directors, and employees, as applicable;

6.  the Asia JV, the marketing or sale process for the TRU Asia Equity Interests held directly or indirectly by the Debtors, the Bidding Procedures, the Bidding Procedures Order, the Auction, the Credit Bid, or the Credit Bid Transaction; or

7.  any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the effective date relating to any of the foregoing.

Notwithstanding the foregoing, nothing in this Article or this Plan shall release any Non-Released Claims, any D&O Claims, or any claims of TRU Inc. against the D&O Parties, in respect of which the Settlement Agreement and/or the Global Settlement Agreement (as applicable) shall control over this provision in all respects, with respect to the parties thereto.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any post-Effective Date obligations of any party or entity under the Plan or any document, instrument, or agreement (including those set forth in the plan supplement) executed to implement the Plan, the Credit Bid Transaction, and the Restructuring Transactions, or (ii) any claims or causes of action relating to or arising out of the chapter 11 cases of the Propco I Debtors, Wayne, or Propco II Plan Entities.

D.      *Releases by Holders of Claims and Interests.*

Pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, on and after the Effective Date, except as otherwise expressly set forth herein, each Releasing Party is deemed to have released and discharged each Debtor, Reorganized Debtor, and other Released Party from any and all claims and Causes of Action, including any derivative claims asserted on behalf of the Debtors that such

entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, among other things:

1.    the Debtors or the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the formulation, preparation, dissemination, negotiation, or filing of any documents related to the Restructuring;

2.    any contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring, the Disclosure Statement, or the Plan;

3.    the Chapter 11 Cases, the Disclosure Statement, the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement;

4.    the negotiation, implementation, terms, or amendments to the DIP Facility or DIP Orders prior to or during the Chapter 11 Cases;

5.    (a) the transactions undertaken by the Sponsors in relation to the acquisition of the interests in TRU Inc., or (b) any and all refinancing transactions or sale transactions related to the equity or assets of the Debtors undertaken, approved, planned, or implemented by the Sponsors and/or the Debtor's managers, officers, directors, and employees, as applicable;

6.    the Asia JV, the marketing or sale process for the TRU Asia Equity Interests held directly or indirectly by the Debtors, the Bidding Procedures, the Bidding Procedures Order, the Auction, the Credit Bid, or the Credit Bid Transaction; or

7.    any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the effective date relating to any of the foregoing.

Notwithstanding the foregoing, nothing in this Article or this Plan shall release any Non-Released Claims, any D&O Claims, or any claims of TRU Inc. against the D&O Parties, in respect of which the Settlement Agreement and/or the Global Settlement Agreement (as applicable) shall control over this provision in all respects, with respect to the parties thereto.  Notwithstanding the foregoing, nothing in this Article or this Plan shall release any claims that are specifically preserved or created by the Global Settlement Agreement, including claims to enforce the terms of the Global Settlement Agreement or the further agreements (including license and transition services arrangements) contemplated by the Global Settlement Agreement. Notwithstanding the foregoing, the releases set forth above do not release (i) any post-Effective Date obligations of any party or entity under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, the Credit Bid Transaction, and the Restructuring Transactions, or (ii) any claims or causes of action relating to or arising out of the chapter 11 cases of the Propco I Debtors, Wayne, or Propco II Plan Entities.  For the avoidance of doubt, pursuant to Section 3.1(b) of the Global Settlement Agreement, each of the Geoffrey Debtors, the Toys Delaware Debtors, the TRU Inc. Debtors and their respective estates, hereby releases all claims and Causes of Action, if any, whether known or unknown, whether direct or derivative, against the Taj Debtors, Asia JV (and its direct shareholders), its direct and indirect subsidiaries, and each of the foregoing parties' respective officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, investment bankers, consultants, representatives and other professionals solely in their role or capacity for the foregoing parties.  For the avoidance of doubt, no claims against Wayne held by any creditor, including guarantee claims of the B-4 lenders against Wayne, are in any way affected, impaired or released by the Plan.

E.    *Exculpation.*

Except as otherwise specifically provided in the Plan or any other Restructuring Documents, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from any

cause of action for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, filing, or termination of any documents related to the Restructuring and related prepetition transactions, the Disclosure Statement, the Plan, or any Restructuring transaction, contract, instrument, release or other agreement or document (including providing any legal opinion requested by any entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Disclosure Statement, the Plan, the DIP Facility, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of securities pursuant to the Plan, or the distribution of property under the Plan, or any other related agreement, except for claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.  The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of, and distribution of, consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.  Notwithstanding anything to the contrary, this Plan shall not exculpate or otherwise release any "Non-Released Claims", "D&O Claims," and Claims against the "D&O Parties" by TRU Inc. or the Toys Delaware Debtors, in respect of which the Settlement Agreement and/or the Global Settlement Agreement (as applicable) shall control over this provision in all respects, with respect to the parties thereto.

F.    *Injunction.*

Except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities that have held, hold, or may hold Claims or Interests that have been compromised, settled, or released, or are subject to exculpation pursuant to the Plan, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Credit Bid Purchasers, or any of the other Released Parties:  (i) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests; (ii) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such entities on account of or in connection with or with respect to any such claims or interests; (iii) creating, perfecting, or enforcing any lien or encumbrance of any kind against such entities or the property or the estates of such entities on account of or in connection with or with respect to any such claims or interests; (iv) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such entities or against the property of such entities on account of or in connection with or with respect to any such claims or interests unless such entity has timely asserted such setoff right in a document filed with the Bankruptcy Court explicitly preserving such setoff, and notwithstanding an indication of a claim or interest or otherwise that such entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (v) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests released or settled pursuant to the Plan.

G.    *Certain Claims of Governmental Units.*

Nothing in this Plan discharges, releases, precludes, or enjoins: (i) any liability to any Governmental Unit that is not a Claim; (ii) any Claim of a Governmental Unit arising on or after the Effective Date; (iii) any police or regulatory liability to a Governmental Unit on the part of any Entity as the owner or operator of property after the Effective Date; or (iv) any liability to a Governmental Unit on the part of any Person other than the Debtors.  Nor shall anything in the Confirmation Order or the Plan enjoin or otherwise bar a Governmental Unit from asserting or enforcing, outside this Court, any liability described in the preceding sentence.  Nothing in this Confirmation Order or the Plan divest any tribunal of any jurisdiction it may have law to adjudicate any defense based on this paragraph of this Confirmation Order.

H.      *Setoffs.*

Except as otherwise expressly provided for in the Plan, the Global Settlement Agreement, or a Final Order by the Bankruptcy Court, each Debtor, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy law, or as may be agreed to by the Holder of a Claim, may set off against any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim), any claims, rights, and Causes of Action of any nature that such Debtor may hold against the Holder of such Allowed Claim, to the extent such claims, rights, or Causes of Action against such Holder have not been otherwise compromised or settled on or before the Effective Date (whether pursuant to the Plan or otherwise); *provided, however,* that neither the failure to effect such a setoff nor the allowance of any Claim pursuant to the Plan shall constitute a waiver or release by such Debtor of any such claims, rights, and Causes of Action that such Debtor may possess against such Holder.  In no event shall any Holder of Claims be entitled to set off any Claim against any Claim, right, or Cause of Action of a Debtor unless such Holder has timely Filed a Proof of Claim with the Bankruptcy Court preserving such setoff; *provided,* that the foregoing shall not prevent any Holder of Claims or Interests from asserting setoff as an affirmative defense to the extent provided by applicable law.

I.      *Recoupment.*

In no event shall any Holder of Claims or Interests be entitled to recoup any Claim against any claim, right, or Cause of Action of the Debtors unless such Holder actually has timely Filed a Proof of Claim with the Bankruptcy Court preserving such recoupment; *provided,* that the foregoing shall not prevent any Holder of Claims or Interests from asserting recoupment as an affirmative defense to the extent provided by applicable law.

J.      *Subordination Rights.*

Subject to Article III.G. of the Plan, the classification and treatment of all Claims and Interests under the Plan shall conform to and with the respective contractual, legal, and equitable subordination rights of such Claims and Interests.

K.      *Document Retention.*

On and after the Effective Date, the Debtors may maintain documents in accordance with their standard document retention policy, as may be altered, amended, modified, or supplemented by the Debtors; *provided, however,* that the Debtors shall retain and preserve any documents, information (including electronically stored information), and other evidence potentially relevant to Claims or Causes of Action against the D&O Parties or to Non-Released Claims.

L.      *Reimbursement or Contribution.*

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of allowance or disallowance, such Claim shall be forever disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless before the Confirmation Date:  (1) such Claim has been adjudicated as non-contingent; or (2) the relevant Holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered before the Confirmation Date determining such Claim as no longer contingent.

## ARTICLE IX
## CONDITIONS PRECEDENT TO CONFIRMATION AND THE EFFECTIVE DATE

A.      *Conditions Precedent to Confirmation.*

It shall be a condition to Confirmation of the Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of Article IX.C:

1.      the Bankruptcy Court shall have entered the Confirmation Order in form and substance satisfactory to the Debtors, the Taj Holders Steering Group, Fung, the Ad Hoc Group of B-4 Lenders, and the Creditors' Committee;

2.      the Bankruptcy Court shall have approved the Global Settlement Agreement and entered an order approving such agreement in form and substance satisfactory to the Debtors, the Taj Holders Steering Group, the Ad Hoc Group of B-4 Lenders, and the Creditors' Committee.

3.      the Confirmation Order shall:

(a)     authorize the Debtors to take all actions necessary to enter into, implement, and consummate the contracts, instruments, releases, leases, indentures, and other agreements or documents created in connection with the Plan;

(b)     decree that the provisions of the Confirmation Order and the Plan are nonseverable and mutually dependent;

(c)     authorize the Debtors to enter into any agreements, transactions, and sales of property as set forth in the Plan;

(d)     authorize the implementation of the Plan in accordance with its terms and the Interest Transfer Agreement; and the other Restructuring Documents; and

(e)     provide that, pursuant to section 1146 of the Bankruptcy Code, the assignment or surrender of any lease or sublease, and the delivery of any deed or other instrument or transfer order, in furtherance of, or in connection with the Plan, including any deeds, bills of sale, or assignments executed in connection with any disposition or transfer of assets contemplated under the Plan, shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax (including, any mortgages or security interest filing to be recorded or filed in connection with the Credit Bid Transaction); and

4.      Neither the Interest Transfer Agreement nor the Fung Settlement Agreement shall have been terminated in accordance with its terms.

B.      *Conditions Precedent to the Effective Date.*

It shall be a condition to Consummation that the following conditions shall have been satisfied or waived pursuant to the provisions of Article IX.C:

1.      the Bankruptcy Court shall have entered the Confirmation Order and it shall have become a Final Order; *provided*, *however*, that in accordance with Bankruptcy Rules 3020(e), 6004(h), and 6006(d) (and notwithstanding any other provision of the Bankruptcy Code or the Bankruptcy Rules), the Confirmation Order shall not be stayed and shall be effective immediately upon its entry;

2.      the Bankruptcy Court's order approving the Global Settlement Agreement shall have become a Final Order;

3.      all documents and agreements necessary to implement the Plan, including any documents related to the Credit Bid Transaction shall have (a) all conditions precedent to the effectiveness of such documents and agreements satisfied or waived pursuant to the terms of such documents or agreements, (b) been tendered for delivery, and (c) been effected or executed;

4.      all governmental and material third party approvals and consents, including Bankruptcy Court approval, necessary in connection with the transactions contemplated by the Plan shall have been obtained, not be subject to unfulfilled conditions and be in full force and effect, and all applicable waiting periods shall have expired

without any action being taken or threatened by any competent authority that would restrain, prevent, or otherwise impose materially adverse conditions on such transactions;

5.      the Professional Fee Escrow Account shall have been funded with Cash in the amount of the aggregate Professional Fee Escrow Amount for all Professionals;

6.      the closing of the Rights Offering, if any, and the other Restructuring Transactions shall have occurred in the manner set forth in the Transaction Steps Memorandum;

7.      the Effective Date shall have occurred; and

8.      the closing of the Credit Bid Transaction contemplated by the Interest Transfer Agreement or other definitive documents shall have occurred.

C.      *Waiver of Conditions.*

The conditions to Confirmation and Consummation set forth in this Article IX may be waived or modified only by consent of the Debtors, the Taj Holders Steering Group, and Fung, as applicable, and without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate the Plan, *provided that* the conditions to Confirmation and Consummation set forth in this Article IX relating to the Global Settlement Agreement may be waived or modified with additional consent of the Ad Hoc Group of B-4 Lenders, Toys Delaware, Geoffrey, LLC, and the Creditors' Committee.

## ARTICLE X
## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

A.      *Modification and Amendments.*

Except as otherwise specifically provided in the Plan, the Debtors, with the consent of the Taj Holders Steering Group, Fung, the Ad Hoc Group of B-4 Lenders, and the Creditors' Committee, as applicable, reserve the right to modify the Plan, whether materially or immaterially, and seek Confirmation, in each instance, to the extent permitted under the Bankruptcy Code. Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in the Plan, the Debtors, with the consent of the Taj Holders Steering Group, and Fung, as applicable, expressly reserve their rights to alter, amend, or modify materially the Plan with respect to the Debtors, one or more times, after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan. Any such modification or supplement shall be considered a modification of the Plan and shall be made in accordance with this Article X. For the avoidance of doubt, the Plan may not be modified to alter any term of the Global Settlement Agreement, or to deprive any party thereto of any benefit of the Global Settlement Agreement, absent the express written consent of such affected party.

B.      *Effect of Confirmation on Modifications.*

Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan occurring after the solicitation thereof and before the Confirmation Date are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

C.      *Revocation or Withdrawal of the Plan.*

The Debtors, with the consent of the Taj Holders Steering Group, and Fung, as applicable, reserve the right to revoke or withdraw the Plan with respect to one or more of the Debtors before the Confirmation Date or the Effective Date and to file subsequent plans of reorganization. If the Debtors, with the consent of the Taj Holders Steering Group, and Fung, as applicable, revoke or withdraw the Plan with respect to any Debtor, or if Confirmation

or Consummation does not occur with respect to any Debtor, then:  (1) the Plan with respect to such Debtor shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan with respect to such Debtor (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption and assignment or rejection of Executory Contracts or Unexpired Leases effected by the Plan with respect to such Debtor, and any document or agreement executed pursuant to the Plan with respect to such Debtor, shall be deemed null and void; and (3) nothing contained in the Plan with respect to such Debtor shall:  (a) constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the rights of the Debtors or any other Entity; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors or any other Entity.   For the avoidance of doubt, any revocation or withdrawal of the Plan following approval by the Bankruptcy Court of the Global Settlement Agreement shall have no effect on that agreement and any party's obligations to comply with that agreement.

## ARTICLE XI
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain such jurisdiction over the Chapter 11 Cases and all matters, arising out of, or related to, the Chapter 11 Cases and the Plan, including jurisdiction to:

1.	Allow, disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the Secured or unsecured status, priority, amount, or allowance of Claims or Interests;

2.	Decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.	Resolve any matters related to:  (a) the assumption, assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable in any manner and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Claims related to the rejection of an Executory Contract or Unexpired Lease, Cure Obligations pursuant to section 365 of the Bankruptcy Code, or any other matter related to such Executory Contract or Unexpired Lease; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed and/or assigned; (c) the Debtors amending, modifying, or supplementing, after the Effective Date, pursuant to Article V, any Executory Contracts or Unexpired Leases to the Assumed Executory Contract and Unexpired Lease List, the Rejected Executory Contract and Unexpired Lease List, or otherwise; and (d) any dispute regarding whether a contract or lease is or was executory or expired;

4.	Ensure that distributions to Holders of Allowed Claims and Allowed Interests are accomplished pursuant to the provisions of the Plan;

5.	Adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6.	Adjudicate, decide, or resolve any and all matters related to Causes of Action;

7.	Enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Disclosure Statement;

8.	Enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

9.      Resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

10.      Issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

11.      Resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the settlements, compromises, releases, injunctions, exculpations, and other provisions contained in Article VIII and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

12.      Resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or Interest for amounts not timely repaid pursuant to Article VI.F;

13.      Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

14.      Adjudicate, decide, or resolve any and all matters related to the Settlement Agreement, the Fung Settlement Agreement, or the Global Settlement Agreement;

15.      Determine any other matters that may arise in connection with or relate to the Plan, the Credit Bid Transaction, the Restructuring Documents, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Disclosure Statement;

16.      Adjudicate any and all disputes arising from or relating to distributions under the Plan or any transactions contemplated therein;

17.      Consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

18.      Determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

19.      Resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with any Non-Released Claims, including the D&O Claims;

20.      Hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

21.      Hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

22.      Hear and determine matters concerning section 1145 of the Bankruptcy Code;

23.      Hear and determine all disputes involving the existence, nature, or scope of the Debtors' release, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred before or after the Effective Date;

24.      Enforce all orders previously entered by the Bankruptcy Court;

25.    To resolve any disputes arising under the Interest Transfer Agreement or other documents related to the Credit Bid Transaction;

26.    Hear any other matter not inconsistent with the Bankruptcy Code;

27.    Enter an order concluding or closing the Chapter 11 Cases; and

28.    Enforce the injunction, release, and exculpation provisions set forth in Article VIII.

## ARTICLE XII
## MISCELLANEOUS PROVISIONS

A.    *Immediate Binding Effect.*

Subject to Article IX and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding upon the Debtors and any and all Holders of Claims or Interests (irrespective of whether the Holders of such Claims or Interests accepted or rejected the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, and injunction described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.

B.    *Additional Documents.*

On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The Debtors and all Holders of Claims or Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

C.    *Payment of Statutory Fees.*

All fees payable pursuant to section 1930(a) of the Judicial Code shall be paid by the Debtors for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed, or closed, whichever occurs first.  For the avoidance of doubt, the Debtors shall pay any outstanding U.S. Trustee fees in full on the Effective Date and the Debtors or the applicable Wind Down Entities shall continue to pay such fees until the Chapter 11 cases are converted, dismissed, or closed, whichever occurs first.

D.    *Dissolution of Committees.*

On the Effective Date, any statutory committee appointed in the chapter 11 cases of the Taj Debtors and the TRU Inc. Debtors shall dissolve solely with respect to the Taj Debtors and TRU Inc. Debtors, and members thereof shall be released and discharged from all rights and duties from or related to the chapter 11 cases of the Taj Debtors and the TRU Inc. Debtors.  The Taj Debtors and TRU Inc. Debtors shall no longer be responsible for paying any fees or expenses incurred by the members of or advisors to the Creditors' Committee after the Effective Date.  Upon the dissolution of the Creditors' Committee, the current and former members of the Creditors' Committee, and their officers, employees, counsel, advisors, and agents, shall be released and discharged of and from all further authority, duties, responsibilities, and obligations related to and arising from and in connection with the chapter 11 cases of the Taj Debtors and the TRU Inc. Debtors, and the retention or employment of the Creditors' Committee's respective attorneys, accountants, and other agents shall terminate, except that the Creditors' Committee and its professionals shall have the right to pursue, review, and object to any applications for compensation and reimbursement of expenses filed in accordance with Article II.B hereof.

E.    *Monthly Operating Reports and Post-Effective Date Reports*

The Debtors will continue to include information regarding their deposits, expenditures, and other relevant financial information in monthly operating reports (prior to the Effective Date) and quarterly post-confirmation reports (after the Effective Date) Filed with the Court until the applicable Chapter 11 cases are converted, dismissed, or closed, whichever occurs first.

F.    *Reservation of Rights.*

The Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order. Neither the Plan, any statement or provision contained in the Plan, nor any action taken or not taken by any Debtor with respect to the Plan, the Disclosure Statement, the Confirmation Order, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests before the Effective Date.

G.    *Successors and Assigns.*

The rights, benefits, and obligations of any Entity named or referred to in the Plan or the Confirmation Order shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor, or assign, Affiliate, officer, director, manager, trustee, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

H.    *Service of Documents.*

Any pleading, notice, or other document required by the Plan to be served on or delivered to the Debtors shall be served on:

1.    the Debtors:

Toys "R" Us, Inc.
One Geoffrey Way,
Wayne, New Jersey 07470
Attention:  James Young

with copies to:

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022-4611
Facsimile:  (212) 446-4900
Attention:  Edward O. Sassower, Joshua A. Sussberg
E-mail addresses:  edward.sassower@kirkland.com, joshua.sussberg@kirkland.com

and

Kirkland & Ellis LLP
300 North LaSalle
Chicago, Illinois 60654-3406
Facsimile:  (312) 862-2200
Attention:  Chad J. Husnick, Emily E. Geier
E-mail addresses:  chad.husnick@kirkland.com, emily.geier@kirkland.com

2.    Counsel to Toys "R" Us, Inc. at Direction of the Disinterested Directors of Toys "R" Us, Inc.

Munger Tolles & Olson, LLP
Thomas B. Walper

Seth Goldman
350 South Grand Avenue, 50th Floor
Los Angeles, California 90071-1560
Telephone: (213) 683-9100
Facsimile: (213) 687-3702
Email:  thomas.walper@mto.com
            seth.goldman@mto.com

3.      Counsel to Tru Taj, LLC and TRU Taj Finance, Inc. at the Direction of the Disinterested Directors of Tru Taj, LLC and TRU Taj Finance, Inc.

Proskauer Rose, LLP
Mark K. Thomas (admitted pro hac vice)
70 West Madison, Suite 3800
Chicago, Illinois 60602-4342
Telephone: (312) 962-3550
Facsimile: (312) 962-3551

Peter J. Young (admitted pro hac vice)
2049 Century Park East, Suite 3200
Los Angeles, California 90067-3206
Telephone: (310) 557-2900
Facsimile: (310) 557-2193

4.      Counsel to the Taj Holders Steering Group

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, New York 10019
Attn: Brian S. Hermann, Samuel E. Lovett
E-mail addresses: bhermann@paulweiss.com; slovett@paulweiss.com

5.      the Creditors' Committee:

Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, New York 10036
Facsimile:  (212) 715-8000
Attn: Kenneth Eckstein, Adam Rogoff, Rachael Ringer
E-mail addresses: keckstein@kramerlevin.com, arogoff@ kramerlevin.com, rringer@kramerlevin.com

After the Effective Date, the Debtors have authority to send a notice to Entities that to continue to receive documents pursuant to Bankruptcy Rule 2002, such Entity must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002.  After the Effective Date, the Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed such renewed requests.

*I.      Term of Injunctions or Stays.*

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or the Confirmation Order (including the Injunction) shall remain in full force and effect in accordance with their terms.

J.       *Entire Agreement.*

Except as otherwise indicated, the Plan, the Confirmation Order, and the Plan Supplement supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

K.       *Exhibits.*

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan.  After the exhibits and documents are Filed, copies of such exhibits and documents shall be available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the Debtors' restructuring website at https://cases.primeclerk.com/toysrus/ or the Bankruptcy Court's website at https://www.vaeb.uscourts.gov.

L.       *Nonseverability of Plan Provisions.*

If, before Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.   Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the consent of the Debtors, the Creditors' Committee, the Taj Holders Steering Group, or Fung, as applicable; and (3) nonseverable and mutually dependent.

M.       *Waiver or Estoppel.*

Each Holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, Secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers Filed with the Bankruptcy Court before the Confirmation Date.

Respectfully submitted, as of the date first set forth above,

Dated:  December 12, 2018

Toys "R" Us, Inc. (for itself and all Debtors)

By:      */s/ Matthew Finigan*
Name:    Matthew Finigan
Title:   Executive Vice President - Chief Financial Officer and
         Treasurer

Prepared by:

Edward O. Sassower, P.C.
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Emily E. Geier (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:       (212) 446-4800
Facsimile:       (212) 446-4900

-and-

Michael A. Condyles (VA 27807)
Peter J. Barrett (VA 46179)
Jeremy S. Williams (VA 77469)
**KUTAK ROCK LLP**
901 East Byrd Street, Suite 1000
Richmond, Virginia 23219-4071
Telephone:       (804) 644-1700
Facsimile:       (804) 783-6192

James H.M. Sprayregen, P.C.
Anup Sathy, P.C.
Chad J. Husnick, P.C. (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:       (312) 862-2000
Facsimile:       (312) 862-2200

*Co-Counsel to the Debtors and Debtors in Possession*

**Exhibit A**

<u>**SETTLEMENT AGREEMENT**</u>

**PREAMBLE**

This settlement agreement (this "<u>Settlement Agreement</u>"), is made and entered into as of July 17, 2018, by and among the following parties:

(a)     (i) Toys "R" Us, Inc. ("<u>Toys Inc.</u>"), (ii) Toys "R" Us - Delaware Inc. ("<u>Toys Delaware</u>"), (iii) Geoffrey Holdings, LLC, (iv) Geoffrey, LLC; and (v) Geoffrey International, LLC (those entities identified in subclauses (iii)-(v), the "<u>Geoffrey Debtors</u>"); (vi) Giraffe Holdings, LLC, (vii) MAP 2005 Real Estate, LLC, (viii) Toys "R" Us - Value, Inc., (ix) Toys Acquisition, LLC, (x) TRU - SVC, Inc., (xi) TRU Guam, LLC, (xii) TRU Mobility, LLC, (xiii) TRU of Puerto Rico, Inc., and (xiv) Wayne Real Estate Parent Company, LLC ("<u>Wayne</u>") (each of the foregoing entities identified in subclauses (i) through (xiv) individually, a "<u>Debtor</u>" and, collectively, the "<u>Debtors</u>");[1]

(b)     the undersigned members of an ad hoc group of B-4 Lenders (the "<u>Ad Hoc Group of B-4 Lenders</u>"), comprised of funds and accounts (or holding companies thereof) managed or advised by Angelo, Gordon & Co., L.P.; Franklin Mutual Advisors, LLC; Highland Capital Management, LP; Oaktree Capital Management, L.P.; or Solus Alternative Asset Management LP, holding the positions set forth in the *Bankruptcy Rule 2019 Statement* filed on June 29, 2018 [Docket No. 3637];

(c)     any other lender parties whose signature pages are affixed hereto;

(d)     the official committee of unsecured creditors appointed in the Chapter 11 Cases (defined below) pursuant to the *Appointment of Unsecured Creditors Committee* [Docket No. 206] (the "<u>Creditors Committee</u>");

(e)     NexBank SSB (the "<u>Term DIP Agent</u>"), as administrative agent and collateral agent in connection with the Debtor-in-Possession Credit Agreement, dated as of September 18, 2017 (as amended, novated, supplemented, extended, or restated from time to time) by and among Toys Delaware, as borrower, the Term DIP Agent and the lenders party thereto (the "<u>Term DIP Credit Agreement</u>");

(f)     Bank of America, N.A. (the "<u>Prepetition Term Loan Agent</u>"), as administrative agent and collateral agent in connection with the Amended and Restated Credit Agreement, dated as of August 24, 2010 (as amended, novated, supplemented, extended, or restated from time to time) by and among the Prepetition Term Loan Agent, Toys Delaware, as borrower, certain of the borrowers' domestic

---

[1]     Certain Debtors party to this Settlement Agreement may not be Debtors under the Plan (as defined herein). Subject to the terms of this Settlement Agreement and the Term Sheet (as defined herein), all Parties hereto reserve all rights as to any chapter 11 plan or other form of resolution of the chapter 11 cases of any Debtor other than the Debtors under the Plan (as defined herein).

subsidiaries, as guarantors, and the lender parties thereto (the "Secured Term Loan B Credit Agreement");

(g)     an ad hoc group of postpetition vendor administrative claimants, including those parties that executed the Term Sheet, (the "Ad Hoc Vendor Group") holding approximately $100-150 million in asserted postpetition administrative claims that have executed and delivered counterpart signature pages to this Settlement Agreement;

(h)     other administrative claimants whose signature pages are affixed hereto; and

(i)     Bain Capital Private Equity, LP, Kohlberg Kravis Roberts & Co. L.P. and Vornado Realty Trust, and their respective affiliates that are equity owners of Toys Inc. (each of the foregoing, collectively with their respective affiliates (but excluding Toys Inc. and its direct and indirect subsidiaries) and any investment funds or investment holding companies sponsored, organized, formed, managed, or controlled (or caused to be sponsored, organized, formed, managed, or controlled) by such entities, each in their capacities as such, the "Sponsors").

Each of the foregoing are referred to herein as a "Party" and are collectively referred to herein as the "Parties."

## RECITALS

WHEREAS, on September 18, 2017 (the "Petition Date"), the Debtors and certain of their direct and indirect subsidiaries filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Chapter 11 Cases") in the United States Bankruptcy Court for the Eastern District of Virginia (the "Bankruptcy Court"), which Chapter 11 Cases are being jointly administered and are captioned In re Toys "R" Us, Inc., et al., Case No. 17-34665 (KLP);

WHEREAS, on October 24, 2017, the Court entered the Final DIP Financing Order (as defined below), pursuant to which (i) the Debtors stipulated to, among other things, the amount, validity, perfection, enforceability, and priority of the claims and liens of the Prepetition Secured Parties (as defined in the Final DIP Financing Order), and waived and released the Prepetition Secured Parties and their representatives from any claims or causes of action arising prior to the Petition Date, and (ii) all stipulations and releases by the Debtors were binding on all other parties in interest and the Creditors Committee, subject to the Creditors Committee's investigation of such claims and liens of the Prepetition Secured Parties and ability to commence an adversary proceeding or contested matter challenging such claims and liens (the "Challenge Period");

WHEREAS, the Creditors Committee's Challenge Period as it relates to the B-4 Claims and B-4 Lenders under the Final DIP Financing Order was extended by stipulations [Docket Nos. 1772, 2465, 2920, 3282, 3708] through and including August 3, 2018;

WHEREAS, on March 15, 2018, the Debtors filed the *Debtors' Omnibus Motion for Entry of Orders: (I) Authorizing the Debtors to Wind-Down U.S. Operations, (II) Authorizing the*

2

*Debtors to Conduct U.S. Store Closings, (III) Establishing Bidding Procedures for the Sale of the Debtors' Canadian Equity, (IV) Enforcing an Administrative Stay, and (V) Granting Related Relief* [Docket No. 2050] (the "U.S. Wind-Down Motion"), seeking, among other relief, authority to wind down the Debtors' U.S. Operations (the "U.S. Wind-Down");

**WHEREAS**, on March 19, 2018, the Debtors filed the *Debtors' Motion for Entry of an Order (A) Authorizing The North American Debtors' Entry Into Waivers with Respect to ABL/FILO DIP Documents and the Term DIP Documents and (B) Amending Final Order (I) Authorizing the North American Debtors to Obtain Postpetition Financing, (II) Authorizing the North American Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection to the Prepetition Lenders, (V) Modifying the Automatic Stay, and (V) Granting Related Relief* [Docket No. 2189] (the "North American DIP Amendment Motion"), seeking, among other relief, approval of amendments to the Debtors' debtor-in-possession financing documents and modifications to the Debtors' DIP Budget to facilitate the U.S. Wind-Down;

**WHEREAS**, certain parties, including the Creditors Committee and each of the Ad Hoc Vendor Group members, objected to the relief initially sought by the U.S. Wind-Down Motion and the North American DIP Amendment Motion (collectively the "Wind-Down Objections") on various grounds and alleged various claims and causes of action against, among others, the Debtors and their directors, officers, and managers;

**WHEREAS**, on March 22, 2018, the Bankruptcy Court entered the *Order (I) Authorizing the Debtors to Wind-Down U.S. Operations, (II) Authorizing the Debtors to Conduct U.S. Store Closings, (III) Establishing Administrative Claims Procedures, and (IV) Granting Related Relief* [Docket No. 2344] (the "U.S. Wind-Down Order"), granting, in part, the relief requested in the U.S. Wind-Down Motion and resolving objections related to such motion, but reserving all parties' rights related to various claims and matters as set forth in the U.S. Wind-Down Order;

**WHEREAS**, on March 21, 2018, March 27, 2018, and April 13, 2018, the Bankruptcy Court entered interim orders related to the North American DIP Amendment Motion [Docket Nos. 2318, 2427, and 2713] while the Parties worked to resolve the Wind-Down Objections on mutually agreeable terms;

**WHEREAS**, on April 25, 2018, the Bankruptcy Court entered the *Final Order (A) Authorizing The North American Debtors' Entry Into Waivers with Respect to ABL/FILO DIP Documents and the Term Dip Documents and (B) Amending Final Order (I) Authorizing the North American Debtors to Obtain Postpetition Financing, (II) Authorizing the North American Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection to the Prepetition Lenders, (V) Modifying the Automatic Stay, and (V) Granting Related Relief* [Docket No. 2853] (the "North American DIP Amendment Order") granting the North American DIP Amendment Motion;

**WHEREAS**, on May 25, 2018, the Bankruptcy Court entered the *Amended Order (I) Setting a Bar Date for Filing Proofs of Administrative Claims Against Certain Debtors, (II) Establishing Administrative Claims Procedures, (III) Approving the Form and Manner of Filing Proofs of Administrative Claims, (IV) Approving Notice of the Administrative Claim Bar*

3

*Date, and (V) Granting Related Relief* [Docket No. 3260] (the "Administrative Claims Bar Date Order"), setting a bar date for administrative claim holders to file administrative claims;

**WHEREAS**, pursuant to its investigation subject to the Challenge Period under the Final DIP Financing Order, the Creditors Committee identified various alleged claims and causes of action against, among others, the Prepetition Secured Lenders, which claims are contested by such lenders;

**WHEREAS**, the Parties recognize that the outcome of litigation in connection with the U.S. Wind-Down and related matters is uncertain and may cause the Parties to incur significant costs and suffer delay in resolving their disputes, and the Parties seek to avoid the uncertainty, cost, and delay of litigating such disputes and have been, therefore, engaged in good-faith, arm's-length negotiations with each other regarding settlement of such disputes;

**WHEREAS**, on June 14, 2018, certain of the Parties entered into that certain term sheet, attached hereto as **Exhibit A** (the "Term Sheet"), setting forth the key terms of a settlement among the Parties;

**WHEREAS**, the Term Sheet provides that the settlement contemplated thereby is subject to definitive documentation to be negotiated between the Parties;

**WHEREAS**, the Ad-Hoc Group of B-4 Lenders represents that it comprises "Required Lenders" (as such term is defined in the Secured Term Loan B Credit Agreement), and the Prepetition Term Loan Agent's entry into this Settlement Agreement is solely based upon the consent of such Required Lenders to the terms hereof, and, for the avoidance of doubt, the Prepetition Term Loan Agent's entry into this Settlement Agreement shall not in any way be deemed to bind any Prepetition Secured Lender (as defined below) to any term of this Settlement Agreement;

**WHEREAS**, Kramer Levin Naftalis & Frankel LLP, counsel to the Creditors Committee, has authority to execute this Settlement Agreement and any other definitive documentation negotiated between the Parties on behalf of the Creditors Committee;

**WHEREAS**, certain of the members of the Creditors Committee that are holders of asserted Administrative Claims individually support and agree to become Parties to the Settlement Agreement, in each case in their capacity as holders of Administrative Claims; and

**WHEREAS**, the Parties intend to memorialize the settlement proposed in the Term Sheet by entering into this Settlement Agreement.

## AGREEMENT

**NOW, THEREFORE**, in consideration of the above recitals and the promises and mutual covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

## Section 2.        Definitions and Interpretation.

2.1    <u>Definitions</u>.  The following terms shall have the following definitions:

"<u>ABL/FILO DIP Facility</u>" means that certain Superpriority Secured Debtor-In-Possession Credit Agreement, dated as of September 18, 2017 (as amended, novated, supplemented, extended, or restated from time to time), by and among Toys Delaware and Toys Canada, as borrowers, the other guarantors thereto, and JPMorgan Chase Bank, N.A., as administrative agent and collateral agent.

"<u>Ad Hoc Group of B-4 Lenders</u>" has the meaning ascribed to it in the Recitals.

"<u>Ad Hoc Vendor Group</u>" has the meaning ascribed to it in the Recitals.

"<u>Additional Fixed Amount</u>" has the meaning ascribed to it in Section 3.1(c)1.B.

"<u>Administrative Claims Bar Date Order</u>" has the meaning ascribed to it in the Recitals.

"<u>Administrative Claims Distribution Pool</u>" has the meaning ascribed to it in Section 3.1.

"<u>Administrative Claim Holders</u>" has the meaning ascribed to it in Section 3.1.

"<u>Administrative Claims</u>" has the meaning ascribed to it in Section 3.1.

"<u>Allowed</u>" means, with respect to Claims: (a) any Claim, proof of which is timely filed by the applicable bar date or which, pursuant to the Bankruptcy Code or an order of the Bankruptcy Court is not required to be filed; (b) any Claim that is listed in the Debtors schedules and statements as of the Plan Effective Date as neither contingent, unliquidated, nor disputed, and for which no Proof of Claim has been timely filed; or (c) any Claim Allowed pursuant to the Plan; provided, however, that with respect to any Claim described in clause (a) or (b) above, such Claim shall be considered Allowed only if and to the extent that with respect to any Claim no objection to the allowance thereof has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court or such an objection is so interposed and the Claim shall have been Allowed for distribution purposes only by a Final Order.  Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated, or disputed, and for which no Proof of Claim has been timely filed, is not considered Allowed and shall be expunged without further action by the Debtors or the Reorganized Debtors and without any further notice to or action, order or approval of the Bankruptcy Court.

"<u>B-4 Claims</u>" means Claims arising under the Term B-4 Loans.

"<u>B-4 Lenders</u>" means the lenders holding the Term B-4 Loans.

"<u>Bankruptcy Court</u>" has the meaning ascribed to it in the Recitals.

"<u>Causes of Action</u>" means any Claim, cause of action (including any avoidance actions under section 5 of the Bankruptcy Code), controversy, right of setoff, cross-claim, counterclaim,

or recoupment and any claim on contracts or for breaches of duties imposed by law or in equity, demand, right, action, lien, indemnity, guaranty, suit, obligation, liability, damage, judgment, account, defense, power, privilege, license, and franchise of any kind or character whatsoever, known, unknown, fixed or contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity, or pursuant to any other theory of law.

"Chapter 11 Cases" has the meaning ascribed to it in the Recitals.

"Claim" has the meaning set forth in section 101(5) of the Bankruptcy Code, and shall also include any motion, application, or action seeking "surcharge" under section 506(c) of the Bankruptcy Code or application of the "equities of the case" doctrine under section 552(b) of the Bankruptcy Code.

"Creditors Committee" has the meaning ascribed to it in the Preamble.

"D&O Claims" has the meaning ascribed to it in Section 3.2(c).

"D&O Party" has the meaning ascribed to it in Section 3.2(c).

"Debtor" has the meaning ascribed to it in the Preamble.

"Disclosure Statement" means a disclosure statement approved by the Bankruptcy Court as containing adequate information with respect to the Plan pursuant to section 1125 of the Bankruptcy Code, and otherwise in form and substance reasonably acceptable to the Creditors Committee, the Sponsors, the Ad Hoc Group of B-4 Lenders, and the Ad Hoc Vendor Group.

"DIP Lenders" has the meaning ascribed to it in the Final DIP Financing Order.

"Emeryville Property" means that certain property located at 3938 Horton Street, Emeryville, California.

"Final DIP Financing Order" means the *Final Order (I) Authorizing the North American Debtors to Obtain Postpetition Financing, (II) Authorizing the North American Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection to the Prepetition Lenders, (V) Modifying the Automatic Stay, and (V) Granting Related Relief* [Docket No. 711] as amended by the North American DIP Amendment Order.

"Fixed Amounts" has the meaning ascribed to it in Section 3.1(c)1.B.

"Geoffrey Debtors" has the meaning ascribed to it in the Preamble.

"Initial Fixed Amount" has the meaning ascribed to it in Section 3.1(c)1.A.

"Merchandise Reserve" has the meaning ascribed to it in the North American DIP Amendment Order.

"<u>Non-Debtor Released Parties</u>" means (a) the Creditors Committee and its members, (b) each member of the Ad Hoc Vendor Group, (c) the Term DIP Agent, (d) each member of the Ad Hoc Group of B-4 Lenders (whether as a Prepetition Secured Lender or as a Term DIP Lender), (e) each of the other lender parties hereto, (f) each of the other administrative creditors party hereto, (g) the Prepetition Term Loan Agent, (h) each of the Sponsors, (i) all holders of Administrative Claims at Toys Delaware that do not affirmatively opt-out of participating in the Administrative Claims Distribution Pool, in each case in their respective capacities as such, and (j) for each of those persons' or entities' identified in (a)-(i) above, such parties non-Debtor affiliates and its and their respective, directors, officers, agents, advisors, or professionals; *provided, however,* notwithstanding the foregoing, no directors, officers, or managers of any of the Debtors, including any directors, officers, or managers affiliated with or designated by any of the Sponsors, in each case in their respective capacities as such, shall be "Non-Debtor Released Parties" under this Settlement Agreement.

"<u>Non-Debtor Releasing Parties</u>" means (a) the Creditors Committee and its members, (b) each member of the Ad Hoc Vendor Group, (c) the Term DIP Agent, (d) each member of the Ad Hoc Group of B-4 Lenders, (e) each of the other lender parties hereto, (f) the Prepetition Term Loan Agent, (g) each of the Sponsors and (h) all holders of Administrative Claims at Toys Delaware other than those that affirmatively opt-out of participating in the Administrative Claims Distribution Pool, in each case on behalf of themselves and their respective successors, assigns, and representatives, in each case in their respective capacities as such.

"<u>Non-Released Claims</u>" has the meaning ascribed to it in Section 3.2(b).

"<u>Non-Released Claims Trust</u>" means that certain trust formed pursuant to Section 3.2 hereof for the purpose of administrating the Non-Released Claims.

"<u>Non-Released Claims Trust Manager</u>" has the meaning ascribed to it in Section 3.2(a).

"<u>Non-Released Claims Trust Oversight Committee</u>" has the meaning ascribed to it in Section 3.2(a).

"<u>North American DIP Amendment Motion</u>" has the meaning ascribed to it in the Recitals.

"<u>North American DIP Amendment Order</u>" has the meaning ascribed to it in the Recitals.

"<u>Party</u>" or "<u>Parties</u>" have the meanings ascribed to them in the Preamble.

"<u>Permitted Transfer</u>" has the meaning ascribed to it in Section 4.15.

"<u>Permitted Transferee</u>" has the meaning ascribed to it in Section 4.15.

"<u>Petition Date</u>" has the meaning ascribed to it in the Recitals.

"Plan" means a chapter 11 plan to be filed by certain of the Debtors[2] in the Chapter 11 Cases consistent in all respects with the terms of this Settlement Agreement, including, without limitation, the release, exculpation, and injunction provisions set forth herein, and otherwise in form and substance reasonably acceptable to the Creditors Committee and its members that are party hereto in their individual capacity, the Sponsors, the members of the Ad Hoc Group of B-4 Lenders, and the members of the Ad Hoc Vendor Group.

"Plan Effective Date" means the effective date of the Plan.

"Prepetition Secured Lenders" means all current, former, and future lenders under the Term B-2 Loans, Term B-3 Loans, and Term B-4 Loans.

"Prepetition Secured Parties" means, collectively, the Prepetition Secured Lenders and the Prepetition Term Loan Agent.

"Prepetition Term Loan Agent" has the meaning ascribed to it in the Preamble.

"Qualified Marketmaker" means an entity that (a) holds itself out to the public or the applicable private markets as standing ready in the ordinary course of business to purchase from customers and sell to customers claims against the Company (or enter with customers into long and short positions in claims against the Company), in its capacity as a dealer or market maker in claims against the Company and (b) is, in fact, regularly in the business of making a market in claims against issuers or borrowers (including debt securities or other debt).

"Releases" means those releases contemplated by Section 3.4

"Secured Term Loan B Credit Agreement" has the meaning ascribed to it in the Preamble.

"Settlement Agreement" has the meaning ascribed to it in the Preamble.

"Settlement Approval Motion" has the meaning ascribed to it in Section 3.3(a)1.

"Settlement Effective Date" has the meaning ascribed to it in Section 4.1.

"Settlement Order" means an order of the Bankruptcy Court approving this Settlement Agreement and the compromise and settlement memorialized herein among the Parties pursuant to Rule 9019(a) of the Bankruptcy Rules, which Settlement Order shall be consistent with this Settlement Agreement in all respects and otherwise in form and substance reasonably acceptable to the Creditors Committee and its members, the members of the Ad Hoc Group of B-4 Lenders, the Prepetition Term Loan Agent, the Sponsors, and the members of the Ad Hoc Vendor Group, and will be binding on the Parties regardless of whether the cases proceed in Chapter 11 or in Chapter 7 (in which case they will be binding on the Chapter 7 trustee (if any)), or are otherwise disposed of or dismissed.

---

[2]   As of the date hereof, all Debtors hereto with the exception of Toys Inc. and Wayne are contemplated to be party to the Plan.

"Solicitation Materials" means, collectively, the Disclosure Statement and the other solicitation materials in respect of the Plan, as approved by the Bankruptcy Court.

"Sponsors" has the meaning ascribed to it in the Preamble.

"Term B-2 Loans" means the B-2 term loans maturing on May 25, 2018 provided for by the Secured Term Loan B Credit Agreement.

"Term B-3 Loans" means the B-3 term loans maturing on May 25, 2018 provided for by the Secured Term Loan B Credit Agreement.

"Term B-4 Loans" means B-4 term loans maturing on April 24, 2020 provided for by the Secured Term Loan B Credit Agreement.

"Term DIP Credit Agreement" has the meaning ascribed to it in the Preamble.

"Term DIP Facility" means loans made under the Term DIP Credit Agreement.

"Term DIP Lenders" means lenders under that certain Debtor-in-Possession Credit Agreement, dated as of September 18, 2017 (as amended, novated, supplemented, extended, or restated from time to time), by and among Toys Delaware, as borrower, and NexBank SSB, as administrative agent and collateral agent.

"Term Loan Wind-Down Carve Out" has the meaning ascribed to it in the North American DIP Amendment Order.

"Term Sheet" has the meaning ascribed to it in the Recitals.

"Toys Delaware" has the meaning ascribed to it in the Preamble.

"Toys Inc." has the meaning ascribed to it in the Preamble.

"Transfer" has the meaning ascribed to it in Section 4.15.

"U.S. Wind-Down" has the meaning ascribed to it in the Recitals.

"U.S. Wind-Down Motion" has the meaning ascribed to it in the Recitals.

"U.S. Wind-Down Order" has the meaning ascribed to it in the Recitals.

"Wayne" has the meaning ascribed to it in the Preamble.

"Wind-Down Budget" has the meaning ascribed to it in the North American DIP Amendment Order.

"Wind-Down Objections" has the meaning ascribed to it in the Recitals.

2.2    Interpretation.  For the purposes of this Settlement Agreement:

(a)     in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender;

(b)     capitalized terms defined only in the plural or singular form shall nonetheless have their defined meanings when used in the opposite form;

(c)     unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions;

(d)     unless otherwise specified, any reference herein to an existing document, schedule, or exhibit shall mean such document, schedule, or exhibit, as it may have been or may be amended, restated, supplemented, or otherwise modified from time to time; provided that any capitalized terms herein which are defined with reference to another agreement, are defined with reference to such other agreement as of the date of this Settlement Agreement, without giving effect to any termination of such other agreement or amendments to such capitalized terms in any such other agreement following the date hereof;

(e)     unless otherwise specified, all references herein to "Sections" are references to Sections of this Settlement Agreement;

(f)     the words "herein," "hereof," and "hereto" refer to this Settlement Agreement in its entirety rather than to any particular portion of this Settlement Agreement;

(g)     captions and headings to Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation or construction of this Settlement Agreement;

(h)     references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable laws and in proper context; and

(i)     the use of "include" or "including" is without limitation, whether stated or not.

**Section 3.    Settlement Terms**

3.1    Economic Terms.

(a)     Except as provided in Section 3.1(c)1 with respect to the Initial Fixed Amount, Toys Delaware shall repay all remaining amounts owing under the Term DIP Facility prior to making any other distributions, including distributions into the Administrative Claims Distribution Pool (as defined below).    The Term DIP

Agent and all other Parties reserve all rights regarding the amounts owing under the Term DIP Facility.[3]

(b)    After repayment in full of all amounts owing under the Term DIP Facility, the Prepetition Secured Lenders—on account of their adequate protection and other Claims—will receive all remaining value in the estate of Toys Delaware, other than as expressly set forth in this Settlement Agreement.[4]    This Settlement Agreement constitutes a resolution of any and all objections of the Toys Delaware estate (including the Creditors' Committee on behalf of the estate) and any other Parties hereto to the claims of the Prepetition Secured Lenders.  Upon approval of this Settlement Agreement and subject to the funding of the Administrative Claims Distribution Pool in the amounts set forth below:   (i) the adequate protection claims of the Prepetition Secured Lenders under paragraph 18 of the Final DIP Financing Order shall exceed in size and amount the fair market value of all assets in the Toys Delaware estate that will remain following repayment in full of the Term DIP Facility, including all assets that were unencumbered as of the Petition Date but pledged to the Prepetition Secured Lenders to secure their adequate protection claims; and (ii) accordingly, the Prepetition Secured Parties shall have valid and perfected liens under the Final DIP Financing Order on all assets in the Toys Delaware estate other than amounts funded into the Administrative Claims Distribution Pool, as well as super-priority administrative claims against all such assets under the Final DIP Financing Order and section 507(b) of the Bankruptcy Code.  Notwithstanding any other provision of this Settlement Agreement, and for the avoidance of doubt, the allocation of recoveries and value among Prepetition Secured Lenders under the Term B-2 Loans, Term B-3 Loans, and Term B-4 Loans on account of their funded debt and adequate protection claims shall be determined in accordance with applicable contractual provisions or applicable law and is not affected or altered by this Settlement Agreement.  All arguments regarding such allocation are expressly reserved, including any arguments by the B-4 Lenders that they are entitled to a greater than pro rata share of Toys Delaware's remaining assets due to the pledge in their favor of Toys Delaware's equity interest in Toys "R" Us Canada Ltd.

(c)    The following consideration (collectively, the "Administrative Claims Distribution Pool") will be included in the Term Loan Wind-Down Carve Out and made available, subject to the repayment of the ABL/FILO DIP Facility and the Term DIP Facility as set forth below, only to (i) all merchandise vendors who have unpaid administrative claims arising under sections 503(b)(1) and 503(b)(9) of the Bankruptcy Code and for agreed to, but unpaid, critical vendor payments, in all such cases arising out of ordinary course sales of goods or provision of

---

[3]    Nothing in this Agreement affects or alters the amounts owed under the Term Dip Facility, which had an original principal amount of $450 million.

[4]    For the avoidance of doubt, nothing in this Settlement Agreement shall alter or modify the ABL Wind-Down Carve Out, the Term Loan Wind-Down Carve Out, or the Carve Out, as applicable (each as defined in the North American DIP Amendment Order).

services to Toys Delaware for the value of such goods and services, and (ii) holders of other unpaid Administrative Claims (including merchandise vendors) not otherwise accounted for in the Wind-Down Budget (excluding, for the avoidance of doubt, professional fee claims and adequate protection claims) (collectively, the "<u>Administrative Claim Holders</u>" and the Allowed Claims held by such Administrative Claim Holders, the "<u>Administrative Claims</u>"), free and clear of liens, claims, and encumbrances, except as provided herein.

1.    <u>Fixed Amounts</u>:

A.    After the repayment of the ABL/FILO DIP Facility, a fixed amount equal to $160 million (the "<u>Initial Fixed Amount</u>"), which shall include amounts required to be funded into the Merchandise Reserve pursuant to the DIP Amendment Order [Docket No. 2853], shall be transferred to the Administrative Claims Distribution Pool by no later than August 31, 2018, *provided that*, if this Settlement Agreement has not been approved by the Court by August 31, 2018, the Initial Fixed Amount shall be set aside on such date and transferred to the Administrative Claims Distribution Pool promptly upon such Court approval.[5]

B.    After the repayment in full of the ABL/FILO DIP Facility and the Term DIP Facility, the first $20 million of proceeds from the liquidation of any assets held by Toys Delaware (the "<u>Additional Fixed Amount</u>," and, together with the Initial Fixed Amount, the "<u>Fixed Amounts</u>") shall be transferred by Toys Delaware to the Administrative Claims Distribution Pool as soon as practicable following approval of this Settlement Agreement and before any distributions are made to the Prepetition Secured Lenders.

C.    The Fixed Amounts will not be subject to any increases, offsets, discounts, or reductions.

D.    The obligation to fund the Administrative Claims Distribution Pool with the Fixed Amounts, as well as other agreements herein regarding allocation of value, including the allocation of value to the Term DIP Lenders and the Prepetition Secured Lenders, shall not be affected by any subsequent events during the Chapter 11 Cases, including without limitation, any conversion or dismissal of the Chapter 11 Cases, the appointment of any trustee under chapter 7 or chapter 11 of the Bankruptcy Code, or any subsequent Event of Default under the Term DIP Facility or any covenant breaches under such facility.

---

[5]    For the avoidance of doubt, in the event this Settlement Agreement is not approved by the Court, the Debtors remain obligated under the North American DIP Amendment Order to calculate and fund the full amount of the Merchandise Reserve as set forth in the North American DIP Amendment Order.

2.    <u>Contingent Amounts</u>:   Once the aggregate postpetition recovery of all
B-4 Lenders from Toys Delaware and Wayne reaches 50% of the face
amount of the approximately $1.03 billion in aggregate B-4 Claims
(principal plus accrued interest) as of the Petition Date (for the avoidance
of doubt, after giving effect to applicable distributions on account of Term
B-2 Loans and Term B-3 Loans):  (i) the Prepetition Secured Lenders will
receive 50% of any further recoveries from Toys Delaware and the
remaining 50% will be distributed to the Administrative Claims
Distribution Pool; and  (ii) subject to the last two sentences of
Section 3.1(b) hereof, the B-4 Lenders will receive 50% of any further
recoveries from Wayne and the remaining 50% will be distributed to the
Administrative Claims Distribution Pool.  For purposes of this paragraph:

A.    the aggregate recoveries of the B-4 Lenders (referenced above)
shall include the approximately $27.7 million in total adequate
protection payments made to them under paragraph 18(d) of the
Final DIP Financing Order, but shall not include any fees or
expenses paid to any advisors under the Final DIP Financing Order
or otherwise, and, for the avoidance of doubt, shall exclude any
recoveries from the Geoffrey Debtors or any other sources besides
Toys Delaware and Wayne;

B.    the aggregate recoveries of the B-4 Lenders shall include (i) any
recoveries of the B-4 Lenders from Toys Delaware or Wayne on
account of distributions received by either of those Debtors on
account of equity interests held by Toys Delaware or Wayne in any
other Debtor or non-Debtor entities or affiliates (but excluding, for
the avoidance of doubt, any recoveries resulting from any credit
bid of the Prepetition Secured Lenders for the equity of Geoffrey
Holdings, LLC or any other Geoffrey Debtor), (ii) proceeds
distributed to the B-4 Lenders from any Claims or Causes of
Action of Toys Delaware (whether against affiliated debtors or
others) seeking to recover the value or proceeds of the sale of the
Emeryville Property, and (iii) proceeds from the Non-Released
Claims Trust allocated and distributed to the B-4 Lenders as set
forth in Section 3.2(e) hereof;

C.    any non-cash consideration distributed to the B-4 Lenders (whether
directly or indirectly, including through a liquidating trust or other
entity of which the B-4 Lenders may be beneficiaries or holders)
shall be valued at its fair market value as of the date of such
distribution and not any cash that may be received on account of
such non-cash consideration at any later date;

D.    the fair market value at the time of distribution of any direct or
indirect equity interest (or interest in any entity that holds a direct
or indirect equity interest) in one or more Debtors, or any

13

non-debtor subsidiary, shall be determined by the valuation included in the applicable Debtor's chapter 11 plan, disclosure statement, or by any applicable order of the Bankruptcy Court (and, if applicable, at the mid-point of any range of values in such plan, disclosure statement, or order) and shall not include any cash that may be received on account of such interest at any later date; for the avoidance of doubt, the value to Toys Delaware and the B-4 Lenders of any direct or indirect equity interests (or other recovery) they receive or retain in the TRU Taj Debtors or their subsidiaries, through intercompany claims against Toys Inc. or otherwise, shall thus be determined by the plan, disclosure statement, or confirmation or other order for the Debtor (including Toys "R" Us, Europe, LLC, if applicable) that distributes or allocates such equity (or other recovery) on account of such claims or interests.

3.      <u>Residual Amounts</u>.  In the event that the Prepetition Secured Lenders receive payment in full—including of all principal amounts outstanding as of the Petition Date, plus any Allowed Claims for postpetition interest and any other contractually owed amounts—on their Claims via cash or non-cash consideration under any chapter 11 plan or other disposition of any of the Debtors' assets or cases, all other proceeds of the Toys Delaware liquidation will be distributed (i) first to holders of all Administrative Claims in the Chapter 11 Cases until such Claims are paid in full, and (ii) then to holders of Allowed general unsecured Claims.  For purposes of determining whether the Prepetition Secured Lenders receive payment in full in connection with the Debtors' cases, any non-cash consideration (including direct or indirect equity interests) distributed by or recovered from any of the Debtors shall be valued as set forth in Section 3.1(c)2 above.

3.2    <u>Non-Released Claims Trust</u>.

(a)    <u>Control</u>.  A manager (the "<u>Non-Released Claims Trust Manager</u>") shall control the actions and decisions of the Non-Released Claims Trust, which shall be consistent with this Settlement Agreement.  Prior to making material decisions on behalf of the Non-Released Claims Trust, the Non-Released Claims Trust Manager shall consult with an oversight committee consisting of three members (collectively, the "<u>Non-Released Claims Trust Oversight Committee</u>").  The members of the Non-Released Claim Trust Oversight Committee shall be appointed: (i) one by the Creditors' Committee, (ii) one by the Ad Hoc Vendor Group, and (iii) one by the Ad Hoc Group of B-4 Lenders.  The Non-Released Claims Trust Manager shall be selected by the Creditors' Committee, with the consent of the Ad Hoc Vendor Group and the Ad Hoc Group of B-4 Lenders. The identity of the Non-Released Claims Trust Manager and the members of the Non-Released Claims Trust Oversight Committee shall be disclosed prior to the hearing on the Settlement Agreement.

14

(b)    <u>Non-Released Claims</u>.  Any causes of action held by Toys Delaware, Toys Inc., or their respective estates against the Debtors' directors, officers, or managers (including any Sponsor-affiliated directors, officers, or managers) that are not released pursuant to this Settlement Agreement, and any avoidance actions (including under chapter 5 of the Bankruptcy Code or any state law equivalents) held by Toys Delaware or Toys Inc. or their respective estates (including avoidance actions held by Toys Delaware or Toys Inc. against other Debtors or their direct or indirect subsidiaries but excluding, for the avoidance of doubt, any other intercompany Claims between or among any of the Debtors and their direct or indirect subsidiaries) that are not released pursuant to this Settlement Agreement (collectively, the "<u>Non-Released Claims</u>"), including any preference claims against non-insiders not otherwise released herein, shall be assigned and transferred to the Non-Released Claims Trust, in each case subject to the terms set forth herein.  The Non-Released Claims Trust shall be a successor to the Debtors' rights, title, and interest in any Non-Released Claims, and the Non-Released Claims Trust shall have standing to pursue the Non-Released Claims.[6]

(c)    <u>Claims Against Debtors' Directors, Officers, or Managers</u>.  All Claims or Causes of Action, if any, held by Toys Inc. and Toys Delaware, and their respective estates or creditors against the Debtors' directors, officers, or managers (including any Sponsor-affiliated directors, officers, or managers) in their respective capacities as such are preserved (such claims the "<u>D&O Claims</u>" and each such party in its capacity as such, a "<u>D&O Party</u>"), and shall be transferred and/or assigned to the Non-Released Claims Trust, *provided* that the Parties hereto covenant that: (i) any recovery by the Non-Released Claims Trust (and the beneficiaries thereof) on account of any D&O Claim, including in each case by way of settlement or judgment, shall be satisfied solely by and to the extent of the proceeds of the Debtors' available D&O liability insurance policies, including any tail policies (the "<u>D&O Insurance Policies</u>"), after payment from such D&O Insurance Policies of any and all covered costs and expenses incurred by any of the D&O Parties in connection with the defense of the D&O Claims; (ii) any party, including any trustee or any beneficiary of the Non-Released Claims Trust, seeking to execute, garnish, or otherwise attempt to collect on any settlement of or judgment in the D&O Claims shall do so solely upon available insurance coverage; (iii) no party shall (a) record any judgment against any D&O Party, or (b) otherwise attempt to collect, directly or indirectly, from the personal assets of any D&O Party.  Only upon the occurrence of the earlier of (x) a release being given as part of any later settlement of the D&O Claims; (y) final resolution of any coverage claims asserted against the Debtors' available D&O Insurance Policies on account of the D&O Claims; or (z) exhaustion of the available

---

[6]    To the extent any Non-Released Claims cannot be transferred to the Non-Released Claims Trust because of a restriction on transferability under applicable non-bankruptcy law that is not superseded or preempted by the Bankruptcy Code, such Non-Released Claims shall be deemed to be retained by the Debtors and the Non-Released Claims Trust shall be deemed to have been designated as a representative of the Debtors pursuant to section 1123(b)(3)(B) of the Bankruptcy Code to enforce and pursue such Non-Released Claims on behalf of the Debtors to the extent set forth herein.

insurance coverage under the D&O Insurance Policies, the D&O Claims shall be released and discharged without the need for further action or Bankruptcy Court order.  For the avoidance of doubt, any release of the D&O Claims shall not become effective until one of the three conditions stated in the preceding sentence above has been met.  The Debtors will seek a finding in the Settlement Order that the D&O Insurance Policies are in full force and effect as of the date of such Settlement Order.

(d)     Funding.  The Non-Released Claims Trust shall be funded in the initial amount of $5.0 million in order to fund the costs of pursuing and litigating the D&O Claims as set forth herein, which funding will come solely from the Administrative Claims Distribution Pool (or from third-parties who fund such trust pursuant to an agreement with the Non-Released Claim Trust Manager) and will not come from the DIP Term Lenders' or Prepetition Secured Lenders' collateral or recoveries.

(e)     Distribution of Proceeds.

1.     Subject to Section 3.2(k) below, the proceeds of the settlement or litigation of any Non-Released Claims or D&O Claims in the Non-Released Claims Trust shall be distributed:

A.     first, to the Administrative Claims Distribution Pool until the amount provided to fund the Non-Released Claims Trust provided in Section 3.2(d) has been recovered, and

B.     thereafter, 80% to the Administrative Claims Distribution Pool, and 20% to the Prepetition Secured Lenders.

2.     Consideration allocated to the Administrative Claims Distribution Pool shall be placed in a segregated account held and controlled by Toys Delaware (*provided, however,* that for the avoidance of doubt, Toys Delaware shall not have any economic interest in the funds in the Administrative Claims Distribution Pool and shall hold such account solely for administrative purposes) or another person or entity determined by Toys Delaware, as agreed to by the Parties, and shall be distributed only to Administrative Claims Holders of Toys Delaware.

3.     Notwithstanding the above, for the avoidance of doubt, any Claims or Causes of Action of Toys Delaware (whether against affiliated debtors or others) seeking to recover the value or proceeds of the sale of the Emeryville Property will not be transferred to the Non-Released Claims Trust; such Claims or Causes of Action will be funded by, or from Debtor assets allocable to, either the Term DIP Lenders or the Prepetition Secured Lenders, as applicable, and will not be funded out of the Administrative Claims Distribution Pool, and the proceeds of such Claims or Causes of Action will be deemed to be recoveries from Toys Delaware and distributed to the Term DIP Lenders or Prepetition Secured Lenders along

16

with other Toys Delaware property, subject only to the contingent sharing provision Section 3.1(c)2. Such Claims or Causes of Action shall, at the option of Toys Delaware in consultation with the Term DIP Lenders and/or Prepetition Secured Lenders, be transferrable to a separate trust for the benefit of the DIP Lenders and/or Prepetition Secured Lenders.

(f)    Pro Rata Distribution Finding.  The Debtors, the Creditors Committee, and the Ad Hoc Group of B-4 Lenders agree to support the pro rata distribution of the funds in the Administrative Claims Distribution Pool as contemplated by this Settlement Agreement.  The Parties will seek a finding in the Settlement Order that no party shall have liability, including to any creditor, solely because of the Parties' agreement to provide for a pro rata distribution of the Administrative Claims Distribution Pool to all Administrative Claims Holders.  Nothing in this paragraph shall be construed to or is intended to release any Debtor from liability for any Administrative Claims, except as expressly stated herein.

(g)    D&O Party Obligations.  For the avoidance of doubt, (i) all Claims and Causes of Action against the D&O Parties are expressly preserved hereunder (to the extent set forth herein, including Section 3.2(c)) and are not being released or settled by the Debtors and (ii) the treatment of the D&O Claims described herein is a contractual obligation solely under this Settlement Agreement and is not a release or waiver of any Claims against any D&O Party (except as set forth herein).  Nothing herein or in the Term Sheet shall be construed as an admission of liability or an agreement to settle any D&O Claims, and the D&O Parties deny any liability with respect to the Non-Released Claims.  Each of the D&O Parties shall cooperate with their insurance carriers in connection with the defense of any Non-Released Claims pursued by the Non-Released Claims Trust against such D&O Parties and will fulfill all contractual obligations in such insurance policies.

(h)    Good Faith.  The treatment of the Non-Released Claims and the D&O Claims described herein was negotiated by the Parties in good faith and at arm's-length, and there was no collusion in the negotiation of the treatment of the D&O Claims or any other terms of this Settlement Agreement or the Term Sheet.

(i)    Document Retention.  The Debtors and the Debtors' officers, directors, and managers shall retain and preserve any documents, information (including electronically stored information), and other evidence potentially relevant to any Non-Released Claims and D&O Claims (or Claims of the Geoffrey Debtors) and will not knowingly or intentionally, after the good faith exercise of reasonable diligence and inquiry, take any action to compromise or interfere with, or knowingly or intentionally, after the good faith exercise of reasonable diligence and inquiry, fail to take any action if such failure would knowingly or intentionally, after the good faith exercise of reasonable diligence and inquiry, jeopardize, compromise, or interfere with, insurance coverage applicable to such Claims and Causes of Action.  For the avoidance of doubt, neither the Debtors nor any other possible target of the Non-Released Claims or D&O Claims (or Claims of the Geoffrey Debtors) shall have any obligation to provide any documents,

17

information, or other evidence protected by the attorney-client privilege or work product doctrine, absent further order of the court.

(j)    <u>Coordination and Sharing with Geoffrey Debtors</u>.

1.    To the extent any Claims or Causes of Action of the Geoffrey Debtors are not otherwise resolved in connection with any chapter 11 plan or sale of the assets of TRU Taj LLC, the Geoffrey Debtors and the Non-Released Claims Trust will coordinate with respect to the Non-Released Claims as set forth herein.

2.    Prior to taking any action to pursue any Non-Released Claim(s) (whether by litigation, settlement, or otherwise) held by the Non-Released Claim Trust or any Claims of the Geoffrey Debtors against the D&O Parties, the Geoffrey Debtors or the Non-Released Claim Trust Manager, as applicable (the "<u>Noticing Party</u>"), shall provide ten business days' notice to the other party (the "<u>Noticed Party</u>") of (i) the Claims it intends to pursue and (ii) other pertinent information reasonably requested by the Noticed Party.

3.    The proceeds of any judgement or settlement of any Claims or Causes of Action against the D&O Parties from any applicable D&O liability insurance policies shall be held in escrow and, absent agreement between the Geoffrey Debtors and the Non-Released Claim Trust Manager, shall not be distributed to either the Geoffrey Debtors or the beneficiaries of the Non-Released Claims Trust prior to the resolution of all Claims or Causes of Action against the D&O Parties pursued by the Geoffrey Debtors or the Non-Released Claims Trust.  To the extent the amount of any judgment or settlement of Claims or Causes of Action against the D&O Parties exceeds the amount of available D&O liability insurance, the proceeds shall be distributed to the Geoffrey Debtors and the Non-Released Claims Trust on a pro rata basis based on the settlement and/or judgment amounts of the Claims or Causes of Action, absent further agreement between the Geoffrey Debtors and the Non-Released Claim Trust Manager.

(k)    <u>Unresolved Non-Released Claims Held by Toys Inc</u>.

1.    The allocation or sharing of recoveries from any Non-Released Claims and/or D&O Claims held by or allocable to Toys Inc. among creditors of Toys Inc. (other than Toys Delaware or its estate) and the beneficiaries of the Non-Released Claims Trust shall be determined (i) in connection with any confirmation of a chapter 11 plan for Toys, Inc. or other negotiated resolution of the Toys, Inc. chapter 11 cases among the Parties hereto, the disinterested directors for Toys, Inc. and Toys Delaware, and the trustee for the Toys Inc. unsecured notes, or (ii) by further order of the Court.

3.3   <u>Commitments Regarding Implementation of the Settlement Agreement</u>.

(a)   The Debtors shall use good faith efforts to implement this Settlement Agreement and the disposition of the Debtors' chapter 11 cases on the agreed terms set forth herein, including:

     1.   filing a motion consistent with this Settlement Agreement and otherwise in a form reasonably acceptable to the Parties (the "<u>Settlement Approval Motion</u>") with the Bankruptcy Court seeking (i) approval of this Settlement Agreement pursuant to Rule 9019(a) of the Bankruptcy Rules, (ii) a substantial contribution claim, solely as and to the extent set forth herein, and (iii) waiver of any stay of the Settlement Order pursuant to Rule 6004(h) of the Bankruptcy Rules to be heard by the Bankruptcy Court on or prior to August 7, 2018;

     2.   seeking entry of an order, which shall be consistent with this Settlement Agreement and otherwise in a form reasonably acceptable to the Parties, by September 30, 2018 confirming the Plan, or, if necessary, seeking a structured dismissal as contemplated herein, and taking all actions reasonably necessary to obtain such relief; and

     3.   not taking any action inconsistent with this Settlement Agreement, including entry into any agreement to pursue any auction, sale process, or restructuring transaction for the Debtors inconsistent with this Settlement Agreement.

(b)   The chapter 11 Plan filed by Toys Delaware shall provide that, except to the extent that proceeds of the Toys Delaware liquidation are required to be transferred to the Administrative Claims Distribution Pool or applied to the Term DIP Loan, all proceeds of the Toys Delaware liquidation shall be transferred to the Prepetition Secured Parties on the Plan Effective Date. In the event that the Debtors, the Creditors Committee, the Ad Hoc Vendor Group, or the Ad Hoc Group of B-4 Lenders conclude prior to the confirmation hearing, based on formal or informal objections to the Disclosure Statement or Plan that denial of confirmation is reasonably likely, the Debtors (with the support of the Ad Hoc Group of B-4 Lenders, the Creditors Committee, and the Ad Hoc Vendor Group) will use reasonable best efforts to submit a motion to dismiss the Toys Delaware Chapter 11 Case to be considered as soon as practicable after denial of confirmation, including at the confirmation hearing, if possible. The terms of this Settlement Agreement, including all provisions relating to allocation and distribution of the assets and value of Toys Delaware and the preservation of Claims and Causes of Action as set forth herein, shall be preserved and effectuated (to the extent not already effectuated) in the proposed order of dismissal, which shall further provide that the Bankruptcy Court shall retain jurisdiction to enforce the Settlement Agreement.

(c)     The proposed Settlement Order shall provide that, upon approval of this Settlement Agreement, payment in full of the Term DIP Loan and the transfer to the Administrative Claims Distribution Pool of the Fixed Amounts set forth in Section 3.1 hereof, Toys Delaware is authorized and directed, without further order of the Court, to distribute cash in the Administrative Claims Distribution Pool to Administrative Claim Holders and other cash held by Toys Delaware to the Prepetition Secured Lenders on account of their secured and super-priority administrative claims. The Debtors (including, for the avoidance of doubt, any trustee of Toys Delaware) will cooperate with the Ad Hoc Group of B-4 Lenders and the Prepetition Term Loan Agent to facilitate the distribution to the Prepetition Secured Lenders, with minimum delay, of all cash in the Toys Delaware estate not required to be transferred to the Administrative Claims Distribution Pool or otherwise payable to professionals or other third parties under the Wind-Down Budget. In the event that any such distribution to the Prepetition Secured Lenders requires a further order of the Court, Toys Delaware (including, for the avoidance of doubt, any trustee or other successor) will act promptly to seek and obtain such further order, including (if requested by the Ad Hoc Group of B-4 Lenders) a consensual order granting relief from the automatic stay to effectuate the transfer of cash held by Toys Delaware to the Prepetition Secured Lenders.

(d)     All Parties, including the Debtors, will reasonably cooperate to facilitate an initial distribution to Administrative Claim Holders from the Administrative Claims Distribution Pool, as well as an initial distribution to the Prepetition Secured Lenders from the remaining assets of Toys Delaware, by the earlier of the Effective Date of the Plan or September 30, 2018. The initial distribution to the Prepetition Secured Lenders shall include all cash assets held at the time by Toys Delaware (following the transfer of the Fixed Amounts as set forth in Section 3.1(c)1 into the Administrative Claims Distribution Pool), but will not include such assets reasonably projected to be necessary to pay Toys Delaware's unpaid costs and expenses under the Wind-Down Budget.

(e)     Provided that the Debtors are not in breach of this Settlement Agreement, the non-Debtor Parties shall (severally and not jointly):

      1.     use good faith efforts to implement this Settlement Agreement and the transactions and other actions contemplated hereby including confirmation of the Plan or, if necessary, approval of a structured dismissal incorporating the terms of this Settlement Agreement, including all releases and provisions relating to value allocation;

      2.     support and take all commercially reasonable actions necessary or reasonably requested by the Debtors to facilitate confirmation of the Plan or, if necessary, approval of a structured dismissal as contemplated hereby, including support for any motion by the Debtors filed with the Bankruptcy Court seeking to extend the exclusive periods to file and solicit a plan under section 1121 of the Bankruptcy Code, and to the extent

a class is permitted to vote to accept or reject the Plan and upon and subject to receipt of a disclosure statement that has been approved by the Bankruptcy Court, vote each of its Claims (including, for the avoidance of doubt, any Claims acquired after the Settlement Effective Date by any Party) to (A) accept the Plan by delivering its duly executed and completed ballot(s) accepting the Plan on a timely basis and (B) not withdraw, amend, or revoke (or cause to be withdrawn, amended, or revoked) its vote with respect to the Plan;

3. support the confirmation of the Plan or, if necessary, structured dismissal and the transactions contemplated therein and approval of the Disclosure Statement and the Solicitation Materials related to the Plan;[7]

4. not (i) object to, delay, interfere, impede, or take any other action to delay, interfere, or impede, directly or indirectly, with the confirmation of the Plan, or approval of the Disclosure Statement or the Solicitation Materials (including joining in or supporting any efforts to object to or oppose any of the foregoing) or (ii) propose, file, support, or vote for, directly or indirectly, any restructuring, workout, plan of arrangement, alternative transaction, including a sale pursuant to section 363 of the Bankruptcy Code, or chapter 11 plan for the Debtors other than the Plan;

5. support and take all commercially reasonable actions necessary to ensure that any and all assets or value of the Debtors, including Toys Delaware and the Geoffrey Debtors, shall be sold, allocated, and/or distributed as soon as practicable in accordance with the agreements and commitments in this Settlement Agreement, whether under the Plan or otherwise;

6. not, nor encourage any other person or entity to, take any action, including (i) initiating or joining in any legal proceeding that is inconsistent with this Settlement Agreement and the allocation and distribution of assets and value set forth in this Settlement Agreement or (ii) delaying, impeding, appealing, or taking any other action, directly or indirectly, that could reasonably be expected to interfere with the approval, acceptance, confirmation, consummation, or implementation of the Plan or the Settlement Agreement, as applicable;

7. not use, assign, convey, grant, transfer, hypothecate, or otherwise dispose of, in whole or in part, any Administrative Claims or B-4 Claims unless such transfer is in compliance with Section 4.16 hereof; and

---

[7] For the avoidance of doubt, parties that are or become a Party to this Settlement Agreement but are not members of the Ad Hoc Group of B-4 Lenders and the Ad Hoc Vendor Group are not expected to affirmatively file pleadings in support of confirmation of a Plan.

8.     not object to or opt out of any release included in this Settlement Agreement, the Solicitation Materials, or the Plan, so long as such release is consistent with the Settlement Agreement.

For the avoidance of doubt, (i) no non-Debtor Party will have any obligation to support a chapter 11 plan other than the Plan contemplated by this Settlement Agreement and (ii) all non-Debtor Parties reserve all rights and shall have no obligations with respect to any chapter 11 plan or other resolution of the chapter 11 cases of any of the Debtors not party to the Plan.  For the avoidance of doubt, no Term DIP Lender or Prepetition Secured Lender will have any obligation under this Settlement Agreement to support or accept any chapter 11 plan for Toys Delaware or the Geoffrey Debtors contemplating payments exceeding the Wind-Down Budget.

For the avoidance of doubt, the voting requirements in Section 3.3(e)2 hereof shall not apply to the Prepetition Term Loan Agent and the entry by the Prepetition Term Loan Agent into this Settlement Agreement shall not be deemed an acceptance or adoption on behalf of any Prepetition Secured Lender of any chapter 11 plan, arrangement, adjustment or composition affecting the "Obligations" (as defined in the Secured Term Loan B Credit Agreement) or the rights of any Prepetition Secured Lender.

(f)     The Plan will not contain any management compensation or bonus payments or programs (other than with respect to the Geoffrey Debtors with the consent of the Ad Hoc Group of B-4 Lenders) and the D&O Parties shall not seek or otherwise be allowed any payments (or participate in any recoveries from the Administrative Claims Distribution Pool) from the Debtors or their estates on account of any (x) pre- or postpetition bonus programs implemented by the Debtors, (y) severance payments or alleged or actual breaches of any employment agreement(s), or (z) other claims under state or federal law (other than ordinary course compensation claims) arising out of any D&O Party's employment by or interest in the Debtors.

(g)     The Debtors, the Prepetition Term Loan Agent, and the Ad Hoc Group of B-4 Lenders agree that the Creditors Committee's Challenge Period under the Final DIP Financing Order shall be extended through the earlier of (i) 30 days after the termination of this Settlement Agreement, or (ii) the Plan Effective Date; *provided, that*, if prior to the termination of the Challenge Period, the Creditors' Committee files a motion seeking standing to pursue a Challenge, then the Challenge Period for the Creditors' Committee shall be extended until the date that is two (2) business days after the Court rules on such request; *provided*, *further*, that in the event the Settlement Effective Notice (as defined in the Settlement Order) is delivered and the settlement remains effective, the Challenge Period shall immediately expire.

(h)     The Parties shall cooperate with each other in good faith and shall coordinate their activities (to the extent possible and subject to the terms of this Settlement

22

Agreement) in respect of (a) the implementation of the terms set forth in this Settlement Agreement, and (b) the consummation of the transactions contemplated by this Settlement Agreement and the allocation and distribution of assets and value contemplated by this Settlement Agreement.

(i)    In no event shall any Party file, cause an affiliate or any other third party to file, or encourage any affiliate or any third party to file, an opposition to the Settlement Approval Motion or the Settlement Agreement, or a motion to appoint a Chapter 11 trustee or examiner or a motion to convert any of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code.

3.4    Releases.

(a)    Releases Among Non-Debtor Parties.  For good and valuable consideration, on and after the date of entry of the Settlement Order, each of the Non-Debtor Releasing Parties hereby releases any and all Claims and Causes of Action, whether known of unknown, against each of the Non-Debtor Released Parties (including any claims seeking recovery from the collateral of the Term DIP Lenders or the Prepetition Secured Parties) relating in any way to any of the Debtors, including any such Claims and Causes of Action such person or entity could seek to assert directly or derivatively or on behalf of any estate, including Toys Delaware and Wayne, and based on any theory, including fraudulent transfer, preference, section 506(c), or section 552(b) "equities of the case."[8]

(b)    Debtor Release.  For good and valuable consideration, on and after the date of the entry of the Settlement Order, the Debtors and their estates hereby release and discharge the following Claims and Causes of Action whether known or unknown:

1.    all Claims and Causes of Action against the Administrative Claim Holders that participate in the Administrative Claims Distribution Pool, each in their capacity as such, including (a) all Claims or Causes of action relating to credits, rebates, advertising incentives, and like items,[9] and (b) any claims for disgorgement or claw-back of any payments made on account of trade agreements or section 503(b)(9) claims; *provided that* any claims described in clause (a) of this paragraph relating to credits, rebates, advertising incentives, and like items, may be asserted in a defensive

---

[8]    For the avoidance of doubt, this release does not apply to any put agreements or other postpetition contract related credit protection entered into directly between any non-Debtor Parties.

[9]    The Debtors reserve the right to reconcile the claims asserted by Administrative Claims Holders based on trade allowances, credits, or other trade agreements with respect to such Administrative Claims, and all merchandise vendors reserve and retain the right to challenge any such claim by the Debtors.  The Debtors shall not pursue Claims or Causes of action relating to credits, rebates, advertising incentives, and like items against prepetition creditors who are not or may not be eligible to participate in the Administrative Claims Distribution Pool; *provided*, *however*, that the Debtors reserve the right to reconcile any Claims asserted by such creditors based on such Claims or Causes of Action.

manner as off-sets to the Claims of merchandise vendors in the claims reconciliation procedures set forth herein and in the DIP Amendment Order (or in any litigation in the event of a challenge to the reconciliation); *provided, further, that* notwithstanding any other provisions of this Settlement Agreement, Claims or Causes of Action of Toys Inc. or Toys Delaware against any affiliated Debtors or any of their non-debtors subsidiaries shall not be released or discharged hereunder.

2.    to the extent not already released in the Final DIP Financing Order, any and all Claims or Causes of Action against any of the Term DIP Lenders, the Term DIP Agent, the Prepetition Term Loan Agent, and any of the Prepetition Secured Lenders, in each case in their capacity as such, including, for the avoidance of doubt, any Claim or Cause of Action preserved for the Creditors Committee to seek to pursue on behalf of any estate under the Final DIP Financing Order (including any Claim or Cause of Action for fraudulent transfer or preference or based on section 506(c) or section 552(b) of the Bankruptcy Code);

3.    all Claims and Causes of Action, if any, against the Sponsors (for the avoidance of doubt, excluding any Sponsor-affiliated directors, officers, and managers), and their respective professionals, in their capacity as such;

4.    all Claims and Causes of Action, if any, against the Creditors Committee, its members, and each of their respective professionals, in each case in their capacity as such; and

5.    any and all Claims and Causes of Action arising under (a) chapter 5 of the Bankruptcy Code (including, for the avoidance of doubt, claims arising under section 502(d) of the Bankruptcy Code), or (b) any state-law equivalents of chapter 5 of the Bankruptcy Code, including state fraudulent conveyance laws and/or state preference laws, against any non-insider pre- or postpetition creditors, whether or not they are eligible to participate in the Administrative Claims Distribution Pool (including, without limitation, vendors, suppliers, landlords, employees, and other creditors, each in their capacity as such) other than any Administrative Claim Holders that affirmatively opt-out of participation in the Administrative Claims Distribution Pool.

(c)    For the avoidance of doubt, (i) notwithstanding anything in this section to the contrary, all chapter 5 claims against a D&O Party are expressly preserved, subject to the limitations set forth in the D&O Claims section (Section 3.2(c)) of this Settlement Agreement and (ii) all Claims or Causes of Action between or among the Debtors and their direct or indirect subsidiaries, including all Claims or Causes of Action of Toys Delaware or the Geoffrey Debtors against Toys Inc. or any of its direct or indirect subsidiaries (both Debtor or non-debtor subsidiaries,

24

including Toys (Labuan) Holding Limited, Wayne and its subsidiaries, and Toys "R" Us Property Company II, LLC), are fully preserved.

(d)  <u>Opt-Outs</u>.

    1.  As part of the Settlement Motion, the Debtors will seek approval of the opt-out mechanism, which will require parties to opt-out by no later than August 24, 2018.

    2.  All Administrative Claims Holders (other than members of the Ad Hoc Vendor Group or those that are Parties to this Settlement Agreement) will have an option to opt out of this Settlement Agreement and the Releases contained herein.

    3.  Only Administrative Claims Holders that do not opt out of the Settlement Agreement shall be entitled to receive their pro rata share of the Administrative Claims Distribution Pool.

    4.  The pro rata share of the Administrative Claims Distribution Pool allocable to any creditor that opts out of this Settlement Agreement shall be paid to the Prepetition Secured Lenders.

    5.  If Administrative Claims Holders holding more than 7.5% in aggregate value of Allowed Administrative Claims eligible to share in the Administrative Claims Distribution Pool (excluding the value of professional fees and adequate protection claims) exercise their right to opt out of this Settlement Agreement, the Ad Hoc Group of B-4 Lenders and the Debtors will have the option to terminate this Settlement Agreement.

(e)  <u>Sponsor Releases</u>.  As consideration for the releases of the Sponsors (other than the Sponsor-affiliated or appointed directors, officers, and managers) described herein, the Sponsors shall (i) waive and release all Claims for further payments of any management, advisory, or other fees or expenses from the Debtors and their estates, (ii) not take, and direct their affiliates to not take, any action that would require compliance with the *Final Order (A) Approving Notification and Hearing Procedures for Certain Transfers of and Declarations of Worthlessness with Respect to Common Stock and (B) Granting Certain Related Relief* [Docket No. 728] for as long as such order as in effect, and (iii) otherwise cooperate with the Debtors and the Parties hereto in connection with the implementation of this Settlement Agreement and any Plan or order of dismissal.

(f)  Notwithstanding anything to the contrary herein, nothing in this Settlement Agreement shall release the Parties from any obligations they may have under this Settlement Agreement, or any contract, instrument, release, or other agreement entered into in connection with this Settlement Agreement or the Plan.

3.5     Administrative Claims.

(a)     The Debtors will work to expeditiously reconcile all Administrative Claims filed consistent with the bar date set in the Administrative Claims Bar Date Order.

(b)     The Debtors will work with the Creditors Committee members and the Ad Hoc Vendor Group in good faith to reconcile the Claims held by each such party prior to the implementation of the Settlement Agreement.

(c)     The Debtors and all holders of Administrative Claims party hereto agree to retain and preserve any documents, information (including electronically stored information), and other evidence potentially relevant to the reconciliation of any Administrative Claims.

3.6     Vendor Professionals' Fees and Expenses.

(a)     The Parties agree that the Ad Hoc Vendor Group and the vendor members of the Creditors Committee have made a substantial contribution to these Chapter 11 Cases through the benefits provided pursuant to the Term Sheet and Settlement Agreement.  Accordingly, the Debtors will seek approval of a substantial contribution claim for such Parties under section 503(b) of the Bankruptcy Code in the amount of $2 million in the Settlement Order.

(b)     The Claim for substantial contribution under this Section 3.6 will be satisfied solely from the Fixed Amount distributed to the Administrative Claims Distribution Pool and will be used to pay the professional fees and expenses of the members of the Ad Hoc Vendor Group and the vendor Creditors Committee members in connection with the negotiation of the U.S. Wind-Down Order, the North American DIP Amendment Order, the Term Sheet, and this Settlement Agreement.  The Ad Hoc Vendor Group and the vendor Creditors Committee members' professionals will agree among themselves as to an allocation of these funds.  The hearing on the Claim for substantial contribution shall be simultaneous with the hearing on the approval of the Settlement Agreement.

(c)     The Creditors Committee, the Ad Hoc Vendor Group, and any other party seeking and receiving a distribution from the Administrative Claim Distribution Pool hereunder agree not to seek substantial contribution claims from the Debtors' estates for any other fees and expenses incurred.

3.7     Geoffrey Debtors.

(a)     The Debtors and the Creditors Committee will continue to support (and the Debtors will act to implement, on the schedule set forth in Docket No. 3601) the ongoing sale process for the equity and assets of the Geoffrey Debtors, whether through a chapter 11 plan or a section 363 sale.

(b)     The Prepetition Secured Lenders shall have the right to credit bid for the equity and assets of the Geoffrey Debtors and the Creditors Committee will not object to

or seek to impede such credit bid; *provided*, *however*, that the Prepetition Secured Lenders will consult with the Debtors and the Creditors Committee about the terms of any such credit bid.

(c)     The Ad Hoc Group of B-4 Lenders, the Debtors, and the Creditors Committee will consult on whether to consummate the sale through a chapter 11 plan or a section 363 sale.  Any chapter 11 plan filed by the Geoffrey Debtors shall provide for the allocation and distribution of 100% of the value and assets of the Geoffrey Debtors to the Prepetition Secured Lenders, except to the extent necessary to pay valid administrative expense claims of the Geoffrey Debtors in connection with confirmation of a chapter 11 plan.  Any chapter 11 plan filed by the Geoffrey Debtors will also preserve all Claims and Causes of Action of those Debtors (except as expressly set forth in Section 3.7(f) below), unless the Geoffrey Debtors have previously entered into one or more settlements to release any such Claims or Causes of Action, including in connection with any chapter 11 plan of TRU Taj LLC.

(d)     The disposition of the Geoffrey Debtors' assets, whether through a chapter 11 plan or a section 363 sale, will be completed by September 26, 2018, or such other date as the Parties mutually agree.

(e)     For the avoidance of doubt, assets and value of the Geoffrey Debtors (including Causes of Action) will be available only to the Prepetition Secured Lenders (provided such assets are not necessary to satisfy the Term DIP Loan) and will not be available for distribution to the Administrative Claims Distribution Pool.

(f)     Notwithstanding any other provision of this Settlement Agreement, no Claims or Causes of Actions of the Geoffrey Debtors including causes of action against Toys (Labuan) Holding Limited or its subsidiaries are released or otherwise impaired by this Settlement Agreement; *provided*, *however*, that, notwithstanding the foregoing, the Geoffrey Debtors (a) will release any and all Claims and Causes of Action against the Creditors' Committee, its members, and their respective professionals, the Ad Hoc Vendor Group, the Holders of Administrative Claims, and any avoidance actions against non-insider creditors, each as set forth in Section 3.4 hereof and (b) will limit their recoveries against (and ultimately release, only if and as applicable) the individual officers, directors, and managers of the Debtors, to the same extent that Toys Delaware is limiting recoveries against such officers, directors, and managers as set forth in the D&O Claims section (Section 3.2(c)); *provided*, *further*, *however*, notwithstanding the foregoing, the Geoffrey Debtors shall release any Claims and Causes of Action against the Sponsors (but not Sponsor-affiliated directors, officers, and managers).

3.8     Creditors Committee.

(a)     Except as expressly set forth herein, nothing herein shall impact, impair, or restrict the Creditors Committee's role or ability to continue to act on account of

unsecured creditors in connection with any restructuring, sale, or liquidation of the assets of any Debtor, including Toys Delaware (consistent with this Settlement Agreement), the Taj Debtors, Toys Inc., and Toys "R" Us Property Company II, LLC, and all such rights are expressly preserved.

(b)     In the event that the holders of a majority of the Toys, Inc. unsecured notes reach agreement with Toys Delaware and the Ad Hoc Group of B-4 Lenders on a restructuring of the Taj Debtors or allocation of the proceeds of a sale of the equity or assets of the Taj Debtors, the Creditors Committee will reasonably cooperate with the trustee for the Toys Inc. unsecured notes in connection with such agreement.

**Section 4.      Miscellaneous Provisions**

4.1     <u>Settlement Agreement Effective Date.</u>

This Settlement Agreement shall become effective and binding on the Parties at 12:01 a.m., prevailing Eastern Time, on the date (the "<u>Settlement Effective Date</u>") on which all of the Parties have executed and delivered to the other Parties pursuant to Section 4.11 hereof counterpart signature pages of this Settlement Agreement; *provided*, *however*, that no provisions of this Settlement Agreement shall be effective as to the Debtors until the entry of the Settlement Order; *provided*, *further*, for the avoidance of doubt, that any applicable person or entity may become a Party to this Settlement Agreement after the Settlement Effective Date by executing and delivering to the other Parties pursuant to Section 4.11 hereof its counterpart signature page to this Settlement Agreement.

4.2     <u>Non-Debtor Parties Representations and Warranties.</u>

To induce each other Party to enter into and perform its obligations under this Settlement Agreement, each non-Debtor Party, severally but not jointly, represents, warrants and acknowledges, as of the Settlement Effective Date, as follows:

(a)     *Authority*.  (A) It is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization and has all the requisite corporate, partnership, limited liability company, or other power and authority to execute and deliver this Settlement Agreement and the other documents and instruments contemplated hereby to which it is contemplated to be a party and perform its obligations under this Settlement Agreement and the other documents and instruments contemplated hereby to which it is contemplated to be a party, and to consummate the transactions contemplated herein and therein, and (B) the execution, delivery and performance by it under this Settlement Agreement and the other documents and instruments contemplated hereby to which it is contemplated to be a party and the consummation of the transactions contemplated herein and therein, have been duly authorized by all necessary action on its part, and no other actions or proceedings on its part are necessary to authorize and approve this Settlement Agreement or the other documents or

28

instruments contemplated hereby to which it is contemplated to be a party or any of the transactions contemplated herein or therein.

(b)    *Ownership*.    Other than with respect to the Creditors Committee and the Prepetition Term Loan Agent, it is the legal owner, beneficial owner, and/or the investment advisor or manager for such legal or beneficial owner or discretionary account of such legal or beneficial owner of a Claim against and/or Equity Interest in the Debtors, as applicable.

(c)    *Validity*.    This Settlement Agreement has been duly executed and delivered by it and constitutes its legal, valid, and binding agreement, enforceable against it in accordance with its terms.

(d)    *No Conflict*.    Its execution, delivery, and performance (when such performance is due) of this Settlement Agreement does not and shall not (A) subject to the actions, consents, and filings referred to in Section 4.2(e) below, violate any provision of law, rule, or regulation applicable to it or any of its subsidiaries or its or their subsidiaries' certificates of incorporation or bylaws or other organizational documents, or (B) conflict with, result in a breach of, or constitute a default under any material contractual obligations to which it or any of its subsidiaries is a party.

(e)    *Authorization of Governmental Authorities*.    No action by (including any authorization, consent, or approval), in respect of, or filing with, any governmental authority or regulatory body, except such filing as may be necessary and/or required for disclosure by the Securities and Exchange Commission or pursuant to state securities or "blue sky" laws, is required for, or in connection with, the valid and lawful authorization, execution, delivery, and performance by it of this Settlement Agreement.

(f)    *No Reliance*.    It (A) is a sophisticated party with respect to the matters that are the subject of this Settlement Agreement, (B) has had the opportunity to be represented and advised by legal counsel in connection with this Settlement Agreement, (C) has adequate information concerning the matters that are the subject of this Settlement Agreement, and (D) has independently and without reliance upon any other Party hereto, or any of their affiliates, or any officer, employee, agent, or representative thereof, and based on such information as it has deemed appropriate, made its own analysis and decision to enter into this Settlement Agreement, except that it has relied upon each other Party's express representations, warranties, and covenants in this Settlement Agreement, which it enters, or as to which it acknowledges and agrees, voluntarily and of its own choice and not under coercion or duress.

4.3    <u>Debtor Representations and Warranties.</u>

To induce each other Party to enter into and perform its obligations under this Settlement Agreement, each Debtor hereby represents, warrants, and acknowledges, as of the Settlement Effective Date, as follows:

(a)    *Authority*.  Except as expressly provided in this Settlement Agreement and subject to the Bankruptcy Code, Bankruptcy Court approval, and/or regulatory approvals associated with the Settlement Agreement, Plan, or a structured dismissal, as applicable, (A) each of the Debtors is duly organized, validly existing, and in good standing under the laws of the jurisdiction of its organization and has all the requisite corporate, partnership, limited liability company, or other power and authority to execute and deliver this Settlement Agreement and the other documents and instruments contemplated hereby to which the Debtors are contemplated to be parties and perform their obligations under this Settlement Agreement and the other documents and instruments contemplated hereby to which they are contemplated to be parties, and to consummate the transactions contemplated herein and therein, and to consummate the transactions contemplated herein and therein, and (B) the execution, delivery, and performance by such Debtors under this Settlement Agreement and the other documents and instruments contemplated hereby to which each such Debtor is contemplated to be a party and the consummation of the transactions contemplated herein and therein, have been duly authorized by all necessary action on the part of such Debtor, and no other actions or proceedings on the part of such Debtor are necessary to authorize and approve this Settlement Agreement or the other documents or instruments contemplated hereby to which such Debtor is contemplated to be a party or any of the transactions contemplated herein or therein.

(b)    *Validity*.  Except as expressly provided in this Settlement Agreement and subject to the Bankruptcy Code, Bankruptcy Court approval, and/or regulatory approvals associated with the Plan or a structured dismissal, as applicable, this Settlement Agreement has been duly executed and delivered by the Debtors and constitutes the legal, valid, and binding agreement of the Debtors, enforceable against the Debtors in accordance with its terms.

(c)    *No Conflict*.  Subject to the Bankruptcy Code, Bankruptcy Court approval and/or regulatory approvals associated with this Settlement Agreement, the Plan, or a structured dismissal, as applicable, the execution, delivery, and performance by the Debtors (when such performance is due) of this Settlement Agreement does not and shall not (A) subject to the actions, consents, and filings referred to in Section 4.3(d) below, violate any provision of law, rule, or regulation applicable to the Debtors or any of their subsidiaries or the Debtors' or their subsidiaries' certificates of incorporation or bylaws or other organizational documents, or (B) conflict with, result in a breach of, or constitute (with due notice or lapse of time or both) a default under any material contractual obligations to which it or any of its subsidiaries is a party.

30

(d) *Authorization of Governmental Authorities*. No action by (including any authorization, consent, or approval), in respect of, or filing with, any governmental authority or regulatory body, except such filing as may be necessary and/or required for disclosure by the Securities and Exchange Commission or pursuant to state securities or "blue sky" laws, and the approval of the Bankruptcy Court of the Debtors' authority to enter into and implement this Settlement Agreement, is required for, or in connection with, the valid and lawful authorization, execution, delivery and performance by the Debtors of this Settlement Agreement.

(e) *No Reliance*. Each of the Debtors (A) is a sophisticated party with respect to the matters that are the subject of this Settlement Agreement, (B) has had the opportunity to be represented and advised by legal counsel in connection with this Settlement Agreement (including its disinterested directors' counsel, as applicable), (C) has adequate information concerning the matters that are the subject of this Settlement Agreement, and (D) has independently and without reliance upon any other Party hereto, or any of their affiliates, or any officer, employee, agent or representative thereof, and based on such information as such Debtor has deemed appropriate, made its own analysis and decision to enter into this Settlement Agreement, except that the Debtors have relied upon each other Party's express representations, warranties, and covenants in this Settlement Agreement, which each of the Debtors enters, or as to which each Debtor acknowledges and agrees, voluntarily and of its own choice and not under coercion or duress.

4.4   Termination.

(a) This Settlement Agreement and the obligations of the Parties may be terminated by mutual written agreement of the Parties.

(b) This Settlement Agreement and the obligations of the Parties may be terminated by the Ad Hoc Group of B-4 Lenders or the Debtors, in the exercise of their sole discretion, by delivery of a written notice to the other Parties in accordance with Section 4.11 hereof, if, **and only if**, Administrative Claims Holders holding more than 7.5% in aggregate value of such Allowed Claims (excluding professional fees and adequate protection claims) exercise their right to opt out of this Settlement Agreement.

(c) This Settlement Agreement shall terminate automatically as among the Parties if the Court has not approved the Settlement Approval Motion by September 30, 2018.

4.5   Effect of Termination.

Upon termination of this Settlement Agreement in accordance with Section 4.4 hereof, all obligations of the Parties under this Settlement Agreement shall terminate and shall be of no further force and effect; *provided*, that any Claim for prior breach of this Settlement Agreement

shall survive termination and all rights and remedies with respect to such Claim shall be neither waived nor prejudiced in any way by termination of this Settlement Agreement.  For the avoidance of doubt, in the event this Settlement Agreement is not approved by the Court, the Debtors remain obligated under the DIP Amendment Order to calculate and fund the full amount of the Merchandise Reserve as set forth in the DIP Amendment Order.

4.6    Acknowledgments.

**Notwithstanding any other provision herein, this Settlement Agreement is not and shall not be deemed to be an offer with respect to any securities or solicitation of votes for the acceptance of a plan for purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise.  Any such offer or solicitation will be made only in compliance with all applicable securities laws and provisions of the Bankruptcy Code.  The relevant Parties will not solicit acceptances of the Plan from the relevant Parties in any manner inconsistent with the Bankruptcy Code or applicable non-bankruptcy law.**

4.7    Cooperation and Support.

The Parties shall cooperate with each other in good faith and shall coordinate their activities (to the extent possible and subject to the terms of this Settlement Agreement) in respect of (a) the filing of the Settlement Approval Motion with the Bankruptcy Court, obtaining Bankruptcy Court approval of this Settlement Agreement, the entry of the Settlement Order, and the implementation of the terms set forth in this Settlement Agreement, and (b) the consummation of the transactions contemplated by this Settlement Agreement.

4.8    Governing Law; Jurisdiction.

(a)    This Settlement Agreement shall be construed and enforced in accordance with, and the rights of the Parties shall be governed by, the laws of the State of New York, without giving effect to the conflict of laws principles thereof.  Each Party hereto agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Settlement Agreement in the Bankruptcy Court, and solely in connection with claims arising under this Settlement Agreement: (i) irrevocably submits to the exclusive jurisdiction and the constitutional authority of the Bankruptcy Court; (ii) waives any objection to laying venue in any such action or proceeding in the Bankruptcy Court; and (iii) waives any objection that the Bankruptcy Court is an inconvenient forum, does not have jurisdiction over any Party hereto, or lacks the constitutional authority to enter final orders in connection with such action or proceeding; *provided*, *however*, that this Settlement Agreement and the releases set forth herein may be submitted in any court, arbitration, and/or other legal proceeding to enforce the terms of such releases.

(b)    Each Party hereby waives, to the fullest extent permitted by applicable law, any right it may have to a trial by jury in any legal proceeding arising out of, or relating to, this Settlement Agreement or the transactions contemplated hereby (whether based on contract, tort, or any other theory).  Each Party (i) certifies that

no representative, agent, or attorney of any other Party has represented, expressly or otherwise, that such other Party would not, in the event of litigation, seek to enforce the foregoing waiver and (ii) acknowledges that it and the other Parties have been induced to enter into this Settlement Agreement by, among other things, the mutual waivers and certifications in this Section 4.8.

4.9     No Admission of Liability.

Each Party enters into this Settlement Agreement without admitting any liability or conceding any allegations not already expressly admitted.  This Settlement Agreement and its provisions shall not be offered or received in evidence in any action or proceeding as an admission or concession of liability or wrongdoing of any nature on the part of any Party except that it may be offered and received in evidence solely to enforce this Settlement Agreement.

4.10    Third-Party Beneficiaries.

Except as otherwise explicitly set forth herein, nothing in this Settlement Agreement is intended to benefit or create any right or cause of action in or on behalf of any person other than the Parties hereto (and their affiliated persons and entities who are intended to be beneficiaries of the releases and settlements set forth herein).

4.11    Notices.

All notices hereunder shall be deemed given if in writing and delivered, if sent by electronic mail, courier, or registered or certified mail (return receipt requested) to the following addresses (or at such other addresses as shall be specified by like notice):

(a)     if to the Debtors, to:

> Toys "R" Us, Inc.
> One Geoffrey Way
> Wayne, New Jersey  07470
> Attention:  James Young, General Counsel
> E-mail address:  James.Young@toysrus.com

> with copies (which shall not constitute notice) to:

> Kirkland & Ellis LLP
> 601 Lexington Avenue
> New York, New York  10022
> Attention:  Joshua Sussberg, P.C.
> E-mail address:  jsussberg@kirkland.com

> and

> Kirkland & Ellis LLP
> 300 North LaSalle Street
> Chicago, IL  60654

Attention:  Chad J. Husnick, P.C.
E-mail address:  chusnick@kirkland.com

(b)     if to the Creditors Committee, to:

Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, New York  10036
Attention:     Kenneth H. Eckstein
               Rachael L. Ringer
E-mail address:  keckstein@kramerlevin.com; rringer@kramerlevin.com

(c)     if to the Ad Hoc Group of B-4 Lenders, to:

Wachtell, Lipton Rosen and Katz
51 West 52nd Street
New York, New York  10019
Attention:     Joshua A. Feltman
               Emil A. Kleinhaus
E-mail address:  jafeltman@wlrk.com; eakleinhaus@wlrk.com

(d)     if to the Sponsors, to:

Milbank, Tweed, Hadley & McCloy LLP
28 Liberty Street
New York, NY 10005
Attention:     Dennis F. Dunne
               Samuel A. Khalil
               Andrew M. LeBlanc
E-mail address:  ddunne@milbank.com; skhalil@milbank.com;
               aleblanc@milbank.com

(e)     if to the Ad Hoc Vendor Group, to:

Foley & Lardner LLP
3000 K Street, N.W., Suite 600
Washington, DC 20007
Attention:     Erika L. Morbito
E-mail address:  emorabito@foley.com

(f)     if to the Prepetition Term Loan Agent, to:

Shearman & Sterling LLP
599 Lexington Avenue
New York, New York 10022
Attention:     Fredric Sosnick
E-mail address: Fsosnick@shearman.com

34

or such other address as may have been furnished by a Party to each of the other Parties by notice given in accordance with the requirements set forth above.  Any notice given by delivery, mail, or courier shall be effective when received.

4.12    Entire Agreement.

This Settlement Agreement, including any exhibits, annexes, and/or schedules hereto and the exhibits, annexes, and/or schedules thereto, constitutes the entire agreement between the Parties concerning the subject matter of this Settlement Agreement and supersedes all prior negotiations, agreements, and understandings, whether written or oral, between and among the Parties concerning the subject matter of this Settlement Agreement.  Each of the Parties hereto acknowledges that it is executing this Settlement Agreement without reliance on any representations, warranties, or commitments other than those representations, warranties, and commitments expressly set forth in this Settlement Agreement.

4.13    Modification or Amendment.

This Settlement Agreement may be modified or amended only by written agreement executed by: (i) the Debtors, (ii) the undersigned members of the Ad Hoc Group of B-4 Lenders, (iii) the undersigned members of the Ad Hoc Vendor Group, (iv) the Creditors Committee, (v) the Sponsors, (vi) the members of the Creditors Committee that are Party hereto in their individual capacity, and (vii) the Prepetition Term Loan Agent; *provided, however*, that if the proposed modification, amendment, or supplement has a material, disproportionate, and adverse effect on any particular Administrative Claim Holder party hereto, then the consent of each such disproportionately affected holder shall also be required to effectuate such modification, amendment, or supplement.

The Parties may extend or modify any dates in this Settlement Agreement or in the Term Sheet via e-mail confirmation.

4.14    Further Assurances.

From and after the Settlement Effective Date, each of the Parties agrees to use their respective reasonable best efforts to execute or cause to be executed and deliver or cause to be delivered all such agreements, instruments and documents and take or cause to be taken all such further actions as may reasonably be necessary from time to time to carry out the intent and purpose of this Settlement Agreement, and to consummate the transactions contemplated hereby and thereby.

4.15    Transfer of Claims.

For each non-Debtor Party hereto holding Claims against the Debtors (other than the Prepetition Term Loan Agent), for the period commencing as of the date such Party executes this Agreement and through the earlier to occur of (w) termination of this Agreement and (x) the Effective Date of the Plan, and subject to the terms and conditions hereof, each Party agrees, that it shall not sell, assign, convey, transfer, hypothecate, or otherwise dispose of, in whole or in part (any such action, a "Transfer") any ownership (including any beneficial ownership) in the Claims or any option thereon or any right or interest therein (including by granting any proxies

or depositing any interests in the Claims into a voting trust or by entering into a voting agreement (other than this Settlement Agreement) with respect to the Claims), unless the intended transferee (x) is a Party to this Settlement Agreement, or (y) becomes a party to this Settlement Agreement (solely with respect to transferred Claims) pursuant to Section 4.1 hereof by the time such Transfer becomes effective (it being understood that any Transfer shall not be effective until notification of such Transfer is received by counsel to the Debtors (such transfer, a "<u>Permitted Transfer</u>" and such party to such Permitted Transfer, a "<u>Permitted Transferee</u>")).

(a)    Notwithstanding anything to the contrary herein (i) a Qualified Marketmaker that acquires any Claims with the purpose and intent of acting as a Qualified Marketmaker for such Claims, shall not be required to become party to this Settlement Agreement or otherwise agree to be bound by the terms and conditions set forth in this Agreement if such Qualified Marketmaker transfers such Claims (by purchase, sale, assignment, participation, or otherwise) within five (5) Business Days of its acquisition to a Party or Permitted Transferee and the transfer otherwise is a Permitted Transfer, and (ii) to the extent any Party is acting solely in its capacity as a Qualified Marketmaker, it may Transfer any ownership interests in the Claims that it acquires from a holder of Claims that is not a Party to a transferee that is not a Party at the time of such Transfer without the requirement that the transferee be or become a signatory to this Agreement.

(b)    This Settlement Agreement shall in no way be construed to preclude any Party from acquiring additional Claims; *provided*, *however*, that any such acquired Claims shall automatically and immediately upon acquisition by such Party be deemed subject to the terms of this Settlement Agreement (regardless of when or whether notice of such acquisition is given to the Debtors and the Creditors Committee as set forth above), other than with respect to any Claims acquired by such Party in its capacity as a Qualified Marketmaker.

(c)    This Section shall not impose any obligation on the Debtors to issue any "cleansing letter" or otherwise publicly disclose information for the purpose of enabling a Party to Transfer any Claims. Notwithstanding anything to the contrary herein, to the extent the Debtors and another Party have entered into a separate agreement with respect to the issuance of a "cleansing letter" or other public disclosure of information (each such executed agreement as may be amended from time to time, a "<u>Confidentiality Agreement</u>"), the terms of such Confidentiality Agreement shall continue to apply and remain in full force and effect according to its terms.

(d)    Any Transfer made in violation of this Section shall be void ab initio.

(e)    For the avoidance of doubt, (i) following a Permitted Transfer by a Party of all of its interests in the Claims, such Party shall have no additional or continuing obligations under this Settlement Agreement or any related direction letters to any agent or trustee, and (ii) prior to the effective date of a Permitted Transfer, the Permitted Transferee shall not have obligations or liabilities under this Settlement Agreement or any related direction letters to any agent or trustee to any party to the Settlement Agreement.

4.16    Successors and Assigns.

Except as otherwise provided in this Settlement Agreement, this Settlement Agreement is intended to bind and inure to the benefit of each of the Parties and each of their respective successors, assigns, heirs, executors, administrators, and representatives.  For the avoidance of doubt, each Party agrees, solely with respect to itself, that it shall not sell, assign, convey, transfer, hypothecate, or otherwise dispose of, in whole or in part, any Claims in violation of Section 4.15 hereof.

4.17    Interpretation.

This Settlement Agreement is the product of negotiations among the Parties, and the enforcement or interpretation of this Settlement Agreement is to be interpreted in a neutral manner and in accordance with section 102 of the Bankruptcy Code; and any presumption with regard to interpretation for or against any Party by reason of that Party (or its counsel) having drafted or caused to be drafted this Settlement Agreement or any portion of this Settlement Agreement, shall not be effective in regard to the interpretation of this Settlement Agreement.

4.18    Settlement Discussions.

This Settlement Agreement and the transactions contemplated herein are part of a settlement among the Parties.  Nothing herein shall be deemed an admission of any kind.  To the extent provided by Federal Rule of Evidence 408, any applicable mediation privileges, and any applicable state rules of evidence, this Settlement Agreement and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce the terms of this Settlement Agreement.

4.19    Specific Performance.

It is understood and agreed by the Parties that money damages would be an insufficient remedy for any breach of this Settlement Agreement by any Party, that such breach would represent irreparable harm, and that each non-breaching Party shall be entitled to specific performance and injunctive relief (without the posting of any bond and without proof of actual damages), but no other form of equitable relief, as the sole remedy for any such breach, including an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder; *provided*, that each Party agrees to waive any requirement for the securing or posting of a bond in connection with such remedy.

4.20    Execution of Agreement.

This Settlement Agreement may be executed in counterparts, and by the different Parties hereto on separate counterparts, each of which when executed and delivered shall constitute an original.  Delivery of an executed counterpart by facsimile or electronic mail shall be equally as effective as delivery of an original executed counterpart.

4.21    <u>Non-Severability of Agreement.</u>

This Settlement Agreement is to be construed as a whole, and all provisions of it are to be read and construed together.  Notwithstanding anything in this Settlement Agreement or the Settlement Order to the contrary, and in light of the integrated nature of the settlements and compromises embodied in this Settlement Agreement and the Settlement Order, in the event that (a) a court of competent jurisdiction enters a final order ruling that any of the provisions of this Settlement Agreement or the Settlement Order are void, invalid, illegal, or unenforceable in any material respect, or (b) any of the provisions of this Settlement Agreement or the Settlement Order are reversed, vacated, overturned, voided, or unwound in any material respect, then in each case, the entirety of this Settlement Agreement (other than this Section 4.21) shall be void ab initio and of no force and effect and, during any subsequent proceeding, the Parties shall not assert claim preclusion, issue preclusion, estoppel or any similar defense in respect of rights and claims of the Parties that were the subject of this Settlement Agreement prior to this Settlement Agreement being of no force or effect.

4.22    <u>Distribution of Cash to Prepetition Secured Lenders.</u>

Any distribution to any Prepetition Secured Lender contemplated by this Settlement Agreement shall be made to the Prepetition Term Loan Agent on behalf of the Prepetition Secured Lenders, and distributed in accordance with the Secured Term Loan B Credit Agreement and the related loan documentation.

[Signature pages follow]

**IN WITNESS WHEREOF, the Parties execute this Settlement Agreement as of the date first written above.**

Toys "R" Us, Inc.

By: _____

*Its duly authorized representative*

**Name:** Matthew Finigan
**Title:** Executive Vice President - Chief
Financial Officer and Treasurer

*[Signature Page to Settlement Agreement]*

**IN WITNESS WHEREOF, the Parties execute this Settlement Agreement as of the date first written above.**

**TOYS "R" US – DELAWARE, INC.**

By: _____

*Its duly authorized representative*

**Name:** Matthew Finigan
**Title:** Executive Vice President- Chief Financial Officer and Treasurer

*[Signature Page to Settlement Agreement]*

IN WITNESS WHEREOF, the Parties execute this Settlement Agreement as of the date first written above.

Geoffrey, LLC

By: _____
*Its duly authorized representative*

**Name:** Matthew Finigan
**Title:** Executive Vice President - Chief Financial Officer and Treasurer

Geoffrey Holdings, LLC

By: _____
*Its duly authorized representative*

**Name:** Matthew Finigan
**Title:** Executive Vice President - Chief Financial Officer and Treasurer

Geoffrey International, LLC

By: _____
*Its duly authorized representative*

**Name:** Matthew Finigan
**Title:** Executive Vice President - Chief Financial Officer and Treasurer

**IN WITNESS WHEREOF, the Parties execute this Settlement Agreement as of the date first written above.**

Giraffe Holdings, LLC

By: _____
*Its duly authorized representative*

**Name:** Matthew Finigan
**Title:** Executive Vice President - Chief
Financial Officer and Treasurer

*[Signature Page to Settlement Agreement]*

IN WITNESS WHEREOF, the Parties execute this Settlement Agreement as of the date first written above.

MAP 2005 Real Estate, LLC

By: _____
*Its duly authorized representative*

**Name:** Matthew Finigan
**Title:** Executive Vice President - Chief Financial Officer and Treasurer

*[Signature Page to Settlement Agreement]*

**IN WITNESS WHEREOF,** the Parties execute this Settlement Agreement as of the date first written above.

**Toys "R" Us – Value, Inc.**

By:_____
*Its duly authorized representative*

**Name:** Matthew Finigan
**Title:** Executive Vice President - Chief
Financial Officer and Treasurer

*[Signature Page to Settlement Agreement]*

**IN WITNESS WHEREOF, the Parties execute this Settlement Agreement as of the date first written above.**

Toys Acquisition, LLC

By:_____
*Its duly authorized representative*

**Name:** Matthew Finigan
**Title:** Executive Vice President - Chief Financial Officer and Treasurer

**IN WITNESS WHEREOF, the Parties execute this Settlement Agreement as of the date first written above.**

**TRU – SVC, Inc.**

**By:**_____

*Its duly authorized representative*

**Name:** Matthew Finigan
**Title:** Executive Vice President - Chief Financial Officer and Treasurer

*[Signature Page to Settlement Agreement]*

**IN WITNESS WHEREOF,** the Parties execute this Settlement Agreement as of the date first written above.


**TRU Guam, LLC**

**By:** _____
*Its duly authorized representative*

**Name:** Matthew Finigan
**Title:** Executive Vice President - Chief
Financial Advisor and Treasurer

*[Signature Page to Settlement Agreement]*

IN WITNESS WHEREOF, the Parties execute this Settlement Agreement as of the date first written above.

TRU Mobility, LLC

By: _____

*Its duly authorized representative*

**Name:** Matthew Finigan
**Title:** Executive Vice President - Chief Financial Officer and Treasurer

*[Signature Page to Settlement Agreement]*

IN WITNESS WHEREOF, the Parties execute this Settlement Agreement as of the date first written above.

Wayne Real Estate Parent Company, LLC

By: _____

*Its duly authorized representative*

**Name:** Matthew Finigan
**Title:** Executive Vice President - Chief
Financial Officer and Treasurer

*[Signature Page to Settlement Agreement]*

**IN WITNESS WHEREOF, the Parties execute this Settlement Agreement as of the date first written above.**

TRU of Puerto Rico, Inc.

**By:** _____

*Its duly authorized representative*

**Name**:Matthew Finigan

**Title:**  Executive Vice President - Chief Financial Officer and Treasurer

*[Signature Page to Settlement Agreement]*

**IN WITNESS WHEREOF**, the Parties hereto have executed this Settlement Agreement as of the date set forth above.

Angelo, Gordon & Co., L.P.

By:_____

Name:

Title:
           **David Kamin**
           **Authorized Signatory**

37

**IN WITNESS WHEREOF**, the Parties hereto have executed this Settlement Agreement as of the date set forth above.

Solus Alternative Asset Management LP, on behalf of certain funds managed thereby

By: _C. J. Lanktree_

Name: C.J. Lanktree

Title: Partner/Portfolio Manager

38

To consent to the Settlement

**ACIS CLO 2013-1, LTD.**, as a Lender
By:      Acis Capital Management, L.P., its
          Portfolio Manager
By:      Acis Capital Management GP, LLC,
          its general partner

By: _____
Name: James Dondero
Title: President


**ACIS CLO 2014-3, LTD.**, as a Lender
By:      Acis Capital Management, L.P., its
          Portfolio Manager
By:      Acis Capital Management GP, LLC,
          its general partner

By: _____
Name: James Dondero
Title: President


**ACIS CLO 2014-4, LTD.**, as a Lender
By:      Acis Capital Management, L.P., its
          Portfolio Manager
By:      Acis Capital Management GP, LLC,
          its general partner

By: _____
Name: James Dondero
Title: President


**ACIS CLO 2014-5, LTD.**, as a Lender
By:      Acis Capital Management, L.P., its
          Portfolio Manager
By:      Acis Capital Management GP, LLC,
          its general partner

By: _____
Name: James Dondero
Title: President

**ACIS CLO 2015-6, LTD.**, as a Lender

By:     Acis Capital Management, L.P., its
        Portfolio Manager

By:     Acis Capital Management GP, LLC,
        its general partner

By: _____

Name: James Dondero

Title: President


**ACIS CLO 2017-7, LTD.**, as a Lender

By:     Acis Capital Management, L.P., its
        Portfolio Manager

By:     Acis Capital Management GP, LLC,
        its general partner

By: _____

Name: James Dondero

Title: President


**HIGHLAND FLOATING RATE
OPPORTUNITIES FUND**, as a Lender


By: _____

Name: Trey Parker

Title: Executive Vice President


**HIGHLAND FUNDS II**, on behalf of its
Series, **HIGHLAND GLOBAL
ALLOCATION FUND**, as a Lender


By: _____

Name: Trey Parker

Title: Executive Vice President


**HIGHLAND FUNDS I**, on behalf of its
Series, **HIGHLAND OPPORTUNISTIC
CREDIT FUND**, as a Lender


By: _____

Name: Trey Parker

Title: Executive Vice President

**ACIS CLO 2015-6, LTD.**, as a Lender

By:    Acis Capital Management, L.P., its
Portfolio Manager

By:    Acis Capital Management GP, LLC,
its general partner


By: _____

Name: James Dondero

Title: President


**ACIS CLO 2017-7, LTD.**, as a Lender

By:    Acis Capital Management, L.P., its
Portfolio Manager

By:    Acis Capital Management GP, LLC,
its general partner


By: _____

Name: James Dondero

Title: President


**HIGHLAND FLOATING RATE
OPPORTUNITIES FUND**, as a Lender


By: _____

Name: Trey Parker

Title: Executive Vice President


**HIGHLAND FUNDS II**, on behalf of its
Series, **HIGHLAND GLOBAL
ALLOCATION FUND**, as a Lender

By: _____

Name: Trey Parker

Title: Executive Vice President


**HIGHLAND FUNDS I**, on behalf of its
Series, **HIGHLAND OPPORTUNISTIC
CREDIT FUND**, as a Lender

By: _____

Name: Trey Parker

Title: Executive Vice President

**HIGHLAND DYNAMIC INCOME
MASTER FUND, L.P.**, as a Lender
By:     Highland Capital Management, L.P.,
        its Investment Manager
By:     Strand Advisors, Inc., its General
        Partner

By: _____
Name: Scott Ellington
Title: Secretary


**HIGHLAND FUNDS I**, on behalf of its
Series, **HIGHLAND IBOXX SENIOR
LOAN ETF**, as a Lender

By: _____
Name: Trey Parker
Title: Executive Vice President


**PENSIONDANMARK
PENSIONSFORSIKRINGSAKTIESELS
KAB,** as a Lender
By:     Highland Capital Management, L.P.,
        its Investment Manager
By:     Strand Advisors, Inc., its General
        Partner

By: _____
Name: Scott Ellington
Title: Secretary


**NEXPOINT CAPITAL.,** as a Lender

By: _____
Name: James Dondero
Title: President and Principal Executive
        Officer

**HIGHLAND DYNAMIC INCOME MASTER FUND, L.P.**, as a Lender

By:    Highland Capital Management, L.P., its Investment Manager

By:    Strand Advisors, Inc., its General Partner

By: _____
Name: Scott Ellington
Title: Secretary


**HIGHLAND FUNDS I**, on behalf of its Series, **HIGHLAND IBOXX SENIOR LOAN ETF**, as a Lender

By: _____
Name: Trey Parker
Title: Executive Vice President


**PENSIONDANMARK PENSIONSFORSIKRINGSAKTIESELS KAB,** as a Lender

By:    Highland Capital Management, L.P., its Investment Manager

By:    Strand Advisors, Inc., its General Partner

By: _____
Name: Scott Ellington
Title: Secretary


**NEXPOINT CAPITAL.,** as a Lender

By: _____
Name: James Dondero
Title: President and Principal Executive Officer

**HIGHLAND DYNAMIC INCOME MASTER FUND, L.P.**, as a Lender

By:     Highland Capital Management, L.P., its Investment Manager

By:     Strand Advisors, Inc., its General Partner

By: _____
Name: Scott Ellington
Title: Secretary

**HIGHLAND FUNDS I**, on behalf of its Series, **HIGHLAND IBOXX SENIOR LOAN ETF**, as a Lender

By: _____
Name: Trey Parker
Title: Executive Vice President

**PENSIONDANMARK PENSIONSFORSIKRINGSAKTIESELSKAB,** as a Lender

By:     Highland Capital Management, L.P., its Investment Manager

By:     Strand Advisors, Inc., its General Partner

By: _____
Name: Scott Ellington
Title: Secretary

**NEXPOINT CAPITAL.,** as a Lender

By: _____
Name: James Dondero
Title: President and Principal Executive Officer

**IN WITNESS WHEREOF**, the Parties execute this Settlement Agreement as of the date first written above.

**Franklin Mutual Advisers, LLC on behalf of its advisory clients.**

By: _____

*Its duly authorized representative*
**Name:**        Shawn Tumulty
**Title:**        Vice President

Address:        101 JFK Parkway
_____
Short Hills, NJ 07078
_____
_____

*[Signature Page to Settlement Agreement]*

IN WITNESS WHEREOF, the Parties execute this Settlement Agreement as of the date first written above.

| Oaktree Opportunities Fund X Holdings (Delaware), L.P. | Oaktree Opps X Holdco Ltd. |
|---|---|
| By:    Oaktree Fund GP, LLC<br>Its:    General Partner<br><br>By;    Oaktree Fund GP I, L.P.<br>Its:    Managing Member<br><br>By:<br>Name:    Robert O'Leary<br>Title:    Authorized Signatory<br><br>By:<br>Name:    Kaj Vazales<br>Title:    Authorized Signatory | By:    Oaktree Capital Management, L.P.<br>Its:    Director<br><br>By:<br>Name:    Robert O'Leary<br>Title:    Managing Director<br><br>By:<br>Name:    Kaj Vazales<br>Title:    Managing Director |
| Oaktree Cascade Investment Fund I, L.P.<br><br>By:    Oaktree Cascade Investment Fund I GP, L.P.<br>Its:    General Partner<br><br>By:    Oaktree Fund GP, LLC<br>Its:    General Partner<br><br>By:    Oaktree Fund GP I, L.P.<br>Its:    Managing Member<br><br>By:<br>Name:    Robert O'Leary<br>Title:    Authorized Signatory<br><br>By:<br>Name:    Kaj Vazales<br>Title:    Authorized Signatory | |

*[Signature Page to Settlement Agreement]*

**IN WITNESS WHEREOF, the Parties execute this Settlement Agreement as of the date first written above.**

**DIP LENDER**

Marathon Special Opportunity Master Fund Ltd.
Marathon Credit Dislocation Fund LP
TRS Credit Fund, LP
Marathon Centre Street Partnership, L.P.
Marathon CLO V Ltd.
Marathon CLO VI Ltd.
Marathon Strategic Opportunities Program, LP
Marathon CLO VII Ltd.
Marathon CLO VIII Ltd.
AustralianSuper
Marathon CLO IX Ltd.
Marathon Blue Grass Credit Fund, LP
MAM Corporate Loan Fund
Marathon CLO X Ltd.

By: Marathon Asset Management LP, the investment advisor to each of the entities listed above

By: _____  JB

*Its duly authorized representative*
**Name:** Louis Hanover
**Title:** Authorized Signatory

Address:     One Bryant Park, 38th Floor
             New York, NY 10036

*[Signature Page to Settlement Agreement]*

IN WITNESS WHEREOF, the Parties execute this Settlement Agreement as of the date first written above.

TERM DIP AGENT

NexBank SSB, as administrative agent and collateral agent

By: _____
*Its duly authorized representative*
**Name:** Rhett Miller
**Title:** EVP, Chief Credit Officer

Address:    NexBank SSB
             2515 McKinney Ave., Ste. 1100
             Dallas, Texas 75201

*THE TERM DIP AGENT HAS EXECUTED THIS SETTLEMENT AGREEMENT ON THE EXPRESS UNDERSTANDING OF THE PARTIES THAT IT DOES NOT MAKE THE REPRESENTATION CONTAINED IN SECTION 4.2(b) of THIS SETTLEMENT AGREEMENT.*

IN WITNESS WHEREOF, the Parties execute this Settlement Agreement as of the date first written above.

Bank of America, N.A., the Prepetition Term Loan Agent

By: ___Melissa Mullis___

*Its duly authorized representative*
Name: Melissa Mullis
Title: AVP

**IN WITNESS WHEREOF,** the Parties execute this Settlement Agreement as of the date first written above.

Bain Capital Private Equity, LP, as a Sponsor

By: _____

*Its duly authorized representative*

Name: JOSH BEKENSTEIN

Title: MANAGING DIRECTOR

*[Signature Page to Settlement Agreement]*

**IN WITNESS WHEREOF, the Parties execute this Settlement Agreement as of the date first written above.**

Kohlberg Kravis Roberts & Co. L.P., as a Sponsor

By:_____

*Its duly authorized representative*

**Name:** Nathaniel Taylor

**Title:** Member

*[Signature Page to Settlement Agreement]*

IN WITNESS WHEREOF, the Parties execute this Settlement Agreement as of the date first
written above.

Vornado Realty Trust, as a Sponsor

By: _____

*Its duly authorized representative*
Name: JOSEPH MACNOW
Title: EVP - CFO r Chief Administrative
Officer

*[Signature Page to Settlement Agreement]*

IN WITNESS WHEREOF, the Parties execute this Settlement Agreement as of the date first written above.

Administrative Claim Holder

_Just Play LLC_,

By: _Geoff Greenberg_

*Its duly authorized representative*
**Name:** Geoffrey Greenberg
**Title:** Co-President

Address: _6 Terry Drive_
_Newtown PA 18940_

Aggregate Amount of Asserted Administrative Claims:

($)_____

Date: _7/17/18_

**IN WITNESS WHEREOF**, the Parties hereto have executed this Settlement Agreement as of the date set forth above.

Artsana (USA) Inc.
The Boppy Company LLC
Caben Asia Pacific LTD.

By their counsel:


  /s/ *John D. Demmy*
John D. Demmy
**SAUL EWING ARNSTEIN & LEHR, LLP**
1201 N. Market Street, Suite 2300
Wilmington, DE 19801
Telephone: (302) 421-6848
E-mail: john.demmy@saul.com

IN WITNESS WHEREOF, the Parties hereto have executed this Settlement Agreement as of the date set forth above.

CRAYOLA LLC

By: _____

Name: Stephen Hoff
Title: Chief Financial Officer

IN WITNESS WHEREOF, the Parties hereto have executed this Settlement Agreement as of the date set forth above.

**DOREL INDUSTRIES, INC.**, on its own behalf, and on behalf of Dorel Juvenile Group, Inc., Dorel Asia, Inc., Dorel Home Furnishings, Inc., Pacific Cycle, Inc.,

By: _____

Frank Rana

SVP Finance

**IN WITNESS WHEREOF**, the Parties hereto have executed this Settlement Agreement as of the date set forth above.

KENT INTERNATIONAL, INC., USA
HELMET SUB KENT INTL, INC., AND
KAZAM, LLC

By: _____

Name: ARNOLD KAMLER
Title:   Chief Executive Officer

**IN WITNESS WHEREOF,** the Parties hereto have executed this Settlement Agreement as of the date set forth above.

**KIDS II, INC.**

By: _____

Name: Ryan Gunnigle

Title:   Chief Executive Officer

**KIDS II FAR EAST LIMITED**

By: _____

Name: Ryan Gunnigle

Title:   Chief Executive Officer

38

IN WITNESS WHEREOF, the Parties hereto have executed this Settlement Agreement
as of the date set forth above.

THE STEP2 COMPANY, LLC

By: _____

Name:  Marc Mucci

KE 54853895

IN WITNESS WHEREOF, the Parties execute this Settlement Agreement as of the date first written above.

The Official Committee of Unsecured Creditors of Toys "R" Us, Inc. and Its Co-Debtors and Debtors-in-Possession

KRAMER LEVIN

By: _____

*Its duly authorized representative*
Name: KENNETH ECKSTEIN
Title: PARTNER

**IN WITNESS WHEREOF, the Parties execute this Settlement Agreement as of the date first written above.**

LEGO Systems, Inc. (solely in its capacity as an
Administrative Claim Holder)

By: _____

*Its duly authorized representative*
**Name:**   R. Scott Slifka
**Title:**   Secretary

IN WITNESS WHEREOF, the Parties execute this Settlement Agreement as of the date first written above.

Mattel, Inc. (solely in its capacity as an Administrative Claim Holder)

By: *Joseph J. Entenener*
*Its duly authorized representative*
Name: JOSEPH J. ENTENEUER
Title: CFO

*[Signature Page to Settlement Agreement]*

IN WITNESS WHEREOF, the Parties execute this Settlement Agreement as of the date first written above.

Evenflo Company, Inc. (solely in its capacity as an Administrative Claim Holder)

By: _____ AMY E NEFF _____

*Its duly authorized representative*
Name:
Title: ASSOCIATE GENERAL COUNSEL

**IN WITNESS WHEREOF, the Parties execute this Settlement Agreement as of the date first written above.**

Huffy Corporation (solely in its capacity as an Administrative Claim Holder)

_____,

By: _____

*Its duly authorized representative*
**Name:** Matthew S. Kerr
**Title:** SVP, Chief Financial Officer

*[Signature Page to Settlement Agreement]*

## Exhibit 2

**First Amendment to Settlement Agreement**

## FIRST AMENDMENT TO SETTLEMENT AGREEMENT

THIS FIRST AMENDMENT TO SETTLEMENT AGREEMENT[1] (this "<u>Amendment</u>") is made and entered into as of August 7, 2018, by and among (a) the Debtors, (b) the Ad Hoc Group of B-4 Lenders, (c) other lender parties whose signature pages are affixed to the Settlement Agreement, (d) the Creditors Committee, (e) the Term DIP Agent, (f) the Prepetition Term Loan Agent, (g) the Ad Hoc Vendor Group, (h) other administrative claimants whose signature pages are affixed to the Settlement Agreement, and (i) the Sponsors (the "<u>Settlement Parties</u>").

## RECITALS

**WHEREAS**, the Settlement Parties are parties to the Settlement Agreement; and

**WHEREAS**, the Settlement Parties now desire to amend the Settlement Agreement as set forth herein;

**NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Settlement Parties agree as follows:

1.      The definitions of "Non-Debtor Released Parties" and "Non-Debtor Releasing Parties" in Section 2.1 of the Settlement Agreement are each amended and restated to provide as follows:

> "<u>Non-Debtor Released Parties</u>" means (a) the Creditors Committee and its members, (b) each member of the Ad Hoc Vendor Group, (c) the Term DIP Agent, (d) each member of the Ad Hoc Group of B-4 Lenders (whether as a Prepetition Secured Lender or as a Term DIP Lender), (e) each of the other lender parties hereto, (f) each of the other administrative creditors party hereto, (g) the Prepetition Term Loan Agent, (h) each of the Sponsors, (i) all holders of Administrative Claims at Toys Delaware that do not affirmatively opt-out of participating in the Administrative Claims Distribution Pool, in each case in their respective capacities as such, (j) the administrative agent and collateral agent and lenders under the ABL/FILO DIP Facility, and (k) for each of those persons' or entities' identified in (a)-(j) above, such parties non-Debtor affiliates and its and their respective, directors, officers, agents, advisors, or professionals; *provided, however,* notwithstanding the foregoing, no current or former directors, officers, or managers of any of the Debtors, including any directors, officers, or managers affiliated with or designated by any of the Sponsors, in each case in their respective capacities as such, shall be "Non-Debtor Released Parties" under this Settlement Agreement.

---

[1]     The "Settlement Agreement" is that certain Settlement Agreement dated as of July 17, 2018, relating to, among other things, certain claims in the chapter 11 cases of *Toys "R" Us, Inc.* pending in the United States Bankruptcy Court for the Eastern District of Virginia as Case No. 17-34665.  Capitalized terms used but not defined in this Amendment shall have the meanings given to such terms in the Settlement Agreement.

"Non-Debtor Releasing Parties" means (a) the Creditors Committee and its members, (b) each member of the Ad Hoc Vendor Group, (c) the Term DIP Agent, (d) each member of the Ad Hoc Group of B-4 Lenders, (e) each of the other lender parties hereto, (f) the Prepetition Term Loan Agent, (g) each of the Sponsors (h) all holders of Administrative Claims at Toys Delaware other than those that affirmatively opt-out of participating in the Administrative Claims Distribution Pool, and (i) the administrative agent and collateral agent and lenders under the ABL/FILO DIP Facility,  in each case on behalf of themselves and their respective successors, assigns, and representatives, in each case in their respective capacities as such.

2.     The definition of "D&O Party" is amended and restated to provide as follows:

"D&O Party" means all current and former directors, officers, or managers (including Sponsor affiliated directors, officers, and managers) of the Debtors, in their respective capacities as such.

3.     Section 3.1(c)(2) of the Settlement Agreement is amended and restated to provide as follows:

Contingent Amounts:  Once the aggregate postpetition recovery of all B 4 Lenders from Toys Delaware and Wayne reaches 50% of the face amount of the approximately $1.003 billion in aggregate B-4 Claims (principal plus accrued interest) as of the Petition Date (for the avoidance of doubt, after giving effect to applicable distributions on account of Term B-2 Loans and Term B-3 Loans):  (i) the Prepetition Secured Lenders will receive 50% of any further recoveries from Toys Delaware and the remaining 50% will be distributed to the Administrative Claims Distribution Pool; and (ii) subject to the last two sentences of Section 3.1(b) hereof, the B-4 Lenders will receive 50% of any further recoveries from Wayne and the remaining 50% will be distributed to the Administrative Claims Distribution Pool.

4.     Section 3.4(b)(2) of the Settlement Agreement is amended and restated to provide as follows:

to the extent not already released in the Final DIP Financing Order, any and all Claims or Causes of Action against any of the Term DIP Lenders, the Term DIP Agent, the Prepetition Term Loan Agent, the administrative agent and collateral agent and lenders under the ABL/FILO DIP Facility, and any of the Prepetition Secured Lenders, in each case in their capacity as such, including, for the avoidance of doubt, any Claim or Cause of Action preserved for the Creditors Committee to seek to pursue on behalf of any estate under the Final DIP Financing Order (including any Claim or Cause of Action for fraudulent transfer or preference or based on section 506(c) or section 552(b) of the Bankruptcy Code)

2

5.      Except as set forth herein, the Settlement Agreement shall remain in full force and effect.  This Amendment may be signed in counterparts and electronic signatures shall be binding.

**IN WITNESS WHEREOF**, the Settlement Parties have executed this Amendment as of the date first set forth above.

[Signature pages follow]

KE 56267033

**Exhibit 3**

**Opt-Out Form**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

| | )  | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| TOYS "R" US, INC., *et al.*,[10] | ) | Case No. 17-34665 (KLP) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## ADMINISTRATIVE CLAIM HOLDER OPT-OUT
## FORM FOR OPTING OUT OF THE VENDOR SETTLEMENT AGREEMENT

**PLEASE READ AND FOLLOW THE ENCLOSED INSTRUCTIONS CAREFULLY
BEFORE COMPLETING THIS OPT-OUT FORM.**

IN ORDER FOR YOUR OPT-OUT TO BE EFFECTIVE, THIS FORM
MUST BE ACTUALLY RECEIVED BY AUGUST 24, 2018, AT 4:00 P.M.
(PREVAILING EASTERN TIME) (THE "SETTLEMENT OPT OUT DEADLINE").

FAILURE TO OPT OUT OF THE SETTLEMENT
AGREEMENT OR SUBMIT AN OPT-OUT FORM
WILL BIND  YOU TO THE TERMS OF THE SETTLEMENT AGREEMENT,
INCLUDING WITH RESPECT TO THE PLAN CONFIRMATION PROCESS.

On [August --, 2018], the Bankruptcy Court for the Eastern District of Virginia (the "Bankruptcy Court") approved a settlement agreement (the "Settlement Agreement") by and among, among others, certain of the above-captioned debtors and debtors in possession (collectively, the "Debtors"), the Creditors' Committee, an Ad Hoc Vendor Group, and an Ad Hoc Group of B-4 Lenders, which Settlement Agreement resolves certain issues related to, among others, the Debtors' wind-down of U.S. operations [Docket No. __] (the "Settlement Order").  The Settlement Order is attached hereto as **Exhibit 1**. The Settlement Agreement is attached to the Settlement Order as **Exhibit A**.  Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Settlement Order.

The Settlement Agreement provides certain benefits to all Holders of Administrative Claims and, subject to the opt-out described below, will bind any such Holder to its terms.  Pursuant to the Settlement Agreement, among other things, Holders of Administrative Claims that are party to the Settlement Agreement:

---

[10]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are set forth in the *Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief* [Docket No. 78].  The location of the Debtors' service address is One Geoffrey Way, Wayne, New Jersey 07470.

- are entitled to their pro rata share of $180 million from the Administrative Claims Distribution Pool;
- may share in additional recoveries if the recovery of the Prepetition Secured Lenders from certain Debtor entities reaches certain thresholds;
- may share in recoveries from the settlement or litigation of Non-Released Claims in the Non-Released Claims Trust;
- will receive a waiver and release of all potential preference and avoidance actions under the Bankruptcy Code and state and federal law that could be brought by the Debtors or any Chapter 7 trustee;
- agree to vote in favor of and support the Plan, if and when solicited;
- agree that your acceptance of and consent to the Settlement Agreement will be deemed consent to the Plan and acceptance of the treatment under the Plan in satisfaction of section 1129(a)(9) of the Bankruptcy Code; and
- agree to provide the Releases described in the Settlement Agreement.[11]

You are receiving this opt-out form (the "Opt-Out Form") because either (i) the Debtors believe you are a Holder of an Administrative Claim as of June 30, 2018 or (ii) you filed a proof of Administrative Claim, filed a motion seeking allowance of an Administrative Claim, or have otherwise asserted an Administrative Claim in these Chapter 11 Cases. All Holders of Administrative Claims (other than those party to the Settlement Agreement) have an option to opt out of the Settlement Agreement and Releases contained therein.

If you wish to opt out of the Settlement Agreement, you may only do so by following the procedures of this Opt-Out Form. **The Creditors' Committee, the Ad Hoc Vendor Group, and the Debtors recommend that you <u>not</u> opt out of the Settlement Agreement.**

<u>**IF YOU OPT OUT OF THE SETTLEMENT AGREEMENT, YOU WILL NOT BE ENTITLED TO ANY OF THE BENEFITS DESCRIBED ABOVE.**</u>

<u>**IF YOU DO NOT WISH TO OPT OUT OF THE SETTLEMENT AGREEMENT, YOU DO NOT NEED TO TAKE ANY FURTHER ACTION AT THIS TIME.**</u>

In order to opt out of the Settlement Agreement, your Opt-Out Form must be received by the Notice and Claims Agent on or before the Settlement Opt-Out Deadline, which is **[August 24], 2018, at 4:00 p.m., prevailing Eastern Time**. If an Opt-Out Form indicating your election is not received by the Settlement Opt-Out Deadline, and if the Settlement Opt-Out Deadline is not extended, **you will become a party to the Settlement Agreement, become entitled to the benefits thereof, and become bound by its terms and obligations.** If Administrative Claim Holders holding more than 7.5% in aggregate value of allowed Administrative Claims elect to opt out of the Settlement Agreement, the Ad Hoc group of B-4 Lenders and Debtors will have the option to terminate the Settlement Agreement.

---

[11]  Under the Settlement Agreement, the "Non-Debtor Released Parties" receiving a release include (a) the Creditors' Committee and its members, (b) each member of the Ad Hoc Vendor Group, (c) the Term DIP Agent, (d) each member of the Ad Hoc Group of B-4 Lenders, (e) each of the other lender parties hereto, (f) each of the other administrative creditors party hereto, (g) the Prepetition Term Loan Agent, (h) each of the Sponsors, (i) all holders of Administrative Claims at Toys Delaware that do not affirmatively opt-out of participating in the Administrative Claims Distribution Pool, in each case in their respective capacities as such, and (j) for each of those persons' or entities' identified in (a)-(i) above, such parties non-Debtor affiliates and its and their respective, directors, officers, agents, advisors, or professionals; *provided*, *however*, notwithstanding the foregoing, no directors, officers, or managers of any of the Debtors, including any directors, officers, or managers affiliated with or designated by any of the Sponsors, shall be "Non-Debtor Released Parties" under the Settlement Agreement.

You are strongly encouraged to review the Settlement Agreement before you make an election.  You may wish to seek legal advice concerning the Settlement Agreement and this Opt-Out Form.

<u>Item 1</u>.  **Amount of Claim(s).**

The undersigned hereby certifies that as of the date of completion of this Opt-Out Form, the undersigned asserts it was the Holder of an Administrative Claim or Claims in the following aggregate amount:[12]

$$\boxed{\$\underline{\hspace{6cm}}}$$

<u>Item 2</u>.  **Settlement Election.**  You may elect to opt out of the Settlement Agreement by checking the box below and returning this Opt-Out Form to the Notice and Claims Agent on or before the Settlement Opt-Out Deadline by mail or by using the electronic balloting portal, as set forth below.  If you return this Opt-Out Form but do not check the box below or do not return this Opt-Out Form, you will be bound by the Settlement Agreement.  If you submit multiple Opt-Out Forms, your last timely received Opt-Out form shall control.  Election to withhold consent is at your option.

☐     **THE HOLDER OF THE ADMINISTRATIVE CLAIM OR CLAIMS SET FORTH IN ITEM 1 ELECTS TO OPT OUT OF THE SETTLEMENT AGREEMENT.**

Should you wish to obtain a copy of the Settlement Agreement or any other documents in these Chapter 11 Cases, you should contact Prime Clerk LLC, by:  (a) calling the Debtors' restructuring hotline at (844)-794-3476; (b) visiting the Debtors' restructuring website at:  https://cases.primeclerk.com/toysrus; (c) writing to Toys "R" Us, Inc. Ballot Processing, c/o Prime Clerk LLC, 830 Third Avenue, 3rd Floor, New York, NY 10022; and/or (d) emailing **toysrusballots@primeclerk.com**.  You may also obtain copies of any pleadings filed in the Chapter 11 Cases for a fee via PACER at: http://www.vaeb.uscourts.gov.

To submit your Opt-Out Form via the Claims and Solicitation Agent's online balloting portal, visit https://cases.primeclerk.com/toysrus.  Click on the "Submit E-Ballot" section of the website and follow the instructions to submit your Election Form.

**IMPORTANT NOTE: You will need the following information to retrieve and submit your electronic Opt-Out Form:**

**Unique E-Ballot ID#:**_____

The Claims and Solicitation Agent's online balloting portal is the sole manner in which Opt-Out Forms will be accepted via electronic or online transmission.  Opt-Out Forms submitted by facsimile, email or other means of electronic transmission will not be counted.

Please complete and submit an electronic Opt-Out Form for each E-Ballot ID# you receive, as applicable.  Holders who cast an Opt-Out Form using the Claims and Solicitation Agent's online portal should NOT also submit a paper Opt-Out Form.

---

[12] This amount should represent the amount of your previously-asserted Administrative Claim.  Do not assert your Administrative Claim via this Opt-Out Form.  For more information about asserting an Administrative Claim, visit the Debtors' case website: https://cases.primeclerk.com/toysrus/EPOC-Index.  The Debtors reserve the right to dispute the asserted amount and validity of your asserted Administrative Claim.

<u>**Item 3**</u>.  **Acknowledgments.**  By signing this Opt-Out Form, the undersigned Holder of an Administrative Claim or Claims identified in Item 1 above certifies that (i) it is the Holder of the Administrative Claim(s) identified in Item 1 above or (ii) it has full power and authority to act on behalf of the Holder of the Administrative Claim(s) identified in Item 1 above.

_____
Name
_____
Social Security or Federal Tax I.D. No. (optional)
_____
Signature
_____
If by Authorized Agent, Name and Title
_____
Name of Institution
_____
Street Address
_____
City, State, Zip Code
_____
Telephone Number
_____
Email Address
_____
Date Completed

---

**PLEASE FOLLOW THESE INSTRUCTIONS FOR SUBMITTING YOUR ELECTION.  IF YOU ELECT TO OPT OUT OF THE SETTLEMENT AGREEMENT, PLEASE COMPLETE, SIGN, DATE, AND TRANSMIT THIS OPT-OUT FORM SO THAT IT IS *ACTUALLY RECEIVED* BY THE NOTICE AND CLAIMS AGENT ON OR BEFORE THE SETTLEMENT OPT-OUT DEADLINE.**

**IF YOU WOULD LIKE TO RECEIVE THE BENEFITS OF THE SETTLEMENT AGREEMENT AND DO NOT WISH TO OPT OUT OF THE SETTLEMENT AGREEMENT, YOU DO NOT NEED TO TAKE ANY FURTHER ACTION AT THIS TIME.**

**YOU MAY RETURN YOUR OPT-OUT FORM IN THE PRE-ADDRESSED, PRE-PAID RETURN ENVELOPE PROVIDED OR VIA FIRST CLASS MAIL, HAND DELIVERY, OR OVERNIGHT COURIER, TO:**

**TOYS "R" US, INC.
BALLOT PROCESSING CENTER
C/O PRIME CLERK LLC
830 THIRD AVENUE, 3RD FLOOR
NEW YORK, NY 10022**

**If you elect to opt out of the Settlement Agreement, please return your Opt-Out Form promptly.**

If you have any questions regarding this Opt-Out Form or the procedures for opting out, please contact Prime Clerk, by: (a) calling the Debtors' restructuring hotline at (844)-794-3476 (TOLL FREE); (b) visiting the Debtors' restructuring website at: https://cases.primeclerk.com/toysrus; (c) writing to Toys "R" Us, Inc. Ballot Processing, c/o Prime Clerk LLC, 830 Third Avenue, 3rd Floor, New York, NY 10022; and/or (d) emailing toysrusballots@primeclerk.com.

---

If Prime Clerk LLC does not actually receive the Opt-Out Form on or before [August 24], 2018, at 4:00 p.m., prevailing Eastern Time indicating your intent to opt out of the Settlement Agreement (and if the Settlement Opt-Out Deadline is not extended), your opt-out election will not be effective

## Exhibit B

**Form of Notice of Confirmation**

Edward O. Sassower, P.C.
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Emily E. Geier (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:       (212) 446-4800
Facsimile:       (212) 446-4900

-and-

Michael A. Condyles (VA 27807)
Peter J. Barrett (VA 46179)
Jeremy S. Williams (VA 77469)
**KUTAK ROCK LLP**
901 East Byrd Street, Suite 1000
Richmond, Virginia 23219-4071
Telephone:       (804) 644-1700
Facsimile:       (804) 783-6192

James H.M. Sprayregen, P.C.
Anup Sathy, P.C.
Chad J. Husnick, P.C. (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:       (312) 862-2000
Facsimile:       (312) 862-2200

*Co-Counsel to the Debtors and Debtors in Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

| | ) | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| TOYS "R" US, INC., *et al.*,[5] | ) | Case No. 17-34665 (KLP) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## NOTICE OF (I) ENTRY OF
## ORDER CONFIRMING THE DEBTORS' AMENDED
## CHAPTER 11 PLANS AND (II) OCCURRENCE OF EFFECTIVE DATE

**TO ALL CREDITORS, INTEREST HOLDERS, AND OTHER PARTIES IN INTEREST:**

**PLEASE TAKE NOTICE** that the Honorable Keith L. Phillips, United States Bankruptcy Judge, entered an order confirming the *Third Amended Joint Chapter 11 Plan of the Taj Debtors and TRU Inc. Debtors* (as may be modified, the "Plan") [Docket No. ●] (the "Confirmation

---

[5] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are set forth in the *Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief* [Docket No. 78]. The location of the Debtors' service address is One Geoffrey Way, Wayne, New Jersey 07470.

Order"), which the Clerk of the United States Bankruptcy Court for the Eastern District of Virginia (Richmond Division) (the "Bankruptcy Court") docketed on December [●], 2018.[6]

**PLEASE TAKE FURTHER NOTICE** that copies of the Confirmation Order, the Plan, and the related documents are available on the Bankruptcy Court's website at https://www.vaeb.uscourts.gov.   To access the Bankruptcy Court's website, you will need a PACER password and login, which can be obtained at http://www.pacer.psc.uscourts.gov.

**PLEASE TAKE FURTHER NOTICE** that the Effective Date occurred on December [●], 2018.

**PLEASE TAKE FURTHER NOTICE** that, unless otherwise provided in the Plan, the Confirmation Order, or any other applicable order of the Bankruptcy Court or Holders of an Allowed Administrative Claim and the Debtors have agreed otherwise, all requests for payment of Administrative Claims must be Filed and served on the Debtors on or before the Administrative Claims Bar Date:  (a) **July 16, 2018, at 5:00 p.m., prevailing Eastern Time**, for Administrative Claims arising on or prior to June 30, 2018; (b) for an Administrative Claim arising after June 30, 2018, the affected party shall file a Proof of Administrative Claim with respect to such claim following the Administrative Claims Procedures on or before the earlier of (i) the 15th day of the month following the month in which the claim arose at 5:00 p.m., prevailing Eastern Time, and (ii) fourteen (14) days following any hearing on a plan of liquidation, structured settlement, or other proposed resolution to the Debtors' chapter 11 cases, at 5:00 p.m., prevailing Eastern Time. Holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims that do not File and serve such a request on or before the Administrative Claims Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors, any purchasers of their assets, or their respective property, and such Administrative Claims shall be deemed compromised, settled, and released as of the Effective Date.[7]  Parties exempted from filing requests for payment of Administrative Claims under the Administrative Claims Bar Date Order are not required to comply the Administrative Claims Bar Date.

**PLEASE TAKE FURTHER NOTICE** that, unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be filed with the Bankruptcy Court within thirty (30) days after the later of (a) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection, (b) the Effective Date of such rejection, or (c) the Effective Date.

*[Remainder of page intentionally left blank]*

---

[6]   Capitalized terms used in this notice shall have the meanings ascribed to them in the Plan and the Confirmation Order.

[7]   For the avoidance of doubt, administrative Intercompany Claims between Debtors will be treated separately than all other Administrative Claims or prepetition Intercompany Claims and will receive Treatment as agreed to by and among the applicable Debtors or as determined by the Bankruptcy Court.

**PLEASE TAKE FURTHER NOTICE** that the Plan and its provisions are binding on the Debtors, the Reorganized Debtors, any Holder of a Claim against, or Interest in, the Debtors and such Holder's respective successors and assigns, whether or not the Claim or Interest of such Holder is Impaired under the Plan and whether or not such Holder or Entity voted to accept the Plan.

Richmond, Virginia
Dated: December [●], 2018

/s/ *Draft*
_____

| | |
|---|---|
| **KUTAK ROCK LLP** | **KIRKLAND & ELLIS LLP** |
| Michael A. Condyles (VA 27807) | **KIRKLAND & ELLIS INTERNATIONAL LLP** |
| Peter J. Barrett (VA 46179) | Edward O. Sassower, P.C. |
| Jeremy S. Williams (VA 77469) | Joshua A. Sussberg, P.C. (admitted *pro hac vice*) |
| 901 East Byrd Street, Suite 1000 | Emily E. Geier (admitted *pro hac vice*) |
| Richmond, Virginia 23219 | 601 Lexington Avenue |
| Telephone:  (804) 644-1700 | New York, New York 10022 |
| Facsimile:  (804) 783-6192 | Telephone:  (212) 446-4800 |
| Email:  Michael.Condyles@KutakRock.com | Facsimile:  (212) 446-4900 |
|   Peter.Barrett@KutakRock.com | Email:  edward.sassower@kirkland.com |
|   Jeremy.Williams@KutakRock.com |   joshua.sussberg@kirkland.com |
| |   emily.geier@kirkland.com |

*Co-Counsel to the Debtors*
*and Debtors in Possession*

-and-

James H.M. Sprayregen, P.C.
Anup Sathy, P.C.
Chad J. Husnick, P.C. (admitted *pro hac vice*)
300 North LaSalle
Chicago, Illinois 60654
Telephone:  (312) 862-2000
Facsimile:  (312) 862-2200
Email:  james.sprayregen@kirkland.com
  anup.sathy@kirkland.com
  chad.husnick@kirkland.com

*Co-Counsel to the Debtors*
*and Debtors in Possession*