**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| TOYS "R" US, INC., *et al.*[1] | ) | Case No. 17-34665 (KLP) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

**DISCLOSURE STATEMENT FOR THE CHAPTER 11
PLAN OF WAYNE REAL ESTATE PARENT COMPANY, LLC**

Edward O. Sassower, P.C.
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Emily E. Geier (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:       (212) 446-4900

-and-

Michael A. Condyles (VA 27807)
Peter J. Barrett (VA 46179)
Jeremy S. Williams (VA 77469)
**KUTAK ROCK LLP**
901 East Byrd Street, Suite 1000
Richmond, Virginia 23219-4071
Telephone:      (804) 644-1700
Facsimile:       (804) 783-6192

James H.M. Sprayregen, P.C.
Anup Sathy, P.C.
Chad J. Husnick, P.C. (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:       (312) 862-2200

*Co-Counsel to the Debtors and Debtors in Possession*

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are set forth in the *Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief* [Docket No. 78]. The location of the Debtors' service address is One Geoffrey Way, Wayne, New Jersey 07470.

THE DEBTOR IS PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT TO HOLDERS OF CLAIMS FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE *CHAPTER 11 PLAN OF WAYNE REAL ESTATE PARENT COMPANY, LLC*. NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY OTHER PURPOSE. BEFORE DECIDING WHETHER TO VOTE FOR OR AGAINST THE PLAN, EACH HOLDER ENTITLED TO VOTE SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN ARTICLE IX HEREIN. IN THE EVENT OF ANY INCONSISTENCY BETWEEN THIS DISCLOSURE STATEMENT AND THE PLAN, THE RELEVANT PROVISIONS OF THE PLAN WILL GOVERN.

THE DEBTOR URGES HOLDERS OF CLAIMS WHOSE VOTES ARE BEING SOLICITED TO ACCEPT THE PLAN. THE DEBTOR URGES EACH HOLDER OF A CLAIM TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN, AND THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY. FURTHERMORE, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, AND CERTAIN ANTICIPATED EVENTS IN THE DEBTOR'S CHAPTER 11 CASE. ALTHOUGH THE DEBTOR BELIEVES THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH ANTICIPATED EVENTS. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTOR'S MANAGEMENT EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. THE DEBTOR DOES NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

IN PREPARING THIS DISCLOSURE STATEMENT, THE DEBTOR RELIED ON FINANCIAL DATA DERIVED FROM THE DEBTOR'S BOOKS AND RECORDS AND ON VARIOUS ASSUMPTIONS REGARDING THE DEBTOR'S BUSINESS. WHILE THE DEBTOR BELIEVES THAT SUCH FINANCIAL INFORMATION FAIRLY REFLECTS THE FINANCIAL CONDITION OF THE DEBTOR AS OF THE DATE HEREOF AND THAT THE ASSUMPTIONS REGARDING FUTURE EVENTS REFLECT REASONABLE BUSINESS JUDGMENTS, NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN OR ASSUMPTIONS REGARDING THE DEBTOR'S BUSINESS AND ITS FUTURE RESULTS AND OPERATIONS. THE DEBTOR EXPRESSLY CAUTIONS READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD-LOOKING STATEMENTS CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER. THE DEBTOR OR ANY OTHER AUTHORIZED PARTY IN INTEREST MAY SEEK TO INVESTIGATE, FILE, AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS.

THE DEBTOR IS MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED. ALTHOUGH THE DEBTOR MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTOR HAS NO AFFIRMATIVE DUTY TO DO SO, AND EXPRESSLY DISCLAIMS ANY DUTY TO PUBLICLY UPDATE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE. HOLDERS OF CLAIMS OR INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THIS DISCLOSURE STATEMENT WAS FILED. INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION, MODIFICATION, OR AMENDMENT. THE DEBTOR RESERVES THE RIGHT TO FILE AN AMENDED OR MODIFIED PLAN AND RELATED DISCLOSURE STATEMENT FROM TIME TO TIME.

THE DEBTOR HAS NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT.

THE DEBTOR HAS NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTOR OR THE VALUE OF ITS PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS AND INTERESTS (INCLUDING THOSE HOLDERS OF CLAIMS OR INTERESTS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN, OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN.

THE CONFIRMATION AND EFFECTIVENESS OF THE PLAN ARE SUBJECT TO CERTAIN MATERIAL CONDITIONS PRECEDENT DESCRIBED HEREIN AND SET FORTH IN ARTICLE IX OF THE PLAN. THERE IS NO ASSURANCE THAT THE PLAN WILL BE CONFIRMED, OR IF CONFIRMED, THAT THE CONDITIONS REQUIRED TO BE SATISFIED FOR THE PLAN TO GO EFFECTIVE WILL BE SATISFIED (OR WAIVED).

YOU ARE ENCOURAGED TO READ THE PLAN AND THIS DISCLOSURE STATEMENT IN ITS ENTIRETY, INCLUDING THE SECTION ENTITLED "RISK FACTORS," BEFORE SUBMITTING YOUR BALLOT TO VOTE ON THE PLAN.

THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A GUARANTEE BY THE BANKRUPTCY COURT OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN OR AN ENDORSEMENT BY THE BANKRUPTCY COURT OF THE MERITS OF THE PLAN.

THE DEBTOR HAS SOUGHT TO ENSURE THE ACCURACY OF THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT; HOWEVER, THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR INCORPORATED HEREIN BY REFERENCE HAS NOT BEEN, AND WILL NOT BE, AUDITED OR REVIEWED BY THE DEBTOR'S INDEPENDENT AUDITORS UNLESS EXPLICITLY PROVIDED OTHERWISE.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(B) AND IS NOT NECESSARILY PREPARED IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS.

UPON CONFIRMATION OF THE PLAN, THE SECURITIES DESCRIBED IN THIS DISCLOSURE STATEMENT WILL BE ISSUED WITHOUT REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED, TOGETHER WITH THE RULES AND REGULATIONS PROMULGATED THEREUNDER (THE "SECURITIES ACT"), OR SIMILAR FEDERAL, STATE, LOCAL, OR FOREIGN LAWS, IN RELIANCE ON THE EXEMPTION SET FORTH IN SECTION 1145 OF THE BANKRUPTCY CODE. IF THE HOLDER OF SUCH SECURITIES (I) IS AN "UNDERWRITER" AS DEFINED IN SUBSECTION (B) OF SECTION 1145 OF THE BANKRUPTCY CODE OR (II) IS, OR WITHIN 90 DAYS OF SUCH PROPOSED DISPOSITION HAS BEEN, AN "AFFILIATE" (AS DEFINED IN RULE 144(A)(1) UNDER THE SECURITIES ACT) OF THE REORGANIZED DEBTOR, THE SECURITIES ISSUED UNDER THE PLAN MAY NOT BE OFFERED OR SOLD EXCEPT PURSUANT TO A VALID EXEMPTION FROM OR UPON REGISTRATION UNDER THE SECURITIES ACT.

THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR ANY SIMILAR FEDERAL, STATE, LOCAL, OR FOREIGN REGULATORY AGENCY, NOR HAS THE SEC OR ANY OTHER AGENCY PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT OR THE MERITS OF THE PLAN.

THE DEBTOR MAKES STATEMENTS IN THIS DISCLOSURE STATEMENT THAT ARE CONSIDERED FORWARD-LOOKING STATEMENTS UNDER FEDERAL SECURITIES LAWS. THE DEBTOR CONSIDERS ALL STATEMENTS REGARDING ANTICIPATED OR FUTURE MATTERS TO BE FORWARD-LOOKING STATEMENTS. FORWARD-LOOKING STATEMENTS MAY INCLUDE STATEMENTS ABOUT THE DEBTOR'S:

- BUSINESS STRATEGY;

- ESTIMATED FUTURE NET RESERVES AND PRESENT VALUE THEREOF;

- FINANCIAL CONDITION, REVENUES, CASH FLOWS, AND EXPENSES;

- **LEVEL OF INDEBTEDNESS, LIQUIDITY, AND COMPLIANCE WITH DEBT COVENANTS;**

- **FINANCIAL STRATEGY, BUDGET, AND OPERATING RESULTS;**

- **THE AMOUNT, NATURE, AND TIMING OF CAPITAL EXPENDITURES, INCLUDING FUTURE DEVELOPMENT COSTS;**

- **COSTS OF DEVELOPING THE DEBTOR'S PROPERTIES AND CONDUCTING OTHER OPERATIONS;**

- **GENERAL ECONOMIC AND BUSINESS CONDITIONS;**

- **COUNTERPARTY CREDIT RISK;**

- **THE OUTCOME OF PENDING AND FUTURE LITIGATION;**

- **GOVERNMENTAL REGULATION AND TAXATION POLICY;**

- **UNCERTAINTY REGRADING THE DEBTOR'S FUTURE OPERATING RESULTS; AND**

- **PLANS, OBJECTIVES, AND EXPECTATIONS.**

**STATEMENTS CONCERNING THESE AND OTHER MATTERS ARE NOT GUARANTEES OF THE DEBTOR'S FUTURE PERFORMANCE, IF ANY.   THERE ARE RISKS, UNCERTAINTIES, AND OTHER IMPORTANT FACTORS THAT COULD IMPACT THE DEBTOR'S ACTUAL FUTURE PERFORMANCE, IF ANY. THESE RISKS, UNCERTAINTIES, AND FACTORS MAY INCLUDE: THE DEBTOR'S ABILITY TO CONFIRM AND CONSUMMATE THE PLAN; THE POTENTIAL THAT THE DEBTOR MAY NEED TO PURSUE AN ALTERNATIVE TRANSACTION IF THE PLAN IS NOT CONFIRMED; THE POTENTIAL ADVERSE IMPACT OF THE CHAPTER 11 CASES ON THE DEBTOR'S OPERATIONS, MANAGEMENT, AND EMPLOYEES, THE RISKS ASSOCIATED WITH OPERATING THE DEBTOR'S BUSINESSES DURING THE CHAPTER 11 CASES; GENERAL ECONOMIC, BUSINESS, AND MARKET CONDITIONS; THE DEBTOR'S INABILITY TO DISCHARGE OR SETTLE CLAIMS DURING THE CHAPTER 11 CASES; EXPOSURE TO LITIGATION; THE DEBTOR'S ABILITY TO DIVEST EXISTING BUSINESSES; ADVERSE TAX CHANGES; LIMITED ACCESS TO CAPITAL RESOURCES; CHANGES IN DOMESTIC AND FOREIGN LAWS AND REGULATIONS; NATURAL DISASTERS; GEOPOLITICAL INSTABILITY; AND THE EFFECTS OF GOVERNMENTAL REGULATION ON THE DEBTOR'S BUSINESSES.**

**THIS DISCLOSURE STATEMENT IS SUBJECT TO FURTHER REVISION AND WILL BE AMENDED PRIOR TO THE HEARING TO CONSIDER ADEQUACY OF THIS DISCLOSURE STATEMENT AND THE RELATED SOLICITATION PROCEDURES TO, AMONG OTHER THINGS, TAKE INTO ACCOUNT THE RESULTS OF THE AUCTION, IF ANY, FURTHER SPECIFICS OF ANY RESTRUCTURING TRANSACTION TO BE CONSUMMATED PURSUANT TO THE PLAN, AND TO ACCOMMODATE ADDITIONAL REQUESTS FOR DISCLOSURE.**

# TABLE OF CONTENTS

Page

I.  INTRODUCTION ................................................................................................................1

II.  PRELIMINARY STATEMENT ......................................................................................1

III.  QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND
THE PLAN ..........................................................................................................................3

    A.  What is chapter 11? ................................................................................................3
    B.  Why is the Debtor sending me this Disclosure Statement? ...................................3
    C.  Am I entitled to vote on the Plan? .........................................................................3
    D.  What will I receive from the Debtor if the Plan is consummated? .........................4
    E.  What will I receive from the Debtor if I hold an Allowed Administrative Claim or a
       Priority Tax Claim? ................................................................................................4
    F.  Are any regulatory approvals required to consummate the Plan? ..........................4
    G.  What happens to my recovery if the Plan is not confirmed or does not go effective? .....................4
    H.  If the Plan provides that I get a distribution, do I get it upon Confirmation or when the
       Plan becomes effective, and what is meant by "Confirmation," "Effective Date," and
       "Consummation?" ...................................................................................................4
    I.  What are the sources of Cash and other consideration required to fund the Plan? ...........................5
    J.  Is there potential litigation related to the Plan? ....................................................5
    K.  How will the release of Avoidance Actions affect my recovery under the Plan? ...........................5
    L.  Will there be releases and exculpation granted to parties in interest as part of the Plan? ...............5
    M.  What is the effect of the Plan on the Debtor's ongoing business? .........................6
    N.  Could subsequent events potentially affect recoveries under the Plan? ................6
    O.  Do the Debtor recommend voting in favor of the Plan? .......................................6

IV.  OVERVIEW OF THE PLAN .............................................................................................6

    A.  General Settlement of Claims. ................................................................................7
    B.  Restructuring Transactions. ...................................................................................7
    C.  Sources of Consideration for Plan Distributions. ..................................................7
    D.  Issuance of New Common Stock ...........................................................................7
    E.  Exemption from Registration Requirements. .........................................................8
    F.  Subordination. ........................................................................................................8
    G.  Vesting of Assets in the Reorganized Debtor. .......................................................9
    H.  Cancellation of Securities and Agreements. ..........................................................9
    I.  Corporate Action. ..................................................................................................9
    J.  Corporate Existence; Tax Classification. .............................................................10
    K.  Charter, Bylaws, and New Organizational Documents. .......................................10
    L.  Effectuating Documents; Further Transactions. ..................................................10
    M.  Exemption from Certain Taxes and Fees. ............................................................11
    N.  Directors and Officers. ........................................................................................11
    O.  Retention of Causes of Action. ............................................................................11
    P.  Avoidance Actions. ..............................................................................................12
    Q.  Regulatory Requirements. ....................................................................................12
    R.  Insurance Contracts. ............................................................................................12
    S.  Settlement, Compromise, and Release of Claims and Interests. ..........................12
    T.  Discharge of Claims and Termination of Equity Interests ..................................13
    U.  Release of Liens. ..................................................................................................14
    V.  Releases by the Debtor. .......................................................................................14
    W.  Releases by Holders of Claims and Interests. .....................................................15
    X.  Exculpation. .........................................................................................................15
    Y.  Injunction. ............................................................................................................16

**V.    VOTING AND CONFIRMATION** .................................................................................**17**

    A.    Classes Entitled to Vote on the Plan. ............................................................... 17
    B.    Votes Required for Acceptance by a Class. ..................................................... 17
    C.    Certain Factors to Be Considered Prior to Voting. ......................................... 17
    D.    Solicitation Procedures. ................................................................................... 18
    E.    Voting Procedures. ........................................................................................... 19
    F.    Plan Objection Deadline. ................................................................................. 20
    G.    Confirmation Hearing. ..................................................................................... 20

**VI.    THE DEBTOR'S CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW** ...........**21**

    A.    History of Toys "R" Us, Inc. (the Debtor's Ultimate Parent). ........................ 21
    B.    History of the Debtor. ...................................................................................... 21
    C.    Debtor's Current Assets. .................................................................................. 22

**VII.    EVENTS LEADING TO THE CHAPTER 11 FILINGS** ...............................................**22**

    A.    Operational and Market Considerations. .......................................................... 22

**VIII.    EVENTS OF THE CHAPTER 11 CASES** ...................................................................**23**

    A.    First and Second Day Relief. ........................................................................... 23
    B.    Other Procedural and Administrative Motions. ............................................... 24
    C.    Retention Applications for Chapter 11 Professionals ...................................... 25
    D.    Appointment of Official Committee. ............................................................... 25
    E.    Schedules, Statements, Claims Bar Date, and Administrative Claims Bar Date ............................ 25
    F.    Postpetition Financing ..................................................................................... 26

**IX.    RISK FACTORS** .........................................................................................................**26**

    A.    Bankruptcy Law Considerations. ..................................................................... 26
    B.    Risks Related to the Debtor's Businesses. ....................................................... 29

**X.    STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN** ...................**30**

    A.    Requirements for Confirmation of the Plan. .................................................... 30
    B.    Alternative Plans. ............................................................................................. 32
    C.    Acceptance by Impaired Classes. ..................................................................... 32
    D.    Confirmation Without Acceptance by All Impaired Classes. .......................... 33

**XI.    CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE
    PLAN** ........................................................................................................................**34**

    A.    Introduction. ..................................................................................................... 34
    B.    Certain United States Federal Income Tax Consequences to the Debtor. ....... 35
    C.    Certain United States Federal Income Tax Consequences to U.S. Holders of Allowed
        Claims and Interests. ........................................................................................ 36
    D.    Certain United States Federal Income Tax Consequences to Non-U.S. Holders of Claims. ......... 40
    E.    Information Reporting and Back-Up Withholding. .......................................... 44

**XII.    RECOMMENDATION** ..............................................................................................**45**

**EXHIBITS**

EXHIBIT A      Chapter 11 Plan

## I.      INTRODUCTION

Wayne Real Estate Parent Company, LLC, as debtor and debtor in possession (the "<u>Debtor</u>"), submits this disclosure statement (this "<u>Disclosure Statement</u>") pursuant to section 1125 of the Bankruptcy Code to Holders of Claims against the Debtor in connection with the solicitation of acceptances with respect to the *Chapter 11 Plan of Wayne Real Estate Parent Company, LLC* (the "<u>Plan</u>"), dated December 24, 2018.[1]    A copy of the Plan is attached hereto as **Exhibit A** and incorporated herein by reference.

**THE DEBTOR BELIEVES THAT THE COMPROMISE CONTEMPLATED UNDER THE PLAN IS FAIR AND EQUITABLE, MAXIMIZES THE VALUE OF THE DEBTOR'S ESTATE, AND PROVIDES THE BEST RECOVERY TO CLAIM HOLDERS.    AT THIS TIME, THE DEBTOR BELIEVES THE PLAN IS THE BEST AVAILABLE ALTERNATIVE FOR COMPLETING THE CHAPTER 11 CASE.  THE DEBTOR STRONGLY RECOMMENDS THAT YOU VOTE TO ACCEPT THE PLAN.**

## II.      PRELIMINARY STATEMENT

On September 18, 2017 (the "<u>Petition Date</u>"), Toys "R" Us, Inc. and certain of its affiliates, including the Debtor (the "<u>TRU Retail Debtors</u>," and, together with its debtor affiliates, the "<u>Company</u>") filed voluntary petitions with the Bankruptcy Court under chapter 11 of the Bankruptcy Code.  On March 20, 2018, Toys "R" Us Property Company I, LLC and its debtor affiliates (the "<u>Propco I Debtors</u>") filed voluntary petitions with the Bankruptcy Court under chapter 11 of the Bankruptcy Code.

Following the commencement of the TRU Retail Debtors' cases the TRU Retail Debtors experienced reduced revenues and constricted cash flow, largely due to a weaker than expected 2017 holiday shopping season.  In the weeks leading up to March 20, 2018, it became clear to Toys "R" Us, Inc. and its stakeholders that the continuation of their business as a going concern in the United States was no longer tenable.  Accordingly, on March 15, 2018, the TRU Retail Debtors filed the *Debtors' Omnibus Motion for Entry of Orders: (I) Authorizing the Debtors to Wind-Down U.S. Operations, (II) Authorizing the Debtors to Conduct U.S. Store Closings, (III) Establishing Bidding Procedures For the Sale of the Debtors' Canadian Equity, (IV) Enforcing an Administrative Stay, and (V) Granting Related Relief* [Docket No. 2050] (the "<u>Wind-Down Motion</u>") seeking entry of orders for facilitating the orderly wind-down of the TRU Retail Debtors' operations in the United States, including the closure of the remainder of the TRU Retail Debtors' domestic retail locations.

On July 20, 2018, the Bankruptcy Court authorized the Propco I Debtors' retention of Raider Hill Advisors, LLC ("<u>Raider Hill</u>") as real estate advisor to the Propco I Debtors.  Since Raider Hill's retention, the Propco I Debtors have been engaged in the process of selling or otherwise disposing of their leased and owned properties.  On September 27, 2018, the Propco I Debtors conducted an auction of several of their leased properties.  And, on October 16, 2018, the Propco I Debtors assumed 22 of their store leases, prior to the expiration of their time period to assume unexpired leases of non-residential real property pursuant to section 365(d)(4) of the Bankruptcy Code (the "<u>365(d)(4) Deadline</u>").  With the status of the Propco I Debtors' leased properties largely determined, the Propco I Debtors have engaged in negotiations with the Creditors' Committee to bring a resolution to these chapter 11 cases so that the Propco I Debtors can manage, market and/or otherwise dispose of the remainder of their assets outside of chapter 11.  The result

---

[1]    Capitalized terms used but not otherwise defined in this Disclosure Statement will have the meaning ascribed to such terms in the Plan.  The summary of the Plan provided herein is qualified in its entirety by reference to the Plan.  In the case of any inconsistency between this Disclosure Statement and the Plan, the Plan will govern.

of those negotiations is the *Joint Chapter 11 Plan of Toys "R" Us Property Company I, LLC and its Debtor Affiliates*.

The Debtor, in consultation with its stakeholders, determined that the best path forward would be a separate plan for the Debtor.  The result of that determination and subsequent negotiations is the *Chapter 11 Plan of Wayne Real Estate Parent Company, LLC* attached hereto as **Exhibit A** (the "<u>Plan</u>").  The Plan contemplates a reorganization of the Debtor, allowing it to emerge from chapter 11 as a holding company for the Propco I Debtors, allowing the General Unsecured Creditors of the Debtor to receive the Debtor's recovery under the Propco I Plan.  Specifically, under the terms of the Plan, holders of Claims and Interests will receive the following treatment in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, such holders' Claims and Interests:

- **Allowed Priority Tax Claims**.  Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

- **Class 1 - Other Secured Claims**.  On the Effective Date, or as soon as reasonably practicable thereafter, except to the extent that a Holder of an Allowed Other Secured Claim agrees to a less favorable treatment, in full and final satisfaction and discharge of each Allowed Other Secured Claim, each Holder thereof shall receive, either:  (a) payment in full in Cash; or (b) delivery of the collateral securing any such Claim and payment of any interest required under section 506(b) of the Bankruptcy Code.

- **Class 2 - Other Priority Claims**.  On the Effective Date, or as soon as reasonably practicable thereafter, except to the extent that a Holder of an Allowed Other Priority Claim agrees to a less favorable treatment, in full and final satisfaction and discharge of each Allowed Other Priority Claim, each Holder thereof shall receive, either:  (a) payment in full in Cash or (b) such other treatment as shall render such Claim Unimpaired.

- **Class 3 – General Unsecured Claims**.  On the Effective Date, or as soon as reasonably practicable thereafter, except to the extent that a Holder of an Allowed General Unsecured Claim agrees to a less favorable treatment, in full and final satisfaction of each Allowed General Unsecured Claim, each Holder of an Allowed General Unsecured Claim shall receive their pro rata share of the consideration to be specified in the Restructuring Transactions Memorandum, which in any case will consist of either direct or indirect ownership of the New Contingent Equity Rights (as defined in the Propco I Plan), which direct or indirect ownership may be accomplished through the receipt of New Common Stock, the direct receipt of the New Contingent Equity Rights, or another mechanism to be determined.

- **Class 4 - Intercompany Claims**.  On the Effective Date, or as soon as reasonably practicable thereafter, each Intercompany Claim shall be Reinstated or canceled without any distribution on account of such Intercompany Claim as determined by the Debtor in its sole discretion.

- **Class 5 - Interests in the Debtor**.  On the Effective Date, or as soon as reasonably practicable thereafter, in full and final satisfaction and discharge of each Interest in the Debtor, each Holder of an Interest in the Debtor will be cancelled without any distribution on account of such Interest.

The Debtor believes that the Plan maximizes stakeholder recoveries in this Chapter 11 Case.  The Debtor seeks the Bankruptcy Court's approval of the Plan and urges all holders of Claims entitled to vote to accept the Plan by returning their Ballots so that Prime Clerk LLC, the Debtor's solicitation agent (the "Solicitation Agent"), actually receives such Ballots by the Voting Deadline, *i.e.*, January 18, 2019, at 4:00 p.m. prevailing Eastern Time.  Assuming the Plan receives the requisite acceptances, the Debtor will seek the Bankruptcy Court's approval of the Plan at the Confirmation Hearing.

## III.    QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND THE PLAN

### A.    What is chapter 11?

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code.  In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment of creditors and similarly situated equity interest holders, subject to the priority distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the Debtor as of the date the chapter 11 case is commenced.  The Bankruptcy Code provides that the Debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummating a chapter 11 plan is the principal objective of a chapter 11 case.  A bankruptcy court's confirmation of a plan binds the debtor, any person acquiring property under the plan, any creditor or equity interest holder of the debtor, and any other entity as may be ordered by the bankruptcy court. Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for treatment of the debtor's liabilities in accordance with the terms of the confirmed plan.

### B.    Why is the Debtor sending me this Disclosure Statement?

The Debtor is seeking to obtain Bankruptcy Court approval of the Plan.  Before soliciting acceptances of the Plan, section 1125 of the Bankruptcy Code requires the Debtor to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan and to share such disclosure statement with all holders of claims or interest whose votes on the Plan are being solicited.  This Disclosure Statement is being submitted in accordance with these requirements.

### C.    Am I entitled to vote on the Plan?

Your ability to vote on, and your distribution (if any) under, the Plan depends on what type of Claim or Interest you hold.  Each category of holders of Claims or Interests, as set forth in Article III of the Plan pursuant to section 1122(a) of the Bankruptcy Code, is referred to as a "Class."  Each Class's respective voting status is set forth below:

| Class | Claims and Interests | Status | Voting Rights |
|-------|---------------------|--------|---------------|
| Class 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 3 | General Unsecured Claims | Impaired | Entitled to Vote |
| Class 4 | Intercompany Claims | Unimpaired or Impaired | Not Entitled to Vote (Deemed to Accept or Deemed to Reject) |

| Class | Claims and Interests | Status | Voting Rights |
|-------|---------------------|--------|---------------|
| Class 5 | Interests in the Debtor | Impaired | Not Entitled to Vote (Deemed to Reject) |

**D.      What will I receive from the Debtor if the Plan is consummated?**

The following chart provides a summary of the anticipated recovery to Holders of Claims and Interests under the Plan.  Any estimates of Claims and Interests in this Disclosure Statement may vary from the final amounts allowed by the Bankruptcy Court.  Your ability to receive distributions under the Plan depends upon the ability of the Debtor to obtain Confirmation and meet the conditions necessary to consummate the Plan.

Each Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under the Plan the treatment described below in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, such Holder's Allowed Claim or Allowed Interest, except to the extent different treatment is agreed to by the Debtor and the Holder of such Allowed Claim or Allowed Interest, as applicable.  Unless otherwise indicated, the Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the later of the Effective Date and the date such Holder's Claim or Interest becomes an Allowed Claim or Allowed Interest or as soon as reasonably practicable thereafter.

**E.      What will I receive from the Debtor if I hold an Allowed Administrative Claim or a Priority Tax Claim?**

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.  Administrative Claims will be satisfied as set forth in Article II.A of the Plan, and Priority Tax Claims will be satisfied as set forth in Article II.C of the Plan.

**F.      Are any regulatory approvals required to consummate the Plan?**

No.  There are no known regulatory approvals that are required to consummate the Plan.  Nonetheless, assignment of any federal leases requires the consent of the United States Department of the Interior or other governmental units.  In addition, certain of the Debtor's operations may require federal approval as further described in Article IX.B of this Disclosure Statement.

**G.      What happens to my recovery if the Plan is not confirmed or does not go effective?**

In the event that the Plan is not confirmed or does not go effective, there is no assurance that the Debtor will be able to effectuate the restructuring transaction.  It is possible that any alternative, including a potential sale under section 363 of the Bankruptcy Code may provide holders of Claims and Interests with less than they would have received pursuant to the Plan.

**H.      If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan becomes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation?"**

"Confirmation" of the Plan refers to approval of the Plan by the Bankruptcy Court.  Confirmation of the Plan does not guarantee that you will receive the distribution indicated under the Plan.  After Confirmation of the Plan by the Bankruptcy Court, there are conditions that need to be satisfied or waived so that the Plan can go effective.  Initial distributions to holders of Allowed Claims or Interests will only be made on the date the Plan becomes effective—the "Effective Date"—or as soon as practicable thereafter,

as specified in the Plan. *See* Article X of this Disclosure Statement, entitled "Statutory Requirements for Confirmation of the Plan," for a discussion of the conditions precedent to consummation of the Plan. "Consummation" refers to "substantial consummation" of the Plan, as defined in section 1101(2) of the Bankruptcy Code, and means (1) the transfer of all or substantially all of the property proposed by the Plan to be transferred; (2) assumption by the Debtor or by the successors to the Debtor under the Plan of the business or of the management of all or substantially all of the property dealt with by the Plan; and (3) commencement of distributions under the Plan.

**I.      What are the sources of Cash and other consideration required to fund the Plan?**

The Plan will be funded by Cash on hand and any other Cash received or generated by the Debtor.

**J.      Is there potential litigation related to the Plan?**

Parties in interest may object to the approval of this Disclosure Statement and may object to Confirmation of the Plan as well, which objections potentially could give rise to litigation. In the event that it becomes necessary to confirm the Plan over the objection of certain Classes, the Debtor may seek confirmation of the Plan notwithstanding the dissent of such objecting Classes. The Bankruptcy Court may confirm the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code, which allow the Bankruptcy Court to confirm a plan that has been rejected by an impaired Class if it determines that the plan satisfies section 1129(b) of the Bankruptcy Code.

**K.      How will the release of Avoidance Actions affect my recovery under the Plan?**

In accordance with section 1123(b) of the Bankruptcy Code, on the Effective Date, and except to the extent otherwise reserved in the Plan Supplement, the Debtor, on behalf of itself and its estate, shall release any and all Avoidance Actions and the Debtor, and any of their successors or assigns and any Entity acting on behalf of the Debtor shall be deemed to have waived the right to pursue any and all Avoidance Actions. No Avoidance Actions shall revert to creditors of the Debtor.

**L.      Will there be releases and exculpation granted to parties in interest as part of the Plan?**

Yes, the Plan contains certain releases (as described more fully in Article IV of this Disclosure Statement), including mutual releases between (a) the Debtor; (b) the Reorganized Debtor; (c) the TRU Retail Debtor Parties; (d) the Propco I Debtors; (e) the Creditors' Committee and its members; (f) the Sponsors; and (g) with respect to each of the foregoing entities in clauses (a) through (f), such entity's current and former Affiliates, and each of such entity's, and such entity's current and former affiliates', current and former equity holders (regardless of whether such interests are held directly or indirectly), subsidiaries, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals; (h) all Holders of Claims and Interests that are deemed to accept the Plan and do not opt-out of the releases; (i) all Holders of Claims and Interests who vote to accept the Plan; and (j) all Holders of Claims who receive a Ballot, abstain from voting, and do not otherwise opt-out of the releases.

The Debtor believes that the Debtor's releases, third-party releases, and exculpation provisions included in the Plan are an integral part of the Debtor's overall restructuring efforts. On balance, the value of any potential claim held by the Estate is far outweighed by the cost of prosecuting such a claim. Indeed, any prosecution of such claims would only further deplete estate resources and reduce creditor recoveries. Further, the Debtor assert that many of the Released Parties and the Exculpated Parties have made substantial and valuable contributions to the Debtor's restructuring through efforts to negotiate and implement the Plan, which will maximize the value of the Debtor for the benefit of all parties in interest.

Accordingly, for all of these reasons the Debtor believes that each of the Released Parties and the Exculpated Parties warrants the benefit of the release and exculpation provisions. Based on the foregoing, the Debtor believes that the releases and exculpations in the plan are necessary and appropriate and meet the applicable legal standard. Moreover, the Debtor will present evidence at the Confirmation Hearing to demonstrate the basis for the propriety of the release and exculpation provisions.

The Plan also provides that all holders of Claims that (i) vote to accept or (ii) are deemed to accept the Plan or are in a voting Class who abstain from voting on the Plan and do not opt out of the release provisions contained in Article VIII of the Plan will be deemed to have expressly, unconditionally, generally, individually, and collectively released all Claims and Causes of Action against the Debtor and the Released Parties.

**Importantly, all holders of Claims and Interests that are not in the Voting Class that do not file an objection with the Bankruptcy Court in the Chapter 11 Cases that expressly objects to the inclusion of such holder as a Releasing Party under the provisions contained in Article VIII.E of the Plan or do not elect to opt out of the provisions contained in Article VIII.E of the Plan using the documents provided, if any, will be deemed to have expressly, unconditionally, generally, individually, and collectively consented to the release of all Claims and Causes of Action against the Debtor and the Released Parties. By objecting to or electing to opt out of the releases set forth in Article VIII.E of the Plan you will forgo the benefit of obtaining the releases set forth in Article VIII.E of the Plan if you otherwise would be a Released Party thereunder. The releases are an integral element of the Plan.**

M.    **What is the effect of the Plan on the Debtor's ongoing business?**

Upon the Effective Date, all actions contemplated by the Plan will be deemed authorized and approved. The Debtor will continue its existence as the parent company for the Propco I Debtors.

N.    **Could subsequent events potentially affect recoveries under the Plan?**

Potentially, yes. The Debtor's only asset is its ownership interest in the Propco I Debtors. Recoveries to Holders of Equity Interests in the Propco I Debtors are governed by the Propco I Plan, which contemplates that such Interest Holders will receive recoveries only once sufficient value is realized from the sale of the Propco I Debtors' assets outside of chapter 11. The extended time frame of the distribution of the Propco I Debtors' assets, and the fact that the Propco I Debtors are being recapitalized rather than immediately liquidated, creates additional risks that market factors may affect long-term recoveries to General Unsecured Creditors of the Debtor.

O.    **Do the Debtor recommend voting in favor of the Plan?**

Yes. The Debtor believes the Plan provides for a larger distribution to the Debtor's creditors than would otherwise result from any other available alternative. The Debtor, in consultation with their advisors, believe that the Plan is in the best interest of all holders of Claims or Interests, and that any other alternatives (to the extent they exist) fail to realize or recognize the value inherent under the Plan.

IV.    **OVERVIEW OF THE PLAN**

The Plan provides for the reorganization of the Debtor as a real estate company, which will manage and/or dispose of the Debtor's property outside of chapter 11. The key terms of the Plan are as follows:

A.       **General Settlement of Claims.**

As discussed further herein, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, or otherwise resolved pursuant to the Plan.  The Plan shall be deemed a motion to approve such good-faith compromise and settlement of all such Claims, Interests, Causes of Action, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable, and in the best interests of the Debtor and its Estate.  Distributions made to holders of Allowed Claims in any Class are intended to be final.

B.       **Restructuring Transactions.**

On or before the Effective Date, the Debtor may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, the Plan Supplement and the Confirmation Order (the "Restructuring Transactions"), including:  (1) the execution, filing, and delivery of appropriate agreements or other documents of merger, sale, disposition, transfer, consolidation, reorganization, restructuring, liquidation, dissolution, or equity issuance, certificates of incorporation, certificates of conversion, certificates of formation, operating agreements, bylaws, or other documents containing terms that are consistent with or reasonably necessary to implement the terms of the Plan and that satisfy the requirements of applicable law; (2) the execution and delivery of appropriate instruments of sale, equity issuance, transfer, assignment, assumption, or delegation of any property, right, liability, duty, or obligation on terms consistent with the terms of the Plan; (3) the issuance of the New Common Stock (if applicable), (4) the execution of the New Organizational Documents, (5) the vesting of the Debtor's assets in the Reorganized Debtor, in each case in accordance with the Plan and the Plan Supplement; (6) such other transactions that are necessary or appropriate to implement the Plan in the most tax efficient manner, including any mergers, sales, dispositions, transfers, consolidations, restructurings, conversions, formations, organizations, dissolutions or liquidations (including the transactions set forth in the Restructuring Transactions Memorandum); and (7) all other transactions or actions that either (x) the Debtor or (y) the Reorganized Debtor, as applicable, determine are necessary or appropriate to implement the Plan.  The Restructuring Transactions may include a transfer of all or substantially all or a part of the Debtor's assets or entities to a newly-formed entity (or an affiliate or subsidiary of such entity) formed and controlled by certain holders of Claims against the Debtor and, in such case, some or all of the New Common Stock (and/or other interests) issued to holders of Claims pursuant to the Plan may comprise stock (and/or other interests) of such new entity (or an affiliate or subsidiary of such entity).

C.       **Sources of Consideration for Plan Distributions.**

The Debtor Cash on hand, and any other Cash received or generated by the Debtor shall be used to fund the distributions to holders of Allowed Claims against the Debtor in accordance with the treatment of such Claims as set forth herein and subject to the terms provided herein.

D.       **Issuance of New Common Stock**

Upon the Effective Date, all Interests in the Debtor shall be cancelled and the New Common Stock may be issued as set forth under the Plan.  The New Common Stock (if applicable) shall be freely tradable and eligible for the book-entry delivery, depository and settlement services of DTC.  On the Effective Date,

the Reorganized Debtor shall issue all securities, notes, instruments, certificates, and other documents required to be issued pursuant to the Plan.

On the Effective Date, Holders of New Common Stock (if applicable) shall be parties to certain New Organizational Documents. On the Effective Date, the Reorganized Debtor and the Holders of New Common Stock (to the extent applicable) shall enter into and deliver the New Organizational Documents to each Entity that is intended to be a party thereto and such New Organizational Documents shall be deemed to be valid, binding, and enforceable in accordance with their terms, and each Holder of New Common Stock shall be bound thereby, in each case, without the need for execution by any party thereto other than the Reorganized Debtor.

E.     **Exemption from Registration Requirements.**

The New Common Stock is or may be a security within the meaning of Section 2(a)(1) of the Securities Act, Section 101 of the Bankruptcy Code and applicable state securities laws.

The offering, issuance, sale and distribution of all shares of New Common Stock will be exempt from, among other things, the registration and prospectus delivery requirements under the Securities Act or any similar federal, state, or local laws in reliance upon section 1145 of the Bankruptcy Code to the maximum extent permitted and applicable, without further act or action by the Reorganized Debtor. The New Common Stock (a) is not a "restricted security" as defined in Rule 144(a)(3) under the Securities Act unless the initial recipient thereof is an entity that is an "underwriter" as defined in subsection (b) of section 1145 of the Bankruptcy Code, and (b) if such security is not a "restricted security" as defined in Rule 144(a)(3) under the Securities Act, such security will be freely tradable and transferable by the initial recipient thereof if at the time of transfer such initial recipient is not an "affiliate" (as defined in Rule 144(a)(1) under the Securities Act) of the Reorganized Debtor and has not been such an "affiliate" within 90 days of such transfer.

The Reorganized Debtor need not provide any further evidence to DTC other than the Plan or the Confirmation Order with respect to the treatment of securities to be issued under the Plan (including securities issuable upon exercise of such securities) under applicable securities laws.

DTC shall be required to accept and conclusively rely upon the Plan or Confirmation Order in lieu of a legal opinion regarding whether such securities are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services. Notwithstanding anything to the contrary in the Plan, no entity (including, for the avoidance of doubt, DTC) may require a legal opinion regarding the validity of any transaction contemplated by the Plan, including, for the avoidance of doubt, whether the New Common Stock is exempt from registration and/or eligible for DTC book-entry delivery, settlement and depository services.

F.     **Subordination.**

The allowance, classification, and treatment of all Claims and Interests under the Plan conform to and are consistent with the respective contractual, legal, and equitable subordination rights of such Claims and Interests, and the Plan recognizes and implements any such rights. Pursuant to section 510 of the Bankruptcy Code, except where otherwise provided herein, the rights of the Debtor or the Reorganized Debtor, as applicable, are hereby reserved to re-classify any Allowed Claim or Allowed Interest in accordance with any contractual, legal, or equitable subordination rights relating thereto upon entry of a Final Order ruling that such Allowed Claim or Allowed Interest (or portion thereof) is subordinated. On the Effective Date, any and all subordination rights or obligations that a Holder of a Claim or Interest may have with respect to any distribution to be made under the Plan will be discharged and terminated, and all actions related to the enforcement of such subordination rights will be enjoined permanently. Accordingly,

8

distributions under the Plan to holders of Allowed Claims and Allowed Interests will not be subject to turnover or payment to a beneficiary of such terminated subordination rights, or to levy, garnishment, attachment or other legal process by a beneficiary of such terminated subordination rights.

### G.    Vesting of Assets in the Reorganized Debtor.

Except as otherwise provided herein, or in any agreement, instrument, or other document incorporated in the Plan (including, without limitation, the Restructuring Transactions Memorandum), on the Effective Date, all property in Debtor's Estate, including the Reorganized Debtor's Assets, all Causes of Action, claims, or defenses, and any property acquired by any of the Debtor under the Plan shall vest in each respective Reorganized Debtor (excluding any Executory Contracts and Unexpired Leases included on the Schedule of Rejected Executory Contracts and Unexpired Leases), free and clear of all Liens, Claims, charges, or other encumbrances.  On and after the Effective Date, except as otherwise provided herein, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and pursue, compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than any restrictions expressly imposed by the Plan, the Plan Supplement, or the Confirmation Order. Notwithstanding anything to the contrary in the Plan, the Unimpaired Claims against a Debtor shall remain the obligations solely of the Debtor or the Reorganized Debtor and shall not become obligations of any other Debtor or Reorganized Debtor by virtue of the Plan, the Chapter 11 Cases, or otherwise.

### H.    Cancellation of Securities and Agreements.

On the Effective Date, except to the extent otherwise provided in the Plan, under Article IV.G and IV.H, all notes, instruments, Certificates, and other documents evidencing, or in anyway related to, Claims or Interests shall be canceled and the obligations of the Debtor or Reorganized Debtor thereunder or in any way related thereto shall be released, settled, and compromised.

### I.    Corporate Action.

On the Effective Date, or as soon thereafter as is reasonably practicable, all actions as may be necessary or appropriate to effect any transactions described in, approved by, contemplated by, or necessary to effectuate the Restructuring Transactions shall be deemed authorized and approved by the Bankruptcy Court in all respects, including, as applicable:  (a) the adoption, execution, delivery and/or filing of the New Organizational Documents, (b) the selection of the directors, managers, and officers for the Reorganized Debtor, including the appointment of the New Board, in accordance with the terms of the Plan; (c) the authorization, issuance, delivery and distribution of New Common Stock; (d) the rejection, assumption, or assumption and assignment, as applicable, of Executory Contracts and Unexpired Leases; and (e) all other actions that may be required by applicable law.  Upon the Effective Date, all matters provided for in the Plan involving the corporate structure the Reorganized Debtor, and any corporate action required by the Debtor, or the Reorganized Debtor in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders, directors, or officers of the Debtor or the Reorganized Debtor.  On or before the Effective Date (as applicable), the appropriate officers of the Debtor or the Reorganized Debtor shall be authorized and (as applicable) directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effectuate the Restructuring Transactions) in the name of and on behalf of the Reorganized Debtor, including any and all other agreements, documents, Securities, and instruments relating to the foregoing, to the extent not previously authorized by the Bankruptcy Court.  The authorizations and approvals contemplated by Article IV.M of the Plan shall be effective notwithstanding any requirements under non-bankruptcy law.

### J.    Corporate Existence; Tax Classification.

As noted above, Holders of Class 3 Claims will directly or indirectly receive the New Contingent Equity Rights, which constitute Interests in Propco I.  Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, Reorganized Propco I and the Reorganized Propco I Subsidiaries shall continue to exist as separate limited liability companies, with all the powers of a corporation, limited liability company, partnership, or other form of Entity, as the case may be, pursuant to the applicable law in the jurisdiction in which each Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and by-laws (or other analogous formation documents) in effect before the Effective Date, except to the extent such certificate of incorporation and bylaws (or other analogous formation documents) are amended or amended and restated by the Plan (including pursuant to the provisions of <u>Article IV.K</u> of the Plan), the New Organizational Documents, or otherwise, and to the extent such documents are amended or amended and restated, such documents are deemed to be amended or amended and restated pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law).  Subject to the Restructuring Transactions Memorandum, Reorganized Propco I will be treated as a partnership for U.S. federal income (and applicable state and local) tax purposes, and the Reorganized Propco I Subsidiaries will be treated as disregarded entities of Reorganized Propco I for U.S. federal income (and applicable state and local) tax purposes; *provided* that, on or before the Effective Date and at the option of the Creditors' Committee, the Propco I Debtors will (and will cause their affiliates to) take any actions necessary to cause Reorganized Propco I and/or one or more of the Reorganized Propco I Subsidiaries to be treated as a corporation for U.S. federal income (and applicable state and local) tax purposes effective as of prior to the actual or constructive receipt of any consideration under the Plan, including by executing and filing one or more IRS Forms 8832 (and analogous forms for applicable state and local tax purposes).

To the extent the New Common Stock is issued, the tax classification of the entity issuing the New Common Stock will be specified in the Restructuring Transactions Memorandum.

### K.    Charter, Bylaws, and New Organizational Documents.

On the Effective Date, or as soon thereafter as is reasonably practicable, to the extent applicable, the Debtor's respective certificates of incorporation and bylaws (and other formation and constituent documents relating to limited liability companies) shall be amended or amended and restated as may be required to be consistent with the provisions of the Plan, the New Organizational Documents, and any other documents required to complete the Restructuring Transactions, as applicable, and the Bankruptcy Code.  The New Organizational Documents shall, among other things:  (a) authorize the issuance of the New Common Stock; and (b) be modified or deemed to be modified to include a provision pursuant to and only to the extent required by section 1123(a)(6) of the Bankruptcy Code, prohibiting the issuance of non-voting equity Securities.  After the Effective Date, each Reorganized Debtor may amend and restate its certificate of incorporation and other formation and constituent documents as permitted by the laws of its respective jurisdiction of formation and the terms of such documents.

### L.    Effectuating Documents; Further Transactions.

Prior to the Effective Date, the Debtor, and on and after the Effective Date, the Reorganized Debtor, in each case to the extent applicable, and the officers and members thereof are authorized to and may issue, execute, deliver, file, or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.

**M.**     **Exemption from Certain Taxes and Fees.**

Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property or any Interests pursuant to the Plan, including the recording of any amendments to such transfers, or any new mortgages or liens placed on the property in connection with such transfers, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment.

**N.**     **Directors and Officers.**

To the extent applicable, the members of the New Board shall be identified prior to the Confirmation Hearing in the Plan Supplement or at the Confirmation Hearing consistent with section 1129(a)(5) of the Bankruptcy Code.  On the Effective Date, except as otherwise provided in the Plan Supplement or announced on the record at the Confirmation Hearing, the existing officers of the Debtor shall serve in their current capacities for the Reorganized Debtor.  From and after the Effective Date, each director, officer, or manager of the Reorganized Debtor shall serve pursuant to the terms of the respective Reorganized Debtor's charters and bylaws or other formation and constituent documents, and applicable laws of the respective Reorganized Debtor's jurisdiction of formation.

**O.**     **Retention of Causes of Action.**

Unless any Cause of Action against an Entity is expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order such that the Debtor retain no right or interest in such Cause of Action as of the Effective Date, in accordance with section 1123(b) of the Bankruptcy Code, the Debtor shall reserve, retain, and may enforce, all rights to commence, prosecute or settle, as appropriate, any and all Causes of Action, whether arising or accruing before or after the Petition Date, which authority shall vest in the Reorganized Debtor on the Effective Date pursuant to the terms of the Plan.  The Reorganized Debtor may enforce all rights to commence, prosecute, or settle, as appropriate, any and all such Causes of Action, whether arising or accruing before or after the Petition Date, and the Reorganized Debtor's rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date.  Any Reorganized Debtor may, in its reasonable business judgment, pursue such Causes of Action and may retain and compensate professionals in the analysis or pursuit of such Causes of Action to the extent the Reorganized Debtor deems appropriate, including on a contingency fee basis.

**No Entity may rely on the absence of a specific reference in the Plan or the Disclosure Statement to any Cause of Action against them as any indication that the Debtor, or the Reorganized Debtor will not pursue any and all available Causes of Action against them.  The Debtor and the Reorganized Debtor expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan**.  Unless any Cause of Action against an Entity is expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order such that the Debtor hold no right or interest in such Cause of Action as of the Effective Date, the Debtor and the Reorganized Debtor expressly reserve all Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.  The Reorganized Debtor reserves and shall retain the foregoing Causes of Action notwithstanding the rejection of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan.  The

Reorganized Debtor shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, or to decline to do any of the foregoing, without the consent or approval of any third party or any further notice to or action, order, or approval of the Bankruptcy Court.

**P.    Avoidance Actions.**

As of the Effective Date, the Debtor waives all rights to commence or otherwise pursue any and all Avoidance Actions arising under section 547 of the Bankruptcy Code or any comparable "preference" action arising under applicable non-bankruptcy law, *provided that*, (i) neither the Debtor nor the Reorganized Debtor waive any rights to commence or pursue any Avoidance Actions against the TRU Retail Debtors or any Former Debtors; and (ii) except as expressly provided in the Plan, the Reorganized Debtor shall retain the right to assert any Causes of Action assertable in any Avoidance Action as defenses or counterclaims in any Cause of Action brought by any Entity.

**Q.    Regulatory Requirements.**

All parties shall abide by, and use their reasonable best efforts to obtain, any regulatory and licensing requirements or approvals as promptly as practicable to achieve Consummation.

**R.    Insurance Contracts.**

Notwithstanding anything to the contrary in the Disclosure Statement, the Plan, the Plan Supplement, the Confirmation Order, any bar date notice or claim objection, any other document related to any of the foregoing or any other order of the Bankruptcy Court in the Chapter 11 Cases (including any other provision that purports to be preemptory or supervening, grants an injunction or release, or requires a party to opt out of any releases): (i) on and after the Effective Date, nothing shall alter, amend or otherwise modify the terms and conditions of (or the coverage provided by) any of the Insurance Contracts except that the Reorganized Debtor shall be liable in full for all of its and the Debtor's obligations thereunder regardless of whether such obligations arise before or after the Effective Date, without the requirement or need for the Insurer to file a proof of claim, an Administrative Claim, a Cure Claim or object to any cure amount, *provided* that any and all rights of the Debtor to dispute such payments or reimbursements are expressly reserved; (ii) nothing shall permit or otherwise effect a sale, an assignment or any other transfer of any Insurance Contract that has been issued by ACE American Insurance Company, Federal Insurance Company, or any of their affiliates or successors (together, "Chubb Companies") at any time to (or which provide coverage to) any of the Debtor (or any of their Affiliates or any of their predecessors), and all agreements, documents or instruments relating thereto (collectively, the "Chubb Insurance Contracts") and/or any rights, benefits, claims, rights to payments, or recoveries under or relating to the Chubb Insurance Contracts without the express written consent of the Chubb Companies; and (iii) nothing shall permit or otherwise effect a sale, an assignment or any other transfer of any Insurance Contract that has been issued by Zurich American Insurance Company, American Zurich Insurance Company, Steadfast Insurance Company, or any of their affiliates or successors (together, "Zurich") at any time to (or which provide coverage to) the Debtor (or any of their Affiliates or any of their predecessors), and all agreements, documents or instruments relating thereto (collectively, the "Zurich Insurance Contracts") and/or any rights, benefits, claims, rights to payments, or recoveries under or relating to the Zurich Insurance Contracts without the express written consent of Zurich.  For the avoidance of doubt, any such rights and obligations shall be determined under the Insurance Contracts and applicable non-bankruptcy law.

**S.    Settlement, Compromise, and Release of Claims and Interests.**

Pursuant to Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, and except as otherwise specifically provided in the Plan or in any contract,

instrument, or other agreement or document created pursuant to the Plan, the distribution, rights, and treatment that are provided in the Plan shall be in complete settlement, compromise, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Debtor), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on such Claims, Interests, or Causes of Action from and after the Petition Date, whether known or unknown, against, liabilities, of Liens on, obligations of, rights, or Causes of Action against, and Interests in, the Debtor or any of their assets or properties, regardless of whether any property shall have been assumed, assumed and assigned, distributed, or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose or accrued before the Effective Date, any liability (including withdrawal liability) to the extent such Causes of Action, Claims, or Interests related to service performed by employees of the Debtor before the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representation or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (1) a Proof of Claim or Proof of Interest based upon such Cause of Action, Claim, debt, right, or Interest is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (2) a Cause of Action, Claim, or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the holder of such Cause of Action, Claim, or Interest has accepted the Plan.  Any default by the Debtor or their Affiliates with respect to any Cause of Action, Claim, or Interest that existed immediately before or on account of the filing of the Chapter 11 Cases shall be deemed cured on the Effective Date.  The Confirmation Order shall be a judicial determination of the settlement, compromise, and release of all Causes of Action, Claims, and Interests subject to the Effective Date occurring.

## T.      Discharge of Claims and Termination of Equity Interests

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in any contract, instrument, or other agreement or document created pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Debtor), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on such Claims, Interests, or Causes of Action from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtor or any of their assets or properties, regardless of whether any property shall have been assumed, assumed and assigned, distributed, or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose or accrued before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtor before the Effective Date and that arise from a termination of employment, any contingent or non contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not:  (1) a Proof of Claim based upon such debt or right is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right, or Interest is allowed pursuant to section 502 of the Bankruptcy Code; or (3) the holder of such a Claim or Interest has accepted the Plan.  Any default or "event of default" by the Debtor or their Affiliates with respect to any Claim or Interest that existed immediately before or on account of the filing of the Chapter 11 Cases shall be deemed cured (and no longer continuing) as of the Effective Date.  The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to Consummation.

U.    **Release of Liens.**

Except as otherwise provided herein or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estate shall be fully released, settled, and compromised and all rights, titles, and interests of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estate shall revert to the Debtor or Reorganized Debtor, as applicable.

V.    **Releases by the Debtor.**

Pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, on and after the Effective Date, each Released Party is deemed released and discharged by the Debtor and the Debtor's Estate, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing entities, from any and all Causes of Action, including any derivative Cause of Action asserted on behalf of the Debtor, that the Debtor or the Debtor's Estate would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Cause of Action against, or Interest in, the Debtor or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtor, the Debtor's in- or out-of-court restructuring efforts, intercompany transactions, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, the Plan (including, for the avoidance of doubt, the Plan Supplement), or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, the Plan, or the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date; provided, however, that notwithstanding anything to the contrary herein, nothing in the Plan shall release (a) any post-Effective Date obligations of any party or entity under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan and the Restructuring Transactions; (b) any Administrative Claims held by the Debtor against the TRU Retail Debtor Parties or any Former Debtor, including any Administrative Claims pursuant to sections 503(b) or 507(a)(2) of the Bankruptcy Code; (c) any Non-Released Claims; or (d) any and all setoff, subrogation, recoupment, or other similar legal or equitable right held by the Debtor against any Entity.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in <u>Article VIII.D</u> of the Plan by the Debtor, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute its finding that each release described in <u>Article VIII.D</u> of the Plan is: (1) in exchange for the good and valuable consideration provided by the Released Parties, a good faith settlement and compromise of such Causes of Action; (2) in the best interest of the Debtor and all Holders of Interests and Causes of Action; (3) fair, equitable, and reasonable; (4) given and made after due notice and opportunity for hearing; and (5) subject to the terms and provisions herein, a bar to the Debtor asserting any Cause of Action, or liability related thereto, of any kind whatsoever, against any of the Released Parties or their property.

W.      **Releases by Holders of Claims and Interests.**

As of the Effective Date, each Releasing Party is deemed to have released and discharged the Debtor and each Released Party from any and all Causes of Action, whether known or unknown, including any derivative Causes of Action asserted on behalf of the Debtor, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtor, the Debtor's in- or out-of-court restructuring efforts, intercompany transactions, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, the Plan (including, for the avoidance of doubt, the Plan Supplement), or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, the Plan, or the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date; _provided_, _however,_ that notwithstanding anything to the contrary herein, nothing in the Plan shall release (a) any post-Effective Date obligations of any party or entity under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan and the Restructuring Transactions; (b) any Administrative Claims held by the Debtor against the TRU Retail Debtor Parties or any Former Debtor, including any Administrative Claims pursuant to sections 503(b) or 507(a)(2) of the Bankruptcy Code; (c) any Non-Released Claims; or (d) any and all setoff, subrogation, recoupment, or other similar legal or equitable right held by the Debtor against any Entity.

For the avoidance of doubt, nothing contained herein shall affect any rights of any parties to the Settlement Agreement preserved under the Settlement Agreement.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in <u>Article VIII.E</u> of the Plan, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute its finding that each release described in <u>Article VIII.E</u> of the Plan is: (1) in exchange for the good and valuable consideration provided by the Released Parties, a good faith settlement and compromise of such Causes of Action; (2) in the best interests of the Debtor and all Holders of Interests and Causes of Action; (3) fair, equitable, and reasonable; (4) given and made after due notice and opportunity for hearing; and (5) subject to the terms and provisions herein, a bar to any of the Releasing Parties asserting any Cause of Action, or liability related thereto, of any kind whatsoever, against any of the Released Parties or their property.

X.      **Exculpation.**

Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur any liability with respect to, and each Exculpated Party is released and exculpated from, any Cause of Action related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, the Plan, or any Restructuring Transaction, contract, instrument, release or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, except for Causes of Action related to any act or omission that is determined in a Final Order to have constituted

actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan; provided, however, notwithstanding anything to the contrary herein, the following shall not release or exculpate: (i) any post-Effective Date obligations of any party or entity under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan and the Restructuring Transactions; (ii) any Administrative Claims held by the Debtor against the TRU Retail Debtor Parties or any Former Debtor, including any Administrative Claims pursuant to sections 503(b) or 507(a)(2) of the Bankruptcy Code; (iii) any Non-Released Claims; or (iv) any and all setoff, subrogation, recoupment, or other similar legal or equitable right held by the Debtor against any Entity.

Y.    Injunction.

Except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan, or the Confirmation Order, all Entities who have held, hold, or may hold Causes of Action, Claims, or Interests that have been compromised, settled, or released, or are subject to exculpation are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtor, the Exculpated Parties, or the Released Parties: (1) commencing or continuing in any manner any and all Causes of Action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against the Debtor, the Exculpated Parties, or the Released Parties on account of or in connection with or with respect to any such Claims or Interests; (3) creating, perfecting, or enforcing any encumbrance of any kind against the Debtor, the Exculpated Parties, or the Released Parties or the property or the estate of the Debtor, the Exculpated Parties, or the Released Parties on account of or in connection with or with respect to any such Causes of Action, Claims, or Interests; (4) asserting any right of setoff, subrogation, recoupment, or other similar legal or equitable right of any kind against any obligation due from the Debtor, the Exculpated Parties, or the Released Parties or against the property of the Debtor, the Exculpated Parties, or the Released Parties on account of or in connection with or with respect to any such Causes of Action, Claims, or Interests unless such Holder has Filed a motion requesting the right to perform such legal or equitable right on or before the Effective Date, and notwithstanding an indication of any Cause of Action, Claim, or Interest or otherwise that such Holder asserts, has, or intends to preserve pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any and all Causes of Action or other proceeding of any kind on account of or in connection with or with respect to any such Causes of Action, Claims, or Interests released or settled pursuant to the Plan; provided, however, that, notwithstanding anything to the contrary herein, nothing in the Plan shall enjoin: (i) any Entity from taking the preceding actions with respect to any post-Effective Date obligations of any party or entity under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan and the Restructuring Transactions; (ii) any Administrative Claims held by the Debtor against the TRU Retail Debtor Parties or any Former Debtor, including any Administrative Claims pursuant to sections 503(b) or 507(a)(2) of the Bankruptcy Code; (iii) any Non-Released Claims; or (iv) any and all setoff, subrogation, recoupment, or other similar legal or equitable right held by the Debtor against any Entity.

**Upon entry of the Confirmation Order, all Holders of Claims and Interests and their respective current and former employees, agents, officers, directors, principals, and direct and indirect affiliates shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan.  Each Holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim or Interest, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in <u>Article VIII.G</u> of the Plan.**

## V.    VOTING AND CONFIRMATION

### A.    Classes Entitled to Vote on the Plan.

As described more fully above, Class 3 (General Unsecured Claims) is the only class entitled to vote to accept or reject the Plan (the "<u>Voting Class</u>").

If your claim or Interest is not included in the Voting Class, you are not entitled to vote and you will not receive a Solicitation Package or a Ballot.  If your Claim is included in the Voting Class, you should read your Ballot and carefully follow the instructions set forth therein.  Please use only the Ballot that accompanies this Disclosure Statement or the Ballot that the Debtor, or the Solicitation Agent on behalf of the Debtor, otherwise provide to you.

### B.    Votes Required for Acceptance by a Class.

Under the Bankruptcy Code, acceptance of a plan of reorganization by a class of claims or interests is determined by calculating the amount and, if a class of claims, the number, of claims and interests voting to accept, as a percentage of the allowed claims or interests, as applicable, that have voted.  Each Class of Claims entitled to vote on the Plan will have accepted the Plan if:  (a) the Holders of at least two-thirds in dollar amount of the Claims actually voting in each Class vote to accept the Plan; and (b) the Holders of more than one-half in number of the Claims actually voting in each Class vote to accept the Plan.

### C.    Certain Factors to Be Considered Prior to Voting.

There are a variety of factors that all Holders of Claims entitled to vote on the Plan should consider prior to voting to accept or reject the Plan.  These factors may impact recoveries under the Plan, including that:

- the financial information contained in this Disclosure Statement has not been audited and is based on an analysis of data available at the time of the preparation of the Plan and this Disclosure Statement;

- although the Debtor believes that the Plan complies with all applicable provisions of the Bankruptcy Code, the Debtor can neither assure such compliance nor that the Bankruptcy Court will confirm the Plan;

- the Debtor may request Confirmation without the acceptance of all Impaired Classes entitled to vote in accordance with section 1129(b) of the Bankruptcy Code; and

- any delays of either Confirmation or Consummation could result in, among other things, increased Administrative Claims or Professional Compensation Claims.

While these factors could affect distributions available to Holders of Allowed Claims under the Plan, the occurrence or impact of such factors will not necessarily affect the validity of the vote of Holders

within the Voting Class or necessarily require a re-solicitation of the votes of Holders of Claims in such Voting Class.

For a further discussion of risk factors, please refer to Article IX hereof, entitled "Risk Factors."

**D.      Solicitation Procedures.**

**1.      Solicitation Agent.**

The Debtor retained Prime Clerk LLC ("Prime Clerk") to act, among other things, as the solicitation agent (the "Solicitation Agent") in connection with the solicitation of votes to accept or reject the Plan.

**2.      Solicitation Package.**

Holders of Claims who are entitled to vote to accept or reject the Plan as of December 28, 2018 (the "Voting Record Date"), will receive appropriate solicitation materials (the "Solicitation Package"), which will include, in part, the following:

- the appropriate Ballot(s) and applicable voting instructions, together with a pre-addressed, postage pre-paid return envelope;  and

- this Disclosure Statement, including the Plan as an exhibit thereto.

**3.      Distribution of the Solicitation Package and Plan Supplement.**

The Debtor will cause Prime Clerk to distribute the Solicitation Packages to holders of Claims in the Voting Class on or before **January 3, 2019 (or as soon as practicable thereafter)**, which will be at least **15 days** before the Voting Deadline (*i.e.*, January 18, 2019, at 4:00 p.m., prevailing Eastern Time).

The Solicitation Package (except for the Ballots) may also be obtained:  (a) from Prime Clerk by (i) visiting https://cases.primeclerk.com/toyspropcoI, (ii) by writing to Prime Clerk at Wayne Real Estate Parent Company, LLC, Disclosure Statement / Plan Requests, c/o Prime Clerk LLC, 830 3rd Avenue, New York, NY 10022; or (b) for a fee via PACER at http://www.vaeb.uscourts.gov.

At least seven (7) days prior to the Voting Deadline, the Debtor intends to file the Plan Supplement. If the Plan Supplement is updated or otherwise modified, such modified or updated documents will be made available at https://cases.primeclerk.com/toyspropcoI  The Debtor will not serve paper or CD-ROM copies of the Plan Supplement; however, parties may obtain a copy of the Plan Supplement:  (a) from Prime Clerk by (i) visiting https://cases.primeclerk.com/toyspropcoI, (ii) writing to Prime Clerk at Toys "R" Us Property Company I, LLC, Disclosure Statement / Plan Requests, c/o Prime Clerk LLC, 830 3rd Avenue, New York, NY 10022; or (b) for a fee via PACER at http://www.vaeb.uscourts.gov.

As described above, certain holders of Claims may not be entitled to vote because they are Unimpaired or are otherwise presumed to accept the Plan under section 1126(f) of the Bankruptcy Code. In addition, certain holders of Claims and Interests may be Impaired but are receiving no distribution under the Plan, and are therefore deemed to reject the Plan and are not entitled to vote.  Such holders will receive only the Confirmation Hearing Notice and a non-voting status notice.  The Debtor is only distributing a Solicitation Package, including this Disclosure Statement and a Ballot to be used for voting to accept or reject the Plan, to the holders of Claims or Interests entitled to vote to accept or reject the Plan as of the Voting Record Date.

### E.    Voting Procedures.

If, as of the Voting Record Date, you are a Holder of a Class 3 Claim (General Unsecured Claims) you may vote to accept or reject the Plan in accordance with the Solicitation Procedures by completing the Ballot and returning it in the envelope provided. If your Claim or Interest is not included in the Voting Class, then you are not entitled to vote and you will not receive a Solicitation Package. Except as otherwise set forth herein, the Voting Record Date and all of the Debtor's solicitation and voting procedures shall apply to all of the Debtor's creditors and other parties in interest.

### 1.    Voting Deadline.

The deadline to vote on the Plan is **January 18, 2019, at 4:00 p.m., prevailing Eastern Time** (the "Voting Deadline"). To be counted as a vote to accept or reject the Plan, a Ballot must be properly executed, completed, and delivered, whether by first class mail, overnight delivery, personal delivery, or electronic online submission so that the Ballot is **actually received** by Prime Clerk no later than the Voting Deadline.

### 2.    Voting Instructions.

As described above, the Debtor has retained Prime Clerk to serve as the Solicitation Agent for purposes of the Plan. Prime Clerk is available to answer questions, provide additional copies of all materials, oversee the voting process, and process and tabulate Ballots for each Class entitled to vote to accept or reject the Plan.

| **BALLOTS** |
|---|
| To be counted, all Ballots must be **actually received** by Prime Clerk by the Voting Deadline, which is **January 18, 2019, at 4:00 p.m., prevailing Eastern Time**, at the following address:<br><br>Wayne Real Estate Parent Company, LLC<br>Ballot Processing<br>c/o Prime Clerk LLC<br>830 3rd Avenue, New York, NY 10022<br><br>If you have any questions on the procedure for voting on the Plan, please call the Debtor's restructuring hotline maintained by Prime Clerk at:<br>(844) 794-3476. |

More detailed instructions regarding the procedures for voting on the Plan are contained in the Ballots distributed to holders of Claims that are entitled to vote to accept or reject the Plan. All votes to accept or reject the Plan must be cast by using the appropriate Ballot. All Ballots much be properly executed, completed, and delivered according to their applicable voting instructions by: (i) first class mail, in the return envelope provided with each Ballot; (ii) overnight courier; (iii) hand-delivery; (iv) electronic online submission at https://cases.primeclerk.com/toyspropcoI, so that the Ballots are **actually received** by Prime Clerk no later than the Voting Deadline in accordance with the procedures set forth in the applicable Ballot. Any Ballot that is properly executed by the holder of a Claim entitled to vote that does not clearly indicate an acceptance or rejection of the Plan or that indicates both an acceptance and a rejection of the Plan will not be counted.

Each holder of a Claim entitled to vote to accept or reject the Plan may cast only one Ballot for each Claim in a Voting Class held by such holder.  By signing and returning a Ballot, each holder of a Claim entitled to vote will certify to the Bankruptcy Court and the Debtor that no other Ballots with respect to such Claim have been cast or, if any other Ballots have been cast with respect to such Claim, such earlier Ballots are superseded and revoked.

All Ballots will be accompanied by postage prepaid return envelopes.  It is important to follow the specific instructions provided on each Ballot, as failing to do so may result in your Ballot not being counted.

The Plan also provides that all Holders of Claims that (i) vote to accept or (ii) or are deemed to accept the Plan or are in a voting Class who abstain from voting on the Plan and do not opt out of the release provisions contained in Article VIII of the Plan will be deemed to have expressly, unconditionally, generally, individually, and collectively released all Claims and Causes of Action against the Debtor and the Released Parties.

**Importantly, all Holders of Claims and Interests that are not in the Voting Class that do not file an objection with the Bankruptcy Court in the Chapter 11 Cases that expressly objects to the inclusion of such holder as a Releasing Party under the provisions contained in Article VIII.E of the Plan or do not elect to opt out of the provisions contained in Article VIII.E of the Plan using the documents provided, if any, will be deemed to have expressly, unconditionally, generally, individually, and collectively consented to the release of all Claims and Causes of Action against the Debtor and the Released Parties.  By objecting to or electing to opt out of the releases set forth in Article VIII.E of the Plan you will forgo the benefit of obtaining the releases set forth in Article VIII.E of the Plan if you otherwise would be a Released Party thereunder.  The releases are an integral element of the Plan.**

### 3.    Ballots Not Counted.

No Ballot will be counted toward Confirmation if, among other things:  (i) it is illegible or contains insufficient information to permit the identification of the holder of the Claim; (ii) it was transmitted by means other than as specifically set forth in the ballots; (iii) it was cast by an entity that is not entitled to vote on the Plan; (iv) it was cast for a Claim listed in the Debtor's schedules as contingent, unliquidated, or disputed for which the applicable Bar Date has passed and no proof of claim was timely filed; (v) it was cast for a Claim that is subject to an objection pending as of the Voting Record Date (unless temporarily allowed in accordance with the Disclosure Statement Order); (vi) it was sent to any party other the Solicitation Agent; (vii) it is unsigned; or (viii) it is not clearly marked to either accept or reject the Plan or it is marked both to accept and reject the Plan.  **Please refer to the Disclosure Statement Order for additional requirements with respect to voting to accept or reject the Plan**.

### F.    Plan Objection Deadline.

Parties must object to Confirmation of the Plan by **January 25, 2019, at 11:00 a.m., prevailing Eastern Time** (the "Plan Objection Deadline").  All objections to the Plan must be filed with the Bankruptcy Court and served on the Debtor, counsel to the Creditors' Committee, and certain other parties in interest so that they are **actually received** on or before the Plan Objection Deadline.

### G.    Confirmation Hearing.

Assuming the requisite acceptances are obtained for the Plan, the Debtor intends to seek Confirmation of the Plan at the Confirmation Hearing.  The Confirmation Hearing is scheduled to commence on **January 29, 2019, at 1:00 p.m., prevailing Eastern Time**, before the Honorable Keith L. Phillips, in the United States Bankruptcy Court for the Eastern District of Virginia, located at 701 East

Broad Street, Suite 4000, Richmond, Virginia 23219. The Confirmation Hearing may be continued from time to time without further notice other than an adjournment announced in open court or a notice of adjournment filed with the Bankruptcy Court and served on the entities who have filed objections to the Plan, without further notice to other parties in interest. The Bankruptcy Court, in its discretion and before the Confirmation Hearing, may put in place additional procedures governing the Confirmation Hearing. The Plan may be modified, if necessary, before, during, or as a result of the Confirmation Hearing, without further notice to parties in interest.

## VI.    THE DEBTOR'S CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW

### A.    History of Toys "R" Us, Inc. (the Debtor's Ultimate Parent).

Seeking to capitalize on the post-World War II baby boom, Charles Lazarus, the founder of Toys "R" Us, Inc., first opened Children's Bargain Town, a baby furniture store, in Washington D.C. in 1948. After the success of adding toys and baby products to Children's Bargain Town, Lazarus shifted focus and opened his first store dedicated exclusively to toys in 1957 and called it Toys "R" Us Inc. The Company went on to open big-box stores across the United States.

Toys "R" Us, Inc. completed an initial public offering in 1978. Over time, the Company grew into a toy conglomerate with a broad, loyal customer base. The Company expanded internationally in 1984 with its first wholly-owned store in Canada and a licensed operation in Singapore. The Company launched Toysrus.com in 1998. In addition, the company launched its first Babies "R" Us location in 1996. Babies "R" Us stores focus solely on baby products and furniture, aiming to provide shopping expertise and specialized products for new families.

Toys "R" Us was acquired and taken private in 2005. Following a highly competitive process, an investment group led by entities advised by or affiliated with Bain Capital Private Equity, LP, Kohlberg Kravis Roberts & Co. L.P., and Vornado Realty Trust bought Toys "R" Us for approximately $6.6 billion, including $5.3 billion of debt secured in large part by company assets. After going private, Toys "R" Us further expanded its international presence, primarily in China and Southeast Asia.

### B.    History of the Debtor.

The Debtor was incorporated in 2005 as Delaware limited liability companies as part of a legal reorganization of the businesses of the Company. A simplified corporate structure chart showing the Debtor in relation to the Propco I Debtors, TRU DE, and Toys "R" Us, Inc. is set forth below.



### C.   Debtor's Current Assets.

The Debtor is an indirect wholly owned subsidiary of Debtor Toys "R" Us, Inc.  The Debtor's primary asset is its indirect 99.99% ownership interest in Propco I.  The Debtor is also the direct owner of the remaining 0.01% ownership interest in Propco I.

As of November 15 2018, the Propco I Debtors owned fee simple and leasehold interests in, collectively, 186 real properties located in 41 states, which include 154 owned real estate stores, 21 ground leasehold interests, and 11 building leasehold interests.  Pursuant to the Master Lease, the Propco I Debtors leased the Properties to TRU DE on a triple-net basis, which means that under the Master Lease, TRU DE paid all real estate taxes, building insurance, and maintenance on the Properties up until the Master Lease was rejected on June 30, 2018.  Whereas prior to the rejection of the Master Lease, substantially all of Propco I's revenues and cash flows derived from payments from TRU DE under the Master Lease, today, substantially all of the Propco I Debtors' cash flows were derived from the sale and assignment of owned and leased assets, with expected future revenue from leases executed with new tenants at the Propco I Debtors' real property.

## VII.   EVENTS LEADING TO THE CHAPTER 11 FILINGS

On September 18, 2017, the TRU Retail Debtors filed voluntary petitions with the Bankruptcy Court under chapter 11 of the Bankruptcy Code.  The Debtor's subsidiaries, the Propco I Debtors, own or directly lease a substantial portion of the Company's interests in real property, including, at the commencement of these Chapter 11 Cases, approximately 311 retail locations.  These leases were subleased to TRU DE pursuant to the Master Lease.  The Master Lease was rejected on June 30, 2018.  As a result, a substantial portion of Propco I, and in turn, the Debtor's revenues ceased.

### A.   Changing Retail Environment, Liquidity Concerns, and Debt Service Obligations.

The Company was no exception to the substantial challenges facing many other retailers over the last several years.  Market forces in tandem with consumer trends towards online shopping have caused many retailers with primarily brick-and-mortar based business models to restructure their operations and,

for some, to file voluntary petitions under the Bankruptcy Code. The TRU Retail Debtors' business model fits this category of retailers, as it relied heavily on revenue being generated from consumer purchases at retail store locations to maintain profitability. Competition from online companies like Amazon® and big-box retailers such as Walmart® and Target® was a major contributing factor in the decline in the Company's revenues in recent years. Specifically, the Company's revenue decreased approximately 3.9 percent during the 2016 holiday season compared to the 2015 holiday season after certain competitors began implementing deep discounts to drive in-store sales. This trend continued into 2017, which forced the Company to limit its investments in growth initiatives.

In addition, prior to the Petition Date, the Company's capital structure was highly leveraged with an unsustainable cash debt service burden of approximately $400 million per year. The Company faced a $186 million liability, as the Term B-2 Loans and Term B-3 Loans had a scheduled maturity in May 2018. Applicable accounting regulations could have prompted the Company to make certain disclosures because there was substantial doubt about its ability to continue as a going concern in fiscal year 2018. As a result, the Company decided that it needed a comprehensive deleveraging to right-size its balance sheet. The strategic decision to deleverage the capital structure would allow the Company to make necessary investments to maximize the business' long-term value. The Company hired Lazard Frères & Co. LLC ("Lazard") and other advisors to analyze different ways to raise approximately $200 million in incremental liquidity. They began engaging with potential lenders and their advisors about alternative structures for such incremental funds, including a sale-leaseback transaction with certain existing lenders. Ultimately, no such liquidity-enhancing transaction proved to be a viable option.

Meanwhile, the Company retained Kirkland & Ellis LLP ("K&E") and Alvarez & Marsal ("A&M") to focus on contingency planning, which involved securing DIP financing and preparing for an orderly chapter 11 filing. These plans were ultimately accelerated after a news article stating that the Company was considering restructuring options was published on September 6, 2017. Major media outlets around the world immediately picked up this story, and, within 72 hours, suppliers began to pull terms and withhold products that were not paid with cash on delivery. Most of the Company's international credit insurers withdrew or significantly limited their coverage for vendors shipping to the Company. This loss in product and tightening of liquidity had a deleterious impact on the Company's supply chain and happened at a time when the Company typically began securing additional inventory for the upcoming holiday season. Accordingly, the Company prepared for these Chapter 11 Cases, finalized negotiations, and documented the DIP financing arrangement on an expedited timeline so that it could resolve these operational and financial issues expeditiously.

## VIII.    EVENTS OF THE CHAPTER 11 CASES

### A.    First and Second Day Relief.

On the Petition Date, the TRU Retail Debtors filed their voluntary petitions for relief under chapter 11 (the "Petitions") of the Bankruptcy Code and various motions to facilitate the Chapter 11 Cases, to minimize disruption to the TRU Retail Debtors' businesses, and to continue operating as a going concern. The relief sought in the "first day" and "second day" pleadings allowed the TRU Retail Debtors to transition seamlessly into chapter 11 and aided in preserving the Company's going-concern value. A brief description of the first day motions and the evidence in support thereof are set forth in the *Declaration of David A. Brandon, Chief Executive Officer of Toys "R" Us, Inc., in Support of Chapter 11 Petitions and First Day Motion*s (the "Brandon Declaration") [Docket No. 20] and the *Declaration of Michael J. Short, Chief Financial Officer of Toys "R" Us, Inc., in Support of Debtors' First Day Motions* [Docket No. 30] (the "Short Declaration" and, together with the Brandon Declaration, the "First Day Declarations") filed on September 19, 2017. The first and second day motions, the First Day Declarations, and all others for relief granted in these Chapter 11 Cases can be viewed at no charge at https://cases.primeclerk.com/toysrus.

**B.    Other Procedural and Administrative Motions.**

The TRU Retail Debtors received authorization to implement procedural and administrative measures that would allow them to efficiently administer their Chapter 11 Cases and reduce administrative burdens associated therewith.  Such authority included the following:

- granting the joint administration of the Chapter 11 Cases;

- approving notice, case management, and administrative procedures to govern the Chapter 11 Cases;

- extending the time for the TRU Retail Debtors to file certain schedules of assets and liabilities, schedules of executory contracts and unexpired leases, and statements of financial affairs;

- authorizing the TRU Retail Debtors to file a consolidated list of creditors in lieu of a separate mailing matrix for each Debtor and to file a consolidated list of the TRU Retail Debtors' 50 largest creditors; and

- approving procedures for the interim compensation and reimbursement to retained Professionals in the Chapter 11 Cases.

The TRU Retail Debtors recognized that any interruption in their businesses, even if for a brief period of time, would negatively impact their operations, customer relationships, and revenue and profits.  As a result, the TRU Retail Debtors obtained Court approval that facilitated stabilizing their businesses and effectuated a smooth transition into operating as debtors in possession.  Specifically, the TRU Retail Debtors sought and obtained orders authorizing them to do the following:

- maintain and administer customer programs and honor obligations arising under or relating to those such programs;

- pay prepetition wages, salaries and other compensation, reimbursable employee expenses, employee medical costs, and similar benefits;

- determine adequate assurance for future utility service and establish procedures for utility providers to object to such assurance;

- continue insurance coverage, including performance under their self-insurance programs, and enter into new insurance policies, if necessary;

- establish procedures for certain transfers and declarations of worthlessness with respect to common stock;

- maintain their existing cash management systems; and

- remit and pay certain taxes and fees.

In addition to the foregoing relief, the TRU Retail Debtors sought and obtained Bankruptcy Court approval to pay up to approximately $325 million in certain prepetition vendor and third-party service providers' claims who the TRU Retail Debtors believed were essential to their ongoing business operations [Docket No. 708].  Importantly, the TRU Retail Debtors were able to condition payments of these prepetition claims on the vendors' agreement to provide, among other things, favorable trade terms for the

24

postpetition procurement of goods from the vendors.  This relief was critical to the TRU Retail Debtors maintaining their ongoing business operations at the early stages of their Chapter 11 Cases.

### C.    Retention Applications for Chapter 11 Professionals

The TRU Retail Debtors filed several applications and obtained authority to retain various professionals to assist the TRU Retail Debtors in carrying out their duties under the Bankruptcy Code during the Chapter 11 Cases.  These professionals include (a) K&E, as counsel, (b) Kutak Rock LLP, as co-counsel, (c) A&M, as restructuring advisors, (d) Lazard, as investment banker, (e) Prime Clerk, as solicitation agent and administrative agent, (f) A&G Realty Partners, LLC, as real estate consultant and advisor, (g) Cushman & Wakefield U.S., Inc., as co-real estate advisor, (h) Consensus Advisory Services LLC ("Consensus") and Consensus Securities LLC, as sale process investment bankers, (i) Malfitano Advisors, LLC, as asset dispositions advisor and consultant, (j) DJM Realty Services, LLC ("DJM"), as real estate consultant and advisor, (k) KPMG LLC, as tax consultants and internal audit advisor, and (l) PricewaterhouseCoopers LLP ("PwC"), as tax and accounting advisory consultants, among other professionals.

Toys Delaware and Geoffrey appointed their own Disinterested Directors who retained their own professionals for all matters involving a conflict of interest between other Debtors ("Conflict Matters"). Toys Delaware retained Curtis, Mallet-Prevost, Colt & Mosle LLP, as its counsel (Katten Muchin Rosenman LLP has succeeded Curtis, Mallet-Prevost, Colt & Mosle LLP, as counsel) and Zolfo Cooper, LLC, as its financial advisor, and Geoffrey retained Cleary Gottlieb Steen & Hamilton LLP, as its counsel, and Kaufman & Canoles, P.C., as co-counsel.

### D.    Appointment of Official Committee.

On September 26, 2017, the U.S. Trustee appointed the following constituents to the Creditors' Committee:  (a) Mattel, Inc.; (b) Huffy Corporation; (c) Evenflo Company Inc.; (d) KIMCO Realty; (e) The Bank of New York Mellon, (f) Euler Hermes North America Insurance Co., (g) LEGO Systems, Inc., (h) Veritiv Operating Company, and (i) Simon Property Group, Inc.  The Creditors' Committee retained (a) Kramer Levin Naftalis & Frankel LLP and Wolcott Rivers Gates as co-counsels, (b) Bennett Jones LLP as Canadian counsel, (c) Berwin Leighton Paisner LLP (which is now known as Bryan Cave Leighton Paisner LLP) as special foreign counsel, (d) Moelis & Company LLC as investment banker, (e) FTI Consulting, Inc. as financial advisor, and (f) JND Corporate Restructuring as information services agent.  The Creditors' Committee established a website at www.jndla.com/cases/toyscommittee that has been maintained by and through JND Corporate Restructuring to share case information with unsecured creditors.

### E.    Schedules, Statements, Claims Bar Date, and Administrative Claims Bar Date

On November 16, 2017, the TRU Retail Debtors filed their Schedules and Statements with the Bankruptcy Court pursuant to section 521 of the Bankruptcy Code.

The Bankruptcy Code allows the time to be fixed as to when proofs of claim must be filed in a chapter 11 case.  Subject to certain exceptions, any creditor whose Claim is not scheduled in the Schedules and Statements or whose Claim is scheduled as disputed, contingent, or unliquidated must file a Proof of Claim.  The Bankruptcy Court entered the Amended Bar Date Order [Docket No. 1332] that established April 6, 2018, at 5:00 p.m., prevailing Eastern Time as the General Claims Bar Date ("Bar Date") for claimants with claims arising prior to the Petition Date, including claims under section 503(b)(9), to file Proofs of Claims.  Government units and certain claimants with specific types of prepetition claims were required to submit their Proofs of Claim on or before June 18, 2018, at 5:00 p.m., prevailing Eastern Time.

Further, on May 25, 2018, the Bankruptcy Court entered an order establishing the following deadlines for filing certain administrative proofs of claim against the TRU Retail Debtors:  (a) for an Administrative Claim arising on or prior to June 30, 2018: July 16, 2018, at 5:00 p.m., prevailing Eastern Time, and (b) for an Administrative Claim arising after June 30, 2018: the affected party shall file a Proof of Administrative Claim with respect to such claim following the Administrative Claims Procedures by the earlier of (i) the 15th day of the month following the month in which the claim arose at 5:00 p.m., prevailing Eastern Time and (ii) 14 days following any hearing on a plan of liquidation, structured settlement, or other proposed resolution to the TRU Retail Debtors' chapter 11 cases, at 5:00 p.m., prevailing Eastern Time [Docket No. 3260].  The Administrative Claims Procedures Order does not apply to Toys Canada or claims relating to Toys Canada.

The TRU Retail Debtors and their professionals continue to review and analyze Claims Filed in response to the Amended Bar Date Order and Administrative Bar Date Order and will file objections to Claims with the Bankruptcy Court as necessary and appropriate in compliance with the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules, and the proposed Plan's terms.  The Claims resolution process is ongoing, which means that the Claims figures identified in this Disclosure Statement represent *estimates* only.  The recoveries set forth in this Disclosure Statement could be materially lower if the actual Allowed Claims are higher than the current estimates.

### F.        Postpetition Financing

Prior to the Petition Date, the TRU Retail Debtors and their advisors engaged in a marketing process to obtain DIP financing to fund their global operations during these Chapter 11 Cases.  On October 25, 2017, the Bankruptcy Court approved approximately $3.1 billion in combined postpetition DIP financing for both the domestic and international silos.  The North American DIP facility and subsequent waivers and amendments thereto is addressed below.

## IX.    RISK FACTORS

Holders of Claims should read and consider carefully the risk factors set forth below before voting to accept or reject the Plan.  Although there are many risk factors discussed below, these factors should not be regarded as constituting the only risks present in connection with the Debtor's businesses or the Plan and its implementation.

### A.        Bankruptcy Law Considerations.

The occurrence or non-occurrence of any or all of the following contingencies, and any others, could affect distributions available to holders of Allowed Claims under the Plan but will not necessarily affect the validity of the vote of the Impaired Classes to accept or reject the Plan or necessarily require a re-solicitation of the votes of Holders of Claims in such Impaired Classes.

#### 1.        Parties in Interest May Object to the Plan's Classification of Claims and Interests.

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class.  The Debtor believes that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtor created Classes of Claims and Interests each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims or Interests, as applicable, in each such Class.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

2.      **The Conditions Precedent to the Effective Date of the Plan May Not Occur.**

As more fully set forth in Article IX of the Plan, the Effective Date is subject to a number of conditions precedent.  If such conditions precedent are not met or waived, the Effective Date will not take place.

3.      **The Debtor May Fail to Satisfy Vote Requirements.**

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtor intends to seek, as promptly as practicable thereafter, Confirmation of the Plan.  In the event that sufficient votes are not received, the Debtor may seek to confirm an alternative chapter 11 plan or transaction.  There can be no assurance that the terms of any such alternative chapter 11 plan or other transaction would be similar or as favorable to the holders of Interest and Allowed Claims as those proposed in the Plan and the Debtor do not believe that any such transaction exists or is likely to exist that would be more beneficial to the Estate than the Plan.

4.      **The Debtor May Not Be Able to Secure Confirmation of the Plan.**

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the Bankruptcy Court that:  (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting holders of claims and equity interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the Debtor were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received.  Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan.  A non-accepting holder of an Allowed Claim might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules.  Even if the Bankruptcy Court determines that this Disclosure Statement, the balloting procedures, and voting results are appropriate, the Bankruptcy Court could still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation are not met. If a chapter 11 plan of reorganization is not confirmed by the Bankruptcy Court, it is unclear whether the Debtor will be able to reorganize their business and what, if anything, holders of Interests and Allowed Claims against them would ultimately receive.

The Debtor reserves the right to modify the terms and conditions of the Plan as necessary for Confirmation.  Any such modifications could result in less favorable treatment of any non-accepting Class of Claims or Interests, as well as any Class junior to such non-accepting Class, than the treatment currently provided in the Plan.  Such a less favorable treatment could include a distribution of property with a lesser value than currently provided in the Plan or no distribution whatsoever under the Plan.

5.      **Nonconsensual Confirmation.**

In the event that any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one impaired class (as defined under section 1124 of the Bankruptcy Code) has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired class(es).  The Debtor believes that the

Plan satisfies these requirements, and the Debtor may request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code. Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion. In addition, the pursuit of nonconsensual Confirmation or Consummation of the Plan may result in, among other things, increased expenses relating to professional compensation.

### 6. Continued Risk upon Confirmation.

Even if the Plan is consummated, the Debtor will continue to face a number of risks, including certain risks that are beyond their control, such as further industry deterioration or other changes in economic conditions, potential revaluing of their assets due to chapter 11 proceedings, and increasing expenses. Some of these concerns and effects typically become more acute when a case under the Bankruptcy Code continues for a protracted period without indication of how or when the case may be completed. As a result of these risks and others, there is no guarantee that a chapter 11 plan of reorganization reflecting the Plan will achieve the Debtor's stated goals.

In addition, at the outset of the Chapter 11 Cases, the Bankruptcy Code gave the Debtor the exclusive right to propose a chapter 11 plan and prohibited creditors and others from proposing a plan. On December 19, 2017, the Court extended the exclusive period to propose a chapter 11 plan [Docket No. 1319] and on August 8, 2018, the Court further extended the exclusive period to propose a chapter 11 plan [Docket No. 4081], and on November 12, 2018, the Debtor requested a further extension through February 10, 2019. The Debtor will have retained the exclusive right to propose and solicit votes on the Plan upon filing its Petition. If the Bankruptcy Court terminates that right, however, or the exclusivity period expires, there could be a material adverse effect on the Debtor's ability to achieve confirmation of the Plan in order to achieve the Debtor's stated goals.

Furthermore, even if the Debtor's debts are reduced and/or discharged through the Plan, the Debtor may need to raise additional funds through public or private debt or equity financing or other various means to fund the Debtor's business after the completion of the proceedings related to the Chapter 11 Cases. Adequate funds may not be available when needed or may not be available on favorable terms.

### 7. The Chapter 11 Cases May Be Converted to Cases Under Chapter 7 of the Bankruptcy Code.

If the Bankruptcy Court finds that it would be in the best interest of creditors and/or the debtor in a chapter 11 case, the Bankruptcy Court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code. In such event, a chapter 7 trustee would be appointed or elected to liquidate the debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code. The Debtor believes that liquidation under chapter 7 would result in significantly smaller distributions being made to creditors than those provided for in a chapter 11 plan because of (a) the likelihood that the assets would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time rather than selling in a controlled manner affecting the business as a going concern, (b) additional administrative expenses involved in the appointment of a chapter 7 trustee, and (c) additional expenses and Claims, some of which would be entitled to priority, that would be generated during the liquidation, and including Claims resulting from the rejection of Unexpired Leases and other Executory Contracts in connection with cessation of operations.

### 8. The Debtor May Object to the Amount or Classification of a Claim.

Except as otherwise provided in the Plan, the Debtor reserves the right to object to the amount or classification of any Claim under the Plan. The estimates set forth in this Disclosure Statement cannot be relied upon by any holder of a Claim where such Claim is subject to an objection. Any Holder of a Claim

that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

### 9. Risk of Non-Occurrence of the Effective Date.

Although the Debtor believes that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur.

### 10. Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Plan.

The distributions available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims. The occurrence of any and all such contingencies, which could affect distributions available to holders of Allowed Claims under the Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

The estimated Claims and creditor recoveries set forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims may significantly differ from the estimates. Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary from the estimated Claims contained in this Disclosure Statement. Moreover, the Debtor cannot determine with any certainty at this time, the number or amount of Claims that will ultimately be Allowed. Such differences may materially and adversely affect, among other things, the percentage recoveries to Holders of Allowed Claims under the Plan.

### 11. Releases, Injunctions, and Exculpations Provisions May Not Be Approved.

Article VIII of the Plan provides for certain releases, injunctions, and exculpations, including a release of liens and third-party releases that may otherwise be asserted against the Debtor or Released Parties, as applicable. The releases, injunctions, and exculpations provided in the Plan are subject to objection by parties in interest and may not be approved. If the releases are not approved, certain Released Parties may withdraw their support for the Plan, and the Debtor may not be able to obtain Confirmation of the Plan.

### 12. Certain Tax Implications of the Plan.

Holders of Allowed Claims and Interests should carefully review Article XI of this Disclosure Statement entitled "Certain United States Federal Income Tax Consequences of the Plan," to determine how tax implications of the Plan and the Chapter 11 Cases may adversely affect the Holders of Claims and Interests.

### B. Risks Related to the Debtor's Businesses.

### 1. The Debtor Will Be Subject to the Risks and Uncertainties Associated with the Chapter 11 Cases.

For the duration of the Chapter 11 Cases, the Debtor's ability to operate, develop, and execute a business plan, and continue as a going concern, will be subject to the risks and uncertainties associated with bankruptcy. These risks include: (a) ability to develop, confirm, and consummate the Sale Transaction specified in the Plan; (b) ability to obtain Bankruptcy Court approval with respect to motions filed in the Chapter 11 Cases from time to time; (c) ability to maintain relationship with suppliers, vendors, service

29

providers, contract counterparties, employees, and other third parties; (d) ability to maintain contracts that are critical to the Debtor's operations; (e) ability of third parties to seek and obtain Bankruptcy Court approval to terminate contracts and other agreements with the Debtor; (f) ability of third parties to seek and obtain Bankruptcy Court approval to terminate or shorten the exclusivity period for the Debtor to propose and confirm a chapter 11 plan, to appoint a chapter 11 trustee, or to convert the Chapter 11 Cases to chapter 7 cases; and (g) the actions and decisions of the Debtor's creditors and other third parties who have interest in the Chapter 11 Cases that may be inconsistent with the Debtor's plans.

These risks and uncertainties could affect the Debtor's businesses and operations in various ways. For example, negative events associated with the Chapter 11 Cases could adversely affect the Debtor's relationships with suppliers, service providers, contract counterparties, employees, and other third parties, which in turn could adversely affect the Debtor's operations and financial condition.  Also, the Debtor will need the prior approval of the Bankruptcy Court for transactions outside the ordinary course of business, which may limit the Debtor's ability to respond timely to certain events or take advantage of certain opportunities.  Because of the risks and uncertainties associated with the Chapter 11 Cases, the Debtor cannot accurately predict or quantify the ultimate impact of events that occur during the Chapter 11 Cases that may be inconsistent with the Debtor's plans.

## 2. Operating in Bankruptcy for a Long Period of Time May Harm the Debtor's Businesses.

A long period of operations under Bankruptcy Court protection could have a material adverse effect on the Debtor's businesses, financial condition, results of operations, and liquidity.  A prolonged period of operating under Bankruptcy Court protection Debtor will add significant transaction costs as the Debtor dispose of their properties, reducing the recoveries available to their stakeholders.  In addition, the longer the proceedings related the Chapter 11 Cases continue, the more likely it is that suppliers and potential purchasers will lose confidence in the Debtor's ability to sell their businesses and may seek to establish alternative commercial relationships.

So long as the proceedings related to the Chapter 11 Cases continue, the Debtor will be required to incur substantial costs for professional fees and other expenses associated with the administration of the Chapter 11 Cases.  As of the date hereof, the chapter 11 proceedings are being funded through the Debtor's unencumbered cash on hand.  If the Chapter 11 Cases continue for a prolonged period of time, it may be necessary for the Debtor to seek debtor-in-possession financing to fund their operations.  If the Debtor is forced to seek debtor-in-possession financing, the likelihood that the Debtor will instead be required to liquidate may be increased, and, as a result, creditor recoveries may be significantly impaired.

## X. STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN

### A. Requirements for Confirmation of the Plan.

Among the requirements for Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code are:  (1) the Plan is accepted by all Impaired Classes of Claims or Interests, or if rejected by an Impaired Class, the Plan "does not discriminate unfairly" and is "fair and equitable" as to the rejecting Impaired Class; (2) the Plan is feasible; and (3) the Plan is in the "best interests" of Holders of Claims and Interests.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies all of the requirements of section 1129 of the Bankruptcy Code.  The Debtor believes that:  (1) the Plan satisfies, or will satisfy, all of the necessary statutory requirements of chapter 11 for plan confirmation; (2) the Debtor has complied, or will have complied, with all of the necessary requirements of chapter 11; and (3) the Plan has been proposed in good faith.

1.      **Feasibility.**

The Bankruptcy Code requires that to confirm a chapter 11 plan, the Bankruptcy Court must find that confirmation of such plan is not likely to be followed by the liquidation or the need for further financial reorganization of the debtor(s) unless contemplated by the plan.

The Plan provides for the transfer of the Debtor's equity solely so that Holders of General Unsecured Claims against the Debtors can receive any applicable recoveries under the Propco I Plan. Accordingly, the Debtor believes that all Plan obligations will be satisfied without the need for further reorganization of the Debtor.

2.      **Best Interests of Creditors—Liquidation Analysis.**

Notwithstanding acceptance of the Plan by a voting Impaired Class, to confirm the Plan, the Bankruptcy Court must still independently determine that the Plan is in the best interests of each holder of a Claim or Interest in any such Impaired Class that has not voted to accept the Plan, meaning that the Plan provides each such holder with a recovery that has a value at least equal to the value of the recovery that each such Holder would receive if the debtor was liquidated under chapter 7 of the Bankruptcy Code beginning on what would have been the Effective Date. Accordingly, if an Impaired Class does not unanimously vote to accept the Plan, the best interests test requires the Bankruptcy Court to find that the Plan provides to each member of such Impaired Class a recovery on account of the Class member's Claim or Interest that has a value, as of the Effective Date, at least equal to the value of the recovery that each such Class member would receive if the Debtor were liquidated under chapter 7 beginning on the Effective Date.

The Debtor believes that the Plan will satisfy the best interests test because, among other things, they have been advised by their advisors that the recoveries expected to be available to Holders of Allowed Claims under the Plan will be greater than the recoveries expected to be available in a chapter 7 liquidation, as discussed more fully below.

In a typical chapter 7 case, a trustee is elected or appointed to liquidate a debtor's assets and to make distributions to creditors in accordance with the priorities established in the Bankruptcy Code. Generally, secured creditors are paid first from the proceeds of sales of their collateral. If any assets remain in the bankruptcy estate after satisfaction of secured creditors' claims from their collateral, administrative expenses are next to be paid. After accounting for administrative expenses, unsecured creditors (including any secured creditor deficiency claims) are paid from the sale proceeds of any unencumbered assets and any remaining sale proceeds of encumbered assets in excess of any secured claims, according to their respective priorities. Unsecured creditors with the same priority share in proportion to the amount of their allowed claims in relationship to the total amount of allowed claims held by all unsecured creditors with the same priority. Finally, interest holders receive the balance that remains, if any, after all creditors are paid.

A chapter 7 liquidation beginning on what would have been the Effective Date would provide less recovery for creditors than the Plan. The Debtor's only asset is its ownership interest in the Propco I Debtors, the value of which is entirely speculative and contingent on the proceeds from the sale of the Propco I Debtors' assets. Accordingly, the only effect of appointment of a chapter 7 trustee would be a delay and increased fees while the chapter 7 trustee attempted to sell those interests. In contrast, the Plan provides for a direct transfer of such Interests to the Debtor's General Unsecured Creditors, which will allow those Claimants to directly receive their recoveries, if any, under the Propco I Plan.

The Estate would continue to be obligated to pay all unpaid expenses incurred by the Debtor during the Chapter 11 Cases (such as compensation for Professionals), which may constitute Allowed Claims in

any chapter 11 case.  Moreover, the conversion to chapter 7 would also require entry of a new bar date for filing claims that would be more than 90 days following conversion of the case to chapter 7.  See Fed. R. Bankr. P. 1019(2); 3002(c).  Thus, the amount of Claims ultimately filed and Allowed against the Debtor could materially increase, thereby further reducing creditor recoveries versus those available under the Plan.

In light of the foregoing, the Debtor submit that a chapter 7 liquidation would result in materially reduced sale proceeds, increased expenses, delayed distributions, and the prospect of additional claims that were not asserted in the Chapter 11 Cases.  Accordingly, the Debtor believes that the Plan provides an opportunity to bring the highest return for creditors.

### B.      Alternative Plans.

The Debtor do not believe that there are any alternative plans for the reorganization or liquidation of the Debtor's Estate.  The Debtor believes that the Plan structure, as described herein, enables holders of Claims and Interests to realize the greatest possible value under the circumstances and that, compared to any alternative plan, for example, a fire sale liquidation, the Plan has the greatest chance to be confirmed and consummated.

### C.      Acceptance by Impaired Classes.

The Bankruptcy Code requires, as a condition to Confirmation that, except as described in the following section, each class of claims or equity interests that is impaired under a plan accept the plan.  A class that is not "impaired" under a plan is presumed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required.  Pursuant to section 1124 of the Bankruptcy Code, a class is "impaired" unless the plan:  (1) leaves unaltered the legal, equitable, and contractual rights to which the claim or the equity interest entitles the holder of such claim or equity interest; (2) cures any default, reinstates the original terms of such obligation, and compensates the applicable party in question; or (3) provides that, on the consummation date, the holder of such claim or equity interest receives cash equal to the allowed amount of that claim or, with respect to any equity interest, any fixed liquidation preference to which the holder of such equity interest is entitled to any fixed price at which the debtor may redeem the security.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired creditors as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of claims in that class, but for that purpose counts only those who actually vote to accept or to reject a plan.  Votes that have been "designated" under section 1126(e) of the Bankruptcy Code are not included in the calculation of acceptance by a class of claims.  Thus, a Class of creditor Claims will have voted to accept the Plan only if two-thirds in amount and a majority in number actually voting cast their Ballots in favor of acceptance, subject to Article III of the Plan.  Only Holders of Claims in the Voting Class will be entitled to vote on the Plan.

Section 1126(d) of the Bankruptcy Code defines acceptance of a plan by a class of interests as acceptance by holders of at least two-thirds in dollar amount of those interests who actually vote to accept or reject a plan.  Votes that have been "designated" under section 1126(e) of the Bankruptcy Code are not included in the calculation of acceptance by a class of interests.  Thus, a Class of Interests will have voted to accept the Plan only if two-thirds in amount actually voting cast their Ballots in favor of acceptance, not counting designated votes, subject to Article III of the Plan.  No Class including Holders of Interests is entitled to vote on the Plan.

### D.   Confirmation Without Acceptance by All Impaired Classes.

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if Impaired Classes entitled to vote on the plan have not accepted it or if an Impaired Class is deemed to reject the Plan; provided that the plan is accepted by at least one Impaired Class.  Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, such plan will be confirmed, at the plan proponent's request, in a procedure commonly known as "cram down," so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

### 1.   No Unfair Discrimination.

This test applies to Classes of Claims or Interests that are of equal priority and are receiving different treatment under the Plan.  The test does not require that the treatment be the same or equivalent, but that such treatment be "fair."  In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of Classes of Claims of equal rank (e.g., classes of the same legal character).  The Debtor do not believe the Plan discriminates unfairly against any Impaired Class of Claims or Interests.  The Debtor believes that the Plan and the treatment of all Classes of Claims and Interests satisfy the foregoing requirements for nonconsensual Confirmation.

### 2.   Fair and Equitable Test.

This test applies to classes of different priority and status (e.g., secured versus unsecured) and includes the general requirement that no class of claims receive more than 100 percent of the amount of the allowed claims in such class.  As to the non-accepting class, the test sets different standards depending on the type of claims or interests in such class.  As set forth below, the Debtor believes that the Plan satisfies the "fair and equitable" requirement because, for each applicable Class, there is no Class of equal priority receiving more favorable treatment and no Class that is junior to such dissenting Class that will receive or retain any property on account of the Claims or Interests in such Class.

#### a.   Secured Claims.

The condition that a plan be "fair and equitable" to a non-accepting class of secured claims includes the requirements that:  (i) the holders of such secured claims retain the liens securing such claims to the extent of the allowed amount of the claims, whether the property subject to the liens is retained by the debtor or transferred to another entity under the plan; and (ii) each holder of a secured claim in the class receives deferred cash payments totaling at least the allowed amount of such claim with a present value, as of the effective date of the plan, at least equivalent to the value of the secured claimant's interest in the debtor's property subject to the liens.

#### b.   Unsecured Claims.

The condition that a plan be "fair and equitable" to a non-accepting class of unsecured claims requires that either:  (i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (ii) the holder of any claim or any equity interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or junior equity interest any property.

#### c.   Equity Interests.

The condition that a plan be "fair and equitable" to a non-accepting class of equity interests includes the requirements that either: (i) the plan provides that each holder of an equity interest in that class receives or retains under the plan on account of that equity interest property of a value, as of the effective date of the plan, equal to the greater of: (A) the allowed amount of any fixed liquidation preference to which such holder is entitled; (B) any fixed redemption price to which such holder is entitled; or (C) the value of such interest; or (ii) if the class does not receive the amount as required under (i) hereof, no class of equity interests junior to the non-accepting class may receive a distribution under the plan.

## XI.    CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

### A.    Introduction.

The following discussion is a summary of certain U.S. federal income tax consequences of the consummation of the Plan to the Debtor and to certain Holders of Claims entitled to vote on the Plan. The following summary does not address the U.S. federal income tax consequences to Holders of Claims who are Unimpaired or otherwise entitled to payment in full in Cash under the Plan. This summary is based on the Internal Revenue Code of 1986, as amended (the "IRC"), the U.S. Treasury Regulations promulgated thereunder, judicial authorities, published administrative positions of the U.S. Internal Revenue Service (the "IRS") and other applicable authorities, all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations, possibly with retroactive effect and affect the accuracy of this discussion. Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below. No opinion of counsel has been obtained and the Debtor do not intend to seek a ruling from the IRS as to any of the tax consequences of the Plan discussed below. The discussion below is not binding upon the IRS or the courts. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

This summary does not address non-U.S., state, local or non-income tax consequences of the Plan, nor does it purport to address all aspects of U.S. federal income taxation that may be relevant to a Holder in light of its individual circumstances or to a Holder that may be subject to special tax rules (such as Entities that are related to the Debtor within the meaning of the IRC, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, real estate investment trusts, tax-exempt organizations, governmental authorities or agencies, pass-through entities, beneficial owners of pass-through entities, subchapter S corporations, employees or persons who received their Claims pursuant to the exercise of an employee stock option or otherwise as compensation, persons using a mark-to-market method of accounting, and Holders of Claims who are themselves in bankruptcy), unless otherwise specifically stated herein. Furthermore, this summary assumes that a Holder holds only Claims in a single Class and holds a Claim only as a "capital asset" (within the meaning of Section 1221 of the IRC). This summary also assumes that the various debt and other arrangements to which any of the Debtor is a party will be respected for U.S. federal income tax purposes as debt, as applicable, in accordance with their form. This summary does not discuss differences in tax consequences to a Holder that acts or receives consideration in a capacity other than as a Holder of a Claim of the same Class, and the tax consequences for such Holders may differ materially from that described below.

For purposes of this discussion, a "U.S. Holder" is a Holder that is: (1) an individual citizen or resident of the United States for U.S. federal income tax purposes; (2) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof or the District of Columbia; (3) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (4) a trust (A) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more "United

States persons" (within the meaning of Section 7701(a)(30) of the IRC) have authority to control all substantial decisions of the trust or (B) that has a valid election in effect under applicable Treasury Regulations to be treated as a United States person.  For purposes of this discussion, a "Non-U.S. Holder" is any Holder that is not a U.S. Holder other than any partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes).

If a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a Holder, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or other beneficial owner) and the activities of the entity.  Partners (or other beneficial owners) of partnerships (or other pass-through entities) that are Holders should consult their respective tax advisors regarding the U.S. federal income tax consequences of the Plan.

**THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY, ONLY ADDRESSES CERTAIN CONSIDERATIONS WITH RESPECT TO THE U.S. FEDERAL INCOME TAX TREATMENT OF THE DEBTOR, U.S. HOLDERS AND NON-U.S. HOLDERS, AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM. SEVERAL OF THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN, AND OF OWNING CONSIDERATION ISSUED PURSUANT TO THE PLAN, ARE SUBJECT TO SIGNIFICANT UNCERTAINTY. ALL HOLDERS OF CLAIMS OR INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS AS TO THE U.S. FEDERAL, STATE, LOCAL, NON-U.S., AND NON-INCOME, ESTATE, AND OTHER TAX CONSEQUENCES OF THE PLAN.**

**B.      Certain United States Federal Income Tax Consequences to the Debtor.**

**3.      In General - Taxable Transaction.**

The implementation of the Plan is expected to be treated as a taxable transaction from the perspective of the Debtor and its Affiliates.  For U.S. federal income tax purposes, the Debtor is disregarded entity of Toys "R" Us Europe, LLC, which is a member of an affiliated group of corporations (or entities disregarded for U.S. federal income tax purposes that are wholly owned by members of such group), of which Toys "R" Us Inc. is the common parent (the "Toys Group").  As such, any taxable gain or loss resulting from the implementation of the Plan will be recognized by Toys "R" Us Europe, LLC, rather than the Debtor.

**4.      Partnership Treatment; No Partnership with Toys Group.**

The discussion in this tax disclosure assumes that (a) Reorganized Propco I is taxable as a partnership for U.S. federal income tax purposes and (b) the Debtor is never treated as owning the New Contingent Equity Rights as a member of the Toys Group.  In particular, the discussion assumes that Reorganized Propco I is not subject to the "publicly traded partnership" provisions of the IRC or that the Holders of Propco I Credit Agreement Claims (as defined in the Propco I Plan) do not exercise their right to treat Reorganized Propco or any of its subsidiaries as a corporation for U.S. federal income tax purposes. In the event those provisions applied or such Holders were to exercise such right, the U.S. federal income tax consequences of the Plan to the Debtor could differ (and the tax consequences of the Plan to Holders of Claims would be materially different).

Because the Debtor will be making distributions on account of a guarantee claim against it, and the primary issuer of the relevant debt is another member of the Toys Group, the Debtor expects that a

subrogation claim will arise as between the Debtor and Toys Delaware, with such claim immediately being cancelled.  This is not expected to result in any tax consequences for the Debtor.

    **C.**    **Certain United States Federal Income Tax Consequences to U.S. Holders of Allowed Claims and Interests.**

    **THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND DEPEND IN PART ON AN ASSUMPTION REGARDING THE POTENTIAL HOLDING STRUCTURE FOR THE NEW CONTINGENT EQUITY RIGHTS THAT HAS NOT YET BEEN FINALIZED.  AS SUCH, U.S. HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING TAX CONSEQUENCES OF THE PLAN.**

    **5.**    **Certain General Considerations.**

    **a.**  **Holding Structure for New Contingent Equity Rights.**

    The following discussion assumes that, pursuant to the Plan, the Debtor directly distributes the New Contingent Equity Rights to Holders of Class 3 Claims (the "Direct Holding Structure").  The Debtor and Holders of such Claims are actively considering alternative holding structures, which may include, among other things, treatment that would result in the New Contingent Equity Rights being directly or indirectly owned by entity taxed as a corporation ("Corporate Holdco"), with Holders of Class 3 Claims receiving equity in Corporate Holdco rather than receiving the New Contingent Equity Rights directly ("Corporate Holdco Equity").  In such a case, Corporate Holdco would be directly subject to the go-forward tax consequences of owning the New Contingent Equity Rights, while Holders of the Corporate Holdco Equity would be subject to tax consequences associated with owning stock of a corporation, which consequences have not been disclosed below.  In the event the Debtor and Holders of Class 3 Claims elect to utilize a Corporate Holdco structure, or any structure other than the Direct Holding Structure, a supplemental disclosure regarding such structure shall be filed with the Plan Supplement.

    **b.**  **Partnership Treatment; No Partnership with Toys Group.**

    Holders of Claims and Interests are referred to the discussion in the section titled "Partnership Treatment; No Partnership with Toys Group," above.  In the event different treatment applied, consequences to Holders of Claims of the implementation of the Plan, as well as ownership of the consideration under the Plan, would be materially different.

    **6.**    **Consequences to U.S. Holders of Class 3 Claims**

    Regardless of whether the Direct Holding Structure or another structure is utilized, the Debtor generally anticipates that, in any contemplated structure, the direct or indirect receipt of the New Contingent Equity Rights under the Plan will ultimately be treated as an exchange subject to section 1001 of the IRC.  As such, U.S. Holders are expected to recognize gain or loss in an amount equal to the difference between their adjusted tax basis in their Claims and the fair market value of the New Contingent Equity Rights received in exchange for such Claims, after also taking into account any recoveries received on account of their primary claims against the Delaware Debtors.

    **7.**    **Accrued Interest and OID.**

    A portion of the consideration received directly or indirectly by U.S. Holders of Allowed Claims may be attributable to accrued interest or OID on such Claims.  Such amount should be taxable to that U.S. Holder as interest income if such accrued interest or OID has not been previously included in the Holder's gross income for U.S. federal income tax purposes.  Conversely, U.S. Holders of Claims may be able to

recognize a deductible loss to the extent any accrued interest or OID on the Claims was previously included in the U.S. Holder's gross income but was not paid in full by the Debtor.

If the fair value of the consideration is not sufficient to fully satisfy all principal and interest or OID on Allowed Claims, the extent to which such consideration will be attributable to accrued interest or OID is unclear. Under the Plan, the aggregate consideration to be distributed to Holders of Allowed Claims in each Class will be allocated first to the principal amount of Allowed Claims, with any excess allocated to unpaid interest or OID that accrued on such Claims, if any. Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan is binding for U.S. federal income tax purposes, while certain Treasury Regulations generally treat payments as allocated first to any accrued but unpaid interest or OID and then as a payment of principal. The IRS could take the position that the consideration received by the U.S. Holder should be allocated in some way other than as provided in the Plan.

U.S. federal income tax laws enacted in December 2017 modified section 451 of the IRC. Under this new provision, accrual method U.S. Holders that prepare an "applicable financial statement" (as defined in section 451 of the IRC) generally would be required to include certain items of income such as OID (but not market discount) no later than the time such amounts are reflected on such a financial statement. The application of this rule to income of a debt instrument with OID is effective for taxable years beginning after December 31, 2018. U.S. Holders should consult their tax advisors with regard to interest, OID, market discount and premium matters concerning the Claims and non-Cash consideration received therefor.

**U.S. HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE ALLOCATION OF CONSIDERATION RECEIVED IN SATISFACTION OF THEIR CLAIMS AND THE U.S. FEDERAL INCOME TAX TREATMENT OF ACCRUED INTEREST.**

### 8. Market Discount.

Under the "market discount" provisions of the IRC, some or all of any gain realized by a U.S. Holder of a Claim who exchanges the Claim for consideration in connection with the Plan may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the debt instruments constituting the exchanged Claim. In general, a debt instrument is considered to have been acquired with "market discount" if it is acquired other than on original issue and if its U.S. Holder's adjusted tax basis in the debt instrument is less than (a) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or (b) in the case of a debt instrument issued with original issue discount, its adjusted issue price, in each case, by at least a *de minimis* amount (equal to 0.25% of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a U.S. Holder on the taxable disposition of Allowed Claims (determined as described above) that were acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while the Allowed Claims were considered to be held by the U.S. Holder (unless the U.S. Holder elected to include market discount in income as it accrued).

Section 451 of the IRC (as discussed above) generally would require accrual method U.S. Holders that prepare an "applicable financial statement" (as defined in section 451 of the IRC) to include certain items of income such as market discount no later than the time such amounts are reflected on such a financial statement. The application of this rule to income of a debt instrument with market discount is effective for taxable years beginning after December 31, 2018. However, the IRS recently announced in Notice 2018-80 that it intends to issue proposed regulations confirming that taxpayers may continue to defer income — including market discount income — for tax purposes until there is a payment or sale at a gain. Accordingly, although market discount may have to be included in income currently as it accrues for

financial accounting purposes, taxpayers may continue to defer the income for U.S. federal income tax purposes.  U.S. Holders should consult their tax advisors with regard to interest, OID, market discount and premium matters concerning the Claims and non-Cash consideration received therefor.

### 9. Limitations on Use of Capital Losses.

A U.S. Holder of a Claim who recognizes capital losses as a result of the distributions under the Plan will be subject to limits on the use of such capital losses.  For a non-corporate U.S. Holder, capital losses may be used to offset any capital gains (without regard to holding periods), and also ordinary income to the extent of the lesser of (1) $3,000 annually ($1,500 for married individuals filing separate returns) or (2) the excess of the capital losses over the capital gains.  A non-corporate U.S. Holder may carry over unused capital losses and apply them against future capital gains and a portion of their ordinary income for an unlimited number of years.  For corporate Holders, capital losses may only be used to offset capital gains.  A corporate U.S. Holder that has more capital losses than may be used in a tax year may carry back unused capital losses to the three years preceding the capital loss year or may carry over unused capital losses for the five years following the capital loss year.

### 10. Medicare Tax.

Certain U.S. Holders that are individuals, estates, or trusts are required to pay an additional 3.8% tax on, among other things, dividends, and gains from the sale or other disposition of capital assets.  U.S. holders that are individuals, estates, or trusts should consult their tax advisors regarding the effect, if any, of this tax provision on the exchange of Claims for consideration in accordance with the Plan and the subsequent disposition of any such consideration.

### 11. Ownership of New Contingent Equity Rights in Direct Holding Structure.

#### c. New Contingent Equity Rights.

Reorganized Propco I is expected to be taxable as a partnership for U.S. federal income tax purposes and the subsidiaries of Reorganized Propco I are expected to be disregarded as separate from Reorganized Propco I for U.S. federal income tax purposes.  As such, items of income, gain, loss, and deduction of Reorganized Propco I and its subsidiaries will be allocated to U.S. Holders of the New Contingent Equity Rights.  As a general rule, the Debtor anticipates that under most, but not all, circumstances, the New Contingent Equity Rights would not be allocated items of taxable income, gain, loss, and deduction prior to being "in the money," but that may not be true in all circumstances.  Each item generally will have the same character as if the U.S. Holder had realized the item directly.  U.S. Holders will be required to report these items regardless of the extent to which, or whether, they receive cash distributions from Reorganized Propco I for such taxable year, and thus may incur income tax liabilities in excess of any cash distributions from Reorganized Propco I.

A U.S. Holder is allowed to deduct its allocable share of Reorganized Propco I's losses (if any) only to the extent of such Holder's adjusted tax basis (discussed below) in the New Contingent Equity Rights at the end of the taxable year in which the losses occur.  In addition, various other limitations in the IRC may significantly limit a U.S. Holder's ability to deduct its allocable share of deductions and losses of Reorganized Propco I against other income.

Reorganized Propco I will provide each U.S. Holder with the necessary information to report its allocable share of Reorganized Propco I's tax items for U.S. federal income tax purposes.  However, no assurance can be given that Reorganized Propco I will be able to provide such information prior to the initial due date of the U.S. Holder's U.S. federal income tax return and U.S. Holders may therefore be required to apply to the IRS for an extension of time to file their tax returns.

38

Reorganized Propco I will determine how items will be reported on Reorganized Propco I's U.S. federal income tax returns in accordance with the New Organizational Documents, and all U.S. Holders of New Common Stock will be required under the IRC to treat the items consistently on their own returns, unless they file a statement with the IRS disclosing the inconsistency. In the event that Reorganized Propco I's income tax returns are audited by the IRS, the tax treatment of Reorganized Propco I's income, gain, loss, and deductions generally will be determined at the Reorganized Propco I level in a single proceeding, rather than in individual audits of U.S. Holders of New Contingent Equity Rights. Reorganized Propco I's "partnership representative" will have considerable authority under the IRC and the New Organizational Documents to make decisions affecting the tax treatment and procedural rights of the U.S. Holders of New Contingent Equity Rights.

A U.S. Holder of New Contingent Equity Rights generally will not recognize gain or loss on the receipt of a distribution of cash or property from Reorganized Propco I (provided that such Holder is not treated as exchanging such Holder's share of Reorganized Propco I's "unrealized receivables" and/or certain "inventory items" (as those terms are defined in the IRC, and together, "ordinary income items") for other partnership property). A U.S. Holder, however, will recognize gain on the receipt of a distribution of cash and, in some cases, marketable securities, from Reorganized Propco I (including any constructive distribution of money resulting from a reduction of the U.S. Holder's share of Reorganized Propco I's indebtedness) to the extent such distribution or the fair market value of such marketable securities distributed exceeds such Holder's adjusted tax basis in the New Contingent Equity Rights. Such distribution would be treated as gain from the sale or exchange of the New Contingent Equity Rights, which is described below.

A U.S. Holder's adjusted tax basis in the New Contingent Equity Rights generally will be equal to such Holder's initial tax basis, increased by the sum of (a) any additional capital contribution such Holder makes to Reorganized Propco I; (b) the Holder's allocable share of the income of Reorganized Propco I; and (c) increases in the Holder's allocable share of Reorganized Propco I's indebtedness, and reduced, but not below zero, by the sum of (a) the Holder's allocable share of Reorganized Propco I's losses, and (b) the amount of money or the adjusted tax basis of property distributed to such Holder, including constructive distributions of cash resulting from reductions in such Holder's allocable share of Reorganized Propco I's indebtedness.

A sale of all or part of the New Contingent Equity Rights will result in the recognition of gain or loss in an amount equal to the difference between the amount of the sales proceeds or distribution (including any constructive distribution) and such Holder's adjusted tax basis for the New Contingent Equity Rights disposed of. Any gain or loss recognized with respect to such a sale generally will be treated as capital gain or loss, and will be long-term capital gain or loss if the New Contingent Equity Rights have been held for more than one year, except to the extent (a) that the proceeds of the sale are attributable to a Holder's allocable share of certain of Reorganized Propco I's ordinary income items and such proceeds exceed the Holder's adjusted tax basis attributable to such ordinary income items and (b) of previously allowed bad debt or ordinary loss deductions. A U.S. Holder's ability to deduct any loss recognized on the sale of the New Contingent Equity Rights will depend on the Holder's own circumstances and may be restricted under the IRC.

Reorganized Propco I is expected to derive income that would constitute unrelated business taxable income ("UBTI") for tax-exempt U.S. Holders. Such tax-exempt U.S. Holders should consult their own advisors regarding the potentially detrimental consequences of such treatment.

### d. Corporate Holdco Structure.

Subject to additional disclosure, the following discussion addresses certain considerations that may apply if a Corporate Holdco structure is utilized. In such case, the Corporate Holdco would be treated as

corporations for U.S. federal income tax purposes. As such, items of taxable income, gain, loss, and deduction of Reorganized Propco I will not flow through the Corporate Holdco to owners of Corporate Holdco Equity.

Any distributions made on account of the Corporate Holdco Equity equity will constitute dividends for U.S. federal income tax purposes to the extent of the current or accumulated earnings and profits of the Corporate Holdco Equity as determined under U.S. federal income tax principles. To the extent that a Holder receives distributions that would otherwise constitute dividends for U.S. federal income tax purposes but that exceed such current and accumulated earnings and profits, such distributions will be treated first as a non-taxable return of capital reducing the Holder's basis in its shares. Any such distributions in excess of the Holder's basis in its shares (determined on a share by share basis) generally will be treated as capital gain.

Dividends paid to U.S. Holders that are corporations generally will be eligible for the dividends received deduction so long as there are sufficient earnings and profits. However, the dividends received deduction is only available if certain holding period requirements are satisfied. The length of time that a shareholder has held its stock is reduced for any period during which the shareholder's risk of loss with respect to the stock is diminished by reason of the existence of certain options, contracts to sell, short sales, or similar transactions. In addition, to the extent that a corporation incurs indebtedness that is directly attributable to an investment in the stock on which the dividend is paid, all or a portion of the dividends received deduction may be disallowed.

Unless a non-recognition provision applies, Holders generally will recognize capital gain or loss upon the sale, redemption, or other disposition of Corporate Holdco Equity. Such capital gain will be long term capital gain if at the time of the sale, exchange, retirement, or other disposition, the Holder held the Corporate Holdco Equity for more than one year. Long term capital gains of an individual taxpayer generally are taxed at preferential rates.

**D.      Certain United States Federal Income Tax Consequences to Non-U.S. Holders of Claims.**

**12.      Consequences to Non-U.S. Holders of Claims and Interests.**

The following discussion includes only certain U.S. federal income tax consequences of the exchange of Claims for consideration in accordance with the Plan and the subsequent ownership and disposition of such consideration to Non-U.S. Holders. The discussion does not include any non-U.S. tax considerations. The rules governing the U.S. federal income tax consequences to Non-U.S. Holders are complex. Each Non-U.S. Holder should consult its own tax advisor regarding the U.S. federal, state, and local and the non-U.S. tax consequences of the consummation of the Plan to such Non-U.S. Holder.

Except as otherwise noted, the following discussion assumes the Direct Holding Structure is utilized.

**e.    Gain Recognition.**

Whether a Non-U.S. Holder realizes gain or loss on the exchange of Claims under the Plan, or in connection with a subsequent exchange of the consideration received under the Plan, is generally determined in the same manner as set forth above in connection with U.S. Holders.

Any gain realized by a Non-U.S. Holder on the exchange of its Claim under the Plan, or in connection with an exchange of the consideration received under the Plan, generally will not be subject to U.S. federal income taxation unless (i) the Non-U.S. Holder is an individual who was present in the United

40

States for 183 days or more during the taxable year in which the Restructuring Transactions or other applicable transactions occur and certain other conditions are met, (ii) such gain is effectively connected with the conduct by such non-U.S. Holder of a trade or business in the United States (and if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States), or (iii) any gain is subject to taxation under FIRPTA (as defined and discussed below).

If the first exception applies, to the extent that any gain is taxable, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of the exchange. If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to any gain realized on the exchange if such gain is effectively connected with the Non-U.S. Holder's conduct of a trade or business in the United States in the same manner as a U.S. Holder. In order to claim an exemption from withholding tax, such Non-U.S. Holder will be required to provide a properly executed IRS Form W-8ECI (or such successor form as the IRS designates). In addition, if such a Non-U.S. Holder is a corporation, it may be subject to a branch profits tax equal to 30% (or such lower rate provided by an applicable treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments. Importantly, as discussed below, the second exception would be expected to apply with respect to any disposition of New Contingent Equity Rights by a Non-U.S. Holder.

**f.    Interest Payments; Accrued but Untaxed Interest and OID.**

Payments to a Non-U.S. Holder that are attributable to accrued but untaxed interest on their Allowed Claim generally will not be subject to U.S. federal income or withholding tax, provided that the withholding agent has received or receives, prior to payment, appropriate documentation (generally, IRS Form W-8BEN or W-8BEN-E) establishing that the Non-U.S. Holder is not a U.S. person, unless:

(a)    the Non-U.S. Holder actually or constructively owns 10% or more of the total combined voting power of all classes of the stock or other equity of the Debtor obligor on a Claim (in the case of consideration received under the Plan);

(b)    the Non-U.S. Holder is a "controlled foreign corporation" that is a "related person" with respect to the Debtor or Reorganized Debtor (each, within the meaning of the IRC);

(c)    the Non-U.S. Holder is not a bank receiving interest described in Section 881(c)(3)(A) of the IRC; or

(d)    such interest and OID is effectively connected with the conduct by the Non-U.S. Holder of a trade or business within the United States (in which case, provided the Non-U.S. Holder provides a properly executed IRS Form W-8ECI (or successor form) to the withholding agent, the Non-U.S. Holder (x) generally will not be subject to withholding tax, but (y) will be subject to U.S. federal income tax in the same manner as a U.S. Holder (unless an applicable income tax treaty provides otherwise), and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such Non-U.S. Holder's effectively connected earnings and profits that are attributable to the accrued but untaxed interest at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty)).

A Non-U.S. Holder that does not qualify for exemption from withholding tax with respect to accrued but untaxed interest that is not effectively connected income generally will be subject to withholding of U.S. federal income tax at a 30% rate (or at a reduced rate or exemption from tax under an applicable income tax treaty) on payments that are attributable to accrued but untaxed interest. For purposes

41

of providing a properly executed IRS Form W-8BEN or W-BEN-E, special procedures are provided under applicable Treasury Regulations for payments through qualified foreign intermediaries or certain financial institutions that hold customers' securities in the ordinary course of their trade or business.

### g.  Ownership of New Contingent Equity Rights.

Any income generated by Reorganized Propco I and its subsidiaries that are disregarded entities would be expected to give rise to "effectively connected income" (or "ECI") to Non-U.S. Holders. In such case, a Non-U.S. Holder of New Contingent Equity Rights would be subject to U.S. federal income tax on its share of such income. A Non-U.S. Holder's share of ECI would be subject to tax at normal graduated U.S. federal income tax rates and, if the Non-U.S. Holder is a corporation for U.S. federal income tax purposes, may also be subject to U.S. branch profits tax equal to 30% (or such lower rate provided by an applicable income tax treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments. Additionally, some or all of the gain on a disposition of New Contingent Equity Rights would be treated as ECI to the extent that such gain is attributable to assets that generate ECI, including real estate located in the United States and other U.S. real property interests (as defined in the IRC).

Under section 1446 of the IRC, Reorganized Propco I would be subject to withholding obligations with respect to any Non-U.S. Holder of New Contingent Equity Rights, and any purchaser of New Contingent Equity Rights would also be subject to withholding requirements.

In addition to these considerations, Non-U.S. Holders of New Contingent Equity Rights would be subject to certain rules under FIRPTA, as described in greater detail below.

### h.  Ownership of Corporate Holdco Equity.

Any non-liquidating distributions made with respect to Corporate Holdco Equity will constitute dividends for U.S. federal income tax purposes to the extent of the issuer's current or accumulated earnings and profits as determined under U.S. federal income tax principles. To the extent that a Non-U.S. Holder receives distributions that would otherwise constitute dividends for U.S. federal income tax purposes but that exceed such current and accumulated earnings and profits, such distributions will be treated first as a non-taxable return of capital reducing the Non-U.S. Holder's basis in its shares. Any such distributions in excess of a Non-U.S. Holder's basis in its shares (determined on a share-by-share basis) generally will be treated as capital gain from a sale or exchange (and the respective excess distributions as proceeds from a sale or exchange). Except as described below, dividends paid with respect to Corporate Holdco Equity held by a Non-U.S. Holder that are not effectively connected with a Non-U.S. Holder's conduct of a U.S. trade or business (or if an income tax treaty applies, are not attributable to a permanent establishment maintained by such non-U.S. Holder in the United States) will be subject to withholding at a rate of 30% (or lower treaty rate or exemption from tax, if applicable). A Non-U.S. Holder generally will be required to satisfy certain IRS certification requirements in order to claim a reduction of or exemption from withholding under a tax treaty by filing IRS Form W-8BEN or W-8BEN-E (or a successor form) upon which the Non-U.S. Holder certifies, under penalties of perjury, its status as a non-U.S. person and its entitlement to the lower treaty rate or exemption from tax with respect to such payments. Dividends paid with respect to Corporate Holdco Equity held by a Non-U.S. Holder that are effectively connected with a Non-U.S. Holder's conduct of a U.S. trade or business (and if an income tax treaty applies, are attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States) generally will be subject to U.S. federal income tax in the same manner as a U.S. Holder, and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such Non-U.S. Holder's effectively connected earnings and profits that are attributable to the dividends at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty). Distributions to a Non-U.S.

42

Holder treated as capital gain from a sale or exchange may also be subject to taxation under FIRPTA (as discussed below).

Dispositions of Corporate Holdco Equity are expected to be subject to taxation under FIRPTA (as discussed below), unless, at the time of such a disposition, the Corporate Holdco does not directly or indirectly hold any U.S. real property interests ("USRPIs") as defined in the IRC, and it had directly or indirectly disposed of all of the USRPIs it directly or indirectly owned in one or more fully taxable transactions.

### i.  FIRPTA.

Under the Foreign Investment in Real Property Tax Act ("FIRPTA"), the disposition of certain investments in U.S. property is subject to taxation in the hands of Non-U.S. Holders and treated as ECI even if a Non-U.S. Holder is not otherwise engaged in a U.S. trade or business. Different rules apply with respect to Corporate Holdco Equity, on one hand, and New Contingent Equity Rights, on the other hand.

With respect to Corporate Holdco Equity equity, rules with respect to U.S. real property holding corporations ("USRPHCs") may apply. In general, a corporation is a USRPHC if the fair market value of the corporation's U.S. real property interests (as defined in the IRC and applicable Treasury Regulations) equals or exceeds 50% of the aggregate fair market value of its worldwide real property interests and its other assets used or held for use in a trade or business (applying certain look-through rules to evaluate the assets of subsidiaries) at any time within the shorter of the 5-year period ending on the effective time of the applicable disposition or the period of time the Non-U.S. Holder held such interest. The Debtor currently anticipate that the Corporate Holdco Equity would constitute a USRPHC on the Effective Date. Taxable gain from the disposition of an interest in a USRPHC (generally equal to the difference between the amount realized and such Non-U.S. Holder's adjusted tax basis in such interest) will constitute effectively connected income. In general, the FIRPTA provisions will not apply if (a)(i) the Non-U.S. Holder does not directly or indirectly own more than 5% of the value of such interest during a specified testing period and (ii) such interest is regularly traded on an established securities market, or (b) at the time of such a disposition, the corporation does not directly or indirectly hold any USRPIs and it had directly or indirectly disposed of all of the USRPIs it directly or indirectly owned in one or more fully taxable transactions. Further, the buyer of the Corporate Holdco Equity may be required to withhold a tax equal to 15% of the amount realized on the sale. The amount of any such withholding would be allowed as a credit against the Non-U.S. Holder's U.S. federal income tax liability and may entitle the Non-U.S. Holder to a refund, provided that the Non-U.S. Holder properly and timely files a tax return with the IRS. However, in the event Corporate Holdco Equity is regularly traded on an established securities market, the withholding obligation described above would not apply, even if a Non-U.S. Holder is subject to the substantive FIRPTA tax.

With respect to the New Contingent Equity Rights, the Debtor anticipates that all or substantially all of the assets of Reorganized Propco I and its subsidiaries will constitute USRPIs. As such, a disposition of assets by Reorganized Propco I and its subsidiaries generally will subject a Non-U.S. Holder of New Contingent Equity Rights to taxation as if the ECI rules discussed above applied (even if Reorganized Propco I and its subsidiaries were not otherwise determined to be engaged in a U.S. trade or business), and certain withholding requirements would also apply. Additionally, the disposition of New Contingent Equity Rights would be treated as a disposition of a proportionate share of such USRPIs for purposes of substantive FIRPTA taxation as well as withholding requirements.

### j.  FATCA.

Under legislation commonly referred to as the Foreign Account Tax Compliance Act ("FATCA"), foreign financial institutions and certain other foreign entities must report certain information with respect

to their U.S. account holders and investors or be subject to withholding at a rate of 30% on the receipt of "withholdable payments." For this purpose, "withholdable payments" are generally U.S. source payments of fixed or determinable, annual or periodical income, and also include gross proceeds from the sale of any property of a type which can produce U.S. source interest or dividends. FATCA withholding will apply even if the applicable payment would not otherwise be subject to U.S. federal nonresident withholding.

As currently proposed, FATCA withholding rules would apply to payments of gross proceeds from the sale or other disposition of property of a type which can produce U.S. source interest or dividends that occur after December 31, 2018. Each Non-U.S. Holder should consult its own tax advisor regarding the possible impact of these rules on such Non-U.S. Holder.

### E. Information Reporting and Back-Up Withholding.

The Debtor and applicable withholding agents will withhold all amounts required by law to be withheld from payments of interest and dividends, whether in connection with distributions under the Plan or in connection with payments made on account of consideration received pursuant to the Plan, and will comply with all applicable information reporting requirements. The IRS may make the information returns reporting such interest and dividends and withholding available to the tax authorities in the country in which a Non-U.S. Holder is resident. In general, information reporting requirements may apply to distributions or payments under the Plan. Additionally, under the backup withholding rules, a Holder of a Claim may be subject to backup withholding (currently at a rate of 24%) with respect to distributions or payments made pursuant to the Plan unless that Holder: (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates that fact; or (b) timely provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the Holder is not subject to backup withholding (generally in the form of a properly executed IRS Form W-9 for a U.S. Holder, and, for a Non-U.S. Holder, in the form of a properly executed applicable IRS Form W-8 (or otherwise establishes such Non-U.S. Holder's eligibility for an exemption)). Backup withholding is not an additional tax but is, instead, an advance payment that may be refunded to the extent it results in an overpayment of tax; provided that the required information is timely provided to the IRS.

In addition, from an information reporting perspective, Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders of Claims subject to the Plan are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holders' tax returns.

**THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER OF A CLAIM IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS AGAINST THE DEBTOR SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTION CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, OR FOREIGN TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

## XII.    RECOMMENDATION

In the opinion of the Debtor, the Plan is preferable to all other available alternatives and provides for a larger distribution to the Debtor's creditors than would otherwise result in any other scenario. Accordingly, the Debtor recommend that holders of Claims entitled to vote on the Plan vote to accept the Plan and support Confirmation of the Plan.

Dated:  December 24, 2018

Respectfully submitted,

Wayne Real Estate Parent Company, LLC

By:    */s/ Matthew Finigan*
Name: Matthew Finigan
Title:  Executive Vice President – Chief Financial
          Officer and Treasurer

45

**<u>Exhibit A</u>**

**Chapter 11 Plan**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**RICHMOND DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| TOYS "R" US, INC., *et al.*,[1] | ) | Case No. 17-34665 (KLP) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

---

# CHAPTER 11 PLAN
## OF WAYNE REAL ESTATE PARENT COMPANY, LLC

---

**NOTHING CONTAINED HEREIN SHALL CONSTITUTE AN OFFER, ACCEPTANCE,
COMMITMENT, OR LEGALLY BINDING OBLIGATION OF THE DEBTOR
OR ANY OTHER PARTY IN INTEREST.**

**YOU SHOULD NOT RELY ON THE INFORMATION CONTAINED IN, OR THE TERMS OF, THIS PLAN
FOR ANY PURPOSE PRIOR TO THE CONFIRMATION OF THIS PLAN BY THE BANKRUPTCY COURT.**

**THIS PLAN IS SUBJECT TO APPROVAL BY THE BANKRUPTCY COURT AND OTHER
CUSTOMARY CONDITIONS.  THIS PLAN IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES.**

---

Edward O. Sassower, P.C.
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Emily E. Geier (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:        (212) 446-4800
Facsimile:        (212) 446-4900

-and-

Michael A. Condyles (VA 27807)
Peter J. Barrett (VA 46179)
Jeremy S. Williams (VA 77469)
**KUTAK ROCK LLP**
901 East Byrd Street, Suite 1000
Richmond, Virginia 23219-4071
Telephone:        (804) 644-1700
Facsimile:        (804) 783-6192

*Co-Counsel to the Debtors and Debtors in Possession*

James H.M. Sprayregen, P.C.
Anup Sathy, P.C.
Chad J. Husnick, P.C. (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:        (312) 862-2000
Facsimile:        (312) 862-2200

Dated:  December 24, 2018

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are set forth in the *Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief* [Docket No. 78].  The location of the Debtors' service address is One Geoffrey Way, Wayne, New Jersey 07470.

**TABLE OF CONTENTS**

**Page**

**ARTICLE I DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND GOVERNING LAW** ........................................................................................................1
    A.    Defined Terms. .........................................................................................................1
    B.    Rules of Interpretation. ............................................................................................9
    C.    Computation of Time. ............................................................................................10
    D.    Governing Law. ......................................................................................................10
    E.    Reference to Monetary Figures. .............................................................................10
    F.    Reference to the Debtor or the Reorganized Debtor. .............................................10
    G.    Controlling Document. ...........................................................................................10

**ARTICLE II ADMINISTRATIVE CLAIMS AND PRIORITY TAX CLAIMS** ...................................11
    A.    Administrative Claims. ...........................................................................................11
    B.    Accrued Professional Compensation Claims. ........................................................11
    C.    Priority Tax Claims. ...............................................................................................12

**ARTICLE III CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS** ...........................12
    A.    Summary of Classification. ....................................................................................13
    B.    Treatment of Claims and Interests. ........................................................................13
    C.    Special Provision Governing Unimpaired Claims. ................................................14
    D.    Elimination of Vacant Classes; Presumed Acceptance by Non-Voting Classes. ...............15
    E.    Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code. .....................15
    F.    Subordinated Claims. .............................................................................................15

**ARTICLE IV MEANS FOR IMPLEMENTATION OF THE PLAN** ......................................................15
    A.    General Settlement of Claims. ................................................................................15
    B.    Restructuring Transactions. ....................................................................................15
    C.    Sources of Consideration for Plan Distributions. ..................................................16
    D.    Issuance of New Common Stock. ...........................................................................16
    E.    Exemption from Registration Requirements. .........................................................16
    F.    Subordination. ........................................................................................................17
    G.    Vesting of Assets in the Reorganized Debtor. .......................................................17
    H.    Cancellation of Securities and Agreements. ..........................................................17
    I.    Corporate Action. ...................................................................................................17
    J.    Corporate Existence; Tax Classification. ..............................................................18
    K.    Charter, Bylaws, and New Organizational Documents .........................................18
    L.    Effectuating Documents; Further Transactions. ....................................................18
    M.    Exemption from Certain Taxes and Fees. ..............................................................19
    N.    Directors and Officers. ...........................................................................................19
    O.    Retention of Causes of Action. ..............................................................................19
    P.    Avoidance Actions. ................................................................................................19
    Q.    Regulatory Requirements .......................................................................................20
    R.    Insurance Contracts. ...............................................................................................20

**ARTICLE V TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES** .......................20
    A.    Assumption and Rejection of Executory Contracts and Unexpired Leases. ....................20
    B.    Claims Based on Rejection of Executory Contracts and Unexpired Leases. ....................21
    C.    Cure of Defaults for Assumed and Assigned Executory Contracts and Unexpired Leases. ...................................................................................................21
    D.    Preexisting Obligations to the Debtor Under Executory Contracts and Unexpired Leases. ...................................................................................................21
    E.    D&O Liability Insurance Policies. ..........................................................................22
    F.    Indemnification Obligations ...................................................................................22

G.      Modifications, Amendments, Supplements, Restatements, or Other Agreements............22
H.      Reservation of Rights. ...............................................................................................22
I.      Nonoccurrence of Effective Date................................................................................22

**ARTICLE VI PROVISIONS GOVERNING DISTRIBUTIONS** .......................................................**23**
A.      Timing and Calculation of Amounts to Be Distributed. ..................................................23
B.      Disbursing Agent. ....................................................................................................23
C.      Distributions on Account of Claims Allowed After the Effective Date...........................23
D.      Delivery of Distributions and Undeliverable or Unclaimed Distributions......................24
E.      Compliance with Tax Requirements/Allocations. .........................................................24
F.      No Postpetition Interest on Claims. ...........................................................................25
G.      Setoffs and Recoupment. ..........................................................................................25
H.      Claims Paid or Payable by Third Parties. ...................................................................25
I.      Indefeasible Distributions. .........................................................................................26
J.      Distributions on Account of Subordinated Claims. .......................................................26

**ARTICLE VII PROCEDURES FOR RESOLVING CONTINGENT,  UNLIQUIDATED, AND
DISPUTED CLAIMS**...........................................................................................................**26**
A.      Allowance of Claims and Interests. ............................................................................26
B.      Claims and Interests Administration Responsibilities. ...................................................26
C.      Estimation of Claims and Interests. ............................................................................26
D.      Adjustment to Claims or Interests without Objection.....................................................27
E.      Time to File Objections to Claims. .............................................................................27
F.      Disallowance of Claims..............................................................................................27
G.      Amendments to Claims...............................................................................................27
H.      No Distributions Pending Allowance. .........................................................................27
I.      Distributions After Allowance. ...................................................................................27
J.      Single Satisfaction of Claims. ....................................................................................28

**ARTICLE VIII SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS** ......................**28**
A.      Settlement, Compromise, and Release of Claims and Interests.......................................28
B.      Discharge of Claims and Termination of Equity Interests..............................................28
C.      **Release of Liens.** ......................................................................................................29
D.      **Releases by the Debtor.** ............................................................................................29
E.      **Releases by Holders of Claims and Interests.** ............................................................30
F.      **Exculpation.** ...........................................................................................................30
G.      **Injunction.** .............................................................................................................31
H.      Protections Against Discriminatory Treatment.............................................................31
I.      Setoffs. ...................................................................................................................32
J.      Recoupment. ............................................................................................................32
K.      Subordination Rights. ...............................................................................................32
L.      Document Retention. .................................................................................................32
M.      Reimbursement or Contribution. .................................................................................32

**ARTICLE IX CONDITIONS PRECEDENT TO CONFIRMATION AND THE EFFECTIVE DATE**...........**32**
A.      Conditions Precedent to Confirmation.........................................................................32
B.      Conditions Precedent to the Effective Date. ................................................................33
C.      Waiver of Conditions.................................................................................................33

**ARTICLE X MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN**................................**33**
A.      Modification and Amendments. ..................................................................................33
B.      Effect of Confirmation on Modifications......................................................................34
C.      Revocation or Withdrawal of the Plan.........................................................................34

**ARTICLE XI RETENTION OF JURISDICTION** ......................................................................**34**

**ARTICLE XII MISCELLANEOUS PROVISIONS** ............................................................... **36**
  A.        Immediate Binding Effect. ................................................................. 36
  B.        Additional Documents. ...................................................................... 36
  C.        Payment of Statutory Fees. ............................................................... 36
  D.        Dissolution of Committees. ............................................................... 36
  E.        Reservation of Rights. ....................................................................... 36
  F.        Successors and Assigns. .................................................................... 37
  G.        Service of Documents. ....................................................................... 37
  H.        Term of Injunctions or Stays. ............................................................ 38
  I.         Entire Agreement. .............................................................................. 38
  J.         Exhibits. ............................................................................................ 38
  K.        Nonseverability of Plan Provisions. .................................................. 38
  L.         Waiver or Estoppel. ........................................................................... 38
  M.        Enforcement of the Confirmation Order ........................................... 38
  N.        Votes Solicited in Good Faith ........................................................... 39
  O.        Creditor Default ................................................................................ 39

**INTRODUCTION**

The Debtor proposes the following plan pursuant to chapter 11 of the Bankruptcy Code (together with the documents comprising the Plan Supplement, the "Plan").  Capitalized terms used in the Plan and not otherwise defined have the meanings ascribed to such terms in Article I.A.

The Chapter 11 Cases have been consolidated for procedural purposes only and are being jointly administered pursuant to an order of the Bankruptcy Court.  Reference is made to the Disclosure Statement for a discussion of the Debtor's history, businesses, results of operations, historical financial information, projections, and future operations, as well as a summary and analysis of the Plan and certain related matters, including distributions to be made under the Plan.  The Debtor is a proponent of the Plan contained herein within the meaning of section 1129 of the Bankruptcy Code.  This Plan is separate from the Propco II Plan,[2] the Toys Delaware Plan, and any other plan for any entity or entities other than the Debtor.

ALL HOLDERS OF CLAIMS AND INTERESTS, TO THE EXTENT APPLICABLE, ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

**ARTICLE I**
**DEFINED TERMS, RULES OF INTERPRETATION,**
**COMPUTATION OF TIME, AND GOVERNING LAW**

A.      *Defined Terms.*

As used in this Plan, capitalized terms have the meanings and effect as set forth below.

1.      "*Accrued Professional Compensation Claims*" means, at any given moment, all Claims for accrued fees and expenses (including success fees) for services rendered by a Professional through and including the Effective Date, to the extent such fees and expenses have not been paid pursuant to the Interim Compensation Order or any other order of the Bankruptcy Court and regardless of whether a fee application has been Filed for such fees and expenses.  To the extent the Bankruptcy Court denies or reduces by a Final Order any amount of a Professional's fees or expenses, then the amount by which such fees or expenses are reduced or denied shall reduce the applicable Accrued Professional Compensation Claim.

2.      "*Ad Hoc Group of Term B-4 Lenders*" means the ad hoc group of certain holders of Secured Term Loan B Credit Facility Claims (as defined in the Toys Delaware Plan) consisting of funds and accounts managed or advised by Angelo, Gordon & Co., L.P.; Franklin Mutual Advisors, LLC; Highland Capital Management, LP; Oaktree Capital Management, L.P.; and Solus Alternative Asset Management LP.

3.      "*Ad Hoc Vendor Group*" means the ad hoc group of merchandise vendors represented by Foley & Lardner LLP, Fox Rothschild LLP; Schiff Hardin LLP; Saul Ewing Arnstein & Lehr LLP; Morris, Nichols, Arsht & Tunnell; and Wasserman, Jurista & Stolz, P.C.

4.      "*Administrative Claim*" means a Claim for costs and expenses of administration of the Debtor's estate pursuant to sections 328, 330, 503(b) or 507(a)(2) of the Bankruptcy Code, including:  (a) the actual and necessary costs and expenses of preserving the Estate and operating the business of the Debtor incurred after the Petition Date and through and including the Effective Date; and (b) Accrued Professional Compensation Claims.

5.      "*Administrative Claims Bar Date*" means, except for Accrued Professional Compensation Claims, the first Business Day that is 30 days following the Effective Date, except as specifically set forth in the Plan or a Final Order.

---

[2]      The Propco II Plan was confirmed by the Bankruptcy Court on August 22, 2018.

6.　　　"*Administrative Claims Objection Bar Date*" means the deadline to filing objections to requests for payment of Administrative Claims (other than requests for payment of Accrued Professional Fee Claims and Claims arising under sections 503(b)(9) of the Bankruptcy Code), which shall be the later of (a) 60 days after the Effective Date or (b) 60 days after the Filing of the applicable request for payment of an Administrative Claim, *provided, that* the Administrative Claims Objection Bar Date may be extended by order of the Bankruptcy Court.

7.　　　"*Affiliate*" has the meaning set forth in section 101(2) of the Bankruptcy Code.

8.　　　"*Allowed*" means, with reference to any Claim or Interest, as may be applicable, (a) any Claim that is evidenced by a Proof of Claim or a request for payment of an Administrative Claim, as applicable, that is Filed on or before the applicable Claims Bar Date or Administrative Claims Bar Date or which, pursuant to the Bankruptcy Code or a Final Order, is not required to be Filed; (b) any Claim that is listed in the Schedules as of the Effective Date as neither contingent, unliquidated, nor disputed, and for which no Proof of Claim has been timely Filed; or (c) any Claim Allowed pursuant to the Plan; *provided*, *however*, that with respect to any Claim described in clauses (a) or (b) above, such Claim shall be considered Allowed only if and to the extent that, with respect to such Claim, no objection to the allowance thereof has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court or such an objection is so interposed and the Claim shall have been Allowed by a Final Order.  Except as otherwise specified in the Plan, any Final Order, or as otherwise agreed by the Debtor, and except for any Claim that is Secured by property of a value in excess of the principal amount of such Claim (as determined by Final Order of the Bankruptcy Court), the amount of an Allowed Claim shall not include interest or fees on such Claim accruing from and after the Petition Date.  Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated, or disputed, and for which no Proof of Claim has been timely Filed, is not considered Allowed and shall be expunged without further action by the Debtor and without any further notice to or action, order or approval of the Bankruptcy Court.  Notwithstanding anything to the contrary herein, no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes such Debtor or Reorganized Debtor, as the case may be.  "Allow" and "Allowing" shall have correlative meanings.

9.　　　"*Assumed Liabilities*" means any liability of any Debtor that is fully assumed by a Purchaser or other entity pursuant to Sale Transaction Documents.

10.　　　"*Avoidance Actions*" means any and all actual or potential avoidance, recovery, subordination, or other Causes of Action or remedies that may be brought by or on behalf of the Debtor or its Estate or other authorized parties in interest under the Bankruptcy Code or applicable non-bankruptcy law, including Causes of Action or remedies under sections 502, 510, 542, 544, 545, 547, 548, 549, 550, 551, and 553(b) of the Bankruptcy Code or under similar or related local, state, federal, or foreign statutes and common law, including fraudulent transfer laws.

11.　　　"*Ballot*" means the ballot form for accepting or rejecting this Plan and making certain elections under this Plan, distributed to the Holders of Claims or Interests that are Impaired under this Plan and entitled to vote to accept or reject this Plan pursuant to Article III.

12.　　　"*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532.

13.　　　"*Bankruptcy Court*" means the United States Bankruptcy Court for the Eastern District of Virginia having jurisdiction over the Chapter 11 Cases and, to the extent of the withdrawal of any reference under 28 U.S.C. § 157 or the General Order of the District Court pursuant to section 151 of the Judicial Code, the United States District Court for the Eastern District of Virginia.

14.　　　"*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure promulgated under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court.

15.　　　"*Business Day*" means any day, other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

16.　　　"*Cash*" means the legal tender of the United States or the equivalent thereof.

17.    "*Causes of Action*" means any claim (including any Claim), cause of action, controversy, right of setoff, cross claim, counterclaim, or recoupment and any claim on contracts or for breaches of duties imposed by law or in equity, demand, right, action, Lien, indemnity, guaranty, suit, obligation, liability, debt, damage, remedy, judgment, account, defense, offset, power, privilege, license, or franchise of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising,  contingent or non contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity, or pursuant to any other theory of law.  For the avoidance of doubt, "Causes of Action" include:  (a) any right of setoff, counterclaim, or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity; (b) any claim based on or relating to, or in any manner arising from, in whole or in part, tort, breach of contract, breach of fiduciary duty, violation of local, state, federal, or foreign law, or breach of any duty imposed by law or in equity, including securities laws, negligence, and gross negligence; (c) any right to object to or otherwise contest Claims or Interests; (d) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code; (e) any claim or defense, including fraud, mistake, duress, usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (f) any Avoidance Action.

18.    "*Certificate*" means any instrument evidencing a Claim or Interest.

19.    "*Chapter 11 Cases*" means the chapter 11 case of the Debtor pending before the Bankruptcy Court under the lead case of Toys "R" Us, Inc., Case No. 17-34665 (KLP) (Bankr. E.D. Va.).

20.    "*Claim*" means any claim against the Debtor, as defined in section 101(5) of the Bankruptcy Code, including: (a) any right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or (b) any right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

21.    "*Claims Bar Date*" means, either, the General Claims Bar Date or the Governmental Claims Bar Date, as applicable.

22.    "*Claims Objection Bar Date*" means the later of: (a) the date that is 180 days after the Effective Date; and (b) such other date as may be fixed by the Bankruptcy Court, after notice and hearing, upon a motion filed before the expiration of the deadline to object to Claims or Interests.

23.    "*Claims Register*" means the official register of Claims maintained by the Notice and Claims Agent.

24.    "*Class*" means a category of Holders of Claims or Interests as set forth in <u>Article III</u> in accordance with section 1122(a) of the Bankruptcy Code.

25.    "*Confirmation*" means the entry on the docket of the Chapter 11 Cases of a Confirmation Order.

26.    "*Confirmation Date*" means the date upon which the Bankruptcy Court enters the Confirmation Order.

27.    "*Confirmation Hearing*" means the hearing held by the Bankruptcy Court to consider Confirmation pursuant to section 1129 of the Bankruptcy Code.

28.    "*Confirmation Order*" means an order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

29.    "*Consummation*" means the occurrence of the Effective Date for the Plan.

30.    "*Creditors' Committee*" means the official committee of unsecured creditors appointed in the Chapter 11 Cases.

31.      "*Cure Claims*" means all Claims for Cure Obligations.

32.      "*Cure Obligations*" means all (a) amounts (or such lesser amount as may be agreed upon by the parties under an Executory Contract, Unexpired Lease, or Sale Transaction Document) required to cure any monetary defaults and (b) other obligations required to cure any non-monetary defaults (the performance required to cure such non-monetary defaults and the timing of such performance will be described in reasonable detail in a notice of proposed assumption and assignment) under any Executory Contract or Unexpired Lease that is to be assumed by the Debtor pursuant to sections 365 or 1123 of the Bankruptcy Code.

33.      "*D&O Liability Insurance Policies*" means all insurance policies for directors', members', trustees', officers', and managers' liability issued to the Debtor as of the applicable Effective Date.

34.      "*Debtor*" means Wayne Real Estate Parent Company, LLC.

35.      "*Disallowed*," when used with respect to a Claim, means a Claim that has been disallowed by the Bankruptcy Code or Final Order (including, for the avoidance of doubt, the Confirmation Order).

36.      "*Disclosure Statement*" means the *Disclosure Statement for the Chapter 11 Plan of Wayne Real Estate Parent Company, LLC*, including all exhibits and schedules thereto.

37.      "*Disclosure Statement Order*" means the Order approving the Disclosure Statement and certain procedures for solicitation of votes on the Plan and granting related relief.

38.      "*Disputed*" means a Claim or an Interest or any portion thereof: (a) that is not Allowed; and (b) that is not Disallowed under the Plan, the Bankruptcy Code, or a Final Order.

39.      "*Disbursing Agent*" means the party to be selected by the Creditors' Committee in its sole discretion to make or facilitate distributions that are to be made on or after the Effective Date pursuant to the Plan.

40.      "*Distribution Record Date*" means the date for determining which holders of Claims or Interests are eligible to receive distributions hereunder and shall be the Confirmation Date or such other date as designated in a Final Order of the Bankruptcy Court.

41.      "*DTC*" means Depository Trust Company.

42.      "*Effective Date*" means, with respect to the first date that is a Business Day selected by the Debtor after the Confirmation Date on which:  (a) no stay of the Confirmation Order is in effect; (b) all conditions precedent specified in Article IX.A have been satisfied or waived (in accordance with Article IX.C); and (c) the Plan is declared effective, after consultation with the Creditors' Committee.  Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable after the Effective Date.

43.      "*Entity*" has the meaning set forth in section 101(15) of the Bankruptcy Code.

44.      "*Estate*" means, the estate created for the Debtor on the Petition Date pursuant to sections 301 and 541 of the Bankruptcy Code and all property (as defined in section 541 of the Bankruptcy Code) acquired after the Petition Date through the Effective Date.

45.      "*Exculpated Parties*" means, subject to Article VIII, collectively, and in each case in its capacity as such: (a) the Debtor; (b) the Reorganized Debtor; (c) the TRU Retail Debtor Parties; (d) the Propco I Debtors; (e) the Holders of Claims against and Interests in the Debtor; (e) the Creditors' Committee and its members; (f) the Sponsors; and (g) with respect to each of the foregoing entities in clauses (a) through (f), such entity's current and former affiliates, and each of such entity's, and such entity's current and former affiliates', current and former equity holders (regardless of whether such interests are held directly or indirectly), subsidiaries, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals.

4

46.     "*Executory Contract*" means a contract to which one or more of the Debtor is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

47.     "*Federal Judgment Rate*" means the federal judgment rate in effect as of the Effective Date.

48.     "*Fee Examiner Order*" means the *Stipulation and Order for Appointment of a Fee Examiner* [Docket No. 3463].

49.     "*File*," "*Filed*," or "*Filing*" means file, filed, or filing in the Chapter 11 Cases with the Bankruptcy Court or, with respect to the filing of a Proof of Claim or Proof of Interest, the Notice and Claims Agent.

50.     "*Final Order*" means, an order or judgment of the Bankruptcy Court, as entered on the docket in any Chapter 11 Case or the docket of any other court of competent jurisdiction, that has not been reversed, stayed, modified, or amended, and as to which the time to appeal, or seek certiorari or move for a new trial, reargument, reconsideration, or rehearing has expired according to applicable law and no appeal or petition for certiorari or other proceedings for a new trial, or motion for reargument, reconsideration, or rehearing has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be timely filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument, or rehearing shall have been denied, resulted in no modification of such order, or has otherwise been dismissed with prejudice.

51.     "*Former Debtor*" means any former TRU Retail Debtor for which a chapter 11 plan of reorganization has been confirmed and declared effective.

52.     "*General Claims Bar Date*" means April 6, 2018 at 5:00 p.m. prevailing Eastern Time, or such other date established by the Bankruptcy Court by which Proofs of Claim must have been Filed by a Governmental Unit, as ordered by the Bankruptcy Court in the *Amended Order (I) Setting Bar Dates for Filing Proofs of Claim, Including Requests for Payment Under Section 503(b)(9), (II) Establishing Amended Schedules Bar Date and Rejection Damages Bar Date, (III) Approving the Form and Manner for Filing Proofs of Claim, Including Section 503(b)(9) Requests, (IV) Approving Notice of Bar Dates, and (V) Granting Related Relief* [Docket No. 1329].

53.     "*General Unsecured Claim*" means any other Claims against any Debtor that are not otherwise paid in full during the Chapter 11 Cases pursuant to an order of the Bankruptcy Court and are not:  (a) an Administrative Claim; (b) an Other Secured Claim; (c) an Other Priority Claim; or (d) an Intercompany Claim.

54.     "*Geoffrey Debtors*" means, collectively, Geoffrey Holdings, LLC, Geoffrey, LLC and Geoffrey International, LLC.

55.     "*Giraffe Junior*" means Giraffe Junior Holdings, LLC.

56.     "*Governmental Claims Bar Date*" means June 18, 2018 at 5:00 p.m. prevailing Eastern Time or such other date established by the Bankruptcy Court by which Proofs of Claim must have been Filed by a Governmental Unit, as ordered by the Bankruptcy Court in the *Amended Order (I) Setting Bar Dates for Filing Proofs of Claim, Including Requests for Payment Under Section 503(b)(9), (II) Establishing Amended Schedules Bar Date and Rejection Damages Bar Date, (III) Approving the Form and Manner for Filing Proofs of Claim, Including Section 503(b)(9) Requests, (IV) Approving Notice of Bar Dates, and (V) Granting Related Relief* [Docket No. 1329].

57.     "*Governmental Unit*" shall have the meaning set forth in section 101(27) of the Bankruptcy Code.

58.     "*Holder*" means any Entity holding a Claim or an Interest.

59.     "*Impaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is not Unimpaired.

60. "*Indemnification Obligations*" means the Debtor's indemnification obligations in place as of the Effective Date, set forth in any of: (a) the organizational documents of the Debtor (including the by-laws, certificates of incorporation or formation, limited liability company agreements, other organizational or formation documents, or board resolutions); (b) employment contracts; or (c) an engagement or retention letter as to professional or advisory services.

61. "*Intercompany Claim*" means any Claim in the Debtor held by another TRU Retail Debtor or Propco I Debtor.

62. "*Insurance Contract*" means all insurance policies that have been issued at any time to or provide coverage to any of the Debtor, including the D&O Liability Insurance Policies, and all agreements, documents or instruments relating thereto.

63. "*Insurer*" means any company or other Entity that issued an Insurance Contract, and any respective predecessors and/or affiliates of the foregoing.

64. "*Interests*" means any interest, equity, or share in the Debtor, including all options, warrants, or other rights to obtain such an interest or share in such Debtor, whether or not certificated, transferable, preferred, common, voting, or denominated "stock" or a similar security, including any Claim subject to subordination under section 510(b) of the Bankruptcy Code arising therefrom.

65. "*Interim Compensation Order*" means the *Order (I) Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Retained Professionals and (II) Granting Related Relief*, entered June 28, 2018 [Docket No. 746].

66. "*Judicial Code*" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001.

67. "*Lien*" shall have the meaning set forth in section 101(37) of the Bankruptcy Code.

68. "*New Board*" means the board of directors of the Reorganized Debtor, to be identified by the Debtor, prior to or at the Confirmation Hearing.

69. "*New Common Stock*" means the common stock in the Reorganized Debtor, which may, for the avoidance of doubt, consist of stock of a newly-formed entity as specified in the Restructuring Transactions Memorandum.

70. "*New Common Stock Summary*" means the term sheet summarizing the characteristics of the New Common Stock,

71. "*New Organizational Documents*" means such certificates or articles of incorporation, certificates of formation, certificates of conversion, by-laws, limited liability company agreements, stockholders' agreements, or such other applicable formation and governance documents of the Reorganized Debtor, forms of which shall be included in the Plan Supplement.

72. "*Non-Released Claims*" has the meaning ascribed to such term in the Settlement Agreement.

73. "*Notice and Claims Agent*" means Prime Clerk LLC.

74. "*Other Priority Claim*" means any Claim accorded priority in right of payment under section 507(a) of the Bankruptcy Code, other than a Priority Tax Claim or Claims entitled to administrative expense priority pursuant to section 503(b)(9) of the Bankruptcy Code.

75. "*Other Secured Claim*" means any secured Claim against the Debtor not specifically described in the Plan.

76.     "*Petition Date*" means September 18, 2017.

77.     "*Plan*" means this *Chapter 11 Plan of Wayne Real Estate Parent Company, LLC*, including the Plan Supplement which is incorporated herein by reference and made part of this Plan as if set forth herein.

78.     "*Plan Supplement*" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan, to be Filed at least seven (7) days prior to the Voting Deadline, as amended, supplemented, or otherwise modified from time to time prior to the Effective Date in accordance with the terms hereof, the Bankruptcy Code, and the Bankruptcy Rules, including:  (a) a list of Executory Contracts and Unexpired Leases to be assumed or assumed and assigned pursuant to the Plan, and as may be amended by the Debtor in accordance with the Plan prior to the Effective Date; (b) a schedule of the retained Causes of Action; (c) the New Common Stock Summary; (d) the New Organizational Documents; (e) the identity of the New Board; and (f) the Restructuring Transactions Memorandum, subject to appropriate confidentiality protections.

79.     "*Priority Claims*" means Priority Tax Claims and Other Priority Claims.

80.     "*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

81.     "*Professional*" means an Entity: (a) retained in the Chapter 11 Cases pursuant to a Final Order in accordance with sections 327, 328, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered and expenses incurred before or on the Confirmation Date, pursuant to sections 327, 328, 329, 330, 363, or 331 of the Bankruptcy Code; or (b) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

82.     "*Professional Fee Escrow Account*" means an interest-bearing escrow account to hold and maintain an amount of Cash equal to the Professional Fee Escrow Amount to be funded by the Debtor on or before the Effective Date solely for the purpose of paying all Allowed and unpaid Accrued Professional Compensation Claims and Accrued Creditor's Committee Member Expense Claims.  Such Cash shall remain subject to the jurisdiction of the Bankruptcy Court.

83.     "*Professional Fee Escrow Amount*" means the aggregate Accrued Professional Compensation Claims through the Effective Date as estimated in accordance with Article II.B.

84.     "*Proof of Claim*" means a proof of Claim Filed against the Debtor in the Chapter 11 Cases.

85.     "*Propco I*" means Toys "R" Us Property Company I, LLC.

86.     "*Propco I Debtors*" means the debtors and debtors-in-possession whose chapter 11 cases are jointly administered under the case *In re Toys "R" Us Property Company I, LLC*, Case No. 18-31429 (KLP) (Bankr. E.D. Va.).

87.     "*Propco I Plan*" means the chapter 11 plan of the Propco I Debtors.

88.     "*Propco II*" means Toys "R" Us Property Company II, LLC.

89.     "*Propco II Plan*" means the chapter 11 plan of the Propco II Plan Entities.

90.     "*Propco II Plan Entities*" means together, Propco II and Giraffe Junior.

91.     "*Purchaser*" means each Entity that is a purchaser under the Sale Transaction Documents to which it is a party.

92.     "*Raider Hill*" means Raider Hill Advisors, LLC.

93.    "*Reinstated*" means, with respect to Claims and Interests, the treatment provided for in section 1124 of the Bankruptcy Code.

94.    "*Released Party*" means, subject to <u>Article VIII</u>, collectively, and in each case in its capacity as such: (a) the Debtor; (b) the Reorganized Debtor; (c) the TRU Retail Debtor Parties; (d) the Propco I Debtors; (e) the Holders of Claims against and Interests in the Debtor; (f) the Creditors' Committee and its members; (g) the Sponsors; and (h) with respect to each of the foregoing entities in clauses (a) through (g), such entity's current and former Affiliates, and each of such entity's subsidiaries, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, *provided* that any party that opts out of the releases contained in the Plan or is otherwise removed from the definition of "Releasing Parties" shall not be a "Released Party."

95.    "*Releasing Parties*' means, subject to <u>Article VIII</u>, collectively, and in each case in its capacity as such: (a) the Debtor; (b) the Reorganized Debtor; (c) the TRU Retail Debtor Parties; (d) the Propco I Debtors; (e) the Creditors' Committee and its members; (f) the Sponsors; and (g) with respect to each of the foregoing entities in clauses (a) through (f), such entity's current and former Affiliates, and each of such entity's, and such entity's current and former affiliates', current and former equity holders (regardless of whether such interests are held directly or indirectly), subsidiaries, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals; (h) all Holders of Claims and Interests that are deemed to accept the Plan and do not opt-out of the releases; (i) all Holders of Claims and Interests who vote to accept the Plan; and (j) all Holders of Claims who receive a Ballot, abstain from voting, and do not otherwise opt-out of the releases.

96.    "*Reorganized Debtor*" means, on an after the Effective Date, the Debtor as reorganized hereunder.

97.    "*Reorganized Debtor Assets*" means, on the Effective Date, all assets and interests of the Estate, control over which will be vested in the Reorganized Debtor, and, thereafter, all assets from time to time controlled by the Reorganized Debtor.

98.    "*Reorganized Propco I*" means, on and after the Effective Date, Propco I, as reorganized under the Propco I Plan.

99.    "*Reorganized Propco I Subsidiaries*" means Map Real Estate, LLC, Wayne Real Estate Company, LLC, TRU 2005 RE I, LLC, and TRU 2005 RE II Trust, on and after the respective Effective Date, as such entities are reorganized under the Propco I Plan.

100.    "*Restructuring Transactions*" has the meaning set forth in <u>Article IV.D</u>.

101.    "*Restructuring Transactions Memorandum*" means a description of the Restructuring Transactions.

102.    "*Schedules*" means, collectively, the schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases, and statements of financial affairs Filed by the Debtor pursuant to section 521 of the Bankruptcy Code and in substantial accordance with the official bankruptcy forms.

103.    "*Secured*" means when referring to a Claim secured by a Lien on property in which the applicable Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order or the Plan, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in such Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code.

104.    "*Securities Act*" means the Securities Act of 1933, 15 U.S.C. §§ 77a–77aa.

105.    "*Securities Exchange Act*" means the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a–78nn.

106.    "*Security*" shall have the meaning set forth in section 101(49) of the Bankruptcy Code.

8

107.    "*Settlement Agreement*" means that certain settlement agreement by and among the Debtor and certain other TRU Retail Debtors and certain Holders of Claims and Interests against the TRU Retail Debtors, including the Creditors' Committee and certain of its members, the Ad Hoc Vendor Group and its members, the Sponsors, and the Ad Hoc Group of Term B-4 Lenders and its members, dated as of July 17, 2018.

108.    "*Sponsors*" means, collectively, (a) Bain Capital Private Equity, LP, (b) Kohlberg Kravis Roberts & Co. L.P., (c) Vornado Realty Trust, and (d) funds and entities advised by each such Entity, and each such Entity's current and former Affiliates.

109.    "*Toys Delaware Debtors*" means Toys Delaware, TRU Guam, LLC, Toys Acquisition, LLC, Giraffe Holdings, LLC, TRU of Puerto Rico, Inc., and TRU-SVC, Inc.

110.    "*Toys Delaware Plan*" means the chapter 11 plan of the Toys Delaware Debtors.

111.    "*TRU Inc.*" means Toys "R" Us, Inc.

112.    "*TRU Retail Debtor Parties*" means, excluding the Debtor, (a) the TRU Retail Debtors, (b) the Sponsors, and (c) with respect to each of the foregoing entities in clauses (a) and (b), such entity's current and former affiliates (for the avoidance of doubt, not including the Debtor), and each of such entity's, and such entity's current and former affiliates', current and former equity holders (regardless of whether such interests are held directly or indirectly), subsidiaries, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals.

113.    "*TRU Retail Debtors*" means, excluding the Debtor, Toys "R" Us, Inc. and its affiliated debtors and debtors-in-possession in the cases jointly administered under Case No. 17-34665 (KLP), which includes, for the avoidance of doubt, the Toys Delaware Debtors.

114.    "*U.S. Trustee*" means the Office of the United States Trustee for the Eastern District of Virginia.

115.    "*Unexpired Lease*" means a lease to which one or more of the Debtor is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

116.    "*Unimpaired*" means, with respect to a Class of Claims or Interests, a Claim or an Interest that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

117.    "*United States*" means the United States of America, its agencies, departments, or agents.

118.    "*Voting Deadline*" means January 18, 2019, or such other date ordered by the Bankruptcy Court.

119.    "*Wayne Parent*" means the Debtor.

B.    *Rules of Interpretation.*

For purposes of the Plan:  (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (3) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit, whether or not Filed, having been Filed or to be Filed shall mean that document, schedule, or exhibit, as it may thereafter be amended, modified, or supplemented; (4) any reference to an Entity as a Holder of a Claim or Interest includes that Entity's successors and assigns; (5) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (6) unless otherwise specified, all references herein to exhibits are references to exhibits in the Plan Supplement; (7) unless otherwise specified, the words "herein," "hereof," and

"hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (8) subject to the provisions of any contract, certificate of incorporation, by-law, instrument, release, or other agreement or document entered into in connection with the Plan, the rights and obligations arising pursuant to the Plan shall be governed by, and construed and enforced in accordance with the applicable federal law, including the Bankruptcy Code and Bankruptcy Rules; (9) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (10) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply to the Plan; (11) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; (12) all references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (13) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, and as applicable to the Chapter 11 Cases, unless otherwise stated; and (14) any immaterial effectuating provisions may be interpreted in such a manner that is consistent with the overall purpose and intent of the Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity. References in the Plan to the Debtor shall mean the Debtor or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date, as applicable.

C.        *Computation of Time.*

The provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed in the Plan or Confirmation Order.  If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.

D.        *Governing Law.*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of Delaware, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control); *provided*, *however*, that corporate or limited liability company governance matters relating to the Debtor shall be governed by the laws of the state of incorporation or formation (as applicable) of the Debtor.

E.        *Reference to Monetary Figures.*

All references in the Plan to monetary figures shall refer to the legal tender of the United States, unless otherwise expressly provided.

F.        *Reference to the Debtor or the Reorganized Debtor.*

Except as otherwise specifically provided in the Plan to the contrary references to the Reorganized Debtor means the Debtor to the extent context requires.

G.        *Controlling Document.*

Except as set forth in the Plan, to the extent that any provision of the Disclosure Statement, the Plan Supplement, or any other order referenced in the Plan (or any exhibits, schedules, appendices, supplements, or amendments to any of the foregoing), conflict with or are in any way inconsistent with any provision of the Plan, the Plan shall govern and control; provided, however, with respect to any conflict or inconsistency between the Plan and the Confirmation Order, the Confirmation Order shall govern.

# ARTICLE II
## ADMINISTRATIVE CLAIMS AND PRIORITY TAX CLAIMS

A.  *Administrative Claims.*

Except with respect to Administrative Claims that are Accrued Professional Compensation Claims and except to the extent that an Administrative Claim has already been paid during the Chapter 11 Cases or a Holder of an Administrative Claim and the Debtor agree to less favorable treatment, each holder of an Administrative Claim shall be paid in full in Cash on the unpaid portion of such Administrative Claim in accordance with the following:  (a) on or as soon as reasonably practicable after the Effective Date if such Administrative Claim is Allowed as of the Effective Date; (b) if such Administrative Claim is not Allowed as of the Effective Date, on or as soon as reasonably practicable after the date such Administrative Claim is Allowed pursuant to a Final Order; (c) at such time and upon such terms as set forth in a Final Order of the Bankruptcy Court, or (d) if an Allowed Administrative Claim is not due and payable as of the Effective Date, the date such Allowed Administrative Claim becomes due and payable in accordance with the terms and conditions agreed upon by the Holder of such Allowed Administrative Claim and the Debtor or Reorganized Debtor, as applicable, or as soon thereafter as is reasonably practicable; *provided* that Allowed Administrative Claims that arise in the ordinary course of the Debtor's businesses, including Claims held by Governmental Units for taxes incurred by the Debtor following the Petition Date (in accordance with section 503(b)(1)(D) of the Bankruptcy Code), shall be paid in the ordinary course of business in accordance with applicable law and the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to such transactions; *provided* that any Administrative Claim that has been expressly assumed by a Purchaser pursuant to Sale Transaction Documents to which it is a party shall not be an obligation of the Debtor.

Except as otherwise provided in this <u>Article II.A</u> and except with respect to Administrative Claims that are Accrued Professional Compensation Claims, requests for payment of (or Proofs of Claim for) Administrative Claims must be Filed and served on the Debtor pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order no later than the Administrative Claims Bar Date.  Holders of Administrative Claims that are required to, but do not, File and serve a request for payment of (or Proofs of Claim for) such Administrative Claims by such date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtor or their property and such Administrative Claims shall be deemed discharged, compromised, settled, and released as of the Effective Date.  Notwithstanding the foregoing, no request for payment of an Administrative Claim need be Filed with respect to an Administrative Claim previously Allowed by Final Order.

Objections to requests for payment of such Administrative Claims, if any, must be Filed and served on the requesting party and the Reorganized Debtor by the Administrative Claims Objection Bar Date.  After notice and a hearing in accordance with the procedures established by the Bankruptcy Code, the Bankruptcy Rules, and prior Bankruptcy Court orders, the Allowed amounts, if any, of Administrative Claims as to which an objection is Filed shall be determined by, and satisfied in accordance with, an order that becomes a Final Order of the Bankruptcy Court.

B.  *Accrued Professional Compensation Claims.*

1.  **Professional Fee Escrow Account.**

As soon as reasonably practicable after the Confirmation Date and no later than the Effective Date, the Debtor shall establish the Professional Fee Escrow Account.  The Debtor shall fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Escrow Amount.  The Professional Fee Escrow Account shall be funded no later than the Effective Date and maintained in trust for the Professionals and members of the Creditors' Committee and shall not be considered property of the Debtor's Estate or the Reorganized Debtor; *provided* that the Estate shall have a reversionary interest in the excess amount, if any, remaining in the Professional Fee Escrow Account when all such Allowed amounts owing to Professionals and members of the Creditors' Committee have been paid in full, and any remaining amount in the Professional Fee Escrow Account shall promptly be transferred to the Estate and shall be distributed by the Reorganized Debtor in accordance with the Plan without any further action or order of the Bankruptcy Court.

2.       **Final Fee Applications, Payment of Accrued Professional Compensation Claims, and Payment of Accrued Creditors' Committee Member Expense Claims.**

All final requests for payment of Accrued Professional Compensation Claims incurred during the period from the Petition Date through the Confirmation Date, shall be Filed no later than the first Business Day that is 60 days following the Effective Date. All Entities' respective rights (if any) to object to allowance or payment of all or any portion of any Accrued Professional Compensation Claims shall be preserved. After notice and a hearing in accordance with the procedures established by the Bankruptcy Code, Bankruptcy Rules and prior Bankruptcy Court orders, the Allowed amounts of such Accrued Professional Compensation Claims shall be determined by the Bankruptcy Court. The amount of Accrued Professional Compensation Claims owing to the Professionals shall be paid in Cash to such Professionals from funds held in the Professional Fee Escrow Account when such Claims are Allowed by a Final Order. To the extent that funds held in the Professional Fee Escrow Account are unable to satisfy the Allowed amount of Accrued Professional Compensation Claims owing to the Professionals, such Professionals shall have an Allowed Administrative Claim for any such deficiency, which shall be satisfied in accordance with Article II.A of the Plan. Notwithstanding anything to the contrary herein, the Fee Examiner Order shall remain in effect pursuant to its own terms.

3.       **Professional Fee Escrow Amount.**

To receive payment for unbilled fees and expenses incurred through the Confirmation Date, the Professionals shall estimate their Accrued Professional Compensation Claims before and as of the Confirmation Date and shall deliver such estimate to the Debtor no later than 10 days prior to the Effective Date; *provided* that such estimate shall not be considered an admission or limitation with respect to the fees and expenses of such Professional and such Professionals are not bound to any extent by the estimates. If a Professional does not provide an estimate, the Debtor may estimate the unbilled fees and expenses of such Professional. The total aggregate amount so estimated shall be utilized by the Debtor to determine the Professional Fee Escrow Amount; *provided that* the Reorganized Debtor shall use Cash on hand to increase the amount of the Professional Fee Escrow Account to the extent fee applications are Filed after the Effective Date in excess of the amount held in the Professional Fee Escrow Account based on such estimates.

4.       **Post-Confirmation Fees and Expenses.**

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Debtor shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable legal, professional, or other fees and expenses related to implementation and Consummation of the Plan incurred by the Debtor. Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code or the Interim Compensation Order in seeking retention or compensation for services rendered after such date shall terminate, and the Debtor may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

C.       *Priority Tax Claims.*

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

### ARTICLE III
### CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in this Article III.

A.      *Summary of Classification.*

Claims and Interests, except for Administrative Claims, Accrued Professional Compensation Claims, and Priority Tax Claims, are classified in the Classes set forth in this Article III. A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes. A Claim is also classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

| Class | Claims and Interests | Status | Voting Rights |
|-------|---------------------|--------|---------------|
| Class 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 3 | General Unsecured Claims | Impaired | Entitled to Vote |
| Class 4 | Intercompany Claims | Unimpaired or Impaired | Not Entitled to Vote (Deemed to Accept or Deemed to Reject) |
| Class 5 | Interests in the Debtor | Impaired | Not Entitled to Vote (Deemed to Reject) |

B.      *Treatment of Claims and Interests.*

The treatment provided to each Class relating to the Debtor for distribution purposes and voting rights are specified below:

1.      **Class 1 - Other Secured Claims.**

(a)      *Classification*: Class A-1 consists of all Other Secured Claims.

(b)      *Treatment*: On the Effective Date, or as soon as reasonably practicable thereafter, except to the extent that a Holder of an Allowed Other Secured Claim agrees to a less favorable treatment, in full and final satisfaction and discharge of each Allowed Other Secured Claim, each Holder thereof shall receive, either: (a) payment in full in Cash; or (b) delivery of the collateral securing any such Claim and payment of any interest required under section 506(b) of the Bankruptcy Code.

(c)      *Voting*: Class 1 is Unimpaired under the Plan. Holders of Claims in Class 1 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

2.      **Class 2 - Other Priority Claims.**

(a)      *Classification*: Class 2 consists of all Other Priority Claims.

(b)      *Treatment*: On the Effective Date, or as soon as reasonably practicable thereafter, except to the extent that a Holder of an Allowed Other Priority Claim agrees to a less favorable treatment, in full and final satisfaction and discharge of each Allowed Other Priority Claim, each Holder thereof shall receive, either: (a) payment in full in Cash or (b) such other treatment as shall render such Claim Unimpaired.

     (c)     *Voting*:  Class 2 is Unimpaired under the Plan.  Holders of Claims in Class 2 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

3.     **Class 3 - General Unsecured Claims.**

     (a)     *Classification*:  Class 3 consists of all General Unsecured Claims.

     (b)     *Treatment*:  On the Effective Date, or as soon as reasonably practicable thereafter, except to the extent that a Holder of an Allowed General Unsecured Claim agrees to a less favorable treatment, in full and final satisfaction of each Allowed General Unsecured Claim, each Holder of an Allowed General Unsecured Claim shall receive their pro rata share of the consideration to be specified in the Restructuring Transactions Memorandum, which in any case will consist of either direct or indirect ownership of the New Contingent Equity Rights (as defined in the Propco I Plan), which direct or indirect ownership may be accomplished through the receipt of New Common Stock, the direct receipt of the New Contingent Equity Rights, or another mechanism to be determined.

     (c)     *Voting*:  Class 3 is Impaired under the Plan.  Holders of Allowed Claims in Class 3 are entitled to vote to accept or reject the Plan.

4.     **Class 4- Intercompany Claims.**

     (a)     *Classification*:  Class 4 consists of all Intercompany Claims.

     (b)     *Treatment*:  On the Effective Date, or as soon as reasonably practicable thereafter, each Intercompany Claim shall be Reinstated or canceled without any distribution on account of such Intercompany Claim as determined by the Debtor in its sole discretion.

     (c)     *Voting*:  Holders of Claims in Class 4 are conclusively deemed to have accepted or rejected the Plan pursuant to section 1126(f) or section 1126(g) of the Bankruptcy Code, respectively.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

5.     **Class 5 - Interests in the Debtor.**

     (a)     *Classification*:  Class 5 consists of all Interests in the Debtor.

     (b)     *Treatment*:  On the Effective Date, or as soon as reasonably practicable thereafter, in full and final satisfaction and discharge of each Interest in the Debtor, each Holder of an Interest in the Debtor will be cancelled without any distribution on account of such Interest.

     (c)     *Voting*:  Class 5 is Impaired under the Plan.  Holders of Allowed Claims in Class 5 are conclusively presumed to reject the Plan.

C.     *Special Provision Governing Unimpaired Claims.*

Except as otherwise provided in the Plan, nothing under the Plan shall affect the rights of the Debtor or Reorganized Debtor in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claims.  Unless otherwise Allowed, Claims that are Unimpaired shall remain Disputed Claims under the Plan

D.      *Elimination of Vacant Classes; Presumed Acceptance by Non-Voting Classes.*

Any Class of Claims or Interests that, as of the commencement of the Confirmation Hearing, does not have at least one Holder of a Claim or Interest that is Allowed in an amount greater than zero for voting purposes pursuant to the Disclosure Statement Order shall be considered vacant, deemed eliminated from the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to that Class.  If a Class contains Claims or Interests eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Holders of such Claims or Interests in such Class shall be presumed to have accepted the Plan.

E.      *Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code.*

The Debtor shall seek Confirmation for the Debtor pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.  The Debtor reserve the right to modify the Plan in accordance with Article X to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification.

F.      *Subordinated Claims.*

The allowance, classification, and treatment of all Allowed Claims and Allowed Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Debtor reserve the right to re-classify any Allowed Claim or Allowed Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

## ARTICLE IV
## MEANS FOR IMPLEMENTATION OF THE PLAN

A.      *General Settlement of Claims.*

As discussed further in the Disclosure Statement and as otherwise provided herein, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, or otherwise resolved pursuant to the Plan.  The Plan shall be deemed a motion to approve such good-faith compromise and settlement of all such Claims, Interests, Causes of Action, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable, and in the best interests of the Debtor and its Estate.  Distributions made to holders of Allowed Claims in any Class are intended to be final.

B.      *Restructuring Transactions.*

On or before the Effective Date, the Debtor may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, the Plan Supplement and the Confirmation Order (the "Restructuring Transactions"), including:  (1) the execution, filing, and delivery of appropriate agreements or other documents of merger, sale, disposition, transfer, consolidation, reorganization, restructuring, liquidation, dissolution, or equity issuance, certificates of incorporation, certificates of conversion, certificates of formation, operating agreements, bylaws, or other documents containing terms that are consistent with or reasonably necessary to implement the terms of the Plan and that satisfy the requirements of applicable law; (2) the execution and delivery of appropriate instruments of sale, equity issuance, transfer, assignment, assumption, or delegation of any property, right, liability, duty, or obligation on terms consistent with the terms of the Plan; (3) the issuance of the New Common Stock (if applicable); (4) the execution of the New Organizational Documents, (5) the

vesting of the Debtor's assets in the Reorganized Debtor, in each case in accordance with the Plan and the Plan Supplement; (6) such other transactions that are necessary or appropriate to implement the Plan in the most tax efficient manner, including any mergers, sales, dispositions, transfers, consolidations, restructurings, conversions, formations, organizations, dissolutions or liquidations (including the transactions set forth in the Restructuring Transactions Memorandum); and (7) all other transactions or actions that either (x) the Debtor or (y) the Reorganized Debtor, as applicable, determine are necessary or appropriate to implement the Plan.  The Restructuring Transactions may include a transfer of all or substantially all or a part of the Debtor's assets or entities to a newly-formed entity (or an affiliate or subsidiary of such entity) formed and controlled by certain holders of Claims against the Debtor and, in such case, some or all of the New Common Stock (and/or other interests) issued to holders of Claims pursuant to the Plan may comprise stock (and/or other interests) of such new entity (or an affiliate or subsidiary of such entity).

C.      *Sources of Consideration for Plan Distributions.*

The Debtor Cash on hand, and any other Cash received or generated by the Debtor shall be used to fund the distributions to holders of Allowed Claims against the Debtor in accordance with the treatment of such Claims as set forth herein and subject to the terms provided herein.

D.      *Issuance of New Common Stock.*

Upon the Effective Date, all Interests in the Debtor shall be cancelled and the New Common Stock may be issued as set forth under the Plan.  The New Common Stock (if applicable) shall be freely tradable and eligible for the book-entry delivery, depository and settlement services of DTC.  On the Effective Date, the Reorganized Debtor shall issue all securities, notes, instruments, certificates, and other documents required to be issued pursuant to the Plan.

On the Effective Date, Holders of New Common Stock (if applicable) shall be parties to certain New Organizational Documents.  On the Effective Date, the Reorganized Debtor and the Holders of New Common Stock (to the extent applicable) shall enter into and deliver the New Organizational Documents to each Entity that is intended to be a party thereto and such New Organizational Documents shall be deemed to be valid, binding, and enforceable in accordance with their terms, and each Holder of New Common Stock shall be bound thereby, in each case, without the need for execution by any party thereto other than the Reorganized Debtor.

E.      *Exemption from Registration Requirements.*

The New Common Stock is or may be a security within the meaning of Section 2(a)(1) of the Securities Act, Section 101 of the Bankruptcy Code and applicable state securities laws.

The offering, issuance, sale and distribution of all shares of New Common Stock will be exempt from, among other things, the registration and prospectus delivery requirements under the Securities Act or any similar federal, state, or local laws in reliance upon section 1145 of the Bankruptcy Code to the maximum extent permitted and applicable, without further act or action by the Reorganized Debtor. The New Common Stock (a) is not a "restricted security" as defined in Rule 144(a)(3) under the Securities Act unless the initial recipient thereof is an entity that is an "underwriter" as defined in subsection (b) of section 1145 of the Bankruptcy Code, and (b) if such security is not a "restricted security" as defined in Rule 144(a)(3) under the Securities Act, such security will be freely tradable and transferable by the initial recipient thereof if at the time of transfer such initial recipient is not an "affiliate" (as defined in Rule 144(a)(1) under the Securities Act) of the Reorganized Debtor and has not been such an "affiliate" within 90 days of such transfer.

The Reorganized Debtor need not provide any further evidence to DTC other than the Plan or the Confirmation Order with respect to the treatment of securities to be issued under this Plan (including securities issuable upon exercise of such securities) under applicable securities laws.

DTC shall be required to accept and conclusively rely upon the Plan or Confirmation Order in lieu of a legal opinion regarding whether such securities are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.  Notwithstanding anything to the contrary in the Plan, no entity (including, for the avoidance of doubt, DTC) may require a legal opinion regarding the validity of any transaction contemplated by the

Plan, including, for the avoidance of doubt, whether the New Common Stock is exempt from registration and/or eligible for DTC book-entry delivery, settlement and depository services.

F.        *Subordination.*

        The allowance, classification, and treatment of all Claims and Interests under the Plan conform to and are consistent with the respective contractual, legal, and equitable subordination rights of such Claims and Interests, and the Plan recognizes and implements any such rights.  Pursuant to section 510 of the Bankruptcy Code, except where otherwise provided herein, the rights of the Debtor or the Reorganized Debtor, as applicable, are hereby reserved to re-classify any Allowed Claim or Allowed Interest in accordance with any contractual, legal, or equitable subordination rights relating thereto upon entry of a Final Order ruling that such Allowed Claim or Allowed Interest (or portion thereof) is subordinated.  On the Effective Date, any and all subordination rights or obligations that a Holder of a Claim or Interest may have with respect to any distribution to be made under the Plan will be discharged and terminated, and all actions related to the enforcement of such subordination rights will be enjoined permanently.  Accordingly, distributions under the Plan to holders of Allowed Claims and Allowed Interests will not be subject to turnover or payment to a beneficiary of such terminated subordination rights, or to levy, garnishment, attachment or other legal process by a beneficiary of such terminated subordination rights.

G.        *Vesting of Assets in the Reorganized Debtor.*

        Except as otherwise provided herein, or in any agreement, instrument, or other document incorporated in the Plan (including, without limitation, the Restructuring Transactions Memorandum), on the Effective Date, all property in Debtor's Estate, including the Reorganized Debtor's Assets, all Causes of Action, claims, or defenses, and any property acquired by any of the Debtor under the Plan shall vest in each respective Reorganized Debtor (excluding any Executory Contracts and Unexpired Leases included on the Schedule of Rejected Executory Contracts and Unexpired Leases), free and clear of all Liens, Claims, charges, or other encumbrances.  On and after the Effective Date, except as otherwise provided herein, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and pursue, compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than any restrictions expressly imposed by the Plan, the Plan Supplement, or the Confirmation Order.  Notwithstanding anything to the contrary in the Plan, the Unimpaired Claims against a Debtor shall remain the obligations solely of the Debtor or the Reorganized Debtor and shall not become obligations of any other Debtor or Reorganized Debtor by virtue of the Plan, the Chapter 11 Cases, or otherwise.

H.        *Cancellation of Securities and Agreements.*

        On the Effective Date, except to the extent otherwise provided in the Plan, under Article IV.G and IV.H, all notes, instruments, Certificates, and other documents evidencing, or in anyway related to, Claims or Interests shall be canceled and the obligations of the Debtor or Reorganized Debtor thereunder or in any way related thereto shall be released, settled, and compromised.

I.        *Corporate Action.*

        On the Effective Date, or as soon thereafter as is reasonably practicable, all actions as may be necessary or appropriate to effect any transactions described in, approved by, contemplated by, or necessary to effectuate the Restructuring Transactions shall be deemed authorized and approved by the Bankruptcy Court in all respects, including, as applicable:  (a) the adoption, execution, delivery and/or filing of the New Organizational Documents, (b) the selection of the directors, managers, and officers for the Reorganized Debtor, including the appointment of the New Board, in accordance with the terms of the Plan; (c) the authorization, issuance, delivery and distribution of New Common Stock; (d) the rejection, assumption, or assumption and assignment, as applicable, of Executory Contracts and Unexpired Leases; and (e) all other actions that may be required by applicable law.  Upon the Effective Date, all matters provided for in the Plan involving the corporate structure the Reorganized Debtor, and any corporate action required by the Debtor, or the Reorganized Debtor in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders, directors, or officers of the Debtor or the Reorganized Debtor.  On or before the Effective Date (as applicable), the appropriate officers of the Debtor or the Reorganized Debtor shall be authorized and (as applicable) directed to issue, execute, and deliver the agreements,

17

documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effectuate the Restructuring Transactions) in the name of and on behalf of the Reorganized Debtor, including and any and all other agreements, documents, Securities, and instruments relating to the foregoing, to the extent not previously authorized by the Bankruptcy Court. The authorizations and approvals contemplated by this <u>Article IV.M</u> shall be effective notwithstanding any requirements under non-bankruptcy law.

J.      *Corporate Existence; Tax Classification.*

As noted above, Holders of Class 3 Claims will directly or indirectly receive the New Contingent Equity Rights, which constitute Interests in Propco I. Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, Reorganized Propco I and the Reorganized Propco I Subsidiaries shall continue to exist as separate limited liability companies, with all the powers of a corporation, limited liability company, partnership, or other form of Entity, as the case may be, pursuant to the applicable law in the jurisdiction in which each Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and by-laws (or other analogous formation documents) in effect before the Effective Date, except to the extent such certificate of incorporation and bylaws (or other analogous formation documents) are amended or amended and restated by the Plan (including pursuant to the provisions of <u>Article IV.K</u> of the Plan), the New Organizational Documents, or otherwise, and to the extent such documents are amended or amended and restated, such documents are deemed to be amended or amended and restated pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law). Subject to the Restructuring Transactions Memorandum, Reorganized Propco I will be treated as a partnership for U.S. federal income (and applicable state and local) tax purposes, and the Reorganized Propco I Subsidiaries will be treated as disregarded entities of Reorganized Propco I for U.S. federal income (and applicable state and local) tax purposes; *provided* that, on or before the Effective Date and at the option of the Creditors' Committee, the Propco I Debtors will (and will cause their affiliates to) take any actions necessary to cause Reorganized Propco I and/or one or more of the Reorganized Propco I Subsidiaries to be treated as a corporation for U.S. federal income (and applicable state and local) tax purposes effective as of prior to the actual or constructive receipt of any consideration under this Plan, including by executing and filing one or more IRS Forms 8832 (and analogous forms for applicable state and local tax purposes).

To the extent the New Common Stock is issued, the tax classification of the entity issuing the New Common Stock will be specified in the Restructuring Transactions Memorandum.

K.      *Charter, Bylaws, and New Organizational Documents.*

On the Effective Date, or as soon thereafter as is reasonably practicable, to the extent applicable, the Debtor's respective certificates of incorporation and bylaws (and other formation and constituent documents relating to limited liability companies) shall be amended or amended and restated as may be required to be consistent with the provisions of the Plan, the New Organizational Documents, and any other documents required to complete the Restructuring Transactions, as applicable, and the Bankruptcy Code. The New Organizational Documents shall, among other things: (a) authorize the issuance of the New Common Stock; and (b) be modified or deemed to be modified to include a provision pursuant to and only to the extent required by section 1123(a)(6) of the Bankruptcy Code, prohibiting the issuance of non-voting equity Securities. After the Effective Date, each Reorganized Debtor may amend and restate its certificate of incorporation and other formation and constituent documents as permitted by the laws of its respective jurisdiction of formation and the terms of such documents.

L.      *Effectuating Documents; Further Transactions.*

Prior to the Effective Date, the Debtor, and on and after the Effective Date, the Reorganized Debtor, in each case to the extent applicable, and the officers and members thereof are authorized to and may issue, execute, deliver, file, or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.

M.       *Exemption from Certain Taxes and Fees.*

Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property or any Interests pursuant to the Plan, including the recording of any amendments to such transfers, or any new mortgages or liens placed on the property in connection with such transfers, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment.

N.       *Directors and Officers.*

To the extent applicable, the members of the New Board shall be identified prior to the Confirmation Hearing in the Plan Supplement or at the Confirmation Hearing consistent with section 1129(a)(5) of the Bankruptcy Code. On the Effective Date, except as otherwise provided in the Plan Supplement or announced on the record at the Confirmation Hearing, the existing officers of the Debtor shall serve in their current capacities for the Reorganized Debtor. From and after the Effective Date, each director, officer, or manager of the Reorganized Debtor shall serve pursuant to the terms of the respective Reorganized Debtor's charters and bylaws or other formation and constituent documents, and applicable laws of the respective Reorganized Debtor's jurisdiction of formation.

O.       *Retention of Causes of Action.*

Unless any Cause of Action against an Entity is expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order such that the Debtor retain no right or interest in such Cause of Action as of the Effective Date, in accordance with section 1123(b) of the Bankruptcy Code, the Debtor shall reserve, retain, and may enforce, all rights to commence, prosecute or settle, as appropriate, any and all Causes of Action, whether arising or accruing before or after the Petition Date, which authority shall vest in the Reorganized Debtor on the Effective Date pursuant to the terms of the Plan. The Reorganized Debtor may enforce all rights to commence, prosecute, or settle, as appropriate, any and all such Causes of Action, whether arising or accruing before or after the Petition Date, and the Reorganized Debtor's rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. Any Reorganized Debtor may, in its reasonable business judgment, pursue such Causes of Action and may retain and compensate professionals in the analysis or pursuit of such Causes of Action to the extent the Reorganized Debtor deems appropriate, including on a contingency fee basis.

**No Entity may rely on the absence of a specific reference in the Plan or the Disclosure Statement to any Cause of Action against them as any indication that the Debtor, or the Reorganized Debtor will not pursue any and all available Causes of Action against them. The Debtor and the Reorganized Debtor expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan**. Unless any Cause of Action against an Entity is expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order such that the Debtor hold no right or interest in such Cause of Action as of the Effective Date, the Debtor and the Reorganized Debtor expressly reserve all Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation. The Reorganized Debtor reserve and shall retain the foregoing Causes of Action notwithstanding the rejection of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. The Reorganized Debtor shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, or to decline to do any of the foregoing, without the consent or approval of any third party or any further notice to or action, order, or approval of the Bankruptcy Court.

P.       *Avoidance Actions.*

As of the Effective Date, the Debtor waives all rights to commence or otherwise pursue any and all Avoidance Actions arising under section 547 of the Bankruptcy Code or any comparable "preference" action arising under

applicable non-bankruptcy law, *provided that*, (i) neither the Debtor nor the Reorganized Debtor waive any rights to commence or pursue any Avoidance Actions against the TRU Retail Debtors or any Former Debtors; and (ii) except as expressly provided in the Plan, the Reorganized Debtor shall retain the right to assert any Causes of Action assertable in any Avoidance Action as defenses or counterclaims in any Cause of Action brought by any Entity.

Q.   *Regulatory Requirements*

All parties shall abide by, and use their reasonable best efforts to obtain, any regulatory and licensing requirements or approvals as promptly as practicable to achieve Consummation.

R.   *Insurance Contracts.*

Notwithstanding anything to the contrary in the Disclosure Statement, the Plan, the Plan Supplement, the Confirmation Order, any bar date notice or claim objection, any other document related to any of the foregoing or any other order of the Bankruptcy Court in the Chapter 11 Cases (including any other provision that purports to be preemptory or supervening, grants an injunction or release, or requires a party to opt out of any releases): (i) on and after the Effective Date, nothing shall alter, amend or otherwise modify the terms and conditions of (or the coverage provided by) any of the Insurance Contracts except that the Reorganized Debtor shall be liable in full for all of its and the Debtor's obligations thereunder regardless of whether such obligations arise before or after the Effective Date, without the requirement or need for the Insurer to file a proof of claim, an Administrative Claim, a Cure Claim or object to any cure amount, *provided* that any and all rights of the Debtor to dispute such payments or reimbursements are expressly reserved; (ii) nothing shall permit or otherwise effect a sale, an assignment or any other transfer of any Insurance Contract that has been issued by ACE American Insurance Company, Federal Insurance Company, or any of their affiliates or successors (together, "Chubb Companies") at any time to (or which provide coverage to) any of the Debtor (or any of their Affiliates or any of their predecessors), and all agreements, documents or instruments relating thereto (collectively, the "Chubb Insurance Contracts") and/or any rights, benefits, claims, rights to payments, or recoveries under or relating to the Chubb Insurance Contracts without the express written consent of the Chubb Companies; and (iii) nothing shall permit or otherwise effect a sale, an assignment or any other transfer of any Insurance Contract that has been issued by Zurich American Insurance Company, American Zurich Insurance Company, Steadfast Insurance Company, or any of their affiliates or successors (together, "Zurich") at any time to (or which provide coverage to) the Debtor (or any of their Affiliates or any of their predecessors), and all agreements, documents or instruments relating thereto (collectively, the "Zurich Insurance Contracts") and/or any rights, benefits, claims, rights to payments, or recoveries under or relating to the Zurich Insurance Contracts without the express written consent of Zurich.  For the avoidance of doubt, any such rights and obligations shall be determined under the Insurance Contracts and applicable non-bankruptcy law.

**ARTICLE V**
**TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

A.   *Assumption and Rejection of Executory Contracts and Unexpired Leases.*

On the Effective Date, except as otherwise provided herein, each Executory Contract and Unexpired Lease not previously rejected, assumed, or assumed and assigned, including, without limitation, any employee benefit plans, severance plans, and other Executory Contracts under which employee obligations arise, shall be deemed automatically rejected pursuant to sections 365 and 1123 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease:  (1) is specifically described in the Plan as to be assumed in connection with Confirmation of the Plan, or is specifically scheduled to be assumed or assumed and assigned pursuant to the Plan or the Plan Supplement; (2) is subject to a pending motion to assume such Unexpired Lease or Executory Contract as of the Effective Date; (3) is to be assumed or assumed and assigned to a third party, as applicable, in connection with any Sale Transaction; (4) is a contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan; or (5) is an Insurance Contract.  Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such assumptions, assignments, and rejections, including the assumption of the Executory Contracts or Unexpired Leases as provided in the Plan Supplement, pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Unless otherwise indicated, assumptions or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date.  Any motions to assume Executory Contracts or Unexpired Leases pending

on the Effective Date shall be subject to approval by a Final Order of the Bankruptcy Court on or after the Effective Date.

B.      *Claims Based on Rejection of Executory Contracts and Unexpired Leases.*

Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, if any, must be Filed with the Bankruptcy Court by the later of:  (1) the Claims Bar Date, Administrative Claims Bar Date, or the Governmental Bar Date, as applicable; and (2) 4:00 p.m., prevailing Eastern Time, on the date that is thirty (30) days following the entry of an Order of the Bankruptcy Court (including the Confirmation Order) approving such rejection.  Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed within such time shall be automatically Disallowed, forever barred from assertion, and shall not be enforceable against, as applicable, the Debtor, its Estate, the Reorganized Debtor, or property of the foregoing parties, without the need for any objection by the Debtor, its Estate, the Reorganized Debtor and without the need for any further notice to, or action, order, or approval of the Bankruptcy Court.  Claims arising from the rejection of the Debtor's Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with Article III of the Plan, as applicable.

C.      *Cure of Defaults for Assumed and Assigned Executory Contracts and Unexpired Leases.*

Any Cure Claims under each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the Cure Claim in Cash on the Effective Date or as soon as reasonably practicable thereafter, subject to the limitations described below, by the Debtor as an Administrative Claim, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree.  In the event of a dispute regarding (1) the amount of the Cure Claim, (2) the ability of the Debtor's Estate or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (3) any other matter pertaining to assumption, the Cure Claims required by section 365(b)(1) of the Bankruptcy Code shall be satisfied following the entry of a Final Order or Orders resolving the dispute and approving the assumption.

Unless otherwise provided by an Order of the Bankruptcy Court, at least seven (7) days before the Voting Deadline, the Debtor shall cause notice of proposed assumption and proposed Cure Claims to be sent to applicable counterparties.  Any objection by such counterparty must be Filed, served, and actually received by the Debtor not later than seven days after service of notice of the Debtor's proposed assumption and associated Cure Claims.  Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or cure amount will be deemed to have assented to such assumption or Cure Claim.

Assumption (or assumption and assignment) of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, subject to satisfaction of the Cure Claims, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition, restricting use or tenant mix, or other bankruptcy-related defaults, including, without limitation, violation of go-dark or cessation of operation provisions or other provisions which seek to condition or restrict the use or assignment of an Unexpired Lease, arising under any assumed Executory Contract or Unexpired Lease at any time before the effective date of assumption and/or assignment.  Any provisions in any lease or other conveyance document that prohibits or conditions the assignment of an Unexpired Lease or allows the landlord or other counterparty, as applicable, to terminate, recapture, or impose any penalty upon assignment of any such Unexpired Lease, or as a result of a closure or failure to operate in the premises, are deemed by this Plan to be unenforceable anti-assignment provisions that are void and of no force and effect.  **Any liabilities reflected in the Schedules and any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed and assigned shall be deemed Disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.**

D.      *Preexisting Obligations to the Debtor Under Executory Contracts and Unexpired Leases.*

Rejection or repudiation of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtor under such contracts or leases as modified, amended, supplemented, or restated.  In particular, notwithstanding any non-bankruptcy law to the contrary,

to the extent applicable, the Reorganized Debtor expressly reserves and does not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations on goods previously purchased, or services previously received, by the contracting Debtors from counterparties to rejected or repudiated Executory Contracts or Unexpired Leases.

E.      *D&O Liability Insurance Policies.*

On the Effective Date, the Debtor shall assume all of the D&O Liability Insurance Policies pursuant to section 365 of the Bankruptcy Code or otherwise, subject to the Debtor's rights to seek amendment to such D&O Liability Insurance Policies. Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Debtor's foregoing assumption of each of the D&O Liability Insurance Policies. Notwithstanding anything to the contrary contained in the Plan, Confirmation shall not discharge, impair, or otherwise modify any obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such obligation shall be deemed and treated as an Executory Contract that has been assumed by the Debtor under the Plan as to which no Proof of Claim need be Filed.

F.      *Indemnification Obligations.*

To the extent applicable, the Debtor and Reorganized Debtor shall assume the Indemnification Obligations for the Debtor's current and former directors, officers, managers, and employees, and current attorneys, accountants, investment bankers, and other professionals of the Debtor, to the extent consistent with applicable law, and such Indemnification Obligations shall not be modified, reduced, discharged, impaired, or otherwise affected in any way, and shall survive Unimpaired and unaffected, irrespective of when such obligation arose.

G.      *Modifications, Amendments, Supplements, Restatements, or Other Agreements.*

Unless otherwise provided in the Plan, each assumed and assigned Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and all Executory Contracts and Unexpired Leases related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements have been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtor during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith, unless such Executory Contract or Unexpired Lease was assumed by the Debtor and approved by the Bankruptcy Court.

H.      *Reservation of Rights.*

Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on the list of Executory Contracts and Unexpired Leases to be assumed pursuant to the Plan contained in the Plan Supplement, nor anything else in the Plan shall constitute an admission by the Debtor or any other Entity, as applicable, that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that either any Debtor or any other Entity, as applicable, has any liability thereunder.

I.      *Nonoccurrence of Effective Date.*

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code, unless such deadline(s) have expired.

# ARTICLE VI
## PROVISIONS GOVERNING DISTRIBUTIONS

A.      *Timing and Calculation of Amounts to Be Distributed.*

Except as otherwise provided in the Plan, on the Effective Date (or if a Claim or Interest is not an Allowed Claim or Allowed Interest on the Effective Date, on the date that such a Claim or Interest becomes an Allowed Claim or Allowed Interest, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim against or Allowed Interest in the Debtor shall receive the full amount of the distributions that the Plan provides for Allowed Claims or Allowed Interests in the applicable Class as applicable; *provided* that the Debtor or Reorganized Debtor, as applicable, will use reasonable commercial efforts to make distributions to holders of General Unsecured Claims that are Allowed as of the Effective Date within sixty (60) days of the Effective Date.  In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.  If and to the extent that there are Disputed Claims or Disputed Interests, distributions on account of any such Disputed Claims or Disputed Interests shall be made pursuant to the provisions set forth in Article VII of the Plan.  Except as otherwise provided in the Plan, holders of Claims or Interests shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.  Notwithstanding anything to the contrary herein, no holder of an Allowed Claim or Allowed Interest shall, on account of such Allowed Claim or Allowed Interest, receive a distribution in excess of the Allowed amount of such Claim or Interest payable in accordance with the Plan or other Final Order of the Bankruptcy Court.

B.      *Disbursing Agent.*

All distributions under the Plan shall be made by the Disbursing Agent.  The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.  Additionally, in the event that the Disbursing Agent is so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Disbursing Agent.

Subject to the terms of the Plan, the Disbursing Agent shall be empowered to:  (1) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (2) make all distributions contemplated under the Plan; (3) employ professionals to represent it with respect to its responsibilities; (4) object to or otherwise resolve any General Unsecured Claim, Priority Claim, or Other Secured Claim, subject to the terms hereof; and (5) exercise such other powers as may be vested in the Reorganized Debtor by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions of the Plan.

C.      *Distributions on Account of Claims Allowed After the Effective Date.*

1.      **Payments and Distributions on Disputed Claims.**

Distributions made after the Effective Date to Holders of Disputed Claims that are not Allowed Claims as of the Effective Date but which later become Allowed Claims shall be deemed to have been made on the Effective Date.

2.      **Special Rules for Distributions to Holders of Disputed Claims.**

Notwithstanding any provision otherwise in the Plan and except as may be agreed to by the Debtor or the Reorganized Debtor, on the one hand, and the holder of a Disputed Claim, on the other hand, no partial payments and no partial distributions shall be made with respect to any Disputed Claim until all Disputed Claims held by the holder of such Disputed Claim have become Allowed Claims or have otherwise been resolved by settlement or Final Order.

23

D.      *Delivery of Distributions and Undeliverable or Unclaimed Distributions.*

1.      **Record Date for Distribution.**

On the Distribution Record Date, the Claims Register shall be closed and the Debtor, the Reorganized Debtor, or any other party responsible for making distributions shall instead be authorized and entitled to recognize only those record holders listed on the Claims Register as of the close of business on the Distribution Record Date.

2.      **Delivery of Distributions in General.**

Except as otherwise provided herein, the Debtor shall make distributions to Holders of Allowed Claims and Allowed Interests as of the Distribution Record Date at the address for each such Holder as indicated on the Debtor's records as of the date of any such distribution; *provided*, *however*, that the manner of such distributions shall be determined at the discretion of the Debtor; *provided further*, *however*, that the address for each Holder of an Allowed Claim shall be deemed to be the address set forth in any Proof of Claim Filed by that Holder.  If a Holder holds more than one Claim in any one Class, all Claims of the Holder will be aggregated into one Claim and one distribution will be made with respect to the aggregated Claim.

3.      **Minimum; De Minimis Distributions.**

No Cash payment of less than $50.00, in the reasonable discretion of the Debtor or Reorganized Debtor, as applicable, shall be made to a Holder of an Allowed Claim or Allowed Interest on account of such Allowed Claim or Allowed Interest.

4.      **Undeliverable Distributions and Unclaimed Property.**

In the event that any notice or distribution to any holder is returned as undeliverable, no such notice or distribution to such holder shall be made unless and until the Reorganized Debtor have determined the then current address of such holder, at which time such notice or distribution shall be made to such holder without interest; *provided* that such notice or distribution shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of six (6) months from the date of the attempted distribution to the holder.  After such date, all unclaimed property or interests in property shall revert to the Debtor or Reorganized Debtor for the benefit of other Allowed Claims in accordance with the terms of the Plan, and the Claim of any holder to such property or interest in property shall be released, settled, compromised, and forever barred.

5.      **Manner of Payment Pursuant to the Plan.**

Any payment in Cash to be made pursuant to the Plan shall be made at the election of the Debtor or Reorganized Debtor by check or by wire transfer, at the sole and exclusive discretion of the Debtor or Reorganized Debtor

E.      *Compliance with Tax Requirements/Allocations.*

In connection with the Plan, to the extent applicable, the Debtor, Reorganized Debtor, and other withholding agents shall comply with all tax withholding and reporting requirements imposed on it by any Governmental Unit, and all distributions pursuant hereto shall be subject to such withholding and reporting requirements.  Notwithstanding any provision in the Plan to the contrary, the Debtor, Reorganized Debtor, and other withholding agents shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest.

To the extent any subrogation claim is deemed to arise against Toys "R" Us Delaware Inc. or any of its direct or indirect subsidiaries as a result of any distribution made under the Plan, such subrogation claim will be treated as having been immediately cancelled for no consideration, rather than being distributed to Toys "R" Us, Inc. and then contributed to Toys "R" Us Delaware Inc. or any of its direct or indirect subsidiaries.

F.      *No Postpetition Interest on Claims.*

Unless otherwise specifically provided for in an order of the Bankruptcy Court, the Plan, the Confirmation Order, or documents executed as required by this Plan, or required by applicable bankruptcy law, postpetition interest shall not accrue or be paid on any Claims or Interests and no Holder of a Claim or Interest shall be entitled to interest accruing on or after the Petition Date on any such Claim.

G.      *Setoffs and Recoupment.*

Except as otherwise expressly provided herein, the Debtor may, but shall not be required to, setoff against or recoup from any Claims of any nature whatsoever that the Debtor may have against any Holder, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtor of any such Claim, Cause of Action, or legal or equitable defense it may have against the Holder.

H.      *Claims Paid or Payable by Third Parties.*

1.      **Claims Paid by Third Parties.**

The Debtor or Reorganized Debtor, as applicable, shall be authorized to reduce in full a Claim, and such Claim shall be Disallowed without a Claims objection having to be Filed and without any further notice to or action, Order, or approval of the Bankruptcy Court, to the extent that the holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor, as applicable, including on account of recourse to collateral held by third parties that secure such Claim.  To the extent a holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or Reorganized Debtor on account of such Claim, such holder shall, within 14 days of receipt thereof, repay or return the distribution to the Debtor or Reorganized Debtor, to the extent the holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.  The failure of such holder to timely repay or return such distribution shall result in the holder owing the Debtor annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the 14-day grace period specified above until the amount is repaid.

2.      **Claims Payable by Third Parties.**

No distributions under the Plan shall be made on account of a Claim that is payable pursuant to one of the Debtor's Insurance Contracts, surety agreements, other non-Debtor payment agreements, or collateral held by a third party, until the holder of such Claim has exhausted all remedies with respect to such Insurance Contract, surety agreement, other non-Debtor payment agreement, or collateral, as applicable.  To the extent that one or more of the Debtor's Insurers, sureties, or non-Debtor payors pays or satisfies a Claim in full or in part (if and to the extent adjudicated by a court of competent jurisdiction or otherwise settled), or such collateral or proceeds from such collateral is used to satisfy such Claim, then immediately upon such satisfaction, the applicable portion of such Claim shall be expunged without a Claim objection having to be Filed and without any further notice to or action, Order, or approval of the Bankruptcy Court.

3.      **Applicability of Insurance Contracts.**

Except as otherwise provided in the Plan, distributions to holders of Claims covered by an Insurance Contract shall be in accordance with the provisions of any applicable Insurance Contract.  Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtor or any Entity may hold against any other Entity, including Insurers under any Insurance Contract, nor shall anything contained herein constitute or be deemed a waiver by Insurers of any rights or defenses, including coverage defenses, held by such Insurers.

I.      *Indefeasible Distributions.*

Any and all distributions made under the Plan shall be indefeasible and not subject to clawback.

J.      *Distributions on Account of Subordinated Claims.*

The allowance, classification, and treatment of all Allowed Claims and Allowed Interests and the respective distributions on account thereof take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Debtor reserve the right to re-classify any Allowed Claim in accordance with any contractual, legal, or equitable subordination relating thereto.  Notwithstanding the foregoing, the Plan shall be without prejudice to the contractual, legal, or equitable subordination rights (if any) in favor of any holder of any Allowed Claim, and any holder of any Allowed Claim (if any) subject to any such contractual, legal, or equitable subordination shall remit any distribution on account of such Claim to which such holder's Claim is subordinated in accordance with and to the extent required under any applicable contractual, legal, or equitable subordination obligation

## ARTICLE VII
## PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS

A.      *Allowance of Claims and Interests.*

The Debtor and the Reorganized Debtor, as applicable, shall have and shall retain any and all rights and legal or equitable defenses that the Debtor had with respect to any Claim or Interest immediately before the Effective Date. Except as expressly provided in the Plan or in any Order entered in the Chapter 11 Cases prior to the Effective Date (including the Confirmation Order), no Claim or Interest shall become an Allowed Claim or Allowed Interest unless and until such Claim or Interest is deemed Allowed pursuant to the Plan or the Bankruptcy Code or a Final Order, including the Confirmation Order (when it becomes a Final Order), allowing such Claim.

B.      *Claims and Interests Administration Responsibilities.*

Except as otherwise specifically provided in the Plan and notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, on and after the Effective Date, the Reorganized Debtor shall have the sole authority (subject to any party in interest's right to object to a Claim or Interest under section 502(a) of the Bankruptcy Code): (1) to File, withdraw, or litigate to judgment objections to Disputed Claims or Disputed Interests; (2) to settle or compromise any Disputed Claim or Disputed Interest without any further notice to or action, Order, or approval by the Bankruptcy Court; and (3) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, Order, or approval by the Bankruptcy Court.

C.      *Estimation of Claims and Interests.*

Prior to and on the Effective Date, the Debtor, and, after the Effective Date, the Reorganized Debtor, may (but are not required to), at any time, request that the Bankruptcy Court estimate: (1) any Disputed Claim or Disputed Interest pursuant to applicable law; and (2) any Claim pursuant to applicable law, including, without limitation, section 502(c) of the Bankruptcy Code, regardless of whether any party previously has objected to such Claim or Interest, or whether the Bankruptcy Court has ruled on any such objection, the Bankruptcy Court shall retain jurisdiction to estimate any such Claim or Interest, including during the litigation of any objection to any Claim or Interest or during the appeal relating to such objection.  Notwithstanding any provision otherwise in the Plan, a Claim that has been expunged from the Claims Register but that is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court.  In the event that the Bankruptcy Court estimates any Claim or Interest, that estimated amount shall constitute either the Allowed amount of such Claim or Interest or a maximum limitation on such Claim or Interest for all purposes under the Plan, including for purposes of distributions, and the Debtor or the Reorganized Debtor, as applicable, may elect to pursue additional

objections to the ultimate distribution on such Claim or Interest.  If the estimated amount constitutes a maximum limitation on such Claim or Interest, the Debtor or the Reorganized Debtor, as applicable, may elect to pursue any supplemental proceedings to object to any ultimate distribution on account of such Claim or Interest.  Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such holder has Filed a motion requesting the right to seek such reconsideration on or before seven (7) days after the date on which such Claim is estimated.  All of the aforementioned Claims and Interests and objection, estimation, and resolution procedures are cumulative and not exclusive of one another.  Claims and Interests may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

D.      *Adjustment to Claims or Interests without Objection.*

Any Claim or Interest that has been paid or satisfied, or any Claim or Interest that has been amended or superseded, may be adjusted or expunged on the Claims Register by the Reorganized Debtor without a Claims objection having to be Filed and without any further notice to or action, Order, or approval of the Bankruptcy Court.

E.      *Time to File Objections to Claims.*

Any objections to Claims shall be Filed on or before the Claims Objection Bar Date.

F.      *Disallowance of Claims.*

Any Claims or Interests held by Entities from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code, or that are a transferee of a transfer avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed Disallowed pursuant to section 502(d) of the Bankruptcy Code, and holders of such Claims or Interests may not receive any distributions on account of such Claims or Interests until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court Order with respect thereto has been entered and all sums due, if any, to the Debtor or the Reorganized Debtor, as applicable, by that Entity have been turned over or paid to the Debtor or the Reorganized Debtor.

**Except as provided herein or otherwise agreed, any and all Proofs of Claim filed after the Claims Bar Date shall be deemed Disallowed and expunged as of the Effective Date without any further notice to or action, order, or approval of the Bankruptcy Court, and holders of such Claims may not receive any distributions on account of such Claims, unless on or before the Confirmation Hearing such late Claim has been deemed timely filed by a Final Order.**

G.      *Amendments to Claims.*

On or after the Effective Date, except as otherwise provided herein, a Claim or Interest may not be Filed or amended without the prior authorization of the Debtor or the Reorganized Debtor, as applicable, and any such new or amended Claim or Interest Filed shall be deemed Disallowed and expunged without any further notice to or action, Order, or approval of the Bankruptcy Court.

H.      *No Distributions Pending Allowance.*

If an objection to a Claim or Interest or portion thereof is Filed as set forth in <u>Article VII</u> of the Plan, or if such Claim or Interest is scheduled as Disputed, no payment or distribution provided under the Plan shall be made on account of such Claim or Interest or portion thereof unless and until such Disputed Claim or Disputed Interest becomes an Allowed Claim or Allowed Interest; however, at the sole discretion of the Debtor or the Reorganized Debtor, as applicable, payment may be made on any undisputed portion of such Claim or Interest.

I.      *Distributions After Allowance.*

To the extent that a Disputed Claim or Disputed Interest ultimately becomes an Allowed Claim or Allowed Interest, distributions (if any) shall be made to the holder of such Allowed Claim or Allowed Interest in accordance

with the provisions of the Plan.  As soon as practicable after the date that the Order of the Bankruptcy Court allowing any Disputed Claim or Disputed Interest becomes a Final Order, the Reorganized Debtor shall provide to the holder of such Claim or Interest the distribution (if any) to which such holder is entitled under the Plan as of the Effective Date, less any previous distribution (if any) that was made on account of the undisputed portion of such Claim or Interest, without any interest, dividends, or accruals to be paid on account of such Claim or Interest unless required under applicable bankruptcy law or as otherwise provided in <u>Article III.B</u> of the Plan.

    J.      *Single Satisfaction of Claims.*

Holders of Allowed Claims and Allowed Interests may assert such Claims against or Interests in the Debtor(s) obligated with respect to such Claims or Interests, and such Claims or Interests shall be entitled to share in the recovery provided for the applicable Class of Claims or Interests against the Debtor based upon the full Allowed amount of such Claims or Interests.  Notwithstanding the foregoing, in no case shall the aggregate value of all property received or retained under the Plan on account of any Allowed Claim or Allowed Interest exceed 100 percent (100%) of the underlying Allowed Claim or Allowed Interest plus applicable interest, if any.

**ARTICLE VIII**
**SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS**

    A.      *Settlement, Compromise, and Release of Claims and Interests.*

Pursuant to Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, and except as otherwise specifically provided in the Plan or in any contract, instrument, or other agreement or document created pursuant to the Plan, the distribution, rights, and treatment that are provided in the Plan shall be in complete settlement, compromise, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Debtor), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on such Claims, Interests, or Causes of Action from and after the Petition Date, whether known or unknown, against, liabilities, of Liens on, obligations of, rights, or Causes of Action against, and Interests in, the Debtor or any of their assets or properties, regardless of whether any property shall have been assumed, assumed and assigned, distributed, or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose or accrued before the Effective Date, any liability (including withdrawal liability) to the extent such Causes of Action, Claims, or Interests related to service performed by employees of the Debtor before the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representation or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (1) a Proof of Claim or Proof of Interest based upon such Cause of Action, Claim, debt, right, or Interest is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (2) a Cause of Action, Claim, or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the holder of such Cause of Action, Claim, or Interest has accepted the Plan.  Any default by the Debtor or their Affiliates with respect to any Cause of Action, Claim, or Interest that existed immediately before or on account of the filing of the Chapter 11 Cases shall be deemed cured on the Effective Date.  The Confirmation Order shall be a judicial determination of the settlement, compromise, and release of all Causes of Action, Claims, and Interests subject to the Effective Date occurring.

    B.      *Discharge of Claims and Termination of Equity Interests*

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in any contract, instrument, or other agreement or document created pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Debtor), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on such Claims, Interests, or Causes of Action from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtor or any of their assets or properties, regardless of whether any property shall have been assumed, assumed and assigned, distributed, or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose or accrued before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to

28

services performed by employees of the Debtor before the Effective Date and that arise from a termination of employment, any contingent or non contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not:  (1) a Proof of Claim based upon such debt or right is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right, or Interest is allowed pursuant to section 502 of the Bankruptcy Code; or (3) the holder of such a Claim or Interest has accepted the Plan.  Any default or "event of default" by the Debtor or their Affiliates with respect to any Claim or Interest that existed immediately before or on account of the filing of the Chapter 11 Cases shall be deemed cured (and no longer continuing) as of the Effective Date.  The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to Consummation.

C.       *Release of Liens.*

**Except as otherwise provided herein or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estate shall be fully released, settled, and compromised and all rights, titles, and interests of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estate shall revert to the Debtor or Reorganized Debtor, as applicable.**

D.       *Releases by the Debtor.*

**Pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, on and after the Effective Date, each Released Party is deemed released and discharged by the Debtor and the Debtor's Estate, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing entities, from any and all Causes of Action, including any derivative Cause of Action asserted on behalf of the Debtor, that the Debtor or the Debtor's Estate would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Cause of Action against, or Interest in, the Debtor or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtor, the Debtor's in- or out-of-court restructuring efforts, intercompany transactions, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, the Plan (including, for the avoidance of doubt, the Plan Supplement), or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, the Plan, or the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date; provided, however, that notwithstanding anything to the contrary herein, nothing in this Article or this Plan shall release (a) any post-Effective Date obligations of any party or entity under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan and the Restructuring Transactions; (b) any Administrative Claims held by the Debtor against the TRU Retail Debtor Parties or any Former Debtor, including any Administrative Claims pursuant to sections 503(b) or 507(a)(2) of the Bankruptcy Code; (c) any Non-Released Claims; or (d) any and all setoff, subrogation, recoupment, or other similar legal or equitable right held by the Debtor against any Entity.**

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in this Article VIII.D by the Debtor, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute its finding that each release described in this Article VIII.D is: (1) in exchange for the good and valuable consideration provided by the Released Parties, a good faith settlement and compromise of such Causes of Action; (2) in the best interest of the Debtor and all Holders of Interests and Causes of Action; (3) fair, equitable, and reasonable; (4) given and made after due notice and opportunity for hearing; and (5) subject to the terms**

and provisions herein, a bar to the Debtor asserting any Cause of Action, or liability related thereto, of any kind whatsoever, against any of the Released Parties or their property.

E.        *Releases by Holders of Claims and Interests.*

As of the Effective Date, each Releasing Party is deemed to have released and discharged the Debtor and each Released Party from any and all Causes of Action, whether known or unknown, including any derivative Causes of Action asserted on behalf of the Debtor, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtor, the Debtor's in- or out-of-court restructuring efforts, intercompany transactions, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, the Plan (including, for the avoidance of doubt, the Plan Supplement), or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, the Plan, or the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date; provided, however, that notwithstanding anything to the contrary herein, nothing in this Article or this Plan shall release (a) any post-Effective Date obligations of any party or entity under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan and the Restructuring Transactions; (b) any Administrative Claims held by the Debtor against the TRU Retail Debtor Parties or any Former Debtor, including any Administrative Claims pursuant to sections 503(b) or 507(a)(2) of the Bankruptcy Code; (c) any Non-Released Claims; or (d) any and all setoff, subrogation, recoupment, or other similar legal or equitable right held by the Debtor against any Entity.

For the avoidance of doubt, nothing contained herein shall affect any rights of any parties to the Settlement Agreement preserved under the Settlement Agreement.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in this Article VIII.E, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute its finding that each release described in this Article VIII.E is: (1) in exchange for the good and valuable consideration provided by the Released Parties, a good faith settlement and compromise of such Causes of Action; (2) in the best interests of the Debtor and all Holders of Interests and Causes of Action; (3) fair, equitable, and reasonable; (4) given and made after due notice and opportunity for hearing; and (5) subject to the terms and provisions herein, a bar to any of the Releasing Parties asserting any Cause of Action, or liability related thereto, of any kind whatsoever, against any of the Released Parties or their property.

F.        *Exculpation.*

Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur any liability with respect to, and each Exculpated Party is released and exculpated from, any Cause of Action related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, the Plan, or any Restructuring Transaction, contract, instrument, release or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, except for Causes of Action related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be,

liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan; provided, however, notwithstanding anything to the contrary herein, the following shall not release or exculpate: (i) any post-Effective Date obligations of any party or entity under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan and the Restructuring Transactions; (ii) any Administrative Claims held by the Debtor against the TRU Retail Debtor Parties or any Former Debtor, including any Administrative Claims pursuant to sections 503(b) or 507(a)(2) of the Bankruptcy Code; (iii) any Non-Released Claims; or (iv) any and all setoff, subrogation, recoupment, or other similar legal or equitable right held by the Debtor against any Entity.

G.    *Injunction.*

Except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan, or the Confirmation Order, all Entities who have held, hold, or may hold Causes of Action, Claims, or Interests that have been compromised, settled, or released, or are subject to exculpation are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtor, the Exculpated Parties, or the Released Parties:  (1) commencing or continuing in any manner any and all Causes of Action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against the Debtor, the Exculpated Parties, or the Released Parties on account of or in connection with or with respect to any such Claims or Interests; (3) creating, perfecting, or enforcing any encumbrance of any kind against the Debtor, the Exculpated Parties, or the Released Parties or the property or the estate of the Debtor, the Exculpated Parties, or the Released Parties on account of or in connection with or with respect to any such Causes of Action, Claims, or Interests; (4) asserting any right of setoff, subrogation, recoupment, or other similar legal or equitable right of any kind against any obligation due from the Debtor, the Exculpated Parties, or the Released Parties or against the property of the Debtor, the Exculpated Parties, or the Released Parties on account of or in connection with or with respect to any such Causes of Action, Claims, or Interests unless such Holder has Filed a motion requesting the right to perform such legal or equitable right on or before the Effective Date, and notwithstanding an indication of any Cause of Action, Claim, or Interest or otherwise that such Holder asserts, has, or intends to preserve pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any and all Causes of Action or other proceeding of any kind on account of or in connection with or with respect to any such Causes of Action, Claims, or Interests released or settled pursuant to the Plan; provided, however, that, notwithstanding anything to the contrary herein, nothing in this Article or this Plan shall enjoin:  (i) any Entity from taking the preceding actions with respect to any post-Effective Date obligations of any party or entity under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan and the Restructuring Transactions; (ii) any Administrative Claims held by the Debtor against the TRU Retail Debtor Parties or any Former Debtor, including any Administrative Claims pursuant to sections 503(b) or 507(a)(2) of the Bankruptcy Code; (iii) any Non-Released Claims; or (iv) any and all setoff, subrogation, recoupment, or other similar legal or equitable right held by the Debtor against any Entity.

Upon entry of the Confirmation Order, all Holders of Claims and Interests and their respective current and former employees, agents, officers, directors, principals, and direct and indirect affiliates shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan.  Each Holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim or Interest, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in this **Article VIII.G** of the Plan.

H.    *Protections Against Discriminatory Treatment.*

Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, all Entities, including Governmental Units, shall not discriminate against the Debtor or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Debtor, or another Entity with whom the Debtor have been associated, solely because Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the

commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtor are granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

I.      *Setoffs.*

Except as otherwise expressly provided for in the Plan, Debtor, as applicable, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy law, or as may be agreed to by the Holder of a Claim, may set off against any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim), any Claims, rights, and Causes of Action of any nature that such Debtor may hold against the Holder of such Allowed Claim, to the extent such Claims, rights, or Causes of Action against such Holder have not been otherwise compromised or settled on or before the Effective Date (whether pursuant to the Plan or otherwise); *provided, however*, that neither the failure to effect such a setoff nor the allowance of any Claim pursuant to the Plan shall constitute a waiver or release by such Debtor of any such Claims, rights, Causes of Action, and legal or equitable defenses that such Debtor may possess against such Holder. In no event shall any Holder of Claims be entitled to set off any Claim against any Claim, right, or Cause of Action of a Debtor, unless such Holder has timely Filed a Proof of Claim with the Bankruptcy Court preserving such setoff *provided*, that the foregoing shall not prevent any Holder of Claims or Interests from asserting setoff rights as an affirmative defense to the extent provided by applicable law.

J.      *Recoupment.*

In no event shall any Holder of Claims or Interests be entitled to recoup any Claim against any claim, right, or Cause of Action of the Debtor unless such Holder actually has timely Filed a Proof of Claim with the Bankruptcy Court preserving such recoupment, *provided*, that the foregoing shall not prevent any Holder of Claims or Interests from asserting recoupment as an affirmative defense to the extent provided by applicable law.

K.      *Subordination Rights.*

The classification and treatment of all Claims and Interests under the Plan shall conform to and with the respective contractual, legal, and equitable subordination rights of such Claims and Interests, and any such rights shall be settled, compromised, and released pursuant to the Plan.

L.      *Document Retention.*

On and after the Effective Date, the Debtor or Reorganized Debtor, as applicable, may maintain documents in accordance with their standard document retention policy, as may be altered, amended, modified, or supplemented by the Debtor.

M.      *Reimbursement or Contribution.*

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of allowance or disallowance, such Claim shall be forever Disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless before the Confirmation Date: (1) such Claim has been adjudicated as non-contingent; or (2) the relevant Holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered before the Confirmation Date determining such Claim as no longer contingent.

## ARTICLE IX
## CONDITIONS PRECEDENT TO CONFIRMATION AND THE EFFECTIVE DATE

A.      *Conditions Precedent to Confirmation.*

It shall be a condition to Confirmation of the Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of <u>Article IX.C</u>:

1.    the Bankruptcy Court shall have entered the Disclosure Statement Order;

2.    the Plan shall have been Filed;

3.    the Bankruptcy Court shall have entered the Confirmation Order;  and

4.    the Plan Supplement shall have been Filed.

B.        *Conditions Precedent to the Effective Date.*

It shall be a condition to Consummation that the following conditions shall have been satisfied or waived pursuant to the provisions of Article IX.C:

1.        the Bankruptcy Court shall have entered the Confirmation Order and it shall have become a Final Order; *provided*, *however*, that in accordance with Bankruptcy Rules 3020(e), 6004(h), and 6006(d) (and notwithstanding any other provision of the Bankruptcy Code or the Bankruptcy Rules), the Confirmation Order shall not be stayed and shall be effective immediately upon its entry;

2.        all documents and agreements necessary to implement the Plan shall have (a) all conditions precedent to the effectiveness of such documents and agreements satisfied or waived pursuant to the terms of such documents or agreements, (b) been tendered for delivery, and (c) been effected or executed;

3.        all governmental and material third party approvals and consents, including Bankruptcy Court approval, necessary in connection with the transactions contemplated by the Plan shall have been obtained, not be subject to unfulfilled conditions and be in full force and effect, and all applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain, prevent, or otherwise impose materially adverse conditions on such transactions;

4.        the Professional Fee Escrow Account shall have been funded with Cash, as applicable, in the amount of the aggregate Professional Fee Escrow Amount; and

5.        all actions, documents, certificates, and agreements necessary to implement this Plan shall have been effected or executed and delivered to the required parties and, to the extent required, filed with the applicable Governmental Units as provided for in the Plan.

C.        *Waiver of Conditions.*

The conditions to Confirmation and Consummation set forth in this Article IX may be waived by the Debtor only by consent of the Creditors' Committee in its sole discretion, and without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate the Plan.

## ARTICLE X
## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

A.        *Modification and Amendments.*

Subject to the limitations contained in the Plan, the Debtor or the Reorganized Debtor, as applicable, reserve the right to modify the Plan as to material terms and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not resolicit votes on such modified Plan.  Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in the Plan, the Debtor and the Reorganized Debtor, as applicable, expressly reserve their rights to alter, amend, or modify materially the Plan with respect to the Debtor, one or more times, after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order,

in such matters as may be necessary to carry out the purposes and intent of the Plan.  Any such modification or supplement shall be considered a modification of the Plan and shall be made in accordance with Article X hereof.

B.      *Effect of Confirmation on Modifications.*

Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan occurring after the solicitation thereof and before the Confirmation Date are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

C.      *Revocation or Withdrawal of the Plan.*

The Debtor reserve the right to revoke or withdraw the Plan prior to the Confirmation Date.  If the Debtor revoke or withdraw the Plan, or if Confirmation and Consummation does not occur, then:  (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan shall:  (i) constitute a waiver or release of any Claims or Interests; (ii) prejudice in any manner the rights of the Debtor or any other Entity, including the holders of Claims or the non-Debtor subsidiaries; or (iii) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtor or any other Entity.

# ARTICLE XI
# RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain such jurisdiction over the Chapter 11 Cases and all matters, arising out of, or related to, the Chapter 11 Cases and the Plan, including jurisdiction to:

1.      allow, disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the Secured or unsecured status, priority, amount, or allowance of Claims or Interests;

2.      decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.      resolve any matters related to:  (a) the assumption, assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable in any manner and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Claims related to the rejection of an Executory Contract or Unexpired Lease, Cure Obligations pursuant to section 365 of the Bankruptcy Code, or any other matter related to such Executory Contract or Unexpired Lease; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed and/or assigned; (c) the Debtor or Reorganized Debtor amending, modifying, or supplementing, after the Effective Date, pursuant to Article V, any Executory Contracts or Unexpired Leases to the set forth on the list of Executory Contracts and Unexpired Leases to be assumed and assigned or rejected or otherwise; and (d) any dispute regarding whether a contract or lease is or was executory or expired;

4.      ensure that distributions to Holders of Allowed Claims and Allowed Interests are accomplished pursuant to the provisions of the Plan;

5.      adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6.      adjudicate, decide, or resolve any and all matters related to Causes of Action;

7.      enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Disclosure Statement;

8.      enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

9.      resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

10.      issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

11.      resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the settlements, compromises, releases, injunctions, exculpations, and other provisions contained in <u>Article VIII</u> and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

12.      resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or Interest for amounts not timely repaid;

13.      enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

14.      determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Disclosure Statement;

15.      adjudicate any and all disputes arising from or relating to distributions under the Plan or any transactions contemplated therein;

16.      consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

17.      determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

18.      hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

19.      hear, determine, and resolve matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

20.      hear and determine matters concerning section 1145 of the Bankruptcy Code;

21.      hear and determine all disputes involving the existence, nature, or scope of the Debtor's release, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred before or after the Effective Date;

22.      enforce all orders previously entered by the Bankruptcy Court;

23.      resolve any disputes arising in connection with any Sale Transaction, including the interpretation, implementation, modification, of any Sale Transaction Documents;

24.      hear any other matter not inconsistent with the Bankruptcy Code;

25.      enter an order concluding or closing the Chapter 11 Cases; and

26.      enforce the injunction, release, and exculpation provisions set forth in Article VIII.

## ARTICLE XII
## MISCELLANEOUS PROVISIONS

A.      *Immediate Binding Effect.*

Subject to the terms hereof and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan, the Plan Supplement, and the Confirmation Order shall be immediately effective and enforceable and deemed binding upon the Debtor, the Debtor's Estate, the Reorganized Debtor, and any and all holders of Claims or Interests (regardless of whether such Claims or Interests are deemed to have accepted or rejected the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, or injunctions described in the Plan, each Entity acquiring property under the Plan or the Confirmation Order, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtor. All Claims and debts shall be as fixed, adjusted, or compromised, as applicable, pursuant to the Plan regardless of whether any holder of a Claim or debt has voted on the Plan.

B.      *Additional Documents.*

On or before the Effective Date, the Debtor may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan, with the consent of the Creditors' Committee in their sole discretion. The Debtor and all holders of Claims or Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan, in consultation with the Creditors' Committee.

C.      *Payment of Statutory Fees.*

All fees payable pursuant to section 1930(a) of the Judicial Code shall be paid by the Debtor for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed, or closed, whichever occurs first. For the avoidance of doubt, the Debtor shall pay any outstanding U.S. Trustee fees in full on the Effective Date and the Debtor or Reorganized Debtor shall continue to pay such fees until the Chapter 11 cases are converted, dismissed, or closed, whichever occurs first.

D.      *Dissolution of Committees.*

On the Effective Date, any statutory committee appointed in the Chapter 11 Cases shall dissolve and members thereof shall be released and discharged from all rights and duties from or related to the Chapter 11 Cases on the Effective Date. The Debtor and the Reorganized Debtor shall no longer be responsible for paying any fees or expenses incurred by the members of or advisors to the Creditors' Committee after the Effective Date. Upon the dissolution of the Creditors' Committee, the current and former members of the Creditors' Committee, and their officers, employees, counsel, advisors, and agents, shall be released and discharged of and from all further authority, duties, responsibilities, and obligations related to and arising from and in connection with the Chapter 11 Cases, and the retention or employment of the Creditors' Committee's respective attorneys, accountants, and other agents shall terminate, except that the Creditors' Committee and its professionals shall have the right to pursue, review, and object to any applications for compensation and reimbursement of expenses filed in accordance with Article II.B hereof.

E.      *Reservation of Rights.*

36

The Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order. Neither the Plan, any statement or provision contained in the Plan, nor any action taken or not taken by any Debtor with respect to the Plan, the Disclosure Statement, the Confirmation Order, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests before the Effective Date.

F.      *Successors and Assigns.*

The rights, benefits, and obligations of any Entity named or referred to in the Plan or the Confirmation Order shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor, or assign, Affiliate, officer, director, manager, trustee, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

G.      *Service of Documents.*

Any pleading, notice, or other document required by the Plan to be served on or delivered to the Debtor shall be served on:

1.        **the Debtor:**

Wayne Real Estate Parent Company, LLC
One Geoffrey Way,
Wayne, New Jersey 07470
Attention:  Jamie Young

with copies to:

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022-4611
Facsimile:  (212) 446-4900
Attention:  Joshua A. Sussberg, Emily E. Geier
E-mail addresses:  joshua.sussberg@kirkland.com,
                    emily.geier@kirkland.com

and

Kirkland & Ellis LLP
300 North LaSalle
Chicago, Illinois 60654-3406
Facsimile:  (312) 862-2200
Attention:  Chad J. Husnick
E-mail address:  chad.husnick@kirkland.com

2.        **Counsel for the Independent Directors of Wayne Parent.**

Klehr Harrison Harvey Branzburg LLP
1835 Market Street, Suite 1400
Philadelphia, PA 19103
Attention:  Morton R. Branzburg
Telephone:  (215) 569-3007
Facsimile:  (215) 568-6603
E-mail address:  mbranzburg@klehr.com

Any pleading, notice, or other document required by the Plan to be served on or delivered to the Reorganized Debtor or, *after the Effective Date*, the Debtor, shall be served on the Reorganized Debtor, as set forth in the Plan Supplement.

After the Effective Date, the Debtor or Reorganized Debtor, as applicable, have authority to send a notice to Entities that to continue to receive documents pursuant to Bankruptcy Rule 2002, such Entity must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002.  After the Effective Date, the Debtor are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed such renewed request

H.      *Term of Injunctions or Stays.*

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or the Confirmation Order (including the Injunction) shall remain in full force and effect in accordance with their terms.

I.      *Entire Agreement.*

Except as otherwise indicated, the Plan, the Confirmation Order, and the Plan Supplement supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

J.      *Exhibits.*

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan.  After the exhibits and documents are Filed, copies of such exhibits and documents shall be available upon written request to the Debtor's counsel at the address above or by downloading such exhibits and documents from the Debtor's restructuring website at https://cases.primeclerk.com/toyspropcoI or the Bankruptcy Court's website at www.vaeb.uscourts.gov.

K.      *Nonseverability of Plan Provisions.*

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall not alter or interpret such term or provision to make it valid or enforceable; *provided* that at the request of the Debtor (in their sole discretion), the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such terms or provision shall then be applicable as altered or interpreted *provided* that any such alteration or interpretation shall be reasonably acceptable to the Creditors' Committee.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified absent consultation with the Creditors' Committee; and (3) nonseverable and mutually dependent.

L.      *Waiver or Estoppel.*

Each Holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, Secured or not subordinated by virtue of an agreement made with the Debtor or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers Filed with the Bankruptcy Court before the Confirmation Date.

M.      *Enforcement of the Confirmation Order.*

On and after the Effective Date, the Debtor and Reorganized Debtor, as applicable, shall be entitled to enforce the terms of the Confirmation Order and the Plan.

N.       *Votes Solicited in Good Faith.*

Upon entry of the Confirmation Order, the Debtor will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtor and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under the Plan and any previous plan, and, therefore, neither any of such parties or individuals will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan and any previous plan.

O.       *Creditor Default.*

An act or omission by a holder of a Claim or an Interest in contravention of the provisions of this Plan shall be deemed an event of default under this Plan. Upon an event of default, the Debtor or Reorganized Debtor, as applicable, may seek to hold the defaulting party in contempt of the Confirmation Order and shall be entitled to reasonable attorneys' fees and costs of the Debtor or Reorganized Debtor in remedying such default. Upon the finding of such a default by a creditor, the Bankruptcy Court may: (a) designate a party to appear, sign and/or accept the documents required under the Plan on behalf of the defaulting party, in accordance with Bankruptcy Rule 7070; (b) enforce the Plan by order of specific performance; (c) award judgment against such defaulting creditor in favor of the Debtor in an amount, including interest, to compensate the Debtor for the damages caused by such default; and (d) make such other order as may be equitable that does not materially alter the terms of the Plan.

*[Remainder of page intentionally left blank.]*

Respectfully submitted, as of the date first set forth above,

Dated:  December 24, 2018

Wayne Real Estate Parent Company, LLC

By:    */s/ Matthew Finigan*
Name:   Matthew Finigan
Title:    Executive Vice President - Chief Financial Officer and
Treasurer

Prepared by:

Edward O. Sassower, P.C.
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Emily E. Geier (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:   (212) 446-4800
Facsimile:    (212) 446-4900

-and-

Michael A. Condyles (VA 27807)
Peter J. Barrett (VA 46179)
Jeremy S. Williams (VA 77469)
**KUTAK ROCK LLP**
901 East Byrd Street, Suite 1000
Richmond, Virginia 23219-4071
Telephone:   (804) 644-1700
Facsimile:    (804) 783-6192

James H.M. Sprayregen, P.C.
Anup Sathy, P.C.
Chad J. Husnick, P.C. (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:   (312) 862-2000
Facsimile:    (312) 862-2200

*Co-Counsel to the Debtors and Debtors in Possession*