Edward O. Sassower, P.C.
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Emily E. Geier (admitted *pro hac* vice)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:         (212) 446-4800
Facsimile:         (212) 446-4900

-and-

Michael A. Condyles (VA 27807)
Peter J. Barrett (VA 46179)
Jeremy S. Williams (VA 77469)
**KUTAK ROCK LLP**
901 East Byrd Street, Suite 1000
Richmond, Virginia 23219-4071
Telephone:         (804) 644-1700
Facsimile:         (804) 783-6192

James H.M. Sprayregen, P.C.
Anup Sathy, P.C.
Chad J. Husnick, P.C. (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:         (312) 862-2000
Facsimile:         (312) 862-2200

*Co-Counsel to the Debtors and Debtors in Possession*

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| TOYS "R" US, Inc. *et al.* [1] | ) | Case No. 17-34665 (KLP) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| TOYS "R" US, INC. and GEOFFREY, LLC (f/k/a Geoffrey, Inc.), | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Adversary Proceeding No. 18-_____ |
| | ) | |
| AMIC TRADING (PTY) LTD, | ) | |
| | ) | |
| Defendant. | ) | |

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are set forth in the *Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief* [Docket No. 78]. The location of the Debtors' service address is One Geoffrey Way, Wayne, New Jersey 07470.

## COMPLAINT FOR TURNOVER FUNDS OWED TO GEOFFREY, LLC

Plaintiffs Toys "R" Us, Inc. and Geoffrey, LLC (the "Plaintiffs"), file this complaint in their capacity as parties to that certain license agreement dated as of January 1, 2006, as amended on July 1, 2011 and November 29, 2013 (the "License Agreement"), for turnover against AMIC Trading (PTY) LTD ("AMIC" or the "Defendant"). In support thereof, Plaintiffs allege as follows:

### Preliminary Statement

1.      AMIC owes Plaintiffs at least $1,237,314.61 in license fees and interest as of December 15, 2018.

2.      Despite repeated requests over the past year, AMIC has refused and continues to refuse to turn over the license fees plus interest that are due and owing to the Plaintiffs. AMIC's repeated refusal to pay clearly due and owing contractual fees has deprived the Plaintiffs and their creditors of value that is unquestionably owed. Therefore, Plaintiffs hereby file this adversary complaint to timely recover the funds that they are owed.

### The Parties

3.      Plaintiffs are the licensors under the License Agreement at issue. On September 19, 2017, Toys "R" Us, Inc. ("Toys "R" Us") and certain of its direct and indirect subsidiaries, as debtors and debtors in possession (collectively, the "Debtors"), filed a voluntary petition under Chapter 11 of the Bankruptcy Code. [Case No. 17-34665, Docket No. 1]. On November 21, 2018, this Court confirmed Plaintiff Geoffrey, Inc.'s chapter 11 plan of reorganization [Case No. 17-34665, Docket No. 5765]. On December 17, 2018, this Court confirmed Plaintiff Toys "R" Us' chapter 11 plan of reorganization [Case No. 17-34665, Docket No. 6021]. Toys "R" Us is in the process of winding down their affairs pursuant to confirmed chapter 11 plans of reorganization, but Plaintiff Geoffrey, Inc. will continue as a going concern in the business of licensing the Toys

"R" Us intellectual property.   Thus, licensing fees such as the ones at issue are a critical source of ongoing value for creditors of Geoffrey Inc.'s estate.

4.      The Defendant, AMIC, is the licensee under the License Agreement that gives rise to this dispute, as transferor to Redgwoods (Pty) Ltd as of November 12, 2012.

## Jurisdiction and Venue

5.      This Court has subject matter jurisdiction to consider and determine this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Relief Requested

6.      Pursuant to section 542 of Title 11 of the United States Code, Plaintiff seeks the turnover of at least $1,237,314.61 (inclusive of interest).

## Statement of Facts

**A.      The Plaintiffs and AMIC Enter into a Licensing Agreement in 2006, Which Was Later Amended and Extended.**

7.      On January 31, 2006, the predecessors to Plaintiffs and AMIC entered into a license agreement pursuant to which Defendant was granted a license to use certain Marks[2] owed by Plaintiff Geoffrey, LLC (then Geoffrey, Inc.) for the purpose of operating Toys "R" Us stores in South Africa.  *See* License Agreement dated January 1, 2006, attached as Exhibit A, § 3.1.  The original term of the License Agreement was ten (10) years, *id*. § 4, but the term of the agreement was extended via amendment on November 29, 2013 to August 31, 2028.  *See* License Agreement Amendment No. 2 dated November 29, 2013, attached as Exhibit B, § 3(F).

---

[2]      Terms not defined herein are used in accordance with the definitions set forth in the License Agreement.

8.      In exchange for the right to use the Marks, as of February 1, 2015, Defendant is required to make Continuing Royalty payments "equal to two and one-quarter percent (2.25%) of Licensee's Gross Revenues for each three month period ending at the end of each fiscal quarter." *See* Ex. A, § 6.2(a); Ex. B, § 3(L)(a).   In the instance Defendant does not make the required Continuing Royalty payment, they are required to pay interest "at the rate of 10% per annum… accruing daily from the date such amount is first due until such amounts, plus all interest thereon, are paid in full." *See* Ex. A, § 6.6.   Section 6.8 of the License Agreement, "Licensee May Not Withhold Payments," provides that the "Licensee shall not have the right to withhold or offset any payment of any Continuing Royalty or any other amount due to Licensors or their Affiliates pursuant to this Agreement on the grounds of the actual or alleged non-performance or breach of any of Licensors' or their Affiliates obligations under this Agreement or any other agreement between the parties…." *Id*. § 6.8.

**B.      The Debtors, including Plaintiffs, Filed For Chapter 11, and Defendant Ceased Making Licensing Payments, and Refused All Requests For Payment.**

9.      On September 19, 2017, Debtors, including Plaintiffs, filed a voluntary petition under Chapter 11 of the Bankruptcy Code.   Since that date, Defendant has failed to make multiple payments under the License Agreement as required by Sections 6.3 and 6.6.   The Defendant owes the Plaintiffs the following Continuing Royalty payments and accrued interest amounts as of December 15, 2018:

- April 30, 2018:
  - Continuing Royalty: $394,300.98
  - Interest: $24,738.34
- July 31, 2018:
  - Continuing Royalty: $389,686.87

- Interest: $14,626.60

- October 31, 2018:

  - Continuing Royalty: $408,920.34

  - Interest: $5,041.48

- **Total**: $1,237,314.61[3]

10.     Plaintiffs requested payment for overdue Continuing Royalty payments and Accrued Interest on June 25, 2018, September 26, 2018, and December 17, 2018.  *See* Ex. C, Letter dated December 17, 2018.  On December 20, 2018, Defendant responded to Plaintiff's December 17th letter, stating certain amounts had been paid into escrow, but refusing to remit the overdue amounts and interest.  *See* Ex. D, Letter dated December 20, 2018.

**Count I: Turnover of Continuing Royalty Payments and Accrued Interest**

11.     Plaintiff hereby repeats and realleges each of the above paragraphs as though fully set forth herein.

12.     Plaintiffs' Continuing Royalty payments and Accrued Interest on same constitutes property of the Debtors' estate under Section 541 of the Bankruptcy Code that is due and owing to the Plaintiffs and in the possession of the Defendant.  It is therefore subject to turnover pursuant to Section 542 of the Bankruptcy Code and Rule 7001 of the Federal Rules of Bankruptcy Procedure.

13.     All previously due Continuing Royalty payments and Accrued Interest are now due and payable to the Plaintiffs, who are Debtors in these Chapter 11 cases.

---

[3]     The amounts in Defendant's possession that rightfully belongs to Plaintiff increases daily, however.  *See* Ex. A, § 6.6.

14.     More than 120 days have passed since the Plaintiffs properly requested the return of the Continuing Royalty payments and Accrued Interest from the Defendant.  The Defendant has refused to return the Plaintiff's Continuing Royalty payments and Accrued Interest.  Pursuant to Section 505(a)(2)(B) of the Bankruptcy Code, the Bankruptcy Court may determine such contractual liability and require the Defendant to turn over the Continuing Royalty payments and Accrued Interest.

WHEREFORE, Plaintiff respectfully requests judgment in its favor and against AMIC requiring the turnover of the following funds:

a)      Continuing Royalty payments of at least $1,192,908.19 due to the Plaintiffs;

b)      Accrued payments of at least $44,406.42 adjusted for ongoing accumulation of interest at a rate of 10% daily of the date judgment is entered, due to the Plaintiffs; and,

c)      Reimbursement for attorneys' fees and other costs and expenses incurred with the investigation, preparation and prosecution of this action, *see* License Agreement § 19.12.

Richmond, Virginia
Dated:   December 31, 2018

/s/ Jeremy S. Williams
**KUTAK ROCK LLP**
Michael A. Condyles (VA 27807)
Peter J. Barrett (VA 46179)
Jeremy S. Williams (VA 77469)
901 East Byrd Street, Suite 1000
Richmond, Virginia 23219-4071
Telephone:    (804) 644-1700
Facsimile:    (804) 783-6192
Email:          Michael.Condyles@KutakRock.com
                    Peter.Barrett@KutakRock.com
                    Jeremy.Williams@KutakRock.com

*Co-Counsel to the Debtors*
*and Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C.
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Emily E. Geier (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900
Email:          edward.sassower@kirkland.com
                    joshua.sussberg@kirkland.com
                    emily.geier@kirkland.com

**-**and-

James H.M. Sprayregen, P.C.
Anup Sathy, P.C.
Chad J. Husnick, P.C. (admitted *pro hac vice*)
300 North LaSalle
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200
Email:          james.sprayregen@kirkland.com
                    anup.sathy@kirkland.com
                    chad.husnick@kirkland.com

*Co-Counsel to the Debtors*
*and Debtors in Possession*

# EXHIBIT A

## LICENSE AGREEMENT

THIS AGREEMENT, dated as of January 31, 2006 (this "**Agreement**"), by and among TOYS "R" US INTERNATIONAL, LLC, a Delaware corporation ("**TRU**"), GEOFFREY, INC., a Delaware Corporation ("**Geoffrey**" and together TRU, the "**Licensors**") and REDGWOODS (PTY) LTD,  a corporation organized under the laws of South Africa (the "**Licensee**").

## WITNESSETH

**WHEREAS**, the Licensors (or their affiliates) and Licensee are a party to that certain Franchise Agreement, dated as of January 1, 1996, as amended by Amendment No. 1, dated September 18, 1996, as further amended by Amendment No. 2 (incorrectly referred to as Amendment No. 1), dated as of June 7, 1999, as further amended by Amendment No. 3 (incorrectly referred to as Amendment No. 2), dated as of October 16, 2002, as further amended by Amendment No. 4, dated September 11, 2003 (collectively, the "**Franchise Agreement**"), pursuant to which Licensee operates retail stores under the name "Toys "R" Us" in South Africa;

**WHEREAS**, the Franchise Agreement expires by its terms on December 31, 2005.

**WHEREAS**, on April 22, 2005, the Licensee delivered a notice to Licensors, pursuant to Section 14 of the Franchise Agreement, stating its desire to extend the term of the Franchise Agreement an additional ten (10) years (i.e., December 31, 2015);

**WHEREAS**, each of the Licensors and the Licensee desire to renew the rights of the Licensee pursuant to and in accordance with the terms and conditions of this Agreement.

**NOW, THEREFORE**, in consideration of mutual covenants and agreements set forth below, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

## ARTICLE I
## DEFINITIONS

1.1.    <u>Definitions.</u>  In addition to the terms defined elsewhere in this Agreement, for all purposes of this Agreement, including the schedules and exhibits attached hereto, the following capitalized terms shall have the following meanings set forth in this Article I:

"**Advertising**" means any and all advertising, identification and promotional materials and programs of any type or nature whatsoever including, without limitation, print and broadcast advertisements, direct mail materials, catalogues, brochures, advertising specialties, stationery, business cards, signs, posters, displays, leaflets, newspaper and magazine advertisements and inserts, rotos, promotional mailouts, general mailings, telephone greetings, electronic media promotional material, promotional literature, and any other material or communication which either or both of the Licensors hereafter denominate as "advertising" in the Standards or otherwise, in each case in connection with or in furtherance of the Business.

24884-9

"**Affiliate**" in relation to any Person means any other Person that, directly or indirectly, through one or more intermediaries, Controls or is Controlled by or is under common Control with such Person.

"**Bankruptcy Event**" means, with respect to any Person, any of the following events: (i) such Person commences a case or other proceeding under any bankruptcy, reorganization, arrangement, adjustment of debt, relief of debtors, dissolution, insolvency, liquidation or similar law of any jurisdiction relating to it; (ii) there is commenced against such Person any such case or proceeding that is not dismissed within 60 days after commencement; (iii) such Person is adjudicated insolvent or bankrupt or any order of relief or other order approving any such case or proceeding is entered; (iv) such Person suffers any appointment of any custodian or receiver or the like for it or any substantial part of its property that is not discharged or stayed within 60 days; (v) such Person thereof makes a general assignment for the benefit of creditors; or (vi) such Person, by any act or failure to act, expressly indicates its consent to, approval of or acquiescence in any of the foregoing or takes any corporate or other action for the purpose of effecting any of the foregoing.

"**Business**" means the establishment and operation of the Stores pursuant to this Agreement and the Standards.

"**Business Day**" means (i) with respect to obligations of the Licensee, any day except Saturday, Sunday and any day on which banking institutions in South Africa are authorized or required by law or other governmental action to close and (ii) with respect to the obligations of the Licensors, any day except Saturday, Sunday and any day in which bank institutions in the State of New York are authorized or required by law or other governmental action to close.

"**Claims**" mean any and all actions, causes of action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, extents, executions, claims, demands whatsoever, in law, admiralty or equity.

"**Control**" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person or other entity whether by means of voting rights, contract or otherwise; provided, however, that the possession, directly or indirectly, of more than fifty percent (50%) of the voting stock for the election of directors shall always be deemed "Control."

"**Equity Interest**" means, with respect to any Person (other than an individual), (i) a direct or indirect beneficial interest (whether by stock, membership, partnership, profits or other similar interest) in such Person or (ii) any securities of such Person which entitle the holder thereof to acquire a direct or indirect beneficial interest (whether by stock, membership, partnership, profits or other similar interest) in such Person at any time, including without limitation, any debt, preferred stock, rights, options, warrants or other instrument that is at any time convertible into or exchangeable for, or otherwise entitles the holder thereof to receive, a direct or indirect beneficial interest in such Person.

24884-9                                                           2

"**Field Support Services**" means instructions, advice, consultation and training with respect to the operations, programs, procedures, guidelines, systems, specifications, techniques, products, merchandise and service which now or in the future are incorporated in the Standards.

"**Fiscal Year**" means the then applicable fiscal year of TRU, which is, as of the date of this Agreement, the 52 or 53 week period ending on the last Saturday nearest January 31

"**GAAP**" means the generally accepted accounting principles in South Africa.

"**Governmental Body**" means any government or political subdivision thereof, whether U.S. federal, state or local or of any other country or nation, including without limitation, any country situated within the Territory, or any agency or instrumentality of any such government or political subdivision thereof.

"**Gross Revenues**" equals (x) all revenues, payments and receipts from whatever source derived or received by the Licensee from, through, by or on account of the operation of the Business, whether received in cash, in service, in kind, from barter and/or exchange, on credit (whether or not payment on credit transactions is ultimately received by the Licensee), or otherwise, less (y) all documented refunds, charge backs, credits and allowances given in good faith to customers of the Stores by the Licensee and all sales, excise, value added and gross receipts taxes, including, but not limited to, value added and gross receipt taxes collected from customers, but not including any value added taxes included in the prices of purchases made by the Licensee, whether from the Licensors or any third party.  Value added and gross receipts taxes collected from customers shall be deductible from the computation of "Gross Revenues" only if the Licensee separately states such taxes when the customers are charged, remits such tax payments to the appropriate tax authorities in a timely manner, furnishes to the Licensors an official receipt issued by such tax authorities for payment of such taxes within thirty (30) days of such payment, or such other verification of payment as the Licensors may reasonably deem acceptable, and sets forth in the reports to be delivered to the Licensors as required by this Agreement the amount of all such taxes and the payments to which they relate.

"**Law**" means any law, statute, rule, regulation, order, judgment, injunction, or decree of any Governmental Body.

"**Losses**" mean all losses, liabilities, obligations, Claims, contingencies, damages, costs and expenses, including all judgments, amounts paid in settlement, interest, taxes and penalties, court costs and reasonable attorneys' fees, costs of investigation, discovery, case preparation, defense and/or appeal costs, expert witness fees, and disbursements.

"**Marks**" means (a) the trademarks and service marks shown on <u>Exhibit A</u> hereto, (b) the trade names Toys "R" Us, Babies "R" Us and any other trademark, service mark, copyrighted material or trade name used, adopted or intended to be used during the Term in or for the Stores, in each case as designated by the Licensors, and (c) Trade Dress and, in each case, as the same may be revised, modified, deleted, added, altered or amended from time to time by the Licensors, in their sole discretion.

24884-9                                              3

"**Permit**" means all certificates, authorizations, approvals, consents, permits or similar documentation issued by the appropriate Governmental Body, including, without limitation, ordinances, building codes and permit requirements.

"**Person**" means any individual, corporation, Governmental Body, limited liability company, partnership, trust, joint stock company, business trust, joint venture, unincorporated association or other entity.

"**Products**" means the products and services offered and sold in the Stores pursuant to this Agreement and the Standards, including, without limitation, toys, games, sports equipment, dolls, bicycles, electronic games, software, books, confections, clothing, infant formula, diapers, clothing accessories, furniture and related products and services, in each case as modified from time to time by the Licensors.

"**Relevant Exchange Rate**" means the arithmetic mean of the buying rate and the selling rate for conversion of a currency into U.S. dollars published or publicly announced by Absa Bank Limited.

"**Redgwoods Stores**" means the stores operated, directly or indirectly, by the Licensee and it's Affiliates under the names "Reggies," "Baby and Company" and "Little People", and any successor stores to the foregoing.

"**Standards**" means the standard operating procedures set forth by Licensors and in effect on the date hereof, as the same may be amended, modified, supplemented or changed by the Licensors from time to time, which Standards provide the operating standards, procedures and requirements by which Licensee shall operate the Business, which includes, without limitation, standards, procedures and requirements relating to store identification, fixtures, store color scheme and décor, store development; permitted and prohibited uses of Marks, store layout and design, exterior and interior signage, quality assurance programs, Advertising, public relations, purchase orders, store maintenance and appearance, staff training and customer and guest relations.

"**Stores**" means the Toys "R" Us Stores  and such other outlets as determined by the Licensors from time to time.

"**Territory**" means the geographical area comprising the countries of South Africa and, subject to the provision of Section 5.1 (b), Namibia, Zimbabwe, Botswana, Lesotho and Swaziland as constituted as of the date hereof.

"**Toys "R" Us Store**" means a freestanding or independent retail store, that operates under the name "Toys "R" Us" and that offers and sells the Products.

"**Transfer**" means the sale, transfer, assignment, pledge, mortgage, hypothecation, encumbrance, distribution or other disposition.

24884-9                                          4

"**Trade Dress**" means the store design and image developed and owned by the Licensors for the Stores.

## ARTICLE II
## TERMINATION OF FRANCHISE AGREEMENT

2.1.    <u>Termination of Franchise Agreement</u>.  Effective as of the date of this Agreement, the Franchise Agreement shall be terminated and of no further force and effect and shall be replaced in its entirety by this Agreement and the terms and conditions hereof; provided, however, that Licensee shall continue to be obligated to pay any and all payments due but not yet paid to Licensors pursuant to and in accordance with the terms and conditions of the Franchise Agreement.

## ARTICLE III
## GRANT OF LICENSE

3.1.    <u>Grant of License</u>.  The Licensors hereby grant to the Licensee a sole and exclusive license (the "**License**") to operate, subject to the Standards, during the Term (as hereinafter defined), one or more Stores solely within the Territory and to use and display the Marks solely in the operation of the Stores, subject to the Licensee's performance and satisfaction of the conditions set forth in this Agreement.

## ARTICLE IV
## TERM AND RENEWAL

4.1.    <u>Term</u>.  The term of this Agreement shall commence on the date hereof and shall continue until December 31, 2015, unless earlier terminated in accordance with the terms of this Agreement (the "**Initial Term**").

4.2.    <u>Renewal</u>.  Subject to the satisfaction or waiver by the Licensors of the conditions set forth in Section 4.3, the Licensee shall have the right to renew this Agreement on the same terms and conditions for an additional ten (10) year period (the "**Renewal Term**") by notifying the Licensors, in writing (the "**Renewal Notice**"), of its intention to renew this Agreement for the Renewal Term not later than one (1) year prior to the expiration of the Initial Term.  For the avoidance of doubt, this Agreement may not be renewed without the prior written consent of the Licensors after December 31, 2025, and, unless this Agreement terminates or expires prior to such date, all rights granted hereunder shall terminate on December 31, 2025.  The Initial Term and the Renewal Term, if any, shall collectively be referred to as the "**Term**."

4.3.    <u>Renewal Conditions</u>.   The Licensee shall not have the right to deliver a Renewal Notice, and this Agreement shall not be renewed for the Renewal Term, unless at the time of the giving of the applicable Renewal Notice and at the commencement of the applicable Renewal Term, the following conditions have been satisfied or waived by the Licensors:

(a)    the Licensee shall have fully performed, be in compliance with and not be in material breach of any of (x) its obligations under this Agreement and any amendments thereto,

24884-9                                              5

(y) the Standards (as modified from time to time), and (z) all other agreements then in effect between the Licensee and any of its Affiliates, on the one hand, and the Licensors and any of their respective Affiliates, on the other hand;

       (b)    the Licensee shall have satisfied all monetary obligations to Licensors or its Affiliates under this Agreement or otherwise;

       (c)    the representations and warranties of the Licensee set forth in this Agreement shall be true and correct in all respects;

       (d)    the Licensee shall have delivered to Licensors a certificate, signed on behalf of the Licensee by its chief executive officer, certifying the statements set forth in clauses (a)-(c) have been met.

# ARTICLE V
# TERRITORY; ACTIVITIES

5.1.   <u>Territory</u>. (a) Licensee's right to establish and operate Stores and the Business and use the Marks is restricted and limited solely to the Territory and in accordance with the terms and conditions of this Agreement.  Licensee's shall not establish and operate any Stores or use the Marks outside of the Territory.

       (b) Notwithstanding anything to the contrary herein, with respect to each of Namibia, Zimbabwe, Botswana, Lesotho and Swaziland, if the Licensee shall not have opened and be operating at least one (1) Store (i) in Namibia by December 31, 2010, (ii) in Zimbabwe by December 31, 2010, (iii) in Botswana by December 31, 2010, (iv) in Lesotho by December 31, 2010, or (v) in Swaziland by December 31, 2010, then the Licensors shall have the right, in their sole discretion, by delivery of written notice to the Licensee to terminate this Agreement with respect to each such country that has not had at least one Store opened therein by the date specified above, and, thereupon, all rights in such country granted hereunder shall revert to the Licensors and, for purposes of this Agreement, such country shall be deemed deleted from the definition of Territory.

5.2.   <u>Licensee Permitted Activities</u>.

       (a)    Except as set forth in Section 5.2(b), below, during the Term, the Licensee shall only sell or offer to sell the Products in the Stores situated within the Territory, and use the Marks in connection therewith.  The Licensee is also permitted to maintain and operate a web site on the Internet that contains information about hours of the Stores' operation and for general advertising and promotion of the Stores.

       (b)    Notwithstanding the activities permitted in Section 5.2(a) above, Licensee shall have the right to (i) continue to own and operate each of the Redgwoods Stores that are opened and operating as of the date hereof and (ii) open additional Redgwoods Stores following the date of this Agreement; provided, however, the type and quantity of Products sold or offered for sale and the amount of space dedicated to selling such Product in each Redgwoods Store is

24884-9                    6

consistent with past practice in the ordinary course and such Redgwoods Stores shall continue to have a substantially similar look, feel and design as the Redgwoods Stores operated as of the date of this Agreement. The parties hereto agree that each Redgwood Store may increase in size; provided, however, Licensee agrees that each Redgwood Store shall be at, at all times, less than 600 square meters in size and each Toys "R" Us Store shall at all times be greater than 750 square meters in size. Licensee shall not, directly or indirectly, use any of the Marks in connection with the operation of any of the Redgwoods Stores.

5.3.    Licensee Restricted Activities. Except as permitted pursuant to Section 5.2 above or as otherwise mutually agreed in writing between the parties, the Licensee shall not, directly or indirectly, engage in the following activities during the Term (the "**Restricted Activities**"):

        (a)    use the Marks, other than in connection with the operation of the Stores;

        (b)    sell or offer to sell Products in any store, outlet or channel of distribution, including without limitation, wholesale sale (i.e., sale or distribution to a third party for resale, retail sale, use in manufacturing, or further distribution) (other than the whole sale of poorly-performing inventory through a clearance or other similar type of sale) or retail sale (i.e., sale directly to an ultimate consumer), direct mail, catalogues, computer network sales (i.e., World Wide Web or other on-line network), telemarketing and/or telephonic "call in" sales facilities, shops, boutiques, departments, facilities or space situated upon the premises of or within other enterprises, establishments or facilities of any type or nature whatsoever; or

        (c)    engage in any commerce, including without limitation, computer driven "electronic commerce", whatsoever with respect to the offer or sale of any Products, or establish, maintain, participate in, advertise, offer, display or sell any Products by or through any means, including without limitation, the Internet, World Wide Web or other computer network; or

        (d)    operate any other business or conduct any activity from or within a Store, except for the Business.

5.4.    Licensors Restricted Activities. During the Term, the Licensors and their respective Affiliates shall not operate any Store within the Territory or grant a license, franchise or other right to a third party to operate a Store within the Territory. Notwithstanding the foregoing, and for avoidance of doubt, nothing herein shall prevent or restrain the Licensors and their respective Affiliates from establishing or operating, directly or indirectly, whether through a joint venture or the granting of a license or franchise or other right to any Person to establish and operate, a Store outside of the Territory (even if any such Store is situated in immediate proximity to, adjacent to or abutting the boundary of, the Territory).

5.5.    Rights Reserved By Licensors. Notwithstanding anything in this Agreement to the contrary, Licensors reserve the right, directly or indirectly, whether by themselves, through a joint venture or the granting of a license or franchise or other right to any Person, to do any or all of the following:

24884-9                                    7

(a)    to offer and sell within the Territory any and all products, service, and/or programs of any type or nature whatsoever through computer network sales (i.e., World Wide Web or other on-line network), catalogues, telemarketing and/or telephonic "call in" sales facilities;

(b)    to manufacture, or cause to be manufactured, any Products bearing the Marks in the Territory; and

(c)    to merge or consolidate with or into, or purchase all or substantially all of the assets of, or be acquired by, or become an Affiliate of or Affiliated with, through joint venture or otherwise, another Person that, directly or indirectly, has its headquarters in, has any office in, or operates a business or conducts other activities in, the Territory; provided, however, that such Person will not be permitted to operate such business or activity using the Marks in the Territory or operate a competing business in the Territory, except as otherwise set forth in this Agreement.

## ARTICLE VI
## ROYALTY AND OTHER PAYMENTS TO LICENSORS

6.1.    <u>Initial Fee</u>.  There shall be no initial or renewal fee (as contemplated by Section 14.1 of the Franchise Agreement) payable by the Licensee to the Licensors as a result of the execution of this Agreement.

6.2.    <u>Continuing Royalty</u>.

(a)    In consideration of Licensors' grant to Licensee of the License pursuant to the terms and conditions of this Agreement, Licensee shall pay to Geoffrey, in consideration for the license to use the Marks, a continuing quarterly payment (the "**Continuing Royalty**") equal to three percent (3%) of Licensee's Gross Revenues for each three-month period ending at the end of each of fiscal quarter of each Fiscal Year.

(b)    Notwithstanding the foregoing, for each New Store (as hereinafter defined) opened by Licensee during a Fiscal Year, Licensee shall pay to the Geoffrey an amount equal to 2% of the Gross Revenues attributable to such New Store for such Fiscal Year.  For avoidance of doubt, the parties agree that the amount of Gross Revenues for such New Store shall be calculated pursuant to this 6.2(b) from the date such New Store is opened until the end of the Fiscal Year in which such New Store opened.  Following the end of the Fiscal Year in which the New Store was opened, the Licensee shall pay the Continuing Royalty calculated in accordance with 6.2 (a).  For purposes of this subsection, "**New Store**" means a Store opened at a new location that adds to the previous maximum number of Stores then operated by the Licensee, but shall not include a Store that has been remodeled, relocated, or otherwise acts as a replacement for a Store, in each case as mutually agreed by the parties prior to such New Store being opened.

6.3    <u>Manner of Payment</u>.

24884-9                                    8

(a)    Each and every payment due to Licensors hereunder shall be made, by wire transfer, in immediately available funds, in U.S. Dollars, to such bank account or accounts as designated by Licensors for such purpose.

(b)    When calculating the Continuing Royalty payable hereunder, the amounts due shall be converted to United States Dollars using the Relevant Exchange Rate on the last Business Day of the fiscal quarter in which the Continuing Royalty payment relates.  All other amounts due to the Licensors hereunder shall be converted to U.S. Dollars at the Relevant Exchange Rate in effect when such amounts first become due and payable or in effect when the amounts are actually paid, whichever rate is more favorable to Licensors.

(c)    All costs of currency exchange, if any, and electronic transfers of funds shall be borne by Licensee.

6.4.    <u>Commencement of Payments</u>.  Except as expressly provided in this Agreement, the Continuing Royalty due hereunder will commence accruing on the date of execution of this Agreement.  Licensee shall pay to Geoffrey the Continuing Royalty not later than 30 days following the end of the fiscal quarter of each Fiscal Year.  Concurrent with each payment made, Licensee shall deliver a statement to Geoffrey, setting forth all Gross Revenues for the applicable preceding three-month period and the amount of the Continuing Royalty due thereon.  All other payments due Licensors with regard to products and/or service provided by Licensors or any of their Affiliates will accrue on such dates and on such terms as specified by Licensors or such Affiliate.

6.5.    <u>Other Payments to Licensors</u>.  In addition to any other payments required under this Agreement, Licensee shall pay to Licensors or their Affiliates immediately upon demand by Licensors any and all amounts advanced by Licensors, or which Licensors have paid, or for which Licensors have become obligated to pay, on behalf of Licensee for any reason.

6.6.    <u>Interest</u>.  Licensee shall pay to Licensors interest on any amounts past due pursuant to this Agreement at the rate of 10% per annum (or such lesser maximum amount that is permitted to be paid by applicable law), accruing daily from the date such amount is first due until such amounts, plus all such interest thereon, are paid in full.  Notwithstanding the foregoing, the Licensee acknowledges that the accruing of interest on any unpaid amounts due under this Agreement will not constitute an agreement by Licensors or their Affiliates to accept any payments after they are due, or a commitment by Licensors or their Affiliates to extend credit to Licensee or otherwise finance the operation of the Business hereunder.  Licensee also acknowledges and agrees a failure to pay any and all amounts due under this Agreement at such times as such payments are first due will constitute a material breach of this Agreement which, will result in this Agreement being terminated.

6.7.    <u>Application of Funds</u>.  All payments made by the Licensee to the Licensors under this Agreement will be first applied to interest on any unpaid amounts, and then to the amount of the oldest obligation due and payable hereunder.

24884-9                                                9

6.8.    <u>Licensee May Not Withhold Payments</u>.  Licensee shall not have the right to withhold or offset any payment of any Continuing Royalty or any other amount due to Licensors or their Affiliates pursuant to this Agreement on the grounds of the actual or alleged non-performance or breach of any of Licensors' or their Affiliates obligations under this Agreement or any other agreement between the parties (including agreements for the sale of products and merchandise or the providing of services by Licensors to Licensee).

**ARTICLE VII**
**REPRESENTATIONS AND ACKNOWLEDGEMENTS OF LICENSEE**

7.1.    <u>Representations of Licensee</u>.  Licensee represents, warrants and acknowledges to the Licensors as follows:

(a)    <u>Organization and Qualification</u>.  Licensee is an entity duly incorporated or otherwise organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation, organization or formation (as applicable), with the requisite power and authority to own and use its properties and assets and to carry on its business as currently conducted.  The Licensee is not in violation of any of the provisions of its certificate or articles of incorporation, memorandum of association, bylaws or other organizational or charter documents.  Licensee is duly qualified to conduct business and is in good standing as a foreign corporation or other entity in each jurisdiction in which the nature of the business conducted or property owned by it makes such qualification necessary.  Prior to the execution of this Agreement, Licensee shall have furnished to Licensors true and correct copies of its organizational or charter documents.

(b)    <u>Authorization; Enforcement</u>.  Licensee has the requisite power and authority to enter into and to consummate the transactions contemplated by this Agreement and otherwise to carry out its obligations hereunder.  The execution and delivery of this Agreement by the Licensee and the consummation by it of the transactions contemplated hereby have been duly authorized by all necessary corporate action on the part of the Licensee and no further action is required by the Licensee in connection therewith.  This Agreement has been (or upon delivery will have been) duly executed by the Licensee and, when delivered in accordance with the terms hereof, will constitute the valid and binding obligation of the Licensee enforceable against the Licensee in accordance with its terms.

(c)    <u>No Conflicts</u>.  The execution, delivery and performance of this Agreement by the Licensee and the consummation by it of the transactions contemplated hereby do not and will not: (i) conflict with or violate any provision of the Licensee's organizational or charter documents, or (ii) conflict with, or constitute a default (or an event that with notice or lapse of time or both would become a default) under, or give to others any rights of termination, amendment, acceleration or cancellation (with or without notice, lapse of time or both) of, any agreement, credit facility, debt or other instrument (evidencing debt or otherwise) or other understanding to which the Licensee is a party or by which any property or asset of the Licensee is bound or affected, or (iii) result in a violation of any Law, any court or Governmental Body to which the Licensee is subject, or by which any property or asset of the Licensee is bound or affected.

24884-9                                    10

(d)   <u>Litigation</u>.  There is no action, suit, inquiry, notice of violation, proceeding or investigation pending or threatened against or affecting the Licensee or its Affiliates or any of their respective properties before or by any court, arbitrator, Governmental Body or administrative agency or regulatory authority (collectively, an "**Action**") which adversely affects or challenges or could adversely affect or challenge the legality, validity or enforceability of this Agreement or the operation of the Business.   Neither the Licensee nor its Affiliates nor any of their respective officers, director or equityholders is or has been for the last three years, the subject of any Action involving a Claim or violation which adversely affects or challenges or could adversely affect or challenge this Agreement or the operation of the Business.

(e)   <u>Labor Relations</u>.  No labor dispute exists or is imminent with respect to any of the employees of the Licensee.

(f)   <u>Compliance</u>.  The Licensee (i) is not in default under or in violation of (and no event has occurred that has not been waived that, with notice or lapse of time or both, has had or could reasonably be expected to result in a default by the Licensee under), nor has the Licensee received notice of a Claim that it is in default under or that it is in violation of, any indenture, loan or credit agreement or any other agreement or instrument to which it is a party or by which it or any of its properties is bound (whether or not such default or violation has been waived), (ii) is not in violation of any order of any court, arbitrator or Governmental Body, and (iii) is not and has not been for the past five years in violation of any Law, including without limitation all Laws relating to taxes, environmental protection, occupational health and safety, product quality and safety and employment and labor matters.

(g)   <u>Liabilities</u>.  Licensee does not have any liabilities, adverse claims, commitments or obligations of any nature as of the date of execution of this Agreement, whether accrued, unliquidated, absolute, contingent or otherwise which are not reflected as liabilities on the balance sheets of Licensee's current financial statements, which financial statements Licensee has furnished to Licensors prior to the execution hereof.

(h)   <u>No obligation on part of Licensors</u>.  Licensee acknowledges and agrees that Licensors may, but need not, provide any service or support to the Licensee in connection with the Licensee's operation of the Business or the Stores, and that the Licensors will have no affirmative obligation to provide any such services or support.  Notwithstanding the foregoing, Licensors will continue to provide marketing support to the Licensee, perform store visits, participate in conference calls with the Licensee, and provide suggestions on the operation of the Business.

(i)   <u>Disclosure</u>.  All representations and warranties of the Licensee set forth in this Agreement and all information and documentation provided by the Licensee to the Licensors are true and correct and do not contain any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made therein, in light of the circumstances under which they were made, not misleading.

24884-9                                              11

## ARTICLE VIII
## SITE APPROVAL; STORE DEVELOPMENT AND OPERATIONS

8.1     Store Approval and Development.

       (a)     Site Approval

          (i)     Prior to the opening of any Store, the Licensee shall select a site within the Territory suitable (in the reasonable belief of the Licensee) for the operation of such Store (such site, the "**Proposed Site**") and submit to the Licensors, in writing, a report, in the form provided by the Licensors to the Licensee, (the "**Proposed Site Report**") containing the information required by the Standards to be provided, including a site layout and preliminary fixture layouts for the Proposed Site

          (ii)     The Licensors shall use their commercially reasonable efforts to approve or disapprove any such Proposed Site within thirty (30) days of the receipt from the Licensee of the Proposed Site Report, such approval to be given or withheld upon Licensors reasonable discretion and good faith judgment.  If the Proposed Site is disapproved by the Licensors or the Licensee shall not have expressly approved a Proposed Site, the Licensee shall not open or operate, directly or indirectly, a Store at the Proposed Site.

          (iii)     The Licensee acknowledges and understands that the Licensors' approval of a Proposed Site, if given, does not constitute any assurance by Licensors that a Store will be profitable at the Proposed Site or more profitable at such Proposed Site in comparison to other locations.  Approval by the Licensors, if given, is only an indication that a particular Proposed Site meets the requirements of the Standards and Licensors shall have no responsibility for the performance (financial or otherwise) of any Store located on any site approved.

8.2.     Furnishings.  In connection with the development and operation of each Store, the Licensee shall use only equipment, furniture, fixtures and signs displaying the Marks that comply with the Standards.

8.3.     Approvals Required.  Prior to the opening of any Store, the Licensee agrees to do or cause to be done, at its sole cost and expense, the following:  (i) obtain lawful possession of the Proposed Site, (ii) secure all financing required, if any, to develop fully such Store; (iii) obtain and comply with all required zoning changes, building, utility, signage, health, safety, sanitation and business permits and licenses and any other required Permits; (iv) decorate such Store in compliance with the Standards; (v) purchase, lease or otherwise obtain the use of, and install, all equipment, furniture, fixtures and signs required to comply with the Standards; (vi) have installed computer and information systems necessary so that the Licensee may comply with the information requirements of the Standards and this Agreement; (vii) purchase an opening inventory; and (viii) obtain all customary contractors' statements and partial and final waivers of lien for construction, remodeling, decorating and installation service (if obtainable in the Territory).

8.4     Leases

24884-9                                              12

(a)    The Licensee shall make available to Licensors, at Licensees' request, copies of all leases, subleases, licenses and any other agreement from the registered owner of the property with respect to the construction, use and/or occupancy of a Store on such property, together with any renewals, amendments or modifications thereto (collectively, referred to as a "**Lease**") in connection with the opening or continued operation of a Store.

(b)    With regard to any Lease, Licensee covenants and agrees with the Licensors as follows:

(i)    Licensee shall not create any obligations on behalf of Licensors or any of their Affiliates, grant any rights against Licensors or any of Affiliates, or agree to any term, condition or covenant which is inconsistent with any provision of this Agreement or any related agreement;

(ii)    Licensee agrees to duly and timely perform all terms, conditions, covenants and obligations under the Lease and all related agreements or documents;

(iii)    Except as otherwise provided in this Agreement, Licensee may not assign, charge, dispose, encumber or transfer any of its rights or obligations under the Lease, or sublet all or any portion of any Store to any Person;

(iv)    Licensee shall use its commercially reasonable efforts to include in each Lease a provision prohibiting the lessor under such Lease, to the extent within such lessor's control, from allowing any third party from operating any store or business within ____ meters of any Store, if such store or business operated by such third party competes with the Business.

8.5.    Store Relocation.  Licensee may not relocate any Store to another location without first obtaining Licensors' written approval for the new location as if such new location was a Proposed Site.  Any such relocation will be at Licensee's sole cost and expense, and Licensee shall promptly reimburse Licensors for any and all costs and expenses incurred by Licensors in connection with the Licensors review of such relocation.

8.6.    Store Build-Out.  Licensee shall, at its sole cost and expense, make all leasehold improvements and install all fixtures, furniture and equipment at each Store as may be required to comply with the Standards.

8.7.    Signs.  All interior and exterior signs used in connection with any Store shall conform to the Standards.

8.8.    Minimum Number of Stores.  During the Term, the Licensee shall operate no less than ten (10) Stores.

8.9    Training and Technical Assistance

(a)    In connection with the opening of a Store, Licensors may require or Licensee may request, certain of Licensee's personnel, including without limitation, the Business Manager and Store Managers (each as hereinafter defined), to attend and successfully complete

24884-9                                          13

special training programs provided or sponsored by Licensors. Licensee shall pay all costs and expenses of such Licensee's personnel in connection with attending such programs, including, without limitation, all travel, meals, lodging and other living expenses. Licensors shall not charge any fees to Licensee for these training programs.

(b)     Upon terms and conditions mutually agreed to between the parties (including the payment of costs and expenses), Licensors will send its personnel to a location requested by the Licensee for the purpose of performing such training or attending such program

(c)     The Licensors shall determine, in their sole and absolute discretion, the duration and subject matter of any training programs and the right to train any number of individuals from any number of licensed or non-licensed businesses at the same time.

8.10.  Field Support Service

(a)     If requested by Licensee, Licensors may, but need not, furnish to Licensee, at no additional charge, Field Support Services as Licensors alone considers advisable. Licensors' representatives may render Field Support Service either on-site, off-site, by telephone, through electronic communications or through other communication devices, as determined by Licensors. The timing of all such Field Support Service will be subject to the availability of Licensors' personnel, as determined by Licensors in their sole and absolute discretion.

(b)     If Licensee requests, Licensors may, but need not, furnish to Licensee, for a fee, certain additional services beyond the Field Support Services. The price, timing and location of the provision of such additional services will be mutually agreed between the parties.

8.11.  On-Going Training. If Licensee requests, Licensors may, but need not, from time to time conduct conferences, conventions, or training sessions or other programs, the duration, curriculum and location of which shall be determined by Licensors in their sole and absolute discretion. Licensee and its personnel may be invited or may be required to attend such conferences, conventions and/or training sessions. No fee will be imposed by Licensors for such conferences, conventions and training sessions, but Licensee shall pay all costs and expenses incurred by Licensee and its personnel in connection therewith including, without limitation, transportation costs, meals, lodging and living expenses.

8.12  Marketing, Advertising, Training and Other Materials

(a)     If requested by Licensee, Licensors (directly, or through an Affiliate) may, but need not, offer and sell to Licensee any of the following materials and service upon such terms and conditions as mutually agreed to between the parties at the time of offer and sale: (i) material and documentation related to Advertising; (ii) forms used in the operation of the Business; (iii) media buying service (i.e., purchasing media time and/or print space and placing commercials and/or advertisements on behalf of Licensee); (iv) direct mail marketing materials and/or the service of mailing these materials to prospective customers situated within the Territory; and (v) visual training aids.

24884-9                                      14

(b)     Licensee acknowledges that any or all of the foregoing materials was or will be developed for use by Licensors or its Affiliates for its own use. Licensee shall, at its sole cost and expense, revise such materials to clearly designate Licensee as the owner and operator of the Store. No title to the contents, format, layout, design, graphics or any other element of such Advertising material shall pass to Licensee, and Licensee must immediately and permanently cease using same upon the expiration or earlier termination of this Agreement.

8.13.   <u>Private Label Products, Exclusive Products and Merchandise</u>. Licensee acknowledges that (i) Licensors, their Affiliates or designees may, from time to time, manufacture for or on behalf of Licensors and its Affiliates certain private label products and merchandise which may bear one or more of the Marks (collectively, the "**Private Label Products**") and (ii) Licensors and their Affiliates may, from time to time, obtain exclusive rights from third party vendors or manufacturers to sell certain products and merchandise (collectively, the "**Exclusive Products**"), in each case which Licensors, their Affiliates and/or such third party vendors may offer for sale to Licensee. Notwithstanding the foregoing, Licensors and their Affiliates shall have no obligation to offer or sell to Licensee any of the aforementioned Private Label Products or Exclusive Products, and Licensee shall have no obligation to purchase any of the aforementioned Private Label Products or Exclusive Products. In addition, Licensors, their Affiliates or designees may, from time to time, offer to Licensee other products and merchandise (collectively, the "**Merchandise**"). The terms and conditions of any purchase and sale of the Private Label Products, the Exclusive Products and the Merchandise shall be on mutually agreed to terms and conditions. Nothing herein shall be construed or interpreted as and Licensors and their Affiliates neither make nor intend, nor authorize any agent or representative to make, any representation or warranty, either express or implied, with respect to such Private Label Product, Exclusive Product or Merchandise. Licensors and their Affiliates and designees expressly exclude and disclaim all implied warranties of merchantability and fitness for a particular purpose with respect to such products. Unless otherwise agreed to by the Licensors in writing, Licensee shall not sell or offer to sell any Private Label Product, Exclusive Product, Merchandise or any other product sourced or acquired through the Licensors or its Affiliates other than through the Stores.

8.14.   <u>Merchandise Facilitation Service</u>. From time to time, Licensors and/or one or more of their Affiliates may operate, or contract for the operation of, a merchandise facilitation service to facilitate the purchase of goods and merchandise (including, without limitation, facilitation, consolidation and quality control), including the use of Licensors' Hong Kong office or any other such office Licensors may establish, or other logistics service provided by any of the Licensors' global merchandising operations (such service, the "**Merchandise Facilitation Service**"). In consideration for the Merchandise Facilitation Service, Licensee shall pay to Licensors a service fee equal to 110% of the actual costs (including all internal and out-of-pocket fees and expenses) of procuring and delivering the products to Licensee, which amount represents the standard world-wide service fee charged by Licensors to its other licensees and franchisee for such service. In no event will Licensee be required to utilize or participate in any such Merchandise Facilitation Service.

24884-9                                    5

## ARTICLE IX
## DUTIES OF LICENSEE

9.1.    <u>Permits for Operation</u>.  During the Term, Licensee shall effect such registrations and filings as may be necessary under the laws of the Territory to conduct the activities contemplated by this Agreement and obtain all required business, building, zoning and other permits and/or licenses to carry out Licensee's obligations hereunder, in each case, in Licensee's sole cost and expenses.

9.2.    <u>Standards</u>.  Licensees shall at all times during the Term operate the Business and each Store in accordance with the terms of this Agreement and the Standards; provided, that in the case of any inconsistency between the terms of this Agreement and the Standards, then the terms of this Agreement shall prevail.  Licensors retain the right, at any time and from time to time, to revise, modify, amend or otherwise change the Standards, in which case the Licensors shall notify the Licensee.  If such Standards are revised, modified, amended or otherwise changed, Licensee shall conform each Store to such revised Standards as promptly as possible.

9.3.    <u>Maintenance and Repair</u>.  At all times throughout the Term, Licensee shall, at its sole expense, maintain the interior and exterior of each Store, and keep and maintain all equipment, furniture, decorating, signs and appurtenances situated in or at such store, in the highest degree of cleanliness, maintenance, condition and repair, both as required by the Standards and as may otherwise be desirable or necessary.

9.4.    <u>Compliance with Laws and Permits</u>.  Licensee shall operate the Business in strict compliance with all applicable Laws and other requirements of each Governmental Body having jurisdiction within or over the Territory, or any portion thereof.  Licensee shall obtain and keep in good standing all necessary Permits required of Licensee to operate the Business and to offer and sell the Products from the Stores.   In the event that a court, arbitrator or Governmental Body having jurisdiction within or over the Territory, or any portion thereof, notifies the Licensee that it desires to review this Agreement or the Licensee determines (based on the advise of its counsel) that this Agreement is required to be submitted to such court, arbitrator or Governmental Body for review, the Licensee shall promptly notify the Licensors, but in no event later than 30 days' prior to the proposed date of submission of this Agreement to such court, arbitrator or Governmental Body.  In the event that such Governmental Body determines that any term of this Agreement violates a Law, then the parties shall use their commercially reasonable efforts to amend this Agreement so as to be in compliance with such applicable Law; provided, that if (i) the parties cannot agree on the terms of such amendment within 30 calendar days after such determination or (ii) Licensors determine in their sole discretion that such amendment would materially adversely effect any of its respective rights under this Agreement, then, upon notice to the other party, this Agreement shall terminate.

9.5.    <u>Payment of Taxes</u>.  The Licensee shall file all tax returns which are required to be filed by it and shall pay all taxes shown as due thereon, prior to the date on which any penalties would attach thereto, and the Licensee shall pay and discharge any assessments or governmental charges imposed in connection therewith, together with all other lawful claims and obligations for labor, materials and supplies or otherwise.  Licensee shall withhold all applicable withholding taxes

24884-9

required by law to be withheld resulting from the payment of the Continuing Royalty to the Licensors and shall remit, as promptly as possible, such withheld amounts to the applicable taxing authorities. Licensee shall deliver to Licensors any and all receipts evidencing the payment of the withholding taxes. All monies payable by the Licensee to the Licensors pursuant to the terms of this Agreement, including, without limitation, the Continuing Royalty, shall be without reference or taking account of any taxes payable by the Licensee (including, without limitation, withholding taxes).

9.6.    Business Manager and Store Manage.

(a)    Throughout the Term, the Licensee shall designate one individual person to have ultimate supervisory responsibility for the management of the Business (the "**Business Manager**"). The Business Manager shall exercise direct supervision and personally participate in the direct operation of the Business and the Stores. Licensee shall notify Licensors in writing as to the identity of the Business Manager (and any successor or placement Business Manager). The Licensors may require each Business Manager to attend and successfully complete a special training program conducted by Licensors, and complete any other reasonable training at the times and places Licensors specifies.

(b)    Throughout the Term, Licensee shall designate one manager for each Store (such person, the "**Store Manager**"). Licensee shall inform Licensors in writing as to the identity of each the Store Manager. Each Store Manager will have day-to-day management responsibility for its respective Store, exercise on-premises supervision of such Store, and personally participate in the direct operation of such Store.

(c)    Notwithstanding the designation of a Business Manager and Store Manager, the Licensee shall be solely responsible for the operation of the Business and complying with each and every obligation under this Agreement and the Standards.

9.7.    Products. Licensee shall offer and sell only those Products in the Stores permitted by the Standards. The Licensors reserve the right to test, analyze, inspect or randomly sample the products or service of any Licensee-proposed supplier at Licensee's expense. At any time and from time to time, Licensors may require Licensee to discontinue offering any Product which, in Licensors' opinion, does not conform to the Standards or the image of quality, ethics, packaging, source or specifications established by Licensors in connection with the operation of the Business.

9.8.    Returned Merchandise. Licensee's policy with respect to returns of Products shall be consistent with the Standards.

9.9.    Sales, Barter and Exchange. The Stores shall only accept cash or credit cards in connection with the sale of the Products and not through any barter or exchange of any product or services.

9.10.    Hours of Operation. Each Store shall be open and operating on such days and during such minimum hours as Licensee may from time to time specify, subject to approval by the Licensors;

24884-9    7

provided, however, that Licensee will comply with any worldwide promotion conducted by Licensors requiring the Stores to be open during hours beyond the approved minimum.

9.11.    Sales.  All retail sales conducted at any of the Stores shall be processed, consummated and recorded through computerized cash registers.  Licensee agrees to procure, install, and maintain at Licensee's cost and expense, the computerized cash register system and software options (including, without limitation, a polling package), associated computer hardware, required dedicated telephone and power lines, modems, and other related accessories or peripheral equipment as specified in the Standards or otherwise required by Licensors.  Licensee must accurately, consistently and completely record, structure and all information concerning the operation of the Business, including recording all sales at the time of receipt.

9.12.    Trade Accounts.  Licensee shall maintain its trade accounts in a current status and shall promptly resolve any disputes with its trade suppliers.  Licensee shall maintain its relationship with trade accounts and suppliers in a manner so as to not in any way impair the goodwill of the Licensors or their respective Affiliates.

9.13.    No Conflicting Agreements.  Throughout the Term, Licensee shall not be party to any contract, agreement, understanding, mortgage, Lease or restriction of any type or nature which may conflict with, or be breached by, the execution, delivery, consummation or performance of this Agreement or the transactions contemplated hereby.

9.14.    Best Efforts.  Licensee agrees to use its best efforts to develop and expand the market for the Products offered by the Business and to cooperate with Licensors in accomplishing the purposes of this Agreement.

9.15.    Bookkeeping and Accounting.  Licensee shall be solely responsible for performing and bearing the costs and expenses of all bookkeeping, record keeping and accounting functions necessary to comply with the reporting obligations prescribed in this Agreement or in the Standards.

9.16.    Submission of Sales Reports.  Licensee shall submit to Licensors true and correct copies of daily, weekly, monthly, semi-annual and annual sales reports (whether electronic or otherwise) regarding the activity of the Business and the Stores that Licensors may from time to time prescribe and as necessary to comply with the reporting obligations set forth in the Standards.

9.17    Restrictions on Issuances and Transfers of Equity Interest in Licensee.

(a)    The Licensee shall not, directly or indirectly, issue an Equity Interest in Licensee, a Store or a Lease without the prior written consent of Licensors, which consent may be given or withheld in Licensors' sole and absolute discretion.

(b)    No holder of an Equity Interest of Licensee, a Store or a Lease shall, directly or indirectly, Transfer any of such Equity Interest without the prior written consent of Licensors, which consent may be given or withheld in Licensors' sole and absolute discretion.

24884-9                                                18

(c)    Any such issuance or Transfer that has not been approved Licensors in advance shall be null, void and of no effect.

9.18.   Right of First Refusal.

(a)    If the Licensee or any holders of Equity Interests in the Licensee (the "**Proposed Seller**") shall at any time receive an offer for, and/or determine to sell a direct or indirect interest in this Agreement, the License, the Stores or any direct or indirect Equity Interests in the Licensee, then such Proposed Seller shall (i) obtain a bona fide, executed written offer and either (x) an earnest money deposit (in the amount of at least five percent (5%) or more of the offering price) or (y) a written offer that by its terms is irrevocable and may not be withdrawn or cancelled until at least the expiration of the 30-day period referred to below, from a responsible and fully disclosed purchaser (collectively, the "**Offer**"). Concurrently upon the receipt thereof by Proposed Seller, shall deliver a true and complete copy of the Offer and any proposed agreements (together with a certified translation thereof into the English language if not written in English) and (ii) concurrently with the receipt thereof, submit the same to the Licensors.

(b)    Following its receipt of the Offer, the Licensors or any of their respective designees shall have the right, exercisable by written notice delivered to the Proposed Seller, within thirty (30) days from the date of delivery of the Offer, to purchase such interest for the price and on the terms and conditions contained in such Offer; provided that the Licensors or its respective designees may substitute cash, a cash equivalent or marketable securities reasonably acceptable to Licensee, in each case of equal value for any form of payment proposed in such Offer. The Licensors or their respective designees shall he entitled to purchase such interest subject to customary representations and warranties, including, without limitation, representations and warranties as to ownership, condition and title to the Equity Interests any liens or encumbrances relating to the foregoing and assets, validity of contracts, and liabilities, contingent or otherwise.

(c)    If the Licensors or its respective designees do not exercise its right of first refusal pursuant to this Section, the Proposed Seller may consummate the sale to such purchaser pursuant to and on the exact terms of such Offer, subject to the Licensors' approval of the transfer pursuant to Section 9.17.

(d)    If the sale to such purchaser is not consummate within one hundred and twenty (120) days after delivery of the Offer the Licensors, or if there is a material change in the terms or conditions of the Offer, the Proposed Seller, shall be required to again comply with the provisions of this Section 9.18.

(e)    Title rights of the Licensors under this Section 9.18 shall be prior to, and take precedence over, any first refusal or similar rights granted to the holders of Equity Interests in the Licensee's articles or memorandum of association or other charter documents or otherwise.

9.19.   No Encumbrance.  Licensee shall not, during the Term, pledge, encumber, hypothecate or otherwise Transfer to any Person a security interest in this Agreement, the Licensee, the Business, any Lease, the Stores, any leasehold improvements or fixtures, furniture and equipment within a

24884-9                                    19

Store, any assets (real or personal) of the Licensee or any Equity Interests of Licensee or its Affiliates, in any manner, without Licensors' prior written consent, which consent may be given or withheld in Licensors' sole and absolute discretion.

9.20.   No Ability to Bind Licensors.   The Licensee shall not have any power to obligate Licensors for any expenses, liabilities or other obligations.   Licensors do not assume any liability and will not be deemed liable, for any agreements, representations, or warranties made by Licensee.   Licensors will not be obligated for any damages to any person or property which directly or indirectly arise from or relate to the operation of the Business.

**ARTICLE X**
**INDEMNIFICATION**

10.1   Indemnification

(a)   Licensee shall defend, indemnify and hold harmless to the fullest extent permitted by law, Licensors and their Affiliates, each of their respective corporate parents and subsidiaries and the successors, assigns and designees of each of the foregoing, and, the respective directors, officers, employees, agents, shareholders, designees and representatives of each (collectively, the "**Licensor Indemnitees**") from, against and in respect of, and shall pay and reimburse the Licensor Indemnitees for, any and all Claims, Losses, costs, expenses, obligations, liabilities, damages, recoveries and deficiencies of any kind, including costs of investigation, interest, penalties, reasonable attorney's fees and costs of investigation, whether or not arising from third-party claims, that any such Licensor Indemnitee may suffer or incur as a result of or relating to:  (i) any breach, or inaccuracy of, or failure by the Licensee to perform, any of the representations, warranties, covenants or agreements, as the case may be, contained in this Agreement, (ii) the operation of the Business and the Stores, (iii) any claims or demands by creditors of Licensee, (iv) any personal injury or death suffered by any customer, visitor, employee or guest of the Stores, (v) claims of any type or nature advanced by or against Licensee or any of Licensee's officers, directors, shareholders, agents, employees, representatives and contractors by a third party (or, as applicable, against a third party) or between or among themselves, (vi) crimes committed on or near any of the premises, facilities or Stores, (vii) claims of liability for products manufactured or supplied or service performed by third parties which are offered, sold or utilized by Licensee in the operation of the Business (including product liability), (ix) Licensee's alleged or actual violation or breach of any contract or Lease, (x) Licensee's alleged or actual violation of any Law applicable to Licensee or the Business, whether within or outside of the Territory, (xi) any acts, errors, or omissions by Licensee or Licensee's officers, directors, management, employees, agents, servants, contractors, partners, proprietors, affiliates or representatives, (xii) all liabilities arising from or related to Licensee's offer, sale and delivery of Products or any other products, goods, merchandise and service sold or offered in the Stores, (xiii) Licensees' use of the Marks in a manner not consistent with the terms and conditions of this Agreement or the Standards, (xiv) all "vicarious liabilities" imposed upon the Licensor Indemnitees by any Law and (xv) errors and omissions of Licensee's contractors, subcontractors and others when constructing, converting, remodeling, renovating or otherwise performing any work upon any Store.

24884-9                                    20

(b)    All claims for indemnification by the Licensor Indemnitees (in such capacity, an "**Indemnified Party**") against the Licensee (in such capacity, an "**Indemnifying Party**") relating to a Claim (as defined below) shall be asserted and resolved as set forth in this Section.

(i)    In the event that any Claim for which an Indemnifying Party would be liable to an Indemnified Party is made against or sought to be collected from any Indemnified Party, promptly after the assertion of any such Claim, the Indemnified Party shall notify the Indemnifying Party of such Claim; provided, however, that the failure promptly to give such notice shall not affect any Indemnified Party's rights hereunder. The Indemnified Party shall advise the Indemnifying Party in writing of all facts relating to such assertion within the knowledge of the Indemnified Party. The Indemnified Party shall afford the Indemnifying Party the opportunity, at the Indemnifying Party's sole cost and expense, to participate in the defense thereof and, if the Indemnifying Party so chooses, to assume the defense of such Claims and to settle or compromise any Claim. Should the Indemnifying Party so elect to assume the defense of such Claim, the Indemnifying Party will not be liable to the Indemnified Party for legal expenses subsequently incurred by the Indemnified Party in connection with the defense thereof, except as specifically provided below. If the Indemnifying Party assumes such defense, the Indemnified Party shall have the right to participate in the defense thereof, it being understood that the Indemnifying Party shall control such defense, and in any such action or proceeding, the Indemnified Party shall have the right to retain its own counsel, but the fees and expenses of such counsel shall be at its own expense unless (1) the Indemnifying Party and the Indemnified Party mutually agree to the retention of such counsel or (2) the named parties to any such suit, action, or proceeding (including any impleaded parties) include both the Indemnifying Party and the Indemnified Party, and in the reasonable judgment of the Indemnified Party, representation of the Indemnifying Party and the Indemnified Party by the same counsel would be inadvisable due to actual or potential differing or conflicts of interests between them; provided that the Indemnifying Party shall only be responsible for the reasonable fees and expenses of one counsel (in addition to local counsel) for the Indemnified Party. The Indemnifying Party shall be liable for the fees and expenses of counsel employed by the Indemnified Party for any period during which the Indemnifying Party has not assumed the defense thereof. The Indemnified Party shall not have the right to settle or compromise any Claim subject to indemnification under this Section without the prior written consent of the Indemnifying Party other than a claim for monetary damages. The Indemnifying Party may not without the prior written consent of the Indemnified Party agree to any settlement of any claim or action (i) as a result of which any remedy or relief, other than solely for monetary damages for which the Indemnifying Party will be responsible hereunder, will be applied to or against the Indemnified Party or (ii) which does not include as an unconditional term thereof the giving by the claimant or the plaintiff to the Indemnified Party of a release from all liability in respect of such claim or action in form and substance reasonably satisfactory to the Indemnified Party.

(ii)    The Indemnifying Party shall keep the Indemnified Party fully informed at all times of the status of the claim. Each party shall cooperate in the defense or prosecution of any Claim. Such cooperation shall include the retention and (upon the request of the party defending such Claim) the provision to such defending party of records and information

24884-9                                21

which are reasonably relevant to such claim and making of employees available on a mutually convenient basis to provide additional information and explanation of any matters relating to such claim.

## ARTICLE XI
## INSPECTION

11.1.    <u>Inspection.</u>  Licensee agrees that Licensors or any of their authorized agents or representatives may at any time, during normal business hours, with or without prior notice to Licensee, enter any of the Stores, offices, warehouses to determine compliance with this Agreement and the Standards.  Licensors' representatives may examine and inspect the facilities, the programs, Products, merchandise, and the goods and service contained therein and offered and sold therefrom, and the books and records related to the operation of the Business..  Licensors or any of their authorized agents or representatives may also freely confer with Licensee's employees and customers.  Following such inspection, and subject to the other provisions of this Agreement, Licensee agrees to use commercially reasonable efforts to incorporate into the Business any corrections and modifications Licensors may require for the Business as promptly as possible.

## ARTICLE XII
## INSURANCE

12.1.    <u>Required Insurance Coverage</u>.  Licensee shall purchase at its expense, and maintain in effect at all times during the Term and for two years thereafter, the categories of insurance coverage for the Business, each Store and the offices and warehouses of the Licensee, in the form and in the amounts set forth on Schedule XII attached hereto, such insurance to be in forms and through insurance companies reasonably satisfactory to Licensors, and shall name the Licensors and the Licensor Indemnitees as additional insureds.

(a)    Further, the insurance shall (i) provide that the coverage afforded applies separately to each insured against whom a claim is brought as though a separate policy had been issued to each insured; (ii) not contain any provision which in any way limits or reduces coverage for Licensee if there is a claim by any one or more of the Licensor Indemnitees; (iii) extend to and provide indemnity for all obligations assumed by Licensee under this Agreement and all other items for which Licensee is required to indemnify Licensors under this Agreement; (iv) be primary to and without right of contribution from any other insurance purchased by Licensor Indemnitees; (v) provide, by endorsement, that Licensors are entitled to receive at least thirty days prior written notice of any intent to reduce policy limits, restrict coverage, cancel, not renew or otherwise alter or amend the policy; and (vi) at Licensee's option, be included in a package policy format.

(b)    Licensee understands and agrees that Licensors may from time to time modify and supplement the types, minimum limits, deductibles and self-insured provisions of insurance coverage required to be obtained and maintained by Licensee.  Licensors shall do so by written notice to Licensee.  Upon delivery of any such written notice, Licensee shall immediately purchase insurance conforming to the newly established insurance requirements so imposed by Licensors.

24884-9                                                              22

(c)    Licensee shall not reduce the policy limits, restrict coverage, cancel or otherwise alter or amend these insurance policies without Licensors prior written consent. If there is a claim by any one or more of the Licensors Indemnitees against Licensee, Licensee shall, upon Licensors' request, assign to Licensors all rights which Licensee then has or thereafter may have with respect to the claim against the insurers providing the coverages described in this Section.

12.2.    Purchase of Insurance on Licensee's Behalf. If Licensee fails, for any reason, to purchase insurance conforming to the requirements prescribed by Licensors, Licensors may obtain, with prior notice to Licensee, the insurance necessary to meet these requirements on Licensee's behalf, through agents and insurance companies of Licensors' choosing; provided that the premiums for such insurance will be reasonable in comparison to other similar insurance products offered in the Territory. Licensee shall be responsible for the payments for any such insurance so obtained by Licensors, and shall immediately either pay the required premiums or, if already advanced by Licensors, reimburse Licensors for the premiums. Nothing contained in this Agreement will impose any duty or obligation on Licensors to obtain or maintain any specific forms, kinds or amounts of insurance on behalf of Licensee.

12.3.    No Undertaking or Representation. Nothing contained in this Agreement may be considered an undertaking or representation by Licensors that the insurance that Licensee is required to obtain (or that Licensors obtains for Licensee) will insure Licensee sufficiently (or at all) against any or all insurable risks of loss which may arise out of or in connection with the operation of the Business.

12.4.    Certificates of Insurance. Licensee shall promptly provide Licensors with certificates of insurance evidencing the required coverage designated herein no later than the date immediately preceding the opening of the initial Store. Licensee shall renew all insurance policies and documents, and on renewal shall furnish renewal certificates of insurance to Licensors before the expiration date of the policy in question. Licensors may at any time require Licensee to forward to Licensors full copies of all insurance policies.

**ARTICLE XIII**
**ADVERTISING**

13.1.    Advertising. All Advertising used by Licensee in connection with, and in furtherance of, the Business, shall conform to the Standards. Licensee shall submit to Licensors, for prior written approval, before use or dissemination, copies of all proposed Advertising that is not in conformity with the Standards ("**Non-Conforming Advertising**"). All such Non-Conforming Advertising submitted to Licensors shall be translated into English. Unless so provided by or approved by Licensors, Licensee shall not use or disseminate any Non-Conforming Advertising. Licensee shall furnish to Licensors copies of all Advertising used by Licensee in connection with, and in furtherance of, the Business as promptly as possible after the use thereof, in each case, translated into English.

(a)    Licensee acknowledges that Licensors shall not be required to pay for any Advertising.

24884-9                                          23

(b)      Notwithstanding the foregoing, Licensee shall conduct all Advertising in a dignified manner, and in a manner to avoid fraud, deception, misrepresentation, embarrassment, shame, ridicule, disparagement or liability of any type or nature whatsoever accruing to the Licensors, the Licensee, the Business, the Stores or any other Person, including, without limitation, other licensees and franchisees of the Licensors.

(c)      If, in the determination of Licensors, Licensee has breached the provisions of this Section, Licensors will notify Licensee in writing of the facts which Licensors believe have given rise to such breach.  If Licensee does not cure the breach within three days following delivery of such notice (including purchasing and placing any corrective advertising Licensors may require), then Licensors may place any such corrective advertising and Licensee shall promptly reimburse Licensors the expense of such corrective advertisement.

**ARTICLE XIV**
**REPORTING REQUIREMENTS; AUDIT**

14.1.   Reporting Requirements.  The Licensee shall furnish to the Licensors the following information and reports:

(a)      Daily Gross Revenue Reports.  On each day, the amount of Gross Revenue for the previous day, denominated in the local currency of the Territory.

(b)      Weekly Gross Revenue Reports.  Beginning with the first Sunday following the opening of the initial Store, within 2 Business Days after the end of each week (ending on Saturday night), the amount of Gross Revenue for such week, denominated in local currency of the Territory, setting forth in each case in comparative form the corresponding figures for the corresponding period of the preceding fiscal year and for each Store in operation for more than one year (i.e., comparative store sales).

(c)      Monthly Gross Revenue Reports.  Beginning with the first month of the opening of the initial Store, within 2 Business Days after the end of such month, the amount of Gross Revenue for such month, denominated in local currency of the Territory, setting forth in each case in comparative form the corresponding figures for the corresponding period of the preceding fiscal year and for each Store in operation for more than one year (i.e., comparative store sales).

(d)      Annual Reports. As soon as available and in any event within 75 days after the end of each Fiscal Year, a copy of the annual audit report for such year for the Business, including therein balance sheets of the Licensee with respect to such Business as of the end of such Fiscal Year and statements of income and retained earnings and of changes in financial position of the Licensee with respect to the Business for such Fiscal Year, setting forth in each case in comparative form the corresponding figures for the preceding Fiscal Year, reported on by, and accompanied by an opinion of the Licensee's independent accounting firm, all prepared in accordance with GAAP as in effect in the country in the domicile of the Licensee consistently applied, with a reconciliation to GAAP in the United States.

24884-9

24

(e)    Budgets.  As soon as available and in any event within 30 days prior to the end of each Fiscal Year, a business plan and projected financial statements for the Business forthcoming Fiscal Year.

(f)    Other Information.  Such other information respecting the operations of the Business or any Store, financial or otherwise, as the Licensors may from time to time request.

14.2.    Use of Reports by Licensors.  The Licensee acknowledges that the reports furnished to Licensors pursuant to this Agreement, including without limitation, the financial reports furnished pursuant to this Article, will be used by Licensors and incorporated in Licensors financial statements and tax returns that Licensors file with government and regulatory agencies, including the U.S. Securities and Exchange Commission.  Licensee covenants and agrees that all such information furnished by it to the Licensors will be true, correct and complete in all respects.

14.3.    Report Formats.  All reports furnished by Licensee pursuant to this Agreement shall be in English, and shall be delivered in written format or as otherwise agreed to between the parties hereto.

14.4.    Business Review Procedures.  At least annually the Licensee's senior management responsible for the Business shall be available to meet with representatives of the Licensors at a location determined by Licensors to review financial information about the Business and to discuss operating results and procedures, including, without limitation, budgeting, capital expenditures, development, advertising, marketing, personnel development, community involvement, accounting systems, and other aspects of the Business.

14.5.    Financial Records and Audit.  Licensee shall properly record all revenues received by the Business.  Licensee shall keep and maintain adequate records of such revenues, and shall maintain and preserve accurate books, records and tax returns, including related supporting material (such as cash receipts and credit and charge records) for the Business and each Store for at least five (5) years.  Licensee shall keep and preserve for five (5) years the types and classes of records (electronic and/or otherwise) of all business, personnel, financial and operating records (electronic and/or otherwise) relating to the Business.

14.6.    Audit.  Licensors, their agents, designees and employees will have the right, at any time, upon reasonable written notice to Licensee, to enter any of Licensee's facilities during regular hours to inspect, audit and make copies of all records of the Licensee including, without limitation, bank statements, cash or other receipts, checkbooks, documents, records related to value added tax (or any equivalent thereof), sales, income and other tax returns, and, files of Licensee relating to the Business, including, without limitation, operating records, bookkeeping and accounting records, customer lists, any and all reports concerning a Store, correspondence, general business records, invoices, payroll records, journals, ledgers.  Licensee shall make any of these materials available for examination at Licensee's premises.  If an audit reveals that Licensee understated the amount of the Continuing Royalty by 2% or more for any period of examination, then in addition to paying the additional amounts due and interest as calculated above, Licensee shall immediately pay Licensors the full cost of the audit for the entire period of examination.

24884-9                                   25

## ARTICLE XV
## CONFIDENTIAL INFORMATION

**15**    Restriction on Use of Confidential Information

(a)    During the Term hereof and at all times thereafter, each party shall keep confidential and shall not use except in the performance of its obligations under this Agreement, any proprietary technical or other business information of the other party including, without limitation, the following items, all technical or other business information of the disclosing party or its respective Affiliates, including, without limitation, the Standards, all procedures, systems, techniques and activities employed in the course of offering or selling products, goods, merchandise and services, all pricing paradigms established by the disclosing party or its respective Affiliates, all of the disclosing party's or its respective Affiliates sources (or prospective sources) of supply and all information pertaining to same (including, without limitation, wholesale pricing structures), store construction, build-out, design, decor, equipment, signage and appurtenance specifications, all information pertaining to Advertising, computer network "web" sites, instructional materials, quality assurance programs, supervision systems, record keeping and accounting systems and materials, revenue reports, activity schedules, job descriptions, records pertaining to customers, business forms, general operations materials, all goods, products, merchandise or service required or permitted to be offered and sold at any Store and the means and manner of offering and selling same, underlying literary material, creative elements, style guides, research material and data, specifications, processes, technological developments, strategies, policies and procedures employed by the other in the operation of their respective business or other materials as well as other confidential and information unrelated to the foregoing such as patents, copyrights, trademarks, trade secrets, sales and financial data, prices and manufacturing and distribution methods and including the financial and other terms of this Agreement, which such party has heretofore obtained or may obtain during the Term, or which has been or may be developed by such party, as well as any proprietary technical or business information of third parties which is made available to such party in connection this Agreement (collectively, the ("**Confidential Information**")).

(b)    The parties shall operate as though any information disclosed by either party to the other party, either directly or indirectly, in writing, orally, or by inspection of tangible objects (including without limitation documents, prototypes, samples, plant and equipment), whether or not designated as "Confidential", "Proprietary" or some similar designation, is Confidential Information.

(c)    Confidential Information shall not, however, include any information which (i) was publicly known and made generally available in the public domain prior to the time of disclosure by the disclosing party; (ii) becomes publicly known and made generally available after disclosure by the disclosing party to the receiving party through no action or inaction of the receiving party; (iii) is already legally in the possession of the receiving party at the time of disclosure by the disclosing party as shown by the receiving party's files and records immediately prior to the time of disclosure; (iv) is obtained by the receiving party from a third party without a breach of such third party's obligations of confidentiality; or (v) is independently developed by the

receiving party without use of or reference to the disclosing party's Confidential Information, as shown by documents and other competent evidence in the receiving party's possession.

(d)    Each party agrees that, at all times both during the term of this Agreement and thereafter, it keep all of such Confidential Information of the other party in confidence and trust; shall not use such other party's Confidential Information other than as expressly permitted herein or with the other party's prior approval.  Neither party shall directly or indirectly disclose to the public or to any person and/or entity that does not need to know such information any of the terms of this Agreement without the other party's approval, unless otherwise required to do so by any Law, in the opinion of such disclosing party's counsel, such information is otherwise required to be disclosed.  Notwithstanding the foregoing, the Licensors may use and incorporate any Confidential Information of the Licensee in connection with the operation of its or its Affiliates businesses.

(e)    Each party acknowledges and agrees that damages at law will be an insufficient remedy in the event that any of the covenants contained in this Article XV are violated.  Accordingly, in addition to any other remedies or rights that may be available, each party shall also be entitled, upon application to a court of competent jurisdiction, to obtain injunctive relief to enforce the provisions of this Article XV and shall require the receiving party to account for and pay over to the disclosing party all compensation, profits, monies, accruals, increments or other benefits derived or received by the receiving party as the result of any transactions constituting a breach of any of the provisions of this Section.

(f)    For avoidance of doubt, Licensee shall not use any Confidential Information in connection with the operation of any of the Redgwoods Stores or other business in which the Licensee or any of it's  Affiliates is engaged, except as permitted by the terms and conditions of this Agreement.

(g)    This Section shall survive the expiration or earlier termination of this Agreement

## ARTICLE XVI
## NON-COMPETE, NON-SOLICITATION

16.    Covenant Not to Compete.

(a)    Except as otherwise set forth in this Agreement, Licensee agrees that during the Term and for a period of one (1) year thereafter, neither it nor any of its Affiliates, or other Person holding a legal or beneficial interest in any Person which is a Licensee or an Affiliate of a Licensee, shall, directly or indirectly, anywhere in the world, engage in, affiliate with, assist or in any fashion serve, any other Person which offers or sells, through any means or manner whatsoever (including, without limitation, stores, other retail outlets, catalogues, telephone "call in" centers and/or the Internet or any other computer network) products, goods, merchandise or service identical, similar or related in any way to the types of products, goods, merchandise and service which now or in the future Licensee offers and sells as part of the Business, whether toys, games, electronic games, software, books, confections, infant formula, diapers and/or related

24884-9                                          27

products; clothing, accessories, furniture, and/or related products; and/or, babies' clothing, accessories, furniture and/or related products, or which engage in any of the activities in which this Agreement contemplates that Licensee or the Business will engage (collectively, a "**Competitive Business**").

(b)    Licensee and its Affiliates are prohibited from engaging in any Competitive Business as a proprietor, partner, investor, shareholder, director, officer, employee, principal, agent, adviser or consultant, and regardless of whether Licensee is to receive compensation, directly or indirectly or not from such Competitive Business; provided, however, that nothing in this Section will prevent Licensee from owning, for investment purposes only, up to an aggregate of 5% of the capital stock of any Competitive Business, so long as the Competitive Business is a publicly held corporation whose stock is listed and traded on a national or international stock exchange and so long as Licensee does not an Affiliate of the company in question.

16.2.    Covenant not to Solicit.    During the Term and for one (1) year thereafter, Licensee and Licensee's Affiliates shall not hire any employee of the Licensors or any of Licensors' respective Affiliates or solicit any employee of Licensors or its Affiliates to leave the employ of the Licensors or its Affiliates, as the case may be.

16.3.    Licensee's Shareholders.    If Licensee is a corporation, Licensee shall cause all of its shareholders (or, if a publicly traded corporation, shareholders owning 2% or more of the issued and outstanding stock of Licensee), to refrain from any of the competitive activities described above in any manner which Licensors reasonably requests.    If Licensee is a partnership, Licensee shall cause each general partner or other beneficial owner to refrain from any of the competitive activities described above in any manner which Licensors reasonably requests.    If Licensee is a limited partnership, Licensee shall cause its general partner and the shareholders of such, to refrain from any of the competitive activities described above in any manner which Licensors reasonably requests.

16.4.    Enforcement.    Licensee acknowledges that a violation of the covenants contained in this Article would result in immediate and irreparable injury to Licensors for which no adequate remedy at law will be available.    Accordingly, Licensee consents to the entry of an injunction prohibiting any conduct by Licensee in violation of the terms of such covenant.

**ARTICLE XVII**
**MARKS**

**7    Identification of Licensed Marks.**

(a)    Licensee acknowledges that Geoffrey's rights in the Marks are not limited to the specific presentation or configuration of any of them, but rather extend to all combinations and displays of the words and/or designs elements thereof and extend to all translations thereof in any language.    Further, Licensee acknowledges and agrees that Geoffrey's rights in and to the Marks are not limited to such rights as may be conferred by registrations thereof or by applications for registrations but, instead, include extensive common law and other rights in the

24884-9                                28

Marks vested in Geoffrey as a result of the use thereof by Geoffrey and other authorized parties in the United States and in nations around the world.

(b)   Licensee shall not use, and shall not permit or cause another to use, the Marks, except in the manner and to the extent specifically licensed to Licensee hereunder, including pursuant to the Standards. Each such use of any Mark will accurately portray same and will not be used or portrayed in a manner which jeopardizes the goodwill associated therewith, the Stores or the Business. Without limiting the foregoing, Licensee's use of the Marks shall comply with the Standards, as same may be modified from time to time, and any other use and quality restrictions, requirements and guidelines as may be specified by Licensors.

17.2.   <u>Licensee's Non-Ownership of Marks</u>. Nothing in this Agreement will give Licensee any right, title or interest in or to any of the Marks, except as a mere privilege and license, during the term of this Agreement, to display and use the Marks in accordance with this Agreement and the Standards. Licensee expressly understands and agrees that it is bound not to represent in any manner that it has acquired any ownership or equitable rights in any the Marks by virtue of the limited license granted under this Agreement, or by virtue of Licensee's use of any of the Marks. Under no circumstance may Licensee sublicense, assign in whole or in part, pledge, encumber, hypothecate or otherwise Transfer or grant to any third party any of Licensee's interest in the Marks, and any violation of this restriction shall entitle Licensors to immediately terminate this Agreement upon notice to Licensee (with no right to cure afforded). All uses of the Marks by Licensee, whether as a trademark, service mark, trade name, trade style or otherwise, will inure to the benefit of Geoffrey. Following the expiration or termination of this Agreement, no monetary amount will be attributable to any goodwill associated with the Marks or its operation of the Business licensed hereunder, including any "local goodwill".

17.3.   <u>Acts in Derogation of the Marks</u>. Licensee agrees that the Marks are the exclusive property of Geoffrey. Licensee asserts and will in the future assert no claim to any goodwill, reputation or ownership of the Marks by virtue of Licensee's licensed use of the Marks, or for any other reason. Licensee acknowledges that all good will associated with the use of the Marks shall inure to the benefit of the Licensor. Licensee agrees that it will not do or permit any act or thing to be done in derogation of any of the rights of Geoffrey in connection with the Marks, either during or after the term of this Agreement. Licensee shall not apply for or obtain any registration for the Marks, including any trademark, service mark, domain name, or copyright registration of any of the licensed Marks or any confusingly similar marks in its own name or in the name of any other party. Licensee shall use the Marks only for the uses and in the manner licensed under this Agreement and as provided in this Agreement. Licensee agrees that it will not, during or after the term of this Agreement, in any way dispute or impugn the validity of the Marks, the rights of Geoffrey to the Marks, or the rights of Licensors, their Affiliates or other Licensees of Licensors to use the Marks.

17.4   <u>Use and Display of Marks</u>

(a)   Licensee in each instance shall use the Marks only as previously authorized in writing by Licensors and at all times in full compliance with rules prescribed from time to time by Licensors, as part of their Standards or otherwise. Licensee is prohibited (except as expressly

provided in this Agreement) from using any Mark with any prefix, suffix, or other modifying words, terms, designs or symbols (other than logos licensed by Licensors to Licensee).  Licensee may not use any Mark in connection with the sale of any unauthorized product, service or program or in any other manner not explicitly authorized in writing by Licensors.  Licensee may use the Marks only for the operation of the Business licensed hereunder or in Advertising for the Business licensed hereunder.  Licensee's right to use the Marks is limited to the uses authorized under this Agreement.  Any unauthorized use of the Marks by Licensee will constitute an infringement of Licensors' rights and a material and incurable breach of this Agreement which, unless waived by Licensors, will entitle Licensors to terminate this Agreement immediately upon notice to Licensee, with no opportunity to cure.

(b)     Licensee may not use the Marks in any way which will incur any obligation or indebtedness on behalf of Licensors.  Licensee shall comply with Geoffrey's instructions in filing and maintaining all requisite trade name or fictitious name registrations, and to execute any documents and take any action deemed necessary by Licensors or its counsel to obtain protection for the Marks (including any new, substitute or modified Marks hereafter designated by Geoffrey) or to maintain their continued validity and enforceability.

(c)     Licensee shall affix the Marks to the Stores and the uniforms, equipment, fixtures, signs, stationery, Advertising, sales/promotional materials and other objects, in the size, color, lettering style and fashion and at the places which Licensors may designate.  Licensee shall also display the Marks and any relevant trademark and copyright notices applicable or necessary for the protection of the Marks or as otherwise required from time to time by the Licensors.  Except as expressly provided in the Standards or otherwise, Licensee may not erect or display in or on its facilities, stationery, advertising, sales or promotional materials or any other objects bearing any other trademarks, logotypes, symbols or service marks.  Licensee may not use any names, marks or logotypes other than the Marks in connection with the Business.

17.5.   Non-Use of Trade Name.  The Licensee shall not use the Marks or any confusingly similar words or symbols in Licensee's name.  In particular, Licensee may not use the words "Toys 'R' Us" or any variant or translation of same, as part of its name.

### Required Means of Identification

(a)     Each Toys "R" Us Store shall do business only under the name "Toys "R" Us" (the "Store Name").

(b)     Licensee shall, at its sole cost and expense, perform any filings and secure any required or necessary governmental approvals or registrations required to do business under the requisite Store Name.

(c)     All Advertising used by Licensee in connection with the Business shall include the applicable Store Name in the English language set forth in Licensors' minimum required text and logos, in the size and style prescribed by Licensors in its Standards or otherwise.

### Defense of Marks By Geoffrey

24884-9                                      30

(a)   If Licensee receives notice, is informed or learns of any Claim against it on account of any alleged infringement, counterfeiting, passing off, unfair competition or similar matter relating to the use of the Marks, as licensed hereunder, Licensee shall promptly notify Geoffrey and shall not communicate with any third party other than Geoffrey and their counsel regarding any such Claim. Geoffrey will then promptly take any action it may consider necessary, including action in the name of Licensee, to protect and defend Licensee against the Claim and indemnify Licensee against any loss, cost or expense incurred in connection with the Claim (except for costs related to any substituted Marks which Geoffrey may require), so long as the claim is based solely on any alleged infringement, unfair competition, counterfeiting, passing off or similar matter relating to the use of the Marks as licensed hereunder. Licensee may not settle or compromise the claim by a third party without Geoffrey' prior written consent. Geoffrey will have the right to defend, compromise and settle the claim at its sole cost and expense, using its own counsel. Licensee shall cooperate fully with Licensors in connection with the defense of the claim; shall execute any and all instruments and documents required by Geoffrey; and, shall do such acts and things as may, in the opinion of Geoffrey's counsel, be necessary or advisable to protect the interests of Geoffrey and their Affiliates in any litigation or other proceeding, or to otherwise protect and maintain the interests of Geoffrey and their Affiliates in the Marks. Licensee grants irrevocable authority to Geoffrey, and appoints Geoffrey as Licensee's attorney in fact, to defend and/or settle all claims of this type. Licensee may participate at its own expense in the defense or settlement, but Geoffrey's decisions with regard to the defense and/or settlement will be final. All damages, costs and/or attorneys' or experts' fees or disbursements awarded to Geoffrey or their Affiliates, or paid by any adverse party, in any such action or proceeding shall be solely for the account of Geoffrey or its Affiliates (as applicable). Geoffrey will have no obligation to defend or indemnify Licensee pursuant to this Section if the claim arises out of or relates to Licensee's use of any of the Marks in violation of the terms of this Agreement.

(b)   Geoffrey is extending to Licensee under this Agreement its license to lawfully use the Marks solely under the conditions and limitations set forth in this Agreement, and only to the extent that Geoffrey could make use thereof if not for the license granted herein. While Geoffrey is not aware of any challenges to the use of the Marks in the Territory, Licensee acknowledges that others may have acquired, attempted to acquire or may claim rights in or to the Marks, or colorable variations or copies of same. Accordingly, Licensee acknowledges, understands and agrees that Geoffrey has not and does not represent, warrant or covenant that it has the sole or exclusive right to use the Marks in the Territory, or that the uses licensed hereunder do not or may not violate the rights of any other person. Geoffrey represents and warrants that it has not granted any license or other right to any Person to use any of the Marks in the Territory. Licensee shall promptly notify Geoffrey if Licensee's use of any of the Marks in the Territory pursuant to this Agreement would, or is claimed to, violate the rights of any other person and, if so, Geoffrey may require that Licensee modify the Marks, including substitution at Licensee's sole expense of another trade name, trademark, service mark and/or logotype other than the Marks licensed hereunder, and Licensee specifically acknowledges that such an event shall not constitute a failure or partial failure of consideration.

17.8.   Prosecution of Infringers.  If Licensee receives notice, is informed or learns that any third party which it believes is not authorized to use the Marks is using the Marks or any variant of the

24884-9                                        31

Marks, Licensee shall promptly notify Licensors. Licensors will then determine whether or not it wishes to take any action against the third party on account of the alleged infringement of the Marks. Licensee will have no right to make any demand or to prosecute any claim against any alleged infringer of the Marks for or on account of an alleged infringement. Should Licensors, at its sole discretion, determine to make any demand or prosecute any claim against any alleged infringer of the Marks or on account of an alleged infringement, Licensee shall cooperate fully with Licensors; render such assistance; execute any and all instruments and documents; and, do such other acts and things as may, in the opinion of Licensors' or their Affiliates' counsel, be necessary or advisable, all at Licensee's expense. Any damages, recoveries, costs, attorneys' and/or experts' fees or disbursements awarded to Licensors, or paid by any adverse party, in connection with any such demand or prosecution shall be solely for the account of Licensors.

17.9.   Modification of Marks.  If it becomes advisable at any time, in the sole judgment of Licensors, to delete or withdraw from further use any Mark, modify any Mark, and/or, to adopt or use one or more additional and/or substitute Marks, then Licensee shall comply with any such instruction by Licensors. Licensee waives any claim arising from or relating to any Mark change, modification or addition. Licensors will not be liable to Licensee for any expenses, losses or damages sustained by Licensee as a result of any Mark addition, subtraction, substitution or modification. Licensee covenants not to commence or join in any litigation or other proceeding against Licensors for any of these expenses, losses or damages.

**ARTICLE XVIII**
**EVENTS OF DEFAULT; TERMINATION**

**18**    Termination By Licensors.

(a)    Automatic Termination.  This Agreement and all rights granted herein shall immediately and automatically terminate upon the occurrence of a Bankruptcy Event with respect to the Licensee.

(b)    Termination By Notice.  Upon the occurrence of any of the following events, Licensors may, at their sole and absolute discretion, by written notice to the Licensee, terminate this Agreement and all rights granted hereunder, which termination shall be effective on the date set forth in the termination notice, or if no such date is specified, on the date such notice is given (but in no event will such date of termination be a date that is prior to the date such notice is given):

(i)    Licensee materially breaches any of the terms and conditions of this Agreement and such breach is not cured within 60 days after Licensee receives written notice from Licensors describing in reasonable detail the breach;

(ii)    Licensee, or it's Affiliates or the Business Manager is convicted of a felony, fraud, crime involving moral turpitude, or any other crime or offense which Licensors reasonably believe is related to Licensee's operation of the Business or is reasonably likely to have an adverse effect on the Business, the Marks or the goodwill associated with the Marks;

24884-9                                    32

(iii)     Licensee conceals revenue, knowingly maintains false books or records, falsifies information or otherwise defrauds or makes false representations to Licensors or knowingly submits any reports or documentation to Licensors that contain misrepresentations or omissions of material facts;

(iv)     the Gross Revenues (as shown by Licensee's statements submitted to Licensors in accordance with this Agreement) is intentionally or deliberately or as a result of Licensee's gross negligence or willful misconduct is understated by 8% or more for the applicable period;

(v)     Licensee (1) takes, withholds, misdirects or appropriates for Licensee's own use any funds withheld from Licensee's employees' wages which should have been set aside for the taxes, insurance or benefits of the employees of the Business, (2) wrongfully takes or appropriates for Licensee's own use any property or funds of Licensors, (3) systemically fails to deal fairly and honestly with Licensee's employees, vendors and suppliers or customers or (4) knowingly permits or, having discovered the facts, fails to take any action against or to discharge any agent, representative or employee who has embezzled any funds or property of any customers, Licensors or other Person;

(vi)     Licensee does not cure any default under this Agreement within seven (7) days after Licensee is given notice of such default) which materially impairs the goodwill associated with the Marks;

(vii)     Licensee does not pay any Continuing Royalty or other amounts due to Licensors or their Affiliates within ten (10) days following receipt by Licensee of written notice that such fees or payments are overdue;

(viii)     Licensee offers or sells any unapproved program, product, merchandise, goods or services in a Store without the Licensors prior written consent;

(ix)     There occurs with respect the Licensee, either directly or indirectly, whether by operation of law or otherwise, (i) a consolidation with, or merger of Licensee with or into another unaffiliated Person; (ii) a Transfer or issuance of Equity Interests of Licensee; or (iii) any other transaction or related series of transactions, and as a result of a transaction set forth in (i), (ii) and (iii) above, one or more third parties, individually or acting as a group, acquires Control, directly or indirectly, of Licensee or the Business;

Licensee sell all or substantially all of its assets to an unaffiliated Person;

(xi)     Licensee enters into any agreement to accomplish any of subclauses (xvi) or (xvii) above;

(xii)     Licensee breaches any other agreement between Licensors, any of their Affiliates or any other Person, on the one hand, and the Licensee or any of its Affiliates, on the other hand;

24884-9                                          33

(xiii)    A judgment, order or arbitral award for the payment of money in an amount in excess of $5,000,000 Dollars (or its equivalent in South Africa Rand) is rendered against the Licensee, and such judgment, order or arbitral award shall not be satisfied, dismissed or stayed within thirty (3) days of its rendering.

18.2.    Termination By Licensee.  The Licensee may, at its sole and absolute discretion, by written notice to the Licensors, terminate this Agreement and all rights granted hereunder, which termination shall be effective on the date set forth in the termination notice, or if no such date is specified, on the date such notice is given (but in no event will such date of termination be a date that is prior to the date such notice is given) in the event that Licensors materially breach any of the terms and conditions of this Agreement and such breach is not cured within 60 days after Licensors receive written notice from Licensee describing in reasonable detail the breach.

18.3.    Effect of Termination or Expiration of this Agreement.  Immediately following the expiration of earlier termination of this Agreement, the Licensee shall no longer have the right to operate the Business or any Store, and the Licensee shall:

(a)    immediately pay all sums due and owing to Licensors or their Affiliates, plus interest thereon;

(b)    discontinue the use of the Marks, and not operate or do business under any name or in any manner which might tend to give the general public the impression that it is operating the Business.  Licensee may not use, in any manner or for any purpose, directly or indirectly, Confidential Information, the Marks or any other proprietary marks, trade secrets, procedures, forms, techniques, know-how or materials acquired by Licensee by virtue of the relationship established by this Agreement, including, without limitation, the Toys Products, Advertising, the Standards and Software.  In addition, Licensee shall not identify itself to third parties as a former licensee of Licensors;

(c)    take all necessary action to cancel any governmental or other registration, filing and/or notice of its name of or pertaining to this Agreement, the Business, the Standards and/or any of the Marks, or any variant, including, without limitation, any assumed name or equivalent registration within 15 days following the expiration or earlier termination of this Agreement.

(d)    immediately deliver to Licensors (or, at Licensors' direction, destroy and have a third party confirm destruction of) all Confidential Information, including, without limitation, all documentation relating to the Standards, any items which bear the Marks and any other document (in whatever format) give to the Licensees by the Licensors or any of their Affiliates in connection with the operation of the Business;

(e)    discontinue operations as a Store;

(f)    assign, or cause to be assigned, all Marks that may have been registered, including domain names used in connection with the operation of the Business, if any, to Geoffrey; and

24884-9                                        34

(g)    take, or cause to be taken, all appropriate action, do or cause to be done all things necessary, proper or advisable, and execute and deliver such documents and other papers, as may be requested by Licensors in connection with the termination of this Agreement.

If Licensee fails or refuses to take any of the aforementioned actions, Licensors may, in Licensee's name, on Licensee's behalf and at Licensee's expense, execute all documents necessary to accomplish the foregoing, and Licensee irrevocably appoints Licensors as Licensee's attorney-in-fact to do so.

18.4.    Survival.  The termination or earlier expiration of this Agreement will be without prejudice to Licensors' rights against Licensee, and will not relieve Licensee of any of its obligations to Licensors at the time of expiration or termination, or terminate Licensee's obligations which by their nature survive the expiration or termination of this Agreement.

## ARTICLE XIX
## MISCELLANEOUS

19.1.    Release of Licensor Indemnitees.  In further consideration for the Licensors agreeing to enter into this Agreement, the Licensee does hereby RELEASE and DISCHARGE each of the Licensor Indemnitees each of their respective successors and assigns (collectively, the "**Releasees**") from Claims which against the Releasees, the Licensee ever had, now has or hereafter can, shall or may have for, upon, or by reason of any matter, cause or thing whatsoever, from the beginning of the world through and including the day of the date of this Agreement. Notwithstanding the foregoing, Claims shall not include any anything arising under or as a result of this Agreement.

19.2.    Entire Agreement.  This Agreement and all ancillary agreements executed contemporaneously with this Agreement, constitute the entire agreement between the parties with reference to the subject matter of this Agreement and supersede any and all prior negotiations, understandings, representations and agreements.

19.3.    Waiver and Delay.  No waiver or delay in either party's enforcement of any breach of any term, covenant or condition of this Agreement will be construed as a waiver by that party of any preceding or succeeding breach, or of any other term, covenant or condition of this Agreement. Without limiting any of the foregoing, the acceptance of any payment specified to be paid by Licensee under this Agreement will not be, nor be construed to be, a waiver of any breach of any term, covenant or condition of this Agreement.

19.4.    Survival.  Upon the expiration or earlier termination of this Agreement, all of Licensee's rights and privileges hereunder shall terminate immediately, except that the following provisions shall survive such expiration or earlier termination of this Agreement and Licensee shall continue to be bound by such provisions: [        ]

19.5.    Licensors' Withholding of Consent.  In no event shall Licensee, or any of it's Affiliates, make any claim for money damages based on any claim or assertion that Licensors has

24884-9                                              35

unreasonably withheld or delayed any consent or approval to a proposed act by Licensee under the terms of this Agreement.

19.6.    No Oral Modification or Amendments.  This Agreement may not be changed or terminated unless evidenced by an instrument in writing duly executed by parties hereto and no waiver of compliance with any provision or condition hereof or thereof and no consent provided for herein shall be effective unless evidenced by an instrument in writing duly executed by the party sought to be charged.

19.7.    Notices.  Any and all notices or other communications or deliveries required or permitted to be provided hereunder shall be in writing and shall be deemed given and effective on the earliest of (i) the date of transmission, if such notice or communication is delivered via facsimile at the facsimile number specified in this Section prior to 5:30 p.m. on a Business Day, (ii) the Business Day after the date of transmission, if such notice or communication is delivered via facsimile at the facsimile number specified in this Agreement later than 5:30 p.m. on any date and earlier than 11:59 p.m. on such date, (iii) the second Business Day following the date of mailing, if sent by internationally recognized courier service, or (iv) upon actual receipt by the party to whom such notice is required to be given.  All times stated above are (i) New York City times, if the Licensors are the recipient of the notice and (ii) South African time, if Licensee is the recipient of the notice.  The address for such notices and communications shall be as follows:

If to TRU:

Toys "R" Us International, LLC
One Geoffrey Way
Wayne, NJ 07470
Fax No.: (973) 617- 4012
Attention:  Vice President – International Operations and Franchising,
            Toys "R" Us International

with a copy to

Toys "R" Us, Inc.
One Geoffrey Way
Wayne, NJ 07470
Fax No.: (973) 617-4043
Attention:  General Counsel

If to Geoffrey:

24884-9                              36

Geoffrey, Inc.
One Geoffrey Way
Wayne, NJ 07470
Fax No.: (973) 617-4043
Attention:  General Counsel

If to Licensee

Redgwoods (PTY) LTD
P.O. Box 701
Durban 4000
South Africa
Fax No.:
Attn: Chief Executive Officer

or such other address as may be designated in writing hereafter, in the same manner, by such Person.

19.8.   Construction.  The headings herein are for convenience only, do not constitute a part of this Agreement and shall not be deemed to limit or affect any of the provisions hereof.  The language used in this Agreement will be deemed to be the language chosen by the parties to express their mutual intent, and no rules of strict construction will be applied against any party.

19.9.   No Third-Party Beneficiaries.  This Agreement is intended for the benefit of the parties hereto and their respective successors and permitted assigns and is not for the benefit of, nor may any provision hereof be enforced by, any other Person.

19.10.   Severability.  If any provision of this Agreement is held to be invalid or unenforceable in any respect, the validity and enforceability of the remaining terms and provisions of this Agreement shall not in any way be affected or impaired thereby and the parties will attempt to agree upon a valid and enforceable provision that is a reasonable substitute therefor, and upon so agreeing, shall incorporate such substitute provision in this Agreement.

19.11.   Translation of Agreement and Materials.  The controlling versions of this Agreement, the exhibits hereto and any related agreements shall be the English language versions of such agreements furnished by Licensors.  Licensee may, at its sole expense, appoint a translator to translate this Agreement; the exhibits hereto, any related agreements and any and all written materials, forms, manuals, advertising, catalogues and other such writings furnished by Licensors to Licensee under this Agreement as may be required for use in the Territory, subject, in each case, to the prior approval of such use by Licensors.  Title to any and all of the foregoing translations shall vest exclusively in Licensors.

19.12.   Governing Law.  This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of New York applicable to contracts made and to be performed entirely therein.  Each party hereby irrevocably submits to the exclusive jurisdiction of the state and federal courts sitting in the City of New York, borough of Manhattan, for the

24884-9                                    37

adjudication of any dispute hereunder or in connection herewith or with any transaction contemplated hereby or discussed herein (including with respect to the enforcement of this Agreement), and hereby irrevocably waives, and agrees not to assert in any suit, action or proceeding, any claim that it is not personally subject to the jurisdiction of any such court, that such suit, action or proceeding is improper. EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE, EACH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT SUCH PARTY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY. Each party hereby irrevocably waives personal service of process and consents to process being served in any such suit, action or proceeding by mailing a copy thereof to such party at the address in effect for notices to it under this Agreement and agrees that such service shall constitute good and sufficient service of process and notice thereof. Nothing contained herein shall be deemed to limit in any way any right to serve process in any manner permitted by law. If either party shall commence an action or proceeding to enforce any provisions of this Agreement, then the prevailing party in such action or proceeding shall be reimbursed by the other party for its attorneys fees and other costs and expenses incurred with the investigation, preparation and prosecution of such action or proceeding. Nothing in this Section is intended to invoke the application of any franchise, business opportunity, antitrust, "implied covenant," unfair competition, fiduciary or any other doctrine of law of the State of New York (or any other state) or of the United States of America which would not otherwise apply.

19.13. <u>Counterparts</u>. This Agreement may be executed in any number of counterparts, each of which, when executed, shall be deemed to be an original and all of which together shall be deemed to be one and the same instrument.

19.14. <u>Facsimiles</u>. A facsimile signature to this Agreement shall have the effect of the original thereof.

19.15. <u>Independent Contractor</u>. Licensee understands and agrees that Licensee is and will be an independent contractor of Licensors under this Agreement. Nothing in this Agreement shall be construed to create a partnership, joint venture or agency. No employee of Licensee will be deemed to be an employee of Licensors. Neither Licensee nor any employee of Licensee whose compensation for service is paid by Licensee may, in any way, directly or indirectly, expressly or by implication, be construed to be an employee of Licensors for any purpose, most particularly with respect to any mandated or other insurance coverage, tax or contributions, or requirements pertaining to withholdings, levied or fixed by any city, state or federal governmental agency.

19.16. <u>Punitive Damages</u>. In no event will Licensors be liable to Licensee for punitive damages in any action or proceeding arising out of or relating to this Agreement, any breach, termination, cancellation or non-renewal of this Agreement or in any other action or proceeding whatsoever between the parties hereto and/or any of their affiliates.

24884-9                                                    38

19.17. <u>Assignment</u>. This Agreement, and the rights and obligations hereunder shall be binding upon and inure to the benefit of the parties and their respective successors, legal representatives and assigns. Notwithstanding the forgoing, the Licensee shall not, directly or indirectly, assign this Agreement or any of its rights and obligations hereunder, whether by operation by law or otherwise, without the prior written consent of the Licensors, which consent may be withheld in Licensors' sole and absolute discretion.

19.18. <u>Submission of Agreement</u>. The submission of this Agreement to Licensee does not constitute an offer. This Agreement will become effective only upon the execution of this Agreement by Licensors and Licensee. The date of execution by Licensors will be considered the date of execution of this Agreement. THIS AGREEMENT WILL NOT BE BINDING ON LICENSORS UNLESS AND UNTIL IT HAS BEEN ACCEPTED AND SIGNED BY AN AUTHORIZED OFFICER OF LICENSORS. LICENSEE HAS READ ALL OF THE FOREGOING AGREEMENT AND ACCEPTS AND AGREES TO EACH AND ALL OF THE PROVISIONS, COVENANTS AND CONDITIONS OF THE FOREGOING AGREEMENT.

24884-9

IN WITNESS WHEREOF, the parties hereto have caused this License Agreement to be duly executed by their respective authorized signatories as of the date first indicated above.

**LICENSORS**

**TOYS "R" US INTERNATIONAL, LLC**

By: TOYS "R" US, Inc., its managing member

By: _____

Name: DANNY GARDNER

Title: VICE PRESIDENT OPERATIONS / FRANCHISE INTL. DIVISION

**GEOFFREY, INC.**

By: _____

Name:

Title: David M. Kastin
Vice President -
Deputy General Counsel

By: _____

Name: RAYMOND L ARTHUR

Title: EVP CFO

LICE

REDG

By: _____

Name: A. M. SACHER

Title: GROUP CEO

24884-9                                                                40

AMENDMENT NO. 1 TO LICENSE AGREEMENT

This Amendment No. 1 (this "**Amendment**") is effective as of July 1, 2011 (the "**Effective Date**") and amends that certain License Agreement (the "**Agreement**"), dated as of January 31, 2006 by and among TOYS "R" US, INC. (as the successor in interest to Toys "R" Us International, LLC), GEOFFREY, LLC (f/k/a Geoffrey, Inc.) (Toys "R" Us, Inc. and Geoffrey, LLC shall be collectively referred to herein as "**Licensors**") and REDGWOODS (PTY) LTD. ("**Licensee**").

WITNESSETH

**WHEREAS**, the parties desire to amend the Agreement in order to grant the Licensee the right to operate certain websites within the Territory.

**NOW, THEREFORE**, in consideration of the premises and of the mutual covenants and obligations hereinafter set forth, the parties hereby agree as follows:

1.    Defined Terms; Conflicts.   Capital terms used in this Amendment but not otherwise defined herein shall have the meanings set forth in the Agreement.  In the case of a conflict between any of the terms and conditions contained in the Agreement and any of the terms and conditions contained herein, the terms and conditions of this Amendment shall control and prevail.

2.    Amendment to the Agreement.  The Agreement is hereby amended as follows:

(A)    Section 1.1 of the Agreement is hereby amended to include the following defined terms:

"**Babiesrus.com Store**" means the web site on the Internet (as defined below) using the domain names "BABIESRUS.CO.ZA", and/or such other domain names approved by Geoffrey in writing, and registered and owned by Geoffrey for the retail sale of the Products through online, networking and electronic technologies (whether now known or anticipated), including but not limited to, websites, handheld wireless devices, electronic commerce and virtual shopping, operated by Licensee in accordance with this Agreement.

"**Governmental Body**" means any government or political subdivision thereof, whether federal, state or local or of any other country or nation, including without limitation, any country situated within the Territory, or any agency or instrumentality of any such government or political subdivision thereof.

"**Internet**" means the wide area cooperative network of university, corporate, government and private computer networks communicating predominately through Transmission Control Protocol/Internet Protocol.

"**Reggies.com Store**" means the web site on Internet (as defined above) using the domain names REGGIES.CO.ZA and/or such other domains names used for the retail sale of products and services under the REGGIE'S brand through online, networking and electronic technologies (whether now known or anticipated), including but not limited to, websites, handheld wireless devices, electronic commerce and virtual shopping, operated by Licensee in accordance with this Agreement."

"**Toysrus.com Store**" means the web site on Internet (as defined above) using the domain names TOYSRUS.CO.ZA and/or such other domains names

1

approved by Geoffrey in writing, and registered and owned by Geoffrey for the retail sale of the Products through online, networking and electronic technologies (whether now known or anticipated), including but not limited to, websites, handheld wireless devices, electronic commerce and virtual shopping, operated by Licensee in accordance with this Agreement."

(B)     The definition of "**Business**" in Section 1.1 of the Agreement is hereby amended and restated in its entirety as follows:

""**Business**" means the establishment and operation of the Stores pursuant to this Agreement and the Standards and the establishment and operation of the Reggies.com Store."

(C)     The definition of "**Gross Revenues**" in Section 1.1 of the Agreement is hereby amended by deleting the word "Stores" and replacing it with the words "Stores. and the Reggies.com Store". The definition of "**Gross Revenues**" in Section 1.1 of the Agreement is hereby amended by adding a new sentence at the end of the definition as follows:

"For the avoidance of doubt, with respect to the Toysrus.com Store, Babiesrus.com Store and Reggies.com Store, Gross Revenues shall not include (i) the actual cost of shipping charges paid by Licensee to its third party carriers or couriers to ship products to customers in connection with products purchased by such customers on the Toysrus.com Store, Babiesrus.com Store and Reggies.com Store and (ii) the amount of fees paid by Licensee to credit card processing companies."

(D)     The definition of "**Redgwoods Stores**" in Section 1.1 of the Agreement is hereby amended and restated in its entirety as follows:

""**Redgwoods Stores**" means the stores operated, directly or indirectly, by the Licensee and its Affiliates under the names "Reggies," "Baby and Company" and "Little People", and any successor stores to the foregoing, and the Reggies.com Store."

(E)     The definition of "**Stores**" in Section 1.1 of the Agreement is hereby amended and restated in its entirety as follows:

""**Stores**" means the Toys "R" Us Stores and such other outlets as determined by the Licensors from time to time, and the Toysrus.com Store and Babiesrus.com Store."

(F)     Article III of the Agreement is hereby amended by adding the following Section 3.1 (a) immediately after Section 3.1 as follows

"3.1 (a) Toysrus.com Store and Babiesrus.com Store. Solely for the purposes of clarity, the License granted pursuant this Article III includes the right for the Licensee to operate and market the Toysrus.com Store and the Babiesrus.com Store within the Territory. Such sites shall be solely targeted to persons located within the Territory and any products ordered through the Toysrus.com Store and the Babiesrus.com Store shall be delivered solely to addresses located within the Territory. Licensee shall identify and redirect all inquiries and orders to be delivered outside the Territory as specified by Licensors and subject to Licensor's requirements. All products and services sold by Licensee through the Toysrus.com Store and the Babiesrus.com Store shall comply with the terms and

2

conditions of this Agreement.  Licensors may revoke Licensee's right to operate a Toysrus.com Store or Babiesrus.com Store within the Territory if Licensee is not operating either site within a particular Territory.  On or before July 1, 2011, Licensee shall discontinue and cease the operation of its "Baby and Company" branded website.

Subject to any Law, the design, content, features, functionality, "look and feel", performance, terms of use, privacy policies and other attributes of the Toysrus.com Store and the Babiesrus.com Store shall be substantially similar to other websites operated by Licensors using the Marks and shall be subject in all aspects to Licensor's prior written approval.  Licensee shall comply with the terms of use and privacy policies applicable to the Toysrus.com Store and the Babiesrus.com Store and all applicable Laws.

To the extent permitted by Law, upon the request of Licensors and upon any termination or expiration of this Agreement, Licensee shall provide to Licensors in an electronic format reasonably specified by Licensors (i) reports with respect to traffic and usage patterns of the Toysrus.com Store and the Babiesrus.com Store including such information as may be specified by Licensors, and (ii) copies of all data collected and databases maintained by Licensee with respect to users of the Toysrus.com Store and the Babiesrus.com Store, including personally-identifiable information regarding such users, such as names, addresses, telephone numbers, email addresses, credit card numbers, purchasing history and registry information, all in the English language.  Licensors and their designees shall have the right in their discretion to process and use all such data in their discretion and, following any termination or expiration of this Agreement, to contact, market and sell to and otherwise deal with such users. Licensee shall provide that the terms of use and privacy policies applicable to the Toysrus.com Store and the Babiesrus.com Store disclose such potential processing and transfers and shall solicit any necessary consents to such processing and transfers from the users of the Toysrus.com Store and the Babiesrus.com Store to the extent required by Law or requested by Licensors. Notwithstanding the foregoing, Licensee shall have no obligations under this paragraph and the requirements under this paragraph shall be null and void to the extent that any of the obligations and requirements under this paragraph are prohibited by or otherwise conflict with any Law, including without limitation the Consumer Protection Act (CPA) of South Africa.

The parties acknowledge that Licensors own all right, title and interest in and to the Internet addresses for the Toysrus.com Store and Babiesrus.com Store and any other sites approved by Licensors for sale of products under this Agreement and upon termination of this Agreement for any reason, Licensee shall assign all right title and interest in the aforementioned Internet addresses and sites to Licensors.  Licensee shall provide such reasonable assistance as is needed by Licensors in order to properly register such Internet addresses and sites in Licensors' or its designee's name."

(G)    Section 6.2 (a) of the Agreement is hereby amended by deleting the word "Marks" and replacing it with the words "Marks and to operate the Reggies.com Store".

(H)    Section 6.2 of the Agreement is hereby amended by adding a new Section 6.2 (c) immediately after Section 6.2 (b) as follows :

3

53829-3

"(c) Notwithstanding the foregoing, for the Toysrus.com Store. the Babiesrus.com Store and the Reggies.com Store only during the time period from April 1, 2011 until the time when the Gross Revenues for the Toysrus.com Store, the Babiesrus.com Store and the Reggies.com Store collectively equals ZAR 20,000,000 (Twenty Million South African Rands), Licensee shall pay to Geoffrey an amount equal to 1.5% of the Gross Revenues attributable to the Toysrus.com Store, the Babiesrus.com Store and Reggies.com Store.  From the time after April 1, 2011 when the Gross Revenues for the Toysrus.com Store, the Babiesrus.com Store and the Reggies.com Store collectively has exceeded ZAR 20,000,000 (Twenty Million South African Rands), Licensee shall pay to Geoffrey an amount equal to 3.0% of the Gross Revenues attributable to the Toysrus.com Store, the Babiesrus.com Store and Reggies.com Store.  For the avoidance of doubt, no royalty shall be paid by Licensee in connection with any Redgwoods Stores other than the Reggies.com Store."

3.    Continued Force and Effect.  Except as otherwise amended pursuant to this Amendment, the Agreement, shall remain in full force and effect.

4.    Miscellaneous.  This Amendment contains the entire understanding of the parties with respect to the subject matter hereof and supersedes all prior agreements and understandings, oral or written, with respect to such matters, which the parties acknowledge have been merged into this Amendment.  No provision of this Amendment may be waived or amended except in a written instrument signed, in the case of an amendment, by the parties or, in the case of a waiver, by the party against whom enforcement of any such waiver is sought.  This Amendment may be executed in two or more counterparts, all of which when taken together shall be considered one and the same agreement and shall become effective when counterparts have been signed by each party and delivered to the other parties. it being understood that the parties need not sign the same counterpart and that a signature delivered by facsimile shall create a valid and binding obligation of the party executing (or on whose behalf such signature is executed) the same.  All questions concerning the construction, validity, enforcement and interpretation of this Amendment shall be governed by and construed and enforced in accordance with the internal laws of the State of New York, without regard to the principles of conflict of laws thereof.

[*******]

4

**IN WITNESS WHEREOF,** the parties have executed this Amendment as of the Effective Date.

TOYS "R" US, INC

By:

Name: *LARRY GARDNER*

Title: *VICE PRESIDENT – LICENSE OPERATIONS*

GEOFFREY, LLC

By:

Name:

Title:

MATTHEW LONCAR
Vice President - Corporate Counsel

REDGWOODS (PTY) LTD.

By:

Name: *A. M. SACHER.*

Title: *CEO.*

5

# EXHIBIT B

AMENDMENT NO. 2 TO LICENSE AGREEMENT

This Amendment No. 2 (this "**Amendment**") is effective as of November 29, 2013 (the "**Effective Date**") and amends that certain License Agreement, dated as of January 31, 2006, as amended by Amendment No. 1 to License Agreement dated as of July 1, 2011, by and among TOYS "R" US, INC. (as the successor in interest to Toys "R" Us International, LLC), GEOFFREY, LLC (f/k/a Geoffrey, Inc.) (Toys "R" Us, Inc. and Geoffrey, LLC shall be collectively referred to herein as "**Licensors**") and REDGWOODS (PTY) LTD (as transferor to AMIC TRADING (PTY) LTD, "**AMIC**" shall be referred to as "**Licensee**") and Mohsin Mahmood Mia and Christian Anthony Larsen (collectively, the "**Guarantors**") (the "**Agreement**").

WITNESSETH

**WHEREAS**, on November 12, 2012, Licensor delivered its consent for Redgwoods (Pty) Ltd to assign all rights and obligations under the Agreement to AMIC (the "**Sales Transaction**");

**WHEREAS**, on or about December 31, 2012, Redgwoods (Pty) Ltd consummated its Sales Transaction whereby Redgwoods (Pty) Ltd assigned all of its rights and obligations under the Agreement, AMIC assumed all of the Licensee's rights and obligations under the Agreement, and the Guarantors guaranteed performance of certain of AMIC's obligations under the Agreement;

**WHEREAS**, the parties desire to memorialize AMIC's assumption of Redgwoods (Pty) Ltd rights and obligations under the Agreement;

**WHEREAS**, the parties desire to amend the Agreement to, among other things, extend the term of the License, increase the scope of the License and expand the Territory.

**NOW, THEREFORE**, in consideration of the promises and of the mutual covenants and obligations hereinafter set forth, the parties hereby agree as follows:

1.  Defined Terms; Conflicts.  Capitalized terms used in this Amendment but not otherwise defined herein shall have the meanings set forth in the Agreement.  In the case of a conflict between any of the terms and conditions contained in the Agreement and any of the terms and conditions contained herein, the terms and conditions of this Amendment shall control and prevail.

2.  Acknowledgement of Assumption.  AMIC hereby acknowledges its assumption of all of the rights, obligations and responsibilities of Redgwoods (Pty) Ltd under the Agreement and accordingly, all references to Licensee in the Agreement shall mean AMIC.

3.  Amendment to the Agreement.  Effective as of the Effective Date, the Agreement is hereby amended as follows:

(A)    The definition of "**Marks**" in Section 1.1 of the Agreement is hereby amended by adding the words: "Toys "R" Us Express, Toys "R" Us Toy Box, Toys "R" Us Discount Outlet, all of Licensor's private label brands", immediately after the words "Babies "R" Us".

(B)    The definition of "**Territory**" in Section 1.1 of the Agreement is hereby amended and restated in its entirety as follows:

"**Territory**" means the geographical area comprising the countries of South Africa and, subject to the provisions of Section 5.1(b), the Primary

Expansion Territory and Secondary Expansion Territory as constituted on November 29, 2013.

(C)    The definition of "**Transfer**" in Section 1.1 of the Agreement is hereby amended and restated in its entirety as follows :

"**Transfer**" or "**Transferred**" means the sale, transfer, assignment, pledge, mortgage, hypothecation, encumbrance, distribution or other disposition; and an assignment, sale or other transfer shall include, without limitation, (i) the transfer of ownership of capital stock or partnership interests, (ii) merger or consolidation or issuance of additional securities representing any ownership interest, (iii) sale of capital stock, partnership interests or any security, (iv) any direct or indirect transfer of an interest in this Agreement, Licensee or any Store, whether in an insolvency, corporate or partnership dissolution, by operation of Law, by way of a change of Control or otherwise, or (v) any direct or indirect transfer of any interest in this Agreement, Licensee or any Store, in the event of a death of an owner of Licensee, whether by will, declaration of or transfer in trust, under Law or otherwise.

(D)    Section 1.1 of the Agreement is hereby amended to include the following defined terms:

"**Primary Expansion Territory**" shall mean the countries of Namibia, Zimbabwe, Zambia, Botswana, Mozambique, Angola and Mauritius.

"**Secondary Expansion Territory**" shall mean the countries of Ghana, Nigeria, Tanzania, Uganda, Kenya, South Sudan and Malawi.

"**Transfer Consideration**" means (i) the fair market value of all payments of any type (including cash, notes, securities, in-kind service commitments, payments in escrow, or any other form of property) made to the Licensee, the holders of any capital stock, partnership interests or other securities of Licensee or any of their Affiliates in connection with a Transfer of any interest in this Agreement, plus (ii) the face amount of any debt or other liability or obligation maturing in more than one year assumed in such Transfer. If any of the Transfer Consideration committed to be paid is (i) contingent upon the future performance of the business or assets being purchased (*e.g.,* revenues or income) or (ii) scheduled to be paid in installments, the portion of the Transfer Fee attributable to such portion of the Transfer Consideration shall be estimated for the purposes of fee calculation at an expected value reasonably acceptable to the Licensee and Licensors, and shall be paid to Licensors upon completion of the Transfer, unless it shall be impracticable to estimate such portion of the Transfer Fee, and the Licensee and Licensors shall be unable to agree upon an appropriate payment to be made in respect thereof, in which case such portion of the Transfer Fee shall be paid to Licensors at such time or times as such portion of the Transfer Consideration is paid. If the Transfer of Consideration is paid in whole or in part in non-cash consideration, the value of such payment for purposes of fee calculation shall be determined as follows: (i) if paid in the form of nonconvertible debt securities, the value of such securities shall be the face value thereof, (ii) if paid in the form of publicly traded capital stock, the value thereof shall be determined by the average of the last sale prices for such stock on the last 20 trading days thereof prior to the Transfer of such

capital stock, (iii) if paid in the form of one or more non-competition, consulting or other similar agreements, the value thereof shall be the present value of the aggregate amounts payable over the life of such agreements, and (iv) if paid in the form of capital stock which is not publicly traded or in the form of any other securities or property, the value thereof shall be the fair market value as established by the Licensee and Licensors in good faith.

"**Transfer Fee**" means an amount equal to 1% of the Transfer Consideration to be paid by the purchaser in the Transfer.

(E)     Article III of the Agreement is hereby amended by adding a new Section 3.2 as follows:

3.2.  Rights to Sublicense.  Licensee shall not be permitted to sublicense the right to open or operate any Store in any country within the Territory to any Person; provided that, subject to Licensors prior written consent which shall not be unreasonably withheld, Licensee shall have the right to grant a sublicensee to a Person to open and operate one or more Stores within one or more countries in the Primary Expansion Territory or Secondary Expansion Territory (so long as each such country is part of the Territory); provided, further, that (i) the terms and conditions of the sublicense agreement shall be the same as this Agreement (other than the sub-license royalties to be charged), and the sublicensee shall agree to be bound to the terms and conditions thereof; (ii) the sublicense shall not relieve the Licensee from any of its obligations under this Agreement (including without limitation the obligation to pay the Continuing Royalties to Licensors in any sublicensed territory); (iii) the sublicensee must have sufficient business experience, skill aptitude, financial capability and capital resources to operate the Business being sublicensed; (iv) neither the sublicensee nor any of its Affiliates shall be engaged in a Competitive Business anywhere in the world; and (v) the Licensors shall be third party beneficiaries under the sublicense agreement. Licensor's consent or rejection shall be delivered within thirty (30) days of Licensee's request for sublicensing rights.

For avoidance of doubt, Licensee shall be entitled to enter in a Primary Expansion Territory or Secondary Expansion Territory subject to the terms in this Agreement, and set up a nominee company to operate the Stores without Licensors consent provided that such nominee company are 100% owned by Licensee or its current shareholders.

(F)     Section 4.1 of the Agreement is hereby amended by deleting the words "December 31, 2015" and replacing it with the words "August 31, 2028".

(G)     Section 4.2 of the Agreement is hereby amended and restated in its entirety as follows:

Renewal.  Subject to the satisfaction or waiver by the Licensors of the conditions set forth in Section 4.3, the Licensee shall have the right to renew this Agreement with respect to South Africa and the Primary Expansion Territory only without the incurrence of any renewal fee on the same terms and conditions for an additional fifteen (15) year period (the "**Renewal Term**") by notifying the Licensors, in writing (the "**Renewal Notice**"), of its intention to renew this Agreement with respect to South Africa and the Primary Expansion Territory for the Renewal Term not later than one (1)

year prior to the expiration of the Initial Term.  For the avoidance of doubt, this Agreement may not be renewed without the prior written consent of the Licensors after August 31, 2043, and, unless this Agreement terminates or expires prior to such date, all rights granted hereunder shall terminate on August 31, 2043. And further, the Licensee shall not have the right to renew the Term of this Agreement with respect to the Secondary Expansion Territory.  The Initial Term and the Renewal Term, if any, shall collectively be referred to as the "**Term**."

(H)     Section 4.3(d)  of the Agreement is hereby amended by changing the reference of such Section 4.3(d) to Section 4.3(e); and by deleting the words "(a)-(c)" and replacing it with "(a)-(d)".

(I)     Section 4.3 of the Agreement is hereby amended by adding a new Section 4.3(d) as follows:

(d) The Licensee shall operate a minimum of eighty-five (85) physical, brick and mortar Stores in the Territory with each Store having a minimum size of 210 square meters (i.e. approximately 2,260 square feet) as of September 1, 2028.  For avoidance of doubt, the e-commerce sites Babiesrus.com and Toysrus.com shall not count towards the minimum number of Stores required for satisfaction of this renewal condition.

(J)     Section 5.1(b) of the Agreement is hereby amended and restated in its entirety as follows:

(b) Notwithstanding anything to the contrary herein, with respect the Primary Expansion Territory and Secondary Expansion Territory, if the Licensee shall not have opened and be operating at least one (1) physical, brick and mortar Store of not less than 700 square meters (approximately 7,535 square feet) in each country of the Primary Expansion Territory or the Secondary Expansion Territory by August 31, 2018, then with respect to each such country that has not had at least one Store opened therein by the date specified above, thereupon, all rights in such country granted hereunder shall automatically terminate and revert to the Licensors and, for purposes of this Agreement, such country shall be deemed deleted from the definition of Territory.

(K)     Section 5.2(b) of the Agreement is hereby amended and restated in its entirety as follows:

(b) Notwithstanding the activities permitted in Section 5.2(a) above, Licensee shall have the right to continue to own and operate each of the Redgwoods Stores that are opened and operating as of the November 29, 2013; provided, however, that a minimum of  twelve (12) Redgwoods Stores (including the Reggies.com Store) are converted to a Store by January 31, 2015, a minimum of  twelve (12) Redgwoods Stores  are converted to a Store by January 31, 2016, and with the balance of the  existing stores to be converted by January 31, 2017, using the Marks "Toys "R" Us" (including Toysrus.com), "Toys "R" Us Express", "Toys "R" Us Discount Outlet" or "Babies "R" Us" in accordance with the Scope of Conversion as mutually agreed upon by Licensors and Licensee.  Licensee shall deliver the Scope of Conversion to Licensors no later than February 1, 2014.



(L)    Section 6.2 of the Agreement is hereby amended and restated in its entirety as follows:

<u>Continuing Royalty</u>

(a) <u>General</u>. In consideration of Licensors' grant to Licensee of the License pursuant to the terms and conditions of this Agreement, Licensee shall pay to Geoffrey, in consideration for the license to use the Marks, a continuing quarterly payment (the "**Continuing Royalty**") equal to three percent (3%) of Licensee's Gross Revenues for each three-month period ending at the end of each of fiscal quarter until January 31, 2015. Commencing on February 1, 2015, the Continuing Royalty shall equal two and one-quarter percent (2.25%) of Licensee's Gross Revenues for each three-month period ending at the end of each of fiscal quarter.

(b) <u>New Stores</u>. Notwithstanding the foregoing, for each "New Store" (as hereinafter defined) opened by Licensee through January 31, 2015, Licensee shall pay to Geoffrey an amount equal to 2% of the Gross Revenues attributable to such New Store for each three-month period ending at the end of each of fiscal quarter until January 31, 2014; and then thereafter Licensee shall pay to the Geoffrey an amount equal 3% of the Gross Revenues attributable to such New Store for each three-month period ending at the end of each of fiscal quarter until January 31, 2015. Commencing on February 1, 2015, the Continuing Royalty for each New Store shall equal two and one-quarter percent (2.25%) of Licensee's Gross Revenues for each three-month period ending at the end of each of fiscal quarter. "**New Store**" shall mean a physical, brick and mortar Store opened at a new location that adds to the previous maximum number of Stores then operated by the Licensee, but shall not include a (i) Store that has been remodeled, relocated, or otherwise acts as a replacement for a Store, in each case as mutually agreed by the parties prior to such New Store being opened or (ii) any Store opened before February 1, 2015 under 600 square meters (approximately 6500 square feet).

(c) <u>Converted Redgwoods Stores or Stores Under 600 Square Meters Opened Between June 1, 2013 and January 31, 2015</u>. Notwithstanding the foregoing, Licensee shall not pay any Continuing Royalty for (i) any of the Redgwoods Stores through January 31, 2015, whether or not such Redgwoods Store has been converted pursuant to Section 5.2(b) of the Agreement or (ii) any Store opened after June 1, 2013 under 600 square meters through January 31, 2015. Commencing on February 1, 2015, the Continuing Royalty for such Stores (including any Store under 600 square meters (approximately 6500 square feet) or any Regdwoods Stores, whether or not such Redgwoods Store has been converted pursuant to Section 5.2(b)) shall equal two and one-quarter percent (2.25%) of Licensee's Gross Revenues for each three-month period ending at the end of each of fiscal quarter.

(d) <u>New Stores in South Africa after January 31, 2015</u>. Notwithstanding the foregoing, for each New SA Store (as hereinafter defined) opened by Licensee after January 31, 2015, Licensee shall pay to Geoffrey an amount equal to 1.5% of the Gross Revenues attributable to such New SA Store for such Fiscal Year; and then thereafter Licensee shall pay to the Geoffrey an amount equal 2.25% of the Gross Revenues attributable to such New SA Store for each three-month period ending at the end of each of fiscal quarter "**New SA Store**" shall mean a physical, brick and mortar Store, with no regard to size, opened at a new location in South Africa that adds to the previous maximum number of Stores then operated by the Licensee, but shall not include a Store that has been



remodeled, relocated, or otherwise acts as a replacement for a Store, in each case as mutually agreed by the parties prior to such New SA Store being opened.

(e) Expansion Territory Stores. Notwithstanding the foregoing, for each Expansion Territory Store (as hereinafter defined) opened by Licensee in the Primary Expansion Territory or Secondary Expansion Territory, the Continuing Royalty shall be waived for each Expansion Territory Store for the twelve (12) month period commencing on the date such store is open to the public. For the immediate successive twelve (12) month period, the Continuing Royalty for each Expansion Territory Store shall equal two percent (2%) of Licensee's Gross Revenues for each three-month period ending at the end of each of fiscal quarter. After the twenty four (24) month period commencing on the date an Expansion Territory Store is opened to the public, the Licensee shall pay to Geoffrey a Continuing Royalty shall equal two and one-quarter percent (2.25%) of Licensee's Gross Revenues for each three-month period ending at the end of each of fiscal quarter. For purposes of this subsection, **"Expansion Territory Store"** shall mean a physical, brick and mortar Store opened in the Primary Expansion Territory or Secondary Expansion Territory.

(f) Internet Stores. Notwithstanding the foregoing, for the Toysrus.com Store, the Babiesrus.com Store and the Reggies.com Store only during the time period from April 1, 2011 through January 31, 2015, if the Gross Revenues during a fiscal year for the Toysrus.com Store, the Babiesrus.com Store and the Reggies.com Store collectively equals less than ZAR 20,000,000 (Twenty Million South African Rands), Licensee shall pay to Geoffrey an amount equal to 1.5% of the Gross Revenues attributable to the Toysrus.com Store, the Babiesrus.com Store and Reggies.com Store. From April 1, 2011 through January 31, 2015, if the annual Gross Revenues during a fiscal year for the Toysrus.com Store, the Babiesrus.com Store and the Reggies.com Store collectively has equaled or exceeded ZAR 20,000,000 (Twenty Million South African Rands), Licensee shall pay to Geoffrey an amount equal to 3.0% of the Gross Revenues attributable to the Toysrus.com Store, the Babiesrus.com Store and Reggies.com Store.

Commencing on February 1, 2015, the Reggies.com Store shall have been converted to a Toysrus.com Store or Babiesrus.com Store pursuant to Section 5.2(b) of the Agreement. After February 1, 2015 if the Gross Revenues during a fiscal year for the Toysrus.com Store and the Babiesrus.com Store collectively equals less than ZAR 20,000,000 (Twenty Million South African Rands), Licensee shall pay to Geoffrey an amount equal to 1.25% of the Gross Revenues attributable to the Toysrus.com Store and the Babiesrus.com Store. After February 1, 2015, if the annual Gross Revenues during a fiscal year for the Toysrus.com Store and the Babiesrus.com Store collectively has equaled or exceeded ZAR 20,000,000 (Twenty Million South African Rands), Licensee shall pay to Geoffrey an amount equal to 2.25% of the Gross Revenues attributable to the Toysrus.com Store and the Babiesrus.com Store.

(M)    Sections 9.17 of the Agreement are hereby amended and restated in its entirety as follows:

(a) The Licensee shall not, directly or indirectly, issue an Equity Interest in Licensee, a Store or a Lease without (i) the prior written approval of Licensors, which may be withheld by Licensors in their reasonable discretion, and (ii) the payment of the Transfer Fee, including all parts thereof due after the initial Transfer. Licensee acknowledges that Licensors may consider the following factors of the transferee to withhold its consent: (i)

financial strength, (ii) retail experience, (iii) competitive overlap, and (iv) affiliations, reputation and ethics.

(b) No holder of an Equity Interest of Licensee, a Store or a Lease shall, directly or indirectly, Transfer any of such Equity Interest without (i) the prior written approval of Licensors, which may be withheld by Licensors in their reasonable discretion, and (ii) the payment of the Transfer Fee, including all parts thereof due after the initial Transfer. Licensee acknowledges that Licensors may consider the following factors of the transferee to withhold its consent: (i) financial strength, (ii) retail experience, (iii) competitive overlap, and (iv) affiliations, reputation and ethics.

(c) Any purported Transfer of this Agreement or the License that has not been so approved shall be void. Licensee shall cause purchaser in the Transfer pay to Licensors any Transfer Fee within thirty (30) calendar days after payment of any Transfer Consideration (or part thereof). Without limiting the foregoing, under no circumstances shall Licensee Transfer this Agreement, the License granted under this Agreement, or any part or all of the ownership of Licensee or any Store (any interest therein) without paying Licensors the Transfer Fee when due. The transfer of this License is expressly conditioned on the payment when due of the Transfer Fee.

(N)    Section 16.a of the Agreement is hereby amended by adding the following immediately after the last sentence:

Notwithstanding the foregoing, the Licensee and its affiliates will be allowed to open a Competing Business if the Licensors decline approval for "entry" into any country listed as a Primary Expansion Territory or Secondary Expansion Territory through August 31, 2018 subject to Section 5.1(b). For avoidance of doubt, Licensees shall not have the right to open a Competing Business in any country of the Primary Expansion Territory or Secondary Expansion Territory after August 31, 2018 if the license granted herein automatically terminates and revert to the Licensors in accordance with Section 5.1(b). Further, for avoidance of doubt, Licensors right to reject a Site location, a sublicensee, or any other rejection rights provided for in the Agreement shall not be deemed as "Licensor declining approve for entry".

(O)    Section 17.6(a) of the Agreement is hereby amended and restated in its entirety as follows:

(a) Each Store shall only do business under one of the following names: "Toys "R" Us", "Toys "R" Us Express", "Toys "R" Us Toy Box", "Toys "R" Us Discount Outlet", or "Babies "R" Us" (the **Store Name**").

(P)    Section 18.1(b)(ix) of the Agreement is hereby amended and restated in its entirety as follows:

(ix) Licensee, directly or indirectly, Transfers or attempts to Transfer any of its rights or obligations under this Agreement to any Person in violation of the terms of this Agreement or the Standards without the prior written consent of Licensors or without payment of the Transfer Fee (or any part of the Transfer Fee) when due.

(Q)    Section 19.17 of the Agreement is hereby amended and restated in its entirety as follows:



<u>Assignment</u>.  This Agreement, and the rights and obligations hereunder shall be binding upon and inure to the benefit of the parties and their respective successors, legal representatives and assigns.  Notwithstanding the forgoing, Licensee shall not, directly or indirectly, assign this Agreement or any of its rights and obligations hereunder, whether by operation by Law or otherwise, without the prior written consent of Licensors, which consent may be withheld in Licensors' reasonable discretion, and payment of the Transfer Fee when due.  Any purported assignment without such consent and payment shall be void.  Each Licensor shall have the right, at any time, to assign any of its respective rights and obligations hereunder to any Person; provided, however, that such Person assumes the obligations of the assigning Licensor.

(R)    Exhibit A to the Agreement is hereby amended and restated in its entirety with a new Exhibit A as set forth on <u>Annex I</u> of this Amendment.

3.    <u>Continued Force and Effect</u>.  Except as otherwise amended pursuant to this Amendment, the Agreement, shall remain in full force and effect.

4.    <u>Miscellaneous</u>.  This Amendment contains the entire understanding of the parties with respect to the subject matter hereof and supersedes all prior agreements and understandings, oral or written, with respect to such matters, which the parties acknowledge have been merged into this Amendment.  No provision of this Amendment may be waived or amended except in a written instrument signed, in the case of an amendment, by the parties or, in the case of a waiver, by the party against whom enforcement of any such waiver is sought.  This Amendment may be executed in two or more counterparts, all of which when taken together shall be considered one and the same agreement and shall become effective when counterparts have been signed by each party and delivered to the other parties, it being understood that the parties need not sign the same counterpart and that a signature delivered by facsimile shall create a valid and binding obligation of the party executing (or on whose behalf such signature is executed) the same.  All questions concerning the construction, validity, enforcement and interpretation of this Amendment shall be governed by and construed and enforced in accordance with the internal laws of the State of New York, without regard to the principles of conflict of laws thereof.

[*******]

63325-8                                    8                    

**IN WITNESS WHEREOF,** the parties have executed this Amendment as of the Effective Date.

TOYS "R" US, INC.

By: _____

Name:

Title:


GEOFFREY LLC

By: _____

Name:

Title:


AMIC TRADING (PTY) LTD.

By: _____

Name: M. M. MIA

Title: DIRECTOR


_____

Mohsin Mahmood Mia, as Guarantor


_____

Christian Anthony Larsen, as Guarantor

63325-8

Annex I to Amendment

Marks[1]

"R" US (Stylized) (reversed R) (Black Bubble Letters)
"R" ZONE (Stylized) and Design (reversed R)
A GALAXY OF DISCOVERY & FUN
A GALAXY OF TOYS
ANIMAL ALLEY FILLED WITH LOVE
ANIMAL ALLEY FILLED WITH LOVE and Design
BABIES "R" US
BABIES "R" US (Stylized) (reversed R) (Black Bubble Letters)
BABIES "R" US in plain block letters (reversed R)
BRUIN & Design
BRUIN in plain block letters
EDU-SCIENCE
FAST LANE
FUN YEARS
GEOFFREY
GEOFFREY in plain block letters
GEOFFREY'S WORLD
GIRAFFE Design (Geoffrey ) (1994 Version)
Giraffe Design (Geoffrey)
Giraffe Design (Geoffrey) (1996 Version)
Giraffe Design (Geoffrey-2)
IMAGINARIUM[2]
JESSICA
JUST LIKE HOME
KIDS "R" US
KIDS "R" US (Stylized) (reversed R) (Black Bubble Letters)
KIDSRUS in plain block letters
MOM & ME TOYS R US (Stylized)
MOM & ME TOYS R US and Design
PAVILION
PLAY MORE SPEND LESS
THERE'S NEVER BEEN A BETTER TIME TO BE A TOYS "R"
US KID
TOYOLOGIST
TOYS "R" US
TOYS "R" US (Stylized)
TOYS "R" US (Stylized) (reversed R)
TOYS "R" US (Stylized) (reversed R) (Black Bubble Letters)
TOYS "R" US (Stylized) and Star Design (reversed R inside
Star)
TOYS "R" US in French (LES JOUETS C'EST NOUS)
TOYS "R" US in plain block letters (reversed R)
TOYSRUS.COM
UNIVERSE OF IMAGINATION[3]
YOU & ME
ANIMAL ALLEY
ANIMAL ZONE
AVIGO and Design

10

63325-8

DREAM DAZZLERS
JOURNEY GIRLS
SIZZLIN COOL
STATS
TM!
TOTALLY ME
TRUE HEROS
Toys"R"Us Express
Toys"R"Us Discount Outlet
Toys"R"Us Toybox

1.  LICENSEE ACKNOWLEDGES AND AGREES THAT LICENSOR DISCLAIMS ALL
    REPRESENTATIONS OR WARRANTIES WITH RESPECT TO THE MARKS INCLUDING,
    BUT NOT LIMITED TO, NONINFRINGEMENT OF THIRD PARTY RIGHTS OR
    REGISTRATION OF THE MARKS.

2.  "IMAGINARIUM" Mark only granted in the following countries: South Africa, Zimbabwe,
    Zambia, Botswana, Mauritius.  Upon Licensee's entry into the countries of Ghana, Tanzania,
    Uganda, Malawi, Namibia or Angola Licensors, Licensor shall notify Licensee regarding the use
    of the IMAGINARIUM or UNIVERSE OF IMAGINATION mark in such countries.

3.  "UNIVERSE OF IMAGINATION" Mark only granted in the following countries: Nigeria,
    Kenya, South Sudan, Mozambique.  Upon Licensee's entry into the countries of Ghana,
    Tanzania, Uganda, Malawi, Namibia or Angola Licensors, Licensor shall notify Licensee
    regarding the use of the IMAGINARIUM or UNIVERSE OF IMAGINATION mark in such
    countries.



63325-8

# EXHIBIT C

# KIRKLAND & ELLIS LLP

### AND AFFILIATED PARTNERSHIPS

601 Lexington Avenue
New York, NY 10022

Joshua A. Sussberg, P.C.
To Call Writer Directly:
(212) 446-4829
joshua.sussberg@kirkland.com

(212) 446-5932

www.kirkland.com

Facsimile:
(212) 446-4900

December 17, 2018

**By Overnight Mail and Electronic Mail**

AMIC Trading (Pty) Ltd ("AMIC")
4 Northgate Place
Redhill, 4051
South Africa
Attn:  Muhammad Omar

**Re:**     **Notice and Demand Letter for Delinquent Continuing Royalty
Payment**

Dear Mr. Omar:

We represent Toys "R" Us, Inc. and certain of its subsidiaries, including Geoffrey, LLC (collectively, the "Company"), which commenced chapter 11 proceedings in the United States Bankruptcy Court for the Eastern District of Virginia (the "Bankruptcy Court").  As you know, AMIC is delinquent on its obligations to pay the Continuing Royalty for each of the first three quarters of 2018 pursuant to the License Agreement, as amended by Amendment No. 2 on November 12, 2012 (the "License Agreement").[1]  As has been conveyed by the Company on June 25, 2018 and September 26, 2018,[2] AMIC is in breach of Section 6.2 of the License Agreement. We demand payment of $1,237,314.61,[3] which is the total amount due, plus 10% per annum interest, accruing daily, pursuant to Section 6.6 (the "Accrued Fees").

Your repeated failure to respond to the Company's request for payment are not only a breach of the License Agreement—it is also a willful violation of the automatic stay under section 362 of the Bankruptcy Code.  Pursuant to section 542 of the Bankruptcy Code, AMIC may be ordered to turnover all Accrued Fees, as well as any additional fees and expenses arising out of

---

[1]     Capitalized terms used herein but not otherwise defined shall have the meaning set forth in the License Agreement.

[2]     The foregoing letters are attached hereto as **Exhibit A** and **Exhibit B**.

[3]     For the avoidance of doubt, this figure only includes amounts owed as of December 15, 2018.

## KIRKLAND & ELLIS LLP

December 17, 2018
Page 2

your failure to satisfy the provisions of the License Agreement and Bankruptcy Code.  If payment is not received within five (5) business days, the Company intends to initiate legal proceedings in the Bankruptcy Court regarding your violation of the automatic stay and demanding turnover of the Company's property.

Nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict the ability of the Company to protect and preserve its rights, remedies, and interests in all respects.

Sincerely,

*S/ Joshua A. Sussberg*

Joshua A. Sussberg, P.C.

## **Exhibit A**

June 25, 2018 Letter



James M. Young
EVP· General Counsel
One Geoffrey Way
Wayne, NJ 07470

June 25, 2018

AMIC Trading (Pty) Ltd
4 Northgate Place
Redhill, 4051
South Africa
Attn: Chief Executive Officer

**RE: Notice and Demand Letter for Delinquent Continuing Royalty Payment**

Dear Sir/Madam:

This notice is to inform that you are delinquent on your Continuing Royalty payment for the first quarter of 2018.  As such, you are in breach of your obligations under Section 6.2 of the License Agreement, as amended by Amendment No. 2 on November 12, 2012.  We request payment of the total amount due, plus 10% per annum interest, accruing daily, pursuant to Section 6.6.  If payment is not received within five (5) business days, we may exercise our rights under this agreement, including Section 18.1(b)(vii), allowing termination within ten (10) business days.

Your prompt attention to this matter is appreciated.

Sincerely,

cc:
AMIC Trading (Pty) Ltd
PO Box 201857
Durban North, 4051
South Africa

AMIC Trading (Pty) Ltd
11 Columbine Place
Durban, 4051
South Africa

Mohsin Mahmood Mia
1 Taylor Place, Glen Ashley
Durban North, 4051
South Africa

Christian Anthony Larsen
36 Grosvenor Crescent
Durban North, 4051
South Africa

## **Exhibit B**

September 26, 2018 Letter

September 26, 2018

AMIC Trading (Pty) Ltd
4 Northgate Place
Redhill, 4051
South Africa
Attn: Chief Executive Officer

**RE: Notice and Demand Letter for Delinquent Continuing Royalty Payment**

Dear Sir/Madam:

This notice is to inform that you are delinquent on your Continuing Royalty payment for the first and second quarters of 2018. As such, you are in breach of your obligations under Section 6.2 of the License Agreement, as amended by Amendment No. 2 on November 12, 2012. We request payment of the total amount due, plus 10% per annum interest, accruing daily, pursuant to Section 6.6. If payment is not received within five (5) business days, we may exercise our rights under the License Agreement, including Section 18.1(b)(vii), allowing termination within ten (10) business days.

Your prompt attention to this matter is appreciated.

Sincerely,

James M. Young
Toys "R" Us, Inc.
Executive Vice President – General Counsel & Secretary
One Geoffrey Way
Wayne, NJ 07470

cc:

AMIC Trading (Pty) Ltd
PO Box 201857
Durban North, 4051
South Africa

AMIC Trading (Pty) Ltd
11 Columbine Place
Durban, 4051
South Africa

Mohsin Mahmood Mia
1 Taylor Place, Glen Ashley
Durban North, 4051
South Africa

Christian Anthony Larsen
36 Grosvenor Crescent
Durban North, 4051
South Africa



**South Africa**
**Interest on Royalty Calculation**
**As of  15-Sep-18**

| | Amount Due | Date Due | Days Past Due | Interest Due (10% Per Annum) |
|---|---|---|---|---|
| Q1 (Jan-Mar) | $  394,300.98 | 30-Apr-2018 | 138 | $   14,907.82 |
| Q2 (Apr-July) | 389,686.87 | 31-Jul-2018 | 46 | 4,911.12 |
| | | | | |
| **Total Interest due as of  15-Sep-18** | | | $ | **19,818.94** |

| | |
|---|---|
| $   **394,300.98** | Q1 Royatly |
| $   **389,686.87** | Q2 Royalty |
| $   **19,818.94** | Interest   **as of Septembr 15,2018** |
| | |
| $   **803,806.79** | TTL |



| | |
|---|---|
| DATE | 04-Apr-18 |
| INVOICE # | 01-2018 |
| ROYALTY DUE DATE | 30-Apr-18 |

One Geoffrey Way
Wayne, NJ  07470

TO:
Amic Trading (Pty) Ltd
11 Columbine Place
Glen Anil
Durban, 4051
South Africa

**Please remit payment to:**
*Citibank N. A.*
*300 Park Avenue*
*New York, NY*
*ABA 021 000 089*
*Swift CITIUS33*
*Account:  3089 2943    Account Name:  Geoffrey LLC*

## ROYALTY RECEIVABLE

| MONTH | EXCHANGE RATE | TOTAL SALES USD | ROYALTY % | ROYALTY RECEIVABLES LC | ROYALTY RECEIVABLES USD |
|---|---|---|---|---|---|
| January | 0.0848 | 5,875,230.00 | 2.25%, 1.5%, 1.25% | 1,490,317.19 | 126,405.19 |
| February | 0.0848 | 5,184,634.50 | 2.25%, 1.5%, 1.25% | 1,373,196.68 | 116,471.30 |
| March | 0.0848 | 6,734,826.16 | 2.25%, 1.5%, 1.25% | 1,785,294.70 | 151,424.49 |
| TOTAL ROYALTY RECEIVABLE | | | | | $394,300.98 |

## NON-ROYALTY RECEIVABLE

| PDF PAGE NO. | DESCRIPTION | VENDOR NAME | INVOICE NO. | NET CASH DUE USD |
|---|---|---|---|---|
| | | | | |
| TOTAL NON-ROYALTY RECEIVABLE | | | | $0.00 |

| INVOICE TOTAL | $394,300.98 |
|---|---|

**Scott Bruffy**
**Director, International Operations**



One Geoffrey Way
Wayne, NJ  07470

TO:
   Amic Trading (Pty) Ltd
   11 Columbine Place
   Glen Anil
   Durban, 4051
   South Africa

| DATE | 03-Jul-18 |
|---|---|
| INVOICE # | 03-2018 |
| ROYALTY DUE DATE | 31-Jul-18 |

Please remit payment to:
*Citibank N. A.*
*300 Park Avenue*
*New York, NY*
*ABA 021 000 089*
*Swift CITIUS33*
*Account:  3089 2943*    *Account Name:  Geoffrey LLC*

## ROYALTY RECEIVABLE

| MONTH | EXCHANGE RATE | TOTAL SALES USD | ROYALTY % | ROYALTY RECEIVABLES LC | ROYALTY RECEIVABLES USD |
|---|---|---|---|---|---|
| April | 0.0759 | 6,005,051.28 | 2.25%, 1.5%, 1.25% | 1,772,581.14 | 134,592.34 |
| May | 0.0759 | 5,215,581.84 | 2.25%, 1.5%, 1.25% | 1,533,069.16 | 116,406.16 |
| June | 0.0759 | 6,213,071.40 | 2.25%, 1.5%, 1.25% | 1,826,525.74 | 138,688.36 |
| TOTAL ROYALTY RECEIVABLE | | | | | $389,686.87 |

## NON-ROYALTY RECEIVABLE

| PDF PAGE NO. | DESCRIPTION | VENDOR NAME | INVOICE NO. | NET CASH DUE USD |
|---|---|---|---|---|
| | | | | |
| TOTAL NON-ROYALTY RECEIVABLE | | | | $0.00 |

| INVOICE TOTAL | $389,686.87 |
|---|---|

**Scott Bruffy**
**Director, International Operations**

# EXHIBIT D

# MAHARAJ ATTORNEYS

_____

**YOUR REF** : JOSHUA SUSSBERG        **OUR REF :** M D MAHARAJ/T0183.18

20 DECEMBER 2018

KIRKLAND & ELLIS LLP

***Per E-mail : joshua.sussberg@kirkland.com***

DEAR SIRS

**RE  :    AMIC TRADING (PTY) LTD**

1.      I represent AMIC TRADING (PTY) LTD, who as you are aware is the licensee for the territory comprising South Africa and the primary and secondary expansion territories under a written licence agreement concluded with TOYS 'R' US INTERNATIONAL LLC and GEOFFERY INC on 31 January 2006 (as renewed) that was assigned to it on 12 November 2012.

2.      My client has handed to me a copy of your letter to it dated 17 December 2018 for reply on its behalf.

3.      Your allegation that my client is delinquent on its obligations to pay the continuing royalty for each of the first three quarters of 2018 is denied. My client has diligently made each payment, in the amount claimed by your client into an escrow account held by me, with instructions to release

_____

| | | | | |
|---|---|---|---|---|
| **M D MAHARAJ** | Tel: | +27 (31) 566 2100 | 3 Rydall Vale Crescent | |
| **N BAWABHAI** | Fax: | +27 (31) 566 2400 | Rydall Vale Park | |
| **M STAMP** | E-mail: | mdm@maharajattorneys.co.za | La Lucia Ridge | |
| **Y SEWBUCKUS** | Web: | www.maharajattorneys.co.za | 4320 | |
| | Docex: | 33 Umhlanga | PO Box 5209, Rydall Vale, 4019 | |

payment to its Licensor upon the resolution of several disputes that it has raised regarding the underperformance of your client's obligations to it during your client's bankruptcy proceedings.

4.      The aforegoing is common cause and is the subject matter of several written correspondences between your firm and mine.

5.      Attached hereto is a copy of the escrow account statement demonstrating that my client has diligently made payment of the disputed amounts.

6.      Your allegation that my client has repeatedly failed to respond to your client's request for payment is therefore denied and is objectively contradicted by facts referred to above.

7.      More recently my client attempted to schedule a meeting in the new year with your client's new directorate to explore a resolution of its dispute. It is in poor taste for its request to be met with your *in terrorem* letter threatening legal proceedings before attempting to ventilate the issues under circumstances where the disputed claim is held in escrow.

8.      Needless to state the threatened legal proceedings shall be opposed by my client's US Attorneys who hold the prima facie view that an attempt at mediating the issues ought first to be pursued before litigation. I accept that you may hold an alternate view, in which event my client shall as

2

aforesaid have no alternative other than to place its answer to your client's

claim before the Courts.

9. May I kindly request that we arrange a meeting in the new year to explore

a negotiated settlement?

Yours faithfully

M D MAHARAJ

_____

**MAHARAJ ATTORNEYS**
*Transmitted electronically and therefore not signed by the author.*